UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jared Goyette, *on behalf of himself and*
*other similarly situated individuals*,

        Plaintiff,

   v.

City of Minneapolis; Minneapolis Chief of
Police Medaria Arradondo, *in his*
*individual and official capacity*;
Minneapolis Police Lieutenant Robert
Kroll, *in his individual and official*
*capacity*; Minnesota Department of Public
Safety Commissioner John Harrington*, in*
*his individual and official capacity*;
Minnesota State Patrol Colonel Matthew
Langer, *in his individual and official*
*capacity*; and John Does 1-2, *in their*
*individual and official capacities*,

        Defendants.

Court File No.  _____

---

## MEMORNDAUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

---

## INTRODUCTION

Plaintiff Jared Goyette, a freelance journalist, brings this class-action lawsuit on

behalf of himself and numerous other journalists whose constitutional rights were violated

by officers of the Minneapolis Police Department and Minnesota State Patrol who shot the

journalists with pepper spray and rubber bullets, arrested the journalists, and engaged in

other violent and threatening forms of harassment while the journalists covered the protests

following the death of George Floyd.  These retaliatory tactics were aimed at intimidating reporters and chilling media coverage in violation of the United States Constitution and the Governor's explicit orders to the contrary.  In targeting reporters who were peacefully and lawfully reporting on the events that unfolded, the Defendants in this case violated the First Amendment right to a free press, the journalists' Fourth Amendment right to be free from unlawful seizures and excessive force, and their right to due process under the Fourteenth Amendment.  Mr. Goyette seeks a temporary restraining order enjoining Defendants and their officers from further employing such tactics to harass and intimidate members of the press.

## FACTUAL BACKGROUND

### I.      The Murder of George Floyd and Aftermath.

On  May 25, 2020, George Floyd, a citizen of Minneapolis, was murdered by an officer of the Minneapolis Police Department ("MPD").[1]  Video of the encounter captured by bystanders show the MPD officers placing Mr. Floyd, who is black, in handcuffs and pinning him to the ground, face down, while MPD Officer Derek Chauvin knelt on Mr. Floyd's upper back and neck, restricting his airway.  Mr. Floyd himself, and several of the bystanders, pleaded with Officer Chauvin to change position to allow Mr. Floyd to breathe, but Officer Chauvin refused. Mr. Floyd then became unresponsive.  Two publicly-released

---

[1] Brandt Williams, et al., *Man dies in MPD custody, 4 cops fired; protesters, police clash,* Minnesota Public Radio (May 26, 2020, 6:25 a.m.), available at https://www.mprnews.org/story/2020/05/26/fbi-bca-investigate-death-of-man-in-minneapolis-police-custody.

medical examinations have determined that Mr. Floyd's death was a homicide, and Derek

Chauvin has been charged with third-degree murder and manslaughter.[2]

The video of the incident was shared rapidly via social media, and Mr. Floyd's

murder at the hands of the MPD reached news headlines around the world.[3]  Over the next

several days, thousands of people gathered across Minneapolis to mourn Mr. Floyd's death

and demand that the four officers involved be held accountable.[4]  The public

demonstrations grew in size and intensity, and isolated bad actors engaged in looting and

burning of hundreds of buildings in Minneapolis and St. Paul.[5]

The horrific murder of Mr. Floyd and subsequent events are matters of intense and

ongoing local, national, and international interest.  Hundreds of reporters, photographers,

---

[2] Liz Navratil & Paul Walsh, *Hennepin medical examiner classifies George Floyd's death as 'homicide,'* Star Tribune (June 2, 2020), available at https://www.startribune.com/medical-examiner-classifies-floyd-s-death-as-homicide/5709187920/.

[3] *See, e.g.* Kenya Evelyn, *FBI Investigates death of black man after footage shows officers kneeling on his neck*, The Guardian (May 27, 2020, 2:28 BST) https://www.theguardian.com/us-news/2020/may/26/george-floyd-killing-police-video-fbi-investigation; Zamira Rahim and Rob Picheta, *Thousands around the world protest George Flloyd's death in global display of solidarity*, CNN (June 1, 2020, 6:31 p.m.), https://www.cnn.com/2020/06/01/world/george-floyd-global-protests-intl/index.html.

[4] *See, e.g.*, *Tear gas, chaos, rain: Protests rage after man dies in Mpls. Police custody*, Minnesota Public Radio (May 26, 2020, 5:40 a.m.), https://www.mprnews.org/story/2020/05/26/protesters-rally-to-call-for-justice-for-man-who-died-in-mpls-police-incident; CBS Minnesota, "Thousands Gather At 31st And Lake For NAACP Demonstration," (May 30, 2020) (video), https://minnesota.cbslocal.com/video/4571390-thousands-gather-at-31st-and-lake-for-naacp-demonstration/

[5] Andy Mannix, *Minneapolis police station set on fire; protesters march downtown*, StarTribune (May 29, 2020, 9:43 a.m.), https://www.startribune.com/minneapolis-police-station-set-on-fire-protesters-march-downtown/570849592/.

and videographers have been deployed to the scene by media organizations from around the world to cover the demonstrations and the government's response.

