UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jared Goyette,
On behalf of himself and other similarly
situated individuals,

Ct. File No. 20-cv-01302
(WMW/DTS)

Plaintiff,

v.

City of Minneapolis; Minneapolis Chief
of Police Medaria Arradondo in his
individual and official capacity;
Minneapolis Police Lieutenant Robert
Kroll, in his individual and official
capacity; Minnesota Department of
Public Safety Commissioner John
Harrington, in his individual and official
capacity, Minnesota State Patrol Colonel
Matthew Langer, in his individual and
official capacity; and John Does 1-2, in
their individual and official capacities.

Defendants.

DEFENDANTS'
MEMORANDUM IN
OPPOSITION TO PLAINTIFF'S
MOTIONS FOR CLASS
CERTIFICATION AND
TEMPORARY RESTRAINING
ORDER

## **INTRODUCTION**

This case involves the Minneapolis Police Department ("MPD") and the

Minnesota State Patrol's attempts to restore order and protect the public during

the unprecedented, chaotic, and at times destructive civil unrest following the

tragic death of George Floyd  on May 25, 2020. Plaintiff Jared Goyette, a freelance journalist, filed this putative class action against various state and city entities and officials, challenging the treatment of the media by law enforcement.   Plaintiff contemporaneously moved for a temporary restraining order ("TRO") and class certification; these motions are currently before the Court.

Plaintiff's request for a TRO should be denied because Plaintiff has not carried his burden to show that any of the requirements of a TRO are met here, particularly where the heat of the chaotic, volatile, and at times violent protests has subsided.   Plaintiff's premature motion for class certification fails because Plaintiff cannot establish that any of the requirements for class certification are met. Therefore, Defendants respectfully request that the Court deny Plaintiff's motions in their entirety.[1]

---

[1] The state and city defendants are represented by separate counsel in this matter, but assembled this brief jointly at the specific request of the Court. Specifically, the City of Minneapolis and Minneapolis Chief of Police Medaria Arradondo are represented by Heather Robertson and Kristin Sarff. Commissioner John Harrington and Colonel Matthew Langer are represented by Solicitor General Liz Kramer, Leah Hedman, and Julianna Passe.  Defendant Robert Kroll has only been served late in the afternoon of June 5 and has not had an opportunity to participate in the briefing.

Defendants file this memorandum jointly as required by the Court's June 3, 2020 Order.  [Doc. 18.]  Defendants, however, are differently situated and would request leave to file separate briefing in the future.

## FACTS

On May 25, 2020, George Floyd was killed by an MPD officer.  When the video of this incident circulated, large numbers of justifiably angry citizens came to protest in the streets of Minneapolis.[2]

On Tuesday May 26, 2020, protestors at the Minneapolis Police Third Precinct building "vandalized police vehicles with graffiti and targeted the precinct house where the [involved] officers had been assigned . . ."[3]  Police used "foam projectiles known as marking rounds and used tear gas to try to repel some of the protestors . . . ."[4]

On Wednesday May 27, 2020, "[h]undreds of protestors poured into the Minneapolis streets . . ."[5]  An auto parts store near the Third Precinct was set on fire, and other nearby stores were looted and vandalized.[6]  It is on this day that Plaintiff alleges that he personally was "shot in the face with less-lethal ballistic ammunition" while engaged in media activities at the Third Precinct.  That night the Minneapolis Fire Department responded to around 30 fires related to the

---

[2] Christine Hauser et al, 'I can't Breathe': 4 Minneapolis Officers Fired After Black Man Dies in Custody, N.Y. Times, May 26, 2020.
   [3] Id.
   [4] Id.
   [5] Matt Furber, et al, Minneapolis Police, Long Accused of Racism, Face Wrath of Wounded City, N.Y. Times May 27, 2020.
   [6] Id.

protests and Fire Trucks attempting to respond were hit with rocks and other projectiles.[7]

On Thursday May 28, 2020, Minneapolis Police were forced to abandon the Third Precinct building which was set ablaze by rioters.[8]  Dozens of fires were set in Minneapolis and St. Paul, in addition to looting and vandalism at over 100 businesses.[9]

On Friday, May 29, 2020, Governor Tim Walz announced that the State was going to restore order, calling on the resources of the State Patrol and other state agencies, and the National Guard, in conjunction with local law enforcement in affected cities.[10]  A curfew was imposed, however it was largely disregarded and

---

[7] 'We Must Restore Peace': Minneapolis Burns During 2nd Night Of Protests Over George Floyd's Death", WCCO, May 28, 2020 (available at https://minnesota.cbslocal.com/2020/05/28/1-person-shot-dead-during-minneapolis-riots-over-george-floyds-death/)

[8] Protests Continue to Rage After Death of George Floyd, N.Y. Times, May 28, 2020 (available at https://www.nytimes.com/2020/05/28/us/george-floyd-national-guard.html)

[9] Tim Elfrink et al, Protests, fires rage through the night in Minneapolis, Washington Post, May 29, 2020  (available at https://www.washingtonpost.com/nation/2020/05/28/minneapolis-protests-george-floyd-death/); Protests Continue to Rage After Death of George Floyd, N.Y. Times, May 28, 2020.

[10] WCCO, 'Minneapolis And St. Paul Are On Fire': Gov. Walz Says Order Must Be Restored As Twin Cities Enters 4th Day Of George Floyd Unrest, May 29, 2020 (available at https://minnesota.cbslocal.com/2020/05/29/minneapolis-and-st-paul-are-on-fire-gov-walz-says-order-must-be-restored-as-twin-cities-enters-4th-day-of-george-floyd-unrest/)

individuals hiding amongst the otherwise peaceful protestors continued to commit acts of looting, vandalism, and arson.[11]

On Saturday May 30, 2020, the largest deployment of National Guard in Minnesota history was mobilized in addition to State Patrol and local law enforcement.[12] They moved quickly to disperse protestors who remained out after curfew.[13]

On Sunday May 31, 2020, officers arrested around 150 people for breaking curfew.[14] That was the last day that any tear gas or less-lethal munitions (such as

---

[11] Nick Woltman, Protests descend into chaos in Minneapolis Friday; more looting, fires in 'incredibly dangerous' situation, Pioneer Press, May 29, 2020 (available at https://www.twincities.com/2020/05/29/george-floyd-minneapolis-cleans-up-after-night-of-destruction-more-peaceful-protests-continue/); Mary Lynn Smith and Michael Corey, Officials back off after first blaming outsiders, extremists for Twin Cities violence, Star Tribune, May 31, 2020 (available at https://www.startribune.com/officials-back-off-after-first-blaming-outsiders-extremists-for-twin-cities-violence/570906572/)

[12] Kyle Brown, Gov. Walz calls for full mobilization of the Minnesota National Guard; says many protesters from out of state, May 30, 3030 (available at https://kstp.com/news/citing-largest-national-guard-deployment-in-minnesotas-history-gov-walz-addresses-efforts-to-contain-george-floyd-protests/5745408/?cat=1)

[13] 'We Are In A Position Of Strength Tonight': Minnesota National Guard Aggressively Clears Streets; Neighbors Defend Minneapolis Businesses, WCCO, May 30, 2020 (available at https://minnesota.cbslocal.com/2020/05/30/additional-1000-national-guard-soldiers-tapped-for-saturday-in-riot-torn-minneapolis/)

[14] John Reinan, A dramatic clash during George Floyd protest turns into peaceful arrest in Minneapolis, Star Tribune, June 1, 2020 (available at https://www.startribune.com/a-dramatic-clash-during-george-floyd-protest-turns-into-peaceful-arrest-in-minneapolis/570918032/).

marking rounds or foam bullets) were used by the MPD or State Patrol.  (Gerlicher Decl. ¶ 14, Langer Decl. ¶ 5.)

From Monday, June 1, 2020, through Friday, June 5, 2020, there have been no major incidents of rioting, vandalism, looting, or arson.

