UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jared Goyette, Craig Lassig, and The Communications Workers of America, *On behalf of* ~~himself~~themselves *and other similarly situated individuals,*<br><br>Plaintiff,<br><br>v.<br><br>City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; and John Does 1-2, *in their individual and official capacities.*<br><br>Defendants. | Court File No. ~~20-cv-01302 (WMW/DTS)~~<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR A JURY TRIAL** |

For ~~his~~their First Amended Complaint, ~~Plaintiff states~~Plaintiffs state and ~~alleges~~allege as follows:

## **INTRODUCTION**

The press is under assault in our City.

Over the past week, the Minneapolis Police and the Minnesota State Patrol have tear-gassed, pepper-sprayed, shot in the face with rubber bullets, arrested without cause, and threatened journalists at gunpoint, all after these journalists identified themselves and were otherwise clearly engaged in their reporting duties.  These are not isolated incidents.

The past week has been marked by an extraordinary escalation of unlawful force deliberately targeting reporters.

The ostensible leaders of our law enforcement agencies have been unable to curb this unlawful violence.  Governor Walz and others have repeatedly issued statements apologizing for the violence against reporters and the unlawful arrests.  But these statements, and whatever behind-the-scenes actions have accompanied them, have proven toothless.

This pattern and practice of conduct by law enforcement tramples on the Constitution.  It violates the sacrosanct right to freedom of speech and freedom of the press that form the linchpin of a free society.  It constitutes a pattern of unreasonable force and unlawful seizures under the Fourth Amendment.  And it deprives liberty without a modicum of due process protected by the Fourteenth Amendment.

~~Plaintiff brings~~Plaintiffs bring this action and ~~asks~~ask the Court to restrain Defendants from further violence and unconstitutional conduct.

## **PARTIES**

1.     Plaintiff Jared Goyette is a Minnesota resident who lives in the city of Minneapolis.  Plaintiff is a freelance journalist who works for national and international news publications.

2.     Plaintiff Craig Lassig is a Minnesota resident and freelance photographer. He has been a freelancer since 2008, and his clients include AP, Reuters, the NY Times, and the European Pressphoto Agency ("EPA").  Prior to 2008, Lassig worked as a photographer for Sun Newspapers.

2

3.     Plaintiff The Communications Workers of America ("CWA") is an international labor union representing over 700,000 workers in a broad range of industries, including print and broadcast news media, telecommunications, airline, manufacturing, education, public service, and healthcare, among others.  CWA's central purpose is protecting the rights of workers through collective bargaining and public advocacy.  CWA's headquarters is in Washington, DC; its members work and live throughout the United States, including Minnesota.  CWA is comprised of multiple sectors and districts representing members in different industries.  The News-Guild CWA ("NewsGuild") is an affiliate union of the CWA.  NewsGuild members include many on the reporting staff of the Los Angeles Times, the Chicago Tribune, the Detroit Free Press, the Denver Post, Reuters, the Associated Press, the Washington Post, the New York Times, the St. Paul Pioneer Press, and the Minneapolis Star Tribune, among others.

2.4.    Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota.

3.5.    Defendant Medaria Arradondo is the Minneapolis Chief of Police and a Minnesota resident.

4.6.    Defendant Robert Kroll is a Lieutenant in the Minneapolis Police Department, the president of the Minneapolis Police Federation, and a Minnesota resident.

5.7.    Defendant John Harrington is the Minnesota Commissioner of Public Safety with supervisory responsibility over Colonel Matthew Langer and the Minnesota State Patrol.  Commissioner Harrington is a Minnesota resident.

3

6.8.   Defendant Colonel Matthew Langer commands the Minnesota State Patrol. Colonel Langer is a Minnesota resident.

7.9.   Defendants John Does are unidentified individuals who committed the acts and omissions set forth below as agents of Defendants City of Minneapolis and Minnesota State Patrol.

**JURISDICTION**

8.10.   Plaintiff'sPlaintiffs' claims arise under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitutions, and the First and Fourth Amendments, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

9.11.   Jurisdiction is proper in this Court according to 28 U.S.C. § 1331 because Plaintiff'sPlaintiffs' claims arise under the United States Constitution and federal law.

**BACKGROUND**

**A.   GEORGE FLOYD'S MURDER AND THE ENSUING UNREST.**

10.12. On Monday May 25, 2020, George Floyd, a citizen of Minneapolis, was murdered by an officer of the Minneapolis Police Department ("MPD").  The events of Floyd's arrest and murder were captured on video by multiple bystanders as well as individual officers' body cameras.    The videos depicted Mr. Floyd pinned on the street, face down and increasingly unresponsive, while MPD Officer Derek Chauvin knelt on Mr. Floyd's upper back and neck, two officers held him down, and another stood by.  All four officers were soon fired by the City.  Derek Chauvin has been charged with third-degree murder and manslaughter.  The other officers have also been charged.

4

11.13. The videos were widely and rapidly disseminated around the world via social media and news media platforms.  Mr. Floyd's murder became international breaking news.

12.14. Over the next five days and nights, thousands of people gathered across Minneapolis to protest and mourn Mr. Floyd's murder.  Some of the protests grew in intensity, and isolated bad actors used the protests to engage in the looting and burning of hundreds of buildings in Minneapolis and Saint Paul.

13.15. The public unrest became international breaking news.  Numerous members of the news media arrived to cover the demonstrations and unrest and the government response.

14.16. Many confrontations occurred during this period between the MPD and State Patrol, and groups of demonstrators, in which law enforcement, without any forewarning, deployed less-lethal ballistics and chemical irritants against the demonstrators.

15.17. It is abnormal in situations of public unrest for law enforcement to engage in potentially injurious riot control tactics without issuing clear warnings and orders to disperse.

16.18. In addition to confronting civilian demonstrators, the MPD and State Patrol also aggressively confronted members of the news media providing on-the-scene coverage. Numerous journalists reported injuries sustained as a result of law enforcement's unforewarned, indiscriminate use of riot control tactics against clearly identifiable members of the news media.  In one high-profile incident, CNN correspondent Omar Jimenez was arrested on national television despite asking the State Patrol to "put us back

5

where you want us, we are getting out of your way."[1]  Mr. Jimenez was only released after

a personal phone call from CNN president Jeff Zucker to Minnesota Governor Tim Walz.[2]

~~17.~~19.  Governor Walz acknowledged that arresting members of the news media

providing coverage of breaking news stories was improper and said that "there is absolutely

no reason something like this should happen . . . . In a situation like this, even if you're

clearing an area, we have got to ensure that there is a safe spot for journalism to tell this

story.  The issue here is trust, the community that's down there that's terrorized by this, if

they see a reporter being arrested, their assumption is something is going to happen that

they don't want to be seen so that is unacceptable."[3]

~~18.~~20.  Despite Governor Walz's assurances that the role of the media would be

fostered and respected, the MPD, State Patrol, and other law enforcement authorities

continued to target and intimidate members of the news media in a concerted effort to chill

protected First Amendment activity.

**B.    CURFEWS ESTABLISHED BY EXECUTIVE ORDER.**

~~19.~~21.  Due to widespread threat to personal safety and property, Governor Walz

mobilized the Minnesota National Guard. ~~As a result of this order, Defendants all began to~~

~~conduct planning and operations in concert as one cohesive law enforcement agency.~~

---

[1] https://apnews.com/eadfe65c7ce593d04c0aef7eb0276e22.

[2] https://www.startribune.com/cnn-reporter-arrested-on-live-tv-let-go-after-gov-tim-walz-intervened/570860202/

[3] https://www.cnn.com/2020/05/29/politics/tim-walz-minnesota-cnn-arrest/index.html

20.22.  Governor Walz also issued an executive order establishing a curfew, effective from 8:00 p.m. to 6:00 a.m. on Friday, May 29 and Saturday, May 30.[4]  The Governor re-issued the curfew order for Sunday, May 31. ("Curfew Orders").[5] The Curfew Orders apply to "all public places within the City of Minneapolis and the City of Saint Paul[.]"  The curfews expired on Friday, June 5, 2020.

21.23.  The Curfew Orders mandate that "[d]uring the curfew, all persons must not travel on any public street or in any public place."

