UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Jared Goyette, Craig Lassig, and The Communications Workers of America, on behalf of themselves and other similarly situated individuals, | Case No. 20-cv-1302 (WMW/DTS) |
| Plaintiffs, | |
| v. | **ORDER DENYING PLAINTIFF JARED GOYETTE'S MOTIONS FOR CLASS CERTIFICATION AND TEMPORARY RESTRAINING ORDER** |
| City of Minneapolis; Medaria Arradondo, Minneapolis Chief of Police, in his individual and official capacity; Robert Kroll, Minneapolis Police Lieutenant, in his individual and official capacity; John Harrington, Minnesota Department of Public Safety Commissioner, in his individual and official capacity; Matthew Langer, Minnesota State Patrol Colonel, in his individual and official capacity; and John Does, 1-2, in their individual and official capacities, | |
| Defendants. | |

---

Plaintiff Jared Goyette, a freelance journalist, filed this putative class-action lawsuit against Defendants, challenging the treatment by law enforcement officers of members of the news media reporting on the events in Minneapolis following the tragic death of George Floyd.[1] Before the Court are Goyette's Motion to Certify Class and Motion for Temporary

---

[1] Goyette filed an amended complaint on June 8, 2020, the day on which the Court held the hearing on Goyette's motions for a temporary restraining order and class certification. The amended complaint adds two Plaintiffs: Craig Lassig and The Communications Workers of America. Because Goyette's motions and accompanying argument are premised on the allegations as stated in the initial complaint, and because

Restraining Order. (Dkts. 2, 5.) For the reasons addressed below, Goyette's motions are denied without prejudice.

## BACKGROUND

On May 25, 2020, George Floyd died as a result of an encounter with four officers of the Minneapolis Police Department (MPD). Video of the encounter captured by bystanders shows MPD officers placing Floyd, who is black, in handcuffs and pinning him to the ground face down, while then-officer Derek Chauvin knelt on Floyd's neck. Floyd and several bystanders pleaded with Officer Chauvin to change his position to allow Floyd to breath. Officer Chauvin refused and continued to kneel on Floyd's neck for several minutes after Floyd became unresponsive. Video of the encounter circulated rapidly, and hundreds of justifiably angry citizens began protesting in Minneapolis and Saint Paul, as well as nationally and around the world.

On May 26, 2020, despite mostly peaceful demonstrations, protesters at the MPD's 3rd Precinct building vandalized police vehicles with graffiti and targeted the precinct building where the officers involved in bringing about Floyd's death were assigned. Law enforcement officers used foam projectiles and tear gas in an effort to repel some of the protestors. Again, on May 27, 2020, hundreds of people protested in Minneapolis. While covering the protests at the 3rd Precinct, Goyette witnessed a projectile fired by MPD officers near the precinct building hit a young male protester in the head. As Goyette was documenting bystanders assisting the injured protester, Goyette was hit in the head with a

---

Defendants did not have a fair opportunity to address the amended complaint, the Court declines to consider the amended complaint for purposes of the instant motions.

projectile. A moment later, a canister of tear gas landed nearby, making it impossible for Goyette to see. Goyette maintains that he was clearly identifiable as a member of the news media as he carried a large camera, monopod, and notebook. That same evening, an auto parts store near the 3rd Precinct building was set on fire, and other nearby stores were looted and vandalized. In total, the Minneapolis Fire Department responded to approximately 30 fires related to the protests that evening, during which some fire trucks attempting to respond were hit with rocks and other projectiles.

On May 28, 2020, MPD officers abandoned the 3rd Precinct building, which was set on fire by protesters. The fire department was unable to respond the 3rd Precinct building fire, and others nearby, because of safety concerns. The Saint Paul Police Department reported dozens of fires and more than 170 damaged or looted businesses.

On May 29, 2020, Minnesota Governor Tim Walz announce that the state would restore order, calling on the resources of the Minnesota State Patrol, other state agencies, and the Minnesota National Guard. Governor Walz implemented an emergency executive order imposing a nighttime curfew in Minneapolis and Saint Paul. *See* Minn. Exec. Order No. 20-65 (May 29, 2020). All "members of the news media" were exempted from the curfew. *Id.* The curfew was disregarded by many, and individuals hiding among otherwise peaceful protesters continued to commit acts of looting, vandalism, and arson.

On May 30, 2020, the largest deployment of the Minnesota National Guard in state history was mobilized, along with the State Patrol and local law enforcement officers, to restore order. They moved aggressively to disperse protesters who remained out after the

curfew. On May 31, 2020, law enforcement officers arrested approximately 150 people near downtown Minneapolis for disregarding the curfew.

