## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Jared Goyette, Craig Lassig, Michael Shum, Katie Nelson, Tannen Maury, Stephen Maturen, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals,*

        Plaintiffs,

    v.

City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; John Does 1-10, *in their individual and official capacities*;

        Defendants.

Court File No. 20-cv-01302 (WMW/DTS)

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR A JURY TRIAL**

---

For their Second Amended Complaint, Plaintiffs state and allege as follows:

## <u>INTRODUCTION</u>

During the protests arising out of the George Floyd murder, the Minneapolis Police and the Minnesota State Patrol tear-gassed, pepper-sprayed, shot in the face with rubber bullets, arrested without cause, and threatened journalists at gunpoint, all after these journalists identified themselves or were otherwise clearly engaged in their reporting

duties.  These were not isolated incidents. The protests were marked by an extraordinary escalation of unlawful force deliberately targeting reporters.

The ostensible leaders of our law enforcement agencies publicly said the right things in the wake of this police lawlessness but failed to curb the violence.  Governor Walz and others  repeatedly issued statements apologizing for the violence against reporters and the unlawful arrests.  But these statements, and whatever behind-the-scenes actions accompanied them, were not enough and the attacks continued.

This pattern and practice of conduct by law enforcement and the reckless and deliberate indifference of leadership to this conduct tramples on the Constitution.  It violates the sacrosanct rights to freedom of speech and freedom of the press that form the linchpin of a free society.  It constitutes a pattern of unreasonable force and unlawful seizures under the Fourth Amendment.  And it deprives liberty without a modicum of due process protected by the Fifth and Fourteenth Amendments.

The violence against journalists has ceased, for now.  But the chill on their First Amendment right to document the protests continues, as does the physical damage done by Defendants' violence.

Plaintiffs bring this action and ask the Court to restrain Defendants from further violence and unconstitutional conduct and to provide relief for the damage done.

## PARTIES

1.      Plaintiff Jared Goyette is a Minnesota resident who lives in the city of Minneapolis.  Goyette is a freelance journalist who works for national and international news publications.

2.      Plaintiff Craig Lassig is a Minnesota resident and freelance photographer. He has been a freelancer since 2008, and his clients include AP, Reuters, the NY Times, and the European Pressphoto Agency ("EPA").  Prior to 2008, Lassig worked as a photographer for Sun Newspapers.

3.      Plaintiff Michael Shum is a resident of Denver, Colorado but currently resides in Saint Paul, Minnesota due to the COVID19 pandemic.  Shum is a freelance videographer and has worked for CNN International, France 24, National Geographic, and the New York Times.

4.      Plaintiff Katie Nelson is a freelance journalist, photographer and filmmaker from Nairobi, Kenya.  She is currently residing in Minneapolis, Minnesota due to the COVID-19 pandemic.  Her  work has been published by The New York Times, National Geographic, BBC, Al Jazeera, The Telegraph, Associated Press and Public Radio International, among others. She is also the Vice Chair of the Foreign Correspondents' Association of East Africa.

5.      Plaintiff Tannen Maury is a photographer with the European Pressphoto Agency ("EPA").  Prior to working for the EPA, Maury was a staff photographer for AP and as a contract photographer for Reuters and AFP.  He is an Illinois resident.

6.      Plaintiff Stephen Maturen is a freelance photographer based in Minneapolis. Maturen's clients include the New York Times, the Wall Street Journal, USA TODAY, and Getty Images.  Maturen is a Minnesota resident.

7.      Plaintiff The Communications Workers of America ("CWA") is an international labor union representing over 700,000 workers in a broad range of industries,

including print and broadcast news media, telecommunications, airline, manufacturing, education, public service, and healthcare, among others. CWA's central purpose is protecting the rights of workers through collective bargaining and public advocacy. CWA's headquarters is in Washington, DC; its members work and live throughout the United States, including Minnesota. CWA is comprised of multiple sectors and districts representing members in different industries. The News-Guild CWA ("NewsGuild") is an affiliate union of the CWA. NewsGuild members include many on the reporting staff of the Los Angeles Times, the Chicago Tribune, the Detroit Free Press, the Denver Post, Reuters, the Associated Press, the Washington Post, the New York Times, the St. Paul Pioneer Press, and the Minneapolis Star Tribune, among others.

8.     Plaintiffs either live in or intend to return to Minnesota to cover future newsworthy events, including both small- and large-scale protests. Plaintiffs also intend to cover similar protests and gatherings throughout the United States as part of their journalistic activities. Plaintiffs fear that they will be subjected to similar unlawful actions by law enforcement, including Defendants, as they conduct their job duties in the future.

9.     Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota.

10.     Defendant Medaria Arradondo is the Minneapolis Chief of Police and a Minnesota resident.

11.     Defendant Robert Kroll is a Lieutenant in the Minneapolis Police Department, the president of the Police Officers Federation of Minneapolis ("the

Federation"), and a Minnesota resident. Kroll has been a member of the Federation Board since 1996 and Federation President since 2015.

12. Defendant John Harrington is the Minnesota Commissioner of Public Safety with supervisory responsibility over Colonel Matthew Langer and the Minnesota State Patrol. Commissioner Harrington is a Minnesota resident.

13. Defendant Colonel Matthew Langer commands the Minnesota State Patrol. Colonel Langer is a Minnesota resident.

14. Defendants John Does are unidentified individuals who committed the acts and omissions set forth below as agents of the City of Minneapolis, Minneapolis Police Department, and the Minnesota State Patrol.

## JURISDICTION

15. Plaintiffs' claims arise under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitutions, and the First and Fourth Amendments, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

16. Jurisdiction is proper in this Court according to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law.

## BACKGROUND

**A. GEORGE FLOYD'S MURDER AND THE ENSUING UNREST.**

17. On Monday May 25, 2020, George Floyd, a citizen of Minneapolis, was murdered by an officer of the Minneapolis Police Department ("MPD"). The events of Floyd's arrest and murder were captured on video by multiple bystanders as well as

individual officers' body cameras. The videos depicted Mr. Floyd pinned on the street, face down and increasingly unresponsive, while MPD Officer Derek Chauvin knelt on Mr. Floyd's upper back and neck, two officers held him down, and another stood by. All four officers were soon fired by the City. Derek Chauvin has been charged with second- and third-degree murder and manslaughter. The other officers have also been charged.

18.     The videos were widely and rapidly disseminated around the world via social media and news media platforms. Mr. Floyd's murder became international breaking news.

19.     Over the next five days and nights, thousands of people gathered across Minneapolis to protest and mourn Mr. Floyd's murder. Some of the protests grew in intensity, and isolated bad actors used the protests to engage in the looting and burning of hundreds of buildings in Minneapolis and Saint Paul.

20.     The public unrest became international breaking news. Numerous members of the news media arrived to cover the demonstrations and unrest and the government response.

21.     Many confrontations occurred during this period between the MPD and State Patrol, and groups of demonstrators, in which law enforcement, without any forewarning, deployed less-lethal ballistics and chemical irritants against the demonstrators.

22.     It is abnormal in situations of public unrest for law enforcement to engage in potentially injurious riot control tactics without issuing clear warnings and orders to disperse.

23.     In addition to confronting civilian demonstrators, the MPD and State Patrol also aggressively confronted members of the news media providing on-the-scene coverage. Numerous journalists reported injuries sustained as a result of law enforcement's use of riot control tactics against clearly identifiable members of the news media.  In one high-profile incident, CNN correspondent Omar Jimenez was arrested on national television despite asking the State Patrol to "put us back where you want us, we are getting out of your way."[1]  Mr. Jimenez was only released after a personal phone call from CNN president Jeff Zucker to Minnesota Governor Tim Walz.[2]

24.     Governor Walz acknowledged that arresting members of the news media providing coverage of breaking news stories was improper and said that "there is absolutely no reason something like this should happen . . . . In a situation like this, even if you're clearing an area, we have got to ensure that there is a safe spot for journalism to tell this story.  The issue here is trust, the community that's down there that's terrorized by this, if they see a reporter being arrested, their assumption is something is going to happen that they don't want to be seen so that is unacceptable."[3]

25.     Despite Governor Walz's assurances that the role of the media would be fostered and respected, the MPD, State Patrol, and other law enforcement authorities continued to target and intimidate members of the news media in a concerted effort to chill protected First Amendment activity.

---

[1] https://apnews.com/eadfe65c7ce593d04c0aef7eb0276e22.
[2] https://www.startribune.com/cnn-reporter-arrested-on-live-tv-let-go-after-gov-tim-walz-intervened/570860202/
[3] https://www.cnn.com/2020/05/29/politics/tim-walz-minnesota-cnn-arrest/index.html

**B. CURFEWS ESTABLISHED BY EXECUTIVE ORDER.**

26.     Due to widespread threat to personal safety and property, Governor Walz mobilized the Minnesota National Guard.

27.      Governor Walz also issued an executive order establishing a curfew, effective from 8:00 p.m. to 6:00 a.m. on Friday, May 29 and Saturday, May 30.[4]  The Governor re-issued the curfew order for Sunday, May 31. ("Curfew Orders").[5] The Curfew Orders apply to "all public places within the City of Minneapolis and the City of Saint Paul[.]"  The curfews expired on Friday, June 5, 2020.

28.     The Curfew Orders mandate that "[d]uring the curfew, all persons must not travel on any public street or in any public place."

29.     The Curfew Orders contain exceptions to the travel prohibition, however: "All law enforcement, fire, medical personnel, **and members of the news media** . . . **are exempt from the curfew**.  Individuals traveling directly to and from work, seeking emergency care, fleeing dangerous circumstances, or experiencing homelessness are also exempt."

30.     The City of Minneapolis implemented a nearly identical curfew order that exempted members of the news media.

---

[4] Minn. Exec. Order No. 20-65 (May 29, 2020),
https://mn.gov/governor/assets/EO%2020-65%20Final_tcm1055-434635.
[5] Minn. Exec. Order No. 20 68 (May 31, 2020),
https://mn.gov/governor/assets/EO%2020-68%20Final_tcm1055-434305.

31.     Upon information and belief, there is no system in place for members of the media to apply for or obtain official credentials from the Minneapolis Police Department or the State Patrol.

32.     Throughout the duration of the protests, both before and after the Governor's and the City of Minneapolis curfew orders, the Defendants acted in communication and coordination with one another in responding to the George Floyd protests and in committing the constitutional violations described below.

33.     Command staff from both the Minnesota State Patrol and MPD were in regular communication and coordination during the George Floyd protests regarding crowd control techniques, use of chemical agents and less-lethal ballistics and other crowd control technologies, and tactical deployment of officers and troopers, including the protest responses that resulted in the violation of constitutional rights described below.

34.     Defendants coordinated activities during the protests in part through the activities of the Multi-Agency Command Center ("MACC") set up to respond to the George Floyd Protests.  Per the Department of Public Safety:

> The MACC serves as a unified command of federal, state and local law enforcement and public safety agencies supporting the state's response to any unrest that develops following the death of George Floyd. Agencies represented in the MACC include the Minnesota Department of Public Safety (State Patrol, Bureau of Criminal Apprehension, Alcohol and Gambling Enforcement, Division of Homeland Security and Emergency Management, State Fire Marshal division, Minnesota State Patrol); National Guard; Minneapolis Police Department; Saint Paul Police Department; Metro Transit Police; Bloomington Police; University of Minnesota Police; Sheriff departments from Ramsey County, Hennepin County,

Anoka County, Dakota County, Washington County; and the FBI.[6]

35.     According to July 9, 2020 legislative testimony from Commissioner Harrington, functional control of all law enforcement responding to the protests devolved to the Department of Public Safety and ultimately to Commissioner Harrington, with the sole exception of the Minneapolis Police.[7] Per Commissioner Harrington, the State Patrol and other agencies under command of the Department of Public safety acted "in concert" with the MPD.  MPD "was not able to dictate missions to the State Patrol," but they were able to make requests.  Commissioner Harrington and his staff would then vet the requests and inform the MPD if it could take on the requested mission.  Senior officials from MPD were always present at the MACC to facilitate coordination with the State Patrol and the other state agencies minute-by-minute as the protests unfolded.

36.     Like their command staffs, MPD officers and State Patrol troopers at the protest scenes worked literally side-by-side and in coordination in responding to the George Floyd protests.[8]

---

[6] https://dps.mn.gov/divisions/ooc/news-releases/Pages/multi-agency-command-center-report-on-civil-unrest.aspx
[7] http://mnsenate.granicus.com/player/clip/5416?view_id=1
[8] *E.g.,* https://media.vanityfair.com/photos/5ed72084d991ee5f708bd991/master/w_1600%2Cc_limit/george-floyd-protests-minneapolis-montgomery-18.jpg, https://reason.com/2020/06/08/video-shows-cops-slashing-tires-across-minneapolis-during-george-floyd-protests/

## C. DEFENDANTS' UNCONSTITUTIONAL ACTIONS AGAINST THE PRESS COVERING THE RECENT PROTESTS.

37.     Even though members of the news media were expressly exempt from the Curfew Orders, Defendants ignored the exemption.  Even when members of the news media clearly identified themselves, Defendants continued to target and intimidate the press by threatening them, spraying chemical irritants, and firing less-lethal ballistics designed for riot control directly at members of the media.  Defendants further interfered with the news media's right to cover public events by arresting journalists despite the lack of any probable cause to do so, refusing access to areas where events were unfolding and creating obstacles to reporters' movement about the city.  These incidents constitute flagrant infringements on the constitutional rights of individual reporters as well as the public's interest in the dissemination of accurate information and accountability of government for its actions.

38.     The violence, intimidation, detention, and arrest of journalists, separately and collectively, had and is continuing to have a chilling effect on the First Amendment rights of the Plaintiffs and the Plaintiff Class, as well as other individuals seeking to lawfully exercise their First Amendment rights in the City of Minneapolis.

39.     The unlawful actions of the Defendants include but are not limited to the following incidents.

<u>ARRESTS</u>

40.     On May 29, a Minnesota State Patrol trooper handcuffed and arrested CNN reporter Omar Jimenez and his news crew during a live broadcast.  It was daytime, there

were no protesters around, and Jimenez asked the State Patrol where they should position themselves prior to being arrested, stating, "Put us back where you want us, we are getting out of your way, just let us know." When Jimenez further pressed the trooper who arrested him why he was being arrested, the trooper stated, "Look, I don't know man, I'm just following orders." The crew was readily identifiable as a CNN news crew and identified themselves as such repeatedly before being handcuffed and arrested.[9] The crew was detained for an hour.

41.     Later that day, in response to the arrest of Jimenez and his crew, Governor Walz issued the following statement:

> So to CNN, to the CNN team, to the journalists here, this is about having a plan, and that's what these folks are going to talk about. This is about having an aggressive approach to understanding what the community needs, to not coming in heavy-handed with them but to create space where the story can be told. In a situation like this, even if you're clearing an area, we have got to ensure that there is a safe spot for journalism to tell the story. The issue here is trust. The community that's down there that's terrorized by this, if they see a reporter being arrested, their assumption is it's because something's going to happen that they don't want to be seen. And so that is unacceptable. We will continue to strive to make sure that that accessibility is maintained. Not only that, the protection and security and safety of the journalists covering this is a top priority, not because it is a nice thing to do, because it is a key component of how we fix this. Sunshine, disinfectant and seeing what's happening has to be done.[10]

---

[9] https://www.nytimes.com/2020/05/29/business/media/cnn-reporter-arrested-omar-jimenez.html

[10] https://www.washingtonpost.com/opinions/2020/05/29/minnesota-governor-issues-spectacular-apology-arrest-cnn-crew/

42.     Governor Walz's apology and plea to law enforcement to treat journalists with respect and allow them to document the protests clearly fell on deaf ears, as the unconstitutional arrests of journalists and unlawful violence against journalists escalated significantly over the next several days.

