| | |
|---|---|
| Jared Goyette, Craig Lassig, Michael Shum, Katie Nelson, Tannen Maury, Stephen Maturen, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals*, | Court File No. 0:20-cv-01302 (WMW/DTS) |
| Plaintiffs, | |
| vs. | **MEMORANDUM IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| City of Minneapolis, et al., | |
| Defendants. | |

## INTRODUCTION

Defendants Commissioner John Harrington and Colonel Matthew Langer, the respective leaders of the Minnesota Department of Public Safety and the Minnesota State Patrol (collectively, "State Defendants") move to dismiss the Second Amended Complaint ("SAC") in this purported class action. Plaintiffs' section 1983 claims against State Defendants fail as a matter of law for many reasons, including failure to state a claim, qualified immunity, and lack of standing. Indeed, the SAC contains no factual allegations against State Defendants to support any plausible claim. For these reasons, all claims against State Defendants must be dismissed.

## STATEMENT OF FACTS[1]

This case arises out of the intense civil unrest that engulfed the City of Minneapolis in the days immediately following the tragic death of George Floyd. Plaintiffs bring this purported class action, claiming that the Minneapolis Police Department ("MPD") and the Minnesota State Patrol ("State Patrol"), when working to restore order in the Twin Cities, inappropriately "targeted" members of the media who were reporting on the protests. Plaintiffs are six members of the media and an international labor union.

Plaintiff Jared Goyette is a freelance journalist. (SAC ¶ 1.) Goyette alleges that on May 27, 2020, he was documenting a demonstration in Minneapolis when he was shot by the MPD with less-lethal munitions. (SAC ¶¶ 106-09.) Goyette makes no allegations about the State Patrol. (*See* SAC ¶¶ 106-112.)

Plaintiffs Craig Lassig and Stephen Maturen are freelance photographers. (SAC ¶¶ 113, 115.) Plaintiff Tannen Maury is a photographer with the European Pressphoto Agency. (*Id.* ¶ 114.) On May 30, 2020, Lassig, Maturen, and Maury allege that they were documenting protests occurring near the Fifth Precinct. (*Id.* ¶ 117.) Lassig, Maturen, and Maury allege that when they were standing in a parking lot, law enforcement officers arrested them. (*Id.* ¶ 119.) Lassig, Maturen, and Maury allege that they had verbally identified themselves as members of the media prior to their arrests.

---

[1] The facts in this section are drawn from the SAC and are accepted as true for the purposes of this motion to dismiss only. *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir. 1993).

(*Id.*) Lassig, Maturen, and Maury do not allege that the MPD or State Patrol troopers were the officers who arrested them, apparently due to differences in their recollections. (*Id.* ¶ 119 n.63.) However, the State Patrol did not issue citations to Lassig, Maturen, or Maury, nor is the State Patrol implicated anywhere on the citations, which were issued by the Hennepin County Sheriff's Office.[2] (Affidavit of Julianna F. Passe, Exs. 1-3.)

Plaintiff Michael Shum was covering the protests for the New York Times on May 28, 2020. (SAC ¶ 121.) Shum alleges that MPD fired flash-bang grenades, less-lethal projectiles, and tear gas at him. (*Id.*) Shum alleges that his foot was injured by one of the projectiles fired by the MPD. (*Id.*) Shum alleges that on May 30, the MPD and State Patrol began clearing a street where he was located. (*Id.* ¶ 122.) Shum alleges that he was climbing a "half wall" to leave the area, when two State Patrol troopers pushed him off of the wall. (*Id.*) Shum alleges that he suffered "several scratches, bruises, and cuts" as a result. (*Id.*)

Katie Nelson is a "freelance journalist" who was working on contract with the New York Times when covering the protests. (*Id.* ¶ 124.) Nelson alleges that the MPD shot tear gas at her on May 28, 2020. (*Id.*) Nelson alleges that on May 30, 2020, MPD told the crowd to disperse, and "police" shot rubber bullets at her as she fled. (*Id.* ¶ 127.) Nelson alleges that when she drove down a street that was blocked off with National Guard vehicles and "police with riot gear," and "police" fired pepper bullets or other less-

---

[2] The Court may consider public records on a motion to dismiss. *Stahl v. U.S. Dep't of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003).

lethal projectiles at her car.  (*Id.* ¶ 129.)  Nelson makes no allegations about the State Patrol.

Plaintiff Communication Workers of America ("CWA") is a labor union representing over 700,000 workers in a range of industries, including news media and telecommunications.  (*Id.* ¶ 130.)  The SAC alleges that many reporting staff of the Minneapolis Star Tribune and other newspapers are members of the CWA's affiliate union, News-Guild CWA.  (*Id.*)  The SAC alleges that some of the CWA's members were hit with chemical irritants and less-lethal munitions between the dates of May 26 and May 31, 2020.  (*Id.* ¶¶ 45, 54, 60-65, 84, 88, 92, 95, 121, 131.)  The CWA does not allege that it has suffered injuries as an organization, but instead alleges that some of its members have been injured by unknown individuals and seeks relief on their behalf.  (*Id.* ¶ 136.)

Plaintiffs filed this lawsuit on June 2, 2020, naming the City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo, Minneapolis Police Chief Lieutenant Robert Kroll, Minnesota Department of Public Safety Commissioner John Harrington and State Patrol Colonel Matthew Langer (collectively, "State Defendants") as Defendants.[3]  State Defendants are sued in both their individual and official capacities.

The State Patrol is primarily a traffic law enforcement entity, which does not have

---

[3] Plaintiffs also name as defendants "John Does" who are "unidentified individuals who committed the acts set forth [in the SAC], as agents of Defendants City of Minneapolis and Minnesota State Patrol."  (SAC ¶ 14.)  Notably, however, the State Patrol is not named as a defendant in this lawsuit.  To the extent that any of the "John Does" are troopers with the State Patrol, they have not been served.

primary responsibility for protecting the public in a particular community. Rather, the State Patrol is principally charged with enforcing the law relating to the use of trunk highways and only "cooperate[s] with sheriffs and other police officers" when necessary. Minn. Stat. § 299D.03, subd. 1(b) (providing the authority of State Patrol troopers).

