## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jared Goyette, Craig Lassig, Michael Shum, Katie Nelson, Tannen Mauy, Stephen Maturen, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals*,

                 Plaintiff,

  vs.

City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; and John Does 1-10, *in their individual and official capacities*.

                Defendants.

Court File No. 20-cv-01302 (WMW/DTS)

**DEFENDANT MINNEAPOLIS POLICE LIEUTENANT ROBERT KROLL'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)**

## INTRODUCTION

The instant case is a claim by members of the media for injuries allegedly sustained during the protests and riots on May 27 and 30, 2020 in Minneapolis, Minnesota. Because Plaintiffs fail to allege any culpable conduct by Defendant Minneapolis Police Lieutenant Robert Kroll ("Defendant Kroll"). Plaintiff's claims against Defendant Kroll must be

1

dismissed.

# FACTS

The Complaint describes the series of events leading up to the protests and riots that took place in the City of Minneapolis, Minnesota in May 2020.

Plaintiff Goyette alleges he was a member of the media and was injured by a projectile while covering the riots for "the media" on May 27, 2020. See Complaint p. 33. There is no allegation that Defendant Kroll deployed the projectile or directed MPD officers to do so (or use any force).

Plaintiffs Lassig, Maury, and Maturen allege they were members of the media and were arrested on May 30, 2020. There is no allegation that Defendant Kroll arrested Plaintiffs Lassig, Maury, and Maturen or directed Police Officers to do so.

Plaintiffs Nelson and Shum allege that law enforcement shot projectiles, tear gas, and flash bangs at them and shoved or struck Plaintiff Strum. There is no allegation that Defendant Kroll shot projectiles or struck/shoved Plaintiffs Nelson or Shum. In fact, there is no allegation that Defendant Kroll was on duty as a police officer at the time of the alleged injuries – he was not.

Per Minneapolis Police Department ("MPD") policy, to be in command of an event, a Minneapolis police officer must hold the rank of Commander. See MPD Policy 1-404.[1]

---

[1] available at http://www2.minneapolismn.gov/police/policy/mpdpolicy_1-400_1-400, last visited July 16, 2020. ("Persons in positions of command may refer to a person who holds the official rank of Commander as defined in section 1-400 Rank Structure and Supervision; may refer to someone who is commanding an event/incident; or may refer to a Watch Commander. (07/01/13)").

Plaintiffs cannot allege Defendant Kroll acted in any command capacity at any point when Plaintiffs' alleged injuries took place because he was not in Command and, in fact, was not even on duty.

"Persons in position of command are responsible and accountable for every aspect of their commands. In order to achieve organizational objectives, they have the authority and responsibility to coordinate, direct, and allocate assigned personnel and resources within policy and legal restraints." *Id.* Plaintiffs fail to allege Defendant Kroll acted in a supervisory capacity at any point when Plaintiffs' alleged injuries were sustained.

"Persons in position of command shall continuously evaluate all aspects of their command. Existing policies, procedures, programs and budget requests should be reviewed to ensure that necessary changes are made. Personnel, vehicles and equipment must be inspected per MPD policy. It is a Commander's responsibility to ensure that deficiencies or inadequacies are noted and corrected." *Id.* There is no allegation that Defendant Kroll was in command of any law enforcement agency or function at the time of Plaintiffs' alleged injuries.

Defendant Kroll is named in this lawsuit simply because he is the President of the Police Officers' Federation of Minneapolis ("POFM"), which is the Exclusive Representative of all licensed police officers employed by the City of Minneapolis between the ranks of Police Officer and Lieutenant. See Kelly Aff. Ex. 1 (Labor Agreement between the POFM and City of Minneapolis). The POFM is a private non-profit corporation. See Kelly Aff. Ex. 2 (Minnesota Secretary of State Business Record Detail). As President of the POFM, Defendant Kroll is contractually "relieved from [his] regularly

scheduled duties to engage in Federation activities…" and is designated to "work exclusively on Federation business on a permanent basis (the "Full-Time Personnel")…" Kelly Aff. Ex 1 at 57. The City of Minneapolis and its Police Department "shall not order Full-Time Personnel to perform duties for the Police Department…" Id at 58. POFM directs the "activities of personnel while such personnel are engaged in Federation business…" Id. Thus, the City of Minneapolis and the MPD are prohibited from requiring Defendant Kroll to perform law enforcement duties for the MPD with only a few exceptions[2]. Id. Although Defendant Kroll holds the rank of Lieutenant with the Minneapolis Police Department, he is designated as Full-Time personnel working exclusively for the POFM. Defendant Kroll has been Full-Time for the POFM since 2014.

Accordingly, on the date of Plaintiffs' alleged injuries, Defendant Kroll was designated as Full-Time Personnel of the POFM, working exclusively on POFM business. As Full-Time Personnel of the POFM, Defendant Kroll supervises and directs other POFM personnel with respect to their role with the Union and holds no supervisory role or responsibility within the MPD.

Plaintiffs' only alleged basis for naming Defendant Kroll in this lawsuit is due to his role as the elected President of the POFM. According to Plaintiffs, because he is the POFM President, he is influential with the Department and, depending on the paragraph of

_____

[2] "[T]raining required for such Full-Time Personnel to retain their POST license and/or good standing as employees of the Minneapolis Police Department; being interviewed under Garrity by Internal Affairs; or required participation in criminal or civil litigation relating to duties performed by the employee as a Minneapolis Police officer (collectively the "Mandatory MPD Duties")."

the complaint, acts as either an unofficial or official policymaker within the Department. To summarize pages 71 through 92 of Plaintiffs' complaint, Defendant Kroll is an outspoken Union President who advocates for his membership and is disliked by his adversaries.

## ISSUES

1. Whether the Complaint should be dismissed for failure to state a claim upon which relief can be granted?

## STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court generally must ignore materials outside the pleadings, but it may consider materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *see also Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011). Accordingly, while courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;" without converting the motion into one for summary judgment under Rule 12(d). *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)).

The Court must grant a Rule 12(b)(6) motion to dismiss for failure to state a claim

if the plaintiff "cannot prove any set of facts in support of the claim which would entitle him to relief." *Stone Motor Co. v. General Motors Corp.*, 293 F.3d 456, 464 (8th Cir. 2002). The Supreme Court has emphasized that even under the liberal pleading standard of Rule 8, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Iqbal*, 129 S. Ct. at 1964-65. "The threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster. *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555). Accordingly, a plaintiff must provide more than labels and conclusions.

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id*. (citing Fed. R. Civ. P. 8(a)(2)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).

Courts ordinarily do not consider matters outside the pleadings on a motion to dismiss. See Fed. R. Civ. P. 12(d). A court may, however, consider exhibits attached to

the complaint, documents that are necessarily embraced by the pleadings, and public records. *Little Gem Life Scis., LLC v. Orphan Med., Inc*., 537 F.3d 913, 916 (8th Cir. 2008). "Documents necessarily embraced by the pleadings include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.'" *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (quoting *Kushner v. Beverly Enters., Inc*., 317 F.3d 820, 831 (8th Cir. 2003)). For instance, the contract upon which a claim rests is necessarily embraced by the pleadings and may be considered. *Gorog v. Best Buy Co*., 760 F.3d 787, 791 (8th Cir. 2014). The Exhibits attached to the Kelly Affidavit are all referenced in specific paragraphs of the Amended Complaint, incorporated by the Amended Complaint, and are properly considered by the Court.

