## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Jared Goyette, Craig Lassig, Michael Shum, Katie Nelson, Tannen Maury, Stephen Maturen, and The Communications Workers of America, *on behalf of themselves and other similarly situated individuals*, | Court File No.: 0:20-cv-01302 (WMW/DTS) |

         Plaintiffs,

  v.

City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; and John Does 1-10, *in their individual and official capacities*,

         Defendants.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT MINNEAPOLIS POLICE LIEUTENANT ROBERT KROLL'S MOTION TO DISMISS**

---

## <u>INTRODUCTION</u>

Defendant Lieutenant Robert Kroll has a long and notorious history of using his position as a Minneapolis Police Lieutenant and president of the Police Officers' Federation of Minneapolis to promote overly-aggressive law enforcement tactics, protect officers who engage in misconduct, and obstruct policy reforms and training designed to prevent the use of excessive force and other illegal law enforcement tactics against the media and private citizens. The City's mayors and chiefs of police have publicly

1

acknowledged Kroll's role in usurping MPD leadership and establishing official and unofficial MPD policies and practices, and in creating a toxic culture that is intractable so long as he remains in control.  These policies, practices, and culture created an environment in which, time after time, whenever there is civil unrest in the City of Minneapolis, the police officers called in to quell it overstep the bounds of the law and deliberately target the media.  The breathtaking scope and number of intentional attacks on journalists during the Floyd protests speaks to how thoroughly entrenched this culture and practice has become.  This has to stop, and Defendant Kroll must bear responsibility for his central role in causing these constitutional violations.

Kroll asserts that Plaintiff's claims should be dismissed because he did not personally commit any of the unconstitutional acts alleged in the Second Amended Complaint (SAC) and was not responsible for directly supervising the officers who did; and because, despite his official position as a police Lieutenant and role as Federation President in establishing police policy and culture, he was not acting under color of law when he set policy for the Minneapolis Police Department (MPD) through official and unofficial channels.  Kroll further argues that Plaintiffs' conspiracy count should be dismissed because they did not sufficiently allege a "meeting of the minds" between the defendants and that his unofficial policymaking constituted "protected speech" under the First Amendment.  Kroll's arguments misconstrue Plaintiffs' claims and seek to apply a heightened pleading standard that is inappropriate on a Motion to Dismiss under Rule 12(b), and the Court should reject his Motion accordingly.

## FACTUAL BACKGROUND

### I.   LAW ENFORCEMENT DELIBERATLEY TARGETED JOURNALISTS DURING THE GEORGE FLOYD PROTESTS.

The facts surrounding the death of George Floyd are by now well known. On May 25, 2020, officers of the Minneapolis Police Department restrained Mr. Floyd by kneeling on his neck and ultimately killing him. Bystanders recorded the incident and the video quickly went viral. Hundreds and thousands of people were shocked by what they saw and gathered to mourn and protest. Demonstrators condemned the use of excessive force against racial minorities, and activists called for the MPD officers involved in Mr. Floyd's death to be held accountable.

As tensions between protesters and law enforcement grew, the mayors of Minneapolis and Saint Paul issued emergency curfew orders. Governor Tim Walz mobilized the entire Minnesota National Guard and issued his own curfew order. These orders expressly exempted the media from the curfews so the public would remain informed of the significant events that were unfolding. Hundreds of reporters, photographers, and videographers continued to cover the demonstrations and recorded the use of force against demonstrators by law enforcement officers in the days the followed.

But despite the curfew's exemptions, the MPD and other law enforcement agencies aggressively and intentionally targeted reporters. Even when journalists were clearly identifiable, local and state police fired tear gas and other chemical irritants at them from short range; fired rubber bullets, beanbag rounds and other "less lethal" projectiles at videographers holding news cameras; and even handcuffed and arrested a CNN reporter in the middle of a live broadcast. The SAC details many instances of this behavior, including:

unlawful arrests (¶¶ 40-53); unjustified use of force, including the intentional targeting of some journalists with "less-lethal" projectiles (¶¶ 54-83); use of chemical agents (¶¶ 84-91); and intimidation and use of threatening gestures and language (¶¶ 92-95).

Minnesota officials at the highest level have admitted that the targeted attacks against reporters were wholly improper. Governor Walz personally apologized for the arrest of the CNN newscaster and called it "unacceptable." (SAC ¶¶ 24, 41.) The State Patrol admitted the need "to prevent similar incidents from happening in the future." (*Id.* ¶ 142.) MPD Chief Arradondo himself reiterated this message in an interview on June 10, 2020, stating that "Our media must be protected," and committed to investigating "why journalists were fired upon." (*Id.*) As this Court has observed, "no civilized society would condone [this conduct], even in an uncivilized time." (Dkt. No. 35, at 9 n.5.)

## II.   THE MPD HAS A HISTORY AND PRACTICE OF VIOLATING JOURNALISTS' FIRST AMENDMENT RIGHTS.

Although the MPD's abuse of journalists in the protests following Mr. Floyd's death was publicly condemned by state and local officials, it was sadly not unusual. To the contrary, the MPD has a long history of mistreating the media during periods of civil unrest. Afterwards, the MPD has failed to discipline offending officers effectively and has made no genuine commitment to improve. Whatever training the City may have offered in response to these incidents has amounted to window-dressing at best. Although the City's

official policy purports to protect the rights of journalists,[1] that policy stands in stark contrast to actual practice, as the repeated pattern of abuses against journalists illustrates.

This sadly predictable pattern of hostility towards the media has been continuing for decades: whenever there are widespread protests, the MPD cracks down on journalists as part of its response.  In 2002, during riots after a University of Minnesota hockey championship, MPD officers pushed a news photographer to the ground and kicked her in the back.  (SAC ¶ 144.)  When another reporter tried to help, police pepper-sprayed that reporter in the face.  Two other photographers were also pepper-sprayed and beaten with riot sticks while trying to document the event.  (*Id.*)  The officers who targeted these individuals knew that they were journalists because they plainly displayed their credentials and told police they were members of the press.  (*Id.*)  Kroll was the commanding officer during the riots and bore direct responsibility for preventing the assaults on journalists.  (*Id.*)[2]

In 2008, during protests arising from the Republican National Convention, MPD officers assaulted and injured a journalist and destroyed his video camera.  (*Id.* ¶ 146.)  MPD officers knew he was a journalist because he displayed his credentials and identified himself as a member of the media during the assault.  (*Id.*)  The journalist filed a federal

---

[1] The formal policy states that, "MPD employees shall not unnecessarily obstruct news media personnel from performing their duties at emergency scenes."  (SAC ¶ 157.)

[2] Kroll by his own admission has extensive experience supervising MPD officers during protests. (*See* SAC ¶ 144, n. 69 at 2:56 ("I have been in charge at many of these riotous situations over the years . . . the U of M, etc.))

civil rights lawsuit against the City of Minneapolis and the officers who injured him, which settled for an undisclosed amount.  (*Id.*)

In 2012, an MPD officer shoved a television photographer to the ground, injuring him and damaging his equipment.  (*Id.* ¶ 147.)  Earlier that same year, the same officer was videotaped choking a peaceful protester, pepper-spraying other protesters, and arresting a journalist without cause.  (*Id.*)  The police chief at the time, Tim Dolan, apologized to the journalist, but the officer was not disciplined and the MPD failed to implement effective training in response to these incidents.  (*Id*.)

