| | |
|---|---|
| Jared Goyette, Craig Lassig, Michael Shum, Katie Nelson, Tannen Maury, Stephen Maturen, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals,* | Court File No. 20-cv-01302 (WMW/DTS) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS** |
| City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; the Police Officers Federation of Minneapolis; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; and John Does 1–4, *in their individual and official capacities.* | |
| Defendants. | |

## INTRODUCTION

Four days after the murder of George Floyd, the eyes of the world were on Minnesota. Worried and uneasy, Americans rose from sleep and turned on the news. What they saw shocked the nation. Right there, on live national television, agents of the state of Minnesota arrested CNN journalist Omar Jimenez without the slightest hint of justification. This brazen attack on the press was not an isolated incident. As Plaintiffs have exhaustively

detailed in their Second Amended Complaint, state and local Defendants engaged in a pattern and practice of targeting journalists with arrests, threats, force, and violence.

We've seen this before. During times of great strife and rapid change, authorities often target the press. Early in our nation's history, more than two dozen government critics and journalists were prosecuted under the ignominious Alien and Sedition Acts. Journalists were arrested and harassed during the Civil War, *e.g.*, *Ex parte McCardle*, 74 U.S. 506 (1869), and during World War I and II, *e.g.*, *Abrams v. United States*, 250 U.S. 616 (1919) (Holmes, J., dissenting). And news reporters faced down mortal threats again during the first Civil Rights movement 60 years ago. The late U.S. Rep. John Lewis, describing his Freedom Ride into Montgomery, Alabama, recalled that "[i]t was very dangerous to be a reporter." *Civil rights leader John Lewis celebrates Pulitzer Centennial at Poynter*, Tampa Bay Times, Mar. 30, 2016.[1] Journalists were beaten first, he said: "If you had a pencil and a pad and if you had cameras, they would take the cameras and smash the cameras. And I saw reporters and photographers left lying in the street bleeding. And then they turned on us." *Id.*

George Floyd's murder, and the rise of the Black Lives Matter movement, have brought us to a similar point in history. And once again, attacks on the press have followed. The question before us is whether we can heed history's lessons. The public relies on journalists to understand current events and make informed decisions. "The Free Speech Clause exists principally to protect discourse on public matters." *Brown v. Entm't Merch.*

---

[1] https://www.tampabay.com/things-to-do/events/civil-rights-leader-john-lewis-celebrates-pulitzer-centennial-at-poynter/2271182/.

*Ass'n*, 564 U.S. 786, 790 (2011). It reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). It is "[p]remised on mistrust of governmental power." *Citizens United*, 558 U.S. at 340, and "ensure[s] that…individual citizen[s] can effectively participate in and contribute to our republican system of self-government," *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). Unless the constitutional rights of journalists are protected, the public's ability to participate meaningfully as citizens in a constitutional democracy will be severely diminished.

It is in light of this history and these background principles that the State Defendants' motion to dismiss comes into focus. The motion should be denied in its entirety. Plaintiffs have plausibly claimed that State Defendants' pattern and practice of targeting the press violates the First, Fourth, and Fourteenth Amendments. Plaintiffs have also plausibly stated conspiracy and supervisory-liability claims against Defendants Harrington and Langer. Harrington's and Langer's deliberate indifference to and tacit authorization of their subordinates' misconduct caused Plaintiffs' First, Fourth, and Fourteenth Amendment rights to be violated. For these same reasons, Harrington and Langer have no entitlement to qualified immunity. Finally, State Defendants cannot insulate themselves from Plaintiffs' claims for prospective relief. As the Ninth Circuit recently held in another case challenging the unconstitutional treatment of journalists covering protests of George Floyd's murder, "[journalists'] risk of future injury is not speculative." *Index Newspapers LLC v. United States Marshals Serv.*, --- F.3d ----, No. 20-35739, 2020 WL 5988501, at *4 (9th Cir. Oct. 9, 2020). Where, as here, there is "evidence

of [a] sustained pattern of conduct that resulted in numerous injuries to members of the press," and that pattern of conduct has chilled the exercise of First Amendment rights, Plaintiffs have standing to seek injunctive relief. *Id.*

For these reasons, Defendants' motion to dismiss should be denied.

## FACTUAL BACKGROUND

Plaintiffs' Second Amended Complaint ("SAC") alleges in great detail, over 114 pages, the many violations of Plaintiffs' constitutional rights and the many actions and failures of Defendants that led to them. Plaintiffs here will only summarize the allegations in their complaint, focusing on those relevant to State Defendants, and refer the Court to the SAC for all other pertinent allegations.

In the days following Minneapolis police officers' killing of George Floyd on May 25, 2020, thousands of people gathered across Minneapolis to protest and mourn Mr. Floyd's murder. SAC ¶¶ 17–19. As the protests built in intensity, the growing public unrest became international breaking news and members of the media from around the world arrived to cover the demonstrations and the government's response. *Id.* ¶¶ 19–20.

When tensions between protesters and law enforcement continued to grow, Governor Tim Walz and the mayor of Minneapolis issued curfew orders. *Id.* ¶¶ 27–30. These orders expressly exempted the news media from the curfew, *id.* ¶¶ 29–30, and members of the press continued to cover the demonstrations, capturing law enforcement officers' often brutal response to the protests on video, in photos, and in their reporting.

That's not all they captured. Although the media was exempted from the curfew orders, the Minneapolis Police Department (MPD), the Minnesota State Patrol, and other

law enforcement agencies aggressively and intentionally targeted reporters covering the demonstrations. The attacks journalists suffered—being shot at with tear gas, pepper spray, and other chemical agents, *id.* ¶¶ 54–83; fired on with rubber bullets, beanbag rounds, and other so-called "less lethal" projectiles, *id.*; arrested on and off live television, *id.* ¶¶ 40–53; and subjected to intimidation and threats, *id.* ¶¶ 92–95—became part of the stories that they reported. These brazen attacks on the press drew swift condemnation, with Governor Walz personally apologizing for Omar Jimenez's arrest. *Id.* ¶¶ 24, 41. Governor Walz recognized that "there is absolutely no reason something like this should happen," and that "we have got to ensure that there is a safe spot for journalism to tell this story." *Id.*

The State Patrol—which is overseen by Defendant John Harrington as the Minnesota Commissioner of Public Safety, and by Defendant Colonel Matthew Langer as the patrol's commander, *id.* ¶¶ 12–13—stated that it was "reviewing the incidents involving our troopers in an effort to prevent similar incidents in the future." *Id.* ¶ 142. That review comes years too late. The State Patrol has unconstitutionally infringed on the rights of reporters under nearly identical circumstances and in nearly identical ways at least twice in the past five years. In 2015, troopers arrested reporter Jack Highberger in the middle of a live shot, while he reported on protests about the MPD's killing of Jamar Clark. *Id.* ¶ 148. The incident was reminiscent of what John Lewis witnessed during the Freedom Ride: like the journalists who were singled out and attacked *before* other Freedom Riders were turned on, Highberger was arrested before the trooper arrested anyone else. *Id.* The incident report states that the arresting trooper was instructed by his commanding officer "to first arrest [the] male with a video camera." *Id.* Like his predecessors at the Freedom Ride, Highberger

was clearly targeted *because* he was in the act of reporting. *Id.* Highberger's arrest received national media attention and was widely reported locally. *Id.*

Two years later, at another protest following another high-profile police killing, the State Patrol arrested two journalists—Susan Du and David Clarey—and seized their camera, notes, and laptop. The State Patrol detained the journalists even though they identified themselves as members of the press. *Id.* ¶ 151. There is no evidence—and the State Defendants do not claim to have any—that any troopers were investigated or disciplined for these unlawful arrests, or that additional training or supervision on the limits the Constitution places on troopers' interactions with the press during protests was implemented. *Id.* ¶¶ 148, 151.

