## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jared Goyette, Craig Lassig, Michael Shum, Katie Nelson, Tannen Maury, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals,* | Court File No. 20-cv-01302 (WMW/DTS) |
|       Plaintiffs, | |
| v. | |
| City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; and John Does 1-4, *in their individual and official capacities*. | |
|       Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS JOHN HARRINGTON, MATTHEW LANGER, AND JOHN DOE**

## <u>INTRODUCTION</u>

Local, national, and international press have gathered in Brooklyn Center to report on the protests arising from the recent police killing of Daunte Wright. The Minnesota State Patrol has targeted these journalists with arrest, chemical weapons, "less-lethal" ballistics, and orders to "disperse" and cease reporting. This despite the fact that curfews imposed by Brooklyn Center and Hennepin County exempt journalists, and there is no evidence any journalists have been

involved in incitement or violence or have otherwise impeded the activities of law enforcement. If journalists are exempt from the curfew order, and are not impeding the function of law enforcement, there can be only one purpose for the actions of the State Patrol, and that is to stop journalists from reporting on the protests in violation of the First Amendment.

Sadly, the State Patrol's unconstitutional conduct is nothing new. Last May, police tragically killed George Floyd in an event that drew (and continues to draw) international attention. Media from around the world gathered in Minnesota to cover the resulting protests. The journalists covering these protests were threatened, harassed, assaulted, and unlawfully arrested by law enforcement in dozens of incidents over several days. Police blinded a journalist. Others were severely injured. These systematic, widespread, and targeted attacks against the press violated Plaintiffs' constitutional rights and are documented at length in Plaintiffs' Second Amended Complaint. On June 2, 2020, Plaintiffs filed a Motion for Temporary Restraining Order to prevent further abuse. (ECF 5.) The Court denied the motion without prejudice on June 9, 2020, explaining that Plaintiffs had not shown "that harm is certain and of such imminence that there is a clear and present need for equitable relief." (ECF 35 at 8.)

But history is now repeating itself, and such imminent harm is present and requires relief. On April 11, 2021, a Brooklyn Center police officer shot and killed Daunte Wright after stopping him for expired tabs. Again, protests arose, this time enflamed by the ongoing murder trial of Derek Chauvin, the police officer who killed George Floyd. Again, members of the media have sought to document the protests and law enforcement's response. And again, law enforcement – in this case the Minnesota State Patrol – has assaulted these journalists and flagrantly violated (and continues to violate) the First Amendment rights of members of the media.

The State Patrol knows it cannot lawfully interfere with the journalists covering these protests, let alone assault them. Yet at least one journalist – a Star Tribune videographer shot in the hand while filming the protests – has been so severely injured that he required immediate surgery. Other journalists have been shot with less-lethal munitions, pepper-sprayed, and arrested or threatened with arrest. In a particularly Orwellian turn, the State Patrol has begun to issue generalized dispersal orders through loudspeakers specifically commanding media to leave the area and abandon their reporting.

These protests will continue and are likely to grow when the Chauvin trial concludes and the jury delivers a verdict. The need for journalists to cover these protests, and keep the community informed of the actions of its law enforcement agencies, will continue. What must cease immediately is law enforcement's targeted abuse and harassment of journalists, which violates the First Amendment and threatens to cut off the flow of information critical to the functioning of our democratic society.

The Minnesota State Patrol appears to believe it is open-season on journalists again. Plaintiffs bring this motion to disabuse the State Patrol of that idea and to protect the First Amendment rights of those journalists seeking to cover the Daunte Wright (and inevitable Chauvin verdict) protests.

## **FACTUAL BACKGROUND**

On April 11, 2021, a Brooklyn Center police officer shot and killed Daunte Wright. Protests occurred almost immediately, have continued into April 14, and show no signs of stopping. Journalists from local and national news organizations, including the Star Tribune, the Washington Post, the New York Times, CNN, and others, have gathered in Brooklyn Center to document the protests.

### A.      April 11 to April 13 Curfew Orders

Governor Walz and the Cities of Brooklyn Center, Brooklyn Park, and Minneapolis, among others, have issued and likely will continue to issue nighttime curfews restricting travel on public streets and in public places. In the immediate aftermath of Mr. Wright's killing on April 11, Brooklyn Center issued a city-wide curfew for the period from 1:00 a.m. until 6:00 a.m. on Monday, April 12.[1] The "news media" was specifically exempted from this curfew.

