UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Jared Goyette, Craig Lassig, Michael
Shum, Katie Nelson, Tannen Maury,
Stephen Maturen, and The
Communications Workers of America,
*On behalf of themselves and other similarly
situated individuals*,

Plaintiff,

vs.

City of Minneapolis, et al.

Defendants.

Court File No.  20-CV-01302
(WMW/DTS)

**STATE DEFENDANTS'
MEMORANDUM IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY
RESTRAINING ORDER**

**INTRODUCTION**

This case involves the Minneapolis Police Department ("MPD") and the Minnesota

State Patrol's attempts to restore order and protect the public in the aftermath of the

unprecedented, chaotic, and at times destructive civil unrest following the tragic death of

George Floyd on May 25, 2020. Plaintiffs filed this putative class action against various

state and city entities and officials, challenging the treatment of the media by law

enforcement.  Plaintiffs now move for a temporary restraining order ("TRO") relating to

entirely different, more recent unrest related to the death of Daunte Wright.  Defendants

Commissioner John Harrington and Colonel Matthew Langer, the respective leaders of the

Minnesota Department of Public Safety and the Minnesota State Patrol (collectively, "State Defendants"), oppose Plaintiffs' motion.[1]

To be clear, State Defendants recognize the essential service the media plays in reporting on matters of public concern, particularly protests as significant as those that erupted in the wake of the deaths of George Floyd and Daunte Wright. State Defendants reject any allegation that they would intentionally impede journalistic activities to prevent honest and transparent reporting. Indeed, law enforcement agencies benefit when their work is conducted in a public and transparent manner. In the face of widespread violence and criminal conduct, however, law enforcement officials have no choice but to take swift lawful action to restore public safety. Such efforts sometimes require the use of dispersal orders, which necessarily apply to everyone in the area being cleared (including the media). Plaintiffs' request for a TRO should be denied because Plaintiffs have not carried their burden to show a TRO is appropriate here.

## FACTS

Plaintiffs filed this lawsuit on June 2, 2020, naming the City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo, Minneapolis Police Chief Lieutenant Robert Kroll, and State Defendants as Defendants. A previous TRO motion filed by Plaintiffs was denied on June 9, 2020. (Doc. 35.) Since that time, Plaintiffs filed a Second

---

[1] This Court directed the Defendants to file a "joint" memorandum addressing Plaintiffs' TRO motion. (Doc. 99.) However, Plaintiffs' motion seeks only an injunction against the State Defendants. Indeed, Plaintiffs' motion does not contain any allegations or claims related to Minneapolis Police Officers, nor does it seek to enjoin the City of Minneapolis or any of its officers, officials or employees from any action. Accordingly, because the City Defendants are not included in Plaintiffs' motion, the City Defendants have not participated in the drafting of this memorandum.

Amended Complaint (Doc. 53), and State Defendants filed a motion to dismiss, which is currently under advisement.  (Doc. 88.)

This putative class action pertains to the alleged mistreatment of news media personnel by law enforcement during the wave of protests that occurred after the tragic death of George Floyd.  Plaintiffs (six journalists and the Communications Workers of America union), allege generally that they and other members of news media were targeted by the Minneapolis Police Department ("MPD") or the State Patrol when they were gathering and reporting information on the protests.  (*See, generally*, Second Amended Complaint ("SAC") [Doc. 53].)

Plaintiffs filed the underlying TRO motion on April 14, 2021.  This motion pertains to the treatment of media during the unrest that followed the death of Daunte Wright this past Sunday, April 11.  Minnesota State Patrol ("MSP") troopers, as part of a coalition formed to respond to unrest related to the trial of former police officer Derek Chauvin, were called to duty this week to protect businesses and the community in Brooklyn Center. This coalition is referred to as Operation Safety Net ("OSN") and includes National Guard members, MSP troopers, Hennepin County sheriff's deputies, and others.  OSN has provided law enforcement support near the Brooklyn Center Police Department, where numerous peaceful and non-peaceful protesters were present.

