UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jared Goyette, Craig Lassig, Michael Shum, Katie Nelson, Tannen Maury, Stephen Maturen, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals*,

                Plaintiff,

vs.

City of Minneapolis, et al.

                Defendants.

Court File No. 0:20-cv-01302 (WMW/DTS)

**DECLARATION OF LIEUTENANT COLONEL ROCHELLE SCHROFER**

I, Lieutenant Colonel Rochelle Schrofer, being first duly sworn on oath, depose and state as follows:

1. My name is Rochelle Schrofer and I am Lieutenant Colonel for the Minnesota State Patrol ("MSP"). I submit this declaration based on my personal knowledge of the unrest that followed the death of Daunte Wright on Sunday April 11, 2021.

2. On Sunday evening, severe violence and looting erupted in numerous locations in the Twin Cities, beginning in the Brooklyn Center area and spreading beyond to neighboring communities. MSP is aware of over 75 business affected from Sunday's events, including many on Lake Street in Minneapolis. MSP troopers responded to multiple locations to assist local law enforcement in quelling the violence and restoring peace. The rapid escalation of law enforcement resources across the Twin Cities was

necessary to prevent the repeat of the incredible property destruction, looting, and arson that occurred last year following the death of George Floyd.

3. As a result of the criminal activity that occurred on Sunday evening, Operation Safety Net ("OSN") moved to "Phase 3" of the plan which included the rapid escalation of law enforcement and National Guard resources. OSN moved to Phase Three because of the unrest in Brooklyn Center, Minneapolis, and other communities. Specific attention was placed on the Brooklyn Center Police Department where a large number of protesters had gathered. OSN was comprised to respond to any unrest stemming from the Derek Chauvin trial, and is an organized group of unified command. It includes State Patrol, DNR, Minneapolis PD, Hennepin County Sheriff, St. Paul P.D., National Guard, among other law enforcement agencies.

4. On Monday night, OSN officers were present, along with members of the Bloomington Police Department, the Anoka County Sherriff's Office, and others. On Tuesday, OSN officers were present, along with the Anoka County Sherriff's Office, the West Metro Field Force and others. It is important to note that MSP jurisdiction is limited under Minn. Stat. sec. 299D.03, but it does have the power and authority to "to cooperate, under instructions and rules of the commissioner of public safety, with all sheriffs and other police officers anywhere in the state."

5. Prior to the events of this week, OSN officers held a recurring weekly news availability with members of the media regarding law enforcement expectations during anticipated protests with the ability to ask questions and seek clarification. On Monday, direct efforts were made by OSN officers to clarify with media members present in the

crowd that while the media was exempt from the curfew, the media was not exempt from lawful orders from OSN officers, including dispersal orders. This was also consistent with the Governor's Executive Order regarding the 7:00 p.m. curfew put in place that evening.

6. On Monday evening, a large gathering of approximately 1,000 protestors remained in the vicinity of the Brooklyn Center Police Department past the curfew. OSN officers, however, did not immediately act to enforce the curfew. Unfortunately, several members of the protest became violent. The conduct included throwing rocks, bricks, bottles filled with frozen liquid, and other heavy objects at police, hurling commercial-grade fireworks, gunfire, shining lasers into the eyes of law enforcement officers, arson and attempted arson, and damaging public property. At least seven MSP troopers were injured as a result.

7. Given the illegal conduct, law enforcement issued numerous lawful dispersal orders over a long-range acoustical device before taking any enforcement action to disperse the crowd. These dispersal orders contained a direct reference to the media, for the sake of clarity, to ensure the media was aware that the dispersal order applied to everyone. Law enforcement officials then worked directly with known members of the media, providing an alternative location where they could continue their coverage: 67th Avenue and Humboldt Avenue, only ten feet away from the Brooklyn Center Police Department building. As the clearing efforts of law enforcement physically moved forward, law enforcement officials worked with the media to find other safe locations for them to continue their coverage without entering the dispersal area or impeding law enforcement efforts. Despite best efforts to provide notice of the impending action to disperse the

crowd, some members of the media, however, simply refused to comply or stay within the designated areas.

8. While the unified command of law enforcement agencies was ultimately able to minimize the violence, looting, and arson on Monday night, hundreds of protesters came back to the same location on Tuesday. Again, most of the protesters were peaceful. But, as evening drew near, violent protesting erupted once again. After at least 28 MSP troopers were struck with various items hurled from protestors, lawful dispersal orders were again issued over the long-range acoustical device. The first message directed the crowd to move north. The second following message stated that this directive also applied to the media. Once again, some members of the media refused to comply, despite the fact that these dispersal orders were announced 75 times, once every two minutes. The group only started moving when law enforcement officials started moving in order to clear them.

9. Last night, the protest activities continued outside of the Brooklyn Center Police Department, but the level of violence was somewhat diminished. The unified command of law enforcement leaders is hopeful that the unrest will not continue for a fifth night, but are preparing to continue their efforts to ensure public safety, protect public and private property, and keep the peace. In total, MSP is aware of over 200 calls for service in response to burglaries after the death of Daunte Wright, with 140 businesses impacted.

10. Dispersal orders are a longstanding law enforcement tactic used to address large and volatile crowds of protestors. Such orders are typically given over a long range acoustical device far in advance of any efforts to physically enforce the dispersal order. Stated simply, persons are given every opportunity to lawfully leave the scene of unrest

before any enforcement activity occurs. The goal is to encourage as many people to leave under their own free will, as possible. It goes without saying, however, that efforts to control large groups that include violent protestors are dangerous, chaotic and unpredictable. A swift and efficient law-enforcement response is necessary for obvious safety reasons, as the May 2020 unrest demonstrated, a delayed law enforcement response can cause significant damage to our community.

11.     Ascertaining who is actually a member of the media during the enforcement of a lawful dispersal order is challenging, especially when the scenes are dark and chaotic. OSN has a policy and practice of not arresting members of the media in a dispersal area (despite their unlawful presence). Discerning between protesters, onlookers, members of the media, freelance journalists, podcasters or bloggers, and people who may be committing crimes is extraordinarily difficult, especially in cases where people claim to be with the media but have no photo badge or credentials displayed. That is precisely why the goal of a dispersal order is to establish the complete removal of all individuals and restore peace in a defined areas. The unfettered presence of media, in the midst of a dispersal area, impedes law enforcement activity during an emergency and make the situation more dangerous for everyone (protestors, onlookers, media, and law enforcement).

12.     Minnesota State Patrol recognizes the essential service the media plays in reporting on matters of public concern, particularly protests as significant as those that erupted in the wake of the deaths of George Floyd and Daunte Wright. MSP is committed to utilizing law enforcement tactics that honor and safeguard members of the media, to the

full extent possible. In light of that commitment, MSP recently amended its General Order ("GO") pertaining to first amendment assemblies. The purpose of the GO, in part, "is to provide guidance to members regarding protests, demonstrations, rallies, hereafter referred to as 'First Amendment assemblies[.]'" One of the many "guiding principles" of the GO states as follows: "MSP respects the rights of the media to cover First Amendment activity and shall never intentionally target them for dispersal or enforcement action based on their media status."

13. Attached hereto as Exhibit A is a true and correct copy of the March 9, 2021 General Order 21-10-013 entitled "First Amendment Assemblies; Strikes and Industrial Labor Disputes; Signs and Banners on Highway."

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT EVERYTHING I HAVE STATED IN THIS DOCUMENT IS TRUE AND CORRECT.

*[signature]*

Lieutenant Colonel Rochelle Schrofer

Dated: April 15, 2021
County of Ramsey, State of Minnesota

|#4948763-v1