UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jared Goyette et al.,                                          Case No. 20-cv-1302 (WMW/DTS)

                              Plaintiffs,

                                                    **ORDER GRANTING PLAINTIFFS'**
     v.                                             **MOTION FOR A TEMPORARY**
                                                    **RESTRAINING ORDER**
City of Minneapolis et al.,

                              Defendants.

---

This matter is before the Court on Plaintiffs' motion for a temporary restraining order. (Dkt. 94.) Plaintiffs seek an order enjoining Defendants Minnesota Department of Public Safety Commissioner John Harrington, in his individual and official capacity; Minnesota State Patrol Colonel Matthew Langer, in his individual and official capacity; and their agents, servants, employees, and representatives (collectively, State Defendants). For the reasons addressed below, Plaintiffs' motion for a temporary restraining order is granted.

## BACKGROUND

The individual Plaintiffs are journalists, photographers, and other members of the press who bring this lawsuit on behalf of themselves and other similarly situated individuals. Plaintiff The Communications Workers of America is an international labor union that represents news media workers. Defendant John Harrington is the Minnesota Commissioner of Public Safety who has supervisory responsibility over the Minnesota State Patrol and its commander, Defendant Colonel Matthew Langer.

On May 25, 2020, George Floyd died as a result of an encounter with four officers of the Minneapolis Police Department, including then-officer Derek Chauvin. Plaintiffs commenced this lawsuit in June 2020 alleging that the State Defendants engaged in a pattern and practice of infringing the constitutional rights of members of the press who were documenting the protests that followed George Floyd's death. In response to the protests, Minnesota Governor Tim Walz implemented nighttime curfews in Minneapolis and Saint Paul, with an exemption for members of the press. The State Defendants allegedly disregarded the press exemption and targeted the press. According to Plaintiffs, the State Defendants threatened, harassed, assaulted and arrested members of the press in multiple incidents over several days after the death of George Floyd. Goyette moved for a temporary restraining order to prevent the State Defendants from further violating the constitutional rights of the press. The Court denied the motion without prejudice because the protests had quelled and Goyette failed to demonstrate an imminent threat of harm.

Recently, additional protests have occurred in Minnesota in connection with the now-ongoing trial of Derek Chauvin. On April 11, 2021, a Brooklyn Center police officer shot and killed Daunte Wright, which led to additional ongoing protests. Plaintiffs allege that the State Defendants continue to violate the constitutional rights of the members of the press who are covering these protests.

Plaintiffs allege several examples, including the police firing rubber bullets at a videographer who was a safe distance from other protestors, orders directing the press to disperse despite the curfew orders expressly exempting the press, and various other acts

impeding the press's ability to observe and report about the protests and law enforcement's interactions with protestors.

Plaintiffs seek a temporary restraining order enjoining the State Defendants from taking certain actions against "any person whom [the State Defendants] know or reasonably should know is a Journalist."  In particular, Plaintiffs seek to enjoin the State Defendants from taking the following actions against such individuals: (1) the use of any physical force, including but not limited to non-lethal projectiles; (2) the use of chemical agents, including but not limited to mace, pepper spray, and tear gas; and (3) seizing any photographic equipment, audio- or videorecording equipment, or press passes from such individuals.  The temporary restraining order that Plaintiffs seek would not apply to circumstances in which members of the press present an imminent threat of violence or bodily harm to persons or damage to property.

