UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jared Goyette, Craig Lassig, Katie Nelson, Tannen Maury, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals*, | Court File No. 20-cv-01302 (WMW/DTS) |
| Plaintiffs, | |
| v. | |
| City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; and John Does 1-4, *in their individual and official capacities*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUCTION AGAINST THE STATE DEFENDANTS AND ALL THOSE IN ACTIVE CONCERT OR PARTICIPATION WITH THEM**

## **INTRODUCTION**

The Court is by now well familiar with the facts upon which this action is based.

Following the deaths of George Floyd and Daunte Wright, Minneapolis and its neighboring

suburbs have been rocked by clashes between law enforcement officers and protesters

seeking to hold law enforcement to account for the killing of unarmed black men suspected

of committing minor offenses. Since May 2020, the Twin Cities metropolitan area has seen dozens of civilian protests, some of which have turned violent as police have met protesters with projectiles, chemical irritants, concussion grenades and other weapons. Journalists from around the world have attempted to document these scenes as the world watches, but instead found themselves the targets of abusive and unconstitutional law enforcement tactics.

Defendants were on notice of the unconstitutional behavior pervading their ranks even before Plaintiffs filed this lawsuit last June on behalf of the journalists who are being targeted, but they have done little to address the problem. Last month the killing of Daunte Wright reignited clashes between protesters and Defendants, who by then had begun working with other law enforcement agencies under the unified command of Operation Safety Net ("OSN"). Despite numerous public pronouncements decrying the targeting of journalists—including statements from the Governor himself—the attacks on journalists also resumed. These attacks demonstrated Defendants' failure to take this matter seriously, to adequately hold themselves accountable for the misconduct, and to sufficiently investigate and discipline the individuals responsible for it.

In response to the recent targeting of journalists, and based on particularized evidence that the State Troopers bore direct responsibility for a significant part of it, Plaintiffs sought a Temporary Restraining Order ("TRO") against Minnesota Department of Public Safety Commissioner John Harrington, Minnesota State Patrol Colonel Matthew Langer, and their agents, servants, employees, and representatives ("State Defendants"). The Court granted Plaintiffs' motion on April 21 and provided temporary relief, but the

TRO will soon expire, leaving Plaintiffs without the Court's protection when the unrest predictably resurfaces.

Plaintiffs respectfully submit that a preliminary injunction is necessary to ensure journalists are protected during the pendency of this lawsuit, and to remove the First Amendment chill created by Defendants' abuse. Despite overwhelming video, photographic and eye-witness accounts of repeated transgressions against journalists by State Troopers and other OSN participants acting in concert with them, the State Defendants have fervently disavowed any inappropriate conduct toward the media. Their refusal to acknowledge their own officers' behavior demonstrates that they have no plan to implement the kinds of effective disciplinary or other actions needed to prevent these violations from recurring. In light of State Defendants' failure to accept responsibility, continuing involvement from the Court is needed to ensure the misconduct will not recur. Plaintiffs should not have to seek relief from the Court on an emergency basis every time the simmering unrest boils over. In contrast, the State Defendants will suffer no harm if the TRO is converted into a preliminary injunction, since it merely mandates that they comply with the Constitution and what they acknowledge is the applicable law. Plaintiffs accordingly seek a preliminary injunction against the State Defendants and all others operating in active concert or participation with them, effective until this matter is resolved on the merits.

## FACTUAL BACKGROUND

**I.    Law Enforcement Agencies, Including the State Defendants, Targeted Journalists in the Wake of the Murder of George Floyd.**

As outlined in detail in Plaintiffs' June 2, 2020 motion for a temporary restraining order,[1] in the days that followed the death of George Floyd, civil unrest erupted in Minneapolis and the surrounding areas. Law enforcement and demonstrators had many violent confrontations as part of the government's efforts to regain order and control.  In addition, law enforcement forces, including the State Patrol, engaged in alarming, aggressive tactics to harm and intimidate members of the media providing on-the-scene coverage. Examples of this unconstitutional conduct by State Defendants included the arrests of WCCO videographer Tom Aviles and CNN reporter Omar Jimenez,[2] and targeting Los Angeles Times reporter Molly Hennessey-Fiske and photographer Carolyn Cole with rubber bullets and tear gassing them.[3]  State Troopers also deliberately targeted NBC photojournalist Ed Ou with pepper spray after he was hit and injured with an apparent concussion grenade.[4] The troopers then followed Mr. Ou and other reporters into an area where the reporters had sought shelter away from the protesters, and continued to attack them.[5]   Plaintiffs' June 2, 2020 motion also described numerous other incidents of

---

[1] Pls'. Mot. for a TRO, ECF No. 7.

[2] *Id*. at 7-8.

[3] *Id.* at 7-8, 10.

[4] Decl. of Ed Ou ("Ou Decl.") ¶¶ 11- 24, with attached photographs and video recording.

[5] *Id*.

unconstitutional conduct by members of the Minneapolis Police Department and law enforcement officers whose agency affiliations were not immediately apparent to the victims.[6]

## II.     Law Enforcement Agencies Join Forces in OSN.

To address the ongoing civil unrest in Minnesota following George Floyd's murder, and in anticipation of widespread protests during the trial of his killer, former police officer Derek Chauvin, authorities created OSN by joining the "Minneapolis Police, Metro Transit Police, Hennepin County Sheriff's Office, Ramsey County Sheriff's Office, the Minnesota State Patrol, the Minnesota National Guard, and other entities."[7] OSN is "an organized group of unified command."[8] The unified command of OSN placed state and local law enforcement side by side on the streets, working as one to respond to the protests by carrying out the command's "operational decisions."[9] OSN, in turn, is working closely with the East Metro Response Group—a parallel organization including the Sheriffs' Offices of Ramsey, Dakota and Washington Counties, the State Patrol, the Minnesota National Guard, and other entities—"to ensure a unified response."[10] Under OSN's "unified command,"

---

[6] ECF No. 7 at 5-18.

[7] *FAQs about Operation Safety Net*, Operation Safety Net, https://safetynet.mn.gov/Pages/frequently-asked-questions.aspx (last visited May 3, 2021).

[8] Decl. of Lieutenant Colonel Rochelle Schrofer ("Schrofer Dec."), ECF No. 104, ¶ 3; *see also* State Defs. Mem. in Opp'n to Pls'. Mot. for a TRO, ECF No. 102, at 7 (describing "the unified command of OSN").

[9] *FAQs about Operation Safety Net*, *supra* note 7.

[10] *Id.*

participating law enforcement agencies act in active concert and participation with one another.

### III.   OSN Targets the Media in Brooklyn Center.

When Daunte Wright was shot on April 11, 2021, in the midst of the Chauvin trial, protests arose around the Brooklyn Center police station. OSN took charge of the law enforcement response.[11] Although the protests were mostly peaceful, clashes between protesters and police erupted, and journalists from around the world were there to report the events. But following in the footsteps of many of its individual member-entities,[12] OSN continued the tradition of abuse and harassment towards journalists that characterized the response to the George Floyd protests in May and June 2020.

