UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jared Goyette, Craig Lassig, Katie Nelson, Tannen Maury, Stephen Maturen, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals*,

        Plaintiffs,

   v.

City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; and John Does 1-4, *in their individual and official capacities*,

        Defendants.

Court File No. 20-cv-01302
(WMW/DTS)

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST THE STATE DEFENDANTS AND ALL THOSE IN ACTIVE CONCERT OR PARTICIPATION WITH THEM**

---

**INTRODUCTION**

This Court's Order granting a TRO determined that Plaintiffs are likely to succeed on the merits of their claims—and for good reason. Over the past year, from the George Floyd protests to the Daunte Wright protests (the "April Protests"), Plaintiffs have documented dozens of unconstitutional arrests, assaults, and incidents of intimidation

against journalists by Defendants.  The evidence is incontrovertible.  Moreover, the recurrence of law enforcement violence against journalists at the April Protests, one year after the George Floyd protests, shows that State Defendants learned nothing over the past year.  Instead of demonstrating respect for the First Amendment, it was open season on journalists again.

Incredibly, in the face of this incontrovertible evidence, and the local, national, and international condemnation it inspired, Defendants[1] deny any wrongdoing and refuse to accept responsibility for what everyone witnessed at the April Protests: thuggish, unconstitutional attacks by law enforcement—including Defendants' agents—on journalists. Defendants' continuing refusal to hold themselves and their employees accountable lies at the core of this lawsuit and compels the conclusion that injunctive relief is necessary.

Rather than accepting even a modicum of responsibility, Defendants seek to deflect blame, hiding behind the smokescreen of Operation Safety Net ("OSN").  Defendants misconstrue not only the law, but the relief that Plaintiffs seek. Plaintiffs seek to bind other law enforcement agencies only to the extent they act together with Defendants. Defendants' heavy emphasis on their lack of "control" over OSN's unified command structure demonstrates the need for a preliminary injunction and clear notice to parties

---

[1]  For purposes of this memorandum, "Defendants" refers to State Defendants Commissioner Harrington, Colonel Langer, and their agents, servants, employees, and representatives.  The City Defendants also opposed the motion for preliminary injunction, but because many of their arguments overlap with those of the State Defendants, Plaintiffs focus on the State Defendants' response.

acting in active concert and participation with Defendants. They too should be bound to the terms of the Preliminary Injunction under Federal Rule of Civil Procedure 65(d)(2) ("Rule 65(d)(2)").

Having already established that they are likely to succeed on the merits, that they face imminent and irreparable harm, and that the balance of harms and public interest weigh heavily in their favor, Plaintiffs respectfully request that this Court grant the Motion for Preliminary Injunction (the "Motion") and adopt the Proposed Order submitted by Plaintiffs.

## ARGUMENT

Defendants make numerous arguments opposing the Motion—some relate to the *Dataphase* factors and the application of Rule 65(d)(2), others to Plaintiffs' alleged lack of standing and Defendants' newfound concerns over the claims raised, the parties, and their counsel. These arguments all lack merit.

## I. The Motion Arises from the Same Continuing Pattern of Unconstitutional Misconduct Alleged in the SAC.

The relief Plaintiffs request in this Motion is sufficiently related to the claims in the Second Amended Complaint ("SAC") to support injunctive relief. Defendants contend otherwise, arguing that because Plaintiffs' Preliminary Injunction lacks claim-to-claim parity with the SAC, injunctive relief is not appropriate. But the cases Defendants cite do not require such claim-to-claim parity.

In *Devose v. Herrington*, a prisoner's complaint alleged violations of his Eighth Amendment right to adequate medical treatment. 42 F.3d 470, 471 (8th Cir. 1994). He

3

then sought to enjoin defendants from retaliating against him for filing the claim.  *Id.* Because the prisoner's retaliation claim raised issues entirely distinct from the Eighth Amendment claim, the Eighth Circuit affirmed the denial of injunctive relief.  *Id.* Defendants' two other cases are analogous to *Devose.  See Redd v. Lutgen*, Civ. No. 11-3046, 2013 WL 5757864, at *3–4 (N.D. Iowa Oct. 23, 2013) (prisoner filed suit alleging violations of his First Amendment rights and sought injunctive relief based on claim of retaliation); *Shannon v. Williams*, No. 11-3404, 2012 WL 1657526, at *1 (D. Minn. Apr. 20, 2012) (denying preliminary injunction based on allegation that placement in intensive supervised release violated constitutional rights when underlying lawsuit was based on separate and distinct claim alleging an improper parole hold and prevention of release on bond).

