UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jared Goyette et al.,

                Plaintiffs,

   v.

City of Minneapolis et al.,

                Defendants.

Case No. 20-cv-1302 (WMW/DTS)


**ORDER GRANTING IN PART AND DENYING IN PART STATE DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANT KROLL'S MOTION TO DISMISS**

---

This matter is before the Court on Defendants' motions to dismiss. (Dkts. 54, 60.) Defendants Commissioner John Harrington and Colonel Matthew Langer, as respective leaders of the Minnesota Department of Public Safety and the Minnesota State Patrol (State Defendants), move to dismiss the second amended complaint (SAC). Defendant Minneapolis Police Lieutenant and President of the Police Officers Federation of Minneapolis Robert Kroll (Kroll) also moves to dismiss the SAC.[1] For the reasons addressed below, the Court grants in part and denies in part the State Defendants' motion to dismiss and denies Kroll's motion to dismiss.

---

[1] After the SAC was filed, Kroll retired from the Minneapolis Police Department in January 2021.

# BACKGROUND

## I.     Facts

The Individual Plaintiffs are journalists, photographers, and other members of the press who filed this lawsuit on behalf of themselves and other similarly situated individuals. Plaintiff Communications Workers of America (CWA) is an international labor union that represents news media workers.   Defendant John Harrington is the Minnesota Commissioner of Public Safety who has supervisory responsibility over the Minnesota State Patrol and its commander, Defendant Colonel Matthew Langer.   Defendant Robert Kroll was a Minneapolis Police Lieutenant and President of the Police Officers Federation of Minneapolis (Federation).

### A.     Protests

On May 25, 2020, George Floyd died as a result of an encounter with four officers of the Minneapolis Police Department (MPD).   Video of the encounter captured by bystanders shows the MPD officers placing Floyd in handcuffs and pinning him to the ground face down, while then-officer Derek Chauvin knelt on Floyd's neck.   Floyd and several bystanders pleaded with Officer Chauvin to change his position to allow Floyd to breathe.   Officer Chauvin refused and continued to kneel on Floyd's neck for several minutes after Floyd became unresponsive.   Video of the encounter circulated rapidly, and hundreds of citizens began protesting in Minneapolis and Saint Paul, as well as nationally and around the world.

Local, state, and federal law enforcement agencies created a Multi-Agency Command Center (MACC) to coordinate their "response to any unrest that develops following the death of George Floyd." Commissioner Harrington led the state of Minnesota's law enforcement response to the protest. The Minnesota State Patrol worked closely with the MPD in forming their plan for responding to the protests. And, throughout the protests, the MPD and the Minnesota State Patrol worked side-by-side when deploying riot-control tactics to control the protests.

On May 26, 2020, despite mostly peaceful demonstrations, protesters at the MPD's 3rd Precinct building vandalized police vehicles with graffiti and targeted the precinct building where the officers involved in Floyd's death were assigned. Law enforcement officers used foam projectiles and tear gas to repel some of the protestors. Again, on May 27, 2020, hundreds of people protested in Minneapolis. While covering the protests at the 3rd Precinct, Plaintiff Jared Goyette witnessed a projectile fired by the MPD officers near the precinct building hit a young male protester in the head. As Goyette documented bystanders assisting the injured protester, a projectile struck Goyette in the head. A moment later, a canister of tear gas landed nearby, making it impossible for Goyette to see. Goyette maintains that he was clearly identifiable as a member of the news media as he carried a large camera, monopod, and notebook. That same evening, an auto parts store near the 3rd Precinct building was set on fire, and other nearby stores were looted and vandalized. In total, the Minneapolis Fire Department responded to approximately 30 fires

related to the protests that evening, during which some fire trucks attempting to respond were hit with rocks and other projectiles.

On May 28, 2020, the MPD officers abandoned the 3rd Precinct building, which was set on fire by protesters. Because of safety concerns, the fire department was unable to respond to the 3rd Precinct building fire and other fires nearby. The Saint Paul Police Department also reported dozens of fires and more than 170 damaged or looted businesses in Saint Paul.

