```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                      )
      Jared Goyette, Craig Lassig,      )  File No. 20-CV-1302
 4    Katie Nelson, Tannen Maury,       )         (WMW/DTS)
      Stephen Maturen, Michael Shum,    )
 5    and The Communications            )
      Workers of America, on behalf     )  St. Paul, Minnesota
 6    of themselves and other           )  July 28, 2021
      similarly-situated individuals,   )  9:17 a.m.
 7                                      )
               Plaintiffs,             )
 8                                      )
      vs.                               )
 9                                      )
      City of Minneapolis; Medaria      )
10    Arradondo, Minneapolis Chief of   )
      Police, in his individual and     )
11    official capacity; Robert         )
      Kroll, Minneapolis Police         )
12    Lieutenant, in his individual     )
      and official capacity; John       )
13    Harrington, Minnesota             )
      Department of Public Safety       )
14    Commissioner, in his individual   )
      and official capacity; Matthew    )
15    Langer, Minnesota State Patrol    )
      Colonel, in his individual and    )
16    official capacity; and John       )
      Does, 1-4, in their individual    )
17    and official capacities,          )
                                        )
18             Defendants.

19    ------------------------------------------------------------

20           BEFORE THE HONORABLE WILHELMINA M. WRIGHT
               UNITED STATES DISTRICT COURT JUDGE
21
                       (MOTIONS HEARING)
22

23

24
           Proceedings reported by court reporter; transcript
25    produced by computer.
```

1      <u>APPEARANCES</u>

2      For the Plaintiffs:        Fredrikson & Byron, PA
                                  DULCE J. FOSTER, ESQ.
3                                 PARI McGARRAUGH, ESQ.
                                  KAREN G. SCHANFIELD, ESQ.
4                                 Suite 4000
                                  200 South Sixth Street
5                                 Minneapolis, Minnesota 55402

6                                 ACLU of Minnesota
                                  TERESA J. NELSON, ESQ.
7                                 ISABELLA S. NASCIMENTO, ESQ.
                                  P.O. Box 14720
8                                 Minneapolis, Minnesota 55414

9                                 The Law Office of Kevin C. Riach
                                  KEVIN C. RIACH, ESQ.
10                                P.O. Box 270815
                                  Vadnais Heights, Minnesota 55127
11
       For Defendants City of     Minneapolis City Attorney's
12     Minneapolis and Chief      Office
       Medaria Arradondo:         HEATHER PASSE ROBERTSON, ESQ.
13                                KRISTIN R. SARFF, ESQ.
                                  SHARDA R. ENSLIN, ESQ.
14                                Room 210
                                  350 South Fifth Street
15                                Minneapolis, Minnesota 55415

16     For Defendant              Kelly & Lemmons, P.A.
       Lieutenant Robert          JOSEPH A. KELLY, ESQ.
17     Kroll:                     Suite 200
                                  2350 Wycliff Street
18                                St. Paul, Minnesota 55114

19     For Defendants             Minnesota Attorney General's
       Commissioner John          Office
20     Harrington and Colonel     ALEXANDER HSU, ESQ.
       Matthew Langer:            KATHRYN IVERSON LANDRUM, ESQ.
21                                JOSEPH D. WEINER, ESQ.
                                  Suite 1100
22                                445 Minnesota Street
                                  St. Paul, Minnesota 55101
23
       Court Reporter:            LORI A. SIMPSON, RMR-CRR
24                                Suite 146
                                  316 North Robert Street
25                                St. Paul, Minnesota 55101

```
1                        I N D E X

2    PLAINTIFFS' WITNESSES:                            PAGE

3    EDWARD OU (Via Zoom)
       Direct Examination By Ms. Foster                 10
4      Cross Examination By Ms. Landrum                  69
       Redirect Examination By Ms. Foster               93
5
     CHRISTOPHER TUITE
6      Direct Examination By Ms. McGarraugh              94
       Cross Examination By Mr. Hsu                     128
7      Redirect Examination By Ms. McGarraugh           141

8
     DEFENDANTS' WITNESSES:
9
     JOHN HARRINGTON
10     Direct Examination By Mr. Hsu                    147
       Cross Examination By Mr. Riach                   176
11
     JOSEPH DWYER
12     Direct Examination By Ms. Landrum                200
       Cross Examination By Mr. Riach                   259
13     Redirect Examination By Ms. Landrum              299
       Recross Examination By Mr. Riach                 304
14     Examination By the Court                         305

15

16
     PLAINTIFFS' EXHIBITS                              REC'D
17       1                                              119
         3                                              100
18       4-A                                            115
         4-B                                            117
19       5                                              122
         6                                              122
20       8                                               56
         9                                               44
21       10                                              34
         12                                              37
22       14                                              25
         27                                             310
23       37                                             290
         68                                             195
24       71                                             185

25
```

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1

## I N D E X  (Cont.)

2

DEFENDANTS' EXHIBITS                                          REC'D

| Exhibit | REC'D |
|---|---|
| 1 | 202 |
| 2 | 206 |
| 7 | 268 |
| 10 | 310 |
| 11 | 209 |
| 12 | 203 |
| 15 | 155 |
| 19 | 205 |
| 21 | 248 |
| 22 | 249 |
| 41 | 226 |
| 42 | 215 |
| 43 | 242 |

1
**P R O C E E D I N G S**

2
**IN OPEN COURT**

3
LAW CLERK:  The United States District Court for

4
the District of Minnesota is now in session.  The case

5
number is 20-CV-1302, Jared Goyette, et al. vs. City of

6
Minneapolis, et al.

7
Counsel, please identify yourselves for the

8
purposes of the record.

9
MS. FOSTER:  Your Honor, Dulce Foster on behalf of

10
the plaintiffs.  I'm here today with Kevin Riach, Pari

11
McGarraugh, and Karen Schanfield.

12
THE COURT:  Thank you.  Good morning, Ms. Foster.

13
MS. LANDRUM:  Good morning, Your Honor.  Kathryn

14
Iverson Landrum here on behalf of the Minnesota State Patrol

15
and the Minnesota Department of Public Safety.  With me is

16
Joseph Weiner, Assistant Attorney General; Alexander Hsu,

17
Assistant Attorney General; and Shirley Kosek, a paralegal

18
with our office.

19
THE COURT:  Okay.  Good morning, everyone.

20
And as an initial matter, we are here for the

21
preliminary injunction hearing today and I would like to

22
remind everyone to please keep your face masks on while

23
you're in the courtroom.  Counsel or other participants, you

24
may remove your face mask temporarily while you are

25
addressing the Court provided that you are appropriately

1    distanced from each other and all others around you.

2              I believe there are people who are listening by

3    telephone.  If you are not listening -- I'm sorry.  If you

4    are not speaking, please mute your device, and you can do

5    that either by pressing star 6 or by using the mute on your

6    own device.

7              I will remind everyone that pursuant to General

8    Order No. 15 that was issued by Chief Judge Tunheim on

9    January 15, 2021, it is strictly prohibited for anyone to

10   record or broadcast any hearing in whole or in part in any

11   fashion, and that applies to this hearing as well.

12             Are there any preliminary matters that need to be

13   addressed at this time before we move to witness testimony?

14             MR. RIACH:  One quick housekeeping matter for the

15   plaintiffs, Your Honor.  We would ask that nonparty

16   witnesses be sequestered during the hearing.  I believe that

17   would impact two witnesses.  Once a witness is done

18   testifying, then I think we have no objection to their

19   presence in the courtroom.

20             THE COURT:  Okay.  Does anybody wish to be heard

21   on that matter?

22             MS. LANDRUM:  Yes, Your Honor.  Thank you.  We

23   have two witnesses that we will be calling today.  One is a

24   party, Commissioner Harrington.  He is here with us today.

25   We would object to our second witness, Major Joseph Dwyer,

1    being sequestered.  We would like for him to hear the

2    testimony of the two witnesses so that he may respond to it.

3    And there is no basis to sequester otherwise.

4              THE COURT:  You may respond or reply.

5              MR. RIACH:  Your Honor, when the witnesses are

6    testifying, they can certainly be asked questions that are

7    relevant to testimony that has come before, but we think

8    it's important to have testimony that hasn't been impacted

9    by the statements that have been given by other witnesses in

10   this case.

11             THE COURT:  I'm going to grant the motion.

12   Nonparty witnesses shall be excluded.  As I understand it,

13   Commissioner Harrington is a party and so he may remain, but

14   the one other gentleman, I believe it is a gentleman that

15   you addressed, will need to be removed or sequestered until

16   his testimony or her testimony.

17             MS. LANDRUM:  Understood.  Thank you, Your Honor.

18             THE COURT:  Okay.  Is there anything else that we

19   need to address?

20             MR. WEINER:  Your Honor, yes, just one

21   additional --

22             COURT REPORTER:  If you could stay near the

23   microphone, that would be --

24             MR. WEINER:  Is this any better?

25             THE COURT:  It's fine, but also if you would like

1    to remain seated, you may do so.

2         MR. WEINER:  Given the microphone situation, maybe

3    I will do that.

4         THE COURT:  Okay.

5         MR. WEINER:  Your Honor, we would just like some

6    clarity as to the text order that was entered this morning

7    regarding the confidential documents that are going -- and

8    the closing of the courtroom.  We just want to make sure

9    that this applies only to parties and not to other

10   individuals who may be testifying today but are not parties,

11   and that those individuals will be excluded in the event

12   that there's any confidential documents or exhibits that are

13   put before the Court.

14        THE COURT:  You're asking whether nonparties need

15   to be excluded when confidential information is being

16   addressed; is that correct?

17        MR. WEINER:  Yes, Your Honor, and specifically

18   talking about the witnesses that the plaintiffs have

19   identified today, neither of whom are parties to this

20   matter, and just making sure that --

21        THE COURT:  You said who are or who are not?

22        MR. WEINER:  Are testifying today, yes, Your

23   Honor.

24        THE COURT:  Are they parties to the matter?

25        MR. WEINER:  They are not parties to this matter

1    and so --

2              THE COURT:  So if they are not parties, they need

3    to be not present in the courtroom during the confidential

4    disclosure.  Understood?

5              MR. WEINER:  Yes, Your Honor.  That was our

6    understanding.  We just wanted to make sure that that was

7    correct.  Thank you, Your Honor.

8              THE COURT:  Is there anything further that needs

9    to be addressed?

10             MS. LANDRUM:  No, Your Honor.

11             MS. FOSTER:  No, Your Honor.

12             THE COURT:  Okay.  Very well.  Are we ready to

13   proceed?

14             MS. FOSTER:  Yes, Your Honor.  The plaintiffs call

15   Ed Ou.

16             Are you off mute?

17             THE WITNESS:  Hi.  Hello.

18             MS. FOSTER:  Good morning, Mr. Ou.  Could you

19   please state your name and --

20             COURT REPORTER:  Wait.  We need to swear him in.

21             MS. FOSTER:  Oh, right.

22       (Witness sworn)

23             THE COURT:  And please state your name, your full

24   name, and spell your last name, please.

25             THE WITNESS:  My name is Edward Ou,

1    E-d [audio distortion] r-d, and then Ou is spelled O-u.

2              THE COURT:  Okay.  And we are having some

3    difficulty hearing you and so that means that you probably

4    need to adjust where your microphone is located.  As you

5    move in, we can hear a little bit better, but it's not

6    uniformly good.  Would you --

7              THE WITNESS:  What about right now, if I speak

8    like this?

9              THE COURT:  If you speak like that, we can hear

10   you, but --

11             THE WITNESS:  Okay.

12             THE COURT:  Okay.

13             THE WITNESS:  Will do.  I will try to speak

14   louder.  And if you can't hear me, just please let me know

15   and I can repeat.

16             THE COURT:  I will.  Thank you.

17             Counsel, you may proceed.

18             MS. FOSTER:  Thank you, Your Honor.

19                       **(Edward Ou)**

20                   **DIRECT EXAMINATION**

21   BY MS. FOSTER:

22   Q.  Mr. Ou, we have you participating by Zoom today.  Where

23   are you currently dialing in from?

24   A.  I'm in Copenhagen, Denmark.

25   Q.  Okay.  Where do you live, Mr. Ou?

1    A.  I live in New York, in the U.S.

2    Q.  And where did you grow up?

3    A.  I grew up in Canada.

4    Q.  How long have you lived in the United States?

5    A.  This time around, around four years.  Since 2017.

6    Q.  What do you do for a living, Mr. Ou?

7    A.  I am a journalist, photojournalist, and documentary

8    filmmaker.

9    Q.  How long have you worked as a photojournalist?

10   A.  I've been working since around 2006, so 15 years.

11   Q.  And can you please tell us what media outlets you've

12   worked for in your career.

13   A.  I've worked for companies like the Associated Press,

14   The New York Times, NBC News, and a few others.

15   Q.  Have you received any awards for your work?

16   A.  Yeah, I have.  Actually, yesterday I was nominated for

17   an Emmy Award for coverage of last year.  I've received

18   Peabody Awards, other internationally-recognized awards,

19   like World Press Photo, et cetera.  So yes.

20   Q.  So I'm going to ask you to speak a little bit slower, if

21   you could, because the court reporter is here trying to take

22   down everything that you say and I'm sure she would

23   appreciate being able to take that down without you speaking

24   quickly.  Thank you.

25           What is your current employment status, Mr. Ou?

1    A.  I'm a freelance journalist right now.

2    Q.  Okay.  And what photo equipment do you normally carry

3    with you when you cover an event?

4    A.  I have a combination of video cameras and then stills

5    cameras.  So usually I have two cameras with me with a

6    microphone and one for stills and depending on, you know,

7    what the event is and what I'm covering, additional cameras

8    you know, stuff like that, tripod.

9    Q.  Do you carry a backpack or anything else?

10   A.  Yeah, I have a backpack.  And then depending on the

11   situation, you know, like safety equipment or first aid kits

12   or stuff and then -- it just really depends.

13   Q.  Would you be recognizable to the public as a journalist

14   when you're out covering an event?

15                   MS. LANDRUM:  Objection --

16                   THE WITNESS:  Yes.

17                   MS. LANDRUM:  Objection, calls for speculation.

18                   THE COURT:  Overruled.

19   BY MS. FOSTER:

20   Q.  Do you carry credentials with you?

21   A.  Yes.

22   Q.  And where and how do you typically carry those?

23   A.  Usually I have a lanyard and a badge and then -- that

24   says, like, who I am working with or, you know, that I am a

25   journalist.

```
 1                    THE COURT:  Okay.  And I am going to ask you again
 2        to please make sure that we can hear you, so please move
 3        your microphone closer to you.
 4                    THE WITNESS:  Sure.
 5                    THE COURT:  And, Ms. Foster, I'm wondering if it
 6        might not be better for you to use the podium.  Do you mind
 7        using the podium?
 8                    MS. FOSTER:  No, Your Honor.
 9                    THE COURT:  Okay.
10                    THE WITNESS:  I'm going to -- can you hear me now?
11                    MS. FOSTER:  And may I remove my mask?
12                    THE COURT:  You may remove your mask.  And also
13        would you turn off -- okay.  The video has been turned off
14        for you.
15                    I think this is the better way for us to move
16        forward, Counsel, just as we are testing what our
17        capabilities are in terms of being able to hear and
18        understand everyone with masks or without.  So let's proceed
19        in this manner.
20                    If any attorney who is questioning a witness feels
21        uncomfortable at the podium because of COVID protections
22        that are needed, please let me know.  You will be permitted
23        to question at your seats if that's what you prefer to do.
24                    And I believe we have covers for the microphone
25        that we can take off every -- between -- after every
```

1   questioner if needed, so that we can maintain the sanitary

2   needs in order to stay safe in this setting.

3   BY MS. FOSTER:

4   Q.  So I am going to repeat the question.  Where and how do

5   you carry your credentials?

6   A.  I usually have a lanyard and then a badge that says,

7   "Press" on it.

8   Q.  If there were a state-sponsored credentialing

9   requirement, would that make it difficult for you to cover

10  events?

11  A.  Yeah.  Because I work nationally and internationally and

12  because we cover breaking news, we're often going to places

13  at the last minute to [audio distortion].

14          COURT REPORTER:  I'm sorry.  I didn't hear --

15          THE COURT:  At the last minute to do what?

16          MS. FOSTER:  Speak again.

17          THE WITNESS:  We often have to travel at the last

18  minute because I work internationally and nationally.

19  Because as journalists we travel a lot and so in a

20  breaking-news situation, it's not exactly practical to have

21  any one credential for anything.  To give an example, I live

22  in New York and I can't actually get a credential even in

23  New York because of some the requirements that are put on

24  us, you know, as journalists in terms of, like,

25  breaking-news contexts, et cetera.  So it's difficult.

```
 1    BY MS. FOSTER:

 2    Q.   Have you traveled outside of North America to cover news

 3    events?

 4    A.   Yeah.

 5    Q.   Where have you traveled in your career?

 6    A.   For most of my career I worked in the Middle East.  I

 7    was there covering mostly, you know, the Arab world.  And

 8    then I was based in East Africa for quite some time covering

 9    mostly Somalia, Uganda, Sudan.  So I've worked mostly

10    internationally, actually, as opposed to in the U.S.

11    Q.   What kind of --

12                THE COURT:  I didn't hear the last thing you said.

13                THE WITNESS:  I have worked mostly internationally

14    for more of my career than I have spent in the United

15    States.

16                THE COURT:  Thank you.

17    BY MS. FOSTER:

18    Q.   What kinds of events have you covered in those

19    locations?  Can you describe them.

20    A.   In the Middle East, the majority of my work there has

21    been covering protests, conflict-related events.  For

22    example, in Iraq or during the Arab Spring, I was in Egypt,

23    in Tahrir Square.  I was in Libya, for example, when the

24    civil war broke out in 2011.  So a lot of the -- because of

25    the nature of, you know, the Middle East and the political
```

1    situation, it's a lot of, you know, conflict related and

2    civil unrest and stories within that.

3    Q.  Do you ever feel that there are risks to your own -- or

4    have you ever historically felt that there were risks to

5    your own safety when covering those events?

6    A.  Yeah.  In a lot of countries in the Middle East or

7    places like Ukraine, there isn't exactly that much freedom

8    of the press and so a lot of times I have been targeted for

9    my work, you know, arrested.  Colleagues of mine have been

10   kidnapped.  So, yes, it is difficult to work in a lot of

11   those places.

12   Q.  Do you do anything to minimize threats to your safety

13   when you are covering a protest event?

14   A.  Yes.  A lot of different -- a lot of protests are just

15   very different, so there's not one thing, but it's important

16   for us to have, you know, body armor, for example, should we

17   need it, to have a gas mask, to have goggles, to have a

18   helmet, to have a thing that says, "Press."  It really

19   depends on the situation, but the key thing for us is to

20   always be prepared for every outcome.

21   Q.  Have you developed any practices with respect to where

22   you stand when you're covering a protest event?

23   A.  Yeah, all the time.  I think when you cover a protest,

24   it's important to be always aware of where your exits are

25   and knowing where the police are, where protesters are.  And

1    you kind of have this, like, running commentary in your head

2    that if something were to happen, where would you run to,

3    how would you get out of there.  A lot of times, you know,

4    you're just thinking, okay, exit, where's the exit.  So

5    that's really important.  And then also being able to kind

6    of muscle memory how to -- where you went into the place, so

7    that you can get out should you be tear-gassed, should you

8    be unable to see.  So, yeah, you kind of have to just

9    develop a skill to know how to get out of trouble if you get

10   into it.

11   Q.  Do you make it a practice to avoid standing between the

12   protesters and police?

13   A.  Yes.  That area is usually the most fraught place.  So

14   the best places are places off to the side, where you can

15   kind of, like, see what's going on and not get in the middle

16   of things, that have a good exit and cover as well.

17   Q.  How close to the protesters do you typically have to be

18   to get good coverage?

19   A.  It depends on what you're shooting.  If you are shooting

20   photos, you tend to need to be a little bit closer, but

21   sometimes you kind of just think to yourself, like, when is

22   a safe time to get close to protesters to get the shots that

23   you need, when is a good time to back off.  And it's the

24   same thing with, you know, police or security forces.  You

25   kind of just use your intuition to know what the mood is and

1    what the situation is to see what's safe and what's not

2    safe.

3    Q.  Would it make it difficult for you to film what's

4    happening if you were required to stand and remain in a

5    particular spot?

6    A.  Yeah, it would be because protests by their nature are

7    very dynamic.  Usually they have an element of people

8    marching.  There's people coming from different places.  So

9    you kind of need to move around a lot, both to have coverage

10   and also for safety.  Because if a designated place is not

11   safe anymore, it could become unsafe within a millisecond

12   and then you just have to adapt.  So a lot of covering

13   protests is just -- it's very fluid.

14   Q.  How long did you live in the Middle East, Mr. Ou?

15   A.  I lived there until about 2017 or so.  So about ten

16   years.

17   Q.  And why did you leave the Middle East?

18   A.  There isn't one particular reason, but it was just

19   getting very dangerous to work there.  After the Arab

20   Spring, countries started becoming progressively more

21   dangerous and hostile toward journalists, Cairo, for

22   example, when a lot of journalists were arrested.  I was

23   living in Turkey and I got kicked out of that country.  And

24   a lot of my colleagues, you know, were being kidnapped in

25   Syria.  Colleagues of mine have been killed.  I had multiple

1    incidences where, you know, I got into trouble.  And so at

2    around that time I kind of decided that it was just getting

3    a little bit too dangerous to [audio distortion].

4              THE COURT:  I didn't hear the last thing you said.

5    It got a little bit dangerous, and then you said something

6    else and that was not audible.

7              THE WITNESS:  Around that time it got a little bit

8    too dangerous to work there.  And so a combination of those

9    factors led to me leaving the Middle East.

10              THE COURT:  Thank you.

11   BY MS. FOSTER:

12   Q.  Did you continue to cover protest activity after you

13   moved to New York City?

14   A.  Yep, I did.  When I moved there, Charlottesville

15   happened, so there was a lot of protests related to that.

16   There were protests related to, you know, the Trump

17   administration.  So, yeah, there's a lot of different

18   protests I've covered once I moved to the U.S.

19   Q.  How concerned were you about becoming a law enforcement

20   target once you moved to the United States versus as

21   compared to the Middle East?

22   A.  I wasn't concerned when I got there because, you know,

23   in the U.S. it felt like it wasn't the Middle East, where

24   there is, you know, the First Amendment and there's the

25   freedom of the press.  And so I wasn't exactly concerned

 1    because it was the one place I actually felt that I could,

 2    like, very proudly declare that I was a journalist and just

 3    do my job without fear of, you know, retribution, like I had

 4    experienced in a lot of places in the [audio distortion].

 5              THE COURT:  I didn't hear the last bit again.

 6              THE WITNESS:  Sorry.  It was one of the places --

 7    the U.S. is one of the places where I felt that I could

 8    operate pretty freely and film, you know, the police, cover

 9    the police as long as I was, you know, not interfering with

10    their work.  So I didn't feel unsafe at all.

11    BY MS. FOSTER:

12    Q.  Did you cover the May 2020 Minnesota protests following

13    the death of George Floyd?

14    A.  Yes.

15    Q.  Who was your employer at the time?

16    A.  I was a staff journalist with NBC News.

17    Q.  And what day did you arrive in Minnesota?

18    A.  The 30th of May 2020.

19    Q.  And do you recall the approximate time when you started

20    filming events after your arrival?

21    A.  Yeah.  I landed around 5:00 and we met -- we had a

22    briefing with the team, the NBC News team there, and I

23    started shooting at around 6:30, 7:00-ish.

24    Q.  Were you aware, when you began filming, of a curfew in

25    place?

1   A.  Yes, I was aware of a curfew, but I --

2   Q.  What was your understanding with respect to whether it

3   covered the media?

4   A.  Yeah, as I understood it, it didn't cover -- like, we

5   were exempt, we, as the media, were exempt from that curfew.

6   Q.  Were you visibly identifiable as a member of the media

7   while you were out there?

8   A.  Yes.  I was wearing --

9           MS. LANDRUM:  Objection --

10      (Simultaneous indiscernible crosstalk)

11          THE COURT:  Wait.  You stop.  We have an objection

12  and so I need to hear the nature of the objection, please.

13          MS. LANDRUM:  Objection, Your Honor, calls for

14  speculation.

15          THE COURT:  Overruled.

16  BY MS. FOSTER:

17  Q.  Mr. Ou, you may answer.

18  A.  Sorry.  What was the question again?

19  Q.  Sorry.  The question was whether you were visibly

20  identifiable as a member of the media while you were out

21  there.

22  A.  Yes.  I had cameras and a press badge with me that was

23  very -- which made me obviously a member of the press.

24  Q.  Were you also wearing a lanyard with your press badge?

25  A.  Yeah, I had a lanyard with the NBC News logo that says,

1    "NBC News" on it and then a badge that also says, "NBC" and

2    "Press" on it.

3    Q.   Okay.  And where in Minneapolis did you go?

4    A.   I went to the Fifth -- so the first place that we went

5    was the Fifth Precinct because we had heard that there was a

6    rally there.  So that was the first place, the precinct.  It

7    was the first place I covered, started shooting, but then we

8    had like a briefing or meeting, I think on Lake Street,

9    before that.

10   Q.   Okay.  Can you describe the area when -- not the

11   briefing, but when you started covering the rally, where

12   were you standing?

13   A.   So the rally took place between 31st Street and, like,

14   this bus station that was, like, right next door and then

15   Nicollet.  So the protesters had set up like a temporary --

16   not podium exactly, but there was, like, a mini stage-ish

17   area where people were standing, and most people were

18   sitting down.  It was like a rally that was, like, right on

19   31st and Nicollet and people were giving speeches and had

20   been occupying kind of that space, you know, giving speeches

21   and listening to -- they were chanting and stuff like that.

22   Q.   Were there any other reporters present?

23   A.   Yes, there were many, many reporters.

24   Q.   And how did you know that they were reporters?

25   A.   Well, so, first off, it's a really small world of

1   journalists, so I recognized a lot of colleagues who are

2   also friends, so we caught up with them.  And then a lot of

3   people had, you know, cameras and were filming and they had

4   tripods and kind of journalistic equipment.

5   Q.  Did you see anyone there who was audibly claiming to be

6   a reporter whom you know was not a reporter?

7   A.  No.

8   Q.  When you arrived, were any of the people participating

9   in the rally engaging in violent or threatening behavior?

10  A.  No, they weren't.

11  Q.  Was anyone from law enforcement in the area?

12  A.  Yeah.  There were state troopers kind of off to the

13  side, down the street from Nicollet, closer to 32nd Street,

14  kind of, like, at [audio distortion].

15          COURT REPORTER:  I'm sorry.  I didn't hear the

16  last part he said.

17  BY MS. FOSTER:

18  Q.  Can you repeat that, please?

19  A.  Yeah.  There were, I think, Minnesota state troopers on

20  the south side of Nicollet, like, towards, like, 32nd Street

21  or so.  They had been filing kind of in and out of the Fifth

22  Precinct.

23  Q.  Was anyone throwing projectiles at the state troopers?

24  A.  No.

25  Q.  Did you see any fires burning?

1    A.  No, I didn't.

2    Q.  Did you see anyone looting?

3    A.  No.

4    Q.  How would you describe the mood of the crowd at that

5    point when you were watching them rally?

6    A.  When I first got there, it was -- I guess the mood, I

7    would say, would be there was -- people were giving

8    speeches, talking about kind of, like, their engagement with

9    race.  So I would say it was actually kind of quite

10   cathartic and the mood was quite high.  It was a pretty calm

11   mood because people were mostly giving speeches and most

12   people, except for the people who were speaking up on this

13   mini podium thing, they were mostly sitting down and kind

14   of, like, cheering on the people who were giving speeches.

15   Q.  Did the mood of the crowd change at some point?

16   A.  Things turned a little bit tense.  We all got a text

17   message on our phone that [audio distortion].

18   Q.  We lost sound, and I'm not sure why.  But can you start

19   over again?

20   A.  Things turned a little tense when we all got this, like,

21   push alert on our phones that said that there is a curfew

22   coming up.  And so everyone took time to look at their

23   phones, and that was kind of like a signal that -- you know,

24   the mood went from calm and I wouldn't use the word

25   celebratory, but it went to, like, what's going to happen.

1      It got tense.

2      Q.  And what did the state troopers do at that point?

3      A.  So at that point they had started to form a line around

4      32nd Street and Nicollet, so Nicollet and 32nd Street.  Most

5      of the protesters were kind of still on 31st kind of near

6      the bus station where they were rallying.  And so the

7      cops -- sorry, the State Patrol were gathering and forming a

8      line.

9      Q.  Mr. Ou, did you have an opportunity to film this portion

10     of the events that we've been talking about?

11     A.  Yes.

12     Q.  And have you had an opportunity prior to this hearing to

13     review the video that was previously marked as Plaintiffs'

14     Exhibit 14?

15     A.  Yes.

16     Q.  Is Plaintiffs' Exhibit 14 a copy of the video that you

17     took that night?

18     A.  Yes.

19             MS. FOSTER:  Your Honor, I would like to offer

20     Plaintiffs' Exhibit 14.

21             THE COURT:  Any objection to the admission of

22     Exhibit 14?

23             MS. LANDRUM:  No, Your Honor.

24             THE COURT:  Exhibit 14 is admitted in evidence.

25             MS. FOSTER:  Now I would like to publish a portion

1    of that video, if you would, Leslie?

2              THE COURT:  You may.  Let's verify that our

3    witness also can see that portion or the video as you are

4    playing it.

5              MS. FOSTER:  Can you see the video?

6              THE WITNESS:  Yes, I can see the video.

7              THE COURT:  Very well.  Thank you.

8         (Video recording played)

9    BY MS. FOSTER:

10   Q.  At this point, Mr. Ou, did you hear the announcement

11   that was being made by the troopers?

12   A.  Yes.

13   Q.  Were they announcing a curfew?

14   A.  Yeah.  They were telling the crowd to disperse, as I

15   understood it.

16   Q.  And --

17             THE COURT:  Ms. Foster, is there a way for you to

18   identify where on the video you have stopped the video just

19   so we have --

20             MS. FOSTER:  I believe we stopped --

21             THE COURT:  -- a clear record?

22             MS. FOSTER:  -- at 59 seconds, 58 or 59 seconds.

23             THE COURT:  Thank you.

24             MS. FOSTER:  58 seconds.

25             THE COURT:  You may proceed.

 1              MS. FOSTER:  I will continue to do that if it is

 2       helpful.

 3              THE COURT:  Would you please do that.  It will

 4       make for a clear record.

 5              MS. FOSTER:  Absolutely.

 6       BY MS. FOSTER:

 7       Q.  At this point was the -- oh, so we were talking about

 8       the announcement that we heard on the video of the curfew.

 9       Again, it was your understanding that the curfew did not

10       apply to journalists; is that what you testified to earlier?

11       A.  Yes, we didn't think it applied to us.

12       Q.  At this point in time was the crowd getting more

13       agitated?

14       A.  There were a few protesters that you saw on the video

15       that were saying things at the State Patrol.  They were

16       giving them the finger.  You know, there were a few people

17       who were saying not-so-nice things [audio distortion].

18       Q.  Aside from --

19              THE COURT:  I didn't hear the last thing you said,

20       sir.  Would you say -- "there were a few people that," and

21       then you trailed off.

22              THE WITNESS:  That were saying not-so-nice things

23       to the State Patrol --

24              THE COURT:  Thank you.

25              THE WITNESS:  -- profanities.

```
 1    BY MS. FOSTER:
 2    Q.  Aside from those profanities, were any of the protesters
 3    looting or behaving violently at that point?
 4    A.  No.
 5    Q.  What did the State Patrol do after announcing the
 6    curfew?
 7    A.  So it was pretty quick.  We had -- all us journalists
 8    kind of went off to the side, to the right of where you saw,
 9    and pretty immediately they started to attack us and launch
10    concussion grenades at us pretty quickly.  And so that
11    escalated and -- yeah, so we were attacked.
12    Q.  So you said you moved off to the side.  And who were you
13    standing with when you moved off to the side?
14    A.  I was standing with a group of journalists and my
15    colleagues, and so we were -- we kind of, like -- at that
16    moment, you know, like, because, you know, we felt it was
17    kind of -- like, we just gravitated and stayed into a group
18    so that we could be easily, like, discerned from the
19    protesters.  So there was like an alcove that also gave us,
20    you know, cover and so we kind of just, like, went off to
21    the side.
22    Q.  At least initially did you feel safe in that alcove?
23    A.  I did, actually, because when I was talking about, like,
24    where our egress is and what our cover is, these alcoves
25    actually provided us a really good cover so that we had like
```

1    a solid wall in front of us kind of, like, blocking us so

2    that should there be any projectiles, we had a place to

3    duck.

4    Q.  Were there any protesters standing in the alcove with

5    you?

6    A.  No.

7    Q.  And you mentioned being attacked.  Can you describe for

8    me what happened to you.

9    A.  It happened really quickly.  They were -- we were

10   shooting and then all of a sudden something started being

11   launched at us and a projectile of some sort exploded in

12   front of my face, and that disoriented us because I think it

13   was a concussion grenade.

14        And so as I was trying to get my bearings, the

15   State Patrol, the state troopers came up to us pretty

16   quickly and I was pepper-sprayed in the face.  And then they

17   kept on throwing concussion grenades at our feet, so they

18   kept on exploding.  And so as I was pepper-sprayed, I

19   couldn't see.

20        I figured that they would -- we were in these

21   alcoves, so that they would just pass us so that they

22   could -- you know, if they were trying to disperse the

23   crowd, they would just pass us.  But then they kept on --

24   they targeted us and they kept corralling us into the place

25   where the protesters were, and we were -- it was -- it

```
1    happened really quickly and it was quite confusing because I

2    thought that they were just trying to move past us, but over

3    time it was pretty clear that we were being targeted and,

4    yeah, they were actively -- they were trying to disperse us

5    and they were trying to get us into -- kind of, like, mix us

6    in with the protesters.

7            MS. FOSTER:  So at this point in time I would like

8    to play another portion of the video, starting at -- where

9    we left off and going through a minute, approximately a

10   minute and 34 seconds.

11           THE COURT:  Thank you, Counsel.  You may.

12       (Pause)

13           MS. FOSTER:  We are trying to get the technology

14   worked out.  Sorry.

15       (Pause)

16           MS. FOSTER:  I apologize, Your Honor.

17           THE COURT:  That's quite all right.

18       (Pause)

19           MS. FOSTER:  She's having trouble with sharing the

20   screen.  She said she got booted out.

21           THE COURT:  Let's pause.  We can go off the record

22   for this.

23       (Discussion off the record)

24           MS. FOSTER:  Thank you, Judge.

25           THE COURT:  You're welcome.  We'll move forward.
```

1        (Video recording played)

2   BY MS. FOSTER:

3   Q.  Mr. Ou, at the very end of that segment we saw a bright

4   flash and we heard some screaming.  Is that the point at

5   which the projectile hit you?

6   A.  Yes.

7            THE COURT:  Counsel, is it possible to identify

8   where on the recording we are -- you stopped the display

9   just so that it's clear in the record what you are referring

10  to?

11           MS. FOSTER:  Yes.  A minute 34.

12           THE COURT:  Perfect.  Thank you.

13  BY MS. FOSTER:

14  Q.  Could you tell who threw it?

15  A.  It came from the state troopers.

16  Q.  Do you know what that object was that hit you?

17  A.  I'm not an expert on this, but I think it was a

18  concussion grenade that exploded that was launched.

19  Q.  Did it hurt?

20  A.  It happened pretty quickly, so it was disorienting.

21  Yeah, it -- pain, I guess, at that moment doesn't really

22  register to --

23  Q.  Okay.  Did it cause you any injuries?

24  A.  Yeah.  It hit my forehead right here (indicating).  In

25  fact, you can still see a scar from it.

```
 1   Q.  At this time I would like to direct your attention to a

 2   photograph that I showed you before the hearing.  It was

 3   previously marked as Plaintiffs' Exhibit 10.  Did you

 4   recognize that photo?

 5   A.  That's a question for me?

 6   Q.  Yes.

 7           MS. ANDERSON:  I just got kicked out of Zoom, so I

 8   might need just a minute.

 9           MS. FOSTER:  All right.  We are having more

10   technical issues with the wifi.  It's booting us out

11   periodically.

12   BY MS. FOSTER:

13   Q.  We can talk about Plaintiffs' Exhibit 10 while she's

14   getting back booted up.  Did you recognize that photograph?

15   I think you said yes?

16   A.  Yeah, [audio distortion].

17   Q.  What is that --

18           COURT REPORTER:  I didn't hear that answer.

19           THE COURT:  Let's stop right here.  Let me just

20   ask you to stop right here.  I'll ask -- we are off the

21   record now.

22       (Discussion off the record)

23   BY MS. FOSTER:

24   Q.  Are you familiar with Plaintiffs' Exhibit 10?

25   A.  Yeah.  I am looking at it right now.
```

1    Q.  Okay.  You have -- I sent you a copy of it before the

2    hearing so you would have that in front of you.  What is

3    that a --

4            THE COURT:  Let me just stop here.  I want to make

5    sure, Ms. Landrum, that you have access to the exhibit that

6    is being referred to and that you are able to follow along

7    with the examination that's being made as to exhibits.  So

8    are you able to do so?

9            MS. LANDRUM:  Yes, Your Honor.  I have paper

10   copies of all the exhibits, except for videos, right in

11   front of me.

12           THE COURT:  Okay.  So for purposes of this

13   hearing, we will be a little disorderly and that is to say

14   that if at any time you are having difficulty seeing any

15   exhibit that's being addressed, Counsel, please let me know

16   that and we will make sure that we remedy that problem using

17   whatever ingenuity we can muster to do so.  Okay?

18           MS. FOSTER:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           MS. FOSTER:  Thank you.

21           THE COURT:  You may proceed.

22   BY MS. FOSTER:

23   Q.  Mr. Ou, could you please describe what Plaintiffs'

24   Exhibit 10 is.

25   A.  That's a photo of me after I was hit in the face and --

1    it's me after what happened.

2    Q.  On May 30th at the protest after you were hit with the

3    projectile; is that what you mean?

4    A.  Yeah, and after I was pepper-sprayed in the face as

5    well.

6    Q.  Okay.

7              MS. FOSTER:  At this time I would like to offer

8    Plaintiffs' Exhibit 10 and I would like to publish it.

9              MS. LANDRUM:  No objection, Your Honor.

10             THE COURT:  Okay.  Exhibit 10 is received in

11   evidence and you may publish.

12       (Pause)

13             THE COURT:  Let's take a brief recess now.  We

14   will go off the record.  We can keep all of our video and

15   audio up so that we are all hearing and speaking to each

16   other and we can make sure that we know what we need to do

17   in order to display exhibits.  Okay?

18             MS. FOSTER:  Thank you.  I apologize for this,

19   Judge.

20             THE COURT:  Please don't apologize.

21       (Discussion off the record)

22             THE COURT:  We are ready to proceed.  We are back

23   on the record now.

24   BY MS. FOSTER:

25   Q.  Mr. Ou, we are looking at Plaintiffs' Exhibit 10.  What

1    does this show?

2    A.   This is me after I was attacked by the police.

3    Q.   And what is -- why is your face red in this picture?

4    A.   It's a combination of blood and pepper spray.

5    Q.   And was this caused by the -- was the blood caused by

6    the projectile that hit you?

7    A.   Yes, I think so, and amongst other things.

8    Q.   Okay.  And you mentioned being pepper-sprayed.  Who

9    pepper-sprayed you?

10   A.   The Minnesota State Patrol.

11   Q.   What kind of uniform was the individual who

12   pepper-sprayed you wearing; do you recall?

13   A.   A person wearing riot gear, like a -- one of those,

14   like, state trooper things and black armor thing and then a

15   big helmet.

16   Q.   Okay.  And so you said a state trooper thing.  Was there

17   a state trooper label on the uniform?

18   A.   I think so, yeah.

19   Q.   Okay.  How far away was he standing from you when he

20   sprayed you?

21   A.   They were like a foot away from me, like, right next --

22   right in front of me.

23   Q.   Were you standing next to any protesters at that time?

24   A.   No.

25          MS. FOSTER:  Okay.  At this point in time I would

 1    like to play the next segment of the video, starting at a

 2    minute 34.

 3         (Pause)

 4              MS. FOSTER:  It appears we don't have audio.

 5         (Video recording played)

 6              THE COURT:  Please make a record where the video

 7    has stopped if you are going to question about what we have

 8    seen so far.

 9              MS. FOSTER:  I believe we stopped at 2 minutes and

10    13 seconds.

11              THE COURT:  Thank you.

12    BY MS. FOSTER:

13    Q.  Was it obvious that you were a journalist when this

14    happened?

15    A.  Yes.

16    Q.  Were you still carrying professional camera equipment?

17    A.  Yeah, I had a camera and then my press credentials.

18              MS. LANDRUM:  Objection, Your Honor.  This

19    testimony calls for speculation, has a lack of foundation.

20    He can't testify as to what other people's perception of him

21    was.

22              THE COURT:  Sustained.  You may restate the

23    question in a manner in which you elicit the information you

24    need.

25    BY MS. FOSTER:

1    Q.  Mr. Ou, what were you carrying with you at this time?

2    A.  I was carrying a camera with a microphone and stuff, so

3    it's what I use to shoot with.  I had a backpack.  I had a

4    credential, like a press lanyard that said, "NBC News" with

5    the pretty iconic logo of the peacock, and then a badge that

6    said, "Press" on it.

7    Q.  Are you familiar with Plaintiffs' Exhibit 12, which I

8    sent to you before the hearing?  Did you have an opportunity

9    to review that?

10   A.  Yeah.  12, yes.

11   Q.  And do you recognize that photograph?

12   A.  Yes.  That's me.

13   Q.  Who's the person in that photograph?

14   A.  That's me.

15   Q.  Was this taken during the Floyd protests on May 30,

16   2020?

17   A.  Yes.

18        MS. FOSTER:  Your Honor, at this time I would like

19   to offer Plaintiffs' Exhibit 12.

20        MS. LANDRUM:  No objection, Your Honor.

21        THE COURT:  Exhibit 12 is received, Plaintiffs'

22   Exhibit 12.

23   BY MS. FOSTER:

24   Q.  As you can see in the picture, there's, it looks like, a

25   lanyard that you are wearing on the outside of your clothes.

```
1     Was that an NBC -- the NBC press lanyard that you were just

2     referring to with the peacock logo?

3     A.  Yes.

4     Q.  What were you wearing on your head?

5     A.  These are headphones.

6     Q.  Is that part of the professional gear that you normally

7     carry?

8     A.  Yes.

9     Q.  And were you standing with other reporters at that time?

10    A.  Yes, reporters, video journalists.

11    Q.  When you were pepper-sprayed, were you or any of the

12    journalists you were standing with, were you doing anything

13    to provoke the troopers?

14    A.  No.  We were filming.

15    Q.  Were you throwing anything at them?

16    A.  No.

17    Q.  Did the trooper who sprayed you warn you before he did

18    it?

19    A.  No.

20    Q.  Did he appear to be intentionally targeting you?  Was

21    that your perception?

22    A.  Yes.

23              MS. LANDRUM:  Objection, Your Honor, again, lack

24    of personal knowledge and speculation.

25              MS. FOSTER:  Your Honor, I'm asking about his
```

1    perception.

2              THE COURT:  Overruled.

3    BY MS. FOSTER:

4    Q.  Was that your perception, that you were being targeted?

5    A.  Yes.

6    Q.  What were you sprayed with?  Do you know what the

7    substance was?

8    A.  It was pepper spray, I think, or Mace or --

9    Q.  What was the consistency of the spray?

10   A.  It was like a liquid that once it got on you, it started

11   to -- it made me -- it really hurt and it kind of blinded

12   me.

13   Q.  What does tear gas -- have you been tear-gassed before

14   in your --

15   A.  Many --

16       (Simultaneous indiscernible crosstalk)

17   Q.  -- covering protests?

18             COURT REPORTER:  I didn't hear that answer.

19             THE COURT:  And please keep your voice up.  We are

20   having trouble hearing you.  Okay?

21             THE WITNESS:  I have been tear-gassed

22   [audio distortion].

23             COURT REPORTER:  I didn't hear that either.

24   BY MS. FOSTER:

25   Q.  You have been tear-gassed before?

1    A.  Yes.

2    Q.  How did this differ from tear gas?

3    A.  Tear gas, once you are in the region, it starts to burn,

4    but the moment you leave the region, the area that's

5    being -- that there's the puff of smoke, you're kind of --

6    it takes a second to recover, but then you're fine.

7           With this pepper spray, it sticks on you so it --

8    there's nowhere to go and it just stays on you.  In fact, it

9    stayed on me for weeks and weeks after this happened.

10   Q.  So what happened after that?  Did you get hit with

11   anything else?

12   A.  It's hard to say, but we -- I was blind at this point.

13   So we were pushed and shoved a bunch of places as we

14   were trying to leave.  So I was hit multiple times with

15   [audio distortion].

16          COURT REPORTER:  I'm sorry.  I couldn't hear.  I

17   think what is happening is when he moves a lot, we lose the

18   audio.

19          MS. FOSTER:  Yeah, so if you could avoid moving

20   back and forth.  Sorry.

21          THE WITNESS:  So, yeah, I was blind at this point,

22   so I don't know exactly what hit me.  But I was shoved

23   around.  At some point in time I also hit a wall.  I don't

24   know if I was being -- I was running into other people or if

25   I was being hit from behind by other people or people were

1   bumping into me.  I don't know because I was blind at that

2   moment.

3   BY MS. FOSTER:

4   Q.  Why were you blind?

5   A.  Because I was pepper-sprayed in the face, and there was

6   also blood streaming down.  So I don't know what -- it was a

7   combination of [audio distortion].

8            COURT REPORTER:  A combination of?  I didn't hear.

9   BY MS. FOSTER:

10  Q.  You didn't finish the sentence.  It's a combination of

11  what?

12  A.  It was a combination of both pepper spray and then

13  blood, which I didn't know at that time what it was, but I

14  couldn't see.

15  Q.  Okay.  Did you leave the alcove that you were standing

16  in after you got pepper-sprayed?

17  A.  Yes.  We were pushed away from that alcove.  I thought

18  that in that alcove the state troopers would pass us, but

19  they did not.

20  Q.  Where did you go?

21  A.  We were corralled down Nicollet Street towards 31st.

22  So, yeah, we kept on trying to stay in the alcove to get out

23  of the way of the state troopers, but then they specifically

24  kept on pushing us forward into where the rally was

25  happening.  I was trying to just leave, but I couldn't see,

1    so I got, like, corralled into kind of, like -- in the bus

2    station there was like a fenced-off area, which I think is

3    where the power generator or something was, and so we got

4    trapped inside like a fenced-off area.

5    Q.  When you say "we," who do you mean other than yourself?

6    A.  Myself and the journalists I was with.

7    Q.  So it was a whole group of journalists that went to this

8    area?

9    A.  Yes.

10   Q.  Did the protesters come with you or were you segregated

11   from the protesters?

12   A.  I didn't see protesters.  I was mostly -- we were in a

13   pretty packed group of journalists.  So, as I recall, it was

14   mostly journalists I was with.

15   Q.  Were you safe there?

16   A.  No, I wasn't because we were trapped.  And then the

17   state troopers came and they kept on throwing concussion

18   grenades at us, telling us to leave, but there was nowhere

19   for us to go.  So, no, I was not safe there.  We would have

20   been safe if we weren't [audio distortion].

21              THE COURT:  I didn't hear you.  You said we would

22   have been safe if what?

23              THE WITNESS:  If we weren't targeted by the state

24   troopers.

25              MS. FOSTER:  At this point I would like to play

1     another segment of the video, starting at where we left

2     off --

3                  THE COURT:  You may.

4                  MS. FOSTER:  -- and going through 3 minutes and

5     46 seconds, approximately.

6          (Video recording played)

7                  THE COURT:  Let's stop here.  You've made the

8     record clear you have been -- the video played from 2:13 to

9     what is the stopping point?

10                 MS. FOSTER:  3:46.

11                 THE COURT:  3:46.  Thank you, Counsel.

12    BY MS. FOSTER:

13    Q.  Mr. Ou, towards the end of that video there were people

14    climbing over a wall, it appeared.  Do you know who those

15    people were?

16    A.  Yes.  So the first batch of people who were passing the

17    microphone, I think that was a TV crew.  And then the second

18    person who was shoved over the wall is a colleague and

19    friend of mine.  His name is Mike Shum.

20    Q.  You said he was shoved over the wall.  Did you see who

21    was shoving him?

22    A.  It was the state troopers who did that.

23    Q.  Did you climb over the wall?

24    A.  I tried to at first, but I couldn't see and it was a

25    pretty high wall, so I -- like, I couldn't see, so it just

1    felt a little bit dangerous.  So I was very disoriented at

2    that time.  But I had thought about this, but I had a

3    backpack and all my camera gear and I couldn't see and I was

4    bleeding, so it felt really -- it just -- I tried to, but it

5    seemed a little difficult.

6    Q.  You said you were having trouble breathing.  Why were

7    you having trouble breathing?

8    A.  Because I was pepper-sprayed in the face.

9    Q.  Okay.  Are you familiar with Plaintiffs' Exhibit 9,

10   which I sent to you prior to this hearing?

11   A.  Let me just take a look.  Yes.

12   Q.  Do you recognize that photograph?

13   A.  Yes.

14   Q.  What is that a photograph of?

15   A.  That was an N95 mask I was wearing at that moment.

16   Q.  And was this taken during the Floyd protests on

17   May 30th?

18   A.  It was taken after, when I got back to the hotel room

19   where I was staying.

20           MS. FOSTER:  Your Honor, I would like to offer

21   Plaintiffs' Exhibit 9.

22           MS. LANDRUM:  No objections.

23           THE COURT:  Exhibit 9 is received in evidence.

24   BY MS. FOSTER:

25   Q.  So what appears to be covering your mask in this photo?

1    A.  I think it's a combination of blood and also pepper

2    spray or Mace.

3    Q.  Did that make it difficult for you to breathe, the fact

4    that your mask was covered in substances?

5    A.  Yeah.

6    Q.  Did any of the troopers approach you while you were

7    trapped against the wall in that area?

8    A.  Yeah.  One person, I think, threw a concussion grenade

9    at us and grabbed me, I think, as I remember, and I was kind

10   of, like, handled.  But, yeah, I -- but it was hard for me

11   to see, so I think that's what happened.

12   Q.  Did they say anything?

13   A.  They -- I remember they said, like, "What do you want me

14   to do with this person?"  I thought that they were going to

15   arrest me.  And at that point I just wanted anything to get

16   out of that situation.  If they arrested me, so be it.  I

17   just wanted to get out of the alcove because there was

18   nowhere else to go.

19   Q.  Did they arrest you?

20   A.  No.

21           MS. FOSTER:  I would like to play the video,

22   another segment, starting at where we left off.

23      (Video recording played)

24           MS. FOSTER:  I don't know if you heard that.

25   Should we -- can we replay that?

1          THE COURT:  And let's identify what portion of the

2     video that is.  Is it 3:50?

3          MS. FOSTER:  It's 3:51 -- so 3:46 to 3:51.

4          THE COURT:  Thank you.

5          MS. FOSTER:  Very brief segment.

6     (Video recording played)

7     BY MS. FOSTER:

8     Q.  So is he talking about maybe handcuffing you?

9     A.  Yeah.  They said, "What do you want me to do with this?"

10    The "this" was me.

11    Q.  Okay.

12    A.  I'm the "this."

13    Q.  Was it obvious that you were injured at that point?

14    A.  Yes, I --

15    Q.  I'm sorry.  Was it your perception that it was obvious

16    that you were injured at that point?

17    A.  I was bleeding in my face, so, yeah, I was injured.

18    Q.  Did the troopers offer to help you?

19    A.  No.

20    Q.  What did you do when they left?

21    A.  I was asking for help.

22    Q.  Were you still bleeding as you were asking for help?

23    A.  Yeah.  I also couldn't see and I was in considerable

24    pain, but it was -- I didn't know where -- this happened

25    very quickly.  So mostly I couldn't see and then my face was

 1    on fire and then something hurt.

 2    Q.  Did you go anywhere?

 3    A.  I tried to get help.  And I was really disoriented, so I

 4    was just trying to get out of that situation and find some

 5    help.

 6    Q.  Who did you ask for help from?

 7    A.  The law enforcement officers.  There were state troopers

 8    that were filing through and then, I think, Minneapolis

 9    Police were kind of passing me.

10    Q.  Did anyone help you?

11    A.  No.

12    Q.  Were you still recording while all of this was

13    happening?

14    A.  As you saw in the video, around like a minute before, I

15    was trying to.  So when I got into the alcove, I was kind

16    of, like, still trying to film a little bit, but then I

17    couldn't see.  So I was, like, half trying to do my job,

18    thinking at that alcove that I was then finally safe, and

19    then the state troopers came and started throwing grenades

20    at us again and so then I went into survival mode again.  So

21    I tried to report, but I couldn't.

22            MS. FOSTER:  I would like to play another segment

23    of the video, starting at 3:51.

24        (Video recording played)

25            MS. FOSTER:  So, for the record, we have stopped

1    at 5 minutes and 15 seconds in Plaintiffs' Exhibit 14.

2    BY MS. FOSTER:

3    Q.  Who ultimately helped you at the end of that video,

4    Mr. Ou?

5    A.  A colleague of mine and a friend.  His name is Peter van

6    Agtmael.

7    Q.  Where did he take you?

8    A.  He took me to the corner of 32nd, so down Nicollet, and

9    he kind of gave me first -- to the -- I guess the -- not the

10   corner.  So he started helping me there, and then we had to

11   run again because I think they started -- so he was trying

12   to give me first aid, and some other civilians or bystanders

13   showed up and someone gave me water and someone gave me a

14   T-shirt and gauze and stuff.  And so we were there for a

15   second and then we had to move again because there was

16   cops or there was explosions or concussion grenades and

17   [audio distortion].

18   Q.  You faded out again.  I'm sorry.  Could you repeat the

19   end of that?  You said you had to leave again because?

20   A.  Because we were -- I guess we were targeted again by

21   concussion grenades.  So everyone ran closer down

22   32nd Street and we got cover by the bus depot, like, just

23   half a block down.

24   Q.  Eventually were you able to get medical treatment?

25   A.  Yeah.  I reconnected with the colleagues I was with, my

```
1    reporting partner, and they patched me up or they put gauze
2    on my face, but then I kept on bleeding and eventually I had
3    to go to the hospital.
4    Q.  How long were you at the hospital?
5    A.  Around four hours or so.
6    Q.  What did the doctors do to treat your injuries?
7    A.  They stitched my -- they gave me four stitches, and then
8    I got a tetanus shot and a bunch of tests.  I forget what.
9    But they gave me tests and then they stitched me up.
10   Q.  Was it painful?
11   A.  It was pretty painful, yes.
12   Q.  You said it took several hours.  Did you get a
13   diagnosis?
14   A.  It was pretty clear what had happened.  So it was trauma
15   to my face.
16   Q.  Okay.
17   A.  But then the other thing, too, is I had pepper spray
18   still kind of, like, dripping down all over my body, so that
19   was -- it was a combination of many things.
20   Q.  Were you able to continue your coverage of the events
21   that night?
22   A.  Not that night.  Actually, our editors pulled out a lot
23   of the teams working and we were all told to go back to our
24   hotels.
25   Q.  Why did they do that?  What was the reason you were
```

```
 1    given?

 2    A.  After -- I had not known this, but other people from NBC

 3    News were attacked that night by law enforcement and so they

 4    deemed it was too dangerous for us to stay out.

 5              MS. LANDRUM:  Objection, Your Honor, hearsay.

 6    That testimony was based off of hearsay, about the other

 7    attacks.

 8              THE COURT:  Counsel?

 9              MS. FOSTER:  He's explaining what his

10    understanding of the events was and the reason for the

11    reporters being taken off the street.

12              MS. LANDRUM:  With that understanding, Your Honor,

13    it's based off hearsay alone versus his personal knowledge.

14              THE COURT:  Sustained.

15              MS. LANDRUM:  Thank you, Your Honor.

16    BY MS. FOSTER:

17    Q.  What happened the next day, Mr. Ou?

18    A.  So the next day being -- so this happened at 8:00 on the

19    30th, and the next day was -- if you are asking what

20    happened, like, at midnight, I was in the hospital and I was

21    there until around, I think, in the early morning and then

22    we went to the hotel because we hadn't checked in yet.

23              And so I checked into the hotel with a bloody face

24    and I -- it took another few hours to just clean my face,

25    and so I started to file all my footage that night.  So it
```

1    was a combination of working and then talking to, you know,

2    my girlfriend, my partner, and then also cleaning my face.

3              And then I talked to my editors when they woke up

4    and told them -- we kind of had a debriefing of what

5    happened.  They asked me if I wanted to stay there, and I

6    did.  And so we made a plan with Dani, the reporter I was

7    with, to go back out and keep working.

8    Q.  And where did you go back out?

9    A.  In the morning we went by 30th and Chicago to just see

10   what was happening there.  I found -- I had met some

11   characters, some people the night before, who I called and

12   we filmed them at home.

13             And then there was a protest in the evening near a

14   highway, like on a highway, which I don't remember the name

15   of the highway because I'm not from Minneapolis, but.  So

16   there was a protest there and that's what -- that was our

17   day.  We were going to protests.

18   Q.  And where were you when you were covering the

19   protests -- that protest that was on the highway, where were

20   you standing?

21   A.  We originally went down to kind of, like, this exit

22   ramp, but there was a lot of state troopers and I was pretty

23   shaken, so we kind of pulled back.  And then I was filming

24   from like an overpass looking down at things.  But we kind

25   of kept our distance.

1    Q.  Why did you keep your distance?

2    A.  I was scared.  I didn't know how to act around the

3    police or just law enforcement in general because what

4    happened the night before really caught, I think, a lot of

5    us -- well, it caught me off guard and I just didn't know

6    how they would react to us because they targeted us pretty

7    deliberately the night before and I just wasn't sure, like,

8    what -- whether they would attack us again.

9    Q.  So did having been attacked and targeted the night

10   before affect where you decided to cover the events the

11   following night?

12             MS. LANDRUM:  Your Honor --

13             THE WITNESS:  Yes.

14             MS. LANDRUM:  -- the defendants object to this

15   line of questioning with regard to the [inaudible].

16             COURT REPORTER:  Excuse me.  Is your microphone

17   on?  I am having trouble hearing you.

18             MS. LANDRUM:  Oh.  My apologies, Your Honor.

19             THE COURT:  And if you would like, you may remain

20   seated, because it might be the best way for us to hear you.

21   And the Court knows you respect the Court.  Thank you.

22             MS. LANDRUM:  Thank you, Your Honor.  We are

23   objecting to this line of testimony, the questions and the

24   answers, with regard to the phrase "intentional and

25   deliberate targeting."  There's a lack of personal knowledge

1    and speculation as to the state of mind of any

2    individuals -- of anyone other than Mr. Ou.  So we would

3    object on those bases.

4            MS. FOSTER:  Your Honor, this line of questioning

5    goes to Mr. Ou's state of mind and to his perception that he

6    was being attacked and targeted.  It's totally proper.

7            MS. LANDRUM:  Your Honor, if I may, the phrase

8    "deliberate and intentional," those are phrases that are

9    going at the state of mind of other actors who are not

10   Mr. Ou.

11           THE COURT:  I will overrule the objection.  My

12   hearing of the witness was his rationale and his

13   understanding and his reasons for his actions.  So the Court

14   is receiving that evidence in that manner.

15           MS. LANDRUM:  Thank you, Your Honor.

16   BY MS. FOSTER:

17   Q.  So you were -- were you concerned about getting

18   assaulted again?

19   A.  Yes.  I was scared.

20   Q.  Has that had a lasting impact on your ability to do your

21   job as a journalist?

22   A.  Yeah, it has, even now.

23   Q.  Did you return to Minneapolis in April 2021?

24   A.  Yes.

25   Q.  And why did you return to Minneapolis at that time?

```
 1    A.  I was assigned to cover the Chauvin verdict.  It was --
 2    at that time we were expecting that there would be a verdict
 3    in the trial.  So around that same time there was another
 4    incident in Brooklyn Center and so there were protests
 5    related to Daunte Wright.  And so around that same time that
 6    I was going to cover the Chauvin verdict, that happened, so
 7    we went.
 8    Q.  Where did you go in Brooklyn Center?
 9    A.  I went to the police department, where protests were
10    happening.
11    Q.  And what kind of story did you cover there?
12    A.  I did a combination of news, but I stayed back a bit.
13    So I did a story where I covered -- I was inside an
14    apartment building that overlooked where the protests were
15    happening and so I was with a family watching them kind of,
16    like, witness what was happening from their balcony because
17    their house/balcony looked over, right over, the police
18    station.
19    Q.  Did that story get published?
20    A.  It was published in The New York Times.
21    Q.  Where were you physically located when you were covering
22    that story?
23    A.  At the beginning I was kind of covering a march down on
24    the ground, but as things became a bit more tense, I went
25    inside and stayed inside this apartment block --
```

1   Q.  Why did you choose --

2               THE COURT:  Let's let him finish --

3               MS. FOSTER:  I'm sorry.

4               THE COURT:  -- his response.

5               MS. FOSTER:  I thought he was done.

6               THE COURT:  You may finish your response.

7               THE WITNESS:  Yes.  So I was inside of an

8   apartment block filming from someone's house.

9   BY MS. FOSTER:

10  Q.  Why did you choose that location?

11  A.  It felt safer because, you know, it was -- it was

12  difficult covering Minneapolis because, again, law

13  enforcement was really unpredictable, and that was

14  consistent.  And I just really didn't want to get targeted,

15  so I decided to be somewhere safer.

16  Q.  Was there a curfew in place that night?

17  A.  Yes.

18  Q.  What was your understanding -- and what was your

19  understanding of how the curfew applied to journalists?

20  A.  As I understood it, the curfew did not apply to

21  journalists.

22  Q.  Did you witness any dispersal orders being issued by law

23  enforcement that night?

24  A.  Yes.

25  Q.  Did you capture that on video?

1    A.  Yes.

2    Q.  Have you had an opportunity to review the video, prior

3    to this hearing, that was marked as Plaintiffs' Exhibit 8?

4    A.  Yes.

5    Q.  And is Plaintiffs' Exhibit 8 a copy of the video that

6    you took that night?

7    A.  Yes.

8              MS. FOSTER:  Your Honor, I would like to offer

9    Plaintiffs' Exhibit 8.

10             MS. LANDRUM:  No objections, Your Honor, subject

11   to there are some statements from a witness in the video

12   that would be hearsay, but the video itself and what it's

13   capturing we have no objection to.

14             THE COURT:  Exhibit 8 is received.

15        (Video recording played)

16   BY MS. FOSTER:

17   Q.  What was the announcement that we just heard saying --

18   about the media?

19   A.  They told the media to disperse.

20   Q.  Is it common for law enforcement to issue multiple

21   dispersal orders before they move forward with a mass arrest

22   after giving an order like that?

23             MS. LANDRUM:  Objection --

24             THE WITNESS:  I think --

25             MS. LANDRUM:  -- no foundation.

```
 1     BY MS. FOSTER:

 2     Q.  Mr. Ou, have you participated and covered a number of --

 3               THE COURT:  Let me rule on the --

 4               MS. FOSTER:  I apologize.

 5               THE COURT:  -- objection.  Sustained.

 6     BY MS. FOSTER:

 7     Q.  Have you covered a number of protests in your career?

 8     A.  Yes.

 9     Q.  Have you witnessed dispersal orders in the past?

10     A.  Yes.

11     Q.  Have you seen -- in your experience, have you seen mass

12     arrests taking place?

13     A.  Yes.

14     Q.  So do you have a common base of experience from which to

15     determine -- a base of experience from which to determine,

16     at least in your career, what has been common?

17     A.  Yes.

18               MS. FOSTER:  Your Honor, I think that establishes

19     foundation for the question that was asked.

20               THE COURT:  You may ask the question.

21               MS. FOSTER:  Okay.

22     BY MS. FOSTER:

23     Q.  Is it common for law enforcement to issue multiple

24     dispersal orders before they move forward with mass arrests,

25     based on your experience?
```

1    A.  In general, yeah.

2    Q.  Can a significant period of time pass between the first

3    dispersal order and any arrests that occur?

4    A.  Yes.

5    Q.   Is it common for members of the media to stay during

6    this period of time so that they can cover the interactions

7    between police and protesters?

8    A.  Yes.

9    Q.  Do you believe that's important?

10   A.  Yes.

11   Q.  Why?

12   A.  Because that's the foundational nature of our job as

13   journalists, is to bear witness and hold any side to

14   anything to account.  And especially with law enforcement,

15   to hold them to account and just see what happens so we can

16   see with our own eyes, like, what -- how they act.

17   Q.  Did you see any members of the media attacking law

18   enforcement officers that night in Brooklyn Center?

19   A.  [Inaudible.]

20   Q.  Could you repeat that?

21          THE COURT:  I didn't hear your response.

22   BY MS. FOSTER:

23   Q.  We didn't hear your response.

24   A.  No, I did not see members of the media attacking law

25   enforcement.

```
 1    Q.  Were any journalists throwing things or looting?

 2    A.  No.

 3            MS. LANDRUM:  Objection, Your Honor, lack of

 4    foundation, lack of personal knowledge, speculation inasmuch

 5    as Mr. Ou couldn't possibly know who on the ground was or

 6    was not media.

 7            THE COURT:  Overruled.  You may answer based on

 8    your personal knowledge.

 9            THE WITNESS:  Sorry.  Can you repeat the question?

10    I got --

11    BY MS. FOSTER:

12    Q.  Sure.  Based on your personal knowledge or what you saw,

13    were any journalists throwing things or looting?

14    A.  No, I did not see that happen.

15    Q.  To the extent that you were able to see what was going

16    on, what were the journalists you saw doing at the protest?

17    A.  I saw journalists reporting, holding cameras, writing

18    stuff down in notebooks, holding -- streaming, doing their

19    job.

20    Q.  And how were you able to recognize who were the

21    journalists?

22    A.  People had cameras.  They had notepads.  They were

23    holding their phones in a way that made it clear that they

24    were livestreaming.  It's pretty simple to tell who is doing

25    journalism.
```

```
 1   Q.  When you heard that dispersal message, did you leave the

 2   area?

 3   A.  No, I didn't because I was already in private property.

 4   Q.  Okay.

 5   A.  It didn't [audio distortion].

 6   Q.  We didn't hear that.  Could you move closer to the mike?

 7   A.  We were -- I was in private property and so -- and,

 8   also, it was my understanding that that dispersal order did

 9   not apply to journalists.

10   Q.  Did anyone threaten you while you were on the private

11   property?

12   A.  Yeah.  When I was filming from the vantage point that

13   you saw inside -- not even on the balcony, but from inside,

14   law enforcement pointed stuff at us, pointed something at me

15   and said, "Go away, go away," like "Back off, back off."

16   And so I backed off because I didn't want to put the person

17   whose home I was in in jeopardy, because I didn't know how

18   the law enforcement would react if I was there.  So I kind

19   of just made myself scarce.

20   Q.  Were you able to identify which law enforcement agency

21   that individual worked for?

22   A.  No.

23   Q.  Were there multiple law enforcement agencies that you

24   saw present that night?

25   A.  Yeah.  There were state troopers there, but then also
```

 1    Brooklyn Center was -- I'm not exactly used to what people

 2    were wearing, but, as I remember, there was also National

 3    Guard there and there were people wearing fluorescent

 4    yellow, fluorescent greenish jackets and dark -- it seemed

 5    like a combination of different law enforcement agencies.

 6    Q.  Did the presence of multiple agencies make it difficult

 7    for you to identify who pointed the thing at you and told

 8    you to back off?

 9    A.  Yes.

10    Q.  How did you respond to that threat?  What did you do?

11    A.  I backed off because, you know, even though objectively

12    I knew that I was on private property and was filming, like,

13    I didn't need to go anywhere, as journalists we have to also

14    act ethically and knowing that if there was -- if law

15    enforcement punished the people I was filming, I wouldn't

16    want that -- I wouldn't want to cause somebody to get in

17    trouble because of what I was doing.  And so it's always a

18    balance of what you are legally allowed to do, but ethically

19    how to not do harm to your subjects [audio distortion].

20            COURT REPORTER:  His audio cut off at the end.

21    BY MS. FOSTER:

22    Q.  Could you repeat the last sentence?

23    A.  Yeah.  It's a balance, because I made a decision -- you

24    always have to balance what you can legally do and ethically

25    what your responsibilities are to your subjects.  At this

1    point my character was a person who lived in Brooklyn

2    Center, so I was thinking about maybe if it became known

3    that she had a journalist over, she would maybe be targeted

4    by law enforcement or something like that.  So with that in

5    mind, I decided to be less visible to law enforcement and

6    film from a distance so they couldn't see me.

7                  MS. FOSTER:  Were you able to catch that?

8                  COURT REPORTER:  Yes.

9    BY MS. FOSTER:

10   Q.  Has anyone from the State contacted you to discuss what

11   happened to you during the protests?

12   A.  I got an e-mail I think around in the fall of 2020.

13   Q.  Okay.  Do you know who contacted you?

14   A.  Yeah.  His name was Jerry -- I don't know how to say his

15   last name -- Cziok.  It's C-zed-i-o-k.

16   Q.  Okay.  Did you respond to that e-mail?

17   A.  No, I did not.

18   Q.  Why not?

19   A.  My company at that time, NBC News, told me not to.

20   Q.  So your employer basically instructed you not to

21   respond --

22   A.  That's correct.

23   Q.  -- is that what you are saying?

24          Okay.  How long has it been since you were

25   injured?

```
 1    A.  That was June or May 2020 and it is now July.  So a year

 2    and a month or two.

 3    Q.  Has anyone from the State ever apologized to you for

 4    what happened?

 5    A.  No.

 6    Q.  Have you decided to join this lawsuit as a named

 7    plaintiff, Mr. Ou?

 8    A.  Yes.

 9    Q.  How would you describe your views towards law

10    enforcement before the protests we've been talking about

11    today?

12    A.  Are we talking about the American context or --

13    Q.  Yes.  That's a good clarification.

14    A.  Yeah.  In the American context, I didn't think so much

15    of law enforcement.  In fact, I've actually -- the story I

16    did before this, I embedded with a police department in

17    San Antonio for quite a few months and worked on a

18    documentary looking at a community police -- San Antonio

19    Police Department going to mental health calls.  So I

20    didn't -- like, I had covered law enforcement and being

21    around protests, you know, you're in their proximity, but I

22    always operated under the assumption that, you know, if

23    you're not getting in anyone's way, you had the right to

24    film and, you know, just work.  So I didn't really think

25    much of it.
```

1    Q.  How would you describe your relationship with the police

2    in San Antonio that you covered during that -- when you were

3    embedded with them?

4    A.  It was quite good because these are mental health --

5    these are police officers who are also trained in mental

6    health, so they went to [audio distortion].

7            COURT REPORTER:  He cut out again.

8    BY MS. FOSTER:

9    Q.  You cut out.  Sorry.  I don't know why.

10    A.  These are police officers who specialized in

11    de-escalation, so they would go to places with mental health

12    distress calls and they would, you know, use their

13    de-escalation training and their mental health skills to

14    kind of, like, de-escalate situations and then kind of,

15    like, get people into services.  So it was actually a really

16    interesting thing to cover to show, you know, like, police

17    doing their jobs at their best and kind of like an example

18    for law enforcement to follow.

19    Q.  When you cover a protest event, do you try to avoid bias

20    towards any group?

21    A.  Yes.  That's the --

22    Q.  And why is -- I'm sorry.  Go ahead.

23    A.  That's the foundation of what we do as journalists, is

24    to report the truth without bias, you know, just report all

25    sides of a story with nuance and kind of, like, report in a

1    balanced way.

2    Q.  How have the attacks that you experienced during the

3    protests in Minneapolis affected your ability to continue

4    doing your job as an objective observer?

5    A.  In the American context it's difficult because it's hard

6    to operate safely in a protest situation or in general when

7    you don't know if someone will turn on you and attack you

8    without having really done anything.

9          And so it has been a little bit difficult for me

10   to know what's what, how to stay safe, how to not get in

11   people's way, you know, just how to navigate coverage in

12   America.  It's actually been -- even now, a year and a bit

13   later, it still has been quite difficult to navigate.

14   Q.  How long did it take you to recover from your physical

15   injuries?

16   A.  My scar healed.  I still have a scar right here

17   (indicating) that you can see, but it took quite some time

18   for all the pepper spray to get out of my hair.  My eyes

19   were quite affected and my breathing was affected for quite

20   a few months afterwards.  Some of my camera gear right now

21   is still pepper spray-ee [phonetic].  So it took some time.

22   And I have a scar here (indicating) that hasn't gone away.

23   Q.  Would you say that you've recovered from the

24   psychological impact?

25   A.  No, I have not.  It's hard because, you know, you don't

1    want to make it about you, but it's hard because the things

2    that happened really affect you.  And, you know, like, even

3    yesterday there was a thunderstorm where I was -- where I am

4    at right now and just even hearing loud noises or, you know,

5    seeing -- being in situations in large crowds, it's hard.

6    It just makes you constantly, like, really nervous and not

7    know how to be safe.

8    Q.  Do you continue to experience fear when you cover events

9    with a large law enforcement presence?

10   A.  I do.  I do because, yeah, I don't know how to act

11   anymore.  In the American context it used to be just make

12   sure everyone knows that you are a journalist.  I remember

13   covering protests in New York with the NYPD where I would

14   kind of go out of my way to, like, make eye contact with all

15   the police and show them my camera so that they could have,

16   like, some memory of me so that if there was, like, any

17   incident, they would know that I was there.  And so I think

18   a lot of it is, like, make your intentions known so that

19   you're not mistaken for anything other than a journalist.

20         But now, I guess after what happened on the 30th,

21   in the American context I don't know what is safe anymore

22   because at that moment I thought that we were in the perfect

23   position.  We were in a group of people.  We were protected.

24   We were out of the way.  They could have easily passed us if

25   they wanted to, but instead it almost felt like we were

1    targeted because we were journalists.  And because of that,

2    now I don't [audio distortion] any protests.

3              COURT REPORTER:  I'm sorry.  He is cutting out.

4    BY MS. FOSTER:

5    Q.  Could you repeat the very end of that?

6    A.  So when you -- I don't feel safe covering protests or

7    being around police because I don't know how to act anymore.

8    Because what happened in Minneapolis on the 30th of May in

9    2020, I was in what I thought -- it was almost like a

10   textbook, the best place that we could have been.  We had

11   cover and we were in a group of people who were so clearly

12   identified as journalists.

13             And I've replayed that over and over in my head to

14   go -- to think to myself, like, where did we screw up, like,

15   what did we do wrong.  And that's a large part of what we do

16   as journalists, is that we learn from our mistakes.

17             And any time things happen and when the stakes are

18   even higher, like in Libya, where my colleagues have been

19   killed, or in Syria, we take accidents and incidents and we

20   kind of, like, think to ourselves, okay, what did we do

21   wrong, how can we do things any differently.

22             And having thought about what happened in

23   Minneapolis on the 30th of 2020, I don't know what the

24   takeaway is.  I don't know how I would have done anything

25   differently.  And because I don't have any -- other than to

1    just not have been there.  And so because I don't -- I spent

2    a year and two months really trying to figure out, like,

3    what did we do wrong.  And the fact that I don't have an

4    answer to that makes me feel fundamentally unsafe covering

5    protests or, you know, marches where there's law

6    enforcement.  Because if the answer is, well, just don't be

7    a journalist and, like, just -- if you will be targeted no

8    matter what you do, then, yeah, I feel quite unsafe.

9              MS. FOSTER:  Thank you.  I have no further

10   questions.

11             THE COURT:  Let's take our break at this point and

12   then we will have our cross examination of this witness.  So

13   we will take a break now and I will ask everyone to be

14   prepared to return at ten minutes after 11:00 Central

15   Standard Time.  So I believe that may be ten minutes after

16   12:00 your time.

17             MS. FOSTER:  He is in Europe.

18             THE COURT:  Sorry.  I was thinking New York.  I'm

19   quite provincial.  So we will take a 15-minute break, and

20   then please be ready to return on camera for your cross

21   examination.

22             MS. FOSTER:  You can keep it dialed in if you

23   want, Ed.  That might be the easiest.

24             THE COURT:  Yes.

25             MS. FOSTER:  So we don't have to reconnect.

```
1            THE WITNESS:  So 15 minutes, 1-5?

2            THE COURT:  1-5, yes.

3            THE WITNESS:  Okay.

4            THE COURT:  We are in -- oh, I'm sorry.  Is there

5     anything else that we need to address at this time?

6            MS. LANDRUM:  No, Your Honor.

7            THE COURT:  Okay.  Very well.  We are in recess.

8        (Recess taken at 10:56 a.m.)

9                        *   *   *   *   *

10       (11:13 a.m.)

11                        IN OPEN COURT

12           THE COURT:  We are ready to proceed.

13           MS. LANDRUM:  Yes, Your Honor.

14           THE COURT:  You may.  We are back on the record.

15    You may proceed, Counsel.

16           MS. LANDRUM:  Thank you, Your Honor.

17                     CROSS EXAMINATION

18    BY MS. LANDRUM:

19    Q.  Good morning, Mr. Ou.  My name is Kathryn Iverson

20    Landrum.  Can you hear me okay?

21    A.  Yeah, I can hear you.

22    Q.  Great.  Wonderful.  My name is Kathryn Iverson Landrum.

23    I'm an attorney representing the defendants, the Minnesota

24    Department of Public Safety and Minnesota State Patrol.  I

25    want to thank you for your testimony here today.
```

```
1                I would like to start off with asking you about

2      your experiences on May 30th that you just discussed with

3      us.  First, you did not arrive in Minneapolis until May 30,

4      2020; is that right?

5      A.  That is correct.

6      Q.  That was several days after the unrest had erupted in

7      that area, correct?

8      A.  Yes.

9      Q.  And you did not begin your physical coverage in

10     Minneapolis until, I believe, 6:30 or 7:00 that night?

11     A.  Yes.

12     Q.  Now, you began your coverage located near the Fifth

13     Precinct in Minneapolis; is that correct?

14     A.  Yep.

15     Q.  Were you aware that there were significant concerns that

16     the Fifth Precinct, like the Third, would be set afire?

17              MS. FOSTER:  Objection --

18              THE WITNESS:  I was --

19              MS. FOSTER:  -- assumes facts not in evidence.

20              THE COURT:  Overruled.  You are asking what he

21     understood.

22              MS. LANDRUM:  Thank you, Your Honor.

23     BY MS. LANDRUM:

24     Q.  I will ask the question again, Mr. Ou.  Were you aware

25     at that time, when you located yourself at the Fifth
```

1    Precinct, that there were significant concerns that the

2    Fifth Precinct, like the Third Precinct, would be set on

3    fire?

4    A.  I was aware of the context of what had happened the days

5    previous.

6    Q.  So you were aware at that time that the Third Precinct

7    had been given up and had been set on fire?

8    A.  Yes.

9    Q.  Okay.  And you also testified that there were several

10   law enforcement agencies present there in addition to

11   Minnesota State Patrol troopers?

12   A.  Yes.

13   Q.  Now, you heard the dispersal orders before you were

14   injured on May 30th; is that correct?

15   A.  Yes.

16   Q.  Those dispersal orders were fairly loud?

17   A.  Yes.

18   Q.  And they were given over an acoustic device; is that

19   correct?

20   A.  Yes.

21   Q.  The protesters, however, based off of your personal

22   knowledge and the video footage that we saw, they did not

23   disperse as directed, right?

24   A.  Yes.

25   Q.  And neither did you; is that right?

1    A.  Yes.

2    Q.  Is it your practice not to follow directives from law

3    enforcement when you're covering protest activities?

4    A.  We were under the understanding that the curfew did not

5    apply to us as media.

6    Q.  I understand that that's your understanding of the legal

7    posture there, but is it your practice, generally speaking,

8    when an order is issued by law enforcement, that you do not

9    follow those when you're covering a protest?

10   A.  We -- when we operate, you know, we operate under what

11   we're allowed to do.  And at that moment we were on public

12   property, also not getting in anyone's way, and so based off

13   my experience with the police in general is if the media

14   makes themselves known and is not interfering, then we have

15   the right to be places because that's our job.

16   Q.  So the answer to my question is, yes, you believe that

17   you are not required to follow the directives of law

18   enforcement when covering protests?

19          MS. FOSTER:  Objection, argumentative.

20          THE COURT:  Sustained.

21   BY MS. LANDRUM:

22   Q.  Now, you testified that you were somewhat close to

23   protesters, is that right, when the dispersal order was

24   granted -- or given?

25   A.  Yeah.

1    Q.  About 12 to 15 feet away from protesters when the

2    dispersal order was granted -- or given?

3    A.  I guess somewhat -- so we were, by the time that they

4    had granted -- they were saying that, we were off to the

5    side, as I remember.

6    Q.  Now, when you were off to the side, you were technically

7    between law enforcement and the protesters, is that correct,

8    off to the side but between the law enforcement line and the

9    line of protesters; is that correct?

10   A.  We were behind the alcoves, so we were physically in

11   between.  If the protesters are here (indicating) and we

12   were here (indicating), we were here but behind alcoves.

13   Q.  Understood.  Stated differently, when that law

14   enforcement line started to move forward, you did not

15   disperse north with the protesters; is that correct?

16   A.  North is towards 31st, right?  So, yes, that's true, we

17   did not, yes.

18   Q.  Instead you attempted to stay in an alcove to the side?

19   A.  Yes.  We thought that they would [audio distortion].

20   Q.  And ultimately if that --

21           MS. LANDRUM:  Sorry.

22           THE COURT:  I didn't hear what the witness said.

23   Would you please repeat your response?

24           THE WITNESS:  Yeah.  We were in the alcoves

25   thinking they would pass us, the state troopers.

1    BY MS. LANDRUM:

2    Q.  And so you were intending to locate yourself behind that

3    line of law enforcement as they were moving north, that was

4    your intention?

5    A.  At that exact -- it depends on when you are referring

6    to.  This is quite a dynamic situation.  But we were

7    intending to stay out of the way in these alcoves, yes.

8    Q.  So then at that point, had that been successful, you

9    would have been facing -- you would have been further away

10   from the protesters and you would have been looking at the

11   law enforcement line from behind?

12   A.  Yes.

13            MS. LANDRUM:  I would like to pull up Plaintiffs'

14   Exhibit 14, please, if we may, Ms. Kosek, which has already

15   been entered into evidence, specifically at 49 seconds.

16   BY MS. LANDRUM:

17   Q.  And while we are pulling that up, Mr. Ou, I believe you

18   testified earlier this morning that persons who are

19   livestreaming during a protest are considered members of the

20   media.  Did I hear that correctly?

21   A.  I think people who are engaged in acts of journalism are

22   members of the media.

23   Q.  So it's your testimony that every person who is holding

24   up a personal cell phone and livestreaming or taking

25   photographs with their cell phone would be a member of the

1    media?

2    A.   That or exercising their First Amendment right to film.

3    Q.   Okay.  And you testified that you didn't see anybody on

4    that day, May 30, 2020, who was a member of the media that

5    was in any way antagonizing towards the Minnesota State

6    Patrol.  Did I hear that correctly?

7    A.   Yeah.

8    Q.   Okay.  We will wait to pull up Exhibit 14.

9         (Pause)

10   Q.   You had testified that immediately prior to the law

11   enforcement line moving north on Nicollet, that there were a

12   couple of individuals that were somewhat antagonistic

13   towards the Minnesota State Patrol and yelling obscenities;

14   is that correct?

15   A.   [Inaudible.]

16            THE COURT:  I didn't hear your response.

17            THE WITNESS:  Yes.

18            MS. LANDRUM:  And this is, for the record,

19   49 seconds into Plaintiffs' Exhibit 14.

20   BY MS. LANDRUM:

21   Q.   Are these the individuals that were yelling those

22   obscenities?

23   A.   Yeah, and off a bit, I guess, to where the right area

24   would be.

25   Q.   And this individual that we see at 49 seconds, do you

 1    see there it appears that he is either taking a photograph

 2    or possibly livestreaming; would you agree?

 3    A.  Yes.

 4    Q.  Do you recognize that individual?

 5    A.  No.

 6    Q.  Do you recognize him as being a member of the media?

 7    A.  No.  I don't know who that person is.

 8    Q.  But it's your position that he is media based off the

 9    fact that he is holding up his phone in this image of your

10    video?

11    A.  At this moment he's taking a picture.  I don't know who

12    he is.

13    Q.  Now, at this moment this gentleman is between other

14    protesters that are farther north on Nicollet and the line

15    of police officers that are south; is that correct?

16    A.  Can you say that one more time?

17    Q.  Sorry.  So at this point this gentleman that we see here

18    in Exhibit 14 has positioned himself between -- directly

19    between the protesters that are north of him and the law

20    enforcement officials that are south of him, correct?

21    A.  Yes.

22    Q.  And that's contrary to one of your primary rules as a

23    journalist, is that right, not to get in between the

24    protesters and law enforcement?

25    A.  Who are you talking about in this exact context, like

1    what is contrary to?

2    Q.  I am talking about the gentleman that we see here at

3    49 seconds in Exhibit 14.  He has placed himself directly

4    between protesters and law enforcement, correct?

5    A.  Yes.

6    Q.  And that's contrary to your rule as a journalist to

7    never, in fact, do that?

8    A.  That's inaccurate.  We would be in those positions when

9    it's safe.  So I would very feasibly be in that position and

10   then retreat to [audio distortion].

11           COURT REPORTER:  I'm sorry.  He's cutting out.

12           THE COURT:  Your voice is cutting out.  Our audio

13   is not helping us right now.  So I don't know what

14   adjustments can be made, but we did not hear your response.

15           THE WITNESS:  I would be possibly, you know --

16   it's not a hard-and-fast rule to never get in between.  Like

17   I said previously, we would be in that position if we felt

18   that that was a safe place to be at that exact moment and

19   maybe would get a shot or, you know, shoot what we need to

20   shoot and then go somewhere else that was safer.  So a lot

21   of times it's these calculations that we make as we read the

22   situation.

23   BY MS. LANDRUM:

24   Q.  You don't have any expertise in law enforcement; is that

25   right, Mr. Ou?

```
1    A.  No, I'm not a law enforcement officer.

2    Q.  So when you're making calculations as to when it's

3    appropriate for you to get in between law enforcement and

4    protest activity, that's based off of your assessment of

5    your personal safety?

6    A.  Yes, and that's [audio distortion].

7    Q.  And that's not --

8              COURT REPORTER:  I heard, "Yes, and that's."  I

9    didn't hear what he said after.

10             THE COURT:  Did you have more to say in your

11   response?

12             THE WITNESS:  Yeah.  Sorry.  That's based off of,

13   you know, my experience covering protests.

14   BY MS. LANDRUM:

15   Q.  So outside of your personal factor -- your own personal

16   safety, you are not factoring in the law enforcement needs

17   when you are deciding to insert yourself in between

18   protesters and law enforcement?

19   A.  We are thinking of how we're perceived and we are

20   thinking of, like, at that moment is it tense, is it more

21   tense, is there -- you know, like, I think you are always

22   making a calculation as to how appropriate would a law

23   enforcement response be.  And at that moment it felt

24   [audio distortion].

25             THE COURT:  I didn't hear what you said.  "At that
```

1    moment," and then what did you say?

2          THE WITNESS:  At that moment it did not feel

3    tense.  These people -- the protesters were saying things

4    that were antagonistic, but there was nothing being thrown.

5    And, you know, saying profanities towards the police at that

6    moment, in my assessment, was not -- would not -- did not

7    meet a threshold that, oh, something is going to happen

8    because of this, because there are profanities.  So I

9    assessed at that moment for myself that it was still quite

10   calm.

11   BY MS. LANDRUM:

12   Q.  But that, again, is not based on any law enforcement

13   expertise or training that you have, right, Mr. Ou?

14   A.  No, it's not, but I guess it comes from just knowing or

15   thinking of when there would be a proportionate response

16   from law enforcement and not to be in the middle of that if

17   there was one.

18   Q.  Now, at a certain point -- we heard about the injuries

19   that you sustained that day.  You became separated from the

20   other journalists in your group; is that right?

21   A.  I became separated from my colleagues, like, my direct

22   colleague, the reporter I was working with and the security

23   team.  So, yeah, we got separated, but I was with other

24   colleagues, like, who were not working with NBC News but

25   were fellow journalists.

1    Q.  And I think you testified that after you experienced

2    your initial injuries, that you were blinded at that point;

3    is that right?

4    A.  Yes.

5    Q.  But based off of your other senses, it was your

6    experience or your belief that you were being corralled

7    north towards the protesters; is that correct?

8    A.  Yes.

9    Q.  And that was the movement of that enforcement line,

10   correct, that law enforcement was moving to disperse

11   everyone north; is that correct?

12   A.  Yes.

13   Q.  So your experience was that those law enforcement

14   officers were attempting to move you north as well?

15   A.  Yes, that is accurate.

16   Q.  But you, in fact, did not move out of that dispersal

17   area, did you?

18   A.  At which moment?

19   Q.  So ultimately you ended up back in the alcove; is that

20   correct?

21   A.  Just timeline-wise, we were in the alcoves off to the

22   side and when I was first hit by a projectile, I was already

23   disoriented, so I was unable to kind of, like, figure out

24   where to go.  So I went further into the alcove thinking

25   that the police, if they want to disperse people, they would

1    just -- they had the option to pass us and we were out of

2    the way.

3    Q.  So you remained in the area that law enforcement was

4    attempting to disperse, right?

5    A.  Yes.

6    Q.  Now -- let's see here.  And after that point you had

7    other interactions with law enforcement; is that right?  You

8    were asking for help; is that -- did I hear that correctly?

9    A.  So I just want to clarify.  There were kind of, like,

10   two alcoves.  The first time when I was pepper-sprayed, that

11   was alcove number one.  And then we were corralled and then

12   we tried to get out to 31st Street, but then I ended up in

13   another alcove.  I don't know if it's an alcove, but a

14   trapped, fenced-off area.

15          And so that's -- the interaction happened twice.

16   So the first time I was pepper-sprayed and then corralled

17   from the alcoves, which is where we are looking at right now

18   in this area on the screenshot.  And then a second time I

19   interacted with the police again, that's when -- that's

20   around that time that I filmed my colleague being shoved

21   over a wall and that's -- yes, I interacted with them.

22   Q.  But that second alcove was still in the dispersal area,

23   right, Mr. Ou?

24   A.  Yes, the second place was in the dispersal area.  At

25   that time we were trying to leave, but there was nowhere to

1    go, so that's when, I guess -- when I filmed my colleague,

2    Mike Shum, being shoved over the wall.  If that is the idea

3    of how we are to disperse, it felt like a very dangerous

4    one.

5    Q.  So you indicated that after that point your vision was

6    substantially impaired, correct?

7    A.  Yes.

8    Q.  And in that state of impairment, it sounds like you had

9    some other interactions with other law enforcement

10   officials, right?

11   A.  Yes.

12   Q.  But at that point -- and you recognize that there were

13   other law enforcement officials on the ground outside of

14   Minnesota State Patrol, correct?

15   A.  Yes.  Is the question do I know if there was different

16   police departments, like MPD, et cetera?

17   Q.  Yes, that were present on the ground on May 20, 2020

18   where you were.

19   A.  Yes.

20   Q.  Now, you didn't file a complaint with the Department of

21   Public Safety Office of Internal Affairs, did you?

22   A.  No.

23   Q.  And when the Office of Internal Affairs reached out to

24   you, you didn't respond; is that correct?

25   A.  That's correct.

1    Q.  So I would like to talk to you next about your coverage

2    in Brooklyn Center.

3              Now, I heard that prior to coming to Brooklyn

4    Center you were preparing to cover the Chauvin trial

5    verdict; is that right?

6    A.  Yes.

7    Q.  In anticipation of that, did you attend the Operation

8    Safety Net press briefings that were happening weekly?

9    A.  No.  There were a few things on YouTube or on Twitter,

10   if I understand, that were -- that I watched a few times,

11   but I did not physically attend.

12   Q.  Okay.  So then you did see guidance from OSN in order to

13   prepare for your coverage of the Chauvin verdict?

14   A.  I wouldn't use the word "guidance" because, you know, as

15   journalists we monitor, we look at what's been tweeted out,

16   press conferences and stuff like that.  So a lot of that is

17   passive.  And it's our job to be informed of what people are

18   saying.

19   Q.  But it sounds like you were fully aware that OSN was

20   reaching out in order to provide resources to the press in

21   anticipation of the Chauvin verdict; is that right?

22   A.  As someone, just to be -- OSN, I am not familiar with

23   that acronym and, again, I'm based in New York, so I don't

24   regularly cover the Minneapolis/Minnesota state area, so I

25   don't know what that -- can you clarify that acronym?

1    Q.  Sorry.  I thought that you had said that you had seen

2    some of the YouTube videos from Operation Safety Net,

3    specifically the press briefings that were being given on a

4    weekly basis.  Did I mishear that?

5    A.  Again, I would see them every so often, but it's not

6    like I regularly sought them out.  When you are on Twitter,

7    you just see videos.  And especially when you are in

8    New York, you are not making a distinction between this

9    police department, that one, Brooklyn Center, Minneapolis.

10   It kind of -- it just depends on -- you get more specific as

11   you get closer to what you are covering.

12   Q.  Did you reach out to anyone, Minnesota State Patrol, the

13   Department of Public Safety, to get guidance about how you

14   can be safe for purposes of the Chauvin trial coverage?

15   A.  No, because it was pretty -- we shouldn't have to.

16   Again, my understanding is as long as we're not interfering

17   with police activities or law enforcement activities,

18   there's no permissions or things to seek to be safe other

19   than just use your common sense and don't -- you know, like,

20   that's not something that we, as journalists, generally

21   should have to do.

22   Q.  So you covered the unrest in Brooklyn Center from an

23   apartment building; is that right?

24   A.  Yes.

25   Q.  How many days were you there?

```
 1    A.  I was there for the duration of the week.  I got there,

 2    I think, on a Monday or a Tuesday and I was there for a few

 3    days in and out.

 4    Q.  So in the video, I believe it's Plaintiffs' Exhibit 8,

 5    you could hear quite clearly the dispersal order; is that

 6    right?

 7    A.  Yes.

 8    Q.  And it was loud?

 9    A.  Yes.

10    Q.  And it was -- it specifically indicated and instructed

11    media that the dispersal order did, in fact, apply to media;

12    is that right?

13    A.  I -- as journalists, we are there to be able to cover

14    things.  And the other thing, too, is from my exact vantage

15    point, I was in private property, so I wasn't outside.

16    Q.  Going back to my question, though, Mr. Ou, that

17    dispersal order specifically instructed you, as a member of

18    media, that the dispersal order did, in fact, apply to you,

19    correct?

20    A.  Yes, that is true, except we, as journalists, should be

21    in places -- where the freedom of the press is recognized,

22    we should be able to film activities so long as we are not

23    interfering with law enforcement or taking a part in

24    anything.  And so --

25    Q.  Let me just stop you there.
```

1          THE COURT:  No.  Let him respond to your question

2     and then you may ask a follow-up.

3          You may finish your response.

4          THE WITNESS:  So in a lot of places, not just in

5     protests, like a lot of the times as journalists we are

6     often told, like, don't film here, get out of here,

7     et cetera, by law enforcement.  And it's just a central

8     tenet to the First Amendment, which is if we are filming on

9     public property, we, the media, are allowed to undertake our

10    job, which is why, as I understand it, you know, we are

11    exempt from curfew.  During COVID we were able to go out

12    because our job is a very specific function of keeping an

13    open society informed.  And so that dispersal order, I felt,

14    did not apply to us because it is clear that we didn't need

15    to recognize the curfew.

16    BY MS. LANDRUM:

17    Q.  Well, so because you heard the dispersal order, though,

18    Mr. Ou, you could not have been confused that law

19    enforcement believed that media was subject to the --

20         MS. FOSTER:  Objection --

21    Q.  -- dispersal order, correct?

22         MS. FOSTER:  -- argumentative.

23         THE COURT:  Overruled.  You may answer if you can.

24         THE WITNESS:  Sorry.  Can you say that one more

25    time?

1    BY MS. LANDRUM:

2    Q.  Absolutely.  Because of the nature of the dispersal

3    order, because of the content of it, where it specifically

4    said that the dispersal order applied to media, you were not

5    confused that law enforcement believed that you were, in

6    fact, subject to the dispersal order, right?

7    A.  Right, but, again, there's two things at play.  I was in

8    private property at that exact moment, so I don't know where

9    I would have gone.  And that certainly did not apply to me

10   at that moment because what would they tell me, that I would

11   not be able to interview people in their homes?  That would

12   be a gross violation of many press freedoms and the First

13   Amendment, to say I am not allowed to interview citizens in

14   their apartments where I am directly invited.  So it did not

15   apply to [audio distortion].

16            COURT REPORTER:  I didn't hear the last part.

17            THE COURT:  The last bit we didn't hear.  Did you

18   say so it did not apply to me that way?

19            THE WITNESS:  At that exact moment.  Because

20   how -- in what open, free society would the police tell me

21   that I couldn't be in someone's private property at that

22   moment?  So that's why -- again, I was in someone's house,

23   invited, filming from private property, so I was already not

24   outside.

25   BY MS. LANDRUM:

1    Q.  Mr. Ou, did you review the governor's executive order

2    declaring the curfew in April 2021 before you came to

3    Brooklyn Center?

4    A.  I didn't personally look at it, but in talking to

5    colleagues, you know, et cetera, I knew generally what was

6    happening.

7    Q.  So you weren't aware, then, that that executive order

8    specifically stated that even persons exempted from the

9    dispersal order were not exempted from lawful orders from

10   law enforcement, right?

11   A.  I don't understand.

12   Q.  So you were not aware that that executive order

13   specifically stated that even if exempt from the curfew,

14   individuals that had that exemption were not exempt from

15   lawful orders from law enforcement, you were not aware of

16   that; is that right?

17   A.  I'm aware of that, but, again, I was in someone's

18   private property.  So just if I were to take that to its

19   logical conclusion, if I rented a flat or an apartment

20   across from there, would -- no law enforcement would have

21   been able to tell me to stop filming or not exist -- I could

22   very easily have had a flat there.  And so I just don't

23   understand.  It didn't apply to me, because if we're in a

24   world where the police can tell journalists to stop filming,

25   this is not America.

1          MS. LANDRUM:  I would like to pull up Plaintiffs'

2    Exhibit 8 at 16 seconds, please, Ms. Kosek.

3    BY MS. LANDRUM:

4    Q.  This is Plaintiffs' Exhibit 8.  This is a video that's

5    already been admitted into evidence.  This is the view that

6    you have from that apartment; is that correct?

7    A.  Yes.

8    Q.  Now, in this still image at 16 seconds, you can see a

9    line of law enforcement to the left, right?

10   A.  Yes.

11   Q.  And then it looks like there's protesters to the right.

12   What was beyond this scene to the right?  Were there several

13   more protesters to the right?

14   A.  If you were looking where I'm looking now and you were

15   to pivot to, let's say, 2:00 to the right, as I recall,

16   there was kind of like a clump of people who were protesters

17   and then, like, that's, like, kind of, like, right up to the

18   fence area but a bit further down the street, and then there

19   were kind of people here and there.

20   Q.  So, then, these individuals that we see here at

21   16 seconds -- for example, we see someone holding up a phone

22   who may be livestreaming or taking a photo, right?

23   A.  Yeah.

24   Q.  And it looks like there might be a gentleman with a

25   camera of some kind near him?

1    A.  Yes.

2    Q.  Would you agree with me that these individuals are

3    placing themselves between law enforcement and the

4    protesters?

5    A.  Yes.

6    Q.  Is it possible that they themselves are protesters?

7    A.  At this moment it looks like they're filming, so

8    they're -- they have a phone.

9    Q.  Did you recognize these people, as you were there on the

10   scene, as colleagues of yours?

11   A.  I saw colleagues there, but at this exact moment I was

12   in private property filming from an apartment, so I didn't

13   personally know these individuals.

14   Q.  And doesn't this again violate your general rule not to

15   get between protesters and law enforcement?

16   A.  I'm not these people over here.  So are you asking me if

17   that's something that I would do or --

18   Q.  Exactly.  I'm saying these two individuals that appear

19   to be taking photos or livestreaming, if they would be

20   violating your rule getting -- if they are, in fact,

21   journalists, if they are getting in between the law

22   enforcement line and the protesters.

23   A.  I would say at this moment, because there isn't anything

24   being actively -- there's no hostility at this moment.  It's

25   not like behind them anyone is throwing rocks or anything

1    like that.  So if I were there in that spot, if someone were

2    to escalate that, it would be the police because I would --

3    we're not getting in between anything.  As I remember, at

4    that exact moment, and, again, many things happened that

5    night, it was mostly people filming the police and a lot of

6    the clashes or the more escalated actions of protesters were

7    to the [audio distortion].

8              COURT REPORTER:  I'm sorry.  I didn't --

9              THE COURT:  The protesters were where when things

10   escalated?

11             THE WITNESS:  Like at this exact moment, if you

12   were to just take the exact dead center of this frame as,

13   like, 12:00, I would say 2:00 or 3:00, kind of maybe to the

14   right, that's where a lot of the protesters were -- like

15   protester protesters and then people were throwing things

16   and bottles at the police and stuff.  Here the law

17   enforcement was [audio distortion].

18             THE COURT:  I didn't hear the last bit.  "Here the

19   law enforcement," and then you could not be heard.

20             THE WITNESS:  People here were being filmed by

21   these people on the bottom, like the law enforcement on the

22   left.

23   BY MS. LANDRUM:

24   Q.  And I think I heard you just testify that you witnessed

25   that individuals were throwing bottles and other objects at

```
 1    law enforcement; is that right?

 2    A.  Yes.

 3    Q.  Now, you said at a certain point that a law enforcement

 4    official pointed something at you from the ground; is that

 5    right?

 6    A.  Yes.

 7    Q.  But you don't know what that object was?

 8    A.  No.  It was cylindrical.

 9    Q.  And you don't know which law enforcement agency was

10    represented by this individual?

11    A.  No, I don't.

12    Q.  And you were not harmed in any way by law enforcement in

13    April 2021 in Brooklyn Center, were you?

14    A.  No, I was not.

15    Q.  Thank you.

16              MS. LANDRUM:  No further questions.

17              THE COURT:  Anything further for this witness?

18              MS. FOSTER:  Just very brief redirect.

19              THE COURT:  You may.

20              MS. FOSTER:  I would like to call up the long

21    video.  I think that's Plaintiffs' Exhibit 14.

22        (Video recording played)

23              MS. FOSTER:  We can stop there at 42, 42 seconds.

24

25
```

1                    **REDIRECT EXAMINATION**

2    BY MS. FOSTER:

3    Q.  On that recording you heard the announcement to

4    disperse.  Did they say to disperse because of being in

5    violation of a curfew?

6    A.  Yes.

7    Q.  Was it your understanding that the curfew did not apply

8    to journalists?

9    A.  Yes.

10   Q.  Is that the reason why you did not disperse?

11   A.  That is correct.

12             MS. FOSTER:  No further questions, Your Honor.

13             THE COURT:  Anything further for this witness?

14             MS. LANDRUM:  No, Your Honor.  Thank you.

15             THE COURT:  May the witness be excused?

16             MS. FOSTER:  Yes, Your Honor, the witness may be

17   excused.  Thank you.

18             THE COURT:  Sir, you are excused.  Thank you.

19             THE WITNESS:  Thank you.  Do I leave or --

20             MS. FOSTER:  Just leave the Zoom session.

21             THE WITNESS:  Okay.

22             MS. McGARRAUGH:  Your Honor, are you ready for us

23   to proceed with our next witness?

24             THE COURT:  Yes, please.

25             MS. McGARRAUGH:  Plaintiffs call Chris Tuite.

```
 1              COURT REPORTER:  Remain standing and raise your
 2      right hand, please.
 3          (Witness sworn)
 4              COURT REPORTER:  If you could state your full
 5      name, spelling your first and last name, please.
 6              THE WITNESS:  Christopher David Tuite.  First name
 7      Christopher, C-h-r-i-s-t-o-p-h-e-r.  Last name Tuite,
 8      T-u-i-t-e.
 9                          (Christopher Tuite)
10                          DIRECT EXAMINATION
11      BY MS. McGARRAUGH:
12      Q.  Thank you, Mr. Tuite.  What is your profession?
13      A.  I'm a freelance photographer.
14      Q.  What publications have your photographs been published
15      in?
16      A.  New York Times, New York Post, Washington Post, Rolling
17      Stone, Time magazine, People magazine, Wall Street Journal,
18      FOX News, CNN, lots of places.
19      Q.  Are you employed by any particular news organization?
20      A.  I'm not.
21      Q.  How do your photographs end up in these publications?
22      A.  I work for a place that's called the wire, a place
23      called imageSPACE, and from imageSPACE my photos get pushed
24      out to lots of other places, Associated Press, ZUMA.  And
25      then publications that want to run things, they buy things
```

1   per photo and then they put them in their publication.

2   Q.  Where do you currently live?

3   A.  I live in Hayward, California, which is out near

4   Oakland.

5   Q.  And where geographically do you work as a photographer?

6   A.  All over the place.  I shoot concerts.  I shoot events,

7   shoot weddings.  I shoot journalism.  I go wherever the work

8   is, wherever the story is, wherever I can.

9   Q.  How do you decide where to go?

10  A.  This last year has been very different for me.  Concerts

11  and events were taken away, so I had to find a way to adapt.

12  So I started covering protests and I went where the story

13  was.  I tried to encapsulate different areas, mostly around

14  social justice, you know, police brutality protests in

15  general.

16  Q.  How far in advance do you decide where you're going to

17  go?

18  A.  This really depends.  Some events, like the march on

19  Washington, I planned to be at a couple months ahead of

20  time.  I was out here covering the Derek Chauvin trial.  I

21  planned to do that.  But mostly it's kind of on the fly.

22  And I have a lot of other friends that -- for instance, when

23  Daunte Wright was killed, he flew out the next morning.  So

24  it's one of those things where you can't really plan very

25  well where you're going to be.  You just have to go where

1    the story is.  And it makes it very tricky planning flights,

2    planning hotels, but also very tricky, you know, making

3    accommodations on where you are going to be.

4    Q.  If you were required to apply for city or state press

5    credentials in advance, would that be practical with the

6    schedule?

7    A.  No, not in my opinion at all.  I don't believe that

8    press credentials are standard in any way.  There are

9    certain cities, like New York, that does it, but it requires

10   quite a while to apply.  Like if I was able to do this, I

11   wouldn't be able to have been in Minnesota, Brooklyn Center.

12   I'm up to Portland kind of on a whim.  I spent four days up

13   there.  There's no way I could have applied and been able to

14   be out there covering, documenting anything.

15   Q.  So you mentioned earlier that you were in Minneapolis

16   covering the Derek Chauvin trial.  When did you arrive in

17   Minneapolis?

18   A.  I arrived on March 27th.  I was there for an entire

19   month.

20   Q.  Of 2021?

21   A.  Correct.

22   Q.  And you were there for a month.  So until late April

23   of --

24   A.  Yes.

25   Q.  -- 2021?

1          So you were present in the Twin Cities when the

2    Daunte Wright protests came up?

3    A.  I was.  I was covering another protest in St. Paul and

4    the word got out that Daunte Wright had been killed.  We

5    went directly from there to the area he was killed and then

6    followed the protests to the Brooklyn Center Police

7    Department.

8    Q.  What days or nights did you cover the protests in

9    Brooklyn Center related to Daunte Wright?

10   A.  I covered the entire thing until numbers got very small.

11   So it would be seven or eight days I was out there every

12   single day and night covering, documenting everything.

13   Q.  Okay.  I would like to walk through some of the

14   experiences that you had in Brooklyn Center.

15   A.  Sure.

16   Q.  So, first, what law enforcement agencies did you observe

17   there?

18   A.  State troopers.  I observed National Guard.  I observed

19   the sheriff's department.  I observed what appeared to be

20   Brooklyn Center Police Department, but they were usually a

21   little ways away.  There was a fence after the first night,

22   and they were generally out towards the building and they

23   weren't very identifiable.

24   Q.  How did you recognize state troopers?

25   A.  They were very recognizable.  They had the long-sleeve

```
1    yellow arms.  They had the state logo on the chest.  You

2    could see them in the daytime.  In the night it would

3    really, really reflect with the police lights or flashlights

4    or whatever.  They were very, very identifiable.

5    Q.  All right.  I would like to direct your attention

6    specifically to the evening of Tuesday, April 13th.  Do you

7    recall that evening?

8    A.  I do.

9    Q.  Were you in Brooklyn Center?

10   A.  I was.

11           MS. McGARRAUGH:  All right.  I would like to pull

12   up Plaintiffs' Exhibit 3.  Can he see it on his screen?

13           THE WITNESS:  Yeah.

14           MS. McGARRAUGH:  Okay.  Great.  Leslie, do you

15   mind scrolling through this for him so he can see the pages?

16           THE COURT:  Let's just stop right here.  Can you

17   turn on my screen?

18           LAW CLERK:  You can't see it?

19       (Pause)

20           THE COURT:  Thank you.  You may proceed, Counsel.

21           MS. McGARRAUGH:  Your Honor, may I approach and

22   give him the book?  It will be easier for him to see the

23   multipage exhibit.

24           THE COURT:  Yes, you may.

25       (Witness reviews exhibit)
```

1    BY MS. McGARRAUGH:

2    Q.  Have you had a chance to look at that Exhibit 3?

3    A.  Yeah.  I will flip all the way through.

4        (Witness reviews exhibit)

5    A.  Okay.

6    Q.  Do you recognize this exhibit?

7    A.  Yes, I do.  This is my Instagram posts that I was

8    covering from this specific day.

9    Q.  When you say "this specific day," you mean Tuesday,

10   April 13th?

11   A.  Correct.  When I make my posts, I go home at night, I

12   have a chance to cull my photos, which means go through the

13   photos, select them, dump my photos onto the hard drive, and

14   then I essentially write a little post that summarizes the

15   day's events.

16   Q.  Okay.  This first page -- actually, let me go back.  So

17   this says, "April 14"?

18   A.  Yes.

19   Q.  Why does it say, "April 14" on --

20   A.  It was done after midnight.  By the time I got home,

21   took a Lyft ride back to --

22           MR. HSU:  Objection.  The witness is testifying to

23   a document not submitted in evidence.

24           MS. McGARRAUGH:  Fair point.  Plaintiffs offer --

25           THE COURT:  Sustained.  Do you wish to offer the

1    exhibit?

2              MS. McGARRAUGH:  I do.  Plaintiffs offer

3    Exhibit 3.

4              MR. HSU:  We would object to the admission as

5    hearsay.

6              THE COURT:  Any response?

7              MS. McGARRAUGH:  Well, so --

8              THE COURT:  Is it offered for the truth of the

9    matter asserted or is it offered --

10             MS. McGARRAUGH:  So the caption on the first page

11   is offered only to refresh his recollection.  And the

12   photographs, I think, are not hearsay, and it's my

13   understanding that the hearsay rule doesn't necessarily

14   apply in a preliminary injunction hearing with the

15   limitation on witnesses.  And the Court certainly can take

16   the evidence for, you know, what its weight deserves.

17             THE COURT:  Do you wish to be heard, sir?

18             MR. HSU:  We would state even the photographs are

19   paired with the written commentary related to the event and,

20   accordingly, the whole document would be submitting hearsay

21   statements.  And while the burden may differ from an

22   injunction, the admissibility of evidence is still a key

23   aspect.

24             THE COURT:  The objection is overruled.  You may

25   proceed.  It is admitted.

```
 1    BY MS. McGARRAUGH:

 2    Q.  So you made this post in the early morning hours of

 3    April 14th?

 4    A.  That's correct.

 5    Q.  All right.  During that evening did you hear any

 6    dispersal orders in Brooklyn Center?

 7    A.  Yes, I did.

 8    Q.  Can you tell -- what did those dispersal orders sound

 9    like?

10    A.  They were generally given over some sort of a loud

11    speaker.  I believe it was a mobile loud speaker that one of

12    them was carrying, one of the state police officers, state

13    troopers.  They formed a line out coming from the south side

14    of the department on the street of about, I would say, a

15    hundred officers.  They were saying people need to disperse.

16    They were very specifically focusing on media.  They said,

17    "Media need to leave the area."  They said it nearly 50

18    times over the loud speaker.  And being a journalist, I

19    believe I know my rights and I did not disperse because I

20    needed to be there to document what's happening in public.

21    Q.  So you said that order was given maybe 50 times.  Over

22    what period of time?

23    A.  I would say an hour or so.

24    Q.  Do you have a sense -- excuse me.  You referred to a

25    line of maybe a hundred officers.  Were those -- could you
```

1    tell what agency they were affiliated with?

2    A.  Yes.  They were state troopers.  I believe every single

3    one of them was.  There might have been one in between that

4    was not, but to my recollection, they were all state

5    troopers.

6    Q.  Do you have any sense of -- well, from your observation,

7    could you perceive what triggered the transition from 50

8    dispersal orders to the line moving through?

9    A.  I'm sorry.  Can you repeat that?

10   Q.  In your observation, what changed that went from 50

11   dispersal orders being given over an hour to the line moving

12   through?

13   A.  To them chasing people?

14   Q.  Yeah.  What was -- what did you perceive the trigger to

15   be?

16   A.  Well, I believe that they wanted to clear the area, but

17   they waited a long time.  It was an hour, hour and a half.

18   It was essentially protesters expressing their displeasure

19   verbally to the line of officers.  It stayed fine.

20           A small fire was started in the street,

21   essentially like a campfire shape with some pieces of wood.

22   The second that happened, all the troopers started rushing,

23   running after people, and it chased everyone down, including

24   cars.  Cars were driving in the opposite direction.  People

25   were running north away from the area on the sidewalk, on

1    the grass.  It created a fairly dangerous situation.

2              Do you want me to proceed with what happened after

3    that?

4    Q.  Sure, yeah.  What happened next?

5    A.  So we got to the corner of the gas station across from

6    the Pump N Munch.  I actually in my first deposition said

7    Pump N Munch.  It's the one across the street from the

8    Pump N Munch -- I wanted to correct that right now -- on the

9    other corner.

10   Q.  When you said "deposition," do you mean declaration?

11   A.  Yes.  Excuse me.  Declaration.  Sorry.

12             We got up to the corner.  I recognized a

13   photographer.  His name was Josh McFadden.  He is a *New York*

14   *Times* freelance photographer.  He is based out of upstate

15   New York and he was out here covering the entire trial as

16   well as the Daunte Wright protests.

17             We were trying to figure out a way to get out

18   because it was very hectic.  There were -- as soon as we

19   turned the corner, there were cars that came screeching in,

20   officers jumped out, including National Guard.  Mostly the

21   state troopers were around tackling people, grabbing them,

22   saying, "Get on the ground," arresting people before they

23   could actually disperse.

24   Q.  Were you able to get back to your car?

25   A.  Our car was on the -- actually, I came with Lyft, but I

1  asked him if I could get a ride earlier and he said that was

2  fine.  So I saw him.  And it was a Good Samaritan that

3  offered to give us a ride.

4  Q.  Why didn't you go to Mr. McFadden's car?

5  A.  His car was on the opposite side of the protest and it

6  was all blocked by vehicles and state troopers.  We were not

7  allowed to go that direction.  So I asked -- he actually

8  asked for a ride and this lady said, "Sure, I'll give you a

9  ride back."  We hopped in the car, buckled our seat belts

10  and were surrounded by state troopers with their weapons

11  pulled screaming, "Get out of the vehicle, get out of the

12  vehicle."  And frantically I took my press pass, put it up

13  to the window and screamed, "Press, press, press, press,

14  press," like 50 times.  One trooper grabbed me out.  He

15  actually listened to me, but they took Josh.  He threw him

16  up into the car, and it took me telling them 50 times he was

17  also press and he was with me.  He had also said, "Press" at

18  least ten times, had it around his neck, very identifiable

19  was press, multiple cameras on his sides.

20  Q.  Were you also carrying a camera at that time?

21  A.  I was.

22  Q.  How large is your camera?

23  A.  I have two.  I have one with a bigger lens.  So the

24  bigger lens would have been about this big (indicating), and

25  the other one is about that big (indicating) with the

1    smaller lens because they -- very similar size.

2              THE COURT:  You need to describe what "that big"

3    is.

4              THE WITNESS:  Okay.  The 70 to 200 millimeter lens

5    is used for medium and zoom range and it's about, I would

6    say, six to eight inches in length.  The wider lenses I

7    have, I have a 17 to 35 millimeter and a 24 to 70.  Those

8    are about three to five inches in length.  I believe I had

9    the 24-70, which was probably four-ish inches.

10   BY MS. McGARRAUGH:

11   Q.  And Mr. McFadden had similar equipment?

12   A.  Yes.

13   Q.  And you were wearing a press pass?

14   A.  I was.

15   Q.  What did that look like?

16   A.  It was an independent pass.  So this is the tricky thing

17   about not having standard passes and why it's not possible

18   to do this, because there's people that go all over the

19   place.  They are assignment based and there's no

20   standardized press pass for people to get.  So I have an

21   independent pass that was made up for me.  It has my

22   picture, identifies me as independent press.  That's

23   basically all it is.  It is has a little scanner on the

24   bottom that goes right to my social media on there.  It just

25   has my picture as independent press on it.

1    Q.  Did you have the opportunity to see Mr. McFadden's press

2    pass?

3    A.  I did.  It was a National Press Photographers

4    Association pass, which is a pretty standardized one, but

5    you have to apply to get it and it costs money to get.  So

6    there's a barrier there, but anyone can get that.

7    Q.  Did you perceive a difference in how your press

8    credentials were received versus his press credentials?

9    A.  I don't know exactly why they listened to me.  He did

10   the same thing I did.  All I can tell you is that I am white

11   and he is black, and we are covering social justice

12   protests.

13   Q.  Was it your impression that he was not believed that he

14   was a journalist?

15   A.  That's my impression.  He has spoken -- this happened to

16   him multiple times in other areas as well.

17                MR. HSU:  Objection, hearsay.

18                THE COURT:  Overruled.

19                THE WITNESS:  This is a problem right now.  A lot

20   of agencies are being criticized for not sending

21   African-American photographers to cover social justice

22   things and there's been a very conscious effort over the

23   last couple of years to make sure that they're included and

24   their voices are being heard and this sort of thing, and

25   they're not treated the same way in many situations from my

1    perspective.

2    BY MS. McGARRAUGH:

3    Q.  Are you confident that the officers that pulled you out

4    of that car are state troopers?

5    A.  I am 100 percent confident.

6    Q.  How do you know?

7    A.  I saw the very identifiable sleeves with the Minnesota

8    state logo on their chest.

9    Q.  How did that incident affect your ability to do your job

10   on that night?

11   A.  Well, we had to leave the area.  As soon as we got out

12   of the car, we were negotiating on how to get back to our

13   car.  We didn't know how we were going to do that because

14   they closed off all the roads that got there.  It was only

15   National Guard that offered to okay us to walk through this

16   specific area, and even the same time we walked very slowly.

17           What we did first, though, before we left, we went

18   into the church, which was a safe haven for protesters and

19   for everyone alike.  We got a little bit of something to

20   drink and a snack.  And Josh had to process his photos and

21   he had to take a few minutes to wind down from the

22   encounter.  It shook him up a little bit.  And he had to

23   send it to *The New York Times* and he had to text his editor

24   at *The New York Times* telling him what happened; and, of

25   course, they were concerned.

1              So once we left the church, we talked to
2    the Guard.  We obviously had to get back to our car.  No one
3    was letting us go through here.  Everything was blocked off.
4    They said, "That's fine."  But the whole time we walked like
5    this (indicating).  I had my pass up, hand out, because I
6    didn't want to spook anyone because we had to go back to an
7    area that was essentially closed all the way across the
8    protest.  It was very uncomfortable.  He was not
9    comfortable.  I told him, "It will be okay.  I'll go first.
10   I'll hold this."  He's like, "I don't know about this."  He
11   thought we were going to have an issue.  And once that
12   happened, we got back to our car.  I asked permission from
13   the Guard, "Can we leave here?"  And he said, "Yes, you're
14   fine."
15   Q.  Were you able to take photographs as you walked with
16   your hands up?
17   A.  No.
18   Q.  So you were not able to do your job during -- after that
19   portion of the evening?
20   A.  (Shaking head.)
21   Q.  I would like to move to the evening of April 16, 2021.
22   That's a Friday.  Where were you on that evening?
23   A.  I was at Brooklyn Center.
24   Q.  What time did you arrive in Brooklyn Center?
25   A.  I would say about 7:00.

1    Q.  What was the crowd like on that evening?

2    A.  There was a smaller number than the previous night.  I

3    would say there was about 150 protesters out there.  People

4    were mostly standing in place talking around the outside of

5    the fence.  At this point, to my recollection, there was a

6    second fence that had been installed outside the department.

7    The first night we got there, the night that Daunte was

8    killed, there was no fence, so protesters got all the way up

9    to the department up in front.  And then the next night we

10   came back, there was one fence there and then they had put a

11   secondary protective fence up at this point.  So people were

12   kind of standing around.  There were some umbrellas.  People

13   were hanging out and chatting for the most part.

14   Q.  Did you see any fireworks?

15   A.  I did.

16   Q.  Did you see them -- what direction did they go off?

17   A.  Directly up or back behind the apartment complexes.  So

18   they were straight up in the air.  I actually have some

19   photos that were taken, you know, from those areas that were

20   just fireworks that were nowhere near the department that I

21   saw.  They were mostly straight up.

22   Q.  Did you personally observe any fireworks fired in the

23   direction of law enforcement?

24   A.  I did not.

25   Q.  Did you observe anybody throwing bottles?

1    A.  Yes.

2    Q.  In your opinion, was the crowd violent?

3    A.  No.

4    Q.  Was it riotous?

5    A.  Was not.

6    Q.  How did it compare to the sort of atmosphere of the

7    crowd on the prior evening, that Thursday?

8    A.  It was very similar.  I would say it was even more

9    peaceful than the night before.  It was very interesting.

10   The night before word got out, I believe it was through

11   Signal, which is an encrypted app that people use on their

12   phone to talk to each other, and the word got out that there

13   was a kettle being set up around the protest by state

14   troopers.  A kettle is when they surround the protest in a

15   circle and do a mass arrest.  So this word got out very

16   quickly between journalists, activists, everyone that was

17   out there, and people started to disperse, like we don't

18   want to get arrested.  We're -- no reason to be arrested,

19   we're just standing around, but we don't want to mess with

20   this.  So this dispersal occurred over probably a 20-minute

21   period.  By the time curfew hit, people were pretty much

22   dispersed.

23   Q.  Did you observe a confrontation between law enforcement

24   and protesters or journalists on Thursday, April 15th?

25   A.  Not that I recall.

1    Q.  Okay.  So going back to Friday night, did you hear any

2    dispersal orders on Friday night?

3    A.  Not that I recall.

4    Q.  Did you observe a mass arrest on Friday night?

5    A.  I did.

6    Q.  About what time did that occur?

7    A.  I would say 10:02.

8    Q.  Do you have -- what was your perception of what

9    triggered that mass arrest starting?

10   A.  I believe that officers were using the curfew as grounds

11   to make a mass arrest.  I personally did not see anything

12   that night that warranted a mass arrest or arrest of anyone,

13   any individual.  I believe their attempt was to quell future

14   protests.

15              MR. HSU:  Objection, speculation.

16              THE COURT:  Overruled.

17              THE WITNESS:  So I can answer?

18   BY MS. McGARRAUGH:

19   Q.  You can go ahead.

20   A.  So I do believe that their plan was to make a mass

21   arrest and to scare people from coming back.  I don't

22   believe there were grounds to make a mass arrest or make any

23   arrests in general.  I thought that was their tactic.

24              I also believe that the previous night there were

25   a lot of -- there was a drone flying frequently, as well as

1    a helicopter, and I do believe they used it as intel on how

2    protesters dispersed from the area.

3            And as soon as 10:02 hit, state troopers came in

4    from the south and the east, sheriff in came from the corner

5    of the fence, and they plugged up those areas instantly.  He

6    said, "Plug the hole in the fence.  Go over here."  They

7    watched exactly how activists left the area by using that as

8    intel.

9    Q.  So you mentioned that you observed both the state

10   troopers and the sheriff during that rush.  What happened in

11   that initial rush?

12   A.  It was pretty chaotic.  No one expected to be rushed

13   like this because nothing happened the previous night.  It

14   was very similar.  It was just from the east there was a

15   line of probably 20 to 25 state troopers that came running

16   in, as well as from the south, and they met with the sheriff

17   kind of in a jumble.  They came in screaming, "Get on the

18   ground, get on the ground, get on the ground," and they

19   started taking people down to the ground and started

20   arresting them.

21   Q.  Where did you go?

22   A.  I stayed inside the kettle because I believed it was my

23   duty to document the arrests that were happening at the

24   time.  That is generally the job of media, is to document

25   people in power to make sure their power is not being

 1    abused.

 2    Q.  Can you turn to Exhibit 4 in your book, Plaintiffs'

 3    Exhibit 4.  Just take a minute to page through it.  Then

 4    when you are ready, let me know what this is.

 5          (Witness reviews exhibit)

 6    A.  Okay.

 7    Q.  What is this, Mr. Tuite?

 8    A.  This is my Instagram post talking about what happened on

 9    April 16th.  Again, this is posted on April 17th because I

10    got back after midnight.

11              MS. McGARRAUGH:  Plaintiffs offer their Exhibit 4.

12              MR. HSU:  State objects.  The document is hearsay

13    and presents hearsay testimony.

14              THE COURT:  Is it offered for the truth of the

15    matter asserted?

16              MS. McGARRAUGH:  No, it's not.  We're going to

17    just talk about the photographs.

18              THE COURT:  What's the purpose of the exhibit?

19              MS. McGARRAUGH:  The purpose of the exhibit is to

20    refresh his recollection of what he saw and also to look at

21    the photographs that are included.  From our perspective, we

22    can disregard the text.

23              THE COURT:  The objection is sustained.  You may

24    use it to refresh recollection, but you don't admit exhibits

25    to refresh recollection.

```
 1                    MS. McGARRAUGH:  Okay.

 2      BY MS. McGARRAUGH:

 3      Q.  All right.  So if you can look at page 3 of this

 4      document --

 5                    THE COURT:  Or I should say you don't admit

 6      exhibits to refresh recollection.

 7      BY MS. McGARRAUGH:

 8      Q.  What is this page, speaking just about the photograph in

 9      the center on page 3 here?

10      A.  Did you ask me what it is?

11      Q.  Yes.

12      A.  So this is when I'm inside the kettle and the mass

13      arrests are happening.  This is a photo of two protesters

14      being arrested while holding hands by the sheriff's

15      department right in front of me.  Back behind them there is

16      a very large line of state troopers.

17                    MS. McGARRAUGH:  Plaintiffs offer just this

18      page -- and we will redact out the text -- just the

19      photograph.  We can call it Exhibit 4-A, and we will provide

20      a redacted-out copy following the hearing.

21                    THE COURT:  This is Exhibit 4, page 3 that you're

22      offering?

23                    MS. McGARRAUGH:  Yes, Your Honor.  Just the part

24      that Ms. Anderson has excerpted on the screen, so just the

25      photograph.
```

1          THE COURT:  Would you publish it just so that I am

2     sure that we are on the same page as to what is being

3     offered, and then I'll hear from opposing counsel if there's

4     anything to be heard.

5          MS. McGARRAUGH:  Just that call-out.  Just the

6     photograph.

7          THE COURT:  Is there any objection?

8          MR. HSU:  No objection, Your Honor.

9          THE COURT:  It is received in the manner in which

10    you have offered it.

11         MS. McGARRAUGH:  Yes.  And we will submit a copy

12    of just this excerpt --

13         THE COURT:  Please do.

14         MS. McGARRAUGH:  -- following the hearing.

15         THE COURT:  Thank you.

16    BY MS. McGARRAUGH:

17    Q.  All right.  And then turning to the following page in

18    this document, which we can -- we don't have to publish

19    this.  We're going to do the same exercise again with this

20    next picture.  What is the photograph on the following page,

21    page 4 of that Exhibit 4?

22    A.  This is a state trooper making an arrest on the lawn

23    inside of the kettle.  Back behind them is a flashlight

24    being shown on me from a state trooper.

25    Q.  Did that state trooper say anything to you as --

1    A.  Yes, he did.

2    Q.  What did he say to you?

3    A.  He said, "Media" -- do I have permission to cuss, to say

4    in quotes for this?

5              THE COURT:  You may state what you heard.

6              THE WITNESS:  "Media, get the fuck out of here

7    now."

8    BY MS. McGARRAUGH:

9    Q.  Did you understand from that interaction that this state

10   trooper recognized you as a member of the media?

11   A.  Yes, I did.  Not only did he say, "Media, get the fuck

12   out of here now," I held up my pass and he acknowledged that

13   I was media.

14             MS. McGARRAUGH:  Okay.  So plaintiffs offer just

15   the photograph, this one as Exhibit 4-B --

16             THE COURT:  Okay.

17             MS. McGARRAUGH:  -- in the same manner.

18             THE COURT:  I just want to make sure that I

19   understand what exhibit we are talking about.  It's the

20   exhibit that's on the screen, correct?

21             MS. McGARRAUGH:  Yes, just this call-out that

22   pictures a state trooper standing over someone and then a

23   light flashing in the photographer's lens right here.

24             THE COURT:  Okay.  Any objection?

25             MR. HSU:  No objection, Your Honor.

1              THE COURT:  That exhibit is received.

2              MS. McGARRAUGH:  Thank you.

3     BY MS. McGARRAUGH:

4     Q.  What happened after you took this photograph?

5     A.  He charged up to me, along with about four other state

6     troopers.  He walked up and said, "Media, get the fuck out

7     of this area now.  You have to get the fuck out of here."

8     And I said, "I am allowed to document."  He said, "Get the

9     fuck out of here now."  And I put my hands up and I said,

10    "Okay, okay, okay."

11             I turned to my right as I was walking and I saw

12    someone on the ground, which was being pinned by the foot of

13    a police officer.  I took photos for a total of four

14    seconds.  I looked at the metadata inside.  When you take a

15    photo, it shows you exactly when each photo was taken.  Four

16    seconds.  That turned out to be Tim Evans, a photographer.

17             I then went to walk again.  He told me to walk

18    north, and I was grabbed from behind by a trooper.  He

19    grabbed my hood, pulled me backwards and said, "You're under

20    arrest," and pulled me enough to rip the neck of my shirt.

21    Q.  What happened after that?

22    A.  Another state trooper, who may have been a captain, came

23    and he grabbed my arm and pulled me away from that trooper.

24    He said, "Come this way" and he said, "Go north."  He walked

25    me up to the back side of the apartment building.  And I was

1   listening to him, going north.  I get around the corner and

2   I have five more troopers come up to me and get into my face

3   and say, "What the fuck did you not hear?  I told you to

4   leave."  One trooper came up and put pepper spray in my

5   face.  He said, "You had your fucking free pass.  What, are

6   you stupid?  We told you to fucking leave the area."

7   Q.  What happened then?

8   A.  I continue to leave the area, and apparently I wasn't

9   walking fast enough.  They said, "Go fucking faster, go

10  fucking faster, go, go, go, go faster," just very

11  aggressively kind of pounding their chest, trying to

12  intimidate me to not be able to do my job anymore.  I got

13  past the fence.  After that happened, they directed us to

14  this area outside of the kettle.  The area outside of the

15  kettle was behind a line of state troopers.  They were

16  obstructing our view completely of what was happening inside

17  the kettle.

18  Q.  All right.

19  A.  They told us to document from there.

20  Q.  So I would like to look at Plaintiffs' Exhibit Number 1.

21  Can you tell me what this exhibit is.

22  A.  This is the view that they gave us to document from

23  outside of the kettle.  As you can see, there are state

24  troopers standing there with their backs turned.  Sometimes

25  their face is to us.  You can basically just see their legs.

1    I can see a member of the media holding their press pass up,

2    which is inside the kettle, as they are being detained

3    inside of the kettle.

4              MS. McGARRAUGH:  Plaintiffs offer their Exhibit 1.

5              MR. HSU:  No objection.

6              THE COURT:  Exhibit 1 is received.

7              MS. McGARRAUGH:  Permission to publish?

8              THE COURT:  Yes, you may.

9              MS. McGARRAUGH:  Thank you.

10   BY MS. McGARRAUGH:

11   Q.  Zooming in on the center of this picture, in between

12   those two state troopers, what do you see here?

13   A.  I see a photographer that has a gas mask on holding up

14   the press credential while he's inside the kettle.

15   Q.  Where did the state troopers eventually direct you?

16   A.  One trooper came out and said, "You need to leave the

17   area."  And we said, "Why do we have to leave the area?  We

18   are trying to take photos."  He said, "No.  You need to

19   leave the area now."  We're like, "This is public.  We can

20   document in public.  We are not obstructing you in any way."

21   He said, "No.  You need to leave immediately."  He said, "Go

22   two blocks up to the gas station on the corner."

23   Q.  From that vantage point, could you see the ongoing

24   arrests in the kettle?

25   A.  Could I see what?

```
1    Q.  From the gas station two blocks up, could you see the

2    ongoing arrests in the kettle?

3    A.  Absolutely not.

4    Q.  Could you do your job from there?

5    A.  I was not even allowed to do my job.  They made us get

6    into a line here and they said we need to have our faces

7    photographed, our media credentials, as well as our IDs.  I

8    tried to walk to the right to take a photo of someone

9    getting arrested.  He said, "Get back in line.  You are not

10   allowed to document.  Get back in line," the state trooper

11   to me.

12          So we get into the line.  I was forced to take my

13   gas mask off as well as my helmet to have my face

14   photographed at close range on their -- keep in mind it's

15   also a pandemic.  The officer did not have a mask on.  So I

16   had to take all protective gear off to get my face

17   photographed before I could leave the kettle.  People that

18   were inside the kettle were not allowed to leave until we

19   let them photograph us.

20   Q.  So drawing your attention to Exhibit 5 here, Plaintiffs'

21   Exhibit 5 --

22          MS. LANDRUM:  Your Honor?

23          THE COURT:  Yes.

24          MS. LANDRUM:  The defense would --

25          COURT REPORTER:  Is your microphone on?
```

1              MS. LANDRUM:  Oh, I'm sorry.

2              THE COURT:  If it is, you may be seated and remain

3      seated while you are speaking, just so that we have access

4      to the microphone and it's comfortable for you to express

5      yourself.

6              MS. LANDRUM:  Absolutely.  I apologize, Your

7      Honor.

8              Just as it was becoming published, I just wanted

9      to note for the record that driver's license data is

10     protected under the Data Practices Act.  I understand that

11     this is this witness's photograph and that later a driver's

12     license is going to be displayed with his permission.  I

13     just wanted to note that for the record.

14             THE COURT:  Okay.  The record is so noted.

15     BY MS. McGARRAUGH:

16     Q.  On this Exhibit 5, whose photograph is on this page?

17     A.  That is a picture of me that was taken from the state

18     trooper.

19     Q.  Okay.  And then below that, do you see a map?

20     A.  Yes, I do.

21     Q.  Is that map approximately where your face was

22     photographed by state troopers?

23     A.  Yeah, it looks accurate to me.

24     Q.  And do you see in the corner that there is a text that

25     says, "STATEDEF0000148"?

```
 1    A.  Yes, I do.

 2              MS. McGARRAUGH:  Plaintiffs offer their Exhibit 5.

 3              MR. HSU:  No objection.

 4              THE COURT:  The exhibit is received.

 5    BY MS. McGARRAUGH:

 6    Q.  Is it your understanding that this is the photograph

 7    that was taken of you by the state troopers?

 8    A.  Yes, it is.

 9    Q.  Looking at Exhibit 6, what's photographed at the top of

10    this page?

11    A.  That's my independent press pass, and then below it is

12    my driver's license.

13    Q.  Okay.  You see that any identifying information on the

14    driver's license has been redacted out?

15    A.  Yes, I do.

16    Q.  And the map right below that, does this again depict

17    approximately where these photographs were taken, to your

18    knowledge?

19    A.  To my knowledge, yes, it does.

20              MS. McGARRAUGH:  Defendants offer -- excuse me.

21    Plaintiffs offer their Exhibit 6.

22              THE COURT:  Exhibit 6, is that what --

23              MS. McGARRAUGH:  Yes, Your Honor.

24              MR. HSU:  No objection.

25              THE COURT:  Exhibit 6 is received.
```

```
 1                    MS. McGARRAUGH:  I would like to publish it.

 2                    THE COURT:  You may.

 3                    MS. McGARRAUGH:  Thank you.

 4      BY MS. McGARRAUGH:

 5      Q.  While we're looking at this, I want to talk just briefly

 6      about the press pass that you were wearing.  Is this the

 7      press pass that you were wearing the entire time that you

 8      were in Brooklyn Center?

 9      A.  Yes, it is.

10      Q.  Okay.  And how are you wearing it?

11      A.  Around my neck.  There's a lanyard that pulls all the

12      way around my neck and then it sits in front of my chest.

13      Q.  You were carrying two photographs, I believe you

14      testified?

15      A.  I was carrying what?

16      Q.  Excuse me.  Not two photographs.  Two cameras?

17      A.  Correct.

18      Q.  What other gear did you have?

19      A.  I had a helmet, a full-face gas mask.  I had a

20      bulletproof vest with plates inside of it.  I had a cup.  I

21      had shin guards.

22      Q.  Why do you wear protective equipment?

23      A.  This documentation can be very dangerous in a lot of

24      ways.  Many times I find myself dodging rubber bullets,

25      ducking.  I had a flash-bang go off directly on my head
```

1    before, exploded on top of my helmet.  Thankfully I had the

2    helmet.  I also usually use earplugs because the flash-bangs

3    are very loud and they are generally thrown

4    indiscriminately.  Flash-bangs, they just kind of chuck them

5    up over a fence.  They want to make sure people are

6    uncomfortable and they want them to leave.  Those

7    flash-bangs are very rattling.  You can feel it in your

8    bones.  It's essentially like an explosion.  It is not

9    comfortable at all.

10            I know photographers that have been hit and

11   wounded severely by rubber bullets.  I have met people who

12   have lost their eyes by being shot by a rubber bullet.

13   Soren Stevenson, if you recall, last year here in Minnesota

14   lost his eye from a rubber bullet.

15   Q.  All right.  On the evening of April 16 through -- or 11

16   through 16, 2021, that's a Sunday through Friday, did you

17   observe anyone claiming to be a journalist who was not?

18   A.  I did not.

19   Q.  What is your experience covering protests?

20   A.  It is a wide range of experience.  I was fortunate to be

21   able to travel the country this last year to document this.

22   I spent time in Portland; in Seattle; in Louisville,

23   Kentucky; here; New York City; Washington, D.C.; Richmond,

24   Virginia; Philadelphia.

25   Q.  Have you observed other law enforcement agencies

1    handling protests?

2    A.  Many.

3    Q.  Which ones, if you can recall?

4    A.  LMPD, which is Louisville, Kentucky, Police Department.

5    I observed Capitol Police handling Stop the Steal rallies.

6    I observed D.C. Metro Police.  I observed in Portland a wide

7    variety.  So when I was in Portland was the time they were

8    protecting the federal courthouse.  So there were federal

9    officers there protecting the courthouse.  There was BORTAC.

10   There was ICE.  There was Department of Homeland Security.

11   There were a lot of officers there protecting the

12   courthouse.  I also saw officers in Seattle, so Seattle PD,

13   as well as Richmond PD and NYPD.

14   Q.  How does your experience with Minnesota state troopers'

15   treatment of you as a journalist compare to your

16   observations of other law enforcement's interactions with

17   journalists?

18   A.  The state troopers, to me directly, were by far the most

19   aggressive and intimidating.  I --

20   Q.  What's different about how Minnesota state troopers

21   interacted with you?

22   A.  They tried to intimidate me from being in an area.

23   Generally in other areas, if you're not obstructing an

24   officer while they are making arrest, if you are a safe

25   distance, you're allowed to do your job.  If you get too

1    close, they say, "Back up, back up, back up."  Not once did

2    I ever have an officer get in my face and say, "Get the fuck

3    out of here," not once, including federal officers, like I

4    said, ICE, LNPD, NYPD, not once was I threatened like that

5    with arrest.

6    Q.  If an officer asks you to back up, do you comply with

7    that kind of direction?

8    A.  Absolutely.

9    Q.  Why did you contact the ACLU?

10   A.  I was very concerned with what was happening here.  I

11   was here to cover the Derek Chauvin trial.  I knew what

12   happened last year.  I was scared this was going to happen

13   to us with the verdict coming in.  I didn't feel safe.  I

14   didn't feel that we would be allowed to do our jobs.  We

15   didn't know what was going to happen with the verdict,

16   obviously, but if stuff started to hit the fan, we thought

17   we were going to be detained because State Patrol, to my

18   knowledge, has jurisdiction in the state.  So I assumed

19   that --

20             MR. HSU:  Objection, speculation, foundation.

21   This witness has no basis to testify as to the

22   jurisdictional authority.

23             THE COURT:  Sustained.

24             THE WITNESS:  Okay.  So I --

25             THE COURT:  Let's pose a question and there will

1    be a response.

2              MS. McGARRAUGH:  Sure.

3    BY MS. McGARRAUGH:

4    Q.  Why did you think it was important for journalists to be

5    able to cover the Derek Chauvin verdict?

6    A.  Because I believe that the truth needed to be told.  I

7    believe that this documentation of this time in our life is

8    very important to show what's actually happening.  I believe

9    that, with the way social media is these days, there is a

10   lot of information that is not checked.  I believe that

11   sources need to have accurate documentation as well as

12   photographic evidence of what's actually happening.

13             People believe almost anything these days with

14   social media.  People are going to YouTube for information.

15   We're seeing social media play huge parts in understanding

16   of basically anything.  Opinions are swayed on a YouTube

17   video.

18             So I do believe that people being out and on the

19   ground here and doing real documentation is a service that

20   is integral to our democracy.

21             MS. McGARRAUGH:  I have nothing further.

22             THE COURT:  Is there cross examination for this

23   witness?

24             MR. HSU:  Yes, Your Honor.

25             THE COURT:  Counsel, I think we should take our

1      lunch break now, and we will begin again at 1:00.  Okay?  So

2      everyone please be ready to resume the hearing at 1:00 p.m.

3           (Lunch recess taken at 12:28 p.m.)

4                          *     *     *     *     *

5           (1:15 p.m.)

6                            **IN OPEN COURT**

7                THE COURT:  We are ready to resume.

8                MR. HSU:  Is the podium all right?

9                THE COURT:  I didn't hear you.

10               MR. HSU:  Is the podium permissible for the cross?

11               THE COURT:  Yes, it is.  And you may adjust the

12     height if you need to.

13               MR. HSU:  My understanding is the mask can be

14     removed as well?

15               THE COURT:  You may.

16                          **CROSS EXAMINATION**

17     BY MR. HSU:

18     Q.  Good afternoon, sir.  My name is Alexander Hsu.  I'm

19     here today representing the state defendants in this matter,

20     Minnesota Department of Public Safety and the Minnesota

21     State Patrol.

22               And just to make sure I'm saying it right, it's

23     Mr. Tuite?

24     A.  Correct.

25     Q.  To begin, I would like to talk with you about your

1    experience on April 13, 2021 that you described previously.

2    You stated that the State Patrol was issuing dispersal

3    orders to the crowd; is that correct?

4    A.  Correct.

5    Q.  About -- you heard about 50 times that order was issued?

6    A.  50 times specifically talking about media need to leave

7    the area, yes.

8    Q.  A general order was also being issued to the crowd?

9    A.  My recollection, yes, but generally it was targeted,

10   saying, "Media leave the area."  That's what I recall,

11   "Media leave the area" about 50 times.

12   Q.  And that was issued over the course -- those 50 times

13   was issued over the course of approximately an hour?

14   A.  Yes, sir.

15   Q.  And dispersal orders across that time were also being

16   issued to the crowd?

17   A.  Yes, sir.

18   Q.  And you stated that a fire was started in the middle of

19   the street near --

20   A.  Yes.

21   Q.  -- the police department?

22          And it was after that fire started that officers

23   began to advance towards the crowd?

24   A.  Yes, sir.

25   Q.  So the fire was the trigger for the advance?

```
1    A.  It appeared to be that way, yes.

2    Q.  And you testified previously that you witnessed officers

3    arresting and detaining individuals throughout the crowd as

4    they advanced?

5    A.  Yes.

6    Q.  And they did so after they had issued the previous

7    dispersal orders over the preceding hour?

8    A.  Yes, sir.

9    Q.  But the crowd did not disperse in response?

10   A.  [Inaudible.]

11            COURT REPORTER:  I didn't hear the answer.

12            THE WITNESS:  I said, "No."  Sorry.

13   BY MR. HSU:

14   Q.  Is it correct that you attempted to leave the area in

15   response to the dispersal orders?

16   A.  I attempted to leave the area in a car, yes, sir.

17   Q.  And that car was driven by, you described, a Good

18   Samaritan?

19   A.  Yes.

20   Q.  Did you know who that person was --

21   A.  [Inaudible.]

22   Q.  -- to that night?

23            THE COURT:  You have to answer with words.  I did

24   not hear your words.

25            THE WITNESS:  I'm sorry.  I did not.
```

1        COURT REPORTER:  Excuse me.  I think you are just

2   talking over him.  If you would just wait until he is done

3   with his question, we can hear your answer.

4        THE WITNESS:  Sorry.

5        MR. HSU:  I can repeat the question.

6        THE COURT:  You may.

7   BY MR. HSU:

8   Q.  You didn't recognize the individual driving the car

9   prior to that evening?

10  A.  No, I did not.

11  Q.  And that vehicle wasn't marked as press or media, was

12  it?

13  A.  No.

14  Q.  And when you got in the vehicle, you were riding in the

15  back seat; is that correct?

16  A.  Yes, sir.

17  Q.  Was Mr. McFadden in the back seat as well?

18  A.  Yes, sir.

19  Q.  And officers then detained that vehicle and asked you to

20  leave the vehicle?

21  A.  They pulled the driver out of the car.  I never saw them

22  again.

23  Q.  Officers detained you and pulled you out of the car as

24  well?

25  A.  Yes, sir.

1    Q.  And they pulled Mr. McFadden out of the car?

2    A.  Yes, sir.

3    Q.  And you showed your press badge to the officers?

4    A.  Yep.  I held it up to the window, screamed it 50 times,

5    and then after I got out of the car as well, yes.

6    Q.  And after they pulled you out of the car, they

7    subsequently released you after they confirmed you were

8    press?

9    A.  Yes, sir.

10   Q.  And they also subsequently released Mr. McFadden after

11   they confirmed that he was press?

12   A.  After I helped them confirm he was press, yes, sir.

13   Q.  And you testified today that you didn't have any further

14   issue after you were released following that brief encounter

15   near the vehicle?

16   A.  No physical issue, no, but I was not allowed to document

17   inside the area anymore.

18   Q.  But you were free to leave the area?

19   A.  Yes, sir.

20   Q.  I would like to move to the events of April 15, 2021.

21   You testified that during that evening the crowd dispersed;

22   is that correct?

23   A.  Yes, sir.

24   Q.  And that was prior to the curfew?

25   A.  To my recollection, it was just before the curfew and it

```
 1    kind of filtered through the curfew.  So maybe 10:20, 10:30
 2    everyone seemed to be just about gone.
 3    Q.  And you didn't observe any encounters between protesters
 4    and law enforcement officers on that evening?
 5    A.  Not to my recollection, no.  Nothing of a serious
 6    nature, no.
 7    Q.  And there were dispersal orders issued that evening as
 8    well; is that correct?
 9    A.  From my recollection, there were.
10    Q.  And the crowd dispersed in response to them?
11    A.  The crowd dispersed, yes.
12    Q.  I would like to now talk about the events of April 16,
13    2021.  On that evening you were located near the Brooklyn
14    Center Police Department, correct?
15    A.  Yes, sir.
16    Q.  And you testified that fireworks were being shot off in
17    the area?
18    A.  Yes, sir.
19    Q.  Multiple fireworks?
20    A.  Yes.  Up in the air, yes, sir.
21    Q.  And the dispersal order was issued at that time as well;
22    is that correct?
23    A.  Not that I recall, sir.
24    Q.  You don't recall any dispersal order?
25    A.  I don't recall a dispersal order.
```

```
1    Q.  Is it possible that you didn't hear any dispersal order
2    that was issued?
3    A.  I was standing near the fence and I'm pretty perceptive.
4    I'm pretty sure I would have heard the order.
5    Q.  So is it your testimony today that no dispersal order
6    was issued on April 16th?
7    A.  I do not recollect a dispersal order being issued.
8             MR. HSU:  Your Honor, we would ask to publish to
9    the Court and to the witness what's been previously marked
10   as Defense Exhibit 25.
11            THE COURT:  Is there any objection?
12            MS. McGARRAUGH:  No.
13            THE COURT:  Okay.  You may.
14            MR. HSU:  Excuse me, Your Honor.  One moment.  May
15   I retrieve a paper from counsel table?
16            THE COURT:  Yes, you may.
17       (Pause)
18   BY MR. HSU:
19   Q.  Mr. Tuite, do you have Exhibit Number 25 in front of you
20   right now?
21   A.  Yes, sir.  It's a few pages.
22   Q.  And this document is titled the Second Declaration of
23   Chris Tuite; is that correct?
24   A.  I don't see that in Number 25, no.  I see a letter from
25   Paul Schnell.
```

```
 1                  MS. McGARRAUGH:  He has the plaintiffs' book.

 2                  MR. HSU:  Permission to approach, Your Honor?

 3                  THE COURT:  You may.

 4      BY MR. HSU:

 5      Q.  I'm showing you what's been marked as Defense

 6      Exhibit 25.  Mr. Tuite, you have that document in front of

 7      you and it's entitled Second Declaration of Chris Tuite; is

 8      that correct?

 9      A.  Yes, sir.

10      Q.  And that's your name, correct?

11      A.  Chris Tuite, yes.

12      Q.  Do you recall signing a declaration similar to this

13      document?

14      A.  Yes.

15      Q.  I'll give you a chance to review it.  Would you -- is

16      this a true and accurate copy of the declaration that you

17      submitted?

18          (Witness reviews exhibit)

19      A.  Yes, sir.

20      Q.  And this was a sworn declaration; is that correct?

21      A.  Yes, sir.

22      Q.  On the last page, that's your signature?

23      A.  Yes, sir.

24      Q.  Dated May 30, 2021?

25      A.  Yes, sir.
```

1   Q.  And you were telling the truth when you signed this

2   declaration; is that correct?

3   A.  Yes, sir.

4   Q.  And you just testified that no dispersal order was

5   issued on the evening of April 16th; is that correct?

6   A.  Not that I recall.

7   Q.  Mr. Tuite, I would ask you to please read silently along

8   as I read aloud on page 4, paragraph 9, of the declaration.

9   A.  Whoa.  I don't have a page 4.  I have page 1, 3, and 5.

10  Q.  Mr. Tuite, are they double-spaced on the back side?

11  A.  Oh.  There we go.

12  Q.  And I will direct you again to page 4, paragraph 9.

13  A.  Yes, sir.

14  Q.  "My recollection is that on April 16, no dispersal order

15  was issued" --

16          THE COURT:  Are you asking him to refresh his

17  recollection?

18          MR. HSU:  Yes, Your Honor.

19          THE COURT:  Okay.  So he can look at it.  You

20  don't need to read it for him.  And then you can pose your

21  question.

22  BY MR. HSU:

23  Q.  Mr. Tuite, I would ask you to please read through that

24  paragraph.  Let me know when you have read it.

25          (Witness reviews exhibit)

1    A.   Okay.

2    Q.   Does that refresh your recollection of the events of

3    April 16, 2021?

4    A.   Well, it was essentially simultaneous saying, "Get on

5    the ground."  That was what I am trying to say here.  When

6    they said, "Get on the ground," they didn't say, "You have

7    ten minutes to disperse," if that makes sense.  Like by

8    10:02 there was a swarm.

9    Q.   And officers were directing the crowd to --

10   A.   Get on the ground.

11   Q.   You testified that officers were conducting a mass

12   arrest --

13   A.   Yes, sir.

14   Q.   -- on April 16th?

15        And officers were attempting to encircle the

16   crowd; is that correct?

17   A.   Yes.

18   Q.   And you recognized that they were conducting a mass

19   arrest at that time --

20   A.   Yes, sir.

21   Q.   -- when they started the encirclement?

22   A.   Yes, sir.

23   Q.   And you chose intentionally to remain within the

24   encirclement; is that --

25   A.   Yes.  I stayed there to document the arrests, yes, sir.

1   Q.  Officers directed you specifically to leave the area; is

2   that correct?

3   A.  Yes, sir.

4   Q.  And you continued to stay within the mass arrest area?

5   A.  Yes, sir.  I stood on the sidewalk and in the grass in

6   an area that was not obstructing to them.

7   Q.  That remained within the encirclement area; is that

8   correct?

9   A.  Yes, sir.

10   Q.  And officers repeatedly directed you to leave the area;

11   is that correct?

12   A.  Yes, sir.

13   Q.  Is it your standard practice to disobey police orders?

14   A.  No, sir.

15   Q.  Yet when police ordered you to leave the area, you

16   refused; is that correct?

17   A.  I stood to take photos.

18   Q.  Within a mass arrest zone?

19   A.  Yes, sir.

20   Q.  Despite the fact that officers were directing you to

21   leave that area?

22   A.  Yes, sir.

23   Q.  And you testified that you were -- one officer grabbed

24   you by your coat; is that correct?

25   A.  Yes, sir.

1    Q.  And when he grabbed you, you were still within that mass

2    arrest area --

3    A.  Yes, sir.

4    Q.  -- is that correct?

5              You were -- eventually another officer pulled you

6    away from that encounter; is that right?

7    A.  That's correct.

8    Q.  And that was a state trooper?

9    A.  Yes, sir.

10   Q.  And he directed you to move north out of the area?

11   A.  Yes, sir.

12   Q.  And that's when you ended up near a gas station; is that

13   correct?

14   A.  There's time in between that.  So in between that we

15   were out of the zone and directed to the area behind the

16   kettle, which is the photo that they put into the exhibit

17   where there's an obstructed view with a person holding up a

18   press pass.  So I attempted to photograph there before

19   another trooper came over and said, "You need to leave the

20   area completely."

21   Q.  And then he directed you to move north?

22   A.  He said, "Leave the area now.  Go to the gas station."

23   Q.  And you obeyed his order at --

24   A.  Yes, sir.

25   Q.  -- that time?

```
 1              And you testified that as you were moving that
 2    way, that one trooper held what appeared to you as a
 3    chemical dispersal -- dispersant?
 4    A.  Yes, sir.
 5    Q.  But he didn't fire that at you, did you?
 6    A.  No.
 7    Q.  He didn't use it on you?
 8    A.  He did not.
 9    Q.  Did you have any further physical interaction with
10    troopers prior to arriving at the gas station?
11    A.  Between that time?
12    Q.  Yes.
13    A.  I do believe there was a small shove in the back when I
14    wasn't walking fast enough, but nothing other than that.
15    Q.  And was that -- it was at the gas station that you were
16    photographed?
17    A.  Yes, sir.
18    Q.  And those are the exhibits that you testified to?
19    A.  Yes, sir.
20    Q.  After those photographs were taken, you were allowed to
21    leave; is that correct?
22    A.  We were told to go across the street from the gas
23    station, and all the media was kind of lined up right there.
24    This is murky because the roads are all blocked.  So being
25    able to leave means going through a zone of an active
```

1    protest with police.  So I would say, no, I was not able to

2    leave at that time.

3    Q.  Were you arrested?

4    A.  No, sir.

5    Q.  Were you detained?

6    A.  No, sir.

7              MR. HSU:  No further questions.

8              THE COURT:  Anything further for this witness?

9              MS. McGARRAUGH:  Just very briefly.

10             THE COURT:  You may.

11                         **REDIRECT EXAMINATION**

12   BY MS. McGARRAUGH:

13   Q.  You just testified about a state trooper holding pepper

14   spray up to you?

15   A.  Yes, sir.

16   Q.  Did you understand that to be a threat?

17   A.  I did.

18   Q.  All right.  And then --

19   A.  He screamed at me, "You had your free pass.  Are you

20   fucking stupid?"

21   Q.  During the time that you were being photographed by the

22   gas station -- about how long did that take?

23   A.  I would say the line took about ten minutes to get to

24   the front.

25   Q.  Were you allowed to document the proceedings during that

1    time?

2    A.  No.  I tried.  There was an arrest happening to the

3    right, and I walked over there.  I got about ten seconds and

4    the state trooper walked up and said, "Get back in line.

5    That's enough."

6              MS. McGARRAUGH:  We have nothing further.

7              THE COURT:  Anything further for this witness?

8              MR. HSU:  No, Your Honor.

9              THE COURT:  Okay.  You may be excused.

10             THE WITNESS:  Thank you, Your Honor.

11        (Pause)

12             MR. RIACH:  Excuse me, Your Honor.  Can I ask a

13   question of the Court?

14             THE COURT:  You may.

15             MR. RIACH:  Mr. Tuite is finished testifying.  May

16   he remain in the courtroom?

17             THE COURT:  Yes.  Has he been excused as a

18   witness?

19             MS. McGARRAUGH:  Yes.

20             THE COURT:  Okay.  He may remain, yes.

21             MR. RIACH:  Thank you, Your Honor.

22             And then one more kind of housekeeping point, Your

23   Honor.  I think before we begin with the State's witnesses,

24   it might be a good idea to just make sure we understand who

25   will need to be excused when confidential or attorneys' eyes

1    only documents are discussed.  It's my understanding that

2    the procedure is going to be to close the courtroom to

3    anyone other than the parties during that period of time.

4    There's some folks in the gallery.  I don't know if now is a

5    good time to make that determination or the Court would just

6    prefer to wait, but I figured, since I'm standing here, I

7    would raise it.

8                THE COURT:  Does counsel wish to be heard on this

9    matter?

10               MS. LANDRUM:  Your Honor, attending with state

11   defendants are counsel for state defendants.

12               THE COURT:  I'm going to ask you either to be

13   seated or you can come to the podium.  I'm sorry for the

14   logistics, but we have --

15               MS. LANDRUM:  Absolutely.

16               THE COURT:  -- to make sure that we can hear and

17   make --

18               MS. LANDRUM:  Absolutely.  Of course, Your Honor.

19   Present with state defendants today, Your Honor, are,

20   outside of Commissioner Harrington and our witness, Major

21   Dwyer, are our general counsel for Minnesota State Patrol as

22   well as counsel for the Department of Public Safety.  We

23   would like for them to remain as a part of our legal team,

24   of course.  We also have someone from the Attorney General's

25   Office.  One of our law clerks who is here observing is a

1    part of the Attorney General's Office.  And we also have

2    Bruce Gordon with us, who is the director for Department of

3    Safety with regard to communications.  These are all

4    high-level officials for the Department of Safety.  Because

5    the Department of Safety is sued in its official capacity,

6    we would like for them to be able to stay for that purpose.

7    And the other two individuals in the back I don't actually

8    recognize on state defendants' side.

9            With regard to parties, Your Honor, the defendants

10   would take the position that Mr. Tuite is not a party and

11   that's because he is not a named plaintiff in this case.  It

12   is a putative class action, but the class action hasn't been

13   certified.  So to the extent that those documents are being

14   referenced, those types of -- even though he was a witness

15   today, I believe he would have to leave the courtroom.

16           THE COURT:  So your view is Mr. Tuite does need to

17   leave the courtroom?

18           MS. LANDRUM:  That's correct, Your Honor.

19           THE COURT:  Okay.  And then you said there are

20   other individuals in the rear who are members of your

21   organization; is that correct?

22           MS. ROBERTSON:  I'm sorry, Your Honor.  I am

23   Heather Robertson.  I'm the attorney for the City of

24   Minneapolis, here with my co-counsel, Sharda Enslin and

25   Kristin Sarff.  And Mr. Joe Kelly, who is the attorney for

1    Defendant Robert Kroll, is also present here.

2            THE COURT:  Okay.  Thank you.  Is there any

3    objection to these individuals remaining in the courtroom?

4            MS. LANDRUM:  Because they are counsel, no, Your

5    Honor.  They would have received these documents under the

6    protective order.

7            THE COURT:  Okay.  Anything further to address as

8    to who is present in the courtroom at this time?

9            MR. RIACH:  I think that covers everybody, Your

10   Honor, and we are in agreement with the State --

11           THE COURT:  Very well.

12           MR. RIACH:  -- on how to proceed.  We are fine --

13           THE COURT:  We are ready to proceed.  I'm sorry.

14   I spoke over everyone else.  So please finish what you said

15   and make sure that we have a clear record.

16           MR. RIACH:  Nothing else to say, Your Honor.

17           THE COURT:  Okay.  Are we ready to proceed, then?

18   Okay.  You may.

19           MR. HSU:  Your Honor, the State would call

20   Commissioner John Harrington as a witness.

21           THE COURT:  Please.

22           COURT REPORTER:  Would you raise your right hand,

23   please.

24       (Witness sworn)

25           COURT REPORTER:  You can have a seat in the

 1    witness stand.  If you would state your name, spelling your

 2    first and last name, please.

 3              THE WITNESS:  My name is John Mark Harrington.

 4    Last name is spelled H-a-r-r-i-n-g-t-o-n.

 5              THE COURT:  And, Commissioner Harrington, as you

 6    are comfortable, you may remove your mask if you would like

 7    to, but I will --

 8              THE WITNESS:  Thank you very much, Your Honor.

 9              THE COURT:  -- leave you to do as you would like.

10              And you may proceed.

11              MR. HSU:  Your Honor, we're just going to put --

12    we have a physical copy of the exhibits for ease.  I'm just

13    going to put it in front of the witness and --

14              THE COURT:  You may.

15              MR. HSU:  -- request permission as we move.

16              THE COURT:  And I don't know what the other

17    exhibit -- does the other exhibit book need to be there at

18    this time?

19              MR. RIACH:  Your Honor, I can -- with permission

20    to approach, I can come get our exhibit book.

21              THE COURT:  I think just because of the size, if

22    we can remove one and make sure that Commissioner Harrington

23    has enough space to be able to look at the documents, that

24    would be great.

25              (Pause)

```
 1              THE COURT:  Are we ready to proceed?

 2              MR. HSU:  Yes, Your Honor.

 3              THE COURT:  You may.

 4                   (John Harrington)

 5                   DIRECT EXAMINATION

 6   BY MR. HSU:

 7   Q.  Commissioner Harrington, good afternoon.

 8   A.  Good afternoon.

 9   Q.  Could you please tell the Court where you are currently

10   employed.

11   A.  I'm currently employed as the commissioner of the

12   Minnesota Department of Public Safety.

13   Q.  And how long have you been serving as a commissioner?

14   A.  I've been serving as commissioner since January of 2019.

15   Q.  Can you briefly describe your job duties as the

16   commissioner of Public Safety.

17   A.  The commissioner of the Department of Public Safety is a

18   cabinet-level official reporting to the governor.  I oversee

19   the Department of Public Safety, which is comprised of

20   14 divisions that oversee public safety in both the law

21   enforcement sense and the fire and emergency management

22   sense.  Also oversees victim services and driver's license

23   and vehicle services.

24   Q.  Prior to that role, were you employed in the law

25   enforcement field?
```

```
 1    A.   Yes, I was.

 2    Q.   Can you briefly describe that prior experience.

 3    A.   Absolutely.  I started policing in 1977 with the City of

 4    St. Paul as a police officer.  I rose through the ranks over

 5    the course of the next 30 years or so to the rank of senior

 6    commander, and then promoted from there by Mayor Randy Kelly

 7    as the chief of police in 2004.  I served as chief of police

 8    for the City of St. Paul from 2004 to 2010.  At the end of

 9    my term, I was elected to the Minnesota State Senate for the

10    biennium year, so 2010 to 2012, and then returned to law

11    enforcement as the chief of police for the Metropolitan

12    Transit Police, where I served from 2012 until twenty --

13    until I left to take this assignment with Governor Walz.

14    Q.   In total, how many years of law experience would you

15    estimate you have?

16    A.   44 years, I would say.  That's a pretty good ballpark.

17    Q.   And you've already touched on some of it, but I would

18    like to get a little more background on the Department of

19    Public Safety.  Could you describe its role and what the

20    Department serves in terms of state functions.

21    A.   Certainly.  The Department of Public Safety is the

22    agency that both serves and protects Minnesotans on a

23    statewide basis.  We do that through administration of

24    programs, such as officer justice programs, where we serve

25    victims; officer traffic safety, where we work to increase
```

1    traffic safety.  But we also serve it in education in terms

2    of educating the public in terms of victims rights,

3    services.

4              And then what is probably most notable in this

5    context is we serve as the enforcement arm of the state, at

6    least in some part, because we oversee the Minnesota State

7    Patrol, the Minnesota Bureau of Criminal Apprehension, and

8    the Alcohol and Gambling Enforcement.  That's not all of the

9    officers or peace officers that work for the State, DNR has

10   a separate section and they are run by that agency, but the

11   majority of peace officers in the state of Minnesota work

12   under the Department of Public Safety.

13   Q.  Does the Department of Public Safety have an Internal

14   Affairs Division?

15   A.  Yes, it does.

16   Q.  Is that a separate division from the Minnesota State

17   Patrol?

18   A.  Yes, it is.

19   Q.  Why is that?

20   A.  We believe that an independent review of cases brought

21   where there was an allegation of misconduct ensures an

22   independent and a thorough investigation.  We also believe

23   that it increases the transparency for the public when they

24   have a complaint about any member of the Department of

25   Public Safety staff.

1    Q.  What is the mission of the Department?

2    A.  We are there to serve and protect Minnesotans.  The

3    Department has a very broad mission, as I mentioned, with a

4    wide range of organizations.  So protecting them from fires

5    with the state fire marshal, protecting them from traffic

6    collisions with officer traffic safety and the Department --

7    State Patrol, investigating crimes with the Bureau of

8    Criminal Apprehension, and then also working to -- working

9    in partnership with local jurisdictions to assist them when

10   they have needs, whether it is in criminal investigation, in

11   traffic crash reconstruction, or facilitating their

12   administration of justice.

13   Q.  And you mentioned Minnesota State Patrol and its role

14   there.  Are there any jurisdictional limits on the authority

15   of the State Patrol?

16   A.  Minnesota State Patrol's primary jurisdiction is the

17   state trunk highways.  That is really what their primary

18   role is.  They also have assignments to protect the State

19   Capitol and they also provide the executive protection for

20   the governor.

21   Q.  What is the source of those jurisdictional limits?

22   A.  The Minnesota State Patrol's jurisdictional limits are

23   set in statute.

24   Q.  Is the Minnesota State Patrol a statewide police force?

25   A.  No, it is not.

1     Q.  Why not?

2     A.  The state of Minnesota is made up of 87 counties and

3     then countless individual local jurisdictions, each of which

4     has local policing authority over what happens in their

5     jurisdiction, whether it's in their town or their city or

6     within their county.

7            The Minnesota State Patrol's jurisdiction is

8     statewide in the sense that it is on any of the trunk

9     highways that cross the state from north to south or east to

10    west, but we have no local jurisdiction to investigate

11    crimes outside of our primary purview.

12    Q.  Does the State Patrol have any authority over city or

13    county law enforcement entities?

14    A.  No, it does not.

15    Q.  And you mentioned that the State Patrol and Department

16    of Public Safety can assist local entities.  What role does

17    the State Patrol play in that regard?

18    A.  The State Patrol's role when we're called to assist, we

19    try to meet the local jurisdiction's needs where they are.

20    So in some cases we're there because they need traffic

21    control.  For example, in the case of an emergency or a

22    flood, we might be there to do traffic control and traffic

23    direction.  In other cases we would be there because they

24    need accident reconstruction or they need an accident

25    investigation and we have a high level of expertise in crash

1   investigations, as you would expect.

2           We, because of the State Capitol, have also been

3   trained in crowd control and so we have been called upon by

4   other jurisdictions to assist them in crowd control when

5   they have felt the need.

6           But we typically try and meet the needs that the

7   local agency is asking us to fulfill if we have both the

8   resources and/or the expertise or the competence to do that.

9   Q.  Does the State Patrol require a request from a local

10  entity before it provides those resources?

11  A.  Yes, it does.

12  Q.  What is the typical process for that type of request?

13  A.  Typically you would see either -- the local

14  jurisdiction's on-duty officer, for example, chief of police

15  or a police captain, would request the State Patrol to come

16  in to do an accident reconstruction in some cases.

17          In the case of an emergency, typically it is a

18  chief-to-chief correspondence where the chief of a local

19  jurisdiction would request Colonel Matt Langer, who is the

20  colonel and chief of the State Patrol, to assist or we may

21  get a request through the duty officer, which is a 24/7

22  operation out of the BCA where any emergency requests for

23  state aid are received and then can be transferred to the

24  proper jurisdiction.

25  Q.  Commissioner, what is the Mobile Response Team?

1    A.   The MRT or Mobile Response Team is a team of state

2    troopers who have been trained to do crowd control and to

3    respond as an emergency services response team.  Primarily

4    they were trained to respond to crises at the State Capitol,

5    but over the course of the last few years we have been

6    called upon to expand where they respond to in the cases of

7    an emergency.

8    Q.  You mentioned crowd control.  Are there any other types

9    of events that they would respond to in terms of

10   emergencies?

11   A.   They have responded to parades, civil unrest, and they

12   also have worked simply large-scale special events.  For

13   example, they were involved I believe at the Republican

14   National Convention.

15   Q.  Is the Mobile Response Team involved in any disaster

16   relief responses?

17   A.   The Mobile Response Team has capabilities to do that

18   also.  It depends on where the disaster would occur and what

19   the logistics are for responding, having troopers respond.

20   So if it was in greater Minnesota in the far north, it might

21   be more logistically feasible to send local troopers there

22   than it would be to send MRT from the Twin Cities, but in

23   some cases where the disaster is sustained and where there's

24   going to be a long-term need for troopers there that work in

25   a very close-knit team environment, you would see them sent

1    there also.

2    Q.  When the State Patrol assists local law enforcement, who

3    is in charge regarding the setting of law enforcement goals?

4    A.  The local agency sets the overall mission that we're

5    attempting to respond to.  However, within the context of

6    that overall mission, the Minnesota State Patrol retains its

7    own jurisdiction and its own responsibility for the

8    direction of its actual officers.  So while we may be called

9    to a city to assist, the captain or the lieutenant of the

10   State Patrol would be the person who is actually directing

11   the activities of the State Patrol.

12   Q.  Does the State Patrol assume any control over the local

13   agency when it's assisting?

14   A.  No, it does not.

15   Q.  Commissioner, does the Department of Public Safety set

16   forth any standards of conduct for officers acting under its

17   umbrella?

18   A.  Yes, we do.

19            MR. HSU:  Your Honor, we would request permission

20   to publish to the witness and the Court what's been marked

21   as Exhibit 15 --

22            THE COURT:  You may.

23            MR. HSU:  -- of the defendants' exhibits.  I think

24   Ms. Kosek is going to pull it up on the screen here.  I

25   would ask, could you please just scroll through it.

```
 1    BY MR. HSU:

 2    Q.  And I will ask, Commissioner, if you could just please

 3    review the document briefly.

 4    A.  Certainly.  It's scrolling still.

 5        (Witness reviews exhibit)

 6    Q.  Commissioner, do you recognize this document?

 7    A.  Yes, I do.

 8    Q.  What is this document?

 9    A.  It's Minnesota Department of Public Safety.  It's an

10    administrative policy published in 1996.  It describes --

11    it's from the Office of the Commissioner.  It was approved

12    by the commissioner and it describes -- thank you very much.

13    I was going to have to get spectacles out.  It describes

14    conduct unbecoming a peace officer.

15    Q.  And how do you recognize this document?

16    A.  I reviewed this document when I took over the

17    organization, and I review it on an annual basis.

18    Q.  Is this a true and accurate copy of that?

19    A.  Yes, it so appears.

20             MR. HSU:  Your Honor, the state defendants would

21    move to admit Exhibit 15 into evidence.

22             THE COURT:  Any objection?

23             MR. RIACH:  No objection, Your Honor.

24             THE COURT:  Exhibit 15 is received.

25    BY MR. HSU:
```

1    Q.  Commissioner, you've touched on it a bit already, but

2    could you please describe this exhibit for the Court and its

3    role in terms of the Department and its actions.

4    A.  The document spells out the purpose for it, first of

5    all.  So the purpose is to define conduct unbecoming, which

6    helps bracket for an officer what is conduct that should

7    be -- how we should operate.  So while it defines the thou

8    shall not effectively, it also defines what you should be

9    doing also.

10        It's a policy specifically geared toward law

11   enforcement, so it's geared for peace officers, sworn peace

12   officers within the organization, and it talks about the

13   fact that we recognize that our effectiveness is dependent

14   upon community support and community respect and that that's

15   a two-way street and that we understand that without

16   community respect and without their confidence, that our

17   ability to function is at best *de minimis*.

18        The scope applies to all officers of the

19   Department, so it applies to -- whether you're a BCA agent,

20   State Patrol, or in AGE.  And it doesn't matter where you

21   are in the state of Minnesota, it applies to all of them

22   equally.

23        And then it outlines principles or pillars that

24   talk about what are the background for that.  So Principle

25   One, for example, talks about all peace officers conducting

1    themselves in accordance with the Constitution of the United

2    States, Minnesota Constitution, and applicable laws.  It is

3    effectively the oath of office that every peace officer

4    takes when they are sworn in as a peace office or when

5    they're promoted.

6    Q.  Commissioner, how would an officer become aware of this

7    document?

8    A.  Every peace officer who works with the State of

9    Minnesota would be trained in this document.  For example,

10   the Minnesota State Patrol, which offers a state police

11   academy at Camp Ripley, they would be instructed in this

12   document during their academy and then it's also reviewed

13   with them on an annual basis during performance reviews.

14   Q.  Commissioner, I want to draw you to -- your attention to

15   the language on page 2 under the second principle, item

16   number 4, and that states that an officer shall take no

17   action knowing it will violate the constitutional rights of

18   any person.

19            How do you understand that as it applies to peace

20   officers under the Department?

21   A.  My understanding of rule number 4 is that as we look at

22   the United States Constitution and the Minnesota

23   Constitution, those amendments, the right to free speech,

24   the right to assembly, the right to not be searched without

25   warrant, the right against self-incrimination, all of those

1    rights are to be protected under this rule and that no

2    officer should take any action that knowingly violates these

3    constitutional rights, because if they do, they then are

4    subject to discipline.

5    Q.  Would the intention of targeting members of the media or

6    the press be a violation of these standards?

7    A.  Yes, it would.

8    Q.  I believe you mentioned the importance of partnership.

9    Is it important for the Department and State Patrol to

10   maintain a relationship with members of the media?

11   A.  Yes, it is.

12   Q.  Why is that?

13   A.  I was brought up as a community policing cop, that was

14   how St. Paul trained their cops, and it's the philosophy

15   that I have operated under for the 40 years that I've been

16   in the business.

17          The basic philosophy of community policing, which

18   is generally recognized by everyone as the most effective

19   and the most authentic form of policing, essentially says

20   that the public and the police have to work together.

21          And then as we think about how we break down who

22   is the public, we -- the media is one of those major

23   components.  It's one of those groups that we recognize as

24   being a part of the public, just as we recognize elected

25   officials, community groups, nonprofit organizations,

1    schools, they are all partners that we should be working

2    with.

3            The media is given particular attention as we talk

4    about community policing because we recognize that

5    especially in the -- law enforcement has an educational

6    goal.  The media becomes really an essential partner with us

7    in trying to make sure that the information we want to get

8    out, whether it's about distracted driving or drunk driving

9    or about a curfew that we want people to abide by, the media

10   plays an essential role in doing that.  And they also play

11   an essential role as sort of a watchdog for the community,

12   bringing to our attention crime, in some cases, or

13   misconduct.

14   Q.  With all of those concerns in mind, what steps does the

15   Department of Public Safety and Minnesota State Patrol take

16   to maintain their relationship with the media?

17   A.  The Department of Public Safety at the commissioner's

18   level operates an Office of Communications, which has -- it

19   has, frankly, one of the more robust staffs that I've ever

20   worked with in terms of communication.

21           So almost all the divisions have a communications

22   person that works with them and their job is to make sure

23   that they have ongoing relations with the media, both in

24   terms of advising the media when we have information or a

25   press release, but also fielding the day-to-day questions

1    the media has about incidents that happened across the

2    state.

3              In addition to that role, we've also done an

4    extensive amount of outreach to the media, especially over

5    the last few years, to try and make sure that we are

6    operating with the media under best practices.  And so

7    whether it is at the commissioner's level, at the State

8    Patrol level or the BCA level or any of the other agencies,

9    we oftentimes find ourselves having regular dialogue with

10   the media and bringing them in to make sure they know what's

11   going on within the Department of Public Safety.  We believe

12   that transparency is our best vehicle.

13   Q.  Commissioner, I would like to move to more specifically

14   the unrest that occurred in Minneapolis in May 2020

15   following the death of George Floyd.  Was the Department of

16   Public Safety or Minnesota State Patrol involved in those

17   events?

18   A.  Yes, we were.

19   Q.  And how did the Minnesota State Patrol become involved?

20   A.  After George Floyd was murdered and after the video

21   became public, the duty officer made me aware of the crowds

22   that were gathering in protest.

23              As we coordinated with Minneapolis, asking

24   Minneapolis and Hennepin County what they needed and we

25   received requests from them, one of the concerns that was

1   voiced was that with a very large crowd that was moving in

2   the direction of the freeway, that we might well have a

3   freeway protest, which brought great concern to the State

4   Patrol.  We have seen people killed on the freeway.  We've

5   seen people run over on the freeway in those kind of

6   traffic-blocking events.  So we began having the State

7   Patrol position themselves to assist -- to be in position to

8   assist if we did have a freeway protest.

9          We received requests from the City of Minneapolis,

10  through the police department, to also assist them in the

11  Third Precinct area down off of Lake Street because they

12  were seeing very large crowds and they were concerned about

13  their ability to respond to those crowds.

14  Q.  And were you involved in the State Patrol and the

15  Department of Public Safety responses in your role as

16  commissioner?

17  A.  Yes, I was.

18  Q.  Can you describe, based on your experiences as the

19  commissioner and your role there, what was happening on the

20  ground during those events and what were the concerns faced

21  by the State Patrol and the Department?

22  A.  There were several concerns, some expressed initially by

23  the City of Minneapolis and Hennepin County, others that we

24  saw once we actually got on the ground.

25          And then part of my role is I'm the homeland

1     security advisor for the governor and so one of my jobs is

2     also to make sure the governor is aware of major critical

3     events within the state of Minnesota that might affect or

4     involve state assets or require state resources to respond.

5                As we progressed through the first and second day,

6     the crowds were gathering.  We noted with some distress that

7     there were, in fact, multiple crowds and there was not just

8     one protest.  There were, in fact, several protests spread

9     out over a larger geographic area, which made the city's

10    response more complicated and it was far more taxing to try

11    and have enough peace officers to respond to any one of

12    those crowds, some of which estimated in the eight to ten

13    thousand range at one point or another.

14                There was also calls from MPD that talked about

15    the need for this to become a sustained element, that they

16    didn't expect that this was going to end appropriately --

17    not appropriately.  In a timely fashion.

18                Many special events we respond to have a set

19    beginning and a set end time and so you can plan for this is

20    a four-hour protest or this is an all-day protest.  But in

21    this case, because the protests seem to be more organically

22    or spontaneously driven, it didn't have any boxes around it

23    in terms of where the protest was going to be.  It didn't

24    have any boxes around it in terms of how long the protest

25    was going to last.

 1              And it also didn't have -- what we oftentimes work

 2      with when we're dealing with protests or events, it didn't

 3      have any clear defined leaders who you could work with to

 4      help with the organization of the protest, to be able to

 5      work out what do they want to do, where do they want to go,

 6      how can we facilitate their movement along streets and

 7      highways.

 8              So those all complicated the response to the

 9      protests as a matter of planning.

10              And then as the protests continued, we saw two new

11      elements that we had not seen really in my police career.

12      We saw the use of arson and we saw organized looting go on

13      with the protests.

14              And so while the protests would be going on in one

15      place, we would have a car parts place or liquor store,

16      oftentimes those seemed to be the two places that got hit

17      first, they would be set on fire.

18              Once those were on fire, you would see stores

19      nearby looted, which further depleted city and county

20      resources to respond as they were trying to figure out how

21      to get the fire department to the fires and then how to

22      respond to the looting incidents.

23              The fire department, in fact, ended up calling to

24      say they needed, in fact, protection because they couldn't

25      get out of their fire --

```
1              MR. RIACH:  Your Honor, I am going to --
2         (Simultaneous indiscernible crosstalk)
3              THE WITNESS:  -- because they were being -- had
4    rocks thrown at them.
5              THE COURT:  Is there an objection?
6              MR. RIACH:  Withdrawn, Your Honor.  Withdrawn.
7    BY MR. HSU:
8    Q.  Commissioner, I believe you touched on this in your
9    answer, but in your 44 years of experience, have you ever
10   dealt with the level of unrest that was faced in May 2020?
11   A.  No, I have not.
12   Q.  And you touched on a few of the points.  What made it
13   stand out in your experience?
14   A.  The size of the groups were far larger, the geographic
15   spread, and what seemed to almost be a coordinated effort,
16   that if you went to one area to meet a group, that group
17   sometimes would leave, but it would pop up in another area.
18   And so the level of coordination.  The use of fire and arson
19   as a tactic was also a new element.
20              And then the looting that seemed to go on and went
21   on in places that did not seem to have any local connection
22   to the precipitating event.  For example, we responded to
23   looting in West St. Paul on Robert Street and we responded
24   to looting in Anoka County and we responded to looting in --
25   the Lakeville City Hall was fire-bombed, none of which
```

1    seemed to have any direct connection to George Floyd or the

2    Minneapolis Police Department protests.

3    Q.  In light of those challenges and those experiences from

4    that time, can you describe for the Court what lessons were

5    learned by the Department or by the State Patrol in terms of

6    handling these types of events.

7    A.  There were several lessons learned.  I would say from

8    the State Patrol's perspective, we learned that we needed to

9    find a way to quickly mobilize large numbers of State Patrol

10   to be able to respond to an area, and that was something

11   that we had not really -- had never had to do before.

12          In the few events where the State Patrol had been

13   called in to a major special event, it had been a special

14   event, like the Super Bowl or like the Republican National

15   Convention, where we knew months in advance it was coming.

16   You could plan and stage for this.

17          But an organically spontaneous event calling upon

18   us to not just move a couple hundred troopers, but literally

19   to strip every highway in the state of Minnesota of all of

20   the troopers they had to try and respond was an

21   extraordinary event that we had never seen.

22          So how to mobilize them, how to work with the

23   National Guard was also a lesson learned.  We learned about

24   what -- the capabilities of the Minnesota National Guard,

25   how quickly they could mobilize.

1          We also had to work through emergency declarations

2     by the governor, the activation of the National Guard, and

3     then how to actually get them into theater and get them into

4     appropriate positions.

5          We learned that -- communication became one of the

6     key points that I think we learned probably most acutely in

7     especially the May 2020 events.  Communication with the

8     media was -- right away that was one of the points that we

9     recognized that we needed to do more with, but also

10    communication with our elected officials and communications

11    with community groups were all part and parcel of, I think,

12    some of the lessons learned that we've applied as we moved

13    forward from that day.

14    Q.  Commissioner, as a clarification, how many troopers were

15    mobilized in response to May 2020?

16    A.  Every trooper that was able and ready in the state of

17    Minnesota was mobilized and brought into the Twin Cities to

18    respond.

19    Q.  And that had never happened before?

20    A.  That had never happened before.

21    Q.  Commissioner, were there any lessons learned regarding

22    the importance of media credentials or identification of

23    press members?

24    A.  Yes, there were.

25    Q.  What were those lessons?

1    A.  I believe one of the first nights that the State Patrol

2    was out on Lake Street we got calls that we had arrested

3    members of the media, and part of the question we had was

4    how do we determine who is a member of the media and so we

5    began asking the question of what credentials would clearly

6    identify members of the media so that we could expedite

7    their release if they were arrested or avoid arresting them

8    if that was possible.  So credentials became a topic very

9    early on.

10          From that point on, I think virtually every event

11   since then we have reminded the media via Twitter or social

12   media to please have credentials with them and visible if at

13   all possible so that we can avoid any unnecessary encounters

14   with the media and so that we can facilitate -- in those

15   cases where we do end up making an arrest with the media, so

16   we can expedite their release as quickly as possible.

17   Q.  With regards to both those actions related to media and

18   broadly, what other actions did the Department take to act

19   or implement the lessons learned from May of 2020?

20   A.  There have been several.  I would say the ones that come

21   most -- come to mind, we tasked Bruce Gordon, who is the

22   director of communications for the Commissioner's Office, to

23   work with the media to talk about best practices, lessons

24   learned to try and figure out what we should gather from the

25   May 2020 events.

1          Beyond that, we committed to having a more robust

2     schedule of briefings and trainings with the media, which we

3     did do, as we got into what we call OSN, the Operation --

4     OSN, which is the Chauvin trial preparation.  We did

5     trainings with them.  We worked with the media before that.

6     We embedded media into our ranks, asked them to come join us

7     within -- on the inside of the line to help facilitate their

8     understanding of what we were doing.

9          And subsequent to those events we have contracted

10    with 21CP, 21st Century Policing, which is a nonprofit

11    organization or a think tank organization.  They were the

12    group that facilitated the Deadly Force Encounters Working

13    Group that Keith Ellison and I put together.  But we asked

14    them to do an outreach to the media subsequent to --

15          MR. RIACH:  Your Honor, I am going to object to

16    the narrative.

17          THE COURT:  You object to the narrative?

18          MR. RIACH:  Object that the witness is delivering

19    a narrative answer.  We have had multiple questions now

20    where Mr. -- or Commissioner Harrington has talked for

21    three, four, five minutes at a time.  Don't have a problem

22    with the information coming out, but we would just prefer

23    some interplay between counsel and Commissioner Harrington.

24          THE COURT:  I believe the question was what type

25    of -- state the question that you asked.

1              MR. HSU:  What did the Department or the State

2       Patrol do to act on the lessons learned from May 2020.

3              THE COURT:  Okay.  Overruled.  You may continue

4       with your answer.

5              THE WITNESS:  Thank you.  I was just wrapping up.

6              But we did contract with 21CP.  They have

7       surveyed, conducted focus groups and conducted interviews

8       with members of the media, and I believe within the next

9       month we will have a document which will document some

10      additional best practices, that the Department of Public

11      Safety paid for their work, to make sure that we are

12      reaching out to the media.

13             We have had multiple meetings with the media

14      throughout to have this conversation with them to try and

15      figure out where there are concerns and how do we best meet

16      them.

17      BY MR. HSU:

18      Q.  Thank you, Commissioner.  Were there any lessons or

19      actions taken with regard to the efficacy of mass arrest

20      actions following May 2020?

21      A.  Yes, there were.

22      Q.  What were those?

23      A.  Two in particular.

24             One, we made a directive, and it has been

25      repeated -- ordered to be repeated at every roll call before

```
1    a team would go out, to remind them of First Amendment

2    protest policies and to make sure that they were avoiding

3    arresting the media if at all possible.

4            In addition to that, we also began working on a

5    policy to expedite release.  If we did have a media person

6    that came into contact with the State Patrol, to get them

7    released as quickly as possible thereafter.

8    Q.  Commissioner, were those policies and practices in

9    effect in April of 2021?

10   A.  Yes, they were.

11   Q.  And you mentioned it briefly, but could you please

12   describe for the Court, what is Operation Safety Net?

13   A.  Operation Safety Net was the plan for how the City of

14   Minneapolis and the County of Hennepin and, by extension,

15   the State of Minnesota would be prepared for potential

16   protests in the wake of the Derek Chauvin trial.

17           From a historical perspective, if we look at LA,

18   Oakland, Ferguson, there are oftentimes riots that happen

19   when the precipitating event started, but there are also at

20   times riots or civil disturbances that occur when the jury's

21   verdict comes out and it is not viewed favorably by the

22   public.

23           Having no pre-knowledge of how the court case

24   would resolve, Minneapolis began planning in July of 2020

25   for how they should be prepared for potential protests
```

 1     during the trial.  That plan was being conducted through the

 2     fall.

 3               And in January of 2021 the State reviewed the

 4     plan, because there was then a request from the City of

 5     Minneapolis for potentially National Guard and State Patrol

 6     and DNR assets to be assigned to this plan.  The plan was

 7     under-resourced in our opinion and at that time the State

 8     Patrol, Minnesota National Guard, DNR, and others joined

 9     with Minneapolis and Hennepin County into unified command

10     for a planning effort to revise the Operation Safety Net

11     plan, and we worked together through -- from January through

12     the end of the trial, when we demobilized and went through

13     what we call phase four.

14     Q.  Commissioner, was the State Patrol and the Department of

15     Public Safety, did they join OSN in response to requests

16     from Minneapolis?

17     A.  Yes, we did.

18     Q.  And was the State Patrol or the Department of Public

19     Safety responsible for any other law enforcement agencies

20     involved with OSN?

21     A.  No, we were not.

22     Q.  What is unified command?

23     A.  Unified command is a concept that originally came out of

24     the fire service, but it comes out of FEMA or NIMS, the

25     National Incident Management System.  It is the recognition

1    that there are certain events, catastrophes that occur that

2    are too big for any one department to be able to handle on

3    its own.

4          And when you bring in multiple other jurisdictions

5    and multiple other departments to respond to whether it's a

6    special alarm fire, a tornado, a flood, or a civil

7    disturbance, there has to be a format for how the entities

8    that are joining into the effort work together.

9          And so unified command brings the senior staffs of

10   those organizations together so that they can work in

11   concert and in a coordinated fashion to respond to whatever

12   it is that you are responding to, once again, natural or

13   man-made disaster.

14   Q.  Who directs the mission goals under a unified command

15   structure?

16   A.  The local jurisdiction has the -- is the decision-maker

17   under unified command.  While it's a unified command and

18   everybody is at the table together, ultimately the decision

19   of what you do in a particular case in a particular

20   jurisdiction resides with the local jurisdiction that has

21   that.

22          So, for example, if we have a crisis that happens

23   in St. Paul, while the State Patrol may well be there as

24   part of unified command, the St. Paul Police Department and

25   Todd Axtell would be the decision-maker for that particular

1    incident.

2    Q.  And would State Patrol -- in the context of Operation

3    Safety Net, would the State Patrol retain control over its

4    own troopers?

5    A.  Yes.  The State Patrol would have command staff that

6    would be responsible for the direction of its own personnel

7    while we're operating under -- whether in mutual aid or

8    under the Operation Safety Net under unified command.

9    Q.  And would State Patrol have any authority to direct the

10   conduct or actions of other agencies under Operation Safety

11   Net?

12   A.  No, we have no legal authority over any other agencies

13   other than our own.

14              THE COURT:  Other than?

15              THE WITNESS:  Other than our own.  Sorry.

16   BY MR. HSU:

17   Q.  Commissioner, turning to the events in Brooklyn Center

18   in April 2021, how did the Department of Public Safety and

19   State Patrol become involved there?

20   A.  On April 11th, as I recall, the Brooklyn Center Police

21   Department had an officer-involved shooting.  BCA does the

22   investigations on the officer-involved shootings and so DPS,

23   under the auspices of BCA, and the use of force team were

24   sent to do the investigation there.

25              Shortly after their arrival at the scene, there

1    was a report that crowds had gathered at the crime scene and

2    that there was cars being broken, windows being broken,

3    there was a crowd that was refusing to leave.

4         Brooklyn Center had not been part of Operation

5    Safety Net.  The Hennepin County chiefs or what we would

6    call the west metro chiefs of police had made a decision

7    that they would create a mobile field force of their own,

8    but that they were not going to move into Minneapolis as

9    part of Operation Safety Net.  Brooklyn Center was one of

10   those departments.

11        And so as the protests grew at the crime scene,

12   they called in the West Metro Command Team and they

13   responded there.  They were able to disperse the crowd from

14   there, but shortly thereafter we got reports that that crowd

15   was now moving to the Brooklyn Center Police Department over

16   on Humboldt.  The West Metro Command went with them to

17   protect the Brooklyn Center Police Department and City Hall.

18        Hennepin County, which is -- was part of Operation

19   Safety Net and where Brooklyn Center resides, was part of

20   Operation Safety Net and so as the crowd grew on that first

21   night, Hennepin County was asked to join in.  And the State

22   was asked to work with Hennepin County and with Brooklyn

23   Center to assist them as there did not appear to be

24   sufficient resources to respond to Brooklyn Center.

25   Q.  And in Brooklyn Center, was it the local entity in

1    charge of the mission goals?

2    A.   At the beginning Brooklyn Center Police Department was

3    in charge, and then within a day or so the mayor relieved

4    the chief of police of his position and there was a period

5    where it was unclear who was in charge of the Brooklyn

6    Center policing effort.

7              And during that time frame Hennepin County Sheriff

8    Dave Hutchinson assumed command of the incident when there

9    was a vacuum in place.  He remained in command of the

10   incident for the next four or five days until the new

11   appointed -- newly-appointed interim chief for Brooklyn

12   Center re-assumed command of the operation.

13   Q.   At any point did Minnesota State Patrol or the

14   Department of Public Safety assume command of the incident?

15   A.   No, at no point were we in charge of the incident.

16   Q.   Was the Department of Public Safety or State Patrol ever

17   responsible for any other law enforcement agency at Brooklyn

18   Center?

19   A.   No, we were not.

20   Q.   Was the Department of Public Safety or the Minnesota

21   State Patrol ever issuing commands to other law enforcement

22   agencies in Brooklyn Center?

23   A.   No, we were not.

24   Q.   Thank you, Commissioner.

25             MR. HSU:  I have no further questions.

```
 1              THE COURT:  Cross examination?  And we can take a
 2      stretch break at this time.  I will take one.  If anyone
 3      else would like to join me, you may, just at your seats.
 4          (Pause)
 5              THE COURT:  We are ready to resume.
 6              MS. McGARRAUGH:  We just lost our questioning
 7      lawyer.
 8              THE COURT:  Okay.
 9          (Pause)
10              THE COURT:  We are ready to proceed.
11              MR. RIACH:  Thank you, Your Honor.
12                          CROSS EXAMINATION
13      BY MR. RIACH:
14      Q.  Good afternoon, Commissioner Harrington.  My name is
15      Kevin Riach.  I'm an attorney for the plaintiffs.
16      A.  Good afternoon.
17      Q.  Now, you are familiar with the Police Officer Standards
18      and Training Board, correct?
19      A.  Yes, I am.
20      Q.  That's a board that's organized within the Department of
21      Public Safety, correct?
22      A.  No, it is not.
23      Q.  It's not a board organized within the Department of
24      Public Safety?
25      A.  No, it is not.
```

1    Q.  What is it organized within?

2    A.  The POST Board is an independent standard and training

3    board that is appointed by the governor.  The Department of

4    Public Safety did up until fairly recently provide their HR

5    department, but it has its own board of directors, it has

6    its own appointed executive director, and it does not report

7    to the Department of Public Safety.

8    Q.  Are the Board employees employees of the Department of

9    Public Safety?

10   A.  No, they're not.

11   Q.  All right.  But you're familiar with the operations of

12   the Board, correct?

13   A.  Yes.  I have one member -- the BCA has one member that

14   sits on the POST Board on the training section.

15   Q.  Okay.  And you're aware that they from time to time

16   promulgate model policies for law enforcement to use to

17   guide their practices, correct?

18   A.  Yes, I am.

19   Q.  Sometimes those model policies are adopted and become

20   mandatory policies; is that correct?

21   A.  If they propose a model policy and it is voted upon by

22   the Board, it can become a mandatory policy for all state

23   peace officers or POST agencies, yes.

24   Q.  It has to go through the rulemaking process at that

25   point; is that right?

1    A.  I'm not positive about whether it has to go through

2    rulemaking or not.

3    Q.  Okay.  It goes through some kind of legislative

4    sausage-making and becomes mandatory for state law

5    enforcement, though, if that's the course the Board chooses

6    to take with the model policy?

7    A.  That has been my experience, yes.

8    Q.  Okay.

9         MR. RIACH:  Ms. Anderson, can you call up

10   Exhibit 71, please, Plaintiffs' 71.

11   BY MR. RIACH:

12   Q.  We'll see if you can see these on the screen.  If that

13   works, we'll just stick with the electronic version.  Is

14   that okay, Commissioner?

15   A.  Sure.

16   Q.  All right.  Now, what you are looking at is a document

17   labeled Plaintiffs' Exhibit 71.  It says, "Background on

18   Draft Model Policy on Public Assembly and First Amendment

19   Activity" at the top of this document.

20        THE COURT:  Okay.  You have to raise your voice or

21   speak into the microphone, but we can't mumble what the

22   document says.

23        MR. RIACH:  All right.  Sorry, Your Honor.

24   BY MR. RIACH:

25   Q.  You are looking at a document.  This is marked

1    Plaintiffs' Exhibit 71 and the title is Background on Draft

2    Model Policy on Public Assembly and First Amendment

3    Activity; is that accurate?

4    A.  That's correct, sir.

5    Q.  Have you reviewed this document?

6    A.  No, I don't believe I have reviewed this document.

7    Q.  Can you just briefly --

8            MR. RIACH:  Well, let's do this.  Turn ahead to

9    page 8, Ms. Anderson.

10           MR. HSU:  Objection, Your Honor.  This document

11   hasn't been admitted into evidence.

12           MR. RIACH:  First of all, I'm just looking to ask

13   some questions to see if I can lay foundation.  Then if the

14   State still has an objection on hearsay grounds, I'll be

15   prepared to argue that, if that's okay with the Court.

16           THE COURT:  Overruled.

17           MR. RIACH:  Flip ahead to the next page, please.

18   BY MR. RIACH:

19   Q.  You see that there's a section of this document entitled

20   Media, Commissioner Harrington?

21   A.  Yes, I do.

22   Q.  Were you aware that the POST Board was drafting a model

23   policy on law enforcement interaction with the media?

24   A.  Yes, I knew that was one of the topics they were

25   entertaining.

1    Q.  How did you know that?

2    A.  I believe I saw it in the media actually, so.

3    Q.  Okay.  Did anyone at the Board consult with you about

4    this policy?

5    A.  Not with me particularly, no.

6    Q.  There is a representative of the Department of Public

7    Safety on the Board, though, correct?

8    A.  The BCA training -- the BCA director is, in fact, on the

9    POST Board, yes.

10   Q.  Okay.  Is he there to represent the interests of the

11   Department of Public Safety?

12   A.  He's there to represent the BCA's interests as one of

13   the premiere training departments within the state of

14   Minnesota.  So he's not a DPS or the commissioner's

15   representative, although he is a state employee and does

16   work for the Department of Public Safety, but he is in

17   command of his own police department effectively.

18   Q.  Okay.  And you see under subparagraph E here it

19   states -- this is the model policy that we're discussing and

20   laying some foundation for here -- it states, "Even after a

21   dispersal order has been given, clearly identified media

22   must be permitted to carry out their professional duties

23   unless their presence would unduly interfere with the

24   enforcement action."

25            Were you aware that this particular policy was

1    under discussion at the POST Board?

2    A.  Not in particular, no.

3    Q.  Okay.  Now, the POST Board maintains a website, correct?

4    A.  That's correct.

5    Q.  And that's located within the Department of Public

6    Safety website, correct?

7    A.  There's a link to the POST Board from the Department of

8    Public Safety, but the POST Board has its own website.

9    Q.  Okay.  But you can get there from the Department of

10   Public Safety website, correct?

11   A.  I'm certain you can.

12   Q.  Go to the section that says, "Boards" and click on it

13   and it says, "Department" -- or it says, "POST Board," and

14   you click on that and then it takes you through to the POST

15   Board website?

16   A.  I have no doubt that we can get there from there.

17   Q.  All right.  Very good.  Are you aware that model

18   policies are regularly posted on the Peace Officer Standards

19   and Training Board website for review prior to discussion by

20   the POST Board at their sessions?

21   A.  Yes, I am.

22   Q.  Okay.

23            MR. RIACH:  Your Honor, we would move to admit

24   Document 71, the POST Board model policy we've been

25   discussing.

1                    THE COURT:  Any objection?

2                    MR. HSU:  Yes, Your Honor.  The State would object

3          to the admission of this document on several grounds, both

4          it's hearsay and lack of foundation.  The Commissioner has

5          testified he's not previously reviewed this document or was

6          ever involved in the creation or drafting of the same.

7                    Furthermore, the document at issue appears to be a

8          draft policy, not a model policy approved through rulemaking

9          process, and therefore should have no basis there.

10         Furthermore, this exhibit was disclosed to state defendants

11         yesterday and we would further object as an untimely

12         disclosure of an exhibit as we didn't have sufficient time

13         to review and prepare in response to the same.

14                   THE COURT:  Anything further on this matter?

15                   MR. RIACH:  Your Honor, with respect to the

16         hearsay and the other evidentiary objections, I would just

17         reiterate what's contained in our briefing on the State's

18         motion in limine, that in proceedings such as the one we

19         have here, a preliminary injunction proceeding, especially

20         when there's limited time and opportunity to present live

21         testimony about things like this policy, flexible standards

22         of admission are allowed to permit the Court to have the

23         information it needs to make the decision on the motion at

24         issue in --

25                   THE COURT:  What is this exhibit being offered for

1    such that the Court would need to use it?

2              MR. RIACH:  This exhibit is being offered to show

3    that -- and we can include this argument in our briefing

4    subsequent to this hearing.

5              THE COURT:  Is it offered for the truth of the

6    matter asserted?  What's its purpose?

7              MR. RIACH:  It's not, Your Honor.  It's offered to

8    show that a model policy has been developed that is --

9              THE COURT:  The relevance of a model policy is

10   what?

11             MR. RIACH:  The relevance of the model policy is

12   it shows that law enforcement officers from multiple

13   agencies, who came together to promulgate this process with

14   community activists, have determined that provisions similar

15   to those contained within the plaintiffs' proposed

16   injunction are feasible and, in fact, going to be adopted as

17   best practices.

18             I don't want to get into argument here during my

19   cross examination, but this policy is relevant because it

20   shows that what the plaintiffs have proposed is something

21   that's been viewed as reasonable by multiple law enforcement

22   officers.

23             The members of the ad hoc committee that developed

24   this policy were made up of four community activists and

25   four law enforcement officers, including the head of the

Sheriffs Association and the Minnesota Peace Officers Association. They came together and put this document together. It went before the POST Board last week, at the end of the week. The POST Board adopted it as a model policy and advanced it through for review as a mandatory policy. That adoption was unanimous by the entire POST Board.

It's relevant because it shows that what we're asking for makes sense. Now, Commissioner Harrington hasn't reviewed it, so there's a limited amount of what I can ask him about within the document, but given the nature of this proceeding and the importance of the questions that the Court has to consider here, this is the kind of evidence that should be before the Court.

If the state defendants want to contest the accuracy of this document, its validity, think it's full of errors, it's fraud, whatever, if they have some evidence that this isn't what it purports to be, they can certainly advance that in their briefing, but it should at least be before the Court. And I can represent this is pulled from the Department of Public Safety website link that goes to the POST Board.

THE COURT: Counsel, do you wish to be heard?

MR. HSU: Yes, Your Honor. We would stress again that, as plaintiffs' counsel pointed out, this policy has

1      yet to be passed as any sort of permanent rulemaking

2      authority.  It exists as a draft policy reviewed by the POST

3      Board and that's all it is at this point.

4                Furthermore, to the extent that counsel alleges

5      that this is a model policy crafted by experts in the field,

6      we would further dispute this exhibit as an undisclosed

7      expert opinion since plaintiff is offering it as apparent

8      best practices without any supporting expert testimony or

9      disclosures to support that inference.

10               THE COURT:  The Court will admit it as an exhibit

11     of the Court, and its weight and merit will be -- is

12     evident, frankly, based on the arguments made by counsel.

13     So for limited purposes, frankly, informational and not any,

14     it appears, bearing on the issues before the Court, it will

15     be admitted.

16               MR. RIACH:  Thank you, Your Honor.

17               You can take that down, Ms. Anderson.

18     BY MR. RIACH:

19     Q.  Commissioner Harrington, am I correct that no state

20     trooper has been disciplined for arresting a journalist

21     during your tenure as the commissioner of Public Safety?

22     A.  Not to my knowledge.

23     Q.  Has any state trooper been disciplined for using force

24     against a journalist during your tenure as commissioner of

25     Public Safety?

1    A.  Not to my knowledge.

2    Q.  And has any state trooper been disciplined for using

3    chemical weapons against a journalist during your tenure as

4    commissioner of Public Safety?

5    A.  Not to my knowledge.

6              MR. RIACH:  Ms. Anderson, can you call up

7    Exhibit 68, please.

8    BY MR. RIACH:

9    Q.  Do you recognize the image that you are seeing on the

10   screen there, Commissioner Harrington?

11   A.  No, I do not.

12   Q.  Okay.

13             MR. RIACH:  Can you play the first part of this --

14   the first minute of this video, Ms. Anderson.

15             MR. HSU:  Objection, Your Honor.  The video has

16   not been offered into evidence and on its face it appears to

17   be a hearsay statement.

18             MR. RIACH:  Your Honor, I'm simply seeing if we

19   can get some foundation on this.  If not, I am going to

20   offer it as an exhibit anyways and if the State has a

21   hearsay objection, I'll address that when the State makes

22   its objection.  I'm sorry if the Court can't hear me.  I'll

23   try to move --

24             THE COURT:  I couldn't hear you.  You said you

25   have no foundation?

```
1            MR. RIACH:  Not yet.  Not yet.  And it may not

2    have any when I'm done, Your Honor, but I would like to at

3    least show Mr. -- Commissioner Harrington the first section

4    of the video and ask him foundational questions.  If he has

5    none, I still intend to offer it as an exhibit.  The State,

6    I anticipate, will object on hearsay and foundational

7    grounds.  I'll make my argument.  Then the Court can decide

8    what it would like to do.  But it should be pretty brief.

9            THE COURT:  You may proceed as you have indicated.

10    The matter -- the exhibit is not admitted.  You're seeking

11    to lay foundation for it, correct?

12            MR. RIACH:  That's correct, Your Honor.

13            THE COURT:  Okay.

14            MR. RIACH:  Okay.  Can you play the first minute

15    of the video, Ms. Anderson.

16       (Pause)

17    BY MR. RIACH:

18    Q.  While we are awaiting the video -- oh, maybe we've got

19    it here.

20       (Video recording played)

21    Q.  Having watched the first minute or so of this video, do

22    you recall having seen this video before?

23    A.  I don't recall it particularly, no.

24    Q.  Are you familiar with the arrest of Omar Jimenez in May

25    of 2020?
```

1    A.  I'm not particularly -- I do not recall that in

2    particular, no.

3    Q.  Okay.  Do you recall discussion during the George Floyd

4    protests of a CNN news crew being arrested while they were

5    covering the protests?

6    A.  Yes, I do.

7    Q.  Okay.  And what do you recall about that discussion?

8    A.  That there was a complaint, that we were told that a CNN

9    group was arrested.  We got a call -- I believe the

10   governor's office received a call from the CEO of CNN.  The

11   governor responded.  And CNN did not ever file a complaint

12   with internal affairs alleging any misconduct against the

13   State Patrol subsequent to that.

14   Q.  Did you have any conversations with Governor Walz about

15   that arrest?

16   A.  Nothing in particular.  I heard from Governor Walz his

17   displeasure at having news media arrested, so that was very

18   clear from his public statements and the statements we had

19   as we were coordinating resources.

20   Q.  Did you have any discussions with Colonel Langer, the

21   State Patrol commander, about the arrest of the CNN crew?

22   A.  We had the same level of conversation about that that

23   was not the way we wanted to be doing business and that we

24   needed to make sure that we could identify and expedite --

25   in those cases where someone was arrested, that we could

1   expedite their release as quickly as possible.

2   Q.  Did you ask any questions of Colonel Langer about what

3   happened?

4   A.  No, not in particular.

5   Q.  All right.  Were you concerned that you heard a report

6   that state troopers had arrested a CNN crew?

7   A.  Yes, I was.

8   Q.  And why were you concerned?

9   A.  As I said earlier, I really do believe that the media is

10  a partner that we need to work with and it is -- whenever

11  you are making an arrest, I think, especially an arrest of

12  the media, I think that's something that should be -- that

13  is concerning.  It is not something that we do every day.

14  It is an exceptional -- it should be an exceptional event.

15  And even in the context of what was a fairly massive amount

16  of civil unrest, it still was concerning that it happened.

17           And, frankly, there also was just a concern of

18  what were -- what happened behind the scene there.  And so I

19  was assuming that we would have a complaint from them that

20  would then be investigated and we would have some facts that

21  would come out of that.  They never did choose to make the

22  complaint and so I don't know that there was any

23  investigation beyond the initial complaint about it.

24  Q.  So there was no complaint, so the State Patrol, as far

25  as you know, never investigated the event further?

```
1     A.  Not that I'm aware of, no.

2          MR. RIACH:  Your Honor, at this time I would move

3     to admit Plaintiffs' Exhibit 68.  I anticipate the State

4     will have a number of objections.  I'll make the same

5     arguments right out of the gate, which is this is a very

6     important matter for the Court to -- I'm sorry.  I can tell

7     now that I am in mike range.  This is a very important

8     matter for the Court, making this decision, and the Court

9     should see and hear all the relevant evidence that can be

10    put before it.

11         We're constrained by the nature of this hearing

12    and these proceedings from duly authenticating things like

13    this video.  But if the State has any argument, after

14    viewing the video, that it doesn't -- that it purports to

15    show something that didn't happen, that it's inaccurate,

16    that it's fraud, I would certainly welcome them presenting

17    that evidence.  Otherwise we would like to admit it for what

18    it is.

19         And I do have a few more questions for

20    Commissioner Harrington.  I would like to watch the video

21    with him and ask him a few follow-up questions based on

22    what's in the video.  I am not sure that intrudes into

23    hearsay because I'm going to be asking him if what he sees

24    is consistent with the policies he discussed on his direct

25    examination.  But that's what I would ask the Court for
```

1    permission to do at this time.

2              THE COURT:  Okay.  And you said you want him to

3    see it for what it is.  What is "it"?

4              MR. RIACH:  It's a video of the arrest of Omar

5    Jimenez, the CNN crew and the reporter that we were just

6    discussing during my cross examination of Commissioner

7    Harrington.

8              THE COURT:  Okay.  Counsel?

9              MR. HSU:  Yes, Your Honor.  As counsel

10   anticipated, we object to the admission of this exhibit on

11   the grounds of hearsay and also on the grounds of

12   foundation, authentication.  Commissioner Harrington has

13   testified he hasn't seen this video before.

14             Furthermore, while we recognize the important

15   issues before this Court, the issues with presenting a video

16   like this unauthenticated is it appears to be an edited news

17   clip.  So we don't have the full extent, context, or scope

18   of the footage or the events preceding or subsequent to.

19             And as Commissioner Harrington has stated, he

20   doesn't have the foundation to testify to those events

21   specifically either.  Accordingly, admitting this exhibit

22   and presenting it here would risk misconception of the

23   events at hand and offers an improper view as portrayed by

24   this video.

25             THE COURT:  Any response?

```
 1              MR. RIACH:  We would just ask that the Court

 2      afford the evidence the weight the Court believes it

 3      deserves.  I would --

 4              THE COURT:  Is there foundation for it?  Is it a

 5      complete -- how do I know that it's not edited?  I just

 6      don't have -- I am trying to get some sense of

 7      authentication.

 8              MR. RIACH:  Sure, Your Honor.  And I'll represent

 9      to the Court that this is a video that I downloaded from the

10      CNN website.  And we can watch the video.  I don't think

11      there are any visible edits in the video.  It's a matter of

12      public record, frankly.  It's been viewed many times around

13      the world, including by Governor Walz.  Really it's the

14      conduct that is seen in the video that is what I would like

15      to ask Commissioner Harrington about.  If the Court has

16      concerns that there's something amiss with the video,

17      obviously the Court can reject this testimony and ignore

18      what we see here.

19              I would note that there are multiple affidavits,

20      declarations that have already been submitted in support and

21      opposition of this motion that contain hearsay, evidence

22      without foundation.  It's just the nature of these kinds of

23      proceedings that some of these evidentiary rules have to be

24      viewed flexibly.  Otherwise important information is not

25      considered as part of the process.
```

1              THE COURT:  And do the Rules of Evidence apply?

2              MR. RIACH:  Well, I don't think they do, Your

3     Honor, quite frankly.  I think that in these kinds of

4     proceedings the Court, especially with the experience that

5     Your Honor has, you having seen testimony and viewed

6     evidence many, many times over the years, can give the

7     evidence the weight it deserves.

8              The Tenth Circuit Court of Appeals has said

9     explicitly the Rules of Evidence do not apply in

10    preliminary --

11             THE COURT:  And the Eighth Circuit?

12             MR. RIACH:  -- injunction proceedings.  The Eighth

13    Circuit, as far as I know, has not weighed in on this

14    question, Your Honor, one way or the other.

15             THE COURT:  Counsel?

16             MR. HSU:  Yes, Your Honor.  With regards to the

17    Rules of Evidence specifically, we would note that as the

18    Court -- the case the Court cited in its recent order notes

19    that while likelihood of success is a basis of preliminary

20    injunction, success is still an aspect of that to whatever

21    degree the Court should weigh it.

22             And to that end the admissibility of the evidence

23    should still be weighed, particularly in cases like this

24    where the authentication issue presents grave concerns about

25    the video itself, that plaintiffs can't prove their case

1     through evidence like this because of some of the

2     admissibility issues and the core aspects of them.

3                THE COURT:  What are the grave concerns as to the

4     authenticity of what is being reflected here?

5                MR. HSU:  Yes, Your Honor.  As it pertains to this

6     one, the circumstances and facts surrounding this video, the

7     actions portrayed within are not fully informed because we

8     don't know the scope of this video and its full recording.

9                THE COURT:  So you think it was a staged event and

10     did not happen?

11               MR. HSU:  No, Your Honor.  I'm certainly not

12     stating that, but the dynamic circumstances of these types

13     of crowd situations require a full contextual consideration.

14     The difficulties with presenting this video here,

15     particularly with Commissioner Harrington, is that he has

16     stated he doesn't have the foundation to address those

17     contextual concerns with this exhibit.

18                And admitting it with him and through him would

19     prejudice the State particularly -- unfairly, we would

20     argue, particularly in light of the argument of time issues.

21     This video has existed, as counsel portends.  He has had

22     opportunity to find the source if he chose to.

23               THE COURT:  I don't understand.  You're saying

24     there's a problem of timing and that there's been some bad

25     faith on the part of the proponent of this evidence?

1          MR. HSU:  No, Your Honor.  Our position is that

2     the Rules of Evidence still apply.  While that degree may or

3     may not differ, the lack of foundation as to this video, the

4     lack of authentication to determine the full scope of the

5     events portrayed within the video, or lack thereof, are

6     dispositive on the matter of its admissibility.

7          We are -- the State is not taking the position

8     that there's bad faith or insincerity as to that, but the

9     mere framing of the events as portrayed in the video, which

10    we don't know whether it is edited or not, can shift the

11    perspective and remove context, which informs those facts.

12         THE COURT:  I'll overrule the objection and give

13    the evidence the weight it deserves.

14         MR. RIACH:  Thank you, Your Honor.

15         Ms. Anderson, can you press play.

16    (Video recording played)

17         MR. RIACH:  You can stop the video now.

18         THE COURT:  And so let's address the exhibit that

19    has been admitted.  The purpose of that exhibit -- it is

20    being admitted for what?  Because it needs to have some

21    limiting purposes, correct?  You are not indicating that the

22    statements of the reporter are offered for the truth of the

23    matter asserted; is that right?

24         MR. RIACH:  That's correct, Your Honor.  The

25    purpose of this exhibit is to ask Commissioner Harrington

1    some questions about the State Patrol conduct that's

2    displayed in the video and the propriety of that conduct

3    under the Department of Public Safety policies that were

4    discussed on direct examination.

5              THE COURT:  So the description of what is going on

6    by the reporter is not evidence, it is the visual depiction

7    of what is going on that is evidence; is that what you are

8    indicating?

9              MR. RIACH:  That's correct, Your Honor.

10             THE COURT:  Okay.  Just for clarification.

11             MR. RIACH:  Thank you.

12             Can you please call up Defense Exhibit 15 and turn

13   to page 2 of that exhibit, Ms. Anderson.  Can you close the

14   exhibit, please.  Defense Exhibit 15, please.  Thank you.

15   There we go, page 2.  Actually, can you move -- here we are.

16   BY MR. RIACH:

17   Q.  One of the rules that's listed on this exhibit,

18   Commissioner Harrington, under Principle Two, rule number 4,

19   is:  "Peace officers shall take no action knowing it will

20   violate the constitutional rights of any person."

21             Is the conduct that we just witnessed, is it the

22   position of the Department of Public Safety that that

23   conduct is consistent with this rule?

24   A.  Having not been at the scene and having only seen this

25   video, I do not know the full context of why they were

1    arrested or what the circumstances that surround that are.

2    So I'm unable to give you an answer based on what I've just

3    seen.

4    Q.  Okay.  Rule number 6 states, "Peace officers learning of

5    conduct or observing conduct which is in violation of any

6    law or policy of this department shall take action and/or

7    report the incident to the officer's immediate

8    supervisor...."

9              Are you aware of any internal reports or

10   complaints based on this incident?

11   A.  I'm not sure what you mean by "internal reports."

12   Q.  Fair point.  Let me rephrase the question.  Are you

13   aware of any state troopers who reported this incident to

14   their supervisor?

15   A.  I cannot say that I know in particular.  I know that

16   State Patrol documents all arrests as a matter of general

17   practice and procedure.  So it would be unusual in my

18   experience for them not to document an arrest.

19   Q.  Okay.  But no trooper, to your knowledge, reported this

20   arrest as a violation of the rules that we're looking at

21   right now; is that correct?

22   A.  None that I'm aware of, no.

23   Q.  And you haven't -- prior to today you hadn't seen this

24   video, correct?

25   A.  I don't remember seeing this particular video.

```
 1    Q.  Okay.  And you hadn't looked into this incident at all,

 2    correct?

 3    A.  No, other than to check whether -- I knew that there had

 4    been CNN reporters arrested.  I checked to see if a

 5    complaint had been lodged by CNN; and when I found that

 6    there was no complaint lodged by CNN, I didn't pursue the

 7    matter further than that.

 8    Q.  Okay.

 9              MR. RIACH:  Your Honor, it's my understanding we

10    have a hard stop at 3:30; is that correct?

11              THE COURT:  That's correct.

12              MR. RIACH:  Well, I will end my cross examination

13    now.  Thank you, Commissioner Harrington.

14              THE WITNESS:  Thank you.

15              THE COURT:  Is there anything further for this

16    witness?

17              MR. HSU:  Nothing further, Your Honor.

18              THE COURT:  May the witness be excused?

19              MR. HSU:  Yes, Your Honor.

20              THE COURT:  Sir, you are excused.

21              MS. LANDRUM:  Your Honor, the defense calls Major

22    Joseph Dwyer.

23              And, Your Honor, while we're waiting for Major

24    Dwyer, I would just like to note for the record that based

25    off our rough timekeeping, we've put on approximately an
```

1    hour and 15 minutes of testimony, which includes both of our

2    cross examinations.

3          So I understand that there's a hard stop today at

4    3:30 and that Your Honor has other things on her schedule.

5    I just want to mention that, as a result, we will not get as

6    much time to put on our affirmative testimony as plaintiffs

7    were allotted.

8          THE COURT:  Okay.  Are there witnesses that you

9    are planning to excuse because of that?

10         MS. LANDRUM:  No, Your Honor.  We were thinking

11   that we were going to be spending more than 40 minutes with

12   Major Dwyer inasmuch as there's a lot of ground to cover

13   here with regard to the unrest in May of 2020, as well as

14   April of 2021.

15         So, from that standpoint, I have been trying to

16   cut questions on my outline here to make sure that we cover

17   everything that we believe Your Honor would need to hear.

18   That being said, I am nervous about being done by 3:30.  And

19   then, of course, plaintiffs will want to cross-examine.

20         THE COURT:  Certainly.  And so it may mean that we

21   need to schedule more time for the hearing.

22         MS. LANDRUM:  I will move as quickly as humanly

23   possible, Your Honor, but I worry that we won't be able to

24   cover everything that we had hoped.

25         THE COURT:  I think we need to proceed as you see

```
 1   fit to proceed professionally.  If we need to have more time
 2   for this hearing, we will have more time.  The Court's
 3   schedule is not going to impede the ability to fairly
 4   adjudicate this issue.  Okay?
 5            MS. LANDRUM:  Absolutely.
 6            THE COURT:  And so I'm not going to end the
 7   hearing and the submission of evidence and the presentation
 8   of witnesses and close and take the matter under advisement
 9   based on the 3:30 stop.  Okay?
10            MS. LANDRUM:  Okay, Your Honor.
11            THE COURT:  So if we need to, we will reconvene.
12            MS. LANDRUM:  Thank you, Your Honor.  We call
13   Major Dwyer to the stand.  Thank you.
14       (Witness sworn)
15            COURT REPORTER:  You can have a seat.  If you
16   could state your name, spelling your first and last name,
17   please.
18            THE WITNESS:  Joseph Jason Dwyer.  Last name
19   D-w-y-e-r.
20                        (Joseph Dwyer)
21                      DIRECT EXAMINATION
22   BY MS. LANDRUM:
23   Q.  Good afternoon, Major.  Are you currently employed?
24   A.  Yes, ma'am, I am.
25   Q.  Where is that?
```

```
 1    A.  With the Department of Public Safety, specifically the

 2    Minnesota State Patrol.

 3    Q.  And how long have you been working for the Minnesota

 4    Department -- or for Minnesota State Patrol?

 5    A.  Since May of 1997.  24 years.

 6    Q.  What is your current title?

 7    A.  I hold the rank of major.

 8    Q.  And could you describe for the Court briefly your

 9    duties.

10    A.  Certainly.  As a rank of major, we oversee an

11    operational region.  So at this time or in the near future

12    it will be the southern region of the state of Minnesota.

13    And then currently I'm also on special assignment in the

14    realm of demonstration preparedness.

15    Q.  Major, does Minnesota State Patrol have a mission

16    statement?

17    A.  It does.

18              MS. LANDRUM:  Your Honor, permission to publish

19    Exhibit 1 to the witness?

20              THE COURT:  You may.

21              MS. LANDRUM:  Ms. Kosek, would you please.  Thank

22    you.

23    BY MS. LANDRUM:

24    Q.  Major, do you recognize Exhibit 1?

25    A.  I do.
```

1    Q.  What is it?

2    A.  That is our General Order, specifically the policy

3    related to the mission statement, vision statement, and core

4    values.

5    Q.  Does this appear to be an accurate copy of that mission

6    statement?

7    A.  Yes, it does.

8          MS. LANDRUM:  State defendants move to admit

9    Exhibit 1.

10          THE COURT:  Any objection?

11          MR. RIACH:  No objection.

12          THE COURT:  Exhibit 1 is received.

13   BY MS. LANDRUM:

14   Q.  Major, are there any expectations regarding trooper

15   conduct as they work to achieve this mission as we see here

16   in Exhibit 1?

17   A.  Most certainly.

18          MS. LANDRUM:  Your Honor, permission to publish to

19   the witness Exhibit 12?

20          THE COURT:  You may.

21   BY MS. LANDRUM:

22   Q.  Major, do you recognize Exhibit 12?

23   A.  I do.

24   Q.  What is it?

25   A.  That is our General Order again, our policy related to

1    conduct of sworn members.

2    Q.  Does this appear to be an accurate copy of this policy

3    as Ms. Kosek is cycling through it?

4    A.  Yes, it is.

5              MS. LANDRUM:  State defendants move to admit

6    Exhibit 12 into evidence, Your Honor.

7              THE COURT:  Any objection?

8              MR. RIACH:  No objection, Your Honor.

9              THE COURT:  Exhibit 12 is received.

10   BY MS. LANDRUM:

11   Q.  Major, what's the purpose of this conduct policy?

12   A.  That is to provide guiding principles for all of our

13   members to abide by and to not only set the parameters of

14   how they'll conduct themselves during their work hours, but

15   also outside of those.

16   Q.  Major, I would like to talk to you next about training.

17   Are you familiar with the training required to become a

18   Minnesota State Patrol trooper?

19   A.  Yes, I am.

20   Q.  Can you describe that briefly for the Court.

21   A.  So our agency requires that members receive or hold a

22   two- or four-year degree in law enforcement or criminal

23   justice or there is reciprocity through -- from military

24   partners, but we also have a law enforcement training

25   opportunities program where an individual can hold a two- or

1    four-year degree in any realm and then our agency, through

2    the use of MnSCU universities, will provide condensed law

3    enforcement training for them to attend our academy.

4    Q.  And then can you briefly describe what's required for

5    the academy.

6    A.  So our academy is a 16-week residential academy where

7    cadets are exposed to a vast variety of topics related to

8    the State Patrol.

9    Q.  Do troopers receive any dedicated training on how to

10   respond to mass unrest or mass violence?

11   A.  So there is a module in the academy and that's an

12   eight-hour course.

13   Q.  Do troopers receive any dedicated training on how to

14   interact with the media during incidents of mass unrest or

15   mass violence?

16   A.  They do.

17   Q.  Can you describe that for the Court.

18   A.  So that is a part of the eight-hour module, and they

19   also receive another block on media relations.

20   Q.  Has there been any additional training of Minnesota

21   State Patrol troopers since the unrest that occurred in

22   Minneapolis in May of 2020?

23   A.  There has been.

24           MS. LANDRUM:  Permission, Your Honor, to publish

25   Exhibit 19 to the witness?

1              THE COURT:  You may.

2    BY MS. LANDRUM:

3    Q.  Major, do you recognize Exhibit 19?

4    A.  I do.

5    Q.  And as Ms. Kosek is going through it, can you just

6    describe what this is to the Court.

7    A.  So it is a joint venture with the Department of Public

8    Safety and the Department of Natural Resources on the topic

9    of media relations.

10   Q.  Does this appear to be an accurate copy of the training

11   that you were just referencing?

12   A.  Yes, it does.

13             MS. LANDRUM:  Your Honor, state defendants move to

14   admit Exhibit 19.

15             THE COURT:  Any objection?

16             MR. RIACH:  No objection.

17             THE COURT:  It is received in evidence,

18   Exhibit 19.

19             MS. LANDRUM:  Thank you, Your Honor.

20   BY MS. LANDRUM:

21   Q.  Major, why were troopers required to take this training?

22   A.  This was an initiative prior to the operation known as

23   Safety Net in the city of Minneapolis leading up to the

24   trials in an effort to provide them additional training.

25   Q.  Did troopers have to certify that they took this

```
 1    training?

 2    A.  They did.

 3    Q.  Was there a date upon which they had to certify that?

 4    A.  It was prior to April 1st.

 5    Q.  Major, does Minnesota State Patrol -- April of 2021, did

 6    you say?

 7    A.  Yes, that is correct, ma'am.

 8    Q.  Does Minnesota State Patrol have any policies or

 9    procedures pertaining to the treatment of media, Major?

10    A.  Yes, we do.

11              MS. LANDRUM:  Permission to publish Exhibit 2 to

12    the witness, Your Honor?

13              THE COURT:  You may.

14    BY MS. LANDRUM:

15    Q.  Major, do you recognize Exhibit 2?

16    A.  Yes, I do.  That's our First Amendment assemblies

17    policy, General Order.

18    Q.  And Ms. Kosek has just cycled through the pages here on

19    the screen.  Does it appear to be an accurate copy of that

20    First Amendment policy?

21    A.  It does.

22              MS. LANDRUM:  Your Honor, defendants move to admit

23    Exhibit 2 into evidence.

24              MR. RIACH:  No objection, Your Honor.

25              THE COURT:  Exhibit 2 is received.
```

```
1    BY MS. LANDRUM:

2    Q.  Major, what's the purpose of this First Amendment

3    policy?

4    A.  Much like our other policies, it's to provide us

5    guidance and those guiding principles on how troopers will

6    conduct themselves in, this instance, First Amendment

7    assemblies.

8    Q.  Are troopers trained on this policy?

9    A.  Yes, they are.

10   Q.  Can you explain that to the Court.

11   A.  So during the course of the academy, all of our policies

12   are introduced and they, through training, the cadets,

13   trooper candidates, need to have an understanding of that

14   policy before they sign off on that.

15   Q.  Major, I would like to talk to you a little bit about

16   trooper performance.  Does Minnesota State Patrol have a

17   process in place for evaluating trooper performance?

18   A.  We do.

19   Q.  Can you describe that to the Court.

20   A.  So we engage in annual evaluations, and they are

21   delivered by March 15th of each year.  And even though

22   there's an annual performance evaluation delivered on a

23   specific -- or by a specific date, there's feedback that

24   each trooper will receive during the course of the year so

25   they can make corrective actions as necessary so it's not
```

1   memorialized in the document if they change their

2   trajectory.

3   Q.  For purposes of providing that feedback throughout the

4   year, Major, if discipline were to become necessary, does

5   Minnesota State Patrol have a procedure for that?

6   A.  Yes, we do.

7   Q.  Can you describe that to the Court.

8   A.  So our discipline process implements the use of an

9   outside agency, if you will, or outside entity.  It's housed

10  under the Department of Public Safety, but it is the

11  Internal Affairs Division.

12  Q.  Going back to discipline, though, that you might issue

13  to someone under your ranks, is there a policy or a

14  procedure for that?

15  A.  There is.

16  Q.  Could you describe that to the Court.

17  A.  So that would actually fall under the bargaining unit,

18  collective bargaining, and the troopers' MLEA contract.

19  Q.  If a trooper were found to have violated a Minnesota

20  State Patrol policy pertaining to the treatment of media or

21  any of the policies that we've discussed this afternoon,

22  would they be subject to discipline?

23  A.  Yes, they would be.

24  Q.  Now, you just mentioned the Internal Affairs Department.

25          MS. LANDRUM:  I would like permission from the

1      Court to publish to you Exhibit 11.

2                    THE COURT:  You may.

3                    MS. LANDRUM:  Thank you, Your Honor.

4      BY MS. LANDRUM:

5      Q.  Do you recognize Exhibit 11, Major?

6      A.  Yes, I do.

7      Q.  And what is this?

8      A.  Our policy specific to investigations, and then the

9      Minnesota Department of Public Safety's guidelines as well.

10     Q.  And Ms. Kosek has just cycled through on the screen the

11     pages.  Does this appear to be an accurate copy of the

12     internal affairs policy?

13     A.  It does.

14                   MS. LANDRUM:  Defendants move to admit Exhibit

15     Number 11, Your Honor.

16                   MR. RIACH:  No objection, Your Honor.

17                   THE COURT:  Exhibit Number 11 is received.

18     BY MS. LANDRUM:

19     Q.  Major, do Minnesota State Patrol troopers or lieutenants

20     or even members of your rank participate directly when

21     internal affairs complaints are being investigated and

22     making investigatory decisions?

23     A.  So this is an independent process.  There will be

24     initial conversations that will initiate the disciplinary

25     process, but as far as our insertion, no.

1    Q.  And why is that?

2    A.  To provide transparency and to rule out any type of

3    nepotism that may be claimed, independent from our agency.

4    Q.  Major, I would like to switch gears here and talk about

5    May of 2020.  Do you have any personal knowledge of what

6    occurred in Minneapolis in May of 2020 following the murder

7    of George Floyd?

8    A.  Yes, I do.

9    Q.  And how did you develop that personal knowledge?

10   A.  So I was -- at that time held the rank of captain and

11   was a commander of our Mobile Response Team.

12   Q.  And during the testimony of Commissioner Harrington, he

13   testified a little bit about what was occurring on the

14   ground, but could you testify from your personal experience

15   what was occurring on the ground during that time in

16   Minneapolis.

17   A.  So at the time that our state assets were inserted,

18   specifically the Mobile Response Team and then progressing

19   to the entire State Patrol, it was an evolution of an event,

20   reaching, you know, to various pinnacles of riotous

21   behavior.  At times, you know, reflecting back, it was

22   complete pandemonium and, as far as details, just utter

23   chaos.

24   Q.  Were there any other law enforcement agencies involved

25   in the response in Minneapolis in May of 2020?

1    A.   There were.

2    Q.   As a state agency, statewide agency, was Minnesota State

3    Patrol in charge of any of those other law enforcement

4    agencies?

5    A.   They were not.

6    Q.   Why not?

7    A.   So our statutory existence from 299D is that of a

8    separate entity.  So we do not hold any authoritative power

9    over any local jurisdiction or sheriff's jurisdiction of any

10   of our allied agencies.

11   Q.   Does Minnesota State Patrol give orders to other law

12   enforcement agencies?

13   A.   We do not.

14   Q.   When did Minnesota State Patrol's involvement on the

15   ground in Minneapolis began in 2020?

16   A.   So specifically to our Mobile Response Team, we were

17   requested on Tuesday, May 26th.

18   Q.   Requested by who?

19   A.   That would have been the Minneapolis Police Department.

20   Q.   And when did Minnesota State Patrol's involvement end in

21   that unrest that was happening?

22   A.   So we were involved in demobilization.  It would have

23   been June 7th, which was a Sunday.

24   Q.   So I know we're talking about a substantial amount of

25   time here and there's a lot of details to cover, but I want

1    to focus from your perspective as a law enforcement official

2    on the ground the key events that Minnesota State Patrol

3    participated in, going in chronological order to the best

4    that you can.

5           What was the first major event that Minnesota

6    State Patrol was involved in on the ground?

7    A.  So that Tuesday we were asked to provide site security

8    basically outside of the Third Precinct, but not an overt

9    presence, standing behind a line of Minneapolis police

10   officers.  That night was drawn to a conclusion as most

11   nights were, there was a pinnacle event and then activity

12   subsided.

13          The very next evening -- I should say that all of

14   our troopers returned to their home destinations throughout

15   the state and the very next evening was, like, the same

16   cycle, notified at approximately the same time and then

17   tasked with security again outside of the Minneapolis Police

18   Department.

19   Q.  What precinct?

20   A.  The Third Precinct.

21   Q.  And what day was this?  So you testified that you're

22   securing the Third Precinct and this is the second night.

23   What day is that?

24   A.  So that is Wednesday.

25   Q.  And what significant event happened there?

1    A.  So that was the -- again, escalation and really the

2    introduction of fires and continued looting, and the night

3    ended with automatic gunfire in a Target parking lot across

4    the street from our location.

5    Q.  Can you describe that in a little bit more detail.  So

6    you mentioned fires.  What was on fire?  And you mentioned

7    gunfire.  What are you referring to?

8    A.  Most certainly.  So during the course of the evening the

9    fires had commenced.  Actually, the one parts store,

10   AutoZone, had been the subject of arson previously.  That

11   fire had restarted and it was totally engulfed at one point.

12   There was also a high-rise residential complex behind that

13   that was fully engulfed.  So really it's this surreal

14   environment of fire and smoke and loud boisterous crowds and

15   riotous behavior, projectiles, and then holding firm through

16   the night.

17        There was an incident over in the Target parking

18   lot with multiple gunshots, which led our troopers being out

19   in the open struggling to find concealment or cover.  So our

20   whole team was, like, piled on top of each other behind like

21   a three-foot Jersey barrier trying to avoid any harm to our

22   team.

23   Q.  Major, did you take any videos of what occurred that

24   night with the fires?

25   A.  I took a variety of photos, and on the iPhone platform

```
 1    some of those are saved as live photos, which convert to

 2    videos, yes.

 3              MS. LANDRUM:  Permission to publish to the witness

 4    and to the Court Exhibit 42, which are two videos taken by

 5    Major Dwyer?

 6              THE COURT:  Any objection?

 7              MR. RIACH:  No objection, Your Honor.

 8              THE COURT:  You may.

 9        (Video recording played)

10    BY MS. LANDRUM:

11    Q.  Do you recognize this video, Major?

12    A.  I do.

13    Q.  Was this a video you took?

14    A.  I did, yes.

15    Q.  Does this appear to be an accurate copy of the video you

16    took?

17    A.  It is.

18    Q.  And is this the scene from the Third Precinct?

19    A.  It is, the intersection of Lake and Minnehaha.

20              MS. LANDRUM:  Exhibit 42, Your Honor, actually has

21    two videos within it.  Permission to play the second one?

22              THE COURT:  You may.

23        (Video recording played)

24    BY MS. LANDRUM:

25    Q.  Major --
```

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1          MS. LANDRUM:  Oh, it's actually quite short.  Can

2     you play it again.

3          THE COURT:  Let me ask you:  Are these received in

4     evidence?

5          MS. LANDRUM:  I was trying to lay the foundation

6     and then I was going to offer them.

7          THE COURT:  Okay.  So you are playing for him --

8          MS. LANDRUM:  Yes.

9          THE COURT:  -- to lay the foundation?

10         MS. LANDRUM:  Yes.  Just to show it one more time.

11    Sorry.

12        (Video recording played)

13    BY MS. LANDRUM:

14    Q.  Does this appear to be an accurate video, a copy of a

15    video that you took?

16    A.  It does.

17         MS. LANDRUM:  Defendants move to admit Exhibit 42,

18    both videos.

19         MR. RIACH:  No objection.

20         THE COURT:  They are received.

21         MS. LANDRUM:  Thank you, Your Honor.  And was Your

22    Honor able to view those as they were being seen or would

23    Your Honor prefer to see them again?

24         THE COURT:  I would like to see them again,

25    please.

 1              MS. LANDRUM:  Perfect.  Ms. Kosek, if you could

 2      play them both in succession.

 3          (Video recording played)

 4              MS. LANDRUM:  And the second one, if you could

 5      enlarge the screen.

 6          (Video recording played)

 7      BY MS. LANDRUM:

 8      Q.  So we just discussed what happened on that night in

 9      front of the Third Precinct.  From your standpoint, Major,

10      what was the next major event that Minnesota State Patrol

11      was involved in?

12      A.  So on the next shift cycle, which would have been

13      Thursday, we were actually removed from the Third Precinct

14      and that security aspect and given an assignment downtown

15      outside the First Precinct to provide security and then also

16      to prevent any type of looting on Nicollet Mall.

17      Q.  So you were reassigned away from the Third Precinct.

18      What happened that night at the Third Precinct?

19      A.  So that was the evening that the Third Precinct was

20      abandoned and destroyed.

21      Q.  The mission that Minnesota State Patrol was called to on

22      Nicollet Avenue that evening, can you just briefly describe

23      how that went.

24      A.  Yes.  We progressed through the evening.  There were a

25      variety of various crowds down in that downtown area, some

1    scheduled events outside the First Precinct, but ultimately

2    criminal and dangerous activity was curbed.  There was some

3    instance of damage to property on Nicollet Mall, but by and

4    large it was evaded.

5    Q.  What was the next key event for purposes of Minnesota

6    State Patrol's participation during the unrest in

7    Minneapolis in May 2020?

8    A.  So it would have been that very same day, the Thursday

9    evening into the early morning hours of Friday, we were

10   tasked or I was advised that we needed to go down and

11   establish as large as perimeter, based on the Third Precinct

12   dynamic, as large as perimeter as possible to provide like a

13   safety barrier so that the events that occurred on Tuesday,

14   Wednesday, Thursday would not occur again.

15   Q.  So was there significant concerns, safety concerns,

16   around the area of the Third Precinct despite the fact that

17   it now been sort of abandoned and lit on fire?

18   A.  Without a doubt based on the previous night's activity,

19   criminal and otherwise, yes.

20   Q.  We've heard testimony when you were not in the room,

21   Major, about the arrest of CNN -- a CNN crew.  Were you

22   aware that that happened?

23   A.  I am.

24   Q.  Are you aware of approximately when that happened?

25   A.  It would have been that early morning hours of Friday.

 1    Q.  So was that the same time when Minnesota State Patrol

 2    was being called to establish a larger perimeter in that

 3    area?

 4    A.  Yes, it is.

 5    Q.  Was that a safe area?

 6    A.  Based on what we had seen transpire the previous two

 7    nights, the evacuation of the Third Precinct and the arson

 8    that occurred, it was not.

 9    Q.  Were individuals being dispersed or otherwise arrested

10    in that area because of the safety concerns there and the

11    looting and rioting and fires?

12    A.  Yes, they were.

13    Q.  Now, in order to establish the perimeter that you just

14    mentioned, what did Minnesota State Patrol do to assist

15    Minneapolis?

16    A.  So really the first time in the history of our agency,

17    we had called every state trooper and activated them in the

18    early morning hours to respond to the city of Minneapolis.

19    Q.  Had that ever happened before?

20    A.  Not to my knowledge.

21    Q.  What's the next significant event that occurred?

22    A.  So we did establish that perimeter, just a large,

23    multiple-block area.  And then upon successfully doing that,

24    we started the next cycle, which would have been Friday

25    evening into Saturday morning.

1    Q.  And so you mention "the next cycle."  Where did that

2    happen; where was that?

3    A.  So on this particular day we were provided an assignment

4    to respond to the area of the Fifth Precinct.  There was a

5    large demonstration outside there.  Based on concerns of

6    what had happened at the Third Precinct, we were asked to

7    respond and try to prevent, you know, a similar situation of

8    arson and damage and just harm to citizens in that area.  So

9    we did respond to that area.  Immediately the crowd

10   dispersed, and that was after curfew, so at that point we

11   initiated patrolling the streets on foot patrol and issuing

12   curfew citations, curfew enforcement basically.

13   Q.  Okay.  And that's around the area of the Fifth Precinct?

14   A.  Yes, ma'am.

15   Q.  What happened next?

16   A.  So working collaboratively with Minneapolis Police

17   Department, we did try to effect a mass arrest.

18   Q.  And the Court has heard today that phrase, "mass

19   arrest," but it would be helpful, I think, if you would just

20   explain to the Court from your perspective.  What is a mass

21   arrest?

22   A.  Yes.  So in the arena of crowd control or crowd

23   management, there are a couple of different tactics that we

24   can employ.

25           One of it is crowd dispersal.  The issue with

1    crowd dispersal, and especially given the environment that

2    we were transgressing through, it just pushes the, if you

3    will, problem area to another area or allows it to occur,

4    you know, the next evening.  So that's the cycle.  It really

5    doesn't culminate to an end.

6         A mass arrest situation, working in conjunction

7    with various departments, if you have enough resources to

8    encircle a group, putting pieces of the puzzle into place

9    systematically, and I like to call it like a choreography,

10   so that it's built in a timely fashion, allowing people

11   to -- you know, an avenue of exit and then if there's

12   noncompliance, that final piece comes into place and then

13   there's enforcement action taken.

14   Q.  You mentioned there that dispersal on its own was not

15   always effective.  Is that a lesson that Minnesota State

16   Patrol was learning on the ground in Minneapolis in May of

17   2020?

18   A.  Yes, we were.

19   Q.  Are mass arrests common?

20   A.  Previously, no.  Over the last 18 months it has been

21   more common based on the environment that we're working

22   through.

23   Q.  Now, you mentioned that you attempted to do a mass

24   arrest.  Where did that -- where was that occurring?

25   A.  After navigating through the city streets, in the area

1    of Lake and Grand there was a large crowd of demonstrators.

2    There was actually a fire built within the middle of that

3    intersection.  And based on reports, aerial with the use of

4    a helicopter or otherwise monitoring different entities of

5    this crowd, we were able to set up a larger perimeter blocks

6    out and, you know, move in.  Unfortunately, one of the lines

7    broke down and a large majority of that crowd was able to

8    escape.

9    Q.  What about in the area of the Fifth Precinct, did

10   Minnesota State Patrol participate in any attempt to do a

11   mass arrest there?

12   A.  Yes, we did.

13   Q.  Major Dwyer, are you familiar with the Declaration of

14   Edward Ou?

15   A.  Yes, I am.

16   Q.  Did I ask you to review that this morning before your

17   testimony?

18   A.  Yes, ma'am, you did.

19   Q.  And did you, in fact, review it?

20   A.  I did.

21   Q.  And did I ask you to review the videos that he took that

22   were attached to his declaration?

23   A.  Yes, you did.

24   Q.  And did you review those videos?

25   A.  Yes, ma'am.

1    Q.  So you're familiar, then, when I refer to what is

2    Plaintiffs' Exhibit 14, which is an exhibit during the

3    daytime which appears to be outside of the Fifth Precinct.

4    Would you agree with me, having viewed that this morning,

5    that it looks like that is in the area of the Fifth

6    Precinct?

7    A.  Yes, it is.

8    Q.  After having watched that video again this morning, can

9    you describe to the Court from a law enforcement perspective

10   what was happening there.

11   A.  So the video, as viewed, provides, you know, a very

12   short and small window into the event that was transpiring.

13   So there is, you know, an active line of law enforcement and

14   they are moving down the street there.  There is an

15   encounter with Mr. Ou.  And what's not seen on the video is

16   everything, you know, in the periphery, and, again, it is a

17   chaotic event.

18          And I think reflecting on that scene, you know, we

19   had came up a side street adjacent to Nicollet Avenue,

20   descended on 32nd Avenue or thereabouts.  And immediately

21   upon, you know, forming the line formation on Nicollet Mall,

22   we were met with volatility and debris thrown, from rocks,

23   bottles, metal projectiles.  There's even a report from one

24   of our troopers seeing a machete fly through the air and

25   land near him.  There were still fires, maybe not from this

1    particular day, but a residual from the previous evening.

2    So it was that, again, volatile, agitated state of the

3    crowd.

4    Q.  And were you physically there on the ground witnessing

5    what you just described to the Court?

6    A.  Yes, I was.

7    Q.  Was Minnesota State Patrol the only law enforcement

8    agency present?

9    A.  We were not.

10   Q.  Can you explain from a law enforcement perspective what

11   that line in the video, the line of law enforcement that was

12   moving through the video, what were they attempting to do?

13   A.  So in, again, field force operations there's some basic

14   formations, the line maybe being the easiest to implement.

15          Based on the crowd size and what we were facing,

16   we do -- we did have multiple lines and it's what we call

17   close support, so line formation, line formation, line

18   formation, just a bolstering of resources so we have enough

19   personnel to accomplish what we're trying to do.

20          But on this particular evening it was to, again,

21   protect that area.  Once we had evaluated the crowd and

22   assessed where was the vast majority of them, we did

23   formulate a plan, based on the curfew order, to move that

24   crowd into the Kmart parking lot to the north near Lake

25   Street and effect a mass arrest.

1    Q.  Was a dispersal order given before that law enforcement

2    line started to move forward?

3    A.  In conjunction with the curfew order, there was a

4    dispersal.

5    Q.  What was the basis for the dispersal?

6    A.  Being after curfew and that this was no longer a

7    lawful -- it was after hours.

8    Q.  Did the dispersal order apply to media, members of the

9    media who were present in that area?

10   A.  Yes.

11   Q.  Why?

12   A.  Because even though media personnel were exempt from a

13   curfew order, based on the law enforcement operation to

14   provide a safe perimeter and safe area to work, not only for

15   the law enforcement personnel, but everybody in that area,

16   it was the intent to clear the entire landscape.

17   Q.  Why couldn't media just stay behind?  Why couldn't they

18   stay behind the law enforcement line as it was moving

19   forward to effect the mass arrest?

20   A.  From a law enforcement perspective, that provides a

21   significant security risk, not only to personnel, but for

22   their safety as well.  We also house a large number of

23   resources, tools that we need to effectively move crowds.

24   So the best practice is that everybody stays out in front of

25   the line and either disperses in the direction -- the

1    momentum, if you will, or off to the sides.

2    Q.  Major, I know that the unrest in Minneapolis and in

3    St. Paul and surrounding areas lasted for several days, but

4    in the interest of time, how did it ultimately come to an

5    end?

6    A.  So there was the evening on Nicollet Mall.  And then the

7    following day there was a mass arrest at Bobby & Steve's on

8    Washington Avenue, which took a lot of the energy out.

9    Knowing that there was an insertion of consequences, we

10   didn't see the same level of energy from that point on.

11   Q.  Major, I know that you already mentioned this, that you

12   took photos while you were present on the ground in

13   Minneapolis in May 2020?

14   A.  I did.

15           MS. LANDRUM:  Permission to publish Exhibit 41 to

16   the witness, Your Honor?

17           THE COURT:  You may.

18           MS. LANDRUM:  Shirley, if you could -- Ms. Kosek,

19   if you could pull it up.

20   BY MS. LANDRUM:

21   Q.  Major, this is a compilation of 25 photos.  If Ms. Kosek

22   can just move through them one at a time for you to identify

23   them as being the photos that you, in fact, took.

24       (Witness reviews exhibit)

25   A.  Yes.

1     Q.  Major, are those accurate copies of some of the

2     photographs that you took in May of 2020?

3     A.  Yes, they are.

4               MS. LANDRUM:  Your Honor, state defendants move to

5     admit Exhibit 41.

6               MR. RIACH:  No objection.

7               THE COURT:  Exhibit 41 is received.

8               MS. LANDRUM:  And, Your Honor, I see that it is

9     3:29.  I'm about to transition.  We certainly could talk

10    about some of these photos, but I am wondering if now is a

11    time to stop for the day.

12              THE COURT:  Let me confer with my staff.  I think

13    we probably can continue the hearing --

14              MS. LANDRUM:  Wonderful.

15              THE COURT:  -- but I do need to at this point get

16    a better understanding of how much more time we would need

17    to determine whether it makes sense to continue it today or

18    whether we need to also schedule another day for the

19    hearing.

20              MS. LANDRUM:  Thank you.

21              THE COURT:  So can you tell me in your estimation

22    what more the hearing would entail?

23              MS. LANDRUM:  I would guess for this, ideally

24    another half hour to 45 minutes.

25              THE COURT:  Okay.  And that's simply for direct,

1    correct?

2              MS. LANDRUM:  That's correct, Your Honor.

3              THE COURT:  Okay.  I'm going to take a recess now.

4    I'm going to confer with my staff to determine whether we

5    can accommodate staying later than the originally scheduled

6    time to end this hearing or whether we need to find another

7    day to continue it, and there may -- if we can have

8    spokespeople from each party in the courtroom, there may

9    need to be some conferral with you just to figure out the

10   logistics of what we can accommodate in terms of counsel's

11   availability as well.  Okay?

12             MS. LANDRUM:  Thank you, Your Honor.

13             THE COURT:  All right.  We'll be in recess.

14        (Recess taken at 3:31 p.m.)

15                        *   *   *   *   *

16        (3:49 p.m.)

17                        **IN OPEN COURT**

18             THE COURT:  You may proceed.

19             MS. LANDRUM:  Thank you, Your Honor.

20   BY MS. LANDRUM:

21   Q.  Major Dwyer, you just discussed sort of at a high level

22   what was happening on the ground in Minneapolis in May of

23   2022 -- or May of 2020.  In your 22 years of law enforcement

24   experience, had you ever participated in an event like that

25   before?

1    A.  I had not.

2    Q.  Can you explain to the Court what made it different.

3    A.  Really was an unprecedented event, navigating through,

4    like, the night after night after night after night of

5    riotous behavior.

6         I always revert back to this one reflection or

7    memory, and it was the Friday evening into the early morning

8    hours of Saturday.  From a supervisory standpoint, the

9    things that we asked our troopers to do were like no other.

10        So we were in a, like, western direction in the

11   area of 31st and Blaisdell, and there's a high-rise

12   apartment behind us.  And knowing some of the background

13   and, like, attacks on law enforcement, that was on our

14   minds.  We were already met with violence, debris being

15   thrown out at us.

16        There's fires within the street, and our troopers

17   were progressing down the street.  We would have them go up

18   to the fire, try to engage these violent actors.  We'd put

19   out the fire as best as we could with the fire extinguishers

20   that we would have, but it wasn't totally extinguished.  We

21   would ask them to walk through the fire up to the next fire

22   to engage the crowd.

23        And then ultimately on that evening there was an

24   unattended vehicle that was -- with a brick on the

25   accelerator that was placed in our direction or trajectory

1    towards our line of troopers.  So really that threat of

2    vehicle assault also was something that we hadn't

3    encountered to that degree ever, and that was a nightly

4    occurrence.

5    Q.  Taking a step back, in your 22 years of experience,

6    Major, prior to this time did you have experience in crowd

7    control?

8    A.  Yes, I do.

9    Q.  Can you describe that to the Court.

10   A.  So I've been involved in field force operations since

11   2008 prior to the Republican National Convention.  And since

12   that time I've been a member of our Field Force Team, which

13   is now our Mobile Response Team.  But I've attended all the

14   training and have led the training, but I also hold some

15   credentialing on a federal level with the Center For

16   Domestic Preparedness and instruct for them in field force

17   operations.

18   Q.  So it sounds like you actually have a lot of experience

19   in crowd control?

20   A.  Yes, ma'am.

21   Q.  Okay.  On the ground in Minneapolis in 2020, was

22   Minneapolis State Patrol -- or Minnesota State Patrol ever

23   called to use any type of force, such as less lethal

24   munitions or chemicals?

25   A.  So we did employ riot control tools.

1    Q.  Can you describe for the Court what types of tools were

2    used.

3    A.  So there's a variety, but actually through the course of

4    evaluation, we've actually limited our inventory.  So there

5    may be blast balls that are inert.  There may be some that

6    carry a payload or other dispensaries.  There are chemical

7    agents as well that we use, specifically CS gas, along with

8    direct impact.  And then every trooper on their belt carries

9    pepper spray, but also there are larger canisters that are

10   used.

11   Q.  Has the Minnesota State Patrol ever utilized rubber

12   bullets?

13   A.  We do not.

14   Q.  Would any of those agents be utilized without first

15   giving an opportunity to disperse?

16   A.  They would not.

17   Q.  Does Minnesota State Patrol have any policies or

18   procedures pertaining to the use of force?

19   A.  We have a specific use of force policy.

20           MS. LANDRUM:  Permission to publish Exhibit 10 to

21   the witness, Your Honor?

22           THE COURT:  You may.

23   BY MS. LANDRUM:

24   Q.  Major, do you recognize Exhibit 10?

25   A.  I do.

1    Q.  What is it?

2    A.  That is our General Order on use of force.

3    Q.  And Ms. Kosek has just flipped through the pages.  Does

4    this appear to be an accurate copy of Minnesota State

5    Patrol's use of force policy?

6    A.  It does.

7    Q.  If a trooper were to violate this policy, would they be

8    subject to discipline?

9    A.  Yes, ma'am.

10   Q.  Now I would like to talk to you about what Minnesota

11   State Patrol did immediately after the May into June 2020

12   unrest subsided.  From a high level, what lessons did

13   Minnesota State Patrol learn when it comes to the treatment

14   of media?

15   A.  So there's tactics or there are procedures that we have

16   implemented.  We've always had an outstanding relationship

17   and held that in high regard and want to continue that.  So

18   from a documentation standpoint, we invested into certain

19   tools.  We made ourself what we would say readily

20   identifiable in the interest of transparency, that if there

21   was an issue, that it could be identified that that indeed

22   was a state trooper that was involved.  And some of those

23   tools, specifically we invested in the Intrepid app and

24   Salamander application just for better oversight of our

25   operations.

1   Q.  And specifically what do those tools, Intrepid and

2   Salamander, do for State Patrol?

3   A.  Basically provide tracking of not only personnel, but,

4   like, the Intrepid application allows real-time

5   documentation in the field, so as commanders or whoever is

6   logging information, that is stored on a server or web base

7   and it can be monitored virtually real time by supervisory

8   or command staff and there's input that can be given related

9   to the events.

10  Q.  And I think you mentioned about Minnesota State Patrol

11  being more identifiable.  Can you just explain that to the

12  Court to make sure we understand what you mean by that.

13  A.  Through the course or the aftermath of events in

14  Minneapolis, there were several events that were brought to

15  our attention and every time it was always State Patrol,

16  State Patrol, State Patrol.

17          So on the front chest protector or the front panel

18  of our chest protector, there's an identifier.  Previously

19  it just used to be one row of text.  As we tried to identify

20  individuals in like a Twitter video or grainy quality videos

21  that are posted in a myriad of places, it became apparent

22  that, like, if it said, "Sheriffs" or "Police "Officer" --

23  there was only one during this event that really stood out

24  and that was our partners from the DNR.  They had two rows

25  of text, "Conservation Officer."  So in an effort to just

1    make us readily identifiable, we went with a state

2    silhouette with a bright white background and then it says,

3    "State Trooper" on it and it's approximately eight inches by

4    four inches wide.

5    Q.  And is that because Minnesota State Patrol wanted to be

6    easily and readily identified as Minnesota State Patrol?

7    A.  Without a doubt.

8    Q.  And just to clarify the testimony that you just gave, in

9    May -- for purposes of May 2020, I think you said it

10   was Patrol, it was Patrol, it was Patrol.  Did you mean

11   there that other officers were being confused for Minnesota

12   State Patrol?

13   A.  That is correct.

14   Q.  I would like to move to a discussion of Operation Safety

15   Net, which the Court has already heard about.  But are you

16   familiar with Operation Safety Net?

17   A.  I am.

18   Q.  Are you aware of any steps Operation Safety Net took to

19   plan for the presence of media for purposes of the Derek

20   Chauvin trial?

21   A.  I am.  There were different platforms of outreach to

22   make contact with our media partners, different forums.  I

23   participated in one that was best practices if media

24   encountered law enforcement.  And then also I know that

25   there was an initiative to move towards a standardized press

1    credential.

2    Q.  You mentioned that you participated in something

3    pertaining to best practices.  Best practices as to what?

4    A.  As far as if there is interaction on the media side with

5    our partners in law enforcement, of how to navigate safely

6    through these very tumultuous and unpredictable events.

7    Q.  And you mentioned the discussion of a press credential.

8    Can you explain that further to the Court.

9    A.  So in the interest of -- much like our front panel chest

10   protector to make us readily identifiable, if there was one

11   standardized press pass or credential, it would serve the

12   same purpose.  So looking at it, you would be able to

13   identify that individual as press.  Even if they were

14   standing side by side with somebody active in the crowd or

15   an agitator, a bad actor, there would be that discernible

16   markings to allow us to make sure the correct action was

17   taken.

18   Q.  In your law enforcement experience, do members of the

19   media sometimes get so close as to be side by side with

20   agitators or other members within a crowd situation?

21   A.  In recent events I've seen that frequently.

22   Q.  From a law enforcement perspective, why would it be

23   important for you to be able to clearly identify who is or

24   is not media visually?

25   A.  So in a crowd dynamic, there is this intermixture of

1   everybody.  And so there are people that, you know, come to

2   the event out of curiosity, there are individuals that come

3   to the event to cause harm or damage or create chaos, and

4   then there are media individuals that are there to cover the

5   events and report on that.  So to have that amount of people

6   in a very small footprint, it's very challenging to identify

7   which person is affiliated with which group.

8   Q.  Can you explain that to the Court, why that is.  Because

9   we have heard testimony today from individuals claiming that

10  they were easily and readily identifiable as media.  Can you

11  explain from your perspective how that occurs in the field.

12  A.  As far as trouble in identifying?

13  Q.  Being able to identify who is or is not media.

14  A.  Certainly.  So what we saw in Brooklyn Center and

15  Minneapolis, there's, let's say, kind of a covert or trying

16  to blend in with the crowd that perhaps media is engaged in.

17      Because we have seen that when media is identified

18  by certain groups of demonstrators, protesters, that they

19  aren't always accepted kindly and that they direct action

20  towards some of these reporters based on, you know, certain

21  stories that they've provided or direction or, you know,

22  something portrayed in the news.  So we've actually had to

23  separate reporters from bad actors in the past.

24      And then on the other side, it provides a tool for

25  demonstrators.  Those that would like to engage in criminal

1    activity or riotous behavior, it provides them almost like a

2    cloak of, again, blending in, not anonymity, but they are

3    portraying themselves as media personnel so that they are,

4    you know, in this hands-off type environment, knowing the

5    particulars of how we treat media and wanting to uphold the

6    Constitution and freedom of press.

7    Q.  So you mentioned two concerns there with regard to the

8    identification of media, one possibly being a safety issue

9    for the media coming from persons intending to do harm in

10   the field.  Did I hear that correctly?

11   A.  Yes, that is correct.

12   Q.  Have you seen that yourself in the field?

13   A.  Yes.

14   Q.  Did you see that in Brooklyn Center?

15   A.  There were instances of that in Brooklyn Center.  We've

16   seen it at the Capitol.  We've seen it in other venues.

17   Q.  And then you also mentioned that another concern is that

18   individuals might claim to be press who aren't, in fact,

19   press.  Did I hear that right?

20   A.  Yes, that is correct.

21   Q.  Is that something that you've actually seen in the

22   field?

23   A.  Yes.

24   Q.  And did you see that in Brooklyn Center?

25   A.  Yes, we did.

1    Q.  And were some of those instances documented?

2    A.  They were.

3    Q.  Okay.  Because that's active criminal investigative

4    data, I won't be asking specific questions about those.

5            So let's just take a step back, then.  We started

6    bleeding into Brooklyn Center.  Taking a high level, did

7    Minnesota State Patrol have involvement in responding to

8    Brooklyn Center?

9    A.  Yes, we did.

10   Q.  How did Minnesota State Patrol become involved?

11   A.  Again, much like the events of Minneapolis, in the death

12   of Daunte Wright we were asked to provide additional

13   services or resources to the city as their resources were

14   not adequate to respond to the event.

15   Q.  And who made that request?

16   A.  That would have been the City of Brooklyn Center.

17   Q.  Was Minnesota State Patrol the only other law

18   enforcement agency that came to aid Brooklyn Center?

19   A.  They were not.

20   Q.  Who else responded?

21   A.  So there was a variety of metro or suburban departments.

22   West Metro Command, they were there, the Hennepin County

23   Sheriff's Office.  A variety of departments.

24   Q.  Was Minnesota State Patrol in charge of the law

25   enforcement response that occurred in Brooklyn Center in

1    April 2021?

2    A.  No, we weren't.

3    Q.  Was Minnesota State Patrol issuing commands to any other

4    law enforcement agency on the ground in Brooklyn Center in

5    2021?

6    A.  No, we were not.

7    Q.  From a law enforcement perspective -- first of all,

8    Major, were you on the ground in Brooklyn Center?

9    A.  I was.

10   Q.  From a law enforcement perspective, what was occurring

11   on the ground there?

12   A.  Again, it's this chaotic environment.  Initially that

13   first day, that Sunday, a very energetic, boisterous crowd,

14   noncompliant, agitated, engaging in, you know, throwing

15   debris, much like what we saw in Minneapolis.  But when

16   dealing with this crowd, my assessment of it was even more

17   noncompliant than Minneapolis.  The groups of individuals or

18   individuals themselves were not afraid to stand, like, toe

19   to toe with law enforcement.

20   Q.  I'm certain that you witnessed individuals there who

21   were not engaging in unlawful conduct, right?

22   A.  Yes.

23   Q.  But so I'm hearing that there were some individuals

24   engaging in unlawful conduct?

25   A.  That is correct.

1    Q.  Did Minnesota State Patrol incur any injuries as a

2    result?

3    A.  We did have troopers that were injured.

4    Q.  How did this unrest in Brooklyn Center, and I think you

5    touched upon this a little bit, but how did it compare as a

6    whole to what you experienced in May 2020?

7    A.  So it really contributed to -- a difference was the

8    smaller footprint.  In Minneapolis it was spread out, you

9    know, through a large sector or various sectors of the city.

10   In Brooklyn Center, it was confined to the area directly in

11   front of the Brooklyn Center Police Department, specifically

12   that Humboldt Avenue area and just that north-south

13   corridor, and those week's events transpired in that very

14   small footprint.  So there is a small, like, commercial

15   sector, but also there is a larger residential footprint as

16   well.

17   Q.  And when did Minnesota State Patrol -- or how long was

18   Minnesota State Patrol on the ground in Brooklyn Center?

19   A.  For a period of a week.

20   Q.  Can you describe for the Court from a high level what

21   the law enforcement response to that was.  What did law

22   enforcement do in response to the unrest they were seeing?

23   A.  Certainly.  So we worked cooperatively, collaboratively

24   with our law enforcement partners of those various

25   jurisdictions to quell the unrest.

1    Q.  And how did you do that?

2    A.  So there were evenings that we would try to effect,

3    like, the mass arrest situation.  Some of those evenings

4    were successful.  The very first night that we were there,

5    putting all the, again, puzzle pieces together, one arrest

6    was effected out in front of the police department.  And

7    then the Friday evening, that was on the other end of the

8    spectrum where a large mass arrest was effected.

9    Q.  The Court heard a little bit of testimony today about a

10   fence around the Brooklyn Park -- or Brooklyn Center Police

11   Department.  Can you share, what was the law enforcement

12   purpose of that?

13   A.  Really it was a de-escalation.

14        So any time that there's law enforcement

15   insertion, we recognize that that very well could serve as

16   an audience at some point and there's a lot of energy

17   directed at that group of law enforcement, which we saw

18   there.

19        So in an effort to remove that law enforcement

20   line, which was there the first night, on Monday there was a

21   single fence that was erected on the front side of the

22   Brooklyn Center Police Department.

23        And then on a subsequent night there was a double

24   layer of fence, which would allow for law enforcement to be

25   totally removed and at a greater distance from the crowd,

1    not to incite undue or unneeded energy.

2    Q.  Was that a lesson learned from May 2020, the fencing?

3    A.  Without a doubt, and that's a tactic that is still

4    implemented in locations.

5    Q.  Did Minnesota State Patrol officers take photos of what

6    was occurring in Brooklyn Center?

7    A.  They did.

8    Q.  And where were they housed?

9    A.  So we do have a server, a specific drive based on

10   events, and they're kept at that location.

11   Q.  And were they also obtained through Intrepid, the new

12   system that you just discussed?

13   A.  Yes, ma'am.

14          MS. LANDRUM:  Permission to publish Exhibit 43 to

15   the witness, Your Honor?

16          THE COURT:  You may.

17   BY MS. LANDRUM:

18   Q.  Exhibit 43, Major, is a compilation of photos, and

19   Ms. Kosek will cycle through them quickly.  Do you recognize

20   these as being photos taken from Brooklyn Center?

21   A.  I do.

22   Q.  And how do you know that?

23   A.  It's a depiction of various debris.  Location is outside

24   of the Brooklyn Center Police Department in the area of

25   Humboldt Avenue.

```
1    Q.  And are these maintained by Minnesota State Patrol as

2    part of their law enforcement duties?

3    A.  They are.

4              MS. LANDRUM:  The state defendants move to admit

5    Exhibit 43 into evidence, Your Honor.

6              MR. RIACH:  No objection.

7              THE COURT:  Exhibit 43 is received in evidence.

8              MS. LANDRUM:  Thank you, Your Honor.

9    BY MS. LANDRUM:

10   Q.  Were dispersal orders given in Brooklyn Center, Major?

11   A.  Yes, ma'am, there were.

12   Q.  Did they apply to media?

13   A.  Yes.

14   Q.  Why?

15   A.  Much like in the city of Minneapolis, the environment

16   was unsafe and it needed to be cleared in order to prevent

17   the ongoing activity that was occurring.

18   Q.  Now, the Court heard testimony today that in Brooklyn

19   Center the dispersal orders specifically mentioned the

20   media.  Can you explain why.

21   A.  Yes.  So understanding the dynamic that we navigated

22   through in Minneapolis and wanting to make it clear to our

23   media partners and provide like a safe environment and,

24   like, specific instructions, like this is -- in order to

25   continue reporting of events, we've designated an area or a
```

1    safe location for you to continue your journalism.

2    Q.  And how are the dispersal orders issued?

3    A.  So we have what's called an LRAD, it's a long-range

4    acoustical device, and they're broadcast on that device.

5    Q.  This morning did I direct you, Major, to review the

6    videos -- we already reviewed this, but so this morning I

7    asked you to review the videos of Edward Ou; is that

8    correct?

9    A.  Yes, ma'am.

10   Q.  And had you seen those before?

11   A.  I have.

12   Q.  I think it's worth --

13        MS. LANDRUM:  Shirley, if you can pull up very

14   quickly Plaintiffs' Exhibit 8, we'll play it again.  It's

15   been admitted into evidence.

16        (Video recording played)

17        MS. LANDRUM:  Can you pause it there, Shirley.

18   Thank you, Shirley.

19   BY MS. LANDRUM:

20   Q.  Major, can you share with the Court from a law

21   enforcement perspective what you're seeing in this video.

22   A.  So my assessment and recollection is there's a line of

23   law enforcement, which would be to the south here on

24   Humboldt Avenue.  It's directly in front of the Brooklyn

25   Center Police Department.  And there are still a number of

1    individuals out in front of that law enforcement line to the

2    north of them.

3    Q.  Now, here at this portion where Ms. Kosek has stopped

4    the video, can you see two individuals that appear to be

5    recording the law enforcement officers?

6    A.  I do.

7    Q.  Based on your law enforcement experience on the ground,

8    can you determine, one way or the other, whether or not

9    these are members of the media?

10   A.  Given this snapshot in time, no.

11   Q.  Why not?

12   A.  Like I spoke about previously, just mere attire and in

13   an effort to blend in, but also it's just the use of cell

14   phones or devices, cameras.  This is not uncommon, for

15   everybody to bring a cell phone or some sort of recording

16   device to these events.

17   Q.  Now, in the shot here you can see some individuals in

18   the street that appear to be between the law enforcement

19   line and protesters.  Can you explain to the Court, is there

20   anything problematic with their location there?

21   A.  Yes.  So the intent of the law enforcement line in this

22   general area, in order to bring the events of this

23   particular evening to a close safely, is to actually clear

24   the streets.

25              What is to the north of this location is a large

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1    strip mall parking lot, and we know that many of the

2    vehicles that -- the individuals at this event parked their

3    vehicles there.  So we were trying to disperse, move that

4    crowd to the north.

5    Q.  Did you ever utilize -- not you.  Did Minnesota State

6    Patrol utilize force of any kind in order to effectuate a

7    dispersal without first giving the dispersal order?

8    A.  We did not.

9    Q.  In Brooklyn Center did you ever personally witness a

10   trooper intentionally targeting a member of the media with a

11   use of force or arrest?

12   A.  I did not.

13              MS. LANDRUM:  I would like to show now, Your

14   Honor, Exhibit 29 for demonstrative purposes only.  This is

15   a video that this witness did not take.  Would that be --

16              THE COURT:  Are there any objections?

17              MR. RIACH:  No objection, Your Honor.

18              THE COURT:  You may.

19       (Video recording played)

20   BY MS. LANDRUM:

21   Q.  Can you see this video, Major?

22   A.  Yes, I can.

23   Q.  Can you just describe for the Court -- do you have any

24   recognition of what you're seeing here?

25   A.  Yeah.  So this is the very commercial area that I spoke

1    to, the strip mall just to the north of the Brooklyn Center

2    Police Department.

3    Q.  And what was occurring at this area at the time?

4         MS. LANDRUM:  Could you play it again, Ms. Kosek.

5       (Video recording played)

6         THE WITNESS:  So those behaviors that we've seen

7    at previous riots, the looting, the damage to property, the

8    Dollar Tree was subject to arson and the individuals, you

9    know, capturing that.

10   BY MS. LANDRUM:

11   Q.  From your perspective as a law enforcement official on

12   the ground, would you identify all these people as being

13   members of -- journalists or members of the media?

14   A.  Given that snippet of video, it's very hard to discern

15   who is media and who is general public.

16        MS. LANDRUM:  If you could play it again,

17   Ms. Kosek.

18      (Video recording played)

19        MS. LANDRUM:  You can turn the volume down or off.

20   BY MS. LANDRUM:

21   Q.  Given what was occurring here, the looting, as you

22   mentioned, is it appropriate for people to be in this area?

23   A.  So this also would be unsafe, and this area needs to be

24   cleared to prevent further criminal activity.

25   Q.  Did Minnesota State Patrol take any videos of the unrest

1    that occurred in Brooklyn Center?

2    A.  We did.

3              MS. LANDRUM:  Permission to show to the witness

4    Exhibit 21, Your Honor?

5              THE COURT:  Any objection?

6              MR. RIACH:  No, Your Honor.

7              THE COURT:  You may.

8        (Video recording played)

9    BY MS. LANDRUM:

10   Q.  Major, do you recognize Exhibit 21?

11   A.  I do, yep.  That's consistent with the crowds that we

12   would see over the course of the days.

13             MS. LANDRUM:  Can you play it again.

14       (Video recording played)

15             THE WITNESS:  There is a law enforcement

16   contingent to the forefront, and then also just a large mass

17   of people beyond that.

18   BY MS. LANDRUM:

19   Q.  Does this appear to be an accurate copy of the video

20   Minnesota State Patrol took in Brooklyn Center in April

21   2021?

22   A.  It is.

23             MS. LANDRUM:  State defendants move to admit

24   Exhibit 21, Your Honor.

25             MR. RIACH:  No objection.

```
1              THE COURT:  Exhibit 21 is received.

2              MS. LANDRUM:  And if we could play it again,

3    Ms. Kosek.

4        (Video recording played)

5    BY MS. LANDRUM:

6    Q.  There's a moment here in this video where you see a

7    bright light flashing, right there (indicating).  Can you

8    describe for the Court what that is.

9    A.  So at many of these events the crowd, members of the

10   crowd or a member of the crowd, will use distractionary

11   devices.  So this very well could be like a high-intensity

12   light that is pointed towards law enforcement.  Otherwise,

13   you know, it's not out of the realm of possibility for laser

14   light to be used.

15             MS. LANDRUM:  Permission to present to the witness

16   Exhibit 22?

17             THE COURT:  You may.

18       (Video recording played)

19   BY MS. LANDRUM:

20   Q.  Major, do you recognize Exhibit 22?

21   A.  I do.

22   Q.  What is it?

23   A.  So that's a scene from Brooklyn Center outside the

24   residential area in the area of 6700 Humboldt and the crowd

25   in that area.
```

1    Q.  Is this a video that Minnesota State Patrol took?

2    A.  It is.

3    Q.  Does this appear to be an accurate copy of the video

4    Minnesota State Patrol took in Brooklyn Center in April

5    2021?

6    A.  Yes.

7            MS. LANDRUM:  Your Honor, the state defendants

8    move to admit Exhibit 22.

9            MR. RIACH:  No objection.

10            THE COURT:  It is received.

11    BY MS. LANDRUM:

12    Q.  Now, we'll probably have Ms. Kosek play it a couple

13    times and you could just maybe provide a narrative for us,

14    what all we're seeing here on the ground and sort of from

15    the law enforcement perspective the importance of it.

16            Maybe we could talk about the umbrellas first.

17    What's happening there with the umbrellas?

18    A.  So that's not out of the realm of normal at these

19    events.  We've seen it across the nation and now we've seen

20    it in Minnesota.  But they are used to mask, like, the next

21    intentional move, to provide concealment, whether it is to

22    compile debris to be thrown or talk about strategy, like the

23    next move that they're going to implement, but really the

24    biggest fear is some type of weaponry directed at law

25    enforcement.

1    Q.  At this point in the evening, would a dispersal order

2    already have been issued?

3    A.  Yes, it would have.

4    Q.  Now, I have seen periodically what looks like objects

5    being thrown towards law enforcement.  Am I seeing that

6    right?

7    A.  Yes, you are.

8              MS. LANDRUM:  If you could play it again,

9    Ms. Kosek.  Thank you.

10        (Video recording played)

11   BY MS. LANDRUM:

12   Q.  I also notice this really bright light here kind of in

13   the bottom left quadrant.  What's that?

14   A.  So this individual driving this vehicle was present on

15   most nights in the area and, again, that's a distractionary

16   device.  It affects the visibility of our troopers and

17   causes distraction.

18             MS. LANDRUM:  If we can pause it here, Ms. Kosek.

19   BY MS. LANDRUM:

20   Q.  So you can see here that an individual is just running

21   across the line of protesters, and then there's another

22   individual standing there with what looks like a GoPro.

23   From a law enforcement perspective, is that a safe place for

24   those individuals to be?

25   A.  Under the current conditions, no.

1     Q.  Given the dispersal order, is that a lawful place for

2     them to be?

3     A.  It is not.

4     Q.  And from your perspective as a law enforcement official,

5     the individuals that you can see here, some of whom on the

6     sides are recording, would you consider them to be media or

7     would you be able to identify them as media?

8     A.  Given the information that I have here, again, it's hard

9     to discern who is affiliated with media or who is a member

10    of the public.

11    Q.  I want to turn to the evening of Friday, April 16th, and

12    I think that you mentioned that that was the night where

13    there was the largest mass arrest.  Did I hear that right?

14    A.  Yes, ma'am.

15    Q.  Was a dispersal order given that day?

16    A.  It was.

17    Q.  Who gave it?

18    A.  A member of the law enforcement.  I don't recall if it

19    was the State Patrol.

20    Q.  The Court heard testimony today from a witness that was

21    present who believed that perhaps a dispersal order was not

22    given.  What's your reaction to that?

23    A.  So I know that a dispersal order was given and it very

24    well could have been using our LRAD system, but considering

25    it wasn't our primary authority, that we were assisting, it

1    would have defaulted to either the Hennepin County Sheriff's

2    Office or one of the other departments assisting.

3    Q.  Would Minnesota State Patrol ever effectuate a mass

4    arrest without first issuing a dispersal?

5    A.  We would not.

6    Q.  Can you explain to the Court what was happening that

7    Friday night before the dispersal order was given.

8    A.  Much like some of the previous evenings, there was a

9    large congregation of a crowd.  It was volatile.  It was

10   violent at times.  The projectiles, the debris, a lot of

11   this was directed at the Brooklyn Center Police Department

12   even though the law enforcement contingent was removed from

13   the direct fence area and up towards the building, but there

14   were reports of, again, large items of debris, paint being

15   used.  And really what precipitated or the, I guess, flash

16   point, if you will, for the mass arrest was individuals

17   trying to breach the first fence that was erected.

18   Q.  The Court also heard testimony today from a member of

19   the media who was photographed on that Friday, April 16th,

20   and this is actually the testimony of Christopher -- now I

21   forget and I'm going to mispronounce his last name --

22   T-u-i-t-e.  Are you familiar with his testimony via his

23   declaration and videos?

24   A.  I have reviewed the declaration and videos.

25   Q.  Because I asked you to do that this morning?

1    A.  Yes, ma'am.

2    Q.  Can you describe for the Court what Minnesota State

3    Patrol was attempting to do in photographing members of the

4    media on Friday, April 16th.

5    A.  Certainly.  So there was no ill intent by photographing

6    individuals or press credentials.  It was really in an

7    effort to expedite the process to be able to log the

8    information and either confirm at a later time or have

9    documentation that we did indeed have contact with these

10   individuals, so there wasn't, you know, reports of

11   wrongdoing afterwards.

12   Q.  What was the purpose in the first place?  Why was there

13   a need to identify who these individuals were?

14   A.  So it's our standard protocol that everybody, like,

15   within a containment or that mass arrest situation, that

16   we're identifying all those individuals.  It's part of our

17   enforcement or arrest process.  Through the use of Intrepid

18   everybody has their photograph taken, a trooper will enter

19   individual notes, and then either they're released after

20   determining, you know, proper affiliation or they're

21   escorted to, you know, the enforcement line.

22   Q.  So those individuals who were photographed, they had

23   been caught -- they had been encircled in a mass arrest; is

24   that right?

25   A.  Yes, ma'am.

1    Q.  And had a dispersal order already been granted by that

2    time -- or had a dispersal order already been issued at that

3    time?

4    A.  That is correct.

5    Q.  And did members of the media know that it applied to

6    them?

7    A.  It is my belief that the dispersal order -- they should

8    have known, yes.

9    Q.  So those individuals being photographed, were they not

10   members of the media, were they otherwise subject to arrest?

11   A.  Yes, they would be.

12   Q.  Why?

13   A.  Because they were still present at the scene after

14   direct information was given them to leave the scene.

15   Q.  We heard testimony today from a photographer who had

16   refused to leave a mass arrest encirclement.  From a law

17   enforcement perspective, what is the problem with members of

18   the media remaining in an encircled area where a mass arrest

19   is being conducted?

20   A.  Really it complicates the entire process from an

21   efficiency standpoint, but also, again, as I previously

22   spoke to, it's this intermixing of people from different

23   affiliations, media, the public.  So trying to navigate

24   through that is troublesome.

25   Q.  Are there any safety issues presented by a member of the

1    media maintaining their presence within an encirclement?

2    A.  Without a doubt.  So even though that -- it's relatively

3    stabilized, it's still unpredictable within that

4    environment.  It's not uncommon for individuals to still

5    resist law enforcement in that environment.  So the process

6    of mass arrest is to form this encirclement, but then to

7    send controlled teams to effect an arrest and extract

8    individuals from the inside.

9    Q.  When Minnesota State Patrol troopers were directing

10   members of the media to remove themselves from the mass

11   arrest encirclement, did they do that for the purpose of

12   preventing them from doing their jobs as reporters?

13   A.  No, ma'am.

14   Q.  Why did they do it, then?

15   A.  It was really in an effort to remove them from the

16   unsafe environment and to provide them with an area to

17   continue their reporting in a safe area.

18   Q.  Well, could they continue that reporting just

19   immediately outside the encirclement area?

20   A.  We did allow that.

21   Q.  And so talk to me about that.  With regard -- you

22   mentioned providing a safe area.  Is that something that was

23   happening in Brooklyn Center?

24   A.  Every evening, yes.

25   Q.  Can you describe that to the Court.

1    A.  So even in one of our dispersal orders we had given

2    direction to go to a certain location because it was deemed

3    safe.  And we're at a little bit of an advantage because we

4    know our next move, and there were times where myself or

5    other commanders would have conversations with members of

6    the media, telling them that we're going to start effecting

7    arrests here and that this will be, you know, a safe

8    location for you, and those, obviously, were the ones that

9    were clearly identifiable with what we deemed, you know,

10   like mainstream credentialing.  And then there were other

11   times where they had to be extracted from that inside and

12   then a location was identified where they can continue their

13   coverage.

14   Q.  Is that a standard practice for Minnesota State Patrol,

15   to try to provide a safe area where media can continue their

16   coverage if they're located in an area that's not safe?

17   A.  It is.  It's something that we've been doing for a

18   number of years.  Also, like, at the State Capitol, that's

19   really where we've had the most exposure prior to

20   Minneapolis and Brooklyn Center, but there are times that we

21   are having conversations with our media partners and telling

22   them that maybe the best area is not right on top of the

23   demonstration.  So we will point out several locations.  It

24   might be across the street with elevation.  It might be at a

25   different vantage point.  But I think a lot of media

1    relations partners are trying to, like, capture from the

2    best vantage point to tell the story.

3    Q.  Major Dwyer, did you personally have any other direct

4    experiences with members of the media on the ground in

5    Brooklyn Center?

6    A.  Yes, I did.

7    Q.  Can you describe for the Court what that experience was.

8    A.  So there were multiple occasions where I would go out in

9    front of our line of troopers, so I was in between law

10   enforcement and the members of the crowd, but I would

11   initiate conversations with the media and let them know,

12   like, where safe locations were.

13          If they were in the middle of a mass arrest

14   situation, I would make contact with those, have the

15   troopers identify them, try to verify their credentialing,

16   and then as soon as possible, as soon as feasible, we would,

17   like, escort them out of that inner circle.  And then there

18   was an incident where I did intervene to prevent an arrest

19   of a media partner.

20   Q.  Can you describe that intervention for the Court.

21   A.  So it was on the evening of that Friday.  Another allied

22   agency -- so the encirclement had occurred.  A member of the

23   media was trying to get back to his vehicle.  He was

24   directed by a member of the allied agency to go around the

25   other side of the building.  There was noncompliance by the

1     individual from the media.  He wanted to go around what he

2     thought was the most efficient travel to his vehicle.  He

3     was directed again to go around the opposite side of the

4     building.  Again there was noncompliance.  At that time the

5     allied agency informed him that he was under arrest.

6             Having some experience and additional knowledge

7     about relationships of media and wanting to provide that

8     freedom of press, I intervened and said that I'll handle

9     this situation, despite putting me in an awkward situation

10    with a member of law enforcement, but then escorting him

11    around the building and to a safe location where he could

12    exit the encirclement.

13    Q.  Given the chaos that was happening at that time, why did

14    you choose to intervene?

15    A.  It's the right thing to do.  It's the -- not

16    everybody -- not every department possesses the same level

17    of knowledge in what I like to call the care and handling of

18    our media to ensure that their best interests are upheld.

19    Q.  Thank you, Major.  I have no further questions.

20    A.  Thank you.

21             THE COURT:  Cross examination?

22             MR. RIACH:  Thank you, Your Honor.

23             THE COURT:  You're welcome.

24

25

1          **CROSS EXAMINATION**

2     BY MR. RIACH:

3     Q.  Good afternoon, Major.  My name is Kevin Riach.  I'm an

4     attorney with the plaintiffs in this case.  Okay?

5     A.  Good afternoon, sir.

6     Q.  Just as a preliminary matter, you are Major Dwyer now,

7     correct?

8     A.  That is correct.

9     Q.  And during the George Floyd protests, you were a captain

10    at that time; am I correct?

11    A.  That is correct, sir.

12    Q.  So you were promoted between the George Floyd protests

13    and today, correct?

14    A.  That is correct.

15    Q.  When were you promoted?

16    A.  June 3rd of 2021.

17    Q.  Okay.  There was a purge of records at the State Patrol

18    immediately after the George Floyd protests; is that

19    correct?

20    A.  So there was a purge of e-mails and text messages,

21    correct.

22    Q.  All right.  What date was it that those materials were

23    purged?

24    A.  I don't have a recollection, sir.

25    Q.  It was immediately after the George Floyd protests,

1    though, correct?

2    A.  That is correct.

3    Q.  Was it before you demobilized on June 7th?

4    A.  It was not.

5    Q.  Okay.  It was after June 7th?

6    A.  I believe so, yes.

7    Q.  And the purge included e-mail correspondence, correct?

8    A.  Correct.

9    Q.  And text messages?

10   A.  Yes, sir.

11   Q.  Were any paper documents purged?

12   A.  They were not.

13   Q.  What other electronic records were purged?

14   A.  To my knowledge, none.

15   Q.  And who ordered that those records be purged?

16   A.  There's no order.  It's really a standard practice over

17   the course of time that we remove, you know, delete text

18   messages, delete e-mail messages.

19   Q.  And the text messages and e-mail messages that were

20   deleted, did that include any text messages and e-mail

21   messages sent during the George Floyd protests?

22   A.  It was all e-mails and texts.

23   Q.  Were any electronic reports that had been created during

24   the George Floyd protests destroyed?

25   A.  They were not.

1    Q.  And you said this is just an automatic purge that

2    happened?

3    A.  Periodically, correct.

4    Q.  How often does that happen?

5    A.  There's no set occurrence to it, it varies from person

6    to person, but it is a recommended practice.

7    Q.  Was this a state -- was this throughout the State Patrol

8    that records were destroyed?

9            MS. LANDRUM:  Objection, lack of personal

10   knowledge, calls for speculation.

11           THE COURT:  I don't understand your response.  You

12   said it was person to person?

13           THE WITNESS:  So it varies person to person, Your

14   Honor.  So one individual may purge documents on the 1st of

15   every month or, you know, remove them from their e-mail

16   server.  Another person may do it on the 15th.  There is no

17   set practice delineating this.  It varies individually.

18           THE COURT:  But it's automatic?

19           THE WITNESS:  No.  It is an act where individuals

20   delete their e-mail basket and then go into another layer of

21   the deleted folders and then remove from that server.

22           MR. RIACH:  May I inquire, Your Honor?

23           THE COURT:  Please.

24   BY MR. RIACH:

25   Q.  So help me understand this, Major.  Was this something

1    you did with your own records; is that correct?

2    A.  It was common practice through the agency, not just my

3    records.

4    Q.  Okay.  Let's start with you.  Okay?  You purged your

5    records sometime immediately after the George Floyd

6    protests, correct?

7    A.  I deleted my e-mails and text messages, correct.

8    Q.  All right.  Do you know of anyone else who deleted their

9    e-mails and text messages immediately after the George Floyd

10   protests?

11   A.  Yes, I do.

12            MS. LANDRUM:  Objection, calls for speculation,

13   lack of personal knowledge.

14            THE COURT:  It does not.  You may answer the

15   question "do you know."

16            THE WITNESS:  Yes, ma'am.

17            THE COURT:  You may proceed with your questioning.

18            MR. RIACH:  Thank you, Your Honor.

19   BY MR. RIACH:

20   Q.  Who else deleted their e-mails and text messages?

21   A.  So I will, I guess, offer speculation.  I don't --

22   didn't actually see them delete them, but I do believe a

23   vast majority of the agency.

24   Q.  So normal practice was kind of person to person, a

25   person might do this just to clear out their inbox.  In this

1    particular instance, though, most of the State Patrol

2    deleted at the same time?

3    A.  No.  It would have been, you know, following

4    according -- I can't speak to how everybody deleted their

5    e-mails.

6    Q.  What was your historic practice for deleting and

7    destroying your e-mails?

8    A.  Periodically.  You know, I don't have a set time of the

9    month.  It's just periodically.

10   Q.  Now, are there any record retention policies employed by

11   the State Patrol?

12   A.  There are.  We do have a retention schedule.

13   Q.  What's your retention schedule?

14   A.  Related to?

15   Q.  To e-mail correspondence.  Are you required to keep

16   e-mail correspondence for a certain period of time?

17   A.  We are not.

18   Q.  You can delete your e-mails any time you want?

19   A.  That is correct.

20   Q.  What about text messages, are you required to keep your

21   text messages for any period of time?

22   A.  We are not.

23   Q.  You can delete those any time you want?

24   A.  That is correct.

25   Q.  All right.  And you just decided, shortly after the

1    George Floyd protests, this would be a good time to clean

2    out my inbox?

3    A.  It is consistent with events, large-scale or otherwise,

4    we periodically delete our inboxes.

5    Q.  So after a large-scale event, mass unrest, it's your

6    practice to delete all your e-mails?

7    A.  I periodically delete my e-mails.

8    Q.  Were any of the records that you deleted reviewed to

9    determine if they had any bearing on this case?

10   A.  Other than myself?

11   Q.  Did anyone review what you deleted to determine whether

12   it was relevant to this case?

13   A.  No, they did not.

14   Q.  You were aware that this case had been filed, though, at

15   the time the materials were deleted, correct?

16   A.  I was aware that there was litigation and I retained my

17   records in relation to a litigation hold.

18   Q.  When was the litigation hold placed?

19   A.  I'd have to have my memory refreshed.

20   Q.  That was after the purge, correct?

21   A.  Again, I don't remember the exact date.

22            THE COURT:  When you say you retained your

23   records, are you also including your e-mail as your records?

24            THE WITNESS:  No, ma'am.  So we have, again,

25   several folders on a server.  And specifically to myself and

1    operations, any type of operational plan or anything as far

2    as rosters or pertinent information relevant to the events,

3    they would be kept in those folders or files.  As far as

4    generic or benign e-mails between one another or members,

5    those are the items that are deleted.

6    BY MR. RIACH:

7    Q.  So I want to make sure I understand you correctly.  Some

8    of your e-mails were saved?

9    A.  No, sir.

10   Q.  Everything you had in your inbox was destroyed shortly

11   after the George Floyd protests?

12   A.  So different platforms.  We're talking about Outlook.

13   So everything that's within that system, that was deleted.

14   That doesn't mean that there's not a record of it or, you

15   know, if there's an attachment or something relevant to the

16   operational needs, that those are not -- those would be

17   saved in a separate folder.

18   Q.  And did you communicate with the other troopers that are

19   under your command about deleting their inboxes?

20   A.  There are reminders by district commanders and

21   supervisory staff at various times to clean up their Outlook

22   folders.

23   Q.  Did you speak with any of your lieutenants about them

24   deleting their e-mails shortly after the George Floyd

25   protests?

1    A.  I don't have a recollection, but it's not out of the

2    realm of possibility.

3    Q.  All right.  Now, troopers were instructed at some point

4    during the George Floyd protests that they did not need to

5    complete use of force reports, correct?

6    A.  That is correct.

7    Q.  And who provided that instruction?

8    A.  It was an assessment made by the MACC or the

9    Multi-Agency Command Center.  And given the chaotic

10   nature -- so I should say on the first day that we were

11   there, there wasn't any use of force.  On the second day

12   there were four individual uses of direct impact rounds, and

13   those were captured by use of force reports.

14          After that period of time, use of force reports

15   weren't documented given the really unprecedented chaotic

16   environment and an inability to track the munitions used by

17   individual members, considering the violence that was

18   portrayed against us.

19   Q.  So let me just make sure I'm clear here.  Were troopers

20   instructed that they didn't have to complete use of force

21   reports or were they told do not complete use of force

22   reports?

23   A.  I don't recall the exact conversation.  I just know that

24   the number of instances where riot control agents were used

25   were so vast that -- unable to document the use of force.

1      Also, unchartered territory or waters.  Like for our agency,

2      considering, like, we're -- typically we know the

3      individuals engaged in force against us.  So if there was an

4      individual that was throwing debris or other objects or

5      engaged in violence against us, in an effort to curb that,

6      it is best practice to use like a direct marking round so

7      that individual is marked and possibly arrested later, but

8      there are times where they abscond and that individual isn't

9      identified.  So it would -- potentially there is the

10     scenario where you're completing a use of force report where

11     there's no information.

12     Q.  Were there any use of force reports completed, to your

13     knowledge, after the instruction was given not to fill out

14     use of force reports?

15     A.  So there were -- to my knowledge, no.

16     Q.  All right.  Now, you did prepare a summary report, kind

17     of a day-by-day catalog, of the things that happened during

18     the protests, correct?

19     A.  I did complete a commander's report, yes.

20     Q.  Okay.  That's called a commander's report?

21     A.  That's what I titled it, sir.

22     Q.  And that included a summary of the events that happened

23     on May 30th, correct?

24     A.  Yes.

25              MR. RIACH:  Your Honor, I want to make sure

1    that I'm clear here in the use of this exhibit.  Defense

2    Exhibit 7, I believe, was a redacted version of that

3    commander's report.

4              MS. LANDRUM:  That's correct.

5              MR. RIACH:  And that's something that we can

6    display right now without clearing the courtroom; is that

7    correct?

8              MS. LANDRUM:  That's correct.

9              MR. RIACH:  Okay.  Ms. Anderson, can you call up

10   Defense Exhibit 7, please.

11   BY MR. RIACH:

12   Q.  Now, can you -- well, first of all, Major Dwyer, do you

13   recognize this document?

14   A.  I do.

15   Q.  This is your commander's report, yes?

16   A.  Yes, sir.

17             MR. RIACH:  We would move admission of Defense 7.

18             MS. LANDRUM:  No objection, Your Honor.

19             THE COURT:  Exhibit 7 is received.

20             MR. RIACH:  Thank you, Your Honor.

21             Can you scroll ahead to the third page, please,

22   and can you pull out the second paragraph, Ms. Anderson, the

23   second paragraph under the date May 30th.  There you go.

24   BY MR. RIACH:

25   Q.  Can you see that up there, Major?

1    A.  Yes, I can, sir.

2    Q.  Very good.  So this is a description of what happened

3    that day that you recorded for posterity in your commander's

4    report, correct?

5    A.  That is my narrative report to capture the events, yes.

6    Q.  Okay.  You testified about the 30th of May during your

7    direct examination by Ms. Landrum, correct?

8    A.  Yes, sir.

9    Q.  And I just want to kind of briefly run through -- I have

10   a couple of questions about the report.  Okay?

11   A.  Sure.

12   Q.  So you and your team of troopers, all the troopers that

13   were deployed to the Fifth Precinct that day, you drove over

14   there on some Metro Transit buses; is that correct?

15   A.  That is correct.

16   Q.  Okay.  And then the buses dropped you off at the

17   intersection of 32nd and Nicollet; is that right?

18   A.  That is my recollection, yes.

19   Q.  And then you disembarked from the buses and formed a

20   line; is that correct?

21   A.  Yes.

22   Q.  Okay.  And upon forming that line, you began to get hit

23   with debris; is that correct?

24   A.  Yes.

25   Q.  So it says here you were taking large amounts of

1    projectiles, correct?

2    A.  Yes, sir.

3    Q.  And that included rocks, yes?

4    A.  Yes.

5    Q.  Bricks?

6    A.  Yes.

7    Q.  Fireworks were being thrown at you?

8    A.  They were being launched, yes.

9    Q.  Water bottles were being thrown at you?

10   A.  Yes.

11   Q.  Glass bottles were being thrown at you?

12   A.  Correct.

13   Q.  Construction debris?

14   A.  Yes.

15   Q.  When you say "construction debris," what are you talking

16   about there?

17   A.  So adjacent to this area, it's in proximity to I-35,

18   which was under construction, so I'm speculating that it

19   came from that area.  Otherwise, I guess construction debris

20   would include, you know, landscaping or other items in that

21   general vicinity that people would gather.

22   Q.  Were people throwing concrete blocks at you?

23   A.  Not, like, traditional concrete blocks, no.

24   Q.  Like chunks of concrete from construction?

25   A.  Yes.

1    Q.  What about, like, pieces of rebar, you know, those metal

2    bars that go in concrete, was some of that being thrown at

3    you as well?

4    A.  There was metal debris, yes.

5    Q.  Okay.  And then in response to this, to clear out that

6    area you deployed some crowd control munitions, correct?

7    A.  Riot control agents, yes.

8    Q.  So the debris is coming in on you and you decided we

9    need to clear these people out, let's use some crowd control

10   munitions; is that how it played out?

11   A.  So there was a dispersal first.

12   Q.  Okay.

13   A.  There was crowd behavior, which included their acts --

14   Q.  Okay.

15   A.  -- a dispersal order, and then riot control agents.

16   Q.  Okay.  So the debris is getting thrown, you fire the

17   crowd control munitions, and then you start to move forward;

18   is that correct?

19   A.  Debris, dispersal.

20   Q.  Okay.  Debris, dispersal, munitions, and then the line

21   moves forward?

22   A.  Correct.

23   Q.  Okay.

24        MR. RIACH:  Can you take down this exhibit,

25   please, Ms. Anderson, and can you please bring up

```
1    Plaintiffs' Exhibit 14.

2    BY MR. RIACH:

3    Q.  That's the Ed Ou video.  I believe you said you reviewed

4    this earlier today?

5    A.  Yes, sir.

6            MR. RIACH:  Can you just pause that at 14 seconds.

7    You can scoot it ahead there.  Can you advance maybe like a

8    frame or two.  Go one more.  There we go.

9    BY MR. RIACH:

10   Q.  Can you see that up there, Major Dwyer, this picture of

11   the scene?

12   A.  I can.

13   Q.  Okay.  So behind you is the buses that you were deployed

14   from, correct?

15   A.  Yes.

16   Q.  And then this is the line you formed, right?

17   A.  Yes.

18   Q.  Okay.  Now, there's no debris on the ground at this

19   point, so this must have been before things were being

20   thrown at you, correct?

21   A.  That is our initial line, yes.

22   Q.  All right.  So do you see any debris on the ground

23   there?

24   A.  Not in the forefront.

25   Q.  Do you see any construction debris, either behind or in
```

 1    front of you?

 2    A.  I do not.

 3    Q.  Do you see any glass bottles on the ground?

 4    A.  No, I don't.

 5    Q.  Do you see any water bottles?

 6    A.  No, sir.

 7    Q.  Do you see any rocks?

 8    A.  I don't.

 9    Q.  Do you see any spent fireworks?

10    A.  I don't.

11    Q.  Okay.

12              THE COURT:  Counsel, before you move, if you're

13    planning to progress, let's just note where you are in this

14    visual.

15              MR. RIACH:  Sure.  I believe we're at 25 seconds

16    in the video, Your Honor.

17              THE COURT:  Thank you.

18    BY MR. RIACH:

19    Q.  So all that must have come flying at some point after

20    this frame in the video, correct, Major?

21    A.  Yes.

22    Q.  Okay.

23              MR. RIACH:  Can you go ahead and play the video,

24    Ms. Anderson.

25    BY MR. RIACH:

1   Q.  Tell us to pause the video when you see the debris start

2   to fly.

3        (Video recording played)

4            MR. RIACH:  Can you pause it there, Ms. Anderson.

5   BY MR. RIACH:

6   Q.  Can you direct me to where the debris is located there

7   in front of your line?  Is there any debris there?

8   A.  I don't see anything to the front there, sir.

9            THE COURT:  And you are paused at what point in

10  the video?

11           MR. RIACH:  We are paused at 1 minute and

12  10 seconds, Your Honor.

13           THE COURT:  Just so counsel knows, I'm a former

14  appellate judge --

15           MR. RIACH:  I appreciate that.

16           THE COURT:  -- so I am looking at the record with

17  that lens in mind, perhaps prematurely thinking that there

18  may be some other judges that may also be interested in this

19  transcript.  So that's the reason for me interrupting.

20           MR. RIACH:  I very much appreciate it.  And, quite

21  frankly, at this point in the day, I'm not too sharp on

22  these kinds of things, so I very much appreciate you

23  stopping me, Judge.  Thank you.

24  BY MR. RIACH:

25  Q.  So there are munitions being fired, though, correct?

1    A.  There are.

2    Q.  So your prior testimony that you were being hit with

3    rocks, glass bottles, water bottles, construction debris,

4    chunks of concrete, that is not accurate, correct?

5    A.  I wouldn't say it's inaccurate.  It's not depicted on

6    this video.  So there is this period of time and I can't say

7    that there's -- I'm not seeing anything in the foreground

8    here on the video, but there's from 25 seconds to when the

9    camera pans a different angle that's unaccounted for.

10   Q.  So that was that -- when the camera panned, that was

11   when the debris rained down on you?

12   A.  I can't say for sure, sir.  I know that there was debris

13   being thrown.  In looking at this, perhaps it didn't reach

14   that initial line, but it's not any depiction of what's

15   happening to the south of us -- or to the north of us,

16   excuse me.

17   Q.  Well, your report says you were taking large amounts of

18   projectiles, which included rocks, bricks, fireworks, water

19   bottles, glass bottles, and construction debris.  And we

20   just discussed in your testimony that that occurred and then

21   the dispersal order was given and then less lethal munitions

22   were fired.  So what I'm trying to understand is:  Where is

23   the debris?  Can you point out to me the debris that was

24   landing on you?

25   A.  I'm not going to be able to point it out on this video,

1    sir.

2    Q.  But you stand by this report as an accurate report of

3    what happened that day?

4    A.  It is a recollection of events that transpired.

5    Q.  Okay.  So it might not be accurate is what you are

6    telling me?

7    A.  It's a recollection of events that had transpired in

8    that vicinity.

9          MR. RIACH:  Okay.  Can you go ahead and press

10   play.

11      (Video recording played)

12         MR. RIACH:  Can you -- I'm sorry, Ms. Anderson.

13   Can you pause.  We're at 1 minute 29, Your Honor.  Can you

14   scroll back just kind of frame by frame, Ms. Anderson.  I

15   promise not to spend too much time on this, but I just want

16   to see something here.  Go back another one.  Go back one

17   more maybe.  Go forward.

18         MS. ANDERSON:  Frame by frame?

19         MR. RIACH:  Yeah, just go forward one frame.

20   Well, go ahead and just play the whole thing.

21      (Video recording played)

22         MR. RIACH:  All right.  Pause it right there.

23   Sorry.  I'm sorry.

24   BY MR. RIACH:

25   Q.  Do you see that individual kind of to the right part of

1    the frame?

2    A.  Yes, sir, I do.

3    Q.  Does that individual -- is there anything about that

4    individual that suggests he might be a journalist?

5    A.  I see the camera.

6    Q.  Do you see anything on his clothing?

7    A.  I see on his back there may be some identifying marking,

8    but I can't read what it says, sir.

9    Q.  Okay.  If he had a big sign on him that said, "Press,"

10   would that be something you would consider an indicator that

11   he might be a journalist?

12   A.  That would be one element, yes.

13   Q.  Okay.  That's one element.  The fact that he's got kind

14   of a professional-looking camera and he is taking

15   photographs, is that another element?

16   A.  Yes, sir.

17   Q.  He's not participating in the protests, correct, or do

18   you consider that to be participation in the protests?

19   A.  So there's a dispersal order that's given to this

20   vicinity, so I would say that he's engaged in the area where

21   riotous behavior was occurring.

22   Q.  Okay.  What was the riotous behavior that was occurring

23   right before you fired those munitions?

24   A.  And, again, it's probably outside of the shot here.  My

25   recollection is there's this riotous venue that's occurring.

1          MR. RIACH:  Okay.  Go ahead and --

2          THE COURT:  And all this testimony pertains to

3     this exhibit at 1:22?

4          MR. RIACH:  Correct, Your Honor.  Thank you.

5       (Video recording played)

6          MR. RIACH:  You can pause it there, Ms. Anderson.

7     BY MR. RIACH:

8     Q.  At this point we haven't seen any debris come flying

9     across the screen, have we?  We've paused at 1 minute and

10    47 seconds.  Have you seen any construction debris flying

11    through the air?

12    A.  No, sir.

13         MR. RIACH:  You can take this exhibit down.

14    BY MR. RIACH:

15    Q.  Now, you had an operational plan in place when you

16    arrived at 32nd and Nicollet on May 30th, correct?

17    A.  Yes.

18    Q.  And the plan was to execute a mass arrest, right?

19    A.  That was developed, yes, upon prior knowledge of knowing

20    that the crowd was there, realizing that the Kmart parking

21    lot is there, yes.

22    Q.  But before you got there on the buses, you already

23    planned to effectuate a mass arrest, correct?

24    A.  There were conversations about that based on the curfew

25    violation, yes.

1   Q.  And before you could effect that mass arrest, you had to

2   disperse the crowd for operational purposes, correct?

3   A.  So they go hand in hand, you know, there's a dispersal

4   and then there's an arrest process.  They can also be

5   separated.  They can -- you can just give dispersal orders

6   and let the crowd continue and then, as previously stated,

7   that pushes the problem into a different area or a different

8   day.  But, yes, given what we were faced that day, it was to

9   disperse into the area to the north.

10  Q.  All right.  Just to come back to the question, the plan

11  was you were going to go down there and effectuate a mass

12  arrest, correct?

13  A.  That's my recollection.

14  Q.  And as part of that plan you had to disperse the crowd,

15  to drive them towards the Kmart parking lot because that's

16  where you were going to effectuate the mass arrest, correct?

17  A.  Yes, sir.

18  Q.  Okay.  And that was all decided before you even arrived,

19  correct?

20  A.  We had those conversations, yes.

21  Q.  All right.  As a matter of fact, you had conversations

22  that the plan was to use shock and awe to subdue the

23  protesters, correct?

24  A.  So that was a term or a military term that was assigned

25  to it afterwards, and I don't even recall where that

1    assignment occurred.

2    Q.  Well, when you briefed the troopers before you went down

3    there, you told them that you were going to use the tactic

4    of overwhelming power and spectacular displays of force,

5    correct?

6    A.  I don't recall that being my direction.

7    Q.  That's not what you told the troopers?

8    A.  I don't recall, sir.  We have briefings on the front

9    side of it and there are, you know, conversations that occur

10   to get the mind-set of the troopers aligned with what's

11   going to occur.

12   Q.  The plan was to paralyze the opposition to regain

13   control; is that correct?

14   A.  I don't recall those being my words.

15   Q.  Okay.  So if that was the message that someone took away

16   from that briefing, would that have been an incorrect

17   message?

18   A.  That is correct.

19   Q.  Okay.  They misunderstood you?

20   A.  I don't ever recall using that terminology.

21   Q.  Okay.  You had been told, however, that the governor

22   wanted the unrest to end that night, correct?

23   A.  I was told, and I had also heard that law enforcement

24   would have a different posture.

25   Q.  An offensive posture?

1    A.  A different posture than previous nights.

2    Q.  You were -- you briefed your troopers that they were to

3    use all necessary force to end the protests, correct?

4    A.  I do not recall "all necessary."  We would use tools

5    that we had to quell the riotous behavior.

6    Q.  So if that was a trooper's understanding when they

7    arrived at that scene under your command, they misunderstood

8    the instructions you gave them?

9    A.  Yes, sir.

10   Q.  Okay.  Now, you did not inform the troopers that the

11   media was exempt from the curfew that night, correct?

12   A.  There were conversations about media.  Actually, so we

13   did have conversations that there was a media exemption.

14   Q.  Let me clarify my question because it was a little

15   unclear.  You provided a briefing before you deployed out

16   that night, correct?

17   A.  Yes.

18   Q.  You gathered together in a room with your troopers, yes?

19   A.  Given the large amount, it was outside, yes.

20   Q.  Okay.  But you spoke to the group of troopers to tell

21   them what the mission was, right?

22   A.  Yes, sir.

23   Q.  Okay.  And as part of that conversation, you didn't

24   discuss with them that media were exempt from the curfew,

25   correct?

1   A.  Personally, I did not.

2   Q.  Okay.  And you hadn't given that cautionary instruction

3   to them any of the nights, did you?

4   A.  So my memory of that is we had conversations at the

5   command level, at the captains level.  So I am one of the

6   commanders.  That information was communicated from the

7   captains to the lieutenants, that there was -- they were

8   exempted from the curfew, but they were not exempted from a

9   dispersal order.

10  Q.  And you had talked with your lieutenants about that?

11  A.  So I had a conversation with my peer group of commanders

12  and then that message was relayed to the lieutenants, who in

13  turn would relay it to the troopers.

14  Q.  When you say "was relayed," were you the person who

15  relayed that message?

16  A.  To my peer group, yes.

17  Q.  To the lieutenants?

18  A.  Not personally, no.

19  Q.  Whose job was it to relay that information to the

20  lieutenants?

21  A.  The other co-commanders.

22  Q.  Okay.  So if the message wasn't conveyed, it was because

23  they didn't convey it, correct?

24  A.  I'm -- I don't understand, sir.

25  Q.  If the lieutenants didn't learn that press was exempt

```
1    from the curfews, that was because the other commanders you

2    are talking about didn't inform them, correct?

3    A.  I would not agree with that, sir.

4    Q.  Okay.  Well, whose fault was it that the lieutenants

5    didn't know the media was exempt from the curfew?

6              MS. LANDRUM:  Objection, assumes facts, Your

7    Honor.

8              THE COURT:  Sustained.  You may lay a foundation

9    and then ask that question, if you can.

10             MR. RIACH:  At this point in time I'm going to

11   pull up -- ask Ms. Anderson to pull up an attorneys' eyes

12   only marked document, Your Honor, so to the extent we need

13   to clear -- I think there may only be one individual.

14   Sorry, Mr. Tuite.

15       (Mr. Tuite excused from courtroom)

16             MR. RIACH:  Can you pull up Plaintiffs'

17   Exhibit 43, please, Ms. Anderson.  Thank you.

18             MS. LANDRUM:  Your Honor, if I may be heard on

19   this exhibit?

20             THE COURT:  You may.

21             MS. LANDRUM:  Your Honor, Exhibit 43, not only is

22   it an attorneys' eyes only internal investigation document,

23   but on the face you can see that it is a transcript of an

24   interview with Timothy Salto.  So to the extent that counsel

25   is currently trying to impeach my witness with that
```

1    testimony, it would be improper impeachment.  You can't

2    impeach one witness with the testimony of another one.

3    Likewise, this is hearsay evidence as well.  He also can't

4    refresh the recollection of my witness with the testimony --

5    hearsay testimony of another individual.  So for all these

6    reasons this line of questioning is inappropriate.

7              THE COURT:  Do you wish to be heard?

8              MR. RIACH:  Your Honor, I'm kind of in a bind here

9    because the objection to my last question was that we

10   assumed facts not in evidence, we're assuming facts -- we're

11   assuming the fact in my last question that the lieutenants

12   did not know about the curfew order.

13             Now I have an exhibit here that's a transcribed

14   internal affairs interview with one of Major Dwyer's

15   lieutenants where he explains he didn't know there was a

16   curfew in place.  And there are other such statements in

17   these internal affairs interviews.  I can't call this

18   lieutenant because of the nature of this proceeding.  So I'm

19   kind of stuck where we are right now with my ability to even

20   dwell on this topic with Major Dwyer.

21             If the Court will allow the submission of the

22   internal affairs documents related to May 30th in connection

23   with the briefing, we can point out to the Court the gaps in

24   the understanding of the troopers that were under Major

25   Dwyer's command that I have been discussing over the past

 1    five or ten minutes.

 2            But I'm a little stuck right now with my ability

 3    to discuss this fact, but I think it's important for the

 4    Court to be aware of what was communicated to the troopers

 5    before they deployed.  That's the reason why I'm bringing up

 6    this issue at all.

 7            THE COURT:  And so is this impeachment or is

 8    there -- when you say you can't bring this evidence in,

 9    can't you subpoena a witness?

10            MR. RIACH:  We were limited by the number of

11    witnesses we could bring in today and, frankly, we wanted to

12    make sure we presented several journalists' story, so we

13    asked two journalists to testify.  That was definitely a

14    choice of ours.

15            But I do think this evidence is important for the

16    Court to see.  We can submit it on paper and argue about it

17    there.  If the Court is going to sustain the objection and

18    we want to move on, I understand, but I think this is

19    material that's relevant to the decision that needs to be

20    made on the motion.

21            THE COURT:  Counsel?

22            MS. LANDRUM:  Thank you, Your Honor.  Even if

23    Mr. Salto was on the stand right now, he could not testify

24    as to what every trooper on the ground knew in May of 2020,

25    which was every trooper in the state of Minnesota.  What the

1    Major has testified to is the command structure and how that

2    information is disseminated, and that's his personal

3    knowledge.

4            And plaintiffs are limited to the witnesses that

5    they have put on.  Simply because this is a preliminary

6    injunction hearing does not mean that every piece of

7    evidence in the world that is possibly relevant is now

8    admissible.

9            For purposes of admitting evidence, there needs to

10   be a witness for which foundation is laid.  This exhibit is

11   objectionable and should not be considered for multiple

12   reasons, and it certainly cannot refresh his recollection or

13   impeach this particular witness.

14           And the idea that all of these pieces of evidence

15   pertaining to this IA investigation would become relevant is

16   completely divorced from the principles of the rule of law

17   on evidence and how evidence is supposed to be submitted and

18   considered.  There is no witness that could put this hearsay

19   evidence in.

20           THE COURT:  Well, for purposes of refreshing

21   recollection, you can refresh one's recollection with a ham

22   sandwich.  So the question is whether this would -- looking

23   at this document would refresh the witness's recollection.

24   It may or may not.

25           MS. LANDRUM:  Your Honor, if it's limited to that

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1    and this is not admitted into evidence and it's not read

2    into the record and rather the Major is allowed the time to

3    read whatever portions he would want him to read -- there is

4    a significant concern with that inasmuch as this is an

5    attorneys' eyes only document that typically Major Dwyer

6    would not have access to until this investigation is

7    finalized.  So that's the reason why we submitted our motion

8    in limine in the first place.  There's so many reasons as to

9    why this evidence is particularly troublesome to be

10   considered here.

11          MR. RIACH:  Your Honor, this exhibit is

12   inadmissible under the Rules of Evidence.  It's true that it

13   is.  The question is whether or not it contains information

14   that's relevant to the Court's determination, just like some

15   of the materials that were submitted by affidavit in support

16   and opposition of the preliminary injunction motion were not

17   admissible -- would not have been admissible unless they had

18   a witness testifying about them.

19          So we're back to the principle of what is

20   important for the Court to see.  Even if it's not admissible

21   in kind of the trial context where the Rules of Evidence are

22   strictly applied, what's the information that the Court

23   should see before it makes its decision.

24          I would note that this document has been produced

25   to us by the State.  It's a transcription of a recorded

1    interview by a state investigator.  I assume it is what it

2    is and that it has some indicia of reliability simply

3    because the State produced it in discovery, representing it

4    was a document from the State that was in their custody and

5    control that was part of their operation.

6             But I think -- I am going to move on, Your Honor,

7    and resolve this conundrum for everyone because, frankly,

8    it's just going to take us too long to fight about this.  We

9    should be talking about other things.  So I apologize for

10   taking up the time with this and I will move on.

11            THE COURT:  Okay.

12   BY MR. RIACH:

13   Q.  Major Dwyer, you testified during your direct

14   examination that at Daunte Wright protests you had seen some

15   clearly identifiable journalists, you went to them and told

16   them to move to a safer place.  Do you recall discussing

17   that in your direct testimony?

18   A.  Yes, sir, I do.

19   Q.  What was it about those journalists that made them

20   clearly identifiable?

21   A.  Either previous contact with them, recognition from one

22   of the metro stations.  Otherwise a verifiable press

23   credential that I saw affiliated with a station or

24   reporting.

25   Q.  So you could see on these individuals a press

1    credential, and that indicated to you they might be a member

2    of the press.  Then you went and spoke with them and you

3    confirmed they were a member of the press.  Is that how it

4    went with some of these folks?

5    A.  Yes, sir.

6    Q.  Okay.  And when you say "a verifiable credential," what

7    did you do to verify the credentials of these individuals

8    you spoke with?

9    A.  Given the environment, you know, if it proceeded to a

10   mass arrest situation, that's probably where the verifiable

11   came in, but having some knowledge of what Fox or KARE 11 or

12   those stations' logos, they seemed legitimate as I looked at

13   those and talked to them.

14   Q.  All right.  Now, you are familiar with the arrest of

15   Carolyn Sung, correct?

16   A.  I am.

17   Q.  You discussed that in your declaration you filed in this

18   case, right?

19   A.  Yes.

20   Q.  Okay.

21            MR. RIACH:  And let's pull up Exhibit 37.

22   BY MR. RIACH:

23   Q.  Do you recognize this document, Major Dwyer?

24   A.  Yes, I do.

25   Q.  All right.

1           MR. RIACH:  And, Ms. Anderson, can you move ahead

2    to page 8.  Thank you.

3    BY MR. RIACH:

4    Q.  That's your signature, correct, sir?

5    A.  Yes, sir, it is.

6    Q.  All right.

7           MR. RIACH:  Your Honor, we would move admission of

8    Plaintiffs' 37.

9           MS. LANDRUM:  No objection, Your Honor.  It's

10   already filed in this case.

11          THE COURT:  Exhibit 37 is received.

12          MR. RIACH:  Thank you, Judge.

13          MR. RIACH:  So can you turn back to page 5,

14   please, of this exhibit, Ms. Anderson.  Thank you.

15   BY MR. RIACH:

16   Q.  Paragraph 14 of this declaration relates to Ms. Sung,

17   correct?

18   A.  It does.

19   Q.  All right.  And it states you're aware of plaintiffs'

20   claim that CNN reporter Carolyn Sung was arrested by MSP

21   troopers on April 13th after she repeatedly offered her

22   press credentials, correct?

23   A.  Yes, sir.

24   Q.  Okay.  And it states, "Ms. Sung did not have her press

25   credentials on her person, nor was she clearly identifiable

1    as press."  That -- is that information that you got from

2    your troopers?

3    A.  Yes, it is.

4    Q.  And which troopers did you talk about this arrest with?

5    A.  So I had a conversation actually again with one of my

6    peers, and that was a fellow captain and he informed me of

7    the situation.  As far as the specific troopers involved, I

8    believe it was one of the troopers from the Detroit Lakes

9    district, but that's trying to recall.

10   Q.  Okay.  So you talked to the captain who supervised these

11   troopers, but not the troopers themselves; is that correct?

12   A.  So we were made aware of the arrest of Ms. Sung after

13   the fact.  So from our standpoint, myself and my captain

14   partner, we were trying to decipher or find out the timeline

15   of where Ms. Sung was at.  And as soon as, like, her

16   credentials were matched up with her -- she had already

17   progressed through the processing line without credentials

18   and without identification, but as soon as that was made

19   known to us, she was taken off site to a location to reunite

20   with her reporting team.

21   Q.  All right.  So you were present on the night of

22   April 13th when Ms. Sung was arrested?

23   A.  I was in Brooklyn Center, yes.

24   Q.  Okay.  And I just want to make sure I'm understanding

25   your testimony correctly.  So some of this information

1    that's in paragraph 14 comes from your experiences on

2    April 13th dealing with the arrest of Ms. Sung; is that

3    accurate?

4    A.  Dealing with the individual's information relayed to me

5    who had --

6    Q.  Okay.  So you got information that a CNN journalist had

7    been arrested, her name was Carolyn Sung.  Who gave you that

8    information?

9    A.  One of my fellow captains.

10   Q.  All right.  And you get this information from your

11   captain.  What did you do next?

12   A.  So then he was assigned to find out the location of this

13   individual or if Ms. Sung had proceeded through the

14   processing line; and once we were able to determine if that

15   occurred, then we were able to match her up with her

16   reporting team.

17   Q.  So you set about trying to find out if she was still on

18   site at the protests, that was your first step; is that

19   correct?

20   A.  That was assigned to a captain, yes.

21   Q.  Okay.  And it was determined that she was still on site,

22   correct?

23   A.  That is my belief.

24   Q.  Okay.  And it's your understanding that then she was

25   reunited with her reporting team?

1    A.  Correct.

2    Q.  And you're confident that you have the whole story

3    there?

4    A.  That's my understanding, yes.

5    Q.  You write she was apparently separated from her

6    backpack.  How did she get separated from her backpack; do

7    you know?

8    A.  I do not.

9    Q.  Okay.  You're not aware of troopers grabbing her by the

10   backpack and throwing her to the ground?

11   A.  No.

12   Q.  The captain didn't convey that information to you?

13   A.  That's not information I have.

14   Q.  Are you aware that a trooper yelled at her, "Do you

15   speak English?"

16   A.  I am not aware of that.

17   Q.  You didn't hear anything about that?

18   A.  I did not.

19   Q.  Okay.  Do you know Ms. Sung is Asian?

20   A.  I do not.

21   Q.  Okay.  And you state, "Ms. Sung was released immediately

22   after her media status was confirmed," correct?

23   A.  It is my belief that she was transported to one of our

24   district offices off site to be reunited.

25   Q.  So she wasn't transported to the Hennepin County Jail,

```
1     that's your understanding?

2     A.  That is my understanding, yes.

3     Q.  She wasn't patted down and searched at the Hennepin

4     County Jail?

5     A.  I do not have that information.

6     Q.  There was no correction officer who put her hands into

7     Ms. Sung's pants and bra, you never heard about that?

8     A.  I never heard that, sir.

9     Q.  You never heard that she was told to strip and put on an

10    orange uniform?

11    A.  I did not hear that, sir.

12    Q.  Okay.  Did you hear that she was placed in a jail cell?

13    A.  I did not.

14    Q.  Okay.  Did you talk to Commissioner Schnell about this

15    incident at all?

16    A.  I did not.

17    Q.  He never reached out to you and said, "I'm investigating

18    an incident involving Carolyn Sung"?

19    A.  I do not have that knowledge.

20    Q.  Okay.  Did you talk to him about this declaration?

21    A.  To Mr. Schnell?

22    Q.  Correct.

23    A.  I did not.

24    Q.  Okay.

25              MR. RIACH:  You can take that down.  Thanks,
```

1    Ms. Anderson.

2              Your Honor, I want to make sure I'm not trying the

3    Court's patience here.  I have maybe 15 more minutes, 20

4    more minutes.  Is that going to sit me in bad stead?

5              THE COURT:  And that would be the conclusion of

6    any evidence from any party; is that correct?

7              MS. LANDRUM:  Your Honor, typically I would like

8    to do a redirect examination to address several of these

9    topics.

10             THE COURT:  So you may have until 5:35, and then

11   we'll have redirect and then we will conclude this hearing.

12             MR. RIACH:  Understood, Your Honor.  Thank you

13   very much for your patience and forbearance.  It's much

14   appreciated.

15   BY MR. RIACH:

16   Q.  When did you first become aware of the temporary

17   restraining order in this case, Major?

18   A.  It was the day following April 16th -- or the mass

19   arrest at Brooklyn Center.  So April 15th?

20             MR. RIACH:  Ms. Anderson, can you pull up -- I

21   want to make sure that we don't pull up an AEO document

22   inadvertently.  I think we're okay.  Ms. Anderson, can you

23   pull up Plaintiffs' Exhibit 27, please.

24   BY MR. RIACH:

25   Q.  This is -- Exhibit 27 is an e-mail from Matt Sokol.  The

1    top e-mail is from Matt Sokol to DPS patrol captains and

2    above from April 17th.  Is this the e-mail that -- where you

3    learned of the TRO?

4    A.  I believe it says a TRO attachment, so yes.

5    Q.  You are on this distribution list, I guess is my

6    question?

7    A.  Yes, sir, I am.

8    Q.  All right.  And you don't recall hearing about the TRO

9    before this e-mail was sent out, correct?

10   A.  Not in the field, no.

11   Q.  When you're out in the field, how often do you

12   communicate with your supervisors?

13   A.  So it's at that point situational dependent.  When we

14   are engaged in an operation, if you will, we will deploy and

15   implement our operation.  If there's something where we need

16   assistance or contact with our supervisor, we will initiate

17   that.

18   Q.  And how do you communicate with your supervisors when

19   you're out in the field?

20   A.  Typically by cell phone.

21   Q.  Okay.  You have your cell phone on you when you're out

22   there?

23   A.  Yes, sir.

24   Q.  Do you recall talking to your supervisors at all on the

25   evening of April 16th?

 1    A.  I'm sure there were multiple conversations.

 2    Q.  You don't recall anybody mentioning the temporary

 3    restraining order during any of those conversations?

 4    A.  I do not.

 5    Q.  Okay.  Now, you talked on your direct about documented

 6    instances of individuals who claimed to be press.  Do you

 7    remember discussing that?

 8    A.  Yes, I do.

 9    Q.  Okay.  And as an attachment to your declaration, you

10    attached police reports related to the documentation of

11    those incidents, correct?

12    A.  Yes, sir.

13    Q.  Other than those particular reports, were there any

14    other documented instances to your knowledge?

15    A.  Not that our troopers had recollection or that were

16    provided.

17    Q.  Okay.

18           MR. RIACH:  Can you pull up Plaintiffs' Exhibit 37

19    again, Ms. Anderson, and take us to paragraph 21.  Can you

20    just pull up the last sentence of that paragraph, please.

21    BY MR. RIACH:

22    Q.  Now, in your declaration you wrote, "Approximately

23    one-third of the crowd on any given evening during the April

24    2021 protests claimed media status."  That's not an accurate

25    statement, is it?

1    A.  That was my assessment of the situation.

2              MR. RIACH:  So can you pull us back to

3    paragraph 6, Ms. Anderson, and just highlight the first

4    line, please.

5    BY MR. RIACH:

6    Q.  So it states here, "On April 12, 2021, a gathering of

7    approximately 1,000 protesters remained in the vicinity of

8    the Brooklyn Center Police Department past the lawfully

9    imposed curfew."

10             It was your assessment that one-third of those

11   thousand protesters were claiming media status?

12   A.  These are estimated numbers, certainly, but I think the

13   key term in that is "claimed."  So they were claiming to be

14   press, not that they were press.

15   Q.  So you -- what was the -- did you hear 300 different

16   people claim to be media?

17   A.  No, I did not.

18   Q.  Did one of your troopers tell you that 300 people had

19   claimed to be media?

20   A.  No.

21   Q.  Is there documentation in the reports of 300 different

22   people claiming to be media who were not media?

23   A.  There is not.

24   Q.  So what did you base your assessment on that 300 people

25   on April 12th were falsely claiming to be media?

1     A.  So a majority of individuals -- not a majority.

2     Individuals that I would come in contact with, because I

3     would progress past the line of troopers to gain a better

4     vantage point, because we were engaged in like a lawful

5     arrest situation, to go, like, in close proximity to

6     individuals, they would say, "I'm a member of the media" or

7     "I'm press."  There would be some conversation there.  So

8     it's a mere correlation of the individuals that I

9     encountered and then --

10    Q.  So you are extrapolating from your experience that

11    300 people falsely claimed to be media on the night of

12    April 12th?

13    A.  There is some degree of that, yes.

14    Q.  All right.

15              MR. RIACH:  That's all I have, Your Honor.

16                    **REDIRECT EXAMINATION**

17    BY MS. LANDRUM:

18    Q.  Major, I want to touch very briefly on just a couple of

19    topics that you were just questioned on.

20              Number one, with regard to the fact that there

21    were -- that the use of force reports, that those stopped

22    being issued during May of 2020, was that a problem that was

23    solved for purposes of April 2021?

24    A.  Yes, it was.

25    Q.  How so?

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1    A.  After reviewing what had occurred in that event in

2    Minneapolis, we made the decision or implemented across the

3    board that we need to revert back to the strict adherence to

4    the use of force policy and specifically no matter if an

5    individual is identified or not, that a use of force report

6    would be used.

7          So we have use of force reports that are preserved

8    now that are completed by a trooper and it simply says what

9    was the precipitating factor and what force was used in

10   return, but it doesn't identify an individual in those cases

11   where they couldn't be identified.

12   Q.  And the new technology that you mentioned during our

13   direct examination, did that assist Minnesota State Patrol

14   in being able to better document the use of force and the

15   use of munitions?

16   A.  Without a doubt.  It provides it real time.  If there

17   are instances of use of force or riot control agents are

18   used, it can be documented at the time that they are used.

19   Q.  You also received questioning about Ed Ou's video and

20   the presence or nonpresence of debris within that video.  Do

21   you remember that testimony?

22   A.  Yes, I do.

23   Q.  How long was Minnesota State Patrol on the ground on

24   May 30, 2020 in order to effect that mass arrest?

25   A.  Leading up to it or --

1    Q.  In total that day.

2    A.  That day?  So, like, in the area of Nicollet Mall,

3    ma'am?

4    Q.  Yes.

5    A.  We were there for a period of time to assess the crowd.

6    I'm estimating 15 to 20 minutes.

7    Q.  Okay.  And then after that portion of the video, how

8    long after that was Minnesota State Patrol on the ground?

9    A.  For the duration of the evening into the early morning

10   hours the following day.

11   Q.  We all saw on that video that we didn't see much debris.

12   Can you explain to the Court why that was, given your

13   recollection that you experienced Minnesota State Patrol

14   taking on significant debris?

15   A.  Yes.  So it is a recollection.  I will add that it's not

16   real-time reporting.  So the report was completed in a

17   manner that, just given the levity of the situation, I

18   wasn't able to document items as they were occurring or even

19   that evening and in the processing of the events that

20   transpired during this period of time, it was completed days

21   after the fact.

22   Q.  Now, we did see in the video the use of munitions.  Did

23   Minnesota State Patrol ever experience rioters throwing

24   munitions at Minnesota State Patrol?

25   A.  Yes, that did happen.

1    Q.  In Minneapolis in May of 2020?

2    A.  Yes.

3    Q.  Did it happen on Nicollet Avenue?

4    A.  It did.

5    Q.  To your recollection, did it appear on May 30th?

6    A.  Yes, it did.

7    Q.  Now, we heard some testimony that Minnesota State

8    Patrol, before they arrived in the bus, that they were

9    planning to do a mass arrest or a mass arrest was being

10   discussed.  Did I hear that?

11   A.  Yes, ma'am.

12   Q.  At that point why?  Why was that being planned in

13   advance of arrival?  What was going on that was factoring

14   into that decision?

15   A.  So this wasn't an isolated event.  It wasn't a

16   gathering, a demonstration of individuals relative to the

17   events that had previously occurred.  This is an ongoing

18   event.  So it was Monday, Tuesday, Wednesday, essentially a

19   whole entire week of unrest, riotous behavior; and without

20   the implementation to effect a mass arrest where there's

21   consequences, that behavior would continue to occur.

22           So that was a tactic, a strategy that was

23   discussed in order to bring just the events of the week that

24   were unprecedented and unpredictable, to draw that to a

25   close, to restore some sort of order to a chaotic

1    environment that had infected the city.

2    Q.  Was it the goal of Minnesota State Patrol, in effecting

3    that mass arrest, to stop peaceful protesters from having

4    their voice heard?

5    A.  There was no ill intent.  That was not the intent.

6    Q.  Was it the intent of Minnesota State Patrol, in

7    effectuating and planning that mass arrest, to stop

8    journalistic efforts?

9    A.  It was not.

10   Q.  What was the intent?

11   A.  Again, to restore order to a chaotic environment, to

12   clear that area.  And we always adhere to the elements of

13   neutrality and to make sure that ultimately the First

14   Amendment is upheld and that safety is provided.

15   Q.  We heard your testimony about your rough estimate in

16   Brooklyn Center that you believed approximately one-third of

17   individuals to possibly be press.  Could you explain to the

18   Court the reasons why you -- why there was that belief that

19   so many individuals may or may not be media.

20   A.  Yes.  Again, it's that term of "claimed."  So there were

21   individuals that were displaying just, like, press patches.

22   Much like a law enforcement patch where it says, "Police,"

23   it was just a Velcro add-on to a piece of clothing.

24   Individuals with cameras and cell phones, I guess it's the

25   generalization that individuals are affiliated with the

1    press.

2    Q.  We heard the testimony about Carolyn Sung and you heard

3    that there's an allegation that a Minnesota State Patrol

4    trooper or a law enforcement officer may have spoken to her

5    in a derogatory fashion.  Did you hear that?

6    A.  I did hear that.

7    Q.  If that were to turn out to be true, Major, would that

8    be a violation of Minnesota State Patrol policy?

9    A.  Yes, it would.

10   Q.  And if that turned out to be true and it was validated,

11   would that be subject to discipline?

12   A.  It would.

13             MS. LANDRUM:  Thank you.  No further questions.

14             THE COURT:  Is there anything further for this

15   witness?

16             MR. RIACH:  Just two --

17             MS. LANDRUM:  No, Your Honor.  Sorry.

18             MR. RIACH:  I have two quick recross questions,

19   Your Honor.

20             THE COURT:  You may.

21             MR. RIACH:  Thank you.

22                     **RECROSS EXAMINATION**

23   BY MR. RIACH:

24   Q.  Major Dwyer, are you aware of any state trooper being

25   disciplined for any conduct involving journalists?

1    A.  I am not.

2    Q.  And you just testified that when you were circulating

3    among the protesters and the mass arrests, you saw people

4    wearing press patches; is that correct?

5    A.  That is correct.

6    Q.  Did you document that anywhere?

7    A.  I don't recall.

8         MR. RIACH:  That's all I have, Your Honor.

9                          **EXAMINATION**

10   BY THE COURT:

11   Q.  I have a question.  Was it the press patches that some

12   were wearing and the fact that individuals had cameras, or

13   was it that individuals were using their phones to videotape

14   or the camera aspect of their phone to record what was going

15   on?

16   A.  Thank you, Your Honor.  So I think that speaks to the

17   mere, like, confusing element of it.

18         There are individuals that are trying to portray

19   themselves as press, so they would indeed, you know, have

20   additions to their clothing.  I think in one of the videos

21   we saw a vest that said, "Press" on it, but there's no,

22   like, verifiable credentials.

23         There were many individuals documenting the

24   events, and then having contact with them at a later point

25   they would say that they are affiliated with a blog or an

1    independent business or what have you.  So in those

2    instances we would try to take steps to verify either

3    through their employer, but even we would implement means,

4    like, through the Secretary of State to see if they had an

5    affiliation.  And if there was anything leaning towards, we

6    would, you know, give the benefit of the doubt.  So it was

7    the actual claim that, yes, individuals were affiliated with

8    the press.

9    Q.  And that was based on their verbal representation?

10   A.  At times, yes.  We would have very -- it was very close

11   quarters and many times they were standing right in front of

12   the line and asking, you know, for compliance and it would

13   be a matter of "I'm the press," which was also compounded

14   by, like, my previous interactions with members of the

15   media, there were times where there was very unprofessional

16   dialogue being purported to myself or troopers by people

17   that were portraying them as press.  So it was engaged in

18   conversation, yes.

19   Q.  Given the prevalence of phones that record and the use

20   of phones to record activity by individuals in the community

21   and members of the press, were you discerning any means of

22   differentiation?

23   A.  So that's what lends itself to this difficult scenario

24   that we're trying to navigate through.  So there's not an

25   assignment that they're press, but they can certainly claim

1      that they're press.

2            So if there's interaction with law enforcement and

3      an individual and if they merely have a phone and they say,

4      "I'm with the press," you know, anybody at that location,

5      the entire crowd could say, "I'm a member of the press"

6      based on simply having a phone.

7            So if we are unable to identify and verify, that

8      speaks to the compounding issue or what complicates the

9      matter when we're trying to restore order in these areas.

10     It's a hurdle at the scene, and it severely complicates or

11     hinders the ability of law enforcement.

12     Q.  Well, it seems to also hinder the ability of the free

13     press to do its work with the tools that it has, if they are

14     presumed not to be members of the press because they're

15     using an iPhone to record as opposed to something else,

16     doesn't it?

17     A.  Yeah.  And it's not, like, so much the recording tool,

18     but it's the working relationship.  So to be able to have a

19     conversation with the individuals and ask them to go to a

20     safe location.  Considering the law enforcement operation

21     and that an area that is deemed unsafe not only for the

22     individuals inside, law enforcement and in this case the

23     Brooklyn Center area, the heavily residential area, we need

24     compliance.  We need to work collaboratively and

25     cooperatively.  And given the instances that we've talked

1   about in Minneapolis and Brooklyn Center, it's those

2   instances that are problematic.

3   Q.  So if a member of the press is using an iPhone as

4   opposed to a huge, you know, camera that would look like

5   something that an ordinary tourist would not have, you would

6   not be able to discern, but you would not necessarily take

7   their word for the fact that they were a member of the press

8   when they told you they were?

9   A.  So, Your Honor, like, a piece of equipment has no

10  bearing on or, like, in my assessment of things on their

11  affiliation with the media.  It could be a flip phone.  It

12  could be an iPhone.  It could be a commercial-grade camera.

13  It's being able to work through the dialogue and the

14  parameters, a conversation that they do have a press

15  affiliation.

16          So it's this double-edged sword of members of the

17  media in the crowd and the same riotous dynamic, even though

18  they may not be engaged in it, but then on the other side

19  it's individuals that are trying to emulate or mock members

20  of the media, which is the biggest concern, who try to cause

21  harm not specifically on law enforcement, but anybody in

22  that area, which we saw in Minneapolis.  It wasn't -- nobody

23  was exempt from it.  It was the business owners.  It was

24  residences that were subject to the arson and the looting

25  and criminal activity night after night after night.

1          So the media element isn't necessarily the largest

2     issue.  It's those that are trying to portray themselves as

3     media.  And given the chaotic environment and when we're

4     asked to make basically split-second decisions on how to

5     implement a plan to restore order in that environment, it's

6     very, very difficult, not to mention the environmental

7     conditions and other situational experiences that are

8     occurring.

9          THE COURT:  I'm going to ask counsel in light

10    of -- I invited these -- I asked these questions, invited

11    this testimony from this witness.  You have not had an

12    opportunity to question the witness about anything that the

13    witness has just said as a result of my questions.  Are

14    there any additional questions that either counsel would

15    like to make or ask in light of this additional information?

16          MS. LANDRUM:  No, Your Honor.

17          MR. RIACH:  No, Your Honor.

18          THE COURT:  Okay.  Then the matter is taken under

19    advisement.  Is there anything else that we need to address

20    at this time?

21          MS. LANDRUM:  Your Honor, I have one minor

22    housekeeping.  My co-counsel, Mr. Weiner, alerted me to the

23    fact that we laid foundation for Exhibit 10, which was the

24    use of force policy, but then I never asked Your Honor to

25    actually enter Exhibit 10, the use of force policy, into

 1   evidence.  May I do that now?

 2          THE COURT:  You may.  And I thank your co-counsel

 3   because I didn't realize that either.

 4          MS. LANDRUM:  Thank you.  So the state defendants

 5   move to admit Exhibit 10.

 6          MR. RIACH:  No objection.

 7          MS. LANDRUM:  Thank you, Your Honor.

 8          THE COURT:  Exhibit 10 is received.

 9          MS. LANDRUM:  Thank you so much, Your Honor, for

10   the extra time today as well.

11          MR. RIACH:  Your Honor, I also received one of

12   those notes, that I forgot to offer Exhibit 27, which is the

13   e-mail thread to the DPS captains and above about the TRO.

14   We would ask to admit Exhibit 27.

15          THE COURT:  Any objection?

16          MS. LANDRUM:  I believe there's hearsay within

17   that exhibit, but now I don't have it pulled up and I don't

18   remember what it is.  We won't object, Your Honor.  You can

19   consider it.

20          THE COURT:  Exhibit 27 is received.

21          I want to thank co-counsel for both parties for

22   your diligence and making sure that we have a clear and

23   accurate record and a fulsome one.  So thank you.

24          I also want to thank the attorneys for your

25   presentations today and your questioning of the witnesses

1    and for handling this in such a professional and fulsome

2    manner.  So thank you for the excellence in your work today.

3              And so we will conclude now.  The matter is taken

4    under advisement and this will conclude our hearing.

5              MS. LANDRUM:  Thank you.

6         (Court adjourned at 5:49 p.m.)

7                            *      *      *

8

9

10        I, Lori A. Simpson, certify that the foregoing is a

11   correct transcript from the record of proceedings in the

12   above-entitled matter.

13

14             Certified by:   *s/ Lori A. Simpson*

15                             Lori A. Simpson, RMR-CRR

16

17

18

19

20

21

22

23

24

25