## II.    Nighttime Curfews and Mobilization of the Minnesota National Guard.

By Friday, May 29, Minnesota Governor Tim Walz mobilized the National Guard and issued an executive orders establishing a nighttime curfew for the cities of Minneapolis and Saint Paul ("Curfew Orders").[6]  The Curfew Orders were extended through Tuesday, June 2.  The Curfew Orders provided:

> 1.  **Nighttime Curfew.**  A curfew is imposed in all public places within the City of Minneapolis and the City of Saint Paul . . . .
>
> 2.  **Travel Prohibited.**  During the curfew, all persons must not travel on any public street or any public place.
>
> 3.  **Exemptions.**  All law enforcement, fire, medical personnel, and members of the news media . . . are exempt from the curfew.  Individuals traveling directly to and from work, seeking emergency care, fleeing dangerous circumstances, or experiencing homelessness are also exempt….[7]

There does not appear, however, to be any system in place that members of the news media can use to officially identify themselves to law enforcement.

---

[6]      Mayors Jacob Frey and Melvin Carter, of Minneapolis and Saint Paul, respectively, have each issued their own municipal emergency curfew orders as well.  *See, e.g.* Minneapolis Emergency Regulation No. 2020-2-3 (June 1, 2020), Saint Paul Emergency Exec. Order No. 2020-14 (June 1, 2020).

[7]      Minn.   Exec.   Order   No.   20-68   (May   31,   2020), https://mn.gov/governor/assets/EO%2020-68%20Final_tcm1055-434218.pdf.

III.    **Defendants Are Targeting Journalists for Engaging in Constitutionally Protected Activity.**

Over the course of the past week, there have been many violent confrontations between law enforcement forces—initially the MPD, and later the Minnesota State Patrol—and demonstrators as part of the government's efforts to regain order and control. Hundreds, if not thousands, of videos have been posted online of law enforcement deploying chemical irritants, including tear gas and pepper spray, as well as injurious, nonlethal projectiles, at demonstrators without any forewarning or order to disperse.[8]

In addition to confronting civilian demonstrators, the MPD and the State Patrol have engaged in alarming, aggressive tactics to harm and intimidate credentialed, or otherwise identifiable members of the news media providing on-the-scene coverage. Notwithstanding the absence of any threat posed by journalists covering the demonstrations and their constitutional right to do so, numerous journalists have reported injuries suffered from un-forewarned, wanton uses of force by law enforcement officers.  Other journalists have reported the aggressive, intimidating verbal and non-verbal interactions, including threats of physical violence, by law enforcement against members of the media even after they have identified themselves as such.[9]

---

[8] *See, e.g.*, Guardian News, *Minneapolis police fire teargas at protesters after death of George Floyd* (Youtube, May 27, 2020) (video), https://www.youtube.com/watch?v=m6LXdsdbzbk.

[9] *See generally Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, N.Y. Times (June 1, 2020) available at, https://www.nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html.

The government's antagonistic conduct against members of the press for exercising their constitutional right to observe and record the public demonstrations and law enforcement activities is unprecedented.  Typically, in situations of public unrest, law enforcement officers respect the media's right to be present and observe by, for example, providing warnings and dispersal orders before dangerous tactics are used, allowing journalists to move to safe areas and travel through restricted areas, and by taking care not to aim chemical irritants and nonlethal projectiles at members of the press.  Defendants here have a demonstrated a pattern and practice of not only disregarding these important norms and understandings, but subverting them by intentionally targeting the media for harm and intimidation including, shockingly, arresting journalists on live national television.  Defendants' retaliation against Plaintiff and other journalists for exercising their First Amendment rights must stop.

The reality on the ground stands in stark contrast to the messaging from officials and leaders at the top.  For example, Governor Walz has appropriately struck a conciliatory tone about the conduct of law enforcement officers against members of the press.  He explained that "there is absolutely no reason something like [the arrest of a journalist on national live television] should happen … In a situation like this, even if you're clearing an area, we have got to ensure there is a safe spot for journalism to tell this story.  The issue here is trust, the community that's down there and that's terrorized by this, if they see a

reporter being arrested, their assumption is something is going to happen that they don't want to be seen so that is unacceptable."[10]

In addition to this messaging, Governor Walz's Curfew Orders, and the corresponding municipal curfews established by Minneapolis and Saint Paul, give journalists' constitutionally-protected activities a clear safe harbor by permitting them to move about the protest areas in order to provide news coverage. These activities are integral to providing the public with accurate, timely information regarding the events affecting the community's safety.

Notwithstanding these assurances, the events of the past week demonstrate that the Defendants have engaged conduct intended to intimidate and silence members of the news media and press, violating their First Amendment rights to observe and record events of public interest and undermining the  constitutional interest the greater public has in receiving this information. The litany of targeted arrests, violence, and intimidation grows by the day.  Examples include[11]:

**<u>Arrests</u>**

- A Minnesota State Patrol officer forced WCCO videographer Tom Aviles to the ground and arrested him even though he had identified himself as a

---

[10] *Minnesota governor: I take full responsibility for CNN arrests* (May 29, 2020), available at https://www.cnn.com/videos/us/2020/05/29/minnesota-governor-tim-walz-omar-jimenez-arrest-vpx.cnn.