The MPD did deploy tear gas or less-lethal munitions (foam rounds or marking rounds) to attempt to restore order and protect lives and property. (Gerlicher Decl. ¶ 3, 4, 7, 8.)  During the state of civil unrest, the MPD had a chain of command to authorize the use of the tear gas or less-lethal munitions.  (*Id.*) Officers at the scene had to radio for permission from the incident commander, giving details of why they are asking to use tear gas or munitions, for example that the crowd is throwing rocks or bottles at officers on scene.  (*Id.*)  The incident commander would decide whether to authorize the use of the requested force in consultation with the Chief of Police.  (*Id.*)  If the force was authorized, the on-scene commanders directed its use by individual officers.  (*Id.*)

MPD incident commanders did not approve the use of force specifically against the media, and certainly did not authorize the use of force because individuals were members of the media.  (*Id.* at ¶5.)  While individual officers have discretion to use the "marking rounds" or "foam bullets" it is only in situations where there is an imminent threat to life or safety.  (*Id.* at ¶4.)  It is against the policy and customs of the MPD to use tear gas or munitions punitively against

anyone, including members of the media. (*Id.* at ¶9.)  This was a rapidly evolving, violent, and dangerous situation and there may have been members of the media inadvertently affected.  (*Id.* at ¶10.)

The State Patrol assisted the MPD on the evenings of May 26 and May 27 to provide a perimeter for the MPD and did not use chemical irritants or less-lethal munitions, and deployed only four "marking rounds."  (Langer Dec. ¶3.)  The State Patrol became more involved beginning the evening of May 28, when law enforcement agencies across the State joined efforts to restore order in Minneapolis and the broader metropolitan area.  (Langer Dec. ¶ 4.)  The State Patrol deployed chemical irritants or less-lethal munitions to attempt to restore order to Minneapolis and St. Paul and to protect their residents.  (*Id.*)  The State Patrol gave dispersal orders requiring everyone to vacate a particular area they were attempting to secure, according to its normal practice.  (*Id.*)  Such orders applied to all individuals, including the media.  (*Id.*)  The State Patrol does not have a practice or policy of targeting or harassing members of the media.  (*Id.*)  The State Patrol has a policy to respect the rights of the people to peacefully assemble and works to preserve peace, protect public safety, provide traffic safety service, and prevent the destruction of property at protests and demonstrations.  (*Id.*)

Plaintiff filed this action on June 2, 2020.  Plaintiff contemporaneously moved for a temporary restraining order and for class certification. Plaintiff alleges

four incidents with media involving the State Patrol, and none of those incidents involve Plaintiff.[15]   (Compl. ¶¶ 26, 27, 33, 34.)  Plaintiff alleges thirteen incidents involving the MPD, including the incident Plaintiff was involved in on May 27.[16] (Compl. ¶¶ 29, 30, 31, 36, 38, 46, 64-69, 48, 51-54, 57.) Ten additional incidents are alleged where no specific agency is identified.  (Compl. ¶¶  32, 35, 28, 38, 39, 40, 47, 49, 50, 56.)

Plaintiff brings claims against the City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo in his individual and official capacities, and police union president Robert Kroll is his individual and official capacities.  Plaintiff also brings claims against two state government officials in both their individual and official capacities: Minnesota Department of Public Safety Commissioner John Harrington and Minnesota State Patrol Colonel Matthew Langer ("State Defendants").[17]

---

[15] State Defendants dispute the factual allegations in the Complaint pertaining to the State Patrol.  However, due to the time constraints State Defendants do not yet have detailed affidavits regarding those alleged situations at this time.

[16] City of Minneapolis Defendants have had no opportunity to investigate the incidents alleged by Plaintiffs.

[17] Plaintiff also purports to bring claims against "John Does 1-2" in their individual and official capacities.  Because Defendants are not aware of the identity of the John Doe Defendants, they are not currently represented by the counsel for the City or State Defendants.

# ARGUMENT

## I.   THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff seeks to enjoin all Defendants from taking certain actions against "Class Members who [have] identified themselves as a member of the news media" or if "it is 'reasonably clear' that the individual is engaged in news gathering activities." (Motion [Doc. No. 8], at 1.) (emphasis added). Plaintiff seeks to prevent Defendants from taking the following actions against any Class Member: (1) using chemical agents (i.e. pepper spray, tear gas, inert smoke); (2) using physical force (i.e. flash bang grenades, non-lethal projectiles, riot batons, or "any other means"); (3) arresting, detaining or taking into custody; and (4) using threatening language or gestures to harass or intimidate. (*Id.*) This injunction should be denied.

Injunctive relief is an "extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A TRO may be granted only if the moving party can demonstrate: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th

Cir. 1981).  Plaintiff has the "complete burden" of proving all the factors.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**A.    Plaintiff's TRO Motion is Inappropriate As to The State Defendants.**

Plaintiff's TRO Motion seeks an order enjoining the State Defendants from the use of various tactics to combat rioting, civil unrest and restore order.  (TRO Motion, at 1.)  Nowhere in Plaintiff's Complaint or Declaration does he make any allegation that the State Defendants caused him (Mr. Goyette) harm. (*See generally* Compl. and Declaration of Jared Goyette [Doc. No. 9].)  For this reason alone, he has little likelihood of success against the State Defendants and Plaintiff's TRO Motion must be denied as applied to them.

**B. Plaintiff Fails to Carry His Burden to Demonstrate that Injunctive Relief Is Warranted.**

Plaintiff carries the burden to submit evidence in support of his motion. *Gelco*, 811 F.2d at 418.  Plaintiff's Motion should be denied because he fails to show that he has a likelihood of success on the merits, fails to show irreparable harm will result, and fails to show that the equities and public interest justify issuance of an injunction.

**1.  Irreparable Harm**

Failure to show irreparable harm is an independently sufficient ground for denying a preliminary injunction. *Watkins*, 346 F.3d at 844.  To make a showing of

irreparable harm, Plaintiff "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013).

While it is true that loss of First Amendment freedoms can constitute irreparable harm, there still must be the imminent likelihood of that harm. *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999). "Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). Here, Plaintiff cannot show that the violations that were alleged to have occurred, over a period of five days of intense civil unrest, are likely to imminently continue.

As the rioting in the Twin Cities area has subsided, Plaintiff cannot establish a need for the issuance of the TRO here. Minnesota has enjoyed several nights of relative quiet and peaceful protests, and no new allegations have been made by members of the media to indicate an ongoing concern and neither less-lethal munitions nor tear gas have been used by law enforcement. Though Plaintiff's Complaint was filed on June 2, the latest "targeting" of the media alleged in the

Complaint occurred on May 31.  (Compl. ¶¶ 29, 31, 59).  Given the current climate, Plaintiff cannot show a threat of imminent or irreparable harm.

### 2.  Balance of Harms

Courts must "consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 24.  As Plaintiff has not demonstrated that he suffered harm from the State Defendants, he cannot show that the balance of harms is in his favor as to them. *Dataphase*, 640 F.2d at 114.    Further, Plaintiff claims that his First Amendment rights have been chilled, but this is belied by his admission that he continued to report on the civil unrest in Minneapolis in the subsequent days and that he intends to continue.  (Goyette Dec. ¶¶ 8-10.)

Plaintiff cannot establish that the balance of harms or public interest favors him because he fails to plead sufficient grounds or factual allegations that Defendants targeted him or other members of the media.  It is unclear how he arrives at the conclusion that members of the media were targeted rather than involved in an accidental interaction during a riot.

While the Defendants have repeatedly acknowledged the critical role of the media, Plaintiff wholly dismisses the Defendants' interest in maintaining public safety.  However, the government "has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and

sidewalks, and in protecting the property rights of all its citizens." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994).  This interest has been so strong that it has actually supported injunctions which have curtailed the First Amendment rights of citizens.  *See id.*

The harm to the Defendants if the Court enters an injunction would be extraordinary as it would complicate efforts to control riots, breaches of the peace, or other chaotic situations.   Plaintiff's allegations occurred during an unprecedented time of rioting, looting, arson and civil unrest in Minnesota when the Defendants were trying to restore order.  Ascertaining who is actually a member of the media is challenging, especially when the scenes were dark and chaotic.  Discerning between protesters, onlookers, members of the media, and people who may be committing crimes is extraordinarily difficult, especially in cases where people claim to be with the media but have no photo badge or credentials displayed.  The first incident described by Plaintiff Goyette clearly involved a chaotic situation where it would be difficult for an officer to identify press, merely by the existence of a camera and monopod, 50 yards away.  Law enforcement were figuratively, and at times literally, attempting to keep the Twin Cities from burning down.