22.24.  The Curfew Orders contain exceptions to the travel prohibition, however: "All law enforcement, fire, medical personnel, **and members of the news media** . . . **are exempt from the curfew**.  Individuals traveling directly to and from work, seeking emergency care, fleeing dangerous circumstances, or experiencing homelessness are also exempt."

23.25.  The City of Minneapolis implemented a similar curfew order that exempted members of the news media.

24.26.  Upon information and belief, there is no system in place for members of the media to apply for or obtain official credentials from the Minneapolis Police Department or the State Patrol.

27.     Throughout the duration of the protests, both before and after the Governor's curfew order, the Defendants acted in communication and coordination with one another.

---

[4] Minn. Exec. Order No. 20-65 (May 29, 2020), https://mn.gov/governor/assets/EO%2020-65%20Final_tcm1055-434123.pdf434635.
[5] Minn. Exec. Order No. 20 68 (May 31, 2020), https://mn.gov/governor/assets/EO%2020-68%20Final_tcm1055-434218.pdf434305.

**C.    DEFENDANTS' UNCONSTITUTIONAL ACTIONS AGAINST THE PRESS COVERING THE RECENT PROTESTS.**

25. 28. Even though members of the news media were expressly exempt from the Curfew Orders, Defendants ignored the exemption.  Even when members of the news media clearly identified themselves, Defendants continued to target and intimidate the press by threatening, spraying chemical irritants, and firing less-lethal ballistics designed for riot control directly at members of the media.  Defendants further interfered with the news media's right to cover public events by refusing access to areas where events were unfolding and creating obstacles to reporters' movement about the city.  These incidents constitute flagrant infringements on the constitutional rights of individual reporters, as well as the public's interest in the dissemination of accurate information and accountability of government for its actions.  The unlawful actions of the Defendants include but are not limited to the following incidents.

<u>ARRESTS</u>

26. 29. On May 30, a Minnesota State Patrol trooper forced WCCO videographer Tom Aviles to the ground and arrested him even though Aviles had identified himself as a member of the press and was carrying a large video camera.[6]  Aviles's producer Joan

---

[6] https://www.startribune.com/wcco-cameraman-arrested-on-video-while-covering-unrest-in-minnesota/570902742/

8

Gilbertson was with him at the time.  She also identified herself as a journalist.  A State Patrol trooper told her, "You've been warned, or the same thing will happen to you.  Or you're next."  Aviles spent two hours in custody.  Earlier police had shot Aviles with a less-lethal projectile even though he was filming them with a large video camera at the time and was clearly identifiable as a member of the press.[7]

27.30. On May 29, a Minnesota State Patrol trooper handcuffed and arrested CNN reporter Omar Jimenez and his news crew during a live broadcast.  It was daytime, there were no protesters around, and Jimenez asked the State Patrol where they should position themselves prior to being arrested, stating, "Put us back where you want us, we are getting out of your way, just let us know."  When Jimenez further pressed the trooper who arrested him why he was being arrested, the trooper stated, "Look, I don't know man, I'm just following orders."  The crew was readily identifiable as a CNN news crew and identified themselves as such repeatedly before being handcuffed and arrested.[8]  The crew was detained for an hour.

28.31. On May 30, European Press Photo Agency photojournalist Tannen Maury, freelance photographer Stephen Maturen, and professional photojournalistPlaintiff Craig

---

[7] https://twitter.com/WCCO/status/1266920992946954241
https://minnesota.cbslocal.com/2020/05/30/wcco-photojournalist-tom-aviles-arrested-in-south-minneapolis/
[8] https://www.nytimes.com/2020/05/29/business/media/cnn-reporter-arrested-omar-jimenez.html

Lassig were arrested and charged with curfew violations despite having identified themselves as members of the press, as detailed in paragraphs 86-91 below.[9]

29.32. While covering the protests on May 31, Star Tribune reporter Liz Sawyer identified herself as a journalist to Minneapolis Police. She was told, "we don't care, we'll arrest you."[10] Earlier that evening, Sawyer was standing with Star Tribune reporter Chao Xiong, two Kurdish journalists, and one Japanese journalist. Minneapolis Police officers told them to go home. When the group identified themselves as press and showed their credentials, an officer said, "Your cards are bullshit."[11]

30.33. On May 3031, NBC reporter Simon Moya-Smith was arrested by the Minneapolis Police despite identifying himself multiple times as a reporter and displaying his press badge for the arresting officer.[12] Moya-Smith was pepper sprayed during the arrest. At approximately 2:00 a.m., he was walking with a dozen or so activists who were on their way home from the protests in honor of George Floyd. The group was a few blocks west from the location where George Floyd was murdered when they were surrounded by 6 to 8 police cruisers. The officer in the passenger side of the lead car swung the door open, shouting, "Get on the ground! Get the fuck on the ground!" She pepper-sprayed the entire group one by one while they laid on the ground, peaceably complying with the officer's order to remain still. One of the group members, a Native American woman who

---

[9] https://twitter.com/MJKauz/status/1267273646621499392
[10] https://twitter.com/ByLizSawyer/status/1266984068765409280
[11] https://twitter.com/ChaoStrib/status/1266959110265856000
[12] https://twitter.com/SimonMoyaSmith/status/1267054164774916096

is an attorney, asked, "Are you literally maceing us?" The female officer responded by pepper spraying her in the face.

34.    Another police officer approached Moya-Smith, while officers in the background laughed.  The officer asked his name.  He responded, "My name is Simon Moya-Smith.  I am a reporter with NBC News.  My press badge is on my chest."  A third officer approached Moya-Smith, saying, "Roll on your side, Mr. Journalist.  You're going to be charged with, I don't know, breaking curfew."

35.    About 10 to 15 minutes later, Moya-Smith was still lying face down on the concrete sidewalk.  A fourth officer approached, pulled him up by his right bicep, and walked him to a nearby police cruiser.  Moya-Smith told this officer, "I am a journalist with NBC News."  This officer eyed the press badge that was suspended from Moya-Smith's neck, shrugged, and loaded Moya-Smith into the back of the police cruiser.  He was taken to the Fifth Precinct and after identifying himself as a member of the media again, to the officer who was beginning to book him, he was released.[13]

~~31.~~36. Early on the morning of May 31, an Australian television news team led by Tim Arvier was detained and searched by Minneapolis Police after identifying themselves as members of the press.  During this detention the news team's cameraman was handcuffed despite clearly being a member of the news media and being no threat to anyone.[14]

---

[13] The allegations in paragraphs 32-34 are derived in part from the Declaration of Simon Moya-Smith, attached as Exhibit 1 to the First Amended Complaint.

[14] https://twitter.com/TimArvier9/status/1266969637817909250

**USE OF PHYSICAL FORCE**

37.   On May 29, ~~veteran AP photojournalist John Minchillo was shot with a less-lethal projectile.  He~~freelance videographer Mike Shum was covering the protests for the New York Times.  He was positioned outside the Third Precinct, roughly 50 feet from any protesters.  He had a large shoulder-mounted camera and was clearly identifiable as a member of the press.  Minneapolis Police fired flash-bang grenades directly at Shum while he was filming, and those munitions exploded right in front of his camera, despite the fact that Shum was standing alone with no protesters around.  At around 9 p.m. that night, police began to disperse the protesters who had gathered in front of the precinct.  Shum was still about 50 feet away from any protesters, filming with a shoulder-mounted camera.  Minneapolis Police officers nonetheless began shooting less-lethal projectiles and tear gas at Shum and a group of other journalists gathered nearby, including Star Tribune photographer Richard Song-Tatari.  Police did not give any warning or order to disperse before opening fire on Shum.  One projectile ricocheted off a wall or the ground and hit Shum in the side.  Another projectile hit Shum directly in the foot.  His foot swelled up and he has been having difficulty walking since then.

38.   On May 29, freelance photographer Philip Montgomery was covering the protests at the Third Precinct.  He was standing away from the protesters with a group of other news photographers, including Scott Olson from Getty Images, Victor Blue of the New York Times, John Minchillo from AP, and Lucas Jackson from Reuters.  All the photographers had their press badges out and visible, and they were documenting the protests with their professional photography gear.  Minchillo was wearing a vest with

12

"PRESS" written on the front in large letters.  The group was clearly identifiable as journalists and was not standing amidst or near the protestors.  They were not obstructing any crowd control activity being undertaken by law enforcement.  They were not provoking law enforcement.  They were simply standing to the side documenting what was going on.  Around midnight, law enforcement moved to clear out the protests.