Goyette filed this action on June 2, 2020, and contemporaneously moved for a temporary restraining order and for class certification. Goyette's complaint asserts three causes of action arising under 42 U.S.C. § 1983 for alleged violations of the United States Constitution: (1) retaliation for exercising rights protected by the First Amendment, (2) unlawful seizure and excessive force in violation of the Fourth Amendment, and (3) violations of procedural due process rights protected by the Fourteenth Amendment.

In support of his motion for a temporary restraining order, Goyette contends that "the MPD and the State Patrol have engaged in alarming, aggressive tactics to harm and intimidate credentialed, or otherwise identifiable members of the news media providing on-the-scene coverage" of the events following Floyd's death. Goyette alleges that several members of the news media, after identifying themselves as members of the press, have been arrested, threatened, shot with rubber bullets, or subjected to chemical irritants. Goyette alleges four specific incidents involving the Minnesota State Patrol and members of the news media, none of which involved Goyette. Goyette alleges twelve specific incidents involving the MPD and members of the news media, including the incident in which Goyette was hit with a projectile on May 27, 2020. Goyette alleges ten additional incidents in which the law enforcement agency involved is ambiguous or unspecified. As a result of these encounters, Goyette argues that members of the news media "have a reasonable fear that Defendants will continue to carry out their unconstitutional customs or

policies of deploying less-lethal projectiles and chemical irritants without constitutionally adequate warning."

According to Minnesota State Patrol Colonel Matthew Langer, the Minnesota State Patrol has not used chemical irritants or less-lethal munitions to try to maintain order and safety since May 31, 2020. Langer also declares that the Minnesota State Patrol does not have a practice or policy of targeting or harassing members of the news media. And, according to Langer, the Minnesota State Patrol gave dispersal orders before deploying chemical irritants or less-lethal munitions during its attempts to secure any area. Likewise, MPD Commander Scott Gerlicher declares that no tear gas or less-lethal munitions have been used by the MPD since May 31. Gerlicher asserts that he did not approve the use of threats, intimidation, or force against any member of the news media specifically because the individual was a member of the news media, nor did any other incident commander. MPD officers have discretion to use "marking rounds" or "foam rounds," but only in situations in which there is an imminent threat to life or safety. If individuals claiming to be members of the news media were arrested in the process of controlling crowds, the MPD released them once they were identified as members of the news media. Defendants assert that, from June 1, 2020, through Friday, June 5, 2020, there have been no major incidents of rioting, vandalism, looting, or arson.

## ANALYSIS

### I.   Motion for Temporary Restraining Order

Goyette seeks to prevent Defendants from taking certain actions against individuals who have "identified themselves as a member of the news media or [when] it is reasonably

5

clear that the individual is engaged in news gathering activities." Goyette seeks to enjoin Defendants from taking the following actions against such individuals: (1) the use of a chemical agents including but not limited to mace, pepper spray, and tear gas; (2) the use of any physical force, including but not limited to non-lethal projectiles; (3) the arrest, detention, or taking into custody of any person except as justified by probable cause for arrest; and (4) the use of threating language or gestures to harass or intimidate. The prohibitions that Goyette seeks would not apply to circumstances in which members of the news media present an imminent threat of violence or bodily harm to persons or damage to property.

Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of a temporary restraining order. When determining whether a temporary restraining order is warranted, a district court considers the four *Dataphase* factors: (1) the threat of irreparable harm to the movant, (2) the probability that the movant will succeed on the merits, (3) the balance between this harm and the injury that an injunction would inflict on other parties, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The purpose of a temporary restraining order is to maintain the status quo. *Kelley v. First Westroads Bank*, 840 F.2d 554, 558 (8th Cir. 1988). The burden rests with the moving party to establish that injunctive relief should be granted. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Preliminary injunctive relief is an extraordinary remedy that is never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Because the "failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction," *Novus*

*Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013) (internal quotation marks omitted), the Court begins its analysis with this *Dataphase* factor.

Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality). But to establish the need for injunctive relief because of irreparable harm, the movant "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising*, 725 F.3d at 895 (internal quotation marks omitted); *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015). A mere "possibility of harm" is insufficient. *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

Here, Goyette moved for a temporary restraining order on June 2, 2020, seeking to enjoin Defendants from arresting and threatening members of the news media, and from using chemical irritants or physical force, including less-lethal munitions, against members of the news media. But Goyette does not allege that any of the conduct that he seeks to enjoin—occurring over a five-day period of unprecedented civil unrest—has occurred

7

since May 31, 2020, or facts that plausibly demonstrate that such conduct is likely to recur imminently. Commander Gerlicher and Colonel Langer have declared that the MPD and Minnesota State Patrol have used neither chemical irritants nor less-lethal munitions since May 31, 2020, and these assertions are uncontroverted.[2] It is Goyette's burden to establish the threat of irreparable harm. But Goyette's brief does not even address this *Dataphase* factor.[3] As a result, Goyette has not established that harm is certain and of such imminence that there is a clear and present need for equitable relief.[4]

---

[2]     At the June 8, 2020 hearing, neither party claimed that MPD or Minnesota State Patrol has used chemical irritants or less-lethal munitions since May 31, 2020 against the news media or anyone else for crowd control.

[3]     Goyette contends that, when a plaintiff's First Amendment rights are at stake, demonstrating a likelihood of success on the merits is all that is needed to warrant an injunction. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) ("When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." (quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011), *vacated on reh'g*, 705 F.3d 845 (8th Cir. 2012))). The cases on which Goyette relies involve movants seeking to enjoin enforcement of a *statute* restricting speech, a circumstance in which demonstrating a likelihood of success on the merits of the movants' First Amendment claim would generally establish a likelihood of irreparable harm. But that does not obviate the requirement of a movant to show a threat of irreparable harm. "[W]here a duly enacted statute is involved, a likelihood of success on the merits may be characterized as one, but not the only, threshold showing that must be met by a movant for a preliminary injunction." *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 n.5 (8th Cir. 2008); *accord Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.").

[4]     At the June 8, 2020 hearing, Goyette's counsel argued that Defendants' alleged unconstitutional tactics could resume if protests become violent again. As an example, counsel referred to the possibility that an acquittal of the former officers involved in Floyd's death could prompt renewed violent protests in Minneapolis. Such speculative risks of uncertain future events are not a basis for obtaining preliminary injunctive relief.

"[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973). The Court recognizes the gravity of Goyette's claims. Essential to free government, the freedom of speech and freedom of the press are among our most fundamental rights and liberties. Abridgment of these rights "impairs those opportunities for public education that are essential to effective exercise of the power of correcting error through the process of popular government." *Thornhill v. State of Alabama*, 310 U.S. 88, 741 (1940). The protests in Minnesota, and now around the globe, are rooted in acts of shocking police brutality. The police response to those protests is of exceptional importance to how the community moves forward. Media reporting on events like those at issue here enables the public to meaningfully participate as citizens in a constitutional democracy.

Goyette has asserted extensive allegations of egregious conduct by law enforcement directed at members of the news media. Several members of the media were allegedly threatened or subject to unlawful arrests. Others sustained severe, permanent injuries while reporting on events of intense public concern. They deserve better.[5] Indeed, Governor

---

*See, e.g.*, *Chlorine Inst., Inc.*, 792 F.3d at 915–16 (explaining that speculative harm does not support preliminary injunctive relief).

[5]  The Court is acutely aware of the circumstances that law enforcement encountered. Law enforcement has a difficult job under normal circumstances, and "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (internal quotation marks omitted). This was especially true when Minnesota endured an unprecedent period of rioting, looting, arson, and civil unrest. Notwithstanding, there remain allegations of conduct that no civilized society would condone, even in an uncivilized time.

Walz has publicly condemned some of the conduct highlighted by Goyette. The Minneapolis City Council voluntarily entered into a TRO with the Minnesota Department of Human Rights that accelerates the review of officer conduct and requires the Chief of Police or his designee to expressly authorize any use of crowd-control weapons, such as chemical agents and marking rounds, during protests and demonstrations. And Defendants concede that any member of the media that has been injured by the unlawful conduct of law enforcement has a right to seek redress in court. But Goyette has not established that the "extraordinary" equitable relief he seeks, *Winter*, 555 U.S. at 7, is necessary at this time. Accordingly, Goyette's motion for a temporary restraining order is denied without prejudice. *See, e.g.*, *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 934-35 (D. Minn. 2016) (denying temporary restraining order based solely on plaintiff's failure to demonstrate irreparable harm).

## II. Motion for Class Certification

Goyette also moves for an order certifying the following class:

> All members of the news media, as the term is used in Emergency Executive Order 20-69, who intend to engage in news gathering or reporting activities in Minnesota related to the protest activities that followed the death of George Floyd and the law enforcement response to those protests.[6]

---

[6] Notably, Goyette does not offer a definition of news media, and the term in not defined in Executive Order 20-69. Nor does Goyette offer a definition of news gathering or reporting activities. Moreover, Goyette's proposed class would include *any* news media who merely *intend* to engage in news gathering or reporting activities on the specified subject at some unspecified future time. Consequently, the proposed class likely would require an individualized inquiry into the state of mind of each putative member.