43.     On May 30, Plaintiffs Tannen Maury, Stephen Maturen, and Craig Lassig were arrested and charged with curfew violations despite having identified themselves as members of the press, as detailed in paragraphs 113-120 below.[11]

44.     On May 30, a Minnesota State Patrol trooper forced WCCO videographer Tom Aviles to the ground and arrested him even though Aviles had identified himself as a member of the press and was carrying a large video camera.[12] Video footage shows there were no protesters within 50 yards of Aviles, and he was not obstructing law enforcement.[13] State Patrol shouted at him to "get back." He responded, "where do I go, I'm with WCCO." He then tried to retreat into a parking lot, shouting for his producer, Joan Gilbertson. The State Patrol continued to pursue him into the parking lot. At this point, Aviles wasn't even within 50 yards of the police line moving up the street adjacent to the parking lot. Gilbertson also identified herself as a journalist. A State Patrol trooper told her, "You've been warned, or the same thing will happen to you. Or you're next." Aviles spent two hours in custody. Earlier police had shot Aviles with a less-lethal projectile even though

---

[11] https://twitter.com/MJKauz/status/1267273646621499392
[12] https://www.startribune.com/wcco-cameraman-arrested-on-video-while-covering-unrest-in-minnesota/570902742/
[13] https://minnesota.cbslocal.com/2020/05/30/wcco-photojournalist-tom-aviles-arrested-in-south-minneapolis/

he was filming them with a large video camera at the time and was clearly identifiable as a member of the press.[14]

45. While covering the protests on May 31, Star Tribune reporter Liz Sawyer identified herself as a journalist to Minneapolis Police. She was told, "we don't care, we'll arrest you."[15] Earlier that evening, Sawyer was standing with Star Tribune reporter Chao Xiong, two Kurdish journalists, and one Japanese journalist. Minneapolis Police officers told them to go home. When the group identified themselves as press and showed their credentials, an officer said, "Your cards are bullshit."[16]

46. On May 31, NBC reporter Simon Moya-Smith was arrested by the Minneapolis Police despite identifying himself multiple times as a reporter and displaying his press badge for the arresting officer.[17] Moya-Smith was pepper sprayed during the arrest. At approximately 2:00 a.m., he was walking with a dozen or so activists who were on their way home from the protests in honor of George Floyd. The group was a few blocks west from the location where George Floyd was murdered when they were surrounded by 6 to 8 police cruisers. The officer in the passenger side of the lead car swung the door open, shouting, "Get on the ground! Get the fuck on the ground!" She pepper-sprayed the entire group one by one while they laid on the ground, peaceably complying with the officer's order to remain still. One of the group members, a Native American woman who

[14] https://minnesota.cbslocal.com/2020/05/30/wcco-photojournalist-tom-aviles-arrested-in-south-minneapolis/
[15] https://twitter.com/ByLizSawyer/status/1266984068765409280
[16] https://twitter.com/ChaoStrib/status/1266959110265856000
[17] https://twitter.com/SimonMoyaSmith/status/1267054164774916096

is an attorney, asked, "Are you literally maceing us?" The female officer responded by pepper spraying her in the face.

47.     Another police officer approached Moya-Smith, while officers in the background laughed. The officer asked his name. He responded, "My name is Simon Moya-Smith. I am a reporter with NBC News. My press badge is on my chest." A third officer approached Moya-Smith, saying, "Roll on your side, Mr. Journalist. You're going to be charged with, I don't know, breaking curfew."

48.     About 10 to 15 minutes later, Moya-Smith was still lying face down on the concrete sidewalk. A fourth officer approached, pulled him up by his right bicep, and walked him to a nearby police cruiser. Moya-Smith told this officer, "I am a journalist with NBC News." This officer eyed the press badge that was suspended from Moya-Smith's neck, shrugged, and loaded Moya-Smith into the back of the police cruiser. He was taken to the Fifth Precinct and after identifying himself as a member of the media again, to the officer who was beginning to book him, he was released.[18]

49.     Early on the morning of May 31, an Australian television news team led by Tim Arvier was detained and searched by Minneapolis Police after identifying themselves as members of the press. During this detention the news team's cameraman was handcuffed despite clearly being a member of the news media and being no threat to anyone.[19]

---

[18] The allegations in paragraphs 46-48 are derived in part from the Declaration of Simon Moya-Smith, attached as Exhibit 1 to the First Amended Complaint.

[19] https://twitter.com/TimArvier9/status/1266969637817909250

50.    On May 31, a German television news crew from the Deutsche Welle network was threatened with arrest by the State Patrol despite having clearly identified themselves as members of the press.[20]  Earlier that evening, law enforcement had shot at the DW crew with less-lethal projectiles despite (or because of) the crew being obviously identifiable as a news crew doing a live report and shouting, "we're press," at the officers.[21]

51.    MPD Policy 9-200(IV)(1) prohibits arrest and detention of the individuals recording police activity except under very limited circumstances that were not present in any of the incidents described above.  Specifically, the policy authorizes detention or arrest only where a person interferes with officer activity.  Per the policy, a person is not "interfering" if he or she is "recording officers' activity from a safe distance, without any action to obstruct the activity or threaten the safety of the officer . . ."  Even when those circumstances are present (which they were not here), officers must call a supervisor to the scene before detention or arrest.

52.    MPD's actions in detaining and arresting journalists during the Floyd protests violated this policy.  The violations were repeated and widespread and involved numerous different individual officers throughout the MPD.  The number and scope of the violations reflects the MPD's ongoing failure to train and supervise its officers in accordance with its own ostensibly official policies.

53.    Similarly, the State Patrol's unconstitutional arrests and detention of journalists was widespread and involved numerous different individual troopers and

---

[20] https://twitter.com/N_Waters89/status/1267090303867125766
[21] https://twitter.com/rafaelshimunov/status/1267824036878278659

commanders throughout the State Patrol.  The number and scope of the violations reflects the State Patrol's ongoing failure to train and supervise its troopers.

USE OF PHYSICAL FORCE

54.     On May 26, Star Tribune reporter Andy Mannix was shot in the thigh with a less-lethal projectile while documenting the protests.[22]

55.     On May 27, Minnesota Reformer reporter Max Nesterak was shot in the chest by a less-lethal projectile while documenting the protests.[23]  He was filming the protests, and there were no protesters near him when he was shot.

56.     These early police attacks on journalists were widely documented in social media and covered by the press, including Time Magazine, and Defendants were on notice that officers were targeting journalists with less-lethal projectiles and violating journalists' constitutional rights.[24]

57.     On May 29, freelance photographer Philip Montgomery was covering the protests at the Third Precinct.[25]  He was standing away from the protesters with a group of other news photographers, including Scott Olson from Getty Images, Victor Blue of the New York Times, John Minchillo from AP, and Lucas Jackson from Reuters.  All the photographers had their press badges out and visible, and they were documenting the

---

[22] https://twitter.com/AndrewMannix/status/1265447846079315973
[23] https://twitter.com/maxnesterak/status/1265863514754813952
[24] *E.g.,* https://time.com/5843070/george-floyd-minneapolis-protest-police-death/ ("A Minneapolis Star Tribune reporter said he was shot in the thigh with what appeared to be a foam bullet.").
[25] The facts alleged in Paragraphs 57-60 are drawn in part from the Declaration of Phillip Montgomery submitted in support of this Complaint.

protests with their professional photography gear. Minchillo was wearing a vest with "PRESS" written on the front in large letters. The group was clearly identifiable as journalists and was not standing amidst or near the protestors. They were not obstructing any crowd control activity being undertaken by law enforcement. They were not provoking law enforcement. They were simply standing to the side documenting what was going on. Around midnight, law enforcement moved to clear out the protests.

58.     At that same time, without warning, a group of law enforcement officers – Minneapolis Police and Minnesota State Patrol – moved in front of the small cluster of photographers and began to advance. As they closed in on the photographers, the officers fired tear gas canisters and rubber bullets directly into the group. One officer advanced until he was roughly 15 feet away from Montgomery. The officer raised and pointed his riot control gun at Montgomery and fired a less-lethal projectile into Montgomery's chest. The officer aimed directly at Montgomery even though he was clearly identified as a member of the press.

59.     The force of the blow from the projectile shocked Montgomery, and he still has a large bruise from where he was hit, directly over his heart. The injury affected his ability to continue documenting and reporting on the protests. Other photographers in that group were also hit, including Lucas Jackson, Victor Blue, and John Minchillo. The troopers and officers clearly targeted the group even though they were obviously journalists, not provoking or obstructing law enforcement, and were merely standing peaceably to the side exercising their First Amendment rights. Minchillo stated in a social media post, "No distinctions were made . . . when I and my colleagues were hit by officers.

Last night was full force in a wide spread.  This is a protocol that I've not seen elsewhere."[26]

The guns used to fire these less-lethal projectiles are equipped with sights for precision aiming, as shown in this photograph taken by Minchillo:



60.     On May 30, Los Angeles Times reporter Molly Hennessy-Fiske and photographer Carolyn Cole were reporting on protests at the Minneapolis Police Fifth Precinct building.[27]  The two were wearing their press credentials, and Cole wore a flak jacket labeled "TV."  They were standing on the sidewalk of a street bordering the Fifth Precinct building with a group of roughly 20 other journalists.  At around 8:30 p.m., a bullhorn announced, "this is the Minnesota State Patrol" and informed protesters that they

---

[26] https://twitter.com/johnminchillo/status/1267116569223725059
[27] The facts in paragraphs 60-64 are drawn in part from the Declaration of Carolyn Cole ("Cole Dec."), attached as Exhibit 2 to the First Amended Complaint, and the Declaration of Molly Hennessy-Fiske ("Hennessy-Fiske Dec."), attached as Exhibit 3 to the First Amended Complaint.

must disperse because they were violating curfew.  A line of law enforcement officers proceeded up the street, clearing it of protesters.  Hennessy-Fiske, Cole, and the group of journalists huddled against a wall of the Fifth Precinct building that abutted the sidewalk.  Because they were journalists, they were exempt from the curfew.  Moreover, they were clearly separate from the protesters, who were on the opposite side of the street.  There was no legitimate law enforcement reason to force the group of journalists to move, let alone assault them.

61.     Hennessy-Fiske expected the law enforcement officers walking up the street to pass by the journalists.  Instead, the officers turned toward the journalists and started firing less-lethal projectiles into the group.  No protesters were nearby.  Hennessy-Fiske shouted, "We're reporters!" "Wait!" and "Where do we go!" at the officers, and she waved her notebook at them.[28]  The officers did not respond.  The officers were only several feet away at this point, and they fired again into the group of journalists.  Hennessy-Fiske was hit at least five times in the leg with less-lethal projectiles, and her leg was bleeding.  Cole was shot in the face with pepper spray.  The officer was firing from so close a distance, Cole could feel the full force of the pepper spray go into her left ear and eye.  Cole suffered damage to her left cornea from the pepper spray.  She is currently unable to do her job as a photographer due to the injury.

62.     The journalists piled on top of each other in an attempt to get away from the police assault.  Hennessy-Fiske pleaded with the officers to tell her where to go but received

---

[28] https://www.latimes.com/world-nation/story/2020-05-30/la-reporter-tear-gas-police

no answer.  The officers just kept firing.  When the group of journalists tried to flee, the officers chased them and fired more less-lethal projectiles.  Hennessy-Fiske saw NBC photojournalist Ed Ou next to her, stunned and bleeding from the face.  Hennessy-Fiske continued to flee the officers and they cornered her against another wall.  She scaled it and sought shelter in the nearest building, a senior center.

63.     The group of press that Cole was with also ran from the firing officers. They tried to move along the precinct wall, but it was not clear to where the officers wanted the journalists to go.  The officers were yelling "Move! Move!" and continued firing on the journalists.  Cole was unable to see, so she followed along the wall with the other journalists until they reached another wall that was about 4 feet high that she could not get over. The officers pursued the journalists into the corner yelling "Get out! Now!" Cole responded repeatedly, "I'm trying. I'm trying. I'm trying."   A patrol officer told Cole that she had to get out of there, lifted Cole up onto the wall, and Cole fell over to the other side.  Cole stumbled blindly through the neighborhood until local residents helped her and gave her a bucket to wash her face.  Because Cole's face continued burning, one of the local residents drove her to the emergency room along with Hennessy-Fiske, who had reconnected with Cole by this point.  While they were driving to the hospital, police fired a paint ball gun at the car marking it with red paint.  Cole had to stop covering the protests at this point due to the injury to her eye.[29]

---

[29] https://www.latimes.com/world-nation/story/2020-06-01/they-came-toward-us-firing-pepper-spray-and-rubber-bullets

64. Hennessy-Fiske has covered protests involving police in Ferguson, Baton Rouge, Dallas, and Los Angeles. She has covered the United States military in war zones, including Iraq and Afghanistan. But she has never been fired at by police until her reporting in Minnesota. Cole has covered conflicts both nationally and internationally for many years. She is familiar with the dangers involved in such situations, especially when reporters get between riot police and protesters. But she was shocked when the police directly attacked her and Hennessy-Fiske. In fact, this was the first time in Cole's 25 years of reporting for the Los Angeles Times that she has been injured covering a protest or other event.

65. On May 30, Star Tribune reporters Ryan Faircloth and Chao Xiong were trying to leave the protests in Faircloth's car. They mistakenly turned down a street that was blocked off at the end. Before they could turn around, the State Patrol fired less-lethal projectiles at the car, without warning. Later, when Faircloth was driving alone out of the area, officers again fired less-lethal rounds at Faircloth's vehicle, injuring Faircloth and blowing out the windows of the car.[30]

66. On May 30, freelance journalist Linda Tirado was photographing the protests when police or troopers shot her in the face with a less-lethal projectile. She is now permanently blind in her left eye.[31] "I would say there is no way that anyone had looked at me and not known that I am a working journalist," she stated in an interview with the

---

[30] https://twitter.com/RyanFaircloth/status/1266954131324928003
[31] https://www.nytimes.com/2020/05/30/us/minneapolis-protests-press.html

New York Times. "That said, police have been pretty clear that they don't care if you are a working journalist."

67.     On May 30 Minneapolis Police fired less-lethal projectiles at CBS reporter Michael George and his news crew, hitting sound engineer John Marschitz and severely bruising Marschitz's arm.[32]  The crew was not standing within 500 feet of any protesters at the time and had their credentials displayed and their cameras out.[33]  In video of the incident, one of the crew members can be heard saying "they're sighting us in" as the less-lethal projectiles came closer and closer.[34]

68.     On May 30, police or troopers fired less-lethal projectiles at an MSNBC news crew, including reporter Ali Velshi, hitting Velshi in the leg.[35]  After this incident, Velshi and another TV crew were confronted by police in a nearly deserted parking lot.  The group informed the police that they were news media.  The officers responded, "we don't care," and began firing on the group with less-lethal projectiles.

69.     During the protests, a Fox 9 TV news crew was driving in their news van, with a placard placed on their windshield clearly indicating that the van belonged to Fox 9 News, when law enforcement fired less-lethal projectiles into the windshield, shattering it.

---

[32] https://twitter.com/MikeGeorgeCBS/status/1266919447970942986
[33] https://twitter.com/MikeGeorgeCBS/status/1266916104951214080
[34] https://www.washingtonpost.com/politics/police-turn-more-aggressive-against-protesters-and-bystanders-alike-adding-to-violence-and-chaos/2020/05/31/588ad218-a32f-11ea-b619-3f9133bbb482_story.html
[35] https://www.washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482_story.html

70.     On May 30, Reuters TV cameraman Julio-Cesar Chavez was filming police when one aimed a less-lethal projectile gun at directly at Chavez.  Later that evening, in a separate incident, police fired directly at Chavez and his crew with less-lethal projectiles.[36] Chavez was hit in the back of his neck, under his left eye, and in his arm.  A member of his crew was also hit.  They were clearly identifiable as press at the time.[37]

71.     On May 30, photojournalist Lucas Jackson was pepper sprayed in the face and also shot in the back with a less-lethal projectile.[38]  Jackson stated in a social media post, "It's not that we were being shot because we were between cops and protesters. It's that we were shot at if we were anywhere in line of sight.  I've been hit because I was in the wrong place before.  I've never been aimed at so deliberately so many times when I was avoiding it."[39]

72.     On May 30, CBC senior news correspondent Susan Ormiston was hit in the shoulder by a less-lethal projectile and in the back by a tear gas canister.  At the time she was shot, she was in a parking lot that had been cleared of protesters, and she and her crew were clearly identifiable as media.[40]

_____

[36] https://www.reuters.com/article/us-minneapolis-police-protest-update/reuters-camera-crew-hit-by-rubber-bullets-as-more-journalists-attacked-at-us-protests-idUSKBN237050
[37] https://www.washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482_story.html
[38] https://twitter.com/Lucas_Jackson_/status/1266666583012892672
[39] https://twitter.com/Lucas_Jackson_/status/1267114291532046338
[40] https://twitter.com/mcquillanator/status/1266915485741993996

73.     On May 30, Minneapolis Police fired a flash bang grenade directly into an MSNBC news crew led by reporter Morgan Chesky, despite the fact that Chesky was live on television and he and his crew were clearly identifiable as news media.[41]

74.     On May 30, a Univision cameraman clearly identifiable as a member of the media was shot with a less-lethal projectile.  The projectile hit the battery used to power his large commercial video camera, and the battery exploded, burning the cameraman.

75.     On May 30, NBC News photographer Ed Ou was pepper sprayed directly in the face from several feet away by State Patrol troopers and shot with a less-lethal projectile.[42]  Ou was standing out of the way of police, documenting the protests, and clearly identifiable as a member of the press, with his press badge out.  His own footage documents him stumbling down the sidewalk behind the front lines of the protest after this assault, bloody and blind, begging for help and identifying himself as a member of the press as he passes by several Minneapolis Police officers who ignore him.[43]  Ou required medical attention and received 4 stiches to close the wound inflicted by the State Patrol.[44]

76.     Among the munitions used against journalists were the 40mm Skat Shell (which is a delivery device for chemical agents) and the Direct Impact LE 40mm Extended Range Round.