Immediately after filing their Complaint, Plaintiffs moved for class certification and a temporary restraining order. (ECF 3, 5.) On the morning of June 8, 2020, the date of the hearing on the motions, Plaintiffs filed their First Amended Complaint adding one additional individual plaintiff and the CWA. (ECF 31.) The Court subsequently denied Plaintiffs' motions for class certification and a temporary restraining order. (ECF 35.) Plaintiffs filed their SAC on July 30, adding four additional individual Plaintiffs and three additional claims. (ECF 53.)

## STANDARD OF DECISION

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss for failure to state a claim must be granted where the complaint does not allege "enough facts to state a claim to relief that is plausible on its face" rather than merely "conceivable." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a motion to dismiss, courts must accept a plaintiff's specific factual allegations, but not his or her legal conclusions. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010). Detailed factual allegations are not necessary, but it is not sufficient to make bare assertions that are "'devoid of further factual enhancement.'" *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (per curiam) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).). In

addition, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss a claim for lack of subject matter jurisdiction. If subject-matter jurisdiction is lacking, the Court must dismiss the action. *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).

## ARGUMENT

Plaintiffs' SAC must be dismissed in its entirety against State Defendants. First, Plaintiffs cannot bring official-capacity claims against State Defendants. Second, Plaintiffs have failed to state an individual-capacity claim against State Defendants. Third, State Defendants in their individual capacities are entitled to qualified immunity. Finally, most of the named Plaintiffs lack standing to bring any claim against State Defendants. State Defendants should therefore be dismissed from this action with prejudice.

### I.     PLAINTIFFS CANNOT BRING OFFICIAL-CAPACITY CLAIMS.

A state is immune from suit in federal court unless the state has consented to be sued or Congress has expressly abrogated the state's immunity. U.S. Const. amend. XI; *see also Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Federal courts lack jurisdiction over claims against un-consenting states. *Pennhurst*, 465 U.S. at 121; *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968-69 (8th Cir. 2000).

Minnesota has not waived its Eleventh Amendment immunity from suit in federal court. *See DeGidio v. Perpich*, 612 F. Supp. 1383, 1388-89 (D. Minn. 1985). It is well-

settled law that the Eleventh Amendment bars section 1983 damages claims against state officials in their official capacities. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

Moreover, such claims are barred because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997). Therefore, Plaintiffs' official-capacity claims seeking damages from State Defendants must be dismissed. (*See* SAC at pg. 113.)

Although Plaintiffs cannot seek damages from State Defendants in connection with their section 1983 claims, under *Ex Parte Young*, 209 U.S. 123 (1908), a plaintiff may bring official-capacity claims insofar as those claims seek prospective declaratory or injunctive relief in order to end a continuing violation of federal law. *281 Care Committee v. Arneson*, 638 F.3d 621, 32 (8th Cir. 2011). But, all the named Plaintiffs lack standing to bring such a claim for relief against State Defendants, and therefore their official-capacity section 1983 claims must be dismissed against State Defendants in their entirety.

To have Article III standing to seek prospective relief, a plaintiff "must show [he is] likely to suffer future injury that will be remedied by the relief sought." *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006). The same is true of declaratory relief. *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *see also Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1162 (8th Cir. 2019).

The imminence of future harm requirement is essential because it ensures "that the alleged injury is not too speculative for Article III purposes – that the injury is *certainly impending*." *Clapper v. Amnesty Intern'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). Allegations of merely possible future injury are not sufficient. *Id.* And, "past exposure" to allegedly wrongful conduct is also not sufficient to confer standing for prospective relief. *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *see also Harmon v. City of Kansas City, Mo.*, 197 F.3d 321, 327 (8th Cir. 1999) ("The mere fact that injurious activity took place in the past does nothing to convey standing to seek injunctive relief against future constitutional violations.").

Plaintiffs cannot show a "real and immediate threat" of injury by State Defendants in the future. First, it is uncontroverted that the alleged constitutional violations purportedly committed by State Patrol troopers occurred during a three-day period of unprecedented civil unrest in late May.[4] Despite filing the SAC on July 30, Plaintiffs have identified no alleged incidents of the news media being "targeted" by the State Patrol since May 31. (*See, generally*, SAC.) Moreover, the SAC contains only two other allegations that the State Patrol has mistreated the media outside of May 29 through May 31, 2020: Plaintiffs allege that State Patrol troopers arrested one member of the media in 2015 and arrested two members in 2017. (SAC ¶¶ 148, 151.)

Two alleged, isolated incidents in the past five years and six alleged incidents occurring during a three-day span of unprecedented civil unrest is insufficient to

---

[4] The six incidents allegedly involving State Patrol troopers occurred between May 29 and May 31. (SAC ¶¶ 40, 44, 50, 58, 75, 122.)

demonstrate that Plaintiffs face a real and immediate threat of being "targeted" for arrest or force by the State Patrol. Indeed, the civil unrest has greatly diminished, as Plaintiffs themselves admit. (*See* SAC at pg. 2.) Plaintiffs therefore cannot plausibly allege that they will be "again wronged in a similar way" by State Defendants.[5] *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

The Supreme Court's decision in *City of Los Angeles v. Lyons* is instructive. In that case, a plaintiff who had been placed in a chokehold when he was stopped by police sought injunctive relief prohibiting the police from using chokeholds. 461 U.S. at 97-98. The Court found that Lyons lacked standing to seek the injunction because it was no more than speculation to assert that Lyons would be injured again by the police. *Id.* at 105-09 (stating that "[i]n order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with home they happen to have an encounter . . . or, (2) that the City ordered and authorized police officers to act in such manner").