## ARGUMENT

The Complaint should be dismissed because Plaintiffs "cannot prove any set of facts in support of the claim which would entitle [them] to relief." The facts alleged in the Complaint do not allow the court to even infer more than the mere possibility of misconduct let alone the require standard that "the pleader is *entitled to relief*." *Iqbal*, 129 S. Ct. at 1950 (citing Fed. R. Civ. P. 8(a)(2)) (emphasis added).

Plaintiff Goyette alleges that he was injured by a projectile while covering the protests and riots for "the media." Plaintiffs do not allege that Defendant Kroll deployed the projectile that allegedly injured Plaintiff Goyette, and there is no allegation that Defendant Kroll directed MPD officers to deploy a projectile or use force on anyone.

Plaintiffs Lassig, Maury, and Maturen allege they were members of the media and

were arrested on May 30, 2020. There is no allegation that Defendant Kroll arrested those Plaintiffs or directed Police Officers to do so.

Plaintiffs Nelson and Shum allege that law enforcement shot projectiles, tear gas, and flash bangs at them and shoved or struck Plaintiff Strum. There is no allegation that Defendant Kroll shot projectiles or struck/shoved Plaintiffs Nelson and Shum. In fact, there is no allegation that Defendant Kroll was even on duty as a police officer at the time of the alleged injuries because he had no supervisory authority over the involved police officers.

Instead, Plaintiffs allege that Defendant Kroll, as a Union leader, gave implied orders or essentially ran a shadow police department through the POFM. See Complaint pp. 71-92. Defendant Kroll works as full-time personnel for the POFM and holds no supervisory authority over law enforcement personnel. See Kelly Aff. Ex. 1. Plaintiffs' Second Amended Complaint alleges a civil conspiracy, but Plaintiffs fail to properly allege facts to support a meeting of the minds between Defendant Kroll (a private actor) and any government actor to violate any of Plaintiffs' constitutional rights.

Plaintiff's Second Amended Complaint in this case fails to meet even the legally insufficient "unadorned, the defendant-unlawfully-harmed-me accusation"—instead, Plaintiff essentially asserts that Defendant Kroll is somehow liable simply because he is the president of the union certified as the exclusive representative of Minneapolis police officers. The Complaint fails to allege facts that, if proven, "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. 662.

Even assuming *arguendo* that Plaintiff meets the Rule 8 threshold to survive a

motion to dismiss, the allegations against Defendant Kroll fall squarely within the constitutional protections of the First Amendment - the same Constitutional Protection provided to all Plaintiffs listed in the Complaint, specifically Plaintiff CWA. Plaintiff asks this Court to create a cause of action under 42 U.S.C. §1983 that imposes financial liability for third party acts based solely upon the content of protected speech. "When a law burdens such speech, the Court applies 'exacting scrutiny,' upholding the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 334-335 (1995) citing *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 786 (1978). The United States Congress never intended to allow 42 U.S.C. § 1983 as a sword to slaughter the First Amendment. U.S.C.A. Const. Amend. 1.

Plaintiffs' twisting of 42 U.S.C. §1983 cannot pass any level of scrutiny, let alone the exacting scrutiny required in this content-based claim. Plaintiffs' claims against Defendant Kroll are based either upon the actions of others or upon the content of Defendant Kroll's protected speech—neither of which are valid causes of action. The Complaint against Defendant Kroll should be dismissed.

## I. PLAINTIFFS HAVE FAILED TO ALLEGE A PLAUSIBLE CLAIM AGAINST DEFENDANT KROLL.

Defendant Kroll was not supervising MPD Police Officers at the time of Plaintiff's alleged injury and was not present when Plaintiffs allegedly sustained injuries. Defendant Kroll cannot be held liable for the actions of others, especially those that he does not directly supervise. Moreover, Defendant Kroll, as the President of the POFM, was a private

citizen and not acting under color of state law. The allegations in Plaintiffs' Second Amended Complaint do not meet the threshold requirements to plead a § 1983 conspiracy. The motion to dismiss should be granted.

### A. Defendant Kroll was not acting under color of law.

Plaintiffs' § 1983 claim fails as a matter of law because Defendant Kroll's alleged wrongdoing was in his role as President of POFM, a private actor, and not as a police officer. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was *committed by a person acting under color of state law.*" *West v. Atkins*, 487 U.S. 42 (1988) (emphasis added). "Acts of officers in the ambit of their personal pursuits are plainly excluded" from the scope of § 1983 liability. *Dossett v. First State Bank,* 399 F.3d 940, 949 (8th Cir. 2005) (alteration in original) (quoting *Screws v. United States,* 325 U.S. 91, 111 (1945)).

A defendant acts under color of state law only if he/she "acts or purports to act in the performance of official duties . . . ." *Johnson v. Phillips,* 664 F.3d 232,240 (8th Cir. 2011). "[A] public employee acts under color of law when he '[e]xercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Johnson,* 664 F.3d at 239–40 (quoting *West,* 487 U.S. at 49). "[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Roe v. Humke,* 128 F.3d 1213, 1215 (8th Cir. 1997) (internal quotation marks omitted).

To determine whether an official is acting under color of law, the Court "look[s] to

see whether a sufficient nexus exists between the official's public position and the official's harmful conduct." *Ramirez–Peyro v. Holder,* 574 F.3d 893, 900 (8th Cir. 2009). "Absent any actual or purported relationship between the officer's conduct and his duties as a police officer, the officer cannot be acting under color of state law." *Roe,* 128 F.3d at 1216. "In determining whether a sufficient nexus exists in the context of a § 1983 claim brought against a police officer, the Court considers a number of factors, including whether the officer was on duty and in uniform, the motivation for the officer's actions, whether the officer had access to the plaintiff because of the officer's position, and whether the officer invoked his status or threatened to use his official authority in the future. *Magee v. Trusttees of Hamline University, Minn., et al.*, 957 F.Supp. 2d 1047, 1055 (D. Minn. 2013) (citing *Ramirez–Peyro,* 574 F.3d at 901).

### 1.    Defendant Kroll and the POFM are private parties.

Labor unions are generally not state actors. *See Montgomery v. City of Ardmore* 365 F.3d 926 (10th Cir. 2004); *see also Magee*, 747 F.3d at 532. As President of the POFM, Defendant Kroll acts as a private party. The Second Amended Complaint makes it clear that Defendant Kroll's actions are in the scope of his private position as the President of POFM and *not* as a police officer acting under color of state law. "[A] clear nexus must exist between the defendant's official conduct and the violation of the plaintiff's rights." *Ottoman*, 347 F.3d at 761-62.