In 2015, during protests after the MPD's killing of Jamar Clark, an MPD officer pepper-sprayed a WCCO reporter in the face, and other officers arrested credentialed journalists.  (*Id.* ¶ 149.)  In the wake of widespread criticism, the City asked the DOJ to prepare an after-action report reviewing the police response.  (*Id.*)  The DOJ released its report, entitled "Maintaining First Amendment Rights and Public Safety in North Minneapolis," in 2017.  (*Id.*)  The report cited numerous departmental policy shortcomings, including the need for training on "First Amendment Rights and protections."  (*Id.* ¶ 150.)  But despite longstanding notice of these repeated unconstitutional attacks on the media, the MPD failed to effectively implement the DOJ's recommended improvements.  (*Id.* ¶¶149-50, 174-75.)  That failure culminated in 2020 in the widespread abuses detailed in the SAC.

III.   **KROLL IS RESPONSIBLE FOR THE PATTERN AND PRACTICE OF UNCONSTITUTIONAL ATTACKS ON JOURNALISTS.**

Defendant Kroll is both a Lieutenant in the MPD and the president of the Police Officers' Federation of Minneapolis (the "Federation").  (*Id.* ¶ 184).  In these capacities he exercises a unique and extraordinary degree of influence over the policies and practices implemented at the MPD and the culture of impunity within the Department.

A.   **Kroll's Official Responsibilities Include Establishing and Enforcing MPD Policy.**

Kroll is a longtime veteran of the MPD, rising up through the ranks from Officer, to Sergeant, to Lieutenant, despite at least 54 complaints and 11 lawsuits against him for excessive force, off-duty assaults and other inappropriate behavior.  (*Id.* ¶¶ 11, 230.)  With his repeated misconduct, and promotions despite that misconduct, Kroll has served as a role model of impunity for others throughout his long tenure in the MPD.  (*Id.* ¶ 230.)

Moreover, because he has held, and continues to hold, the rank of Lieutenant, Kroll's words and actions have had far greater influence than those of ordinary line police officers in establishing Department culture and practice.  As an MPD Lieutenant, Kroll is a Supervisor, and has the power to "assign cases, direct or evaluate the work of another Police officer, [and] authorize arrests," unlike line officers.  (Aff. of Joseph A. Kelly in Support of Kroll's Mot. To Dismiss, Ex. 1, Dkt. No. 62-1, hereafter "Federation Contract", § 16.01.)  Furthermore, Kroll's responsibilities as a lieutenant include "command[ing] and supervis[ing] major areas of programs as defined by the Chief [and] *enforc[ing] compliance with departmental policies*, procedures, and goals."  (*Id.*, emphasis added.)  The policies he is charged with enforcing include the official MPD policies against

obstructing the news media and against arresting and detaining individuals recording police activity.  (SAC ¶¶ 51, 157.)

Since becoming president of the Federation in 2015, Kroll has been released from regular policing duties and instead is assigned by the MPD to work full-time as Federation president.  (SAC ¶¶ 11, 185.)  But Kroll is not paid for this work by the Federation or by any private party.  The MPD pays his salary and provides him with an office that is located within its Human Resources Department.  (*Id.*)  He carries out the role of Federation president as an MPD employee.

Furthermore, Kroll's position as Federation president has augmented his power to influence and control MPD policy and practice.  The MPD's contract with the Federation mandates that it must discuss any additions or changes to Department rules and regulations with the Federation before it implements them.  (Federation Contract, Art. 6.)

Section 11.07 of the Contract establishes the Federation's policymaking role.  This section first states that the City and the Federation "desire to be able to discuss the resolution" of "disputes or concerns" about MPD policy, practice and custom.  It then states that the City and the Federation wish to enable discussion of these matters without any claim that by engaging in such discussions the City has waived its "unabridged managerial prerogatives."  Accordingly, it provides: "The Parties may freely discuss any such matters [of inherent managerial policy][3] and may reach an understanding regarding the extent to

---

[3]     Minn. Stat. § 179A.07, subd. 1, states: "Matters of inherent managerial policy include, but are not limited to, such areas of discretion or policy as the functions and programs of the employer, its overall budget, utilization of technology, the organizational structure, selection of personnel, and direction and the number of personnel."

which the matter may be resolved and/or the manner of resolution," without the City waiving its right to assert that "the matter is one of inherent managerial policy not subject to mandatory collective bargaining prior to implementation." In other words, the Contract is explicitly written to make possible Federation involvement in the development of MPD policy.

The Contract also calls out the Federation's power to argue that issues viewed by the MPD as matters of inherent managerial policy are instead "employment conditions" subject to collective bargaining prior to implementation. (Federation Contract § 11.07). These provisions effectively prevent the MPD from establishing new policies or procedures targeted at addressing police brutality, racism, excessive force, abusive crowd control tactics, the mistreatment of journalists, or discipline for such misconduct, without obtaining Kroll's input first.

Thus, the Federation Contract creates a framework by which the Federation, and particularly Kroll as its President, can and do influence MPD policy.

### B. Kroll Exercises His Authority to Undermine Compliance and Suppress Needed Reforms.

Kroll leverages his position as president of the Federation to wield outsize influence and control over MPD policy and practice. For instance, Kroll regularly blocked attempts by former Police Chief Janeé Harteau to institute new rules targeted at increasing accountability for police misconduct. (SAC ¶ 196.) When she attempted to institute a policy requiring body cameras after 2017 police shooting, Kroll resisted, both behind the

scenes as well as publicly.  (*Id.* ¶¶ 196-99.)  Kroll also successfully blocked changes to the MPD's "deadly force" policy, leaving instead the policy he preferred.  (*Id.* ¶ 198.)

Kroll is well known for this ability to essentially veto policy changes set by official MPD leadership.  Former Assistant Chief Kris Arneson said "Kroll instigates behind the scenes all the time . . . I've seen him agree to reform efforts and then hack away at them behind the scenes."  (*Id.* ¶ 197.)  Mayor Jacob Frey has stated that Kroll and the Federation are a "persistent barrier" to his reforms and preferred policies.  (*Id.* 204.)  Former Mayor R.T. Rybak went further, calling Kroll "a cancer on this police department; on this city" because of his outsize roll in stonewalling police reform.  (*Id.* ¶ 200).

In addition to blocking official policy reform, Kroll blatantly undermines compliance with the existing policies established by MPD leadership.  For example, in 2019, Mayor Frey banned "warrior-style" training for MPD officers in order to promote "proper training on use of force and de-escalation." (*Id.* ¶ 203.)   In response, Kroll announced that the Federation would pay for and offer the newly-banned warrior-style training.  (*Id.*)  Kroll thus has wielded his considerable influence through both official and unofficial channels to undermine the command structure and usurp the role of elected officials.  (*Id.* ¶¶ 202-204.)  Former Chief Harteau has explained that Kroll and the Federation "historically had more influence over police culture than any police chief ever could."  (*Id.* ¶ 196.)