As it had done in response to the protests of the killings of Jamar Clark and Philando Castile, the State Patrol supported and supervised local law enforcement during the demonstrations after George Floyd's murder. Law enforcement agencies created the Multi-Agency Command Center ("MACC"), which included the MPD and Minnesota Department of Public Safety and State Patrol, to respond to the Floyd protests. *Id.* ¶ 34.

Harrington had functional control of law enforcement's response to the protests. *Id.* ¶ 35. Under Harrington's and Langer's watch, the State Patrol coordinated with the MPD and the other Defendants and determined how they would respond to demonstrators and members of the media reporting on the events. *Id.* ¶¶ 32–33. In legislative testimony that Harrington provided after the protests, Harrington explained that the State Patrol and other agencies under his command acted "in concert" with the MPD. *Id.* Harrington and his staff communicated directly with the MPD: they vetted requests from the MPD about missions

that it wanted to take and then informed the MPD whether it could take on the missions. *Id.* Senior MPD officials were always present at the MACC to facilitate coordination with the State Patrol and other state agencies as the protests unfolded. *Id.* Like their command staffs, MPD officers and state troopers worked side-by-side, providing a unified response to the demonstrations. *Id.* ¶ 36.

That response included scores of direct assaults on journalists. These were not isolated incidents. A pattern consistent with what Highberger, Clarey, and Du experienced emerged in which state troopers flagrantly violated the constitutional rights of people who were unmistakably identifiable as members of the media. In addition to its arrest of Omar Jimenez, the State Patrol also arrested WCCO videographer Tom Aviles even though he had identified himself as a member of the press, was carrying a large video camera, was not obstructing law enforcement, and was more than 50 yards from any protesters. *Id.* ¶ 44. The violations were not limited to false arrests. Working in unison and without providing any warning, the State Patrol and MPD fired tear gas and rubber bullets at a cluster of photographers clearly identifiable as journalists and not standing near protesters. *Id.* ¶¶ 57–59. One officer, standing only fifteen feet away from freelance photographer Philip Montgomery, intentionally shot Montgomery in the chest with a less-lethal projectile. *Id.* Similarly, officers fired on—and hit—Carolyn Cole, Molly Hennessy-Fiske, and other journalists with less-lethal projectiles and pepper spray from mere feet away, even though they were wearing their press credentials and shouting that they were reporters. *Id.* ¶¶ 60–64, 75.

The Defendants had ample notice that state troopers and other law enforcement officers were brazenly and knowingly violating reporters' constitutional rights. Attacks on journalists in the first two days after Floyd's murder received widespread coverage on social media and by the press, including by Time Magazine. *Id.* ¶¶ 54–56.

But the attacks continued, and soon the named individual Plaintiffs were added to the growing list of reporters who were shot, harassed, and arrested. *Id.* ¶¶ 105–12 (Jared Goyette); 113–20 (Craig Lassig, Tanner Maury, and Stephen Maturen); 121–22 (Michael Shum); 123–29 (Katie Nelson). Lassig, Maury, and Maturen were falsely arrested—Maury and Maturen believe by the State Patrol. And with the State Patrol and MPD again working in tandem, officers terrorized Shum and Nelson, firing tear gas and projectiles at them, even though they clearly were press and not protesters. Indeed, after Nelson told officers that she was "press," an officer yelled that he was "gonna get her." *Id.* ¶ 128.

Officers' attacks on the press were deliberate, coordinated attempts to silence and retaliate against reporters. Even though officers knew that Plaintiffs and other reporters were members of the press, officers frequently assaulted them without providing dispersal orders or giving them a reasonable opportunity to leave the protest sites. *See, e.g.*, *id.* ¶¶ 58, 106, 121. Most Plaintiffs and many putative class members live and continue to work as journalists in the Twin Cities. *Id.* ¶¶ 1–4, 6, 8. Plaintiffs intend to cover future newsworthy events in Minnesota, including both small- and large-scale protests, but, given Defendants' deeply entrenched policy and practice of targeting journalists, they reasonably fear that they will be subjected to similar unlawful actions by Defendants in the future. *Id.* ¶ 8. Many of the journalists who were victims of police violence during the Floyd protests

are members of Plaintiff The Communication Workers of America and its affiliate union News-Guild CWA. *Id.* ¶ 131.

## ARGUMENT

### I. Standard of Review.

In reviewing a motion to dismiss for failure to state a claim, the Court must assume that all of the facts alleged in the complaint are true and evaluate whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged need not be detailed, but merely "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In making these determinations, the Court must construe the complaint liberally in the light most favorable to the plaintiffs. *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017).

Where, as here, a motion to dismiss under Rule 12(b)(1) presents a "facial attack" to the court's jurisdiction, "the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

### II. Harrington and Langer are Liable in their Individual Capacities for Violations of Plaintiffs' First, Fourth, and Fourteenth Amendment Rights.

Plaintiffs have plausibly alleged that Harrington and Langer are liable in their individual capacities for violating Plaintiffs' First, Fourth, and Fourteenth Amendment rights. Other than Plaintiffs' procedural due-process claim, Harrington and Langer have not contested the viability of Plaintiffs' underlying constitutional claims. They have

therefore forfeited any arguments concerning those claims in their reply. *See Hodges v. Dep't of Corrs.*, No. 0:20-cv-0090-WMW-KMM, 2020 WL 4459275, at *5 (D. Minn. May 28, 2020) ("Issues raised for the first time in a reply brief are generally deemed to have been waived."), *report and recommendation adopted*, 2020 WL 4432951 (D. Minn. July 31, 2020). Their protestations about Plaintiffs' supervisory-liability and conspiracy claims fail in their own right. The State Defendants' motion should be denied.

## III. Defendants Violated Plaintiffs' First Amendment Rights.

### A. First Amendment Right of Access and Right to Record the Police.

Public streets and sidewalks "occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). "Consistent with the traditionally open character of public streets and sidewalks"—and with their status as traditional public fora—the Supreme Court has "held that the government's ability to restrict speech in these locations is 'very limited.'" *Id.* (quoting *Grace*, 461 U.S. at 177).

Those limitations depend on whether the restriction is based on content. Content-based restrictions are subject to strict scrutiny: they pass constitutional muster only when they are necessary to achieve a compelling governmental interest and are narrowly tailored to meet that aim. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983). By contrast, content-neutral restrictions that regulate the time, place, and manner of expression are permissible, but only when they "are narrowly tailored to serve a

significant government interest, and leave open ample alternative channels of communication." *Id.*

Documenting protests and recording the police in public constitute expressive activities protected under the First Amendment. Case after case confirms that there is a clearly established First Amendment right to engage in these activities. *See, e.g.*, *Chestnut v. Wallace*, 947 F.3d 1085, 1090–91 (8th Cir. 2020); *Fields v. City of Philadelphia*, 862 F.3d 353, 356 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 594–96 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

Plaintiffs have plausibly alleged that Defendants violated their right to access and document protests and record the police. The Defendants' actions constituted unconstitutional content-based discrimination. They targeted Plaintiffs and other journalists based on their status as members of the media and the content of their expressive activity. *See, e.g.*, SAC ¶¶ 47 ("Roll on your side, Mr. Journalist. You're going to be charged with, I don't know, breaking curfew."), 85 ("Davis identified himself as a member of the media, and the officer 'laid on the trigger for a few seconds' spraying Davis directly in the face [with pepper spray]."), 156. Even if the defendants had a compelling interest in taking such actions—though it is hard to imagine what that interest might be—their policy of arresting and using force against Plaintiffs and other members of the press were not necessary or narrowly tailored to meet that aim. They arrested and detained, shot and shoved, and threatened and intimidated reporters even when it was abundantly clear that

they were press and not protesters, posed no threat to law enforcement, and were nowhere near protesters. And even if construed as content-neutral time, place, and manner restrictions, Defendants' actions still violate the First Amendment. Their policies and practices of targeting journalists were neither narrowly tailored to any significant governmental interest; nor did they leave open any—much less ample—alternative channels of communication. *See* SAC ¶¶ 24, 41 (Gov. Walz apology, recognizing that "even if you're clearing an area, we have got to ensure that there is a safe spot for journalism to tell the story," and that the State had failed to provide that safe spot). State and City officers violently attacked and forcibly removed Plaintiffs from the streets, preventing them from recording and reporting on protests and law enforcement's response to them. *See Index Newspapers*, --- F.3d ----, 2020 WL 5988501, at *10–11 (holding that government failed to show dispersal orders were narrowly tailored).