On Monday, April 12, Governor Walz declared a peacetime emergency and implemented a temporary nighttime curfew in all public places in Anoka, Dakota, Hennepin, and Ramsey Counties from 7:00 p.m. on Monday, April 12 until 6:00 a.m. on Tuesday, April 13.[2] Governor Walz's curfew also exempted "members of the news media."  Other cities nearby, including Brooklyn Park and Minneapolis, imposed similar curfews for the same dates and time period.[3]

Governor Walz did not impose a nighttime curfew for Tuesday, April 13, but Brooklyn Center and Minneapolis both imposed curfews beginning 10:00 p.m. on Tuesday, April 13, and

---

[1] City of Brooklyn Center, Minnesota, Mayoral Emergency Proclamation No. 2021-2, dated April 11, 2021.  *See* https://twitter.com/mayor_elliott/status/1381488166327095299/photo/1

[2] Emergency Executive Order 21-17, Declaring a Peacetime Emergency to Provide Safety and Protection, dated April 12, 2021, available at https://mn.gov/governor/assets/EO%2021-17%20Final_tcm1055-476250.pdf ("Walz Executive Order 21-17"); Emergency Executive Order 21-18, Implementing a Temporary Nighttime Curfew in Anoka, Dakota, Hennepin, and Ramsey Counties, dated April 12, 2021, available at https://mn.gov/governor/assets/EO%2021-18%20Final_tcm1055-476249.pdf ("Walz Executive Order 21-18).

[3] Proclamation of the Mayor, Emergency Regulation No. 2021-2-1, dated April 12, 2021, available at https://www.minneapolismn.gov/government/mayor/official-notices/emergency-regulation-2021-2-1/ ("Minneapolis Emergency Regulation No. 2021-2-1"); Public Safety Updates, Brooklyn Park, last accessed April 14, 2021, available at https://www.brooklynpark.org/community-story/public-safety-updates/ ("Brooklyn Park Public Safety Website").

lasting until 6:00 a.m. on Wednesday, April 14.[4] Both of these curfews included exceptions for members of the media.

### B.    Law Enforcement, including the State Patrol, Target Journalists.

Several law enforcement agencies, including the Brooklyn Center Police Department, the Minnesota Department of Natural Resources, and most prominently the Minnesota State Patrol, have deployed in response to the protests. The Minnesota State Patrol, under the command of Defendants Langer and Harrington, have continued the abuse and harassment of journalists that occurred during the response to the George Floyd protests, despite express carve-outs for the media in these curfew orders. Less-lethal weapons have been deployed against journalists. Journalists have been arrested and threatened with arrest. And the State Patrol has been repeatedly broadcasting the Orwellian message: "Media you must disperse and leave the area . . . media and press leave the area now," prior to cracking down on protesters.

Numerous journalists have documented the State Patrol's unconstitutional conduct during the Daunte Wright protests – conduct that mirrors the State Patrol's unlawful tactics during the George Floyd protests and confirms that the State Patrol believes it can violate journalists' constitutional rights with impunity.

Nicholas Bogel-Burroughs (@NickatNews) is a reporter for the New York Times. (Declaration of Isabella Nasciemento ("Nasciemento Dec.") ¶ 3.) He documented his experience as press during the Daunte Wright protests on Twitter. (*Id.*) On April 13, 2021, at 9:02 p.m., Mr.

---

[4] Proclamation of the Mayor, Emergency Regulation No. 2021-2-2, dated April 13, 2021, available at https://www.minneapolismn.gov/government/mayor/official-notices/emergency-regulation-2021-2-2/ ("Minneapolis Emergency Regulation No. 2021-2-2"); City of Brooklyn Center, Minnesota, Mayoral Emergency Proclamation No. 2021-01, dated April 13, 2021, available at https://twitter.com/mayor_elliott/status/1382118830714028033/photo/1 ("Brooklyn Center Proclamation No. 2021-01").