While most of protestors near the Brooklyn Center Police Department this past week have been peaceful, some individuals have taken the opportunity to commit serious acts of violence, including violence against the media.  For example, CNN reported that one of its

reporters was hit in the head by a water bottle and then their crew was chased by protesters.[2] In addition, widespread looting was reported in Brooklyn Center, as well as adjacent cities, damaging an estimated 20 businesses.[3]  Such damage was inflicted, in part, by gunfire.[4] Rocks, bricks, and other large or explosive objects were hurled at police, lasers were shined in law enforcement eyes, fires were lit, and public property was damaged.[5]

More specifically, starting on Sunday evening, severe violence and looting erupted in numerous locations in the Twin Cities, beginning in the Brooklyn Center area and spreading beyond to neighboring communities. MSP is aware of over 75 business affected from Sunday's events, including many on Lake Street in Minneapolis.  (Schrofer Decl. ¶ 2.) MSP troopers responded to multiple locations to assist local law enforcement in quelling the violence and restoring peace.  (*Id.*) The rapid escalation of law enforcement resources across the Twin Cities was necessary to prevent the repeat of the incredible property destruction that occurred last year following the death of George Floyd.  (*Id.*)

---

[2]    *See*    https://bringmethenews.com/minnesota-news/cnn-employee-struck-in-head-by-water-bottle-in-brooklyn-center (last viewed Apr. 15, 2021)

[3]    *See*    https://www.twincities.com/2021/04/11/police-fatally-shoot-man-in-brooklyn-center-sunday-bca-investigating/ (last viewed Apr. 15, 2021).

[4]    *See*  https://minnesota.cbslocal.com/2021/04/12/here-we-go-again-businesses-clean-up-after-night-of-destruction-following-daunte-wright-killing/ (last viewed Apr. 15, 2021).

[5]    *See*    https://www.twincities.com/2021/04/11/police-fatally-shoot-man-in-brooklyn-center-sunday-bca-investigating/    (last    viewed    Apr.    15,    2021); https://www.twincities.com/2021/04/12/nighttime-curfew-going-into-effect-in-st-paul-minneapolis-after-brooklyn-center-officer-fatally-shoots-man/    (last    viewed    Apr.    15, 2021);  https://www.twincities.com/2021/04/12/law-enforcement-issues-dispersal-orders-begins-arrests-in-brooklyn-center-after-curfew-takes-effect/ (last viewed Apr. 15, 2021).

As a result of the criminal activity that occurred on Sunday evening, Operation Safety Net ("OSN") moved to "Phase 3" of the plan which included the rapid escalation of law enforcement and National Guard resources. (*Id.* ¶ 3.) OSN moved to Phase 3 because of the unrest in Brooklyn Center, Minneapolis, and other communities. Specific attention was placed on the Brooklyn Center Police Department where a large number of protesters had gathered. (*Id.*)  OSN was comprised to respond to any unrest stemming from the Derek Chauvin trial, and is an organized group of unified command.  (*Id.*) It includes State Patrol, Department of Natural Resources, Minneapolis P.D., Hennepin County Sheriff, St. Paul P.D., National Guard, among other law enforcement agencies. (*Id.*)

On Monday night, OSN officers were present, along with members of the Bloomington Police Department, the Anoka County Sherriff's Office, and others. (*Id.* ¶ 4.) On Tuesday, OSN officers were present, along with the Anoka County Sherriff's Office, the West Metro Field Force and others. (*Id.*) It is important to note that MSP jurisdiction is limited under Minn. Stat. § 299D.03, but it does have the power and authority to "to cooperate, under instructions and rules of the commissioner of public safety, with all sheriffs and other police officers anywhere in the state." (*Id.*)