## ANALYSIS

Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of a temporary restraining order.  When determining whether a temporary restraining order is warranted, a district court considers the four *Dataphase* factors: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between this harm and the injury that an injunction would inflict on other parties, and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  "A preliminary injunction is an extraordinary remedy," and the party seeking injunctive relief bears the burden of establishing that each factor favors granting such relief.  *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705

(8th Cir. 2011).  The core question in this analysis "is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

## I.   Likelihood of Success on the Merits[1]

Plaintiffs contend that they are likely to succeed on the merits of their claims alleging violations of the First Amendment and Fourth Amendment to the United States Constitution.  When deciding whether to grant a preliminary injunction, the "likelihood of success on the merits is most significant." *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992).  The moving party need not "prove a greater than fifty per cent likelihood that [it] will prevail on the merits." *Dataphase*, 640 F.2d at 113.  Rather, the moving party must demonstrate a "fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  Here, Plaintiffs' likelihood of success on the merits as to their First Amendment and Fourth Amendment claims are addressed in turn.[2]

---

[1]   "The Court takes a short detour before analyzing these factors to stand with many of its sister courts in recognizing the following underlying principles: demonstrators have a right to protest the actions of the police and other members of the government without fear of government retaliation; police officers, especially in their duty to protect person and property, have difficult and often dangerous jobs that require them to make split-second decisions; and just as not all protestors seek destruction, not all officers seek violence.  The Court must thus balance the need to protect the sacred rights of speech and assembly from interference and retaliation with that of police to respond appropriately when the safety of the officers and the City's citizens are threatened." *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 516 (E.D. Mich. 2020).

[2]   The State Defendants, without any factual or legal analysis, assert that Plaintiffs' claims fail on the basis of qualified immunity and lack of standing.  The State Defendants solely reference their prior briefing for these assertions.  It is not the Court's task to

## A.     First Amendment

Plaintiffs argue that they are likely to succeed on the merits of their First Amendment retaliation claim.  The State Defendants disagree.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  A First Amendment retaliation claim requires a plaintiff to show that "(1) [the plaintiff] engaged in a protected activity, (2) the government official took adverse action against [the plaintiff] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Id.* (internal quotation marks omitted); *accord Quraishi v. St. Charles County*, 986 F.3d 831, 837 (8th Cir. 2021). The Court addresses whether Plaintiffs have demonstrated a likelihood of success on the merits as to each of these elements in turn.

### 1.     Protected Activity

Plaintiffs argue that they have a clearly established constitutional right to document protest activities, including law enforcement responses and behavior.  The State Defendants argue that Plaintiffs were exposed to chemical agents, less-lethal projectiles, and dispersal orders because they remained in an active dispersal area, in violation of Minn. Stat. § 607.705.

---

determine which of the State Defendants' prior arguments might be relevant to the pending motion, particularly in light of evolving facts and circumstances.

Any law "abridging the freedom of speech, or of the press" is prohibited under the First Amendment.  U.S. Const., amend. I.  The Supreme Court of the United States has recognized that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).  Moreover, "the First Amendment goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Am. Civ. Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978)).  "Reporting is a First Amendment activity." *Quraishi*, 986 F.3d at 838 (citing *Branzburg*, 408 U.S. at 681).

Here, Plaintiffs' declarations detail the treatment that members of the press, including Goyette, have experienced while photographing, filming, or otherwise documenting government activity at protest scenes.  These undisputed facts demonstrate that Plaintiffs were engaged in constitutionally protected news-gathering activities.  *See Alvarez*, 679 F.3d at 595, 597 ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording" because these news-gathering methods "enable speech.").

The State Defendants argue that the press had no right to "remain in an active dispersal area."  The State Defendants appear to contend that a dispersal order can curtail the right of the press to report on government actions or otherwise limit the press's access,

thereby rendering the press's news-gathering activities no longer a "protected activity" after a dispersal order is given.

When reporting on government conduct, the press serves as "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). The Supreme Court has established a two-part test for evaluating alleged violations of the press's right of access. *See Press-Enter. Co. v. Superior Court of Cal.*, 478 U.S. 1, 8–9 (1986). First, the court must determine "whether the place and process have historically been open to the press and general public and whether public access plays a significant positive role in the function of the particular process in question." *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1147 (D. Or. 2020) (citing *Press Enter.*, 478 U.S. at 8–9). "Second, if the court determines that a qualified right applies, the government may overcome that right only by demonstrating 'an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Id.* (quoting *Press Enter.*, 478 U.S. at 9); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 834 (9th Cir. 2020) (finding that the law enforcement defendants failed to establish that general dispersal orders were essential or narrowly tailored and observing that "[t]he many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others").