Most of the conflict occurred at night, after curfew orders requiring the public to go home came into effect. These orders included explicit exemptions allowing the media to remain on-site and continue reporting.[13] Despite the exemptions, OSN repeatedly singled

---

[11] *See, e.g.*, State Defs. Mem. in Opp'n to Pls'. Mot. for a TRO, ECF No. 102, at 3 ("OSN has provided law enforcement support near the Brooklyn Center Police Department . . ."); Schrofer Decl. ¶ 3, ECF. No. 104 (following the events of Sunday April 11, 2021, OSN "moved to 'Phase 3' of the plan which included the rapid escalation of law enforcement and National Guard resources").

[12] *See* Second Am. Compl. ("SAC"), ECF No. 53, at ¶¶ 37–104 (describing police misconduct during the protests in May-June 2020).

[13] *See* Order Granting Pls'. Mot. for a TRO, ECF No. 105, at 8 ("[B]oth parties acknowledge that the curfew orders exempt the press, which demonstrates that the state and local governments have concluded that press access to these events is both important and workable.").

out members of the media in dispersal orders broadcast to the crowd, which expressly commanded the media leave.[14]

The harassment of journalists in Brooklyn Center was not limited to dispersal orders. Journalists were threatened, physically grabbed, targeted with chemical irritants, shot with less-lethal rounds and concussion grenades, arrested and beaten.[15] A video journalist for the Star Tribune was injured so badly by a less-lethal round that he had to undergo surgery and was told he would be unable to pick up his camera again for six weeks.[16] In one instance, a State Patrol Captain rushed out of a police line, grabbed a New York Times reporter and pulled him aside while another officer held his hands behind his back and took his phone. When the reporter asked why, the officer said, "Because that's our strategy right now."[17] Another New York Times journalist was in a car with others surrounded by officers, who banged on the windows and doors with wooden sticks and

---

[14] *See, e.g.*, Mem. of Law in Supp. of Mot. for TRO, ECF No. 96, at 5-7, 10-11 (detailing numerous accounts from journalists of dispersal orders explicitly targeting the media); Decl. of Jared Goyette ("Goyette Decl."), ECF No. 97, ¶ 6 (explaining how a line of State Troopers began issuing orders through a bullhorn specifically aimed at journalists: "Media you need to disperse. Leave the area . . . ."); *see also* Decl. of Christopher Juhn ("Juhn Decl.") ¶¶ 3–4; Decl. of Christ Tuite ("Tuite Decl.") ¶ 3; Ou Decl. ¶ 26, with attached video recording.

[15] *See, e.g.*, Mem. of Law in Supp. of Mot. for TRO, ECF No. 96, at 6-11 (detailing incidents); ECF No. 97, Goyette Decl. ¶¶ 10-11; Decl. of Dulce Foster ("Foster Decl.") Ex. 1, April 17, 2021 letter from Leita Walker to Governor Tim Walz, Defendants Harrington and Langer, and Dept. of Corrections Commissioner Paul Schnell, at 3-8 (detailing incidents).

[16] *See* Mem. of Law in Supp. of Mot. for TRO, ECF No. 96, at 7-9 (describing injury suffered by Mark Vancleave).

[17] Foster Decl. Ex. 1, at 2.

yelled at them to get out. The driver was dragged out and arrested. The journalist was repeatedly hit by officers while he was still in the car, and the officers tried to break his camera.[18] These and many other incidents documented in Plaintiffs' TRO memorandum demonstrate that targeting the media was neither isolated nor a byproduct of the journalists' proximity to unruly protesters, but an intentional strategy designed to suppress reporting activity and prevent the public from holding police accountable for their actions.

Even after the TRO was issued, OSN engaged in authoritarian tactics designed to threaten and intimidate journalists who were covering the protests. Numerous journalists were rounded up and released only after having their faces and press credentials photographed and added to a database, while some, including WCCO reporter Reg Chapman, were forced to the ground on their stomachs.[19] State Defendants assert that they gathered this information in order to verify credentials, and claim that they stopped the practice "[a]fter receiving complaints and assurance that media would be identified with clear passes/badges/clothing."[20] This response fails to explain why it was necessary to force

---

[18] *Id.* at 3.

[19] WCCO – CBS Minnesota, *WCCO's Reg Chapman Reports Journalists Being Detained, IDs Checked*, YouTube (April 16, 2021), https://www.youtube.com/watch?v=YxH-2u7i-6w (video of WCCO reporter Reg Chapman taken from the ground); *see also* Adriana Rodriguez, *Police in Minnesota round up journalists covering protest, force them to the ground and take pictures of their faces*, USA Today (Apr. 17, 2021), https://www.usatoday.com/story/news/nation/2021/04/17/brooklyn-center-protests-police-round-up-journalists/7268057002; Juhn Decl. ¶ 6; Tuite Decl. ¶ 7.

[20] Foster Decl. Ex. 2, Resp. to Pls.' Expedited Disc. Req. to State Defs. (Set 1), Answer to Interrog. No. 5 ("Answer No. 5").

journalists onto their stomachs, and ignores the fact that most members of the media who were detained already were clearly identifiable as members of the press.[21] State Defendants assert that although the information has been loaded into MSP's Intrepid database, they have "no current plan for this data to be used in the future."[22] They offer no justification for collecting this data and no reassurance that the data has been segregated and secured.

And despite the TRO, OSN continued to threaten and assault reporters who were covering the protests. The picture below documents Agency France-Press photographer Elenore Sens and another photojournalist being pepper-sprayed at very close range by a member of OSN. The photo speaks for itself.[23]

---

[21] Juhn Decl. ¶ 2; Tuite Decl. ¶ 2.

[22] Foster Decl. Ex. 2, Answer No. 5.

[23] Alex Kent (@AlexKentTN), Twitter (Apr. 17, 2021, 12:25 a.m.), https://twitter.com/AlexKentTN/status/1383290508181590018. In an April 27, 2021 letter to Hennepin County Sheriff David Hutchinson, Department of Corrections Commissioner Paul Schnell identified the officer in this photo as a Hennepin County Sheriff's deputy. In the letter he noted, "it is difficult to imagine circumstances that would warrant the use of chemical irritant against these plainly obvious journalists." Tony Webster (@webster), Twitter (Apr. 28, 2021, 6:01 p.m.), https://twitter.com/webster/status/1387542610554744837.



Photojournalist Tim Evans covered the protests on the night of April 16 around 9:45 p.m.[24] He had a press credential attached to a lanyard around his neck and a large PRESS sticker on his backpack.[25]  His cameras were visible, and he was clearly taking photos and shouting "PRESS, PRESS!" when an officer sprayed him with a chemical irritant from 5-7 feet away before another officer tackled him to the ground and sat on his stomach.[26] Mr.