By contrast, this Motion is not based on legal theories that are separate and distinct from, or unrelated to Plaintiffs' claims.  Rather, both the SAC and the Motion are based on Defendants' continuing pattern of targeting the media during protests in violation of Plaintiffs' First, Fourth and Fourteenth Amendment rights.  The Motion is sufficiently related to the SAC that the preliminary injunction is appropriate.[2]

---

[2] Defendants' newfound concern about an alleged disconnect between the parties and their legal representatives also lacks merit.  Plaintiffs are individual members of the media and a union representing such individuals. As Defendants state, Leita Walker represents "a group that include[s] the Star Tribune Media Company, Reuters, Associated Press, Washington Post, and New York Times," i.e. media **organizations**; not individual members of the media.  (*See* ECF No. 143, at 23.)  While this distinction should end the inquiry, the Court and the parties will have a full opportunity to analyze the propriety of the proposed class representatives and class counsel at the class certification stage.

**II.     Plaintiffs' Motion Seeks Only to Apply the Plain Language of Rule 65(d)(2).**

Defendants' due process and personal jurisdiction arguments misapply the legal authorities and misconstrue the scope of Plaintiffs' requested relief.

**A.     Under Rule 65(d)(2), Any Injunction Binds Others Working in Active Concert or Participation with Defendants.**

The plain language of Rule 65(d)(2) establishes that "every injunction" binds not only the parties and the parties' officers, agents, servants, employees, and attorneys, but also "other persons who are in active concert or participation with" the parties ("Active Concert Parties").  Fed. R. Civ. P. 65(d)(2).  Binding Active Concert Parties prevents "defendants [from nullifying] a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Indep. Fed'n of Flight Attendants v. Coopers*, 134 F.3d 917, 920 (8th Cir. 1998) (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).  Here, for example, the SAC did not name the Hennepin County Sheriff as a defendant, but the Sheriff's deputies worked alongside Defendants during the April Protests and likely participated in the assault on photojournalist Tim Evans. (May 30, 2021, Second Declaration of Chris Tuite ("Second Tuite Decl.") ¶¶ 4, 9; Am. Evans Decl. ¶¶ 4-5, 7, 11, ECF No. 126.)[3]

---

[3] Defendants make much of the fact that Mr. Evans corrected his declaration upon discovering that one of his two attackers likely was not a State Trooper, but Mr. Evans's confusion illustrates precisely why the "active concert" provision exists: Law enforcement agencies working together should not be able to skirt compliance with a reasonable injunction simply by pointing fingers at each other and taking advantage of a complainant's

Rule 65(d)(2) provides a mechanism to protect the due process rights of Active Concert Parties. An alleged Active Concert Party may be punished for violating a preliminary injunction only if it receives actual notice of the injunction by personal service or otherwise[4] and the Court has determined, via briefing or a hearing on the matter, that the party violated the terms of the injunction while in active concert or participation with Defendants. *See, e.g.*, *Herrlein v. Kanakis*, 526 F.2d 252, 253–54 (7th Cir. 1975); Fed. R. Civ. P. 65(d)(2). In other words, Defendants' due process and personal jurisdiction concerns have been or will be satisfactorily addressed before the City Defendants or a non-party are held in contempt of any preliminary injunction.

### B.    Other Agencies Participating in OSN Are Active Concert Parties.

Under Rule 62(d)(2), Active Concert Parties include not just those over whom Defendants have control, but also those whose "interests closely 'identify with' those of" Defendants. *Thompson v. Freeman*, 648 F.2d 1144, 1147 (8th Cir. 1981). Plaintiffs' proposed preliminary injunction recognizes that law enforcement agencies participating in OSN are Active Concert Parties.