On May 29, 2020, Minnesota Governor Tim Walz announced that the state would restore order, calling on the resources of the Minnesota State Patrol, other state agencies, and the Minnesota National Guard. Governor Walz implemented an emergency executive order imposing a nighttime curfew in Minneapolis and Saint Paul. *See* Minn. Exec. Order No. 20-65 (May 29, 2020). All "members of the news media" were exempted from the curfew. *Id.* The curfew was disregarded by many, and individuals hiding among otherwise peaceful protesters continued to commit acts of looting, vandalism and arson.

The largest deployment of the Minnesota National Guard in state history was mobilized the following day to restore order, along with the Minnesota State Patrol and local law enforcement officers. They moved aggressively to disperse protesters who remained out after the curfew. On May 31, 2020, law enforcement officers arrested approximately 150 people near downtown Minneapolis for violating the curfew.

### B.    Kroll's Statements and Alleged Conspiracy

Plaintiffs allege that Kroll, as President of the Police Officers Federation of Minneapolis, exerted "outsize[d] influence in setting police policy, custom, and practice." After Kroll became the Federation President, he was released from his policing duties and assigned to work full-time as the Federation President while being paid by the City of Minneapolis.   Plaintiffs allege that the Federation's relationship with the MPD is so intertwined that the Federation and Kroll were able to influence the MPD's policies, customs, and practices.

According to Plaintiffs, Kroll's influence over the MPD was "widely known," and the Federation had more influence over police culture than any police chief in the history of the MPD.  Plaintiffs allege that Kroll's influence regarding the protests occurring after the death of George Floyd has contributed to the harm suffered by Plaintiffs.  Throughout the protests, Kroll continually expressed disdain for the City's elected leadership and stated that the Federation will "get order restored and safety resumed."  According to Plaintiffs, Kroll publicly stated that he spoke with state politicians and police leaders from across the country to share his detailed plan of action for controlling the protests.

Plaintiffs allege that Kroll implicitly and explicitly directed officers to use unnecessary force on the citizens of Minneapolis "by thwarting discipline and enabling a culture and practice of immunity from sanction for constitutional violations."  Kroll used his power as a law enforcement officer to cloak his policy goals in state power, Plaintiffs assert, and used the Federation's financial and political power to exert influence over the

MPD's customs and practices.  Plaintiffs contend that the MPD's unconstitutional policies, practices, and customs, which resulted in injuries to Plaintiffs, derive "at least in part from the acts done under the color of state law by Kroll."

## II.    Procedural History

On June 2, 2020, Plaintiffs commenced this putative class-action lawsuit against the State Defendants, Defendants City of Minneapolis and Minneapolis Chief of Police Medaria Arradondo (City Defendants), and Kroll.  The proposed class is defined as "[a]ll members of the news media, as the term is used in Emergency Executive Order 20-69, who are engaged in news gathering or reporting activities in Minnesota."[2]  All of Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983, alleging various constitutional violations, civil conspiracy and a failure to intervene.  Plaintiffs seek class certification, a permanent injunction, damages and attorneys' fees.

### A.    Plaintiffs' First Motion for a Temporary Restraining Order

On June 2, 2020, Goyette moved for a temporary restraining order to prevent the State Defendants from further violating the constitutional rights of the press.  The Court denied the motion without prejudice on June 9, 2020, because the protests had quelled and Goyette failed to demonstrate an imminent threat of harm.

---

[2]    Executive Order 20-69 does not define the term "members of the news media."

### B.    Plaintiffs' Second Motion for a Temporary Restraining Order

After the Court denied Plaintiffs' first motion for injunctive relief, additional protests commenced in Minnesota in connection with the trial of Derek Chauvin and the police-involved death of Daunte Wright. Plaintiffs filed a second motion for a temporary restraining order, arguing that the State Defendants continued to violate the constitutional rights of the members of the press who were covering the ongoing protests.

By early June 2020, the protests in Minnesota had quelled significantly. But, as the criminal prosecution of Derek Chauvin progressed in March and April 2021, additional protests occurred. And on April 11, 2021, a Brooklyn Center, Minnesota police officer shot and killed Daunte Wright, which led to more protests. Plaintiffs attest that, during these protests, many of the same violations of the press's constitutional rights resumed. Plaintiffs cite several examples, including the police firing rubber bullets at a videographer who was a safe distance from other protestors, orders from police directing the press to disperse despite the curfew orders expressly exempting the press, and various other acts that impeded the ability of the press to observe and report about the protests and law enforcement's interactions with protestors.