[11] Unless otherwise noted, the facts summarized below are documented in Exhibits 1–59 to the Declaration of Isabella S. Nascimento ("Nascimento Decl.") accompanying this motion.

member of the press and was carrying a large video camera.[12]   Aviles'
producer Joan Gilbertson was with him at the time.  She also identified
herself as a journalist.  A state patrolman told her, "You've been warned, or
the same thing will happen to you.  Or your next."[13]  Aviles spent two hours
in custody.  Earlier police had shot Aviles with a rubber bullet even though
he was filming them with a large video camera at the time and clearly
identifiable as a member of the press.

- A Minnesota State Patrol trooper handcuffed and arrested CNN reporter
  Omar Jimenez and his news crew during a live broadcast.[14]  It was daytime,
  there were no protesters around, and Jimenez asked the State Patrol where
  they should position themselves prior to being arrested, stating, "Put us back
  where you want us, we are getting out of your way, just let us know."  When
  Jimenez further pressed the officer who arrested him why he was being
  arrested, the trooper stated, "Look, I don't know man, I'm just following
  orders."   The crew was readily identifiable as a CNN news crew and

---

[12]Torey Van Oot, *Media Members Injured, One Arrested While Covering Unrest in Minnesota*, Star Tribune (May 31, 2020), available at https://www.startribune.com/wcco-cameraman-arrested-on-video-while-covering-unrest-in-minnesota/570902742/.

[13] *WCCO Photojournalist Tom Aviles Arrested in South Minneapolis*, WCCO (May 30, 2020), available at https://minnesota.cbslocal.com/2020/05/30/wcco-photojournalist-tom-aviles-arrested-in-south-minneapolis/.

[14] Michael M. Gynbaum & Marc Santora, *CNN Crew Is Arrested on Live Television While Covering Minneapolis Protests*, N.Y. Times (May 29, 2020), available at https://www.nytimes.com/2020/05/29/business/media/cnn-reporter-arrested-omar-jimenez.html.

identified themselves as such repeatedly before being handcuffed and arrested.  The crew was detained for an hour.

- On May 30, European Press Photo Agency photojournalist Tannen Maury and professional photojournalist Craig Lassig were arrested and charged with curfew violations despite having identified themselves as members of the press. [15]

- While covering the protest on May 31, Star Tribune reporter Liz Sawyer identified herself as a journalist to Minneapolis Police.  She was told, "we don't care, we'll arrest you."    Earlier that evening, Sawyer was standing with Star Tribune reporter Chao Xiong, two Kurdish journalists, and one Japanese journalist.  Minneapolis police officers told them to go home. When the group identified themselves as press and showed their credentials, an officer said, "Your cards are bullshit."

- On May 30, NBC reporter Simon Moya-Smith was pepper sprayed and then arrested by the Minneapolis Police despite identifying himself multiple times as a reporter and displaying his press badge for the arresting officer.[16]

- Early on the morning of May 31, an Australian television news team led by Tim Arvier was detained and searched by Minneapolis Police despite

---

[15]    Mark    Kauzlarich,    Tweet    (May    1,    2020),    available    at https://twitter.com/MJKauz/status/1267273646621499392.

[16]    Simon    Moya-Smith,    Tweet    (May    31,    2020),    available    at https://twitter.com/SimonMoyaSmith/status/1267054164774916096.

identifying themselves as members of the press.[17]  During this detention the news team's cameraman was handcuffed despite clearly being a member of the news media and being no threat to anyone.

**Use of Physical Force**

•   Minnesota State Patrol officers backed Los Angeles Times reporter Molly Hennessy-Fiske and photographer Carolyn Cole against a wall and fired tear gas and rubber bullets at them.  The two were wearing their press credentials, and Cole wore a flak jacket labeled "Press."  Hennessy-Fiske shouted "Press" at the officers and waved her notebook at them before they fired.  They asked the officers where to go but received no answer.  When they tried to flee, the officers chased them and fired more rubber bullets at them.  Hennessy-Fiske was bleeding and saw another reporter next to her, stunned and bleeding from the face.  Hennessy-Fiske stated she has covered protests in Ferguson, Baton Rouge, Dallas and Los Angeles, and covered the military in Iraq and Afghanistan, but had never been fired on until her reporting in Minnesota.

•   Freelance journalist Linda Tirado was photographing the protests when police or troopers shot her in the face with a rubber bullet.  She is now blind in her left eye.

_____

[17] Sarah Swain, *9News correspondent detained at gunpoint by police in Minnesota*, 9News (May 31, 2020), available at https://www.msn.com/en-au/news/australia/9news-correspondent-tim-arvier-detained-at-gunpoint-by-police-in-minnesota/ar-BB14PxAd?li=AAaeSy5.