The Defendants have an interest in the restoration of order and in ensuring public safety.  Should this TRO be granted, law enforcement officers will be

severely hampered in their ability to respond to situations rapidly unfolding on the street.  For example, under the proposed order, if members of the news media are positioned between officers and individuals who are attempting to cause harm, officers would face contempt of court for physically moving the news media out of the way, or using tear gas in the vicinity of the media to try to get the malefactors to disperse.

"Another consideration in the balance of harm calculus is whether the defendant has already voluntarily taken remedial action."  *Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1260 (N.D. Iowa 1995) (citing *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489–90 (8th Cir. 1993)). Injunctive relief may be "wholly unnecessary" where the defendant has taken action to address the concerns of plaintiff.  *Sanborn Mfg. Co.*, 997 F.2d at 489 (quoting *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 774 (2d Cir.1984)).  Here, the Governor has clearly declared that it was improper to arrest a particular member of the press. (Compl. ¶16.) Officers were instructed to immediately release any individuals swept up in arrests who were identified as journalists. (Gerlicher Decl. ¶ 6.)

Furthermore, just today, the Minneapolis City Council voluntarily entered into a TRO with the Minnesota Department of Human Rights which accelerates discipline review of officer conduct (which would include the complained-of

actions here) and requires that crowd control weapons, including chemical agents and marking rounds, during protests and demonstrations must be authorized by the Chief of Police or his designee.[18] These measures have already had success; Plaintiff has not identified any media-related incidents since May 31. The balance of harms weighs against granting a TRO.

### 3. Public Interest

The public interest favors denial of Plaintiff's motion because he cannot establish any chilling effect occurred and during this unprecedented period of rioting and civil unrest the public's interest in the restoration of order and public safety was paramount. During this period, hundreds of businesses were destroyed, damaged, or looted, and fires were set all over the Twin Cities.[19] The public was clamoring for order and a restoration of the peace. Order has since been restored and peaceful protests continue, as does the unfettered media reporting of those events. Even if Plaintiff were able to establish class certification,

---

[18] State of Minnesota v. City of Minneapolis, Stipulation and Order (available at https://lims.minneapolismn.gov/Download/File/3733/Stipulation%20and%20Order%20Signed.pdf). City Council in a special session approved the terms of the stipulation June 5, 2020. (https://lims.minneapolismn.gov/File/2020-00627)

[19] Josh Penrod and C.J. Sinner, Businesses damaged in Minneapolis, St. Paul after riots, Star Tribune, June 4, 2020 (available at https://www.startribune.com/minneapolis-st-paul-buildings-are-damaged-looted-after-george-floyd-protests-riots/569930671/)

the public interest would favor denial of the TRO Motion in light of the chaotic and overwhelming unrest that engulfed the Twin Cities.

### 4. Likelihood of Success on the Merits

"[A]n injunction cannot issue if there is no chance of success on the merits." *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005). The question of whether a plaintiff is likely to succeed on the merits requires the court to weigh the equities to determine whether "the balance of equities so favors the movant that justice requires the court to intervene . . . until the merits are determined." *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, (8th Cir.1987) (quoting *Dataphase*, 640 F.2d at 113)).  In this case, Plaintiff is not asking for a prohibitory injunction to freeze the status quo, but rather a mandatory injunction which orders a party to take action: to order officers to change their tactics and severely limit when force can be deployed near members of the news media.  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009).  These types of injunctions are particularly disfavored and will not be granted unless extreme or very serious damage will result and are not issued in doubtful cases.  *Id.*

### a. <u>Plaintiff is not likely to succeed on the merits against State Defendants</u>

Plaintiff has not put forth any argument or evidence showing a likelihood of success on the merits as to the State Defendants, in either their official or individual capacities.

### i. Plaintiff makes no allegations against State Defendants.

First, and most fundamentally, Plaintiff's Complaint and Declaration makes no claim that the State Defendants caused him harm or had any negative interaction with him.  Instead, the Complaint includes allegations regarding State Defendants' interactions with other members of the media who are not parties here and, for the reasons described below, class certification at this time is inappropriate.  Plaintiff has therefore not demonstrated a likelihood of success on the merits as to the State Defendants.

### ii. Plaintiff has no valid section 1983 claims against State Defendants

To the extent Mr. Goyette or the putative class brings claims pursuant to Section 1983, those claims fail.  First, as to the official-capacity claims for damages, they are barred by Eleventh Amendment immunity. U.S. Const. amend. XI; *see also Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).   The 1983 claims against the State Defendants in their official capacities for damages also fail because Section 1983 does not authorize claims against state officials.  "[N]either a State nor its officials acting in

their official capacities are 'persons' under § 1983." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  Rather, Plaintiff may only bring claims against State Defendants in the official capacities for prospective injunctive relief, but Plaintiff does not have standing to do so as the facts alleged in the Complaint are unlikely to repeat in the future.  *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) (holding plaintiff lacked standing to obtain prospective injunctive relief because it was pure speculation that he would be charged with a crime in the future).

As to the individual-capacity claims against the State Defendants, they also fail. Indeed, the complaint identifies no specific acts taken by the State Defendants. Tellingly, these individuals are hardly mentioned in the complaint.  It goes without saying that it was not Chief Harrington or Colonel Langer who allegedly retaliated against members of the media or used any force.  This is fatal to plaintiffs' 1983 claims against State Defendants because Section 1983 does not allow vicarious liability.  *White v. Jackson*, 865 F.3d 1064, 1076 (8th Cir. 2017). Rather, Plaintiff must plead the personal involvement of these State Defendants to state a claim under Section 1983. *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) (holding that to allege a viable 1983 claim against a supervisory defendant a plaintiff must allege "specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights.").

To state an individual capacity claim under 1983, a plaintiff must be able to prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).).   While Plaintiff claims inadequate supervision and/or training, such a blanket allegation, without facts to support it, will not survive a motion to dismiss.   The Complaint contains almost no factual allegations pertaining to the supervisory or training responsibilities/actions of the State Defendants. "[A] general responsibility for supervising the operations of [an agency] is insufficient to establish the personal involvement required to support liability." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995).  Rather, the Plaintiff must plead "the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive [practices].  A single incident, or isolated incidents, do not ordinarily satisfy this burden." *Williams v. Willits*, 853 F.2d 586, 588 (8th Cir. 1988) (internal quotation marks and citations omitted).

Nor can Plaintiff circumvent these restrictions by alleging that state policies or customs caused their injury, because the *Monell* exception to Eleventh Amendment immunity does not apply to state actors.  *See Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018).

### iii. Plaintiff has not pled any sufficient state custom or deliberate indifference.

Even if Plaintiff were able to overcome the defenses outlined above, his Section 1983 claims still fail. Plaintiff makes the shocking statement that State Defendants have a practice of intentionally targeting the media for harm and intimidation. (Mem. at 6; Compl. ¶¶ 71 -75 (under the heading "municipal allegations").) There is nothing to support that allegation against State Defendants. "[W]hen a plaintiff alleges an unwritten or unofficial policy, there must be 'evidence of ... a practice, so permanent and well-settled so as to constitute a custom, that existed.'" *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018). Before last week's civil unrest, Plaintiffs identify only one previous incident in which State Defendants allegedly mistreated a member of the media in 2017. (Compl. ¶ 80; Nascimiento Decl.) That single instance is insufficient to constitute a "permanent and well-settled" custom or practice by State Defendants. For the same reason, Plaintiffs cannot show that State Defendants had received notice and were deliberately indifferent to violations of the rights of journalists. *Brossart v. Janke*, 859 F.3d 616, 627 (8th Cir. 2017).