39.    At that same time, without warning, a group of law enforcement officers – Minneapolis Police and Minnesota State Patrol – moved in front of the small cluster of photographers and began to advance.  As they closed in on the photographers, the officers fired tear gas canisters and rubber bullets directly into the group.  One officer advanced until he was roughly 15 feet away from Montgomery.  The officer raised and pointed his riot control gun at Montgomery and fired a less-lethal projectile into Montgomery's chest.  The officer aimed directly at Montgomery even though he was clearly identified as a member of the press.

32.40. The force of the blow from the projectile shocked Montgomery, and he still has a large bruise from where he was hit, directly over his heart.  The injury affected his ability to continue documenting and reporting on the protests.  Other photographers in that group were also hit, including Lucas Jackson, Victor Blue, and John Minchillo.  The troopers and officers clearly targeted the group even though they were obviously journalists, not provoking or obstructing law enforcement, and were merely standing peaceably to the side exercising their First Amendment rights.  Minchillo stated in a social media post, "No distinctions were made . . . when I and my colleagues were hit by officers.

13

Last night was full force in a wide spread.  This is a protocol that I've not seen elsewhere."[15]

It should be noted that the guns used to fire these less-lethal projectiles are equipped with sights for precision aiming, as shown in this photograph taken by Minchillo:



41.    On May 30, ~~Minnesota State Patrol troopers backed~~ Los Angeles Times reporter Molly Hennessy-Fiske and photographer Carolyn Cole ~~against a wall and fired tear gas and less lethal projectiles at them.~~ were reporting on protests at the Minneapolis Police Fifth Precinct building.[16]  The two were wearing their press credentials, and Cole

---

[15] https://twitter.com/johnminchillo/status/1267116569223725059

[16] The facts in paragraphs 40-44 are drawn in part from the Declaration of Carolyn Cole ("Cole Dec."), attached as Exhibit 2 to the First Amended Complaint, and the Declaration of Molly Hennessy-Fiske ("Hennessy-Fiske Dec."), attached as Exhibit 3 to the First Amended Complaint.

wore a flak jacket labeled "Press."TV."  They were standing on the sidewalk of a street bordering the Fifth Precinct building with a group of roughly 20 other journalists.  At around 8:30 p.m., a bullhorn announced, "this is the Minnesota State Patrol" and informed protesters that they must disperse because they were violating curfew.  A line of law enforcement officers proceeded up the street, clearing it of protesters.  Hennessy-Fiske, Cole, and the group of journalists huddled against a wall of the Fifth Precinct building that abutted the sidewalk.  Because they were journalists, they were exempt from the curfew.  Moreover, they were clearly separate from the protesters, who were on the opposite side of the street.  There was no legitimate law enforcement reason to force the group of journalists to move, let alone assault them.

42.    Hennessy-Fiske expected the law enforcement officers walking up the street to pass by the journalists.  Instead, the officers turned toward the journalists and started firing less-lethal projectiles into the group.  No protesters were nearby.  Hennessy-Fiske shouted "Press", "We're reporters!" "Wait!" and "Where do we go!" at the officers, and she waved her notebook at them before they fired.[17]  They asked the officers .[18]  The officers did not respond.  The officers were only several feet away at this point, and they fired again into the group of journalists.  Hennessy-Fiske was hit at least five times in the leg with less-lethal projectiles, and her leg was bleeding.  Cole was shot in the face with pepper spray.  The officer was firing from so close a distance, Cole could feel the full force of the pepper spray go into her left ear and eye.  Cole suffered damage to her left cornea

[17] https://twitter.com/mollyhf/status/1266979120686260224?s=20
[18] https://www.latimes.com/world-nation/story/2020-05-30/la-reporter-tear-gas-police

from the pepper spray.  She is currently unable to do her job as a photographer due to the injury.

43.     The journalists piled on top of each other in an attempt to get away from the police assault.  Hennessy-Fiske pleaded with the officers to tell her where to go but received no answer.  The officers just kept firing.  When theythe group of journalists tried to flee, the officers chased them and fired more less-lethal projectiles at them.  Hennessy-Fiske was bleeding and saw another reporterNBC photojournalist Ed Ou next to her, stunned and bleeding from the face.  Hennessy-Fiske stated she Hennessy-Fiske continued to flee the officers and they cornered her against another wall.  She scaled it and sought shelter in the nearest building, a senior center.

44.     The group of press that Cole was with also ran from the firing officers. They tried to move along the precinct wall, but it was not clear to where the officers wanted the journalists to go.  The officers were yelling "Move! Move!" and continued firing on the journalists.  Cole was unable to see, so she followed along the wall with the other journalists until they reached another wall that was about 4 feet high that she could not get over. The officers pursued the journalists into the corner yelling "Get out! Now!" Cole responded repeatedly, "I'm trying. I'm trying. I'm trying."   A patrol officer told Cole that she had to get out of there, lifted Cole up onto the wall, and Cole fell over to the other side.  Cole stumbled blindly through the neighborhood until local residents helped her and gave her a bucket to wash her face.  Because Cole's face continued burning, one of the local residents drove her to the emergency room along with Hennessy-Fiske, who had reconnected with Cole by this point.  While they were driving to the hospital, police fired a paint ball gun at

the car marking it with red paint.  Cole had to stop covering the protests at this point due to the injury to her eye.[19]

33.45. Hennessy-Fiske has covered protests involving police in Ferguson, Baton Rouge, Dallas, and Los Angeles, and.  She has covered the United States military in war zones, including Iraq and Afghanistan, but had.  But she has never been fired onat by police until her reporting in Minnesota.[20]  Cole has covered conflicts both nationally and internationally for many years.  She is familiar with the dangers involved in such situations, especially when reporters get between riot police and protesters. But she was shocked when the police directly attacked her and Hennessy-Fiske.  In fact, this was the first time in Cole's 25 years of reporting for the Los Angeles Times that she has been injured covering a protest or other event.

34.46. On May 30, Star Tribune reporters Ryan Faircloth and Chao Xiong were trying to leave the protests in Faircloth's car.  They mistakenly turned down a street that was blocked off at the end. Before they could turn around, the State Patrol fired less-lethal projectiles at the car, without warning.  Later, when Faircloth was driving alone out of the area, officers again fired less-lethal rounds at Faircloth's vehicle, injuring Faircloth and blowing out the windows of the car.[21]

---

[19] https://www.latimes.com/world-nation/story/2020-06-01/they-came-toward-us-firing-pepper-spray-and-rubber-bullets

[20] https://www.latimes.com/world-nation/story/2020-05-30/la-reporter-tear-gas-police
[21] https://twitter.com/RyanFaircloth/status/1266954131324928003

35.47. On May 30, freelance journalist Linda Tirado was photographing the protests when police or troopers shot her in the face with a less-lethal projectile.  She is now permanently blind in her left eye.[22]  "I would say there is no way that anyone had looked at me and not known that I am a working journalist," she stated in an interview with the New York Times.  "That said, police have been pretty clear that they don't care if you are a working journalist."

36.48. On May 30 Minneapolis Police fired less-lethal projectiles at CBS reporter Michael George and his news crew, hitting sound engineer John Marschitz and severely bruising hisMarschitz's arm.[23]  The crew was not standing within 500 feet of any protesters at the time and had their credentials displayed and their cameras out.[24]

37.49. On May 30, police or troopers fired less-lethal projectiles at an MSNBC news crew, including reporter Ali Velshi, hitting Velshi in the leg.[25]  After this incident, Velshi and another TV crew were confronted by police in a nearly deserted parking lot.  The group informed the police that they were news media.  The officers responded, "we don't care," and began firing on the group with less-lethal projectiles.

---

[22] https://www.nytimes.com/2020/05/30/us/minneapolis-protests-press.html
[23] https://twitter.com/MikeGeorgeCBS/status/1266919447970942986
[24] https://twitter.com/MikeGeorgeCBS/status/1266916104951214080
[25] https://www.washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482_story.html

50.    During the protests, a Fox 9 TV news crew was driving in their news van, with a placard placed on their windshield clearly indicating that the van belonged to Fox 9 News, when law enforcement fired less-lethal projectiles into the windshield, shattering it.