In order to obtain class certification, a plaintiff has the burden of showing that the class should be certified and that the requirements of Federal Rule of Civil Procedure 23 are met. *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994). To obtain class certification under Rule 23, a plaintiff must prove: (1) the class is so numerous that joinder is impracticable; (2) there are common questions of law and fact; (3) the claims and defenses of representative parties are typical of the class; and (4) the representative parties will fairly and adequately protect the class' interests. Fed. R. Civ. P. 23(a).[7] To determine whether class certification is proper, the Court must make a "limited preliminary inquiry, looking behind the pleadings." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). A class action may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. *Gen. Tel. Co of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

Defendants argue that Goyette's motion for class certification is premature because no discovery has occurred in this case.[8] "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify

---

[7] A plaintiff must also demonstrate that a class action is appropriate under Rule 23(b), Fed. R. Civ. P.

[8] Goyette implicitly acknowledges that class certification may be premature by stating that the "Court should also bear in mind that an order that grants or denies class certification may be altered or amended before final judgment" and that the "Court remains free to modify the class certification order as necessary in light of further factual development in this case." *Cf. Klein v. TD Ameritrade Holding Corp.*, 327 F.R.D. 283, 298 (D. Neb. 2018) (finding a motion for certification of an injunctive-relief class to be premature when "plaintiff essentially concedes the motion is premature, stating '[a]t this stage and before any merits discovery has been undertaken, Plaintiff reserves his right to seek any and all of these remedies on behalf of the Class.' ").

the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). "Sometimes the issues are plain enough from the pleadings . . . and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160; *see Hall v. Equity Nat'l Life Ins. Co.*, 730 F. Supp. 2d 936, 941 (E.D. Ark. 2010) ("In some instances, a court can decide on certification before any discovery has yet taken place."). But the propriety of class-action status seldom can be determined on the pleadings alone. *Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th Cir. 1977). Rule 23(c) was amended in 2003 to afford more time to engage in discovery prior to certification and make other determinations, rather than deny class certification. *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1807 (2018) (recognizing that 2003 amendments "raised the standard for certifying a class from an early, conditional ruling to a later, relatively final decision" and "expand[ed] the opportunity for parties to engage in discovery prior to moving for class certification" (quoting Willging & Lee, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation after Ortiz*, 58 U. Kan. L. Rev. 775, 785 (2010))).

A class action may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. *Wal-Mart Stores, Inc. v. Duke*, 564 U.S. 338, 350–51 (2011). At this time, the Court is unable to conduct this rigorous analysis before determining whether Goyette's claims can be resolved on a class-wide basis. While Goyette's claims may ultimately be suitable for class-wide resolution, the Court concludes that fact discovery is necessary to determine whether the Rule 23

requirements can be satisfied.[9] *See Keech v. Sanimax USA, LLC*, Civ. No. 18-683, 2019 WL 79005, at *5 (D. Minn. Jan. 2, 2019) ("Without discovery in this case, the Court cannot undertake the rigorous analysis required of the class allegations."); *see, e.g.*, *Jonathan Small & Jotmar, Inc. v. Target Corp.*, Civ. No. 13-1509, 2013 WL 12142545, at *1 (D. Minn. Aug. 23, 2019) (denying motion for class certification because no discovery had yet to occur). This conclusion is particularly warranted in light of the amended complaint Plaintiffs filed on the morning of the hearing, after the parties had fully briefed the pending motion for class certification.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED:**

1. Plaintiff Jared Goyette's Motion for Temporary Restraining Order, (Dkt. 5), is **DENIED WITHOUT PREJUDICE.**

2. Plaintiff Jared Goyette's Motion for Class Certification, (Dkt. 2), is **DENIED WITHOUT PREJUDICE**.

Dated: June 9, 2020                                s/Wilhelmina M. Wright
                                                                                      Wilhelmina M. Wright
                                                                                      United States District Judge

---

[9] The Court is mindful of Goyette's expedited effort to obtain class certification and prospective injunctive relief for members of the media covering issues of immense public concern, while jeopardizing their own safety in doing so. But "[n]o one benefits when judges are forced to decide premature . . . class-certification motions." *Johnson v. U.S. Bank Nat. Ass'n*, 276 F.R.D. 330, 336 (D. Minn. 2011). Goyette acknowledges as much. Even when no class is certified, the Court retains equitable jurisdiction to craft injunctions that extend beyond the circumstances of the named plaintiff. *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019).