---

[41] https://twitter.com/AndyRowell/status/1266946038373347328
[42] https://www.theguardian.com/us-news/2020/jun/06/george-floyd-protests-reporters-press-teargas-arrested
[43] https://twitter.com/edouphoto/status/1267981849537609728
[44] https://twitter.com/edouphoto/status/1267958349477249024

77. According to Defense Technology, Inc., the manufacturer of the 40mm Skat Shell: "The 40mm Skat Shell® is designed for outdoor use and has fire producing capability. It is not intended for barricade penetration. Do NOT fire directly at personnel, as serious injury or death may result."[45]

78. Defense Technology, Inc., also manufactures the Direct Impact 40mm Extended Range Round. It states: "The Direct Impact® Extended Range Round should only be used at ranges beyond 10 meters, targeting the subject's lower torso or extremities. Impacts closer than 10 meters or targeting the subject's head, neck, or upper torso can result in serious injury or death."[46]

79. The MPD's own use of force policy prohibits using the 40mm projectiles as they were deployed during the George Floyd protests, stating: "Officers shall not deploy 40mm launchers for crowd management purposes." Instead, the 40mm projectiles are to be used with "combative, non-compliant, armed and/or otherwise violent subjects . . . ."[47]

80. The MPD use of force policy further warns against firing 40mm projectiles at an individual's head or chest: "Officers shall be aware that the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to a permanent physical or mental incapacity or possible death. Areas susceptible to death or possible severe injury are the head, neck, throat and chest (in vicinity of the

---

[45] https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw66a06e0e/product-pdfs/less-lethal/40mm_Skat_Shell.pdf
[46] https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw7cc762e7/product-pdfs/40mm%20Direct%20Impact%20LE%20Extended%20Range%20Round.pdf
[47] http://www.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300

heart).” The policy indicates that firing 40mm rounds at the chest or head constitutes the use of “deadly force.”[48]

81.     On information and belief, MPD and the Minnesota State Patrol fired both the Skat Shell and the Direct Impact Round at journalists in a manner contrary to the manufacturer's warnings and likely to cause injury, in contravention of their own written policies on use of force, and in fact resulting in injury in numerous instances. For example, Plaintiff Goyette was struck in the face with a 40mm round and injured. Journalist Linda Tirado was struck in the face and blinded in one eye by a 40mm round. Photojournalist Philip Montgomery was struck directly above the heart at close range by a 40mm round. Any one of these three individuals could have been killed by this outrageous and wholly unjustified use of deadly force. MPD's use of precision gunsights to aim directly at protesters' and journalists' heads and hearts shows that these officers acted with actual malice and with the intent to severely and potentially critically injure protesters and journalists.

82.     MPD officers repeatedly violated its policy regarding use of force during the George Floyd protests. These violations were repeated and widespread and involved numerous different individual officers throughout the MPD. The number and scope of the violations and their continued occurrence day after day reflects the MPD's ongoing failure to train and supervise its officers in accordance with its own ostensibly official policies.

---

[48] http://www.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300

83. Similarly, the State Patrol's unconstitutional use of force against of journalists was widespread and involved numerous different individual troopers and commanders throughout the State Patrol. The number and scope of the violations reflects the State Patrol's ongoing failure to train and supervise its troopers.

## USE OF CHEMICAL AGENTS

84. On May 28, Star Tribune columnist Jennifer Brooks was standing at a light rail station on S. 5th Street documenting the protests in a group of other media members. Several Minneapolis Police squad cars drove by unimpeded. As Squad Car 181 passed the journalists, the driver's side window rolled down and the driver indiscriminately pepper sprayed Brooks, other media members, and nearby protesters.[49]

85. On May 29, USA Today reporter Tyler Davis was covering the protests in downtown Minneapolis. Several squad cars pulled up at his location. Police got out of the squad cars and began indiscriminately spraying pepper spray canisters in every direction and telling people to move north. Davis was filming two young women being pepper sprayed to his left, when the officer doing the spraying turned to Davis. Davis identified himself as a member of the media, and the officer "laid on the trigger for a few seconds" spraying Davis directly in the face.[50]

86. On May 30, Minneapolis Police aimed a rifle directly at Vice magazine journalist Michael Adams while Adams was covering the protests. At the time, Adams

---

[49] https://twitter.com/stribrooks/status/1266186985041022976
[50] https://www.usatoday.com/story/opinion/2020/05/29/george-floyd-protests-leave-usa-today-reporter-hit-chemical-spray/5282374002/

and other journalists clustered near him were holding up their press passes. Shortly thereafter, a Minneapolis Police officer approached Adams with a weapon pointed directly at him and threw him to the ground. He was displaying his press pass and shouting "press." The officer responded, "I don't care." Adams was on his knees, alone, clearly not a threat, and was surrounded by more than a dozen officers.[51] The officer who threw Adams down told him not to move. Adams complied. Another officer slowly walked by Adams. When Adams again said, "I'm Press," and held up his credential, this officer casually pepper-sprayed Adams directly in the face from several inches away, then continued strolling while Adams writhed on the ground in agony.[52]

87.     KSTP investigative reporter Ryan Raiche, his photographer, and his producer, were gathered together with a group of other media members during protests on the evening of May 30 outside the Fifth Precinct. Most had large cameras, boom mikes, or visible press credentials. The group was clearly identifiable as media and not spread out among the protesters. They were pinned against a wall together as a police line advanced. Police walked up to the group and indiscriminately pepper sprayed the entire group of journalists.[53]

88.     On May 30, Star Tribune photographer Anthony Souffle was tear gassed by police or troopers.[54]

[51] https://twitter.com/MichaelAdams317/status/1267203751913422849
[52] https://twitter.com/MichaelAdams317/status/1266945268567678976?s=20
[53] https://twitter.com/ryanraiche/status/1267021649959845888
[54] https://twitter.com/AnthonySouffle/status/1267122936105893892

89.     The MPD use of force policy states that Chemical Agents "shall not be used against persons who are only displaying Passive Resistance as defined by policy." It further states that officers "shall exercise due care to ensure that only intended persons are exposed to the chemical agents."[55]

90.     MPD officers wantonly violated these policies in its use of chemical agents against journalists and others during the George Floyd protests. These violations were repeated and widespread and involved numerous different individual officers throughout the MPD. The number and scope of the violations and their continued occurrence day after day reflects the MPD's ongoing failure to train and supervise its officers in accordance with its own ostensibly official policies.

91.     Similarly, the State Patrol's unconstitutional use of chemical agents against of journalists was widespread and involved numerous different individual troopers and commanders throughout the State Patrol. The number and scope of the violations reflects the State Patrol's ongoing failure to train and supervise its troopers.

USE OF THREATENING LANGUAGE AND GESTURES

92.     On May 30, Star Tribune reporter Chris Serres was twice ordered at gunpoint by Minneapolis Police to "hit the ground," and warned that "if [he] moved an inch [he'd] be shot," despite prominently displaying his Star Tribune press badge for the police.[56] He had already been tear gassed and shot in the groin with a less-lethal projectile earlier in the day.

---

[55] http://www.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300
[56] https://twitter.com/ChrisSerres/status/1267098060938776581

93.     Maggie Koerth, a reporter for the website FiveThirtyEight was covering the protests from a sidewalk on May 30.  A Minneapolis Police officer drew a weapon on Koerth and Plaintiff Jared Goyette.  Koerth and Goyette said "press, press" and held up their press badges.  The officer continued to point the gun at Koerth and told Koerth to "Shut up."[57]

94.     On May 30, MPR reporter Madeleine Baran was covering the protests with American Public Media journalist Samara Freemark.  A Minneapolis police officer pointed a weapon at their heads.  When they identified themselves as press, the officer did not lower his weapon, so they ran for cover and ended their reporting for the night.[58]

95.     On May 31, Minneapolis Police officers in a truck pulled up to a group of reporters, including Star Tribune reporter Andrew Mannix, pointed a "large gun" at the group and shouted, "do you know what curfew is?"   After notifying the officers that they were journalists and walking to their cars, the police ordered them to leave the area.[59]

96.     Graphic images taken during the protests show the trauma wrought by Defendants' unconstitutional actions.

---

[57] https://www.nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html?smid=tw-share
[58] https://twitter.com/madeleinebaran/status/1266610933071138816
[59] https://twitter.com/AndrewMannix/status/1266968276481052672?s=20

97.     Below is a photograph of NBC video and photojournalist Ed Ou, who was

pepper sprayed and hit with a less-lethal projectile:



98.     Below is a photograph of freelance journalist Linda Tirado.  The Minneapolis

Police permanently blinded Ms. Tirado in her left eye with a less-lethal projectile.



99.     Below is the photograph Ms. Tirado took immediately before the police took a potshot at her head and blinded her.[60]



---

[60] https://www.patreon.com/posts/38226327

100.    Below is a photograph of KSTP reporter Ryan Raiche after being pepper sprayed despite identifying himself as a member of the press:



101.   Below is a photo that Reuters cameraman Julio-Cesar Chavez took of police taking direct aim at him despite his being clearly identifiable as a member of the press:



102.    Below is an image of the arrest of Omar Jimenez and his news crew:



103. Below are images published by Molly Hennessey-Fiske of the types of less-lethal projectiles that law enforcement fired at journalists.





104.    Below is a photograph of Molly Hennessy-Fiske's injuries one week after law enforcement shot her with less-lethal projectiles.[61]



## D.     NAMED-PLAINTIFF JARED GOYETTE.

105.   Plaintiff Jared Goyette is a freelance journalist.  At all times relevant to this Complaint, Plaintiff was working on assignment as a contract journalist with a national publication.

106.   At around 5:00 p.m. on May 27, 2020, Goyette was observing and documenting the demonstrations near the MPD's Third Precinct, located at the intersection of Lake Street and Minnehaha Avenue.  MPD officers protecting the Third Precinct were firing ballistic rounds, marker rounds, and tear gas intermittently and without warning or orders for dispersal.

107.   Goyette was clearly a member of the news media.  He carried a camera and a monopod (a single, long leg used to stand a camera on for stability), notepad, and mobile phone.   These items would have been visible to the MPD stationed on top of and outside the Third Precinct.

108.   Goyette was standing 30 to 50 yards from the Third Precinct when he saw a young man who appeared to be severely injured.  Goyette went towards the man to document the incident.

109.    Goyette was shot in the face with less-lethal ballistic ammunition shortly after other bystanders took the injured young man from the scene.  MPD provided no warning for this use of force.  Goyette was standing alone and there was no one else within several feet of Goyette.

110.    Goyette suffered immediate physical injury to his nose and eye and, as a result, had to leave the scene and cease journalistic activities for the evening. After receiving medical treatment, Goyette ventured back to the demonstrations to continue to provide press coverage.

111.    In the days after his injury, Goyette experienced several instances of intimidating and obstructive behavior from Defendants. For example, he was told to "Shut up" by an officer after identifying himself as press. In another instance, an officer passing by Plaintiff and another female reporter shouted at them, "I want to fucking peg you."

112.    Goyette intends to continue documenting and reporting on additional protests and other First Amendment protected expression, and the police response to these protests.

## E.    NAMED-PLAINTIFFS CRAIG LASSIG, TANNER MAURY, AND STEPHEN MATUREN.[62]

113.    Plaintiff Craig Lassig is a Minnesota resident and freelance photographer. He has been a freelancer since 2008, and his clients include AP, Reuters, the NY Times, and the European Pressphoto Agency ("EPA"). Prior to 2008, Lassig worked as a photographer for Sun Newspapers.

114.    Plaintiff Tannen Maury is a photographer with the European Pressphoto Agency ("EPA"). Prior to working for the EPA, Maury was a staff photographer for AP and as a contract photographer for Reuters and AFP. He is an Illinois resident but was in Minneapolis to cover the George Floyd protests from May 27-June 1.

---

[62] The allegations in this section are drawn from the Declaration of Craig Lassig ("Lassig Dec."), attached to the First Amended Complaint as Exhibit 5.)

115.     Plaintiff Stephen Maturen is a freelance photographer based in Minneapolis. Maturen's clients include the New York Times, the Wall Street Journal, USA TODAY, and Getty Images.  He covered the George Floyd protests for Getty Images.

116.     On May 30, Lassig was covering the George Floyd protests for EPA, along with Maury, who had traveled to Minneapolis from Chicago to cover the protests with Lassig.  Maturen had joined with Maury and Lassig to travel together for safety during the protests.

117.     Lassig, Maury, and Maturen were documenting protests occurring near the 5th precinct police station in Minneapolis, at 31st and Nicollet.  Early that evening, the police began to disburse the protesters, pushing them up 1st Avenue toward downtown.  Police fired tear gas and less-lethal projectiles and shot fleeing protesters in the back.

118.     Because the situation had gotten violent, Lassig, Maury, and Maturen left the scene and proceeded up Nicollet Avenue to regroup and decide what to do next.  They stopped in the parking lot of a restaurant on Nicollet Avenue to discuss where they should go next.  They were nowhere near any protesters, and they were the only three individuals standing in the parking lot. Likewise, there were no police in sight.

119.     As they stood in the parking lot talking, several law enforcement vehicles drove down 28th Avenue in front of the restaurant.  One of the cruisers stopped and officers and/or troopers got out.[63]  Lassig, Maury, and Maturen all had their press badges displayed

---

[63] Maury and Maturen remember the officers wearing brown shirts, suggesting that they were Minnesota State Patrol.  Lassig remembers the officers wearing blue shirts, suggesting that they were Minneapolis Police.

at the time, and all were carrying professional camera gear. They verbally identified themselves as news media to the officers. One officer said, "we don't fucking care," and ordered the group onto the ground. They complied. The officers handcuffed Lassig, Maury, and Maturen, searched all their belongings, and seized their photography gear. Then they placed the three handcuffed journalists into a police van and drove them downtown. The three journalists sat handcuffed in the van for about an hour. Then they were booked, fingerprinted, and cited for violating the curfew, despite again identifying themselves as members of the press. After roughly two hours in custody, they were released.

120. Earlier that evening, Lassig and Maury had been with a larger group of journalists covering the protests near the Third Precinct, including an NBC film crew. Lassig saw Minneapolis Police officers mace journalists, deliberately shoot journalists with less-lethal projectiles, and chase journalists, all of whom were clearly identified as journalists, were standing apart from the protesters, and were not obstructing or provoking the police. Lassig was shocked at the aggressive and hostile attitude of the police toward journalists.

F.     NAMED PLAINTIFF MICHAEL SHUM[64]

121. On May 28, Plaintiff Michael Shum was covering the protests for the New York Times. He was positioned outside the Third Precinct, roughly 50 feet from any protesters. He had a large shoulder-mounted camera and was clearly identifiable as a

---

[64] The allegations in this section are drawn from the Declaration of Michael Shum ("Shum Dec.").)

member of the press. Minneapolis Police fired flash-bang grenades directly at Shum while he was filming, and those munitions exploded right in front of his camera, despite the fact that Shum was standing alone with no protesters around. At around 9 p.m. that night, police began to disperse the protesters who had gathered in front of the precinct. Shum was still about 50 feet away from any protesters, filming with a shoulder-mounted camera. Minneapolis Police officers nonetheless began shooting less-lethal projectiles and tear gas at Shum and a group of other journalists gathered nearby, including Star Tribune photographer Richard Song-Tatari. Police did not give any warning or order to disperse before opening fire on Shum. One projectile ricocheted off a wall or the ground and hit Shum in the side. Another projectile hit Shum directly in the foot. His foot swelled up and he has been having difficulty walking since then.

122. On May 30, Shum was again covering the protests for the New York Times. In the early evening, around dusk, Minnesota State Patrol troopers began moving down a street on which Shum and several other journalists were standing, filming the protests. Again, Shum was filming with a large shoulder mounted camera and clearly acting as a member of the news media. As Minneapolis Police and State Patrol pushed down the block, firing tear gas and projectiles, Shum and other journalists took shelter in a little gated area off the sidewalk. Shum continued to film as the troopers approached, and then turned to try and escape this area when the troopers also left the sidewalk and pursued the journalists into the gated area where they were sheltering. By this time, it was clear to Shum that law enforcement was attacking journalists with impunity and he sought to escape the gated area. Shum climbed onto a half wall, hoping if he got to the other side he would

be protected from attack by the police. As he climbed onto the wall, two State Patrol troopers approached and shoved him off the wall. As they shoved Shum, one of the troopers said, "get the fuck off of there." Shum fell to the ground on the opposite side of the wall and suffered several scratches, bruises, and cuts. The officers who pushed Shum off the wall knew he was a journalist. He was not among any protesters, was not impeding the advance of any law enforcement personnel and was merely seeking shelter with other journalists in this little enclosed area.