Like in *Lyons*, here it is conjectural to presume that (1) a similar level of unrest will occur in the Twin Cities again, resulting in significant law enforcement presence; (2) the State Patrol will be called upon to assist local law enforcement in trying to contain the

---

[5] This is particularly true as to claims that Plaintiffs will be subjected to allegedly excessive force through use of chemical irritants or less-lethal munitions because Plaintiffs have not alleged *any* incidents of allegedly improper use of such implements by State Defendants prior to the May 2020 unrest.

unrest;[6] (3) Plaintiffs will choose to go to the scenes of unrest to report; (4) State Patrol

troopers will be aware that Plaintiffs are journalists; and (5) troopers will purposefully

and knowingly arrest, spray with chemical irritants, or fire less-lethal munitions at

Plaintiffs, despite Plaintiffs being law-abiding. *See id.* (providing that threat of injury

must be "real and immediate, not conjectural or hypothetical"). Such speculation

regarding a possibility of future harm is woefully insufficient to establish that Plaintiffs

face an imminent injury from the State Patrol.[7] Therefore, Plaintiffs lack standing to

bring a claim for prospective injunctive relief. *See, e.g.*, *Elend v. Basham*, 471 F.3d

1199, 1209 (11th Cir. 2006) (concluding on Rule 12 motion that protesters lacked

standing to seek injunctive relief regarding unspecified, future protests because of

conjectural nature of future harm); *Pease v. Gore*, Case No. 18-cv-01062, 2018 WL

4951957 (S.D. Cal. Oct. 12, 2018) (same)

## II. PLAINTIFFS HAVE FAILED TO PLEAD AN ACTIONABLE INDIVIDUAL-CAPACITY CLAIM AGAINST STATE DEFENDANTS.

Plaintiffs also bring individual-capacity claims against State Defendants, but these

claims similarly fail as a matter of law. As a threshold matter, such claims fail because

section 1983 does not recognize a theory of vicarious liability. And, there are no factual

allegations lodged against Commissioner John Harrington or Colonel Matthew Langer to

support their personal involvement in any constitutional violation, such that they can be

---

[6] *See* Minn. Stat. § 299D.03, subd. 1(8) (providing that State Patrol officers only "cooperat[e]" with local law enforcement officers when specifically instructed to do so).

[7] This is particularly true because, as discussed *infra* Part V, only Plaintiff Shum alleges that he was injured by State Patrol troopers during the May 2020 unrest.

held personally liable. Regardless, any such claim fails under the doctrine of qualified immunity. For these reasons, all individual capacity claims must be dismissed.

### A. Plaintiffs Fail To Allege Personal Involvement by State Defendants to Support an Individual Capacity Claim.

First, and fundamentally, Plaintiffs' individual-capacity claims fail against State Defendants because there are no allegations in the SAC plausibly linking these Defendants to Plaintiffs' alleged injuries. Plaintiffs' conclusory allegations are insufficient as a matter of law to establish liability under section 1983.

A government official is only responsible for his own misconduct. *Iqbal*, 556 U.S. at 677; *see also Muick v. Reno*, 83 F. App'x 851, 853 (8th Cir. 2003) ("[W]e agree with the district court that Muick's claims against Reno, Hawk-Sawyer, Thompson, and White were improperly based on these defendants' supervisory roles."). And, vicarious liability does not apply to Section 1983 claims. *Kulow v. Nix*, 28 F.3d 855, 858 (8th Cir. 1994). Rather, Section 1983 "requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990).

The facts pleaded regarding State Defendants are sparse. Plaintiffs plead merely that Commissioner Harrington has "supervisory responsibility over Colonel Matthew Langer and the Minnesota State Patrol" and vetted requests from the MPD during the protests regarding whether the State Patrol could take on a particular mission. (SAC ¶¶ 12, 35.) The only other allegation regarding Commissioner Harrington is that twelve years ago, when he was employed as the St. Paul Police Chief, Commissioner Harrington

"brushed off" First Amendment concerns after a journalist was arrested.[8]  (SAC ¶ 145.)
With regard to Colonel Langer, Plaintiffs plead only that he "commands the Minnesota
State Patrol." (*Id.* ¶ 13)

The SAC contains no other specific allegations about State Defendants, merely
stating in conclusory fashion that all of the defendants have non-specified practices and
customs of deploying chemical agents or less-lethal ammunition against and arresting
journalists.  (*Id.* ¶¶ 138-40.)  But, such broad generalizations are insufficient to state a
claim against the individual State Defendants.  While unclear, it appears that Plaintiffs
believe that a *Monell* claim may be asserted against State Defendants, but such claims
only can be asserted against *municipalities* under longstanding case law.  (SAC ¶¶ 137-
141, 143, 251, 272, 310.)  In *Monell v. Dep't of Social Servs. of City of New York*, the
Supreme Court held that municipalities could be held liable under section 1983 if their
custom or policy was the "moving force" behind a prior constitutional violation.  436
U.S. 658, 694 (1978).  But, *Monell* liability does not apply to the State or to individual-
capacity claims.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989) (holding that
*Monell* is not applicable to "States or governmental entities that are considered 'arms of
the state' for Eleventh Amendment purposes."); *Steed v. Mo. State Highway Patrol*, Case

---

[8]  Plaintiffs' claims that Commissioner Harrington "brushed off" First Amendment
concerns when he was St. Paul Police Chief is based on his purported statement that in
moments of chaos police officers cannot always distinguish between citizens and
journalists and that "if a reporter has committed a crime, whether they have credentials or
not, they become regular citizens."  *See* https://www.minnpost.com/politics-
policy/2008/09/amy-goodmans-arrest-when-journalists-are-story/ (last visited September
11, 2020) (cited in SAC ¶ 145 n.70).  Such statements cannot be fairly characterized as
"brushing off" First Amendment concerns.

No. 4:17-cv-1440, 2019 WL 130282, at *2 (E.D. Mo. Jan. 8, 2019) (dismissing individual-capacity *Monell* claims because "[a]s state officials, neither [of the named defendants] is subject to *Monell* liability.").[9] Therefore, to the extent Plaintiffs bring claims based on State Defendants' alleged policies or practices, they are improper *Monell* claims that must be dismissed.