This Court dismissed a similar suit against Dave Titus, then a St. Paul Police Officer and President of the St. Paul Police Federation. *Magee,* 957 F.Supp.2d at 1047. The plaintiff in *Magee* alleged that Titus violated her rights when he published a written

11

response to an editorial written by the plaintiff. *Magee*, 957 F.Supp.2d at 1047. In his response, Titus identified himself as a St. Paul Police Officer and the President of the St. Paul Police Federation, questioned Magee's "fitness to teach" and stated "I hope Professor Magee confines her race baiting and cop-hating to her newspaper submissions and keeps it out of the classroom." *Id.* Titus then contacted Hamline, allegedly with the intent to have Magee fired in retaliation for her critical editorial, and organized a boycott of Hamline University to encourage Hamline to fire Magee. *Id.*

This Court found that those facts were insufficient to show that Titus was acting under color of state law because Titus was not using his position as a police officer to influence others, but was using his position as St. Paul Police Federation President. *Id.* "Mere employment by a state or municipality does not automatically mean that a defendant's actions are taken under the color of state law." *Id.* at 1056 (quoting *Ottman v. City of Independence, Mo.,* 341 F.3d 751, 762 (8th Cir. 2003)). The Eighth Circuit affirmed dismissal. *See Magee v. Trustees of Hamline University, Minn. et al.*, 747 F.3d 532 (8th Cir. 2014). Specifically, the Eighth Circuit held that Titus "was not acting 'under color of state law' when he published [the] editorial" and that the "federation's call for police department to boycott university did not constitute joint activity with state." *Id.* (internal citation omitted).

Like Titus, no facts can be plead here that Defendant Kroll was acting under color of law. The facts alleged in the Second Amended Complaint show that Defendant Kroll was not acting under color of state law in any of the allegations referencing Defendant Kroll's actions as the President of the Police Officers Federation of Minneapolis including

interviews given, an email to MPD Command Staff, and his email to POFM membership. Defendant Kroll works full time as the President of the POFM and does not perform law enforcement duties under the color of law. *See* Kelly Aff., Ex. 1, p. 57. Like Titus, Defendant Kroll was not using his position as a police officer—he was not on duty, not in uniform, and had no contact with any of the plaintiffs—rather, all of his conduct was in the scope of his position as President of the POFM. Like *Magee*, Defendant Kroll's actions on behalf of the POFM do not constitute joint activity with the state.

There are no allegations in the Complaint establishing even an inference of a nexus between Defendant Kroll's official conduct as a police officer acting under color of law and Plaintiffs' alleged injuries. Defendant Kroll's actions were not "made possible by, or undertaken in, his position as a police officer." *Magee*, 957 F.Supp.2d at 1057. "Mere employment by a state or municipality does not automatically mean that a defendant's actions are taken under the color of state law." *Id.* at 1056 (quoting *Ottman v. City of Independence, Mo.,* 341 F.3d 751, 762 (8th Cir. 2003)). Here, the facts alleged prove that Defendant Kroll's actions were made possible and undertaken solely in his private position as President of a labor union. Because Defendant Kroll did not act under color of state law, he cannot be liable under 42 U.S.C. § 1983 and the complaint should therefore be dismissed.

> 2.   Defendant Kroll's "outsized influence" does not create liability under 42 U.S.C. § 1983.

"Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course,

whether an official had final policymaking authority is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) quoting *Pembaur v. Cincinnati, supra,* 475 U.S., at 483, 106 S.Ct., at 1300 (plurality opinion). Neither lieutenants within the MPD nor the elected officials of the POFM have authority to make policies for the City of Minneapolis or the MPD as a matter of law. See MPD Policy 1-400.[3]

The Supreme Court has rejected an application of liability based upon "*de facto* authority", finding that "ad hoc searches for officials possessing such '*de facto*' authority would serve primarily to foster needless unpredictability in the application of § 1983." *Praprotnik*, 485 U.S. at 131. *Praprotnik* noted that the only way to impose liability based upon *de facto* authority would be "as a step towards overruling *Monell* and adopting the doctrine of *respondeat superior*." *Id.* The Supreme Court has not overruled *Monell* nor has it adopted the doctrine of *respondeat superior. See also Lollie v. Johnson*, 2015 WL 3407931 (D. Minn. May 27, 2015) ("unwritten policy must be evaluated under the standards used to analyze the sufficiency of a *Monell* custom claim.").

Plaintiffs' Second Amended Complaint devotes twenty pages to the opinions of Plaintiffs and others regarding Defendant Kroll. See Second Amended Complaint pp. 71-92. The paragraphs discuss allegations against Defendant Kroll that do not provide any relevant connection to the claims set forth by Plaintiffs. None of these opinions or

---

[3] Available at http://www2.minneapolismn.gov/police/policy/mpdpolicy_1-400_1-400, last visited July 17, 2020; see also Minneapolis City Charter § 7.3 (a) (" The Mayor has complete power over the establishment, maintenance, and command of the police department. The Mayor may make all rules and regulations and may promulgate and enforce general and special orders necessary to operating the police department.")

allegations, if proven, show Defendant Kroll did any act that might create even a possibility of liability for Defendant Kroll. It is clear from the Second Amended Complaint that Plaintiffs dislike Defendant Kroll and do not agree with the positions he takes as president of the POFM. Thankfully, disliking someone or their political views does not create a cause of action against that person. The Complaint should be dismissed because Plaintiffs cannot prove any set of facts in support of any claim which would entitle them to relief.

Throughout Plaintiffs' Second Amended Complaint, Plaintiffs allege Defendant Kroll is an "unofficial policymaker," "influences MPD custom and practice through his public and private statements," "his 'opinions' as Federation President have the practical effect of serving as policy guidance," a "*de facto* policy maker", and even goes so far as to claim that he is an "official policy maker." *See* Second Amended Complaint, pp. 71, 72, 80. However, Plaintiffs expressly acknowledge that Kroll's actions are as a private citizen, the Federation President. *See* Second Amended Complaint p. 92 ("Kroll *in his capacity as Federation President* has historically displayed a reckless and deliberate indifference to the constitutional rights of Minnesotans as a whole, but specifically to the constitutional rights of the Plaintiffs in this case.") (emphasis added).

Plaintiff alleges that an email sent by Defendant Kroll to MPD command staff shows Defendant Kroll inserted himself into the command staff and policy making role. The email speaks for itself, and a plain review of the email contradicts Plaintiffs' claims. If Defendant Kroll was actually running a "shadow command structure" he would have no need to send any message to MPD command staff; rather, he would simply institute his demands. Instead, the email shows a union president advocating for his membership by relaying o

management the concerns of the members and stressing the unnecessary risk of bodily harm and death to POFM members and the public. Imposing liability on a union officer under the theory of civil conspiracy whenever a union officer expresses concerns to management would have an extreme chilling effect and would eviscerate the rights of workers in Minnesota.

Plaintiff Communication Workers of America (CWA) should recognize the role of a Union and its President. It is particularly disturbing that Plaintiff CWA files suit and disparages Defendant Kroll and the POFM, another Union, simply because Defendant Kroll performed his fiduciary duty to advocate for POFM's members. Plaintiffs allege that a Union holding an employer to the contractual terms agreed to by both parties and reviewed by an independent arbitrator caused Plaintiffs harm. To call Plaintiffs' claims against Defendant Kroll absurd is a gross understatement. Plaintiff CWA's own stated "number one priority" is "standing up for our members and creating good jobs for all." *See* CWA National Issues.[4] Plaintiffs seek to create civil liability because Defendant Kroll and the POFM fought for and obtained just outcomes in disciplinary proceedings overseen by a neutral arbitrator. The fact that an independent arbitrator agreed, at least in part, with the POFM is proof that the POFM's actions were legitimate.