C. **Kroll Wielded His Power During the Floyd Protests to Promote Police Misconduct.**

Kroll used his official and unofficial authority over MPD policy and practice to influence the behavior of MPD rank-and-file officers <u>during</u> the Floyd protests. On May 29, 2020, after numerous instances of egregious police action against journalists had become public, Kroll emailed command staff—but not to warn officers against continued constitutional violations. (*Id.* ¶ 189.) Instead, Kroll complained that police officers were not free enough and that they were being "handcuffed" by efforts to reign in wrongful police behavior. (*Id.*) In Kroll's view, officers should be making more arrests, have more access to mobile booking stations, and be wholly unrestricted in the use of tear gas and rubber bullets. (*Id.*) The email included a dog-whistle for police brutality, stating that, "At some point community engagement needs to end and law enforcement needs to take place." (*Id.*) Many of the worst attacks on journalists came in the days immediately following Kroll's message. (*Id.*)

On June 2, 2020, following additional unconstitutional clashes with journalists, Kroll released a statement praising officers and stating that no one else was "willing to recognize and acknowledge the extreme bravery you have displayed throughout this riot." (*Id.* ¶ 191.) He then condemned the mayor's and the governor's reactions to the MPD's increasingly brutal tactics, calling their disapproval "despicable." (*Id.* ¶ 191.)

While he undermined the official command structure, Kroll openly touted his own ability to influence police practices and even implied that he was the true leader of the MPD. He stated that the Federation board would have, "a lot to say about failed leadership

when the time is right. We've been formulating plans for that." (*Id.* ¶ 191.) Decked in the mantle of leadership, Kroll stated that he had been "closely monitoring" the protests and explained that he was communicating with high-level state politicians and police leadership nationwide. (*Id.* ¶ 192.) Specifically, he claimed he had presented a "detailed plan of action" regarding deployments of National Guard troops to Senate Majority leader Paul Gazelka. (*Id.* ¶ 191.)

Throughout this period, Kroll influenced rank-and-file officers to target the media by expressing his disdain for journalists and even suggesting the media was putting both his and the officers' personal safety at risk. (*Id.* ¶ 193.) This was not merely a matter of Kroll voicing his personal political views, but of a government official causing the constitutional violations against the media that occurred. Kroll demonstrated his hostility towards journalists and the First Amendment by sending an officer to harass a reporter seeking to interview Kroll during the protests. (*Id.* ¶ 232.) When a reporter from the Washington Post knocked on his door seeking comment for a story, Kroll did not answer the door. Instead, Kroll requested that police pull over the reporter, without probable cause, after he had left Kroll's house. (*Id.*) The officer told the reporter that Kroll had reported him for "suspicious activity," and that Kroll "doesn't want any press." (*Id.*)

The City's response to the egregious police misconduct that occurred during the protests compellingly illustrates that Kroll was a significant driving force behind it. On June 10, Chief Arradondo withdrew from contract negotiations with the Federation, explaining that the Federation – through Kroll – had gone beyond traditional union concerns such as "wages, bonuses or salaries" and instead had usurped the MPD's own

authority over policymaking on "significant matters that touch on things such as critical incident protocol, use of force . . ." (*Id.* ¶ 206.) Chief Arradondo acknowledged that Kroll's policymaking role "diminishes [his] authority as chief . . ." (*Id.* ¶ 205.)

Although the Mayor and Chief Arradondo have expressed frustration with Kroll's command and control over the MPD rank-and-file, the officers who follow Kroll's polices and leadership remain loyal. In a June 24 interview, MPD Sgt. Sherral Schmit said "the Federation and Bob are the *only* ones that are providing" leadership to MPD officers. (*Id.* ¶ 211, emphasis added.)

## ARGUMENT

### I. STANDARD OF REVIEW

The bar for pleading a viable complaint is not onerous. The Rules of Civil Procedure require only that complaint contain a statement of jurisdiction, a demand for relief, and "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.

In reviewing a motion to dismiss a complaint for failure to state a claim, the Court must assume that all of the facts alleged in the complaint are true and evaluate whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged need not be detailed, but merely "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In making these determinations, the Court should construe the complaint liberally in the light most favorable to the plaintiffs. *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017).

Kroll recites this black letter standard (Kroll Mem. at 5-6), but largely ignores it and repeatedly conflates the procedural pleading requirements under the Rule 8 with the substantive "exacting scrutiny" applied to statutes challenged under the First Amendment. (Kroll Mem. at 9.)  As support for his newly concocted legal theory, Kroll cites *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest.)

But *McIntyre* is inapposite.  *McIntyre* describes the applicable standard when a party seeks to strike down a law as unconstitutional for burdening free speech.  *McIntyre* has no application to pleading standards, heightened or otherwise.  At best, Kroll misunderstands the law when he suggests that the Court should apply "exacting scrutiny" to Plaintiffs' claims at this early procedural stage.  Kroll is not asking the Court to strike down § 1983— nor would such a request be appropriate on the pleadings.

The Court should disregard Kroll's claim that exacting scrutiny applies and review the SAC for plausibility under Rule 8, construing the facts in the light most favorable to Plaintiffs.

## II.   KROLL DOES NOT CHALLENGE PLAINTIFFS' OFFICIAL CAPACITY CLAIMS.

Plaintiffs have brought § 1983 claims against Kroll in both his individual and official capacities.  Although Kroll makes almost no mention of the distinction between these claims in his Motion to Dismiss, it is helpful to discuss their requirements separately.  Claims against persons in their official capacity, "generally represent only another way of

14

pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 1978).  Accordingly, as long as the government entity actually in interest receives notice and an opportunity to respond, an official-capacity suit is treated as a suit against that entity, and not against the official personally.  *Id.* at 166.

Although the City of Minneapolis received notice and an opportunity to respond, the City did not file a motion to dismiss, either on its own behalf or on behalf of Kroll in his official capacity.  Nor has Kroll made any arguments challenging Plaintiffs' official capacity claims; he cites only to cases discussing individual-capacity liability.  Plaintiffs' claims against Kroll in his official capacity thus are not at issue in this Motion.

## III.   PLAINTIFFS' INDIVIDUAL CAPACITY CLAIMS AGAINST KROLL SATISFY THE RULE 8 PLEADING STANDARD.

Kroll's motion focuses on Plaintiffs' § 1983 claims against him in his individual capacity.  Individual capacity claims under § 1983 "seek to impose personal liability upon a government official for the actions he takes under color of state law." *Id.* at 165 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237–238 (1974)).  To allege a § 1983 claim, a plaintiff first must show that the defendant has violated his or her Constitutional rights.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970).  Next the plaintiff must show that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'" *Id.*  The SAC plausibly pleads both elements, raising Plaintiffs' right to relief "beyond a speculative level," and thus has more than satisfied the liberal pleading standards of Rule 8.

## A.     Plaintiffs Have Pled That Kroll Violated Their Constitutional Rights.[4]

Kroll does not dispute that the abuses detailed in the SAC are constitutional violations.  He asserts instead that he cannot be liable under § 1983 because he did not command the incident response during the protests or personally fire weapons at reporters who had identified themselves as media.  But Kroll misreads the law.  While the defendant must be personally culpable, direct involvement in the unconstitutional act is not required to trigger § 1983 liability: "While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)).