### B.    First Amendment Retaliation.

The First Amendment also prohibits government actors from retaliating against people who exercise their First Amendment rights. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014); *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To establish a claim for First Amendment retaliation, plaintiffs must show that: (1) they engaged in a protected activity; (2) government officials acted against them in a way that would chill a person of ordinary firmness from continuing in the activity; and (3) the officials' actions were motivated at least in part by the exercise of the protected activity. *Id.* The ordinary-firmness test is "an objective one, not subjective." *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). In terms of causation, "a plaintiff must show that the retaliatory motive was a 'substantial

factor' or 'but-for cause' of the adverse action." *Id.* In cases of retaliatory arrest, plaintiffs also must prove a lack of probable cause or arguable probable cause. *Id.*

Plaintiffs have plausibly alleged all three elements of their retaliation claims.

First, by documenting police encounters with the public, and in accessing public fora, Plaintiffs engaged in protected activities. *See, e.g.*, *Chestnut*, 947 F.3d at 1090–91.

Second, State and City officers have taken a raft of actions that would chill a person of ordinary firmness from continuing in these activities. They shot rubber bullets and less-lethal projectiles at Plaintiffs; used chemical agents and physical force against them; threatened and intimidated them; arrested and detained them; and searched and seized their photography equipment. A person of ordinary firmness subjected to any of these shocking and dangerous actions would be deterred from continuing to document the police and protests. *See, e.g.*, *Peterson*, 754 F.3d at 602 (holding that a police officer who pepper sprayed someone would chill a person of ordinary firmness); *Hoyland v. McMenomy*, 869 F.3d 644, 657 (8th Cir. 2017) ("[T]here can be little doubt that being arrested for exercising the right to free speech would chill a person of ordinary firmness." (quotation omitted)); *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) (recognizing long line of circuit precedent holding that threats to safety can chill a person of ordinary firmness).

Third, Defendants' actions were motivated by Plaintiffs' First Amendment-protected activities. Officers threatened and deliberately targeted Plaintiffs and other reporters in full knowledge of their status as members of the press, warranting the inference that they took these actions to intimidate Plaintiffs and other reporters into leaving the

protest areas and ceasing their First Amendment activity. *See, e.g.*, SAC ¶¶ 47, 156; *Index Newspapers*, --- F.3d ----, 2020 WL 5988501, at *6–7.

Finally, as described more fully below, there was neither probable cause nor arguable probable cause to arrest Lassig, Maury, or Maturen, since the arresting officers knew they were members of the media, and they were not even arguably committing a crime, because the curfew orders exempted members of the media.

## IV.    Defendants Violated Plaintiffs' Fourth Amendment Rights.

Plaintiffs have plausibly pleaded Fourth Amendment claims for excessive force, false arrest, and unreasonable search and seizure.

### A.    Excessive Force.

"To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008). "For purposes of the Fourth Amendment, a seizure occurs whenever 'an officer restrains an individual's liberty through physical force or a show of authority.'" *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009) (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)). Plaintiffs were unquestionably seized through physical force and shows of authority: they were shoved, sprayed with chemical agents, and shot with less-lethal projectiles.

Officers' use of force violates the Fourth Amendment if it is "objectively unreasonable." *Tatum v. Robinson*, 858 F.3d 544, 547 (8th Cir. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Reasonableness depends on the circumstances surrounding the use of force, "including the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham v. Connor*, 490 U.S. at 396).

All three reasonableness factors weigh in favor of finding Defendants' egregious use of chemical agents, physical force, and less-lethal projectiles against Plaintiffs to be unreasonable and excessive. Plaintiffs committed no crime, posed no threat, and presented no resistance. It is clearly established that using these types and levels of force against Plaintiffs was unconstitutional. *See, e.g.*, *Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir. 2017) (holding that a jury could find pepper spraying to be unreasonable use of force where all three *Graham* factors cut in favor of plaintiff); *cf. Brown v. City of Golden Valley*, 574 U.S. 491, 499 (8th Cir. 2009) ("[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public.").

## B.     Unlawful Seizure.

Defendants also unlawfully seized Plaintiffs without reasonable suspicion, in violation of the Fourth Amendment. A police officer may briefly stop a person if the officer has reasonable suspicion that the person has committed or is committing a crime. *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008). "Reasonable suspicion must be supported by 'specific and articulable facts,'" with a particularized and objective basis. *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The reasonableness of an officer's suspicion depends on "the totality of the circumstances, in light of the officer's experience." *United*

*States v. Houston*, 920 F.3d 1168, 1172 (8th Cir. 2019) (quoting *United States v. Polite*, 910 F.3d 384, 387 (8th Cir. 2018)).

Plaintiffs were seized and their freedom of movement was terminated through officers' physical force and show of authority. Shum and Nelson, for instance, were seized within the meaning of the Fourth Amendment several times. *See* SAC ¶ 124 (Officers shot at Shum and Nelson, while Nelson was standing with her arms up yelling "press"); ¶ 128 (Officers boxed Shum and Nelson into street and blocked exits while Nelson waved her arms above her head and yelled "We're press!"). Because as members of the press Nelson and Shum were permitted to be present and record the protests, and posed no threat or obstacle to law enforcement, Defendants did not have reasonable suspicion to seize them.

### C.    False Arrest.

Warrantless arrests are permissible under the Fourth Amendment only when they are supported by probable cause. *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011). Officers are entitled to qualified immunity when there is at least arguable probable cause. *Id.* An officer possesses probable cause to effectuate a warrantless arrest "when the totality of the circumstances at the time of the arrest are 'sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Id.* (quoting *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 186 (8th Cir. 2010)). Arguable probable cause exists if an arrest "was based on an objectively reasonable—even if mistaken—belief that the arrest was based in *probable cause*." *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013).

Officers had neither probable cause nor arguable probable cause to arrest Lassig, Maury, or Maturen.[2] Officers arrested them for violating the curfew. SAC ¶ 119. But because Plaintiffs were exempted from the curfew orders as members of the news media, the officers did not have probable cause to arrest them. *See* SAC ¶¶ 27–30. Neither did they have arguable probable cause, as Lassig, Maury, and Maturen "all had their press badges displayed" and "verbally identified themselves as news media to the officers." SAC ¶ 119. In response, an officer told them, "We don't fucking care." *Id.* There were no other plausible reasons to arrest them: they were standing in a parking lot otherwise devoid of people, nowhere near any protesters or police officers. SAC ¶ 118. And they complied with the officers' commands. SAC ¶ 119. Under these circumstances, the officers were both wrong and unreasonable in arresting Plaintiffs. *See Walker v. City of Pine Bluff*, 414 F.3d 989, 993 (8th Cir. 2005) ("No reasonable police officer could believe that he had arguable probable cause to arrest" a person "for any…purported crime" when that person "stood at considerable distance from police officers…, …spoke only when spoken to, and…complied with [an officer's] request for identification after pointing out that he had done nothing wrong.").