Bogel-Burroughs posted an image of thick white smoke, captioned "Minnesota State Patrol officers are moving in from the side and ordering people in Brooklyn Center to leave." *See* Bogel Twitter 3. He continued, "They're also specifically ordering news media to leave." On April 13, 2021, at 9:42 p.m., Mr. Bogel-Burroughs posted a video with the caption, "Minnesota State Patrol officers just rushed in and appeared to arrest several people in Brooklyn Center on Day 3 of #DaunteWright protests. That came immediately after police fired flashbangs and after about 45 mins of repeatedly ordering the news media, in particular, to leave." (*Id.*)

Chad Davis (@daviss) is a Minneapolis photojournalist. (*Id.* ¶ 4.) He also documented his experiences as press during the Daunte Wright protests on Twitter. (*Id.*) On April 12, 2021, at 8:23 p.m., Mr. Davis tweeted, "Another dispersal order given and they said all media all media [sic] is to gather in front of 67th and Humboldt." *See* Daviss Twitter 2. On April 12, 2021, at 12:56 a.m., Mr. Davis posted a video with the caption, "VIDEO: Brooklyn Center Police begin shooting at protesters (and media). From earlier this evening. (*Id.*)

Evan Frost (@efrostee) is a photojournalist for MPR News. (*Id.* at ¶ 5.) On April 11, 2021, at 11:49 p.m., Mr. Frost posted a video to Twitter and included the caption: "Police are issuing more dispersal orders, stun grenades and tear gas. Say they will arrest anyone who does not disperse in 10 minutes including journalists." (*Id.*)

Carlos Gonzalez (@CarlosGphoto) is a photojournalist at the Star Tribune. (*Id.* at ¶ 6.) On April 12, 2021, at 9:22 p.m., Mr. Gonzalez tweeted a video recording himself being pepper sprayed by Minnesota State Patrol captioned, "I was pepper sprayed in the eye while photographing the scene at the Brooklyn Center Police Department." (*Id.*) He continued, "I had cameras & my press credentials clearly in view. It came from the side w/o warning I was shooting so I didn't even see it coming." (*Id.*)

Kim Hyatt (@kimvhyatt) is a reporter for the Star Tribune. (*Id.* at ¶ 7.) On April 13, 2021, at 8:59 p.m., Ms. Hyatt tweeted that the police were "telling media to leave." (*Id.*) On April 13, 2021, at 9:20 p.m., Ms. Hyatt posted two images, both captioned "The police line pushing protesters back and they keep announcing 'media and press leave the area.'" On April 13, 2021, at 9:38 p.m., Ms. Hyatt posted a video, the still image which shows her large, yellow "PRESS" credentials, with the caption, "They're making arrests and physically grabbing press and telling us to leave." (*Id.*) On April 13, 2021, at 9:45 p.m., Ms. Hyatt tweeted, "Law enforcement came around the backside of the apartment out of nowhere and starting grabbing people including myself." (*Id.*) She continued, "I saw several people on the ground. The officer who forcefully grabbed me told me to 'get the hell out of here.' I was holding up my press badge." (*Id.*) On April 13, 2021, at 9:48 p.m., Ms. Hyatt tweeted, "The curfew isn't effective till 10 p.m. But they announced this was an unlawful assembly and told the media to leave around a dozen times." (*Id.*)

Andrew "Andy" Mannix (@AndrewMannix) is a reporter for the Star Tribune. (*Id.* at ¶ 8.) On April 11, 2021, at 11:30 p.m., Mr. Mannix tweeted a video captioned, "Police declaring unlawful assembly[,] Saying that includes media." (*Id.*) On April 12, 2021, at 8:04 p.m., Mr. Mannix tweeted, "Police calling curfew violation.. said media had to gather in specific spot." (*Id.*)

Mark Vancleave (@MDVancleave) is a video journalist for the Star Tribune. (*Id.* at ¶ 9.) On April 13, 2021, at 8:36 p.m., Mr. Vancleave reposted a video by user @AndrewMannix on Twitter, adding the caption, "Because of an injury I received last night, I won't be on the ground covering events in Brooklyn Center." (*Id.*) Mr. Vancleave was shot in the hand with a "less-lethal" round while filming the protests. He spent 20 hours in the hospital, his injury required surgery, and he will be unable to pick up a camera for six weeks. (*Id.*)

Miguel Otárola (@motarola123) is a climate and environmental reporter for CPR News. (*Id.* ¶ 10.) On April 13, 2021, at 7:51 p.m., he posted an image of Mr. Vancleave's injury on Instagram:



Mr. Otárola captioned his image, "Because I haven't seen it on here yet: The police shot my friend and videojournalist @MDVancleave with a rubber bullet while he covered protests at

Brooklyn Center last night.  They broke his ring finger & he had to have surgery.  Just an example of the force they're using."  (*Id.*)

Mr. Vancleave later posted a photograph of himself after his surgery:



20 hours in the hospital and 1 surgery later, I finally made it home last night.