Prior to the events of this week, OSN officers held a recurring weekly meeting with members of the media regarding law enforcement expectations during anticipated protests. (*Id.* ¶ 5.) On Monday, direct efforts were made by OSN officers to clarify with media members present in the crowd that while the media was exempt from the curfew, the media was not exempt from lawful orders from OSN officers, including dispersal orders. (*Id.*)

This was also consistent with the Governor's Executive Order regarding the 7:00 p.m. curfew put in place that evening.  (*Id.*)

On Monday evening, a large gathering of approximately 1,000 protestors remained in the vicinity of the Brooklyn Center Police Department past the curfew. (*Id.* ¶ 6.)  OSN officers and other law enforcement members, however, did not immediately act to enforce the curfew.  (*Id.*) Unfortunately, several members of the protest began to engage in various acts of violence.  (*Id.*) The conduct included throwing rocks, bricks, bottles filled with frozen liquid, and other heavy objects at police, hurling commercial-grade fireworks, gunfire, shining lasers into the eyes of law enforcement officers, arson and attempted arson, and damaging public property.  (*Id.*) At least seven MSP troopers were injured as a result. (*Id.*)

Given the violence, OSN officers issued numerous lawful dispersal orders over a long-range acoustical device before taking any enforcement action to disperse the crowd. (*Id.* ¶ 7.) These dispersal orders contained a direct reference to the media, for the sake of clarity, to ensure that media was aware that the dispersal order applied to everyone.  (*Id.*) Law enforcement officials then worked directly with known members of the media, providing an alternative location where they could continue their coverage: 67th Avenue and Humboldt Avenue, only ten feet away from the Brooklyn Center Police Department building.  (*Id.*) As the clearing efforts of law enforcement physically moved forward, law enforcement officials worked with the media to find other safe locations for them to continue their coverage without entering the dispersal area or impeding law enforcement efforts.  (*Id.*) Despite best efforts to provide notice of the impending action to disperse the

crowd, some members of the media simply refused to comply or stay within the designated areas. (*Id.*)

While the unified command of OSN and other law enforcement was ultimately able to minimize the violence, looting, and arson on Monday night, hundreds of protesters came back to the same location on Tuesday. (*Id.* ¶ 8.) Again, most of the protesters were peaceful. But, as evening drew near, violence erupted once again. (*Id.*) After at least 28 MSP troopers were struck with various items, lawful dispersal orders were again issued over a long-range acoustical device. (*Id.*) The first message directed the crowd to move north. The second message stated that this directive also applied to the media. (*Id.*) Once again, some members of the media refused to comply, despite the fact that these dispersal orders were announced 75 times, once every two minutes. (*Id.*) The group only started moving when law enforcement officials started moving in order to clear them. (*Id.*)

Last night (Wednesday April 14), the protest activities continued outside of the Brooklyn Center Police Department, but the level of violence was somewhat diminished. (*Id.* ¶ 9.) The unified command of law enforcement leaders is hopeful that the unrest will not continue for a fifth night, but are preparing to continue their efforts to ensure public safety, protect public and private property, and keep the peace. (*Id.*) In total, MSP is aware of over 200 calls for service in response to burglaries after the death of Daunte Wright, with 140 businesses impacted. (*Id.*)

Importantly, the Governor's Executive Order 21-18, imposing the Monday night curfew and exempting media, made clear that <u>no one was exempt</u> from orders from law enforcement:

> **Exemptions**. All law enforcement, fire, medical personnel, and members of the news media, as well as personnel and members of community groups authorized by local units of government, the Minnesota Department of Public Safety, Minnesota State Patrol, or Minnesota National Guard, are exempt from the curfew. Individuals traveling directly to and from work or religious services, seeking medical care, fleeing dangerous circumstances, or experiencing homelessness are also exempt. *All individuals, whether exempt or not, must comply with lawful orders from law enforcement*.

(Landrum Decl. Ex. 1 (emphasis in original.))  It goes without saying that no one, including curfew-exempted members of the media, is entitled to remain in an area subject to a lawful dispersal order.