Here, the protests in Minnesota appear to be occurring on primarily public streets and sidewalks, giving the press a qualified right of access. *See U.S. Marshals Serv.*, 977 F.3d at 830 (recognizing that streets and sidewalks historically have been open to the public). Indeed, the State Defendants do not dispute that public streets and sidewalks

typically are open to the press and public.  Accordingly, in order for the State Defendants'
general dispersal orders limiting the press's access to be constitutional, the State
Defendants must demonstrate that general dispersal orders are "essential to preserve higher
values and [are] narrowly tailored to serve that interest." *Id.* at 831.  The State Defendants
fail to do so here.[3]

The general dispersal orders lack narrow tailoring for at least two reasons.  First,
both parties acknowledge that the curfew orders exempt the press, which demonstrates that
the state and local governments have concluded that press access to these events is both
important and workable.  *Cf. Index Newspapers*, 480 F. Supp. 3d at 1147–48 (concluding
that, because the defendant city previously stipulated to a preliminary injunction exempting
journalists from dispersal orders, the federal law enforcement defendants' "blanket
assertion that federal officers must disperse everyone is rejected").  Second, preliminary
injunctions issued by other courts in similar circumstances have required members of the
press to adequately identify themselves, refrain from impeding law enforcement activities,
and comply with all laws other than general dispersal orders; and those injunctions have
maintained law enforcement officers' authority to, among other things, "arrest or otherwise
engage with persons who commit unlawful acts." *See, e.g.*, *id.* at 1148; *see also U.S.
Marshals Serv.*, 977 F.3d at 838 (affirming district court's preliminary injunction).  These
facts indicate that similar narrow tailoring is possible here, and the State Defendants offer

---

[3]     Indeed, although the State Defendants argue that their general dispersal orders were
"necessary for obvious safety reasons," they make no attempt to demonstrate that the
general dispersal orders were narrowly tailored to address those safety concerns.

no persuasive factual or legal arguments as to why such narrow tailoring would be unworkable.[4]

The State Defendants argue that the dispersal orders are intended to protect the news media, citing reports that one CNN reporter was hit in the head by a water bottle and chased by protesters. This argument is unavailing, particularly when considering the allegations, supported by declarations, that members of the press have sustained severe injuries at the hands of law enforcement in recent days. These severe injuries include bruising and at least one injury requiring surgery. The State Defendants also argue that their actions were undertaken in good faith. But the State Defendants cite no law establishing that good-faith actions satisfy the narrow-tailoring requirement.[5]

Therefore, Plaintiffs have demonstrated a likelihood of success on the merits of demonstrating that they were engaged in constitutionally protected activities.

### 2.    Chill

Plaintiffs argue that the State Defendants' actions toward the press, including dispersal orders, harassment, use of chemical agents and less-lethal weapons, threats,

---

[4]    Although the State Defendants argue that law enforcement identified a location from which the press could safely report, it is unclear whether the State Defendants always offered such a location, whether the location was consistent and provided adequate access for meaningful news-gathering, or whether offering a designated press location otherwise satisfies the narrow-tailoring requirements of the First Amendment.

[5]    The State Defendants cite several cases relating to individuals not following dispersal orders. Only one of those cases involved the press. *See Burbridge v. City of St. Louis*, 430 F. Supp. 3d 595 (E.D. Mo. 2019) (concluding officers had "at least arguable probable cause for the arrests"). Moreover, as the State Defendants acknowledge, the relief Plaintiffs request allows for probable-cause arrests. As such, the State Defendants' reliance on these cases is unavailing.

detention, and arrests, would chill a person of ordinary firmness from documenting protests and law enforcement's conduct in response. The State Defendants argue that, because Goyette asserts that he intends to continue to report on the unrest, his speech has not been chilled.