---

[24] Decl. of Timothy Evans ("Evans Decl."), ¶¶ 2-3. Mr. Evans prepared an initial declaration identifying the officers who assaulted him as State Troopers. At the time he prepared it, Mr. Evans believed the officers who assaulted him were troopers. He later learned from witnesses to the incident that one of the two officers who attacked him may have been from the Hennepin County Sheriff's Office. He is now uncertain to which agency the officers belong. *Id.* ¶ 11. This uncertainty underscores the difficulty of identifying government actors in protest situations and the importance of applying injunctive relief to all law enforcement officers who are acting in concert with each other.

[25] *Id.* at ¶ 4.

[26] *Id.*

Evans told him, "I'm press! I'm press!", but the officer said, "I don't care."[27] The officer pinned him to the ground, struck him in the face, told him to "shut the fuck up," ripped the lanyard containing his press credentials from his neck, and threw it in the dirt.[28] When Mr. Evans repeated that he was a member of the press, the officer responded, "Too bad, you should have left when you had the chance."[29] When he tried to explain that the press was exempt from the curfew, the officer said, "You're a liar. Shut the fuck up."[30] Mr. Evans attempted to make eye contact with another officer whom he hoped would help him and again said, "I'm press!," but the second officer said what sounded like, "Shut up."[31]  The second officer then hit Mr. Evans in the back of his helmet, smashed the left side of his face into the dirt, zip-tied him and left him on the curb after threatening to take his credentials.[32]

In some instances, journalists who were covering the Brooklyn Center protests appear to have been singled out for harassment because of their race. New York Times reporter Joshua McFadden suffered bruising after a group of officers surrounded his car,

---

[27] *Id.* at ¶ 5.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at ¶ 6.

[32] *Id.* at ¶ 7.

forced him out, and began beating him with batons and hitting his camera.[33] Mr. McFadden, who is Black, showed police his press credentials, but they refused to believe he was a journalist until a white photographer vouched for him.[34] Carolyn Sung, an Asian-American producer for CNN, was thrown to the ground and arrested by State Troopers while trying to comply with a dispersal order on April 13.[35] She repeatedly offered her press credentials, but the troopers zip-tied her hands behind her back.[36] When she complained that the ties were too tight, one of the troopers yelled at her, "Do you speak English?"[37] A security agent working for CNN at the time was briefly detained, but quickly released after showing his credentials.[38] Ms. Sung was arrested and transported to Hennepin County Jail, where she was booked and detained for several hours.[39]  During her detention, a law enforcement officer searched Sung, including by putting their hands underneath her underwear and

---

[33] Kellen Browning, *Minnesota Governor Calles Alleged Assaults on Journalists 'Chilling'*, N.Y. Times (Apr. 18, 2021), https://www.nytimes.com/2021/04/18/business/minnesota-journalists-assault-protests.html.

[34] *Id.*

[35] Foster Decl. Ex. 1, at 2-3.

[36] *Id.*

[37] *Id.* at 3.

[38] *Id.*

[39] *Id.*

bra.[40] Officers also required Sung to provide her fingerprints, submit to an electronic body scan, and remove her clothing and put on an orange jump suit.[41]

      Although the State Defendants did not act alone, there is ample evidence that State Troopers participated in the targeting of journalists during the protests in Brooklyn Center. Ms. Sung identified State Troopers as the officers who assaulted and arrested her.[42] Plaintiff Jared Goyette heard State Troopers single out the media in their dispersal orders, and saw them fire less-lethal rounds towards members of the media who were clearly labeled as members of the press and standing apart from protesters.[43] Carlos Gonzales, a photojournalist for the Star Tribune, recorded himself being pepper-sprayed by State Troopers while he was photographing the events.[44] The State Troopers were directly involved in rounding up clearly identified journalists and photographing their faces and credentials on the night of April 16.[45] A trooper grabbed photographer Chris Tuite as he

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Goyette Decl., ECF No. 97, ¶¶ 6, 10.

[44] *See* Mem. of Law in Supp. of Mot. for TRO, ECF No. 96, at 6 (describing the attack on Carlos Gonzales).

[45] Foster Decl. Ex. 2, Answer No. 5 ("MSP's [Minnesota State Patrol] Operational Reinforcement Team [] took photographs of persons claiming to be members of the media . . . ."); Juhn Decl. ¶ 6 (describing the bullet-proof vest he wore to Brooklyn Center); Tuite Decl. ¶ 7 (describing the gas mask and helmet he brought to the protests); Foster Decl. Ex. 1, at 2 (explaining that a journalist was protected by his gas mask when an officer aimed a chemical irritant at him from 4-5 feet away).

tried to leave in response to a dispersal order directed at the press.[46] The trooper pulled him by the hood of his jacket, ripped his clothes, and screamed that he was "under arrest."[47] Additional troopers grabbed him by the arm and threatened him with pepper spray.[48] The State Defendants' categorical denial of complicity in the attacks on journalists strains credulity in the face of this evidence.

## IV.    The Continuing Abuse Has Chilled Protected Speech.

The impact of the threats, harassment, detentions, arrests, beatings, property damage, attacks with chemical agents, concussion grenades and lethal projectiles, and other abuses hurled at journalists by State Defendants and other OSN participants is real, significant, and enduring. Despite the abuse, some dedicated reporters have persisted in their coverage of the events. But this perseverance has come at a real cost.

Reporter Mark Vancleave was forced to leave the scene of the protests and cease reporting to have surgery for his injuries.[49] Photographer Linda Tirado was permanently blinded in one eye.[50] Photojournalist Tim Evans ceased covering the protests after he was

---

[46] Tuite Decl. ¶¶ 3-6.

[47] *Id.*

[48] *Id.*

[49] *See* Mem. of Law in Supp. of Mot. for TRO, ECF No. 96, at 7-9.

[50] Linda Tirado, *I came the Minneapolis protests to cover police aggression. Then I became the victim of it.*, NBCnews.com (June 1, 2020), https://www.nbcnews.com/think/opinion/i-came-cover-aggression-minneapolis-then-i-became-victim-it-ncna1221241.

assaulted, detained and forced to leave the area.[51] In an effort to protect themselves from law enforcement, journalists must wear bulletproof vests, helmets, goggles and gas masks when reporting protest activity in Minnesota.[52]  These protective measures inhibit journalists' ability to see, observe, and record.

Photojournalist Ed Ou is a veteran reporter with years of experience covering the Arab Spring and other volatile events in the Middle East. Despite years of experience reporting protests under authoritarian regimes, after State Troopers assaulted and pepper-sprayed him during the George Floyd protests in 2020, he wrestles with the constant fear of being attacked by law enforcement. NBC, his employer at the time of the assault, was so concerned about the continuing safety risks that it ordered all of its reporters in the field in Minneapolis to leave the protests and go back to their hotel rooms. Mr. Ou's fear is persistent and significant, making it difficult for him to do his job. He avoided the protest site during the protests at Brooklyn Center and instead covered the events from a private home across the street, where he felt safer.  Sadly, even that refuge proved temporary, as law enforcement interfered with his reporting and threatened him through an open window in the home.[53]

---

[51] Evans Decl. ¶¶ 8-9.