Defendants assert that OSN "is a coordinated effort to ensure the safety of the public." (ECF No. 143, at 5.) In addition to the law enforcement agencies Defendants

---

inability to identify which of the agencies present is involved in a particular instance of misconduct.

[4] Plaintiffs have personally served the Motion and its supporting materials on all of the OSN entities, as well as the Ohio State Patrol and the Nebraska State Patrol, both of which were called in by OSN to assist in the April Protests. (*See* June 1, 2021, Declaration of Emily M. McAdam Ex. A.)

name, through OSN, "other law enforcement agencies can be called upon to provide mutual aid during times of mass unrest." (*Id.*)  The legal effect of this coordination and shared purpose is that when entities are participating in OSN deployments, their interests closely align with Defendants' interests and those entities are in active concert and participation with Defendants.  Plaintiffs simply ask the Court to recognize that those in "active concert or participation" with Defendants, including entities whose interests closely align with those of Defendants when acting pursuant to OSN's unified command, should consider themselves bound by the preliminary injunction.  (*See* ECF No. 130, at 2.)

### III.    The *Dataphase* Factors Are Satisfied.

#### A.    Plaintiffs Plainly Have Standing Because They Have Demonstrated Defendants' Unconstitutional Conduct.

Defendants' assertion that Plaintiffs lack standing to seek prospective relief fails for two reasons.  First, Defendants contend that Plaintiffs have presented evidence of only one incident involving unlawful conduct on Defendants' part that occurred in 2020.  (*See* ECF No. 143, at 15, 17–18, 30 *see* Ou Decl., ECF No. 123.)  This assertion not only rests on Defendants' mistaken argument that the Court may not consider news articles and social media posts because such evidence is inadmissible hearsay, but it is also false.   Plaintiffs' proffered evidence extends beyond the scores of news articles, photos and videos posted to social media, and letters of condemnation signed by practically every media organization of note in the country.  In addition to this mountain of "hearsay," Plaintiffs have submitted sworn declarations from people who witnessed or were subject to unlawful conduct on the part of State Troopers at the April Protests.  (*See, e.g.*, Juhn Decl., ECF No. 128; Am.

7

Evans Decl., EFC No. 126; Tuite Decl., ECF No. 127; Goyette Decl., ECF No. 97; Second Tuite Decl.)

Further, yet another federal lawsuit was filed against Defendants last week by two Los Angeles Times journalists who were assaulted by troopers during the George Floyd protests. *See Cole v. Dwyer et al.*, No. 21-cv-01282-PJS-HB (D. Minn. filed May 25, 2021). These incidents are described in the SAC and supported by declaration testimony. (*See* Cole Decl., ECF No. 31-2; Hennessy-Fiske Decl., ECF No. 31-3.) This new lawsuit not only alleges acts of unprovoked violence against these reporters, but also supports and confirms both the sworn declarations Plaintiffs submitted and the media reports of misconduct denigrated as "hearsay" by Defendants. *Cole v. Dwyer et al.*, No. 21-cv-01282-PJS-HB (D. Minn. filed May 25, 2021).

Moreover, even if Plaintiffs had not submitted numerous declarations, courts routinely award preliminary injunctive relief on "procedures that are less formal and evidence that is less complete than in a trial on the merits," including hearsay evidence. *See Mullins v. City of New York*, 626 F.3d 47, 51–52 (2d Cir. 2010) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390. 395 (1981), and citing six other Circuit Courts that have affirmed preliminary injunctions based on hearsay evidence). Indeed, Defendants themselves cite news articles. (*See* ECF No. 143, at 9–10 nn.10–13.) The Court should reject Defendants' suggestion that it ignore the uncontroverted news reports, images, and videos of Defendants' misconduct when it decides this Motion.

Second, Defendants' assertion that their violations of non-parties' constitutional rights are irrelevant to this Motion based on principles of standing is without merit.