On April 14, 2021, Plaintiffs filed a second motion for a temporary restraining order. Specifically, Plaintiffs sought a temporary restraining order enjoining the State Defendants from taking the following actions against members of the press: (1) the use of any physical force, including but not limited to less-lethal projectiles; (2) the use of chemical agents, including, but not limited to, mace, pepper spray, and tear gas; and (3) seizing any

photographic equipment, audio- or videorecording equipment, or press passes from such individuals. On April 16, 2021, the Court granted Plaintiffs' second motion for a temporary restraining order based on Plaintiffs' demonstration of an imminent threat of irreparable harm due to the ongoing protests and the State Defendants' ongoing violations of Plaintiffs' constitutional rights. The parties later stipulated to extend the temporary restraining order until the Court rules on Plaintiffs' pending motion for a preliminary injunction.

### C.    Pending Motions to Dismiss

Presently before the Court are the State Defendants' and Kroll's motions to dismiss the claims against them.[3] The Court addresses each motion in turn.

### ANALYSIS

### I.    State Defendants' Motion to Dismiss

The State Defendants move to dismiss the SAC pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., on five alternative grounds: (1) Plaintiffs' official-capacity claims are barred by sovereign immunity, (2) Plaintiffs lack standing, (3) Plaintiffs' individual-capacity claims are barred by qualified immunity, (4) Plaintiffs fail to allege that the State Defendants were personally involved in the alleged conduct, and (5) Plaintiffs fail to state

---

[3]    The City Defendants filed a memorandum of law requesting dismissal without moving to dismiss, which is procedurally improper. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."); *see also* L.R. 7.1(c)(1). Neither the State Defendants' motion to dismiss nor Kroll's motion to dismiss addresses the City Defendants. The City Defendants' "Memorandum in Response to Defendants' Motion to Dismiss" is insufficient to independently seek dismissal on behalf of the City Defendants. Because the City Defendants have no motion to support their memorandum, the Court declines to address their memorandum of law.

a claim on which relief can be granted as to Plaintiffs' Fifth Amendment due-process and Fourteenth Amendment procedural-due-process claims (Count IV), civil-conspiracy claim (Count V), and failure-to-intervene claim (Count VI).

A defendant may challenge a plaintiff's complaint for lack of subject-matter jurisdiction either on its face or on the factual truthfulness of its averments. *See* Fed. R. Civ. P. 12(b)(1); *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). In a facial challenge, as presented here, the nonmoving party "receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

Under Rule 12(b)(6), a complaint must be dismissed if it fails to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must allege sufficient facts that, when accepted as true, state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When determining whether the complaint states such a claim, a district court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). The factual allegations need not be detailed, but they must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A plaintiff must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555.

Legal conclusions that are couched as factual allegations may be disregarded by the district court. *See Iqbal*, 556 U.S. at 678–79.

Because sovereign immunity and standing implicate the Court's subject-matter jurisdiction, the Court addresses arguments pertaining to these matters first.

### A.    Sovereign Immunity

The State Defendants argue that Plaintiffs' Section 1983 damages claims against Langer and Harrington in their official capacities are barred by sovereign immunity. Plaintiffs do not dispute this argument. The Eleventh Amendment to the United States Constitution bars damages claims against state officials in their official capacities. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Therefore, Plaintiffs may not seek damages against the State Defendants in their official capacities. Accordingly, to the extent that the SAC seeks damages against the State Defendants in their official capacities, those claims are barred.

Although Plaintiffs cannot seek damages against the State Defendants in their official capacities, Plaintiffs can bring official-capacity claims for prospective declaratory or injunctive relief to enjoin a state official from continuing violations of federal law. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011). The State Defendants concede this point, but they challenge whether Plaintiffs have standing to bring official-capacity claims for declaratory or injunctive relief.

B.    Standing

1.    Individual Plaintiffs' Standing

The State Defendants argue that the Individual Plaintiffs (Goyette, Craig Lassig, Tannen Maury, Stephen Maturen and Katie Nelson) lack standing to bring claims against the State Defendants because those Individual Plaintiffs do not specifically allege that the State Defendants injured them.  Plaintiffs contend that they have standing because the Individual Plaintiffs have alleged a causal connection between their injury and the acts of the State Defendants.