- On May 30 Minneapolis Police fired non-lethal projectiles at CBS reporter Michael George and his news crew, hitting sound engineer John Marschitz and severely bruising his arm.[18]  The crew was not standing within 500 feet of any protesters at the time, and had their credentials displayed and their cameras out.

- On May 30, police or troopers fired rubber bullets at an MSNBC news crew, including reporter Ali Velshi, hitting Velshi in the leg.[19]  After this incident, Velshi and another TV crew were confronted by police in a nearly deserted parking lot.  The group informed the police that they were news media.  The officers responded "we don't care," and began firing on the group with rubber bullets.

- On May 30, Reuters TV cameraman Julio-Cesar Chavez was filming police when one aimed a rubber bullet gun at directly at Chavez.[20]  Later that evening, in a separate incident, police fired directly at Chavez and his crew with rubber bullets.   Chavez was hit in the back of his neck, under his left

---

[18] Katelyn Burns, *Police Targeted Journalists Covering the George Floyd Protests*, Vox (May 31, 2020), available at https://www.vox.com/identities/2020/5/31/21276013/police-targeted-journalists-covering-george-floyd-protests.

[19] Lindsey Bahr, *More Journalists Injured Covering George Floyd Protests*, AP (May 31, 2020), available at https://apnews.com/6407d8c1bc281101589eee5f584d49c9.

[20] Reuters Tweet (May 31, 2020), available at https://twitter.com/Reuters/status/1267168895728828416.

eye, and in his arm.  A member of his crew was also hit.  They were clearly identifiable as press at the time.

- On May 30, photojournalist Lucas Jackson was pepper sprayed in the face and also shot in the back with a rubber bullet.[21]  Lucas states, "It's not that we were being shot because we were between cops and protesters. It's that we were shot at if we were anywhere in line of sight.  I've been hit because I was in the wrong place before.  I've never been aimed at so deliberately so many times when I was avoiding it."

- On May 29, veteran AP photojournalist John Minchillo was shot with a rubber bullet.[22]  He stated, "No distinctions were made . . . when I and my colleagues were hit by officers.  Last night was full force in a wide spread. This is a protocol that I've not seen elsewhere."[23]

- On May 30, CBC senior news correspondent Susan Ormiston was hit in the shoulder by a rubber bullet and in the back by a tear gas canister.  At the time she was shot, she was in a parking lot that had been cleared of protesters, and she and her crew were clearly identifiable as media.

---

[21]   Lucas   Jackson   Tweet   (May   30,   2020),   available   at https://twitter.com/Lucas_Jackson_/status/1267114291532046338.

[22]   John   Minchillo,   Tweet   (May   31,   2020),   available   at https://twitter.com/johnminchillo/status/1267116569223725059,

[23]   Morgan   Chesky,   Tweet   (May   30,   2020),   available   at https://twitter.com/BreakingChesky/status/1266920780820029440.

- On May 30, Minneapolis Police fired a flash bang grenade directly into an MSNBC news crew lead by reporter Morgan Chesky, despite the fact that Chesky was live on television and he and his crew were clearly identifiable as news media.

**Use of Chemical Agents**

- On May 30, Minneapolis Police aimed a rifle directly at Vice magazine journalist Michael Adams while Adams was covering the protests, despite Adams and other journalists clustered near him holding up their press passes. Shortly thereafter, a Minneapolis Police officer approached Adams with a weapon pointed directly at him and threw him to the ground.  He was displaying his press pass and shouting "press."  The officer responded, "I don't care."  Adams was on his knees, alone, clearly not a threat, and was surrounded by more than a dozen officers.   The officer who threw Adams down told him not to move.  Adams complied.  Another officer slowly walked by Adams.  When Adams again said "I'm Press" again and held up his credential, this officer casually pepper sprayed Adams directly in the face from several inches away then kept strolling while Adams writhed on the ground in agony.

- KSTP investigative reporter Ryan Raiche, his photographer, and his producer, were gathered together with a group of other media members during protests on the evening of May 30 outside the Fifth Precinct.  Most had large cameras, boom mikes, or visible press credentials.  The group was

clearly identifiable as media.  They were pinned against a wall together as a police line advanced.  Police walked up the group and indiscriminately pepper sprayed the entire group.

- On May 28, Star Tribune columnist Jennifer Brooks was standing at a light rail station on S. 5th Street documenting the protests in a group of other media members.[24]  Several Minneapolis Police squad cars drove by unimpeded.  As Squad Car 181 passed the journalists, the driver's side window rolled down and the driver indiscriminately pepper sprayed Brooks, other media members, and nearby protesters.

- On May 29, USA Today reporter Tyler Davis was covering the protests in downtown Minneapolis.[25]  Several squad cars pulled up at his location, police got out and began indiscriminately spraying pepper spray canisters in every direction and telling people to move north.  Davis was filming two young women being pepper sprayed to his left, when the officer doing the spraying turned to Davis.  Davis identified himself as a member of the media, and the officer "laid on the trigger for a few seconds" spraying Davis directly in the face.

---

[24]    Jennifer   Brooks,   Tweet   (May   28,   2020),   available   at https://twitter.com/stribrooks/status/1266186985041022976.