### b. **Plaintiff is not likely to succeed in his claims against the City**

Plaintiff does not allege that Chief Arradondo personally violated his constitutional rights or the rights of any other news media members referenced in

the Complaint.[20]  The sole basis for liability against the City is municipal liability under *Monell*.  Plaintiff, however, fails to assert a viable *Monell* claim.  A municipality may only be found liable where the violation of a plaintiff's constitutional rights "resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citations omitted); *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91 (1978). Plaintiff alleges all of these but offers no factual support.

### i.  No constitutional violation.

To maintain a *Monell* claim, a plaintiff must first show that a government employee deprived them of their constitutional rights.  *Golberg v. Hennepin Cnty.*, 417 F.3d 808, 813 (8th Cir. 2005).  Plaintiff has not shown a First Amendment or Fourth Amendment violation, and his derivative Due Process claim also fails.

### a)  *The First Amendment Claim Fails*

Plaintiff's claim for First Amendment retaliation suffers from a fatal flaw: Plaintiff cannot establish causation.  "To prevail on a First Amendment retaliation claim, a plaintiff must show protected activity, adverse action, and causation — specifically: (1) that she engaged in activity protected by the First Amendment; (2)

---

[20] Likewise, Plaintiff does not assert that Robert Kroll violated his constitutional rights or that of other new media members.  Additionally, Plaintiff has not served or identified the John Does in his complaint.

that the defendant took action against her that was sufficiently serious to chill a person of ordinary firmness from engaging in protected activity; and (3) that the defendant took the adverse action in retaliation for the protected activity." *Gearin v. City of Maplewood*, 780 F. Supp. 2d 843, 856 (D. Minn. 2011) (citing *Zutz v. Nelson*, 601 F.3d 842, 848–49 (8th Cir. 2010)).  The motive to retaliate against members of the press must have been the but-for causation of the actions of the officers.  *Id.* That is simply not supported here.

In many instances, Plaintiff does not demonstrate the existence of any animosity towards the press.  (Compl. at ¶¶27, 28, 29, 31).  If an officer believes that an individual is falsely identifying themselves to be press, or simply not taking the person's assertion at face value, the officer cannot be said to be retaliating against press because they do not actually think that individual is press. (Compl. at ¶29). In some situations, it is difficult to believe that officers would have any idea that they were using force on a member of the press, for example, when firing on a car owned by a Star Tribune reporter who drove down the wrong street. (Compl. at ¶34).  Other situations are described as police spraying protestors and media "indiscriminately," *i.e.* not targeted at journalists.  (Compl at ¶¶48, 49.)

The key point is that the Plaintiff needs to show that the officers would not have taken the same action if the individuals had not been members of the press. *Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007).  That members of the press

were told to disperse and were fired on with tear gas or marking rounds does not mean the law enforcement actions were retaliatory based on their First Amendment activities. Especially on May 30, when law enforcement deployed tear gas and marker rounds to try to get crowds to disperse so it could focus on keeping the city safe. That some members of the media were inadvertently impacted by these dispersal methods is not proof that it was retaliatory.

After culling the Complaint, there are only a few instances where the Plaintiff alleges that an officer allegedly reacted to a non-threatening individual identifying him or herself as press with force or threats. The existence of isolated instances, however, does not show that Plaintiff is likely to succeed on his claim against the City because Plaintiff is basing his suit on a faulty *Monell* claim.

b)   <u>The Fourth Amendment Claim Fails</u>

To establish a constitutional violation under the Fourth Amendment, a plaintiff must prove that the amount of force used was objectively unreasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. at 396. A court reviewing a police officer's decision must make "allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving." *Id.* "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment." *Id*. at 397.

Plaintiff only addresses the severity of crime and threat factors of a seizure analysis.   He ignores that force must assessed under the totality of the circumstances.  Here, officers were conducting work in a "chaotic environment" marked by "civil unrest" and, at times, during a declared state of emergency. (ECF Doc. No. 3 at p. 3).  Plaintiff does not identify any case law rendering the use of non-lethal force under these circumstances to be objectively unreasonable or ill-suited for qualified immunity.  *See Martz*, 787 F. App'x at 357 (8th Cir. 2019) (pepper spray not excessive force); *White*, 865 F.3d at 1079–80 (8th Cir. 2017) (use of nonlethal projectiles reasonable); *Dundon,* 2017 WL 5894552, at *19 (D.N.D. Feb. 7, 2017), *aff'd*, 701 F. App'x 538 (8th Cir. 2017) (denying motion for preliminary injunction, because officers use of force not unreasonable).  Nor does Plaintiff identify any case law requiring officers to give dispersal warnings prior to the use of chemical irritants or force.

### ii.  Policy

A municipality is liable under Section 1983 only where its policy is the moving force behind a constitutional violation.  *Slaven v. Engstrom*, 848 F.Supp.2d 994, 1002 (D. Minn. 2012) (citing *Monell*, 436 U.S. at 694–95).  A "policy" is an official policy, a deliberate choice of a guiding principle, or procedure made by

the municipal official who has final authority regarding such matters.[21] *Mettler*

*v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  It is only when the "execution of

a government's policy. . . inflicts the injury" that a municipality may be held liable.

*Monell*, 436 U.S. at 694.  Additionally, a "policy is not unconstitutional if it might

allow for unconstitutional conduct in some instances[;] such a policy is

unconstitutional only if it requires its officer to act in such an unconstitutional

manner." *Peroceski v. Tarr*, 2009 WL 3202463, at *12 (D. Minn. Sept. 30,

2009)(citations omitted).

### a) *MPD's Policy regarding news media is constitutional.*

Plaintiff contends that the City's policy caused the alleged First Amendment

retaliation. (Compl. at p. 36, ¶6.)  But MPD policy regarding news media

specifically states that:

> MPD employees shall not unnecessarily obstruct news media
> personnel from performing their duties at emergency scenes. . . .
> Members of the media must follow all municipal, state, and federal
> statutes. Media can be restricted from an area where their presence
> can jeopardize police operations. Only the ranking on-scene officer
> may grant news media representatives access to any area closed
> because of investigation or health and safety hazards.

---

[21] Contrary to Plaintiff's assertion, any opinions or First Amendment
expressions by union president Robert Kroll do not establish policy.  He is not the
City official with "final authority" on police policy, and Plaintiff offers no legal
support for the notion of a *de facto* policy maker establishing municipal liability.

(Compl. at ¶83; MPD Policy and Procedure Manual 6-206). This policy is facially constitutional. Notably, Plaintiff does not contest the legality of the policy's limited restrictions.

Instead, Plaintiff contends that this policy does not provide additional guidance on how to identify media or protect First Amendment rights. "[H]owever, a written policy that is facially constitutional, but fails to give detailed guidance that might have averted a constitutional violation by an employee, does not itself give rise to municipal liability." *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 392 (8th Cir. 2007).

### b) MPD seizure and arrest policy is constitutional.

Plaintiff baldly claims that the City has a policy of deploying chemical agents and non-lethal ballistics at news media. (Compl. at ¶72.) No such policy exists. Section 5-301.01 of the MPD's Policy and Procedure Manual states, "Based on the Fourth Amendment's 'reasonableness' standard, sworn MPD employees shall only use the amount of force that is objectively reasonable in light of the facts and circumstances known to that employee at the time force is used."[22] The policy also explicitly incorporates the Fourth Amendment reasonableness test set forth in *Graham v. Connor*. (See Section 5-303).

---

[22] The Use of Force Chapter may be located at:
http://www.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300

Moreover, none of the City's policies urge or otherwise authorize the targeting of news media, as suggested by Plaintiff.  To the contrary, the Civil Disturbances policy states, in part:

> Civil disturbances are unique situations that often require special planning and tactics to best bring an unlawful situation under effective control. The on-scene incident commander shall evaluate the overall situation and determine if it would be a reasonable force option to use less-lethal or non-lethal weapons to best accomplish that objective.

> Unless there is an immediate need to protect oneself or another from apparent physical harm, sworn MPD employees shall refrain from deploying any less-lethal or non-lethal weapons upon any individuals involved in a civil disturbance until it has been authorized by the on-scene incident commander.