38.51.  On May 30, Reuters TV cameraman Julio-Cesar Chavez was filming police when one aimed a less-lethal projectile gun at directly at Chavez.  Later that evening, in a separate incident, police fired directly at Chavez and his crew with less-lethal projectiles.[26]  Chavez was hit in the back of his neck, under his left eye, and in his arm.  A member of his crew was also hit.  They were clearly identifiable as press at the time.[27]

39.52.  On May 30, photojournalist Lucas Jackson was pepper sprayed in the face and also shot in the back with a less-lethal projectile.[28]  LucasJackson stated in a social media post, "It's not that we were being shot because we were between cops and protesters.  It's that we were shot at if we were anywhere in line of sight.  I've been hit because I was in the wrong place before.  I've never been aimed at so deliberately so many times when I was avoiding it."[29]

40.53.  On May 30, CBC senior news correspondent Susan Ormiston was hit in the shoulder by a less-lethal projectile and in the back by a tear gas canister.  At the time she

---

[26] https://www.reuters.com/article/us-minneapolis-police-protest-update/reuters-camera-crew-hit-by-rubber-bullets-as-more-journalists-attacked-at-us-protests-idUSKBN237050
[27] https://www.washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482_story.html
[28] https://twitter.com/Lucas_Jackson_/status/1266666583012892672
[29] https://twitter.com/Lucas_Jackson_/status/1267114291532046338

was shot, she was in a parking lot that had been cleared of protesters, and she and her crew were clearly identifiable as media.[30]

41.54.  On May 30, Minneapolis Police fired a flash bang grenade directly into an MSNBC news crew led by reporter Morgan Chesky, despite the fact that Chesky was live on television and he and his crew were clearly identifiable as news media.[31]

55.    On May 30, NBC News photographer Ed Ou was pepper sprayed directly in the face from several feet away by State Patrol troopers and shot with a less-lethal projectile.[32]  Ou was standing out of the way of police, documenting the protests, and clearly identifiable as a member of the press, with his press badge out.  His own footage documents him stumbling down the sidewalk behind the front lines of the protest after this assault, bloody and blind, begging for help and identifying himself as a member of the press as he passes by several Minneapolis Police officers who ignore him.[33]

56.    On May 30, freelance videographer Mike Shum was again covering the protests for the New York Times.  In the early evening, around dusk, Minnesota State Patrol troopers began moving down a street on which Shum and several other journalists were standing, filming the protests.  Again, Shum was filming with a large shoulder mounted camera and clearly acting as a member of the news media.  As Minneapolis Police and State Patrol pushed down the block, firing tear gas and projectiles, Shum and other

---

[30] https://twitter.com/mcquillanator/status/1266915485741993996
[31] https://twitter.com/AndyRowell/status/1266946038373347328
[32] https://www.theguardian.com/us-news/2020/jun/06/george-floyd-protests-reporters-press-teargas-arrested
[33] https://twitter.com/edouphoto/status/1267981849537609728

journalists took shelter in a little gated area off the sidewalk.  Shum continued to film as the troopers approached, and then turned to try and escape this area when the troopers also left the sidewalk and pursued the journalists into the gated area where they were sheltering. By this time, it was clear to Shum that law enforcement was attacking journalists with impunity and he sought to escape the gated area.  Shum climbed onto a half wall, hoping if he got to the other side he would be protected from attack by the police.  As he climbed onto the wall, two State Patrol troopers approached and shoved him off the wall.  As they shoved Shum, one of the troopers said, "get the fuck off of there."  Shum fell to the ground on the opposite side of the wall and suffered several scratches, bruises, and cuts.  The officers who pushed Shum off the wall knew he was a journalist.  He was not among any protesters, was not impeding the advance of any law enforcement personnel and was merely seeking shelter with other journalists in this little enclosed area.

42.57. Among the munitions used against journalists were the 40mm Skat Shell (which is a delivery device for chemical agents) and the Direct Impact LE 40mm Extended Range Round.

43.58. According to Defense Technology, Inc., the manufacturer of the 40mm Skat Shell: "The 40mm Skat Shell® is designed for outdoor use and has fire producing capability. It is not intended for barricade penetration. Do NOT fire directly at personnel, as serious injury or death may result."[34]

---

[34] https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw66a06e0e/product-pdfs/less-lethal/40mm_Skat_Shell.pdf

44.59. Defense Technology, Inc., also manufactures the Direct Impact 40mm Extended Range Round. It states: "The Direct Impact® Extended Range Round should only be used at ranges beyond 10 meters, targeting the subject's lower torso or extremities. Impacts closer than 10 meters or targeting the subject's head, neck, or upper torso can result in serious injury or death."[35]

45.60. On information and belief, MPD and the Minnesota State Patrol fired both the Skat Shell and the Direct Impact Round at journalists in a manner contrary to the manufacturer's warnings and likely to cause injury, and in fact resulting in injury in numerous instances.

<u>USE OF CHEMICAL AGENTS</u>

61.     On May 28, Star Tribune columnist Jennifer Brooks was standing at a light rail station on S. 5th Street documenting the protests in a group of other media members. Several Minneapolis Police squad cars drove by unimpeded. As Squad Car 181 passed the journalists, the driver's side window rolled down and the driver indiscriminately pepper sprayed Brooks, other media members, and nearby protesters.[36]

62.     On May 29, USA Today reporter Tyler Davis was covering the protests in downtown Minneapolis. Several squad cars pulled up at his location. Police got out of the squad cars and began indiscriminately spraying pepper spray canisters in every

---

[35] https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw7cc762e7/product-pdfs/40mm%20Direct%20Impact%20LE%20Extended%20Range%20Round.pdf
[36] https://twitter.com/stribrooks/status/1266186985041022976

direction and telling people to move north.  Davis was filming two young women being
pepper sprayed to his left, when the officer doing the spraying turned to Davis.  Davis
identified himself as a member of the media, and the officer "laid on the trigger for a few
seconds" spraying Davis directly in the face.[37]

46.63.  On May 30, Minneapolis Police aimed a rifle directly at Vice magazine
journalist Michael Adams while Adams was covering the protests.  At the time, Adams
and other journalists clustered near him were holding up their press passes.   Shortly
thereafter, a Minneapolis Police officer approached Adams with a weapon pointed directly
at him and threw him to the ground.  He was displaying his press pass and shouting "press."
The officer responded, "I don't care."  Adams was on his knees, alone, clearly not a threat,
and was surrounded by more than a dozen officers.[38]  The officer who threw Adams down
told him not to move.  Adams complied.  Another officer slowly walked by Adams.  When
Adams again said, "I'm Press," and held up his credential, this officer casually pepper-
sprayed Adams directly in the face from several inches away, then continued strolling
while Adams writhed on the ground in agony.[39]

47.64.  KSTP investigative reporter Ryan Raiche, his photographer, and his
producer, were gathered together with a group of other media members during protests on
the evening of May 30 outside the Fifth Precinct.  Most had large cameras, boom mikes,

---

[37] https://www.usatoday.com/story/opinion/2020/05/29/george-floyd-protests-leave-usa-today-reporter-hit-chemical-spray/5282374002/
[38] https://twitter.com/MichaelAdams317/status/1267203751913422849
[39] https://twitter.com/MichaelAdams317/status/1266945268567678976?s=20

or visible press credentials.  The group was clearly identifiable as media.  They were pinned against a wall together as a police line advanced.  Police walked up to the group and indiscriminately pepper sprayed the entire group of journalists.[40]

48.    On May 28, Star Tribune columnist Jennifer Brooks was standing at a light rail station on S. 5th Street documenting the protests in a group of other media members.  Several Minneapolis Police squad cars drove by unimpeded.  As Squad Car 181 passed the journalists, the driver's side window rolled down and the driver indiscriminately pepper sprayed Brooks, other media members, and nearby protesters.[41]

49.    On May 29, USA Today reporter Tyler Davis was covering the protests in downtown Minneapolis.  Several squad cars pulled up at his location, police got out and began indiscriminately spraying pepper spray canisters in every direction and telling people to move north.  Davis was filming two young women being pepper sprayed to his left, when the officer doing the spraying turned to Davis.  Davis identified himself as a member of the media, and the officer "laid on the trigger for a few seconds" spraying Davis directly in the face.[42]

50.65.  On May 30, Star Tribune photographer Anthony Souffle was tear gassed by police or troopers.[43]

<u>USE OF THREATENING LANGUAGE AND GESTURES</u>

---

[40] https://twitter.com/ryanraiche/status/1267021649959845888
[41] https://twitter.com/stribrooks/status/1266186985041022976
[42] https://www.usatoday.com/story/opinion/2020/05/29/george-floyd-protests-leave-usa-today-reporter-hit-chemical-spray/5282374002/
[43] https://twitter.com/AnthonySouffle/status/1267122936105893892

51.   ~~On May 31, Minneapolis Police officers in a truck pulled up to a group of reporters, including Star Tribune reporter Andrew Mannix, pointed a "large gun" at the group and shouted, "do you know what curfew is?"   After notifying the officers that they were journalists and walking to their cars, the police ordered them to leave the area.~~[44]

~~52.~~66. On May 30, Star Tribune reporter Chris Serres was twice ordered at gunpoint by Minneapolis Police to "hit the ground," and warned that "if [he] moved an inch [he'd] be shot," despite prominently displaying his Star Tribune press badge for the police.[45]  He had already been tear gassed and shot in the groin with a less-lethal projectile earlier in the day.