## G. NAMED PLAINTIFF KATIE NELSON

123. Plaintiff Katie G. Nelson is a freelance journalist, photographer and filmmaker in Nairobi, Kenya. Her work has been published by The New York Times, National Geographic, BBC, Al Jazeera, The Telegraph, Associated Press and Public Radio International, among others. She is also the Vice Chair of the Foreign Correspondents' Association of East Africa. During the George Floyd protests, Nelson was working on contract with the New York Times.

124. Nelson was working with Mike Shum as a producer on the night of May 28, 2020, the night that the Third Precinct burned down. At around 9:30 p.m., police began lobbing tear gas and flash bang grenades into the crowd Shum and Nelson were filming. The police intentionally shot directly at Shum and Nelson several times with tear gas canisters, despite the fact that Shum was filming the protests with large commercial camera gear. At the time, Nelson was standing with her arms up yelling "press" at law enforcement as Shum crouched in front of her while filming. MPD directly targeted Shum and Nelson despite the fact that they were clearly media and not protesters.

125.     On May 30, 2020, Nelson was working again with Shum.  They were filming the peaceful protests occurring on Nicollet Avenue behind the Fifth Precinct.  At 8:05 p.m., MPD officers announced that the crowd was in violation of the curfew and began advancing up the street in riot gear by the dozens.  20 seconds after the announcement, and before anyone who wanted to leave could vacate the area, the police began firing tear gas, flash bang grenades, and rubber bullets into the crowd.

126.     Shum and Nelson were standing with a group of other members of the press, away from the protesters.  Law enforcement began to fire at them even though they were clearly members of the news media and exempt from the curfew.  Nelson started running when law enforcement began to fire directly at them.

127.     On left hand side of the sidewalk was a concrete alcove shaped like a triangle. A gate on one side was open.  Nelson thought that if the group of journalists could get into the alcove, they would be safe from the police, could assess the situation and get out.  Nelson quickly realized, however, that there was no exit to the alcove.  As law enforcement pushed toward the group of journalists, Nelson grabbed her assistant Courtney and they ran out of the alcove and into the street.  The police fired rubber bullets at them.  Other members of the press ran into alcove and stayed.  Some were beaten there, and Shum was pushed over the wall.

128.     Shum and Nelson regrouped and continued filming.  At several points, they were boxed into sections of the street by police officers armed with tear gas and flash bangs. Whenever the officers told Shum and Nelson to leave the area, Nelson responded, "We're press!" and waved her hands above her head as Shum continued to film. At one point, police

officers made a line across a street blocking the ability to exit on one side of the road. Shum and Nelson continued filming this, and at one point, a male officer holding the line started yelling "I'm gonna get her," in reference to Nelson. He was looking at Nelson and pointing his tear gas gun at her. At the time, Shum and Nelson were clearly identifiable as journalists.

129.   Around 12am that evening, Nelson was driving away from the protests to try and get to the George Floyd memorial. Nelson turned onto a street that was blocked off at one end by National Guard vehicles and police with riot gear. There were cars behind her and it was almost impossible to turn around as cars were lined on both sides of the street. She turned on her right blinker to indicate that she would pull over and try to exit through an alleyway between the line of officers and her car. The officers gave no direction or indication how individuals who had turned down this street were supposed to turn around given the cars behind them and the cars parked on the street. Nelson moved very slowly forward, trying to get in position to turn around. Her car windows were open, and she shouted "we're press, we're press" at the officers at the end of the street. They shouted back, "we don't care," and began to shoot pepper bullets or some other less-lethal projectiles at Nelson. She heard the projectiles pinging off the roof of her car. She was terrified but somehow managed to turn around while the police fired at her.

### H.   NAMED-PLAINTIFF CWA

130.   Plaintiff The Communications Workers of America ("CWA") is an international labor union representing over 700,000 workers in a broad range of industries, including print and broadcast news media, telecommunications, airline, manufacturing, education, public service, and healthcare, among others. CWA's central purpose is

protecting the rights of workers through collective bargaining and public advocacy. CWA's headquarters is in Washington, DC; its members work and live throughout the United States, including Minnesota. CWA is comprised of multiple sectors and districts representing members in different industries. The News-Guild CWA ("NewsGuild") is an affiliate union of the CWA. NewsGuild represents journalists and media members across America. The guild has roughly 14,000 dues paying members. NewsGuild members include many on the reporting staff of the Los Angeles Times, the Chicago Tribune, the Detroit Free Press, the Denver Post, Reuters, the Associated Press, the Washington Post, the New York Times, the St. Paul Pioneer Press, and the Minneapolis Star Tribune, among others. (Declaration of Jon Schluess ("Schluess Dec.") ¶ 1-2 (attached as Exhibit 4 to the First Amended Complaint).)

131. Many of the individual reporters and photojournalists affected by police violence and intimidation against the news media at the George Floyd protests are represented by the NewsGuild (and by extension the CWA), including all of the Star Tribune journalists mentioned by name in this Complaint. Los Angeles Times journalists Molly Hennessy-Fiske and Carolyn Cole, who were shot with pepper spray and less-lethal projectiles as described in paragraphs 60-64 above, are also NewsGuild members. (Cole Dec. ¶ 1; Hennessy-Fiske Dec. ¶ 1.)

132. Because some of the NewsGuild's affected members, and their news organizations, report on the Minneapolis Police and Minnesota State Patrol as part of their journalism, ethical considerations that guide reporting make directly suing those organizations as individual plaintiffs complicated if not impossible. (Schluess Dec. ¶ 4.)

133.     Article I, Section 2 of the NewsGuild Constitution provides:

SECTION 2. The purpose of the Guild shall be to advance the economic interests and to improve the working conditions of its members; to guarantee, as far as it is able, equal employment and advancement opportunity in the industry and constant honesty in news, editorials, advertising, and business practices; to raise the standards of journalism and ethics of the industry; to foster friendly cooperation with all other workers; and to promote industrial unionism in the jurisdiction of the Guild.

134.     And Article III of the CWA Constitution likewise provides:

The objects of the Union shall be: (a) To unite the workers within its jurisdiction in a single cohesive labor union for the purpose of collective effort; (b) To improve the conditions of the workers with respect to wages, hours, working conditions and other conditions of employment; (c) To disseminate information among the workers respecting economic, social, political and other matters affecting their lives and welfare; (d) To advance the interests of the workers by advocating the enactment of laws beneficial to them and the defeat or repeal of laws detrimental to them; (e) To do all things which may be necessary or proper to secure for the workers the enjoyment of their natural rights.

135.     These foundational provisions of the international labor union and its sector Constitutions undergird CWA's participation in this lawsuit.  Essentially, they provide that all CWA members, including NewsGuild-CWA members, agree to work together, through the auspices of their union, to ensure that members work under safe and lawful conditions. (Schluess Dec. ¶ 7.)

136.     NewsGuild members have been targeted by the recent police violence in Minneapolis.  Members have had their speech chilled.  And Members have been assaulted and injured by both Minneapolis Police and the Minnesota State Patrol and been subjected

to other unconstitutional conduct by those agencies and their officers, agents, and employees.

**MUNICIPAL ALLEGATIONS**

**I.      THE STATE AND MUNICIPAL DEFENDANTS**

137.   The City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo, Minneapolis Police Lieutenant Robert Kroll, Minnesota Department of Public Safety Commissioner John Harrington, and Minnesota State Patrol Colonel Matthew Langer, in their official capacities (the "State and Municipal Defendants") each have established policies, practices, and/or customs of violating the constitutional rights of members of the press and others, and of unlawful use of excessive force, or have been deliberately indifferent to such constitutional violations by their officers, agents, and employees, as discussed below.

**a.      Unconstitutional Treatment of Journalists**

138.   The State and Municipal Defendants each have a policy, practice, or custom of deploying chemical agents and injurious, less-lethal ballistics against members of the news media.  In addition, the State and Municipal Defendants have each been deliberately indifferent to unconstitutional uses of chemical agents and less-lethal ballistics by their officers against members of the news media.

139.   The State and Municipal Defendants each have a policy, practice, or custom of failing to provide warnings and/or dispersal orders before using chemical agents and injurious, less-lethal ballistics against protesters and members of the news media.  In addition, the State and Municipal Defendants have each been deliberately indifferent to

risks that their officers, agents, or employees would fail to provide warning or dispersal orders before using chemical agents and injurious, less lethal ballistics.

140.  The State and Municipal Defendants each have a policy, practice, or custom of intimidating, threatening, arresting, and detaining news media lawfully reporting on protests and other First Amendment expressive activity, or have been deliberately indifferent to the risks that their officers, agents, or employees would behave in such a manner.

141.  The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to First Amendment protected activity amounts to a reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class Members.

142.  In a June 10, 2020 news conference, Chief Arradondo stated: "Our media must be protected," stated that he will be looking at "why journalists were fired upon," and apologized for the police abuses of journalists that occurred during the George Floyd protests.[65]  In a June 5, 2020 statement, the State Patrol stated: "When conducting law enforcement operations to restore order and keep people safe, it can be difficult for officers to distinguish journalists from those who are violating a curfew order or not complying with commands to leave an area. . . . we are reviewing the incidents involving our troopers

---

[65] https://kstp.com/news/-minneapolis-police-department-spokesman-john-elder-and-police-chief-medaria-arradondo-address-the-media/5755828/

in an effort to prevent similar incidents in the future."[66]   On information and belief, however, neither the State Patrol nor the MPD have reprimanded, disciplined or suspended any officer involved in any of the unlawful conduct described in this Complaint, nor has any additional training been implemented to "prevent similar incidents in the future."

143.   The State and Municipal Defendants were on notice of their policies, practices, and/or customs of unconstitutional conduct against journalists covering protests, and they had ample reason to believe that their training and supervision regarding these issues was inadequate.

144.   For example, in 2002, the Minnesota Daily (the University of Minnesota student newspaper) filed a complaint with the MPD's Internal Affairs Division related to officer actions against student journalists during a riot following a University of Minnesota Hockey championship victory.   According to written statements in the complaint, a photographer was pushed to the ground from behind and kicked in the back. When a reporter went to help the photographer, she was sprayed directly in the face with a chemical irritant.   Two other photographers were sprayed in the face with a chemical irritant and hit repeatedly with riot sticks. Two photographers had press passes displayed in the middle of their chests, and the others told police officers they were members of the press, according to the complaint.[67]   On information and belief, none of the officers involved in this

---

[66] https://www.startribune.com/minnesota-aclu-sues-to-halt-alleged-misconduct-by-enforcement-agencies-against-media/570991902/

[67]https://archive.nytimes.com/www.nytimes.com/uwire/uwire_JOIN042420022302015.html

misconduct were disciplined pursuant to this investigation, and no new or additional training regarding journalists' First Amendment rights or the use of force was provided in the wake of this incident.[68]  Defendant Kroll was in command during this riot.[69]

145.  In 2008, Amy Goodman, host of "Democracy Now!", and her crew were arrested during the Republican National Convention in St. Paul, despite posing no threat and complying with police orders.[70]  Defendant John Harrington, then Saint Paul Police Chief, brushed off the First Amendment concerns.  Dozens of other journalists were arrested and/or assaulted by police during these protests, including an AP photographer and a journalist from the New York Post, in incidents strikingly similar to those that occurred during the George Floyd protests.  Goodman and her crew filed a federal civil rights lawsuit against various law enforcement agencies, including the Saint Paul Police Department and the MPD based on these unconstitutional actions.  The lawsuit settled in 2011, with the payment of $100,000 in compensation to the affected journalists, as well as an agreement by the Saint Paul Police Department to implement new training aimed at educating officers regarding the First Amendment and the rights of the press covering demonstrations.[71]  The Saint Paul Police Department also agreed to work to get the MPD to implement similar training and to make its own training available to law enforcement state-wide.  On information and belief, the MPD never implemented such training,

---

[68] https://splc.org/2002/08/students-await-word-on-probe-into-police/
[69] https://www.youtube.com/watch?v=fLbePial8xI
[70]https://www.minnpost.com/politics-policy/2008/09/amy-goodmans-arrest-when-journalists-are-story/
[71] https://www.youtube.com/watch?v=1VtmmFFhTxk

however, nor did the Minnesota State Patrol avail itself of the training offered by the Saint Paul Police Department pursuant to this settlement.

146.    Another journalist, Kelly Benjamin, was also assaulted by Minneapolis Police and unlawfully arrested during the RNC protests after identifying himself as a member of the media and displaying his credentials.  Benjamin was injured and his video camera destroyed as a result of this assault by the MPD.   In 2012, Benjamin filed a federal civil rights lawsuit against the City of Minneapolis and the officers who injured him.  The case settled in October 2013 for an unknown amount.  On information and belief, the MPD officers involved in this unlawful arrest and assault were not disciplined, and the MPD did not implement any additional training as a result of this incident or the lawsuit.

147.    In 2012, MPD's Internal Affairs Unit initiated an investigation after Officer Blayne Lehner shoved KSTP photographer Chad Nelson to the ground, damaging Nelson's news camera and injuring Nelson's neck and shoulder.[72]  Nelson filed a criminal complaint against Lehner based on this assault.  Earlier that same year, Lehner had been videotaped choking a peaceful female protester, pepper-spraying other peaceful protesters, and arresting a journalist for no reason with the help of other officers.[73]  Chief Tim Dolan apologized to Nelson for Lehner's assault, but Lehner received no disciplinary consequences for these constitutional violations, and the MPD did not implement any additional training in the wake of these incidents.

---

[72] https://kstp.com/news/mpd-officer-who-has-been-fired-twice-for-excessive-force-will-remain-fired-following-arbitration-ruling/5772259/
[73] http://www.citypages.com/news/mpd-officer-blayne-lehner-shown-choking-and-pepper-spraying-protesters-in-new-footage-video-6549465

148.    In 2015, the Minnesota State Patrol arrested KMSP-TV reporter Jack Highberger while he reported on protests regarding the MPD's killing of Jamar Clark.[74] Video shows Highberger in the middle of a live shot, speaking into his microphone, reporting on the State Patrol beginning to arrest protesters.[75]  A State Patrol officer walked up to Highberger, said, "You wanna be next?" and cuffed him seconds later.  The State Patrol incident report from Highberger's arrest states that State Patrol Lt. Stricker instructed the arresting trooper Bowman to "first arrest [the] male with a video camera" – Highberger – before arresting anyone else.[76]  Hundreds of protesters and other media were peacefully milling about when Highberger was arrested.  Highberger was clearly targeted for arrest *because* he was in the act of reporting.  Highberger was booked, charged, and jailed, despite his obvious status as a journalist.[77]  Highberger's arrest received national media attention and was widely reported locally.[78]  On information and belief, the State Patrol did not discipline any troopers as a result of Highberger's arrest, nor was any additional training implemented.

149.    Other credentialed journalists covering the Jamar Clark protests were arrested, and WCCO-TV reporter Reg Chapman was pepper sprayed by MPD during the

---

[74] https://www.usnews.com/news/articles/2015/11/17/reporter-arrested-covering-minnesota-highway-protest-over-jamar-clark-shooting
[75] https://www.facebook.com/JackHighbergerJournalist/videos/as-some-of-you-may-know-i-was-arrested-this-evening-while-covering-a-protest-for/981050458623682/
[76] https://www.unicornriot.ninja/wp-content/uploads/2016/05/pdf20160111_11310735-final.pdf
[77] https://twitter.com/JackHighberger/status/666643697581166593
[78] https://money.cnn.com/2015/11/17/media/tv-reporter-arrested-black-lives-matter-minneapolis/index.html

protests. The MPD response to the Jamar Clark protests was widely criticized, and the City asked the Department of Justice to prepare an "after-action" report based on a comprehensive review of the protests and the police response. The report, released in 2017, was entitled "Maintaining First Amendment Rights and Public Safety in North Minneapolis."[79]

150. The DOJ Report made many recommendations, including some regarding crowd control and use-of-force that are discussed below. One of the recommendations was that the MPD implement training on "First Amendment rights and protections, legitimacy, and procedural justice" to avoid future unconstitutional actions by the MPD. On information and belief, the MPD ignored this recommendation from the Department of Justice despite being put on notice by the DOJ Report that its training was deficient with respect to the First Amendment.

151. In 2017, the Minnesota State Patrol arrested City Pages journalist Susan Du and Minneapolis Daily City Editor David Clarey during the protests following the Philando Castile killing. Du's phone, camera, keys, notes, and laptop were seized. The State Patrol detained Du and Clarey for nine hours, even though they had attempted to comply with officers' directions to disperse. Du and Clarey had identified themselves as members of the press but were detained nonetheless. On information and belief, no troopers were

---

[79] https://www.policefoundation.org/wp-content/uploads/2017/03/Maintaining-First-Amendment-Rights-and-Public-Safety-in-North-Minneapolis.pdf

investigated or disciplined for these unlawful arrests, nor did the Minnesota State Patrol implement any new training in the wake of these arrests.

152. The State and Municipal Defendants are fully cognizant of the constitutional rights they are failing to protect, and they had ample notice that officers and troopers were violating journalists' constitutional rights during the George Floyd protests, yet they utterly failed to exercise any supervision or discipline to curb the lawless and unconstitutional acts of officers and troopers.