### B. Plaintiffs Have Failed To Adequately Plead A Failure to Train Or Supervise Claim Against State Defendants In Their Individual Capacities.

Plaintiffs attempts to circumvent their inability to allege personal involvement by contending that State Defendants somehow failed to train or supervise their subordinates. (SAC ¶¶ 53, 83, 91.) But, Plaintiffs' broad and generalized claim for failure to train appears to be an improper extension of *Monell* liability, rather than an individual-capacity claim. *See Marsh v. Phelps Cty.*, 902 F.3d 745, 751 (8th Cir. 2018); *see also Long v. Hannigan*, 990 F.2d 1258, at *1 (9th Cir. 1993) (dismissing section 1983 failure to train claim against State official because "[s]uch a failure is actionable against *municipal* officials in limited circumstances under the doctrine enunciated in *Monell*"); *Scott v. Michigan*, 173 F. Supp. 2d 708, 714 (E.D. Mich. 2001) (holding that theories of municipal liability, namely failure to train or supervise, have no application against State Defendants).

---

[9] Even assuming *arguendo* that a *Monell* claim could be brought against an individual, State Defendants are entitled to qualified immunity because it has not been clearly established that such a claim can be brought against a State official. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

Regardless, Plaintiff's failure-to-train claim against the individual State Defendants fails as a matter of law. Under section 1983, a supervising officer can be held personally liable for a subordinate officer's conduct "if his failure to train or supervise the offending actor caused the deprivation." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1031 (8th Cir. 2012). Failure to supervise and failure to train claims are governed by the same analysis. *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998). Plaintiffs must allege more than a generalized failure to train or supervise. To proceed with such a claim, a plaintiff must plead facts suggesting that the individual named supervisors were aware of, but failed to correct a pattern of unconstitutional conduct by their subordinates, or that they were aware their training practices were inadequate. *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010). Furthermore, a section 1983 claim based on a failure to train or supervise theory requires a showing of deliberate indifference, a stringent standard of fault. *S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017).

A single previous incident, or isolated incidents, does not generally satisfy the burden of deliberate indifference. *Williams v. Willits*, 853 F.2d 586, 588 (8th Cir. 1988). "To impose supervisory liability, other misconduct must be very similar to the misconduct giving rise to liability." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

In this case, Plaintiffs do not even *attempt* to plead facts plausibly showing deliberate indifference on the part of the individual State Defendants. First, the SAC is devoid of any specific allegations about how the training or supervision of the State Patrol by the State Defendants was deficient. (*See* SAC ¶¶ 254 (arguing that State Defendants' training was inadequate, but citing to prior lawsuits and Department of Justice reports and recommendations involving the City of Minneapolis.) In comparison to the specific alleged training deficiencies raised against the City, the SAC contains no specific allegations about how the State Patrol's training or supervision was insufficient. And, a plaintiff must establish a particular deficiency in the training. *See Birkeland as Trustee for Birkeland v. Jorgenson*, Civ. No. 17-1149, 2019 WL 1936736, at *10 (D. Minn. May 1, 2019), *reversed in part on other grounds*, 2020 WL 4876743 (8th Cir. 2020).

In any event, here the SAC alleges in a conclusory fashion that "on information and belief," the State Patrol did not implement unspecified additional training in 2015 or 2017 after a few journalists were arrested during protests.[10] (SAC ¶¶ 148, 151, 173-182.) But such allegations hardly establish deliberate indifference. Furthermore, pleading "on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim." *Kampschroer v. Anoka Cty.*, 57 F. Supp. 3d 1124, 1143 (D. Minn. 2014).

---

[10] Notably, the arrest of a journalist during protests is not necessarily violative of any constitutional rights, as there may be probable cause to believe a journalist may have committed a crime, including, but not limited to, failing to comply with law enforcement orders to disperse from a particular area.

Furthermore, Plaintiffs cannot plead that the allegedly inadequate training was so obviously likely to lead to a constitutional violation that State Defendants were deliberately indifferent for failing to do more or different training. *See Ambrose v. Young*, 474 F.3d 1070, 1079-80 (8th Cir. 2007); *Livers v. Schenck*, 700 F.3d 340, 355-36 (8th Cir. 2012). Indeed, rather than being tasked with general law enforcement duties in a jurisdiction, the State Patrol is primarily tasked with enforcing the law relating to the use of trunk highways. Minn. Stat. § 299D.03, subd. 1(b). In light of the fact that the State Patrol is principally tasked with monitoring traffic, any assertion that it was somehow obvious that the State Patrol needed additional training on the treatment of media during times of intense, chaotic civil unrest is not plausible. This is particularly true because there is no guarantee, even if protests or riots erupt, that the State Patrol will be asked to assist local law enforcement.

It is important to note that Plaintiffs attempt to plead deliberate indifference primarily by reference to the incidents at issue here, not prior conduct that could provide previous notice of significant training inadequacies. Specifically, Plaintiffs allege six incidents involving the State Patrol occurring during three days of unprecedented civil unrest. Outside of this tumultuous three-day time period, which is the subject of the present lawsuit, Plaintiffs allege only two instances of allegedly unconstitutional treatment of the press by the State Patrol. (SAC ¶¶ 148, 151.) Two allegedly improper instances occurring three and five years previously, presumably involving different officers, is not a sufficient basis to assign supervisor liability as a matter of law. *See, e.g.*, *Lenz*, 490 F.3d at 995-96 (one past incident of substantiated excessive force and "several"

other uncorroborated complaints of excessive force by particular officers insufficient to assign supervisor liability).[11]

As to the allegation that the State Patrol had a pattern of arresting journalists, Plaintiffs fail to plead that the individual State Defendants were actually aware of the 2015 or 2017 arrest of journalists. *Whitney v. City of St. Louis, Missouri*, 887 F.3d 857, 860 (8th Cir. 2018) ("The complaint contains a legal conclusion that Sharp was deliberately indifferent but fails to make any allegation about Sharp's knowledge. This conclusory statement does not save the complaint[.]").