**B.    Defendant Kroll did not conspire with a public actor to violate Plaintiffs' civil rights.**

In Plaintiffs' desperate attempt to name Defendant Kroll in this lawsuit, Plaintiffs

---

[4] available at https://cwa-union.org/national-issues/secure-sustainable-jobs, last visited Sept. 10, 2020.

amended their complaint to add a claim of civil conspiracy alleging generally that Defendant Kroll conspired with the City to violate their civil rights. A private actor may be held liable under § 1983 only when the private actor "is a willful participant in joint activity with the State or its agents." *Magee*, 957 F.Supp.2d at 1057 (citing *Gibson v. Regions Fin. Corp.*, 557 F.3d 842, 846 (8th Cir. 2009) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982))). The allegations in the Second Amended Complaint do not create an inference that Defendant Kroll was a willful participant in joint activity with the state.

1. <u>There is no allegation that Defendant Kroll reached a mutual understanding with the State or its agents to violate Plaintiffs' civil rights.</u>

To prove a § 1983 conspiracy claim, Plaintiffs must show "that the defendant conspired with others to deprive . . . [them] of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff[s]." *Askew v. Millerd,* 191 F.3d 953, 957 (8th Cir. 1999). A plaintiff cannot allege a generalized § 1983 conspiracy—the conspiracy must be specific to the plaintiff: "A private actor may be liable as a § 1983 conspirator when the private actor reached an agreement with a person acting under color of state law *to retaliate against the § 1983 plaintiff for her protected First Amendment activity." Lawrence v. City of St. Paul*, 740 F.Supp.2d 1026 (D. Minn. 2010) (emphasis added) (citing *Dossett,* 399 F.3d at 947).

Accordingly, to maintain a § 1983 conspiracy action against Defendant Kroll as a private individual, Plaintiffs must prove that Kroll willfully participated and reached a

mutual understanding with officials acting under color of law to retaliate against the Plaintiffs for *their* protected First Amendment activity. *See Lawrence*, 740 F.Supp.2d at 1026 (citing *White v. McKinley,* 519 F.3d 806, 816 (8th Cir. 2008)). Plaintiffs' Second Amended Complaint, citing nothing beyond generalized legal conclusory statements, does not, and cannot, allege that Defendant Kroll entered into a mutual understanding with government officials to deprive these specific Plaintiffs of their civil rights. The complaint against Defendant Kroll should be dismissed.

2.      There are no allegations of specific facts to show or even infer a meeting of the minds to violate Plaintiffs' constitutional rights.

A conspiracy claim under § 1983 "requires allegations of *specific facts* tending to show a 'meeting of the minds' among the alleged conspirators." *Murray v. Lene,* 595 F.3d 868, 870 (8th Cir. 2010) (emphasis added) (quoting *Kearse v. Moffett,* 311 F.3d 891, 892 (8th Cir. 2002)). A private party does not conspire with government actors for purposes of § 1983 merely by "invoking an exercise of the state official's authority"—for example, by calling the police. *Young v. Harrison,* 284 F.3d 863, 870 (8th Cir. 2002). Rather, a plaintiff alleging a conspiracy between a private party and a government actor must allege facts that would permit a reasonable jury to find that the two reached an agreement to violate the plaintiff's constitutional rights.

The Plaintiff in *Young* rented a hotel room with friends. After consuming a large amount of alcohol, they returned to the hotel room where they were so disorderly that hotel security called the police. Hotel security ultimately let the police into the plaintiff's room where the police officers used force and allegedly violated plaintiff's civil rights. *See*

*Young*, 284 F.3d 863. The court rejected plaintiff's § 1983 conspiracy claim against the private security guard because merely "invoking an exercise of the state official's authority" (e.g. calling the police) was not an agreement to violate the plaintiff's constitutional rights. *Id.* at 870.

Here, like *Young*, Plaintiffs apparently allege that Defendant Kroll conspired with members of the police department because he expressed concerns, in his role as POFM President, to management regarding the terms and conditions of employment for Minneapolis police officers. Plaintiffs' claim appears to be based in large part upon an email sent by Defendant Kroll to command staff on May 30, 2020. As a threshold matter, the email was *sent* at 9:01 p.m. on May 29, 2020. Some of the injuries sustained by Plaintiffs were *prior* to May 29, 2020. See Second Amended Complaint pp. 41-42. The email speaks for itself and does not contain a demand or request that Chief Arradondo violate anyone's constitutional right—or, more importantly, these particular Plaintiffs. It is clearly an attempt by Defendant Kroll, as President of the POFM, to voice concerns related to the ongoing protests and riots.

Plaintiffs claim that this email is evidence of Defendant Kroll inserting himself into the command staff and policy making role. There is no evidence or inference that can be drawn to prove that Defendant Kroll and Chief Arradondo discussed or reached an agreement to violate Plaintiffs' constitutional rights. The email is a one-sided attempt by Defendant Kroll to voice issues raised by his membership regarding unprecedented riots in the City of Minneapolis. Defendant Kroll, like many Minnesotans (to include Governor Walz), was horrified by the rioting, looting, and destruction of property. In Defendant

Kroll's May 29, 2020 email, he simply asked for the restoration of order, as did many people across the state, region, and country. The email concludes by stating "[a]t some point community engagement needs to end and law enforcement needs to take place." That is, in fact, what eventually happened when Governor Walz issued an unprecedented call-out of the entire Minnesota National Guard to end the riots and restore order.

Plaintiffs' self-serving mischaracterization of the email lacks a mutual understanding to deprive *anyone*, let alone these particular Plaintiffs, of any civil rights. Defendant Kroll's email simply asked the Chief of Police for responses to issues identified by the Union. Even viewing it in the light most favorable to Plaintiff, Defendant Kroll was doing nothing more than requesting the police invoke their authority as law enforcement officers (just as Governor Walz had done earlier that very same day) and reiterates issues previously raised by Defendant Arradondo at a press conference. WCCO, May 29, 2020.[5] There are no specific factual allegations to support a conspiratorial agreement to violate Plaintiff's constitutional rights. *See Young*, 284 F.3d at 870 ("A private person does not conspire with a state official merely by invoking an exercise of the state official's authority.").

*Lawrence* held that one-way communication is insufficient proof of a conspiracy. 740 F.Supp.2d at 1050. In particular, *Lawrence* found that "alleging that two people had the *opportunity* to conspire—i.e., that they could have met with each other, or called each

---

[5] available at https://minnesota.cbslocal.com/2020/05/29/minneapolis-and-st-paul-are-on-fire-gov-walz-says-order-must-be-restored-as-twin-cities-enters-4th-day-of-george-floyd-unrest/ (last accessed Aug. 19, 2020).

other, or e-mailed each other—is obviously not sufficient to 'nudge[ ]' a conspiracy claim 'across the line from conceivable to plausible.'" *Id.* (emphasis in original) (quoting *Twombly*, 550 U.S. at 570). To hold otherwise would create potential § 1983 conspiracy liability for nearly any communication to a government actor: "no conspiracy claim . . . could be dismissed for failure to plead 'enough facts to state a claim to relief that is plausible on its face,' because *defendants almost always have the opportunity to communicate*." *Id.* (emphasis added).