" 'Direct action' in this context can include [a supervisor's] implementation of an official policy or tacit custom that resulted in the deprivation of the plaintiff's constitutional rights." *Washington v. Crane*, No. 18-CV-1464 (DWF/TNL), 2019 WL 2147062, at *2 (D. Minn. Apr. 18, 2019), *report and recommendation adopted*, No. CV 18-1464 (DWF/TNL), 2019 WL 2142499 (D. Minn. May 16, 2019) (citing *A.H. v. St. Louis County, Missouri*, 891 F.3d 721, 727-28 (8th Cir. 2018)).

---

[4]     Kroll claims that he has been included as a defendant in this case only because Plaintiff Goyette wants to "harass" him and because Plaintiffs disagree with his political views.  Kroll also disparages Plaintiff CWA apparently for not expressing sufficient solidarity with Kroll and the Federation.  The Court should disregard these *ad hominem*, red herring arguments and attacks.

Thus, "[e]ven if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Id.* (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir.2009)); *see also Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (holding that section 1983 liability "may be established when a supervisor's 'custom or policy ... result[s] in deliberate indifference to constitutional rights' ") (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)); *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988) (stating § 1983 liability may be imposed on a supervisor who either "established or utilized an unconstitutional policy or custom" or "breached a duty imposed by state or local law which caused the constitutional violation"); *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) ( "The liability of a supervisor under § 1983 can be shown [by] ... creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue."); *Maldonado-Denis v. Castillo-Rodriguez* (1st Cir. 1994) (holding a supervisor may incur section 1983 liability "by formulating a policy, or engaging in a custom, that leads to [a constitutional violation]"); *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 799 (9th Cir. 2018) (explaining § 1983 liability may attach where police commander "knowingly participated in creating and maintaining a culture of impunity for officers' use of unconstitutionally excessive force").

The SAC does not allege that Kroll directly assaulted or wrongfully arrested journalists during the protests. The thrust of Plaintiffs' claims is that Kroll personally and intentionally worked to create MPD's policies, practices, customs, and the culture of impunity that resulted in the unconstitutional conduct identified in the SAC. Clearly the

rank-and-file views Kroll as occupying a supervisory position even more significant than that of a run-of-the-mill Lieutenant, as demonstrated by the widespread recognition of Kroll's influence over MPD custom and practice, as well as public statements that Kroll is the true "leader" of the MPD.  At minimum, Plaintiffs have plausibly pled that Kroll occupied a supervisory role at the MPD and created, sanctioned, encouraged, and or engaged in customs and practices that lead to the constitutional violations detailed in the SAC.

Kroll's own history of promotions despite numerous excessive force complaints helped entrench the culture and belief that officers could ignore the limited MPD policies designed to protect the rights of reporters and other citizens without consequence.  As a Sergeant, and later as Lieutenant, it became Kroll's duty not only to *follow* those policies, but to *enforce* them.  (Federation Contract § 16.01.)  He was also charged with directly supervising lower-ranking officers, authorizing arrests, and directing the work of MPD rank and file.  (*Id.*)  But the pattern of police misconduct towards the media worsened throughout his tenure as Lieutenant, Federation Board member, and Federation President, culminating in the widespread misconduct during the Floyd protests.

Kroll's role in creating the policies and practices that resulted in the unconstitutional conditions at issue here substantially expanded when he took the position of Federation president.  As outlined above and in the SAC in comprehensive detail, he has repeatedly acted through both official and unofficial channels to shield misconduct and affirmatively block reforms sought by MPD and City leadership to address the deep deficiencies in MPD policies, training and discipline at the root of that misconduct.  (*See* SAC ¶ 200, quoting

former Mayor R.T. Rybak:  "We've never had a person leading the Federation who is as bombastic, who is as overtly racist, who is as likely to provide comfort to someone when they do something wrong, who is a central to that toxic culture as Bob Kroll.")

Moreover, although Kroll was not physically present during Floyd protests, the SAC explains how he promoted the constitutional violations and encouraged them to continue by actively inserting himself into the MPD's response to the ongoing civil unrest.  Kroll expressly opposed limitations on arrests and restrictions on the use of gas and less-lethal munitions—tactics used repeatedly against the media.  (SAC ¶ 189.)  He undermined attempts to reign in the misconduct by telling MPD staff members that its leaders were "handcuffed" by "political power that despises us," and described the heads of the City and State as "despicable."  (*Id.* ¶¶ 189-191.)  Kroll praised the officers who were attacking the media and non-violent protesters and lauded their "extreme bravery."  (*Id*. ¶ 191.)  Kroll's claim that he was uninvolved is further undermined by his claims that he was "closely monitoring" the events and provided a "detailed plan of action" to a state senator.  (*Id*. at 192).  Plaintiffs' detailed allegations about Kroll's role in encouraging constitutional violations during the Floyd protests, and his role in developing and encouraging the policies, customs, and practices described in the SAC, plausibly plead that Kroll has violated Plaintiffs' constitutional rights.

### B.    Plaintiffs Have Plausibly Pled That Kroll Acted Under Color of Law.

The essential question in determining whether an official's actions were under color of law is whether "the defendant 'exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."

19

*Mahaffy v. Kroll*, No. 08-CV-4992 JMR/SRN, 2010 WL 3385222, at *5 (D. Minn. Aug. 24, 2010) (quoting *Roe v. Humke*, 128 F.3d 1213, 1215 (8th Cir.1997)). That analysis depends on whether there is "a sufficient nexus" between the official's public position and the official's harmful conduct. *See Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009). This analysis is "necessarily fact intensive" and in cases involving police, includes inquiries into the relationship of the conduct to the performance of the officer's official duties. *Id.* at 901.

Although relevant, proof that a police officer was discharging his official duties or wearing a uniform at the time of the misconduct is not necessary to establish that he was acting under color of law. *See Mahaffy*, 2010 WL 3385222, at *5. *Mahaffy* involved an incident in which Kroll and another off-duty officer attacked a man who had accidentally bumped into their vehicle, repeatedly kicking him in the head while he lay handcuffed on the sidewalk. In denying Kroll's motion for summary judgment against the victim's complaint, the court reasoned, "Defendants argue Kroll and Krueger, off-duty and out of uniform, were not acting under color of state law. But the fact that an officer is off-duty or out of uniform is not controlling. The question is more nuanced." *Id.* (citation omitted). Thus, the complaint need only allege a sufficient nexus between the officer's conduct and his position, and not that he was an active duty police officer, to plausibly plead he was acting under color of state law.

### 1.    Kroll Acted Under Color of Law as an MPD Employee.

As discussed herein, the culture that created the unconstitutional conditions at issue here was established long before the Floyd protests. As a Sergeant and Lieutenant with

responsibility to supervise the rank-and-file and enforce MPD policy, Kroll played a central role in establishing and promoting that culture. Kroll's brief does not even address his participation in establishing unconstitutional practices over the many years he actively served in the field.