---

[2]     State Defendants claim that they did not issue citations to Lassig, Maury, and Maturen. Dkt. 57 at 3. But Maury and Maturen remember the officers as state troopers, SAC ¶ 119 n.63, and the complaint must be construed in the light most favorable to them. In any event, there is nothing inconsistent with officers from more than one agency being present and involved in an arrest, especially under the circumstances at issue in this case.

### D. Unconstitutional Seizure of Property.

A seizure of property occurs "when there is some meaningful interference with an individual's possessory interests in the property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). That is what happened here. Officers seized Lassig's, Maury's, and Maturen's photography gear and other belongings. SAC ¶ 119. The officers lacked reasonable suspicion to make that seizure. *See United States v. Morones*, 355 F.3d 1108, 1111 (8th Cir. 2004) (property seized without reasonable and articulable suspicion violates the Fourth Amendment). For the reasons described above, the officers had no basis to be suspicious of Plaintiffs' photography gear or belongings.

### E. Unconstitutional Search.

Under the Fourth Amendment, "[t]he government must obtain a warrant before searching an area where an individual has a reasonable expectation of privacy." *United States v. Parker*, 587 F.3d 871, 878 (8th Cir. 2009). Defendants did not satisfy that requirement here. They searched Lassig's, Maury's, and Maturen's belongings without a warrant even though Plaintiffs had a reasonable expectation of privacy in those items. *See United States v. Voice*, 622 F.3d 870, 877 (8th Cir. 2010) ("It is well-settled that Fourth Amendment limitations on warrantless searches apply to luggage and other closed containers outside the home."). That violated the Fourth Amendment.

## V. Defendants Violated Plaintiffs' Fourteenth Amendment Rights.

### A. Procedural Due Process.

Due process requires that prohibitions on movement must be defined in a way that allows ordinary people to understand what conduct is permitted and must not encourage

arbitrary or discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). These constitutional principles apply to "unwritten polic[ies]," no less than they apply to statutes, ordinances, and formally promulgated rules. *See Abdullah v. Cty. of St. Louis*, 52 F. Supp. 3d 936, 946 (E.D. Mo. 2014) (concluding that unwritten keep-moving policy violated due process). Officers must provide "a lawful order to disperse followed by a reasonable opportunity to comply with that order" before detaining people at a protest. *See Barham v. Ramsey*, 434 F.3d 565, 575 (D.C. Cir. 2006).

These principles are controlling here. Plaintiffs were lawfully present during the protests following George Floyd's murder; the City and State Defendants arrested, detained, and used shocking amounts and types of force on Plaintiffs and other members of the media; and they did so without providing dispersal warnings or an opportunity for Plaintiffs to leave. Defendants' unwritten policies of targeting members of the press and failing to give dispersal warnings did not provide constitutionally adequate notice of when Plaintiffs and other members of the media would be subjected to assault or arrest. As in *Abdullah*, these unwritten policies improperly empowered law enforcement officers to exercise their authority in arbitrary and discriminatory ways—including retaliating against members of the news media for engaging in First Amendment protected activity. *See* 52 F. Supp. 3d at 945–46.

Harrington and Langer argue that Plaintiffs' procedural-due-process claim must be dismissed because it is duplicative. Motion to Dismiss, Dkt. 57 at 22–23. That's wrong. Unlike their First or Fourth Amendment claims, Plaintiffs' procedural-due-process claim alleges that Defendants' unwritten policies were prohibitions on movement that lacked

constitutionally adequate notice. There is nothing anomalous about maintaining this claim as an independent cause of action. *See Abdullah*, 52 F. Supp. 3d at 945–47 (concluding that keep-moving policy violated both First and Fourteenth Amendments).

## B.    Substantive Due Process.

To the extent any of Plaintiffs' claims for excessive force do not fall under the Fourth Amendment, they remain viable and are plausibly alleged as substantive-due-process claims under the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. 386, 393–95 (1989). As with excessive-force claims arising under the Fourth Amendment, those covered by the Fourteenth Amendment are analyzed under an objective-reasonableness test. *See Kingsley v. Hendrickson*, 576 U.S. 389, 392 (2015). Although *Kingsley* nominally concerned the applicable legal standard for a pretrial detainee's excessive-force claim, courts have understood it to set the standard for all excessive-force claims under the Fourteenth Amendment. *See Edrei v. Maguire*, 892 F.3d 525, 537 (2d Cir. 2018) ("[W]e now hold that *Kingsley* provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment."); *Zubrod v. Hoch*, 907 F.3d 568, 577 (8th Cir. 2018) (relying on *Kingsley* in excessive-force case outside of pretrial-detainee context); *Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018) (same).

Defendants' uses of force against Plaintiffs were not objectively reasonable. Because Plaintiffs were not resisting and could not reasonably be perceived to pose a threat or security problem, and because officers did not attempt to limit the amount of force used—indeed, they used *more* force even though they knew Plaintiffs were members of the press, *see, e.g.*, SAC ¶¶ 124, 128—that force was grossly disproportionate to what was

needed. *See Kingsley*, 576 U.S. at 397 (describing the considerations that may bear on the reasonableness inquiry).

## VI. Harrington and Langer Conspired to Violate Plaintiffs' First, Fourth, and Fourteenth Amendment Rights.

To establish a Section 1983 conspiracy claim, plaintiffs must show that: (1) the defendant conspired with others to deprive them of their constitutional rights; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured the plaintiffs. *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). Plaintiffs also must "prove a deprivation of a constitutional right or privilege." *Id.*

Although allegations of a conspiracy must be made with sufficient specificity and factual support to suggest a meeting of the minds, *Manis v. Sterling*, 862 F.2d 679, 681 (1988), that requirement is not onerous. The factual basis neither need be extensive, 699 F.2d 434, 436 (8th Cir. 1983), nor depend on direct evidence; circumstantial evidence is sufficient, *Reasonover v. St. Louis Cty.*, 447 F.3d. 569, 582 (8th Cir. 2006). Nor must it be shown "that each participant knew 'the exact limits of the illegal plan.'" *White*, 519 F.3d at 816 (quoting *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996)). Plaintiffs simply must "point to at least some facts" that suggest that the defendants reached an understanding to violate plaintiffs' rights. *Nelson v. City of McGehee*, 876 F.2d 56, 59 (8th Cir. 1989); *Bonenberger v. St. Louis Metropolitan Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016). "[I]f there is a possibility the jury could infer [that there was a conspiracy] from the circumstances," "[t]he question of the existence of a conspiracy…should not be taken from the jury." *White*, 519 F.3d at 816 (quoting *Larson*, 76 F.3d at 1458).

Plaintiffs have plausibly pleaded their conspiracy claims against Harrington and Langer. They have pointed to sufficient facts to show that Harrington and Langer reached an understanding with the other Defendants to deprive Plaintiffs of their First, Fourth, and Fourteenth Amendment rights. *See* SAC ¶¶ 32–36. And it cannot reasonably be contended that a co-conspirator *did not* engage in an overt act that injured Plaintiffs and deprived them of a constitutional right.

Indeed, Harrington and Langer have argued only that Plaintiffs failed to allege sufficient facts showing that Defendants reached an agreement to violate Plaintiffs' rights.[3] Not so. Plaintiffs have pointed to a bevy of facts demonstrating the depth and extent of Defendants' mutual understanding.