It could be six weeks before I'm able to pick up a camera again.

Shout out to the incredibly talented and compassionate health care workers @northmemorial hospital for taking excellent care of me.

(Nasciemento Dec. ¶ 10.)

Unicorn Riot (@UR_Ninja) is a non-profit media organization. (*Id.* ¶ 11.) Its reporters documented their experiences during the Daunte Wright protests on Twitter. On April 11, 2021, at 10:22 p.m., Unicorn Riot tweeted that "[a] journalist wearing a PRESS vest was just shot in the chest w riot munitions by police in Brooklyn Center." (*Id.*) On April 11, 2021, at 11:27 p.m., while broadcasting a live video feed of the Daunte Wright protests, Unicorn Riot tweeted, "A police officer sounding aggravated over the loudspeaker at the Brooklyn Center just said the unlawful assembly means everyone must leave or face arrest. He made sure to say 'this includes the media.'" (*Id.*) On April 11, 2021, at 11:38 p.m., Unicorn Riot tweeted, "'If you do not cease your unlawful behavior…you will be arrested…you have no time remaining…you must leave now…this includes the media[.]'" (*Id.*) On April 12, 2021, at 9:14 p.m., Unicorn Riot tweeted, "The Brooklyn Center officers on the speaker earlier had told the media to go to 67th and Humboldt – which is where we are now, and the state troopers on scene don't seem aware that media was told they could be here and are clearing the block." (*Id.*) On April 12, 2021, at 9:57 p.m., Unicorn Riot tweeted, "Journalist Louie Tran just arrested." (*Id.*)

On April 13, 2021, at 9:08 p.m., Unicorn Riot tweeted, "'Media and press you must leave the area. Media and press you must leave the area now' – Minnesota State Patrol orders reporters to cease documentation of their actions towards #DaunteWright protesters." (*Id.*) On April 13, 2021, at 9:27 p.m., Unicorn Riot tweeted, "State Patrol once again specifically singling out media with orders to leave." *See* UR Twitter 16. On April 13, 2021, at 9:35 p.m., while broadcasting a live video feed of the Daunte Wright protests, Unicorn Riot tweeted, "Officers just moved in on the crowd and made several arrests of #DaunteWright protesters. One officer just shot our ground reporter in the leg with some kind of impact round – it appeared to be deliberate and not accidental." (*Id.*) On April 13, 2021, at 9:41 p.m., Unicorn Riot tweeted, "A fair amount of the

crowd seems to have dispersed o[r] moved on after that last police charge which grabbed at least a dozen people.  Mostly only press remain in the immediate vicinity of the police line, state patrol is still repeatedly ordering the press specifically to leave."  (*Id.*)  On April 13, 2021, at 9:43 p.m., "'Media leave the area…media and press leave the area now' – state patrol for like the 100th time in the last half hour."  (*Id.*)

On April 14, 2021, at 1:18 a.m., Unicorn Riot posted two images, one of which depicted a bloodied body part and was captioned, "Content Advisory:  Blood[.]  Our field reporter Niko had skin broken and blood drawn by an impact round fired at him by Minnesota police while he was documenting #DaunteWright protests on our stream tonight.":



(*Id.*)

Minnesota Operation Safety Net (@MinnesotaOSN) (hereinafter "OSN") is "[t]he official source of public safety information for the trial of former Minneapolis police officer Derek Chauvin."  (*Id.* ¶ 12.)  It has provided official updates from Minnesota law enforcement officials during the Daunte Wright protests on Twitter.  (*Id.*)  On April 12, 2021, at 7:55 p.m., OSN tweeted

a reminder that there was a "[t]emp. curfew until 6 a.m. in Hennepin, Anoka, Dakota, & Ramsey counties." It listed exemptions to the curfew for, among others, "media." (*Id*.) On April 14, 2021, at 12:22 a.m., OSN tweeted a quote from Minnesota State Patrol Col. Matt Langer: "'We are prepared and we will be back tomorrow.'" (*Id.*)

**LEGAL ARGUMENT**

## I.     LEGAL STANDARD.

In determining whether to grant a TRO, the court must analyze the following factors: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that the temporary restraining order will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

## II.     THE THREAT OF IRREPARABLE HARM IS REAL AND ONGOING.

The threat to Plaintiffs is not speculative or hypothetical. It is immediate. The State Patrol is violating Plaintiffs' First Amendment rights as this sentence is being written. And the threat is ongoing. The Daunte Wright protests show no sign of abating. Whatever the verdict in the George Floyd trial, expected to drop in the next several days, protests and demonstrations are inevitable. As Defendant Langer himself stated in a press conference in the early hours of April 14, 2021, "We are prepared and we will be back tomorrow." (Nasciemento Dec. ¶ 12.)