Dispersal orders are a longstanding law enforcement tactic used to address large and volatile crowds of violent protestors.  (Schrofer Decl. ¶ 10.)  Such orders are typically given over a long-range acoustical device far in advance of any efforts to physically enforce the dispersal order.  (*Id.*) Stated simply, persons are given every opportunity to lawfully leave the scene of violence before any enforcement activity occurs.  (*Id.*) The goal is to encourage as many people to leave under their own free will, as possible. (*Id.*)  It goes without saying, however, that efforts to control wide-spread violence are dangerous, chaotic and unpredictable.  (*Id.*) A swift and efficient law-enforcement response is necessary for obvious safety reasons.  (*Id.*) As the May 2020 unrest demonstrated, a delayed law enforcement response can cause significant damage to our community. (*Id.*)

Interestingly, Plaintiffs take issue with the fact that OSN directed dispersal orders specifically at the media.[6]  This, however, was law enforcement's good faith effort to protect the media from harm and ensure their understanding of the dispersal requirement

---

[6] Referring to these good faith directions as "Orwellian."  (Doc. 96 at 3.)

(and that it applied to them). Numerous warnings were issued to allow time for the public and the media to disburse, as Plaintiffs admit. (Doc 98 ¶ 12(m) ("On April 13, 2021, at 9:43 p.m., Media leave the area…media and press leave the area now – state patrol for like the 100th time in the last half hour.").) (internal quotation marks omitted).

The declaration of Jared Goyette takes issue with the lawful dispersal orders issued by OSN, but confirms that MSP troopers were careful to address members of the media to ensure they knew the dispersal orders applied to them. (Doc. 97 ¶ 6.) The declaration also establishes that multiple dispersal orders were given, which were heard by Goyette but ignored. (*Id.* ¶ 10.) Importantly, Goyette makes clear that he did not follow the dispersal orders and go to the area designated for media, but chose a location "maintaining a line of sight that would allow us to observe the actions of both parties." (*Id.* at ¶ 8.) This location, however, was subject to a dispersal order and Goyette and other members of the media were not legally entitled to be there.

Goyette's decision to ignore lawful dispersal orders placed him in a dangerous situation and impeded law enforcement activity, as his declaration establishes. (Doc. 97 ¶¶ 10-11.) He remained in an area OSN was attempting to lawfully clear, resulting in his exposure to tear gas and less-lethal projectiles. His refusal, as well as the refusal of other members of the media, was met with frustration and additional verbal directions to leave by law enforcement. (*Id.* at ¶ 11.) The declaration makes clear that Goyette chose to remain in an active dispersal area, where violent protesters were present and being addressed by OSN. (*Id.* at ¶ 13.) This was a violation of law. *See* Minn. Stat. § 609.705.

Goyette's Twitter comments, provided by Plaintiffs in the declaration of Isabella Solomão Nascimento, confirms that Goyette chose to disregard the directives of OSN officers by refusing to disperse.  (Doc. 98 ¶ 3(d) ("Trying to stay back but keep eyes on what's happening. . . . .With all due respect, that is our job.").)  Goyette went on to Tweet his belief that he was entitled to cover the unrest, regardless of the dispersal order.  (*Id.* at ¶ 3(e) ("frustrated by @MinnesotaOSN's inability to respect or understand that the [F]irst [A]mendment protects journalists' right to cover events of public interest, even when there is a curfew, *and even when there is a dispersal order*.") (emphasis added).)  The Twitter feeds of other journalists similarly demonstrates that they placed themselves in danger by disregarding lawful dispersal orders.  (*See generally* Doc. 98 ¶¶ 4-12.)