The second element of a First Amendment retaliation claim is that the adverse action against the plaintiff would chill a person of ordinary firmness from continuing in the protected First Amendment activity. *See Peterson*, 754 F.3d at 602. Because there is no justification for harassing people for exercising their constitutional rights, the chilling effect on speech need not be great to be actionable. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003).

Here, Plaintiffs' declarations detail the treatment that members of the press experienced while covering protests on April 11–14, 2021. The declarations reflect that these individuals were directed by law enforcement to vacate the protest area, physically grabbed, struck by less-lethal projectiles and rubber bullets, and pepper sprayed. A person of ordinary firmness would be chilled by such speech-suppressive actions. *See Peterson*, 754 F.3d at 602 (recognizing that "pepper spraying someone in the face would chill a person of ordinary firmness" (internal quotation marks omitted)); *see also Index Newspapers*, 480 F. Supp. 3d at 1142 (concluding that similar enforcement tactics to those alleged here would chill First Amendment activities). Goyette's declaration provides that he intends to continue covering the protests but fears for his safety and the safety of his colleagues. Goyette's declaration also indicates that he had to retreat while observing and reporting about the protests after law enforcement officials carrying batons ran toward him.

And a second declaration indicates that at least one member of the press is likely physically unable to continue reporting for up to six weeks because of injuries he sustained as a result of being struck by a less-lethal projectile.

Therefore, Plaintiffs have demonstrated a likelihood of success on the merits as to the second element of their First Amendment retaliation claim.

### 3. Motivation

Plaintiffs argue that there is a documented pattern of hostility by the State Defendants to members of the press. According to Plaintiffs, this pattern demonstrates that the State Defendants were motivated, at least in part, by the press's First Amendment activities, which is the third element of a First Amendment retaliation claim. *See Peterson*, 754 F.3d at 602.

The State Defendants argue that their dispersal orders were lawful. But the State Defendants do not specifically address Plaintiffs' arguments that the State Defendants' conduct was motivated, at least in part, by the press's First Amendment activities. Plaintiffs' declarations reflect that, although Goyette and other members of the press were clearly identifiable as reporters and press photographers, the State Defendants singled them out in a variety of ways. The State Defendants advised the press that they needed to vacate the protest areas, pepper sprayed them, and hit them with less-lethal projectiles. Law enforcement officers targeted the press, threatening to "arrest anyone who does not disperse in 10 minutes including journalists" and repeatedly ordering the press to leave, shouting messages such as: "Media you need to disperse. Leave the area." Plaintiffs' declarations reflect that a Star Tribune photojournalist, who had a camera and press credentials in clear

view, was pepper sprayed in the eye while photographing a scene.  According to another journalist, "[o]ne officer just shot our ground reporter in the leg with some kind of impact round – it appeared to be deliberate and not accidental."  These facts suggest that the State Defendants' actions were motivated at least in part by the press's engagement in constitutionally protected activity.  *See Index Newspapers*, 480 F. Supp. 3d at 1144–45 (concluding that journalists were targeted when forced to disperse based on similar allegations).

In summary, Plaintiffs have a fair chance of prevailing on the merits of their First Amendment claim and, as such, have satisfied the likelihood-of-success-on-the-merits element.  *See Dataphase*, 640 F.2d at 114.

B.  **Fourth Amendment**

Plaintiffs maintain that they are likely to succeed on the merits of their Fourth Amendment claim, arguing that the State Defendants have restrained them from moving freely throughout the areas where protests are occurring.[6]

---

[6]  The State Defendants do not address Plaintiffs' Fourth Amendment arguments directly, instead referencing their motion-to-dismiss briefing.  Because the State Defendants do not address the merits of Plaintiffs' Fourth Amendment unlawful-seizure and excessive-force claims in their motion-to-dismiss briefing, this reference is not helpful to the Court.