[52] *See* Juhn Decl. ¶ 2; Tuite Decl. ¶ 7; Evans Decl. ¶¶ 5-6.

[53] Ou Decl. ¶¶ 20, 22-23, 25-28.

Governor Walz has publicly acknowledged that the assaults on the media are "chilling" stating, "Apologies are not enough; it just cannot happen."[54] Although Defendant Harrington reports directly to the Governor, the State Defendants continue to deny any responsibility whatsoever for their role in causing the pain and anguish these journalists suffered and inhibiting journalists from doing their jobs.

## V.   OSN Is a Continuing Concern.

Derek Chauvin was convicted on April 20, 2021 for the murder of George Floyd. Following his conviction, the protests have quieted—at least for the time being. OSN has responded by scaling back its operations, but it has not disbanded. On April 22, 2021, OSN (@MinnesotaOSN) tweeted "#OperationSafetyNet Update: We are in Phase four of OSN. This includes scaling back on resources with the ability to quickly increase them if needed." The thread went on to explain, quoting Defendant Langer:

> "We are moving into phase four, so we're actively demobilizing in a strategic way. At the same time, we certainly have resources available as we always do. For sure through to the weekend and into the foreseeable future to make sure we're ready in the event that something comes up, and at the same time, very hopeful that the last few nights are indicative of the future for Minnesota," says @MnDPS_MSP Col. Langer.[55]

Although OSN is currently quiet, it remains on alert and is prepared to rapidly escalate next time protests erupt. State Defendants plainly anticipate that demonstrations will at some point resume and require swift law enforcement action. There is no other

---

[54] Browning, *supra* note 34.

[55] Minnesota OSN (@MinnesotaOSN), Twitter (Apr. 22, 2021, 12:28 p.m.), https://twitter.com/MinnesotaOSN/status/1385284488486215680.

explanation for maintaining a centralized command of at least six law enforcement agencies organized and ready to respond.[56]

## VI.   The Civil Unrest Is Far From Over.

Since last May there have been dozens of protests in the Twin Cities metropolitan area covered by journalists. These protests ranged from massive demonstrations met with a huge police presence, such as those immediately following George Floyd's murder,[57] to peaceful gatherings such as a community block party opposing a temporary headquarters for the 3rd Precinct police station.[58] In June, July, and August of 2020, there were at least

---

[56] It remains unclear how many and which law enforcement agencies were, are or will be acting in active concert and participation with OSN. Plaintiffs served an expedited interrogatory asking State Defendants to identify "every agency participating in Operation Safety Net." Foster Decl. Ex. 5, Resp. to Pls.' Expedited Disc. Req. to State Defs. (Set 2), Interrogatory No. 2. State Defendants' response was limited to those agencies "formally listed [as] a part of OSN." *Id.* State Defendants' response did not include, for example, the Brooklyn Center Police Department or the Nebraska or Ohio State Patrols, despite OSN having made public statements suggesting that these agencies were also involved. *See id.*; Minnesota OSN (@MinnesotaOSN), Twitter (Apr. 19, 2021, 8:52 p.m.), https://twitter.com/MinnesotaOSN/status/1384324142338646021 (indicating that the Ohio and Nebraska state patrol would be sending additional officers to assist and that those officers "will report" to the Minnesota State Patrol); MN Operation Safety Net, *News Conference: April 17, 2021 –Briefing Update #1* (12:20 a.m.) (Apr. 17, 2021) https://www.youtube.com/watch?v=cQSN9kAUwb4 (streaming live OSN press briefing, including comments from the interim chief of the Brooklyn Center Police Department). Plaintiffs have brought this discovery deficiency to State Defendants' attention, but it has not yet been cured.

[57] *See* Jeff Wagner, *'It's Real Ugly': Protesters Clash With Minneapolis Police After George Floyd's Death*, CBSN Minnesota (May 26, 2020, 11:32 p.m.), https://minnesota.cbslocal.com/2020/05/26/hundreds-of-protesters-march-in-minneapolis-after-george-floyds-deadly-encounter-with-police/ (reporting "[t]here was chaos and destruction in Minneapolis [the] night [of May 26, 2020] as police officers and protesters clashed over the death of George Floyd[]").

[58] Brandt Williams, *Minneapolis stops pursuit of a temporary 3rd Precinct space in S. Mpls*, MPR News (Sept. 16, 2020, 11:53 p.m.),

13 protests in the Twin Cities—an average of one per week.[59] Protests continued into the

https://www.mprnews.org/story/2020/09/16/minneapolis-stops-pursuit-of-temporary-3rd-precinct-space.

[59] *See, e.g.*, Unicorn Riot, LIVE: Minneapolis March Demanding MPD is Defunded, YouTube (June 6, 2020), https://www.youtube.com/watch?v=GeyVfLtAcvU (streaming June 6, 2020 protest); Kristi Belcamino, *Protesters tear down Christopher Columbus statue on Minnesota Capitol grounds*, TwinCities.com, (June 10, 2020, 6:20 p.m.), https://www.twincities.com/2020/06/10/protesters-tear-down-christopher-columbus-statue-on-minnesota-capitol-grounds/ (reporting on June 10, 2020 protest); Unicorn Riot, *Thousands March for Breonna Taylor in Minneapolis*, YouTube (July 2, 2020), https://www.youtube.com/watch?v=_TxaAwmIrZY (covering June 26, 2020 and July 2, 2020 protests demanding charges for officers who shot Breonna Taylor); *Remembrance of Philando Castile Rally*, Facebook: Events, https://www.facebook.com/events/2380248172276518/ (advertising July 6, 2020 Remembrance of Philando Castile Rally); *Protesters gather at Governor's Residence demanding another special session*, KSTP (June 24, 2020, 7:57 p.m.), https://kstp.com/minnesota-news/protesters-gather-at-governors-residence-demanding-another-special-session/5770782/?cat=12157 (reporting on protests outside the Governor's residence); Becky Z. Dernbach, *Minnesota's Oromo community demands justice after musician and activist Hachalu Hundessa is killed in Ethiopia*, Sahan Journal (June 30, 2020 11:33 p.m.), https://www.mprnews.org/story/2020/06/30/mn-oromo-community-demands-justice-after-hachalu-hundessa-is-killed-in-ethiopia (covering two hundred person protest at the Minnesota State Capitol to demand justice for Hachalu Hundessa); Callan Gray & KSTP, *Protesters call for resignation of Minneapolis Police Union boss Bob Kroll*, KSTP.com (June 12, 2020, 9:45 p.m.), https://kstp.com/minnesota-news/protesters-call-for-resignation-of-minneapolis-police-union-boss-bob-kroll-june-12-2020/5758778 (covering June 12, 2020 protest of Bob Kroll); Unicorn Riot, *Protest from outside the house of Bob Kroll, President of Minneapolis Police Union*, YouTube (Aug. 15, 2020), https://www.youtube.com/watch?v=GsEeYFDlKXc (covering August 15, 2020 protest of Bob Kroll); *Protesters demand justice for Elijah McClain*, Star Tribune, (July 18, 2020), https://www.startribune.com/protesters-demand-justice-for-elijah-mcclain/571821261/ (reporting on protest of the death of Elijah McClain); Hannah Flood and FOX 9 Staff, *Minneapolis Police: Group vandalized MPD precinct building, shot fireworks at officers*, FOX9 (August 16, 2020), https://www.fox9.com/news/minneapolis-police-group-vandalized-mpd-precinct-building-shot-fireworks-at-officers (covering protest); Unicorn Riot, *Minneapolis – 'Justice for Jacob Blake' Solidarity Rally*, YouTube (Aug. 24, 2020), https://www.youtube.com/watch?v=47j6Lc-OB28 (streaming live protest at Hennepin County Government Center); Unicorn Riot, *Protest in Downtown Minneapolis*, YouTube (Aug. 26. 2020),