8

Plaintiffs have demonstrated a "sustained pattern of conduct that resulted in numerous injuries to members of the press" such that they have standing to seek prospective relief. *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020). In addition to the unlawful actions Plaintiffs detail in the SAC (*see, e.g.*, SAC ¶¶ 21, 23, 25, 40–44, 57–64, 114–22, ECF No. 53), Plaintiffs' more recent sworn declarations describe Defendants' unlawful conduct at the April Protests. These allegations include that State Troopers issued unlawful dispersal orders to journalists and fired less-lethal rounds in the direction of journalists (Goyette Decl. ¶¶ 6, 10, ECF No. 97); that State Troopers barred journalists from documenting mass arrests (Tuite Decl. ¶ 4, ECF No. 127; Second Tuite Decl. ¶¶ 10–11); that a State Trooper threatened a journalist with arrest, grabbed and tore the journalist's jacket, and further threatened him (Tuite Decl. ¶¶ 5–6, ECF No. 127); that State Troopers were especially hostile and aggressive toward journalists as compared with other law enforcement agencies (Second Tuite Decl. ¶ 5); and that State Troopers forcefully removed journalists who were trying to comply with the dispersal order (despite it not lawfully applying to journalists, *see infra* section III.B) from a car and slammed one of them against it despite the journalist trying to present his press pass (Second Tuite Decl. ¶¶ 6–7). Finally, the harm caused by Defendants' assaults is not limited to the journalists who sustained physical injuries during the April Protests. Rather, every instance in which any journalist was sent home, avoided the crowd, or was otherwise deterred from covering the protests because of the chilling impact of Defendants' behavior reflects an injury to journalists' First Amendment rights. (*See, e.g.*, Ou Decl. ¶¶ 22–23, 25, ECF No. 123.)

9

Because Plaintiffs have demonstrated that Defendants have harmed them, Plaintiffs have standing to seek prospective relief.

**B.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

This Court has already recognized that Plaintiffs are likely to succeed on the merits of their First and Fourth Amendment claims.  (*See* ECF No. 105.)  Defendants' arguments do not change that analysis.

The thrust of Defendants' argument that they did not violate journalists' First and Fourth Amendment rights at the April Protests hinges on their assertion that Plaintiffs violated "undisputedly lawful" general dispersal orders after Defendants declared an unlawful assembly.  (*See* ECF No. 143, at 36.)  This argument is flawed because it ignores wide swathes of Plaintiffs' evidence documenting constitutional violations by Defendants as explained in Section III.A. above.  In addition, even if the only conduct at issue were the dispersal orders, Defendants have not demonstrated that the dispersal orders were lawfully directed at Plaintiffs, and the cases on which Defendants rely are readily distinguishable.

Under Minnesota law:

> When three or more persons assemble, each **participant** is guilty of unlawful assembly, which is a misdemeanor, if the assembly is:
>
> (1) with intent to commit any unlawful act by force; or
>
> (2) with intent to carry out any purpose in such manner as will disturb or threaten the public peace; or
>
> (3) without unlawful purpose, but the participants so conduct themselves in a disorderly manner as to disturb or threaten the public peace.

Minn. Stat. § 609.705 (emphasis added).  After an unlawful assembly has been declared, "[w]hoever **without lawful purpose** is present at the place of an unlawful assembly **and refuses to leave when so directed by a law enforcement officer** is guilty of a misdemeanor."  *Id.* § 609.715 (emphasis added).  The plain language of these statutes allows Defendants to issue dispersal orders directed at **participants** of an unlawful assembly, and allows Defendants to arrest anyone who, **without lawful purpose**, refuses to disperse.  Setting aside the dubious constitutionality of this statute, Defendants do not contend, nor could they, that Plaintiffs were participants in any alleged unlawful assembly.[5] **Plaintiffs documented the alleged unlawful assembly; they did not participate in it.**

Indeed, Defendants appear to recognize that journalists should not have been required to disperse. (*See* Dwyer Decl. ¶ 15, ECF No. 147 (describing unsuccessful attempt to implement system to identify journalists so they could be excepted from the dispersal order).)  And despite Defendants' attempted wrangling to expand the applicability of these laws to anyone part of a "unit" at an unlawful assembly, such a reading is clearly contradicted by the plain language of Minnesota's unlawful assembly statutes.  Moreover, Plaintiffs have submitted evidence that journalists were targeted even as they tried to comply with the dispersal orders.  (*See, e.g.*, Tuite Decl. ¶¶ 4–6, ECF No. 127 (describing being targeted and physically and verbally threatened by State Troopers as he tried to leave