To demonstrate Article III standing, a plaintiff must establish (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992).  The State Defendants' arguments implicate the injury-in-fact element of standing, which requires an injury to be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). An allegation of future injury may suffice if the threatened injury is "certainly impending, or there is a substantial risk that the harm will occur." *Id.* (internal quotation marks omitted). The State Defendants' arguments also implicate the causal connection element of standing, which requires an injury to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. *Lujan*, 504 U.S. at 561.

With respect to the injury-in-fact element of standing, Plaintiffs' risk of future injury is not speculative.  Plaintiffs allege recurring instances of the State Defendants' ongoing, sustained pattern of conduct that resulted in numerous injuries to members of the press occurring before the date the SAC was filed.  That conduct continued through the date that this Court entered a temporary restraining order.  The temporary restraining order details the allegations of the State Defendants' ongoing violations of the constitutional rights of the press.  The allegations are supported by the SAC, Plaintiffs' declarations and photographic evidence.  A recurring-injury case, like this one, is not speculative when actual repeated incidents are documented.  *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020).

The nature of Plaintiffs' injuries centers on protecting the press's First Amendment rights.  "A chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not based on a fear of future injury that itself is too speculative to confer standing."  *Id.* (internal quotation marks omitted).  The chill caused by the State Defendants' alleged policy and custom of targeting the press presents both an imminent and ongoing injury.  *See id.* at 826–27.  The harm is neither speculative nor a mere possibility.  Rather, the protests have continued intermittently from May 2020 through at least April 2021.  Moreover, the threat of imminent future interactions between the State Defendants and members of the press persists.

With respect to the causal-connection element of standing, Maury, Maturen, and Nelson plausibly allege that they were injured by the State Defendants.  Maury and

Maturen allege that they were arrested by the Minnesota State Patrol. Nelson and Shum allege that the State Defendants fired tear gas and projectiles at them.[4] Furthermore, all of the Individual Plaintiffs allege a civil-conspiracy claim against the State Defendants. As addressed below in Part I.F. of this Order, Plaintiffs plausibly allege a civil-conspiracy claim against the State Defendants, including injuries that are fairly traceable to the challenged actions of the State Defendants. *See Lujan*, 504 U.S. at 561.

Accordingly, the Individual Plaintiffs have established Article III standing and the State Defendants' motion to dismiss on this basis is denied.

### 2.     CWA Organizational Standing

The State Defendants argue that CWA fails to establish organizational standing to bring suit on behalf of its members. Plaintiffs contend that CWA has met all of the requirements for organizational standing.

Organizational standing is available when "(1) the individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). To have

---

[4]     Plaintiffs allege that the MPD and the Minnesota State Patrol worked "side-by-side and in coordination in responding" to the protests. On a motion to dismiss, the Court must draw all reasonable inferences in favor of Plaintiffs. Therefore, given the tumultuous nature of the protests, even when a specific allegation is not clear as to whether it pertains to the MPD or the Minnesota State Patrol, the Court may reasonably infer that both the MPD and the Minnesota State Patrol were involved until evidence proves otherwise.

standing, the organization must "allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). As long as the organization establishes that "any one" of its members could have brought the claim and the type of relief sought "does not make the individual participation of each injured party indispensable to proper resolution" of the case, the organization has standing. *Id.*

The State Defendants argue that the claims involved in this case require individualized inquiries into the facts and circumstances for each injured member of the press. The facts, however, do not support that conclusion on a motion to dismiss. First, the members of CWA include or are similarly situated to the Individual Plaintiffs, who have standing to sue in their own right for the reasons addressed above. *See Hunt*, 432 U.S. at 343; *Warth*, 422 U.S. at 511. Second, CWA, as a union representing the press, has a genuine interest in protecting the physical safety and constitutional rights of its members. Therefore, CWA has a purpose that "relates to the interests being vindicated." *Sierra Club*, 645 F.3d at 986; *see also Hunt*, 432 U.S. at 343 (holding that for an organization to have standing "the interests it seeks to protect" must be "germane to the organization's purpose"). Third, because CWA seeks declaratory and injunctive relief, the participation of individual plaintiffs is not required. *See Hunt*, 432 U.S. at 343 (holding that for an association to have standing "neither the claim asserted nor the relief requested" may require "the participation of individual members in the lawsuit"); *Heartland Acad. Cmty. Church v. Waddle*, 427

F.3d 525, 533 (8th Cir. 2005) (concluding that individual participation was not required because the plaintiff sought declaratory and prospective injunctive relief).  Therefore, CWA has satisfied all the requirements of organizational standing.