[25] Tyler Davis, *What One USA TODAY Reporter Saw During George Floyd Protests – Until He Was Temporarily Blinded By Pepper Spray*, USA TODAY (May 29, 2020), available   at   https://www.usatoday.com/story/opinion/2020/05/29/george-floyd-protests-leave-usa-today-reporter-hit-chemical-spray/5282374002/.

- On May 30, Star Tribune photographer Anthony Souffle was tear gassed by police or troopers.

These incidents are a continuation of a long standing pattern of abuse by officers of the Defendants.  In 2002, MPD officers kicked, beat, and pepper-sprayed Minnesota Daily journalists covering a riot following the Minnesota Gophers' NCAA hockey championship.[26] The Minnesota Daily filed a complaint with MPD internal affairs.[27] Defendant Medaria Arradondo appears to have involved in the investigation.[28]  In 2008, Amy Goodman, host of "Democracy Now!", and her crew were arrested during the Republican National Convention in St. Paul, despite posing no threat and complying with police orders.[29]  Defendant John Harrington, then St. Paul Police Chief, brushed off the First Amendment concerns.[30]  In 2017, the State Patrol arrested City Pages journalist Susan Du and Minneapolis Daily City Editor David Clarey during the protests following the

---

[26] Joanna Dornfeld, *U. Minnesota Newspaper Files Complaint Over Police Actions in Post-Hockey Riots*, MINNESOTA DAILY (Apr. 24, 2002), https://archive.nytimes.com/www.nytimes.com/uwire/uwire_JOIN042420022302015.html.

[27] *Id.*

[28] *Id.*

[29] Marisa Helms, *Amy Goodman's arrest: When journalists are the story*, MINNPOST (Sept. 2008), https://www.minnpost.com/politics-policy/2008/09/amy-goodmans-arrest-when-journalists-are-story/.

[30] *Id.*

Philando Castile killing even though they had attempted to comply with officers' directions to disperse.[31]

Despite the clear need for action to prevent these constitutional violations, Defendants have failed to supervise and train their personnel adequately to protect members of the press's constitutional rights. For example, the MPD's Policy & Procedure Manual includes only the barest guidance on managing relations with the news media, provides no guidance whatsoever on officers' constitutional obligation not to retaliate against members of the media exercising their constitutional right to document current events.[32] The relevant section of the Policy & Procedure Manual has not been updated in years.[33] Similarly, we are unaware of any internal investigation, discipline or corrective action taken by any of the Defendants to correct the abuses against members of the news media in recent days.

## IV.    Named-Plaintiff Jared Goyette.

Plaintiff Jared Goyette is a Minneapolis-based freelance journalist covering the events after Mr. Floyd's death for a national newspaper. (Declaration of Jared Goyette ("Goyette Decl.") ¶ 2.) The physical injuries inflicted by Defendants on Plaintiff, as well as the intimidating and obstructive conduct he experienced from Defendants, are

---

[31] *Minneapolis journalist arrested while covering protest*, U.S. Press Freedom Tracker (June 17, 2017), https://pressfreedomtracker.us/all-incidents/minneapolis-journalist-arrested-while-covering-protest/.

[32] Minneapolis Police Department Policy & Procedure Manual, § 6-206, http://www.minneapolismn.gov/police/policy/mpdpolicy_6-200_6-200 (last accessed June 2, 2020).

[33] *Id.*

emblematic of the injuries and speech-chilling experiences of other journalists over the course of the past week.

### A.    Plaintiff's injury from a projectile fired by MPD.

On the evening of May 27, Plaintiff was observing and recording the demonstrations near the MPD's Third Precinct station, located at the intersection of Lake Street and Minnehaha Avenue.  (Goyette Decl. ¶ 2.)  Plaintiff was clearly identifiable as a member of the news media, was not taking part in the protest, and did not present any threat to person or property.  (*Id.* ¶ 5.) While covering the demonstration, Plaintiff carried a large camera with a monopod for taking photos and video, as well as a notebook.  (*Id.*)  The street around him was not crowded. (*Id.*)

At around 6:00 p.m., a young male protester near Plaintiff was hit in the head by a projectile fired by the MPD officers from the precinct building.  (*Id.* ¶ 3.)  The man fell to the ground, writhing in pain. (*Id.*)  As Plaintiff was documenting bystanders assisting the man and carrying him into a car, he was hit in the head with a projectile and fell to the ground immediately in intense pain.  (*Id.* ¶ 4.) The projectile hit him in the nose and eye, which swelled up immediately.  (*Id.*)  Just a moment later, a canister of tear gas landed nearby, making it impossible for him to see out of his other eye.  (*Id.* ¶ 6.)  He was helped to safety by another bystander and had to cease journalistic activities for the evening. (*Id.* ¶ 6.)

A doctor who examined Plaintiff's injury said he had been hit by a projectile traveling at high velocity.  (*Id.* ¶ 7.)  The doctor indicated that the pressure from the

swelling reached a dangerous level and would have caused permanent vision loss within 24 to 48 hours had he not sought treatment. (*Id.*).