(Section 5-312).  Additionally, the Use of Chemical Agents policy states, "The use of chemical agents shall be consistent with current MPD training and MPD policies governing the use of force."  (Section 5-313).

There is no policy targeting the news media. In fact, MPD policy affirmatively states that "the act of recording [police activity] does not provide grounds for detention or arrest."[23]   (Section 9-202, IV(2)(e)). Likewise, the City's policy on conducting Arrests does not target the news media and follows lawful

---

[23] Section 9-200 of the MPD Policy & Procedure Manual, relating to Search and Seizure, is located at:
http://www.minneapolismn.gov/police/policy/mpdpolicy_9-200_9-200

cause standards.[24] (Section 9-100).  Plaintiff fails to identify any unconstitutional policy that is a moving force behind his alleged constitutional violation for unreasonable force, detention or arrest.

### iii.  Custom

"[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). For a municipality "to be held liable on the basis of custom, there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (citing *Monell*, 436 U.S. at 691).

Plaintiff's assertions that the City has a custom of violating the constitutional rights of members of the media are not supported by facts.  Plaintiff only points to the May 27-May 31, 2020, incidents alleged in the Complaint and a single incident from 2002.  Clearly, the existence of an 18-year gap between the only other asserted act of wrong-doing to the instant period marked by civil unrest

---

[24] Section 9-100, relating to Adult Arrests, is located at:
http://www.minneapolismn.gov/police/policy/mpdpolicy_9-100_9-100

is insufficient to establish that the MPD has a persistent, widespread, permanent and well settled unconstitutional practice.  Plaintiff has not shown that the MPD has a custom of targeting the press.

### iv.  Deliberate indifference

To establish municipal liability based on a failure to train claim, a plaintiff must show that the failure evinces a "deliberate indifference" to the constitutional rights of its citizens.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).  In other words, the constitutional violation must be the "plainly obvious consequence" of the City's action.  *Bd. of Cty Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).  This is a "stringent standard of fault."  *Id.*

To make such a showing, a plaintiff must also establish that the municipality had notice that its training procedures were constitutionally deficient and likely to cause a constitutional violation.  *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991).  Municipal liability may not be imposed when a plaintiff merely proves that a particular officer is inadequately trained.  *Harris*, 489 U.S. at 390-91.  Officers "occasionally make mistakes" and such mistakes will not provide a legal basis for municipal liability. *Id.* at 391.

There are two avenues that a plaintiff may use to establish deliberate indifference.  *Thelma D. By and Through Delores A.*, 934 F.2d at 934.  With the first avenue, notice may be implied where a failure to train officers is so likely to result

in a violation of constitutional rights that the need for training is patently obvious. *Id.* The second avenue for asserting a failure to train claim arises where the need for additional training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its employees' responses to regularly recurring situations are insufficient to protect the constitutional rights of its citizens. *Id.* at 935. Plaintiff does not establish deliberate indifference under either of these avenues.

Plaintiff does not identify any facts from which this Court could infer that the City was on notice that a failure to offer training focusing on media members as a special subgroup was so likely to result in constitutional violations that the need for training was patently obvious. The Court should reject the Plaintiff's "naked assertion" that the need for specific training regarding media members – as opposed to general training or policy guidance on members of the public recording police activities – was patently obvious. *Ashcroft v. Iqbal*, 556 U.S. at 678 (internal citations omitted); MPD Policy & Procedure Manual, 9-202.

Additionally, there is no pattern of constitutional violations that would have put the City on notice that officers' responses to members of the media required additional or different training to avoid the unlawful seizure of or retaliation against members of the media. *See Thelma D.*, 934 F.2d at 934–35 (holding that five complaints of sexual abuse against a teacher over a 16-year period did not

constitute a persistent and widespread pattern of unconstitutional misconduct). To the extent that Plaintiff implies that the five-day period referenced in the Complaint qualifies as a pattern, Plaintiff does not plead any specific facts to suggest that the City was put on notice of these incidents prior to the filing of this Complaint or could have realistically developed and offered additional training in the midst of the unprecedented civil unrest.

Plaintiff also cannot maintain a *Monell* claim against the City based on its purported failure to adopt an investigative process or discipline officers. (Compl. at ¶19). Plaintiff does not identify any specific incidents prior to those giving rise to this lawsuit that conceivably would have required discipline but for a 2002 incident. The purported absence of any investigation or discipline – within the short timeframe between the described incidents and the filing of this motion, cannot fairly give rise to *Monell* liability. *See generally Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999); *Tompkins v. Frost*, 655 F.Supp. 468, 472 (E.D. Mich. 1987) ("Wrongful conduct after an injury cannot be the proximate cause of the same injury.")

## II. THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR CLASS CERTIFICATION.

Defendants acknowledge that any member of the media that has been injured by a law enforcement officer's allegedly unlawful conduct has a right to seek redress in court. This lawsuit, however, improperly attempts to use class

proceedings to seek a universal resolution to inherently unique claims and facts. Class certification is inappropriate under these circumstances.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citations and quotation marks omitted).  A plaintiff must demonstrate that each element of Fed. R. Civ. P. 23 is satisfied.  *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158-61 (1982).  The court must conduct a "rigorous analysis" regarding whether a plaintiff has satisfied the prerequisites of Rule 23.  *Id.* at 161.

Under Rule 23(a), plaintiff must prove: (1) the class is so numerous that joinder is impracticable; (2) there are common questions of law and fact; (3) the claims and defense of representative parties are typical of the class; and (4) the representative parties will fairly and adequately protect the class' interests.  A plaintiff must also establish that his purported class action is proper under Rule 23(b), which provides standards for three different types of class actions.

Rule 23 is not a "mere pleading standard" and a moving party must affirmatively demonstrate compliance with all Rule 23 requirements.  *Dukes*, 564 U.S. at 350.  A court's "rigorous analysis" must determine that a plaintiff's claims "*in fact*" comply.  *Id.* at 350-51 (emphasis in original).  A court may then certify a class only upon "an adequate statement of the basic facts" establishing that each

requirement is fulfilled. *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612 (8th Cir. 2017) (citation and quotation marks omitted). In this case, not only has the Plaintiff failed to demonstrate compliance with all explicit and implicit Rule 23 requirements, but he has raised this issue prematurely.

### A. <u>Plaintiff's Motion is Premature.</u>

As a threshold matter, Defendants note that Plaintiff's motion for class certification is premature. No discovery has occurred in this case, inhibiting the Court's ability to perform the requisite "rigorous analysis." *Gen. Tel. Co.*, 457 U.S. at 161.

In 2003, the former requirement that a class certification decision occur "as soon as practicable" was replaced with a somewhat looser directive that "the court must—at an early practicable time—determine by order whether to certify the action as a class action." Timing of class action determination—"Early practicable time" requirement, 1 McLaughlin on Class Actions §3:1 (16th ed.); Fed. R. Civ. P. 23(c)(1)(A). The final Advisory Committee Notes to Rule 23 of the Federal Rules of Civil Procedure concluded that an amendment was needed to accommodate the fact that "[t]ime may be needed to gather information necessary to make the certification decision." Advisory Comm. Notes to 2003 Amendments to Fed. R. Civ. P. 23(c)(1). Accordingly, the parties may engage in certification discovery on "merits issues" to clarify the issues bearing on certification because "[a] certain

amount of discovery may be appropriate during this period to illuminate issues bearing on certification, including the nature of the issues that will be tried; whether the evidence on the merits is common to the members of the proposed class; whether the issues are susceptible to class-wide proof; and what trial-management problems the case will present." 2003 Report of the Judicial Conference, Committee on Rules of Practice and Procedure (commentary on amended Rule 23(c)(1)(A)).