~~53.~~67. Maggie Koerth, a reporter for the website FiveThirtyEight was covering the protests from a sidewalk on May 30.  A Minneapolis Police officer drew a weapon on Koerth and Plaintiff Jared Goyette.  Koerth and Goyette said "press, press" and held up their press badges.  The officer continued to point the gun at Koerth and told Koerth to "Shut up."[46]

~~54.~~68. On May 30, MPR reporter Madeleine Baran was covering the protests with American Public Media journalist Samara Freemark.  A Minneapolis police officer pointed a weapon at their heads.  When they identified themselves as press, the officer did not lower his weapon, so they ran for cover and ended their reporting for the night.[47]

---

[44] ~~https://twitter.com/AndrewMannix/status/1266968276481052672?s=20~~
[45] https://twitter.com/ChrisSerres/status/1267098060938776581
[46] https://www.nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html?smid=tw-share
[47] https://twitter.com/madeleinebaran/status/1266610933071138816

69.     On May 31, Minneapolis Police officers in a truck pulled up to a group of reporters, including Star Tribune reporter Andrew Mannix, pointed a "large gun" at the group and shouted, "do you know what curfew is?"   After notifying the officers that they were journalists and walking to their cars, the police ordered them to leave the area.[48]

55.70. Graphic images taken during the protests show the trauma wrought by Defendants' unconstitutional actions.

---

[48] https://twitter.com/AndrewMannix/status/1266968276481052672?s=20

56.71. Below is a photograph of NBC video and photojournalist Ed Ou, who was pepper sprayed and ~~shot~~hit with a less-lethal projectile:



57.72.  Below is a photograph of freelance journalist Linda Tirado.  The Minneapolis Police permanently blinded Ms. Tirado in her left eye with a less-lethal projectile.



58.73. Below is a photograph of KSTP reporter Ryan Raiche after being pepper sprayed despite identifying himself as a member of the press:



59.74. Below is a photo that Reuters cameraman Julio-Cesar Chavez took of police taking direct aim at him despite his being clearly identifiable as a member of the press:



60.75. Below is an image of the arrest of Omar Jimenez and his news crew:



61.76. Below are images published by Molly Hennesy-Fiske of the ~~kinds~~types of

less-lethal projectiles that law enforcement fired at journalists.





62.77. Below is a photograph of the injuries Molly Hennessy-Fiske suffered after law enforcement shot her with less-lethal projectiles:



**D.   NAMED-PLAINTIFF JARED GOYETTE.**

~~63.~~78. Plaintiff Jared Goyette is a freelance journalist.  At all times relevant to this Complaint, Plaintiff was working on assignment as a contract journalist with a national publication.

~~64.~~79. At around 5:00 p.m. on May 27, 2020, Plaintiff was observing and documenting the demonstrations near the MPD's Third Precinct, located at the intersection of Lake Street and Minnehaha Avenue.  MPD officers protecting the Third Precinct were firing ballistic rounds, marker rounds, and tear gas intermittently and without warning or orders for dispersal.

~~65.~~80. Plaintiff was clearly a member of the news media.  He carried a camera and a monopod (a single, long leg used to stand a camera on for stability), notepad, and mobile phone.   These items would have been visible to the MPD stationed on top of and outside the Third Precinct.

~~66.~~81. Plaintiff was standing 30 to 50 yards from the Third Precinct when he saw a young man who appeared to be severely injured.  Plaintiff went towards the man to document the incident.

~~67.~~82. Plaintiff was shot in the face with less-lethal ballistic ammunition shortly after other bystanders took the injured young man from the scene.  MPD provided no warning for this use of force.  Plaintiff was standing alone and there was no one else within several feet of Plaintiff.

~~68.~~83. Plaintiff suffered immediate physical injury to his nose and eye and, as a result, had to leave the scene and cease journalistic activities for the evening.   After

35

receiving medical treatment, Plaintiff ventured back to the demonstrations to continue to provide press coverage.

69.84. In the days after his injury, Plaintiff experienced several instances of intimidating and obstructive behavior from Defendants.  For example, he was told to "Shut up" by an officer after identifying himself as press.  In another instance, an officer passing by Plaintiff and another female reporter shouted at them, "I want to fucking peg you."

70.85. Plaintiff intends to continue documenting and reporting on additional protests and other First Amendment protected expression, and the police response to these protests.

**E.    NAMED-PLAINTIFF CRAIG LASSIG.[49]**

86.    Plaintiff Craig Lassig is a Minnesota resident and freelance photographer. He has been a freelancer since 2008, and his clients include AP, Reuters, the NY Times, and the European Pressphoto Agency ("EPA").  Prior to 2008, Lassig worked as a photographer for Sun Newspapers.

87.    On May 30, Lassig was covering the George Floyd protests for EPA, along with another EPA photographer, Tannen Maury, who had traveled to Minneapolis from Chicago to cover the protests with Lassig.  Another freelance photojournalist, Stephen Maturen, was with Maury and Lassig.

---

[49] The allegations in this section are drawn from the Declaration of Craig Lassig ("Lassig Dec."), attached to the First Amended Complaint as Exhibit 5.)

88.     Lassig, Maury, and Maturen were documenting protests occurring near the 5th precinct police station in Minneapolis, at 31st and Nicollet.  Early that evening, the police began to disburse the protesters, pushing them up 1st Avenue toward downtown.  Police fired tear gas and less-lethal projectiles, and shot protesters running away in the back.

89.     Because the situation had gotten violent, Lassig, Maury, and Maturen left the scene and proceeded up Nicollet Avenue to regroup and decide what to do next.  They stopped in the parking lot of a restaurant on Nicollet Avenue to discuss where they should go next.  They were nowhere near any protesters, and they were the only three individuals standing in the parking lot. Likewise, there were no police in sight.

90.     As they stood in the parking lot talking, several law enforcement vehicles drove down 28th Avenue in front of the restaurant.  One of the cruisers stopped and officers wearing blue shirts (apparently Minneapolis Police officers) got out.  Lassig, Maury, and Maturen all had their press badges displayed at the time, and all were carrying professional camera gear.  They verbally identified themselves as the media to the officers.  One officer said, "we don't fucking care," and ordered the group onto the ground.  They complied.  The officers handcuffed Lassig, Maury, and Maturen, searched all their belongings, and seized their photography gear.  Then they placed the three handcuffed journalists into a police van and drove them downtown.  The three journalists sat handcuffed in the van for about an hour.  Then they were booked, fingerprinted, and cited for violating the curfew.  After roughly two hours in custody total, they were released.

91.     Earlier that evening, Lassig and Maury had been with a larger group of journalists covering the protests near the Third Precinct, including an NBC film crew.

37

Lassig saw Minneapolis Police officers mace journalists, deliberately shoot journalists with less-lethal projectiles, and chase journalists, all of whom were clearly identified as journalists, were standing apart from the protesters, and were not obstructing or provoking the police.  Lassig was shocked at the aggressive and hostile attitude of the police toward journalists.