153. Officers and troopers were either explicitly told to disregard journalists' rights, or there has been a failure of command to supervise and discipline officers and troopers regarding violations of those rights.

154. There is a culture of hostility to the media among officers and troopers that the State and Municipal Defendants have taken no steps to curb and have in some instances encouraged. For example, MPD officers routinely parrot President Trump's demonization of journalists as the enemy of the people, railing about the "lamestream media" and "fake news," comments that echo the disparaging remarks about the media made in Defendant Kroll's statement to Federation Members in the wake of the protests.[80]

155. Minneapolis Police officer David Pena displayed the rank-and-file's attitude towards the media in Facebook posts[81] commenting on the First Amendment violations that occurred during the protests:[82]

---

[80] https://www.gq.com/story/minneapolis-police-officer-interview
[81] Pena posts under the pseudonym Dave Rock.
[82] http://citypages.com/news/minneapolis-police-officer-urges-looting-of-cedar-riverside-arresting-press/571046391



**Dave Rock**
Friday at 5:16 AM · 👥

CNN 2nd guy arrested live just now lolololol




 Dave Rock and 5 others          3 Comments   281 Views

👍 Like                        💬 Comment

**Dave Rock**
Friday at 5:15 AM · 👥

This just happened live and cnn reporter arrested by state patrol!!!! Lolol



 Dave Rock and 7 others          7 Comments   373 Views

156. Consistent with Officer Pena's flippant attitude toward the unlawful arrest of Omar Jimenez and his crew, and Defendant Kroll's disparaging statements about the news media, police officers and state troopers responded with profanity and verbal abuse when members of the press identified themselves in the midst of the unconstitutional acts described above, stating, among other things: "I don't care;" "we don't fucking care;" "shut up;" "if you move an inch you'll be shot;" "Roll on your side, Mr. Journalist. You're going to be charged;" "we don't care, we'll arrest you;" "Your [press badges] are bullshit;" "I'm going to get her;" "Do you know what curfew is?" and "I want to fucking peg you."

157. The Minneapolis Police Policy and Procedure Manual Section 6-200 provides:

> MPD employees shall not unnecessarily obstruct news media personnel from performing their duties at emergency scenes. However, news media will not be allowed to cross police lines, which are set up to protect a crime scene. Members of the media must follow all municipal, state, and federal statutes. Media can be restricted from an area where their presence can jeopardize police operations. Only the ranking on-scene officer may grant news media representatives access to any area closed because of investigation or health and safety hazards.

The manual provides no other instruction or guidance on how to identify the media or ensure their First Amendment rights are respected. It does not discuss how to safeguard press freedoms at protests, Section 6-200 does not appear to have been updated since 2008, and the MPD's conduct throughout the Floyd protests showed a widespread disregard and contempt for this policy. Notably, the words "First Amendment" appear nowhere in the entire MPD Policy and Procedure Manual.

158.    MPD officers either do not know, or do not care, about the press's First Amendment rights.  Or, as is apparently the case with Officer Pena and Defendant Kroll, they are actively hostile toward those rights.  Regardless, this state of affairs reflects an unconstitutional MPD policy, practice or custom regarding the rights of the press, and a failure by Chief Arradondo and his command structure to train and supervise regarding the rights of the press and the First Amendment generally.

159.    The Minnesota State Patrol is similarly dismissive of the rights of journalists. After the barrage of international criticism arising out of its illegal detention of Jimenez and his crew, the State Patrol issued the following statement: "In the course of clearing the streets and restoring order at Lake Street and Snelling Avenue, four people were arrested by State Patrol troopers, including three members of a CNN crew. The three were released once they were confirmed to be members of the media."  Of course, it was obvious from the outset that these individuals were members of the media, posed no threat, and sought to accommodate the State Patrol in its mission.  Arresting them had nothing to do with "restoring order" and everything to do with retaliating against and intimidating the press. This clearly false statement demonstrates the State Patrol's and Defendant Langer's reckless and deliberate indifference to the constitutional rights of the press and the violation of those rights by the State Patrol.

160.    During the Floyd protests, from May 27 to June 2 and beyond, dozens if not hundreds of news articles in the local, national, and international press ran every day regarding abuse and arrest of journalists by the State and Municipal Defendants, yet

nothing was done to curb the rampant unconstitutional conduct or discipline those involved.

161.    The State and Municipal Defendants' failure to properly supervise and train their officers, agents, and employees in the wake of past incidents of unconstitutional conduct and hostility to the press, their unlawful use of force against the press and others, and their inaction despite ample notice during the Floyd protests that journalists' constitutional rights were being violated, demonstrates a reckless and deliberate indifference to and/or a tacit authorization of violations of the constitutional rights of Plaintiffs and the Plaintiff Class.

### b.    Unconstitutional Use of Force

162.    The State and Municipal Defendants each have a policy, practice, or custom of unconstitutional use of excessive force in violation of their own written policies.

163.    The MPD has a custom or practice of ignoring its own written use of force policies, and has failed to adequately train on those policies, failed to supervise its officers with respect to those policies, and failed to discipline officers who violated those policies in the past, all of which contributed to the unlawful acts of violence against journalists described above.

164.    A study in 2013 determined that the Office of Police Conduct Review, created in 2012 to replace the Civilian Review Authority as an oversight body for the

internal MPD disciplinary process, had received 439 complaints about officer misconduct. Not a single complaint resulted in discipline for an accused officer.[83]

165.    In 2015, local nonprofit Communities United Against Police Brutality filed a Data Practices Act request with the MPD.  They learned that only two cases had been closed with discipline between October 2012 and March 2015.[84]

166.    A Reuters investigation determined that between 2012 and 2020, the MPD received roughly 3,000 complaints about officer misconduct, including unlawful use of force.  Ninety-percent of those complaints were resolved without discipline or other intervention.[85]

167.    Ultimately, only 1.5% of complaints filed against MPD officers between 2013-2019 resulted in suspensions, terminations, or demotions.[86]  Letters of Reprimand were issued in just 1.1% of cases.  In other words, 97.4% of the complaints filed during that seven-year period resulted in no discipline.

168.    These statistics are consistent with MPD's message to officers that they need not fear discipline for violating the MPD's use-of-force policies or individuals' constitutional rights, as MPD's policy, practice and custom has been to excuse and ignore patterns of unconstitutional excessive force by its officers.

---

[83] https://www.usccr.gov/pubs/2018/03-22-MN-Civil-Rights.pdf
[84] https://www.southwestjournal.com/news/2015/12/a-look-inside-the-office-of-police-conduct-review/
[85] https://www.reuters.com/article/us-minneapolis-police-culture-specialrep/special-report-how-union-supreme-court-shield-minneapolis-cops-idUSKBN23B2LL
[86] https://www.cnn.com/2020/06/11/us/minneapolis-police-discipline-invs/index.html

169. For example, in 2015, the City settled a federal lawsuit filed after Officer Tyrone Barze, Jr., after he confiscated the cellphone of a woman who was filming him and punched her in the face. The suit settled for $82,000. The City had previously settled a lawsuit filed after Barze put a high school student in a chokehold. That suit settled for $140,000. The City had also settled a lawsuit for $34,000 that was filed after Barze "unreasonably" pepper sprayed the manager of an Uptown bar.[87] Barze was sued again for unnecessary force later that year.[88] The lawsuit noted that Barze had been the subject of five previous unnecessary force lawsuits. The suit settled for $62,500. As of April 2016, the City had paid $318,000 to settle excessive force lawsuits against Barze.[89] A number of these lawsuits involved Barze's unlawful seizure and destruction of the victims' cellphones or deletion of footage of Barze's misconduct.[90] Nonetheless, Kroll lauded Barze as "excellent" and a "hardworking cop" and complained that the City Attorney's office was "too quick to settle" excessive force cases.[91] Kroll had trained and supervised Barze when he first joined the MPD. On information and belief, Barze had been the subject of 12 different complaints at MPD but had only been disciplined once despite the multiple

---

[87] http://www.citypages.com/news/minneapolis-officer-tyrone-barze-investigated-again-for-police-brutality-6544768

[88] https://www.startribune.com/man-sues-city-cop-for-excessive-force-during-2014-arrest/361637401/

[89] https://www.startribune.com/settlement-in-suit-against-mpd-cop-who-s-cost-the-city-320-000/377502941/

[90] https://m.facebook.com/cuapb.org/posts/10156444445252221

[91] https://www.startribune.com/minneapolis-pays-82-000-in-case-of-maple-grove-woman-allegedly-punched-by-officer/328687241/

excessive force settlements. Instead of disciplining Barze, the MPD chose him to train officers on appropriate use-of-force.[92]

170. As another example, despite multiple excessive force complaints, Officer Ty Jindra was not disciplined or removed from patrol duty with the MPD until he came under federal investigation for criminal allegations involving his excessive use of force.[93] On information and belief, at least 12 separate complaints have been filed against Jindra in his 5 years at the MPD. Among the incidents involving Jindra was one in which he pointed his service weapon at two handcuffed individuals and asked them if they wanted "to get fucking shot."[94] Jindra was not disciplined for this incident. Jindra's father, Jeff Jindra, was also an MPD officer with a history of uses of excessive force, including one incident in which he kicked a handcuffed suspect so hard in the face that he broke the individual's jaw. The City settled this lawsuit for $110,000.[95] The elder Jindra was not disciplined for this unlawful use of force.

171. In 2013, Officer Lucas Peterson shot and killed Terrence Franklin during a confrontation in Uptown. At the time, Peterson had been sued at least 13 times for use of excessive force, claims which settled for more than $700,000 total.[96] Notably, one of these

---

[92] https://www.startribune.com/settlement-in-suit-against-mpd-cop-who-s-cost-the-city-320-000/377502941/

[93] https://www.startribune.com/sources-minneapolis-cop-under-federal-investigation-for-alleged-excessive-force-theft/568245842/

[94] http://www.citypages.com/news/charges-dropped-after-scene-of-chaotic-minneapolis-arrest-released-video/566842611

[95] https://www.minnpost.com/politics-policy/2015/10/disorderly-conduct-its-zeal-bust-drug-dealers-and-prostitutes-minneapolis-po/

[96] https://www.startribune.com/13-excessive-force-complaints-against-minneapolis-cop-involved-in-shooting/213718651/

settled claims involved Peterson firing a 40mm "marking round" at close range at an RNC protester in 2008.[97] Peterson was not disciplined for this incident. In fact, despite Peterson's lengthy excessive force complaints, his only discipline has been a letter of reprimand. Franklin's estate sued Peterson for wrongful death, and the City settled that case for $800,000 in February 2020.[98] Peterson was never disciplined for the killing of Franklin, and he remains the training coordinator for the MPD Swat Team.[99]

172. In 2013, MPD officer Blayne Lehner (whose assault of protesters and unlawful arrest of a journalist are described above) kicked an 18-year old handcuffed in the back of his squad car so hard that the man's teeth were knocked out and his jawbone exposed (Lehner's assault and unlawful arrest of journalists in 2012 is described above).[100] Lehner was sued in 2015 for this misconduct. The City paid $360,000 to settle the lawsuit. Lehner had been the subject of at least 30 internal affairs investigations, received two letters of reprimand, and been suspended twice for misconduct. He had been previously disciplined five times for excessive force. Yet on information and belief, he was not disciplined for this incident. It was not his first federal lawsuit for kicking an individual in the face. In 2012, Lehner was sued for a 2011 incident in which he kicked a prone, non-resisting individual in the face during an unlawful warrantless search of a duplex

---

[97] https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/1509687 595/Lucas_Peterson_13_excessive_force_lawsuits.pdf?1509687595
[98] https://www.startribune.com/council-approves-795-000-payment-to-family-of-terrance-franklin-in-2013-police-shooting/567878132/
[99] https://www.linkedin.com/in/lucas-peterson-56237b80
[100] https://minnesota.cbslocal.com/2016/01/28/mpls-police-union-files-grievances-over-2-officer-firings/

apartment.[101]  That lawsuit settled for $85,000.  On information and belief, Lehner was not disciplined for either the 2011 or 2012 incident.

173.  A 2015 Department of Justice analysis of the MPD disciplinary system found that "serious disciplinary actions against officers occur infrequently."  The review recommended that the disciplinary system be re-vamped to better ensure compliance with MPD's use of force and other policies.[102]  On information and belief, the MPD has not implemented the DOJ's recommendations on how to improve its systems for preventing, investigating, and sanctioning police misconduct.[103]

174.  In 2015, protests erupted in North Minneapolis after the MPD killing of Jamar Clark.  The MPD's violent response to the protests was widely criticized.  As noted above, in 2017 the Department of Justice released an after-action report regarding the MPD's response to the Jamar Clark protests.  It found that the MPD "did not have adequate department-wide training on crowd management, negotiated resolution, de-escalation, the use of personal protective equipment or the use of less-lethal instruments . . ."[104]  On information and belief, few if any of these DOJ recommendations were adopted by the MPD.

175.  Among other things, the DOJ Report found:

---

[101] http://www.citypages.com/news/mpd-officer-blayne-lehner-named-in-misconduct-lawsuit-mpls-settles-for-85k-6547490

[102] https://docplayer.net/2826886-Diagnostic-analysis-of-minneapolis-police-department-mn.html

[103] https://www.startribune.com/minneapolis-police-behind-the-ball-on-years-old-department-of-justice-report/510595072/

[104] https://www.policefoundation.org/wp-content/uploads/2017/03/Maintaining-First-Amendment-Rights-and-Public-Safety-in-North-Minneapolis.pdf

"The Minneapolis Police Department did not have adequate department-wide training on crowd management, negotiated resolution, de-escalation, the use of personal protective equipment, or the use of less-lethal instruments prior to the [Jamar Clark protests];"

"The Minneapolis Police Department had inadequate policy, guidelines, training, and equipment for crowd management;"

"No departmental policy currently exists on [crowd-control] equipment type, use, or training. Also, no policy exists to define who receives equipment, training on equipment, or the inspection and deployment of equipment;"

"Marking rounds were deployed without plans for the subsequent extraction and arrest of the individuals who were marked . . . [and] The MPD does not have policy, procedures, or training regarding the deployment of marking rounds."

176. In response to these deficiencies, the DOJ Report recommended that:

At a minimum, future department-wide training should include the following:

■ First Amendment rights and protections, legitimacy, and procedural justice;

■ Crowd management, MFF operations, de-escalation, negotiated management, and problem solving;

■ ICS training that builds on the FEMA curricula as a foundation for the MPD, its regional public safety partners, and elected officials;

■ Use of force and less-lethal instrument deployment in accordance with MPD's recently released use of force policy and best practices;

■ Hands-on personal protective equipment training.

177. The DOJ Report also found that "During the occupation at the Fourth Precinct, MPD employees deployed less-lethal and non-lethal weapons without clear

authorization from the incident commander, in violation of policy 5-312." On information and belief, no officers were disciplined for these violations and no additional training was implemented to prevent similar violations in the future.

178. The DOJ Report also found that: "MPD deployed chemical agents without prior authorization, in violation of policy 5-313." On information and belief, no officers were disciplined for these violations, and no additional training was implemented to prevent similar violations in the future.

179. The MPD did not implement additional policies, controls, or training after the issuance of the DOJ Report to address the negative findings in the report or the recommendations it made.

180. In 2016, the Minneapolis Police Conduct Oversight Commission issued a report regarding the MPD citizen complaint filing procedure.[105] It concluded that some civilian complaints were not even reaching the OPCR. The report flagged the following issues, among others:

- Top search results for the five most commonly used search engines (i.e. "File complaint against Minneapolis police officer) leads to a police department page on the city website that has no mention of OPCR and instructs complainants who want to file in person to go to a precinct;

- MPD website directs complainants to file complaints at any of the five precincts. Testers were sent to each precinct and asked to file complaints. In 13 of the 15 attempts, complainants were not offered the opportunity to file a complaint at the precinct;

---

[105] https://www.aclu-mn.org/sites/default/files/field_documents/wcmsp-184609.pdf

- Testers were often told that no paper forms were available. Forms were provided to precincts and can be printed from the MPD website;

- Testers were told they had to go to another precinct to file a complaint. Complaints should be accepted at any precinct regardless of where the incident occurred.

The report made 11 recommendations regarding how to handle the complaint intake process to ensure all complaints were heard. On information and belief, none of these recommendations have been implemented.