Because Plaintiffs' section 1983 claims are based merely on conclusory allegations that State Defendants improperly trained or supervised troopers, Plaintiffs have failed to state individual-capacity claims as a matter of law and their section 1983 claims must be dismissed with prejudice. *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013) (affirming Rule 12 dismissal of failure to supervise and train claim because plaintiff "fail[ed] to provide facts in his complaint to support his assertion that [the defendant] adopted deficient supervision and training practices with deliberate indifference to the constitutional rights of others, and that these training practices were the product of the [defendant's] deliberate and conscious choices").

### C. Plaintiffs Have Failed To State A Section 1983 Civil Conspiracy Claim Against State Defendants.

---

[11] Furthermore, there is certainly no basis to assign supervisor liability for any alleged excessive use of force because Plaintiffs plead no allegations of excessive use of force, chemical irritants, or less-lethal munition by the State Patrol against journalists prior to the three-day period at issue in this case.

Even if Plaintiffs had sufficiently pleaded personal involvement of State Defendants or facts sufficient to bring claims under a failure to train or supervise theory, a number of their individual-capacity claims fail as a matter of law. Plaintiffs fall far short of sufficiently pleading a civil conspiracy claim (Count V).

A civil conspiracy under section 1983 requires that Plaintiffs plead: "(1) that the defendant conspired with others to deprive him of his constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). Additionally, Plaintiffs must prove "a deprivation of a constitutional right or privilege in order to prevail on a § 1983 conspiracy claim." *Id.* Plaintiffs asserting a civil conspiracy claim must allege "specific facts tending to show a 'meeting of the minds' among the alleged conspirators." *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010). Thus, Plaintiffs must allege with particularity "facts that the defendants reached an agreement." *Reasonover v. St. Louis Cty.*, 447 F.3d 569, 582 (8th Cir. 2006).

Plaintiffs must plead "more than the mere recitation of an improper state of mind such as malice, bad faith, retaliatory motive, or conspiracy." *Myers v. Morris*, 810 F.2d 1437, 1453 (8th Cir. 1987), *overruled on other grounds by Burns v. Reed*, 500 U.S. 478 (1991). Indeed, demonstrating plausibility to survive a Rule 12 motion requires that a plaintiff make "specific factual contentions regarding the nature of the conspiracy or the participants' role in the same." *Avdeef v. Royal Bank of Scotland, P.L.C.*, 616 Fed App'x 665, 675 (5th Cir. 2015). Plaintiffs must "at least allege that the defendants had directed

themselves toward an unconstitutional action by virtue of a mutual understanding." *Deck v. LeftridgeThank*, 771 F.2d 1168, 1170 (8th Cir. 1985) (quotation omitted).

Plaintiffs have failed to state a civil conspiracy claim because they have failed to allege specific facts showing a meeting of the minds between the alleged conspirators to deprive journalists of their constitutional rights. In support of their civil conspiracy claim, Plaintiffs allege simply that the MPD and the State Patrol both worked to quell the unrest. (SAC ¶¶ 32-36.)

Plaintiffs' civil conspiracy claim, however, is based on alleged targeting of journalists because of their role of documenting the protests. (*Id.* ¶¶ 25, 324-30.) Although Plaintiffs claim in a conclusory manner that the Defendants "were in regular communication and coordination" about the use of crowd control techniques during the protests, they allege no facts regarding such coordination. Nor do Plaintiffs allege facts indicating that State Defendants reached a "meeting of the minds" with any of the other defendants regarding how journalists as a class should be treated, much less that they should be "targeted" by chemical irritants, less-lethal munitions or for arrest. And, Plaintiffs' allegations that journalists were mistreated are not allegations that the leaders of the MPD and the State Patrol somehow agreed that journalists should be targeted for arrest, less-lethal munitions, or chemical irritants. *See Alexander v. Hedback*, Civ. No 11-3590, 2012 WL 2004103, at *11 (D. Minn. June 5, 2012) (dismissing section 1983 civil conspiracy claim because plaintiff failed to plead sufficient factual allegations to show that defendants conspired "for the purpose of depriving one of a constitutional right").

Because Plaintiffs' SAC does not sufficiently allege that the MPD and the State Patrol came to a meeting of the minds regarding violating the constitutional rights of journalists, Plaintiffs' civil conspiracy claim should be dismissed. *Manis v. Sterling*, 862 F.2d 679, 681 (8th Cir. 1988) (dismissing conspiracy claim under section 1983 for failure to plead specific facts suggesting a meeting of the minds); *Cooper v. Delo*, 997 F.2d 376, 377 (8th Cir. 1993) (same).

### D.      Plaintiffs Have Failed To State A Failure to Intervene Claim.

Plaintiffs bring a failure to intervene claim under § 1983 (Count VI), but such a claim fails as a matter of law.  First and foremost, this claim fails because as noted above, there are no allegations that State Defendants were personally involved or present for the alleged incidents of excessive force, and therefore they could not have failed to prevent them.  Plaintiffs' failure to intervene argument conflates supervisory liability with bystander liability, which are analyzed using different frameworks.  *Compare S.M.*, 808 F.3d at 340 *with Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015). And, actual knowledge of the allegedly unconstitutional use of force is necessary to state a failure to intervene claim.  *Hollingsworth*, 800 F.3d at 991.

Under the Fourth Amendment, a law enforcement officer may be held liable for failing to intervene to prevent the unconstitutional use of force by another officer.  *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009).  The Eighth Circuit has declined to recognize any failure to intervene claim outside of the excessive force context.  *Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir. 2013); *Livers*, 700 F.3d at 360.  As such, to the extent that Plaintiffs base their failure to intervene claim on other alleged constitutional

violations, such claims fail. But, as described below, any intervention claim based on alleged use of excessive force also fails on its face.