Plaintiffs' allegation is legally insufficient to state a plausible § 1983 conspiracy claim against Defendant Kroll and the complaint should be dismissed. The email from Defendant Kroll reiterated examples of available law enforcement tactics that had also been raised by Governor Walz at a press conference earlier that day, and shows no mutual agreement anymore than it would establish a conspiracy between the City and Governor Walz. For example, at a press conference *earlier that morning*, Governor Walz went further than Defendant Kroll when the governor stated: "We cannot have the looting and recklessness that went on. It's time for us to clean our streets" and floated the possibility of imposing martial law. WCCO, May 29, 2020.[6] When asked if martial law should be considered, Walz responded by saying, "Certainly, all those tools are there." *Id.* Governor Walz called the City's response as "abject failure" and stated that "[i]f [the local response] would have been executed correctly, the state would not lead on this." *Id.* Despite these

---

[6] available at https://minnesota.cbslocal.com/2020/05/29/minneapolis-and-st-paul-are-on-fire-gov-walz-says-order-must-be-restored-as-twin-cities-enters-4th-day-of-george-floyd-unrest/ (last accessed Aug. 19, 2020).

strong statements from Governor Walz, a public actor, he is not named in this lawsuit.

"[C]onclusory allegations are insufficient to state a § 1983 claim." *Id.* Plaintiff can present no evidence that Defendant Kroll acted in concert with the City. There are no specific factual allegations suggesting that Defendant Kroll conspired with the City, the State, or any City or State officer. *Cf. Hughes v. Patrolmen's Benevolent Ass'n of the City of N.Y., Inc.,* 850 F.2d 876, 880–81 (2d Cir. 1988) (holding that complaint alleged sufficient facts to support conclusion that private-actor PBA had acted under color of state law, where complaint alleged, inter alia, that PBA had hired private investigators and placed plaintiff under surveillance with knowledge and consent of a state-actor, the New York City Police Department). Plaintiffs' conclusory allegations of conspiracy ring especially hollow in light of the documented adversarial relationship between the City and Defendant Kroll in his role as President of the POFM.

This Court addressed this precise issue when it denied plaintiff's motion to amend her complaint to add a claim of civil conspiracy in *Magee.* Like the generalized allegations against Defendant Kroll's influence on MPD policy, the plaintiff in *Magee* "allege[d] generally that Titus was able to influence police policy through his position as an officer and president of the SPPF." 957 F.Supp. at 1057. Magee further alleged that Titus conspired with the Saint Paul Police Department ("SPPD"), with a meeting of the minds, to deprive her of constitutionally-guaranteed rights—in particular, that Titus's letter to the editor identified himself as president of the SPPF and that Titus, through the SPPF, declared a boycott against Hamline until it took punitive action against Magee; that the SPPF's boycott resolution urged the SPPD to join the boycott against Hamline and that

"[u]pon information and belief Titus was successful in obtaining assistance from police officers or the SPPD to boycott Hamline." *Id.* at 1071.

The court denied Magee's motion to amend her complaint to add the § 1983 conspiracy allegation, finding that "Magee has not alleged facts supporting a conspiracy or meeting of the minds between the SPPF and any public actors. The Proposed Amended Complaint contains *no factual allegations of a mutual understanding between the SPPF and the police department* concerning an unlawful objective to violate Magee's constitutional rights." *Id.* (*citing White v. McKinley,* 519 F.3d 806, 816 (8th Cir. 2008) (emphasis added). *Magee* held the allegation that the SPPF boycott was "effectuated by numerous public police officers" was insufficient to render her claim against the SPPF plausible because it failed to "acknowledge the distinction between police officers acting in their official capacity and in their personal lives." *Id.* (*citing Lawrence*, 740 F.Supp.2d at 1046. *Magee* further held that plaintiff's "assertion that Titus acted with sufficient nexus to his police officer status to act under color of law is a conclusory allegation of law that is not entitled to an assumption of truth." *Id.* (citing *Delgado–O'Neil v. City of Minneapolis,* No. 08–4924, 2010 WL 330322 (D. Minn. Jan. 20, 2010) *aff'd,* 435 Fed. Appx. 582 (8th Cir. 2011)). "Because the SPPF is a private entity not liable under 42 U.S.C. § 1983 and Magee has not alleged facts supporting her conclusory allegation that defendants acted under "color of law" or that the SPPF acted in concert with public officials, Magee's proposed Section 1983 claim against the SPPF could not survive a Rule 12(b)(6) motion to dismiss." *Id.*

The Court's reasoning in *Magee* applies here—the Second Amended Complaint has

not alleged facts supporting Plaintiffs' conclusory allegation that Defendant Kroll acted under "color of law" or that he or the POFM acted in concert with public officials. Plaintiffs have failed to allege *specific facts* that Defendant Kroll "acted in concert" with the City of Minneapolis or any officer. The general allegation that Defendant Kroll "influenced' Department policy" is inadequate as a matter of law. An email to Defendant Arradondo is insufficient to prove a civil conspiracy. *Magee*, 747 F.3d at 537 (citing *Mershon v. Beasley,* 994 F.2d 449 (8th Cir. 1993) ("contacts, by themselves and without more" do not allow the inference of "any mutual understanding" in a § 1983 action)).

Plaintiffs fail to provide evidence or allegations of "a meeting of the minds where both the Department [or its police officers] and [Kroll] jointly agreed to violate [Plaintiffs'] constitutional rights." *Magee*, 957 F.Supp.2d at 1058. Like *Magee*, Plaintiffs' complaint contains only vague and general legal conclusions that Defendants conspired to violate Plaintiffs' rights. The Court is not bound to accept legal conclusions in a pleading to overcome a motion to dismiss. *Id.* (citing *Farm Credit Servs. of Am. v. Am. State Bank,* 339 F.3d 764, 767 (8th Cir. 2003) (holding that courts are "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations")); *see also Kurtz v. City of Shrewsbury,* 245 F.3d 753, 758 (8th Cir. 2001) ("Other than the appellant's bare allegations, the record is devoid of any evidence substantiating a claim of conspiracy").

The record contains no *factual* allegations to support Plaintiffs' claim of civil conspiracy against Defendant Kroll. There are no facts alleged which, if proven, demonstrate an offer to conspire or a meeting of the minds to deprive anyone of their civil

rights. Without additional facts, Plaintiffs have not "'nudged [their] claims' of retaliation 'across the line from conceivable to plausible'" and the motion to dismiss should be granted. *Iqbal*, 556 U.S. at 680.

### C. Defendant Kroll was not present nor supervising any Minneapolis Police Officers at the time of Plaintiff's alleged injuries

The Supreme Court has ruled that defendants "cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic." *Id* at 683. Because no set of facts can be established or even alleged in good faith to prove that Defendant Kroll, himself, acted on account of a constitutionally protected characteristic, the complaint should be dismissed.