Instead, Kroll contends that that his conduct as Federation president is not done under color of state law, but rather as "a private party." (Kroll Mem. 11-13.) This argument lacks merit. Although Kroll was relieved of his official policing duties when he became president of the Federation, he remains, first and foremost, an MPD employee. The MPD pays his salary and provides him with an office. Moreover, the Federation Contract expressly provides that he is "assigned to the Human Resources Unit of [MPD's] Administrative Services Division" and "shall continue as [an employee] of the Department with all the rights, benefits, and obligations relating thereto." (Federation Contract § 25.03(g)(1)). That Kroll's job titles have changed is of no consequence. His service as Federation President *is* a duty performed by him within the scope of his employment by the City of Minneapolis and as a state actor under the color of law.

### 2.    A Sufficient Nexus Between Kroll's Position and the Harmful Conduct is Alleged.

Further, even if the Court considered Kroll's Federation Presidency an "off duty" role, a sufficient nexus exists between Kroll's Federation position and the harmful conduct alleged for his Federation work establishing MPD policy, custom and practice to be considered action under color of state law.

Kroll cites *Magee v. Trustees of Hamline University* for the proposition that no nexus exists between his position as Federation president and the violations alleged. *Magee v. Trustees of the Hamline Univ., Minn.*, 957 F. Supp. 2d 1047, 1055 (D. Minn. 2013), *aff'd Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532 (8th Cir. 2014). *Magee* involved a police officer and president of the St. Paul Police Union, who wrote an editorial criticizing a law professor and organized a boycott of the university where she worked. The university terminated her employment, and she brought claims against the officer, the university and others under § 1983. The court dismissed her claims against the officer on grounds that she could not show he had acted under color of law. Applying the nexus test outlined in *Ramirez–Peyro*, the court found that his actions were much more like those of a private citizen, and less like actions of a police officer. *Id*. at 1056.

The *Ramirez-Peyro* test is important, because merely holding the job of police officer does not transform every action one takes into state action. *See id.* ("Mere employment by a state or municipality does not automatically mean that a defendant's actions are taken under the color of state law.") (quoting *Ottman v. City of Independence, Mo*., 341 F.3d 751, 762 (8th Cir.2003)). Instead, the nexus test functions more like the proverbial "duck test." *See, e.g., Russell v. Burlington Ins. Co.*, No. CIV. 09-431 RHK/JJK, 2009 WL 2901205, at *4 (D. Minn. Sept. 3, 2009) ("It has sometimes been noted that 'if it walks like a duck, quacks like a duck and looks like a duck, it has got to be a duck.'") (citations omitted.) The more an officer's actions look like policing, the more likely they are to be found under color of law; the more they look like those of a private citizen, the less likely they are to be found under color of law.

22

In *Magee*, the Court found that the officer's actions were like those of a private citizen. *See Magee* at 1056 ("Magee has not pleaded facts indicating that Titus responded to her editorial in his role as a police officer, rather than as a private citizen."). Publishing an op-ed, even if it stated he was a police officer, is a civilian action that is available to anyone, and not a restricted avenue that he could access only by dint of his position. Similarly, organizing a boycott is a time-honored means of civil protest that is not limited to the police.

*Magee* contrasts with *Rossignol v. Voorhaar*, where the Fourth Circuit reached the opposite conclusion. 316 F.3d 516, 524 (4th Cir. 2003). In *Rossignol*, the plaintiff asserted § 1983 claims against a sheriff who directed his off-duty deputies to purchase all the copies of plaintiff's newspaper, which was critical of the sheriff, on election day. *Id.* at 519–21. The Fourth Circuit found that the sheriff's actions arose out of public, not personal, circumstances: "Where the sole intention of a public official is to suppress speech critical of his conduct of official duties or fitness for public office, his actions are more fairly attributable to the state." *Id.* at 524. The court further explained that, "[T]he nexus between defendants' actions and the state arose from more than just defendants' desire to still criticism of their public performance. Their status as sheriff's deputies enabled them to execute their scheme in a manner that private citizens never could have." *Id.* at 526.

In this case the calculus is clear, since Kroll's actions were wholly in the realm of policing. In *Magee*, the defendant was communicating with and appealing to the public regarding matters unrelated to the police department. Here, Kroll was communicating *with* the MPD rank-and-file. He was providing them with instruction, direction, and

23

encouragement.  His work establishing policy and custom at the MPD occurred behind closed doors.  If a private citizen believed that the police should crack down harder on journalists or use more aggressive tactics against protesters, that person could write a letter to the editor or bring a sign to a counter-protest.  Kroll, on the other hand, used his power and authority as both a Lieutenant and the Federation's president *directly* to set policy for rank-and-file MPD.  He did not organize officers in an off-duty civil boycott or a letter writing campaign; he used his status in the Federation to obstruct reforms and set policies impacting the very nature and priorities of their policing.  Arrests, tear gas and rubber bullets: access to these tools is limited to the police and encouraging their use through direct communications with MPD officers and staff is inherently related to policing.  Each of Kroll's actions and their consequences involved the essential nature of police work. Viewed in the light most favorable to Plaintiffs, the SAC plainly alleges a "sufficient nexus" to Kroll's position as an MPD employee.

### 3.     Kroll's Unofficial Acts Fall Under the Color of Law.

Kroll contends that he cannot be liable because, as Federation president, he had no formal policy-making role in the MPD.  But the terms of the Federation Contract, as discussed above, expressly empowered him to affect MPD policy.  In addition, he expanded his influence significantly by working behind the scenes to obstruct reform, circumvent his superiors, and unofficially lead the rank-and-file.  (*See* SAC ¶¶ 196-205.) To choose just one example from the many alleged, Kroll successfully blocked the MPD's attempts to amend its "deadly force" policy in 2017.  (*Id.* ¶ 198.)  His influence is so pervasive and controlling that Mayor Frey has said it may be necessary to abolish the

Federation in order to implement the policies developed by the MPD command structure. (*Id.* ¶ 202.)  Plaintiffs have more than met the liberal standard set by Rule 8 with respect to these claims, and the law clearly allows § 1983 actions based on the kinds of unofficial actions alleged in the SAC.

It is black letter law that § 1983 redresses both official policy and unofficial acts by state actors.  *See Neighborhood Enterprises, Inc. v. City of St. Louis*, 540 F.3d 882, 886 n.6 (8th Cir. 2008) ("If . . . the statute was designed to embrace only action which the State in fact authorized, the words 'under color of any law' were hardly apt words to express the idea.") (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)).  "An officer who abuses official authority to further his private interests is still acting under color of law." *McDonough v. Toles*, No. 19-CV-2238 (PJS/TNL), 2020 WL 4481961, at *5 (D. Minn. Aug. 4, 2020) (collecting authorities).

Further, as discussed above, § 1983 liability may attach if a supervisor's "direct action . . . caused the constitutional violation at issue." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)).  And "direct action" referenced in *Jackson* "can include [a supervisor's] implementation of an official policy or tacit custom that resulted in the deprivation of the plaintiff's constitutional rights."  *Washington v. Crane*, No. 18-CV-1464 (DWF/TNL), 2019 WL 2147062, at *2 (D. Minn. Apr. 18, 2019), *report and recommendation adopted*, No. CV 18-1464 (DWF/TNL), 2019 WL 2142499 (D. Minn. May 16, 2019) (citing *A.H. v. St. Louis County, Missouri*, 891 F.3d 721, 727-28 (8th Cir. 2018)).