These facts include that command staff from the State Patrol and MPD regularly communicated with one another "regarding crowd control techniques, use of chemical

---

[3]     The City Defendants have limited themselves to the same argument against the conspiracy claims in their response to the motions to dismiss. *See* Dkt. 73 at 7. Their argument fails for the same reasons, and the cases they cite for support are readily distinguishable. Their reliance on *Mershon v. Beasley*, 994 F.2d 449 (8th Cir. 1993) is misplaced. Unlike in *Mershon*, Plaintiffs do not base their conspiracy claims on "contacts, by themselves and without more." *Id.* at 452. Plaintiffs have alleged quite a lot "more": namely, that Harrington himself stated that "the State Patrol and other agencies under command of the Department of Public safety acted 'in concert' with the MPD." SAC ¶ 35. *Boone v. PCL Construction Services, Inc.*, No. Civ. 05-24, 2005 WL 1843354 (D. Minn. Aug. 2, 2005) is similarly inapposite. In contrast to *Boone*, Plaintiffs have alleged that there is a "link" between the Defendants' actions, not mere knowledge or approval of one another's actions. *Id.* at *7. And Plaintiffs have not "[m]ere[ly] allu[ded]" to a conspiracy. *Magee v. Trs. of the Hamline Univ.*, 957 F. Supp. 2d 1047, 1058 (D. Minn. 2013). They have pointed to sufficient facts showing that there was one, and that it included deliberately targeting members of the press to deprive them of their constitutional rights.

But the Court need not and should not reach the merits of the City's argument, since its "response" is procedurally improper for the reasons described in Plaintiffs' response to Defendant Kroll's dismissal motion.

agents, and tactical deployment of officers and troopers, including the protest responses that resulted in the violation of constitutional rights." SAC ¶ 33. Defendants' coordination and communication was no informal matter: they created the Multi-Agency Command Center ("MACC") to respond to the protests, *id.* ¶ 34, and MPD officials "were always present at the MACC to facilitate coordination with the State Patrol," *id.* ¶ 35. That unified command included the Minnesota Department of Public Safety, State Patrol, and the MPD, among other agencies. *Id.* The coordination between the State Patrol and the MPD extended to the field, where their officers worked together to violate the constitutional rights of members of the press. *See, e.g.*, *id.* ¶¶ 36, 122.

Moreover, Harrington himself explained that the State Patrol acted "in concert" with the MPD, and that he and his staff, including Commander Langer, vetted requests from the MPD and made decisions about missions the MPD would undertake. *Id.* ¶ 35. These allegations are more than sufficient to state a claim for a conspiracy. As in *Bonenberger*, where the Eighth Circuit held that the defendants' statements could support a finding that the defendants had reached an agreement, *see* 810 F.3d at 1109, so too here Harrington's remarks warrant the inference that Defendants reached an understanding that included committing constitutional violations against members of the press.

Of course, because these and other allegations support a conspiracy claim against Harrington and Langer, they also show that there is nothing to their argument that Plaintiffs failed to plead that they were personally involved in violating Plaintiffs' rights. Eighth Circuit precedent supports a finding that Harrington and Langer were personally involved. *See Jackson v. Nixon*, 747 F.3d 537, 544–45 (8th Cir. 2014) (holding that supervisor's

statutory duty to administer and supervise prison system demonstrated his personal involvement in and supervisory liability for violations arising from prison program). As with the prison director in *Jackson*, Harrington was personally involved in the violations through his position as the head of the MACC, which gave him "functional control of all law enforcement responding to the protests." SAC ¶ 35. Moreover, like the prison director in *Jackson*, as the commissioner of public safety, Harrington had the statutory duty to "provide training programs for the purpose of obtaining qualified personnel for the State Patrol." Minn. Stat. § 299D.03, subd. 6. And it was troopers' lack of training that led to the violations here.

## VII. Plaintiffs Have Stated Supervisory-Liability Claims Under the First, Fourth, and Fourteenth Amendments Against Harrington and Langer.

Plaintiffs have plausibly alleged claims under Section 1983 for supervisory liability.[4] "[A] supervisor may be liable for the acts of a subordinate if injury is inflicted upon the plaintiff as a result of a breach of the supervisor's duty to train, supervise, or control the actions of subordinates." *Hahn v. McLey,* 737 F.2d 771, 773 (8th Cir. 1984) (per curiam). Plaintiffs need not show that the supervisor knew about the constitutional violations. *Wever v. Lincoln Cty.*, 388 F.3d 601, 606 (8th Cir. 2004). Instead, they "must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the

---

[4]      Plaintiffs are not alleging *Monell* claims against Harrington and Langer. Defendants' suggestion that Plaintiffs' supervisory-liability claims may be "an improper extension of *Monell* liability, rather than…individual-capacity claim[s]" is incorrect. Dkt. 57 at 13. There is no question that individuals may be liable under Section 1983 for their supervisory failures. *See Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987) ("[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity.").

offending acts." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). "[T]o show deliberate indifference or tacit authorization, [plaintiffs] must allege and ultimately prove [Harrington and Langer] 'had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.'" *Livers v. Schenck*, 700 F.3d 340, 355–356 (quoting *Andrews*, 98 F.3d at 1078). Although "[a] single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability," *Howard v. Adkinson*, 887 F.2d 134, 138 (8th Cir. 1989), no more than two prior incidents are needed to find a supervisor liable, *see Andrews*, 98 F.3d at 1078 (two complaints not enough to impose *Monell* liability on city, but *are enough* for supervisory liability). And "as the number of incidents grow[s], a finding of tacit authorization or reckless disregard becomes more plausible." *Howard*, 887 F.3d at 138. In addition, courts may consider "inaction after learning of" a violation as "continuing evidence of…tacit authorization or failure to take remedial action." *See Andrews*, 98 F.3d at 1078.

Harrington's and Langer's deliberate indifference to and tacit authorization of their subordinates' misconduct caused Plaintiffs' First, Fourth, and Fourteenth Amendment rights to be violated. A pattern of constitutional violations committed by state troopers against journalists during protests had emerged by the time Plaintiffs were injured. The arrests of reporters during the protests following George Floyd's murder were hardly the first time that troopers had falsely arrested reporters during protests of high-profile police killings: they had done so at least twice since 2015. *See* SAC ¶¶ 148, 151. Those two incidents are sufficient to find supervisory liability. *See Andrews*, 98 F.3d at 1078. But

that's only the beginning of the pattern of unconstitutional conduct. Troopers committed dozens more First, Fourth, and Fourteenth Amendment violations during the Floyd protests *prior to* the violations that Plaintiffs suffered. *See, e.g.*, SAC ¶¶ 23, 57–59. The striking similarities between these earlier violations and those Plaintiffs suffered show a pattern of similar unconstitutional acts.

Harrington and Langer had notice of what was happening under their watch and took no steps to improve troopers' training or supervision. These events were well-documented and received substantial local, national, and international press coverage— indeed some incidents were caught on live television. *See* ¶ 23. And Governor Walz issued a widely publicized apology after these events. ¶¶ 40–42. It was Harrington's and Langer's deliberate indifference to adequately training and supervising troopers about the limits the Constitution placed on troopers' interactions with the press that made an apology necessary.

Defendants' attempts to resist this conclusion miss the mark. They contend that defects in Defendants' training were not obviously likely to lead to a constitutional violation. But that's not so. And the cases they cite for support show why that's the case. *See* Dkt. 57 at 16 (citing *Livers*, 700 F.3d 356 (holding there was no obvious need to train crime-scene-investigation employees not to fabricate evidence); *Ambrose v. Young*, 474 F.3d 1070, 1079–80 (8th Cir. 2007) (determining officer was not obviously trained inadequately because he "knew downed power lines were dangerous and should be avoided")); *see also Andrews*, 98 F.3d at 1077 (concluding there was no "patently obvious need…to specifically train officers not to rape young women"). These cases show that

additional training is unnecessary when it would be on subjects that we learn about in "elementary school." *Ambrose*, 474 F.3d at 1080. The limitations that the Constitution imposes on how troopers may treat the press during protests hardly fit that description. The defects in Defendants' training and supervision posed an obvious risk of harm to reporters' rights.