To demonstrate irreparable harm, a party must show that the harm is certain and great and is of such imminence that there is a clear and present need for equitable relief. *Novus Franchising Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)). In *Novus*, the Eighth Circuit denied the plaintiff's request for a preliminary injunction to enforce a non-complete clause because the plaintiff had failed to seek an injunction for a period of *seventeen months* after the conduct at issue began. *Id.*

The circumstances here are starkly different. Plaintiffs initially sought injunctive relief from this Court on June 2, 2020—while the protests that erupted in the wake of George Floyd's killing were still ongoing, and several days before the Governor's curfew order issued to quell the continuing unrest had expired. (SAC ¶ 27.) The Court denied the motion by order dated June 9, on grounds that Plaintiffs had failed to establish any future harm to the media was sufficiently imminent to grant relief. By that time an entire week had elapsed, and the violent clashes between protesters and law enforcement officers had significantly calmed. In denying the motion, the Court rejected Plaintiffs' argument that the unconstitutional attacks on the media were likely to resume if the protests became violent again, holding that this risk was too speculative and uncertain to establish grounds for injunctive relief. (ECF 35 at 7 n.4.)

But now protests have begun again in the wake of yet another inexplicable death involving a black man killed by law enforcement for potential misdemeanor offenses, and the State defendants are once again directly targeting the media covering the protests with unconstitutional dispersal orders, threatened arrests, chemical irritants and other assaults. The threat of harm is not only "imminent," it is continuing. The unrest provoked by the killing of Daunte Wright, the ongoing trial of George Floyd's killer, and the expected trials of other law enforcement officers later this year have created a volatile situation that has led, and predictably will continue to lead, to additional harassment of the press for months if not years into the future.

The actions of the State Patrol are part of a pattern of officially sanctioned assaults against the First Amendment that must be curtailed to prevent irreparable harm. *See Index Newspapers LLC v. City of Portland*, 474 F. Supp.3d 1113, 1125 (D. Or. 2020) (holding that the loss of First Amendment freedoms "for even minimal periods" constitutes irreparable injury) (quoting *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)). Since Mr. Floyd's death, courts

13

throughout the country have grappled with repeated conflicts between law enforcement and the media provoked by coverage of violent clashes with protesters related to his death and the killings of other black citizens by law enforcement officers. The courts have reiterated the essential public service journalists play in reporting these events and enjoined police from targeting constitutionally protected activity. *Id.; see also Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292-93 (D. Colo. 2020) ("Here, it is clearly in the public interest to protect plaintiff's right to demonstrate, the media's ability to document that demonstration, and third parties' ability to render aid to demonstrators without threat of excessive force by police."); *c.f. Black Lives Matter Seattle-King County v. City of Seattle*, 466 F. Supp. 3d 1150 (W.D. Wash 2020) (enjoining the use of excessive force against protesters); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150 (D. Or. 2020) (same); *Detroit Will Breathe v. City of Detroit*, 484 F. Supp. 3d 511 (E.D. Mich. 2020) (same).

The court in *Index Newspapers* granted injunctive relief under circumstances similar to those here in response to attacks on journalists by federal law enforcement officers during protests at federal buildings in Portland. In doing so, the court rejected the defendants' argument that the plaintiffs lacked standing to obtain an injunction because they had relied on past illegal conduct as grounds for relief: "Although a single injury in the past is not enough to create standing, the threat of future injury may become actionable when actual repeated incidents are documented." *Id.* at 1121. The court held that the combination of the defendants' repeated past misconduct, the plaintiffs' stated intention to continue covering the protests, and the defendants' stated position that their conduct was necessary to protect the property at issue established a threat of future harm that was "not speculative or hypothetical." *Id.* at 1121-22.