Notably, however, Plaintiffs did not provide the entirety of Goyette's Twitter feed related to the Brooklyn Center unrest.  That is probably because Goyette acknowledged that OSN was in a precarious position and forced to respond to violent acts by protestors. (Landrum Aff. Ex. 2 at p. 1 ("Throwing objects for sure leads to police escalation, which is why organizers/collective work to prevent it from happening during the day.") at p. 2 ("A group of people did shake the fence, pull at it and throw stuff.  They didn't get close to pulling it down, but the police had already established the fence as 'off limits.)'") at p. 3 ("Shouldn't need to say this, but this is not directed at individual state troopers, officers or Nat Guard soldier.  I respect they also have a difficult job to do, and also had reasons to be worried about their safety.  Not personal at all.").)

Plaintiffs claim that OSN "targeted" media with the goal of impeding their reporting.  That assertion is false and misconstrues the efforts of OSN to address the

significant and undisputable violence that occurred outside the Brooklyn Center Police Department.  The media is not (and cannot be) exempt from dispersal orders required to restore peace in the face of mass violence.  Moreover, Plaintiffs' own declarations establish OSN's good faith and reasonable efforts to safely address the presence of media, allow coverage, while also keeping the peace.

Plaintiffs now seek a TRO enjoining State Defendants (as opposed to the OSN coalition) from arresting, threatening arrest, or using any form of lawful force against persons they reasonably should know are journalists unless there is probable cause.  Much of this request, however, is already the law of the land for all people, including journalists. Stated simply, the law already requires probable cause to arrest and prohibits the excessive use of force.  So while the Proposed Order is long, what Plaintiffs really seek is a TRO enjoining State Defendants from issuing dispersal orders that pertain to media or using lawful force to enforce those dispersal orders against the media.[7] Stated simply, Plaintiffs want this Court to order that the media is above the law.  They are not and the TRO must be denied.

## ARGUMENT

### I.   THE COURT SHOULD ONCE AGAIN DENY PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER.

This Court should deny Plaintiffs' TRO motion for numerous reasons.  (Doc. 35.) First and foremost, being a member of the media does not give license to violate lawful

---

[7] (*See* Proposed Order [Doc. 95] at ¶ 2(a) ("For purposes of this Order, such persons shall not be required to disperse following the issuance of an order to disperse, and such persons shall not be subject to arrest for not dispersing following the issuance of an order to disperse.").

dispersal orders during an emergency. The declarations filed by Plaintiffs establish that Plaintiffs (not State Defendants), violated the law when they intentionally failed to follow lawful dispersal orders.

Plaintiffs' TRO should also be denied because Mr. Goyette himself admitted his refusal to disperse and suffered no harm at the hands of OSN, including MSP troopers. No other Plaintiff filed a declaration in support of this motion. Plaintiffs are therefore unlikely to succeed on the merits. Instead, the TRO motion includes allegations entirely unrelated to the parties to this lawsuit or the Second Amended Complaint. (Doc. 35 at 10-13 (denying class-certification at this time).) Finally, Plaintiff's TRO motion is not in the public interest in times of chaotic unrest.

Preliminary injunctive relief is an extraordinary remedy. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). When deciding a motion for preliminary injunction, a court must consider: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The *Dataphase* factors govern both temporary restraining orders and preliminary injunctions. *Izabella HMC-MF, LLC v. Radisson Hotels Intl., Inc.*, 378 F. Supp. 3d 775, 778 n.2 (D. Minn. 2019) (citing *S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989)). Plaintiffs have the "complete burden" of proving all the factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

## A. PLAINTIFFS' TRO MOTION IS UNRELATED TO THE STATE DEFENDANTS AND SECOND AMENDED COMPLAINT.

Plaintiffs' TRO motion seeks an order enjoining the State Defendants from the use of various tactics to combat violence, civil unrest and restore order, exempting media from the use of lawful dispersal orders and force.  The Second Amended Complaint, however, does not address the unrest stemming from the death of Daunte Wright, which is different than what occurred in May 2020.  Nor does the Second Amended Complaint include claims against the OSN coalition.  In addition, the TRO is supported by no allegations from any Plaintiff except Goyette, who was not harmed by State Defendants.