The Fourth Amendment protects individuals from seizure through the use of excessive force by a law enforcement officer.  *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989).  "A Fourth Amendment seizure occurs when an officer restrains the liberty of an individual through physical force or show of authority."  *Quraishi*, 986 F.3d at 839 (internal quotation marks omitted).  The reasonableness of law enforcement officers' actions is determined objectively based on the facts and circumstances confronting the officers, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

Plaintiffs contend that they were neither participating in nor suspected of participating in any crime.  Nor did they present a threat to the safety of the police or others, Plaintiffs maintain.  Nonetheless, the State Defendants ordered members of the press to disperse, threatened them, and subjected them to injury-inflicting force.  The State Defendants' tactics constitute unreasonable restraints on the movement of the press throughout the protests in violation of the Fourth Amendment, Plaintiffs argue, supporting this contention with declarations that detail examples of law enforcement limiting the press's movements and using physical force and other unreasonable demonstrations of authority.  The tactics described include the use of less-lethal projectiles, pepper spray, tear gas, batons, and sharply worded verbal commands and threats.

Plaintiffs have demonstrated a likelihood of success on the merits as to their Fourth Amendment claim.

## II.      Threat of Irreparable Harm

Plaintiffs contend that the State Defendants' violation of Plaintiffs' constitutional rights are immediate and ongoing.  The State Defendants counter that Plaintiffs fail to demonstrate irreparable harm because the protests are "tampering off."

Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  But to establish the need for injunctive relief to avoid irreparable harm, the movant "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (internal quotation marks omitted).  A mere "possibility of harm" is insufficient.  *Roudachevski*, 648 F.3d at 706.  In cases alleging constitutional harm, demonstrating a likelihood of success "ordinarily warrants a finding of irreparable harm."  *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

Previously, the Court denied Goyette's motion for a temporary restraining order because Goyette failed to establish irreparable harm.  At that time, the Court concluded that Goyette did not demonstrate that the alleged harm was "certain and of such imminence that there [was] a clear and present need for equitable relief."  *Goyette v. City of Minneapolis*, No. 20-cv-1302 (WMW/DTS), 2020 WL 3056705, at *3 (D. Minn. June 9, 2020).  The harm is no longer speculative or a mere possibility.  Rather, the protests have

continued and the harm exists. Moreover, the threat of imminent future interactions between the State Defendants and members of the press persists.

Several factors demonstrate the clear and present need for equitable relief: (1) the State Defendants' repeated conduct in contravention of Plaintiffs' constitutional rights; (2) the ongoing protests in connection with the Derek Chauvin trial and the recent death of Daunte Wright; and (3) Plaintiffs' intention to continue its press coverage of the protests. In light of the events that have occurred over the last year, demonstrations and protests likely will continue as the criminal trial of Derek Chauvin concludes and an investigation into the death of Daunte Wright continues. If the press cannot document these ongoing events of public importance, Plaintiffs' First Amendment rights will be irreparably harmed. *See Elrod*, 427 U.S. at 373.

Accordingly, absent a temporary restraining order, a real and immediate threat of irreparable harm to Plaintiffs exists.

**III.   Balance of Harms**

The balance of harms weighs in favor of granting the temporary restraining order, Plaintiffs contend. The State Defendants disagree, arguing that the lack of precise allegations against the State Defendants belies Plaintiffs' contention.

When, as here, a plaintiff raises a legitimate constitutional question, the balance of hardships tips sharply in the plaintiff's favor. *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007). A well-tailored injunction that balances the freedom of the press with the government's ability to exercise its police power does not irreparably harm the government. *See Index Newspapers*, 977 F.3d at 835 (holding that the

15

government would not be irreparably harmed by a narrowly tailored injunction that, among other things, exempts journalists from general dispersal orders; allows officers to arrest anyone, including journalists, based on probable cause to believe a crime is being committed; and prevents journalists from interfering with the lawful activities of the officers).