fall and winter[60] and resumed in early 2021 with the trial of Derek Chauvin[61] and the fatal

---

https://www.youtube.com/watch?app=desktop&v=ava1HJ4qIlg (live streaming protest in downtown Minneapolis).

[60] *See, e.g.*, Unicorn Riot, *[LIVE] 'Stop Sterilizing Immigrant Women' Protest in Minneapolis*, YouTube (Sept. 20, 2020), https://www.youtube.com/watch?v=N91IT3VmtOc (streaming live September 20, 2020 protest); David Griswold, *Protesters march in south Minneapolis after former Minneapolis officer Derek Chauvin posts bond* (October 7, 2020, 8:15 p.m.), https://www.kare11.com/article/news/local/protesters-march-in-south-minneapolis-after-former-minneapolis-officer-derek-chauvin-posts-bond/89-8339b702-ecb3-44bf-8b63-1fb3a6b4a0bc (reporting on October 7, 2020 protest); Unicorn Riot, *[LIVE] 4 Year Anniversary March for Elisa Gomez in Minneapolis – Part 2*, YouTube (October 11, 2020), https://www.youtube.com/watch?v=l348EFPkWnc (streaming live protest march for Elisa Gomez); *14 arrested in late night Minneapolis protest*, Star Tribune (November 4, 2020), https://www.startribune.com/14-arrested-in-late-night-minneapolis-protest/572967392/ (reporting on election related gathering); Unicorn Riot, *Police Crash Election Night 2020 Mobile Dance Party in Minneapolis*, YouTube (Nov. 8, 2020), https://www.youtube.com/watch?v=wbazMOfZ1nE (documenting election night march); Kim Hyatt, *Hundreds march in protest of Minneapolis police killing*, Star Tribune (Jan. 3, 2021), https://www.startribune.com/hundreds-march-in-protest-of-minneapolis-police-killing/600006494 (reporting on protest march); Alex Chhith, *Five face riot charges after New Years eve protest in downtown Minneapolis*, Star Tribune (Dec. 31, 2020), https://www.startribune.com/five-face-riot-charges-after-new-year-s-eve-protest-in-downtown-minneapolis/600006758/ (covering protest on New Year's Eve); Katy Read, *Fresh frustration fuels Minneapolis march for racial justice*. Star Tribune (January 9, 2021), https://www.startribune.com/fresh-frustration-fuels-minneapolis-march-for-racial-justice/600008785/ (reporting on racial justice protest).

[61] KARE Staff, *Ahead of Chauvin trial, silent marchers demonstrate in Minneapolis*, Star Tribune (March 7, 2021, 10:13 p.m.), https://www.kare11.com/article/news/local/minneapolis-silent-march-justice-george-floyd-before-chauvin-trial/89-77d4d71f-91fe-4832-9d93-904c0b72d188 (reporting on "'I Can't Breathe' Silent March For Justice" protest); Zoe Jackson, *Peaceful protesters march in Minneapolis as Derek Chauvin in trial in George Floyd's death slowed by legal wrangling*, Star Tribune (March 9, 2021), https://www.startribune.com/peaceful-protesters-march-in-minneapolis-as-derek-chauvin-trial-in-george-floyd-s-death-slowed-by-le/600031760/; Susan Su, *Prayer service on the eve of Derek Chauvin trial urges peace, unity and justice*, Star Tribune (March 29, 2021), https://www.startribune.com/prayer-service-on-eve-of-derek-chauvin-trial-urges-peace-unity-and-justice/600039717/; KARE Staff, *Minneapolis demonstrators call for justice; Chauvin jury wraps for night without verdict*, Kare11 (April 19, 2021, 8:48 p.m.),

police shooting of Daunte Wright by former Brooklyn Center police officer Kim Potter.[62]

The unrest sparked by Mr. Floyd's death shows no signs of abating. In just the next four months, the metropolitan area will see Kim Potter's next court appearance (May 17, 2021),[63] Derek Chauvin's sentencing (June 25, 2021),[64] and the trial of J. Alexander Kueng, Thomas Lane, and Tou Thao—the three officers charged along with Derek Chauvin in connection with George Floyd's murder (August 23, 2021).[65] Federal civil rights indictments of Chauvin, Kueng, Lane and Thao, and related criminal proceedings, are also anticipated.[66]

---

https://www.kare11.com/article/news/local/george-floyd/live-updates-demonstrators-march-in-minneapolis-as-chauvin-verdict-awaited/89-e50dc06b-0717-4f0b-aa4b-a377dab0b87f.

[62] Unicorn Riot, *Protests Over Daunte Wright Killing Defy MN Police Curfew*, YouTube (Apr. 12, 2021), https://www.youtube.com/watch?v=obOjtnT1fDs (reporting on protests).

[63] Tori B. Powell, *Kim Potter, ex-officer charged in Daunte Wright's death, makes first court appearance*, CBS News (April 16, 2021, 7:32 a.m.), https://www.cbsnews.com/news/kim-potter-daunte-wright-killing-court-appearance/.

[64] *Derek Chauvin's Sentencing Rescheduled For June 25*, CBSN Minnesota (April 27, 2021, 12:16 p.m.), https://minnesota.cbslocal.com/2021/04/27/derek-chauvins-sentencing-rescheduled-for-june-25/.

[65] Eric Ferkenhoff and Grace Hauck, *'A harder case to prove': What Derek Chauvin's guilty verdict means for three other officers charged in George Floyd's death*, USA Today (Apr. 22, 2021, 1:15 p.m.), https://www.usatoday.com/story/news/nation/2021/04/21/derek-chauvin-trial-verdict-meaning-cops-charged-floyds-death/7318558002/.