---

[5] A "participant" is "one that participates" or "a person who is involved in an activity or event; a person who participates in an activity or event." *Participant*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/participant (last visited May 29, 2021).

as directed); Second Tuite Decl. ¶¶ 6–7 (describing being targeted by State Troopers as he tried to disperse from the April Protests).)  Because Plaintiffs were not participants in the alleged unlawful assembly who remained without lawful purpose after a dispersal order, Defendants' dispersal orders were not lawfully directed at Plaintiffs.[6]

None of the cases Defendants cite change this fact, and not because the cases do not involve members of the media, but because the cases involve state laws that are distinguishable on their face.  The state law at issue in *Cervantes v. San Diego Police Chief Shelley Zimmerman* established that "**every person** remaining at the place of any . . . unlawful assembly" after a dispersal order is guilty of a misdemeanor.  Cal. Penal Code § 409 (emphasis added); *see* No. 17-cv-01230-BAS-AHG, 2020 WL 5759752, at *7 (S.D. Cal. Sept. 28, 2020).  In *Wise v. City of Portland*, the statute allowed law enforcement to "go among the **persons**" present at an unlawful assembly and arrest anyone who did not disperse on command.  Or. Rev. Stat. § 131.675 (emphasis added); *see* 483 F. Supp. 3d 956, 968 (D. Or. 2021).  And in *Burbridge v. City of St. Louis, Missouri*, the applicable ordinance declared that "**every person present at [an unlawful assembly],** who shall not endeavor to prevent the commission or perpetration of such [acts on which the unlawful assembly was declared]" was guilty of a misdemeanor and subject to arrest.  St. Louis, Mo., Ordinance 15.52.010 (emphasis added); *see* 430 F. Supp. 3d 595, 610 (E.D. Mo. 2019).

---

[6] Defendants' reliance on Minn. Stat. § 169.02, subd. 2 is similarly misguided. (*See* ECF No. 143, at 36.)  It too only applies in situations when a peace officer gives a "**lawful** order or direction."  Minn. Stat. § 169.02, subd. 2 (emphasis added).

Moreover, Defendants' reliance on *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Circuit), is misguided. *Bernini* stands for the proposition that the Fourth Amendment is satisfied when law enforcement has grounds to believe all persons seized were part of a unit violating the law. *See* 665 F.3d at 1003–04. Defendants offer no evidence that law enforcement at the April Protests had grounds to believe that Plaintiffs and the other declarants were part of any "unit" allegedly violating the law. Indeed, Plaintiffs and the other declarants were all clearly identifiable as journalists. (*See* Goyette Decl. ¶ 4, ECF No. 97; Tuite Decl. ¶ 2, ECF No. 127; Am. Evans Decl. ¶ 2, ECF No. 126; Juhn Decl. ¶ 2, ECF No. 128.)

Despite Defendants' efforts to undermine the analysis in the April 16 Order, Plaintiffs respectfully submit that this Court has already correctly concluded that Plaintiffs are likely to succeed on the merits.

## C. Without the Court's Protection, Plaintiffs Face Imminent, Irreparable Harm.

Defendants do not appear to seriously dispute that Plaintiffs have established an imminent threat of irreparable harm. Instead, they attempt to shift blame for unlawful conduct onto other law enforcement agencies. (ECF No. 143, at 40–41.) Defendants also point to their effort with 21CP Solutions to "develop best practices and mutual understanding with members of the media." (*Id.* at 41.)[7] Defendants have not explained how the 21CP process is expected to result in accountability or discipline for those officers

---

[7] Defendants state that Plaintiffs were invited to participate in the 21CP process. They do not explain that Plaintiffs' participation would be in the form of completing a survey or that Plaintiffs' attorneys would be excluded from the process.