The State Defendants also argue that CWA's internal conflicts preclude organizational standing.  But when accepting as true all of the factual allegations in the SAC, there is no reason to believe that any of the Defendants are members of CWA.  And even if some of the Defendants were members of CWA, those Defendants would have no cognizable interest in violating the rights guaranteed by the United States Constitution.  Therefore, drawing all reasonable inferences in favor of Plaintiffs, there are no internal conflicts that weigh against concluding that CWA has organizational standing.

Accordingly, Plaintiffs have plausibly alleged that CWA has standing and the State Defendants' motion to dismiss on this basis is denied.

### C.   Qualified Immunity

The State Defendants contend that Plaintiffs' individual-capacity Section 1983 claims must be dismissed under the doctrine of qualified immunity.  Plaintiffs disagree.

"Under the doctrine of qualified immunity, a court must dismiss a complaint against a government official in his individual capacity that fails to state a claim for violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.' "  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "A court considers whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and

whether the right was clearly established at the time of the alleged infraction." *Id.*  The right must be sufficiently defined so that a reasonable official understands that his or her conduct violates the right. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Granting a motion to dismiss on this basis is proper only if a defendant is "entitled to qualified immunity on the face of the complaint." *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (internal quotation marks omitted).

The qualified-immunity standard for supervisory liability involves the same legal standards as the merits analysis of Plaintiffs' claim for supervisory liability.  *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).  Qualified immunity precludes a supervisory-liability claim unless a plaintiff shows that a supervisor "(1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Id.*  To demonstrate notice, allegations of generalized notice are insufficient.  *Id.*  The prior events giving notice must be "very similar to the conduct giving rise to liability." *Livers v. Schenck*, 700 F.3d 340, 356 (8th Cir. 2012).  To demonstrate deliberate indifference at the motion-to-dismiss stage, a plaintiff must plausibly allege that each defendant had notice that "the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.* at 355–56 (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)).

Any law "abridging the freedom of speech, or of the press" is prohibited under the First Amendment.  U.S. Const., amend. I.  The Supreme Court of the United States has acknowledged that "without some protection for seeking out the news, freedom of the press

could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).  Moreover, "the First Amendment goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978)).  "Reporting is a First Amendment activity." *Quraishi v. St. Charles County*, 986 F.3d 831, 838 (8th Cir. 2021) (citing *Branzburg*, 408 U.S. at 681).

Paragraphs 143 through 151 of Plaintiffs' SAC allege multiple events that give the State Defendants notice of a pattern of unconstitutional conduct, including but not limited to: (1) the 2015 false arrest of news reporter Jack Highberger, (2) the 2017 arrests of multiple journalists after the killing of Philando Castile, and (3) Governor Walz's widely publicized apology and statement directing the police to stop violating the First Amendment right to freedom of the press.[5]  These allegations are sufficient to state a plausible claim that the State Defendants had "notice of a pattern of unconstitutional acts committed by a subordinate." *Krigbaum*, 808 F.3d at 340.

With respect to the deliberate-indifference element, the SAC plausibly alleges that the State Defendants' supervision of the Minnesota State Patrol was "inadequate and likely

---

[5]     Governor Walz acknowledged that the actions of the police against members of the news media were unjust and detrimental to the public, declaring "there is absolutely no reason something like this should happen . . . In a situation like this, even if you're clearing an area, we have got to ensure that there is a safe spot for journalism to tell this story.  The issue here is trust, the community that's down there that's terrorized by this, if they see a reporter being arrested, their assumption is something is going to happen that they don't want to be seen so that is unacceptable."

to result in a constitutional violation." *Livers*, 700 F.3d at 355–56.  Plaintiffs plausibly allege that the State Defendants had supervisory control over the Minnesota State Patrol's response to the protests, had notice of a pattern of unconstitutional acts, and were deliberately indifferent to the unconstitutional acts.  The State Defendants failed to improve the Minnesota State Patrol's training or supervision after receiving notice of the unconstitutional acts by their subordinates, Plaintiffs allege.  Moreover, Plaintiffs allege facts pertaining to the Minnesota State Patrol's statements and actions during and after the May and June 2020 protests that, if true, could reflect deliberate indifference to Plaintiffs' constitutional rights.  After additional discovery is conducted, the State Defendants may show that they are entitled to qualified immunity.  But when considering the merits of the motion to dismiss, Plaintiffs have plausibly alleged that the State Defendants had notice of and were deliberately indifferent to the alleged violations of Plaintiffs' constitutional rights.