### B.      Defendants' subsequent threats against Plaintiff.

Plaintiff returned to covering the demonstrations in the following days. On the evening of May 30, he was approached by a column of MPD officers in riot gear as he was standing on a sidewalk. (*Id.* ¶ 8.) Plaintiff identified himself as a member of the news media by shouting "press, press" loudly. (*Id.*) An officer then turned towards him and pointed his weapon at Plaintiff's head, scaring Plaintiff. (*Id.*) Later that evening, Plaintiff was walking with another journalist, Maggie Koerth. (*Id.* ¶ 9.) A vehicle drove up to them and rolled the window down. Plaintiff and Koerth identified themselves as journalists, and the officer said, "I want to fucking peg you" and drove off. (*Id.*)

Plaintiff intends to continue reporting on and documenting protests arising out of George Floyd's killing and the practices of local law enforcement. (*Id.* ¶ 10.)

## LEGAL ARGUMENT

### I.      Legal Standard.

In determining whether to grant a TRO, the court must analyze the following factors: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that the temporary restraining order will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

II.     **Likelihood of Success on the Merits**

A.     **The claims are likely to succeed on the merits.**

Plaintiff and the claims of other, similarly situated journalists ("Class Members"), alleging violations of the First, Fourth, and Fourteenth Amendments, are likely to succeed on the merits.  Because these claims challenge municipal policies or customs, rather than a statute or order, Plaintiffs demonstrate a likelihood of success if they show a "fair chance of prevailing." *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) ("[C]ourts should … apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes.").

1.     **The First Amendment retaliation claim is likely to succeed on the merits.**

The First Amendment retaliation claim is likely to succeed on the merits.  As demonstrated in the accompanying affidavits, Plaintiff's and other Class Members' constitutionally protected speech has been chilled by the retaliatory abuse they have suffered at the hands of law enforcement officers.  This constitutional harm was caused by Defendants' failure to adequately supervise or train law enforcement personnel.

a.     **Plaintiff and the Class Members have suffered unconstitutional retaliation.**

The First Amendment prohibits government actors from subjecting an individual to retaliatory actions for exercising their First Amendment rights. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). To establish a claim for First Amendment retaliation, plaintiffs must show: (1) that they engaged in a protected activity; (2) that a government official

acted against them in a way that would chill a person of ordinary firmness from continuing in the activity; and (3) that the officers' actions were motivated at least in part by the plaintiffs' engagement in protected activity. *Id.*

Plaintiff and the Class Members have a clearly established constitutional right to document protest activities, including law enforcement responses and behavior. *See, e.g.*, *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The *making* of an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording."); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." (internal quotation omitted)); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Ahmad v. City of St. Louis, Missouri*, No. 4:17 CV 2455 CDP, 2017 WL 5478410, at *12 (E.D. Mo. Nov. 15, 2017) (collecting cases). Plaintiff and the Class Members are members of the news media reporting on quickly evolving public demonstrations of immense national and international interest. As members of the news media, they were given express permission by the Governor's Curfew Orders to be at the protest sites so they could provide live, up-to-date coverage of the activities of protesters and demonstrators, and also monitor the conduct of law enforcement. This express permission constitutes an acknowledgement of the uniquely significant public interest in

press coverage in this case.  In the context of the violent, destructive events of recent days, the public's interest in having information of this nature in a timely manner is obvious and constitutionally unassailable.

Officers' retaliatory actions against Plaintiff and the Class Members, including the use of chemical agents, non-lethal assaults, threats, and detention and arrests would chill a person of ordinary firmness from continuing to pursue their constitutionally protected right to document the protests and demonstrations.  *See Kopp*, 754 F.3d at 602 (pepper spraying a person in the face would chill a person of ordinary firmness).  Indeed, after Plaintiff was struck in the face by a less-lethal ballistic round, he was forced to cease his First Amendment protected reporting and seek medical attention due to his injury.  (*See* Goyette Decl. ¶ 7.)

Moreover, the documented pattern of hostility to members of the news media and press demonstrates that these constitutional violations were motivated in least in part by these individuals' engagement in First Amendment protected activity.  When the Plaintiff was struck in the face by a non-lethal ballistic round, his membership in the press would have been obvious to the officer who fired it.  While covering the demonstration, he was holding a camera, a monopod, and a notepad, he was engaged in no illegal activity, and he posed no imminent threat of violence of bodily harm to any person or of damage to any property.  (*Id.* ¶ 5.)

> **b.**     **Defendants have demonstrated deliberate indifference to Plaintiffs' and the Class Members' constitutional rights.**

Defendants are liable for their officers' prohibited retaliation if the constitutional violation resulted from Defendants' deliberate indifference to Plaintiff's and the Class Member's constitutional rights.  *See Doe v. Fort Zumwalt R-II Sch. Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019).  Because there is a documented pattern of constitutional violations amounting to deliberate indifference, Plaintiff and the Class Members are likely to prevail on the First Amendment claims.