Class certification motions filed prior to discovery are "obviously premature and lack a fully developed factual record." *Jarzyna v. Home Properties*, 201 F. Supp. 650, 658 (E.D. Penn. 2016). Such motions "are neither required nor encouraged by the Federal Rules of Civil Procedure" and burden both the Court and the nonmoving parties. *Church v. Accretive Health, Inc.*, 299 F.R.D. 676, 679 (S.D. Ala. 2014); *Richardson v. Bledsoe*, 829 F.3d 273, 284 (3d Cir. 2016). The majority of the courts across the country have denied such motions. *See, e.g.*, *Church*, 299 F.R.D. at 679 ("Plaintiff's straight-out-of-the chute Rule 23 Motion is highly unlikely to advance her cause one iota, but is virtually certain to impose administrative costs, unnecessary distractions, and an unhelpful drag on efficiency and judicial economy."); *Sandusky Wellness Center LLC v. Medtox Scientific, Inc.*, No. CIV. 12-2066, 2013 WL 951143, *2 (D. Minn. Mar. 12, 2013) ("At this stage in the proceedings, no discovery has taken place, and it appears

the motion for class certification was filed merely as a placeholder. In other words, the motion is untimely, as it is entirely unclear whether a request for class certification will eventually be warranted.").

Plaintiff's motion should be denied on its face because it is premature and serves only to burden the Defendants and the Court at this stage in the litigation.[25] A more developed record is needed before the court can determine whether common questions of fact and law exist and whether plaintiff is an adequate representative, among other issues noted more fully below. *See, e.g.*, *Jonathan Small and Jotmar, Inc. v. Target Corporation*, 2013 WL 12142545, at *1 (D. Minn. 2013) (holding that class certification is premature because no discovery had been conducted).

**B.**  **Plaintiff's Ill-Defined, Subjective Class Definition Does Not Satisfy the Implicit Requirement of Class Certification.**

Prior to considering the explicit requirements of Rule 23, the Court must first address the implicit requirements of class certification. *Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D. Minn. 2012).  Among those requirements, "Plaintiffs must establish that the class, as proposed, is objectively ascertainable and a precise

---

[25] Plaintiff's motion for class certification is an implicit acknowledgment that Plaintiff, on his own, is not entitled to any preliminary injunctive relief or a TRO and is a mask for seeking claims against the State Patrol that are not supported by any injury to Plaintiff.  In fact, Plaintiff explicitly acknowledges in his memorandum of law that a TRO for the Plaintiff alone would be "unworkable and unrealistic."  (ECF Doc. No. 3 at 4-5).

definition of the class must be given." *Id.; see also Sondel v. Northwest Airlines, Inc.*, 1993 WL 559031 (D. Minn. Sept. 30, 1993)(recognizing that a precisely defined class is an implicit requirement of Rule 23); *Bokusky v. Edina Realty, Inc.*, 1993 WL 515827, at *2 (D. Minn. 1993).  Here, the proposed class is ill-defined and subjective.

Plaintiff moves for an order certifying the following class: All members of the news media, as the term is used in Emergency Executive Order 20-69, who intend to engage in news gathering or reporting activities in Minnesota related to the protest activities that followed the death of George Floyd and the law enforcement response to those protests.  (ECF Doc. No. 2 at 1).  But Executive Order 20-69 does not define "news media,"[26] and Plaintiff offers no definition of "news media."  (*See generally* Docket).  It appears, but it is not clear, that Plaintiff would have the Court certify as class members anyone self-declaring a particular intent and self-identifying themselves as "press" or that carries a notepad, cell phone, camera, and/or camera stand.  (Compl. at ¶¶ 53, 65).

The proposed class is embedded with subjectivity: how the members choose to self-identify, and what the members claim their intent was while in the midst of a "chaotic environment" marked by "civil unrest" past an emergency-declared curfew.  (ECF Doc. No. 3 at p. 3; Minn. Exec. Order No. 20-69).  Contrary to

---

[26] Minn. Exec. Order No. 20-69 only defines "travel" and "public space." See https://dps.mn.gov/macc/Documents/eo-20-69.pdf at ¶4.

Plaintiff's assertion, this is not an "objective standard for identifying members of the news media[.]"  (ECF Doc. No. 3 at p. 4).   Thus, the proposed class should be rejected as failing to satisfy the implicit requirement of a precisely defined class. *See Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D. Minn. 2012) (rejecting certification because the class was not objectively ascertainable); *see also Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 495 (7th Cir. 2012) (holding that the class "lacks the definiteness required for class certification" when "there is no way to know or readily ascertain who is a member of the class").

## C. **A Rigorous Analysis of the Rule 23 Requirements Warrants Denial of Class Certification.**

If this Court looks past the motion's prematurity and the lack of any objective standard for defining "news media," the motion would fail on the merits as Plaintiff cannot meet all the explicit requirements of Rule 23.

### 1.    **Numerosity**

Numerosity requires that the class be so numerous that joinder of all members is "impracticable."  Fed. R. Civ. P. 23(a)(1).  To satisfy the numerosity requirement, a plaintiff must present evidence to support the size of the proposed class.  *Campbell v. Minneapolis Pub. Hous. Autho. In & For City of Minneapolis*, 175 F.R.D. 531, 538 (D. MInn. 1997), *vacated on other grounds sub nom. Campbell v. Minneapolis Pub. Hous. Auth. Ex rel. City of Minneapolis*, 168 F.3d 1069 (8th Cir. 1999); *In re Paxil Litig.*, 212 F.R.D. 539, 545 (C.D. Cal. 2003) (stating that the inability to

determine which plaintiffs are class members "makes it difficult for the Court to determine whether . . . numerosity . . . [is] met").

According to Plaintiff, courts routinely cite 20 persons as setting the benchmark for satisfying the numerosity requirement.  (ECF Doc. 3 at p. 3)(citing to *In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d Cir. 2016)).  The cited case actually notes that the Third Circuit has said that "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met" while Supreme Court dicta offers that a class of 15 is too small to meet the numerosity requirement.  837 F.3d at 249-50.

Plaintiff alleges there are hundreds of members of the news media in the Twin Cities covering protests.  (ECF Doc. 3 at p. 3).  Notwithstanding the ill-defined class, it is evident that merely being a member of the media does not entitle a person to be included in a class action lawsuit.  Class members must have also sustained some cognizable injury.  Out of the hundreds of members of the news media interacting with thousands of law enforcement officers on a 24-hour basis for five days, the Complaint alleges approximately 28 discrete incidents (four involving State Patrol, ten that do not identify the law enforcement at-issue, and thirteen that involve the MPD) (*See generally* ECF Doc. No. 1 at ¶12 (referring to the period of "five days and nights").  Joinder of thirteen suits against the City is not impracticable nor is the joinder of four suits against the State, notwithstanding

the "chaotic environment" that is applicable to all suits initiated at this time. (ECF Doc. No. 3 at p. 3).  Indeed, even if the claims were brought individually, they would be manageable by the Court.

Moreover, a plaintiff may not rely on mere speculation about the size of the proposed class.  *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3d Cir. 2013).  In *Hayes*, the court concluded that plaintiff did not fulfill his burden to prove numerosity because, although the class size was greater than zero and less than 3,500, the court could "only speculate as to the number of class members." *Id.* at 357-58.  Here, too, though Plaintiff claims that "hundreds of members of the news media are in the Twin Cities covering the protests that followed George Floyd's death and the aftermath," (ECF No. 3), the Court must improperly speculate about the number of class members, particularly in light of the fact that there is no factual record about who would fall within the class.  *See Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681 (S.D. Cal. 1999) ("A higher level of proof than mere common sense impression or extrapolation from cursory allegations is required.").

Finally, the Complaint does not allege any incidents occurring after May 31, *i.e.* two days before the filing of the instant motions.  While Plaintiff generally alleges the possibility of a chilling effect on speech, he does not identify any other individuals that desire to be a class member in this lawsuit, negating the desirability of class certification. It may be that certain injured individuals would

prefer to forego a formal lawsuit, instead seeking review by an entity offering oversight of officer conduct. An absence of other willing participants negates class certification. *See Elster v. Alexander*, 76 F.R.D. 440, 443 (N.D. Ga. 1977) ("[N]o other shareholder has filed suit or sought to intervene.  This Court is unwilling to breathe the spirit of judicial combat into 8,500 persons who, so far, have shown no desire to litigate this matter."); *Plekowski v. Ralston Purina Co.*, 68 F.R.D. 443, 453 (D. Ga. 1975) ("The courts have recognized, as a negative factor to class certification, this lack of interest in entering the legal arena.")  The small bona fide class does not meet the numerosity requirement under Rule 23.