### F.      NAMED-PLAINTIFF CWA.

92.      Plaintiff The Communications Workers of America ("CWA") is an international labor union representing over 700,000 workers in a broad range of industries, including print and broadcast news media, telecommunications, airline, manufacturing, education, public service, and healthcare, among others.  CWA's central purpose is protecting the rights of workers through collective bargaining and public advocacy.  CWA's headquarters is in Washington, DC; its members work and live throughout the United States, including Minnesota.  CWA is comprised of multiple sectors and districts representing members in different industries.  The News-Guild CWA ("NewsGuild") is an affiliate union of the CWA.  NewsGuild represents journalists and media members across America.  The guild has roughly 14,000 dues paying members.  NewsGuild members include many on the reporting staff of the Los Angeles Times, the Chicago Tribune, the Detroit Free Press, the Denver Post, Reuters, the Associated Press, the Washington Post, the New York Times, the St. Paul Pioneer Press, and the Minneapolis Star Tribune, among others.  (Declaration of Jon Schluess ("Schluess Dec.") ¶ 1-2 (attached as Exhibit 4 to the First Amended Complaint).)

93.     Many of the individual reporters and photojournalists affected by police violence and intimidation against the news media at the George Floyd protests are represented by the NewsGuild (and by extension the CWA), including all of the Star Tribune journalists mentioned by name in this Complaint.  Los Angeles Times journalists Molly Hennessy-Fiske and Carolyn Cole, who were shot with pepper spray and less-lethal projectiles as described in paragraphs 40-44 above, are also NewsGuild members.  (Cole Dec. ¶ 1; Hennessy-Fiske Dec. ¶ 1.)

94.     Because some of the NewsGuild's affected members, and their news organizations, report on the Minneapolis Police and Minnesota State Patrol as part of their journalism, ethical considerations that guide reporting make directly suing those organizations as individual plaintiffs complicated if not impossible.  (Schluess Dec. ¶ 4.)

95.     Article I, Section 2 of the NewsGuild-CWA Constitution provides:

> SECTION 2. The purpose of the Guild shall be to advance the economic interests and to improve the working conditions of its members; to guarantee, as far as it is able, equal employment and advancement opportunity in the industry and constant honesty in news, editorials, advertising, and business practices; to raise the standards of journalism and ethics of the industry; to foster friendly cooperation with all other workers; and to promote industrial unionism in the jurisdiction of the Guild.

96.     And Article III of the CWA Constitution likewise provides:

> The objects of the Union shall be: (a) To unite the workers within its jurisdiction in a single cohesive labor union for the purpose of collective effort; (b) To improve the conditions of the workers with respect to wages, hours, working conditions and other conditions of employment; (c) To disseminate information among the workers respecting economic, social, political and other matters affecting their lives and welfare; (d)

To advance the interests of the workers by advocating the enactment of laws beneficial to them and the defeat or repeal of laws detrimental to them; (e) To do all things which may be necessary or proper to secure for the workers the enjoyment of their natural rights.

97.    These foundational provisions of the international labor union and its sector Constitutions undergird CWA's participation in this lawsuit.  Essentially, they provide that all CWA members, including NewsGuild-CWA members, agree to work together, through the auspices of their union, to ensure that members work under safe and lawful conditions. (Schluess Dec. ¶ 7.)

98.    NewsGuild-CWA members have been targeted by the recent police violence in Minneapolis.  Members have had their speech chilled.  And Members have been assaulted and injured by both Minneapolis Police and the Minnesota State Patrol, and been subjected to other unconstitutional conduct by those agencies and their principals.

**MUNICIPAL ALLEGATIONS**

71.99.   The City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo, Minneapolis Police Lieutenant Robert Kroll, Minnesota Department of Public Safety Commissioner John Harrington, and Minnesota State Patrol Colonel Matthew Langer, in their official capacities (the "State and Municipal Defendants") each have policies and customs of violating the constitutional rights of members of the press.

100.   The State and Municipal Defendants have been operating in close concert and in coordination during the protests.

72.101.    The State and Municipal Defendants each have a custom or policy of deploying chemical agents and injurious, less-lethal ballistics against members of the news

media.  For example, both chemical agents and less-lethal ballistics were fired at the news media from the roof of the Minneapolis Police Department's Third Precinct Police Station by officers detailed to the roof during the protest.  Photographs of the injuries intentionally inflicted on the news media by these shots fired from the Third Precinct roof were published in the international press.

~~73.~~102.       The State and Municipal Defendants each have a custom or policy of failing to provide warnings and/or dispersal orders before using chemical agents and injurious, less-lethal ballistics against protesters and members of the news media.

~~74.~~103.       The State and Municipal Defendants each have a custom or policy of arresting or detaining news media lawfully reporting on protests and other First Amendment expressive activity.

~~75.~~104.       After the barrage of international criticism arising out of its illegal detention of Jimenez and his crew, the State Patrol issued the following statement: "In the course of clearing the streets and restoring order at Lake Street and Snelling Avenue, four people were arrested by State Patrol troopers, including three members of a CNN crew. The three were released once they were confirmed to be members of the media."  Of course, it was obvious from the outset that these individuals were members of the media, no threat, and sought to accommodate the State Patrol in its mission.  Arresting them had nothing to do with "restoring order" and everything to do with retaliating against and intimidating the press.

41

76.105.     On information and belief, the MPD has not investigated, disciplined, or suspended any officer involved in any of the unlawful conduct described in this Complaint.

77.106.     The State and Municipal Defendants have a history of unconstitutional actions against journalists.

78.107.     For example, in 2002, the Minnesota Daily (the University of Minnesota student newspaper) filed a complaint with the MPD's Internal Affairs Division related to officer actions against student journalists during a riot following a University of Minnesota Hockey championship victory.   According to written statements in the complaint, a photographer was pushed to the ground from behind and kicked in the back. When a reporter went to help the photographer, she was sprayed directly in the face with chemical irritant.  Two other photographers were sprayed in the face with chemical irritant and hit repeatedly with a riot stick. Two photographers had press passes displayed in the middle of their chests, and the others told police officers they were members of the press, according to the complaint.[50]  On information and belief, none of the officers involved in this conduct were disciplined pursuant to this investigation.[51]

79.108.     In 2008, Amy Goodman, host of "Democracy Now!", and her crew were arrested during the Republican National Convention in St. Paul, despite posing no

---

[50]https://archive.nytimes.com/www.nytimes.com/uwire/uwire_JOIN042420022302015.html

[51] https://splc.org/2002/08/students-await-word-on-probe-into-police/

**Formatted:** Space After:  0 pt

threat and complying with police orders.[52]  Defendant John Harrington, then St. Paul Police

Chief, brushed off the First Amendment concerns.

80.109.    In 2017, the Minnesota State Patrol arrested City Pages journalist

Susan Du and Minneapolis Daily City Editor David Clarey during the protests following

the Philando Castile killing.  Du's phone, camera, keys, notes, and laptop were seized.  The

State Patrol detained Du and Clarey for nine hours, even though they had attempted to

comply with officers' directions to disperse.  Du and Clarey had identified themselves as

members of the press but were detained nonetheless.  On information and belief, no

troopers were investigated or disciplined for these unlawful arrests.

81.    The State and Municipal Defendants have been operating in close concert

and in coordination during the protests.

82.110.    Defendants have a history of deficient or non-existent training with

respect to the Constitution in general and Plaintiff's First Amendment rights in particular.

83.111.    For example, the Minneapolis Police Policy and Procedure Manual

Section 6-200 provides:

> MPD employees shall not unnecessarily obstruct news media
> personnel from performing their duties at emergency scenes.
> However, news media will not be allowed to cross police lines,
> which are set up to protect a crime scene. Members of the
> media must follow all municipal, state, and federal statutes.
> Media can be restricted from an area where their presence can
> jeopardize police operations. Only the ranking on-scene officer
> may grant news media representatives access to any area
> closed because of investigation or health and safety hazards.

---

[52] https://www.minnpost.com/politics-policy/2008/09/amy-goodmans-arrest-when-journalists-are-story/

The manual provides no other instruction or guidance on how to identify the media or ensure their First Amendment rights are respected.  It does not discuss how to safeguard press freedoms at protests, and Section 6-200 does not appear to have been updated since 2008.

84.112.    The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to First Amendment protected activity amounts to a deliberate indifference to the rights of the Class Members.