181. A current MPD officer told one reporter recently: "We've had a number of cases that led to internal investigations, and the worst punishment any officer has received was a 48-hour suspension. In a department with the track record of Minneapolis, that shows everything."[106] The MPD called this reporter and pushed her to disclose the identity of this anonymous MPD officer, claiming it had launched an "internal investigation" into the "leak."[107]

182. Former Chief Harteau has called MPD's disciplinary system "ineffective." Chief Arradondo has complained that the system is "debilitating" because it prevents him from terminating officers whose misconduct warrants termination. Former Mayor R.T. Rybak has complained about "wanting to take harder discipline and running into all sorts of contract issues."[108]

---

[106] https://www.gq.com/story/minneapolis-police-officer-interview
[107] https://twitter.com/LEBassett/status/1280966908527984645
[108] https://www.cnn.com/2020/06/11/us/minneapolis-police-discipline-invs/index.html

183.     A culture of impunity, tolerance for constitutional violations, and open hostility to the press, all of which constitute the custom, practice, and policy of the MPD, culminated in the police abuses of the press described above.  The constitutional violations alleged above were a direct result of MPD policy, practice, and custom, as well as the failure of the MPD to supervise and discipline officers to ensure they adhered to MPD's written policies on use of force and the media and demonstrated respect for the Constitution and the law.

### J.     THE POLICYMAKING ROLE OF DEFENDANT KROLL.

184.     Defendant Kroll is both a Lieutenant in the Minneapolis Police Department and the president of the Police Officers Federation of Minneapolis.  Kroll's supervisory role in the MPD is significantly amplified by his position as Federation President.  Kroll occupies a unique position among the State and Municipal Defendants, as he acts under color of state law with respect to both his supervisory duties as a lieutenant but also in his role as Federation President.

185.     Under the contract between the City and the Federation, Kroll has full time release from his policing duties while being paid by the city and has an office in the MPD's Human Resources Unit which gives him access to more personnel data and on a quicker basis than he would otherwise have in his role as union president.

186.     Kroll acts as an unofficial policymaker and state actor within the MPD far beyond his command and supervisory duties as a lieutenant.  The Federation's contract with the City of Minneapolis establishes that while certain inherent managerial policy matters fall within the authority of the City (and the MPD command structure), the

Federation has a role in setting those policies, a provision under which Kroll operates in his capacity as Federation President.[109]  Kroll also influences MPD custom and practice through his public and private statements and instructions to officers.

187.    Thus, the MPD's policies, customs and practices derive not just from the command structure within the department, but also from Kroll in his role as Federation President.  Kroll actively sows discord between rank-and-file officers and the command structure as a means of further amplifying his policy role and outsize influence over police culture.  What Kroll casts as his "opinions" as Federation President have the practical effect of serving as policy guidance for officers, which aggravates the State and Municipal Defendant's training and supervision failures described above.

188.    For example, during the George Floyd protests, even after some of the egregious abuses of journalists described above, Kroll implored MPD commanders to further loosen the existing, ineffective restrictions on use of less-lethal projectiles and chemical agents.  In so doing, Kroll inserted himself into the command structure in a policymaking and advisory role inconsistent with his rank.

189.    Kroll wrote in an email to command staff on May 29, 2020: "The officers have lost faith in leadership that appears handcuffed by political power that despises us. That was very evident with numerous examples by several at today's press conference. Examples include no arrests, no mobile booking stations, restrictions on use of gas and less

---

[109]http://www2.minneapolismn.gov/www/groups/public/@hr/documents/webcontent/wc msp-200131.pdf

lethal. At some point community engagement needs to end and law enforcement needs to take place."[110] Unsurprisingly, given Kroll's insistence on "unhandcuffing" the MPD's protest response, many of the most egregious attacks on journalists occurred on May 30 and 31.

190. On June 2, 2020, Kroll released a statement to Federation members that underscores his role as *de facto* policymaker and Kroll's failure to supervise with respect to the particular First and Fourth Amendment issues described in this Complaint.[111]

191. Kroll's June 2 statement seeks to drive a wedge between rank-and-file officers and MPD leadership:

> "No one with the exception of [Kroll and the Federation board] is willing to recognize and acknowledge the extreme bravery you have displayed throughout this riot."

> "What has been very evident throughout this process is you have lacked support from the top."

> "I've noted in press conferences from our mayor, our governor, and beyond, how they refuse to acknowledge the work of MPD and continually shift blame to it. It is despicable behavior. How our command staff can tolerate it and live with themselves I do not know."

> "Your federation board will not remain silent. It's important for us to get order restored and safety resumed. We do have a lot to say about failed leadership when the time is right. We've been formulating plans for that."

---

[110] https://kstp.com/news/minneapolis-police-union-blames-failed-leadership-for-riots-violence-june-23-2020/5769384/

[111] https://twitter.com/ChiefHarteau/status/1267460683408564225/photo/1

192. Kroll's statement flags both his outsized supervisory role and his failure to supervise. In it, he speaks of himself as though he, and not Chief Arradondo, leads the department, and he ratifies the rampant unconstitutional conduct detailed below:

> "Although I have not been visibly present, I am closely monitoring what is occurring. I commend you for the excellent police work you are doing . . ."

> "I've had numerous conversations with politicians at the state level. I gave a detailed plan of action including a range of 2000 to 3000 National Guard, their deployment allocations throughout our city and St. Paul, in a phone meeting with Senate majority leader Paul Gazelka."

> "I've worked with other police leaders from New York to Las Vegas to push our messaging on a national level."

193. Kroll's statement scapegoats the "liberal media," accusing the press of somehow preventing him from being more vocal, and explicitly ties media coverage to danger to the rank-and-file police officers and to Kroll himself, statements which constitute incitement against the press given the current climate of unrest:

> "I've been a visible target from the groups conducting this riot, politicians on the left allowing it and encouraging it, and liberal media. My visibility during this time would only increase your danger. I've received countless death threats throughout this."

194. Former Minneapolis Police Chief Janee Harteau responded to the Kroll statement by stating: "A disgrace to the badge! This is the battle that myself and others have been fighting against. Bob Kroll turn in your badge!"[112]

---

[112] https://twitter.com/ChiefHarteau/status/1267460683408564225

195. Kroll had engaged in public criticism of the department during prior protest situations. During the protests that erupted in the wake of the Jamar Clark killing, Kroll routinely gave radio interviews in which he criticized the Mayor and the Chief, lambasted the MPD command structure for what he viewed as a weak response to the protests, undercutting the Mayor's order that the MPD act with restraint in response to the protests, and the public statements from Chief Harteau that protesters First Amendment rights would be respected.[113]

196. Kroll's outsize influence in setting police policy, custom, and practice, is widely known. During her tenure, Chief Harteau sought to reform policy and practice within the MPD but was consistently resisted and subverted by Kroll. She explained recently: "The police federation has historically had more influence over police culture than any police chief ever could. I was fought at every turn from bringing body cameras to the police department to having implicit bias training to professional development processes and having some more consistency in promotions."[114] She stated that when she sought to implement a body camera program for the department, the Federation opposed the policy change and resisted it "at every turn."[115]

197. Former Assistant Minneapolis Police Chief Kris Arneson, who served during Chief Harteau's tenure, has stated: "Kroll instigates behind the scenes all the time, and if

[113] https://www.policefoundation.org/wp-content/uploads/2017/03/Maintaining-First-Amendment-Rights-and-Public-Safety-in-North-Minneapolis.pdf
[114] https://www.theguardian.com/us-news/2020/jun/05/minneapolis-police-union-bob-kroll-us
[115] https://www.reuters.com/article/us-minneapolis-police-culture-specialrep/special-report-how-union-supreme-court-shield-minneapolis-cops-idUSKBN23B2LL

anybody thinks he doesn't, they don't know what they're talking about. I've seen him agree to reform efforts and then hack away at them behind the scenes."[116]

198. In 2017, the MPD rolled out changes to its "deadly force" policy that the Federation opposed. Kroll attacked the policy in private conversations with officers and in public appearances, complaining it was too vague, hamstrung officers, and visited unfair penalties on those who violated the policy.[117] Kroll's opposition to the policy change ultimately killed the policy, and the Federation's preferred "deadly force" policy remained in place.

199. Also, in 2017, in the wake of the Justine Damond shooting, the MPD instituted a new policy requiring police body cameras be activated when officers were dispatched. Kroll attacked the new policy in public, calling it "a knee-jerk reaction and politically motivated," and stating that any such policy change should be "carefully examined" before going into effect.

200. Former Mayor R.T. Rybak has stated Kroll has an outsize (and highly negative) influence on MPD custom and practice.[118] Rybak recently stated: "We've never had a person leading the Federation who is as bombastic, who is as overtly racist, who is as likely to provide comfort to someone when they do something wrong, who is as central

---

[116] https://www.startribune.com/after-decades-of-union-clout-entire-police-dept-now-at-risk/571242042/
[117] https://m.startribune.com/minneapolis-cops-retreat-from-stricter-deadly-force-policy/429986473/
[118] https://www.theguardian.com/us-news/2020/jun/05/minneapolis-police-union-bob-kroll-us

to that toxic culture as Bob Kroll. And it is time to name names. Bob Kroll is a cancer on this police department; on this city."[119]

201. Current Mayor Jacob Frey has also struggled to combat Kroll's influence on MPD policy, practice, and custom, stating that the Federation has resisted all the reforms he has worked to institute, and that he is "hamstrung by the architecture of the system" of the Federation's contract with the City of Minneapolis.

202. Frey has stated that the main obstacle to changing MPD policy and practice is the Federation, explaining: "what I'm talking about is pushing back hard on the union contract, it's about going after the police union," and suggesting in order to implement the command structure's stated policy, practice and custom at the MPD, it may be necessary to abolish the Federation.[120]

203. For example, in 2019, Frey banned MPD's use of so-called "warrior-style training" for its officers. Frey explained: "We have adopted this new policy because proper training on use of force and de-escalation is of paramount importance," cautioning that "[o]fficers found to pursue any training that conflicts with MPD's training and has not been preapproved will be subject to discipline." MPD spokesman John Elder clarified the importance of officers being trained only through processes sanctioned by the MPD command staff: "The policy just requires preapproval for external trainings on these topics to make sure there is not a conflict. The MPD encourages and supports training for its staff

[119] https://deadspin.com/all-the-reasons-bob-kroll-can-go-to-hell-including-his-1843905449
[120] https://minnesota.cbslocal.com/2020/06/08/mayor-frey-supports-massive-structural-transformational-reform-of-police-department-not-abolishing-it/

that encompasses officer and community safety based on procedurally just methodology."

Undaunted, Kroll announced that the Federation would pay for and offer the warrior-style training to MPD officers, essentially usurping the official training function of the MPD and the training determinations of its command structure.[121] While it is not clear whether any officers took the Kroll up on the offer, warrior-style training videos were ultimately circulated among the MPD rank-and-file to blunt the command structure's attempts at reform.[122]

204.    Frey recently stated: "For years in Minneapolis, police chiefs and elected officials committed to change have been thwarted by police union protections and laws that severely limit accountability among police departments," and Frey identified the Federation as a "persistent barrier" to reforms of the MPD's policies, practices, and customs.[123]

205.    Similarly, Defendant Arradondo has complained that he is stymied in carrying out his duties of supervision and discipline because the Federation's contract

---

[121] https://www.startribune.com/minneapolis-police-union-offers-free-warrior-training-in-defiance-of-mayor-s-ban/509025622/?refresh=true
[122] https://www.washingtonpost.com/national/police-chiefs-and-mayors-push-for-reform-then-they-run-into-veteran-officers-unions-and-how-culture-is-created/2020/06/28/7d2ff812-b2ef-11ea-8f56-63f38c990077_story.html
[123] https://www.startribune.com/minn-officials-push-for-systems-change-at-minneapolis-police-dept/570958652/

"diminishes [his] authority as chief . . ."[124]  Per Arradondo, Kroll's attitudes and outlook "absolutely" has an influence on the police force.[125]

206.    Indeed, Arradondo recently announced publicly that the MPD was withdrawing from its contract negotiations from the Federation in an attempt to curb the Federation's influence over MPD policy, practice, and custom.  Arradondo's stated rationale for this move confirms that the Federation's role has devolved from negotiating for its members to influencing and developing MPD policy:  "This is not about officers' wages, bonuses or salaries . . . [t]his is about examining those significant matters that touch on things such as critical incident protocol, use of force . . . and also the discipline process to include both grievances and arbitration."[126]  Frey supported withdrawal from the negotiations, explaining that changing the MPD's relationship to the Federation was not just about a new contract but about a "new compact between the people of Minneapolis" and the MPD.

207.    As discussed above, in response to a request from Minnesota Senate Majority Leader Paul Gazelka, Kroll developed a "detailed plan" for deployment of National Guard troops to be effectuated in coordination with the MPD's response to the George Floyd protests.  That Gazelka thought it appropriate to reach out to Kroll to solicit policy suggestions related to the protests, that Kroll thought it appropriate to respond and develop

---

[124] https://www.cbsnews.com/news/minneapolis-police-chief-medaria-arradondo-geroge-floyd-killing-60-minutes-2020-06-21/
[125] https://www.cbsnews.com/news/minneapolis-police-chief-medaria-arradondo-geroge-floyd-killing-60-minutes-2020-06-21/
[126] https://minnesota.cbslocal.com/2020/06/10/chief-arradondo-announces-immediate-withdrawal-from-contract-with-police-union/

a "detailed plan of action," and that Gazelka then passed that information on to the Governor's office and discussed it at his own press conference demonstrates that legislative leaders outside the City of Minneapolis view Kroll as an official policy maker separate and distinct from the MPD command structure.[127]

208.    Consistent with this perception, the Minnesota Senate's Judiciary and Public Safety, and Transportation, Finance, and Policy Committees held a joint July 15, 2020 hearing on "Local Law Enforcement Response to Riots and Lawlessness." It invited three representatives from the Federation board to testify and answer questions, to explain the official actions of the MPD during the George Floyd protests, and to make legislative and policy recommendations. Neither Chief Arrandondo, Mayor Frey, nor anyone from the Mayor's staff or the MPD command structure were called to testify. In contrast, Commissioner Harrington and Colonel Langer – those with actual command responsibility for the State response to the protests – were called to testify and answer questions about the State's response.[128]

209.    Kroll's policymaking role was front-and-center at the Mohammad Noor trial, during which both the victim's family and the Hennepin County Attorneys' Office accused the Federation of instructing officers how and when to respond to official inquiries about the killing. When the Hennepin County Attorney's Office threatened to hold officers in

---

[127] *See* https://twitter.com/paulgazelka/status/1267939016940359687
[128] https://www.senate.mn/committees/2019-2020/3102_Committee_on_Transportation_Finance_and_Policy/Agenda%20-%20Joint%20Hearing%204.pdf

contempt for refusing to testify before Noor's grand jury, Kroll threatened that the move could affect officers' relationship with the county attorney, stating: "They need to figure out whose side they're on — law enforcement should work collectively with city and county attorneys to prosecute criminals."[129] After Noor's conviction, Justine Damond's father stated: "We believe that this conviction was reached despite the active resistance of a number of Minneapolis officers, including the head of the union."[130]

210. In 2019, Minneapolis Councilmember Steven Fletcher advanced an initiative to divert money from hiring additional MPD officers and toward a newly created office of violence prevention. Fletcher has stated that in response to this policy initiative, the police stopped responding as quickly to 911 calls placed by his constituents: "Politicians who cross the MPD find slowdowns in their wards. After the first time I cut money from the proposed police budget, I had an uptick in calls taking forever to get a response, and MPD officers telling business owners to call their councilman about why it took so long."[131] Fletcher further stated, "It makes it very hard to implement reforms if … the federation is in the background saying, 'Don't worry about this, we'll file a grievance. That sends a strong signal that you can just ignore leadership. That has, over time, created a culture that is very resistant to change."[132] Councilmember Phillipe Cunningham echoed Fletcher's statement, indicating he too had suffered artificially slow MPD response times after

---

[129] https://www.startribune.com/tension-rises-between-county-attorney-police-union-in-noor-grand-jury-investigation/475458363/
[130] https://kstp.com/news/mohamed-noor-trial-differences-police-prosecutors/5337364/
[131] https://twitter.com/MplsWard3/status/1267891878801915904
[132] https://minnesota.cbslocal.com/2020/06/22/in-minneapolis-talk-of-changing-police-department-means-taking-on-police-union/

proposing to cut the MPD budget.[133]  Councilmember Jeremiah Ellison has stated, "Kroll is now the leader of one of the most hostile PDs in the country.  Officers treat their job less like a job and more like an ideology because of Bob's guidance."[134]

211.    Federation board members also refer to Kroll as a "leader" of the MPD rank-and-file, conflating his role as Federation President into a policymaking role at the MPD far exceeding his rank of Lieutenant.  In a June 24, 2020 interview with KARE 11 news, Federation Vice President Sgt. Sherral Schmidt stated: "Right now our members want . . . they want leadership from someone.  And the Federation and Bob are the only ones that are providing that right now."[135]

212.    In the wake of the George Floyd killing, other Minnesota labor unions called for Kroll's resignation and flagged the Federation's outsize role in establishing MPD's policy, practice, and custom and thwarting the implementation of official policy.  The AFL-CIO castigated Kroll and the Federation for "enabl[ing] violence and brutality to grow within police ranks . . ."[136]  The American Federation of Government Employees, which represents federal law enforcement officers, stated: "as a union that represents law enforcement officers, we also have a special responsibility to ensure that the labor movement doesn't serve as a shield for bad actors or a barrier to needed structural change