"To establish a failure to intervene claim . . . the plaintiff must show that the officer observed or had reason to know that excessive force would be or was being used." *Hollingsworth*, 800 F.3d at 991; *see also Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009) (explaining that a police officer had a duty to intervene to prevent the use of excessive force where the officer was aware of the abuse and the duration of the incident was sufficient to permit an inference of tacit collaboration). Notably, the defendant must have had a "realistic opportunity" to prevent the alleged violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

Here, State Defendants are not alleged to have been present at the episodes where Plaintiffs' constitutional rights were allegedly violated. (*See, generally*, SAC.) Nor are State Defendants alleged to have had specific knowledge of the allegedly unconstitutional conduct that was occurring such that State Defendants could intervene. Under these circumstances, State Defendants cannot be said to have had a "realistic opportunity" to prevent the alleged constitutional violations. *See Alexander/Ryahim*, 5:04CV00420, 2006 WL 8446223, at *2 (E.D. Ark. Oct. 5, 2006) (holding that defendant could be liable for failure to intervene claim "under no scenario" because defendant was not alleged to have been present during the alleged excessive force incident); *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (holding that "liability will not attach [under a failure to intervene theory] where an officer is not present at the scene of the constitutional violation"); *Williams v. Rickman*, 759 F. App'x 849, 853 (11th Cir. 2019) (same).

The Court should reject Plaintiffs' attempt to impose bystander liability based on State Defendants' alleged "pattern" of constitutional violations, rather than on incidents where State Defendants had specific real-time knowledge of then-occurring excessive use of force.

### E.  Plaintiffs Have Failed To State A Procedural Due Process Claim.

Plaintiffs' section 1983 procedural due process claim under the Fifth and Fourteenth Amendments (Count IV) fails as a matter of law.  As such, this claim must be dismissed.

As a threshold matter, Plaintiffs cannot bring a due process claim under the Fifth Amendment against State Defendants because the Fifth Amendment applies only to the actions of the federal government.  *Barnes v. City of Omaha*, 574 F.3d 1003, 1005 n.2 (8th Cir. 2009) ("The Fifth Amendment's Due Process Clause applies only to the federal government or federal actions . . . ."); *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) (same).

Plaintiffs' Fourteenth Amendment procedural due process claim is based on allegations that members of the State Patrol arrested media members without probable cause and deployed chemical agents and nonlethal projectiles without providing a warning and an opportunity to disperse and State Defendants failed to train and supervise their subordinates.  (SAC ¶ 310.)  Plaintiffs' procedural due process claim is improperly duplicative of their other constitutional claims, and can be dismissed for this reason alone.  *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975) ("The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and

public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases."); *Bostrom v. N.J. Div. of Youth & Family Servs.*, 969 F. Supp. 2d 393, 415 (D. N.J. 2013) ("Plaintiffs have not alleged that they were deprived [of] a liberty or property interests which is not already address by Plaintiffs' First and Fourth Amendment claims. If the court were to find that the Plaintiffs have established a deprivation of liberty on these facts, then all unreasonable searches would constitute procedural due process claims. This would be impractical and duplicative."); *Osuna v. City of New York*, Case No. 08-Civ-4759, 2009 WL 2356424 at *6 (S.D.N.Y. July 30, 2009). (*See* SAC ¶¶ 246-308.)

Because Plaintiffs' procedural due process claim is properly analyzed with the specific provisions of the First and Fourth Amendments, the Court should dismiss Plaintiffs' procedural due process claim as duplicative.

### F. State Defendants Are Entitled To Qualified Immunity.

Qualified immunity bars Plaintiffs' section 1983 claims against State Defendants. "Under the doctrine of qualified immunity, a court must dismiss a complaint against a government official in his individual capacity that fails to state a claim for violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A court considers whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and whether the right was clearly established at the time of the alleged infraction." *Id.*

The right must be sufficiently defined so that a reasonable official understands what he does violates the right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Qualified immunity is not merely a defense to liability, but rather provides immunity from suit. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation marks omitted). The immunity is intended to give government officials "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* at 229 (internal quotation marks omitted). This leeway for reasonable error exists so that officials are not incentivized to err on the side of caution for fear of being sued. *Id.* Qualified immunity questions should be resolved "at the earliest possible stage in litigation." *Payne v. Britten*, 749 F.3d 697, 701 (8th Cir. 2014) (quotation omitted). Dismissal under Rule 12(b)(6) is appropriate if defendants "are entitled to qualified immunity on the face of the complaint." *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (internal quotation marks and citation omitted).

Qualified immunity for a supervisory liability claim requires a two-part test. Specifically, a supervisor with no direct participation in a constitutional violation who is sued for failure to train or supervise is entitled to qualified immunity unless a plaintiff can establish that the supervisor "(1) received notice of a pattern of unconstitutional acts committed by a subordinate and (2) was deliberately indifferent to or authorized those acts." *S.M.*, 808 F.3d at 340. "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *Id.* (quotation omitted). The prior conduct must be "very similar" to the conduct giving rise to liability

in order to impose supervisory liability. *Id.* Qualified immunity requires an individualized analysis of each officer's alleged conduct because a government officer is only personally liable for his own misconduct. *Id.* State Defendants will be entitled to qualified immunity unless they "had notice of a pattern of conduct that was sufficiently egregious in nature." *Id.* Plaintiffs' generalized allegations that State Defendants were on notice of a pattern of allegedly improper arrests based on two isolated incidents three and five years in the past are insufficient to defeat qualified immunity. *See Livers*, 700 F.3d at 357 (finding supervisory liability allegations that were vague, speculative, and mere assertions were "not a basis for denying qualified immunity"); *Lenz*, 490 F.3d at 995-96 (holding that a "single incident or series of isolated incidents" is usually insufficient to assign supervisory liability"); *Doe v. Gooden*, 214 F.3d 952, 956 (8th Cir. 2000) (finding that where supervisors knew of a teacher's repeated verbal abuse of students and two incidents of physical abuse, this was not sufficient to establish notice of a pattern of unconstitutional acts); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (two complaints about particular officer and "rumors" that did not implicate a particular officer were insufficient to establish deliberate indifference); *Jones v. Custer Cty.*, Case No. 8:17CV394, 2018 WL 2050568, at *8 (D. Neb. Apr. 26, 2018) (dismissing section 1983 claim on Rule 12 motion because allegation of one prior instance of alleged unconstitutional conduct failed to provide sufficient basis upon which to assign supervisory liability), *aff'd*, 784 F. App'x 976, 976 (8th Cir. 2019).