Plaintiffs cannot plead that Defendant Kroll inflicted harm upon Plaintiffs because he was neither present nor working as a Police Officer at the time of Plaintiffs' alleged injuries. Because there is no allegation that Defendant Kroll used force against Plaintiffs, Plaintiffs cannot plead any facts that Defendant Kroll acted on account of a constitutionally protected characteristic. Likewise, Plaintiffs cannot plead any facts that Defendant Kroll was supervising employees in the discharge of official duties because he was not working as an MPD Lieutenant at the time of Plaintiff's alleged injuries. Because there is no allegation that Defendant Kroll was working as an MPD Lieutenant at the time of Plaintiffs' alleged injuries, Plaintiffs cannot plead any facts that Defendant Kroll was supervising employees in the discharge of official duties.

As a matter of law, even if Defendant Kroll possessed supervisory authority, he cannot be liable for the conduct of a subordinate because "Government officials may not

be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Id.* at 676 (internal citation omitted) (emphasis in original). "A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties" *Id.* (quoting *Robertson v. Sichel*, 127 U.S. 507, 515-516 (1888)). Defendant Kroll was not acting as a supervisor.

As noted previously, Defendant Kroll is a private actor. The Second Amended Complaint alleges that Defendant Kroll has *"de facto"* control over the Minneapolis Police Department, but Plaintiffs proffer no factual allegations to support this generalized allegation. The Supreme Court has rejected claims based upon *"de facto policymaker"* allegations. *See City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ("Nor do we believe that we have left a 'gaping hole'" in § 1983 that needs to be filled with the vague concept of '*de facto* final policymaking authority.' . . . ad hoc searches for officials possessing such '*de facto*' authority would serve primarily to foster needless unpredictability in the application of § 1983.) (internal citation omitted). Like *Praprotnik* observed, allowing Plaintiff's claim of *"de facto"* policymaking authority would create needless unpredictability in the application of § 1983. Plaintiff's claims against Defendant Kroll are based in neither law nor fact and should be dismissed.

      1.    <u>Plaintiffs named Defendant Kroll to attract attention and harass him.</u>

Defendant Kroll is not alleged to have done anything beyond performing his duties as the President of the POFM. None of his alleged actions included an explicit or implicit

call for violence against any one or any entity. There are no facts pled nor any facts which can be pled to show that Defendant Kroll engaged in any act towards Plaintiff that creates § 1983 liability of or for Defendant Kroll. Plaintiff's claims against Defendant Kroll do not go beyond mere averments or conclusory statements. The Complaint fails to allege any facts that support any claim against Defendant Kroll and it should be dismissed.

Plaintiffs name John Does 1-10, in their individual and official capacities, the City of Minneapolis, and Minneapolis Police Chief Medaria Arradondo, in his official capacity, as Defendants in this case. Consequently, Plaintiffs color of law claims are covered by all of the other defendants named in their official capacities. There is no benefit or necessity to name Defendant Kroll, especially considering the absence of any specific factual allegations of a conspiracy. Plaintiffs named Defendant Kroll to garner attention from the media and/or to harass Defendant Kroll. With respect to the latter, Plaintiff Goyette openly gloated about suing Defendant Kroll: "Morning text from gf: 'My baby is suing Bob Kroll.'" Jared Goyette Twitter June 3, 2020.[7] In addition, Plaintiff Goyette has expressed the harassing reasoning behind naming Defendant Kroll in this lawsuit: "On the ACLU lawsuit: I am not looking for a settlement. I hope Bob Kroll and others who made decisions on police tactics have to take the stand. Period." *Id.*, June 4, 2020.[8]

Plaintiffs do not allege Defendant Kroll made any decisions on police tactics leading to Plaintiffs' injuries. Plaintiffs do not allege that Defendant Kroll was present or was

[7] available at https://twitter.com/JaredGoyette/status/1268186622882910215 (last visited July 17, 2020.
[8] available at https://twitter.com/JaredGoyette/status/1268738447231066112 (last visited July 17, 2020).

supervising anyone present at the time of Plaintiffs' alleged injuries. Plaintiffs kept Defendant Kroll as a named party and added 20 pages of opinion and conjecture disparaging Defendant Kroll. Because Plaintiffs cannot prove any facts that Defendant Kroll caused Plaintiffs' injuries, the claim against him must be dismissed.

## II. DEFENDANT KROLL'S SPEECH IS PROTECTED BY THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION.

This lawsuit strikes at the heart of free speech protections. "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) quoting *Roth v. United States*, 354 U.S. 476, 484 (1957). This constitutional safeguard, "'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) quoting *Roth v. United States*, 354 U.S. 476, 484 (1957). The Supreme Court has expressly held that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. *Id* at 270-271 citing *Terminiello v. Chicago*, 337 U.S. 1 (1949) and *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

The ACLU, a signatory to the complaint, recognizes the critical importance of free speech when it comes to persons who are not Bob Kroll: "The First Amendment to the Constitution protects speech no matter how offensive its content." Speech on Campus.[9] Defendant Kroll's speech is protected by the United States Constitution and the complaint

---

[9] available at https://www.aclu.org/other/speech-campus (last visited July 17, 2020)

against him should be dismissed.

A. **Defendant Kroll's speech concerned a matter of significant public concern.**

As the President of the POFM, Defendant Kroll is an outspoken advocate for the union and its members. Simply because Plaintiffs disagree with his views or personally dislike him does not create a cause of action against him. This is particularly true when some of the speech at issue occurred *after* the third-party acts that caused Plaintiffs' alleged injuries. The letter referenced in the Second Amended Complaint was sent by Defendant Kroll, as POFM President, to POFM members and simply voiced his support for POFM members in the face of protests and riots following the death of George Floyd. Defendant Kroll's letter unquestionably addressed a matter of significant public concern after the death of George Floyd and the protests and riots that followed. Likewise, all other instances cited by Plaintiffs over twenty pages involve matters of significant public concern, including treatment of law enforcement by the media and elected officials.

Speech on matters of public concern is at the heart of the First Amendment's protection and, as the President of a Union, Defendant Kroll's speech is heavily protected by the First Amendment. *Snyder v. Phelps*, 562 U.S. 443 (2011). Unions can, and do, speak out on controversial subjects including "climate change, the Confederacy, sexual orientation and gender identity, evolution, and minority religions." *Janus*, 138 S.Ct. at 2466. "These are sensitive political topics, and they are undoubtedly matters of profound 'value and concern to the public.' *Id.* quoting *Snyder,* 562 U.S. at 453. When Unions engage in such speech, it "occupies the highest rung of the hierarchy of First Amendment

values" and merits "special protection." *Janus* 138 S.Ct. 2448 quoting *Snyder*, 562 U.S. 443, 452 (2011). Plaintiff's Second Amended Complaint lay out the introduction of the matters of public concern that caused numerous members of the news media to arrive "to cover the demonstrations and unrest and the government response." Second Amended Complaint, pp. 5-6. Law enforcement's actions in response to the violent protests and riots that rocked the Twin Cities and caused an unprecedented activation of the *entire* Minnesota National Guard by the Governor are most certainly matters of public concern.