This principle specifically applies to unofficial police department customs and practices established by police unions like the Federation. *See, e.g., Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at \*3-4 (N.D. Ill. Mar. 2, 2018) (denying motion to dismiss on where union agreements allegedly prevented investigations and discipline and enabled a "code of silence" around police misconduct).

Kroll cites *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988), for the proposition that he cannot be liable under § 1983 because he does not have "final policymaking authority." In doing so, Kroll misconstrues the central issue in *Praprotnik*. *Praprotnik* addressed the standards for determining whether an official's isolated decision can expose *municipalities* to § 1983 liability. *Id.* It does not in any way address the standards for liability in individual capacity cases against state actors. *See, e.g., Dugas v. Jefferson Cty.*, 931 F. Supp. 1315, 1316 (E.D. Tex. 1996), *aff'd Dugas v. Jefferson Cty., Texas*, 127 F.3d 33 (5th Cir. 1997) ("*Praprotnik* deals with the question of whether a non-policymaking official's acts which are *not pursuant to a policy* may be *attributable to the municipality* for § 1983 purposes. There can be no logical extension from this premise to the issue of whether the acts of a nonpolicy-making official which *are pursuant to an unconstitutional policy* may serve as the basis for § 1983 liability *against the individual.* The *Praprotnik* case is simply not on point.") (emphasis in the original).

Furthermore, as *Praprotnik* itself explained, the "final policymaking authority" standard applies only to *isolated* decisions, such as hiring and firing decisions involving a single employee. 485 U.S. at 123 (discussing the requirements for municipal liability based on "a decision on a single occasion"). *Praprotnik* did not alter the well-established

26

principle that a municipality may be liable under § 1983 based on "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id*. at 127 (quoting *Adickes*, 398 U.S. at 167–68.)   Here, Plaintiffs' claims are based on their allegations that Kroll not only obstructed necessary policy reforms, but also contributed to widespread practice and custom in his supervisory role as both Lieutenant and as Federation President.  The City has not challenged these allegations, and Kroll may not use *Praprotnik* to do so.

### 4. Kroll Would be Liable Even as a Private Actor.

For all the reasons set forth herein, Kroll was a state actor under color of law, and his claims to have acted as a mere "private party" lack merit.   But regardless of his status as a public or private actor, he would be liable for the conduct alleged in the SAC because that conduct was knowingly and pervasively entangled with the MPD.

A private actor may be liable under § 1983 when he is a "willful participant in joint activity with the State or its agents," *Adickes,* 398 U.S. at 151, or when there is 'pervasive entwinement' between the private actor and the state, *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 291 (2001).  For this rule to apply, there must be a "close nexus" between the state and the private actor, and between the state and the constitutional deprivation.  *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007).  A nexus sufficient to bring the conduct under color law exists when the private party "has acted together with or has obtained significant aid from state officials" in

furtherance of the challenged action. *Id*. at 597-98 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935-37 (1982)).

The *Wickersham* case is illustrative. There, the court found that a private organization had set unconstitutional law enforcement rules and priorities, which the police had willingly carried out. Finding that the police had not merely acquiesced in the private organization's policies but played a direct role in adopting and enforcing them, the court found a critical nexus between the challenged conduct and the exercise of state authority. *Wickersham*, 481 F.3d at 598.

Kroll makes much of the argument that he acted for the Federation, and that police unions are private entities. But the fact that the Federation is a police union is no bar to liability. *See, e.g., Dossett v. First State Bank,* 399 F.3d 940, 950 (8th Cir. 2005) ("[W]hen a private entity such as a union acts in concert with a public agency to deprive people of their federal constitutional rights, it is liable under section 1983 along with the agency." (quoting *Hudson v. Chicago Teachers Union Local No. 1*, 743 F.2d 1187, 1191 (7th Cir. 1984)); *see also Hughes v. Patrolmen's Benev. Ass'n of City of New York, Inc.*, 850 F.2d 876, 880 (2d Cir. 1988) (affirming trial court's denial of motion to dismiss police union and union officials because they engaged in joint activity with police department).

Here, Plaintiffs do not allege that Kroll acted alone in establishing the unwritten policies and practices that culminated in the attacks on journalists covering the Floyd protests. Had rank-and-file police officers not acted in concert with him, the practices he promoted—the use of excessive force, the illegal arrests, and the targeting of journalists— would have had no impact. The police did not merely acquiesce in those practices; they

28

looked to him for leadership and played a direct role in executing them.  Kroll's conduct was inextricably entangled with the MPD because—private actor or not—he set the unwritten policies that the MPD enforced.   Such entanglement alone is sufficient to bring his conduct under color of law and make him liable under § 1983.

## IV.   PLAINTIFFS' CONSPIRACY CLAIMS SATISFY THE RULE 8 PLEADING STANDARD.

Kroll argues that the conspiracy claim against him should be dismissed because Plaintiffs' have not sufficiently alleged a "meeting of the minds."  In addition, the City has filed a "Response" to Kroll's motion that, instead of responding to his arguments, affirmatively requests dismissal of Plaintiffs' conspiracy claim against the City.  The Court should disregard the City's response in its entirety as improper and should reject Kroll's motion because it seeks to impose a heightened pleading standard that does not apply.

### A.   The City's Response is Improper and Should Be Disregarded.

On July 30, 2020, Magistrate Judge Schultz ordered all Defendants to respond to the SAC by September 14, 2020.  (Dkt. No. 52.)  The City chose not to file a motion to dismiss on *any* grounds, despite having ample time.  Instead, on September 14, the City filed its Answer to the SAC. (Dkt. No. 66.)  The City requested an opportunity to "respond" to the State's and Kroll's Motions to Dismiss, and Plaintiffs stipulated that it could do so. (Dkt. No. 69.)

The City filed its nominal "Response" to Kroll's Motion on October 16, 2020.  (Dkt. No. 73.)  But instead of simply responding to the other Defendants' motions, the City improperly attempts to bring a partial motion to dismiss on its own account.  This motion

not only violates the Court's scheduling Order and the parties' stipulation, it violates the Rules. *See, e.g.,* D. Minn. L.R. 7.1 (c)(1) (a moving party must file both a memorandum of law and a document defining the "motion" it is bringing).

"Courts have a legitimate interest in the enforcement of scheduling deadlines, both to manage a pending case and to retain the credibility of these deadlines in future cases." *Frazier v. Bickford*, No. 14-CV-3843 (WMW/TNL), 2016 WL 10952821, at *2 (D. Minn. Mar. 31, 2016) (quoting *United States v. Trobee*, 551 F.3d 835, 838 (8th Cir. 2009)). Indeed, a court cannot function if parties are allowed to disregard scheduling orders at will, and an improper and untimely motion "may be subject to dismissal on procedural grounds alone." *Id.* (quoting *Elkharwily v. Mayo Holding Co.*, No. 12-CV-3062, 2014 WL 3573674, at *1 n.2 (D. Minn. July 21, 2014)).

The City may regret its decision to Answer the SAC without bringing a dismissal motion, but it may not revisit that decision now. It may not disregard the Court's scheduling Order and it may not ignore the Rules. The City's so-called "Response" is improper and should be rejected in its entirety.