Those defects are attributable to State Defendants. While "general supervisory authority" over an entity's operations is not sufficient to assign supervisory liability, the matter is otherwise when supervisors have the "authority to…make [organization]-wide policy decisions," as Harrington and Langer did here. *Jackson*, 747 F.3d at 544–45. And where, as here, a supervisor has a statutory duty to supervise and establish department rules and policies, he may be liable for violations of plaintiffs' rights that flow from his failures to discharge that duty appropriately. *Id.* That's what happened in this case: as the Commissioner of Public Safety, Harrington had the statutory duty to "provide training programs for the purpose of obtaining qualified personnel for the State Patrol." Minn. Stat. § 299D.03, subd. 6. Harrington's failure to provide adequate training programs concerning the rights of the press and caused Plaintiffs' rights to be violated.

Harrington and Langer's argument that training was not necessary because state troopers are "primarily tasked" with policing the state's highways fails for three separate reasons. Dkt. 57 at 16. First, the nature of troopers' duties are factual matters, and should not be construed in Defendants' favor on a motion to dismiss. *See Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008) ("[A] court should construe the complaint liberally in the light most favorable to plaintiff."). Second, nowhere does the statute

describing the duties of state troopers state that they are "primarily" or "principally tasked" with monitoring traffic. *See* Minn. Stat. ¶ 299.D.03. Far from it. In fact, that statute provides that troopers "have the power and authority" "to cooperate…with all sheriffs and other police officers anywhere in the state"; "to assist and aid any peace officer whose life or safety is in jeopardy"; and "to make arrest for public offenses committed in their presence anywhere within the state." *Id.* at subd. 1(b)(8), (9), (12). In short, troopers have substantially more duties and authority than simply enforcing traffic laws. Third, Defendants' argument is belied by recent history. State troopers have responded to at least three protests of high-profile police killings since 2015. They have violated reporters' constitutional rights each time.

Finally, Harrington and Langer's substantial reliance on patently inapposite authority shows the weakness of their position. First, Defendants contend that "a plaintiff must establish a particular deficiency in the training." Dkt. 57 at 15 (citing *Birkeland as Tr. for Birkeland v. Jorgenson*, Civ. No. 17-1149, 2019 WL 1936736, at *10 (D. Minn. May 1, 2019), *reversed in part on other grounds*, 2020 WL 4876743 (8th Cir. 2020)). But a plaintiff asserting a claim for *supervisory liability* need establish no such thing. The court in *Birkeland* was deciding what is required to "sustain a *Monell* claim based on deficient policies regarding training." *Id.* at *10. Second, Defendants rely on *Lenz v. Wade*, 490 F.3d 991 (8th Cir. 2007), to suggest that state troopers' two violations of reporters' constitutional rights during protests in 2015 and 2017 are insufficient as a matter of law to provide notice that training was needed. *See* Dkt. 57 at 16 (citing 490 F.3d at 995–96). That's wrong. *See Andrews*, 98 F.3d at 1078 (holding that two prior complaints can establish notice).

Moreover, *Lenz* is not on point. The court was analyzing the plaintiff's Eighth Amendment claim for cruel and unusual punishment. Third, Harrington and Langer err in their assertion, based on *Whitney v. City of St. Louis*, 887 F.3d 857 (8th Cir. 2018), that Plaintiffs' complaint is deficient for allegedly failing to plead that Harrington and Langer were aware of the 2015 and 2017 arrests. Dkt. 57 at 17 (citing 887 F.3d at 860). But *Whitney* did not involve a supervisory-liability claim. Like *Lenz*, the court was analyzing an Eighth Amendment claim, which requires a different showing to establish deliberate indifference than does a claim for supervisory liability: the former has both an objective and a subjective component while the latter is solely objective. *Compare Lenz*, 490 F.3d at 995–96 (holding that under the Eighth Amendment, plaintiff must show there was a substantial risk of serious harm to the inmate, and that the prison official subjectively disregarded that risk), *with Livers*, 700 F.3d 355–356 ("[T]o show deliberate indifference or tacit authorization, [plaintiffs] must allege and ultimately prove [defendants] 'had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.'") (quoting *Andrews*, 98 F.3d at 1078)). Finally, Defendants' reliance on *Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013), is also misplaced, as that case, like *Birkeland*, concerned *Monell* claims against a county. *See* Dkt. 57 at 17 (citing 715 F.3d at 1061).

## VIII.   Harrington and Langer Are Not Entitled to Qualified Immunity.

Harrington and Langer are not entitled to qualified immunity. For a complaint to be dismissed under Rule 12(b)(6) based on qualified immunity, "defendants must show that they are entitled to qualified immunity on the basis of the complaint." *Bradford v.*

*Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005). Harrington and Langer have not made this showing.

They are not entitled to qualified immunity on Plaintiffs' supervisory-liability claims. The qualified-immunity standard mirrors the merits analysis of their claims for supervisory liability: Plaintiffs must show that a supervisor "(1) received notice of a pattern of unconstitutional acts committed by a subordinate and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). For the reasons described in section VII, Plaintiffs have made this showing. Harrington and Langer had ample notice that state troopers had violated in the past—and were continuing to violate—journalists' rights under the First, Fourth, and Fourteenth Amendments. Their deliberate indifference to or tacit authorization of these unconstitutional acts led to the violation of Plaintiffs' rights.

Harrington and Langer have argued only that they are entitled to qualified immunity on the supervisory-liability claims. *See* Dkt. 57 at 23–26. They have made no such arguments regarding any of Plaintiffs' other claims. Since qualified immunity is an affirmative defense, *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996), Defendants have missed their opportunity to raise this defense as to any of Plaintiffs' other claims at this point of the proceedings, *see Hodges*, 2020 WL 4459275, at *5.

## IX. Harrington and Langer are Liable under a Failure-to-Intervene Theory.

Plaintiffs have plausibly alleged failure-to-intervene claims against Harrington and Langer. Harrington and Langer's objections to these causes of action rest on a misunderstanding of both Plaintiffs' claims and the law. Plaintiffs do not contend that

Harrington and Langer are directly liable for not intervening. They instead allege that Defendants' conspiracy and supervisory failings include failing to intervene. That is a viable theory under § 1983. *See Smith v. Hartmann*, No. 12-CV-00915, 2014 WL 4912010, at *4 (N.D. Ill. Sept. 30, 2014) (holding that complaint stated claim for supervisory liability both for excessive force and failure to intervene). And it is a theory that Plaintiffs have sufficiently alleged, since they have pleaded that MPD and State Patrol officers did nothing to stop their colleagues from committing excessive force against Plaintiffs, though the officers were present and had an opportunity to intervene.

## X.   No Eleventh Amendment Immunity Issues Are Presented.

State Defendants complain that Plaintiffs are seeking damages against them in their official capacities, in violation of the Eleventh Amendment. Dkt. 57 at 6–7. But Plaintiffs are doing no such thing. Defendants cite only to the Second Amended Complaint's prayer for relief, which generally lists damages as one remedy sought. *Id.* at 7. But nowhere does the operative complaint seek damages against the *State Defendants* in their official capacities. Defendants' arguments based on this mistaken premise are red herrings.

## XI.   Plaintiffs Have Standing to Seek Declaratory and Injunctive Relief Against the State Defendants.

State Defendants concede that the Eleventh Amendment poses no bar to Plaintiffs seeking declaratory and injunctive relief against them. *Id.* (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 32 (8th Cir. 2011)). But Defendants nevertheless argue that Plaintiffs are not entitled to declaratory or injunctive relief because they lack standing. This conclusion is mistaken. Unlike the plaintiff in *City of Los Angeles v. Lyons*, 461 U.S. 95,

101–03 (1983), who could not show that a *single instance of police force* evidenced a risk of future harm, here, just the opposite is true. Journalists, including Plaintiffs, continue their reporting duties day in and out. And they do so with considerable—and reasonable—fear that they will be targeted again, including by the State Defendants. In light of the substantial "evidence of [a] sustained pattern of conduct that resulted in numerous injuries to members of the press," Plaintiffs have standing to seek injunctive relief. *Index Newspapers*, 2020 WL 5988501, at *4.