The State Patrol's attacks on the media have persisted.  Reporters are again being targeted, shot, and injured with less-lethal projectiles.  They have been forced to leave the area where the protests are taking place, and have been arrested and threatened with arrest.  The repeated dispersal orders issued in Brooklyn Center make clear the State's intention to force the media to stop covering these momentous public events, in violation of the First Amendment.  Plaintiff Goyette intends to continue covering the protests, despite his justifiable fear of injury and arrest at the hands of law enforcement, and other Class Members are similarly situated.  (Goyette Dec. ¶ 14.) If sufficient grounds for injunctive relief did not exist last June, that threshold certainly has been crossed now.  The threat is real and imminent, and immediate relief is imperative.

## II.  THE BALANCE OF HARMS AND THE PUBLIC'S INTEREST IN A FREE PRESS WEIGH STRONGLY IN FAVOR OF GRANTING INJUNCTIVE RELIEF.

It is axiomatic that "the public interest favors protecting core First Amendment freedoms." *See Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999); *see also Associated Press*, 682 F.3d at 826 ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (granting an injunction under the Fourth Amendment and explaining "it is always in the public interest to prevent the violation of a party's constitutional rights"); *Index Newspapers LLC v. City of Portland*, No. 3:20-CV-1035-SI, 2020 WL 4883017 (D. Or. Aug. 20, 2020) (stating "when a plaintiff has "raised serious First Amendment questions," the balance of hardships "tips sharply in [the plaintiffs'] favor") (quoting *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007)).

When, as in this case, a plaintiff's First Amendment rights are at stake, demonstrating a likelihood of success on the merits is all that is needed to warrant an injunction.  *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (when a likely violation of

First Amendment rights has been shown, the other requirements "are generally deemed to have been satisfied"); *see also Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2012), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (likelihood of success on the merits is "often the determining factor" on a request for prospective injunctive relief in First Amendment cases). As discussed below, Plaintiffs' have demonstrated more than a "fair chance of prevailing" on the merits of their case.

Here, the harm to journalists from the tactics employed by the State Patrol extends beyond the sting of tear gas and the injuries caused by the impact of rubber bullets. All journalists covering the protests—even those who were not themselves the direct targets of the harassment—necessarily must fear for their continued physical safety in light of the tactics employed. (*See* Goyette Dec. ¶ 14 (expressing fear of law enforcement violence).) If not enjoined, the State Patrol's misconduct will not only chill protected speech, it will actively interfere with and curtail journalists' ability to cover the protests. And the public will suffer. "It is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Phelps-Roper v. Nixon*, 545 F.3d at 691; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

In contrast, any harm to the State Patrol would be negligible. While law enforcement agencies have an interest in maintaining order and public safety, that interest is not served by using force against individuals who identify as journalists, or who are merely recording events and present no threat of harm to police or the public. *See Ahmad v. City of St. Louis, Missouri, No. 4:17 CV 2455 CDP, 2017 WL 5478410, at *17 (E.D. Mo. Nov. 15, 2017)* *17 (injunction warranted in the absence of force or violent activity by protesters). More fundamentally, the State Patrol has "no significant interest in enforcing unconstitutional customs or policies." *Id.*

This factor weighs in favor of granting Plaintiffs' Motion.

## III. PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS.

Because Plaintiffs' claims challenge the State Defendants' policy or custom, and not the validity of a statute or order, Plaintiffs demonstrate a likelihood of success if they show a "fair chance of prevailing." *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) ("[C]ourts should . . . apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes."). Plaintiffs' Claims have more than a "fair chance of prevailing." The State Patrol's recent unconstitutional conduct confirms that it employs a policy or custom of violating the First Amendment rights of journalists.

### 1. The First Amendment Retaliation Claim Is Likely to Succeed on the Merits.

Plaintiff's and other Class Members' constitutionally protected speech has been chilled by the retaliatory abuse they have suffered and continue to suffer at the hands of law enforcement officers. This constitutional harm was caused by Defendants' ongoing failure to adequately supervise or train law enforcement personnel.

The First Amendment prohibits government actors from subjecting an individual to retaliatory actions for exercising their First Amendment rights. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). To establish a claim for First Amendment retaliation, plaintiffs must show: (1) that they engaged in a protected activity; (2) that a government official acted against them in a way that would chill a person of ordinary firmness from continuing the activity; and (3) that the officers' actions were motivated at least in part by the plaintiffs' engagement in protected activity. *Id.*

Plaintiffs have a clearly established constitutional right to document protest activities, including law enforcement responses and behavior. *See, e.g.*, *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The *making* of an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." (emphasis added)); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." (internal quotation omitted)); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Ahmad*, 2017 WL  at *12 (collecting cases).