Nowhere in the SAC or declarations does Goyette make any allegation that the OSN (or MSP) caused him harm.  (*See generally* Docs. 9, 56, 97.)  No other Plaintiff filed a declaration in support of the pending TRO motion.  Moreover, the SAC does not address the Brooklyn Center unrest, which is entirely different from the unrest following the murder of George Floyd.  The violence in Brooklyn Center is being addressed by OSN, which includes numerous law enforcement agencies who are not parties here, and who are nowhere mentioned in the SAC.  For these reasons alone, Plaintiffs have little likelihood of success on the merits against the State Defendants and the TRO Motion must be denied.

A court may issue a preliminary injunction in a lawsuit "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).  "Thus, a party must establish a relationship between the injury claimed in the party's motion and the conduct asserted *in the complaint*." *Id.* (affirming district court's order denying

prisoner's motion for a preliminary injunction, which raised issues "entirely different" from those raised in his complaint) (emphasis added).

In this case, Plaintiffs seek a TRO related to the conduct of the OSN, which is not the subject of the SAC. Moreover, the pleadings make clear that the only Plaintiff submitting information in support of the TRO (Goyette) was not harmed by State Defendants, but rather, chose to disregard lawful dispersal orders, thereby placing himself in a dangerous situation, but left unharmed. Plaintiffs have not established a relationship between the State Defendants and the claims in the TRO motion, nearly all of which all relate to non-parties. For these reasons, a preliminary injunction against the State Defendants is not proper here.

### B. PLAINTIFFS FAIL TO CARRY THEIR BURDEN TO DEMONSTRATE THAT INJUNCTIVE RELIEF IS WARRANTED.

Plaintiffs fail to meet their heavy burden to establish the requirements for a TRO. *Gelco*, 811 F.2d at 418. The motion should be denied.

#### i. Likelihood of Success on the Merits

"[A]n injunction cannot issue if there is no chance of success on the merits." *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005); *see also Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). The claims against the two State Defendants, Chief Harrington and Colonel Langer, are not likely to succeed in either their official or individual capacities. Indeed, State Defendants filed a motion to dismiss the SAC, which is still pending. State Defendants incorporate by reference their memoranda in support of their motion to dismiss, which establish why Plaintiffs' claims fail. (Docs.

57, 79.)   Stated succinctly, Plaintiffs claims fail as to State Defendants for failure to state a claim, qualified immunity, and lack of standing.  (Doc. 57 at 6-34; Doc. 79 at 2-12.)

In their TRO motion, Plaintiffs emphasize OSN's use of dispersal orders and the lawful use of force to enforce those orders in the face of mass unrest and violence.   Such tactics have been held to be reasonable under similar situations of civil unrest.  *Martz v. Barnes*, 787 F. App'x 356, 357 (8th Cir. 2019) (pepper spray not excessive force); *White v. Jackson*, 865 F.3d 1064, 1079–80 (8th Cir. 2017) (use of nonlethal projectiles reasonable); *Dundon v. Kirchmeier*, No. 1:16-CV-406, 2017 WL 5894552, at *19 (D.N.D. Feb. 7, 2017), *aff'd*, 701 F. App'x 538 (8th Cir. 2017) (denying motion for preliminary injunction, because officers use of force not unreasonable).  Faced with the destruction of property, violence, and mass unrest, OSN was forced to use repeated dispersal orders, and when not obeyed, lawful force to restore peace.