Plaintiffs' motion contains specific allegations that are particularized as to the State Defendants. And, as addressed above, Plaintiffs have demonstrated both irreparable harm and a likelihood of success on the merits of their First and Fourth Amendment claims. For these reasons, the balance of harms tips sharply in Plaintiffs' favor. *See, e.g.*, *Cmty. House*, 490 F.3d at 1059; *see also Kersten v. City of Mandan*, 389 F. Supp. 3d 640, 647 (D.N.D. 2019) (finding that the balance of harms "generally favors the constitutionally-protected freedom of expression" (internal quotation marks omitted)).

Accordingly, the balance of harms weighs in favor of granting Plaintiffs a temporary restraining order.

### IV.    Public Interest

Plaintiffs contend that the public interest favors protecting the constitutional rights of members of the press. The State Defendants disagree, arguing that a temporary restraining order "is not in the public interest in times of chaotic unrest."

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (internal quotation marks omitted). "Abridgment of freedom of speech and of the press . . . impairs those opportunities for public education that are essential to effective exercise of

the power of correcting error through the processes of popular government." *Thornhill v. State of Alabama*, 310 U.S. 88, 95 (1940). "By reporting about the government, the media are 'surrogates for the public.'" *Index Newspapers*, 480 F. Supp. 3d at 1146 (quoting *Richmond Newspapers*, 448 U.S. at 573). As the American public has limited time and resources to devote to first-hand observation of government operations, the press is an indispensable resource in our constitutional democracy. *See id.* (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975)).

At stake here are Plaintiffs' First and Fourth Amendment rights, as well as the public's ability to learn about ongoing events of public importance. The potential harm arising from suppressing press coverage of the protests is great and the public interest favors protecting these First Amendment principles. *See Reno*, 154 F.3d at 288. Constitutional rights are not diminished during a period of "chaotic unrest." *See Ex parte Milligan*, 71 U.S. 2, 120–21 (1866) ("The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes . . . ., at all times, and under all circumstances."). "Democracies die behind closed doors." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002).

Accordingly, the public interest supports granting Plaintiffs a temporary restraining order.

## V.    Rule 65 Bond Requirement

Having concluded that a temporary restraining order is warranted, the Court next considers whether to require Plaintiffs to post a bond as security for the effects of the restraining order on the State Defendants.

A district court must expressly consider whether to require a bond, but a district court is not required to impose one. *See Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989). The bond requirement to secure injunctive relief "is a security device, not a limit on the damages the . . . defendants may obtain against [the plaintiff] if the facts warrant such an award." *Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997). Rule 65(c) of the Federal Rules of Civil Procedure provides, in pertinent part:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). While a district court has broad discretion in setting a bond, that discretion is abused if the district court acts with an improper purpose, fails to require an adequate bond, or fails to make the necessary findings in support of its decision. *See Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). Courts have concluded that a bond is not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment. *See, e.g.*, *Bukaka, Inc. v. County of Benton*, 852 F. Supp. 807, 813 (D. Minn. 1993).

The State Defendants have not objected to Plaintiffs' request for a waiver of Rule 65(c)'s security requirement or otherwise addressed this issue. *See, e.g.*, *Fantasysrus 2, L.L.C. v. City of E. Grand Forks*, 881 F. Supp. 2d 1024, 1033 (D. Minn. 2012) (waiving the security requirement when the government did not object to the movant's request for waiver); *Northshor Experience, Inc. v. Duluth,* 442 F. Supp. 2d 713, 723 (D. Minn. 2006)

(granting a waiver when the defendant had not objected or otherwise "addressed this issue or attempted to quantify any dollar amount of harm that it may face from a wrongly issued injunction").

Accordingly, the Court, in its discretion, waives the security requirement in this case.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.      Plaintiffs' motion for a temporary restraining order, (Dkt. 94), is **GRANTED**.