[66] Andy Mannix, *Feds plan to indict Chauvin, 3 other officers on civil rights charges*, StarTribune (Apr. 28, 2021), https://www.startribune.com/feds-plan-to-indict-chauvin-other-three-ex-officers-on-civil-rights-charges/600051374/.

These are only the potential flash points that we know about. On the day Derek Chauvin was convicted, there were six fatal police shootings across the United States.[67] While none of these led to large protests in Minnesota, they easily could have, given past responses to other out-of-state police involved deaths.[68] If the past year has any lesson, it is that there is a near certainty that unrest arising from police violence against people of color will revisit the Twin Cities.

## VII.   The State Defendants Have Failed to Mitigate the Threat of Imminent Harm.

State Defendants have consistently failed to take their First Amendment obligations seriously. In connection with this Motion, Plaintiffs asked them to produce all training materials used from May 1, 2020 to the present concerning interactions with journalists, compliance with the First Amendment, or similar topics. State Defendants disclosed only two documents:[69] one line in a four-page General Order (the "General Order") dated March 9, 2021,[70] and a 7-minute Media Relations Video (the "Video").[71] The General Order states "MSP [Minnesota State Patrol] respects the rights of the media to cover First Amendment

---

[67] Alanna Durkin Richer and Lindsay Whitehurst, *1 verdict, then 6 police killings across America in 24 hours*, Associated Press (Apr. 24, 2021), https://apnews.com/article/columbus-shootings-death-of-george-floyd-racial-injustice-arrests-89cc1cbfd8d7e452c4b4670e319cdfa9.

[68] *See, e.g.*, *Protesters demand justice for Elijah McClain*, *supra* note 59 (reporting on protest for Elijah McClain, who died after Colorado police restrained him in a chokehold); Unicorn Riot, Thousands March for Breonna Taylor in Minneapolis, YouTube (July 2, 2020), https://www.youtube.com/watch?v=_TxaAwmIrZY (reporting on protests demanding charges for officers who shot Breonna Taylor in her Kentucky apartment).

[69] *See* Foster Decl. Ex. 2, Resp. to Expedited Req. for Production of Docs. No. 1.

[70] *See* Foster Decl. Ex. 3, General Order 21-10-013, STATEDEF0000204.

[71] *See* Foster Decl. Ex. 4, STATEDEF0000208.

21

activity and shall never intentionally target them for dispersal or enforcement action based on their media status."[72] State Defendants plainly failed to adequately train their troopers on this policy because they blatantly ignored it only weeks after the General Order was issued when they broadcast dispersal orders expressly instructing media to disperse at protests in Brooklyn Center or face arrest.[73]

The video also presents policies that State Defendants disregard. For example, Lt. Gordon Shank instructs viewers that they should always communicate with members of the media "with respect."[74] State Troopers pulled Mr. Tuite by the hood of his jacket, ripped his clothes, screamed that he was "under arrest," and threatened him with pepper spray.[75] Another trooper hurled a racial slur at Ms. Sung as she was being arrested, despite showing her press credentials.[76] No reasonable person would view the treatment of reporters during these incidents as "respectful."

State Defendants claim that very recently they have started "discussions . . . for addressing concerns [about the treatment of law enforcement during the Daunte Wright

---

[72] *See* Foster Decl. Ex. 3, STATEDEF0000204–207.

[73] *See* Goyette Decl., ECF No. 97, ¶ 6 (describing dispersal orders issued by State Troopers on April 13, 2021: "Media you need to disperse. Leave the area. Vacate to the north. … Media, disperse."); ECF No. 96, at 6 ("Minnesota State Patrol Officers are moving in from the side and ordering people in Brooklyn Center to leave. … They're also specifically ordering news media to leave."); Juhn Decl. ¶¶ 3-4; Tuite Decl. ¶ 3.

[74] *See* Foster Decl. Ex. 4, STATEDEF0000208, at 1:36. It is presently unclear how the video was used, or who may have actually seen it.

[75] Tuite Decl. ¶¶ 3-6.

[76] Foster Decl. Ex. 1, at 2-3.

protests] and developing best practices for moving forward."[77] Details about these discussions are sparse and the promises are too little too late, coming only after the Court forced the State's hand by issuing the TRO. "Discussions" and toothless policies fall far short of ensuring Plaintiffs' constitutional rights will not be violated in the absence of Court supervision.  The State Defendants' track record shows they cannot be relied upon to enforce their own policies regarding the media and the First Amendment. They do not deserve the benefit of the doubt.

## **LEGAL ARGUMENT**

## I.    **Legal Standard.**

A preliminary injunction is based on consideration of the *Dataphase* factors, the same factors this Court thoroughly considered when it issued the TRO: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that the preliminary injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

## II.    **This Court Should Promptly Issue a Preliminary Injunction.**

### A. The *Dataphase* **Factors Require Granting a Preliminary Injunction.**

In its April 16, 2021 Order, the Court explained carefully and thoroughly that all four *Dataphase* factors favor injunctive relief in this case.[78] The Court's analysis remains

---

[77] Foster Decl. Ex. 5, Resp. to Pls.' Expedited Disc. Req. to State Defs. (Set 2), Answer to Interrog. No. 1.

[78] Order Granting Pls'. Mot. for a TRO, ECF No. 105.

sound. Indeed, in light of the facts developed since Plaintiffs moved for the TRO, the *Dataphase* factor favors the Plaintiffs even more strongly than they did when this Court issued the TRO.

### B. Irreparable Harm.

The key factor for the Court's consideration at this stage is the threat of irreparable harm. Plaintiffs' need for this Court's protection extends beyond May 7, 2021. State Defendants' ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Especially where, as here, Plaintiffs have shown a likelihood of success on the merits. *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). ("In cases alleging constitutional harm, demonstrating a likelihood of success "ordinarily warrants a finding of irreparable harm.").

This is not a mere "possibility of harm." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). Plaintiffs' constitutional rights have been violated. That protests are not currently underway does not diminish the importance of Plaintiffs' constitutional protections or the imminence of the threatened harm. *See Phillips v. Crown Cent. Petroleum Corp.*, 602 F.2d 616, 630 (4th Cir. 1979) ("A future injury of uncertain date and incalculable magnitude is irreparable harm, and protection from such an injury is a legitimate end of injunctive relief." (citation omitted)); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff is likely to suffer

irreparable harm before a decision on the merits can be rendered." (internal quotation and citation omitted)); *Index Newspapers LLC v. Portland*, 480 F. Supp. 3d 1120, 1149-54 (D. Or. 2020) (recognizing imminent threat of irreparable harm despite the fact that defendants had voluntarily agreed to change tactics and there were no active orders for the deployment of defendants' forces, where defendants had engaged in "the commission of past illegal conduct, [which] is highly suggestive of the likelihood of future violations" (internal quotation and citation omitted)). Plaintiffs anticipate that the State Defendants will argue there is no imminent threat of irreparable harm because they claim to have stopped targeting journalists. Given that the State Defendants engaged in illegal conduct during the recent Daunte Wright protests and yet continue to fervently disavow responsibility for that misconduct, the credibility of this defense is questionable. Regardless, "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

As the Court recently held, journalists have been targeted by law enforcement and their protected First Amendment activity chilled by physical and verbal abuse.[79] While performing their duties, journalists have been severely injured with chemical agents and less-lethal projectiles, detained, arrested, dispersed, threatened, pushed, and had their equipment and credentials unlawfully taken by police.[80]

---

[79] Order Granting Pls'. Mot. for a TRO, ECF No. 105, at 12.