who were responsible for the assaults at issue here, and their blanket denials of wrongdoing strongly undermine any inference that this effort will succeed.[8] (*See, e.g.*, *id.* at 14, "State Defendants deny all such allegations of intentional misconduct from MSP troopers.") Despite nearly a year's time passing since the George Floyd protests and the filing of this lawsuit, the 21CP process appears to be in the early stages and is, at best, ill-defined. It does not reduce the threat of imminent, irreparable harm that Plaintiffs face if the Court denies a preliminary injunction through final judgment on the merits.[9]

> **D.    The Balance of Harms and Public Interest Weigh Heavily in Favor of Granting a Preliminary Injunction.**

As Plaintiffs set forth in their opening memorandum, the balance of harms and public interest continue to weigh heavily in favor of granting a preliminary injunction. (*See* ECF No. 120, at 30–31.) Defendants claim otherwise, alleging that the preliminary

---

[8] Defendants deny the egregious and well-documented allegations of the assaults against Ed Ou, but state that they have "not yet had an opportunity to investigate." (ECF No. 143, at 15.) Plaintiffs put Defendants on notice of Mr. Ou's mistreatment at Defendants' hands nearly a year ago in their pleadings, describing it in the Complaint (ECF No. 1, ¶ 56 (filed June 2, 2020)), the Amended Complaint (ECF No. 31, ¶¶ 43, 55, 71 (filed June 8, 2020)), and the Second Amended Complaint (ECF No. 53, ¶¶ 62, 75, 97 (filed July 30, 2020)). Defendants' failure to take any steps whatsoever to investigate Mr. Ou's mistreatment and serious injuries is a stark example of their refusal to take responsibility for their unconstitutional misconduct and hold responsible employees accountable.

[9] Plaintiffs again note that some of Defendants' unlawful conduct occurred *after* the TRO was issued. Defendants disingenuously contend that the situation on the ground on April 16, 2021, was already volatile at the time the TRO was granted around 8:30 p.m. (ECF No. 143, at 13.) This assertion is contradicted, however, by evidence submitted by both Plaintiffs and Defendants that an unlawful assembly was not declared, and dispersal orders not given, until around 10:00 p.m. (*See* Second Tuite Decl. ¶ 8–9; *see generally* Dwyer Decl. Ex. 3, ECF No. 148 (including multiple field reports documenting events beginning around 10:00 p.m.).)

injunction sought by Plaintiffs is unworkable and potentially dangerous. (ECF No. 143, at 18–19.) Defendants argue that they must be able to enforce lawful dispersal orders but fail to demonstrate how any of the dispersal orders at the April Protests were lawfully directed toward the media. (*See supra* section III.B.) Defendants also contend that the preliminary injunction would not be in the public interest because they need a way to quickly and clearly identify media during times of unrest, especially in light of some journalists' refusal to display media credentials and the "demonstrated instances of people falsely claiming to be media." (ECF No. 143, at 41.)

The Court should reject this argument for two reasons. First, the preliminary injunction sets forth a clear process by which to identify members of the media and would not apply when Defendants unintentionally violate the injunction due to an individual's failure to clearly identify themselves as a member of the media. (*See* ECF No. 130, at 4.) Second, although Plaintiffs do not condone people falsely claiming they are members of the media, Defendants have not demonstrated how the limited number of people who allegedly did so in any way hindered Defendants' ability to maintain or restore calm. Other than the use of foul language by one of these individuals, there is no evidence that any of them was involved in violent acts of any kind. (*See* Dwyer Decl. Ex. 3, ECF No. 148.)[10] What is more, Defendants' math on this point does not add up. Captain Dwyer, after stating that the crowd at the April Protests was at times close to 1,000 people, declared that

---

[10] By contrast, the SAC and the reports of the April Protests document numerous instances of Defendants using vulgar, obscene, and foul language *and* assaulting journalists.

"approximately 1/3 of the crowd on any given evening during the [April Protests] claimed media status." (*Compare* Dwyer Decl. ¶¶ 6, 8–10, ECF No. 147, *with id.* ¶ 21.) Yet, Defendants provide evidence of what appears to be only nine people who falsely claimed to be media during the April Protests; two of the reports appear to involve the same person and two are duplicates. (*Compare* Dwyer Decl. Ex. 3, at 11, ECF No. 148, *with id.* at 12; *see also id.* at 16, 17.) None would have been considered "clearly identifiable" under the TRO's criteria. Defendants have not provided evidence—beyond Dwyer's self-serving hyperbole—that this is actually a problem.