Accordingly, the State Defendants are not entitled to qualified immunity on the face of the SAC.

### D.    Personal Involvement

The State Defendants argue that Plaintiffs fail to plausibly allege personal involvement by the State Defendants to support any individual-capacity claims.[6]  Plaintiffs contend that the SAC includes sufficient facts to plausibly allege that the State Defendants are liable in their individual capacities.

---

[6]     The State Defendants are sued in their official and individual capacities as to all of Plaintiffs' claims for relief.

Government officials can be sued in their individual capacities for their misconduct. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).  A supervisor may be liable under Section 1983 if either the supervisor's direct action or "failure to properly supervise and train the offending employee" caused the constitutional violation at issue.  *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (internal quotation marks omitted).  Even if a supervisor is not involved in day-to-day operations, that supervisor's personal involvement in "creating, applying, or interpreting a policy" may be sufficient to give rise to individual liability for unconstitutional conditions.  *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009).  In determining whether a plaintiff has alleged that a defendant was personally involved in the deprivation of the plaintiff's constitutional rights, a court addresses each defendant's authority over the alleged constitutional violation.  *See Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014).

The SAC alleges that Commissioner Harrington was personally involved as the head of the MACC, which gave him control over many of the law enforcement officers who responded to the protests.  Although Commissioner Harrington did not have statutory authority over the MACC, it is undisputed that he was the MACC's leader.  The SAC plausibly alleges that Commissioner Harrington was personally involved and, as the MACC leader, had the authority to direct law enforcement officers not to harm the news media.  Because the SAC alleges that Commissioner Harrington failed to prevent the harm, despite having the authority to do so, Plaintiffs have plausibly alleged that Commissioner

Harrington was personally involved in "creating, applying, or interpreting a policy" that gave rise to the alleged constitutional violations. *Bonner*, 552 F.3d at 679.

Plaintiffs allege that Commander Langer had the supervisory authority to establish policies, practices and customs for the Minnesota State Patrol. The Minnesota State Patrol was a part of the MACC and in regular communication with the other Defendants to coordinate their response to the protests. Plaintiffs allege that the "MPD officers and State Patrol troopers at the protest scenes worked literally side-by-side and in coordination." Plaintiffs have plausibly alleged that Commander Langer personally engaged in "creating, applying, or interpreting a policy" that gave rise to the alleged constitutional violations. *Id.*

For these reasons, Plaintiffs have plausibly alleged that Commissioner Harrington and Commander Langer, in their individual capacities, were personally involved in the deprivation of Plaintiffs' constitutional rights.

### E.    Fifth and Fourteenth Amendment Due Process (Count IV)

The State Defendants contend that Plaintiffs fail to plausibly allege Fifth Amendment due-process and Fourteenth Amendment procedural-due-process claims against them.

The Fifth Amendment applies only to the actions of the federal government. *See Barnes v. City of Omaha*, 574 F.3d 1003, 1005 n.2 (8th Cir. 2009) ("The Fifth Amendment's Due Process Clause applies only to the federal government or federal actions . . . ."). But Plaintiffs have not alleged that a federal actor deprived them of

constitutional rights.  For this reason, the Court dismisses Plaintiffs' Fifth Amendment due-process claim.

The State Defendants argue that Plaintiffs' Fourteenth Amendment procedural-due-process claim also must be dismissed because the claim is "improperly duplicative of [Plaintiffs'] other constitutional claims," namely Plaintiffs' First and Fourth Amendment claims.  The State Defendants fail to cite any legal authority that requires a Fourteenth Amendment procedural-due-process claim to be dismissed for duplicity.  Moreover, Rule 8 of the Federal Rules of Civil Procedure permits a plaintiff to plead alternative grounds for relief.  Fed. R. Civ. P. 8(d)(2), (3) (providing that a party may assert alternative claims and also "may state as many separate claims or defenses as it has, regardless of consistency").