There is "a pattern of misconduct that would alert [each Defendant] that its training and supervision were inadequate" to prevent the unlawful targeting of members of the press and news media by law enforcement officers.  *Fort Zumwalt*, 920 F.3d at 1189-90 (municipal liability appropriate where there is a "pattern of similar constitutional violations").  Here, there have been numerous, well-documented and well-publicized incidents of MPD and State Patrol officers specifically targeting members of the news media.  (*See* Nascimento Decl. Exs. 8–59.)  These include numerous incidents in recent days in which reporters, freelance journalist and other members of the news media have been shot with rubber bullets (sometimes causing serious injuries), sprayed with chemical agents, and been subjected to threatening language and gestures, including having guns pointed at them.  (*Id.*)  As described above, there is also a local history of these Defendants targeting members of the press.  In light of these numerous incidents, the Defendants were

on notice[34] that their officers were engaged in a pattern of unconstitutional retaliation against members of the news media.

Despite the clear need for action to prevent these constitutional violations, Defendants have failed to supervise and train their personnel adequately to protect members of the press's constitutional rights.  For example, the MPD's Policy & Procedure Manual does not include any applicable policy or procedure.  We are unaware of any internal investigation, discipline or corrective action taken to correct the abuses against members of the news media in recent days, and it is evident from the continuing nature of these violations that any corrective actions taken are grossly inadequate.

Defendants have been deliberately indifferent to the violation of Plaintiffs' and the Class Members' rights and the First Amendment retaliation claims against these defendants are likely to prevail.  *Fort Zumwalt R-II Sch. Dist.*, 920 F.3d at 1189 (municipal defendant may be liable when "the need for training or supervision was so obvious, and the inadequacy so likely to result in the violation of the constitutional rights, that the policymakers of the [Municipal Defendants] can reasonably be said to have been deliberately indifferent to the need.").

---

[34] It is crystal clear that the State Patrol had actual notice.  Following international criticism for illegally detaining a CNN reporter and his crew live and on camera, the State Patrol issued a statement that the CNN crew "were released once they were confirmed to be members of the media." Minnesota Dept. of Public Safety (@MnDPS_MSP), Twitter (May 29, 2020, 7:00 a.m.), https://twitter.com/MnDPS_MSP/status/1266338580596690949. Although the credibility of this public statement is suspect because it was obvious that a CNN crew conducting a live broadcast were members of the press, the State Patrol's statement implicitly acknowledges that members of the media should not be detained in retaliation for their First Amendment activities.

**2.      The Fourth Amendment claim is likely to succeed on the merits.**

The Fourth Amendment guarantees the right to be free from excessive force.  *See Howard v. Kansas City Police Dept.*, 570 F.3d 984, 988 (8th Cir. 2009).  "To establish a violation of the Fourth Amendment in a Section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable."  *Id*.  The seizure need not result in a claimant's arrest and detention.  Rather, a seizure occurs whenever "an officer restrains an individual's liberty through physical force or a show of authority."  *Id.* (excessive force claim actionable when police restraint physically injured claimant who had sought their assistance).  The test for reasonableness is whether the amount of force used was objectively reasonable under the particular circumstances, including the severity of any crime at issue, whether the targeted individual poses an immediate threat to the safety of the officers or others, and whether the individual is actively resisting arrest or attempting to evade arrest by flight.  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (internal quotation marks and citation omitted); *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Here, Plaintiff and the Class Members were not participating or suspected of participating in any crime and presented no threat to the safety of police or others.  Yet, the officers sought to restrain them from freely moving throughout the areas where protests were occurring—not by setting up barricades, verbal directives or other legitimate means—but by targeting them with threats, projectiles and chemical agents, and arrests without probable cause.  Upon hearing Plaintiff's repeated disclosures that he was a member of the press, one officer responded by pointing a gun at his head.  Later, another officer responded

to Plaintiff's identification of himself as a journalist by threatening, "I want to fucking peg you." Such uses of physical force and demonstrations of authority were designed to intimidate Plaintiff and other members of the press into leaving the protest areas. These tactics constitute unreasonable restraints on movement of the press throughout the protests in violation of the Fourth Amendment.

Defendants have acted with deliberate indifference to these continued violations of Plaintiff's and the Class Members' rights. *Fort Zumwalt*, 920 F.3d at 1189. As demonstrated above, there is a long local history of violating the constitutional rights of members of the news media. This history puts policymakers of Defendants on notice that they needed to take action to safeguard the rights of members of the press by providing training and supervision and by investigating potential incidents of constitutional violations by officers, imposing discipline as appropriate and putting preventative corrective action in place. None of this was done. Plaintiff and the Class Members are likely to succeed on their Fourth Amendment claims against Defendants.

          **3.**      **The procedural due process claim is likely to succeed on the merits.**

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Due process requires that prohibitions on movement must be defined in a way that allows ordinary people to understand what conduct is permitted and must not encourage arbitrary or discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). These constitutional principles apply to "unwritten polic[ies]" as well as to statutes,

ordinances and formally promulgated rules. *Abdullah v. Cnty. of St. Louis*, 52 F. Supp. 3d 936, 946 (E.D. Mo. 2014).