Because joinder is not impracticable, Plaintiff has introduced no evidence of the class, and the lack of expressed interest in class membership, Plaintiff has failed to satisfy the numerosity element of Rule 23(a).

### 2. Class Members Do Not Share Common Questions of Law and Fact Under Rule 23(a)(2).

To establish commonality Plaintiff must "demonstrate that the class members have suffered the same injury[.]" *Dukes*, 564 U.S. at 349-50 (citation and quotation marks omitted).  Every class member's claim must depend upon a common legal contention "capable of classwide resolution." *Id.*  A plaintiff cannot just raise common questions. *Id.*  A class action must "generate common *answers.*" *Id.*  Dissimilarities within the proposed class can impede the generation of common answers. *Id.*

Plaintiff's and the proposed class members' claims are not susceptible to common answers.  Plaintiff alleges the existence of four common questions:

1. Do arrests and targeting of journalists through a series of common methods violate the First, Fourth, and Fourteenth Amendments?

2. Are the State and Municipal Defendants liable for implementing an unlawful policy or custom as set forth under principles of municipal liability?

3. Have the State and Municipal Defendants manifested a failure to properly train and supervise their agents and officers?

4. Have the State and Municipal Defendants exhibited a deliberate indifference to the unconstitutional conduct alleged herein?

(ECF Doc. No. 1 at ¶98; ECF Doc. No. 3 at p. 3.)  Plaintiff's attempt to define the issues in a generalized manner fails to consider the complexity of the individual, fact-intensive inquiries that must be undertaken to assess each claim.  *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016) ("merely advancing a question stated broadly enough to cover all class members is not sufficient under Rule 23(a)(2)").  It is clear that the answers to Plaintiff's proposed questions depend on the analysis of individual facts and circumstances that preclude class certification.

Plaintiff cannot demonstrate that each putative class member possesses a First Amendment retaliation, Fourth Amendment, or Fourteenth Amendment claim because each news media member's experience during the chaotic protests following the death of George Floyd is unique.  (*See, generally*, Compl.)  Indeed,

the Complaint itself alleges a wide variety of experiences: some reporters or journalists are alleged to have interacted with the State Patrol, others with the MPD; others with unidentified law enforcement; some are alleged to have been arrested; some are alleged to have been shot with less-lethal ammunition; some are alleged to have been threatened. (*See, generally*, Compl.) Presumably, some were not injured at all. Additionally, each claimant will necessarily present different facts supporting the assertion that they were recognizable as members of the media, and the conditions and lighting of the surrounding area will be at issue. In contrast, defendants may assert facts supporting the existence of probable cause, arguable probable cause, criminal activity, an immediate threat to an officer, and whether claimants were resisting or disobeying lawful commands, among other possible facts and defenses that are unique to each encounter.

The varied and distinct experiences defeat commonality. Whether the MPD or the State Patrol's treatment of any individual reporter or journalist constitutes First Amendment retaliation or a violation of his or her Fourth Amendment or Fourteenth Amendment rights depends on the unique facts of each case. *See United States v. Wright*, 2018 WL 3696590, at *3 (D. Minn. 2018) ("Probable cause exists when the totality of the circumstances shows that a prudent person would believe that the arrestee has committed a crime."); *Graham v. Connor*, 490 U.S. 386, 396 (1989) (explaining that the Fourth Amendment

reasonableness test for use is not capable of mechanical application but rather requires "careful attention to the facts and circumstances of each particular case"); *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006) (providing that a substantive due process claim "demands an exact analysis of circumstances before any abuse of power is condemned"). Dissimilarities among members of the proposed class short-circuits the generation of common *answers* required under Rule 23(a)(2).

Commonality is especially important in a Rule 23(b)(2) class because unnamed members are bound by the action and cannot opt out.  *See In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121-22 (8th Cir. 2005).  Suits become unmanageable and little benefit is gained in arising as a class if individual issues arise consistently.  *Id.*

Moreover, Plaintiff's attempts to challenge the policy or training of two separate agencies bely his claim of commonality.  The MPD and the State Patrol are separate entities with their own policies and their own training, undermining any argument regarding commonality.  Moreover, even if every putative class member had suffered the same injury, Plaintiff cannot provide any evidence to show that same generally-applicable policy or practice of the State Patrol and the MPD caused an injury to the putative class members, rather than the discretionary,

individual actions of the officers.[27]  Such a situation was fatal to commonality in *Dukes*, where the alleged discrimination was caused not by any discriminatory corporate policy but by individual decisions delegated by Wal-Mart policy to the discretion of individual store managers.  *Dukes*, 564 U.S. at 353-57.

With respect to the second through fourth questions proposed by Plaintiff, each question is simply a variation of whether the defendants may be held liable under a *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91 (1978) theory of liability, which applies only to the city, not the State, *Will v. Mich. Dep't of State Police*, 49 U.S. 58, 70-71 (1989).  None of these questions support a finding of commonality.  To maintain a *Monell* claim, the class members must first show that an officer deprived them of their constitutional rights.  *Golberg v. Hennepin Cnty.*, 417 F.3d 808, 813 (8th Cir. 2005).  Without a constitutional violation, there is no basis for a *Monell* claim.  *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007).  Thus, the "totality of the circumstances" analysis is embedded in the municipal liability claims, rendering them equally unsuitable for class certification.

In sum, Plaintiff has not met his burden to show that each putative class member was harmed, that those allegedly harmed suffered an injury, much less

---

[27] Notably, there are almost no specific factual allegations at all pertaining to Defendants' actual training or supervisory activities, demonstrating that such claims fail as a matter of law.

the same injury, or that any such injury was caused by the same generally applicable policy or action of the MPD or the State Patrol such that the Court can provide a remedy.  Plaintiff has not shown that some universally-applicable action of the MPD or the State Patrol caused putative class members to suffer "the same injury" such that determination of that actions' legality "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 348-50.  Instead, Plaintiff at best alleges that some broad systematic deficiency in the MPD or the State Patrol's policies (or both) has caused some (but not all) putative class members to suffer an individualized injury.[28]  Like in *Dukes*, Plaintiff is improperly asking this Court to find commonality in a number of individual, case-by-case discretionary determinations, here relating to the discretionary judgment of law enforcement officers during widespread and unprecedented civil unrest in Minnesota.  This is insufficient to show commonality, and class certification should be denied.

### 3.    The Typicality and Adequacy Factors Are Not Satisfied.

Rule 23(a)(3) requires that the plaintiff show that the "claims or defense of the representative parties are typical of the claims or defenses of the class."  In

---

[28] Indeed, Plaintiff explicitly requests individualized remedies.  (Compl. at p. 41 (stating that Plaintiff seeks "[d]amages compensating Plaintiff for his injuries, including but not limited to compensatory, pecuniary, and medical expense damages")).

other words, Plaintiff must demonstrate "that there are other members of the class who have the same or similar grievances as the plaintiff." *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977) (citation and quotation marks omitted). "Put another way, 'in the course of proving [their] own claim [the representatives] must also prove the claims of the other members of the class.'" *In re Workers' Compensation*, 130 F.R.D. 99, 106 n.4 (D. Minn. 1990).

"Rule 23(a)(4) asks whether the class representatives will vigorously prosecute the interests of the class." *Id.* at 107. "In considering . . . adequacy of representation, under 23(a)(4) 'the primary criterion is the forthrightness and vigor with which the representative parties can be expected to assert and defend the interests of the members of the class.'" *Buchholtz v. Swift & Co.*, 62 F.R.d. 581, 597 (D. Minn. 1973) (quoting *Mersay v. First Republic Corp. of Am.*, 43 F.R.D. 465, 470 (S.D.N.Y. 1968)). The Court should inquire whether Plaintiff's claims are "sufficiently parallel to the interests of the other class members to assure a vigorous representation of the class." *Donaldson*, 554 F.2d at 831. Courts often equate typicality with adequacy. *Id.* at 829.