85.113.    Defendant Kroll is both a Lieutenant in the Minneapolis Police Department and also the president of the Minneapolis Police Federation, the union that represents Minneapolis police officers.  Kroll's supervisory role is significantly amplified by his position as Federation president.  Kroll acts as an unofficial policymaker within the MPD.  The MPD's customs and practices derive not just from the command structure within the department, but also informally from Kroll, who acts as a *de facto* policy maker for a cadre of officers in the department.  Kroll actively sows discord between rank-and-file officers and the command structure as a means of further amplifying his policy role and exercising an outsize influence over police culture.  What Kroll casts as his "opinions" as union president have the practical effect of serving as policy guidance for officers, which aggravates the training and supervision failures described above.

44

86.114.      On June 2, 2020, Kroll released a statement to Federation members that underscores his role as *de facto* policymaker and his failure to supervise with respect to the particular First Amendment issues described in this Complaint.[53]

87.115.      Kroll's June 2 statement seeks to drive a wedge between rank-and-file officers and MPD leadership:

> "No one with the exception of [Kroll and the Federation board] is willing to recognize and acknowledge the extreme bravery you have displayed throughout this riot."

> "What has been very evident throughout this process is you have lacked support from the top."

> "I've noted in press conferences from our mayor, our governor, and beyond, how they refuse to acknowledge the work of MPD and continually shift blame to it.  It is despicable behavior.  How our command staff can tolerate it and live with themselves I do not know."

> "Your federation board will not remain silent.  It's important for us to get order restored and safety resumed.  We do have a lot to say about failed leadership when the time is right.  We've been formulating plans for that."

88.116.      Kroll's statement also flags both his outsized supervisory role and his failure to supervise.  In it, he speaks of himself as though he, and not Chief Arradondo, leads the department, and he ratifies the rampant unconstitutional conduct detailed below:

> "Although I have not been visibly present, I am closely monitoring what is occurring.  I commend you for the excellent police work you are doing . . ."

> "I've had numerous conversations with politicians at the state level.  I gave a detailed plan of action including a range of 2000

---

[53] https://twitter.com/ChiefHarteau/status/1267460683408564225/photo/1

> to 3000 National Guard, their deployment allocations throughout our city and St. Paul, in a phone meeting with Senate majority leader Paul Gazelka."

> "I've worked with other police leaders from New York to Las Vegas to push our messaging on a national level."

89.117.    Kroll's statement scapegoats the "liberal media," accusing the press of somehow preventing him from being more vocal, and explicitly tying media coverage to danger to the rank-and-file police officers and to Kroll himself, statements which constitute incitement against the press given the current climate of unrest:

> "I've been a visible target from the groups conducting this riot, politicians on the left allowing it and encouraging it, and liberal media.  My visibility during this time would only increase your danger.  I've received countless death threats throughout this."

90.118.    Former Minneapolis Police Chief Janee Harteau responded to the Kroll statement by stating: "A disgrace to the badge!  This is the battle that myself and others have been fighting against.  Bob Kroll turn in your badge!"[54]

91.119.    Notably, Kroll has a long history of racist and inflammatory statements and conduct, from calling Attorney General (then Congressman) Keith Ellison a "terrorist" for calling for police reform, to his membership the City Heat motorcycle club, an organization called out by the Anti-Defamation League for displaying white supremacist symbols.  KrollKroll's misconduct was even suedcalled out in a section 1983 action by current Chief Arradondo and several other plaintiffs.

---

[54] https://twitter.com/ChiefHarteau/status/1267460683408564225

**Formatted:** Space After:  0 pt

120.    The State and Municipal Defendants are fully cognizant of the constitutional rights they are failing to protect.

121.    Nonetheless, the rank-and-file have either been explicitly told to disregard those rights, or there has been a failure of command to supervise and discipline rank-and-file officers regarding violations of those rights.

122.    Minneapolis Police officer David Pena displayed the rank-and-file's attitude towards the media in Facebook posts commenting on the First Amendment violations that occurred during the protests:[55]

---

[55] http://citypages.com/news/minneapolis-police-officer-urges-looting-of-cedar-riverside-arresting-press/571046391



123.   Consistent with Officer Pena's flippant attitude toward the unlawful arrest of Omar Jimenez and his crew, police officers and state troopers responded with profanity and verbal abuse when members of the press identified themselves as such in the midst of the unconstitutional acts described above, stating, among other things: "I don't care;" "we don't fucking care;" "shut up;" "if you move an inch you'll be shot;" "Roll on your side,

Mr. Journalist.  You're going to be charged;" "we don't care, we'll arrest you;" "Your [press badges] are bullshit;" "Do you know what curfew is?" and "I want to fucking peg you."

~~92.~~124.    Officers either do not know, or do not care, about the press's First Amendment rights.  Or, as is apparently the case with Officer Pena, they are actively hostile toward those rights.  Regardless, this state of affairs reflects either an unconstitutional policy and practice regarding the rights of the press, or a failure to train and supervise regarding the rights of the press.

## CLASS ALLEGATIONS

~~93.~~125.    Under Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for prospective relief on behalf of themselves and other similarly situated people who, as members of the news media[56], will in the future observe and record protest activity and the conduct of law enforcement officers on duty in public places within the cities of Minneapolis and Saint Paul in traditional or designated public fora (the "Plaintiff Class"). The Plaintiff Class is defined as:

> All members of the news media, as the term is used in Emergency Executive Order 20-69, who intend to engage in news gathering or reporting activities in Minnesota related to the protest activities that followed the death of George Floyd and the law enforcement response to those protests.

---

[56] The term "members of the news media" is used in the Curfew Orders as well as the May 29, 2020 City of Minneapolis Emergency Regulation No. 2020-2-1.

94.126.     The Plaintiff Class is so numerous that joinder of all the members would be impracticable.  Hundreds of members of the news media are in Minneapolis and Saint Paul to cover the protests that followed Mr. Floyd's murder and the aftermath.

95.127.     As a result of the State and Municipal Defendants' customs and policies of arresting members of the news media, targeting them with less-lethal projectiles and chemical irritants without constitutionally adequate justification or warning, denying them freedom of movement to observe and record public demonstrations and law enforcement officers on duty, and intimidation by threats of violence, the Plaintiff Class have been and will continue to be deprived of their constitutional rights under the First, Fourth, and Fourteenth Amendments.

96.128.     Plaintiff'sPlaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class because Protestsprotests are ongoing and PlaintiffPlaintiffs and the Plaintiff Class members have a reasonable fear that Defendants will continue to carry out their unconstitutional customs or policies of deploying less-lethal projectiles and chemical irritants without constitutionally adequate warning, denying them freedom of movement to observe and record public demonstrations and law enforcement officers on duty, and intimidation by threats of violence.

97.129.     PlaintiffPlaintiffs will fairly and adequately protect the interests the interests of the Plaintiff Class.  Plaintiff hasPlaintiffs have no conflicts involving other class members or Defendants.  PlaintiffPlaintiffs understands histheir role as a class representativerepresentatives and histheir duties to the class in this litigation.  Plaintiff

~~is~~Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

~~98.~~130.      Questions of law or fact are common to the class.  These legal and factual questions include but are not limited to:

    a.    Do arrests and targeting of journalists through a series of common methods violate the First, Fourth, and Fourteenth Amendments?

    b.    Are the State and Municipal Defendants liable for implementing an unlawful policy or custom as set forth under principles of municipal liability?

    c.    Have the State and Municipal Defendants manifested a failure to properly train and supervise their agents and officers?

    d.    Have the State and Municipal Defendants exhibited a deliberate indifference to the unconstitutional conduct alleged herein?

~~99.~~131.      Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards for law enforcement would be entirely untenable. Doing so would only contribute to a state of uncertainty and confusion that allows the constitutional violations described in the complaint to continue.

~~100.~~132.      This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other

members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(A). A ruling

with respect to a single Plaintiff in this case would arguably be strong stare decisis—if not

necessarily res judicata—with respect to other putative class members and members of the

law enforcement community. There is no benefit to allowing the overwhelmingly common

issues in this case to be litigated individually. The interests of both class members and

defendants requires classwide treatment.

~~101.~~133.    Finally, "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P.

23(b)(1)(A). There is no allegation that ~~Plaintiff has~~Plaintiffs have been targeted because

of anything unique to ~~him~~them as ~~an individual.~~individuals. Rather, ~~he has~~they have been

repeatedly targeted because of ~~his~~their membership in a class of journalists.