---

[133] https://twitter.com/CunninghamMPLS/status/1267920374207037448

[134] https://spokesman-recorder.com/2020/06/05/bob-kroll-reaffirms-suspicions-the-mpd-is-beyond-reform/

[135] https://www.kare11.com/article/news/local/george-floyd/police-union-president-bob-kroll-will-not-resign/89-2090d428-d5ab-423f-ac73-626ec6b0c969

[136] https://www.mnaflcio.org/updates/minnesota-afl-cio-calls-minneapolis-police-union-president-bob-kroll%E2%80%99s-immediate-resignation

. . ."[137]  AFSCME wrote: "Unions exist to protect the rights of working people, not to prevent the justice system from doing what is right."[138]  Education Minnesota President Denise Specht stated: "We know the dangerous culture of the Minneapolis Police Department will not be changed overnight by [Kroll's removal], but it's a start."[139]

213.    Community leaders likewise perceive the outsize influence Kroll and the Federation exercise over MPD policy, practice, and custom.  For example, Jaylani Hussein, head of the Minnesota chapter of the Council on American Islamic Relations recently stated that while Arradondo is "the best person to oppose Kroll's influence," he is "fighting an uphill battle."[140]  Former labor leader and local activist Javier Morillo has stated that the Federation today is unlike any union in Minnesota and is far removed from the workers' rights movements central to organized labor, resembling instead something more akin to a union within the U.S. Army, which inevitably confuses the command structure.  Morillo stated: "So long as police departments operate in that same kind of structure, to me it begs the question: Is this really a labor-management situation?"[141]

[137] https://www.afge.org/publication/largest-union-representing-federal-employees-in-minn.-calls-for-immediate-resignation-of-minneapolis-police-union-president-bob-kroll/
[138] https://www.afscmemn.org/council-5/news/afscme-council-5-executive-director-julie-bleyhl-calls-bob-kroll-s-immediate
[139] https://educationminnesota.org/news/media-resources/news-releases/Education-Minnesota-calls-for-resignation-of-Minne
[140] https://www.mprnews.org/story/2020/06/12/calls-for-mpd-union-leaders-resignation-grow-louder
[141] https://www.startribune.com/after-decades-of-union-clout-entire-police-dept-now-at-risk/571242042/

214. Kroll himself has trumpeted his and the Federation's influence. In a 2015 interview with the City Pages, Kroll stated: "I think [protesters] see the police federation as a power and they want to take me out of that equation to eliminate part of that power."[142]

215. In a 2015 interview with WCCO Radio, Kroll was attacking Mayor Hodges when Harteau called into the radio show. Harteau and Kroll debated over MPD policy and practice with respect to protests outside the MPD's Fourth Precinct building, with Kroll pushing for MPD to adopt a more aggressive response to the protests, this policy debate and Kroll's insubordination occurred despite his ostensibly limited role as a mere lieutenant.[143]

216. Kroll's public statements to the news media and at political rallies underscore the shadow command structure that has emerged under his leadership at the Federation. Kroll has appeared many times on local and national television and on radio, disparaging official police policy and undermining the authority of the MPD command structure. Kroll has used these public appearances to render his own and the Federation's positions on MPD policy, practice, and custom. For example, onstage at a rally for President Trump viewed by millions on national television, Kroll complained generally that police reforms advanced by President Obama and the Department of Justice were "despicable," and accused the Department of Justice of "putting handcuffs on the police," that were "taken

---

[142] http://www.citypages.com/news/activists-claim-police-union-chief-bob-kroll-is-racist-7877832
[143] https://www.youtube.com/watch?v=fLbePial8xI

off" by the Trump Administration.[144]  Kroll stated in a 2019 radio interview that officers had the right to attend the prohibited "warrior-style" training and that "this isn't the Soviet Republic of Minneapolis, although a lot of the progressive politicians would like it to become that."[145]

217.    Kroll has also publicly downplayed issues with officer misconduct, stating, "You show me an officer who's never had a [misconduct] complaint in 30 years and I'll show you an officer that's what we call on the job, a load or a slug — that doesn't do anything."[146]

218.    In March 2020, Kroll bragged about his impunity on law enforcement podcast "The Skirmish Line": "I've had 54 complaints filed against me over my 31 years, and I'm still here.  I'm still Lieutenant.  I've been disciplined, but none of it has ever been upheld.  I've been sued 11 times."[147]  In explaining how the Federation "lessen[s] the impact" of civilian oversight of the police, Kroll stated that the Federation "coach[es]" officers facing discipline on how to give a statement during the investigation, specifically, "how to verbalize the justification for their actions," because some officers need "assistance" to explain their conduct.

---

[144] https://www.cnn.com/videos/politics/2020/06/01/minneapolis-police-union-president-praise-trump-campaign-rally.cnn
[145] https://wccoradio.radio.com/media/audio-channel/bob-kroll-chad-hartman-4-19mp3
[146] https://www.mprnews.org/story/2020/06/12/calls-for-mpd-union-leaders-resignation-grow-louder
[147] https://theskirmishline.podbean.com/e/s01e04-a-discussion-about-civilian-oversight-of-the-police

219.    In 2016, the MPD terminated officer Rod Webber after he pulled over a car containing four Somali teens, held them without arrest for 45 minutes, and threatened to break the legs of one of the teens.  This incident was captured on cell phone video.  Kroll commended Webber in an interview, stating Webber was a "highly decorated 25-year veteran officer" and that the termination was "unwarranted."[148]  The federation filed a grievance contesting his termination.[149]

220.    In 2016, Chief Harteau attempted to fire Officer Blayne Lehner, whose lengthy record of misconduct is described above, after a 2014 incident of excessive force by Lehner.  The Federation filed a grievance, arguing that the termination constituted disparate treatment of Lehner "by punishing him more severely than other officers who have engaged in more serious misconduct."[150]  The arbitrator agreed, overturning the termination and explaining "the comparator evidence submitted by the Union shows that other officers who have engaged in other policy violations have received discipline short of discharge."[151]

221.    Incredibly, at the time of his 2016 attempted termination, Lehner was a member of the Federation board.  Kroll stated in response to Lehner's termination that "Blayne Lehner is an exceptional officer and federation board member," that Lehner was

---

[148]https://minnesota.cbslocal.com/2016/01/25/minneapolis-officer-who-allegedly-threatened-to-break-teens-leg-fired/
[149] https://minnesota.cbslocal.com/2016/01/28/mpls-police-union-files-grievances-over-2-officer-firings/
[150] https://mn.gov/bms/documents/BMS/127868-20161006-Mpls.pdf
[151] https://mn.gov/bms/documents/BMS/127868-20161006-Mpls.pdf

an "excellent cop" who had "served the city well," and called him a "great cop."[152] Lehner was ultimately terminated in 2019 for unspecified misconduct.

222.  The Lehner saga demonstrates how the MPD's policy, practice, and custom of lax discipline, driven by Kroll's negative influence, created a culture of impunity at the MPD that was on display during the MPD's response to the George Floyd protests.

223.  At a 2018 U.S. Civil Rights Commission hearing, Kroll testified, among other things, about the death of Eric Garner, who was suffocated by New York police officers while complaining he couldn't breathe, in a horrific precursor to the murder of George Floyd.  With respect to Garner's death, Kroll testified, "of course we had the Eric Garner situation, he said he couldn't breathe 11 times. Now you can't breathe, you can't say you can't breathe, particularly 11 times. It was a false narrative."[153]  In an example of Kroll's malign influence on MPD customs and culture, Officer Chauvin parroted Kroll as he kneeled on George Floyd's neck, dismissing Floyd's pleas that he couldn't breathe and stating, "it takes a heck of a lot of oxygen to talk."

224.  At that same hearing before the Civil Rights Commission, Kroll attacked the news media, accusing it of perpetuating "false narratives" about the MPD that "ha[ve] set us back greatly," and that because of "adverse effect in the media," MPD officers were "thinking twice before getting out and investigating suspicious circumstances."[154]

---

[152] https://www.mprnews.org/story/2016/10/18/minneapolis-police-officer-reinstated-after-firing; https://minnesota.cbslocal.com/2016/10/18/mpls-cop-fired-blayne-lehner/
[153] https://www.usccr.gov/pubs/2018/03-22-MN-Civil-Rights.pdf
[154] https://www.usccr.gov/pubs/2018/03-22-MN-Civil-Rights.pdf

225.     Kroll's dismissive attitude toward use of force complaints and hostility toward the news media have infected the MPD.   His decades of service in Federation leadership, and his strong public and private statements on those issues, have shaped MPD custom and practice, and MPD leadership and the City are well aware of Kroll's influence on MPD policy, practice, and custom.

226.     Notably, Kroll has a long history of racist and inflammatory statements and conduct, from calling Attorney General (then Congressman) Keith Ellison a "terrorist," to his membership in the City Heat off-duty law enforcement motorcycle club, an organization called out by the Anti-Defamation League for displaying white supremacist symbols, including Ku Klux Klan symbols and "proud to be white" patches.[155]  Kroll was asked in a 2009 interview about the motorcycle club, and specifically a picture in which one member's motorcycle jacket included a KKK cross emblem with an "I'm Here For The Hanging" patch right below it.   Kroll said the patch, worn by someone Kroll believed was a Chicago-area member of the club, was being misinterpreted as racist, stating it was "some type of inside joke with Chicago."  He elaborated for the reporter:

> "Aren't you aware of hangings in old Western shows?" Kroll asked. He believes the patch stems from "Beer for My Horses," a country-western song Kroll says is popular among cops because of its strong law-and-order lyrics.  The song "has reference to taking all the rope in Texas, find a tall oak tree, round up all of them bad boys, hang 'em high in the street," Kroll said. "Great song — I have the CD."[156]

---

[155] https://www.adl.org/sites/default/files/documents/assets/pdf/combating-hate/ADL_CR_Bigots_on_Bikes_online.pdf

[156] https://www.twincities.com/2009/01/10/ruben-rosario-cops-off-duty-club-questioned-in-lawsuit/

Kroll's misconduct, including his membership in City Heat and his contribution to the MPD's racist culture, was called out in a 2009 Section 1983 action filed by current Chief Arradondo and several other plaintiffs.

227. Kroll has a reputation for violent threats and conduct both on and off-duty, including against journalists. In October 2018, the Southside Pride newspaper wrote an article about Kroll that discussed, among other things, Arradondo's 2009 racial discrimination lawsuit that included allegations about Kroll. Kroll called the reporter and left him an angry voicemail, stating, "You want to talk about facts? Or you just wanna keep on reporting the same garbage you've been reporting your whole life? I'd love to meet with you and discuss our differences anytime, anywhere. I don't know you, but you seem to know a lot about me. I've about had it with your garbage bullshit reporting. I'm available, [phone number], if you've got the guts, but I doubt it."[157]

228. In October 2019, a local Jewish activist visited Kroll at Federation headquarters to complain about Kroll's participation in the Trump rally. The conversation devolved, and the activist called Kroll an asshole, at which point Kroll walked up to the activist and threatened, "Say that again. I dare you. I'm not wearing a body camera."[158]

229. In November 2019, Kroll responded angrily to a Minneapolis resident who had left a comment on the Federation's Facebook page calling Kroll a "Nazi" after Kroll appeared on stage at a Donald Trump rally. Kroll wrote back, publicly: "If you hate me so

---

[157] https://southsidepride.com/2018/10/16/still-out-of-control-part-two/
[158] http://www.citypages.com/news/bob-kroll-sat-down-with-a-local-jewish-activist-it-didnt-go-well/563847601

much, why don't you stop by and beat the shit out of me? 1811 University Ave. NE. Mid day Mon-Fri. My bet is it won't happen, because you are a cowardly cunt."[159]

230. In 2008, Kroll was sued after assaulting several individuals while off-duty. During this proceeding, three separate witnesses testified they saw Kroll repeatedly kick the plaintiff in the head while the plaintiff lay handcuffed on the sidewalk. The case settled for an undisclosed amount after Kroll's motion for summary judgment was denied. Kroll was suspended for 160 hours as a result of this incident, though this discipline was apparently overturned.[160] This 2008 suit was just one of 11 times Kroll has been sued. As he has bragged publicly, there have been 54 complaints filed against him, but he has never been disciplined.

231. Kroll and the Federation have continued to lay blame for the MPD's deteriorating reputation on the news media, in an unsubtle message to the rank-and-file that the media is their enemy. For example, Federation Vice President Sherral Schmidt stated recently: "we've watched an ongoing barrage of media stories that continue to unfairly demonize an entire profession over the actions of a very few."[161]

232. When a Washington Post reporter knocked on Kroll's door seeking comment on the George Floyd killing, he was soon pulled over by a police officer who said that Kroll

[159] http://www.citypages.com/news/bob-kroll-calls-random-minneapolis-man-cowardly-cunt/566024921
[160] http://www.citypages.com/news/activists-claim-police-union-chief-bob-kroll-is-racist-7877832
[161] https://kstp.com/news/minneapolis-police-union-blames-failed-leadership-for-riots-violence-june-23-2020/5769384/

had reported suspicious activity on his front porch and that "he doesn't want any press."[162] This traffic stop apparently at Kroll's request was made with no probable cause and was clearly an attempt to intimidate the reporter at Kroll's direction.[163]

233.    Thus, past and present Minneapolis mayors, Minneapolis City Council members, past and present MPD commanders, the Hennepin County Attorney's Office, community leaders, Federation leaders, other unions, and Kroll himself, understand and articulate that Kroll plays what amounts to an official role in the establishment of MPD policy, practice, and custom.  The MPD's failures of training and supervision have in some instances been caused, and in some instances been exacerbated, by Kroll's actions.  Kroll in his capacity as Federation President has historically displayed a reckless and deliberate indifference to the constitutional rights of Minnesotans as a whole, but also specifically to the constitutional rights of the Plaintiffs in this case.

234.    The comments of Mayor Rybak, Mayor Frey, Chief Harteau, Chief Arradondo, and others quoted above demonstrate that the MPD command structure does not have complete command of the department.  Kroll exercises control as well, acting essentially as official source of policy, practice, and custom at the MPD, sometimes in concert with and sometimes in contravention of City policy.  The widespread lawlessness and disregard for the Constitution displayed by MPD officers during the George Floyd protests derives not just from the unconstitutional actions of the State and Municipal

---

[162] https://www.washingtonpost.com/nation/2020/06/03/george-floyd-police-officers-charges/
[163] https://www.washingtonpost.com/nation/2020/06/03/george-floyd-police-officers-charges/

Defendants, but also from Kroll's reckless and deliberate indifference to Plaintiffs' constitutional rights.

235.    Defendants City of Minneapolis and Arradondo enabled Kroll's usurpation of authority by failing to negotiate with the Federation for adequate controls that would prevent the MPD and its officers from violating individuals, including Plaintiffs', constitutional rights.

236.    Kroll acted under color of state law in advancing his own preferred policies, practices, and customs at MPD.   Kroll implicitly and explicitly directed officers to operate in a manner abhorrent to the Constitution by encouraging officers to use unnecessary force on the citizens of Minneapolis, by thwarting discipline and enabling a culture and practice of immunity from sanction for constitutional violations, and by creating a climate of hostility to media and the press that resulted in the abuses of Plaintiffs described above. Kroll cloaked these policy goals in state power by using his status as a law enforcement officer to advance those goals, and he used the Federation's financial and political power to breathe life into his preferred MPD customs and practices.   The MPD's unconstitutional policies, practices, and customs, and the injuries to Plaintiffs and the Plaintiff Class, derive at least in part from the acts done under color of state law by Kroll.

## CLASS ALLEGATIONS

237.    Under Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for prospective relief on behalf of themselves and

other similarly situated people who, as members of the news media[164], will in the future observe and record protest activity and the conduct of law enforcement officers on duty in public places within the cities of Minneapolis and Saint Paul in traditional or designated public fora (the "Plaintiff Class"). The Plaintiff Class is defined as:

> All members of the news media, as the term is used in Emergency Executive Order 20-69, who are engaged in news gathering or reporting activities in Minnesota.

238.    The Plaintiff Class is so numerous that joinder of all the members would be impracticable.  Hundreds of members of the news media operate in Minnesota.

239.    As a result of the State and Municipal Defendants' customs and policies of arresting members of the news media, targeting them with less-lethal projectiles and chemical irritants without constitutionally adequate justification or warning, denying them freedom of movement to observe and record public demonstrations and law enforcement officers on duty, and intimidation by threats of violence, the Plaintiff Class have been and will continue to be deprived of their constitutional rights under the First, Fourth, and Fourteenth Amendments.