Indeed, Plaintiffs here are alleging that two incidents in the past five years involving unnamed officers arresting journalists at protests put the State Defendants on

notice that *all* troopers may violate the constitutional rights of the media such that provide additional, unspecified training is deliberate indifference. Such generalized allegations are insufficient to demonstrate that State Defendants had notice of a pattern of unconstitutional arrests of journalists.

Furthermore, because Plaintiffs fail to allege any past incidents of allegedly excessive force against the State Patrol, State Defendants are indisputably entitled to qualified immunity as to those allegations.

Additionally, State Defendants are entitled to qualified immunity because Plaintiffs have failed to plead that State Defendants were personally deliberately indifferent. As explained above, *supra* Part II.B, Plaintiffs have failed to plead any facts supporting their contention that State Defendants were personally deliberately indifferent to the risk of violation of the media's rights by each and every trooper. This is particularly true because Plaintiffs have not identified any particular way in which the State Patrol's training or supervision was deficient and because the allegations regarding State Defendants are minimal. (*See, generally*, SAC.) Therefore, State Defendants are entitled to qualified immunity and the claims against them must be dismissed.

### III. GOYETTE, LASSIG, NELSON, MAURY, AND MATUREN LACK STANDING TO BRING CLAIMS AGAINST STATE DEFENDANTS.

Goyette, Lassig, Maury, Maturen, and Nelson lack standing to bring claims against State Defendants because they do not allege that State Defendants injured them and because Plaintiffs' conspiracy claim fails as a matter of law, as discussed *supra* Part II.C. (SAC ¶¶ 105-110, 116-19, 124-29.) Their claims against State Defendants must therefore be dismissed.

Standing requires that (1) a plaintiff has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In this case, because Goyette, Lassig, Nelson, Maury, and Maturen do not allege that they were injured by State Defendants, they lack standing under well-established caselaw. *See Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (holding that section 1983 claims failed because plaintiff did not allege that public official was involved in or had direct responsibility for incidents that caused injury to plaintiff). The mere fact that these individual plaintiffs may have been harmed by MPD does not give them standing to bring claims against State Defendants. *See Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, *although similar*, to which he has not been subject." (Emphasis added).)

Furthermore, because Goyette, Lassig, Nelson, Maury, and Maturen lack standing to bring claims against State Defendants, they cannot serve as class representatives. *See, e.g.*, *La Mar v. H&B Novelty & Loan Co.*, 489 F.2d 461, 462 (9th Cir. 1973) (holding that a plaintiff "cannot represent those having causes of action against other defendants against whom the plaintiff has no cause of action and from whose hands he suffered no injury"); *In re Intel Securities Litig.*, 89 F.R.D. 104, 119 (N.D. Cal. 1981) ("[C]lass treatment is not proper unless each plaintiff class representative has a cause of action against each defendant, even though the plaintiffs were all injured by a method of dealing

common to all defendants."); *Herlihy v. Ply-Gem Indus., Inc.*, 752 F. Supp. 1282, 1291 (D. Md. 1990) (dismissing putative class action because "each plaintiff has not and cannot allege an injury arising from the conduct of each and every defendant"); 1 J. McLaughlin, Class Actions § 4:28 (16th ed. 2019) ("In a multi-defendant case, a putative class representative must allege that he or she has been injured by the conduct of each defendant to establish standing."). The claims of Goyette, Lassig, Nelson, Maury, and Maturen must therefore all be dismissed as to State Defendants for lack of standing.

## VI.  THE CWA LACKS STANDING.

The CWA also lacks standing. First, the CWA lacks standing to sue in its own right because it cannot show, and does not allege, that the CWA itself suffered an injury in fact. *See Young America Corp. v. Affiliated Computer Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005). (*Id.* ¶ 136 (alleging that members of the CWA, not the CWA itself, have been injured).) Second, CWA lacks associational standing to bring suit on behalf of its members.

Ordinarily, a plaintiff cannot bring claims for the benefit of third parties. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Third-party standing is disfavored by the Supreme Court because the injured party typically has the appropriate and best incentive to pursue (or not pursue) his or her rights with the necessary zeal. *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004). In order to meet the limited exception to this rule, the Supreme Court held that an association must fulfill the following factors to have standing to bring suit on behalf of its members: (1) its members have standing to sue; (2) the interests the association seeks to protect are germane to its purpose; and (3) "neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). In addition, an association must show that there is no conflict of interest among the association's members' interests. *Associated Gen. Contractors of N.D. v. Otter Tail Power Co.*, 611 F.2d 684, 691 (8th Cir. 1971).

### A. The CWA Does Not Meet the *Hunt* Factors For Associational Standing.

CWA does not have associational standing for two primary reasons. First, the claims require highly individualized analysis. Second, the interests the CWA seeks to protect here are not germane to its purpose because of apparent conflicts of interest; moreover, independent from the *Hunt* factors, these same conflicts of interest themselves are reason to deny associational standing.

### 1. Association Standing Is Inappropriate Because Plaintiffs' Claims Require Individualized Proof and Involvement.

Associational standing is inappropriate where individualized proof of the claims asserted is necessary. *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 470 (8th Cir. 1985). Here, however, the claims involved require individualized inquiries into the facts and circumstances for all injured class members.