Here, like *Janus*, "the union speech at issue in this case is overwhelmingly of substantial public concern." 138 S.Ct. at 2447. Likewise, Defendant Kroll's commentary about the hard work that the members of POFM engaged in, which he believed went unrecognized by elected officials in the City of Minneapolis, was, and is, of substantial public concern. Each example of Defendant Kroll's "egregious" statements throughout the complaint revolve around matters of public concern, upon which the Union *should* speak.

Defendant Kroll's speech was not on behalf of the City of Minneapolis or the Minneapolis Police Department. "[I]f the union's speech is really the employer's speech, then the employer could dictate what the union says. Unions, we trust, would be appalled by such a suggestion." *Janus v. American Federation of State, County, and Mun. Employees, Council 31* 138 S.Ct. 2448, 2475 (2018).

Plaintiffs specifically acknowledge that Defendant Kroll's speech was made in his capacity as an elected union officer. See id ("What Kroll casts as his 'opinions' as *Federation President*" have the practical effect of serving as policy guidance for officers, which aggravates the training and supervision failures…") Second Amended Complaint,

p. 72 (emphasis added).  Plaintiffs are unabashedly attacking Union speech.

Paragraphs 190-194 discuss Defendant Kroll's written communication to the members of his Union. Id at 73-44.  The allegation in paragraph 193 is that Defendant Kroll's statement constituted "incitement against the press" because the statement read:

> I've been a visible target from the groups conducting this riot, politicians on the left allowing it and encouraging it, and liberal media. My visibility during this time would only increase your danger. I've received countless death threats throughout this.

Id at 74.  The statement speaks for itself: a plain reading shows that Defendant Kroll was noting that he, himself, is the target from numerous groups.  There was no call to action or call to arms.  There is no reasonable way to read Defendant Kroll's letter to his membership as an explicit or even implicit call to violence against anyone or anything and it is absurd to claim that the statement, issued several days **after** Plaintiffs' alleged injuries, constituted incitement against the press (or the individual plaintiffs to this lawsuit). Plaintiffs cannot reasonably allege that *any* of Defendant Kroll's letter is untrue, for example, immediately leading up to Defendant Kroll's letter, multiple media outlets published negative stories about Defendant Kroll.[10]

---

[10] "Minneapolis Police Union President Allegedly Wore a "White Power Patch" and Made Racist Remarks", Mother Jones, May 30, 2020, available at https://www.motherjones.com/crime-justice/2020/05/minneapolis-police-union-president-kroll-george-floyd-racism/ (last visited July 17, 2020)
"A 2007 lawsuit said the president of the Minneapolis police union wore a 'white power' patch on his motorcycle jacket and discriminated against officers of color" Insider, May 29, 2020, available at https://www.insider.com/president-minneapolis-police-union-wore-white-power-patch-lawsuit-2020-5 (last visited July 17, 2020)
"Former Mayor R.T. Rybak says Police Federation President is a 'cancer'

**B.      Defendant Kroll's speech does not fall within any exception to First Amendment protection.**

Plaintiffs cannot reasonably allege that Defendant Kroll's speech falls within one of the extremely narrow exceptions to First Amendment protection.  Those exceptions include obscenity, defamation, fighting words/incitement to violence. *See R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992). Plaintiffs' feeble attempt to allege incitement (the Second Amended Complaint contains the word "incitement") fails as a matter of law. See Second Amended Complaint p. 74.  This narrow exception to First Amendment protections is not applicable to the facts alleged in the complaint.

Context and the specific words used are critical. "[T]he line between permissible advocacy and impermissible incitation to crime or violence depends, not merely on the setting in which the speech occurs, but also on exactly what the speaker had to say." *Young*

Kroll is "toxic" and "it is time to name names" according to Rybak", WCCO Radio, May 29, 2020, available at https://wccoradio.radio.com/articles/feature-article/former-minneapolis mayor-police-federation-president-cancer (last visited July 17, 2020)
"Minneapolis police leader defending George Floyd's killers tied to 'white power'-linked biker gang," The Gray Zone, May 29, 2020, available at https://thegrayzone.com/2020/05/29/minneapolis-police-george-floyds-white-power-biker-gang/#more-25041 (last visited July 17, 2020)
"Harteau: Kroll's silence is just as much and just as important and loud as those who blatantly do racist things" WCCO Radio, June 1, 2020, available at https://wccoradio.radio.com/articles/harteau-krolls-silence (last visited July 17, 2020)
"Minnesota AG says black Minnesotans have reason to fear local police," The Hill, May 31, 2020 available at https://thehill.com/homenews/sunday-talk-shows/500320-minnesota-ag-says-black-minnesotans-have-reason-to-fear-local, (last visited July 17, 2020)

*v. American Mini Theatres, Inc.,* 427 U.S. 50, 66 (1976) (plurality opinion); see also *Musser v. Utah,* 333 U.S. 95, 100–103 (1948). Those words are words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. State of New Hampshire* 315 U.S. 568 (1942).

A cursory review of the June 2 letter from Defendant Kroll reveals that there were no words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. An incitement to loot and destroy buildings, for example, could be the mayor of a major metropolitan city stating that "brick and mortar are not as important as life. The symbolism of a building cannot outweigh the significant of life" while that city is in the midst of insurrectionists looting and burning down multiple buildings, including a Police Precinct. *See* Mayor Jacob Frey May 29, 2020 press conference, available at https://kstp.com/news/minneapolis-mayor-frey-brick-and-mortar-is-not-as-important-as-life/5744418/ (last visited July 16, 2020). Such a statement could be reasonably construed as encouraging the continued lawless looting and destruction of buildings. When buildings are burned and destroyed after such a statement, a colorable argument could be made that the statement encouraged or called for an immediate breach of peace. No such argument exists with respect to the statements of Defendant Kroll.

"[T]he Supreme Court held that the government cannot punish inflammatory speech unless it *intentionally and effectively* provokes a crowd to immediately carry out violent and unlawful action. This is a very high bar, and for good reason." Campus Speech[11], citing

---

[11] available at https://www.aclu.org/other/speech-campus (last visited July 16, 2020) (emphasis added).

*Brandenburg v. Ohio* 395 U.S. 444 (1969). Plaintiffs cannot allege facts to prove that any speech from Defendant Kroll intentionally and effectively provoked a violent and unlawful action.

"The incitement standard has been used to protect all kinds of political speech, including speech that at least tacitly endorses violence, no matter how righteous or vile the cause." *Id.* "For example, in *NAACP v. Clairborne Hardware*, the court held that civil rights icon Charles Evans could not be held liable for the statement, 'If we catch any of you going in any of them racist stores, *we're going to break your damn neck*.'" *Id.* citing 458 U.S. 866 (1982) (emphasis added). "In *Hess v. Indiana*, the court held that an anti-war protestor could not be arrested for telling a crowd of protestors, 'We'll take the fucking street later.'" *Id.* citing 414 U.S. 105 (1973). "And in *Brandenburg* itself, the court held that a Ku Klux Klan leader could not be jailed for a speech stating 'that there might have to be some revengeance [sic] taken'" for the "continued suppression of the white, Caucasian race.'" *Id.* quoting 395 U.S. at 446.