### B.     The Alleged Facts Establish a Conspiracy.

"[B]oth state officials and private actors may be liable under § 1983 for conspiring to retaliate against protected speech, if the evidence shows the requisite agreement to violate or disregard the law." *Dosset*, 399 F.3d at 951. To assert a § 1983 conspiracy claim, plaintiffs must allege that: 1) they were deprived of a constitutional right; 2) the defendant conspired with others to deprive them of that right; 3) at least one co-conspirator

engaged in an overt act in furtherance of the conspiracy; and 4) the overt act injured the plaintiff. *See Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999).

Kroll does not dispute that the SAC alleges constitutional violations, identifies a litany of co-conspirators including the unidentified police officers who engaged in overt unconstitutional acts in furtherance of the conspiracy, or that these acts injured Plaintiffs. Instead, Kroll's (and the City's) opposition is focused on the second element: whether Plaintiffs plausibly alleged that Kroll conspired with others to deprive Plaintiffs of their constitutional rights. Kroll specifically challenges whether the SAC alleges a meeting of the minds.[5]

### 1.    Plaintiffs Have Pled a Meeting of the Minds.

To establish a conspiracy, a plaintiff must allege that the private party willingly participated "in joint activity with the State or its agents." *Magee*, 957 F. Supp. 2d at 1075 (quoting *Murray v. Wal–Mart, Inc.*, 874 F.2d 555, 558–59 (8th Cir.1989)). To meet this requirement there must be "a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Id.* (quoting *Miller v. Compton*, 122 F.3d 1094, 1098 (8th Cir.1997)).

Kroll suggests that direct evidence of an agreement is required to sustain a conspiracy claim. But direct evidence of an explicit agreement between co-conspirators is

---

[5] Kroll also appears to argue that because Governor Walz expressed views that he deems similar to his own, and Plaintiffs did not name Governor Walz as a co-defendant, they may not name Kroll. This argument is specious. A conspirator's liability is not dependent on whether a plaintiff has named as a defendant everyone who might have a similar viewpoint.

31

not required to meet this element. Courts acknowledge that "direct evidence of an agreement is rare, particularly at the pleading stage." *In re Cattle Antitrust Litig.*, No. CV 19-1129 (JRT/HB), 2020 WL 5884676, at *4 (D. Minn. Sept. 29, 2020) (citing *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553–54 (8th Cir. 1991) ("[I]t is axiomatic that the typical conspiracy is rarely evidenced by explicit agreements, but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators."). Instead, a meeting of the minds can be inferred from circumstantial evidence. *See, e.g, Adickes*, 398 U.S. at 157 (court may infer conspiracy from sequence of events); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (court may infer conspiracy from a tacit understanding). A § 1983 conspiracy may be demonstrated when conspirators "lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit." *Hampton v. Hanrahan*, 600 F.2d 600, 627 (7th Cir. 1979), partially reversed on unrelated grounds, 446 U.S. 754 (1980). Here, a conspiracy may be inferred from the course of conduct of Kroll and the officers on the scene.

The SAC is replete with allegations establishing that Kroll exercised undue influence at the MPD. Kroll points to *Magee* for the proposition that mere allegations of influence are insufficient to establish a conspiracy, but *Magee* is not analogous. *See* 957 F. Supp. 2d at 1057 (granting motion to dismiss where plaintiff had not alleged whether or how the officer in question had actually used his influence). If the SAC had only alleged that Kroll was powerful and then listed subsequent harms, that reasoning might apply. Unlike *Magee*, however, Plaintiffs have identified specific facts showing that Kroll turned his influence into police action.

32

First, Kroll used his office to oppose essential reforms and usurp MPD leadership. For example, he offered warrior-style training to MPD officers after the Mayor had banned it. (SAC ¶ 203.) Such training encourages aggressive police tactics like the assaults at issue here. Second, Kroll inculcated a culture of impunity by routinely supporting officers who engaged in misconduct. (*Id.* ¶ 200.) Third, throughout the protests he assumed the role of leader of the MPD rank and file. (SAC ¶¶ 189-192.) Fourth, the officers themselves have acknowledged that they saw him as their "only" leader. (SAC ¶ 211.) Fifth, Kroll openly encouraged the increased use of less-lethal munitions, chemical irritants, and arrests as tactics during the protests. (SAC ¶ 189.)[6] Sixth, Kroll openly vilified the media and told officers the media was threatening their safety. (SAC ¶ 193.) Seventh, MPD officers instigated the numerous attacks against journalists detailed in the SAC. (SAC ¶¶ 40-95.) Eighth, Kroll voiced his approval of the officers' conduct in the wake of these attacks, as well as his disgust for City and State leaders who spoke out against officers' conduct. (SAC ¶ 191.) Ninth, Kroll directly ordered a police officer to detain and harass a reporter who had attempted to speak to him. (SAC ¶ 232.)

This course of conduct establishes far more than mere "influence" or an "opportunity to conspire." *Magee*, 957 F. Supp. 2d at 1058. Furthermore, because Kroll's praise and encouragement of prior acts are themselves indicative of conspiracy, the fact that his communications both followed and preceded police violence is no defense.

---

[6] Although Kroll disagrees with Plaintiffs' characterization of his communications during with the MPD, Kroll Mem. at 19-20, for purposes of this Motion the Court must take the allegations in the SAC as true and view the facts in the light most favorable to Plaintiffs.

*Hampton*, 600 F.2d at 627 (ratification and adoption of prior acts can constitute conspiracy under § 1983).

Kroll analogizes this case to *Young v. Harrison*, but that analogy is nonsensical. *See* 284 F.3d 863, 870 (8th Cir. 2002). In that case, a hotel security guard was alleged to have "conspired" with the police by calling them when he could not evict unruly tenants. The Eighth Circuit confirmed a grant of summary judgment, finding that the act of calling the police is not the same as conspiring with them to violate the Constitution. *See id.* However, Kroll did not simply call the police or urge the officers to carry out their official duties. Instead, he actively worked to undermine official polices designed to promote compliance and encouraged officers to engage in the aggressive tactics at issue in this case. The facts are in no way similar. Furthermore, it is significant that *Young* involved a grant of summary judgment. The Rule 8 pleading standard applicable here did not apply there, and it is telling that the complaint in *Young* survived until after a full record was developed.

Taken in its entirety, and drawing all inferences favorable to Plaintiffs, the SAC plausibly alleges a meeting of the minds between Kroll and MPD officers. The Court should reject Kroll's Motion to dismiss this claim.

### 2.    A Meeting of the Minds with MPD Leadership is Not Required.

As previously noted, the City's Response to Kroll's Motion is improper and the Court should disregard it. To ensure all issues are addressed, however, Plaintiffs respond to the City's additional arguments here.

The City argues that because Kroll was openly hostile towards MPD leadership he could not have conspired with the MPD. While the SAC points to the significant

antagonism between Kroll and MPD leadership—both mayors and MPD chiefs—his relationship with them has no bearing on whether he conspired with the City's agents.[7]

As the Supreme Court has reaffirmed in numerous cases, a § 1983 conspiracy must involve concerted action with state agents. *See, e.g., United States v. Price*, 383 U.S., 787, 794, (1966); *Adickes*, 398 U.S. at 158, *Lugar*, 457 U.S. at 941). There is no requirement that the conspiracy involve formal leadership, or the state's designee, or any other particular state actor. Indeed, what would it mean to say that an official was officially authorized to enter into a conspiracy?