In order to show a cognizable injury required to demonstrate standing, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct" and "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 101–02 (citations omitted).

In *Lyons*, the plaintiff sought an injunction based on a single police chokehold that occurred five months before he filed suit. *Id.* at 105. In that circumstance, the Supreme Court concluded that it was "no more than speculation to assert" that (1) the plaintiff would be arrested again and (2) "be subjected to a chokehold without any provocation whatsoever." *Id.* at 108. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief...if unaccompanied by any continuing, present adverse effects." *Id.* at 102 (citation omitted).

*Lyons* is readily distinguishable, and the Ninth Circuit's recent opinion in *Index Newspapers* does an excellent job of explaining why. Plaintiffs' "risk of future injury is not speculative." *Index Newspapers*, 2020 WL 5988501, at *4. Rather than the single

incident of misconduct alleged in *Lyons*, here Plaintiffs have alleged a "sustained pattern of conduct that resulted in numerous injuries to members of the press." *Id.* Plaintiffs' operative pleading documents many instances of misconduct by State Defendants and their agents. SAC ¶¶ 21, 23, 25, 40–44, 102, 159. These include the arrest of Omar Jimenez, *id.* ¶ 40, the separate arrest of WCCO reporter Tom Aviles, *id.* ¶ 40, the threats made against a news crew from the Deutsche Welle network, *id.* ¶ 50, the use of tear gas and rubber bullets against a group of journalists, including freelance photographer Philip Montgomery, *id.* ¶¶ 57–59, the use of pepper spray and rubber bullets against a group of roughly 20 journalists reporting near the Fifth Precinct police station, *id.* ¶¶ 60–64, the firing of less-lethal projectiles at two Star Tribune reporters, *id.* ¶ 65, and the pepper spraying and shooting of NBC News photographer Ed Ou, *id.* ¶ 75. Plaintiffs Tannen Maury and Stephen Maturen were arrested by law enforcement officers they believe were agents of State Defendants. *Id.* ¶¶ 114–20. Plaintiff Michael Shum, a reporter for the New York Times, was physically assaulted by state troopers in the course of his duties. *Id.* ¶¶ 121–22. There is every reason to believe, moreover, that these documented instances only scratch the surface of State Defendants' misconduct. *Id.* ¶ 91. Many members of Plaintiff The Communications Workers of America have been targeted by Defendants. *Id.* ¶ 136. And Plaintiffs' complaint details instances of past misconduct targeting journalists by the State Defendants. *Id.* ¶ 148–52. This pattern of abuse demonstrates that the risk of future injury is immediate and real.

"The nature of [P]laintiffs' injuries also sharply differs from the substantive due process injury asserted in *Lyons*." *Index Newspapers*, 2020 WL 5988501, at *5. Here,

Plaintiffs allege that Defendants' conduct has "'chilled' the exercise of their First Amendment rights, and that this First Amendment injury is ongoing." *Id.* "A chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not 'based on a fear of future injury that itself [is] too speculative to confer standing.'" *Id.* (citing *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015). *See also Balogh v. Lombardi*, 816 F.3d 536, 542 (8th Cir. 2016) ("A chilling effect on speech protected by the First Amendment can constitute an injury in fact."); *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury."). As Plaintiffs' amended complaint sets out in detail, Plaintiffs' speech has been chilled by Defendants' misconduct. SAC ¶¶ 8, 38, 136, 240, 249–50, 271, 287. The chill caused by Defendants' policy and custom of targeting journalists covering protests represents both an *imminent* and *ongoing* injury. *Index Newspapers*, 2020 WL 5988501, at *5.

*Lyons* is distinguishable for a third, related reason: while it was certainly speculative to assume that Lyons would be arrested again—a predicate to even being in a position to be choked a second time—there is *no speculation needed* to determine that Plaintiffs in this case will continue to *engage in journalism*. They intend to continue covering law enforcement's response to protests—day in and day out. *E.g.*, SAC ¶ 112. This so-called innocence barrier—the requirement that the plaintiff commit a crime before he's even in a position to face the unlawful conduct—is thus no barrier here. *See Roe v. City of New York*, 151 F. Supp. 2d 495, 503–04 (S.D.N.Y. 2001) (collecting cases and distinguishing *Lyons* on the basis that plaintiffs were engaging in lawful behavior).

It is speculative—*on Defendants' part*—to assume that no further protests will occur in Minnesota. There have already been protests related to a suicide in downtown Minneapolis that was initially reported to be a police killing. *See* Michael Levenson, *Minneapolis Homicide Suspect's Suicide Spurs More Protests*, Police Say, N.Y. Times, Aug. 26, 2020. Further protests occurred when Derek Chauvin was released on bail. Abby Simons, *More Than 50 Protesters Arrested During Faceoff With Law Enforcement in Minneapolis After Derek Chauvin Release*, Star Tribune, Oct. 8, 2020. Protests occurred again when the judge presiding over Chauvin's criminal trial dismissed the State's third-degree murder charge. Amy Forliti, *Judge Dismisses One Charge Against Former Cop in Floyd's Death*, A.P., October 22, 2020. The State Patrol was called in to assist with these protests. And it is no answer to suggest that no more serious protests will occur. The coming months will bring an election and the result of the state criminal trial against Chauvin and the other charged officers. It is not unreasonable to conclude that serious protests will occur in the future and that Defendants will continue their pattern of abuse against journalists.

Defendants' arguments also rely on the implicit assumption that the unconstitutional conduct complained of was an isolated set of occurrences and not an ongoing policy or custom. Dkt. 57 at 8. But this assumption is wrong. *No one* would question that a class of journalists would be entitled to declaratory and injunctive relief based on a threat of future harm if a law enforcement agency had a *written policy* authorizing threats, violence, and arrest of journalists covering protests. If that's true, then there is no sound reason to treat a *de facto policy or custom* any differently.

*Lyons* involved a single incident, and a single incident is typically insufficient to establish a policy or custom of violating a constitutional right. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985). But even a case involving many law enforcement officers violating a constitutional right in *one incident* or over *a short period of time* can demonstrate a policy or custom of violating constitutional rights—even if the defendant has no history of doing so. *See McElroy v. City of Lowell*, 741 F. Supp. 2d 349, 354 (D. Mass 2010) (citing *Kibbe v. City of Springfield*, 777 F.2d 801, 805 (1st Cir. 1985); *Bordanaro v. McLeod*, 871 F.2d 1151, 1157 (1st Cir. 1989); *Webster v. City of Houston*, 689 F.2d 1220 (5th Cir. 1982)) ("[T]he presence of a large contingent of officers working in concert can provide evidence of municipal policy even when the conduct relates to a single incident.").

Such unlawful policies or customs can equally be inferred from a failure to correct course after a single incident, *see, e.g.*, *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985), or a failure to train law enforcement agents where the need for more training or more supervision was so obvious, and the training or supervision was so inadequate, that a constitutional violation was likely. *Doe v. Fort Zumwalt R-II School Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 390 (1989)).

Under *any* of these three analytical frames, Plaintiffs have shown that State Defendants have an unwritten policy or custom of targeting journalists covering serious protests. Defendants targeted journalists in hundreds of discrete incidents during the initial protests following George Floyd's murder. There is no evidence that Defendants have

changed their policies. And the most logical inference to be drawn from the patently unconstitutional conduct targeting protesters is that Defendants endorsed a policy of allowing such conduct.