The State Patrol's retaliatory actions against Plaintiffs, including dispersal orders and harassment targeting the media, the use of chemical agents, assaults with less-lethal weapons, threats, and detention and arrests, would chill a person of ordinary firmness from continuing to pursue their constitutionally protected right to document the protests and law enforcement conduct in response to them.  *See Kopp*, 754 F.3d at 602 (pepper spraying a person in the face would chill a person of ordinary firmness).

Moreover, the documented pattern of hostility by the State Defendants to members of the news media and press demonstrates that these constitutional violations were motivated in least in part by these individuals' engagement in First Amendment protected activity.  When the Plaintiff was struck in the face by a non-lethal ballistic round last year, his membership in the press would have been obvious to the officer who fired it.  He was holding a camera, a monopod and a notepad, he was engaged in no illegal activity, and he posed no imminent threat of violence of bodily harm

to any person or of damage to any property.  Likewise, when the State Patrol fired a less-lethal round at Star Tribune videographer Mark Vancleave, he was filming the protests and he was obviously working as a journalist.

The Defendants have demonstrated and continue to demonstrate deliberate indifference to these violations of Plaintiffs' rights.  There is "a pattern of misconduct that would alert [State Defendants] that [their] training and supervision were inadequate" to prevent the unlawful targeting of members of the press and news media by law enforcement officers.  *Fort Zumwalt*, 920 F.3d at 1189-90 (municipal liability appropriate where there is a "pattern of similar constitutional violations").

Moreover, "the need for training or supervision was so obvious, and the inadequacy so likely to result in the violation of the constitutional rights, that the policymakers of the [State Defendants] can reasonably be said to have been deliberately indifferent to the need."  *Id.*

### 2. Plaintiffs' Fourth Amendment Claim Is Likely to Succeed on the Merits.

The Fourth Amendment guarantees the right to be free from excessive force.  *See Howard v. Kansas City Police Dept.*, 570 F.3d 984, 988 (8th Cir. 2009).  "To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable."  *Id.*  The seizure need not result in a claimant's arrest and detention.  Rather, a seizure occurs whenever "an officer restrains an individual's liberty through physical force or a show of authority."  *Id.*  (excessive force claim actionable when police restraint physically injured claimant who sought their assistance).  The test for reasonableness is whether the amount of force used was objectively reasonable under the particular circumstances, including the severity of any crime at issue, whether the targeted individual poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight. *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (internal quotation marks and citation omitted); *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Here, Plaintiffs and the Class Members were not participating or suspected of participating in any crime and presented no threat to the safety of police or others. Yet, the State Defendants sought to restrain them from freely moving throughout the areas where protests were occurring, by ordering them to disperse and cease their coverage of the events, and by targeting them with threats, projectiles and chemical agents, and arrests without probable cause. These tactics constitute unreasonable restraints on movement of the press throughout the protests in violation of the Fourth Amendment.

Thus, this factor also weighs in favor of granting Plaintiffs' Motion.

## CONCLUSION

For the above-stated reasons, the Court should grant Plaintiffs' Motion for a Temporary Restraining Order.

Dated: April 14, 2021

/s/ Kevin C. Riach

Kevin C. Riach (#0389277)
Dulce J. Foster (#0285419)
Pari I. McGarraugh (#0395524)
Jacob P. Harris (#0399255)
Mary Fee (#0399936)
Emily McAdam (#
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000
kriach@fredlaw.com
dfoster@fredlaw.com
pmcgarraugh@fredlaw.com
jharris@fredlaw.com
mfee@fredlaw.com
emcadam@fredlaw.com

Adam W. Hansen (#0391704)
Colin Reeves (*pro hac vice*)
**APOLLO LAW LLC**
333 Washington Avenue North, Suite 300
Minneapolis, MN 55401
(612) 927-2969
adam@apollo-law.com
colin@apollo-law.com

Teresa Nelson (#269736)
Isabella S. Nascimento (#0401408)
**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
(651) 529-1692
tnelson@aclu-mn.org
inascimento@aclu-mn.org

*Attorneys for Plaintiffs*