Plaintiffs cite to no authority holding that first amendment rights exempt individuals from lawful dispersal orders in the face of mass unrest. Indeed, the contrary is true.  There is no First Amendment right to remain in an area subject to a lawful dispersal order.[8]  *See, e.g.*, *Colten v. Kentucky*, 407 U.S. 104, 109 (1972) (holding that "conduct in refusing to move on after being directed to do so was not, without more, protected by the First Amendment"); *Cervantes v. San Diego Police Chief Shelley Zimmerman*, No. 17-CV-01230-BAS-AHG, 2020 WL 5759752, at *7 (S.D. Cal. Sept. 28, 2020) (holding "Cervantes Plaintiffs had no First Amendment right to remain in the area of a protest or unrest after

---

[8] "It is undisputed that protesting peaceably is protected speech. Violent protest is not." *Cross v. Mokwa*, 547 F.3d 890, 896 (8th Cir. 2008).

police issued an order to disperse and were violating the law by doing so" and rejecting a retaliation claim for the same reason); *Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, at *12 (D. Or. Nov. 8, 2006) ("Plaintiff had no protected First Amendment to enter the street in violation of a lawful order to disperse."); *Cavanagh v. Humboldt Cty.*, No. C 97-4190 CRB, 1999 WL 96017, at *4 (N.D. Cal. Feb. 22, 1999), aff'd, 1 F. App'x 686 (9th Cir. 2001) (holding lawful dispersal order did not violate First Amendment); *Burbridge v. City of St. Louis, Missouri*, 430 F. Supp. 3d 595, 611-12 (E.D. Mo. 2019) (noting arrests of media who failed to comply with dispersal order supported by probable cause, rejecting First Amendment retaliation claim based on violation of dispersal order);

The dispersal orders in this case were undisputedly lawful, in light of the violence taking place near the Brooklyn Center Police Department. Those who refused to follow the lawful dispersal order committed a crime. Minn. Stat. § 609.705 (Unlawful Assembly); *see also* Minn. Stat. 169.02, subd. 2 ("It is a misdemeanor for any person to willfully fail or refuse to comply with any lawful order or direction of any peace officer invested by law with authority to direct, control, or regulate traffic."); *State v. Mangan*, No. CX-98-2325, 1999 WL 639246, at *1 (Minn. Ct. App. Aug. 24, 1999) (affirming conviction for failure to obey lawful police order "after he ignored a police officer's order to move out of the street, where he had been campaigning" and rejecting First Amendment claim).[9]

---

[9] *City of St. Paul v. Willier*, 304 Minn. 430, 430, 231 N.W.2d 488, 489 (1975) ("Defendant contends that this statute does not apply in this type of situation but only to one where a driver or other person refuses to comply with a peace officer's order regulating traffic. We reject this argument and hold that the statute does apply to defendant's conduct."); *State v. Orsak*, No. A07-1530, 2008 WL 4224503, at *3 (Minn. Ct. App. Sept. 16, 2008) (affirming conviction for failure to comply with lawful order to relocate).

Similarly, Plaintiffs have no right not to be subjected to seizure and arrest for violating lawful dispersal orders, following a warning and an opportunity to leave the scene. *See, e.g.*, *Barnham v. Ramsey*, 434 F.3d 565, 575 (D.C. Cir. 2006) ("[W]hen compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protestors, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order."); *Lyons v. City of Seattle*, 214 F. App'x 655 (9th Cir. 2006) (finding probable cause for arrests where plaintiffs heard dispersal orders and refused to comply); *Hickey v. City of Seattle*, No. C00-1672 MJP, 2006 WL 3692658, at *9 (W.D. Wash. Dec. 13, 2006) (noting that failure to follow dispersal order supports a violation of law. For all of these reasons, the conduct of OSN in ordering dispersal, and then enforcing dispersal, cannot support a viable claim for violation of § 1983. Plaintiffs therefore are not likely to succeed on the merits.

### ii. Irreparable Harm

Failure to show irreparable harm is an independently sufficient ground for denying a preliminary injunction. *Watkins*, 346 F.3d at 844. To make a showing of irreparable harm, Plaintiffs "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959).