2.      Defendants Minnesota Department of Public Safety Commissioner John Harrington, in his individual and official capacity; Minnesota State Patrol Colonel Matthew Langer, in his individual and official capacity; and their agents, servants, employees and representatives ("State Defendants"), are hereby enjoined from:

> a.      arresting, threatening to arrest, or using physical force—including through use of flash bang grenades, non-lethal projectiles, riot batons, or any other means—directed against any person whom they know or reasonably should know is a Journalist (as defined Paragraph 4 below), *unless* the State Defendants have probable cause to believe that such individual has committed a crime.  For purposes of this Order, such persons shall not be required to disperse following the issuance of an order to disperse, and such persons shall not be subject to arrest for not dispersing following the issuance

of an order to disperse.  Such persons shall, however, remain bound by all other laws;

b.      using chemical agents directed against any person whom they know or reasonably should know is a Journalist, including but not limited to mace/oleoresin capsicum spray or mist/pepper spray/pepper gas, tear gas, skunk, inert smoke, pepper pellets, xylyl bromide, and similar substances, unless such Journalist presents an imminent threat of violence or bodily harm to persons or damage to property; and

c.      seizing any photographic equipment, audio- or videorecording equipment, or press passes from any person whom the State Defendants know or reasonably should know is a Journalist, or ordering such person to stop photographing, recording, or observing a protest, unless the State Defendants are lawfully seizing that person consistent with this Order. Except as expressly provided in Paragraph 3 below, the State Defendants must return any seized equipment or press passes immediately upon release of a person from custody.

3.      If any State Defendant, agent or employee of the State Defendants, or any person acting under the State Defendants' direction seizes property from a Journalist who is lawfully arrested consistent with this Order, such State Defendant shall, as soon thereafter as is reasonably possible, make a written list of seized property and shall provide a copy of that list to the Journalist.  If property seized in connection with the lawful arrest of a Journalist is needed for evidentiary purposes, the State Defendants shall promptly seek

a search warrant, subpoena, or other court order to authorize the continued seizure of such property. If such a search warrant, subpoena, or other court order is denied, or if property seized in connection with an arrest is not needed for evidentiary purposes, the State Defendants shall immediately return the seized property to its rightful possessor.

4.     To facilitate the State Defendants' identification of Journalists protected under this Order, the following shall be considered indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional or authorized press pass or wearing a professional or authorized press badge or other official press credentials or distinctive clothing that identifies the wearer as a member of the press. These indicia are not exclusive, and a person need not exhibit every indicium to be considered a Journalist under this Order. The State Defendants shall not be liable for unintentional violations of this Order in the case of an individual who does not carry or wear a press pass, badge, or other official press credential or distinctive clothing that identifies the wearer as a member of the press.

5.     The State Defendants are not precluded by the Order from issuing otherwise lawful crowd-dispersal orders. The State Defendants shall not be liable for violating this injunction if a Journalist is incidentally exposed to crowd-control devices after remaining in the area where such devices were deployed, in conjunction with the enforcement of an otherwise lawful dispersal order.

6.     To promote compliance with this Order, the State Defendants are ordered to provide copies of this Order, in either electronic or paper form, within 24 hours, to: (a) all employees, officers, and agents of the State Defendants currently deployed in Brooklyn

Center, Minnesota (or who later become deployed in Brooklyn Center, Minnesota while this Order is in force); and (b) all employees, officers, and agents of the State Defendants with any supervisory or command authority over any person in group (a) above.

7.     Plaintiffs need not provide any security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

8.     The Court authorizes mutual expedited discovery so that the parties can be fully prepared to present all relevant facts and legal issues at a preliminary injunction hearing.  The parties shall confer and propose to the Court a schedule for briefing and a hearing on whether the Court should issue a preliminary injunction against the State Defendants.

9.     This Order shall expire fourteen (14) days after entry, unless otherwise extended by stipulation of the parties or by further order of the Court.

Dated:  April 16, 2021                                    s/Wilhelmina M. Wright
                                                         Wilhelmina M. Wright
                                                         United States District Judge