[80] *See* ECF No. 53, ¶¶ 37-104 (describing the same); *see also* Mathew Ingram, *Journalism under siege in Minnesota*, Columbia Journalism Review (Apr. 20, 2021),

Despite knowing that this conduct was illegal, Defendants showed no sign of relenting until April 17, the day after the Court granted the TRO.[81] Even after the TRO was issued, State Troopers and their OSN partners continued to violate the First and Fourth Amendments—detaining journalists to photograph their faces, ordering identifiable journalists to their knees or to lie prone on the ground, and assaulting them.[82]

Journalists require the Court's continued protection. The threat of imminent future interactions between the State Defendants and members of the press persists beyond May 7, 2021 when the order extending the TRO expires.[83] In the next four months, at least four

---

https://www.cjr.org/the_media_today/journalism-under-siege-in-minnesota.php (investigating instances of law enforcement targeting journalists).

[81] *See* Foster Decl., Ex. 6, Email sent by Liz Kramer, Minnesota Solicitor General, to Patricia Beety at League of Minnesota Cities (STATEDEF0000004) ("This TRO, while issued against DPS/MSP, is a declaration of what the law is in Minnesota more broadly, and therefore all OSN and law-enforcement partners must comply with it.").) The Minneapolis Police Department ("MPD") has known for years that such actions are illegal because they were told so by the U.S. Department of Justice in 2017. *See* Office of Community Oriented Policing Services, US. Department of Justice, and the Police Foundation, *Maintaining First Amendment Rights and Public Safety in North Minneapolis* (2017), https://www.policefoundation.org/wp-content/uploads/2017/03/Maintaining-First-Amendment-Rights-and-Public-Safety-in-North-Minneapolis.pdf (last visited May 3, 2021). The Department of Justice recently announced that they will conduct another investigation into MPD's conduct, less than five years after the first. *DOJ to Investigate Minneapolis Police Over Possible Patterns of Excessive Force*, NPR, https://www.npr.org/sections/trial-over-killing-of-george-floyd/2021/04/21/989446758/doj-to-investigate-minneapolis-police-for-possible-patterns-of-excessive-force. This ongoing pattern of unconstitutional behavior has continued, showing either no interest in self-regulating the behaviors or no ability to do so.

[82] WCCO – CBS Minnesota, *supra* note 19; Rodriguez, *supra* note 19; Juhn Decl. ¶ 6; Tuite Decl. ¶ 7; Evans Decl. ¶¶ 4-5.

[83] ECF No. 117.

events will likely lead to significant community reaction in the metro area. Journalists must be able to safely report on the May 17, 2021 court hearing for Kim Potter, the former police officer who fatally shot Daunte Wright; the June 25, 2021 sentencing of Derek Chauvin for the murder of George Floyd; the August 23, 2021 trial of former police officers Tou Thao, Thomas Lane and J. Alexander Kueng for their role in George Floyd's murder; and the prosecution of all four former Minneapolis police officers by the U.S. Attorney for violation of federal civil rights.

And there will undoubtedly be future protests stemming from currently unknowable, but not unpredictable, local and national events. Indeed, as courts have long recognized, "[d]emonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate." *See, e.g.*, *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996) (citation omitted) (recognizing further that "the proper response to potential and actual violence is for the government to ensure an adequate police presence, . . . and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct"). Although no one can accurately predict the exact timing of the next time police will create a deadly escalation during a routine traffic stop or other everyday occurrence that will trigger more protests and further mistreatment of journalists by law enforcement, it is certain and, as recent national events have unfortunately demonstrated, imminently likely to occur. If Court protection lapses before this matter is resolved on the merits, journalists, including Plaintiffs, will be forced to choose between risking harm at the hands of law enforcement

27

or diminishing their coverage and exercising their First Amendment rights to safely report on critically important developments as they happen. In addition to this chilling effect, a lapse in the Court's protection will also multiply and complicate these proceedings by forcing Plaintiffs to wait until they are predictably attacked by law enforcement then bringing new and substantially identical motions for injunctive relief on an ongoing basis, all the while enduring further harm as the Court considers their motions. Journalists covering these history-making events must be free to do so without engaging in a perilous game of constitutional whack-a-mole against law enforcement every time a new protest event occurs. Converting the TRO into a preliminary injunction until the matter is fully and finally resolved will protect journalists from physical and emotional harm, reduce the harm of the chill already caused by State Defendants' unconstitutional conduct, and conserve judicial resources.

### C. Plaintiffs Satisfy the Remaining *Dataphase* Factors.

As this Court correctly concluded in the TRO, Plaintiffs are likely to succeed on the merits, and the balance of harms and public interest weighs in favor of preliminary injunctive relief.

### 1. Likelihood of Success on the Merits.

As the Court has already held, Plaintiffs are likely to prevail on the merits of both their First and Fourth Amendment claims.[84] State Defendants consistently chilled protected

---

[84] Order Granting Pls'. Mot. for a TRO, ECF No. 105, at 12, 13.

activity by failing to narrowly tailor their dispersal commands prior to the Order.[85] In addition, State Defendants have unreasonably restrained press movements repeatedly for the past year, and have targeted journalists with broad dispersal orders, pepper spray, less-lethal projectiles, and verbal and physical intimidation.[86] As a result of State Defendants' unconstitutional conduct, "members of the press have sustained severe injuries at the hands of law enforcement in recent days. These severe injuries include bruising and at least one injury requiring surgery."[87] The harassment, threats, use of chemical agents and less-lethal weapons, threatening, detention, and arrests, undertaken by State Defendants against Plaintiffs, has chilled free press activity in persons of ordinary firmness and unreasonably restrained "the movement of the press throughout the protests in violation of the Fourth Amendment."[88]

State Defendants have only recently begun complying with their constitutional obligations. They are doing so solely *because of* the Order. And they are doing so despite

---

[85] *Id.* at 8-9. State Defendants argued in their opposition to the TRO that the dispersal orders were lawful under Minn. Stat. § 609.705. This broad reading of the statute must be rejected. The statute provides only that police may order the dispersal of "participants" who intend to or do in fact "disturb or threaten the public peace." Minn. Stat. § 609.705(c). State Defendants offered no evidence that any journalists were "participants" causing unrest. Therefore, the State Defendants' suggested application of this statute to on-duty journalists—who observe and report protest activities—must be rejected. Indeed, the State Defendants' suggestion that Goyette, who did not and did not intend to disturb or threaten the public peace, committed a state crime may well represent an unconstitutional application of the criminal statute.