Furthermore, Defendants' insistence that media must have a uniform press credential is unworkable because it would hinder the ability of independent journalists and freelancers to do their jobs. (*See* Second Tuite Decl. ¶ 12.) And requiring journalists to obtain some sort of special credential from state or local authorities would interfere with the ability of all journalists to quickly respond to spontaneous or rapidly-developing protests or other matters of public concern. Any such requirement would also have an unconscionable chilling effect on journalists' ability to provide unbiased coverage of authorities who are in control of issuing credentials necessary to do their jobs.

Finally, it is unclear how possession of a uniform credential might have protected the journalists at issue here. The law enforcement officers policing the protests have demonstrated a propensity for ignoring or damaging formally issued press credentials when presented with them. (*See, e.g.*, Am. Evans Decl. ¶¶ 5, ECF No. 126 (describing how an officer ripped the lanyard with his press credential from his neck and threw it in the dirt).) In a lawsuit filed late last week, CNN security officer Michael Cooper described how State

16

Troopers arrested and detained him for approximately 20 hours during the Floyd Protests, despite the fact that he repeatedly notified the troopers he was press and was carrying both his CNN press credential and Illinois State Police credentials at the time. *Cooper v. Kelly, et al.*, No. 21-cv-01294-NEB-KMM (D. Minn. filed May 27, 2021). During the arrest the troopers grabbed him and knocked his identification from his hand.[11]  *Id.*  Requiring a uniform credential would give law enforcement the power to create potentially insurmountable roadblocks to journalists covering protest events and is not in the public interest for these reasons. Particularly given that the preliminary injunction Plaintiffs seek explicitly protects only those who are clearly identifiable as journalists based on common sense, a uniform credential is unnecessary.

The balance of harms and public interest continue to weigh heavily in favor of protecting Plaintiffs' First and Fourth Amendment rights, and a preliminary injunction is warranted.

## CONCLUSION

Based on the foregoing and their opening memorandum in support of the Motion, Plaintiffs respectfully request that the Court convert the TRO into a preliminary injunction lasting through the entry of final judgment resolving all of the claims on the merits.

---

[11] Pat Kelly, one of the troopers involved, stated in his patrol report that he found no credentials on Mr. Cooper when he arrested him. *See* Walsh, P., *Black CNN security officer jailed for 20 hours sues State Patrol over his arrest after George Floyd's death*, Star Tribune (June 1, 2021) https://www.startribune.com/black-cnn-security-officer-jailed-for-20-hours-sues-state-patrol-over-his-arrest-during-unrest-after/600063365/?refresh=true.

Dated: June 2, 2021

*/s/ Dulce Foster*

Dulce J. Foster (#0285419)
Karen G. Schanfield (#0096350)
Pari I. McGarraugh (#0395524)
Emily M. McAdam (#0400898)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000
dfoster@fredlaw.com
kschanfield@fredlaw.com
pmcgarraugh@fredlaw.com
emcadam@fredlaw.com
***Attorneys for Plaintiffs Goyette, Lassig, Maury, Maturen and Nelson***

Kevin C. Riach (#0389277)
**THE LAW OFFICE OF KEVIN C. RIACH, PLLC**
P.O. Box 270815
Vadnais Heights, MN  55127
Telephone: (612) 203-8555
kevin@riachdefense.com

Adam W. Hansen (#0391704)
Colin Reeves (*pro hac vice*)
**APOLLO LAW LLC**
333 Washington Avenue North, Suite 300
Minneapolis, MN 55401
Telephone: 612.927.2969
adam@apollo-law.com

Teresa Nelson (#0269736)
Isabella S. Nascimento (#0401408)
**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Telephone: 651.529.1692
tnelson@aclu-mn.org
inascimento@aclu-mn.org

18

*Attorneys for All Plaintiffs*