The Court, therefore, grants the State Defendants' motion to dismiss Plaintiffs' Fifth Amendment due-process claim and denies the State Defendants' motion to dismiss Plaintiffs' Fourteenth Amendment procedural-due-process claim.

## F.    Civil Conspiracy (Count V)

The parties also contest whether Plaintiffs have plausibly alleged a Section 1983 civil-conspiracy claim against the State Defendants.

A Section 1983 civil-conspiracy claim requires allegations that (1) the defendants conspired with others to deprive the plaintiffs of their constitutional rights, (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy, and (3) the overt act injured the plaintiffs.  *White v. McKinley*, 519 F.3d 806, 814 (8th Cir.

2008).  A plaintiff also must allege "a deprivation of a constitutional right or privilege" to plausibly plead a Section 1983 civil-conspiracy claim.  *Id.*

Allegations of a conspiracy must have sufficient specificity and factual support to suggest a meeting of the minds.  *Manis v. Sterling*, 862 F.2d 679, 681 (8th Cir. 1988).  Mere allegations that the parties had an "opportunity to communicate" or "acted in a manner that was consistent with the existence of a conspiracy" are insufficient to suggest a meeting of the minds.  *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1049–50 (D. Minn. 2010).  To allege a conspiracy, a plaintiff need not plead "that each participant knew the exact limits of the illegal plan," but the plaintiff must provide allegations "sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights."  *White*, 519 F.3d at 816 (internal quotation marks omitted).  The elements of a civil conspiracy often are established through circumstantial evidence.  *See id.*

Here, Plaintiffs allege that the State Defendants, the City Defendants, and Kroll reached an understanding to deprive Plaintiffs of their constitutional rights.  Their claim is based on the allegations that the MPD and the Minnesota State Patrol worked together during the protests and Kroll used his influence as the Federation President to create implicit and explicit policies of the MPD.  Plaintiffs allege that Defendants worked together in their "crowd control techniques, use of chemical agents . . . , and tactical deployment of officers and troopers, including the protest responses that resulted in the violation of constitutional rights."  Plaintiffs also allege that Defendants created the MACC, which

comprised the Minnesota State Patrol, the MPD and other agencies, to respond to the protests. The creation of the MACC, a unified center of communications, supports a reasonable inference that the Defendants reached an agreement as to how they would respond to the protests. Plaintiffs have plausibly alleged that the Defendants acted in concert to deprive the press of their constitutional rights, at least one of the co-conspirators engaged in an overt act in furtherance of the conspiracy, and the overt act injured the press by chilling the First Amendment rights of the press and causing other related harms. *See id.*

The Court, therefore, denies the State Defendants' motion to dismiss Plaintiffs' civil-conspiracy claim.

### G.  Failure to Intervene (Count VI)

The State Defendants argue that Plaintiffs fail to plausibly allege a Section 1983 failure-to-intervene claim against them. Plaintiffs respond that they have plausibly alleged a failure-to-intervene claim based on the State Defendants' alleged conspiracy and supervisory failings.

A law enforcement officer may be held liable for violating the Fourth Amendment by failing to intervene to prevent or stop the unconstitutional use of force by another officer. *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009). To establish a failure-to-intervene claim, a plaintiff must demonstrate that the defendant "observed or had reason to know that excessive force would be or was being used and . . . had both the opportunity and the means

to prevent the harm from occurring." *Id.* (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)).

Plaintiffs allege that the State Defendants were aware of previous deprivations of the constitutional rights of the press involving the excessive use of force, the State Defendants had the authority to prevent this conduct from re-occurring, and the State Defendants failed to do so. When all reasonable inferences are considered in Plaintiffs' favor, the SAC plausibly pleads a failure-to-intervene claim against the State Defendants because they are subject to supervisory liability as explained in Part I.D. of this Order. *Cf. Livers*, 700 F.3d at 360 ("A law enforcement officer who knows another officer is using excessive force has a duty to intervene."). For these reasons, the Court denies the State Defendants' motion to dismiss this claim.

In summary, the Court grants the State Defendants' motion to dismiss as to Plaintiffs' Fifth Amendment due-process claim and denies the State Defendants' motion to dismiss in all other respects.