Defendants' unwritten policies of targeting members of the press and failing to give dispersal warnings provide no notice to members of the news media or press of whether and when they will be subjected to assault, chemical agents or arrest.  These unwritten policies also improperly empower law enforcement officers to exercise their authority in arbitrary and discriminatory ways—including retaliating against members of the news media for engaging in First Amendment protected activity.  For these reasons, Plaintiff and the Class Members are likely to succeed on their Fourteenth Amendment due process claim.

As noted above, liability reaches beyond the individual officers because the Defendants' long-running history of abuse toward members of the press and their failure to provide dispersal warnings amount to an informal policy and evince a deliberate indifference to violating the public's constitutional rights.  Plaintiff and the Class Members are likely to succeed on the merits against these Defendants.

**B.     The balance of harms and the public's interest in a free press weigh strongly in favor of granting injunctive relief.**

When, as in this case, a plaintiff's First Amendment rights are at stake, demonstrating a likelihood of success on the merits is all that is needed to warrant an injunction. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (when a likely violation of First Amendment rights has been shown, the other requirements "are generally deemed to have been satisfied"); *see also Phelps-Roper v.*

*Nixon*, 545 F.3d 685, 690 (8th Cir. 2012), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (likelihood of success on the merits is "often the determining factor" on a request for prospective injunctive relief in First Amendment cases).

Here, the harm to journalists from the tactics employed by MPD and Minnesota State Patrol officers extends beyond the sting of tear gas and the injuries caused by the impact of rubber bullets. All journalists covering the protests—even those who were not themselves the direct targets of the harassment—necessarily must fear for their continued physical safety in light of the tactics employed. If not enjoined, the ramifications of the violent retaliation levied against journalists here may reverberate far into the future. Next time there is a public uprising against police brutality in Minneapolis, some journalists will likely stay away to protect themselves; others will be inclined to shade the truth to avoid retribution. "It is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Phelps-Roper v. Nixon*, 545 F.3d at 691; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

In contrast, any harm to the Defendants would be negligible. While the police have an interest in maintaining order and public safety, that interest is not served by using force against individuals who identify as journalists, or who are merely recording events and present no threat of harm to police or the public. *See Ahmad*, 2017 WL 5478410 at *17 (injunction warranted in the absence of force or violent activity by protesters). If necessary, the officers easily could have cleared reporters from controlled areas by ordering them to leave and notifying them in advance of their intent to use force while giving them time to

comply.  Instead, the officers assaulted them without warning—blatantly ignoring clear disclosures, camera equipment, recording devices, and other obvious indicators of press membership—with apparent intent to intimidate the media and chill reporting of the events. The Defendants have "no significant interest in enforcing unconstitutional customs or policies."  *Id.*

Finally, it would be difficult to identify a situation in which the public has a greater interest in unbiased media coverage of police conduct than this one.  The protests are rooted in an incident of shocking police brutality, and how the police respond to the protesters is of critical importance to how and whether the community will be able to move forward. Although the protests began in Minneapolis, they have now spread across the country and the globe.  The public interest in press coverage of these events cannot be reasonably questioned.

It is "always in the public interest to protect constitutional rights."  *Id.*  But that is especially true here. The public relies on journalists to understand current events and make informed decisions. "The Free Speech Clause exists principally to protect discourse on public matters." *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 790 (2011). It reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). It embraces an "open marketplace of ideas," ensuring access to a wide range of "social, political, esthetic, moral, and other ideas and experiences." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 354 (2010); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969); *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J.,

dissenting). It is "[p]remised on mistrust of governmental power." *Citizens United*, 558 U.S. at 340. "[I]t furthers the search for truth," *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) (citation omitted), and "ensure[s] that…individual citizen[s] can effectively participate in and contribute to our republican system of self-government," *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). Unless the constitutional rights of journalists are protected, the public's ability to participate meaningfully as citizens in a constitutional democracy will be severely diminished.

The public interest and balance of harms weigh heavily in favor of Plaintiff.

## CONCLUSION

For the foregoing reasons, Plaintiff, on behalf of himself and the Class Members, respectfully requests that his request for a temporary injunction be granted.

Dated:  June 2, 2020            /s/ Dulce J. Foster
           Kevin C. Riach (#0389277)
           Dulce J. Foster (#0285419)
           Pari I. McGarraugh (#0395524)
           Jacob P. Harris (#0399255)
           **FREDRIKSON & BYRON, P.A.**
           200 South Sixth Street, Suite 4000
           Minneapolis, MN  55402-1425
           Telephone:  612.492.7000
           kriach@fredlaw.com
           dfoster@fredlaw.com
           pmcgarraugh@fredlaw.com
           jharris@fredlaw.com

           Adam W. Hansen (#0391704)
           **APOLLO LAW LLC**
           333 Washington Avenue North, Suite 300
           Minneapolis, MN 55401
           Telephone: 612.927.2969
           adam@apollo-law.com

           Teresa Nelson (#269736)
           **AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
           P.O. Box 14720
           Minneapolis, MN 55414
           Telephone: 651.529.1692
           tnelson@aclu-mn.org

           *Attorneys for Plaintiff*