Plaintiff cannot establish typicality or adequacy because he has different interests that the proposed class members. Each claim of a First Amendment, Fourth Amendment, or Fourteenth Amendment violation depends on the individual circumstances surrounding that particular reporter's experience. In

*Elizabeth M. v. Montez*, 458 F.3d 779, 786-87 (8th Cir. 2006), a case involving a putative class of female patients who had been  sexually assaulted at a mental health facility, the Eighth Circuit held that plaintiffs had failed to meet the typicality requirement, noting that establishing a violation with regard to every putative plaintiff would require an "individualized inquiry."  Like in *Elizabeth M.*, determining whether the MPD or the State Patrol violated any putative class member's rights will involve a fact-intensive inquiry into the actions of the class member, the actions of the law enforcement officers involved, and the knowledge of the law enforcement officers.

Indeed, Plaintiff's claims are certainly not typical of any claims against the State Patrol, because the State Patrol is not implicated in any of Plaintiff's claims. (*See* Compl. ¶¶53 (alleging that a MPD officer threatened Plaintiff), 64-68 (alleging that MPD fired less lethal ammunition at Plaintiff)).  As such, Plaintiff cannot establish typicality or adequacy because he has different interests than the putative class members, some of whom may allege to have been injured by the MPD, others by the State Patrol, and some who may claim to have suffered different injuries than Plaintiff.  *See East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977) (holding that a plaintiff who is not injured by a defendant's conduct is not a typical class member).

Furthermore, Plaintiff cannot establish that there is no possible conflict with other potential class members, such that he is a proper class representative. Accepting Plaintiff's bare assertion that he has no conflicts and understands his role and duties as class representative does not satisfy this Court's obligation to scrutinize if Plaintiff is, in fact, a proper class representative. *Allnew v. City of Duluth*, 983 F. Supp. 825, 830 (D. Minn. 1997). Given the nature of Plaintiff's purported injuries, Plaintiff has an incentive to prioritize injunctive relief over monetary relief, while members of the media that claim permanent or more severe physical injuries may likely prioritize monetary relief.

Because of the "individualized inquiry" required by the claims of the putative class members and the fact that Plaintiff's claims are not typical of the class, particularly of claims against the State Patrol, the proposed class fails the typicality and adequacy requirements.

### 4.     Certification Is Inappropriate Under Fed. R. Civ. P. 23(b)(1).

Although Plaintiff moves for class certification under Rule 23(b)(1), he fails to meet the Rule's requirements and therefore certification is inappropriate. *See* Doc. 3 at 3-5.

### i.     Rule 23(b)(1)(A)

Certification under Rule 23(b)(1)(A) is appropriate where "prosecuting separate actions by or against individual class members would create a risk of . . .

inconsistent adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). "Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Prods, Inc. v. Windsor*, 521 U.S 591, 613 (1997) (quotation omitted). "A widely-recognized limitation on (b)(1)(A) certification requires that there be more than the mere possibility that inconsistent judgments and resolutions of identical questions of law would result if numerous actions are conducted instead of one class action." *In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1263-64 (10th Cir. 2004) (quotation omitted).

There is no risk of inconsistent judgments here. Each member of the purported class, to the extent they are injured, was injured in unique circumstances during a chaotic, volatile period of unrest in the Twin Cities metropolitan area. This is not a situation where the Defendants were obliged to treat all members of the putative class the same. Rather, the treatment to which the putative class members were entitled is based on the facts specific to their interaction with the officers. The individualized and highly varying experiences of the putative class members eviscerates the risk of inconsistent judgments. *See,*

*e.g.*, *Hallaba v. Worldcom Network Servs., Inc.*, 196 F.R.D. 630, 644 (N.D. Okla. 2000) (holding that "particularized inquiry" involved in adjudicating putative class members' claims made it unlikely that inconsistent adjudications would result from separate proceedings); *Bennett v. Corr. Med. Servs., Inc.*, Civ. No. 02-4993, 2008 WL 2064202, at *14 (D. N.J. May 14, 2008) (same).

### ii.    Rule 23(b)(1)(B)

Rule 23(b)(1)(B) provides that certification is appropriate where individual actions would create a risk of "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."  This subdivision is usually applied when a "limited fund" exists, such that non-class members seeking damages would likely deplete the fund and deprive class members of recovery.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999).  Unlike such claims, here resolution of claims that a reporter's First, Fourth, or Fourteenth Amendment rights have been violated will not be dispositive of other members not part of the class because of the widely varying underlying facts and alleged "targeting" behavior.  Plaintiff's argument runs contrary to the Supreme Court's cautioning against "adventurous application of Rule 23(b)(1)(B)."  *Elizabeth M.*, 458 F.3d at 786 n. 3 (quoting *Ortiz*, 527 U.S. at 845 (1999)).

### 5.      Certification Is Inappropriate Under Fed. R. Civ. P. 23(b)(2).

Plaintiff also moves under Fed. R. Civ. P. 23(b)(2) for class certification, but he fails to meet that Rule's requirements.  (*See* ECF No. 3 at 3).  A Rule 23(b)(2) class may proceed on the theory that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final . . . relief is appropriate respecting the class as a whole[.]"  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Dukes*, 564 U.S. at 360.  "At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness.  Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries."  *In re St. Jude Med., Inc.*, 425 F.3d, 1116, 1121-22 (8th Cir. 2005); *Ebert*, 823 F.3d at 480 ("[T]he cohesiveness requirement of Rule 23(b)(2) is more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3).").  The Eighth Circuit has explained that a class is not suitable  for 23(b)(2) certification when  the  defendant's  "conduct cannot be evaluated without reference to the individual circumstances of each plaintiff." *Harris v. Union Pacific Railroad Company*, 953 F.3d 1030, 1038 (8th Cir. 2020).

The sole explanation provided by Plaintiff as to why this Rule applies is that journalists are being targeted.  (ECF Doc. No. 3 at pp. 5-6).  But whether journalists are, in fact, being targeted requires an individual assessment of the particular facts applicable to each incident: was the class member readily identifiable as a news media member, were they actually gathering news, was the news media member engaging in obstructive behavior or other unlawful conduct, was the officer's conduct actually focused on the news media member versus others engaging in unlawful conduct, and was the officer's conduct reasonable in light of the totality of the circumstances?  Thus, the touchstone of cohesiveness is not established.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motions for class certification and for a TRO.


Dated: June 5, 2020                         ERIK NILSSON
                                            Interim Minneapolis City Attorney
                                            By

                                            */s/ Heather P. Robertson*
                                            Heather P. Robertson (#0390470)
                                            Kristin R. Sarff (#388003)
                                            Assistant City Attorneys
                                            Office of the Minneapolis City Attorney
                                            City Hall, Room 210
                                            350 S. Fifth Street
                                            Minneapolis, MN 55415
                                            Telephone: 612-673-3949
                                            heather.robertson@minneapolismn.gov
                                            kristin.sarff@minneapolismn.gov

*Attorneys for Defendants City of
Minneapolis and Chief of Minneapolis
Police Medaria Arradondo*

Dated:  June 5, 2020                    KEITH ELLISON
                                        **Attorney General**
                                        **State of Minnesota**

                                        */s/ Liz Kramer*
                                        LIZ KRAMER (#0325089)
                                        Solicitor General
                                        JULIANNA F. PASSE (#0397317)
                                        LEAH HEDMAN (#0280501)
                                        Assistant Attorneys General
                                        445 Minnesota Street, Suite 1400
                                        St. Paul, Minnesota 55101-2131
                                        (651) 757-1010 (Voice)
                                        (651) 282-5832 (Fax)
                                        liz.kramer@ag.state.mn.us
                                        ATTORNEYS FOR DEFENDANTS
                                        MINNESOTA DEPARTMENT OF
                                        PUBLIC SAFETY COMMISSIONER
                                        JOHN HARRINGTON AND
                                        MINNESOTA STATE PATROL
                                        COLONEL MATTHEW LANGER, *IN
                                        THEIR OFFICIAL AND INDIVIDUAL
                                        CAPACITIES*