~~Plaintiff's~~Plaintiffs' targeting exists only by virtue of a broader pattern and practice of

unconstitutional conduct directed at journalists as a class. Logically, injunctive relief for

the "class as a whole" is the only mechanism available to afford relief in light of conduct

directed specifically to the class.

**<u>CAUSES OF ACTION</u>**

**COUNT I:**
**First Amendment—Retaliation, 42 U.S.C. § 1983**

1.    ~~Plaintiff~~Plaintiffs and the Plaintiff Class restate and reallege all previous

paragraphs of this Complaint.

2.     ~~Plaintiff~~Plaintiffs  and  the  Plaintiff  Class  engaged  in  constitutionally protected  acts  of  observing  and  recording  events  of  public  interest,  including  public demonstrations and the conduct of law enforcement officers on duty in a public place. ~~Plaintiff~~Plaintiffs and the Plaintiff Class will continue to do so in the future to cover the events related to the protests and law enforcement's response.

3.     Defendants  retaliated  against  ~~Plaintiff~~Plaintiffs  and  the  Plaintiff  Class  for engaging in constitutionally protected activity. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

4.     Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

5.     These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill ~~Plaintiff~~Plaintiffs and the Plaintiff Class from continuing to observe and record some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place.

6.     It was the State and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

7.     The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the First Amendment rights of ~~Plaintiff~~Plaintiffs and

the Plaintiff Class, including a failure to investigate and discipline officers for First Amendment violations, amounts to deliberate indifference to the rights of ~~Plaintiff~~Plaintiffs and the Plaintiff Class.

8.      The pattern of similar constitutional violations against ~~Plaintiff~~Plaintiffs and the Plaintiff Class that occurred during the Floyd protests demonstrates the deliberate indifference of the State and Municipal Defendants to the rights of ~~Plaintiff~~Plaintiffs and the Plaintiff Class.

9.      Further, given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State and Municipal Defendants demonstrated their deliberate indifference to the need for such training and supervision.

10.     Plaintiff Goyette's First Amendment rights were violated when he was deliberately targeted and shot with a ~~rubber bullet~~less-lethal projectile during the course of his reporting activities.

11.     ~~Plaintiff~~Plaintiff Lassig's First Amendment rights were violated when police arrested him without probable cause and despite Lassig identifying himself as a member of the press.

~~11.~~12. Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future if they continue to observe, record, or participate in constitutionally protected activity.

**COUNT II:**
**Fourth Amendment—Unlawful Seizure and Excessive Force**

12.13. ~~Plaintiff~~Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

13.14.  ~~Plaintiff~~Plaintiffs and the Plaintiff Class were seized by Defendants when their officers intentionally, through the use of force and threat of arrest, chemical agents, and nonlethal projectiles, terminated their freedom of movement.  For example, a newscaster was prevented from traveling from Saint Paul to Minneapolis;[57]

14.15. Members of the Plaintiff Class were also seized by Defendants when they were arrested and detained.

16.    Plaintiff Lassig's Fourth Amendment rights were violated when he was detained, booked, and cited for curfew violation without probable cause and after identifying himself as a member of the news media.

15.17. Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

16.18. ~~Plaintiff~~Plaintiffs and the Plaintiff Class did not commit a crime, because as members of the news media, they were specifically exempted from the Curfew Orders and permitted to cover the protests outside the restricted times.

17.19. ~~Plaintiff~~Plaintiffs and the Plaintiff class did not pose a threat to any of Defendants' officers or agents or any other person.

---

[57] https://twitter.com/JohnCroman/status/1266954423147864067?s=20

18.20. It was the State and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

19.21. The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiff Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiff Plaintiffs and the Plaintiff Class.

20.22. The pattern of similar constitutional violations against Plaintiff Plaintiffs and the Plaintiff Class that occurred during the Floyd protests demonstrates the deliberate indifference of the State and Municipal Defendants to the rights of Plaintiff Plaintiffs and the Plaintiff Class.

21.23. Further, given the pattern and practice of constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State and Municipal Defendants demonstrated their deliberate indifference to the need for such training and supervision.

22.24. Plaintiff Goyette's Fourth Amendment rights were violated when he was deliberately targeted and shot with a rubber bullet during the course of his reporting activities.

56

23.25. PlaintiffPlaintiffs and the Plaintiff Class reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

**COUNT III:**
**Fourteenth Amendment—Procedural Due Process**

24.26. PlaintiffPlaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

25.27. The Due Process rights of PlaintiffPlaintiffs and the Plaintiff Class were violated when the State and Municipal Defendants, through their officers and agents, arrested members of the Plaintiff Class without probable cause, and deployed chemical agents and nonlethal projectiles without providing a warning and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

26.28. The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the Due Process rights of PlaintiffPlaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Fourteenth Amendment violations, amounts to deliberate indifference to the rights of PlaintiffPlaintiffs and the Plaintiff Class.

27.29. The pattern of similar constitutional violations against PlaintiffPlaintiffs and the Plaintiff Class that occurred during the George Floyd protests demonstrates the deliberate indifference of the State and Municipal Defendants to the rights of PlaintiffPlaintiffs and the Plaintiff Class.

28.30.  Further, given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State and Municipal Defendants demonstrated their deliberate indifference to the need for such training and supervision.

29.31.   Plaintiff Goyette's Fourteenth Amendment rights were violated when he was deliberately targeted and shot with a rubber bullet during the course of his reporting activities.

32.     Plaintiff Plaintiff Lassig's Fourteenth Amendment rights were violated when he was detained, arrested, and cited for a curfew violation despite a lack of probable cause for the arrest and after he had identified himself as a member of the news media.

30.33. Plaintiffs and the Plaintiff Class reasonably fear further violation of the right to due process in the future if they observe, record, or participate in constitutionally protected activity.

## PRAYER FOR RELIEF

WHEREFORE,     Plaintiff Plaintiffs,     individually     and     as     a representative representatives of the class defined herein, prays pray for relief as follows:

A.   A temporary restraining order barring Defendants from engaging in unconstitutional conduct targeting journalists, as set forth in the proposed order accompanying Plaintiff's Plaintiffs' motion for a temporary restraining order.

B.   A preliminary injunction barring Defendants from engaging in unconstitutional conduct targeting journalists, as set forth in the proposed order accompanying Plaintiff's Plaintiffs' motion for a temporary restraining order.

C. A determination that this action may proceed as a class action under Rule 23(b)(1) or 23(b)(2) of the Federal Rules of Civil Procedure;

D. Designation of ~~Plaintiff~~Plaintiffs as Class Representative and designation of ~~Plaintiff's~~Plaintiffs' counsel as class counsel;

E. A declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments of the U.S. Constitution;

F. A permanent injunction barring Defendants from engaging in unconstitutional conduct targeting journalists, as set forth in the proposed order accompanying ~~Plaintiff's~~Plaintiffs' motion for a temporary restraining order;

G. Damages compensating ~~Plaintiff~~Plaintiffs for ~~his~~their injuries, including but not limited to compensatory, pecuniary, and medical expense damages;

H. An award of pre-judgment interest;

I. An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

J. An award of such other and further relief as the Court deems equitable and just.

## **JURY DEMAND**

~~Plaintiff demands~~ Plaintiffs demand a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

59

Dated: ~~June 2, 2020~~June 7, 2020 /s/ Kevin C. Riach

Kevin C. Riach (#0389277)
Dulce J. Foster (#0285419)
Pari I. McGarraugh (#0395524)
Jacob P. Harris (#0399255)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
kriach@fredlaw.com
dfoster@fredlaw.com
pmcgarraugh@fredlaw.com
jharris@fredlaw.com

*Attorneys for Plaintiffs Goyette and Lassig*

Adam W. Hansen (#0391704)
**APOLLO LAW LLC**
333 Washington Avenue North, Suite 300
Minneapolis, MN 55401
Telephone: 612.927.2969
adam@apollo-law.com

*Attorneys for Plaintiffs*

Teresa Nelson (#269736)
**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Telephone: 651.529.1692
tnelson@aclu-mn.org

***Attorneys for*** ~~*Plaintiff*~~***Plaintiffs***

> Formatted: Hyperlink

60