240.    Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class because protests are ongoing and Plaintiffs and the Plaintiff Class members have a reasonable fear that Defendants will continue to carry out their unconstitutional customs or policies of deploying less-lethal projectiles and chemical irritants without constitutionally adequate warning, denying them freedom of movement to observe and

---

[164] The term "members of the news media" is used in the Curfew Orders as well as the May 29, 2020 City of Minneapolis Emergency Regulation No. 2020-2-1.

record public demonstrations and law enforcement officers on duty, and intimidation by threats of violence.

241. Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. Plaintiffs have no conflicts involving other class members or Defendants. Plaintiffs understands their role as class representatives and their duties to the class in this litigation. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

242. Questions of law or fact are common to the class. These legal and factual questions include but are not limited to:

    **a.** Do arrests and targeting of journalists through a series of common methods violate the First, Fourth, and Fourteenth Amendments?

    **b.** Are the State and Municipal Defendants liable for implementing an unlawful policy or custom as set forth under principles of municipal liability?

    **c.** Have the State and Municipal Defendants manifested a failure to properly train and supervise their agents and officers?

    **d.** Have the State and Municipal Defendants exhibited a reckless and deliberate indifference to the unconstitutional conduct alleged herein?

243. Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards

for law enforcement would be entirely untenable. Doing so would only contribute to a state of uncertainty and confusion that allows the constitutional violations described in this complaint to continue.

244.   This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(A). A ruling with respect to a single Plaintiff in this case would arguably be strong stare decisis—if not necessarily res judicata—with respect to other putative class members and members of the law enforcement community. There is no benefit to allowing the overwhelmingly common issues in this case to be litigated individually. The interests of both class members and defendants requires classwide treatment.

245.   Finally, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b). There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals. Rather, they have been repeatedly targeted because of their membership in a class of journalists. Plaintiffs' targeting exists only by virtue of a broader pattern and practice of unconstitutional conduct directed at journalists as a class. Logically, injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the class.

## CAUSES OF ACTION

### COUNT I:
### First Amendment—Free Speech, Free Press, Free Assembly, 42 U.S.C. § 1983

246.    Plaintiffs[165] and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

247.    Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of observing and recording events of public interest, including public demonstrations and the conduct of law enforcement officers on duty in a public place.  Plaintiffs and the Plaintiff Class will continue to do so in the future to cover the events related to the protests and law enforcement's response.

248.    Defendants, acting under color of law, used excessive force to curb Plaintiffs' and the Plaintiff Class' exercise of their First Amendment rights.

249.    Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

250.    These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to observe and record some events of public interest, including

---

[165] For purposes of Paragraphs 246-337 and the Prayer for Relief, "Plaintiffs" includes members of CWA represented in this litigation by Plaintiff CWA.  Plaintiff CWA seeks only declaratory and injunctive relief on behalf of its members.

constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place.

251. It was the State and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused Defendants to violate the First Amendment rights of Plaintiffs and the Plaintiff Class.

252. The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the First Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for First Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

253. The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the Floyd protests demonstrates the reckless and deliberate indifference of the State and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

254. Given the multiple constitutional violations documented above, the State and Municipal Defendants' lengthy past pattern and practice of such violations, the multiple past federal lawsuits arising out of such violations, and the multiple Department of Justice reports recommending changes in supervision and training protocol regarding individuals' constitutional rights, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of

constitutional rights, that the State and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

255. Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of constitutional rights, was willful and recklessly indifferent to the rights of Plaintiff and the Plaintiff class.

256. Plaintiff Goyette's First Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

257. Plaintiff Lassig's First Amendment rights were violated when police arrested him without probable cause and despite Lassig identifying himself as a member of the press.

258. Plaintiff Maury's First Amendment rights were violated when police arrested him without probable cause and despite Maury identifying himself as a member of the press.

259. Plaintiff Maturen's First Amendment rights were violated when police arrested him without probable cause and despite Maturen identifying himself as a member of the press.

260. Plaintiff Shum's First Amendment rights were violated when State Troopers threatened and assaulted him, despite Shum identifying himself as a member of the press.

261. Plaintiff Nelson's First Amendment rights were violated when police and State Troopers threatened and assaulted her, despite her identifying herself as member of the press.

262. Plaintiff Shum's First Amendment rights were violated when he was targeted and assaulted by Minnesota State Patrol Troopers.

263. Plaintiff Shum's First Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

264. The First Amendment rights of the NewsGuild members identified above were violated when they were arrested without probable cause, shot with less-lethal projectiles, tear-gassed, pepper sprayed, and otherwise assaulted and harassed by law enforcement.

265. Plaintiffs Shum and Goyette suffered physical injury as a direct and proximate result of Defendants' violations of their constitutional rights.

266. Defendants are jointly and severally liable to Plaintiffs and the Plaintiff Class.

## COUNT II:
### First Amendment—Retaliation, 42 U.S.C. § 1983

267. Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

268. Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of observing and recording events of public interest, including public demonstrations and the

conduct of law enforcement officers on duty in a public place. Plaintiffs and the Plaintiff Class will continue to do so in the future to cover the events related to the protests and law enforcement's response.

269. Defendants retaliated against Plaintiffs and the Plaintiff Class for engaging in constitutionally protected activity. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

270. Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

271. These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to observe and record some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place.

272. It was the State and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

273. The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the First Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for First

Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

274. The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the Floyd protests demonstrates the reckless and deliberate indifference of the State and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

275. Given the multiple constitutional violations documented above, the State and Municipal Defendants' lengthy past pattern and practice of such violations, the multiple past federal lawsuits arising out of such violations, and the multiple Department of Justice reports recommending changes in supervision and training protocol regarding individuals' constitutional rights, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

276. Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force to retaliate against Plaintiffs and the Plaintiff Class, and continued retaliatory violation of constitutional rights, was willful and recklessly indifferent to the rights of Plaintiff and the Plaintiff Class.

277. Plaintiff Goyette's First Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities in retaliation for those activities.

278.     Plaintiff Lassig's First Amendment rights were violated when police arrested him without probable cause and despite Lassig identifying himself as a member of the press in retaliation for Lassig's constitutionally protected activity.

279.     Plaintiff Maury's First Amendment rights were violated when police arrested him without probable cause and despite Maury identifying himself as a member of the press in retaliation for Maury's constitutionally protected activity.

280.     Plaintiff Maturen's First Amendment rights were violated when police arrested him without probable cause and despite Maturen identifying himself as a member of the press in retaliation for Maturen's constitutionally protected activity.

281.     Plaintiff Shum's First Amendment rights were violated when State Troopers threatened and assaulted him, despite Shum identifying himself as a member of the press in  retaliation for Shum's constitutionally protected activity.

282.     Plaintiff Shum's First Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities in retaliation for Shum's constitutionally protected activity.

283.     Plaintiff Nelson's First Amendment rights were violated when Minneapolis Police and State Troopers threatened and assaulted her, despite her identifying herself as member of the press in retaliation for her constitutionally protected activity.

284.     The First Amendment rights of the NewsGuild members identified above were violated when they were arrested without probable cause, shot with less-lethal projectiles, tear-gassed, pepper sprayed, and otherwise assaulted and harassed by law enforcement in retaliation for their constitutionally protected activity.

285. Plaintiffs Shum and Goyette suffered physical injury as a direct and proximate result of Defendants' violations of their constitutional rights.

286. Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future if they continue to observe, record, or participate in constitutionally protected activity.

287. The fear of future retaliation establishes an ongoing and continuous injury by chilling their exercise of their First Amendment rights, which will not be remedied by any alleged policy changes voluntarily undertaken by the State and Municipal Defendants.

**COUNT III:**
**Fourth Amendment—Unlawful Seizure and Excessive Force, 42 U.S.C. § 1983**

288. Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

289. Plaintiffs and the Plaintiff Class were seized by Defendants when their officers intentionally, through the use of force and threat of arrest, chemical agents, and nonlethal projectiles, terminated their freedom of movement. Defendants were acting under color of law when they violated the Fourth Amendment rights of Plaintiff and the Plaintiff Class.

290. Members of the Plaintiff Class were also seized by Defendants when they were arrested and detained.

291. Plaintiff Goyette's Fourth Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

292.     Plaintiff Lassig's Fourth Amendment rights were violated when he was detained, booked, and cited for curfew violation without probable cause and after identifying himself as a member of the news media.

293.     Plaintiff Maury's Fourth Amendment rights were violated when he was detained, booked, and cited for curfew violation without probable cause and after identifying himself as a member of the news media.

294.     Plaintiff Maturen's Fourth Amendment rights were violated when he was detained, booked, and cited for curfew violation without probable cause and after identifying himself as a member of the news media.

295.     Plaintiff Shum's Fourth Amendment rights were violated when State Troopers used force to terminate his freedom of movement, despite Shum identifying himself as a member of the press.

296.     Plaintiff Shum's Fourth Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

297.     Plaintiff Nelson's Fourth Amendment rights were violated when police and State Troopers used force to terminate her freedom of movement, despite Nelson identifying herself as member of the press.

298.     The Fourth Amendment rights of the NewsGuild members identified above were violated when they were arrested without probable cause, shot with less-lethal projectiles, tear-gassed, pepper sprayed, and otherwise assaulted and harassed by law enforcement.

299.    Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

300.    Plaintiffs and the Plaintiff Class did not commit a crime, because as members of the news media, they were specifically exempted from the Curfew Orders and permitted to cover the protests outside the restricted times.

301.    Plaintiffs and the Plaintiff class did not pose a threat to any of Defendants' officers or agents or any other person.

302.    It was the State and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

303.    The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

304.    The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the Floyd protests demonstrates the reckless and deliberate indifference of the State and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

305. Given the multiple constitutional violations documented above, the State and Municipal Defendants' lengthy past pattern and practice of such violations, the multiple past federal lawsuits arising out of such violations, and the multiple Department of Justice reports recommending changes in supervision and training protocol regarding individuals' constitutional rights, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

306. Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of constitutional rights, and failure to supervise, discipline, or correct these violations was willful and recklessly indifferent to the rights of Plaintiff and the Plaintiff class.

307. As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs Goyette and Shum have suffered physical injury.

308. Plaintiffs and the Plaintiff Class reasonably fear further violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

## COUNT IV:
## Fifth and Fourteenth Amendment—Due Process, 42 U.S.C. § 1983

309.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

310.    The Due Process rights of Plaintiffs and the Plaintiff Class were violated when the State and Municipal Defendants, through their officers and agents, arrested members of the Plaintiff Class without probable cause, and deployed chemical agents and nonlethal projectiles without providing a warning and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

311.    It was the State and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the due process violations.

312.    The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the Due Process rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Due Process violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

313.    The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred in prior protests and during the George Floyd protests demonstrates the reckless and deliberate indifference of the State and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

314. Given the multiple constitutional violations documented above, the State and Municipal Defendants' lengthy past pattern and practice of such violations, the multiple past federal lawsuits arising out of such violations, and the multiple Department of Justice reports recommending changes in supervision and training protocol regarding individuals' constitutional rights, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

315. Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of constitutional rights, and failure to supervise, discipline, or correct these violations was willful and recklessly indifferent to the rights of Plaintiff and the Plaintiff class.

316. Plaintiff Goyette's Fifth and Fourteenth Amendment rights were violated when he was deliberately targeted and shot with a rubber bullet during the course of his reporting activities.

317. Plaintiff Lassig's Fifth and Fourteenth Amendment rights were violated when he was detained, arrested, and cited for a curfew violation despite a lack of probable cause for the arrest and after he had identified himself as a member of the news media.

318. Plaintiff Maury's Fifth and Fourteenth Amendment rights were violated when he was detained, arrested, and cited for a curfew violation despite a lack of probable cause for the arrest and after he had identified himself as a member of the news media.

319. Plaintiff Maturen's Fifth and Fourteenth Amendment rights were violated when he was detained, arrested, and cited for a curfew violation despite a lack of probable cause for the arrest and after he had identified himself as a member of the news media.

320. Plaintiff Shum's Fifth and Fourteenth Amendment rights were violated when State Troopers threatened and assaulted him, despite Shum identifying himself as a member of the press.

321. Plaintiff Nelson's Fifth and Fourteenth Amendment rights were violated when police and State Troopers threatened and assaulted her, despite her identifying herself as member of the press.

322. The Fifth and Fourteenth Amendment rights of the NewsGuild members identified above were violated when they were arrested without probable cause, shot with less-lethal projectiles, tear-gassed, pepper sprayed, and otherwise assaulted and harassed by law enforcement.

323. Plaintiffs and the Plaintiff Class reasonably fear further violation of the right to due process in the future if they observe, record, or participate in constitutionally protected activity.

## COUNT V:
## CIVIL CONSPIRACY, 42 U.S.C. § 1983

324.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

325.    Defendants conspired, under color of law, to deprive Plaintiffs and the Plaintiff Class of their constitutional rights.

326.    Defendants acted in concert and committed overt acts in furtherance of the conspiracy.  Defendants targeted members of the press and used unlawful, excessive force to interfere with and retaliate against the Plaintiffs' and the Plaintiff Class's exercise of their constitutional rights.

327.    Defendants coordinated with one another prior to and during the George Floyd protests regarding their response to the protests and to the journalists covering the protests.

328.    As described above, Defendants engaged in overt acts in furtherance of their conspiracy to violate the constitutional rights of Plaintiffs and the Plaintiff Class, and these overt acts injured Plaintiffs and the Plaintiff Class.

329.    Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class.

330.    Plaintiffs and the Plaintiff Class reasonably fear Defendants will continue to conspire to violate the constitutional rights of Plaintiff and the Plaintiff Class.

## COUNT VI:
## FAILURE TO INTERVENE, 42 U.S.C. § 1983

331.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

332.    During the constitutional violations described in this Complaint, Defendants, including but not limited to John Doe supervisors and commanders in the MPD and Minnesota State Patrol, Commander Langer, Chief Arradondo, and Commissioner Harrington, stood by without intervening to prevent the misconduct.

333.    Defendants had a duty to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

334.    Defendants had the authority to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

335.    Defendants had a reasonable opportunity to prevent the constitutional harms and personal injuries described in this Complaint but failed to do so.

336.    Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

337.    The misconduct described in this Count was undertaken under color of state law, and Defendants acted at all times under the color of state law when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and as representatives of the class defined herein, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1) or 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as class counsel;

C.    A declaration that Defendants' conduct violated the First, Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution;

D.    A permanent injunction barring:

    1.    Use of chemical agents on Plaintiffs or a Plaintiff Class Member, including but not limited to mace/oleoresin capsicum spray or mist/pepper spray/pepper gas, tear gas, skunk, inert smoke, pepper pellets, xylyl bromide, and similar substances, where the Plaintiff or Plaintiff Class Member has identified themselves as a member of the news media or it is reasonably clear that the individual is engaged in news gathering activities, except where Plaintiffs or Plaintiff Class Members present an imminent threat of violence or bodily harm to persons or damage to property;

    2.    Use of physical force against Plaintiffs or a Plaintiff Class Member, including through the use of flash bang grenades, non-lethal projectiles, riot batons, or any other means, where the Plaintiff or Plaintiff Class Member has identified themselves as a member of the news media or it is reasonably clear that the individual is engaged in news gathering activities, except where Plaintiffs or Plaintiff Class Members present an imminent threat of violence or bodily harm to persons or damage to property;

    3.    The arrest, detention, or taking into custody of Plaintiffs or a Plaintiff Class Member, where the Plaintiff or Plaintiff Class Member has identified themselves as a member of the news media or it is reasonably clear that the individual is engaged in news gathering activities, except where Plaintiffs or Plaintiff Class Members present an imminent threat of violence or bodily harm to persons or damage

to property, or as otherwise justified by the presence of probable cause for arrest;

4. The use of threatening language or gestures to harass or intimidate Plaintiffs or a Plaintiff Class Member, where the Plaintiff or Plaintiff Class Member has identified themselves as a member of the news media or it is reasonably clear that the individual is engaged in news gathering activities, except where Plaintiffs or Plaintiff Class Members present an imminent threat of violence or bodily harm to persons or damage to property.

E. Damages compensating Plaintiffs Goyette and Shum for their injuries, including but not limited to compensatory, pecuniary, and medical expense damages;

F. Punitive damages;

G. An award of pre-judgment interest;

H. An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

I. An award of such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  July 22, 2020          /s/ Kevin C. Riach

Kevin C. Riach (#0389277)
Dulce J. Foster (#0285419)
Pari I. McGarraugh (#0395524)
Jacob P. Harris (#0399255)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
kriach@fredlaw.com
dfoster@fredlaw.com
pmcgarraugh@fredlaw.com
jharris@fredlaw.com
*Attorneys for Plaintiffs Goyette, Lassig,*
*Maury, Maturen, Nelson and Shum*

Adam W. Hansen (#0391704)
**APOLLO LAW LLC**
333 Washington Avenue North, Suite 300
Minneapolis, MN 55401
Telephone: 612.927.2969
adam@apollo-law.com
*Attorneys for Plaintiffs*

Teresa Nelson (#269736)
**AMERICAN CIVIL LIBERTIES UNION**
**OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Telephone: 651.529.1692
tnelson@aclu-mn.org
*Attorneys for Plaintiffs*