Determining whether any of the CWA members' constitutional rights were violated requires an individualized inquiry into the unique facts and circumstances surrounding each allegedly unconstitutional seizure, use of force, or retaliation. *See, e.g.*, *U.S. v. Hager*, 710 F.3d 830, 836 (8th Cir. 2013) ("A totality of the circumstances test is used to determine whether probable cause exists."); *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010) (holding a court must weigh the totality of circumstances in

evaluating First Amendment retaliation claim); *Graham v. Connor*, 490 U.S. 386, 396 (1989) (explaining that the Fourth Amendment reasonableness test for use of force requires "careful attention to the facts and circumstances of each particular case"); *Birdwell v. Hazelwood Sch. Dist.*, 491 F.2d 490, 495 (8th Cir. 1974) (holding that a procedural due process claim is evaluated considering the totality of the circumstances).

More specifically, proof of many individualized circumstances is necessary here, including factors such as whether (1) the individual was acting as a member of the news media; (2) the journalist was identifiable to the State Patrol as a member of the media; (3) the journalist was within or near a group of protesters; (4) the protesters and/or journalist was acting in an unlawful, violent or destructive manner; (5) the journalist was following law enforcement's directives; (6) a dispersal order had been given; and (7) there was probable cause to arrest the journalist.

Because individual participation is required by CWA members, the CWA lacks associational standing and cannot bring claims against State Defendants. *See, e.g.*, *Intern'l Longshore & Warehouse Union v. Nelson*, 599 F. App'x 701, 702 (9th Cir. 2015) (affirming determination that union lacked standing to sue on behalf of its members for claims arising out of arrests made in connection with protests because such claims "require[d] the participation of individual members").

> ## 2. Associational Standing Is Inappropriate Because The Issues Are Not Germane To the CWA's Purposes Due To Conflicts Between The CWA's Members.

Even if individual participation was not required, associational standing is still inappropriate here because conflicts of interest amongst CWA members shows that the

issues presented here are not germane to CWA's purpose. Importantly, some CWA members are law enforcement personnel, who may be directly adverse to the relief sought by Plaintiffs here. This significant conflict of interest implicates two concerns regarding the appropriateness of associational standing, both of which were well-explained by the Seventh Circuit as follows:

> First, because the litigation, if successful, would actually harm some members' interest, there is a concern that the litigation is not germane to the association's purposes. Second, the fact that the litigation, if successful, would harm some members' interest raises a concern that the association will not be fully committed to the litigation and, as a result, will not pursue the litigation with the zealous advocacy necessary to be an adequate representative.

*Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 864-65 (7th Cir. 1996).

The CWA's members are diverse. Not all members are involved in news reporting—instead its workers are employed in a "broad range of industries, including print and broadcast news media, telecommunications, airline, manufacturing, education, public service, and healthcare, among others." (SAC ¶ 130.) The SAC is silent as to the interests of the interests of its members who are not employed in the print and broadcast news media. (*See, generally*, SAC.)

Some of the CWA's members stand to benefit by the requested injunctive relief, while others may be harmed by said relief, making associational standing inappropriate. *See Associated General Contractors*, 611 F.2d at 691 (holding that associational standing was inappropriate because members of the association had different interests with regard to the issue at stake in the litigation). For example, the injunctive relief requested by Plaintiffs would prohibit the State Patrol from using certain chemical agents or physical

force against a member of the purported class (or a crowd that a purported class member was part of or near). (*See* SAC at pg. 112-13; Motion for Temporary Restraining Order [ECF No. 5].) Such an injunction would significantly limit the crowd control tools available to the State Patrol and other law enforcement entities, which is certainly not in the interests of all CWA members

For example, although perhaps intentionally not alleged in the SAC, the CWA's website states that one of the sectors in which its members work is law enforcement and "major employers" of CWA members include "various law enforcement agencies across the country."[12] *CWA Overview*, Communications Workers of America, *available at* https://cwa-union.org/about/cwa-overview (last visited September 11, 2020). It goes without saying that there is a serious potential conflict between the CWA's members who are journalists and those who work in law enforcement about the measures that law enforcement should be permitted to utilize during times of severe civil unrest. The relief sought by Plaintiffs – amounting to barring the use of chemical agents or less-lethal munitions any time a journalist may be present – would potentially protect journalists at the expense of the protection of law enforcement. Because of the clear conflicts between the interests of the CWA's own members, the litigation is not germane to the CWA's interests and the CWA lacks associational standing.

---

[12] The Court should take judicial notice of the CWA's website because the information about its membership "can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). *See, e.g.*, *ELA Med., Inc. v. Arrhythmia Mgmt. Associates, Inc.*, Civ. No. 06-3580, at *4 n.5 (D. Minn. Mar. 21, 2007) (taking judicial notice of information provided by party on its own website).

Because the CWA, along with Plaintiffs Goyette, Lassig, Nelson, Maury, and Maturen, lack standing to bring claims against the State Patrol, their claims against State Defendants must be dismissed. [13]

## CONCLUSION

For the aforementioned reasons, State Defendants respectfully request that the Court dismiss the claims against State Defendants with prejudice.

*SIGNATURE ON FOLLOWING PAGE*

---

[13] Moreover, the CWA cannot serve as a class representative because it is not a member of the purported class. *See* Federal Rule of Civil Procedure 23(a); *Wilhite v. S. Central Bell Tel. & Tel. Co.*, 426 F. Supp. 61, 64-65 (E.D. La. 1976) (holding that even if union had standing to bring claim for injunctive relief on behalf of its members, it could not serve as class representative because it was not a member of the class).

Dated:  September 14, 2020

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota


s/ Julianna F. Passe
KATHRYN IVERSON LANDRUM
(#0389424)

JULIANNA F. PASSE (#0397317)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1136 (Voice)
(651) 282-5832 (Fax)
kathryn.landrum@ag.state.mn.us
julianna.passe@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS
MINNESOTA DEPARTMENT OF PUBLIC
SAFETY COMMISSIONER JOHN
HARRINGTON AND MINNESOTA STATE
PATROL COLONEL MATTHEW
LANGER, *IN THEIR OFFICIAL AND
INDIVIDUAL CAPACITIES*

|#4735491-v1