Defendant Kroll's protected speech could never be construed as being an explicit or even implicit call for violence or a breach of peace. If "we're going to break your damn neck" is protected speech, then "[i]t's important for us to get order restored and safety resumed" is certainly protected. Of equal significant, Defendant Kroll's comments were *after* Plaintiffs' alleged injuries. Plaintiffs cannot reasonably allege that there is a First Amendment exception for ***after the fact*** statements. Incitement requires a call for an ***immediate*** breach of the peace. See *Chaplinsky*, 315 U.S. at 573. It is definitionally

impossible to have incitement after the fact.[12] Defendant Kroll's statements are protected by the First Amendment and he should be dismissed from this lawsuit.

The ACLU, typically a stalwart defender of First Amendment Speech, is a signatory to this complaint. The ACLU has previously explained the critical need to defend free speech protections:

> How much we value the right of free speech is put to its severest test when the speaker is someone we disagree with most. *Speech that deeply offends our morality or is hostile to our way of life warrants the same constitutional protection as other speech because the right of free speech is indivisible*: When we grant the government the power to suppress controversial ideas, we are all subject to censorship by the state.

Campus Speech[13] (emphasis added). Yet, here, the ACLU appears to take the position that engaging in speech it disagrees with is not only *not* protected but *creates* civil liability under 42 U.S.C. §1983 if the speech refers to the media as "liberal." Plaintiffs seek an unprecedented expansion of free speech limitations while monetarily benefitting from those protections.

There is no rational way to read Defendant Kroll's letter as being an explicit or implicit call for a breach of peace. Plaintiffs effectively request this court to censor any criticism of the media. To create liability for third party acts simply by using the phrase "liberal media" is absurd and Plaintiffs ask this court to engage in viewpoint discrimination to recover monetary damages under 42 U.S.C. § 1983. The Supreme Court has correctly prohibited such discrimination. *See Rosenberger v. Rector and Visitors of University of*

---

[12] Black's Law Dictionary defines "incitement" as "the act or an instance of provoking, urging, or stirring up." (11th ed. 2019)

[13] See footnote 11

*Virginia,* 515 U.S. 819 (1995); citing *Perry Ed. Assn. v. Perry Local Educators Assn.,* 460 U.S. 37 (1983); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).

To summarize Plaintiff's claim against Defendant Kroll: they do not like him or what he says so they sued him even though he was in no way involved in the alleged harm brought upon plaintiffs. Despite the opportunity to voluntarily dismiss Defendant Kroll in the first or seconded amended complaint, they doubled-down and added 20 pages of conjecture dressed up as facts vilifying Defendant Kroll.

Disliking an individual or their speech does not create a cause of action. To the contrary, the First Amendment was enacted to expressly protect an individual's speech and is designed to preclude lawsuits such as this one.

 Free speech protection does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered." *N.A.A.C.P. v. Button*, 371 U.S. 415, 445 (1963). The speech in which Defendant Kroll engaged in, "the advocacy of a politically controversial viewpoint-is the essence of First Amendment expression." *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 347 (1995) citing *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, (1992); *Lovell v. City of Griffin,* 303 U.S. 444, (1938). Like *McIntyre*, the speech took place during a time with controversial actions by rioters in response to actions of POFM's members which "only strengthens the protection afforded to [Defendant Kroll's] expression: Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed." *Id* citing *Terminiello v. Chicago,* 337 U.S. 1, 4, (1949). To allow this lawsuit to continue will undoubtedly have a chilling effect on speech—particularly

union speech. In essence, an individual could be liable for the actions of a third party simply because the individual commented on a matter of public concern.

The Supreme Court has rejected similar lawsuits. Plaintiff asks this Court to create "a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." *New York Times*, 376 U.S. at 278, quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). "The fear of damage awards under a rule such as that invoked by the [Plaintiff] here may be markedly more inhibiting than the fear of prosecution under a criminal statute." *New York Times,* 376 U.S. at 277 citing *City of Chicago v. Tribune Co.,* 139 N.E. 86, 90 (Ill. 1923).

To allow this case to move forward would have a significant chilling effect on Unions' and their elected union officials from engaging in speech on matters of public concern. The ironic outcome is that it would likely be turned against parties like Plaintiffs, as members of the media. It would destroy First Amendment protections and create a deluge in litigation based on the content of a Defendant's speech. Plaintiffs have not cited to any Court that has interpreted 42 U.S.C. § 1983 to create liability based upon the content of a Defendant's speech in circumstances similar to this case. They cannot. In short, Plaintiffs' claims turn the First Amendment on its head. Defendant Kroll should be dismissed.

## CONCLUSION

Plaintiffs' claims against Defendant Kroll do not withstand any level of scrutiny. Plaintiff cannot demonstrate that 42 U.S.C. § 1983 creates a content-based restriction and allows for viewpoint discrimination that will survive an exacting scrutiny analysis. The

Supreme Court has recognized that Union speech on matters of public concern like Defendant Kroll's receive the highest level of protection. *Janus* 138 S.Ct. 2448 quoting *Snyder*, 562 U.S. 443, 452 (2011).

Plaintiffs' allegation against Defendant Kroll is based upon their obvious disdain for,[14] or disagreement with, the content of his speech. To allow such a claim to go forward would destroy the fundamental protections of the First Amendment that have been a bedrock principle since our country's infancy. The Complaint does not allege that Defendant Kroll was present at the time of Plaintiffs' alleged injuries nor that he held any role in law enforcement at the time of Plaintiffs' alleged injury. Defendant Kroll's statement cited by Plaintiffs was issued several days *after* the alleged injuries were sustained. Because Plaintiffs' claims against Defendant Kroll lack any legal or factual basis, they should be dismissed.

---

[14] Plaintiff Goyette has vehemently and repeatedly personally attacked Defendant Kroll. For example, on June 22, 2020, Plaintiff Goyette wrote: "Bob Kroll is a racist and a coward." Jared Goyette Twitter, June 22, 2020 available at https://twitter.com/JaredGoyette/status/1275291046474387456 (last visited July 17, 2020). The next day, Plaintiff Goyette wrote "Another reminder: Bob Kroll is a racist and a coward." *Id.*, June 23, 2020 available at https://twitter.com/JaredGoyette/status/1275515372163170311, (last visited July 17, 2020). On June 24, 2020, Plaintiff Goyette again called Defendant Kroll a coward. *Id.*, June 24, 2020, available at https://twitter.com/JaredGoyette/status/1275783508649283587 (last visited July 17, 2020) ("Kroll tried bullying, but didn't get his way. Now he's going for petty, vindictive and again, cowardly.").

Respectfully submitted,

Dated: September 14, 2020

**KELLY & LEMMONS, P.A.**

/s/ Joseph A. Kelly
Joseph A. Kelly (#389356)
jkelly@kellyandlemmons.com
Kevin M. Beck (#0389072)
kbeck@kellyandlemmons.com
2350 Wycliff Road, #200
St. Paul, MN 55114
(651) 224-3781
F: (651) 223-8019

*Attorneys for Defendant Minneapolis*
*Police Lieutenant Robert Kroll*