The City cites *Magee*, and notes that in that case, the court held allegations that a police officer had a close relationship with the chief were insufficient to demonstrate a meeting of the minds. *Magee*, 957 F. Supp. 2d at 1058. This holding merely underscored that good relations with leadership, without more, are insufficient to establish a conspiracy. It does not stand for the proposition that a conspiracy must involve some sort of agreement with department leaders.

The law is clear that plaintiff need only allege a conspiracy with an "agent of the state." *Adickes*, 398 U.S. at 158. Each of the ten John Doe Defendants is an agent of the City. Kroll's participation in a conspiracy with these agents is sufficient to state a claim.

---

[7] Nor, as the City suggests, does Kroll's influence at the state level with Gazelka and others indicate a lack of influence over the MPD rank-and-file. The two audiences are not at odds with each other.

## VI.   KROLL'S FIRST AMENDMENT DEFENSE SHOULD BE REJECTED.

In addition to challenging the sufficiency of the allegations, Kroll attempts to recast himself as the victim of an attempt to use § 1983 "as a sword to slaughter the First Amendment."   Taken at face value, Kroll's arguments make a farce of the First Amendment.   Kroll has not identified a single case that stands for the outlandish proposition that a state actor can invoke the First Amendment as a defense against a claim that he has violated § 1983.   Furthermore, Kroll's bizarre First Amendment defense fails for lack of an alleged wrongdoer.   It is unclear whether he believes that Plaintiffs violated his First Amendment rights by bringing their complaint, that the Court will violate his rights if it denies his motion, or that the statute itself will violate his rights if it is applied to his conduct.   Under any conception of this defense, however, it is entirely meritless.

### A.   Plaintiffs Are Not Subject to the First Amendment.

Kroll's First Amendment defense fails, in the first instance, because Plaintiffs are not state actors or otherwise acting under color of law.   The First Amendment protects the press from government inhibition, not the other way around.   *See, e.g. New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (noting that the First Amendment is a "constitutional safeguard" designed to maintain "the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means").   Plaintiffs cannot be held to have restricted Kroll's speech because they are private citizens, and because the filing of a class action lawsuit by private citizens is not a government act.

## B. Speech Allegations Are Not Grounds for Dismissal.

Kroll might be arguing that the Court will chill his right to free speech if it denies his motion and permits Plaintiffs' claims to proceed. He appears to suggest that even considering his statements as relevant to Plaintiffs' claims would somehow impermissibly chill the entire class of unions and political speech in general. He is not arguing that the pleadings are insufficient to establish liability, but that his words may not be considered by the Court, and that to allow the complaint to stand is an affront to his constitutional rights. This argument would logically extend to all civil complaints that quote another party's statements. Kroll cites no case, rule or statute for the absurd proposition that a Court must limit a party's pleadings to allegations that do not include speech. There is simply no precedent for striking a pleading merely because it cites a defendant's words.

## C. Section 1983 Has Not Infringed on Kroll's First Amendment Rights.

The most generous reading of Kroll's defense is that the statute itself violates his First Amendment Rights. Since Kroll does not challenge the text of § 1983 or demand that it be invalidated, he could only be challenging the statute as applied to his statements that are cited in the SAC.

At best, any such challenge would be premature at this stage in the case. Section 1983 has not been applied to him—at least not yet. Kroll must be enjoined or ordered to pay damages before he can claim that he suffered an injury under the statute in retaliation for his speech. Of course, Kroll will not be enjoined or ordered to pay damages unless the Court first finds there is sufficient evidence for a jury to conclude that he violated Plaintiffs' First Amendment Rights. Any such finding should be based on a complete record. At this

early stage, the standard of review requires the allegations to be construed liberally and in the light most favorable to Plaintiffs. *See Pre-Filled Propane*, 860 F.3d at 1070. Kroll's backhanded attempt to dispute their evidentiary weight by way of the First Amendment is not grounds for dismissal under Rule 12.

Furthermore, as the SAC alleges and the record will show, Plaintiffs' claims are based on Kroll's actions—not his speech. His words are quoted as evidence of his status as a *de facto* policymaker and leader,[8] his motives and intentions, his actions in blocking policy reforms and establishing the unconstitutional practices at issue, and the impact of his words on the conduct of the officers who participated in the attacks on journalists during the Floyd protests. Kroll cannot simultaneously complain, on the one hand, that Plaintiffs have failed to adequately plead facts showing he ordered the unconstitutional conduct and then argue, on the other, that Plaintiffs are prohibited from pointing to the statements he made promoting and ratifying that misconduct as evidence that there was a meeting of the minds.

Kroll's First Amendment defense is predicated on a misreading of Plaintiffs' claims. Plaintiffs cite Kroll's communications as evidence of both his long history of actions in creating the toxic culture that lead to the misconduct at issue, and his complicity in it, but Plaintiffs do not challenge the communications themselves. The First Amendment is not

---

[8] The SAC expressly cites Kroll's June 2 communication to MPD officers on the grounds that it "*underscores* his role as *de facto* policymaker and Kroll's failure to supervise with respect to the particular First and Fourth Amendment issues described in this Complaint." (SAC ¶ 190) (emphasis added); *see also* (SAC ¶ 192) (" Kroll's statement flags both his outsized supervisory role and his failure to supervise.").

a shield that wrongdoers can hide behind to justify their unconstitutional acts, and Kroll's unusual defense should be rejected accordingly.

## **CONCLUSION**

For the above-stated reasons, Plaintiffs respectfully request that the Court deny Defendant Kroll's Motion to Dismiss.


Dated:  October 29, 2020                        /s/ Kevin C. Riach
_____
                                                         Kevin C. Riach (#0389277)
                                                         Dulce J. Foster (#0285419)
                                                         Pari I. McGarraugh (#0395524)
                                                         Jacob P. Harris (#0399255)
                                                         Mary Fee (#0399936)
                                                         **FREDRIKSON & BYRON, P.A.**
                                                         200 South Sixth Street, Suite 4000
                                                         Minneapolis, MN  55402-1425
                                                         (612) 492-7000
                                                         kriach@fredlaw.com
                                                         dfoster@fredlaw.com
                                                         pmcgarraugh@fredlaw.com
                                                         jharris@fredlaw.com
                                                         mfee@fredlaw.com

                                                         Adam W. Hansen (#0391704)
                                                         Colin Reeves (*pro hac vice*)
                                                         **APOLLO LAW LLC**
                                                         333 Washington Avenue North, Suite 300
                                                         Minneapolis, MN 55401
                                                         (612) 927-2969
                                                         adam@apollo-law.com
                                                         colin@apollo-law.com

                                                         Teresa Nelson (#269736)
                                                         Isabella S. Nascimento (#0401408)
                                                         **AMERICAN CIVIL LIBERTIES UNION
                                                         OF MINNESOTA**
                                                         P.O. Box 14720
                                                         Minneapolis, MN 55414

(651) 529-1692
tnelson@aclu-mn.org
inascimento@aclu-mn.org

***Attorneys for Plaintiffs***