It is simply not reasonable to claim that these journalists face no specter of future harm. *See Kolender*, 461 U.S. at 355; *Lake v. Speziale*, 580 F. Supp. 1318 (D. Conn. 1984); *Thomas v. Cty. of Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992) (distinguishing *Lyons* where "numerous instances of police misconduct have occurred in a small six by seven block area, some minority residents of the area have been mistreated by deputies more than once, and many victims purportedly did nothing to warrant detention or apprehension prior to the mistreatment."); *Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 564–65 (D. Md. 1999) (finding plaintiffs to have standing to enjoin racially discriminatory vehicle stops); *National Congress for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 162 (S.D.N.Y. 1999) (standing to enjoin racially discriminatory stop and frisk policy).

## XII. Plaintiffs Goyette, Lassig, Maury, Maturen, and Nelson Have Standing to Assert Their Claims Against the State Defendants.

Defendants separately argue that Plaintiffs "Goyette, Lassig, Maury, Maturen, and Nelson lack standing to bring claims against State Defendants because they do not allege that State Defendants injured them." Dkt. 57 at 26. This is wrong for three reasons. First, it is wrong on the facts: Maury, Maturen, and Nelson all allege that they were injured by the State Defendants. Maury and Maturen believe that they were falsely arrested by the State Patrol, and Nelson was with Shum when state troopers terrorized them with tear gas

and projectiles. *See* SAC ¶¶ 117–19, 122, 125–28. Second, all Plaintiffs assert conspiracy claims for injuries caused by the Defendants. Third, even assuming *arguendo* that Plaintiffs had not been injured in any fashion by State Defendants, that would impact only their damages claims; it would not make a whit of difference to their claims for equitable relief. They are entitled to equitable relief if their "injury or threat of injury [is] 'real and immediate.'" *Lyons*, 461 U.S. at 101–02. (citations omitted). Defendants' "assertion presupposes that a plaintiff must have suffered an injury in the past in order to challenge the future enforcement of an unconstitutional [policy or custom], and of course, that is not the law." *Richardson v. Texas Secretary of State*, --- F. Supp. 3d ----, No. SA-19-cv-00963, 2020 WL 5367216, at *27 n.33 (W.D. Tex. Sept. 8, 2020). Indeed, Defendants' position would make any pre-enforcement challenge to an unconstitutional statute, rule, or policy impossible. This, of course, is not the law either. *See Minnesota RFL Republican Farmer Labor Caucus v. Freeman*, No. 19-cv-1949, --- F. Supp. 3d ----, 2020 WL 5512509, at *2 (D. Minn. Sept. 14, 2020) (standards for pre-enforcement challenges).

For the reasons discussed in the preceding paragraphs, the *ongoing* and *future* injury caused by Defendants is not limited to individual journalists who were specifically targeted in the past. A journalist who sees her colleagues shot, beaten, arrested, and threatened is just as chilled in the exercise of her current duties as a journalist who experienced such mistreatment directly. Moreover, there is no indication that the likelihood of future harm is any different for Plaintiffs Goyette, Lassig, Maury, Maturen, and Nelson as compared to any other journalists. Defendants' policy and custom of targeting members of the press puts them at risk in equal measure.

**XIII. Plaintiff The Communications Workers of America Has Standing to Assert Claims Against the State Defendants.**

Defendants attack the standing of Plaintiff The Communications Workers of America ("CWA"), but here, too, Defendants' critiques are misplaced.

Associational standing is available when "(1) the individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). An organizational plaintiff "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

Defendants first argue that "the claims involved require individualized inquiries into the facts and circumstances for all injured class members." Dkt. 57 at 29. Given the similarities between Plaintiffs' experiences, there is no reason to accept that characterization, especially not on a motion to dismiss. But there is an even more compelling reason to reject Defendants' argument: where an organizational plaintiff "seeks only declaratory and prospective injunctive relief, the participation of individual [members]...is not required." *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005); *Pietsch v. Ward Cty.*, 446 F. Supp. 3d 513, 530 (D. N.D. 2020). That is the

case here. CWA's members are identically situated with respect to the prospective relief sought, which is uniform as to all Plaintiffs and the proposed class. Dkt. 53 at 112–13.

Defendants also argue that purported conflicts among CWA's members preclude organizational standing. Dkt. 57 at 30–31. But this argument fails as well.

To begin, Defendants mistakenly characterize the absence of conflicts as a standalone prerequisite to organizational standing on equal footing with the three canonical *Hunt* factors. *Id.* at 29. That's not correct. Instead, conflicts may serve as *evidence* that "the organization's purpose [does not] relate[] to the interests being vindicated," or that "the claims asserted do not require the participation of individual members." *Minnesota R-80 Med. Transp. Coal. v. Comm'r of the Minnesota Dept. of Human Servs.*, No. 17-4539, 2018 WL 4120075, at *5 (D. Minn Aug. 29, 2018). For example, where the members' "status and interests are...diverse and the possibilities of conflict...obvious," the organization may not be "an appropriate vehicle to litigate the claims of its members." *See Associated Gen. Contractors of N.D. v. Otter Tail Power Co.*, 611 F.2d 684, 691 (8th Cir. 1979). Similarly, organizational standing may be inappropriate where the association asserts "damages claims [which] are not common to the entire membership, nor shared by all in equal degree." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Unanimity of membership is not required. *See e.g.*, *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996). Typically, only obvious conflicts between an association's members will defeat standing. *Otter Tail*, 611 F.2d at 691.

No such conflicts have been demonstrated here. First, any arguments on this front are premature and should be tested in discovery. There is no evidence that, for example, any of the Defendants in this case or their employees are members of CWA.

Second, none of the claimed conflicts undermine the *Hunt* factors in the context of this case. CWA, as a union representing journalists, is certainly "an appropriate vehicle to litigate the claims of its members." *Associated Gen. Contractors*, 611 F.2d at 691. No interest is more germane to a union's existence than protecting the physical well-being and safety of its members. Nor could any law enforcement member claim any cognizable interest in engaging in unprovoked and unconstitutional attacks on journalists. Conflicts among an organization's members must relate to range of *legally permissible outcomes* that affect members differently. *Id.* For much the same reasons, the purported conflicts raised by Defendants do not necessitate "the participation of individual members" in this lawsuit. *Minnesota R-80*, 2018 WL 4120075, at *5. No members of CWA have an interest in engaging in the sort of "uncivilized" conduct at issue here. *See* Dkt. No. 35, at 9 n.5; *cf. Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("[O]fficials do not possess discretion to violate constitutional rights or statutes.") (quoting *United States Fid. Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988)). And "the participation of individual [members]...is not required" where, as here, the organization "seeks only declaratory and prospective injunctive relief." *Heartland Acad.*, 427 F.3d at 533.

Finally, any concerns about conflicts of interest are "allayed where the litigation was properly authorized in accordance with the association's procedures." *Retired Chicago*

*Police Ass'n v. City of Chicago*, 76 F.3d 856, 865 (7th Cir. 1996). That is exactly what occurred here.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: October 29, 2020

Respectfully submitted,

s/Adam W. Hansen
Adam W. Hansen (#0391704)
Colin Reeves*
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401
Telephone: (612) 927-2969
Fax: (419) 793-1804
adam@apollo-law.com

Kevin C. Riach (#0389277)
Dulce J. Foster (#0285419)
Pari I. McGarraugh (#0395524)
Jacob P. Harris (#0399255)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
Telephone: (612) 492-7000
kriach@fredlaw.com
dfoster@fredlaw.com
pmcgarraugh@fredlaw.com
jharris@fredlaw.com

Teresa Nelson (#269736)
AMERICAN CIVIL LIBERTIES UNION OF
MINNESOTA
P.O. Box 14720
Minneapolis, MN 55414
Telephone: (651) 529-1692
tnelson@aclu-mn.org

*\* admitted pro hac vice*

*Attorney for Plaintiffs*
*and the Proposed Classes*