Plaintiffs fail to show that irreparable harm will result if the Court does not grant the TRO. This is because the violence in Brooklyn Center is tampering off and Plaintiffs

have made clear their intention to continue coverage (showing no chilling effect).   In contrast, the harm to the State Defendants if the Court enters a TRO would be extraordinary as it would complicate efforts to control unrest, violence or other chaotic situations and restore the peace.   Plaintiffs' allegations are occurring in an emergency, wherein violence, looting and civil unrest were present and needing a swift law-enforcement response for obvious safety reasons.   Ascertaining who is actually a member of the media during a return to order mission is challenging, especially when the scenes were dark and chaotic. Discerning between protesters, onlookers, members of the media, freelance journalists, podcasters or bloggers, and people who may be committing crimes is extraordinarily difficult, especially in cases where people claim to be with the media but have no photo badge or credentials displayed.   Moreover, OSN took pains to ensure the media was aware of the dispersal order, that it applied to them, and provided an alternative location from while to cover the unfolding events.

The State of Minnesota also has a sovereign interest in the enforcement of the restoration of order and in ensuring public safety.   An injunction inhibiting law enforcement discretion during a crisis would have significant consequences for the future and set a bad precedent.   A TRO in this matter would also be difficult to implement, as the vast majority of ONC members are not parties to this lawsuit and will not be bound by the Court's order.

### iii. Other *Dataphase* Factors

The two remaining *Dataphase* factors also favor denial of Plaintiffs' TRO.   As Plaintiffs have not demonstrated that they individually suffered harm from the State

Defendants, they cannot show that the balance of harms is in their favor. *Dataphase*, 640 F.2d at 114.  Plaintiffs claim that their First Amendment rights have been chilled, but this is belied by Goyette's admission that he will continue to report on the unrest.  (Doc. 97 ¶ 14.)

Plaintiffs claim that a TRO barring the use of dispersal orders would cause "negligible" harm to the OSC.  (Doc. 96 at 16.)  That is simply incorrect as Plaintiffs fail to understand the need for complete dispersal orders in the face of mass violence. In an emergency, media are not always easily identified, nor is there time to verify credentials. "[T]he governmental interest in maintaining order and controlling a large, and unlawfully assembled crowd [i]s substantial." *Hicks*, 2006 WL 3311552, at *10.

Plaintiffs also cannot establish that the balance of harms or public interest favors them because they fail to plead sufficient grounds or factual allegations that State Defendants targeted him or other members of the media.  The standard set forth in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 127 S. Ct 1955 (2007) states that it is a plaintiff's obligation to provide the grounds of his entitlement to relief, which requires that factual allegations must be enough to raise a right to relief above the speculative level.  *Id*. It is unclear how Plaintiffs arrive at that conclusion that members of the media were "targeted" rather than involved in an accidental interaction during a mass unrest. This is particularly true when Plaintiffs admit that they disregarded lawful dispersal orders and refused to leave a dangerous location, which obviously subjected them to a risk of harm while OSN officials attempted to restore peace.

## CONCLUSION

For all of the reasons stated above, Defendants respectfully request that the Court deny Plaintiffs' motion for a temporary restraining order.


Dated:  April 15, 2021                      Respectfully submitted,

                                            KEITH ELLISON
                                            Attorney General
                                            State of Minnesota


                                            s/Kathryn Iverson Landrum
                                            KATHRYN IVERSON LANDRUM
                                            Assistant Attorney General
                                            Atty. Reg. No. 0389424

                                            445 Minnesota Street, Suite 1400
                                            St. Paul, Minnesota 55101-2131
                                            (651) 757-1189 (Voice)
                                            (651) 282-5832 (Fax)
                                            kathryn.landrum@ag.state.mn.us

                                            ATTORNEY FOR DEFENDANTS
                                            MINNESOTA DEPARTMENT OF PUBLIC
                                            SAFETY   COMMISSIONER   JOHN
                                            HARRINGTON AND MINNESOTA STATE
                                            PATROL COLONEL MATTHEW LANGER,
                                            *IN THEIR OFFICIAL AND INDIVIDUAL
                                            CAPACITIES*

|#4948586-v1