[86] Order Granting Pls'. Mot. for a TRO, ECF No. 105, at 12.

[87] *Id.* at 9.

[88] *Id.* at 11, 13.

admitting that the Order captures what the law requires.[89] State Defendants did not begin to follow the law until *after* the Order was issued.[90] And State Defendants have encouraged law enforcement to follow the Order without designating anyone in leadership to ensure the Order is followed or to discipline those who continue to violate the law, making it unlikely that State Defendants will hold those responsible accountable on their own.[91]

Journalists have had to take protective measures to continue doing their jobs. In addition to their press credentials—which should be enough to protect them—they wear bulletproof vests, helmets, and gas masks to protect them from chemical and less-lethal weapons used against them by law enforcement.[92] Journalists have watched law enforcement violate the law and their own policies time and time again, injuring numerous colleagues and chilling their protected First Amendment activity with impunity.[93] The protections of the Order have only begun to work; to be truly effective, they must continue. Without the Court's protection, journalists will continue to be chilled in the exercise of their fundamental Constitutional rights.

### 2. Balance of the Harms.

---

[89] Foster Decl., Ex. 6, STATEDEF0000004 ("This TRO, while issued against DPS/MSP, is a declaration of what the law is in Minnesota . . . .")

[90] Foster Decl., Ex. 6, STATEDEF0000003-4.

[91] *See* Foster Decl., Ex. 2, Resp. to Expedited Req. for Production of Docs. No. 1.

[92] *See* Juhn Decl. ¶ 2; Tuite Decl., ¶ 7.

[93] Ingram, *supra* note 80; Foster Decl., Ex. 1 (compiling incidents of police violence against the media in Minnesota).

The balance of harms continues to "tip[] sharply" in Plaintiffs' favor because of the "legitimate constitutional question" Plaintiffs have raised.[94] And, as the Court has previously noted, "[a] well-tailored injunction that balances the freedom of the press with the government's ability to exercise its police power does not irreparably harm the government."[95] The proposed injunction simply precludes the State Defendants from targeting clearly identifiable journalists with weapons, arrest, threats or assault and preventing them from engaging in lawful First Amendment activity. There is no harm to State Defendants in simply being required to follow the law. Because Plaintiffs continue to face the threat of irreparable harm and they are likely to succeed on the merits of their First and Fourth Amendment claims, the balance of harms continues to weigh in Plaintiffs' favor.

### 3. The Public Interest.

The public interest is served by converting the TRO into a preliminary injunction. As the Court noted in the Order, "it is always in the public interest to prevent the violation of a party's constitutional rights."[96] As "surrogates for the public," the media's role is of paramount importance. *Index Newspapers LLC*, 480 F. Supp. 3d at 1146. The public has a heightened interest in the conduct of law enforcement, particularly in Minnesota where

---

[94] Order Granting Pls'. Mot. for a TRO, ECF No. 105, at 15 (citing *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007)).

[95] *Id.* at 15 (citing *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 835 (9th Cir. 2020)).

[96] *Id.* at 16 (citing *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998)).

there are ongoing state and federal proceedings related to deaths of George Floyd and Daunte Wright and there is ongoing, substantial scrutiny of law enforcement conduct by the federal government.

As set forth above, all four *Dataphase* factors weigh strongly in favor of converting the TRO into a preliminary injunction lasting through trial on the merits in this case.

## III.   All OSN Agencies and Personnel Are in Active Concert or Participation with State Defendants and Should Be Bound by a Preliminary Injunction.

Injunctive relief under Rule 65 is binding on the parties, their "officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation with" any listed person who receive actual notice of the relief. Fed. R. Civ. Pro. 65(d)(2). "The essence of this rule is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Indep. Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 920 (8th Cir. 1998) (holding that a party cannot avoid contempt by carrying out prohibited acts through nonparties) (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14, (1945)) (internal quotations omitted)*; see also Scalia v. Paragon Contractors Corp.*, 796 F. App'x 962, 965–66, 969 (10th Cir. 2019) (finding active concert or participation and enforcing the injunction against a nonparty where the two entities were operated by the same persons, out of the same buildings, and shared numerous employees). The Supreme Court has noted that this provision of Rule 65 "is derived from the commonlaw [*sic*] doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in

interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co.*, 324 U.S. at 14.

Here, OSN is "an organized group of unified command" of state and local law enforcement.[97] OSN leadership has created a single plan for operations and directs the activities of all personnel, including State Defendants.[98] All OSN personnel are "subject to [its] control" and are, therefore, acting in concert with State Defendants. *Regal Knitwear Co.*, 324 U.S. at 14. The State Defendants themselves have acknowledged that all OSN operations are subject to the TRO, stating: "This TRO, while issued against DPS/MSP, is a declaration of what the law is in Minnesota more broadly, and therefore all OSN and law-enforcement partners must comply with it."[99]

Accordingly, Plaintiffs ask that the Court issue injunctive relief that specifically states that it applies to all OSN agencies and personnel and any others who are in active concert or participation with State Defendants.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court convert the TRO into a preliminary injunction lasting through trial on the merits in this case and clarify the Order to specifically state that it applies to all OSN agencies and personnel and any

---

[97] *See* ECF No. 104, ¶ 3.

[98] Operation Safety Net, *supra* note 7.

[99] Foster Decl., Ex. 6, STATEDEF0000004 (emphasis added).

others who are in active concert or participation with the State Defendants in accordance with Rule 65.

Dated: May 5, 2021

/s/ Dulce J. Foster
Dulce J. Foster (#0285419)
Karen Schanfield (#0096350)
Pari I. McGarraugh (#0395524)
Emily McAdam (#0400898)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street
Suite 4000
Minneapolis, MN 55402-1425
Minneapolis, MN 55402-1425
(612) 492-7000
dfoster@fredlaw.com
kschanfield@fredlaw.com
pmcgarraugh@fredlaw.com
emcadam@fredlaw.com

*Attorneys for Plaintiffs Jared Goyette, Craig Lassig, Katie Nelson, and Tannen Maury*

Dated: May 5, 2021

/s/ Kevin C. Riach
Kevin C. Riach (#0389277)
**THE LAW OFFICE OF KEVIN C. RIACH, PLLC**
P.O. Box 270815
Vadnais Heights, MN  55127
Telephone: (612) 203-8555
kevin@riachdefense.com

Adam W. Hansen (#0391704)
Colin Reeves (*pro hac vice*)
**APOLLO LAW LLC**
333 Washington Avenue North, Suite 300
Minneapolis, MN 55401
Telephone: 612.927.2969
adam@apollo-law.com

Teresa Nelson (#269736)
**AMERICAN CIVIL LIBERTIES UNION**

**OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Telephone: 651.529.1692
tnelson@aclu-mn.org

*Attorneys for All Plaintiffs*