## II.     Kroll's Motion to Dismiss

Kroll moves to dismiss Plaintiffs' civil-conspiracy claim against him for failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). Kroll contends that Plaintiffs fail to plausibly allege that he, as a private actor, is liable for Plaintiffs' civil-conspiracy claim. Plaintiffs disagree, arguing that the complaint plausibly alleges that Kroll was a willful participant in the conspiracy.

Generally, only state actors may be held liable under Section 1983. *See, e.g.*, *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)). But, when a civil conspiracy involves both state and private actors, a private actor can be liable for conspiring with state officials as a willful participant in the conspiracy. *White*, 519 F.3d at 816. To successfully plead that a private actor is a willful participant in a civil conspiracy with a state actor, a plaintiff "must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor," *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993), and that the mutual understanding was about the unlawful objective of the conspiracy, *Dossett v. First State Bank*, 399 F.3d 940, 951 (8th Cir. 2005).

As addressed above in Part I.F. of this Order, Plaintiffs plausibly allege a civil-conspiracy claim against the State Defendants. Plaintiffs allege that the Federation's relationship with the MPD is so intertwined that the Federation and Kroll, as Federation President, are able to influence the MPD's policies, customs, and practices. Kroll was in constant communication with state and city policymakers, and he allegedly exerted outsized "influence in setting police policy, custom, and practice." Kroll was released from his policing duties and assigned to work full time as the Federation President while being paid by the City of Minneapolis, Plaintiffs allege. The SAC details many examples of Kroll's actions and statements that, if true, demonstrate his ability to influence the MPD. For example, Plaintiffs allege that in public statements, Kroll's policymaking power has been referenced by multiple city officials including former Assistant Minneapolis Police

Chief Kris Arneson, Minneapolis Mayor Jacob Frey, former Minneapolis Mayor R.T. Rybak, Defendant MPD Chief of Police Medaria Arradondo, and others. Plaintiffs also allege that Kroll's influence over the MPD is well known, and that former Minneapolis Police Chief Harteau has stated publicly that the Federation has more influence over police culture than any police chief ever could.

Not only does Kroll's alleged influence create a reasonable inference that he was a willful participant in creating the policies and customs that led to the deprivation of Plaintiffs' rights, but Kroll's alleged actions also support this inference. On May 29, 2020, Kroll emailed MPD policymakers, advising that the MPD's officers had lost faith in their leadership because their leadership is preventing officers from making more arrests, using mobile booking stations, and exercising the freedom to use more tear gas and less-lethal ammunitions. Kroll's email also asserted: "At some point community engagement needs to end and law enforcement needs to take place." Throughout the protests, Kroll expressed disdain for Minneapolis's elected leadership and stated that the Federation will "get order restored and safety resumed." Kroll also stated that he has spoken with state politicians and police leaders from across the country to share his detailed plan of action for controlling protests.

Plaintiffs allege that Kroll implicitly and explicitly directed officers to use unnecessary force on the citizens of Minneapolis "by thwarting discipline and enabling a culture and practice of immunity from sanction for constitutional violations." Plaintiffs assert that Kroll used his power as a law enforcement officer to cloak his policy goals in

state power, and that he used the Federation's financial and political power to exert influence over the MPD's customs and practices. Plaintiffs contend that the MPD's unconstitutional policies, practices, and customs, which resulted in injuries to Plaintiffs, derive "at least in part from the acts done under the color of state law by Kroll." As such, the SAC plausibly alleges that Kroll is a willful participant in any conspiracy with the State Defendants and City Defendants.

Accordingly, Plaintiffs plausibly allege facts establishing that Kroll, as a private actor, was a willful participant in the conspiracy who acted in concert with the State Defendants and City Defendants. The Court, therefore, denies Kroll's motion to dismiss.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.    The State Defendants' motion to dismiss, (Dkt. 54), is **GRANTED** as to Plaintiffs' Fifth Amendment due-process claim and **DENIED** in all other respects.

2.    Defendant Robert Kroll's motion to dismiss, (Dkt. 60), is **DENIED**.


Dated:  July 29, 2021                                    s/Wilhelmina M. Wright
                                                        Wilhelmina M. Wright
                                                        United States District Judge