CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 1 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

**1**

```
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
 2
   ------------------------------------------------
 3
   Jared Goyette, Craig Lassig,   ) File No. 20-CV-1302
 4 Katie Nelson, Tannen Maury,    )    (WMW/DTS)
   Stephen Maturen, Michael Shum, )
 5 and The Communications         )
   Workers of America, on behalf  ) St. Paul, Minnesota
 6 of themselves and other        ) July 28, 2021
   similarly-situated individuals,) 9:17 a.m.
 7                                 )
        Plaintiffs,                )
 8                                 )
   vs.                             )
 9                                 )
   City of Minneapolis; Medaria    )
10 Arradondo, Minneapolis Chief of )
   Police, in his individual and   )
11 official capacity; Robert       )
   Kroll, Minneapolis Police       )
12 Lieutenant, in his individual   )
   and official capacity; John     )
13 Harrington, Minnesota           )
   Department of Public Safety     )
14 Commissioner, in his individual )
   and official capacity; Matthew  )
15 Langer, Minnesota State Patrol  )
   Colonel, in his individual and  )
16 official capacity; and John     )
   Does, 1-4, in their individual  )
17 and official capacities,        )
                                   )
18      Defendants.                )

19 ------------------------------------------------

20     BEFORE THE HONORABLE WILHELMINA M. WRIGHT
           UNITED STATES DISTRICT COURT JUDGE
21
              (MOTIONS HEARING)
22

23

24     Proceedings reported by court reporter; transcript
   produced by computer.
25
```

**2**

```
 1 APPEARANCES

 2 For the Plaintiffs:     Fredrikson & Byron, PA
                           DULCE J. FOSTER, ESQ.
 3                         PARI McGARRAUGH, ESQ.
                           KAREN G. SCHANFIELD, ESQ.
 4                         Suite 4000
                           200 South Sixth Street
 5                         Minneapolis, Minnesota 55402

 6                         ACLU of Minnesota
                           TERESA J. NELSON, ESQ.
 7                         ISABELLA S. NASCIMENTO, ESQ.
                           P.O. Box 14720
 8                         Minneapolis, Minnesota 55414

 9                         The Law Office of Kevin C. Riach
                           KEVIN C. RIACH, ESQ.
10                         P.O. Box 270815
                           Vadnais Heights, Minnesota 55127
11
   For Defendants City of  Minneapolis City Attorney's
12 Minneapolis and Chief   Office
   Medaria Arradondo:      HEATHER PASSE ROBERTSON, ESQ.
13                         KRISTIN R. SARFF, ESQ.
                           SHARDA R. ENSLIN, ESQ.
14                         Room 210
                           350 South Fifth Street
15                         Minneapolis, Minnesota 55415

16 For Defendant           Kelly & Lemmons, P.A.
   Lieutenant Robert       JOSEPH A. KELLY, ESQ.
17 Kroll:                  Suite 200
                           2350 Wycliff Street
18                         St. Paul, Minnesota 55114

19 For Defendants          Minnesota Attorney General's
   Commissioner John       Office
20 Harrington and Colonel  ALEXANDER HSU, ESQ.
   Matthew Langer:         KATHRYN IVERSON LANDRUM, ESQ.
21                         JOSEPH D. WEINER, ESQ.
                           Suite 1100
22                         445 Minnesota Street
                           St. Paul, Minnesota 55101
23
   Court Reporter:         LORI A. SIMPSON, RMR-CRR
24                         Suite 146
                           316 North Robert Street
25                         St. Paul, Minnesota 55101
```

**3**

```
 1              I N D E X

 2 PLAINTIFFS' WITNESSES:                          PAGE

 3 EDWARD OU (Via Zoom)
     Direct Examination By Ms. Foster              10
 4   Cross Examination By Ms. Landrum              69
     Redirect Examination By Ms. Foster            93
 5
   CHRISTOPHER TUITE
 6   Direct Examination By Ms. McGarraugh          94
     Cross Examination By Mr. Hsu                 128
 7   Redirect Examination By Ms. McGarraugh       141

 8 DEFENDANTS' WITNESSES:

 9 JOHN HARRINGTON
10   Direct Examination By Mr. Hsu               147
     Cross Examination By Mr. Riach              176
11
   JOSEPH DWYER
12   Direct Examination By Ms. Landrum           200
     Cross Examination By Mr. Riach              259
13   Redirect Examination By Ms. Landrum         299
     Recross Examination By Mr. Riach            304
14   Examination By the Court                    305

15

16

17 PLAINTIFFS' EXHIBITS                          REC'D
     1                                           119
18   3                                           100
     4-A                                         115
19   4-B                                         117
     5                                           122
20   6                                           122
     8                                            56
21   9                                            44
     10                                           34
22   12                                           37
     14                                           25
23   27                                          310
     37                                          290
24   68                                          195
     71                                          185
25
```

**4**

```
 1           I N D E X  (Cont.)

 2

   DEFENDANTS' EXHIBITS                           REC'D
 3   1                                            202

     2                                            206
 4   7                                            268

     10                                           310
 5   11                                           209

     12                                           203
 6   15                                           155

     19                                           205
 7   21                                           248

     22                                           249
 8   41                                           226

     42                                           215
 9   43                                           242

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                July 28, 2021

**5**

1     P R O C E E D I N G S
2          IN OPEN COURT
3          LAW CLERK:  The United States District Court for
4    the District of Minnesota is now in session.  The case
5    number is 20-CV-1302, Jared Goyette, et al. vs. City of
6    Minneapolis, et al.
7          Counsel, please identify yourselves for the
8    purposes of the record.
9          MS. FOSTER:  Your Honor, Dulce Foster on behalf of
10   the plaintiffs.  I'm here today with Kevin Riach, Pari
11   McGarraugh, and Karen Schanfield.
12         THE COURT:  Thank you.  Good morning, Ms. Foster.
13         MS. LANDRUM:  Good morning, Your Honor.  Kathryn
14   Iverson Landrum here on behalf of the Minnesota State Patrol
15   and the Minnesota Department of Public Safety.  With me is
16   Joseph Weiner, Assistant Attorney General; Alexander Hsu,
17   Assistant Attorney General; and Shirley Kosek, a paralegal
18   with our office.
19         THE COURT:  Okay.  Good morning, everyone.
20         And as an initial matter, we are here for the
21   preliminary injunction hearing today and I would like to
22   remind everyone to please keep your face masks on while
23   you're in the courtroom.  Counsel or other participants, you
24   may remove your face mask temporarily while you are
25   addressing the Court provided that you are appropriately

**6**

1    distanced from each other and all others around you.
2          I believe there are people who are listening by
3    telephone.  If you are not listening -- I'm sorry.  If you
4    are not speaking, please mute your device, and you can do
5    that either by pressing star 6 or by using the mute on your
6    own device.
7          I will remind everyone that pursuant to General
8    Order No. 15 that was issued by Chief Judge Tunheim on
9    January 15, 2021, it is strictly prohibited for anyone to
10   record or broadcast any hearing in whole or in part in any
11   fashion, and that applies to this hearing as well.
12         Are there any preliminary matters that need to be
13   addressed at this time before we move to witness testimony?
14         MR. RIACH:  One quick housekeeping matter for the
15   plaintiffs, Your Honor.  We would ask that nonparty
16   witnesses be sequestered during the hearing.  I believe that
17   would impact two witnesses.  Once a witness is done
18   testifying, then I think we have no objection to their
19   presence in the courtroom.
20         THE COURT:  Okay.  Does anybody wish to be heard
21   on that matter?
22         MS. LANDRUM:  Yes, Your Honor.  Thank you.  We
23   have two witnesses that we will be calling today.  One is a
24   party, Commissioner Harrington.  He is here with us today.
25   We would object to our second witness, Major Joseph Dwyer,

**7**

1    being sequestered.  We would like for him to hear the
2    testimony of the two witnesses so that he may respond to it.
3    And there is no basis to sequester otherwise.
4          THE COURT:  You may respond or reply.
5          MR. RIACH:  Your Honor, when the witnesses are
6    testifying, they can certainly be asked questions that are
7    relevant to testimony that has come before, but we think
8    it's important to have testimony that hasn't been impacted
9    by the statements that have been given by other witnesses in
10   this case.
11         THE COURT:  I'm going to grant the motion.
12   Nonparty witnesses shall be excluded.  As I understand it,
13   Commissioner Harrington is a party and so he may remain, but
14   the one other gentleman, I believe it is a gentleman that
15   you addressed, will need to be removed or sequestered until
16   his testimony or her testimony.
17         MS. LANDRUM:  Understood.  Thank you, Your Honor.
18         THE COURT:  Okay.  Is there anything else that we
19   need to address?
20         MR. WEINER:  Your Honor, yes, just one
21   additional --
22         COURT REPORTER:  If you could stay near the
23   microphone, that would be --
24         MR. WEINER:  Is this any better?
25         THE COURT:  It's fine, but also if you would like

**8**

1    to remain seated, you may do so.
2          MR. WEINER:  Given the microphone situation, maybe
3    I will do that.
4          THE COURT:  Okay.
5          MR. WEINER:  Your Honor, we would just like some
6    clarity as to the text order that was entered this morning
7    regarding the confidential documents that are going -- and
8    the closing of the courtroom.  We just want to make sure
9    that this applies only to parties and not to other
10   individuals who may be testifying today but are not parties,
11   and that those individuals will be excluded in the event
12   that there's any confidential documents or exhibits that are
13   put before the Court.
14         THE COURT:  You're asking whether nonparties need
15   to be excluded when confidential information is being
16   addressed; is that correct?
17         MR. WEINER:  Yes, Your Honor, and specifically
18   talking about the witnesses that the plaintiffs have
19   identified today, neither of whom are parties to this
20   matter, and just making sure that --
21         THE COURT:  You said who are or who are not?
22         MR. WEINER:  Are testifying today, yes, Your
23   Honor.
24         THE COURT:  Are they parties to the matter?
25         MR. WEINER:  They are not parties to this matter

EXHIBIT A

**9**

1  and so --

2         THE COURT:  So if they are not parties, they need

3  to be not present in the courtroom during the confidential

4  disclosure.  Understood?

5         MR. WEINER:  Yes, Your Honor.  That was our

6  understanding.  We just wanted to make sure that that was

7  correct.  Thank you, Your Honor.

8         THE COURT:  Is there anything further that needs

9  to be addressed?

10        MS. LANDRUM:  No, Your Honor.

11        MS. FOSTER:  No, Your Honor.

12        THE COURT:  Okay.  Very well.  Are we ready to

13  proceed?

14        MS. FOSTER:  Yes, Your Honor.  The plaintiffs call

15  Ed Ou.

16        Are you off mute?

17        THE WITNESS:  Hi.  Hello.

18        MS. FOSTER:  Good morning, Mr. Ou.  Could you

19  please state your name and --

20        COURT REPORTER:  Wait.  We need to swear him in.

21        MS. FOSTER:  Oh, right.

22     (Witness sworn)

23        THE COURT:  And please state your name, your full

24  name, and spell your last name, please.

25        THE WITNESS:  My name is Edward Ou,

**10**

1  E-d [audio distortion] r-d, and then Ou is spelled O-u.

2         THE COURT:  Okay.  And we are having some

3  difficulty hearing you and so that means that you probably

4  need to adjust where your microphone is located.  As you

5  move in, we can hear a little bit better, but it's not

6  uniformly good.  Would you --

7         THE WITNESS:  What about right now, if I speak

8  like this?

9         THE COURT:  If you speak like that, we can hear

10  you, but --

11        THE WITNESS:  Okay.

12        THE COURT:  Okay.

13        THE WITNESS:  Will do.  I will try to speak

14  louder.  And if you can't hear me, just please let me know

15  and I can repeat.

16        THE COURT:  I will.  Thank you.

17        Counsel, you may proceed.

18        MS. FOSTER:  Thank you, Your Honor.

19             (Edward Ou)

20             DIRECT EXAMINATION

21  BY MS. FOSTER:

22  Q.  Mr. Ou, we have you participating by Zoom today.  Where

23  are you currently dialing in from?

24  A.  I'm in Copenhagen, Denmark.

25  Q.  Okay.  Where do you live, Mr. Ou?

**11**

1  A.  I live in New York, in the U.S.

2  Q.  And where did you grow up?

3  A.  I grew up in Canada.

4  Q.  How long have you lived in the United States?

5  A.  This time around, around four years.  Since 2017.

6  Q.  What do you do for a living, Mr. Ou?

7  A.  I am a journalist, photojournalist, and documentary

8  filmmaker.

9  Q.  How long have you worked as a photojournalist?

10  A.  I've been working since around 2006, so 15 years.

11  Q.  And can you please tell us what media outlets you've

12  worked for in your career.

13  A.  I've worked for companies like the Associated Press,

14  The New York Times, NBC News, and a few others.

15  Q.  Have you received any awards for your work?

16  A.  Yeah, I have.  Actually, yesterday I was nominated for

17  an Emmy Award for coverage of last year.  I've received

18  Peabody Awards, other internationally-recognized awards,

19  like World Press Photo, et cetera.  So yes.

20  Q.  So I'm going to ask you to speak a little bit slower, if

21  you could, because the court reporter is here trying to take

22  down everything that you say and I'm sure she would

23  appreciate being able to take that down without you speaking

24  quickly.  Thank you.

25        What is your current employment status, Mr. Ou?

**12**

1  A.  I'm a freelance journalist right now.

2  Q.  Okay.  And what photo equipment do you normally carry

3  with you when you cover an event?

4  A.  I have a combination of video cameras and then stills

5  cameras.  So usually I have two cameras with me with a

6  microphone and one for stills and depending on, you know,

7  what the event is and what I'm covering, additional cameras

8  you know, stuff like that, tripod.

9  Q.  Do you carry a backpack or anything else?

10  A.  Yeah, I have a backpack.  And then depending on the

11  situation, you know, like safety equipment or first aid kits

12  or stuff and then -- it just really depends.

13  Q.  Would you be recognizable to the public as a journalist

14  when you're out covering an event?

15        MS. LANDRUM:  Objection --

16        THE WITNESS:  Yes.

17        MS. LANDRUM:  Objection, calls for speculation.

18        THE COURT:  Overruled.

19  BY MS. FOSTER:

20  Q.  Do you carry credentials with you?

21  A.  Yes.

22  Q.  And where and how do you typically carry those?

23  A.  Usually I have a lanyard and a badge and then -- that

24  says, like, who I am working with or, you know, that I am a

25  journalist.

EXHIBIT A

**13**

1  THE COURT: Okay. And I am going to ask you again
2  to please make sure that we can hear you, so please move
3  your microphone closer to you.
4  THE WITNESS: Sure.
5  THE COURT: And, Ms. Foster, I'm wondering if it
6  might not be better for you to use the podium. Do you mind
7  using the podium?
8  MS. FOSTER: No, Your Honor.
9  THE COURT: Okay.
10  THE WITNESS: I'm going to -- can you hear me now?
11  MS. FOSTER: And may I remove my mask?
12  THE COURT: You may remove your mask. And also
13  would you turn off -- okay. The video has been turned off
14  for you.
15  I think this is the better way for us to move
16  forward, Counsel, just as we are testing what our
17  capabilities are in terms of being able to hear and
18  understand everyone with masks or without. So let's proceed
19  in this manner.
20  If any attorney who is questioning a witness feels
21  uncomfortable at the podium because of COVID protections
22  that are needed, please let me know. You will be permitted
23  to question at your seats if that's what you prefer to do.
24  And I believe we have covers for the microphone
25  that we can take off every -- between -- after every

**14**

1  questioner if needed, so that we can maintain the sanitary
2  needs in order to stay safe in this setting.
3  BY MS. FOSTER:
4  Q. So I am going to repeat the question. Where and how do
5  you carry your credentials?
6  A. I usually have a lanyard and then a badge that says,
7  "Press" on it.
8  Q. If there were a state-sponsored credentialing
9  requirement, would that make it difficult for you to cover
10  events?
11  A. Yeah. Because I work nationally and internationally and
12  because we cover breaking news, we're often going to places
13  at the last minute to [audio distortion].
14  COURT REPORTER: I'm sorry. I didn't hear --
15  THE COURT: At the last minute to do what?
16  MS. FOSTER: Speak again.
17  THE WITNESS: We often have to travel at the last
18  minute because I work internationally and nationally.
19  Because as journalists we travel a lot and so in a
20  breaking-news situation, it's not exactly practical to have
21  any one credential for anything. To give an example, I live
22  in New York and I can't actually get a credential even in
23  New York because of some the requirements that are put on
24  us, you know, as journalists in terms of, like,
25  breaking-news contexts, et cetera. So it's difficult.

**15**

1  BY MS. FOSTER:
2  Q. Have you traveled outside of North America to cover news
3  events?
4  A. Yeah.
5  Q. Where have you traveled in your career?
6  A. For most of my career I worked in the Middle East. I
7  was there covering mostly, you know, the Arab world. And
8  then I was based in East Africa for quite some time covering
9  mostly Somalia, Uganda, Sudan. So I've worked mostly
10  internationally, actually, as opposed to in the U.S.
11  Q. What kind of --
12  THE COURT: I didn't hear the last thing you said.
13  THE WITNESS: I have worked mostly internationally
14  for more of my career than I have spent in the United
15  States.
16  THE COURT: Thank you.
17  BY MS. FOSTER:
18  Q. What kinds of events have you covered in those
19  locations? Can you describe them.
20  A. In the Middle East, the majority of my work there has
21  been covering protests, conflict-related events. For
22  example, in Iraq or during the Arab Spring, I was in Egypt,
23  in Tahrir Square. I was in Libya, for example, when the
24  civil war broke out in 2011. So a lot of the -- because of
25  the nature of, you know, the Middle East and the political

**16**

1  situation, it's a lot of, you know, conflict related and
2  civil unrest and stories within that.
3  Q. Do you ever feel that there are risks to your own -- or
4  have you ever historically felt that there were risks to
5  your own safety when covering those events?
6  A. Yeah. In a lot of countries in the Middle East or
7  places like Ukraine, there isn't exactly that much freedom
8  of the press and so a lot of times I have been targeted for
9  my work, you know, arrested. Colleagues of mine have been
10  kidnapped. So, yes, it is difficult to work in a lot of
11  those places.
12  Q. Do you do anything to minimize threats to your safety
13  when you are covering a protest event?
14  A. Yes. A lot of different -- a lot of protests are just
15  very different, so there's not one thing, but it's important
16  for us to have, you know, body armor, for example, should we
17  need it, to have a gas mask, to have goggles, to have a
18  helmet, to have a thing that says, "Press." It really
19  depends on the situation, but the key thing for us is to
20  always be prepared for every outcome.
21  Q. Have you developed any practices with respect to where
22  you stand when you're covering a protest event?
23  A. Yeah, all the time. I think when you cover a protest,
24  it's important to be always aware of where your exits are
25  and knowing where the police are, where protesters are. And

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                     July 28, 2021

**17**

1  you kind of have this, like, running commentary in your head
2  that if something were to happen, where would you run to,
3  how would you get out of there.  A lot of times, you know,
4  you're just thinking, okay, exit, where's the exit.  So
5  that's really important.  And then also being able to kind
6  of muscle memory how to -- where you went into the place, so
7  that you can get out should you be tear-gassed, should you
8  be unable to see.  So, yeah, you kind of have to just
9  develop a skill to know how to get out of trouble if you get
10  into it.
11  Q.  Do you make it a practice to avoid standing between the
12  protesters and police?
13  A.  Yes.  That area is usually the most fraught place.  So
14  the best places are places off to the side, where you can
15  kind of, like, see what's going on and not get in the middle
16  of things, that have a good exit and cover as well.
17  Q.  How close to the protesters do you typically have to be
18  to get good coverage?
19  A.  It depends on what you're shooting.  If you are shooting
20  photos, you tend to need to be a little bit closer, but
21  sometimes you kind of just think to yourself, like, when is
22  a safe time to get close to protesters to get the shots that
23  you need, when is a good time to back off.  And it's the
24  same thing with, you know, police or security forces.  You
25  kind of just use your intuition to know what the mood is and

**18**

1  what the situation is to see what's safe and what's not
2  safe.
3  Q.  Would it make it difficult for you to film what's
4  happening if you were required to stand and remain in a
5  particular spot?
6  A.  Yeah, it would be because protests by their nature are
7  very dynamic.  Usually they have an element of people
8  marching.  There's people coming from different places.  So
9  you kind of need to move around a lot, both to have coverage
10  and also for safety.  Because if a designated place is not
11  safe anymore, it could become unsafe within a millisecond
12  and then you just have to adapt.  So a lot of covering
13  protests is just -- it's very fluid.
14  Q.  How long did you live in the Middle East, Mr. Ou?
15  A.  I lived there until about 2017 or so.  So about ten
16  years.
17  Q.  And why did you leave the Middle East?
18  A.  There isn't one particular reason, but it was just
19  getting very dangerous to work there.  After the Arab
20  Spring, countries started becoming progressively more
21  dangerous and hostile toward journalists, Cairo, for
22  example, when a lot of journalists were arrested.  I was
23  living in Turkey and I got kicked out of that country.  And
24  a lot of my colleagues, you know, were being kidnapped in
25  Syria.  Colleagues of mine have been killed.  I had multiple

**19**

1  incidences where, you know, I got into trouble.  And so at
2  around that time I kind of decided that it was just getting
3  a little bit too dangerous to [audio distortion].
4        THE COURT:  I didn't hear the last thing you said.
5  It got a little bit dangerous, and then you said something
6  else and that was not audible.
7        THE WITNESS:  Around that time it got a little bit
8  too dangerous to work there.  And so a combination of those
9  factors led to me leaving the Middle East.
10        THE COURT:  Thank you.
11  BY MS. FOSTER:
12  Q.  Did you continue to cover protest activity after you
13  moved to New York City?
14  A.  Yep, I did.  When I moved there, Charlottesville
15  happened, so there was a lot of protests related to that.
16  There were protests related to, you know, the Trump
17  administration.  So, yeah, there's a lot of different
18  protests I've covered once I moved to the U.S.
19  Q.  How concerned were you about becoming a law enforcement
20  target once you moved to the United States versus as
21  compared to the Middle East?
22  A.  I wasn't concerned when I got there because, you know,
23  in the U.S. it felt like it wasn't the Middle East, where
24  there is, you know, the First Amendment and there's the
25  freedom of the press.  And so I wasn't exactly concerned

**20**

1  because it was the one place I actually felt that I could,
2  like, very proudly declare that I was a journalist and just
3  do my job without fear of, you know, retribution, like I had
4  experienced in a lot of places in the [audio distortion].
5        THE COURT:  I didn't hear the last bit again.
6        THE WITNESS:  Sorry.  It was one of the places --
7  the U.S. is one of the places where I felt that I could
8  operate pretty freely and film, you know, the police, cover
9  the police as long as I was, you know, not interfering with
10  their work.  So I didn't feel unsafe at all.
11  BY MS. FOSTER:
12  Q.  Did you cover the May 2020 Minnesota protests following
13  the death of George Floyd?
14  A.  Yes.
15  Q.  Who was your employer at the time?
16  A.  I was a staff journalist with NBC News.
17  Q.  And what day did you arrive in Minnesota?
18  A.  The 30th of May 2020.
19  Q.  And do you recall the approximate time when you started
20  filming events after your arrival?
21  A.  Yeah.  I landed around 5:00 and we met -- we had a
22  briefing with the team, the NBC News team there, and I
23  started shooting at around 6:30, 7:00-ish.
24  Q.  Were you aware, when you began filming, of a curfew in
25  place?

EXHIBIT A

**21**

1  A. Yes, I was aware of a curfew, but I --

2  Q. What was your understanding with respect to whether it

3  covered the media?

4  A. Yeah, as I understood it, it didn't cover -- like, we

5  were exempt, we, as the media, were exempt from that curfew.

6  Q. Were you visibly identifiable as a member of the media

7  while you were out there?

8  A. Yes. I was wearing --

9      MS. LANDRUM: Objection --

10  (Simultaneous indiscernible crosstalk)

11      THE COURT: Wait. You stop. We have an objection

12  and so I need to hear the nature of the objection, please.

13      MS. LANDRUM: Objection, Your Honor, calls for

14  speculation.

15      THE COURT: Overruled.

16  BY MS. FOSTER:

17  Q. Mr. Ou, you may answer.

18  A. Sorry. What was the question again?

19  Q. Sorry. The question was whether you were visibly

20  identifiable as a member of the media while you were out

21  there.

22  A. Yes. I had cameras and a press badge with me that was

23  very -- which made me obviously a member of the press.

24  Q. Were you also wearing a lanyard with your press badge?

25  A. Yeah, I had a lanyard with the NBC News logo that says,

**22**

1  "NBC News" on it and then a badge that also says, "NBC" and

2  "Press" on it.

3  Q. Okay. And where in Minneapolis did you go?

4  A. I went to the Fifth -- so the first place that we went

5  was the Fifth Precinct because we had heard that there was a

6  rally there. So that was the first place, the precinct. It

7  was the first place I covered, started shooting, but then we

8  had like a briefing or meeting, I think on Lake Street,

9  before that.

10  Q. Okay. Can you describe the area when -- not the

11  briefing, but when you started covering the rally, where

12  were you standing?

13  A. So the rally took place between 31st Street and, like,

14  this bus station that was, like, right next door and then

15  Nicollet. So the protesters had set up a temporary --

16  not podium exactly, but there was, like, a mini stage-ish

17  area where people were standing, and most people were

18  sitting down. It was like a rally that was, like, right on

19  31st and Nicollet and people were giving speeches and had

20  been occupying kind of that space, you know, giving speeches

21  and listening to -- they were chanting and stuff like that.

22  Q. Were there any other reporters present?

23  A. Yes, there were many, many reporters.

24  Q. And how did you know that they were reporters?

25  A. Well, so, first off, it's a really small world of

**23**

1  journalists, so I recognized a lot of colleagues who were

2  also friends, so we caught up with them. And then a lot of

3  people had, you know, cameras and were filming and they had

4  tripods and kind of journalistic equipment.

5  Q. Did you see anyone there who was audibly claiming to be

6  a reporter whom you know was not a reporter?

7  A. No.

8  Q. When you arrived, were any of the people participating

9  in the rally engaging in violent or threatening behavior?

10  A. No, they weren't.

11  Q. Was anyone from law enforcement in the area?

12  A. Yeah. There were state troopers kind of off to the

13  side, down the street from Nicollet, closer to 32nd Street,

14  kind of, like, at [audio distortion].

15      COURT REPORTER: I'm sorry. I didn't hear the

16  last part he said.

17  BY MS. FOSTER:

18  Q. Can you repeat that, please?

19  A. Yeah. There were, I think, Minnesota state troopers on

20  the south side of Nicollet, like, towards, like, 32nd Street

21  or so. They had been filing kind of in and out of the Fifth

22  Precinct.

23  Q. Was anyone throwing projectiles at the state troopers?

24  A. No.

25  Q. Did you see any fires burning?

**24**

1  A. No, I didn't.

2  Q. Did you see anyone looting?

3  A. No.

4  Q. How would you describe the mood of the crowd at that

5  point when you were watching them rally?

6  A. When I first got there, it was -- I guess the mood, I

7  would say, would be there was -- people were giving

8  speeches, talking about kind of, like, their engagement with

9  race. So I would say it was actually kind of quite

10  cathartic and the mood was quite high. It was a pretty calm

11  mood because people were mostly giving speeches and most

12  people, except for the people who were speaking up on this

13  mini podium thing, they were mostly sitting down and kind

14  of, like, cheering on the people who were giving speeches.

15  Q. Did the mood of the crowd change at some point?

16  A. Things turned a little bit tense. We all got a text

17  message on our phone that [audio distortion].

18  Q. We lost sound, and I'm not sure why. But can you start

19  over again?

20  A. Things turned a little tense when we all got this, like,

21  push alert on our phones that said that there is a curfew

22  coming up. And so everyone took time to look at their

23  phones, and that was kind of like a signal that -- you know,

24  the mood went from calm and I wouldn't use the word

25  celebratory, but it went to, like, what's going to happen.

EXHIBIT A

**25**

1  It got tense.
2  Q. And what did the state troopers do at that point?
3  A. So at that point they had started to form a line around
4  32nd Street and Nicollet, so Nicollet and 32nd Street. Most
5  of the protesters were kind of still on 31st kind of near
6  the bus station where they were rallying. And so the
7  cops -- sorry, the State Patrol were gathering and forming a
8  line.
9  Q. Mr. Ou, did you have an opportunity to film this portion
10 of the events that we've been talking about?
11 A. Yes.
12 Q. And have you had an opportunity prior to this hearing to
13 review the video that was previously marked as Plaintiffs'
14 Exhibit 14?
15 A. Yes.
16 Q. Is Plaintiffs' Exhibit 14 a copy of the video that you
17 took that night?
18 A. Yes.
19     MS. FOSTER: Your Honor, I would like to offer
20 Plaintiffs' Exhibit 14.
21     THE COURT: Any objection to the admission of
22 Exhibit 14?
23     MS. LANDRUM: No, Your Honor.
24     THE COURT: Exhibit 14 is admitted in evidence.
25     MS. FOSTER: Now I would like to publish a portion

**26**

1  of that video, if you would, Leslie?
2      THE COURT: You may. Let's verify that our
3  witness also can see that portion or the video as are
4  playing it.
5      MS. FOSTER: Can you see the video?
6      THE WITNESS: Yes, I can see the video.
7      THE COURT: Very well. Thank you.
8   (Video recording played)
9  BY MS. FOSTER:
10 Q. At this point, Mr. Ou, did you hear the announcement
11 that was being made by the troopers?
12 A. Yes.
13 Q. Were they announcing a curfew?
14 A. Yeah. They were telling the crowd to disperse, as I
15 understood it.
16 Q. And --
17     THE COURT: Ms. Foster, is there a way for you to
18 identify where on the video you have stopped the video just
19 so we have --
20     MS. FOSTER: I believe we stopped --
21     THE COURT: -- a clear record?
22     MS. FOSTER: -- at 59 seconds, 58 or 59 seconds.
23     THE COURT: Thank you.
24     MS. FOSTER: 58 seconds.
25     THE COURT: You may proceed.

**27**

1      MS. FOSTER: I will continue to do that if it is
2  helpful.
3      THE COURT: Would you please do that. It will
4  make for a clear record.
5      MS. FOSTER: Absolutely.
6  BY MS. FOSTER:
7  Q. At this point was the -- oh, so we were talking about
8  the announcement that we heard on the video of the curfew.
9  Again, it was your understanding that the curfew did not
10 apply to journalists; is that what you testified to earlier?
11 A. Yes, we didn't think it applied to us.
12 Q. At this point in time was the crowd getting more
13 agitated?
14 A. There were a few protesters that you saw on the video
15 that were saying things at the State Patrol. They were
16 giving them the finger. You know, there were a few people
17 who were saying not-so-nice things [audio distortion].
18 Q. Aside from --
19     THE COURT: I didn't hear the last thing you said,
20 sir. Would you say -- "there were a few people that," and
21 then you trailed off.
22     THE WITNESS: That were saying not-so-nice things
23 to the State Patrol --
24     THE COURT: Thank you.
25     THE WITNESS: -- profanities.

**28**

1  BY MS. FOSTER:
2  Q. Aside from those profanities, were any of the protesters
3  looting or behaving violently at that point?
4  A. No.
5  Q. What did the State Patrol do after announcing the
6  curfew?
7  A. So it was pretty quick. We had -- all us journalists
8  kind of went off to the side, to the right of where you saw,
9  and pretty immediately they started to attack us and launch
10 concussion grenades at us pretty quickly. And so that
11 escalated and -- yeah, so we were attacked.
12 Q. So you said you moved off to the side. And who were you
13 standing with when you moved off to the side?
14 A. I was standing with a group of journalists and my
15 colleagues, and so we were -- we kind of, like -- at that
16 moment, you know, like, because, you know, we felt it was
17 kind of -- like, we just gravitated and stayed into a group
18 so that we could be easily, like, discerned from the
19 protesters. So there was like an alcove that also gave us,
20 you know, cover and so we kind of just, like, went off to
21 the side.
22 Q. At least initially did you feel safe in that alcove?
23 A. I did, actually, because when I was talking about, like,
24 where our egress is and what our cover is, these alcoves
25 actually provided us a really good cover so that we had like

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

---

**29**

1   a solid wall in front of us kind of, like, blocking us so
2   that should there be any projectiles, we had a place to
3   duck.
4   **Q.** Were there any protesters standing in the alcove with
5   you?
6   **A.** No.
7   **Q.** And you mentioned being attacked. Can you describe for
8   me what happened to you.
9   **A.** It happened really quickly. They were -- we were
10  shooting and then all of a sudden something started being
11  launched at us and a projectile of some sort exploded in
12  front of my face, and that disoriented us because I think it
13  was a concussion grenade.
14          And so as I was trying to get my bearings, the
15  State Patrol, the state troopers came up to us pretty
16  quickly and I was pepper-sprayed in the face. And then they
17  kept on throwing concussion grenades at our feet, so they
18  kept on exploding. And so as I was pepper-sprayed, I
19  couldn't see.
20          I figured that they would -- we were in these
21  alcoves, so that they would just pass us so that they
22  could -- you know, if they were trying to disperse the
23  crowd, they would just pass us. But then they kept on --
24  they targeted us and they kept corralling us into the place
25  where the protesters were, and we were -- it was -- it

---

**30**

1   happened really quickly and it was quite confusing because I
2   thought that they were just trying to move past us, but over
3   time it was pretty clear that we were being targeted and,
4   yeah, they were actively -- they were trying to disperse us
5   and they were trying to get us into -- kind of, like, mix us
6   in with the protesters.
7   MS. FOSTER: So at this point in time I would like
8   to play another portion of the video, starting at -- where
9   we left off and going through a minute, approximately a
10  minute and 34 seconds.
11  THE COURT: Thank you, Counsel. You may.
12  (Pause)
13  MS. FOSTER: We are trying to get the technology
14  worked out. Sorry.
15  (Pause)
16  MS. FOSTER: I apologize, Your Honor.
17  THE COURT: That's quite all right.
18  (Pause)
19  MS. FOSTER: She's having trouble with sharing the
20  screen. She said she got booted out.
21  THE COURT: Let's pause. We can go off the record
22  for this.
23  (Discussion off the record)
24  MS. FOSTER: Thank you, Judge.
25  THE COURT: You're welcome. We'll move forward.

---

**31**

1   (Video recording played)
2   BY MS. FOSTER:
3   **Q.** Mr. Ou, at the very end of that segment we saw a bright
4   flash and we heard some screaming. Is that the point at
5   which the projectile hit you?
6   **A.** Yes.
7   THE COURT: Counsel, is it possible to identify
8   where on the recording we are -- you stopped the display
9   just so that it's clear in the record what you are referring
10  to?
11  MS. FOSTER: Yes. A minute 34.
12  THE COURT: Perfect. Thank you.
13  BY MS. FOSTER:
14  **Q.** Could you tell who threw it?
15  **A.** It came from the state troopers.
16  **Q.** Do you know what that object was that hit you?
17  **A.** I'm not an expert on this, but I think it was a
18  concussion grenade that exploded that was launched.
19  **Q.** Did it hurt?
20  **A.** It happened pretty quickly, so it was disorienting.
21  Yeah, it -- pain, I guess, at that moment doesn't really
22  register to us.
23  **Q.** Okay. Did it cause you any injuries?
24  **A.** Yeah. It hit my forehead right here (indicating). In
25  fact, you can still see a scar from it.

---

**32**

1   **Q.** At this time I would like to direct your attention to a
2   photograph that I showed you before the hearing. It was
3   previously marked as Plaintiffs' Exhibit 10. Did you
4   recognize that photo?
5   **A.** That's a question for me?
6   **Q.** Yes.
7   MS. ANDERSON: I just got kicked out of Zoom, so I
8   might need just a minute.
9   MS. FOSTER: All right. We are having more
10  technical issues with the wifi. It's booting us out
11  periodically.
12  BY MS. FOSTER:
13  **Q.** We can talk about Plaintiffs' Exhibit 10 while she's
14  getting back booted up. Did you recognize that photograph?
15  I think you said yes?
16  **A.** Yeah, [audio distortion].
17  **Q.** What is that --
18  COURT REPORTER: I didn't hear that answer.
19  THE COURT: Let's stop right here. Let me just
20  ask you to stop right here. I'll ask -- we are off the
21  record now.
22  (Discussion off the record)
23  BY MS. FOSTER:
24  **Q.** Are you familiar with Plaintiffs' Exhibit 10?
25  **A.** Yeah. I am looking at it right now.

EXHIBIT A

33

1   Q.  Okay.  You have -- I sent you a copy of it before the
2   hearing so you would have that in front of you.  What is
3   that a --
4            THE COURT:  Let me just stop here.  I want to make
5   sure, Ms. Landrum, that you have access to the exhibit that
6   is being referred to and that you are able to follow along
7   with the examination that's being made as to exhibits.  So
8   are you able to do so?
9            MS. LANDRUM:  Yes, Your Honor.  I have paper
10  copies of all the exhibits, except for videos, right in
11  front of me.
12           THE COURT:  Okay.  So for purposes of this
13  hearing, we will be a little disorderly and that is to say
14  that if at any time you are having difficulty seeing any
15  exhibit that's being addressed, Counsel, please let me know
16  that and we will make sure that we remedy that problem using
17  whatever ingenuity we can muster to do so.  Okay?
18           MS. FOSTER:  Thank you, Your Honor.
19           THE COURT:  Thank you.
20           MS. FOSTER:  Thank you.
21           THE COURT:  You may proceed.
22  BY MS. FOSTER:
23  Q.  Mr. Ou, could you please describe what Plaintiffs'
24  Exhibit 10 is.
25  A.  That's a photo of me after I was hit in the face and --

34

1   it's me after what happened.
2   Q.  On May 30th at the protest after you were hit with the
3   projectile; is that what you mean?
4   A.  Yeah, and after I was pepper-sprayed in the face as
5   well.
6   Q.  Okay.
7            MS. FOSTER:  At this time I would like to offer
8   Plaintiffs' Exhibit 10 and I would like to publish it.
9            MS. LANDRUM:  No objection, Your Honor.
10           THE COURT:  Okay.  Exhibit 10 is received in
11  evidence and you may publish.
12       (Pause)
13           THE COURT:  Let's take a brief recess now.  We
14  will go off the record.  We can keep all of our video and
15  audio up so that we are all hearing and speaking to each
16  other and we can make sure that we know what we need to do
17  in order to display exhibits.  Okay?
18           MS. FOSTER:  Thank you.  I apologize for this,
19  Judge.
20           THE COURT:  Please don't apologize.
21       (Discussion off the record)
22           THE COURT:  We are ready to proceed.  We are back
23  on the record now.
24  BY MS. FOSTER:
25  Q.  Mr. Ou, we are looking at Plaintiffs' Exhibit 10.  What

35

1   does this show?
2   A.  This is me after I was attacked by the police.
3   Q.  And what is -- why is your face red in this picture?
4   A.  It's a combination of blood and pepper spray.
5   Q.  And was this caused by the -- was the blood caused by
6   the projectile that hit you?
7   A.  Yes, I think so, and amongst other things.
8   Q.  Okay.  And you mentioned being pepper-sprayed.  Who
9   pepper-sprayed you?
10  A.  The Minnesota State Patrol.
11  Q.  What kind of uniform was the individual who
12  pepper-sprayed you wearing; do you recall?
13  A.  A person wearing riot gear, like a -- one of those,
14  like, state trooper things and black armor thing and then a
15  big helmet.
16  Q.  Okay.  And so you said a state trooper thing.  Was there
17  a state trooper label on the uniform?
18  A.  I think so, yeah.
19  Q.  Okay.  How far away was he standing from you when he
20  sprayed you?
21  A.  They were like a foot away from me, like, right next --
22  right in front of me.
23  Q.  Were you standing next to any protesters at that time?
24  A.  No.
25           MS. FOSTER:  Okay.  At this point in time I would

36

1   like to play the next segment of the video, starting at a
2   minute 34.
3       (Pause)
4            MS. FOSTER:  It appears we don't have audio.
5       (Video recording played)
6            THE COURT:  Please make a record where the video
7   has stopped if you are going to question about what we have
8   seen so far.
9            MS. FOSTER:  I believe we stopped at 2 minutes and
10  13 seconds.
11           THE COURT:  Thank you.
12  BY MS. FOSTER:
13  Q.  Was it obvious that you were a journalist when this
14  happened?
15  A.  Yes.
16  Q.  Were you still carrying professional camera equipment?
17  A.  Yeah, I had a camera and then my press credentials.
18           MS. LANDRUM:  Objection, Your Honor.  This
19  testimony calls for speculation, has a lack of foundation.
20  He can't testify as to what other people's perception of him
21  was.
22           THE COURT:  Sustained.  You may restate the
23  question in a manner in which you elicit the information you
24  need.
25  BY MS. FOSTER:

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                           July 28, 2021

**37**

1  **Q.** Mr. Ou, what were you carrying with you at this time?

2  **A.** I was carrying a camera with a microphone and stuff, so

3  it's what I use to shoot with.  I had a backpack.  I had a

4  credential, like a press lanyard that said, "NBC News" with

5  the pretty iconic logo of the peacock, and then a badge that

6  said, "Press" on it.

7  **Q.** Are you familiar with Plaintiffs' Exhibit 12, which I

8  sent to you before the hearing?  Did you have an opportunity

9  to review that?

10  **A.** Yeah.  12, yes.

11  **Q.** And do you recognize that photograph?

12  **A.** Yes.  That's me.

13  **Q.** Who's the person in that photograph?

14  **A.** That's me.

15  **Q.** Was this taken during the Floyd protests on May 30,

16  2020?

17  **A.** Yes.

18  　　　　MS. FOSTER:  Your Honor, at this time I would like

19  to offer Plaintiffs' Exhibit 12.

20  　　　　MS. LANDRUM:  No objection, Your Honor.

21  　　　　THE COURT:  Exhibit 12 is received, Plaintiffs'

22  Exhibit 12.

23  BY MS. FOSTER:

24  **Q.** As you can see in the picture, there's, it looks like, a

25  lanyard that you are wearing on the outside of your clothes.

**38**

1  Was that an NBC -- the NBC press lanyard that you were just

2  referring to with the peacock logo?

3  **A.** Yes.

4  **Q.** What were you wearing on your head?

5  **A.** These are headphones.

6  **Q.** Is that part of the professional gear that you normally

7  carry?

8  **A.** Yes.

9  **Q.** And were you standing with other reporters at that time?

10  **A.** Yes, reporters, video journalists.

11  **Q.** When you were pepper-sprayed, were you or any of the

12  journalists you were standing with, were you doing anything

13  to provoke the troopers?

14  **A.** No.  We were filming.

15  **Q.** Were you throwing anything at them?

16  **A.** No.

17  **Q.** Did the trooper who sprayed you warn you before he did

18  it?

19  **A.** No.

20  **Q.** Did he appear to be intentionally targeting you?  Was

21  that your perception?

22  **A.** Yes.

23  　　　　MS. LANDRUM:  Objection, Your Honor, again, lack

24  of personal knowledge and speculation.

25  　　　　MS. FOSTER:  Your Honor, I'm asking about his

**39**

1  perception.

2  　　　　THE COURT:  Overruled.

3  BY MS. FOSTER:

4  **Q.** Was that your perception, that you were being targeted?

5  **A.** Yes.

6  **Q.** What were you sprayed with?  Do you know what the

7  substance was?

8  **A.** It was pepper spray, I think, or Mace or --

9  **Q.** What was the consistency of the spray?

10  **A.** It was like a liquid that once it got on you, it started

11  to -- it made me -- it really hurt and it kind of blinded

12  me.

13  **Q.** What does tear gas -- have you been tear-gassed before

14  in your --

15  **A.** Many --

16  　　　　(Simultaneous indiscernible crosstalk)

17  **Q.** -- covering protests?

18  　　　　COURT REPORTER:  I didn't hear that answer.

19  　　　　THE COURT:  And please keep your voice up.  We are

20  having trouble hearing you.  Okay?

21  　　　　THE WITNESS:  I have been tear-gassed

22  [audio distortion].

23  　　　　COURT REPORTER:  I didn't hear that either.

24  BY MS. FOSTER:

25  **Q.** You have been tear-gassed before?

**40**

1  **A.** Yes.

2  **Q.** How did this differ from tear gas?

3  **A.** Tear gas, once you are in the region, it starts to burn,

4  but the moment you leave the region, the area that's

5  being -- that there's the puff of smoke, you're kind of --

6  it takes a second to recover, but then you're fine.

7  　　　　With this pepper spray, it sticks on you so it --

8  there's nowhere to go and it just stays on you.  In fact, it

9  stayed on me for weeks and weeks after this happened.

10  **Q.** So what happened after that?  Did you get hit with

11  anything else?

12  **A.** It's hard to say, but we -- I was blind at this point.

13  So we were pushed and shoved a bunch of places as we

14  were trying to leave.  So I was hit multiple times with

15  [audio distortion].

16  　　　　COURT REPORTER:  I'm sorry.  I couldn't hear.  I

17  think what is happening is when he moves a lot, we lose the

18  audio.

19  　　　　MS. FOSTER:  Yeah, so if you could avoid moving

20  back and forth.  Sorry.

21  　　　　THE WITNESS:  So, yeah, I was blind at this point,

22  so I don't know exactly what hit me.  But I was shoved

23  around.  At some point in time I also hit a wall.  I don't

24  know if I was being -- I was running into other people or if

25  I was being hit from behind by other people or people were

EXHIBIT A

**41**

1  bumping into me. I don't know because I was blind at that
2  moment.
3  BY MS. FOSTER:
4  Q.  Why were you blind?
5  A.  Because I was pepper-sprayed in the face, and there was
6  also blood streaming down. So I don't know what -- it was a
7  combination of [audio distortion].
8        COURT REPORTER: A combination of? I didn't hear.
9  BY MS. FOSTER:
10 Q.  You didn't finish the sentence. It's a combination of
11 what?
12 A.  It was a combination of both pepper spray and then
13 blood, which I didn't know at that time what it was, but I
14 couldn't see.
15 Q.  Okay. Did you leave the alcove that you were standing
16 in after you got pepper-sprayed?
17 A.  Yes. We were pushed away from that alcove. I thought
18 that in that alcove the state troopers would pass us, but
19 they did not.
20 Q.  Where did you go?
21 A.  We were corralled down Nicollet Street towards 31st.
22 So, yeah, we kept on trying to stay in the alcove to get out
23 of the way of the state troopers, but then they specifically
24 kept on pushing us forward into where the rally was
25 happening. I was trying to just leave, but I couldn't see,

**42**

1  so I got, like, corralled into kind of, like -- in the bus
2  station there was like a fenced-off area, which I think is
3  where the power generator or something was, and so we got
4  trapped inside like a fenced-off area.
5  Q.  When you say "we," who do you mean other than yourself?
6  A.  Myself and the journalists I was with.
7  Q.  So it was a whole group of journalists that went to this
8  area?
9  A.  Yes.
10 Q.  Did the protesters come with you or were you segregated
11 from the protesters?
12 A.  I didn't see protesters. I was mostly -- we were in a
13 pretty packed group of journalists. So, as I recall, it was
14 mostly journalists I was with.
15 Q.  Were you safe there?
16 A.  No, I wasn't because we were trapped. And then the
17 state troopers came and they kept on throwing concussion
18 grenades at us, telling us to leave, but there was nowhere
19 for us to go. So, no, I was not safe there. We would have
20 been safe if we weren't [audio distortion].
21       THE COURT: I didn't hear you. You said we would
22 have been safe if what?
23       THE WITNESS: If we weren't targeted by the state
24 troopers.
25       MS. FOSTER: At this point I would like to play

**43**

1  another segment of the video, starting at where we left
2  off --
3        THE COURT: You may.
4        MS. FOSTER: -- and going through 3 minutes and
5  46 seconds, approximately.
6   (Video recording played)
7        THE COURT: Let's stop here. You've made the
8  record clear you have been -- the video played from 2:13 to
9  what is the stopping point?
10       MS. FOSTER: 3:46.
11       THE COURT: 3:46. Thank you, Counsel.
12 BY MS. FOSTER:
13 Q.  Mr. Ou, towards the end of that video there were people
14 climbing over a wall, it appeared. Do you know who those
15 people were?
16 A.  Yes. So the first batch of people who were passing the
17 microphone, I think that was a TV crew. And then the second
18 person who was shoved over the wall is a colleague and
19 friend of mine. His name is Mike Shum.
20 Q.  You said he was shoved over the wall. Did you see who
21 was shoving him?
22 A.  It was the state troopers who did that.
23 Q.  Did you climb over the wall?
24 A.  I tried to at first, but I couldn't see and it was a
25 pretty high wall, so I -- like, I couldn't see, so it just

**44**

1  felt a little bit dangerous. So I was very disoriented at
2  that time. But I had thought about this, but I had a
3  backpack and all my camera gear and I couldn't see and I was
4  bleeding, so it felt really -- it just -- I tried to, but it
5  seemed a little difficult.
6  Q.  You said you were having trouble breathing. Why were
7  you having trouble breathing?
8  A.  Because I was pepper-sprayed in the face.
9  Q.  Okay. Are you familiar with Plaintiffs' Exhibit 9,
10 which I sent to you prior to this hearing?
11 A.  Let me just take a look. Yes.
12 Q.  Do you recognize that photograph?
13 A.  Yes.
14 Q.  What is that a photograph of?
15 A.  That was an N95 mask I was wearing at that moment.
16 Q.  And was this taken during the Floyd protests on
17 May 30th?
18 A.  It was taken after, when I got back to the hotel room
19 where I was staying.
20       MS. FOSTER: Your Honor, I would like to offer
21 Plaintiffs' Exhibit 9.
22       MS. LANDRUM: No objections.
23       THE COURT: Exhibit 9 is received in evidence.
24 BY MS. FOSTER:
25 Q.  So what appears to be covering your mask in this photo?

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 12 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

45

1    A.  I think it's a combination of blood and also pepper
2    spray or Mace.
3    Q.  Did that make it difficult for you to breathe, the fact
4    that your mask was covered in substances?
5    A.  Yeah.
6    Q.  Did any of the troopers approach you while you were
7    trapped against the wall in that area?
8    A.  Yeah.  One person, I think, threw a concussion grenade
9    at us and grabbed me, I think, as I remember, and I was kind
10   of, like, handled.  But, yeah, I -- but it was hard for me
11   to see, so I think that's what happened.
12   Q.  Did they say anything?
13   A.  They -- I remember they said, like, "What do you want me
14   to do with this person?"  I thought that they were going to
15   arrest me.  And at that point I just wanted anything to get
16   out of that situation.  If they arrested me, so be it.  I
17   just wanted to get out of the alcove because there was
18   nowhere else to go.
19   Q.  Did they arrest you?
20   A.  No.
21        MS. FOSTER:  I would like to play the video,
22   another segment, starting at where we left off.
23        (Video recording played)
24        MS. FOSTER:  I don't know if you heard that.
25   Should we -- can we replay that?

46

1        THE COURT:  And let's identify what portion of the
2    video that is.  Is it 3:50?
3        MS. FOSTER:  It's 3:51 -- so 3:46 to 3:51.
4        THE COURT:  Thank you.
5        MS. FOSTER:  Very brief segment.
6    (Video recording played)
7    BY MS. FOSTER:
8    Q.  So is he talking about maybe handcuffing you?
9    A.  Yeah.  They said, "What do you want me to do with this?"
10   The "this" was me.
11   Q.  Okay.
12   A.  I'm the "this."
13   Q.  Was it obvious that you were injured at that point?
14   A.  Yes, I --
15   Q.  I'm sorry.  Was it your perception that it was obvious
16   that you were injured at that point?
17   A.  I was bleeding in my face, so, yeah, I was injured.
18   Q.  Did the troopers offer to help you?
19   A.  No.
20   Q.  What did you do when they left?
21   A.  I was asking for help.
22   Q.  Were you still bleeding as you were asking for help?
23   A.  Yeah.  I also couldn't see and I was in considerable
24   pain, but it was -- I didn't know where -- this happened
25   very quickly.  So mostly I couldn't see and then my face was

47

1    on fire and then something hurt.
2    Q.  Did you go anywhere?
3    A.  I tried to get help.  And I was really disoriented, so I
4    was just trying to get out of that situation and find some
5    help.
6    Q.  Who did you ask for help from?
7    A.  The law enforcement officers.  There were state troopers
8    that were filing through and then, I think, Minneapolis
9    Police were kind of passing me.
10   Q.  Did anyone help you?
11   A.  No.
12   Q.  Were you still recording while all of this was
13   happening?
14   A.  As you saw in the video, around like a minute before, I
15   was trying to.  So when I got into the alcove, I was kind
16   of, like, still trying to film a little bit, but then I
17   couldn't see.  So I was, like, half trying to do my job,
18   thinking at that alcove that I was then finally safe, and
19   then the state troopers came and started throwing grenades
20   at us again and so then I went into survival mode again.  So
21   I tried to report, but I couldn't.
22        MS. FOSTER:  I would like to play another segment
23   of the video, starting at 3:51.
24   (Video recording played)
25        MS. FOSTER:  So, for the record, we have stopped

48

1    at 5 minutes and 15 seconds in Plaintiffs' Exhibit 14.
2    BY MS. FOSTER:
3    Q.  Who ultimately helped you at the end of that video,
4    Mr. Ou?
5    A.  A colleague of mine and a friend.  His name is Peter van
6    Agtmael.
7    Q.  Where did he take you?
8    A.  He took me to the corner of 32nd, so down Nicollet, and
9    he kind of gave me first -- to the -- I guess the -- not the
10   corner.  So he started helping me there, and then we had to
11   run again because I think they started -- so he was trying
12   to give me first aid, and some other civilians or bystanders
13   showed up and someone gave me water and someone gave me a
14   T-shirt and gauze and stuff.  And so we were there for a
15   second and then we had to move again because there was
16   cops or there was explosions or concussion grenades and
17   [audio distortion].
18   Q.  You faded out again.  I'm sorry.  Could you repeat the
19   end of that?  You said you had to leave again because?
20   A.  Because we were -- I guess we were targeted again by
21   concussion grenades.  So everyone ran closer down
22   32nd Street and we got cover by the bus depot, like, just
23   half a block down.
24   Q.  Eventually were you able to get medical treatment?
25   A.  Yeah.  I reconnected with the colleagues I was with, my

Goyette, et al. vs. City of Minneapolis, et al.                                      July 28, 2021

**49**

1  reporting partner, and they patched me up or they put gauze
2  on my face, but then I kept on bleeding and eventually I had
3  to go to the hospital.
4  Q.  How long were you at the hospital?
5  A.  Around four hours or so.
6  Q.  What did the doctors do to treat your injuries?
7  A.  They stitched my -- they gave me four stitches, and then
8  I got a tetanus shot and a bunch of tests.  I forget what.
9  But they gave me tests and then they stitched me up.
10  Q.  Was it painful?
11  A.  It was pretty painful, yes.
12  Q.  You said it took several hours.  Did you get a
13  diagnosis?
14  A.  It was pretty clear what had happened.  So it was trauma
15  to my face.
16  Q.  Okay.
17  A.  But then the other thing, too, is I had pepper spray
18  still kind of, like, dripping down all over my body, so that
19  was -- it was a combination of many things.
20  Q.  Were you able to continue your coverage of the events
21  that night?
22  A.  Not that night.  Actually, our editors pulled out a lot
23  of the teams working and we were all told to go back to our
24  hotels.
25  Q.  Why did they do that?  What was the reason you were

**50**

1  given?
2  A.  After -- I had not known this, but other people from NBC
3  News were attacked that night by law enforcement and so they
4  deemed it was too dangerous for us to stay out.
5        MS. LANDRUM:  Objection, Your Honor, hearsay.
6  That testimony was based off of hearsay, about the other
7  attacks.
8        THE COURT:  Counsel?
9        MS. FOSTER:  He's explaining what his
10  understanding of the events was and the reason for the
11  reporters being taken off the street.
12        MS. LANDRUM:  With that understanding, Your Honor,
13  it's based off hearsay alone versus his personal knowledge.
14        THE COURT:  Sustained.
15        MS. LANDRUM:  Thank you, Your Honor.
16  BY MS. FOSTER:
17  Q.  What happened the next day, Mr. Ou?
18  A.  So the next day being -- so this happened at 8:00 on the
19  30th, and the next day was -- if you are asking what
20  happened, like, at midnight, I was in the hospital and I was
21  there until around, I think, in the early morning and then
22  we went to the hotel because we hadn't checked in yet.
23        And so I checked into the hotel with a bloody face
24  and I -- it took another few hours to just clean my face,
25  and so I started to file all my footage that night.  So it

**51**

1  was a combination of working and then talking to, you know,
2  my girlfriend, my partner, and then also cleaning my face.
3        And then I talked to my editors when they woke up
4  and told them -- we kind of had a debriefing of what
5  happened.  They asked me if I wanted to stay there, and I
6  did.  And so we made a plan with Dani, the reporter I was
7  with, to go back out and keep working.
8  Q.  And where did you go back out?
9  A.  In the morning we went by 30th and Chicago to just see
10  what was happening there.  I found -- I had met some
11  characters, some people the night before, who I called and
12  we filmed them at home.
13        And then there was a protest in the evening near a
14  highway, like on a highway, which I don't remember the name
15  of the highway because I'm not from Minneapolis, but.  So
16  there was a protest there and that's what -- that was our
17  day.  We were going to protests.
18  Q.  And where were you when you were covering the
19  protests -- that protest that was on the highway, where were
20  you standing?
21  A.  We originally went down to kind of, like, this exit
22  ramp, but there was a lot of state troopers and I was pretty
23  shaken, so we kind of pulled back.  And then I was filming
24  from like an overpass looking down at things.  But we kind
25  of kept our distance.

**52**

1  Q.  Why did you keep your distance?
2  A.  I was scared.  I didn't know how to act around the
3  police or just law enforcement in general because what
4  happened the night before really caught, I think, a lot of
5  us -- well, it caught me off guard and I just didn't know
6  how they would react to us because they targeted us pretty
7  deliberately the night before and I just wasn't sure, like,
8  what -- whether they would attack us again.
9  Q.  So did having been attacked and targeted the night
10  before affect where you decided to cover the events the
11  following night?
12        MS. LANDRUM:  Your Honor --
13        THE WITNESS:  Yes.
14        MS. LANDRUM:  -- the defendants object to this
15  line of questioning with regard to the [inaudible].
16        COURT REPORTER:  Excuse me.  Is your microphone
17  on?  I am having trouble hearing you.
18        MS. LANDRUM:  Oh.  My apologies, Your Honor.
19        THE COURT:  And if you would like, you may remain
20  seated, because it might be the best way for us to hear you.
21  And the Court knows you respect the Court.  Thank you.
22        MS. LANDRUM:  Thank you, Your Honor.  We are
23  objecting to this line of testimony, the questions and the
24  answers, with regard to the phrase "intentional and
25  deliberate targeting."  There's a lack of personal knowledge

Goyette, et al. vs. City of Minneapolis, et al.                                       July 28, 2021

---

**53**

1  and speculation as to the state of mind of any
2  individuals -- of anyone other than Mr. Ou.  So we would
3  object on those bases.
4       MS. FOSTER:  Your Honor, this line of questioning
5  goes to Mr. Ou's state of mind and to his perception that he
6  was being attacked and targeted.  It's totally proper.
7       MS. LANDRUM:  Your Honor, if I may, the phrase
8  "deliberate and intentional," those are phrases that are
9  going at the state of mind of other actors who are not
10  Mr. Ou.
11       THE COURT:  I will overrule the objection.  My
12  hearing of the witness was his rationale and his
13  understanding and his reasons for his actions.  So the Court
14  is receiving that evidence in that manner.
15       MS. LANDRUM:  Thank you, Your Honor.
16  BY MS. FOSTER:
17  Q.  So you were -- were you concerned about getting
18  assaulted again?
19  A.  Yes.  I was scared.
20  Q.  Has that had a lasting impact on your ability to do your
21  job as a journalist?
22  A.  Yeah, it has, even now.
23  Q.  Did you return to Minneapolis in April 2021?
24  A.  Yes.
25  Q.  And why did you return to Minneapolis at that time?

---

**54**

1  A.  I was assigned to cover the Chauvin verdict.  It was --
2  at that time we were expecting that there would be a verdict
3  in the trial.  So around that same time there was another
4  incident in Brooklyn Center so there were protests
5  related to Daunte Wright.  And so around that same time that
6  I was going to cover the Chauvin verdict, that happened, so
7  we went.
8  Q.  Where did you go in Brooklyn Center?
9  A.  I went to the police department, where protests were
10  happening.
11  Q.  And what kind of story did you cover there?
12  A.  I did a combination of news, but I stayed back a bit.
13  So I did a story where I covered -- I was inside an
14  apartment building that overlooked where the protests were
15  happening and so I was with a family watching them kind of,
16  like, witness what was happening from their balcony because
17  their house/balcony looked over, right over, the police
18  station.
19  Q.  Did that story get published?
20  A.  It was published in The New York Times.
21  Q.  Where were you physically located when you were covering
22  that story?
23  A.  At the beginning I was kind of covering a march down on
24  the ground, but as things became a bit more tense, I went
25  inside and stayed inside this apartment block --

---

**55**

1  Q.  Why did you choose --
2       THE COURT:  Let's let him finish --
3       MS. FOSTER:  I'm sorry.
4       THE COURT:  -- his response.
5       MS. FOSTER:  I thought he was done.
6       THE COURT:  You may finish your response.
7       THE WITNESS:  Yes.  So I was inside of an
8  apartment block filming from someone's house.
9  BY MS. FOSTER:
10  Q.  Why did you choose that location?
11  A.  It felt safer because, you know, it was -- it was
12  difficult covering Minneapolis because, again, law
13  enforcement was really unpredictable, and that was
14  consistent.  And I just really didn't want to get targeted,
15  so I decided to be somewhere safer.
16  Q.  Was there a curfew in place that night?
17  A.  Yes.
18  Q.  What was your understanding -- and what was your
19  understanding of how the curfew applied to journalists?
20  A.  As I understood it, the curfew did not apply to
21  journalists.
22  Q.  Did you witness any dispersal orders being issued by law
23  enforcement that night?
24  A.  Yes.
25  Q.  Did you capture that on video?

---

**56**

1  A.  Yes.
2  Q.  Have you had an opportunity to review the video, prior
3  to this hearing, that was marked as Plaintiffs' Exhibit 8?
4  A.  Yes.
5  Q.  And is Plaintiffs' Exhibit 8 a copy of the video that
6  you took that night?
7  A.  Yes.
8       MS. FOSTER:  Your Honor, I would like to offer
9  Plaintiffs' Exhibit 8.
10       MS. LANDRUM:  No objections, Your Honor, subject
11  to there are some statements from a witness in the video
12  that would be hearsay, but the video itself and what it's
13  capturing we have no objection to.
14       THE COURT:  Exhibit 8 is received.
15       (Video recording played)
16  BY MS. FOSTER:
17  Q.  What was the announcement that we just heard saying --
18  about the media?
19  A.  They told the media to disperse.
20  Q.  Is it common for law enforcement to issue multiple
21  dispersal orders before they move forward with a mass arrest
22  after giving an order like that?
23       MS. LANDRUM:  Objection --
24       THE WITNESS:  I think --
25       MS. LANDRUM:  -- no foundation.

---

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                July 28, 2021

---

**57**

BY MS. FOSTER:

1
2   Q.   Mr. Ou, have you participated and covered a number of --
3        THE COURT:  Let me rule on the --
4        MS. FOSTER:  I apologize.
5        THE COURT:  -- objection.  Sustained.
6   BY MS. FOSTER:
7   Q.   Have you covered a number of protests in your career?
8   A.   Yes.
9   Q.   Have you witnessed dispersal orders in the past?
10  A.   Yes.
11  Q.   Have you seen -- in your experience, have you seen mass
12  arrests taking place?
13  A.   Yes.
14  Q.   So do you have a common base of experience from which to
15  determine -- a base of experience from which to determine,
16  at least in your career, what has been common?
17  A.   Yes.
18       MS. FOSTER:  Your Honor, I think that establishes
19  foundation for the question that was asked.
20       THE COURT:  You may ask the question.
21       MS. FOSTER:  Okay.
22  BY MS. FOSTER:
23  Q.   Is it common for law enforcement to issue multiple
24  dispersal orders before they move forward with mass arrests,
25  based on your experience?

---

**58**

1   A.   In general, yeah.
2   Q.   Can a significant period of time pass between the first
3   dispersal order and any arrests that occur?
4   A.   Yes.
5   Q.   Is it common for members of the media to stay during
6   this period of time so that they can cover the interactions
7   between police and protesters?
8   A.   Yes.
9   Q.   Do you believe that's important?
10  A.   Yes.
11  Q.   Why?
12  A.   Because that's the foundational nature of our job as
13  journalists, is to bear witness and hold any side to
14  anything to account.  And especially with law enforcement,
15  to hold them to account and just see what happens so we can
16  see with our own eyes, like, what -- how they act.
17  Q.   Did you see any members of the media attacking law
18  enforcement officers that night in Brooklyn Center?
19  A.   [Inaudible.]
20  Q.   Could you repeat that?
21       THE COURT:  I didn't hear your response.
22  BY MS. FOSTER:
23  Q.   We didn't hear your response.
24  A.   No, I did not see members of the media attacking law
25  enforcement.

---

**59**

1   Q.   Were any journalists throwing things or looting?
2   A.   No.
3        MS. LANDRUM:  Objection, Your Honor, lack of
4   foundation, lack of personal knowledge, speculation inasmuch
5   as Mr. Ou couldn't possibly know who on the ground was or
6   was not media.
7        THE COURT:  Overruled.  You may answer based on
8   your personal knowledge.
9        THE WITNESS:  Sorry.  Can you repeat the question?
10  I got --
11  BY MS. FOSTER:
12  Q.   Sure.  Based on your personal knowledge or what you saw,
13  were any journalists throwing things or looting?
14  A.   No, I did not see that happen.
15  Q.   To the extent that you were able to see what was going
16  on, what were the journalists you saw doing at the protest?
17  A.   I saw journalists reporting, holding cameras, writing
18  stuff down in notebooks, holding -- streaming, doing their
19  job.
20  Q.   And how were you able to recognize who were the
21  journalists?
22  A.   People had cameras.  They had notepads.  They were
23  holding their phones in a way that made it clear that they
24  were livestreaming.  It's pretty simple to tell who is doing
25  journalism.

---

**60**

1   Q.   When you heard that dispersal message, did you leave the
2   area?
3   A.   No, I didn't because I was already in private property.
4   Q.   Okay.
5   A.   It didn't [audio distortion].
6   Q.   We didn't hear that.  Could you move closer to the mike?
7   A.   We were -- I was in private property and so -- and,
8   also, it was my understanding that that dispersal order did
9   not apply to journalists.
10  Q.   Did anyone threaten you while you were on the private
11  property?
12  A.   Yeah.  When I was filming from the vantage point that
13  you saw inside -- not even on the balcony, but from inside,
14  law enforcement pointed stuff at us, pointed something at me
15  and said, "Go away, go away," like "Back off, back off."
16  And so I backed off because I didn't want to put the person
17  whose home I was in in jeopardy, because I didn't know how
18  the law enforcement would react if I was there.  So I kind
19  of just made myself scarce.
20  Q.   Were you able to identify which law enforcement agency
21  that individual worked for?
22  A.   No.
23  Q.   Were there multiple law enforcement agencies that you
24  saw present that night?
25  A.   Yeah.  There were state troopers there, but then also

---

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 16 of 78

Goyette, et al. vs. City of Minneapolis, et al.                          July 28, 2021

**61**

1  Brooklyn Center was -- I'm not exactly used to what people
2  were wearing, but, as I remember, there was also National
3  Guard there and there were people wearing fluorescent
4  yellow, fluorescent greenish jackets and dark -- it seemed
5  like a combination of different law enforcement agencies.
6  Q. Did the presence of multiple agencies make it difficult
7  for you to identify who pointed the thing at you and told
8  you to back off?
9  A. Yes.
10 Q. How did you respond to that threat?  What did you do?
11 A. I backed off because, you know, even though objectively
12 I knew that I was on private property and was filming, like,
13 I didn't need to go anywhere, as journalists we have to also
14 act ethically and knowing that if there was -- if law
15 enforcement punished the people I was filming, I wouldn't
16 want that -- I wouldn't want to cause somebody to get in
17 trouble because of what I was doing.  And so it's always a
18 balance of what you are legally allowed to do, but ethically
19 how to not do harm to your subjects [audio distortion].
20        COURT REPORTER:  His audio cut off at the end.
21 BY MS. FOSTER:
22 Q. Could you repeat the last sentence?
23 A. Yeah.  It's a balance, because I made a decision -- you
24 always have to balance what you can legally do and ethically
25 what your responsibilities are to your subjects.  At this

**62**

1  point my character was a person who lived in Brooklyn
2  Center, so I was thinking about maybe if it became known
3  that she had a journalist over, she would maybe be targeted
4  by law enforcement or something like that.  So with that in
5  mind, I decided to be less visible to law enforcement and
6  film from a distance so they couldn't see me.
7        MS. FOSTER:  Were you able to catch that?
8        COURT REPORTER:  Yes.
9  BY MS. FOSTER:
10 Q. Has anyone from the State contacted you to discuss what
11 happened to you during the protests?
12 A. I got an e-mail I think around in the fall of 2020.
13 Q. Okay.  Do you know who contacted you?
14 A. Yeah.  His name was Jerry -- I don't know how to say his
15 last name -- Cziok.  It's C-zed-i-o-k.
16 Q. Okay.  Did you respond to that e-mail?
17 A. No, I did not.
18 Q. Why not?
19 A. My company at that time, NBC News, told me not to.
20 Q. So your employer basically instructed you not to
21 respond --
22 A. That's correct.
23 Q. -- is that what you are saying?
24        Okay.  How long has it been since you were
25 injured?

**63**

1  A. That was June or May 2020 and it is now July.  So a year
2  and a month or two.
3  Q. Has anyone from the State ever apologized to you for
4  what happened?
5  A. No.
6  Q. Have you decided to join this lawsuit as a named
7  plaintiff, Mr. Ou?
8  A. Yes.
9  Q. How would you describe your views towards law
10 enforcement before the protests we've been talking about
11 today?
12 A. Are we talking about the American context or --
13 Q. Yes.  That's a good clarification.
14 A. Yeah.  In the American context, I didn't think so much
15 of law enforcement.  In fact, I've actually -- the story I
16 did before this, I embedded with a police department in
17 San Antonio for quite a few months and worked on a
18 documentary looking at a community police -- San Antonio
19 Police Department going to mental health calls.  So I
20 didn't -- like, I had covered law enforcement and being
21 around protests, you know, you're in their proximity, but I
22 always operated under the assumption that, you know, if
23 you're not getting in anyone's way, you had the right to
24 film and, you know, just work.  So I didn't really think
25 much of it.

**64**

1  Q. How would you describe your relationship with the police
2  in San Antonio that you covered during that -- when you were
3  embedded with them?
4  A. It was quite good because these are mental health --
5  these are police officers who are also trained in mental
6  health, so they went to [audio distortion].
7        COURT REPORTER:  He cut out again.
8  BY MS. FOSTER:
9  Q. You cut out.  Sorry.  I don't know why.
10 A. These are police officers who specialized in
11 de-escalation, so they would go to places with mental health
12 distress calls and they would, you know, use their
13 de-escalation training and their mental health skills to
14 kind of, like, de-escalate situations and then kind of,
15 like, get people into services.  So it was actually a really
16 interesting thing to cover to show, you know, like, police
17 doing their jobs at their best and kind of like an example
18 for law enforcement to follow.
19 Q. When you cover a protest event, do you try to avoid bias
20 towards any group?
21 A. Yes.  That's the --
22 Q. And why is -- I'm sorry.  Go ahead.
23 A. That's the foundation of what we do as journalists, is
24 to report the truth without bias, you know, just report all
25 sides of a story with nuance and kind of, like, report in a

**65**

1 balanced way.
2 **Q.** How have the attacks that you experienced during the
3 protests in Minneapolis affected your ability to continue
4 doing your job as an objective observer?
5 **A.** In the American context it's difficult because it's hard
6 to operate safely in a protest situation or in general when
7 you don't know if someone will turn on you and attack you
8 without having really done anything.
9     And so it has been a little bit difficult for me
10 to know what's what, how to stay safe, how to not get in
11 people's way, you know, just how to navigate coverage in
12 America. It's actually been -- even now, a year and a bit
13 later, it still has been quite difficult to navigate.
14 **Q.** How long did it take you to recover from your physical
15 injuries?
16 **A.** My scar healed. I still have a scar right here
17 (indicating) that you can see, but it took quite some time
18 for all the pepper spray to get out of my hair. My eyes
19 were quite affected and my breathing was affected for quite
20 a few months afterwards. Some of my camera gear right now
21 is still pepper spray-ee [phonetic]. So it took some time.
22 And I have a scar here (indicating) that hasn't gone away.
23 **Q.** Would you say that you've recovered from the
24 psychological impact?
25 **A.** No, I have not. It's hard because, you know, you don't

**66**

1 want to make it about you, but it's hard because the things
2 that happened really affect you. And, you know, like, even
3 yesterday there was a thunderstorm where I was -- where I am
4 at right now and just even hearing loud noises or, you know,
5 seeing -- being in situations in large crowds, it's hard.
6 It just makes you constantly, like, really nervous and not
7 know how to be safe.
8 **Q.** Do you continue to experience fear when you cover events
9 with a large law enforcement presence?
10 **A.** I do. I do because, yeah, I don't know how to act
11 anymore. In the American context it used to be just make
12 sure everyone knows that you are a journalist. I remember
13 covering protests in New York with the NYPD where I would
14 kind of go out of my way to, like, make eye contact with all
15 the police and show them my camera so that they could have,
16 like, some memory of me so that if there was, like, any
17 incident, they would know that I was there. And so I think
18 a lot of it is, like, make your intentions known so that
19 you're not mistaken for anything other than a journalist.
20     But now, I guess after what happened on the 30th,
21 in the American context I don't know what is safe anymore
22 because at that moment I thought that we were in the perfect
23 position. We were in a group of people. We were protected.
24 We were out of the way. They could have easily passed us if
25 they wanted to, but instead it almost felt like we were

**67**

1 targeted because we were journalists. And because of that,
2 now I don't [audio distortion] any protests.
3     COURT REPORTER: I'm sorry. He is cutting out.
4 BY MS. FOSTER:
5 **Q.** Could you repeat the very end of that?
6 **A.** So when you -- I don't feel safe covering protests or
7 being around police because I don't know how to act anymore.
8 Because what happened in Minneapolis on the 30th of May in
9 2020, I was in what I thought -- it was almost like a
10 textbook, the best place that we could have been. We had
11 cover and we were in a group of people who were so clearly
12 identified as journalists.
13     And I've replayed that over and over in my head to
14 go -- to think to myself, like, where did we screw up, like,
15 what did we do wrong. And that's a large part of what we do
16 as journalists, is that we learn from our mistakes.
17     And any time things happen and when the stakes are
18 even higher, like in Libya, where my colleagues have been
19 killed, or in Syria, we take accidents and incidents and we
20 kind of, like, think to ourselves, okay, what did we do
21 wrong, how can we do things any differently.
22     And having thought about what happened in
23 Minneapolis on the 30th of 2020, I don't know what the
24 takeaway is. I don't know how I would have done anything
25 differently. And because I don't have any -- other than to

**68**

1 just not have been there. And so because I don't -- I spent
2 a year and two months really trying to figure out, like,
3 what did we do wrong. And the fact that I don't have an
4 answer to that makes me feel fundamentally unsafe covering
5 protests or, you know, marches where there's law
6 enforcement. Because if the answer is, well, just don't be
7 a journalist and, like, just -- if you will be targeted no
8 matter what you do, then, yeah, I feel quite unsafe.
9     MS. FOSTER: Thank you. I have no further
10 questions.
11     THE COURT: Let's take our break at this point and
12 then we will have our cross examination of this witness. So
13 we will take a break now and I will ask everyone to be
14 prepared to return at ten minutes after 11:00 Central
15 Standard Time. So I believe that may be ten minutes after
16 12:00 your time.
17     MS. FOSTER: He is in Europe.
18     THE COURT: Sorry. I was thinking New York. I'm
19 quite provincial. So we will take a 15-minute break, and
20 then please be ready to return on camera for your cross
21 examination.
22     MS. FOSTER: You can keep it dialed in if you
23 want, Ed. That might be the easiest.
24     THE COURT: Yes.
25     MS. FOSTER: So we don't have to reconnect.

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

---

**69**

1    THE WITNESS: So 15 minutes, 1-5?

2    THE COURT: 1-5, yes.

3    THE WITNESS: Okay.

4    THE COURT: We are in -- oh, I'm sorry. Is there

5  anything else that we need to address at this time?

6    MS. LANDRUM: No, Your Honor.

7    THE COURT: Okay. Very well. We are in recess.

8  (Recess taken at 10:56 a.m.)

9              *  *  *  *  *

10  (11:13 a.m.)

11         IN OPEN COURT

12    THE COURT: We are ready to proceed.

13    MS. LANDRUM: Yes, Your Honor.

14    THE COURT: You may. We are back on the record.

15  You may proceed, Counsel.

16    MS. LANDRUM: Thank you, Your Honor.

17         CROSS EXAMINATION

18  BY MS. LANDRUM:

19  **Q.** Good morning, Mr. Ou. My name is Kathryn Iverson

20  Landrum. Can you hear me okay?

21  **A.** Yeah, I can hear you.

22  **Q.** Great. Wonderful. My name is Kathryn Iverson Landrum.

23  I'm an attorney representing the defendants, the Minnesota

24  Department of Public Safety and Minnesota State Patrol. I

25  want to thank you for your testimony here today.

---

**70**

1    I would like to start off with asking you about

2  your experiences on May 30th that you just discussed with

3  us. First, you did not arrive in Minneapolis until May 30,

4  2020; is that right?

5  **A.** That is correct.

6  **Q.** That was several days after the unrest had erupted in

7  that area, correct?

8  **A.** Yes.

9  **Q.** And you did not begin your physical coverage in

10  Minneapolis until, I believe, 6:30 or 7:00 that night?

11  **A.** Yes.

12  **Q.** Now, you began your coverage located near the Fifth

13  Precinct in Minneapolis; is that correct?

14  **A.** Yep.

15  **Q.** Were you aware that there were significant concerns that

16  the Fifth Precinct, like the Third, would be set afire?

17    MS. FOSTER: Objection --

18    THE WITNESS: I was --

19    MS. FOSTER: -- assumes facts not in evidence.

20    THE COURT: Overruled. You are asking what he

21  understood.

22    MS. LANDRUM: Thank you, Your Honor.

23  BY MS. LANDRUM:

24  **Q.** I will ask the question again, Mr. Ou. Were you aware

25  at that time, when you located yourself at the Fifth

---

**71**

1  Precinct, that there were significant concerns that the

2  Fifth Precinct, like the Third Precinct, would be set on

3  fire?

4  **A.** I was aware of the context of what had happened the days

5  previous.

6  **Q.** So you were aware at that time that the Third Precinct

7  had been given up and had been set on fire?

8  **A.** Yes.

9  **Q.** Okay. And you also testified that there were several

10  law enforcement agencies present there in addition to

11  Minnesota State Patrol troopers?

12  **A.** Yes.

13  **Q.** Now, you heard the dispersal orders before you were

14  injured on May 30th; is that correct?

15  **A.** Yes.

16  **Q.** Those dispersal orders were fairly loud?

17  **A.** Yes.

18  **Q.** And they were given over an acoustic device; is that

19  correct?

20  **A.** Yes.

21  **Q.** The protesters, however, based off of your personal

22  knowledge and the video footage that we saw, they did not

23  disperse as directed, right?

24  **A.** Yes.

25  **Q.** And neither did you; is that right?

---

**72**

1  **A.** Yes.

2  **Q.** Is it your practice not to follow directives from law

3  enforcement when you're covering protest activities?

4  **A.** We were under the understanding that the curfew did not

5  apply to us as media.

6  **Q.** I understand that that's your understanding of the legal

7  posture there, but is it your practice, generally speaking,

8  when an order is issued by law enforcement, that you do not

9  follow those when you're covering a protest?

10  **A.** We -- when we operate, you know, we operate under what

11  we're allowed to do. And at that moment we were on public

12  property, also not getting in anyone's way, and so based off

13  my experience with the police in general is if the media

14  makes themselves known and is not interfering, then we have

15  the right to be places because that's our job.

16  **Q.** So the answer to my question is, yes, you believe that

17  you are not required to follow the directives of law

18  enforcement when covering protests?

19    MS. FOSTER: Objection, argumentative.

20    THE COURT: Sustained.

21  BY MS. LANDRUM:

22  **Q.** Now, you testified that you were somewhat close to

23  protesters, is that right, when the dispersal order was

24  granted -- or given?

25  **A.** Yeah.

---

73

1  Q. About 12 to 15 feet away from protesters when the
2  dispersal order was granted -- or given?
3  A. I guess somewhat -- so we were, by the time that they
4  had granted -- they were saying that, we were off to the
5  side, as I remember.
6  Q. Now, when you were off to the side, you were technically
7  between law enforcement and the protesters, is that correct,
8  off to the side but between the law enforcement line and the
9  line of protesters; is that correct?
10 A. We were behind the alcoves, so we were physically in
11 between. If the protesters are here (indicating) and we
12 were here (indicating), we were here but behind alcoves.
13 Q. Understood. Stated differently, when that law
14 enforcement line started to move forward, you did not
15 disperse north with the protesters; is that correct?
16 A. North is towards 31st, right? So, yes, that's true, we
17 did not, yes.
18 Q. Instead you attempted to stay in an alcove to the side?
19 A. Yes. We thought that they would [audio distortion].
20 Q. And ultimately if that --
21        MS. LANDRUM: Sorry.
22        THE COURT: I didn't hear what the witness said.
23 Would you please repeat your response?
24        THE WITNESS: Yeah. We were in the alcoves
25 thinking they would pass us, the state troopers.

74

1  BY MS. LANDRUM:
2  Q. And so you were intending to locate yourself behind that
3  line of law enforcement as they were moving north, that was
4  your intention?
5  A. At that exact -- it depends on when you are referring
6  to. This is quite a dynamic situation. But we were
7  intending to stay out of the way in these alcoves, yes.
8  Q. So then at that point, had that been successful, you
9  would have been facing -- you would have been further away
10 from the protesters and you would have been looking at the
11 law enforcement line from behind?
12 A. Yes.
13        MS. LANDRUM: I would like to pull up Plaintiffs'
14 Exhibit 14, please, if we may, Ms. Kosek, which has already
15 been entered into evidence, specifically at 49 seconds.
16 BY MS. LANDRUM:
17 Q. And while we are pulling that up, Mr. Ou, I believe you
18 testified earlier this morning that persons who are
19 livestreaming during a protest are considered members of the
20 media. Did I hear that correctly?
21 A. I think people who are engaged in acts of journalism are
22 members of the media.
23 Q. So it's your testimony that every person who is holding
24 up a personal cell phone and livestreaming or taking
25 photographs with their cell phone be a member of the

75

1  media?
2  A. That or exercising their First Amendment right to film.
3  Q. Okay. And you testified that you didn't see anybody on
4  that day, May 30, 2020, who was a member of the media that
5  was in any way antagonizing towards the Minnesota State
6  Patrol. Did I hear that correctly?
7  A. Yeah.
8  Q. Okay. We will wait to pull up Exhibit 14.
9         (Pause)
10 Q. You had testified that immediately prior to the law
11 enforcement line moving north on Nicollet, that there were a
12 couple of individuals that were somewhat antagonistic
13 towards the Minnesota State Patrol and yelling obscenities;
14 is that correct?
15 A. [Inaudible.]
16        THE COURT: I didn't hear your response.
17        THE WITNESS: Yes.
18        MS. LANDRUM: And this is, for the record,
19 49 seconds into Plaintiffs' Exhibit 14.
20 BY MS. LANDRUM:
21 Q. Are these the individuals that were yelling those
22 obscenities?
23 A. Yeah, and off a bit, I guess, to where the right area
24 would be.
25 Q. And this individual that we see at 49 seconds, do you

76

1  see there it appears that he is either taking a photograph
2  or possibly livestreaming; would you agree?
3  A. Yes.
4  Q. Do you recognize that individual?
5  A. No.
6  Q. Do you recognize him as being a member of the media?
7  A. No. I don't know who that person is.
8  Q. But it's your position that he is media based off the
9  fact that he is holding up his phone in this image of your
10 video?
11 A. At this moment he's taking a picture. I don't know who
12 he is.
13 Q. Now, at this moment this gentleman is between other
14 protesters that are farther north on Nicollet and the line
15 of police officers that are south; is that correct?
16 A. Can you say that one more time?
17 Q. Sorry. So at this point this gentleman that we see here
18 in Exhibit 14 has positioned himself between -- directly
19 between the protesters that are north of him and the law
20 enforcement officials that are south of him, correct?
21 A. Yes.
22 Q. And that's contrary to one of your primary rules as a
23 journalist, is that right, not to get in between the
24 protesters and law enforcement?
25 A. Who are you talking about in this exact context, like

EXHIBIT A

**77**

1  what is contrary to?
2  Q. I am talking about the gentleman that we see here at
3  49 seconds in Exhibit 14. He has placed himself directly
4  between protesters and law enforcement, correct?
5  A. Yes.
6  Q. And that's contrary to your rule as a journalist to
7  never, in fact, do that?
8  A. That's inaccurate. We would be in those positions when
9  it's safe. So I would very feasibly be in that position and
10  then retreat to [audio distortion].
11      COURT REPORTER: I'm sorry. He's cutting out.
12      THE COURT: Your voice is cutting out. Our audio
13  is not helping us right now. So I don't know what
14  adjustments can be made, but we did not hear your response.
15      THE WITNESS: I would be possibly, you know --
16  it's not a hard-and-fast rule to never get in between. Like
17  I said previously, we would be in that position if we felt
18  that that was a safe place to be at that exact moment and
19  maybe would get a shot or, you know, shoot what we need to
20  shoot and then go somewhere else that was safer. So a lot
21  of times it's these calculations that we make as we read the
22  situation.
23  BY MS. LANDRUM:
24  Q. You don't have any expertise in law enforcement; is that
25  right, Mr. Ou?

**78**

1  A. No, I'm not a law enforcement officer.
2  Q. So when you're making calculations as to when it's
3  appropriate for you to get in between law enforcement and
4  protest activity, that's based off of your assessment of
5  your personal safety?
6  A. Yes, and that's [audio distortion].
7  Q. And that's not --
8      COURT REPORTER: I heard, "Yes, and that's." I
9  didn't hear what he said after.
10      THE COURT: Did you have more to say in your
11  response?
12      THE WITNESS: Yeah. Sorry. That's based off of,
13  you know, my experience covering protests.
14  BY MS. LANDRUM:
15  Q. So outside of your personal factor -- your own personal
16  safety, you are not factoring in the law enforcement needs
17  when you are deciding to insert yourself in between
18  protesters and law enforcement?
19  A. We are thinking of how we're perceived and we are
20  thinking of, like, at that moment is it tense, is it more
21  tense, is there -- you know, like, I think you are always
22  making a calculation as to how appropriate would a law
23  enforcement response be. And at that moment it felt
24  [audio distortion].
25      THE COURT: I didn't hear what you said. "At that

**79**

1  moment," and then what did you say?
2      THE WITNESS: At that moment it did not feel
3  tense. These people -- the protesters were saying things
4  that were antagonistic, but there was nothing being thrown.
5  And, you know, saying profanities towards the police at that
6  moment, in my assessment, was not -- would not -- did not
7  meet a threshold that, oh, something is going to happen
8  because of this, because there are profanities. So I
9  assessed at that moment for myself that it was still quite
10  calm.
11  BY MS. LANDRUM:
12  Q. But that, again, is not based on any law enforcement
13  expertise or training that you have, right, Mr. Ou?
14  A. No, it's not, but I guess it comes from just knowing or
15  thinking of when there would be a proportionate response
16  from law enforcement and not to be in the middle of that if
17  there was one.
18  Q. Now, at a certain point -- we heard about the injuries
19  that you sustained that day. You became separated from the
20  other journalists in your group; is that right?
21  A. I became separated from my colleagues, like, my direct
22  colleague, the reporter I was working with and the security
23  team. So, yeah, we got separated, but I was with other
24  colleagues, like, who were not working with NBC News but
25  were fellow journalists.

**80**

1  Q. And I think you testified that after you experienced
2  your initial injuries, that you were blinded at that point;
3  is that right?
4  A. Yes.
5  Q. But based off of your other senses, it was your
6  experience or your belief that you were being corralled
7  north towards the protesters; is that correct?
8  A. Yes.
9  Q. And that was the movement of that enforcement line,
10  correct, that law enforcement was moving to disperse
11  everyone north; is that correct?
12  A. Yes.
13  Q. So your experience was that those law enforcement
14  officers were attempting to move you north as well?
15  A. Yes, that is accurate.
16  Q. But you, in fact, did not move out of that dispersal
17  area, did you?
18  A. At which moment?
19  Q. So ultimately you ended up back in the alcove; is that
20  correct?
21  A. Just timeline-wise, we were in the alcoves off to the
22  side and when I was first hit by a projectile, I was already
23  disoriented, so I was unable to kind of, like, figure out
24  where to go. So I went further into the alcove thinking
25  that the police, if they want to disperse people, they would

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 21 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

**81**

1  just -- they had the option to pass us and we were out of
2  the way.
3  Q. So you remained in the area that law enforcement was
4  attempting to disperse, right?
5  A. Yes.
6  Q. Now -- let's see here.  And after that point you had
7  other interactions with law enforcement; is that right?  You
8  were asking for help; is that -- did I hear that correctly?
9  A. So I just want to clarify.  There were kind of, like,
10 two alcoves.  The first time when I was pepper-sprayed, that
11 was alcove number one.  And then we were corralled and then
12 we tried to get out to 31st Street, but then I ended up in
13 another alcove.  I don't know if it's an alcove, but a
14 trapped, fenced-off area.
15         And so that's -- the interaction happened twice.
16 So the first time I was pepper-sprayed and then corralled
17 from the alcoves, which is where we are looking at right now
18 in this area on the screenshot.  And then a second time I
19 interacted with the police again, that's when -- that's
20 around that time that I filmed my colleague being shoved
21 over a wall and that's -- yes, I interacted with them.
22 Q. But that second alcove was still in the dispersal area,
23 right, Mr. Ou?
24 A. Yes, the second place was in the dispersal area.  At
25 that time we were trying to leave, but there was nowhere to

**82**

1  go, so that's when, I guess -- when I filmed my colleague,
2  Mike Shum, being shoved over the wall.  If that is the idea
3  of how we are to disperse, it felt like a very dangerous
4  one.
5  Q. So you indicated that after that point your vision was
6  substantially impaired, correct?
7  A. Yes.
8  Q. And in that state of impairment, it sounds like you had
9  some other interactions with other law enforcement
10 officials, right?
11 A. Yes.
12 Q. But at that point -- and you recognize that there were
13 other law enforcement officials on the ground outside of
14 Minnesota State Patrol, correct?
15 A. Yes.  Is the question do I know if there was different
16 police departments, like MPD, et cetera?
17 Q. Yes, that were present on the ground on May 20, 2020
18 where you were.
19 A. Yes.
20 Q. Now, you didn't file a complaint with the Department of
21 Public Safety Office of Internal Affairs, did you?
22 A. No.
23 Q. And when the Office of Internal Affairs reached out to
24 you, you didn't respond; is that correct?
25 A. That's correct.

**83**

1  Q. So I would like to talk to you next about your coverage
2  in Brooklyn Center.
3         Now, I heard that prior to coming to Brooklyn
4  Center you were preparing to cover the Chauvin trial
5  verdict; is that right?
6  A. Yes.
7  Q. In anticipation of that, did you attend the Operation
8  Safety Net press briefings that were happening weekly?
9  A. No.  There were a few items on YouTube or on Twitter,
10 if I understand, that were -- that I watched a few times,
11 but I did not physically attend.
12 Q. Okay.  So then you did see guidance from OSN in order to
13 prepare for your coverage of the Chauvin verdict?
14 A. I wouldn't use the word "guidance" because, you know, as
15 journalists we monitor, we look at what's been tweeted out,
16 press conferences and stuff like that.  So a lot of that is
17 passive.  And it's our job to be informed of what people are
18 saying.
19 Q. But it sounds like you were fully aware that OSN was
20 reaching out in order to provide resources to the press in
21 anticipation of the Chauvin verdict; is that right?
22 A. As someone, just to be -- OSN, I am not familiar with
23 that acronym and, again, I'm based in New York, so I don't
24 regularly cover the Minneapolis/Minnesota state area, so I
25 don't know what that -- can you clarify that acronym?

**84**

1  Q. Sorry.  I thought that you had said that you had seen
2  some of the YouTube videos from Operation Safety Net,
3  specifically the press briefings that were being given on a
4  weekly basis.  Did I mishear that?
5  A. Again, I would see them every so often, but it's not
6  like I regularly sought them out.  When you are on Twitter,
7  you just see videos.  And especially when you are in
8  New York, you are not making a distinction between this
9  police department, that one, Brooklyn Center, Minneapolis.
10 It kind of -- it just depends on -- you get more specific as
11 you get closer to what you are covering.
12 Q. Did you reach out to anyone, Minnesota State Patrol, the
13 Department of Public Safety, to get guidance about how you
14 can be safe for purposes of the Chauvin trial coverage?
15 A. No, because it was pretty -- we shouldn't have to.
16 Again, my understanding is, as long as we're not interfering
17 with police activities or law enforcement activities,
18 there's no permissions or things to seek to be safe other
19 than just use your common sense and don't -- you know, like,
20 that's not something that we, as journalists, generally
21 should have to do.
22 Q. So you covered the unrest in Brooklyn Center from an
23 apartment building; is that right?
24 A. Yes.
25 Q. How many days were you there?

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 22 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                          July 28, 2021

85

1   **A.**  I was there for the duration of the week.  I got there,
2   I think, on a Monday or a Tuesday and I was there for a few
3   days in and out.
4   **Q.**  So in the video, I believe it's Plaintiffs' Exhibit 8,
5   you could hear quite clearly the dispersal order; is that
6   right?
7   **A.**  Yes.
8   **Q.**  And it was loud?
9   **A.**  Yes.
10  **Q.**  And it was -- it specifically indicated and instructed
11  media that the dispersal order did, in fact, apply to media;
12  is that right?
13  **A.**  I -- as journalists, we are there to be able to cover
14  things.  And the other thing, too, is from my exact vantage
15  point, I was in private property, so I wasn't outside.
16  **Q.**  Going back to my question, though, Mr. Ou, that
17  dispersal order specifically instructed you, as a member of
18  media, that the dispersal order did, in fact, apply to you,
19  correct?
20  **A.**  Yes, that is true, except we, as journalists, should be
21  in places -- where the freedom of the press is recognized,
22  we should be able to film activities so long as we are not
23  interfering with law enforcement or taking a part in
24  anything.  And so --
25  **Q.**  Let me just stop you there.

86

1        THE COURT:  No.  Let him respond to your question
2   and then you may ask a follow-up.
3        You may finish your response.
4        THE WITNESS:  So in a lot of places, not just in
5   protests, like a lot of the times as journalists we are
6   often told, like, don't film here, get out of here,
7   et cetera, by law enforcement.  And it's just a central
8   tenet to the First Amendment, which is if we are filming on
9   public property, we, the media, are allowed to undertake our
10  job, which is why, as I understand it, you know, we are
11  exempt from curfew.  During COVID we were able to go out
12  because our job is a very specific function of keeping an
13  open society informed.  And so that dispersal order, I felt,
14  did not apply to us because it is clear that we didn't need
15  to recognize the curfew.
16  BY MS. LANDRUM:
17  **Q.**  Well, so because you heard the dispersal order, though,
18  Mr. Ou, you could not have been confused that law
19  enforcement believed that media was subject to the --
20        MS. FOSTER:  Objection --
21  **Q.**  -- dispersal order, correct?
22        MS. FOSTER:  -- argumentative.
23        THE COURT:  Overruled.  You may answer if you can.
24        THE WITNESS:  Sorry.  Can you say that one more
25  time?

87

1   BY MS. LANDRUM:
2   **Q.**  Absolutely.  Because of the nature of the dispersal
3   order, because of the content of it, where it specifically
4   said that the dispersal order applied to media, you were not
5   confused that law enforcement believed that you were, in
6   fact, subject to the dispersal order, right?
7   **A.**  Right, but, again, there's two things at play.  I was in
8   private property at that exact moment, so I don't know where
9   I would have gone.  And that certainly did not apply to me
10  at that moment because what would they tell me, that I would
11  not be able to interview people in their homes?  That would
12  be a gross violation of many press freedoms and the First
13  Amendment, to say I am not allowed to interview citizens in
14  their apartments where I am directly invited.  So it did not
15  apply to [audio distortion].
16        COURT REPORTER:  I didn't hear the last part.
17        THE COURT:  The last bit we didn't hear.  Did you
18  say so it did not apply to me that way?
19        THE WITNESS:  At that exact moment.  Because
20  how -- in what open, free society would the police tell me
21  that I couldn't be in someone's private property at that
22  moment?  So that's why -- again, I was in someone's house,
23  invited, filming from private property, so I was already not
24  outside.
25  BY MS. LANDRUM:

88

1   **Q.**  Mr. Ou, did you review the governor's executive order
2   declaring the curfew in April 2021 before you came to
3   Brooklyn Center?
4   **A.**  I didn't personally look at it, but in talking to
5   colleagues, you know, et cetera, I knew generally what was
6   happening.
7   **Q.**  So you weren't aware, then, that that executive order
8   specifically stated that even persons exempted from the
9   dispersal order were not exempted from lawful orders from
10  law enforcement, right?
11  **A.**  I don't understand.
12  **Q.**  So you were not aware that that executive order
13  specifically stated that even if exempt from the curfew,
14  individuals that had that exemption were not exempt from
15  lawful orders from law enforcement, you were not aware of
16  that; is that right?
17  **A.**  I'm aware of that, but, again, I was in someone's
18  private property.  So just if I were to take that to its
19  logical conclusion, if I rented a flat or an apartment
20  across from there, would -- no law enforcement would have
21  been able to tell me to stop filming or not exist -- I could
22  very easily have had a flat there.  And so I just don't
23  understand.  It didn't apply to me, because if we're in a
24  house where the police can tell journalists to stop filming,
25  this is not America.

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                              July 28, 2021

---

**89**

1    MS. LANDRUM:  I would like to pull up Plaintiffs'
2  Exhibit 8 at 16 seconds, please, Ms. Kosek.
3  BY MS. LANDRUM:
4    Q.  This is Plaintiffs' Exhibit 8.  This is a video that's
5  already been admitted into evidence.  This is the view that
6  you have from that apartment; is that correct?
7    A.  Yes.
8    Q.  Now, in this still image at 16 seconds, you can see a
9  line of law enforcement to the left, right?
10   A.  Yes.
11   Q.  And then it looks like there's protesters to the right.
12 What was beyond this scene to the right?  Were there several
13 more protesters to the right?
14   A.  If you were looking where I'm looking now and you were
15 to pivot, let's say, 2:00 to the right, as I recall,
16 there was kind of like a clump of people who were protesters
17 and then, like, that's, like, kind of, like, right up to the
18 fence area but a bit further down the street, and then there
19 were kind of people here and there.
20   Q.  So, then, these individuals that we see here at
21 16 seconds -- for example, we see someone holding up a phone
22 who may be livestreaming or taking a photo, right?
23   A.  Yeah.
24   Q.  And it looks like there might be a gentleman with a
25 camera of some kind near him?

**90**

1    A.  Yes.
2    Q.  Would you agree with me that these individuals are
3  placing themselves between law enforcement and the
4  protesters?
5    A.  Yes.
6    Q.  Is it possible that they themselves are protesters?
7    A.  At this moment it looks like they're filming, so
8  they're -- they have a phone.
9    Q.  Did you recognize these people, as you were there on the
10 scene, as colleagues of yours?
11   A.  I saw colleagues there, but at this exact moment I was
12 in private property filming from an apartment, so I didn't
13 personally know these individuals.
14   Q.  And doesn't this again violate your general rule not to
15 get between protesters and law enforcement?
16   A.  I'm not these people over here.  So are you asking me if
17 that's something that I would do or --
18   Q.  Exactly.  I'm saying these two individuals that appear
19 to be taking photos or livestreaming, if they would be
20 violating your rule getting -- if they are, in fact,
21 journalists, if they are getting in between the law
22 enforcement line and the protesters.
23   A.  I would say at this moment, because there isn't anything
24 being actively -- there's no hostility at this moment.  It's
25 not like behind them anyone is throwing rocks or anything

**91**

1  like that.  So if I were there in that spot, if someone were
2  to escalate that, it would be the police because I would --
3  we're not getting in between anything.  As I remember, at
4  that exact moment, and, again, many things happened that
5  night, it was mostly people filming the police and a lot of
6  the clashes or the more escalated actions of protesters were
7  to the [audio distortion].
8    COURT REPORTER:  I'm sorry.  I didn't --
9    THE COURT:  The protesters were where when things
10 escalated?
11   THE WITNESS:  Like at this exact moment, if you
12 were to just take the exact dead center of this frame as,
13 like, 12:00, I would say 2:00 or 3:00, kind of maybe to the
14 right, that's where a lot of the protesters were -- like
15 protester protesters and then people were throwing things
16 and bottles at the police and stuff.  Here the law
17 enforcement was [audio distortion].
18   THE COURT:  I didn't hear the last bit.  "Here the
19 law enforcement," and then you could not be heard.
20   THE WITNESS:  People here were being filmed by
21 these people on the bottom, like the law enforcement on the
22 left.
23 BY MS. LANDRUM:
24   Q.  And I think I heard you just testify that you witnessed
25 that individuals were throwing bottles and other objects at

**92**

1  law enforcement; is that right?
2    A.  Yes.
3    Q.  Now, you said at a certain point that a law enforcement
4  official pointed something at you from the ground; is that
5  right?
6    A.  Yes.
7    Q.  But you don't know what that object was?
8    A.  No.  It was cylindrical.
9    Q.  And you don't know which law enforcement agency was
10 represented by this individual?
11   A.  No, I don't.
12   Q.  And you were not harmed in any way by law enforcement in
13 April 2021 in Brooklyn Center, were you?
14   A.  No, I was not.
15   Q.  Thank you.
16   MS. LANDRUM:  No further questions.
17   THE COURT:  Anything further for this witness?
18   MS. FOSTER:  Just very brief redirect.
19   THE COURT:  You may.
20   MS. FOSTER:  I would like to call up the long
21 video.  I think that's Plaintiffs' Exhibit 14.
22   (Video recording played)
23   MS. FOSTER:  We can stop there at 42, 42 seconds.
24
25

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

---

**93**

1          REDIRECT EXAMINATION
2  BY MS. FOSTER:
3  **Q.** On that recording you heard the announcement to
4  disperse.  Did they say to disperse because of being in
5  violation of a curfew?
6  **A.** Yes.
7  **Q.** Was it your understanding that the curfew did not apply
8  to journalists?
9  **A.** Yes.
10  **Q.** Is that the reason why you did not disperse?
11  **A.** That is correct.
12          MS. FOSTER:  No further questions, Your Honor.
13          THE COURT:  Anything further for this witness?
14          MS. LANDRUM:  No, Your Honor.  Thank you.
15          THE COURT:  May the witness be excused?
16          MS. FOSTER:  Yes, Your Honor, the witness may be
17  excused.  Thank you.
18          THE COURT:  Sir, you are excused.  Thank you.
19          THE WITNESS:  Thank you.  Do I leave or --
20          MS. FOSTER:  Just leave the Zoom session.
21          THE WITNESS:  Okay.
22          MS. McGARRAUGH:  Your Honor, are you ready for us
23  to proceed with our next witness?
24          THE COURT:  Yes, please.
25          MS. McGARRAUGH:  Plaintiffs call Chris Tuite.

**94**

1          COURT REPORTER:  Remain standing and raise your
2  right hand, please.
3    (Witness sworn)
4          COURT REPORTER:  If you could state your full
5  name, spelling your first and last name, please.
6          THE WITNESS:  Christopher David Tuite.  First name
7  Christopher, C-h-r-i-s-t-o-p-h-e-r.  Last name Tuite,
8  T-u-i-t-e.
9          (Christopher Tuite)
10          DIRECT EXAMINATION
11  BY MS. McGARRAUGH:
12  **Q.** Thank you, Mr. Tuite.  What is your profession?
13  **A.** I'm a freelance photographer.
14  **Q.** What publications have your photographs been published
15  in?
16  **A.** New York Times, New York Post, Washington Post, Rolling
17  Stone, Time magazine, People magazine, Wall Street Journal,
18  FOX News, CNN, lots of places.
19  **Q.** Are you employed by any particular news organization?
20  **A.** I'm not.
21  **Q.** How do your photographs end up in these publications?
22  **A.** I work for a place that's called the wire, a place
23  called imageSPACE, and from imageSPACE my photos get pushed
24  out to lots of other places, Associated Press, ZUMA, and
25  then publications that want to run things, they buy things

**95**

1  per photo and then they put them in their publication.
2  **Q.** Where do you currently live?
3  **A.** I live in Hayward, California, which is out near
4  Oakland.
5  **Q.** And where geographically do you work as a photographer?
6  **A.** All over the place.  I shoot concerts.  I shoot events,
7  shoot weddings.  I shoot journalism.  I go wherever the work
8  is, wherever the story is, wherever I can.
9  **Q.** How do you decide where to go?
10  **A.** This last year has been very different for me.  Concerts
11  and events were taken away, so I had to find a way to adapt.
12  So I started covering protests and I went where the story
13  was.  I tried to encapsulate different areas, mostly around
14  social justice, you know, police brutality protests in
15  general.
16  **Q.** How far in advance do you decide where you're going to
17  go?
18  **A.** This really depends.  Some events, like the march on
19  Washington, I planned to be at a couple months ahead of
20  time.  I was out here covering the Derek Chauvin trial.  I
21  planned to do that.  But mostly it's kind of on the fly.
22  And I have a lot of other friends that -- for instance, when
23  Daunte Wright was killed, he flew out the next morning.  So
24  it's one of those things where you can't really plan very
25  well where you're going to be.  You just have to go where

**96**

1  the story is.  And it makes it very tricky planning flights,
2  planning hotels, but also very tricky, you know, making
3  accommodations on where you are going to be.
4  **Q.** If you were required to apply for city or state press
5  credentials in advance, would that be practical with the
6  schedule?
7  **A.** No, not in my opinion at all.  I don't believe that
8  press credentials are standard in any way.  There are
9  certain cities, like New York, that does it, but it requires
10  quite a while to apply.  Like if I was able to do this, I
11  wouldn't be able to have been in Minnesota, Brooklyn Center.
12  I'm up to Portland kind of on a whim.  I spent four days up
13  there.  There's no way I could have applied and been able to
14  be out there covering, documenting anything.
15  **Q.** So you mentioned earlier that you were in Minneapolis
16  covering the Derek Chauvin trial.  When did you arrive in
17  Minneapolis?
18  **A.** I arrived on March 27th.  I was there for an entire
19  month.
20  **Q.** Of 2021?
21  **A.** Correct.
22  **Q.** And you were there for a month.  So until late April
23  of --
24  **A.** Yes.
25  **Q.** -- 2021?

---

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                          July 28, 2021

**97**

1    So you were present in the Twin Cities when the
2  Daunte Wright protests came up?
3  **A.** I was. I was covering another protest in St. Paul and
4  the word got out that Daunte Wright had been killed. We
5  went directly from there to the area he was killed and then
6  followed the protests to the Brooklyn Center Police
7  Department.
8  **Q.** What days or nights did you cover the protests in
9  Brooklyn Center related to Daunte Wright?
10 **A.** I covered the entire thing until numbers got very small.
11 So it would be seven or eight days I was out there every
12 single day and night covering, documenting everything.
13 **Q.** Okay. I would like to walk through some of the
14 experiences that you had in Brooklyn Center.
15 **A.** Sure.
16 **Q.** So, first, what law enforcement agencies did you observe
17 there?
18 **A.** State troopers. I observed National Guard. I observed
19 the sheriff's department. I observed what appeared to be
20 Brooklyn Center Police Department, but they were usually a
21 little ways away. There was a fence after the first night,
22 and they were generally out towards the building and they
23 weren't very identifiable.
24 **Q.** How did you recognize state troopers?
25 **A.** They were very recognizable. They had the long-sleeve

**98**

1  yellow arms. They had the state logo on the chest. You
2  could see them in the daytime. In the night it would
3  really, really reflect with the police lights or flashlights
4  or whatever. They were very, very identifiable.
5  **Q.** All right. I would like to direct your attention
6  specifically to the evening of Tuesday, April 13th. Do you
7  recall that evening?
8  **A.** I do.
9  **Q.** Were you in Brooklyn Center?
10 **A.** I was.
11     MS. McGARRAUGH: All right. I would like to pull
12 up Plaintiffs' Exhibit 3. Can he see it on his screen?
13     THE WITNESS: Yeah.
14     MS. McGARRAUGH: Okay. Great. Leslie, do you
15 mind scrolling through this for him so he can see the pages?
16     THE COURT: Let's just stop right here. Can you
17 turn on my screen?
18     LAW CLERK: You can't see it?
19  (Pause)
20     THE COURT: Thank you. You may proceed, Counsel.
21     MS. McGARRAUGH: Your Honor, may I approach and
22 give him the book? It will be easier for him to see the
23 multipage exhibit.
24     THE COURT: Yes, you may.
25  (Witness reviews exhibit)

**99**

1  BY MS. McGARRAUGH:
2  **Q.** Have you had a chance to look at that Exhibit 3?
3  **A.** Yeah. I will flip all the way through.
4   (Witness reviews exhibit)
5  **A.** Okay.
6  **Q.** Do you recognize this exhibit?
7  **A.** Yes, I do. This is my Instagram posts that I was
8  covering from this specific day.
9  **Q.** When you say "this specific day," you mean Tuesday,
10 April 13th?
11 **A.** Correct. When I make my posts, I go home at night, I
12 have a chance to cull my photos, which means go through the
13 photos, select them, dump my photos onto the hard drive, and
14 then I essentially write a little post that summarizes the
15 day's events.
16 **Q.** Okay. This first page -- actually, let me go back. So
17 this says, "April 14"?
18 **A.** Yes.
19 **Q.** Why does it say, "April 14" on --
20 **A.** It was done after midnight. By the time I got home,
21 took a Lyft ride back to --
22     MR. HSU: Objection. The witness is testifying to
23 a document not submitted in evidence.
24     MS. McGARRAUGH: Fair point. Plaintiffs offer --
25     THE COURT: Sustained. Do you wish to offer the

**100**

1  exhibit?
2      MS. McGARRAUGH: I do. Plaintiffs offer
3  Exhibit 3.
4      MR. HSU: We would object to the admission as
5  hearsay.
6      THE COURT: Any response?
7      MS. McGARRAUGH: Well, so --
8      THE COURT: Is it offered for the truth of the
9  matter asserted or is it offered --
10     MS. McGARRAUGH: So the caption on the first page
11 is offered only to refresh his recollection. And the
12 photographs, I think, are not hearsay, and it's my
13 understanding that the hearsay rule doesn't necessarily
14 apply in a preliminary injunction hearing with the
15 limitation on witnesses. And the Court certainly can take
16 the evidence for, you know, what its weight deserves.
17     THE COURT: Do you wish to be heard, sir?
18     MR. HSU: We would state even the photographs are
19 paired with the written commentary related to the event and,
20 accordingly, the whole document would be submitting hearsay
21 statements. And while the burden may differ from an
22 injunction, the admissibility of evidence is still a key
23 aspect.
24     THE COURT: The objection is overruled. You may
25 proceed. It is admitted.

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 26 of 78

Goyette, et al. vs. City of Minneapolis, et al.                  July 28, 2021

**101**

BY MS. McGARRAUGH:

1  Q.  So you made this post in the early morning hours of
2  April 14th?
3  A.  That's correct.
4  Q.  All right.  During that evening did you hear any
5  dispersal orders in Brooklyn Center?
6  A.  Yes, I did.
7  Q.  Can you tell -- what did those dispersal orders sound
8  like?
9  A.  They were generally given over some sort of a loud
10  speaker.  I believe it was a mobile loud speaker that one of
11  them was carrying, one of the state police officers, state
12  troopers.  They formed a line out coming from the south side
13  of the department on the street of about, I would say, a
14  hundred officers.  They were saying people need to disperse.
15  They were very specifically focusing on media.  They said,
16  "Media need to leave the area."  It was nearly 50
17  times over the loud speaker.  And being a journalist, I
18  believe I know my rights and I did not disperse because I
19  needed to be there to document what's happening in public.
20  Q.  So you said that order was given maybe 50 times.  Over
21  what period of time?
22  A.  I would say an hour or so.
23  Q.  Do you have a sense -- excuse me.  You referred to a
24  line of maybe a hundred officers.  Were those -- could you

**102**

1  tell what agency they were affiliated with?
2  A.  Yes.  They were state troopers.  I believe every single
3  one of them was.  There might have been one in between that
4  was not, but to my recollection, they were all state
5  troopers.
6  Q.  Do you have any sense of -- well, from your observation,
7  could you perceive what triggered the transition from 50
8  dispersal orders to the line moving through?
9  A.  I'm sorry.  Can you repeat that?
10  Q.  In your observation, what changed that went from 50
11  dispersal orders being given over an hour to the line moving
12  through?
13  A.  To them chasing people?
14  Q.  Yeah.  What was -- what did you perceive the trigger to
15  be?
16  A.  Well, I believe that they wanted to clear the area, but
17  they waited a long time.  It was an hour, hour and a half.
18  It was essentially protesters expressing their displeasure
19  verbally to the line of officers.  It stayed fine.
20       A small fire was started in the street,
21  essentially like a campfire shape with some pieces of wood.
22  The second that happened, all the troopers started rushing,
23  running after people, and it chased everyone down, including
24  cars.  Cars were driving in the opposite direction.  People
25  were running north away from the area on the sidewalk, on

**103**

1  the grass.  It created a fairly dangerous situation.
2       Do you want me to proceed with what happened after
3  that?
4  Q.  Sure, yeah.  What happened next?
5  A.  So we got to the corner of the gas station across from
6  the Pump N Munch.  I actually in my first deposition said
7  Pump N Munch.  It's the one across the street from the
8  Pump N Munch -- I wanted to correct that right now -- on the
9  other corner.
10  Q.  When you said "deposition," do you mean declaration?
11  A.  Yes.  Excuse me.  Declaration.  Sorry.
12       We got up to the corner.  I recognized a
13  photographer.  His name was Josh McFadden.  He is a New York
14  Times freelance photographer.  He is based out of upstate
15  New York and he was out here covering the entire trial as
16  well as the Daunte Wright protests.
17       We were trying to figure out a way to get out
18  because it was very hectic.  There were -- as soon as we
19  turned the corner, there were cars that came screeching in,
20  officers jumped out, including National Guard.  Mostly the
21  state troopers were around tackling people, grabbing them,
22  saying, "Get on the ground," arresting people before they
23  could actually disperse.
24  Q.  Were you able to get back to your car?
25  A.  Our car was on the -- actually, I came with Lyft, but I

**104**

1  asked him if I could get a ride earlier and he said that was
2  fine.  So I saw him.  And it was a Good Samaritan that
3  offered to give us a ride.
4  Q.  Why didn't you go to Mr. McFadden's car?
5  A.  His car was on the opposite side of the protest and it
6  was all blocked by vehicles and state troopers.  We were not
7  allowed to go that direction.  So I asked -- he actually
8  asked for a ride and this lady said, "Sure, I'll give you a
9  ride back."  We hopped in the car, buckled our seat belts
10  and were surrounded by state troopers with their weapons
11  pulled screaming, "Get out of the vehicle, get out of the
12  vehicle."  And frantically I took my press pass, put it up
13  to the window and screamed, "Press, press, press, press,
14  press," like 50 times.  One trooper grabbed me out.  He
15  actually listened to me, but they took Josh.  He threw him
16  up into the car, and it took me telling them 50 times he was
17  also press and he was with me.  He had also said, "Press" at
18  least ten times, had it around his neck, very identifiable
19  as press, multiple cameras on his sides.
20  Q.  Were you also carrying a camera at that time?
21  A.  I was.
22  Q.  How large is your camera?
23  A.  I have two.  I have one with a bigger lens.  So the
24  bigger lens would have been about this big (indicating), and
25  the other one is about that big (indicating) with the

Goyette, et al. vs. City of Minneapolis, et al.                                                July 28, 2021

**105**

1   smaller lens because they -- very similar size.

2        THE COURT: You need to describe what "that big"

3   is.

4        THE WITNESS: Okay. The 70 to 200 millimeter lens

5   is used for medium and zoom range and it zoom, I would

6   say, six to eight inches in length. The wider lenses I

7   have, I have a 17 to 35 millimeter and a 24 to 70. Those

8   are about three to five inches in length. I believe I had

9   the 24-70, which was probably four-ish inches.

10   BY MS. McGARRAUGH:

11   **Q.** And Mr. McFadden had similar equipment?

12   **A.** Yes.

13   **Q.** And you were wearing a press pass?

14   **A.** I was.

15   **Q.** What did that look like?

16   **A.** It was an independent pass. So this is the tricky thing

17   about not having standard passes and why it's not possible

18   to do this, because there's people that go all over the

19   place. They are assignment based and there's no

20   standardized press pass for people to get. So I have an

21   independent pass that was made up for me. It has my

22   picture, identifies me as independent press. That's

23   basically all it is. It is has a little scanner on the

24   bottom that goes right to my social media on there. It just

25   has my picture as independent press on it.

**106**

1   **Q.** Did you have the opportunity to see Mr. McFadden's press

2   pass?

3   **A.** I did. It was a National Press Photographers

4   Association pass, which is a pretty standardized one, but

5   you have to apply to get it and it costs money to get. So

6   there's a barrier there, but anyone can get that.

7   **Q.** Did you perceive a difference in how your press

8   credentials were received versus his press credentials?

9   **A.** I don't know exactly why they listened to me. He did

10   the same thing I did. All I can tell you is that I am white

11   and he is black, and we are covering social justice

12   protests.

13   **Q.** Was it your impression that he was not believed that he

14   was a journalist?

15   **A.** That's my impression. He has spoken -- this happened to

16   him multiple times in other areas as well.

17        MR. HSU: Objection, hearsay.

18        THE COURT: Overruled.

19        THE WITNESS: This is a problem right now. A lot

20   of agencies are being criticized for not sending

21   African-American photographers to cover social justice

22   things and there's been a very conscious effort over the

23   last couple of years to make sure that they're included and

24   their voices are being heard and this sort of thing, and

25   they're not treated the same way in many situations, from my

**107**

1   perspective.

2   BY MS. McGARRAUGH:

3   **Q.** Are you confident that the officers that pulled you out

4   of that car are state troopers?

5   **A.** I am 100 percent confident.

6   **Q.** How do you know?

7   **A.** I saw the very identifiable sleeves with the Minnesota

8   state logo on their chest.

9   **Q.** How did that incident affect your ability to do your job

10   on that night?

11   **A.** Well, we had to leave the area. As soon as we got out

12   of the car, we were negotiating on how to get back to our

13   car. We didn't know how we were going to do that because

14   they closed off all the roads that got there. It was only

15   National Guard that offered to okay us to walk through this

16   specific area, and even the same time we walked very slowly.

17        What we did first, though, before we left, we went

18   into the church, which was a safe haven for protesters and

19   for everyone alike. We got a little bit of something to

20   drink and a snack. And Josh had to process his photos and

21   he had to take a few minutes to wind down from the

22   encounter. It shook him up a little bit. And he had to

23   send it to The New York Times and he had to text his editor

24   at The New York Times telling him what happened; and, of

25   course, they were concerned.

**108**

1        So once we left the church, we talked to

2   the Guard. We obviously had to get back to our car. No one

3   was letting us go through here. Everything was blocked off.

4   They said, "That's fine." But the whole time we walked like

5   this (indicating). I had my pass up, hand out, because I

6   didn't want to spook anyone because we had to go back to an

7   area that was essentially closed all the way across the

8   protest. It was very uncomfortable. He was not

9   comfortable. I told him, "It will be okay. I'll go first.

10   I'll hold this." He's like, "I don't know about this." He

11   thought we were going to have an issue. And once that

12   happened, we got back to our car. I asked permission from

13   the Guard, "Can we leave here?" And he said, "Yes, you're

14   fine."

15   **Q.** Were you able to take photographs as you walked with

16   your hands up?

17   **A.** No.

18   **Q.** So you were not able to do your job during -- after that

19   portion of the evening?

20   **A.** (Shaking head.)

21   **Q.** I would like to move to the evening of April 16, 2021.

22   That's a Friday. Where were you on that evening?

23   **A.** I was at Brooklyn Center.

24   **Q.** What time did you arrive in Brooklyn Center?

25   **A.** I would say about 7:00.

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 28 of 78

Goyette, et al. vs. City of Minneapolis, et al.                    July 28, 2021

**109**

1  Q.  What was the crowd like on that evening?

2  A.  There was a smaller number than the previous night.  I

3  would say there was about 150 protesters out there.  People

4  were mostly standing in place talking around the outside of

5  the fence.  At this point, to my recollection, there was a

6  second fence that had been installed outside the department.

7  The first night we got there, the night that Daunte was

8  killed, there was no fence, so protesters got all the way up

9  to the department up in front.  And then the next night we

10  came back, there was one fence there and then they had put a

11  secondary protective fence up at this point.  So people were

12  kind of standing around.  There were some umbrellas.  People

13  were hanging out and chatting for the most part.

14  Q.  Did you see any fireworks?

15  A.  I did.

16  Q.  Did you see them -- what direction did they go off?

17  A.  Directly up or back behind the apartment complexes.  So

18  they were straight up in the air.  I actually have some

19  photos that were taken, you know, from those areas that were

20  just fireworks that were nowhere near the department that I

21  saw.  They were mostly straight up.

22  Q.  Did you personally observe any fireworks fired in the

23  direction of law enforcement?

24  A.  I did not.

25  Q.  Did you observe anybody throwing bottles?

**110**

1  A.  Yes.

2  Q.  In your opinion, was the crowd violent?

3  A.  No.

4  Q.  Was it riotous?

5  A.  Was not.

6  Q.  How did it compare to the sort of atmosphere of the

7  crowd on the prior evening, that Thursday?

8  A.  It was very similar.  I would say it was even more

9  peaceful than the night before.  It was very interesting.

10  The night before word got out, I believe it was through

11  Signal, which is an encrypted app that people use on their

12  phone to talk to each other, and the word got out that there

13  was a kettle being set up around the protest by state

14  troopers.  A kettle is when they surround the protest in a

15  circle and do a mass arrest.  So this word got out very

16  quickly between journalists, activists, everyone that was

17  out there, and people started to disperse, like we don't

18  want to get arrested.  We're -- no reason to be arrested,

19  we're just standing around, but we don't want to mess with

20  this.  So this dispersal occurred over probably a 20-minute

21  period.  By the time curfew hit, people were pretty much

22  dispersed.

23  Q.  Did you observe a confrontation between law enforcement

24  and protesters or journalists on Thursday, April 15th?

25  A.  Not that I recall.

**111**

1  Q.  Okay.  So going back to Friday night, did you hear any

2  dispersal orders on Friday night?

3  A.  Not that I recall.

4  Q.  Did you observe a mass arrest on Friday night?

5  A.  I did.

6  Q.  About what time did that occur?

7  A.  I would say 10:02.

8  Q.  Do you have -- what was your perception of what

9  triggered that mass arrest starting?

10  A.  I believe that officers were using the curfew as grounds

11  to make a mass arrest.  I personally did not see anything

12  that night that warranted a mass arrest or arrest of anyone,

13  any individual.  I believe their attempt was to quell future

14  protests.

15         MR. HSU:  Objection, speculation.

16         THE COURT:  Overruled.

17         THE WITNESS:  So I can answer?

18  BY MS. McGARRAUGH:

19  Q.  You can go ahead.

20  A.  So I do believe that their plan was to make a mass

21  arrest and to scare people from coming back.  I don't

22  believe there were grounds to make a mass arrest or make any

23  arrests in general.  I thought that was their tactic.

24         I also believe that the previous night there were

25  a lot of -- there was a drone flying frequently, as well as

**112**

1  a helicopter, and I do believe they used it as intel on how

2  protesters dispersed from the area.

3         And as soon as 10:02 hit, state troopers came in

4  from the south and the east, sheriff in came from the corner

5  of the fence, and they plugged up those areas instantly.  He

6  said, "Plug the hole in the fence.  Go over here."  They

7  watched exactly how activists left the area by using that as

8  intel.

9  Q.  So you mentioned that you observed both the state

10  troopers and the sheriff during that rush.  What happened in

11  that initial rush?

12  A.  It was pretty chaotic.  No one expected to be rushed

13  like this because nothing happened the previous night.  It

14  was very similar.  It was just from the east there was a

15  line of probably 20 to 25 state troopers that came running

16  in, as well as from the south, and they met with the sheriff

17  kind of in a jumble.  They came in screaming, "Get on the

18  ground, get on the ground, get on the ground," and they

19  started taking people down to the ground and started

20  arresting them.

21  Q.  Where did you go?

22  A.  I stayed inside the kettle because I believed it was my

23  duty to document the arrests that were happening at the

24  time.  That is generally the job of media, is to document

25  people in power to make sure their power is not being

EXHIBIT A

113

1  abused.
2  **Q.** Can you turn to Exhibit 4 in your book, Plaintiffs'
3  Exhibit 4. Just take a minute to page through it. Then
4  when you are ready, let me know what this is.
5      (Witness reviews exhibit)
6  **A.** Okay.
7  **Q.** What is this, Mr. Tuite?
8  **A.** This is my Instagram post talking about what happened on
9  April 16th. Again, this is posted on April 17th because I
10 got back after midnight.
11     MS. McGARRAUGH: Plaintiffs offer their Exhibit 4.
12     MR. HSU: State objects. The document is hearsay
13 and presents hearsay testimony.
14     THE COURT: Is it offered for the truth of the
15 matter asserted?
16     MS. McGARRAUGH: No, it's not. We're going to
17 just talk about the photographs.
18     THE COURT: What's the purpose of the exhibit?
19     MS. McGARRAUGH: The purpose of the exhibit is to
20 refresh his recollection of what he saw and also to look at
21 the photographs that are included. From our perspective, we
22 can disregard the text.
23     THE COURT: The objection is sustained. You may
24 use it to refresh recollection, but you don't admit exhibits
25 to refresh recollection.

114

1      MS. McGARRAUGH: Okay.
2  BY MS. McGARRAUGH:
3  **Q.** All right. So if you can look at page 3 of this
4  document --
5      THE COURT: Or I should say you don't admit
6  exhibits to refresh recollection.
7  BY MS. McGARRAUGH:
8  **Q.** What is this page, speaking just about the photograph in
9  the center on page 3 here?
10 **A.** Did you ask me what it is?
11 **Q.** Yes.
12 **A.** So this is when I'm inside the kettle and the mass
13 arrests are happening. This is a photo of two protesters
14 being arrested while holding hands by the sheriff's
15 department right in front of me. Back behind them there is
16 a very large line of state troopers.
17     MS. McGARRAUGH: Plaintiffs offer just this
18 page -- and we will redact out the text -- just the
19 photograph. We can call it Exhibit 4-A, and we will provide
20 a redacted copy following the hearing.
21     THE COURT: This is Exhibit 4, page 3 that you're
22 offering?
23     MS. McGARRAUGH: Yes, Your Honor. Just the part
24 that Ms. Anderson has excerpted on the screen, so just the
25 photograph.

115

1      THE COURT: Would you publish it just so that I am
2  sure that we are on the same page as to what is being
3  offered, and then I'll hear from opposing counsel if there's
4  anything to be heard.
5      MS. McGARRAUGH: Just that call-out. Just the
6  photograph.
7      THE COURT: Is there any objection?
8      MR. HSU: No objection, Your Honor.
9      THE COURT: It is received in the manner in which
10 you have offered it.
11     MS. McGARRAUGH: Yes. And we will submit a copy
12 of just this excerpt --
13     THE COURT: Please do.
14     MS. McGARRAUGH: -- following the hearing.
15     THE COURT: Thank you.
16 BY MS. McGARRAUGH:
17 **Q.** All right. And then turning to the following page in
18 this document, which we can -- we don't have to publish
19 this. We're going to do the same exercise again with this
20 next picture. What is the photograph on the following page,
21 page 4 of that Exhibit 4?
22 **A.** This is a state trooper making an arrest on the lawn
23 inside of the kettle. Back behind them is a flashlight
24 being shown on me from a state trooper.
25 **Q.** Did that state trooper say anything to you as --

116

1  **A.** Yes, he did.
2  **Q.** What did he say to you?
3  **A.** He said, "Media" -- do I have permission to cuss, to say
4  in quotes for this?
5      THE COURT: You may state what you heard.
6      THE WITNESS: "Media, get the fuck out of here
7  now."
8  BY MS. McGARRAUGH:
9  **Q.** Did you understand from that interaction that this state
10 trooper recognized you as a member of the media?
11 **A.** Yes, I did. Not only did he say, "Media, get the fuck
12 out of here now," I held up my pass and he acknowledged that
13 I was media.
14     MS. McGARRAUGH: Okay. So plaintiffs offer just
15 the photograph, this one as Exhibit 4-B --
16     THE COURT: Okay.
17     MS. McGARRAUGH: -- in the same manner.
18     THE COURT: I just want to make sure that I
19 understand what exhibit we are talking about. It's the
20 exhibit that's on the screen, correct?
21     MS. McGARRAUGH: Yes, just this call-out that
22 pictures a state trooper standing over someone and then a
23 light flashing in the photographer's lens right here.
24     THE COURT: Okay. Any objection?
25     MR. HSU: No objection, Your Honor.

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 30 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

**117**

1        THE COURT:  That exhibit is received.

2        MS. McGARRAUGH:  Thank you.

3  BY MS. McGARRAUGH:

4  Q.  What happened after you took this photograph?

5  A.  He charged up in me, along with about four other state

6  troopers.  He walked up and said, "Media, get the fuck out

7  of this area now.  You have to get the fuck out of here."

8  And I said, "I am allowed to document."  He said, "Get the

9  fuck out of here now."  And I put my hands up and I said,

10  "Okay, okay, okay."

11        I turned to my right as I was walking and I saw

12  someone on the ground, which was being pinned by the foot of

13  a police officer.  I took photos for a total of four

14  seconds.  I looked at the metadata inside.  When you take a

15  photo, it shows you exactly when each photo was taken.  Four

16  seconds.  That turned out to be Tim Evans, a photographer.

17        I then went to walk again.  He told me to walk

18  north, and I was grabbed from behind by a trooper.  He

19  grabbed my hood, pulled me backwards and said, "You're under

20  arrest," and pulled me enough to rip the neck of my shirt.

21  Q.  What happened after that?

22  A.  Another state trooper, who may have been a captain, came

23  and he grabbed my arm and pulled me away from that trooper.

24  He said, "Come this way" and he said, "Go north."  He walked

25  me up to the back side of the apartment building.  And I was

**118**

1  listening to him, going north.  I get around the corner and

2  I have five more troopers come up to me and get into my face

3  and say, "What the fuck did you not hear?  I told you to

4  leave."  One trooper came up and put pepper spray in my

5  face.  He said, "You had your fucking free pass.  What, are

6  you stupid?  We told you to fucking leave the area."

7  Q.  What happened then?

8  A.  I continue to leave the area, and apparently I wasn't

9  walking fast enough.  They said, "Go fucking faster, go

10  fucking faster, go, go, go, go faster," just very

11  aggressively kind of pounding their chest, trying to

12  intimidate me to not be able to do my job anymore.  I got

13  past the fence.  After that happened, they directed us to

14  this area outside of the kettle.  The area outside of the

15  kettle was behind a line of state troopers.  They were

16  obstructing our view completely of what was happening inside

17  the kettle.

18  Q.  All right.

19  A.  They told us to document from there.

20  Q.  So I would like to look at Plaintiffs' Exhibit Number 1.

21  Can you tell me what this exhibit is.

22  A.  This is the view that they gave us to document from

23  outside of the kettle.  As you can see, there are state

24  troopers standing there with their backs turned.  Sometimes

25  their face is to us.  You can basically just see their legs.

**119**

1  I can see a member of the media holding their press pass up,

2  which is inside the kettle, as they are being detained

3  inside of the kettle.

4        MS. McGARRAUGH:  Plaintiffs offer their Exhibit 1.

5        MR. HSU:  No objection.

6        THE COURT:  Exhibit 1 is received.

7        MS. McGARRAUGH:  Permission to publish?

8        THE COURT:  Yes, you may.

9        MS. McGARRAUGH:  Thank you.

10  BY MS. McGARRAUGH:

11  Q.  Zooming in on the center of this picture, in between

12  those two state troopers, what do you see here?

13  A.  I see a photographer that has a gas mask on holding up

14  the press credential while he's inside the kettle.

15  Q.  Where did the state troopers eventually direct you?

16  A.  One trooper came out and said, "You need to leave the

17  area."  And we said, "Why do we have to leave the area?  We

18  are trying to take photos."  He said, "No.  You need to

19  leave the area now."  We're like, "This is public.  We can

20  document in public.  We are not obstructing you in any way."

21  He said, "No.  You need to leave immediately."  He said, "Go

22  two blocks up to the gas station on the corner."

23  Q.  From that vantage point, could you see the ongoing

24  arrests in the kettle?

25  A.  Could I see what?

**120**

1  Q.  From the gas station two blocks up, could you see the

2  ongoing arrests in the kettle?

3  A.  Absolutely not.

4  Q.  Could you do your job from there?

5  A.  I was not even allowed to do my job.  They made us get

6  into a line here and they said we need to have our faces

7  photographed, our media credentials, as well as our IDs.  I

8  tried to walk to the right to take a photo of someone

9  getting arrested.  He said, "Get back in line.  You are not

10  allowed to document.  Get back in line," the state trooper

11  to me.

12        So we get into the line.  I was forced to take my

13  gas mask off as well as my helmet to have my face

14  photographed at close range on their -- keep in mind it's

15  also a pandemic.  The officer did not have a mask on.  So I

16  had to take all protective gear off to get my face

17  photographed before I could leave the kettle.  People that

18  were inside the kettle were not allowed to leave until we

19  let them photograph us.

20  Q.  So drawing your attention to Exhibit 5 here, Plaintiffs'

21  Exhibit 5 --

22        MS. LANDRUM:  Your Honor?

23        THE COURT:  Yes.

24        MS. LANDRUM:  The defense would --

25        COURT REPORTER:  Is your microphone on?

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                      July 28, 2021

**121**

1    MS. LANDRUM:  Oh, I'm sorry.
2        THE COURT:  If it is, you may be seated and remain
3    seated while you are speaking, just so that we have access
4    to the microphone and it's comfortable for you to express
5    yourself.
6        MS. LANDRUM:  Absolutely.  I apologize, Your
7    Honor.
8        Just as it was becoming published, I just wanted
9    to note for the record that driver's license data is
10   protected under the Data Practices Act.  I understand that
11   this is this witness's photograph and that later a driver's
12   license is going to be displayed with his permission.  I
13   just wanted to note that for the record.
14       THE COURT:  Okay.  The record is so noted.
15   BY MS. McGARRAUGH:
16   Q.  On this Exhibit 5, whose photograph is on this page?
17   A.  That is a picture of me that was taken from the state
18   trooper.
19   Q.  Okay.  And then below that, do you see a map?
20   A.  Yes, I do.
21   Q.  Is that map approximately where your face was
22   photographed by state troopers?
23   A.  Yeah, it looks accurate to me.
24   Q.  And do you see in the corner that there is a text that
25   says, "STATEDEF0000148"?

**122**

1    A.  Yes, I do.
2        MS. McGARRAUGH:  Plaintiffs offer their Exhibit 5.
3        MR. HSU:  No objection.
4        THE COURT:  The exhibit is received.
5    BY MS. McGARRAUGH:
6    Q.  Is it your understanding that this is the photograph
7    that was taken of you by the state troopers?
8    A.  Yes, it is.
9    Q.  Looking at Exhibit 6, what's photographed at the top of
10   this page?
11   A.  That's my independent press pass, and then below it is
12   my driver's license.
13   Q.  Okay.  You see that any identifying information on the
14   driver's license has been redacted out?
15   A.  Yes, I do.
16   Q.  And the map right below that, does this again depict
17   approximately where these photographs were taken, to your
18   knowledge?
19   A.  To my knowledge, yes, it does.
20       MS. McGARRAUGH:  Defendants offer -- excuse me.
21   Plaintiffs offer their Exhibit 6.
22       THE COURT:  Exhibit 6, is that what --
23       MS. McGARRAUGH:  Yes, Your Honor.
24       MR. HSU:  No objection.
25       THE COURT:  Exhibit 6 is received.

**123**

1        MS. McGARRAUGH:  I would like to publish it.
2        THE COURT:  You may.
3        MS. McGARRAUGH:  Thank you.
4    BY MS. McGARRAUGH:
5    Q.  While we're looking at this, I want to talk just briefly
6    about the press pass that you were wearing.  Is this the
7    press pass that you were wearing the entire time that you
8    were in Brooklyn Center?
9    A.  Yes, it is.
10   Q.  Okay.  And how are you wearing it?
11   A.  Around my neck.  There's a lanyard that pulls all the
12   way around my neck and then it sits in front of my chest.
13   Q.  You were carrying two photographs, I believe you
14   testified?
15   A.  I was carrying what?
16   Q.  Excuse me.  Not two photographs.  Two cameras?
17   A.  Correct.
18   Q.  What other gear did you have?
19   A.  I had a helmet, a full-face gas mask.  I had a
20   bulletproof vest with plates inside of it.  I had a cup.  I
21   had shin guards.
22   Q.  Why do you wear protective equipment?
23   A.  This documentation can be very dangerous in a lot of
24   ways.  Many times I find myself dodging rubber bullets,
25   ducking.  I had a flash-bang go off directly on my head

**124**

1    before, exploded on top of my helmet.  Thankfully I had the
2    helmet.  I also usually use earplugs because the flash-bangs
3    are very loud and they are generally thrown
4    indiscriminately.  Flash-bangs, they just kind of chuck them
5    up over a fence.  They want to make sure people are
6    uncomfortable and they want to leave.  Those
7    flash-bangs are very rattling.  You can feel it in your
8    bones.  It's essentially like an explosion.  It is not
9    comfortable at all.
10       I know photographers that have been hit and
11   wounded severely by rubber bullets.  I have met people who
12   have lost their eyes by being shot by a rubber bullet.
13   Soren Stevenson, if you recall, last year here in Minnesota
14   lost his eye from a rubber bullet.
15   Q.  All right.  On the evening of April 16 through -- or 11
16   through 16, 2021, that's a Sunday through Friday, did you
17   observe anyone claiming to be a journalist who was not?
18   A.  I did not.
19   Q.  What was your experience covering protests?
20   A.  It is a wide range of experience.  I was fortunate to be
21   able to travel the country this last year to document this.
22   I spent time in Portland; in Seattle; in Louisville,
23   Kentucky; here; New York City; Washington, D.C.; Richmond,
24   Virginia; Philadelphia.
25   Q.  Have you observed other law enforcement agencies

EXHIBIT A

**125**

1  handling protests?
2  A.  Many.
3  Q.  Which ones, if you can recall?
4  A.  LMPD, which is Louisville, Kentucky, Police Department.
5  I observed Capitol Police handling Stop the Steal rallies.
6  I observed D.C. Metro Police.  I observed in Portland a wide
7  variety.  So when I was in Portland was the time they were
8  protecting the federal courthouse.  So there were federal
9  officers there protecting the courthouse.  There was BORTAC.
10  There was ICE.  There was Department of Homeland Security.
11  There were a lot of officers there protecting the
12  courthouse.  I also saw officers in Seattle, so Seattle PD,
13  as well as Richmond PD and NYPD.
14  Q.  How does your experience with Minnesota state troopers'
15  treatment of you as a journalist compare to your
16  observations of other law enforcement's interactions with
17  journalists?
18  A.  The state troopers, to me directly, were by far the most
19  aggressive and intimidating.  I --
20  Q.  What's different about how Minnesota state troopers
21  interacted with you?
22  A.  They tried to intimidate me from being in an area.
23  Generally in other areas, if you're not obstructing an
24  officer while they are making arrest, if you are a safe
25  distance, you're allowed to do your job.  If you get too

**126**

1  close, they say, "Back up, back up, back up."  Not once did
2  I ever have an officer get in my face and say, "Get the fuck
3  out of here," not once, including federal officers, like I
4  said, ICE, LNPD, NYPD, not once was I threatened like that
5  with arrest.
6  Q.  If an officer asks you to back up, do you comply with
7  that kind of direction?
8  A.  Absolutely.
9  Q.  Why did you contact the ACLU?
10  A.  I was very concerned with what was happening here.  I
11  was here to cover the Derek Chauvin trial.  I knew what
12  happened last year.  I was scared this was going to happen
13  to us with the verdict coming in.  I didn't feel safe.  I
14  didn't feel that we would be allowed to do our jobs.  We
15  didn't know what was going to happen with the verdict,
16  obviously, but if stuff started to hit the fan, we thought
17  we were going to be detained because State Patrol, to my
18  knowledge, has jurisdiction in the state.  So I assumed
19  that --
20        MR. HSU:  Objection, speculation, foundation.
21  This witness has no basis to testify as to the
22  jurisdictional authority.
23        THE COURT:  Sustained.
24        THE WITNESS:  Okay.  So I --
25        THE COURT:  Let's pose a question and there will

**127**

1  be a response.
2        MS. McGARRAUGH:  Sure.
3  BY MS. McGARRAUGH:
4  Q.  Why did you think it was important for journalists to be
5  able to cover the Derek Chauvin verdict?
6  A.  Because I believe that the truth needed to be told.  I
7  believe that this documentation of this time in our life is
8  very important to show what's actually happening.  I believe
9  that, with the way social media is these days, there is a
10  lot of information that is not checked.  I believe that
11  sources need to have accurate documentation as well as
12  photographic evidence of what's actually happening.
13        People believe almost anything these days with
14  social media.  People are going to YouTube for information.
15  We're seeing social media play huge parts in understanding
16  of basically anything.  Opinions are swayed on a YouTube
17  video.
18        So I do believe that people being out and on the
19  ground here and doing real documentation is a service that
20  is integral to our democracy.
21        MS. McGARRAUGH:  I have nothing further.
22        THE COURT:  Is there cross examination for this
23  witness?
24        MR. HSU:  Yes, Your Honor.
25        THE COURT:  Counsel, I think we should take our

**128**

1  lunch break now, and we will begin again at 1:00.  Okay?  So
2  everyone please be ready to resume the hearing at 1:00 p.m.
3        (Lunch recess taken at 12:28 p.m.)
4                    *  *  *  *  *
5        (1:15 p.m.)
6                IN OPEN COURT
7        THE COURT:  We are ready to resume.
8        MR. HSU:  Is the podium all right?
9        THE COURT:  I didn't hear you.
10        MR. HSU:  Is the podium permissible for the cross?
11        THE COURT:  Yes, it is.  And you may adjust the
12  height if you need to.
13        MR. HSU:  My understanding is the mask can be
14  removed as well?
15        THE COURT:  You may.
16                CROSS EXAMINATION
17  BY MR. HSU:
18  Q.  Good afternoon, sir.  My name is Alexander Hsu.  I'm
19  here today representing the state defendants in this matter,
20  Minnesota Department of Public Safety and the Minnesota
21  State Patrol.
22        And just to make sure I'm saying it right, it's
23  Mr. Tuite?
24  A.  Correct.
25  Q.  To begin, I would like to talk with you about your

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

---

**129**

1  experience on April 13, 2021 that you described previously.
2  You stated that the State Patrol was issuing dispersal
3  orders to the crowd; is that correct?
4  **A.** Correct.
5  **Q.** About -- you heard about 50 times that order was issued?
6  **A.** 50 times specifically talking about media need to leave
7  the area, yes.
8  **Q.** A general order was also being issued to the crowd?
9  **A.** My recollection, yes, but generally it was targeted,
10 saying, "Media leave the area."  That's what I recall,
11 "Media leave the area" about 50 times.
12 **Q.** And that was issued over the course -- those 50 times
13 was issued over the course of approximately an hour?
14 **A.** Yes, sir.
15 **Q.** And dispersal orders across that time were also being
16 issued to the crowd?
17 **A.** Yes, sir.
18 **Q.** And you stated that a fire was started in the middle of
19 the street near --
20 **A.** Yes.
21 **Q.** -- the police department?
22       And it was after that fire started that officers
23 began to advance towards the crowd?
24 **A.** Yes, sir.
25 **Q.** So the fire was the trigger for the advance?

---

**130**

1  **A.** It appeared to be that way, yes.
2  **Q.** And you testified previously that you witnessed officers
3  arresting and detaining individuals throughout the crowd as
4  they advanced?
5  **A.** Yes.
6  **Q.** And they did so after they had issued the previous
7  dispersal orders over the preceding hour?
8  **A.** Yes, sir.
9  **Q.** But the crowd did not disperse in response?
10 **A.** [Inaudible.]
11       COURT REPORTER:  I didn't hear the answer.
12       THE WITNESS:  I said, "No."  Sorry.
13 BY MR. HSU:
14 **Q.** Is it correct that you attempted to leave the area in
15 response to the dispersal orders?
16 **A.** I attempted to leave the area in a car, yes, sir.
17 **Q.** And that car was driven by, you described, a Good
18 Samaritan?
19 **A.** Yes.
20 **Q.** Did you know who that person was --
21 **A.** [Inaudible.]
22 **Q.** -- to that night?
23       THE COURT:  You have to answer with words.  I did
24 not hear your words.
25       THE WITNESS:  I'm sorry.  I did not.

---

**131**

1       COURT REPORTER:  Excuse me.  I think you are just
2  talking over him.  If you would just wait until he is done
3  with his question, we can hear your answer.
4       THE WITNESS:  Sorry.
5       MR. HSU:  I can repeat the question.
6       THE COURT:  You may.
7  BY MR. HSU:
8  **Q.** You didn't recognize the individual driving the car
9  prior to that evening?
10 **A.** No, I did not.
11 **Q.** And that vehicle wasn't marked as press or media, was
12 it?
13 **A.** No.
14 **Q.** And when you got in the vehicle, you were riding in the
15 back seat; is that correct?
16 **A.** Yes, sir.
17 **Q.** Was Mr. McFadden in the back seat as well?
18 **A.** Yes, sir.
19 **Q.** And officers then detained that vehicle and asked you to
20 leave the vehicle?
21 **A.** They pulled the driver out of the car.  I never saw them
22 again.
23 **Q.** Officers detained you and pulled you out of the car as
24 well?
25 **A.** Yes, sir.

---

**132**

1  **Q.** And they pulled Mr. McFadden out of the car?
2  **A.** Yes, sir.
3  **Q.** And you showed your press badge to the officers?
4  **A.** Yep.  I held it up to the window, screamed it 50 times,
5  and then after I got out of the car as well, yes.
6  **Q.** And after they pulled you out of the car, they
7  subsequently released you after they confirmed you were
8  press?
9  **A.** Yes, sir.
10 **Q.** And they also subsequently released Mr. McFadden after
11 they confirmed that he was press?
12 **A.** After I helped them confirm he was press, yes, sir.
13 **Q.** And you testified today that you didn't have any further
14 issue after you were released following that brief encounter
15 near the vehicle?
16 **A.** No physical issue, no, but I was not allowed to document
17 inside the area anymore.
18 **Q.** But you were free to leave the area?
19 **A.** Yes, sir.
20 **Q.** I would like to move to the events of April 15, 2021.
21 You testified that during that evening the crowd dispersed;
22 is that correct?
23 **A.** Yes, sir.
24 **Q.** And that was prior to the curfew?
25 **A.** To my recollection, it was just before the curfew and it

---

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 34 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                July 28, 2021

### 133

1  kind of filtered through the curfew.  So maybe 10:20, 10:30
2  everyone seemed to be just about gone.
3  **Q.**  And you didn't observe any encounters between protesters
4  and law enforcement officers on that evening?
5  **A.**  Not to my recollection, no.  Nothing of a serious
6  nature, no.
7  **Q.**  And there were dispersal orders issued that evening as
8  well; is that correct?
9  **A.**  From my recollection, there were.
10  **Q.**  And the crowd dispersed in response to them?
11  **A.**  The crowd dispersed, yes.
12  **Q.**  I would like to now talk about the events of April 16,
13  2021.  On that evening you were located near the Brooklyn
14  Center Police Department, correct?
15  **A.**  Yes, sir.
16  **Q.**  And you testified that fireworks were being shot off in
17  the area?
18  **A.**  Yes, sir.
19  **Q.**  Multiple fireworks?
20  **A.**  Yes.  Up in the air, yes, sir.
21  **Q.**  And the dispersal order was issued at that time as well;
22  is that correct?
23  **A.**  Not that I recall, sir.
24  **Q.**  You don't recall any dispersal order?
25  **A.**  I don't recall a dispersal order.

### 134

1  **Q.**  Is it possible that you didn't hear any dispersal order
2  that was issued?
3  **A.**  I was standing near the fence and I'm pretty perceptive.
4  I'm pretty sure I would have heard the order.
5  **Q.**  So is it your testimony today that no dispersal order
6  was issued on April 16th?
7  **A.**  I do not recollect a dispersal order being issued.
8          MR. HSU:  Your Honor, we would ask to publish to
9  the Court and to the witness what's been previously marked
10  as Defense Exhibit 25.
11          THE COURT:  Is there any objection?
12          MS. McGARRAUGH:  No.
13          THE COURT:  Okay.  You may.
14          MR. HSU:  Excuse me, Your Honor.  One moment.  May
15  I retrieve a paper from counsel table?
16          THE COURT:  Yes, you may.
17   (Pause)
18  BY MR. HSU:
19  **Q.**  Mr. Tuite, do you have Exhibit Number 25 in front of you
20  right now?
21  **A.**  Yes, sir.  It's a few pages.
22  **Q.**  And this document is titled the Second Declaration of
23  Chris Tuite; is that correct?
24  **A.**  I don't see that in Number 25, no.  I see a letter from
25  Paul Schnell.

### 135

1          MS. McGARRAUGH:  He has the plaintiffs' book.
2          MR. HSU:  Permission to approach, Your Honor?
3          THE COURT:  You may.
4  BY MR. HSU:
5  **Q.**  I'm showing you what's been marked as Defense
6  Exhibit 25.  Mr. Tuite, you have that document in front of
7  you and it's entitled Second Declaration of Chris Tuite; is
8  that correct?
9  **A.**  Yes, sir.
10  **Q.**  And that's your name, correct?
11  **A.**  Chris Tuite, yes.
12  **Q.**  Do you recall signing a declaration similar to this
13  document?
14  **A.**  Yes.
15  **Q.**  I'll give you a chance to review it.  Would you -- is
16  this a true and accurate copy of the declaration that you
17  submitted?
18   (Witness reviews exhibit)
19  **A.**  Yes, sir.
20  **Q.**  And this was a sworn declaration; is that correct?
21  **A.**  Yes, sir.
22  **Q.**  On the last page, that's your signature?
23  **A.**  Yes, sir.
24  **Q.**  Dated May 30, 2021?
25  **A.**  Yes, sir.

### 136

1  **Q.**  And you were telling the truth when you signed this
2  declaration; is that correct?
3  **A.**  Yes, sir.
4  **Q.**  And you just testified that no dispersal order was
5  issued on the evening of April 16th; is that correct?
6  **A.**  Not that I recall.
7  **Q.**  Mr. Tuite, I would ask you to please read silently along
8  as I read aloud on page 4, paragraph 9, of the declaration.
9  **A.**  Whoa.  I don't have a page 4.  I have page 1, 3, and 5.
10  **Q.**  Mr. Tuite, are they double-spaced on the back side?
11  **A.**  Oh.  There we go.
12  **Q.**  And I will direct you again to page 4, paragraph 9.
13  **A.**  Yes, sir.
14  **Q.**  "My recollection is that on April 16, no dispersal order
15  was issued" --
16          THE COURT:  Are you asking him to refresh his
17  recollection?
18          MR. HSU:  Yes, Your Honor.
19          THE COURT:  Okay.  So he can look at it.  You
20  don't need to read it for him.  And then you can pose your
21  question.
22  BY MR. HSU:
23  **Q.**  Mr. Tuite, I would ask you to please read through that
24  paragraph.  Let me know when you have read it.
25   (Witness reviews exhibit)

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                July 28, 2021

**137**

1   **A.**  Okay.

2   **Q.**  Does that refresh your recollection of the events of

3   April 16, 2021?

4   **A.**  Well, it was essentially simultaneous saying, "Get on

5   the ground."  That was what I am trying to say here.  When

6   they said, "Get on the ground," they didn't say, "You have

7   ten minutes to disperse," if that makes sense.  Like by

8   10:02 there was a swarm.

9   **Q.**  And officers were directing the crowd to --

10  **A.**  Get on the ground.

11  **Q.**  You testified that officers were conducting a mass

12  arrest --

13  **A.**  Yes, sir.

14  **Q.**  -- on April 16th?

15          And officers were attempting to encircle the

16  crowd; is that correct?

17  **A.**  Yes.

18  **Q.**  And you recognized that they were conducting a mass

19  arrest at that time --

20  **Q.**  -- when they started the encirclement?

21  **A.**  Yes, sir.

22  **Q.**  And you chose intentionally to remain within the

23  encirclement; is that --

24  **A.**  Yes.  I stayed there to document the arrests, yes, sir.

25

**138**

1   **Q.**  Officers directed you specifically to leave the area; is

2   that correct?

3   **A.**  Yes, sir.

4   **Q.**  And you continued to stay within the mass arrest area?

5   **A.**  Yes, sir.  I stood on the sidewalk and in the grass in

6   an area that was not obstructing to them.

7   **Q.**  That remained within the encirclement area; is that

8   correct?

9   **A.**  Yes, sir.

10  **Q.**  And officers repeatedly directed you to leave the area;

11  is that correct?

12  **A.**  Yes, sir.

13  **Q.**  Is it your standard practice to disobey police orders?

14  **A.**  No, sir.

15  **Q.**  Yet when police ordered you to leave the area, you

16  refused; is that correct?

17  **A.**  I stood to take photos.

18  **Q.**  Within a mass arrest zone?

19  **A.**  Yes, sir.

20  **Q.**  Despite the fact that officers were directing you to

21  leave that area?

22  **A.**  Yes, sir.

23  **Q.**  And you testified that you were -- one officer grabbed

24  you by your coat; is that correct?

25  **A.**  Yes, sir.

**139**

1   **Q.**  And when he grabbed you, you were still within that mass

2   arrest area --

3   **A.**  Yes, sir.

4   **Q.**  -- is that correct?

5          You were -- eventually another officer pulled you

6   away from that encounter; is that right?

7   **A.**  That's correct.

8   **Q.**  And that was a state trooper?

9   **A.**  Yes, sir.

10  **Q.**  And he directed you to move north out of the area?

11  **A.**  Yes, sir.

12  **Q.**  And that's when you ended up near a gas station; is that

13  correct?

14  **A.**  There's time in between that.  So in between that we

15  were out of the zone and directed to the area behind the

16  kettle, which is the photo that they put into the exhibit

17  where there's an obstructed view with a person holding up a

18  press pass.  So I attempted to photograph there before

19  another trooper came over and said, "You need to leave the

20  area completely."

21  **Q.**  And then he directed you to move north?

22  **A.**  He said, "Leave the area now.  Go to the gas station."

23  **Q.**  And you obeyed his order at --

24  **A.**  Yes, sir.

25  **Q.**  -- that time?

**140**

1          And you testified that as you were moving that

2   way, that one trooper held what appeared to you as a

3   chemical dispersal -- dispersant?

4   **A.**  Yes, sir.

5   **Q.**  But he didn't fire that at you, did you?

6   **A.**  No.

7   **Q.**  He didn't use it on you?

8   **A.**  He did not.

9   **Q.**  Did you have any further physical interaction with

10  troopers prior to arriving at the gas station?

11  **A.**  Between that time?

12  **Q.**  Yes.

13  **A.**  I do believe there was a small shove in the back when I

14  wasn't walking fast enough, but nothing other than that.

15  **Q.**  And was that -- it was at the gas station that you were

16  photographed?

17  **A.**  Yes, sir.

18  **Q.**  And those are the exhibits that you testified to?

19  **A.**  Yes, sir.

20  **Q.**  After those photographs were taken, you were allowed to

21  leave; is that correct?

22  **A.**  We were told to go across the street from the gas

23  station, and all the media was kind of lined up right there.

24  This is murky because the roads are all blocked.  So being

25  able to leave means going through a zone of an active

EXHIBIT A

**141**

1  protest with police.  So I would say, no, I was not able to
2  leave at that time.
3  **Q.** Were you arrested?
4  **A.** No, sir.
5  **Q.** Were you detained?
6  **A.** No, sir.
7        MR. HSU:  No further questions.
8        THE COURT:  Anything further for this witness?
9        MS. McGARRAUGH:  Just very briefly.
10       THE COURT:  You may.
11                REDIRECT EXAMINATION
12  BY MS. McGARRAUGH:
13  **Q.** You just testified about a state trooper holding pepper
14  spray up to you?
15  **A.** Yes, sir.
16  **Q.** Did you understand that to be a threat?
17  **A.** I did.
18  **Q.** All right.  And then --
19  **A.** He screamed at me, "You had your free pass.  Are you
20  fucking stupid?"
21  **Q.** During the time that you were being photographed by the
22  gas station -- about how long did that take?
23  **A.** I would say the line took about ten minutes to get to
24  the front.
25  **Q.** Were you allowed to document the proceedings during that

**142**

1  time?
2  **A.** No.  I tried.  There was an arrest happening to the
3  right, and I walked over there.  I got about ten seconds and
4  the state trooper walked up and said, "Get back in line.
5  That's enough."
6        MS. McGARRAUGH:  We have nothing further.
7        THE COURT:  Anything further for this witness?
8        MR. HSU:  No, Your Honor.
9        THE COURT:  Okay.  You may be excused.
10       THE WITNESS:  Thank you, Your Honor.
11  (Pause)
12       MR. RIACH:  Excuse me, Your Honor.  Can I ask a
13  question of the Court?
14       THE COURT:  You may.
15       MR. RIACH:  Mr. Tuite is finished testifying.  May
16  he remain in the courtroom?
17       THE COURT:  Yes.  Has he been excused as a
18  witness?
19       MS. McGARRAUGH:  Yes.
20       THE COURT:  Okay.  He may remain, yes.
21       MR. RIACH:  Thank you, Your Honor.
22       And then one more kind of housekeeping point, Your
23  Honor.  I think before we begin with the State's witnesses,
24  it might be a good idea to just make sure we understand who
25  will need to be excused when confidential or attorneys' eyes

**143**

1  only documents are discussed.  It's my understanding that
2  the procedure is going to be to close the courtroom to
3  anyone other than the parties during that period of time.
4  There's some folks in the gallery.  I don't know if now is a
5  good time to make that determination or the Court would just
6  prefer to wait, but I figured, since I'm standing here, I
7  would raise it.
8        THE COURT:  Does counsel wish to be heard on this
9  matter?
10       MS. LANDRUM:  Your Honor, attending with state
11  defendants are counsel for state defendants.
12       THE COURT:  I'm going to ask you either to be
13  seated or you can come to the podium.  I'm sorry for the
14  logistics, but we have --
15       MS. LANDRUM:  Absolutely.
16       THE COURT:  -- to make sure that we can hear and
17  make --
18       MS. LANDRUM:  Absolutely.  Of course, Your Honor.
19  Present with state defendants today, Your Honor, are,
20  outside of Commissioner Harrington and our witness, Major
21  Dwyer, are our general counsel for Minnesota State Patrol as
22  well as counsel for the Department of Public Safety.  We
23  would like for them to remain as a part of our legal team,
24  of course.  We also have someone from the Attorney General's
25  Office.  One of our law clerks who is here observing is a

**144**

1  part of the Attorney General's Office.  And we also have
2  Bruce Gordon with us, who is the director for Department of
3  Safety with regard to communications.  These are all
4  high-level officials for the Department of Safety.  Because
5  the Department of Safety is sued in its official capacity,
6  we would like for them to be able to stay for that purpose.
7  And the other two individuals in the back I don't actually
8  recognize on state defendants' side.
9        With regard to parties, Your Honor, the defendants
10 would take the position that Mr. Tuite is not a party and
11 that's because he is not a named plaintiff in this case.  It
12 is a putative class action, but the class action hasn't been
13 certified.  So to the extent that those documents are being
14 referenced, those types of -- even though he was a witness
15 today, I believe he would have to leave the courtroom.
16       THE COURT:  So your view is Mr. Tuite does need to
17 leave the courtroom?
18       MS. LANDRUM:  That's correct, Your Honor.
19       THE COURT:  Okay.  And then you said there are
20 other individuals in the rear who are members of your
21 organization; is that correct?
22       MS. ROBERTSON:  I'm sorry, Your Honor.  I am
23 Heather Robertson.  I'm the attorney for the City of
24 Minneapolis, here with my co-counsel, Sharda Enslin and
25 Kristin Sarff.  And Mr. Joe Kelly, who is the attorney for

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                    July 28, 2021

---

**145**

1  Defendant Robert Kroll, is also present here.

2            THE COURT:  Okay.  Thank you.  Is there any

3  objection to these individuals remaining in the courtroom?

4            MS. LANDRUM:  Because they are counsel, no, Your

5  Honor.  They would have received these documents under the

6  protective order.

7            THE COURT:  Okay.  Anything further to address as

8  to who is present in the courtroom at this time?

9            MR. RIACH:  I think that covers everybody, Your

10  Honor, and we are in agreement with the State --

11           THE COURT:  Very well.

12           MR. RIACH:  -- on how to proceed.  We are fine --

13           THE COURT:  We are ready to proceed.  I'm sorry.

14  I spoke over everyone else.  So please finish what you said

15  and make sure that we have a clear record.

16           MR. RIACH:  Nothing else to say, Your Honor.

17           THE COURT:  Okay.  Are we ready to proceed, then?

18  Okay.  You may.

19           MR. HSU:  Your Honor, the State would call

20  Commissioner John Harrington as a witness.

21           THE COURT:  Please.

22           COURT REPORTER:  Would you raise your right hand,

23  please.

24      (Witness sworn)

25           COURT REPORTER:  You can have a seat in the

---

**146**

1  witness stand.  If you would state your name, spelling your

2  first and last name, please.

3            THE WITNESS:  My name is John Mark Harrington.

4  Last name is spelled H-a-r-r-i-n-g-t-o-n.

5            THE COURT:  And, Commissioner Harrington, as you

6  are comfortable, you may remove your mask if you would like

7  to, but I will --

8            THE WITNESS:  Thank you very much, Your Honor.

9            THE COURT:  -- leave you to do as you would like.

10           And you may proceed.

11           MR. HSU:  Your Honor, we're just going to put --

12  we have a physical copy of the exhibits for ease.  I'm just

13  going to put it in front of the witness and --

14           THE COURT:  You may.

15           MR. HSU:  -- request permission as we move.

16           THE COURT:  And I don't know what the other

17  exhibit -- does the other exhibit book need to be there at

18  this time?

19           MR. RIACH:  Your Honor, I can -- with permission

20  to approach, I can come get our exhibit book.

21           THE COURT:  I think just because of the size, if

22  we can remove one and make sure that Commissioner Harrington

23  has enough space to be able to look at the documents, that

24  would be great.

25      (Pause)

---

**147**

1            THE COURT:  Are we ready to proceed?

2            MR. HSU:  Yes, Your Honor.

3            THE COURT:  You may.

4               (John Harrington)

5            DIRECT EXAMINATION

6  BY MR. HSU:

7  Q.  Commissioner Harrington, good afternoon.

8  A.  Good afternoon.

9  Q.  Could you please tell the Court where you are currently

10  employed.

11  A.  I'm currently employed as the commissioner of the

12  Minnesota Department of Public Safety.

13  Q.  And how long have you been serving as a commissioner?

14  A.  I've been serving as commissioner since January of 2019.

15  Q.  Can you briefly describe your job duties as the

16  commissioner of Public Safety.

17  A.  The commissioner of the Department of Public Safety is a

18  cabinet-level official reporting to the governor.  I oversee

19  the Department of Public Safety, which is comprised of

20  14 divisions that oversee public safety in both the law

21  enforcement sense and the fire and emergency management

22  sense.  Also oversees victim services and driver's license

23  and vehicle services.

24  Q.  Prior to that role, were you employed in the law

25  enforcement field?

---

**148**

1  A.  Yes, I was.

2  Q.  Can you briefly describe that prior experience.

3  A.  Absolutely.  I started policing in 1977 with the City of

4  St. Paul as a police officer.  I rose through the ranks over

5  the course of the next 30 years or so to the rank of senior

6  commander, and then promoted from there by Mayor Randy Kelly

7  as the chief of police in 2004.  I served as chief of police

8  for the City of St. Paul from 2004 to 2010.  At the end of

9  my term, I was elected to the Minnesota State Senate for the

10  biennium year, so 2010 to 2012, and then returned to law

11  enforcement as the chief of police for the Metropolitan

12  Transit Police, where I served from 2012 until twenty --

13  until I left to take this assignment with Governor Walz.

14  Q.  In total, how many years of law experience would you

15  estimate you have?

16  A.  44 years, I would say.  That's a pretty good ballpark.

17  Q.  And you've already touched on some of it, but I would

18  like to get a little more background on the Department of

19  Public Safety.  Could you describe its role and what the

20  Department serves in terms of state functions.

21  A.  Certainly.  The Department of Public Safety is the

22  agency that both serves and protects Minnesotans on a

23  statewide basis.  We do that through administration of

24  programs, such as officer justice programs, where we serve

25  victims; officer traffic safety, where we work to increase

---

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                July 28, 2021

**149**

1  traffic safety.  But we also serve it in education in terms
2  of educating the public in terms of victims rights,
3  services.
4          And then what is probably most notable in this
5  context is we serve as the enforcement arm of the state, at
6  least in some part, because we oversee the Minnesota State
7  Patrol, the Minnesota Bureau of Criminal Apprehension, and
8  the Alcohol and Gambling Enforcement.  That's not all of the
9  officers or peace officers that work for the State, DNR has
10  a separate section and they are run by that agency, but the
11  majority of peace officers in the state of Minnesota work
12  under the Department of Public Safety.
13  **Q.** Does the Department of Public Safety have an Internal
14  Affairs Division?
15  **A.** Yes, it does.
16  **Q.** Is that a separate division from the Minnesota State
17  Patrol?
18  **A.** Yes, it is.
19  **Q.** Why is that?
20  **A.** We believe that an independent review of cases brought
21  where there was an allegation of misconduct ensures an
22  independent and a thorough investigation.  We also believe
23  that it increases the transparency for the public when they
24  have a complaint about any member of the Department of
25  Public Safety staff.

**150**

1  **Q.** What is the mission of the Department?
2  **A.** We are there to serve and protect Minnesotans.  The
3  Department has a very broad mission, as I mentioned, with a
4  wide range of organizations.  So protecting them from fires
5  with the state fire marshal, protecting them from traffic
6  collisions with officer traffic safety and the Department --
7  State Patrol, investigating crimes with the Bureau of
8  Criminal Apprehension, and then also working to -- working
9  in partnership with local jurisdictions to assist them when
10  they have needs, whether it is in criminal investigation, in
11  traffic crash reconstruction, or facilitating their
12  administration of justice.
13  **Q.** And you mentioned Minnesota State Patrol and its role
14  there.  Are there any jurisdictional limits on the authority
15  of the State Patrol?
16  **A.** Minnesota State Patrol's primary jurisdiction is the
17  state trunk highways.  That is really what their primary
18  role is.  They also have assignments to protect the State
19  Capitol and they also provide the executive protection for
20  the governor.
21  **Q.** What is the source of those jurisdictional limits?
22  **A.** The Minnesota State Patrol's jurisdictional limits are
23  set in statute.
24  **Q.** Is the Minnesota State Patrol a statewide police force?
25  **A.** No, it is not.

**151**

1  **Q.** Why not?
2  **A.** The state of Minnesota is made up of 87 counties and
3  then countless individual local jurisdictions, each of which
4  has local policing authority over what happens in their
5  jurisdiction, whether it's in their town or their city or
6  within their county.
7          The Minnesota State Patrol's jurisdiction is
8  statewide in the sense that it is on any of the trunk
9  highways that cross the state from north to south or east to
10  west, but we have no local jurisdiction to investigate
11  crimes outside of our primary purview.
12  **Q.** Does the State Patrol have any authority over city or
13  county law enforcement entities?
14  **A.** No, it does not.
15  **Q.** And you mentioned that the State Patrol and Department
16  of Public Safety can assist local entities.  What role does
17  the State Patrol play in that regard?
18  **A.** The State Patrol's role when we're called to assist, we
19  try to meet the local jurisdiction's needs where they are.
20  So in some cases we're there because they need traffic
21  control.  For example, in the case of an emergency or a
22  flood, we might be there to do traffic control and traffic
23  direction.  In other cases we would be there because they
24  need accident reconstruction or they need an accident
25  investigation and we have a high level of expertise in crash

**152**

1  investigations, as you would expect.
2          We, because of the State Capitol, have also been
3  trained in crowd control and so we have been called upon by
4  other jurisdictions to assist them in crowd control when
5  they have felt the need.
6          But we typically try and meet the needs that the
7  local agency is asking us to fulfill if we have both the
8  resources and/or the expertise or the competence to do that.
9  **Q.** Does the State Patrol require a request from a local
10  entity before it provides those resources?
11  **A.** Yes, it does.
12  **Q.** What is the typical process for that type of request?
13  **A.** Typically you would see either -- the local
14  jurisdiction's on-duty officer, for example, chief of police
15  or a police captain, would request the State Patrol to come
16  in to do an accident reconstruction in some cases.
17          In the case of an emergency, typically it is a
18  chief-to-chief correspondence where the chief of a local
19  jurisdiction would request Colonel Matt Langer, who is the
20  colonel and chief of the State Patrol, to assist or we may
21  get a request through the duty officer, which is a 24/7
22  operation out of the BCA where any emergency requests for
23  state aid are received and then can be transferred to the
24  proper jurisdiction.
25  **Q.** Commissioner, what is the Mobile Response Team?

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 39 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

---

153

1  A.  The MRT or Mobile Response Team is a team of state
2  troopers who have been trained to do crowd control and to
3  respond as an emergency services response team.  Primarily
4  they were trained to respond to crises at the State Capitol,
5  but over the course of the last few years we have been
6  called upon to expand where they respond to in the cases of
7  an emergency.
8  Q.  You mentioned crowd control.  Are there any other types
9  of events that they would respond to in terms of
10  emergencies?
11  A.  They have responded to parades, civil unrest, and they
12  also have worked simply large-scale special events.  For
13  example, they were involved I believe at the Republican
14  National Convention.
15  Q.  Is the Mobile Response Team involved in any disaster
16  relief responses?
17  A.  The Mobile Response Team has capabilities to do that
18  also.  It depends on where the disaster would occur and what
19  the logistics are for responding, having troopers respond.
20  So if it was in greater Minnesota in the far north, it might
21  be more logistically feasible to send local troopers there
22  than it would be to send MRT from the Twin Cities, but in
23  some cases where the disaster is sustained and where there's
24  going to be a long-term need for troopers there that work in
25  a very close-knit team environment, you would see them sent

---

154

1  there also.
2  Q.  When the State Patrol assists local law enforcement, who
3  is in charge regarding the setting of law enforcement goals?
4  A.  The local agency sets the overall mission that we're
5  attempting to respond to.  However, within the context of
6  that overall mission, the Minnesota State Patrol retains its
7  own jurisdiction and its own responsibility for the
8  direction of its actual officers.  So while we may be called
9  to a city to assist, the captain or the lieutenant of the
10  State Patrol would be the person who is actually directing
11  the activities of the State Patrol.
12  Q.  Does the State Patrol assume any control over the local
13  agency when it's assisting?
14  A.  No, it does not.
15  Q.  Commissioner, does the Department of Public Safety set
16  forth any standards of conduct for officers acting under its
17  umbrella?
18  A.  Yes, we do.
19      MR. HSU:  Your Honor, we would request permission
20  to publish to the witness and the Court what's been marked
21  as Exhibit 15 --
22      THE COURT:  You may.
23      MR. HSU:  -- of the defendants' exhibits.  I think
24  Ms. Kosek is going to pull it up on the screen here.  I
25  would ask, could you please just scroll through it.

---

155

1  BY MR. HSU:
2  Q.  And I will ask, Commissioner, if you could just please
3  review the document briefly.
4  A.  Certainly.  It's scrolling still.
5      (Witness reviews exhibit)
6  Q.  Commissioner, do you recognize this document?
7  A.  Yes, I do.
8  Q.  What is this document?
9  A.  It's Minnesota Department of Public Safety.  It's an
10  administrative policy published in 1996.  It describes --
11  it's from the Office of the Commissioner.  It was approved
12  by the commissioner and it describes -- thank you very much.
13  I was going to have to get spectacles out.  It describes
14  conduct unbecoming a peace officer.
15  Q.  And how do you recognize this document?
16  A.  I reviewed this document when I took over the
17  organization, and I review it on an annual basis.
18  Q.  Is this a true and accurate copy of that?
19  A.  Yes, it so appears.
20      MR. HSU:  Your Honor, the state defendants would
21  move to admit Exhibit 15 into evidence.
22      THE COURT:  Any objection?
23      MR. RIACH:  No objection, Your Honor.
24      THE COURT:  Exhibit 15 is received.
25  BY MR. HSU:

---

156

1  Q.  Commissioner, you've touched on it a bit already, but
2  could you please describe this exhibit for the Court and its
3  role in terms of the Department and its actions.
4  A.  The document spells out the purpose for it, first of
5  all.  So the purpose is to define conduct unbecoming, which
6  helps bracket for an officer what is conduct that should
7  be -- how we should operate.  So while it defines the thou
8  shall not effectively, it also defines what you should be
9  doing also.
10      It's a policy specifically geared toward law
11  enforcement, so it's geared for peace officers, sworn peace
12  officers within the organization, and it talks about the
13  fact that we recognize that our effectiveness is dependent
14  upon community support and community respect and that that's
15  a two-way street and that we understand that without
16  community respect and without their confidence, that our
17  ability to function is at best de minimis.
18      The scope applies to all officers of the
19  Department, so it applies to -- whether you're a BCA agent,
20  State Patrol, or in AGE.  And it doesn't matter where you
21  are in the state of Minnesota, it applies to all of them
22  equally.
23      And then it outlines principles or pillars that
24  talk about what are the background for that.  So Principle
25  One, for example, talks about all peace officers conducting

---

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                      July 28, 2021

---

**157**

1  themselves in accordance with the Constitution of the United
2  States, Minnesota Constitution, and applicable laws.  It is
3  effectively the oath of office that every peace officer
4  takes when they are sworn in as a peace office or when
5  they're promoted.
6  **Q.** Commissioner, how would an officer become aware of this
7  document?
8  **A.** Every peace officer who works with the State of
9  Minnesota would be trained in this document.  For example,
10  the Minnesota State Patrol, which offers a state police
11  academy at Camp Ripley, they would be instructed in this
12  document during their academy and then it's also reviewed
13  with them on an annual basis during performance reviews.
14  **Q.** Commissioner, I want to draw you to -- your attention to
15  the language on page 2 under the second principle, item
16  number 4, and that states that an officer shall take no
17  action knowing it will violate the constitutional rights of
18  any person.
19      How do you understand that as it applies to peace
20  officers under the Department?
21  **A.** My understanding of rule number 4 is that as we look at
22  the United States Constitution and the Minnesota
23  Constitution, those amendments, the right to free speech,
24  the right to assembly, the right to not be searched without
25  warrant, the right against self-incrimination, all of those

---

**158**

1  rights are to be protected under this rule and that no
2  officer should take any action that knowingly violates these
3  constitutional rights, because if they do, they then are
4  subject to discipline.
5  **Q.** Would the intention of targeting members of the media or
6  the press be a violation of these standards?
7  **A.** Yes, it would.
8  **Q.** I believe you mentioned the importance of partnership.
9  Is it important for the Department and State Patrol to
10  maintain a relationship with members of the media?
11  **A.** Yes, it is.
12  **Q.** Why is that?
13  **A.** I was brought up as a community policing cop, that was
14  how St. Paul trained their cops, and it's the philosophy
15  that I have operated under for the 40 years that I've been
16  in the business.
17      The basic philosophy of community policing, which
18  is generally recognized by everyone as the most effective
19  and the most authentic form of policing, essentially says
20  that the public and the police have to work together.
21      And then as we think about how we break down who
22  is the public, we -- the media is one of those major
23  components.  It's one of those groups that we recognize as
24  being a part of the public, just as we recognize elected
25  officials, community groups, nonprofit organizations,

---

**159**

1  schools, they are all partners that we should be working
2  with.
3      The media is given particular attention as we talk
4  about community policing because we recognize that
5  especially in the -- law enforcement has an educational
6  goal.  The media becomes really an essential partner with us
7  in trying to make sure that the information we want to get
8  out, whether it's about distracted driving or drunk driving
9  or about a curfew that we want people to abide by, the media
10  plays an essential role in doing that.  And they also play
11  an essential role as sort of a watchdog for the community,
12  bringing to our attention crime, in some cases, or
13  misconduct.
14  **Q.** With all of those concerns in mind, what steps does the
15  Department of Public Safety and Minnesota State Patrol take
16  to maintain their relationship with the media?
17  **A.** The Department of Public Safety at the commissioner's
18  level operates an Office of Communications, which has -- it
19  has, frankly, one of the more robust staffs that I've ever
20  worked with in terms of communication.
21      So almost all the divisions have a communications
22  person that works with them and their job is to make sure
23  that they have ongoing relations with the media, both in
24  terms of advising the media when we have information or a
25  press release, but also fielding the day-to-day questions

---

**160**

1  the media has about incidents that happened across the
2  state.
3      In addition to that role, we've also done an
4  extensive amount of outreach to the media, especially over
5  the last few years, to try and make sure that we are
6  operating with the media under best practices.  And so
7  whether it is at the commissioner's level, at the State
8  Patrol level or the BCA level or any of the other agencies,
9  we oftentimes find ourselves having regular dialogue with
10  the media and bringing them in to make sure they know what's
11  going on within the Department of Public Safety.  We believe
12  that transparency is our best vehicle.
13  **Q.** Commissioner, I would like to move to more specifically
14  the unrest that occurred in Minneapolis in May 2020
15  following the death of George Floyd.  Was the Department of
16  Public Safety or Minnesota State Patrol involved in those
17  events?
18  **A.** Yes, we were.
19  **Q.** And how did the Minnesota State Patrol become involved?
20  **A.** After George Floyd was murdered and after the video
21  became public, the duty officer made me aware of the crowds
22  that were gathering in protest.
23      As we coordinated with Minneapolis, asking
24  Minneapolis and Hennepin County what they needed and we
25  received requests from them, one of the concerns that was

---

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                          July 28, 2021

**161**

1  voiced was that with a very large crowd that was moving in
2  the direction of the freeway, that we might well have a
3  freeway protest, which brought great concern to the State
4  Patrol.  We have seen people killed on the freeway.  We've
5  seen people run over on the freeway in those kind of
6  traffic-blocking events.  So we began having the State
7  Patrol position themselves to assist -- to be in position to
8  assist if we did have a freeway protest.
9       We received requests from the City of Minneapolis,
10  through the police department, to also assist them in the
11  Third Precinct area down off of Lake Street because they
12  were seeing very large crowds and they were concerned about
13  their ability to respond to those crowds.
14  Q.  And were you involved in the State Patrol and the
15  Department of Public Safety responses in your role as
16  commissioner?
17  A.  Yes, I was.
18  Q.  Can you describe, based on your experiences as the
19  commissioner and your role there, what was happening on the
20  ground during those events and what were the concerns faced
21  by the State Patrol and the Department?
22  A.  There were several concerns, some expressed initially by
23  the City of Minneapolis and Hennepin County, others that we
24  saw once we actually got on the ground.
25       And then part of my role is I'm the homeland

**162**

1  security advisor for the governor and so one of my jobs is
2  also to make sure the governor is aware of major critical
3  events within the state of Minnesota that might affect or
4  involve state assets or require state resources to respond.
5       As we progressed through the first and second day,
6  the crowds were gathering.  We noted with some distress that
7  there were, in fact, multiple crowds and there was not just
8  one protest.  There were, in fact, several protests spread
9  out over a larger geographic area, which made the city's
10  response more complicated and it was far more taxing to try
11  and have enough peace officers to respond to any one of
12  those crowds, some of which estimated in the eight to ten
13  thousand range at one point or another.
14       There was also calls from MPD that talked about
15  the need for this to become a sustained element, that they
16  didn't expect that this was going to end appropriately --
17  not appropriately.  In a timely fashion.
18       Many special events we respond to have a set
19  beginning and a set end time and so you can plan for this is
20  a four-hour protest or this is an all-day protest.  But in
21  this case, because the protests seem to be more organically
22  or spontaneously driven, it didn't have any boxes around it
23  in terms of where the protest was going to be.  It didn't
24  have any boxes around it in terms of how long the protest
25  was going to last.

**163**

1       And it also didn't have -- what we oftentimes work
2  with when we're dealing with protests or events, it didn't
3  have any clear defined leaders who you could work with to
4  help with the organization of the protest, to be able to
5  work out what do they want to do, where do they want to go,
6  how can we facilitate their movement along streets and
7  highways.
8       So those all complicated the response to the
9  protests as a matter of planning.
10       And then as the protests continued, we saw two new
11  elements that we had not seen really in my police career.
12  We saw the use of arson and we saw organized looting go on
13  with the protests.
14       And so while the protests would be going on in one
15  place, we would have a car parts place or liquor store,
16  oftentimes those seemed to be the two places that got hit
17  first, they would be set on fire.
18       Once those were on fire, you would see stores
19  nearby looted, which further depleted city and county
20  resources to respond as they were trying to figure out how
21  to get the fire department to the fires and then how to
22  respond to the looting incidents.
23       The fire department, in fact, ended up calling to
24  say they needed, in fact, protection because they couldn't
25  get out of their fire --

**164**

1       MR. RIACH:  Your Honor, I am going to --
2  (Simultaneous indiscernible crosstalk)
3       THE WITNESS:  -- because they were being -- had
4  rocks thrown at them.
5       THE COURT:  Is there an objection?
6       MR. RIACH:  Withdrawn, Your Honor.  Withdrawn.
7  BY MR. HSU:
8  Q.  Commissioner, I believe you touched on this in your
9  answer, but in your 44 years of experience, have you ever
10  dealt with the level of unrest that was faced in May 2020?
11  A.  No, I have not.
12  Q.  And you touched on a few of the points.  What made it
13  stand out in your experience?
14  A.  The size of the groups were far larger, the geographic
15  spread, and what seemed to almost be a coordinated effort,
16  that if you went to one area to meet a group, that group
17  sometimes would leave, but it would pop up in another area.
18  And so the level of coordination.  The use of fire and arson
19  as a tactic was also a new element.
20       And then the looting that seemed to go on and went
21  on in places that did not seem to have any local connection
22  to the precipitating event.  For example, we responded to
23  looting in West St. Paul on Robert Street and we responded
24  to looting in Anoka County and we responded to looting in --
25  the Lakeville City Hall was fire-bombed, none of which

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                      July 28, 2021

---

**165**

1  seemed to have any direct connection to George Floyd or the
2  Minneapolis Police Department protests.
3  **Q.** In light of those challenges and those experiences from
4  that time, can you describe for the Court what lessons were
5  learned by the Department or by the State Patrol in terms of
6  handling these types of events.
7  **A.** There were several lessons learned. I would say from
8  the State Patrol's perspective, we learned that we needed to
9  find a way to quickly mobilize large numbers of State Patrol
10 to be able to respond to an area, and that was something
11 that we had not really -- had never had to do before.
12        In the few events where the State Patrol had been
13 called in to a major special event, it had been a special
14 event, like the Super Bowl or like the Republican National
15 Convention, where we knew months in advance it was coming.
16 You could plan and stage for this.
17        But an organically spontaneous event calling upon
18 us to not just move a couple hundred troopers, but literally
19 to strip every highway in the state of Minnesota of all of
20 the troopers they had to try and respond was an
21 extraordinary event that we had never seen.
22        So how to mobilize them, how to work with the
23 National Guard was also a lesson learned. We learned about
24 what -- the capabilities of the Minnesota National Guard,
25 how quickly they could mobilize.

---

**166**

1        We also had to work through emergency declarations
2  by the governor, the activation of the National Guard, and
3  then how to actually get them into theater and get them into
4  appropriate positions.
5        We learned that -- communication became one of the
6  key points that I think we learned probably most acutely in
7  especially the May 2020 events. Communication with the
8  media was -- right away that was one of the points that we
9  recognized that we needed to do more with, but also
10 communication with our elected officials and communications
11 with community groups were all part and parcel of, I think,
12 some of the lessons learned that we've applied as we moved
13 forward from that day.
14 **Q.** Commissioner, as a clarification, how many troopers were
15 mobilized in response to May 2020?
16 **A.** Every trooper that was able and ready in the state of
17 Minnesota was mobilized and brought into the Twin Cities to
18 respond.
19 **Q.** And that had never happened before?
20 **A.** That had never happened before.
21 **Q.** Commissioner, were there any lessons learned regarding
22 the importance of media credentials or identification of
23 press members?
24 **A.** Yes, there were.
25 **Q.** What were those lessons?

---

**167**

1  **A.** I believe one of the first nights that the State Patrol
2  was out on Lake Street we got calls that we had arrested
3  members of the media, and part of the question we had was
4  how do we determine who is a member of the media and so we
5  began asking the question of what credentials would clearly
6  identify members of the media so that we could expedite
7  their release if they were arrested or avoid arresting them
8  if that was possible. So credentials became a topic very
9  early on.
10        From that point on, I think virtually every event
11 since then we have reminded the media via Twitter or social
12 media to please have credentials with them and visible if at
13 all possible so that we can avoid any unnecessary encounters
14 with the media and so that we can facilitate -- in those
15 cases where we do end up making an arrest with the media, so
16 we can expedite their release as quickly as possible.
17 **Q.** With regards to both those actions related to media and
18 broadly, what other actions did the Department take to act
19 or implement the lessons learned from May of 2020?
20 **A.** There have been several. I would say the ones that come
21 most -- come to mind, we tasked Bruce Gordon, who is the
22 director of communications for the Commissioner's Office, to
23 work with the media to talk about best practices, lessons
24 learned to try and figure out what we should gather from the
25 May 2020 events.

---

**168**

1        Beyond that, we committed to having a more robust
2  schedule of briefings and trainings with the media, which we
3  did do, as we got into what we call OSN, the Operation --
4  OSN, which is the Chauvin trial preparation. We did
5  trainings with them. We worked with the media before that.
6  We embedded media into our ranks, asked them to come join us
7  within -- on the inside of the line to help facilitate their
8  understanding of what we were doing.
9        And subsequent to those events we have contracted
10 with 21CP, 21st Century Policing, which is a nonprofit
11 organization or a think tank organization. They were the
12 group that facilitated the Deadly Force Encounters Working
13 Group that Keith Ellison and I put together. But we asked
14 them to do an outreach to the media subsequent to --
15        MR. RIACH: Your Honor, I am going to object to
16 the narrative.
17        THE COURT: You object to the narrative?
18        MR. RIACH: Object that the witness is delivering
19 a narrative answer. We have had multiple questions now
20 where Mr. -- or Commissioner Harrington has talked for
21 three, four, five minutes at a time. Don't have a problem
22 with the information coming out, but we would just prefer
23 some interplay between counsel and Commissioner Harrington.
24        THE COURT: I believe the question was what type
25 of -- state the question that you asked.

---

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                    July 28, 2021

**169**

1    MR. HSU:  What did the Department or the State
2  Patrol do to act on the lessons learned from May 2020.
3    THE COURT:  Okay.  Overruled.  You may continue
4  with your answer.
5    THE WITNESS:  Thank you.  I was just wrapping up.
6    But we did contract with 21CP.  They have
7  surveyed, conducted focus groups and conducted interviews
8  with members of the media, and I believe within the next
9  month we will have a document which will document some
10  additional best practices, that the Department of Public
11  Safety paid for their work, to make sure that we are
12  reaching out to the media.
13    We have had multiple meetings with the media
14  throughout to have this conversation with them to try and
15  figure out where there are concerns and how do we best meet
16  them.
17  BY MR. HSU:
18  Q.  Thank you, Commissioner.  Were there any lessons or
19  actions taken with regard to the efficacy of mass arrest
20  actions following May 2020?
21  A.  Yes, there were.
22  Q.  What were those?
23  A.  Two in particular.
24    One, we made a directive, and it has been
25  repeated -- ordered to be repeated at every roll call before

**170**

1  a team would go out, to remind them of First Amendment
2  protest policies and to make sure that they were avoiding
3  arresting the media if at all possible.
4    In addition to that, we also began working on a
5  policy to expedite release.  If we did have a media person
6  that came into contact with the State Patrol, to get them
7  released as quickly as possible thereafter.
8  Q.  Commissioner, were those policies and practices in
9  effect in April of 2021?
10  A.  Yes, they were.
11  Q.  And you mentioned it briefly, but could you please
12  describe for the Court, what is Operation Safety Net?
13  A.  Operation Safety Net was the plan for how the City of
14  Minneapolis and the County of Hennepin and, by extension,
15  the State of Minnesota would be prepared for potential
16  protests in the wake of the Derek Chauvin trial.
17    From a historical perspective, if we look at LA,
18  Oakland, Ferguson, there are oftentimes riots that happen
19  when the precipitating event started, but there are also at
20  times riots or civil disturbances that occur when the jury's
21  verdict comes out and it is not viewed favorably by the
22  public.
23    Having no pre-knowledge of how the court case
24  would resolve, Minneapolis began planning in July of 2020
25  for how they should be prepared for potential protests

**171**

1  during the trial.  That plan was being conducted through the
2  fall.
3    And in January of 2021 the State reviewed the
4  plan, because there was then a request from the City of
5  Minneapolis for potentially National Guard and State Patrol
6  and DNR assets to be assigned to this plan.  The plan was
7  under-resourced in our opinion and at that time the State
8  Patrol, Minnesota National Guard, DNR, and others joined
9  with Minneapolis and Hennepin County into unified command
10  for a planning effort to revise the Operation Safety Net
11  plan, and we worked together through -- from January through
12  the end of the trial, when we demobilized and went through
13  what we call phase four.
14  Q.  Commissioner, was the State Patrol and the Department of
15  Public Safety, did they join OSN in response to requests
16  from Minneapolis?
17  A.  Yes, we did.
18  Q.  And was the State Patrol or the Department of Public
19  Safety responsible for any other law enforcement agencies
20  involved with OSN?
21  A.  No, we were not.
22  Q.  What is unified command?
23  A.  Unified command is a concept that originally came out of
24  the fire service, but it comes out of FEMA or NIMS, the
25  National Incident Management System.  It is the recognition

**172**

1  that there are certain events, catastrophes that occur that
2  are too big for any one department to be able to handle on
3  its own.
4    And when you bring in multiple other jurisdictions
5  and multiple other departments to respond to whether it's a
6  special alarm fire, a tornado, a flood, or a civil
7  disturbance, there has to be a format for how the entities
8  that are joining into the effort work together.
9    And so unified command brings the senior staffs of
10  those organizations together so that they can work in
11  concert and in a coordinated fashion to respond to whatever
12  it is that you are responding to, once again, natural or
13  man-made disaster.
14  Q.  Who directs the mission goals under a unified command
15  structure?
16  A.  The local jurisdiction has the -- is the decision-maker
17  under unified command.  While it's a unified command and
18  everybody is at the table together, ultimately the decision
19  of what you do in a particular case in a particular
20  jurisdiction resides with the local jurisdiction that has
21  that.
22    So, for example, if we have a crisis that happens
23  in St. Paul, while the State Patrol may well be there as
24  part of unified command, the St. Paul Police Department and
25  Todd Axtell would be the decision-maker for that particular

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                July 28, 2021

**173**

1    incident.
2    **Q.** And would State Patrol -- in the context of Operation
3    Safety Net, would the State Patrol retain control over its
4    own troopers?
5    **A.** Yes. The State Patrol would have command staff that
6    would be responsible for the direction of its own personnel
7    while we're operating under -- whether in mutual aid or
8    under the Operation Safety Net under unified command.
9    **Q.** And would State Patrol have any authority to direct the
10   conduct or actions of other agencies under Operation Safety
11   Net?
12   **A.** No, we have no legal authority over any other agencies
13   other than our own.
14          THE COURT: Other than?
15          THE WITNESS: Other than our own. Sorry.
16   BY MR. HSU:
17   **Q.** Commissioner, turning to the events in Brooklyn Center
18   in April 2021, how did the Department of Public Safety and
19   State Patrol become involved there?
20   **A.** On April 11th, as I recall, the Brooklyn Center Police
21   Department had an officer-involved shooting. BCA does the
22   investigations on the officer-involved shootings and so DPS,
23   under the auspices of BCA, and the use of force team were
24   sent to do the investigation there.
25          Shortly after their arrival at the scene, there

**174**

1    was a report that crowds had gathered at the crime scene and
2    that there was cars being broken, windows being broken,
3    there was a crowd that was refusing to leave.
4          Brooklyn Center had not been part of Operation
5    Safety Net. The Hennepin County chiefs or what we would
6    call the west metro chiefs of police had made a decision
7    that they would create a mobile field force of their own,
8    but that they were not going to move into Minneapolis as
9    part of Operation Safety Net. Brooklyn Center was one of
10   those departments.
11          And so as the protests grew at the crime scene,
12   they called in the West Metro Command Team and they
13   responded there. They were able to disperse the crowd from
14   there, but shortly thereafter we got reports that crowd
15   was now moving to the Brooklyn Center Police Department over
16   on Humboldt. The West Metro Command went with them to
17   protect the Brooklyn Center Police Department and City Hall.
18          Hennepin County, which is -- was part of Operation
19   Safety Net and where Brooklyn Center resides, was part of
20   Operation Safety Net and so as the crowd grew on that first
21   night, Hennepin County was asked to join in. And the State
22   was asked to work with Hennepin County and with Brooklyn
23   Center to assist them as there did not appear to be
24   sufficient resources to respond to Brooklyn Center.
25   **Q.** And in Brooklyn Center, was it the local entity in

**175**

1    charge of the mission goals?
2    **A.** At the beginning Brooklyn Center Police Department was
3    in charge, and then within a day or so the mayor relieved
4    the chief of police of his position and there was a period
5    where it was unclear who was in charge of the Brooklyn
6    Center policing effort.
7          And during that time frame Hennepin County Sheriff
8    Dave Hutchinson assumed command of the incident when there
9    was a vacuum in place. He remained in command of the
10   incident for the next four or five days until the new
11   appointed -- newly-appointed interim chief for Brooklyn
12   Center re-assumed command of the operation.
13   **Q.** At any point did Minnesota State Patrol or the
14   Department of Public Safety assume command of the incident?
15   **A.** No, at no point were we in charge of the incident.
16   **Q.** Was the Department of Public Safety or State Patrol ever
17   responsible for any other law enforcement agency at Brooklyn
18   Center?
19   **A.** No, we were not.
20   **Q.** Was the Department of Public Safety or the Minnesota
21   State Patrol ever issuing commands to other law enforcement
22   agencies in Brooklyn Center?
23   **A.** No, we were not.
24   **Q.** Thank you, Commissioner.
25          MR. HSU: I have no further questions.

**176**

1          THE COURT: Cross examination? And we can take a
2    stretch break at this time. I will take one. If anyone
3    else would like to join me, you may, just at your seats.
4    (Pause)
5          THE COURT: We are ready to resume.
6          MS. McGARRAUGH: We just lost our questioning
7    lawyer.
8          THE COURT: Okay.
9    (Pause)
10         THE COURT: We are ready to proceed.
11         MR. RIACH: Thank you, Your Honor.
12                CROSS EXAMINATION
13   BY MR. RIACH:
14   **Q.** Good afternoon, Commissioner Harrington. My name is
15   Kevin Riach. I'm an attorney for the plaintiffs.
16   **A.** Good afternoon.
17   **Q.** Now, you are familiar with the Police Officer Standards
18   and Training Board, correct?
19   **A.** Yes, I am.
20   **Q.** That's a board that's organized within the Department of
21   Public Safety, correct?
22   **A.** No, it is not.
23   **Q.** It's not a board organized within the Department of
24   Public Safety?
25   **A.** No, it is not.

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                            July 28, 2021

**177**

1  **Q.** What is it organized within?

2  **A.** The POST Board is an independent standard and training

3  board that is appointed by the governor.  The Department of

4  Public Safety did up until fairly recently provide their HR

5  department, but it has its own board of directors, it has

6  its own appointed executive director, and it does not report

7  to the Department of Public Safety.

8  **Q.** Are the Board employees employees of the Department of

9  Public Safety?

10  **A.** No, they're not.

11  **Q.** All right.  But you're familiar with the operations of

12  the Board, correct?

13  **A.** Yes.  I have one member -- the BCA has one member that

14  sits on the POST Board on the training section.

15  **Q.** Okay.  And you're aware that they from time to time

16  promulgate model policies for law enforcement to use to

17  guide their practices, correct?

18  **A.** Yes, I am.

19  **Q.** Sometimes those model policies are adopted and become

20  mandatory policies; is that correct?

21  **A.** If they propose a model policy and it is voted upon by

22  the Board, it can become a mandatory policy for all state

23  peace officers or POST agencies, yes.

24  **Q.** It has to go through the rulemaking process at that

25  point; is that right?

**178**

1  **A.** I'm not positive about whether it has to go through

2  rulemaking or not.

3  **Q.** Okay.  It goes through some kind of legislative

4  sausage-making and becomes mandatory for state law

5  enforcement, though, if that's the course the Board chooses

6  to take with the model policy?

7  **A.** That has been my experience, yes.

8  **Q.** Okay.

9        MR. RIACH:  Ms. Anderson, can you call up

10  Exhibit 71, please, Plaintiffs' 71.

11  BY MR. RIACH:

12  **Q.** We'll see if you can see these on the screen.  If that

13  works, we'll just stick with the electronic version.  Is

14  that okay, Commissioner?

15  **A.** Sure.

16  **Q.** All right.  Now, what you are looking at is a document

17  labeled Plaintiffs' Exhibit 71.  It says, "Background on

18  Draft Model Policy on Public Assembly and First Amendment

19  Activity" at the top of this document.

20        THE COURT:  Okay.  You have to raise your voice or

21  speak into the microphone, but we can't mumble what the

22  document says.

23        MR. RIACH:  All right.  Sorry, Your Honor.

24  BY MR. RIACH:

25  **Q.** You are looking at a document.  This is marked

**179**

1  Plaintiffs' Exhibit 71 and the title is Background on Draft

2  Model Policy on Public Assembly and First Amendment

3  Activity; is that accurate?

4  **A.** That's correct, sir.

5  **Q.** Have you reviewed this document?

6  **A.** No, I don't believe I have reviewed this document.

7  **Q.** Can you just briefly --

8        MR. RIACH:  Well, let's do this.  Turn ahead to

9  page 8, Ms. Anderson.

10        MR. HSU:  Objection, Your Honor.  This document

11  hasn't been admitted into evidence.

12        MR. RIACH:  First of all, I'm just looking to ask

13  some questions to see if I can lay foundation.  Then if the

14  State still has an objection on hearsay grounds, I'll be

15  prepared to argue that, if that's okay with the Court.

16        THE COURT:  Overruled.

17        MR. RIACH:  Flip ahead to the next page, please.

18  BY MR. RIACH:

19  **Q.** You see that there's a section of this document entitled

20  Media, Commissioner Harrington?

21  **A.** Yes, I do.

22  **Q.** Were you aware that the POST Board was drafting a model

23  policy on law enforcement interaction with the media?

24  **A.** Yes, I knew that was one of the topics they were

25  entertaining.

**180**

1  **Q.** How did you know that?

2  **A.** I believe I saw it in the media actually, so.

3  **Q.** Okay.  Did anyone at the Board consult with you about

4  this policy?

5  **A.** Not with me particularly, no.

6  **Q.** There is a representative of the Department of Public

7  Safety on the Board, though, correct?

8  **A.** The BCA training -- the BCA director is, in fact, on the

9  POST Board, yes.

10  **Q.** Okay.  Is he there to represent the interests of the

11  Department of Public Safety?

12  **A.** He's there to represent the BCA's interests as one of

13  the premiere training departments within the state of

14  Minnesota.  So he's not a DPS or the commissioner's

15  representative, although he is a state employee and does

16  work for the Department of Public Safety, but he is in

17  command of his own police department effectively.

18  **Q.** Okay.  And you see under subparagraph E here it

19  states -- this is the model policy that we're discussing and

20  laying some foundation for here -- it states, "Even after a

21  dispersal order has been given, clearly identified media

22  must be permitted to carry out their professional duties

23  unless their presence would unduly interfere with the

24  enforcement action."

25        Were you aware that this particular policy was

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

**181**

1  under discussion at the POST Board?

2  **A.** Not in particular, no.

3  **Q.** Okay. Now, the POST Board maintains a website, correct?

4  **A.** That's correct.

5  **Q.** And that's located within the Department of Public

6  Safety website, correct?

7  **A.** There's a link to the POST Board from the Department of

8  Public Safety, but the POST Board has its own website.

9  **Q.** Okay. But you can get there from the Department of

10  Public Safety website, correct?

11  **A.** I'm certain you can.

12  **Q.** Go to the section that says, "Boards" and click on it

13  and it says, "Department" -- or it says, "POST Board," and

14  you click on that and then it takes you through to the POST

15  Board website?

16  **A.** I have no doubt that we can get there from there.

17  **Q.** All right. Very good. Are you aware that model

18  policies are regularly posted on the Peace Officer Standards

19  and Training Board website for review prior to discussion by

20  the POST Board at their sessions?

21  **A.** Yes, I am.

22  **Q.** Okay.

23  MR. RIACH: Your Honor, we would move to admit

24  Document 71, the POST Board model policy we've been

25  discussing.

**182**

1  THE COURT: Any objection?

2  MR. HSU: Yes, Your Honor. The State would object

3  to the admission of this document on several grounds, both

4  it's hearsay and lack of foundation. The Commissioner has

5  testified he's not previously reviewed this document or was

6  ever involved in the creation or drafting of the same.

7  Furthermore, the document at issue appears to be a

8  draft policy, not a model policy approved through rulemaking

9  process, and therefore should have no basis there.

10  Furthermore, this exhibit was disclosed to state defendants

11  yesterday and we would further object as an untimely

12  disclosure of an exhibit as we didn't have sufficient time

13  to review and prepare in response to the same.

14  THE COURT: Anything further on this matter?

15  MR. RIACH: Your Honor, with respect to the

16  hearsay and the other evidentiary objections, I would just

17  reiterate what's contained in our briefing on the State's

18  motion in limine, that in proceedings such as the one we

19  have here, a preliminary injunction proceeding, especially

20  when there's limited time and opportunity to present live

21  testimony about things like this policy, flexible standards

22  of admission are allowed to permit the Court to have the

23  information it needs to make the decision on the motion at

24  issue in --

25  THE COURT: What is this exhibit being offered for

**183**

1  such that the Court would need to use it?

2  MR. RIACH: This exhibit is being offered to show

3  that -- and we can include this argument in our briefing

4  subsequent to this hearing.

5  THE COURT: Is it offered for the truth of the

6  matter asserted? What's its purpose?

7  MR. RIACH: It's not, Your Honor. It's offered to

8  show that a model policy has been developed that is --

9  THE COURT: The relevance of a model policy is

10  what?

11  MR. RIACH: The relevance of the model policy is

12  it shows that law enforcement officers from multiple

13  agencies, who came together to promulgate this process with

14  community activists, have determined that provisions similar

15  to those contained within the plaintiffs' proposed

16  injunction are feasible and, in fact, going to be adopted as

17  best practices.

18  I don't want to get into argument here during my

19  cross examination, but this policy is relevant because it

20  shows that what the plaintiffs have proposed is something

21  that's been viewed as reasonable by multiple law enforcement

22  officers.

23  The members of the ad hoc committee that developed

24  this policy were made up of four community activists and

25  four law enforcement officers, including the head of the

**184**

1  Sheriffs Association and the Minnesota Peace Officers

2  Association. They came together and put this document

3  together. It went before the POST Board last week, at the

4  end of the week. The POST Board adopted it as a model

5  policy and advanced it through for review as a mandatory

6  policy. That adoption was unanimous by the entire POST

7  Board.

8  It's relevant because it shows that what we're

9  asking for makes sense. Now, Commissioner Harrington hasn't

10  reviewed it, so there's a limited amount of what I can ask

11  him about within the document, but given the nature of this

12  proceeding and the importance of the questions that the

13  Court has to consider here, this is the kind of evidence

14  that should be before the Court.

15  If the state defendants want to contest the

16  accuracy of this document, its validity, think it's full of

17  errors, it's fraud, whatever, if they have some evidence

18  that this isn't what it purports to be, they can certainly

19  advance that in their briefing, but it should at least be

20  before the Court. And I can represent this is pulled from

21  the Department of Public Safety website link that goes to

22  the POST Board.

23  THE COURT: Counsel, do you wish to be heard?

24  MR. HSU: Yes, Your Honor. We would stress again

25  that, as plaintiffs' counsel pointed out, this policy has

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                July 28, 2021

---

185

1  yet to be passed as any sort of permanent rulemaking
2  authority.  It exists as a draft policy reviewed by the POST
3  Board and that's all it is at this point.
4          Furthermore, to the extent that counsel alleges
5  that this is a model policy crafted by experts in the field,
6  we would further dispute this exhibit as an undisclosed
7  expert opinion since plaintiff is offering it as apparent
8  best practices without any supporting expert testimony or
9  disclosures to support that inference.
10         THE COURT:  The Court will admit it as an exhibit
11 of the Court, and its weight and merit will be -- is
12 evident, frankly, based on the arguments made by counsel.
13 So for limited purposes, frankly, informational and not any,
14 it appears, bearing on the issues before the Court, it will
15 be admitted.
16         MR. RIACH:  Thank you, Your Honor.
17         You can take that down, Ms. Anderson.
18 BY MR. RIACH:
19 Q.  Commissioner Harrington, am I correct that no state
20 trooper has been disciplined for arresting a journalist
21 during your tenure as the commissioner of Public Safety?
22 A.  Not to my knowledge.
23 Q.  Has any state trooper been disciplined for using force
24 against a journalist during your tenure as commissioner of
25 Public Safety?

---

186

1  A.  Not to my knowledge.
2  Q.  And has any state trooper been disciplined for using
3  chemical weapons against a journalist during your tenure as
4  commissioner of Public Safety?
5  A.  Not to my knowledge.
6          MR. RIACH:  Ms. Anderson, can you call up
7  Exhibit 68, please.
8  BY MR. RIACH:
9  Q.  Do you recognize the image that you are seeing on the
10 screen there, Commissioner Harrington?
11 A.  No, I do not.
12 Q.  Okay.
13         MR. RIACH:  Can you play the first part of this --
14 the first minute of this video, Ms. Anderson.
15         MR. HSU:  Objection, Your Honor.  The video has
16 not been offered into evidence and on its face it appears to
17 be a hearsay statement.
18         MR. RIACH:  Your Honor, I'm simply seeing if we
19 can get some foundation on this.  If not, I am going to
20 offer it as an exhibit anyways and if the State has a
21 hearsay objection, I'll address that when the State makes
22 its objection.  I'm sorry if the Court can't hear me.  I'll
23 try to move --
24         THE COURT:  I couldn't hear you.  You said you
25 have no foundation?

---

187

1          MR. RIACH:  Not yet.  Not yet.  And it may not
2  have any when I'm done, Your Honor, but I would like to at
3  least show Mr. -- Commissioner Harrington the first section
4  of the video and ask him foundational questions.  If he has
5  none, I still intend to offer it as an exhibit.  The State,
6  I anticipate, will object on hearsay and foundational
7  grounds.  I'll make my argument.  Then the Court can decide
8  what it would like to do.  But it should be pretty brief.
9          THE COURT:  You may proceed as you have indicated.
10 The matter -- the exhibit is not admitted.  You're seeking
11 to lay foundation for it, correct?
12         MR. RIACH:  That's correct, Your Honor.
13         THE COURT:  Okay.
14         MR. RIACH:  Okay.  Can you play the first minute
15 of the video, Ms. Anderson.
16 (Pause)
17 BY MR. RIACH:
18 Q.  While we are awaiting the video -- oh, maybe we've got
19 it here.
20 (Video recording played)
21 Q.  Having watched the first minute or so of this video, do
22 you recall having seen this video before?
23 A.  I don't recall it particularly, no.
24 Q.  Are you familiar with the arrest of Omar Jimenez in May
25 of 2020?

---

188

1  A.  I'm not particularly -- I do not recall that in
2  particular, no.
3  Q.  Okay.  Do you recall discussion during the George Floyd
4  protests of a CNN news crew being arrested while they were
5  covering the protests?
6  A.  Yes, I do.
7  Q.  Okay.  And what do you recall about that discussion?
8  A.  That there was a complaint, that we were told that a CNN
9  group was arrested.  We got a call -- I believe the
10 governor's office received a call from the CEO of CNN.  The
11 governor responded.  And CNN did not ever file a complaint
12 with internal affairs alleging any misconduct against the
13 State Patrol subsequent to that.
14 Q.  Did you have any conversations with Governor Walz about
15 that arrest?
16 A.  Nothing in particular.  I heard from Governor Walz his
17 displeasure at having news media arrested, so that was very
18 clear from his public statements and the statements we had
19 as we were coordinating resources.
20 Q.  Did you have any discussions with Colonel Langer, the
21 State Patrol commander, about the arrest of the CNN crew?
22 A.  We had the same level of conversation about that that
23 was not the way we wanted to be doing business and that we
24 needed to make sure that we could identify and expedite --
25 in those cases where someone was arrested, that we could

---

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 48 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

**189**

1  expedite their release as quickly as possible.
2  **Q.** Did you ask any questions of Colonel Langer about what
3  happened?
4  **A.** No, not in particular.
5  **Q.** All right. Were you concerned that you heard a report
6  that state troopers had arrested a CNN crew?
7  **A.** Yes, I was.
8  **Q.** And why were you concerned?
9  **A.** As I said earlier, I really do believe that the media is
10  a partner that we need to work with and it is -- whenever
11  you are making an arrest, I think, especially an arrest of
12  the media, I think that's something that should be -- that
13  is concerning. It is not something that we do every day.
14  It is an exceptional -- it should be an exceptional event.
15  And even in the context of what was a fairly massive amount
16  of civil unrest, it still was concerning that it happened.
17       And, frankly, there also was just a concern of
18  what were -- what happened behind the scene there. And so I
19  was assuming that we would have a complaint from them that
20  would then be investigated and we would have some facts that
21  would come out of that. They never did choose to make the
22  complaint and so I don't know that there was any
23  investigation beyond the initial complaint about it.
24  **Q.** So there was no complaint, so the State Patrol, as far
25  as you know, never investigated the event further?

**190**

1  **A.** Not that I'm aware of, no.
2       MR. RIACH: Your Honor, at this time I would move
3  to admit Plaintiffs' Exhibit 68. I anticipate the State
4  will have a number of objections. I'll make the same
5  arguments right out of the gate, which is this is a very
6  important matter for the Court to -- I'm sorry. I can tell
7  now that I am in mike range. This is a very important
8  matter for the Court, making this decision, and the Court
9  should see and hear all the relevant evidence that can be
10  put before it.
11       We're constrained by the nature of this hearing
12  and these proceedings from duly authenticating things like
13  this video. But if the State has any argument, after
14  viewing the video, that it doesn't -- that it purports to
15  show something that didn't happen, that it's inaccurate,
16  that it's fraud, I would certainly welcome them presenting
17  that evidence. Otherwise we would like to admit it for what
18  it is.
19       And I do have a few more questions for
20  Commissioner Harrington. I would like to watch the video
21  with him and ask him a few follow-up questions based on
22  what's in the video. I am not sure that intrudes into
23  hearsay because I'm going to be asking him if what he sees
24  is consistent with the policies he discussed on his direct
25  examination. But that's what I would ask the Court for

**191**

1  permission to do at this time.
2       THE COURT: Okay. And you said you want him to
3  see it for what it is. What is "it"?
4       MR. RIACH: It's a video of the arrest of Omar
5  Jimenez, the CNN crew and the reporter that we were just
6  discussing during my cross examination of Commissioner
7  Harrington.
8       THE COURT: Okay. Counsel?
9       MR. HSU: Yes, Your Honor. As counsel
10  anticipated, we object to the admission of this exhibit on
11  the grounds of hearsay and also on the grounds of
12  foundation, authentication. Commissioner Harrington has
13  testified he hasn't seen this video before.
14       Furthermore, while we recognize the important
15  issues before this Court, the issues with presenting a video
16  like this unauthenticated is it appears to be an edited news
17  clip. So we don't have the full extent, context, or scope
18  of the footage or the events preceding or subsequent to.
19       And as Commissioner Harrington has stated, he
20  doesn't have the foundation to testify to those events
21  specifically either. Accordingly, admitting this exhibit
22  and presenting it here would risk misconception of the
23  events at hand and offers an improper view as portrayed by
24  this video.
25       THE COURT: Any response?

**192**

1       MR. RIACH: We would just ask that the Court
2  afford the evidence the weight the Court believes it
3  deserves. I would --
4       THE COURT: Is there foundation for it? Is it a
5  complete -- how do I know that it's not edited? I just
6  don't have -- I am trying to get some sense of
7  authentication.
8       MR. RIACH: Sure, Your Honor. And I'll represent
9  to the Court that this is a video that I downloaded from the
10  CNN website. And we can watch the video. I don't think
11  there are any visible edits in the video. It's a matter of
12  public record, frankly. It's been viewed many times around
13  the world, including by Governor Walz. Really it's the
14  conduct that is seen in the video that is what I would like
15  to ask Commissioner Harrington about. If the Court has
16  concerns that there's something amiss with the video,
17  obviously the Court can reject this testimony and ignore
18  what we see here.
19       I would note that there are multiple affidavits,
20  declarations that have already been submitted in support and
21  opposition of this motion that contain hearsay, evidence
22  without foundation. It's just the nature of these kinds of
23  proceedings that some of these evidentiary rules have to be
24  viewed flexibly. Otherwise important information is not
25  considered as part of the process.

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                    July 28, 2021

**193**

1    THE COURT: And do the Rules of Evidence apply?
2    MR. RIACH: Well, I don't think they do, Your
3    Honor, quite frankly. I think that in these kinds of
4    proceedings the Court, especially with the experience that
5    Your Honor has, you having seen testimony and viewed
6    evidence many, many times over the years, can give the
7    evidence the weight it deserves.
8    The Tenth Circuit Court of Appeals has said
9    explicitly the Rules of Evidence do not apply in
10   preliminary --
11   THE COURT: And the Eighth Circuit?
12   MR. RIACH: -- injunction proceedings. The Eighth
13   Circuit, as far as I know, has not weighed in on this
14   question, Your Honor, one way or the other.
15   THE COURT: Counsel?
16   MR. HSU: Yes, Your Honor. With regards to the
17   Rules of Evidence specifically, we would note that as the
18   Court -- the case the Court cited in its recent order notes
19   that while likelihood of success is a basis of preliminary
20   injunction, success is still an aspect of that to whatever
21   degree the Court should weigh it.
22   And to that end the admissibility of the evidence
23   should still be weighed, particularly in cases like this
24   where the authentication issue presents grave concerns about
25   the video itself, that plaintiffs can't prove their case

**194**

1    through evidence like this because of some of the
2    admissibility issues and the core aspects of them.
3    THE COURT: What are the grave concerns as to the
4    authenticity of what is being reflected here?
5    MR. HSU: Yes, Your Honor. As it pertains to this
6    one, the circumstances and facts surrounding this video, the
7    actions portrayed within are not fully informed because we
8    don't know the scope of this video and its full recording.
9    THE COURT: So you think it was a staged event and
10   did not happen?
11   MR. HSU: No, Your Honor. I'm certainly not
12   stating that, but the dynamic circumstances of these types
13   of crowd situations require a full contextual consideration.
14   The difficulties with presenting this video here,
15   particularly with Commissioner Harrington, is that he has
16   stated he doesn't have the foundation to address those
17   contextual concerns with this exhibit.
18   And admitting it with him and through him would
19   prejudice the State particularly -- unfairly, we would
20   argue, particularly in light of the argument of time issues.
21   This video has existed, as counsel portends. He has had
22   opportunity to find the source if he chose to.
23   THE COURT: I don't understand. You're saying
24   there's a problem of timing and that there's been some bad
25   faith on the part of the proponent of this evidence?

**195**

1    MR. HSU: No, Your Honor. Our position is that
2    the Rules of Evidence still apply. While that degree may or
3    may not differ, the lack of foundation as to this video, the
4    lack of authentication to determine the full scope of the
5    events portrayed within the video, or lack thereof, are
6    dispositive on the matter of its admissibility.
7    We are -- the State is not taking the position
8    that there's bad faith or insincerity as to that, but the
9    mere framing of the events as portrayed in the video, which
10   we don't know whether it is edited or not, can shift the
11   perspective and remove context, which informs those facts.
12   THE COURT: I'll overrule the objection and give
13   the evidence the weight it deserves.
14   MR. RIACH: Thank you, Your Honor.
15   Ms. Anderson, can you press play.
16   (Video recording played)
17   MR. RIACH: You can stop the video now.
18   THE COURT: And so let's address the exhibit that
19   has been admitted. The purpose of that exhibit -- it is
20   being admitted for what? Because it needs to have some
21   limiting purposes, correct? You are not indicating that the
22   statements of the reporter are offered for the truth of the
23   matter asserted; is that right?
24   MR. RIACH: That's correct, Your Honor. The
25   purpose of this exhibit is to ask Commissioner Harrington

**196**

1    some questions about the State Patrol conduct that's
2    displayed in the video and the propriety of that conduct
3    under the Department of Public Safety policies that were
4    discussed on direct examination.
5    THE COURT: So the description of what is going on
6    by the reporter is not evidence, it is the visual depiction
7    of what is going on that is evidence; is that what you are
8    indicating?
9    MR. RIACH: That's correct, Your Honor.
10   THE COURT: Okay. Just for clarification.
11   MR. RIACH: Thank you.
12   Can you please call up Defense Exhibit 15 and turn
13   to page 2 of that exhibit, Ms. Anderson. Can you close the
14   exhibit, please. Defense Exhibit 15, please. Thank you.
15   There we go, page 2. Actually, can you move -- here we are.
16   BY MR. RIACH:
17   Q. One of the rules that's listed on this exhibit,
18   Commissioner Harrington, under Principle Two, rule number 4,
19   is: "Peace officers shall take no action knowing it will
20   violate the constitutional rights of any person."
21   Is the conduct that we just witnessed, is it the
22   position of the Department of Public Safety that that
23   conduct is consistent with this rule?
24   A. Having not been at the scene and having only seen this
25   video, I do not know the full context of why they were

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

**197**

1  arrested or what the circumstances that surround that are.
2  So I'm unable to give you an answer based on what I've just
3  seen.
4  Q.  Okay.  Rule number 6 states, "Peace officers learning of
5  conduct or observing conduct which is in violation of any
6  law or policy of this department shall take action and/or
7  report the incident to the officer's immediate
8  supervisor...."
9       Are you aware of any internal reports or
10  complaints based on this incident?
11  A.  I'm not sure what you mean by "internal reports."
12  Q.  Fair point.  Let me rephrase the question.  Are you
13  aware of any state troopers who reported this incident to
14  their supervisor?
15  A.  I cannot say that I know in particular.  I know that
16  State Patrol documents all arrests as a matter of general
17  practice and procedure.  So it would be unusual in my
18  experience for them not to document an arrest.
19  Q.  Okay.  But no trooper, to your knowledge, reported this
20  arrest as a violation of the rules that we're looking at
21  right now; is that correct?
22  A.  None that I'm aware of, no.
23  Q.  And you haven't -- prior to today you hadn't seen this
24  video, correct?
25  A.  I don't remember seeing this particular video.

**198**

1  Q.  Okay.  And you hadn't looked into this incident at all,
2  correct?
3  A.  No, other than to check whether -- I knew that there had
4  been CNN reporters arrested.  I checked to see if a
5  complaint had been lodged by CNN; and when I found that
6  there was no complaint lodged by CNN, I didn't pursue the
7  matter further than that.
8  Q.  Okay.
9       MR. RIACH:  Your Honor, it's my understanding we
10  have a hard stop at 3:30; is that correct?
11       THE COURT:  That's correct.
12       MR. RIACH:  Well, I will end my cross examination
13  now.  Thank you, Commissioner Harrington.
14       THE WITNESS:  Thank you.
15       THE COURT:  Is there anything further for this
16  witness?
17       MR. HSU:  Nothing further, Your Honor.
18       THE COURT:  May the witness be excused?
19       MR. HSU:  Yes, Your Honor.
20       THE COURT:  Sir, you are excused.
21       MS. LANDRUM:  Your Honor, the defense calls Major
22  Joseph Dwyer.
23       And, Your Honor, while we're waiting for Major
24  Dwyer, I would just like to note for the record that based
25  off our rough timekeeping, we've put on approximately an

**199**

1  hour and 15 minutes of testimony, which includes both of our
2  cross examinations.
3       So I understand that there's a hard stop today at
4  3:30 and that Your Honor has other things on her schedule.
5  I just want to mention that, as a result, we will not get as
6  much time to put on our affirmative testimony as plaintiffs
7  were allotted.
8       THE COURT:  Okay.  Are there witnesses that you
9  are planning to excuse because of that?
10       MS. LANDRUM:  No, Your Honor.  We were thinking
11  that we were going to be spending more than 40 minutes with
12  Major Dwyer inasmuch as there's a lot of ground to cover
13  here with regard to the unrest in May of 2020, as well as
14  April of 2021.
15       So, from that standpoint, I have been trying to
16  cut questions on my outline here to make sure that we cover
17  everything that we believe Your Honor would need to hear.
18  That being said, I am nervous about being done by 3:30.  And
19  then, of course, plaintiffs will want to cross-examine.
20       THE COURT:  Certainly.  And so it may mean that we
21  need to schedule more time for the hearing.
22       MS. LANDRUM:  I will move as quickly as humanly
23  possible, Your Honor, but I worry that we won't be able to
24  cover everything that we had hoped.
25       THE COURT:  I think we need to proceed as you see

**200**

1  fit to proceed professionally.  If we need to have more time
2  for this hearing, we will have more time.  The Court's
3  schedule is not going to impede the ability to fairly
4  adjudicate this issue.  Okay?
5       MS. LANDRUM:  Absolutely.
6       THE COURT:  And so I'm not going to end the
7  hearing and the submission of evidence and the presentation
8  of witnesses and close and take the matter under advisement
9  based on the 3:30 stop.  Okay?
10       MS. LANDRUM:  Okay, Your Honor.
11       THE COURT:  So if we need to, we will reconvene.
12       MS. LANDRUM:  Thank you, Your Honor.  We call
13  Major Dwyer to the stand.  Thank you.
14  (Witness sworn)
15       COURT REPORTER:  You can have a seat.  If you
16  could state your name, spelling your first and last name,
17  please.
18       THE WITNESS:  Joseph Jason Dwyer.  Last name
19  D-w-y-e-r.
20           (Joseph Dwyer)
21       D I R E C T  E X A M I N A T I O N
22  BY MS. LANDRUM:
23  Q.  Good afternoon, Major.  Are you currently employed?
24  A.  Yes, ma'am, I am.
25  Q.  Where is that?

EXHIBIT A

**201**

1  A.  With the Department of Public Safety, specifically the
2  Minnesota State Patrol.
3  Q.  And how long have you been working for the Minnesota
4  Department -- or for Minnesota State Patrol?
5  A.  Since May of 1997.  24 years.
6  Q.  What is your current title?
7  A.  I hold the rank of major.
8  Q.  And could you describe for the Court briefly your
9  duties.
10  A.  Certainly.  As a rank of major, we oversee an
11  operational region.  So at this time or in the near future
12  it will be the southern region of the state of Minnesota.
13  And then currently I'm also on special assignment in the
14  realm of demonstration preparedness.
15  Q.  Major, does Minnesota State Patrol have a mission
16  statement?
17  A.  It does.
18         MS. LANDRUM:  Your Honor, permission to publish
19  Exhibit 1 to the witness?
20         THE COURT:  You may.
21         MS. LANDRUM:  Ms. Kosek, would you please.  Thank
22  you.
23  BY MS. LANDRUM:
24  Q.  Major, do you recognize Exhibit 1?
25  A.  I do.

**202**

1  Q.  What is it?
2  A.  That is our General Order, specifically the policy
3  related to the mission statement, vision statement, and core
4  values.
5  Q.  Does this appear to be an accurate copy of that mission
6  statement?
7  A.  Yes, it does.
8         MS. LANDRUM:  State defendants move to admit
9  Exhibit 1.
10         THE COURT:  Any objection?
11         MR. RIACH:  No objection.
12         THE COURT:  Exhibit 1 is received.
13  BY MS. LANDRUM:
14  Q.  Major, are there any expectations regarding trooper
15  conduct as they work to achieve this mission as we see here
16  in Exhibit 1?
17  A.  Most certainly.
18         MS. LANDRUM:  Your Honor, permission to publish to
19  the witness Exhibit 12?
20         THE COURT:  You may.
21  BY MS. LANDRUM:
22  Q.  Major, do you recognize Exhibit 12?
23  A.  I do.
24  Q.  What is it?
25  A.  That is our General Order again, our policy related to

**203**

1  conduct of sworn members.
2  Q.  Does this appear to be an accurate copy of this policy
3  as Ms. Kosek is cycling through it?
4  A.  Yes, it is.
5         MS. LANDRUM:  State defendants move to admit
6  Exhibit 12 into evidence, Your Honor.
7         THE COURT:  Any objection?
8         MR. RIACH:  No objection, Your Honor.
9         THE COURT:  Exhibit 12 is received.
10  BY MS. LANDRUM:
11  Q.  Major, what's the purpose of this conduct policy?
12  A.  That is to provide guiding principles for all of our
13  members to abide by and to not only set the parameters of
14  how they'll conduct themselves during their work hours, but
15  also outside of those.
16  Q.  Major, I would like to talk to you next about training.
17  Are you familiar with the training required to become a
18  Minnesota State Patrol trooper?
19  A.  Yes, I am.
20  Q.  Can you describe that briefly for the Court.
21  A.  So our agency requires that members receive or hold a
22  two- or four-year degree in law enforcement or criminal
23  justice or there is reciprocity through -- from military
24  partners, but we also have a law enforcement training
25  opportunities program where an individual can hold a two- or

**204**

1  four-year degree in any realm and then our agency, through
2  the use of MnSCU universities, will provide condensed law
3  enforcement training for them to attend our academy.
4  Q.  And then can you briefly describe what's required for
5  the academy.
6  A.  So our academy is a 16-week residential academy where
7  cadets are exposed to a vast variety of topics related to
8  the State Patrol.
9  Q.  Do troopers receive any dedicated training on how to
10  respond to mass unrest or mass violence?
11  A.  So there is a module in the academy and that's an
12  eight-hour course.
13  Q.  Do troopers receive any dedicated training on how to
14  interact with the media during incidents of mass unrest or
15  mass violence?
16  A.  They do.
17  Q.  Can you describe that for the Court.
18  A.  So that is a part of the eight-hour module, and they
19  also receive another block on media relations.
20  Q.  Has there been any additional training of Minnesota
21  State Patrol troopers since the unrest that occurred in
22  Minneapolis in May of 2020?
23  A.  There has been.
24         MS. LANDRUM:  Permission, Your Honor, to publish
25  Exhibit 19 to the witness?

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 52 of 78

Goyette, et al. vs. City of Minneapolis, et al.                    July 28, 2021

205

1        THE COURT:  You may.
2   BY MS. LANDRUM:
3   Q.  Major, do you recognize Exhibit 19?
4   A.  I do.
5   Q.  And as Ms. Kosek is going through it, can you just
6   describe what this is to the Court.
7   A.  So it is a joint venture with the Department of Public
8   Safety and the Department of Natural Resources on the topic
9   of media relations.
10  Q.  Does this appear to be an accurate copy of the training
11  that you were just referencing?
12  A.  Yes, it does.
13       MS. LANDRUM:  Your Honor, state defendants move to
14  admit Exhibit 19.
15       THE COURT:  Any objection?
16       MR. RIACH:  No objection.
17       THE COURT:  It is received in evidence,
18  Exhibit 19.
19       MS. LANDRUM:  Thank you, Your Honor.
20  BY MS. LANDRUM:
21  Q.  Major, why were troopers required to take this training?
22  A.  This was an initiative prior to the operation known as
23  Safety Net in the city of Minneapolis leading up to the
24  trials in an effort to provide them additional training.
25  Q.  Did troopers have to certify that they took this

206

1   training?
2   A.  They did.
3   Q.  Was there a date upon which they had to certify that?
4   A.  It was prior to April 1st.
5   Q.  Major, does Minnesota State Patrol -- April of 2021, did
6   you say?
7   A.  Yes, that is correct, ma'am.
8   Q.  Does Minnesota State Patrol have any policies or
9   procedures pertaining to the treatment of media, Major?
10  A.  Yes, we do.
11       MS. LANDRUM:  Permission to publish Exhibit 2 to
12  the witness, Your Honor?
13       THE COURT:  You may.
14  BY MS. LANDRUM:
15  Q.  Major, do you recognize Exhibit 2?
16  A.  Yes, I do.  That's our First Amendment assemblies
17  policy, General Order.
18  Q.  And Ms. Kosek has just cycled through the pages here on
19  the screen.  Does it appear to be an accurate copy of that
20  First Amendment policy?
21  A.  It does.
22       MS. LANDRUM:  Your Honor, defendants move to admit
23  Exhibit 2 into evidence.
24       MR. RIACH:  No objection, Your Honor.
25       THE COURT:  Exhibit 2 is received.

207

1   BY MS. LANDRUM:
2   Q.  Major, what's the purpose of this First Amendment
3   policy?
4   A.  Much like our other policies, it's to provide us
5   guidance and those guiding principles on how troopers will
6   conduct themselves in, this instance, First Amendment
7   assemblies.
8   Q.  Are troopers trained on this policy?
9   A.  Yes, they are.
10  Q.  Can you explain that to the Court.
11  A.  So during the course of the academy, all of our policies
12  are introduced and they, through training, the cadets,
13  trooper candidates, need to have an understanding of that
14  policy before they sign off on that.
15  Q.  Major, I would like to talk to you a little bit about
16  trooper performance.  Does Minnesota State Patrol have a
17  process in place for evaluating trooper performance?
18  A.  We do.
19  Q.  Can you describe that to the Court.
20  A.  So we engage in annual evaluations, and they are
21  delivered by March 15th of each year.  And even though
22  there's an annual performance evaluation delivered on a
23  specific -- or by a specific date, there's feedback that
24  each trooper will receive during the course of the year so
25  they can make corrective actions as necessary so it's not

208

1   memorialized in the document if they change their
2   trajectory.
3   Q.  For purposes of providing that feedback throughout the
4   year, Major, if discipline were to become necessary, does
5   Minnesota State Patrol have a procedure for that?
6   A.  Yes, we do.
7   Q.  Can you describe that to the Court.
8   A.  So our discipline process implements the use of an
9   outside agency, if you will, or outside entity.  It's housed
10  under the Department of Public Safety, but it is the
11  Internal Affairs Division.
12  Q.  Going back to discipline, though, that you might issue
13  to someone under your ranks, is there a policy or a
14  procedure for that?
15  A.  There is.
16  Q.  Could you describe that to the Court.
17  A.  So that would actually fall under the bargaining unit,
18  collective bargaining, and the troopers' MLEA contract.
19  Q.  If a trooper were found to have violated a Minnesota
20  State Patrol policy pertaining to the treatment of media or
21  any of the policies that we've discussed this afternoon,
22  would they be subject to discipline?
23  A.  Yes, they would be.
24  Q.  Now, you just mentioned the Internal Affairs Department.
25       MS. LANDRUM:  I would like permission from the

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                       July 28, 2021

**209**

1  Court to publish to you Exhibit 11.
2        THE COURT:  You may.
3        MS. LANDRUM:  Thank you, Your Honor.
4  BY MS. LANDRUM:
5  Q.  Do you recognize Exhibit 11, Major?
6  A.  Yes, I do.
7  Q.  And what is this?
8  A.  Our policy specific to investigations, and then the
9  Minnesota Department of Public Safety's guidelines as well.
10  Q.  And Ms. Kosek has just cycled through on the screen the
11  pages.  Does this appear to be an accurate copy of the
12  internal affairs policy?
13  A.  It does.
14        MS. LANDRUM:  Defendants move to admit Exhibit
15  Number 11, Your Honor.
16        MR. RIACH:  No objection, Your Honor.
17        THE COURT:  Exhibit Number 11 is received.
18  BY MS. LANDRUM:
19  Q.  Major, do Minnesota State Patrol troopers or lieutenants
20  or even members of your rank participate directly when
21  internal affairs complaints are being investigated and
22  making investigatory decisions?
23  A.  So this is an independent process.  There will be
24  initial conversations that will initiate the disciplinary
25  process, but as far as our insertion, no.

**210**

1  Q.  And why is that?
2  A.  To provide transparency and to rule out any type of
3  nepotism that may be claimed, independent from our agency.
4  Q.  Major, I would like to switch gears here and talk about
5  May of 2020.  Do you have any personal knowledge of what
6  occurred in Minneapolis in May of 2020 following the murder
7  of George Floyd?
8  A.  Yes, I do.
9  Q.  And how did you develop that personal knowledge?
10  A.  So I was -- at that time held the rank of captain and
11  was a commander of our Mobile Response Team.
12  Q.  And during the testimony of Commissioner Harrington, he
13  testified a little bit about what was occurring on the
14  ground, but could you testify from your personal experience
15  what was occurring on the ground during that time in
16  Minneapolis.
17  A.  So at the time that our state assets were inserted,
18  specifically the Mobile Response Team and then progressing
19  to the entire State Patrol, it was an evolution of an event,
20  reaching, you know, various pinnacles of riotous
21  behavior.  At times, you know, reflecting back, it was
22  complete pandemonium and, as far as details, just utter
23  chaos.
24  Q.  Were there any other law enforcement agencies involved
25  in the response in Minneapolis in May of 2020?

**211**

1  A.  There were.
2  Q.  As a state agency, statewide agency, was Minnesota State
3  Patrol in charge of any of those other law enforcement
4  agencies?
5  A.  They were not.
6  Q.  Why not?
7  A.  So our statutory existence from 299D is that of a
8  separate entity.  So we do not hold any authoritative power
9  over any local jurisdiction or sheriff's jurisdiction of any
10  of our allied agencies.
11  Q.  Does Minnesota State Patrol give orders to other law
12  enforcement agencies?
13  A.  We do not.
14  Q.  When did Minnesota State Patrol's involvement on the
15  ground in Minneapolis began in 2020?
16  A.  So specifically to our Mobile Response Team, we were
17  requested on Tuesday, May 26th.
18  Q.  Requested by who?
19  A.  That would have been the Minneapolis Police Department.
20  Q.  And when did Minnesota State Patrol's involvement end in
21  that unrest that was happening?
22  A.  So we were involved in demobilization.  It would have
23  been June 7th, which was a Sunday.
24  Q.  So I know we're talking about a substantial amount of
25  time here and there's a lot of details to cover, but I want

**212**

1  to focus from your perspective as a law enforcement official
2  on the ground the key events that Minnesota State Patrol
3  participated in, going in chronological order to the best
4  that you can.
5        What was the first major event that Minnesota
6  State Patrol was involved in on the ground?
7  A.  So that Tuesday we were asked to provide site security
8  basically outside of the Third Precinct, but not an overt
9  presence, standing behind a line of Minneapolis police
10  officers.  That night was drawn to a conclusion as most
11  nights were, there was a pinnacle event and then activity
12  subsided.
13        The very next evening -- I should say that all of
14  our troopers returned to their home destinations throughout
15  the state and the very next evening was, like, the same
16  cycle, notified at approximately the same time and then
17  tasked with security again outside of the Minneapolis Police
18  Department.
19  Q.  What precinct?
20  A.  The Third Precinct.
21  Q.  And what day was this?  So you testified that you're
22  securing the Third Precinct and this is the second night.
23  What day is that?
24  A.  So that is Wednesday.
25  Q.  And what significant event happened there?

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                July 28, 2021

---

**213**

1    **A.**  So that was the -- again, escalation and really the
2    introduction of fires and continued looting, and the night
3    ended with automatic gunfire in a Target parking lot across
4    the street from our location.
5    **Q.**  Can you describe that in a little bit more detail.  So
6    you mentioned fires.  What was on fire?  And you mentioned
7    gunfire.  What are you referring to?
8    **A.**  Most certainly.  So during the course of the evening the
9    fires had commenced.  Actually, the one parts store,
10   AutoZone, had been the subject of arson previously.  That
11   fire had restarted and it was totally engulfed at one point.
12   There was also a high-rise residential complex behind that
13   that was fully engulfed.  So really it's this surreal
14   environment of fire and smoke and loud boisterous crowds and
15   riotous behavior, projectiles, and then holding firm through
16   the night.
17          There was an incident over in the Target parking
18   lot with multiple gunshots, which led our troopers being out
19   in the open struggling to find concealment or cover.  So our
20   whole team was, like, piled on top of each other behind like
21   a three-foot Jersey barrier trying to avoid any harm to our
22   team.
23   **Q.**  Major, did you take any videos of what occurred that
24   night with the fires?
25   **A.**  I took a variety of photos, and on the iPhone platform

---

**214**

1    some of those are saved as live photos, which convert to
2    videos, yes.
3          MS. LANDRUM:  Permission to publish to the witness
4    and to the Court Exhibit 42, which are two videos taken by
5    Major Dwyer?
6          THE COURT:  Any objection?
7          MR. RIACH:  No objection, Your Honor.
8          THE COURT:  You may.
9    (Video recording played)
10   BY MS. LANDRUM:
11   **Q.**  Do you recognize this video, Major?
12   **A.**  I do.
13   **Q.**  Was this a video you took?
14   **A.**  I did, yes.
15   **Q.**  Does this appear to be an accurate copy of the video you
16   took?
17   **A.**  It is.
18   **Q.**  And is this the scene from the Third Precinct?
19   **A.**  It is, the intersection of Lake and Minnehaha.
20          MS. LANDRUM:  Exhibit 42, Your Honor, actually has
21   two videos within it.  Permission to play the second one?
22          THE COURT:  You may.
23   (Video recording played)
24   BY MS. LANDRUM:
25   **Q.**  Major --

---

**215**

1          MS. LANDRUM:  Oh, it's actually quite short.  Can
2    you play it again.
3          THE COURT:  Let me ask you:  Are these received in
4    evidence?
5          MS. LANDRUM:  I was trying to lay the foundation
6    and then I was going to offer them.
7          THE COURT:  Okay.  So you are playing for him --
8          MS. LANDRUM:  Yes.
9          THE COURT:  -- to lay the foundation?
10         MS. LANDRUM:  Yes.  Just to show it one more time.
11   Sorry.
12   (Video recording played)
13   BY MS. LANDRUM:
14   **Q.**  Does this appear to be an accurate video, a copy of a
15   video that you took?
16   **A.**  It does.
17         MS. LANDRUM:  Defendants move to admit Exhibit 42,
18   both videos.
19         MR. RIACH:  No objection.
20         THE COURT:  They are received.
21         MS. LANDRUM:  Thank you, Your Honor.  And was Your
22   Honor able to view those as they were being seen or would
23   Your Honor prefer to see them again?
24         THE COURT:  I would like to see them again,
25   please.

---

**216**

1          MS. LANDRUM:  Perfect.  Ms. Kosek, if you could
2    play them both in succession.
3    (Video recording played)
4          MS. LANDRUM:  And the second one, if you could
5    enlarge the screen.
6    (Video recording played)
7    BY MS. LANDRUM:
8    **Q.**  So we just discussed what happened on that night in
9    front of the Third Precinct.  From your standpoint, Major,
10   what was the next major event that Minnesota State Patrol
11   was involved in?
12   **A.**  So on the next shift cycle, which would have been
13   Thursday, we were actually removed from the Third Precinct
14   and that security aspect and given an assignment downtown
15   outside the First Precinct to provide security and then also
16   to prevent any type of looting on Nicollet Mall.
17   **Q.**  So you were reassigned away from the Third Precinct.
18   What happened that night at the Third Precinct?
19   **A.**  So that was the evening that the Third Precinct was
20   abandoned and destroyed.
21   **Q.**  The mission that Minnesota State Patrol was called to on
22   Nicollet Avenue that evening, can you just briefly describe
23   how that went.
24   **A.**  Yes.  We progressed through the evening.  There were a
25   variety of various crowds down in that downtown area, some

---

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                              July 28, 2021

**217**

1   scheduled events outside the First Precinct, but ultimately
2   criminal and dangerous activity was curbed.  There was some
3   instance of damage to property on Nicollet Mall, but by and
4   large it was evaded.
5   Q.  What was the next key event for purposes of Minnesota
6   State Patrol's participation during the unrest in
7   Minneapolis in May 2020?
8   A.  So it would have been that very same day, the Thursday
9   evening into the early morning hours of Friday, we were
10  tasked or I was advised that we needed to go down and
11  establish as large as perimeter, based on the Third Precinct
12  dynamic, as large as perimeter as possible to provide like a
13  safety barrier so that the events that occurred on Tuesday,
14  Wednesday, Thursday would not occur again.
15  Q.  So was there significant concerns, safety concerns,
16  around the area of the Third Precinct despite the fact that
17  it now been sort of abandoned and lit on fire?
18  A.  Without a doubt based on the previous night's activity,
19  criminal and otherwise, yes.
20  Q.  We've heard testimony when you were not in the room,
21  Major, about the arrest of CNN -- a CNN crew.  Were you
22  aware that that happened?
23  A.  I am.
24  Q.  Are you aware of approximately when that happened?
25  A.  It would have been that early morning hours of Friday.

**218**

1   Q.  So was that the same time when Minnesota State Patrol
2   was being called to establish a larger perimeter in that
3   area?
4   A.  Yes, it is.
5   Q.  Was that a safe area?
6   A.  Based on what we had seen transpire the previous two
7   nights, the evacuation of the Third Precinct and the arson
8   that occurred, it was not.
9   Q.  Were individuals being dispersed or otherwise arrested
10  in that area because of the safety concerns there and the
11  looting and rioting and fires?
12  A.  Yes, they were.
13  Q.  Now, in order to establish the perimeter that you just
14  mentioned, what did Minnesota State Patrol do to assist
15  Minneapolis?
16  A.  So really the first time in the history of our agency,
17  we had called every state trooper and activated them in the
18  early morning hours to respond to the city of Minneapolis.
19  Q.  Had that ever happened before?
20  A.  Not to my knowledge.
21  Q.  What's the next significant event that occurred?
22  A.  So we did establish that perimeter, just a large,
23  multiple-block area.  And then upon successfully doing that,
24  we started the next cycle, which would have been Friday
25  evening into Saturday morning.

**219**

1   Q.  And so you mention "the next cycle."  Where did that
2   happen; where was that?
3   A.  So on this particular day we were provided an assignment
4   to respond to the area of the Fifth Precinct.  There was a
5   large demonstration outside there.  Based on concerns of
6   what happened at the Third Precinct, we were asked to
7   respond and try to prevent, you know, a similar situation of
8   arson and damage and just harm to citizens in that area.  So
9   we did respond to that area.  Immediately the crowd
10  dispersed, and that was after curfew, so at that point we
11  initiated patrolling the streets on foot patrol and issuing
12  curfew citations, curfew enforcement basically.
13  Q.  Okay.  And that's around the area of the Fifth Precinct?
14  A.  Yes, ma'am.
15  Q.  What happened next?
16  A.  So working collaboratively with Minneapolis Police
17  Department, we did try to effect a mass arrest.
18  Q.  And the Court has heard today that phrase, "mass
19  arrest," but it would be helpful, I think, if you would just
20  explain to the Court from your perspective.  What is a mass
21  arrest?
22  A.  Yes.  So in the arena of crowd control or crowd
23  management, there are a couple of different tactics that we
24  can employ.
25       One of it is crowd dispersal.  The issue with

**220**

1   crowd dispersal, and especially given the environment that
2   we were transgressing through, it just pushes the, if you
3   will, problem area to another area or allows it to occur,
4   you know, the next evening.  So that's the cycle.  It really
5   doesn't culminate to an end.
6        A mass arrest situation, working in conjunction
7   with various departments, if you have enough resources to
8   encircle a group, putting pieces of the puzzle into place
9   systematically, and I like to call it like a choreography,
10  so that it's built in a timely fashion, allowing people
11  to -- you know, an avenue of exit and then if there's
12  noncompliance, that final piece comes into place and then
13  there's enforcement action taken.
14  Q.  You mentioned there that dispersal on its own was not
15  always effective.  Is that a lesson that Minnesota State
16  Patrol was learning on the ground in Minneapolis in May of
17  2020?
18  A.  Yes, we were.
19  Q.  Are mass arrests common?
20  A.  Previously, no.  Over the last 18 months it has been
21  more common based on the environment that we're working
22  through.
23  Q.  Now, you mentioned that you attempted to do a mass
24  arrest.  Where did that -- where was that occurring?
25  A.  After navigating through the city streets, in the area

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 56 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

221

1  of Lake and Grand there was a large crowd of demonstrators.
2  There was actually a fire built within the middle of that
3  intersection.  And based on reports, aerial with the use of
4  a helicopter or otherwise monitoring different entities of
5  this crowd, we were able to set up a larger perimeter blocks
6  out and, you know, move in.  Unfortunately, one of the lines
7  broke down and a large majority of that crowd was able to
8  escape.
9     Q.  What about in the area of the Fifth Precinct, did
10  Minnesota State Patrol participate in any attempt to do a
11  mass arrest there?
12    A.  Yes, we did.
13    Q.  Major Dwyer, are you familiar with the Declaration of
14  Edward Ou?
15    A.  Yes, I am.
16    Q.  Did I ask you to review that this morning before your
17  testimony?
18    A.  Yes, ma'am, you did.
19    Q.  And did you, in fact, review it?
20    A.  I did.
21    Q.  And did I ask you to review the videos that he took that
22  were attached to his declaration?
23    A.  Yes, you did.
24    Q.  And did you review those videos?
25    A.  Yes, ma'am.

222

1     Q.  So you're familiar, then, when I refer to what is
2  Plaintiffs' Exhibit 14, which is an exhibit during the
3  daytime which appears to be outside of the Fifth Precinct.
4  Would you agree with me, having viewed that this morning,
5  that it looks like that is in the area of the Fifth
6  Precinct?
7     A.  Yes, it is.
8     Q.  After having watched that video again this morning, can
9  you describe to the Court from a law enforcement perspective
10  what was happening there.
11    A.  So the video, as viewed, provides, you know, a very
12  short and small window into the event that was transpiring.
13  So there is, you know, an active line of law enforcement and
14  they are moving down the street there.  There is an
15  encounter with Mr. Ou.  And what's not seen on the video is
16  everything, you know, in the periphery, and, again, it is a
17  chaotic event.
18         And I think reflecting on that scene, you know, we
19  had came up a side street adjacent to Nicollet Avenue,
20  descended on 32nd Avenue or thereabouts.  And immediately
21  upon, you know, forming the line formation on Nicollet Mall,
22  we were met with volatility and debris thrown, from rocks,
23  bottles, metal projectiles.  There's even a report from one
24  of our troopers seeing a machete fly through the air and
25  land near him.  There were still fires, maybe not from this

223

1  particular day, but a residual from the previous evening.
2  So it was that, again, volatile, agitated state of the
3  crowd.
4     Q.  And were you physically there on the ground witnessing
5  what you just described to the Court?
6     A.  Yes, I was.
7     Q.  Was Minnesota State Patrol the only law enforcement
8  agency present?
9     A.  We were not.
10    Q.  Can you explain from a law enforcement perspective what
11  that line in the video, the line of law enforcement that was
12  moving through the video, what were they attempting to do?
13    A.  So in, again, field force operations there's some basic
14  formations, the line maybe being the easiest to implement.
15         Based on the crowd size and what we were facing,
16  we do -- we did have multiple lines and it's what we call
17  close support, so line formation, line formation, line
18  formation, just a bolstering of resources so we have enough
19  personnel to accomplish what we're trying to do.
20         But on this particular evening it was to, again,
21  protect that area.  Once we had evaluated the crowd and
22  assessed where was the vast majority of them, we did
23  formulate a plan, based on the curfew order, to move that
24  crowd into the Kmart parking lot to the north near Lake
25  Street and effect a mass arrest.

224

1     Q.  Was a dispersal order given before that law enforcement
2  line started to move forward?
3     A.  In conjunction with the curfew order, there was a
4  dispersal.
5     Q.  What was the basis for the dispersal?
6     A.  Being after curfew and that this was no longer a
7  lawful -- it was after hours.
8     Q.  Did the dispersal order apply to media, members of the
9  media who were present in that area?
10    A.  Yes.
11    Q.  Why?
12    A.  Because even though media personnel were exempt from a
13  curfew order, based on the law enforcement operation to
14  provide a safe perimeter and safe area to work, not only for
15  the law enforcement personnel, but everybody in that area,
16  it was the intent to clear the entire landscape.
17    Q.  Why couldn't media just stay behind?  Why couldn't they
18  stay behind the law enforcement line as it was moving
19  forward to effect the mass arrest?
20    A.  From a law enforcement perspective, that provides a
21  significant security risk, not only to personnel, but for
22  their safety as well.  We also house a large number of
23  resources, tools that we need to effectively move crowds.
24  So the best practice is that everybody stays out in front of
25  the line and either disperses in the direction -- the

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 57 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                July 28, 2021

225

1  momentum, if you will, or off to the sides.
2  Q. Major, I know that the unrest in Minneapolis and in
3  St. Paul and surrounding areas lasted for several days, but
4  in the interest of time, how did it ultimately come to an
5  end?
6  A. So there was the evening on Nicollet Mall. And then the
7  following day there was a mass arrest at Bobby & Steve's on
8  Washington Avenue, which took a lot of the energy out.
9  Knowing that there was an insertion of consequences, we
10 didn't see the same level of energy from that point on.
11 Q. Major, I know that you already mentioned this, that you
12 took photos while you were present on the ground in
13 Minneapolis in May 2020?
14 A. I did.
15        MS. LANDRUM: Permission to publish Exhibit 41 to
16 the witness, Your Honor?
17        THE COURT: You may.
18        MS. LANDRUM: Shirley, if you could -- Ms. Kosek,
19 if you could pull it up.
20 BY MS. LANDRUM:
21 Q. Major, this is a compilation of 25 photos. If Ms. Kosek
22 can just move through them one at a time for you to identify
23 them as being the photos that you, in fact, took.
24       (Witness reviews exhibit)
25 A. Yes.

226

1  Q. Major, are those accurate copies of some of the
2  photographs that you took in May of 2020?
3  A. Yes, they are.
4        MS. LANDRUM: Your Honor, state defendants move to
5  admit Exhibit 41.
6        MR. RIACH: No objection.
7        THE COURT: Exhibit 41 is received.
8        MS. LANDRUM: And, Your Honor, I see that it is
9  3:29. I'm about to transition. We certainly could talk
10 about some of these photos, but I am wondering if now is a
11 time to stop for the day.
12       THE COURT: Let me confer with my staff. I think
13 we probably can continue the hearing --
14       MS. LANDRUM: Wonderful.
15       THE COURT: -- but I do need to at this point get
16 a better understanding of how much more time we would need
17 to determine whether it makes sense to continue it today or
18 whether we need to also schedule another day for the
19 hearing.
20       MS. LANDRUM: Thank you.
21       THE COURT: So can you tell me in your estimation
22 what more the hearing would entail?
23       MS. LANDRUM: I would guess for this, ideally
24 another half hour to 45 minutes.
25       THE COURT: Okay. And that's simply for direct,

227

1  correct?
2        MS. LANDRUM: That's correct, Your Honor.
3        THE COURT: Okay. I'm going to take a recess now.
4  I'm going to confer with my staff to determine whether we
5  can accommodate staying later than the originally scheduled
6  time to end this hearing or whether we need to find another
7  day to continue it, and there may -- if we can have
8  spokespeople from each party in the courtroom, there may
9  need to be some conferral with you just to figure out the
10 logistics of what we can accommodate in terms of counsel's
11 availability as well. Okay?
12       MS. LANDRUM: Thank you, Your Honor.
13       THE COURT: All right. We'll be in recess.
14       (Recess taken at 3:31 p.m.)
15                    *   *   *   *   *
16       (3:49 p.m.)
17                    IN OPEN COURT
18       THE COURT: You may proceed.
19       MS. LANDRUM: Thank you, Your Honor.
20 BY MS. LANDRUM:
21 Q. Major Dwyer, you just discussed sort of at a high level
22 what was happening on the ground in Minneapolis in May of
23 2022 -- or May of 2020. In your 22 years of law enforcement
24 experience, had you ever participated in an event like that
25 before?

228

1  A. I had not.
2  Q. Can you explain to the Court what made it different.
3  A. Really was an unprecedented event, navigating through,
4  like, the night after night after night after night of
5  riotous behavior.
6        I always revert back to this one reflection or
7  memory, and it was the Friday evening into the early morning
8  hours of Saturday. From a supervisory standpoint, the
9  things that we asked our troopers to do were like no other.
10       So we were in a, like, western direction in the
11 area of 31st and Blaisdell, and there's a high-rise
12 apartment behind us. And knowing some of the background
13 and, like, attacks on law enforcement, that was on our
14 minds. We were already met with violence, debris being
15 thrown out at us.
16       There's fires within the street, and our troopers
17 were progressing down the street. We would have them go up
18 to the fire, try to engage these violent actors. We'd put
19 out the fire as best as we could with the fire extinguishers
20 that we would have, but it wasn't totally extinguished. We
21 would ask them to walk through the fire up to the next fire
22 to engage the crowd.
23       And then ultimately on that evening there was an
24 unattended vehicle that was -- with a brick on the
25 accelerator that was placed in our direction or trajectory

Goyette, et al. vs. City of Minneapolis, et al.                                                    July 28, 2021

229

1    towards our line of troopers.  So really that threat of
2    vehicle assault also was something that we hadn't
3    encountered to that degree ever, and that was a nightly
4    occurrence.
5    Q.  Taking a step back, in your 22 years of experience,
6    Major, prior to this time did you have experience in crowd
7    control?
8    A.  Yes, I do.
9    Q.  Can you describe that to the Court.
10   A.  So I've been involved in field force operations since
11   2008 prior to the Republican National Convention.  And since
12   that time I've been a member of our Field Force Team, which
13   is now our Mobile Response Team.  But I've attended all the
14   training and have led the training, but I also hold some
15   credentialing on a federal level with the Center For
16   Domestic Preparedness and instruct for them in field force
17   operations.
18   Q.  So it sounds like you actually have a lot of experience
19   in crowd control?
20   A.  Yes, ma'am.
21   Q.  Okay.  On the ground in Minneapolis in 2020, was
22   Minneapolis State Patrol -- or Minnesota State Patrol ever
23   called to use any type of force, such as less lethal
24   munitions or chemicals?
25   A.  So we did employ riot control tools.

230

1    Q.  Can you describe for the Court what types of tools were
2    used.
3    A.  So there's a variety, but actually through the course of
4    evaluation, we've actually limited our inventory.  So there
5    may be blast balls that are inert.  There may be some that
6    carry a payload or other dispensaries.  There are chemical
7    agents as well that we use, specifically CS gas, along with
8    direct impact.  And then every trooper on their belt carries
9    pepper spray, but also there are larger canisters that are
10   used.
11   Q.  Has the Minnesota State Patrol ever utilized rubber
12   bullets?
13   A.  We do not.
14   Q.  Would any of those agents be utilized without first
15   giving an opportunity to disperse?
16   A.  They would not.
17   Q.  Does Minnesota State Patrol have any policies or
18   procedures pertaining to the use of force?
19   A.  We have a specific use of force policy.
20           MS. LANDRUM:  Permission to publish Exhibit 10 to
21   the witness, Your Honor?
22           THE COURT:  You may.
23   BY MS. LANDRUM:
24   Q.  Major, do you recognize Exhibit 10?
25   A.  I do.

231

1    Q.  What is it?
2    A.  That is our General Order on use of force.
3    Q.  And Ms. Kosek has just flipped through the pages.  Does
4    this appear to be an accurate copy of Minnesota State
5    Patrol's use of force policy?
6    A.  It does.
7    Q.  If a trooper were to violate this policy, would they be
8    subject to discipline?
9    A.  Yes, ma'am.
10   Q.  Now I would like to talk to you about what Minnesota
11   State Patrol did immediately after the May into June 2020
12   unrest subsided.  From a high level, what lessons did
13   Minnesota State Patrol learn when it comes to the treatment
14   of media?
15   A.  So there's tactics or there are procedures that we have
16   implemented.  We've always had an outstanding relationship
17   and held that in high regard and want to continue that.  So
18   from a documentation standpoint, we invested into certain
19   tools.  We made ourself what we would say readily
20   identifiable in the interest of transparency, that if there
21   was an issue, that it could be identified that indeed there
22   was a state trooper that was involved.  And some of those
23   tools, specifically we invested in the Intrepid app and
24   Salamander application just for better oversight of our
25   operations.

232

1    Q.  And specifically what do those tools, Intrepid and
2    Salamander, do for State Patrol?
3    A.  Basically provide tracking of not only personnel, but,
4    like, the Intrepid application allows real-time
5    documentation in the field, so as commanders or whoever is
6    logging information, that is stored on a server or web base
7    and it can be monitored virtually real time by supervisory
8    or command staff and there's input that can be given related
9    to the events.
10   Q.  And I think you mentioned about Minnesota State Patrol
11   being more identifiable.  Can you just explain that to the
12   Court to make sure we understand what you mean by that.
13   A.  Through the course or the aftermath of events in
14   Minneapolis, there were several events that were brought to
15   our attention and every time it was always State Patrol,
16   State Patrol, State Patrol.
17           So on the front chest protector or the front panel
18   of our chest protector, there's an identifier.  Previously
19   it just used to be one row of text.  As we tried to identify
20   individuals in like a Twitter video or grainy quality videos
21   that are posted in a myriad of places, it became apparent
22   that, like, if it said, "Sheriffs" or "Police "Officer" --
23   there was only one during this event that really stood out
24   and that was our partners from the DNR.  They had two rows
25   of text, "Conservation Officer."  So in an effort to just

EXHIBIT A

233

1  make us readily identifiable, we went with a state
2  silhouette with a bright white background and then it says,
3  "State Trooper" on it and it's approximately eight inches by
4  four inches wide.
5  Q. And is that because Minnesota State Patrol wanted to be
6  easily and readily identified as Minnesota State Patrol?
7  A. Without a doubt.
8  Q. And just to clarify the testimony that you just gave, in
9  May -- for purposes of May 2020, I think you said it
10 was Patrol, it was Patrol, it was Patrol.  Did you mean
11 there that other officers were being confused for Minnesota
12 State Patrol?
13 A. That is correct.
14 Q. I would like to move to a discussion of Operation Safety
15 Net, which the Court has already heard about.  But are you
16 familiar with Operation Safety Net?
17 A. I am.
18 Q. Are you aware of any steps Operation Safety Net took to
19 plan for the presence of media for purposes of the Derek
20 Chauvin trial?
21 A. I am.  There were different platforms of outreach to
22 make contact with our media partners, different forums.  I
23 participated in one that was best practices if media
24 encountered law enforcement.  And then also I know that
25 there was an initiative to move towards a standardized press

234

1  credential.
2  Q. You mentioned that you participated in something
3  pertaining to best practices.  Best practices as to what?
4  A. As far as if there is interaction on the media side with
5  our partners in law enforcement, of how to navigate safely
6  through these very tumultuous and unpredictable events.
7  Q. And you mentioned the discussion of a press credential.
8  Can you explain that further to the Court.
9  A. So in the interest of -- much like our front panel chest
10 protector to make us readily identifiable, if there was one
11 standardized press pass or credential, it would serve the
12 same purpose.  So looking at it, you would be able to
13 identify that individual as press.  Even if they were
14 standing side by side with somebody active in the crowd or
15 an agitator, a bad actor, there would be that discernible
16 markings to allow us to make sure the correct action was
17 taken.
18 Q. In your law enforcement experience, do members of the
19 media sometimes get so close as to be side by side with
20 agitators or other members within a crowd situation?
21 A. In recent events I've seen that frequently.
22 Q. From a law enforcement perspective, why would it be
23 important for you to be able to clearly identify who is or
24 is not media visually?
25 A. So in a crowd dynamic, there is this intermixture of

235

1  everybody.  And so there are people that, you know, come to
2  the event out of curiosity, there are individuals that come
3  to the event to cause harm or damage or create chaos, and
4  then there are media individuals that are there to cover the
5  events and report on that.  So to have that amount of people
6  in a very small footprint, it's very challenging to identify
7  which person is affiliated with which group.
8  Q. Can you explain that to the Court, why that is.  Because
9  we have heard testimony today from individuals claiming that
10 they were easily and readily identifiable as media.  Can you
11 explain from your perspective how that occurs in the field.
12 A. As far as trouble in identifying?
13 Q. Being able to identify who is or is not media.
14 A. Certainly.  So what we saw in Brooklyn Center and
15 Minneapolis, there's, let's say, kind of a covert or trying
16 to blend in with the crowd that perhaps media is engaged in.
17     Because we have seen that when media is identified
18 by certain groups of demonstrators, protesters, that they
19 aren't always accepted kindly and that they direct action
20 towards some of these reporters based on, you know, certain
21 stories that they've provided or direction or, you know,
22 something portrayed in the news.  So we've actually had to
23 separate reporters from bad actors in the past.
24     And then on the other side, it provides a tool for
25 demonstrators.  Those that would like to engage in criminal

236

1  activity or riotous behavior, it provides them almost like a
2  cloak of, again, blending in, not anonymity, but they are
3  portraying themselves as media personnel so that they are,
4  you know, in this hands-off type environment, knowing the
5  particulars of how we treat media and wanting to uphold the
6  Constitution and freedom of press.
7  Q. So you mentioned two concerns there with regard to the
8  identification of media, one possibly being a safety issue
9  for the media coming from persons intending to do harm in
10 the field.  Did I hear that correctly?
11 A. Yes, that is correct.
12 Q. Have you seen that yourself in the field?
13 A. Yes.
14 Q. Did you see that in Brooklyn Center?
15 A. There were instances of that in Brooklyn Center.  We've
16 seen it at the Capitol.  We've seen it in other venues.
17 Q. And then you also mentioned that another concern is that
18 individuals might claim to be press who aren't, in fact,
19 press.  Did I hear that right?
20 A. Yes, that is correct.
21 Q. Is that something that you've actually seen in the
22 field?
23 A. Yes.
24 Q. And did you see that in Brooklyn Center?
25 A. Yes, we did.

Goyette, et al. vs. City of Minneapolis, et al.                                        July 28, 2021

237

1   **Q.** And were some of those instances documented?

2   **A.** They were.

3   **Q.** Okay. Because that's active criminal investigative

4   data, I won't be asking specific questions about those.

5           So let's just take a step back, then. We started

6   bleeding into Brooklyn Center. Taking a high level, did

7   Minnesota State Patrol have involvement in responding to

8   Brooklyn Center?

9   **A.** Yes, we did.

10  **Q.** How did Minnesota State Patrol become involved?

11  **A.** Again, much like the events of Minneapolis, in the death

12  of Daunte Wright we were asked to provide additional

13  services or resources to the city as their resources were

14  not adequate to respond to the event.

15  **Q.** And who made that request?

16  **A.** That would have been the City of Brooklyn Center.

17  **Q.** Was Minnesota State Patrol the only other law

18  enforcement agency that came to aid Brooklyn Center?

19  **A.** They were not.

20  **Q.** Who else responded?

21  **A.** So there was a variety of metro or suburban departments.

22  West Metro Command, they were there, the Hennepin County

23  Sheriff's Office. A variety of departments.

24  **Q.** Was Minnesota State Patrol in charge of the law

25  enforcement response that occurred in Brooklyn Center in

238

1   April 2021?

2   **A.** No, we weren't.

3   **Q.** Was Minnesota State Patrol issuing commands to any other

4   law enforcement agency on the ground in Brooklyn Center in

5   2021?

6   **A.** No, we were not.

7   **Q.** From a law enforcement perspective -- first of all,

8   Major, were you on the ground in Brooklyn Center?

9   **A.** I was.

10  **Q.** From a law enforcement perspective, what was occurring

11  on the ground there?

12  **A.** Again, it's this chaotic environment. Initially that

13  first day, that Sunday, a very energetic, boisterous crowd,

14  noncompliant, agitated, engaging in, you know, throwing

15  debris, much like what we saw in Minneapolis. But when

16  dealing with this crowd, my assessment of it was even more

17  noncompliant than Minneapolis. The groups of individuals or

18  individuals themselves were not afraid to stand, like, toe

19  to toe with law enforcement.

20  **Q.** I'm certain that you witnessed individuals there who

21  were not engaging in unlawful conduct, right?

22  **A.** Yes.

23  **Q.** But so I'm hearing that there were some individuals

24  engaging in unlawful conduct?

25  **A.** That is correct.

239

1   **Q.** Did Minnesota State Patrol incur any injuries as a

2   result?

3   **A.** We did have troopers that were injured.

4   **Q.** How did this unrest in Brooklyn Center, and I think you

5   touched upon this a little bit, but how did it compare as a

6   whole to what you experienced in May 2020?

7   **A.** So it really contributed to -- a difference was the

8   smaller footprint. In Minneapolis it was spread out, you

9   know, through a large sector or various sectors of the city.

10  In Brooklyn Center, it was confined to the area directly in

11  front of the Brooklyn Center Police Department, specifically

12  that Humboldt Avenue area and just that north-south

13  corridor, and those week's events transpired in that very

14  small footprint. So there is a small, like, commercial

15  sector, but also there is a larger residential footprint as

16  well.

17  **Q.** And when did Minnesota State Patrol -- or how long was

18  Minnesota State Patrol on the ground in Brooklyn Center?

19  **A.** For a period of a week.

20  **Q.** Can you describe for the Court from a high level what

21  the law enforcement response to that was. What did law

22  enforcement do in response to the unrest they were seeing?

23  **A.** Certainly. So we worked cooperatively, collaboratively

24  with our law enforcement partners of those various

25  jurisdictions to quell the unrest.

240

1   **Q.** And how did you do that?

2   **A.** So there were evenings that we would try to effect,

3   like, the mass arrest situation. Some of those evenings

4   were successful. The very first night that we were there,

5   putting all the, again, puzzle pieces together, one arrest

6   was effected out in front of the police department. And

7   then the Friday evening, there was on the other end of the

8   spectrum where a large mass arrest was effected.

9   **Q.** The Court heard a little bit of testimony today about a

10  fence around the Brooklyn Park -- or Brooklyn Center Police

11  Department. Can you share, what was the law enforcement

12  purpose of that?

13  **A.** Really it was a de-escalation.

14          So any time that there's law enforcement

15  insertion, we recognize that that very well could serve as

16  an audience at some point and there's a lot of energy

17  directed at that group of law enforcement, which we saw

18  there.

19          So in an effort to remove that law enforcement

20  line, which was there the first night, on Monday there was a

21  single fence that was erected on the front side of the

22  Brooklyn Center Police Department.

23          And then on a subsequent night there was a double

24  layer of fence, which would allow for law enforcement to be

25  totally removed and at a greater distance from the crowd,

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                  July 28, 2021

241

1   not to incite undue or unneeded energy.
2   Q. Was that a lesson learned from May 2020, the fencing?
3   A. Without a doubt, and that's a tactic that is still
4   implemented in locations.
5   Q. Did Minnesota State Patrol officers take photos of what
6   was occurring in Brooklyn Center?
7   A. They did.
8   Q. And where were they housed?
9   A. So we do have a server, a specific drive based on
10  events, and they're kept at that location.
11  Q. And were they also obtained through Intrepid, the new
12  system that you just discussed?
13  A. Yes, ma'am.
14        MS. LANDRUM:  Permission to publish Exhibit 43 to
15  the witness, Your Honor?
16        THE COURT:  You may.
17  BY MS. LANDRUM:
18  Q. Exhibit 43, Major, is a compilation of photos, and
19  Ms. Kosek will cycle through them quickly.  Do you recognize
20  these as being photos taken from Brooklyn Center?
21  A. I do.
22  Q. And how do you know that?
23  A. It's a depiction of various debris.  Location is outside
24  of the Brooklyn Center Police Department in the area of
25  Humboldt Avenue.

242

1   Q. And are these maintained by Minnesota State Patrol as
2   part of their law enforcement duties?
3   A. They are.
4         MS. LANDRUM:  The state defendants move to admit
5   Exhibit 43 into evidence, Your Honor.
6         MR. RIACH:  No objection.
7         THE COURT:  Exhibit 43 is received in evidence.
8         MS. LANDRUM:  Thank you, Your Honor.
9   BY MS. LANDRUM:
10  Q. Were dispersal orders given in Brooklyn Center, Major?
11  A. Yes, ma'am, there were.
12  Q. Did they apply to media?
13  A. Yes.
14  Q. Why?
15  A. Much like in the city of Minneapolis, the environment
16  was unsafe and it needed to be cleared in order to prevent
17  the ongoing activity that was occurring.
18  Q. Now, the Court heard testimony today that in Brooklyn
19  Center the dispersal orders specifically mentioned the
20  media.  Can you explain why.
21  A. Yes.  So understanding the dynamic that we navigated
22  through in Minneapolis and wanting to make it clear to our
23  media partners and provide like a safe environment and,
24  like, specific instructions, like this is -- in order to
25  continue reporting of events, we've designated an area or a

243

1   safe location for you to continue your journalism.
2   Q. And how are the dispersal orders issued?
3   A. So we have what's called an LRAD, it's a long-range
4   acoustical device, and they're broadcast on that device.
5   Q. This morning did I direct you, Major, to review the
6   videos -- we already reviewed this, but so this morning I
7   asked you to review the videos of Edward Ou; is that
8   correct?
9   A. Yes, ma'am.
10  Q. And had you seen those before?
11  A. I have.
12  Q. I think it's worth --
13        MS. LANDRUM:  Shirley, if you can pull up very
14  quickly Plaintiffs' Exhibit 8, we'll play it again.  It's
15  been admitted into evidence.
16     (Video recording played)
17        MS. LANDRUM:  Can you pause it there, Shirley.
18  Thank you, Shirley.
19  BY MS. LANDRUM:
20  Q. Major, can you share with the Court from a law
21  enforcement perspective what you're seeing in this video.
22  A. So my assessment and recollection is there's a line of
23  law enforcement, which would be to the south here on
24  Humboldt Avenue.  It's directly in front of the Brooklyn
25  Center Police Department.  And there are still a number of

244

1   individuals out in front of that law enforcement line to the
2   north of them.
3   Q. Now, here at this portion where Ms. Kosek has stopped
4   the video, can you see two individuals that appear to be
5   recording the law enforcement officers?
6   A. I do.
7   Q. Based on your law enforcement experience on the ground,
8   can you determine, one way or the other, whether or not
9   these are members of the media?
10  A. Given this snapshot in time, no.
11  Q. Why not?
12  A. Like I spoke about previously, just mere attire and in
13  an effort to blend in, but also it's just the use of cell
14  phones or devices, cameras.  This is not uncommon, for
15  everybody to bring a cell phone or some sort of recording
16  device to these events.
17  Q. Now, in the shot here you can see some individuals in
18  the street that appear to be between the law enforcement
19  line and protesters.  Can you explain to the Court, is there
20  anything problematic with their location there?
21  A. Yes.  So the intent of the law enforcement line in this
22  general area, in order to bring the events of this
23  particular evening to a close safely, is to actually clear
24  the streets.
25        What is to the north of this location is a large

EXHIBIT A

245

1   strip mall parking lot, and we know that many of the
2   vehicles that -- the individuals at this event parked their
3   vehicles there.  So we were trying to disperse, move that
4   crowd to the north.
5   **Q.**  Did you ever utilize -- not you.  Did Minnesota State
6   Patrol utilize force of any kind in order to effectuate a
7   dispersal without first giving the dispersal order?
8   **A.**  We did not.
9   **Q.**  In Brooklyn Center did you ever personally witness a
10  trooper intentionally targeting a member of the media with a
11  use of force or arrest?
12  **A.**  I did not.
13         MS. LANDRUM:  I would like to show now, Your
14  Honor, Exhibit 29 for demonstrative purposes only.  This is
15  a video that this witness did not take.  Would that be --
16         THE COURT:  Are there any objections?
17         MR. RIACH:  No objection, Your Honor.
18         THE COURT:  You may.
19     (Video recording played)
20  BY MS. LANDRUM:
21  **Q.**  Can you see this video, Major?
22  **A.**  Yes, I can.
23  **Q.**  Can you just describe for the Court -- do you have any
24  recognition of what you're seeing here?
25  **A.**  Yeah.  So this is the very commercial area that I spoke

246

1   to, the strip mall just to the north of the Brooklyn Center
2   Police Department.
3   **Q.**  And what was occurring at this area at the time?
4          MS. LANDRUM:  Could you play it again, Ms. Kosek.
5      (Video recording played)
6          THE WITNESS:  So those behaviors that we've seen
7   at previous riots, the looting, the damage to property, the
8   Dollar Tree was subject to arson and the individuals, you
9   know, capturing that.
10  BY MS. LANDRUM:
11  **Q.**  From your perspective as a law enforcement official on
12  the ground, would you identify all these people as being
13  members of -- journalists or members of the media?
14  **A.**  Given that snippet of video, it's very hard to discern
15  who is media and who is general public.
16         MS. LANDRUM:  If you could play it again,
17  Ms. Kosek.
18     (Video recording played)
19         MS. LANDRUM:  You can turn the volume down or off.
20  BY MS. LANDRUM:
21  **Q.**  Given what was occurring here, the looting, as you
22  mentioned, is it appropriate for people to be in this area?
23  **A.**  So this also would be unsafe, and this area needs to be
24  cleared to prevent further criminal activity.
25  **Q.**  Did Minnesota State Patrol take any videos of the unrest

247

1   that occurred in Brooklyn Center?
2   **A.**  We did.
3          MS. LANDRUM:  Permission to show to the witness
4   Exhibit 21, Your Honor?
5          THE COURT:  Any objection?
6          MR. RIACH:  No, Your Honor.
7          THE COURT:  You may.
8      (Video recording played)
9   BY MS. LANDRUM:
10  **Q.**  Major, do you recognize Exhibit 21?
11  **A.**  I do, yep.  That's consistent with the crowds that we
12  would see over the course of the days.
13         MS. LANDRUM:  Can you play it again.
14     (Video recording played)
15         THE WITNESS:  There is a law enforcement
16  contingent to the forefront, and then also just a large mass
17  of people beyond that.
18  BY MS. LANDRUM:
19  **Q.**  Does this appear to be an accurate copy of the video
20  Minnesota State Patrol took in Brooklyn Center in April
21  2021?
22  **A.**  It is.
23         MS. LANDRUM:  State defendants move to admit
24  Exhibit 21, Your Honor.
25         MR. RIACH:  No objection.

248

1          THE COURT:  Exhibit 21 is received.
2          MS. LANDRUM:  And if we could play it again,
3   Ms. Kosek.
4      (Video recording played)
5   BY MS. LANDRUM:
6   **Q.**  There's a moment here in this video where you see a
7   bright light flashing, right there (indicating).  Can you
8   describe for the Court what that is.
9   **A.**  So at many of these events the crowd, members of the
10  crowd or a member of the crowd, will use distractionary
11  devices.  So this very well could be like a high-intensity
12  light that is pointed towards law enforcement.  Otherwise,
13  you know, it's not out of the realm of possibility for laser
14  light to be used.
15         MS. LANDRUM:  Permission to present to the witness
16  Exhibit 22?
17         THE COURT:  You may.
18     (Video recording played)
19  BY MS. LANDRUM:
20  **Q.**  Major, do you recognize Exhibit 22?
21  **A.**  I do.
22  **Q.**  What is it?
23  **A.**  So that's a scene from Brooklyn Center outside the
24  residential area in the area of 6700 Humboldt and the crowd
25  in that area.

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 63 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

**249**

1  Q.  Is this a video that Minnesota State Patrol took?
2  A.  It is.
3  Q.  Does this appear to be an accurate copy of the video
4  Minnesota State Patrol took in Brooklyn Center in April
5  2021?
6  A.  Yes.
7         MS. LANDRUM:  Your Honor, the state defendants
8  move to admit Exhibit 22.
9         MR. RIACH:  No objection.
10        THE COURT:  It is received.
11  BY MS. LANDRUM:
12  Q.  Now, we'll probably have Ms. Kosek play it a couple
13  times and you could just maybe provide a narrative for us,
14  what all we're seeing here on the ground and sort of from
15  the law enforcement perspective the importance of it.
16         Maybe we could talk about the umbrellas first.
17  What's happening there with the umbrellas?
18  A.  So that's not out of the realm of normal at these
19  events.  We've seen it across the nation and now we've seen
20  it in Minnesota.  But they are used to mask, like, the next
21  intentional move, to provide concealment, whether it is to
22  compile debris to be thrown or talk about strategy, like the
23  next move that they're going to implement, but really the
24  biggest fear is some type of weaponry directed at law
25  enforcement.

**250**

1  Q.  At this point in the evening, would a dispersal order
2  already have been issued?
3  A.  Yes, it would have.
4  Q.  Now, I have seen periodically what looks like objects
5  being thrown towards law enforcement.  Am I seeing that
6  right?
7  A.  Yes, you are.
8         MS. LANDRUM:  If you could play it again,
9  Ms. Kosek.  Thank you.
10  (Video recording played)
11  BY MS. LANDRUM:
12  Q.  I also notice this really bright light here kind of in
13  the bottom left quadrant.  What's that?
14  A.  So this individual driving this vehicle was present on
15  most nights in the area and, again, that's a distractionary
16  device.  It affects the visibility of our troopers and
17  causes distraction.
18         MS. LANDRUM:  If we can pause it here, Ms. Kosek.
19  BY MS. LANDRUM:
20  Q.  So you can see here that an individual is just running
21  across the line of protesters, and then there's another
22  individual standing there with what looks like a GoPro.
23  From a law enforcement perspective, is that a safe place for
24  those individuals to be?
25  A.  Under the current conditions, no.

**251**

1  Q.  Given the dispersal order, is that a lawful place for
2  them to be?
3  A.  It is not.
4  Q.  And from your perspective as a law enforcement official,
5  the individuals that you can see here, some of whom on the
6  sides are recording, would you consider them to be media or
7  would you be able to identify them as media?
8  A.  Given the information that I have here, again, it's hard
9  to discern who is affiliated with media or who is a member
10  of the public.
11  Q.  I want to turn to the evening of Friday, April 16th, and
12  I think that you mentioned that that was the night where
13  there was the largest mass arrest.  Did I hear that right?
14  A.  Yes, ma'am.
15  Q.  Was a dispersal order given that day?
16  A.  It was.
17  Q.  Who gave it?
18  A.  A member of the law enforcement.  I don't recall if it
19  was the State Patrol.
20  Q.  The Court heard testimony today from a witness that was
21  present who believed that perhaps a dispersal order was not
22  given.  What's your reaction to that?
23  A.  So I know that a dispersal order was given and it very
24  well could have been using our LRAD system, but considering
25  it wasn't our primary authority, that we were assisting, it

**252**

1  would have defaulted to either the Hennepin County Sheriff's
2  Office or one of the other departments assisting.
3  Q.  Would Minnesota State Patrol ever effectuate a mass
4  arrest without first issuing a dispersal?
5  A.  We would not.
6  Q.  Can you explain to the Court what was happening that
7  Friday night before the dispersal order was given.
8  A.  Much like some of the previous evenings, there was a
9  large congregation of a crowd.  It was volatile.  It was
10  violent at times.  The projectiles, the debris, a lot of
11  this was directed at the Brooklyn Center Police Department
12  even though the law enforcement contingent was removed from
13  the direct fence area and up towards the building, but there
14  were reports of, again, large items of debris, paint being
15  used.  And really what precipitated or the, I guess, flash
16  point, if you will, for the mass arrest was individuals
17  trying to breach the first fence that was erected.
18  Q.  The Court also heard testimony today from a member of
19  the media who was photographed on that Friday, April 16th,
20  and this is actually the testimony of Christopher -- now I
21  forget and I'm going to mispronounce his last name --
22  T-u-i-t-e.  Are you familiar with his testimony via his
23  declaration and videos?
24  A.  I have reviewed the declaration and videos.
25  Q.  Because I asked you to do that this morning?

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                                July 28, 2021

253

1   A.  Yes, ma'am.

2   Q.  Can you describe for the Court what Minnesota State
3   Patrol was attempting to do in photographing members of the
4   media on Friday, April 16th.

5   A.  Certainly.  So there was no ill intent by photographing
6   individuals or press credentials.  It was really in an
7   effort to expedite the process to be able to log the
8   information and either confirm at a later time or have
9   documentation that we did indeed have contact with these
10  individuals, so there wasn't, you know, reports of
11  wrongdoing afterwards.

12  Q.  What was the purpose in the first place?  Why was there
13  a need to identify who these individuals were?

14  A.  So it's our standard protocol that everybody, like,
15  within a containment or that mass arrest situation, that
16  we're identifying all those individuals.  It's part of our
17  enforcement or arrest process.  Through the use of Intrepid
18  everybody has their photograph taken, a trooper will enter
19  individual notes, and then either they're released after
20  determining, you know, proper affiliation or they're
21  escorted to, you know, the enforcement line.

22  Q.  So those individuals who were photographed, they had
23  been caught -- they had been encircled in a mass arrest; is
24  that right?

25  A.  Yes, ma'am.

254

1   Q.  And had a dispersal order already been granted by that
2   time -- or had a dispersal order already been issued at that
3   time?

4   A.  That is correct.

5   Q.  And did members of the media know that it applied to
6   them?

7   A.  It is my belief that the dispersal order -- they should
8   have known, yes.

9   Q.  So those individuals being photographed, were they not
10  members of the media, were they otherwise subject to arrest?

11  A.  Yes, they would be.

12  Q.  Why?

13  A.  Because they were still present at the scene after
14  direct information was given them to leave the scene.

15  Q.  We heard testimony today from a photographer who had
16  refused to leave a mass arrest encirclement.  From a law
17  enforcement perspective, what is the problem with members of
18  the media remaining in an encircled area where a mass arrest
19  is being conducted?

20  A.  Really it complicates the entire process from an
21  efficiency standpoint, but also, again, as I previously
22  spoke to, it's this intermixing of people from different
23  affiliations, media, the public.  So trying to navigate
24  through that is troublesome.

25  Q.  Are there any safety issues presented by a member of the

255

1   media maintaining their presence within an encirclement?

2   A.  Without a doubt.  So even though that -- it's relatively
3   stabilized, it's still unpredictable within that
4   environment.  It's not uncommon for individuals to still
5   resist law enforcement in that environment.  So the process
6   of mass arrest is to form this encirclement, but then to
7   send controlled teams to effect an arrest and extract
8   individuals from the inside.

9   Q.  When Minnesota State Patrol troopers were directing
10  members of the media to remove themselves from the mass
11  arrest encirclement, did they do that for the purpose of
12  preventing them from doing their jobs as reporters?

13  A.  No, ma'am.

14  Q.  Why did they do it, then?

15  A.  It was really in an effort to remove them from the
16  unsafe environment and to provide them with an area to
17  continue their reporting in a safe area.

18  Q.  Well, could they continue that reporting just
19  immediately outside the encirclement area?

20  A.  We did allow that.

21  Q.  And so talk to me about that.  With regard -- you
22  mentioned providing a safe area.  Is that something that was
23  happening in Brooklyn Center?

24  A.  Every evening, yes.

25  Q.  Can you describe that to the Court.

256

1   A.  So even in one of our dispersal orders we had given
2   direction to go to a certain location because it was deemed
3   safe.  And we're at a little bit of an advantage because we
4   know our next move, and there were times where myself or
5   other commanders would have conversations with members of
6   the media, telling them that we're going to start effecting
7   arrests here and that this will be, you know, a safe
8   location for you, and those, obviously, were the ones that
9   were clearly identifiable with what we deemed, you know,
10  like mainstream credentialing.  And then there were other
11  times where they had to be extracted from that inside and
12  then a location was identified where they can continue their
13  coverage.

14  Q.  Is that a standard practice for Minnesota State Patrol,
15  to try to provide a safe area where media can continue their
16  coverage if they're located in an area that's not safe?

17  A.  It is.  It's something that we've been doing for a
18  number of years.  Also, like, at the State Capitol, that's
19  really where we've had the most exposure prior to
20  Minneapolis and Brooklyn Center, but there are times that we
21  are having conversations with our media partners and telling
22  them that maybe the best area is not right on top of the
23  demonstration.  So we will point out several locations.  It
24  might be across the street with elevation.  It might be at a
25  different vantage point.  But I think a lot of media

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                          July 28, 2021

**257**

1  relations partners are trying to, like, capture from the
2  best vantage point to tell the story.
3  **Q.** Major Dwyer, did you personally have any other direct
4  experiences with members of the media on the ground in
5  Brooklyn Center?
6  **A.** Yes, I did.
7  **Q.** Can you describe for the Court what that experience was.
8  **A.** So there were multiple occasions where I would go out in
9  front of our line of troopers, so I was in between law
10  enforcement and the members of the crowd, but I would
11  initiate conversations with the media and let them know,
12  like, where safe locations were.
13       If they were in the middle of a mass arrest
14  situation, I would make contact with those, have the
15  troopers identify them, try to verify their credentialing,
16  and then as soon as possible, as soon as feasible, we would,
17  like, escort them out of that inner circle.  And then there
18  was an incident where I did intervene to prevent an arrest
19  of a media partner.
20  **Q.** Can you describe that intervention for the Court.
21  **A.** So it was on the evening of that Friday.  Another allied
22  agency -- so the encirclement had occurred.  A member of the
23  media was trying to get back to his vehicle.  He was
24  directed by a member of the allied agency to go around the
25  other side of the building.  There was noncompliance by the

**258**

1  individual from the media.  He wanted to go around what he
2  thought was the most efficient travel to his vehicle.  He
3  was directed again to go around the opposite side of the
4  building.  Again there was noncompliance.  At that time the
5  allied agency informed him that he was under arrest.
6       Having some experience and additional knowledge
7  about relationships of media and wanting to provide that
8  freedom of press, I intervened and said that I'll handle
9  this situation, despite putting me in an awkward situation
10  with a member of law enforcement, but then escorting him
11  around the building and to a safe location where he could
12  exit the encirclement.
13  **Q.** Given the chaos that was happening at that time, why did
14  you choose to intervene?
15  **A.** It's the right thing to do.  It's the -- not
16  everybody -- not every department possesses the same level
17  of knowledge in what I like to call the care and handling of
18  our media to ensure that their best interests are upheld.
19  **Q.** Thank you, Major.  I have no further questions.
20  **A.** Thank you.
21       THE COURT:  Cross examination?
22       MR. RIACH:  Thank you, Your Honor.
23       THE COURT:  You're welcome.
24
25

**259**

1                    CROSS EXAMINATION
2  BY MR. RIACH:
3  **Q.** Good afternoon, Major.  My name is Kevin Riach.  I'm an
4  attorney with the plaintiffs in this case.  Okay?
5  **A.** Good afternoon, sir.
6  **Q.** Just as a preliminary matter, you are Major Dwyer now,
7  correct?
8  **A.** That is correct.
9  **Q.** And during the George Floyd protests, you were a captain
10  at that time; am I correct?
11  **A.** That is correct, sir.
12  **Q.** So you were promoted between the George Floyd protests
13  and today, correct?
14  **A.** That is correct.
15  **Q.** When were you promoted?
16  **A.** June 3rd of 2021.
17  **Q.** Okay.  There was a purge of records at the State Patrol
18  immediately after the George Floyd protests; is that
19  correct?
20  **A.** So there was a purge of e-mails and text messages,
21  correct.
22  **Q.** All right.  What date was it that those materials were
23  purged?
24  **A.** I don't have a recollection, sir.
25  **Q.** It was immediately after the George Floyd protests,

**260**

1  though, correct?
2  **A.** That is correct.
3  **Q.** Was it before you demobilized on June 7th?
4  **A.** It was not.
5  **Q.** Okay.  It was after June 7th?
6  **A.** I believe so, yes.
7  **Q.** And the purge included e-mail correspondence, correct?
8  **A.** Correct.
9  **Q.** And text messages?
10  **A.** Yes, sir.
11  **Q.** Were any paper documents purged?
12  **A.** They were not.
13  **Q.** What other electronic records were purged?
14  **A.** To my knowledge, none.
15  **Q.** And who ordered that those records be purged?
16  **A.** There's no order.  It's really a standard practice over
17  the course of time that we remove, you know, delete text
18  messages, delete e-mail messages.
19  **Q.** And the text messages and e-mail messages that were
20  deleted, did that include any text messages and e-mail
21  messages sent during the George Floyd protests?
22  **A.** It was all e-mails and texts.
23  **Q.** Were any electronic reports that had been created during
24  the George Floyd protests destroyed?
25  **A.** They were not.

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                July 28, 2021

**261**

1  **Q.** And you said this is just an automatic purge that
2  happened?
3  **A.** Periodically, correct.
4  **Q.** How often does that happen?
5  **A.** There's no set occurrence to it, it varies from person
6  to person, but it is a recommended practice.
7  **Q.** Was this a state -- was this throughout the State Patrol
8  that records were destroyed?
9      MS. LANDRUM: Objection, lack of personal
10  knowledge, calls for speculation.
11      THE COURT: I don't understand your response. You
12  said it was person to person?
13      THE WITNESS: So it varies person to person, Your
14  Honor. So one individual may purge documents on the 1st of
15  every month or, you know, remove them from their e-mail
16  server. Another person may do it on the 15th. There is no
17  set practice delineating this. It varies individually.
18      THE COURT: But it's automatic?
19      THE WITNESS: No. It is an act where individuals
20  delete their e-mail basket and then go into another layer of
21  the deleted folders and then remove from that server.
22      MR. RIACH: May I inquire, Your Honor?
23      THE COURT: Please.
24  BY MR. RIACH:
25  **Q.** So help me understand this, Major. Was this something

**262**

1  you did with your own records; is that correct?
2  **A.** It was common practice through the agency, not just my
3  records.
4  **Q.** Okay. Let's start with you. Okay? You purged your
5  records sometime immediately after the George Floyd
6  protests, correct?
7  **A.** I deleted my e-mails and text messages, correct.
8  **Q.** All right. Do you know of anyone else who deleted their
9  e-mails and text messages immediately after the George Floyd
10  protests?
11  **A.** Yes, I do.
12      MS. LANDRUM: Objection, calls for speculation,
13  lack of personal knowledge.
14      THE COURT: It does not. You may answer the
15  question "do you know."
16      THE WITNESS: Yes, ma'am.
17      THE COURT: You may proceed with your questioning.
18      MR. RIACH: Thank you, Your Honor.
19  BY MR. RIACH:
20  **Q.** Who else deleted their e-mails and text messages?
21  **A.** So I will, I guess, offer speculation. I don't --
22  didn't actually see them delete them, but I do believe a
23  vast majority of the agency.
24  **Q.** So normal practice was kind of person to person, a
25  person might do this just to clear out their inbox. In this

**263**

1  particular instance, though, most of the State Patrol
2  deleted at the same time?
3  **A.** No. It would have been, you know, following
4  according -- I can't speak to how everybody deleted their
5  e-mails.
6  **Q.** What was your historic practice for deleting and
7  destroying your e-mails?
8  **A.** Periodically. You know, I don't have a set time of the
9  month. It's just periodically.
10  **Q.** Now, are there any record retention policies employed by
11  the State Patrol?
12  **A.** There are. We do have a retention schedule.
13  **Q.** What's your retention schedule?
14  **A.** Related to?
15  **Q.** To e-mail correspondence. Are you required to keep
16  e-mail correspondence for a certain period of time?
17  **A.** We are not.
18  **Q.** You can delete your e-mails any time you want?
19  **A.** That is correct.
20  **Q.** What about text messages, are you required to keep your
21  text messages for any period of time?
22  **A.** We are not.
23  **Q.** You can delete those any time you want?
24  **A.** That is correct.
25  **Q.** All right. And you just decided, shortly after the

**264**

1  George Floyd protests, this would be a good time to clean
2  out my inbox?
3  **A.** It is consistent with events, large-scale or otherwise,
4  we periodically delete our inboxes.
5  **Q.** So after a large-scale event, mass unrest, it's your
6  practice to delete all your e-mails?
7  **A.** I periodically delete my e-mails.
8  **Q.** Were any of the records that you deleted reviewed to
9  determine if they had any bearing on this case?
10  **A.** Other than myself?
11  **Q.** Did anyone review what you deleted to determine whether
12  it was relevant to this case?
13  **A.** No, they did not.
14  **Q.** You were aware that this case had been filed, though, at
15  the time the materials were deleted, correct?
16  **A.** I was aware that there was litigation and I retained my
17  records in relation to a litigation hold.
18  **Q.** When was the litigation hold placed?
19  **A.** I'd have to have my memory refreshed.
20  **Q.** That was after the purge, correct?
21  **A.** Again, I don't remember the exact date.
22      THE COURT: When you say you retained your
23  records, are you also including your e-mail as your records?
24      THE WITNESS: No, ma'am. So we have, again,
25  several folders on a server. And specifically to myself and

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 67 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021

**265**

1   operations, any type of operational plan or anything as far
2   as rosters or pertinent information relevant to the events,
3   they would be kept in those folders or files.  As far as
4   generic or benign e-mails between one another or members,
5   those are the items that are deleted.
6   BY MR. RIACH:
7   **Q.** So I want to make sure I understand you correctly.  Some
8   of your e-mails were saved?
9   **A.** No, sir.
10  **Q.** Everything you had in your inbox was destroyed shortly
11  after the George Floyd protests?
12  **A.** So different platforms.  We're talking about Outlook.
13  So everything that's within that system, that was deleted.
14  That doesn't mean that there's not a record of it or, you
15  know, if there's an attachment or something relevant to the
16  operational needs, that those are not -- those would be
17  saved in a separate folder.
18  **Q.** And did you communicate with the other troopers that are
19  under your command about deleting their inboxes?
20  **A.** There are reminders by district commanders and
21  supervisory staff at various times to clean up their Outlook
22  folders.
23  **Q.** Did you speak with any of your lieutenants about them
24  deleting their e-mails shortly after the George Floyd
25  protests?

**266**

1   **A.** I don't have a recollection, but it's not out of the
2   realm of possibility.
3   **Q.** All right.  Now, troopers were instructed at some point
4   during the George Floyd protests that they did not need to
5   complete use of force reports, correct?
6   **A.** That is correct.
7   **Q.** And who provided that instruction?
8   **A.** It was an assessment made by the MACC or the
9   Multi-Agency Command Center.  And given the chaotic
10  nature -- so I should say on the first day that we were
11  there, there wasn't any use of force.  On the second day
12  there were four individual uses of direct impact rounds, and
13  those were captured by use of force reports.
14          After that period of time, use of force reports
15  weren't documented given the really unprecedented chaotic
16  environment and an inability to track the munitions used by
17  individual members, considering the violence that was
18  portrayed against us.
19  **Q.** So let me just make sure I'm clear here.  Were troopers
20  instructed that they didn't have to complete use of force
21  reports or were they told do not complete use of force
22  reports?
23  **A.** I don't recall the exact conversation.  I just know that
24  the number of instances where riot control agents were used
25  were so vast that -- unable to document the use of force.

**267**

1   Also, unchartered territory or waters.  Like for our agency,
2   considering, like, we're -- typically we know the
3   individuals engaged in force against us.  So if there was an
4   individual that was throwing debris or other objects or
5   engaged in violence against us, in an effort to curb that,
6   it is best practice to use like a direct marking round so
7   that individual is marked and possibly arrested later, but
8   there are times where they abscond and that individual isn't
9   identified.  So it would -- potentially there is the
10  scenario where you're completing a use of force report where
11  there's no information.
12  **Q.** Were there any use of force reports completed, to your
13  knowledge, after the instruction was given not to fill out
14  use of force reports?
15  **A.** So there were -- to my knowledge, no.
16  **Q.** All right.  Now, you did prepare a summary report, kind
17  of a day-by-day catalog, of the things that happened during
18  the protests, correct?
19  **A.** I did complete a commander's report, yes.
20  **Q.** Okay.  That's called a commander's report?
21  **A.** That's what I titled it, sir.
22  **Q.** And that included a summary of the events that happened
23  on May 30th, correct?
24  **A.** Yes.
25          MR. RIACH:  Your Honor, I want to make sure

**268**

1   that I'm clear here in the use of this exhibit.  Defense
2   Exhibit 7, I believe, was a redacted version of that
3   commander's report.
4           MS. LANDRUM:  That's correct.
5           MR. RIACH:  And that's something that we can
6   display right now without clearing the courtroom; is that
7   correct?
8           MS. LANDRUM:  That's correct.
9           MR. RIACH:  Okay.  Ms. Anderson, can you call up
10  Defense Exhibit 7, please.
11  BY MR. RIACH:
12  **Q.** Now, can you -- well, first of all, Major Dwyer, do you
13  recognize this document?
14  **A.** I do.
15  **Q.** This is your commander's report, yes?
16  **A.** Yes, sir.
17          MR. RIACH:  We would move admission of Defense 7.
18          MS. LANDRUM:  No objection, Your Honor.
19          THE COURT:  Exhibit 7 is received.
20          MR. RIACH:  Thank you, Your Honor.
21          Can you scroll ahead to the third page, please,
22  and can you pull out the second paragraph, Ms. Anderson, the
23  second paragraph under the date May 30th.  There you go.
24  BY MR. RIACH:
25  **Q.** Can you see that up there, Major?

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                July 28, 2021

**269**

1   **A.** Yes, I can, sir.
2   **Q.** Very good. So this is a description of what happened
3   that day that you recorded for posterity in your commander's
4   report, correct?
5   **A.** That is my narrative report to capture the events, yes.
6   **Q.** Okay. You testified about the 30th of May during your
7   direct examination by Ms. Landrum, correct?
8   **A.** Yes, sir.
9   **Q.** And I just want to kind of briefly run through -- I have
10  a couple of questions about the report. Okay?
11  **A.** Sure.
12  **Q.** So you and your team of troopers, all the troopers that
13  were deployed to the Fifth Precinct that day, you drove over
14  there on some Metro Transit buses; is that correct?
15  **A.** That is correct.
16  **Q.** Okay. And then the buses dropped you off at the
17  intersection of 32nd and Nicollet; is that right?
18  **A.** That is my recollection, yes.
19  **Q.** And then you disembarked from the buses and formed a
20  line; is that correct?
21  **A.** Yes.
22  **Q.** Okay. And upon forming that line, you began to get hit
23  with debris; is that correct?
24  **A.** Yes.
25  **Q.** So it says here you were taking large amounts of

**270**

1   projectiles, correct?
2   **A.** Yes, sir.
3   **Q.** And that included rocks, yes?
4   **A.** Yes.
5   **Q.** Bricks?
6   **A.** Yes.
7   **Q.** Fireworks were being thrown at you?
8   **A.** They were being launched, yes.
9   **Q.** Water bottles were being thrown at you?
10  **A.** Yes.
11  **Q.** Glass bottles were being thrown at you?
12  **A.** Correct.
13  **Q.** Construction debris?
14  **A.** Yes.
15  **Q.** When you say "construction debris," what are you talking
16  about there?
17  **A.** So adjacent to this area, it's in proximity to I-35,
18  which was under construction, so I'm speculating that it
19  came from that area. Otherwise, I guess construction debris
20  would include, you know, landscaping or other items in that
21  general vicinity that people would gather.
22  **Q.** Were people throwing concrete blocks at you?
23  **A.** Not, like, traditional concrete blocks, no.
24  **Q.** Like chunks of concrete from construction?
25  **A.** Yes.

**271**

1   **Q.** What about, like, pieces of rebar, you know, those metal
2   bars that go in concrete, was some of that being thrown at
3   you as well?
4   **A.** There was metal debris, yes.
5   **Q.** Okay. And then in response to this, to clear out that
6   area you deployed some crowd control munitions, correct?
7   **A.** Riot control agents, yes.
8   **Q.** So the debris is coming in on you and you decided we
9   need to clear these people out, let's use some crowd control
10  munitions; is that how it played out?
11  **A.** So there was a dispersal first.
12  **Q.** Okay.
13  **A.** There was crowd behavior, which included their acts --
14  **Q.** Okay.
15  **A.** -- a dispersal order, and then riot control agents.
16  **Q.** Okay. So the debris is getting thrown, you fire the
17  crowd control munitions, and then you start to move forward;
18  is that correct?
19  **A.** Debris, dispersal.
20  **Q.** Okay. Debris, dispersal, munitions, and then the line
21  moves forward?
22  **A.** Correct.
23  **Q.** Okay.
24        MR. RIACH: Can you take down this exhibit,
25  please, Ms. Anderson, and can you please bring up

**272**

1   Plaintiffs' Exhibit 14.
2   BY MR. RIACH:
3   **Q.** That's the Ed Ou video. I believe you said you reviewed
4   this earlier today?
5   **A.** Yes, sir.
6         MR. RIACH: Can you just pause that at 14 seconds.
7   You can scoot it ahead there. Can you advance maybe like a
8   frame or two. Go one more. There we go.
9   BY MR. RIACH:
10  **Q.** Can you see that up there, Major Dwyer, this picture of
11  the scene?
12  **A.** I can.
13  **Q.** Okay. So behind you is the buses that you were deployed
14  from, correct?
15  **A.** Yes.
16  **Q.** And then this is the line you formed, right?
17  **A.** Yes.
18  **Q.** Okay. Now, there's no debris on the ground at this
19  point, so this must have been before things were being
20  thrown at you, correct?
21  **A.** That is our initial line, yes.
22  **Q.** All right. So do you see any debris on the ground
23  there?
24  **A.** Not in the forefront.
25  **Q.** Do you see any construction debris, either behind or in

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                                July 28, 2021

273

1  front of you?
2  **A.** I do not.
3  **Q.** Do you see any glass bottles on the ground?
4  **A.** No, I don't.
5  **Q.** Do you see any water bottles?
6  **A.** No, sir.
7  **Q.** Do you see any rocks?
8  **A.** I don't.
9  **Q.** Do you see any spent fireworks?
10 **A.** I don't.
11 **Q.** Okay.
12      THE COURT:  Counsel, before you move, if you're
13 planning to progress, let's just note where you are in this
14 visual.
15      MR. RIACH:  Sure.  I believe we're at 25 seconds
16 in the video, Your Honor.
17      THE COURT:  Thank you.
18 BY MR. RIACH:
19 **Q.** So all that must have come flying at some point after
20 this frame in the video, correct, Major?
21 **A.** Yes.
22 **Q.** Okay.
23      MR. RIACH:  Can you go ahead and play the video,
24 Ms. Anderson.
25 BY MR. RIACH:

274

1  **Q.** Tell us to pause the video when you see the debris start
2  to fly.
3  (Video recording played)
4       MR. RIACH:  Can you pause it there, Ms. Anderson.
5  BY MR. RIACH:
6  **Q.** Can you direct me to where the debris is located there
7  in front of your line?  Is there any debris there?
8  **A.** I don't see anything to the front there, sir.
9       THE COURT:  And you are paused at what point in
10 the video?
11      MR. RIACH:  We are paused at 1 minute and
12 10 seconds, Your Honor.
13      THE COURT:  Just so counsel knows, I'm a former
14 appellate judge --
15      MR. RIACH:  I appreciate that.
16      THE COURT:  -- so I am looking at the record with
17 that lens in mind, perhaps prematurely thinking that there
18 may be some other judges that may also be interested in this
19 transcript.  So that's the reason for me interrupting.
20      MR. RIACH:  I very much appreciate it.  And, quite
21 frankly, at this point in the day, I'm not too sharp on
22 these kinds of things, so I very much appreciate you
23 stopping me, Judge.  Thank you.
24 BY MR. RIACH:
25 **Q.** So there are munitions being fired, though, correct?

275

1  **A.** There are.
2  **Q.** So your prior testimony that you were being hit with
3  rocks, glass bottles, water bottles, construction debris,
4  chunks of concrete, that is not accurate, correct?
5  **A.** I wouldn't say it's inaccurate.  It's not depicted on
6  this video.  So there is this period of time and I can't say
7  that there's -- I'm not seeing anything in the foreground
8  here on the video, but there's from 25 seconds to when the
9  camera pans a different angle that's unaccounted for.
10 **Q.** So that was that -- when the camera panned, that was
11 when the debris rained down on you?
12 **A.** I can't say for sure, sir.  I know that there was debris
13 being thrown.  In looking at this, perhaps it didn't reach
14 that initial line, but it's not any depiction of what's
15 happening to the south of us -- or to the north of us,
16 excuse me.
17 **Q.** Well, your report says you were taking large amounts of
18 projectiles, which included rocks, bricks, fireworks, water
19 bottles, glass bottles, and construction debris.  And we
20 just discussed in your testimony that that occurred and then
21 the dispersal order was given and then less lethal munitions
22 were fired.  So what I'm trying to understand is:  Where is
23 the debris?  Can you point out to me the debris that was
24 landing on you?
25 **A.** I'm not going to be able to point it out on this video,

276

1  sir.
2  **Q.** But you stand by this report as an accurate report of
3  what happened that day?
4  **A.** It is a recollection of events that transpired.
5  **Q.** Okay.  So it might not be accurate is what you are
6  telling me?
7  **A.** It's a recollection of events that had transpired in
8  that vicinity.
9       MR. RIACH:  Okay.  Can you go ahead and press
10 play.
11 (Video recording played)
12      MR. RIACH:  Can you -- I'm sorry, Ms. Anderson.
13 Can you pause.  We're at 1 minute 29, Your Honor.  Can you
14 scroll back just kind of frame by frame, Ms. Anderson.  I
15 promise not to spend too much time on this, but I just want
16 to see something here.  Go back another one.  Go back one
17 more maybe.  Go forward.
18      MS. ANDERSON:  Frame by frame?
19      MR. RIACH:  Yeah, just go forward one frame.
20 Well, go ahead and just play the whole thing.
21 (Video recording played)
22      MR. RIACH:  All right.  Pause it right there.
23 Sorry.  I'm sorry.
24 BY MR. RIACH:
25 **Q.** Do you see that individual kind of to the right part of

EXHIBIT A

CASE 0:20-cv-01302-WMW-DTS   Doc. 219-1   Filed 09/03/21   Page 70 of 78

Goyette, et al. vs. City of Minneapolis, et al.                                          July 28, 2021

277

1  the frame?
2  **A.** Yes, sir, I do.
3  **Q.** Does that individual -- is there anything about that
4  individual that suggests he might be a journalist?
5  **A.** I see the camera.
6  **Q.** Do you see anything on his clothing?
7  **A.** I see on his back there may be some identifying marking,
8  but I can't read what it says, sir.
9  **Q.** Okay. If he had a big sign on him that said, "Press,"
10  would that be something you would consider an indicator that
11  he might be a journalist?
12  **A.** That would be one element, yes.
13  **Q.** Okay. That's one element. The fact that he's got kind
14  of a professional-looking camera and he is taking
15  photographs, is that another element?
16  **A.** Yes, sir.
17  **Q.** He's not participating in the protests, correct, or do
18  you consider that to be participation in the protests?
19  **A.** So there's a dispersal order that's given to this
20  vicinity, so I would say that he's engaged in the area where
21  riotous behavior was occurring.
22  **Q.** Okay. What was the riotous behavior that was occurring
23  right before you fired those munitions?
24  **A.** And, again, it's probably outside of the shot here. My
25  recollection is there's this riotous venue that's occurring.

278

1           MR. RIACH: Okay. Go ahead and --
2           THE COURT: And all this testimony pertains to
3  this exhibit at 1:22?
4           MR. RIACH: Correct, Your Honor. Thank you.
5      (Video recording played)
6           MR. RIACH: You can pause it there, Ms. Anderson.
7  BY MR. RIACH:
8  **Q.** At this point we haven't seen any debris come flying
9  across the screen, have we? We've paused at 1 minute and
10  47 seconds. Have you seen any construction debris flying
11  through the air?
12  **A.** No, sir.
13           MR. RIACH: You can take this exhibit down.
14  BY MR. RIACH:
15  **Q.** Now, you had an operational plan in place when you
16  arrived at 32nd and Nicollet on May 30th, correct?
17  **A.** Yes.
18  **Q.** And the plan was to execute a mass arrest, right?
19  **A.** That was developed, yes, upon prior knowledge of knowing
20  that the crowd was there, realizing that the Kmart parking
21  lot is there, yes.
22  **Q.** But before you got there on the buses, you already
23  planned to effectuate a mass arrest, correct?
24  **A.** There were conversations about that based on the curfew
25  violation, yes.

279

1  **Q.** And before you could effect that mass arrest, you had to
2  disperse the crowd for operational purposes, correct?
3  **A.** So they go hand in hand, you know, there's a dispersal
4  and then there's an arrest process. They can also be
5  separated. They can -- you can just give dispersal orders
6  and let the crowd continue and then, as previously stated,
7  that pushes the problem into a different area or a different
8  day. But, yes, given what we were faced that day, it was to
9  disperse into the area to the north.
10  **Q.** All right. Just to come back to the question, the plan
11  was you were going to go down there and effectuate a mass
12  arrest, correct?
13  **A.** That's my recollection.
14  **Q.** And as part of that plan you had to disperse the crowd,
15  to drive them towards the Kmart parking lot because that's
16  where you were going to effectuate the mass arrest, correct?
17  **A.** Yes, sir.
18  **Q.** Okay. And that was all decided before you even arrived,
19  correct?
20  **A.** We had those conversations, yes.
21  **Q.** All right. As a matter of fact, you had conversations
22  that the plan was to use shock and awe to subdue the
23  protesters, correct?
24  **A.** So that was a term or a military term that was assigned
25  to it afterwards, and I don't even recall where that

280

1  assignment occurred.
2  **Q.** Well, when you briefed the troopers before you went down
3  there, you told them that you were going to use the tactic
4  of overwhelming power and spectacular displays of force,
5  correct?
6  **A.** I don't recall that being my direction.
7  **Q.** That's not what you told the troopers?
8  **A.** I don't recall, sir. We have briefings on the front
9  side of it and there are, you know, conversations that occur
10  to get the mind-set of the troopers aligned with what's
11  going to occur.
12  **Q.** The plan was to paralyze the opposition to regain
13  control; is that correct?
14  **A.** I don't recall those being my words.
15  **Q.** Okay. So if that was the message that someone took away
16  from that briefing, would that have been an incorrect
17  message?
18  **A.** That is correct.
19  **Q.** Okay. They misunderstood you?
20  **A.** I don't ever recall using that terminology.
21  **Q.** Okay. You had been told, however, that the governor
22  wanted the unrest to end that night, correct?
23  **A.** I was told, and I had also heard that law enforcement
24  would have a different posture.
25  **Q.** An offensive posture?

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                        July 28, 2021

**281**

1  **A.** A different posture than previous nights.

2  **Q.** You were -- you briefed your troopers that they were to

3  use all necessary force to end the protests, correct?

4  **A.** I do not recall "all necessary." We would use tools

5  that we had to quell the riotous behavior.

6  **Q.** So if that was a trooper's understanding when they

7  arrived at that scene under your command, they misunderstood

8  the instructions you gave them?

9  **A.** Yes, sir.

10  **Q.** Okay. Now, you did not inform the troopers that the

11  media was exempt from the curfew that night, correct?

12  **A.** There were conversations about media. Actually, so we

13  did have conversations that there was a media exemption.

14  **Q.** Let me clarify my question because it was a little

15  unclear. You provided a briefing before you deployed out

16  that night, correct?

17  **A.** Yes.

18  **Q.** You gathered together in a room with your troopers, yes?

19  **A.** Given the large amount, it was outside, yes.

20  **Q.** Okay. But you spoke to the group of troopers to tell

21  them what the mission was, right?

22  **A.** Yes, sir.

23  **Q.** Okay. And as part of that conversation, you didn't

24  discuss with them that media were exempt from the curfew,

25  correct?

**282**

1  **A.** Personally, I did not.

2  **Q.** Okay. And you hadn't given that cautionary instruction

3  to them any of the nights, did you?

4  **A.** So my memory of that is we had conversations at the

5  command level, at the captains level. So I am one of the

6  commanders. That information was communicated from the

7  captains to the lieutenants, that there was -- they were

8  exempted from the curfew, but they were not exempted from a

9  dispersal order.

10  **Q.** And you had talked with your lieutenants about that?

11  **A.** So I had a conversation with my peer group of commanders

12  and then that message was relayed to the lieutenants, who in

13  turn would relay it to the troopers.

14  **Q.** When you say "was relayed," were you the person who

15  relayed that message?

16  **A.** To my peer group, yes.

17  **Q.** To the lieutenants?

18  **A.** Not personally, no.

19  **Q.** Whose job was it to relay that information to the

20  lieutenants?

21  **A.** The other co-commanders.

22  **Q.** Okay. So if the message wasn't conveyed, it was because

23  they didn't convey it, correct?

24  **A.** I'm -- I don't understand, sir.

25  **Q.** If the lieutenants didn't learn that press was exempt

**283**

1  from the curfews, that was because the other commanders you

2  are talking about didn't inform them, correct?

3  **A.** I would not agree with that, sir.

4  **Q.** Okay. Well, whose fault was it that the lieutenants

5  didn't know the media was exempt from the curfew?

6         MS. LANDRUM: Objection, assumes facts, Your

7  Honor.

8         THE COURT: Sustained. You may lay a foundation

9  and then ask that question, if you can.

10         MR. RIACH: At this point in time I'm going to

11  pull up -- ask Ms. Anderson to pull up an attorneys' eyes

12  only marked document, Your Honor, so to the extent we need

13  to clear -- I think there may only be one individual.

14  Sorry, Mr. Tuite.

15  (Mr. Tuite excused from courtroom)

16

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                    July 28, 2021



12  BY MR. RIACH:
13  **Q.** Major Dwyer, you testified during your direct
14  examination that at Daunte Wright protests you had seen some
15  clearly identifiable journalists, you went to them and told
16  them to move to a safer place.  Do you recall discussing
17  that in your direct testimony?
18  **A.** Yes, sir, I do.
19  **Q.** What was it about those journalists that made them
20  clearly identifiable?
21  **A.** Either previous contact with them, recognition from one
22  of the metro stations.  Otherwise a verifiable press
23  credential that I saw affiliated with a station or
24  reporting.
25  **Q.** So you could see on these individuals a press

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                      July 28, 2021

---

**289**

1  credential, and that indicated to you they might be a member
2  of the press.  Then you went and spoke with them and you
3  confirmed they were a member of the press.  Is that how it
4  went with some of these folks?
5  A.  Yes, sir.
6  Q.  Okay.  And when you say "a verifiable credential," what
7  did you do to verify the credentials of these individuals
8  you spoke with?
9  A.  Given the environment, you know, if it proceeded to a
10  mass arrest situation, that's probably where the verifiable
11  came in, but having some knowledge of what Fox or KARE 11 or
12  those stations' logos, they seemed legitimate as I looked at
13  those and talked to them.
14  Q.  All right.  Now, you are familiar with the arrest of
15  Carolyn Sung, correct?
16  A.  I am.
17  Q.  You discussed that in your declaration you filed in this
18  case, right?
19  A.  Yes.
20  Q.  Okay.
21        MR. RIACH:  And let's pull up Exhibit 37.
22  BY MR. RIACH:
23  Q.  Do you recognize this document, Major Dwyer?
24  A.  Yes, I do.
25  Q.  All right.

---

**290**

1        MR. RIACH:  And, Ms. Anderson, can you move ahead
2  to page 8.  Thank you.
3  BY MR. RIACH:
4  Q.  That's your signature, correct, sir?
5  A.  Yes, sir, it is.
6  Q.  All right.
7        MR. RIACH:  Your Honor, we would move admission of
8  Plaintiffs' 37.
9        MS. LANDRUM:  No objection, Your Honor.  It's
10  already filed in this case.
11        THE COURT:  Exhibit 37 is received.
12        MR. RIACH:  Thank you, Judge.
13        MR. RIACH:  So can you turn back to page 5,
14  please, of this exhibit, Ms. Anderson.  Thank you.
15  BY MR. RIACH:
16  Q.  Paragraph 14 of this declaration relates to Ms. Sung,
17  correct?
18  A.  It does.
19  Q.  All right.  And it states you're aware of plaintiffs'
20  claim that CNN reporter Carolyn Sung was arrested by MSP
21  troopers on April 13th after she repeatedly offered her
22  press credentials, correct?
23  A.  Yes, sir.
24  Q.  Okay.  And it states, "Ms. Sung did not have her press
25  credentials on her person, nor was she clearly identifiable

---

**291**

1  as press."  That -- is that information that you got from
2  your troopers?
3  A.  Yes, it is.
4  Q.  And which troopers did you talk about this arrest with?
5  A.  So I had a conversation actually again with one of my
6  peers, and that was a fellow captain and he informed me of
7  the situation.  As far as the specific troopers involved, I
8  believe it was one of the troopers from the Detroit Lakes
9  district, but that's trying to recall.
10  Q.  Okay.  So you talked to the captain who supervised these
11  troopers, but not the troopers themselves; is that correct?
12  A.  So we were made aware of the arrest of Ms. Sung after
13  the fact.  So from our standpoint, myself and my captain
14  partner, we were trying to decipher or find out the timeline
15  of where Ms. Sung was at.  And as soon as, like, her
16  credentials were matched up with her -- she had already
17  progressed through the processing line without credentials
18  and without identification, but as soon as that was made
19  known to us, she was taken off site to a location to reunite
20  with her reporting team.
21  Q.  All right.  So you were present on the night of
22  April 13th when Ms. Sung was arrested?
23  A.  I was in Brooklyn Center, yes.
24  Q.  Okay.  And I just want to make sure I'm understanding
25  your testimony correctly.  So some of this information

---

**292**

1  that's in paragraph 14 comes from your experiences on
2  April 13th dealing with the arrest of Ms. Sung; is that
3  accurate?
4  A.  Dealing with the individual's information relayed to me
5  who had --
6  Q.  Okay.  So you got information that a CNN journalist had
7  been arrested, her name was Carolyn Sung.  Who gave you that
8  information?
9  A.  One of my fellow captains.
10  Q.  All right.  And you get this information from your
11  captain.  What did you do next?
12  A.  So then he was assigned to find out the location of this
13  individual or if Ms. Sung had proceeded through the
14  processing line; and once we were able to determine if that
15  occurred, then we were able to match her up with her
16  reporting team.
17  Q.  So you set about trying to find out if she was still on
18  site at the protests, that was your first step; is that
19  correct?
20  A.  That was assigned to a captain, yes.
21  Q.  Okay.  And it was determined that she was still on site,
22  correct?
23  A.  That is my belief.
24  Q.  All right.  And it's your understanding that then she was
25  reunited with her reporting team?

---

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                                    July 28, 2021

**293**

1  A. Correct.

2  Q. And you're confident that you have the whole story

3  there?

4  A. That's my understanding, yes.

5  Q. You write she was apparently separated from her

6  backpack. How did she get separated from her backpack; do

7  you know?

8  A. I do not.

9  Q. Okay. You're not aware of troopers grabbing her by the

10  backpack and throwing her to the ground?

11  A. No.

12  Q. The captain didn't convey that information to you?

13  A. That's not information I have.

14  Q. Are you aware that a trooper yelled at her, "Do you

15  speak English?"

16  A. I am not aware of that.

17  Q. You didn't hear anything about that?

18  A. I did not.

19  Q. Okay. Do you know Ms. Sung is Asian?

20  A. I do not.

21  Q. Okay. And you state, "Ms. Sung was released immediately

22  after her media status was confirmed," correct?

23  A. It is my belief that she was transported to one of our

24  district offices off site to be reunited.

25  Q. So she wasn't transported to the Hennepin County Jail,

**294**

1  that's your understanding?

2  A. That is my understanding, yes.

3  Q. She wasn't patted down and searched at the Hennepin

4  County Jail?

5  A. I do not have that information.

6  Q. There was no correction officer who put her hands into

7  Ms. Sung's pants and bra, you never heard about that?

8  A. I never heard that, sir.

9  Q. You never heard that she was told to strip and put on an

10  orange uniform?

11  A. I did not hear that, sir.

12  Q. Okay. Did you hear that she was placed in a jail cell?

13  A. I did not.

14  Q. Okay. Did you talk to Commissioner Schnell about this

15  incident at all?

16  A. I did not.

17  Q. He never reached out to you and said, "I'm investigating

18  an incident involving Carolyn Sung"?

19  A. I do not have that knowledge.

20  Q. Okay. Did you talk to him about this declaration?

21  A. To Mr. Schnell?

22  Q. Correct.

23  A. I did not.

24  Q. Okay.

25       MR. RIACH: You can take that down. Thanks,

**295**

1  Ms. Anderson.

2       Your Honor, I want to make sure I'm not trying the

3  Court's patience here. I have maybe 15 more minutes, 20

4  more minutes. Is that going to sit me in bad stead?

5       THE COURT: And that would be the conclusion of

6  any evidence from any party; is that correct?

7       MS. LANDRUM: Your Honor, typically I would like

8  to do a redirect examination to address several of these

9  topics.

10       THE COURT: So you may have until 5:35, and then

11  we'll have redirect and then we will conclude this hearing.

12       MR. RIACH: Understood, Your Honor. Thank you

13  very much for your patience and forbearance. It's much

14  appreciated.

15  BY MR. RIACH:

16  Q. When did you first become aware of the temporary

17  restraining order in this case, Major?

18  A. It was the day following April 16th -- or the mass

19  arrest at Brooklyn Center. So April 15th?

20       MR. RIACH: Ms. Anderson, can you pull up -- I

21  want to make sure that we don't pull up an AEO document

22  inadvertently. I think we're okay. Ms. Anderson, can you

23  pull up Plaintiffs' Exhibit 27, please.

24  BY MR. RIACH:

25  Q. This is -- Exhibit 27 is an e-mail from Matt Sokol. The

**296**

1  top e-mail is from Matt Sokol to DPS patrol captains and

2  above from April 17th. Is this the e-mail that -- where you

3  learned of the TRO?

4  A. I believe it says a TRO attachment, so yes.

5  Q. You are on this distribution list, I guess is my

6  question?

7  A. Yes, sir, I am.

8  Q. All right. And you don't recall hearing about the TRO

9  before this e-mail was sent out, correct?

10  A. Not in the field, no.

11  Q. When you're out in the field, how often do you

12  communicate with your supervisors?

13  A. So it's at that point situational dependent. When we

14  are engaged in an operation, if you will, we will deploy and

15  implement our operation. If there's something where we need

16  assistance or contact with our supervisor, we will initiate

17  that.

18  Q. And how do you communicate with your supervisors when

19  you're out in the field?

20  A. Typically by cell phone.

21  Q. Okay. You have your cell phone on you when you're out

22  there?

23  A. Yes, sir.

24  Q. Do you recall talking to your supervisors at all on the

25  evening of April 16th?

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                          July 28, 2021

**297**

1  A. I'm sure there were multiple conversations.

2  Q. You don't recall anybody mentioning the temporary

3  restraining order during any of those conversations?

4  A. I do not.

5  Q. Okay. Now, you talked on your direct about documented

6  instances of individuals who claimed to be press. Do you

7  remember discussing that?

8  A. Yes, I do.

9  Q. Okay. And as an attachment to your declaration, you

10 attached police reports related to the documentation of

11 those incidents, correct?

12 A. Yes, sir.

13 Q. Other than those particular reports, were there any

14 other documented instances to your knowledge?

15 A. Not that our troopers had recollection or that were

16 provided.

17 Q. Okay.

18     MR. RIACH: Can you pull up Plaintiffs' Exhibit 37

19 again, Ms. Anderson, and take us to paragraph 21. Can you

20 just pull up the last sentence of that paragraph, please.

21 BY MR. RIACH:

22 Q. Now, in your declaration you wrote, "Approximately

23 one-third of the crowd on any given evening during the April

24 2021 protests claimed media status." That's not an accurate

25 statement, is it?

**298**

1  A. That was my assessment of the situation.

2     MR. RIACH: So can you pull us back to

3  paragraph 6, Ms. Anderson, and just highlight the first

4  line, please.

5  BY MR. RIACH:

6  Q. So it states here, "On April 12, 2021, a gathering of

7  approximately 1,000 protesters remained in the vicinity of

8  the Brooklyn Center Police Department past the lawfully

9  imposed curfew."

10     It was your assessment that one-third of those

11 thousand protesters were claiming media status?

12 A. These are estimated numbers, certainly, but I think the

13 key term in that is "claimed." So they were claiming to be

14 press, not that they were press.

15 Q. So you -- what was the -- did you hear 300 different

16 people claim to be media?

17 A. No, I did not.

18 Q. Did one of your troopers tell you that 300 people had

19 claimed to be media?

20 A. No.

21 Q. Is there documentation in the reports of 300 different

22 people claiming to be media who were not media?

23 A. There is not.

24 Q. So what did you base your assessment on that 300 people

25 on April 12th were falsely claiming to be media?

**299**

1  A. So a majority of individuals -- not a majority.

2  Individuals that I would come in contact with, because I

3  would progress past the line of troopers to gain a better

4  vantage point, because we were engaged in like a lawful

5  arrest situation, to go, like, in close proximity to

6  individuals, they would say, "I'm a member of the media" or

7  "I'm press." There would be some conversation there. So

8  it's a mere correlation of the individuals that I

9  encountered and then --

10 Q. So you are extrapolating from your experience that

11 300 people falsely claimed to be media on the night of

12 April 12th?

13 A. There is some degree of that, yes.

14 Q. All right.

15     MR. RIACH: That's all I have, Your Honor.

16            REDIRECT EXAMINATION

17 BY MS. LANDRUM:

18 Q. Major, I want to touch very briefly on just a couple of

19 topics that you were just questioned on.

20     Number one, with regard to the fact that there

21 were -- that the use of force reports, that those stopped

22 being issued during May of 2020, was that a problem that was

23 solved for purposes of April 2021?

24 A. Yes, it was.

25 Q. How so?

**300**

1  A. After reviewing what had occurred in that event in

2  Minneapolis, we made the decision or implemented across the

3  board that we need to revert back to the strict adherence to

4  the use of force policy and specifically no matter if an

5  individual is identified or not, that a use of force report

6  would be used.

7     So we have use of force reports that are preserved

8  now that are completed by a trooper and it simply says what

9  was the precipitating factor and what force was used in

10 return, but it doesn't identify an individual in those cases

11 where they couldn't be identified.

12 Q. And the new technology that you mentioned during our

13 direct examination, did that assist Minnesota State Patrol

14 in being able to better document the use of force and the

15 use of munitions?

16 A. Without a doubt. It provides it real time. If there

17 are instances of use of force or riot control agents are

18 used, it can be documented at the time that they are used.

19 Q. You also received questioning about Ed Ou's video and

20 the presence or nonpresence of debris within that video. Do

21 you remember that testimony?

22 A. Yes, I do.

23 Q. How long was Minnesota State Patrol on the ground on

24 May 30, 2020 in order to effect that mass arrest?

25 A. Leading up to it or --

EXHIBIT A

301

1   **Q.** In total that day.

2   **A.** That day?  So, like, in the area of Nicollet Mall,

3   ma'am?

4   **Q.** Yes.

5   **A.** We were there for a period of time to assess the crowd.

6   I'm estimating 15 to 20 minutes.

7   **Q.** Okay.  And then after that portion of the video, how

8   long after that was Minnesota State Patrol on the ground?

9   **A.** For the duration of the evening into the early morning

10  hours the following day.

11  **Q.** We all saw on that video that we didn't see much debris.

12  Can you explain to the Court why that was, given your

13  recollection that you experienced Minnesota State Patrol

14  taking on significant debris?

15  **A.** Yes.  So it is a recollection.  I will add that it's not

16  real-time reporting.  So the report was completed in a

17  manner that, just given the levity of the situation, I

18  wasn't able to document items as they were occurring or even

19  that evening and in the processing of the events that

20  transpired during this period of time, it was completed days

21  after the fact.

22  **Q.** Now, we did see in the video the use of munitions.  Did

23  Minnesota State Patrol ever experience rioters throwing

24  munitions at Minnesota State Patrol?

25  **A.** Yes, that did happen.

302

1   **Q.** In Minneapolis in May of 2020?

2   **A.** Yes.

3   **Q.** Did it happen on Nicollet Avenue?

4   **A.** It did.

5   **Q.** To your recollection, did it appear on May 30th?

6   **A.** Yes, it did.

7   **Q.** Now, we heard some testimony that Minnesota State

8   Patrol, before they arrived in the bus, that they were

9   planning to do a mass arrest or a mass arrest was being

10  discussed.  Did I hear that?

11  **A.** Yes, ma'am.

12  **Q.** At that point why?  Why was that being planned in

13  advance of arrival?  What was going on that was factoring

14  into that decision?

15  **A.** So this wasn't an isolated event.  It wasn't a

16  gathering, a demonstration of individuals relative to the

17  events that had previously occurred.  This is an ongoing

18  event.  So it was Monday, Tuesday, Wednesday, essentially a

19  whole entire week of unrest, riotous behavior; and without

20  the implementation to effect a mass arrest where there's

21  consequences, that behavior would continue to occur.

22       So that was a tactic, a strategy that was

23  discussed in order to bring just the events of the week that

24  were unprecedented and unpredictable, to draw that to a

25  close, to restore some sort of order to a chaotic

303

1   environment that had infected the city.

2   **Q.** Was it the goal of Minnesota State Patrol, in effecting

3   that mass arrest, to stop peaceful protesters from having

4   their voice heard?

5   **A.** There was no ill intent.  That was not the intent.

6   **Q.** Was it the intent of Minnesota State Patrol, in

7   effectuating and planning that mass arrest, to stop

8   journalistic efforts?

9   **A.** It was not.

10  **Q.** What was the intent?

11  **A.** Again, to restore order to a chaotic environment, to

12  clear that area.  And we always adhere to the elements of

13  neutrality and to make sure that ultimately the First

14  Amendment is upheld and that safety is provided.

15  **Q.** We heard your testimony about your rough estimate in

16  Brooklyn Center that you believed approximately one-third of

17  individuals to possibly be press.  Could you explain to the

18  Court the reasons why you -- why there was that belief that

19  so many individuals may or may not be media.

20  **A.** Yes.  Again, it's that term of "claimed."  So there were

21  individuals that were displaying just, like, press patches.

22  Much like a law enforcement patch where it says, "Police,"

23  it was just a Velcro add-on to a piece of clothing.

24  Individuals with cameras and cell phones, I guess it's the

25  generalization that individuals are affiliated with the

304

1   press.

2   **Q.** We heard the testimony about Carolyn Sung and you heard

3   that there's an allegation that a Minnesota State Patrol

4   trooper or a law enforcement officer may have spoken to her

5   in a derogatory fashion.  Did you hear that?

6   **A.** I did hear that.

7   **Q.** If that were to turn out to be true, Major, would that

8   be a violation of Minnesota State Patrol policy?

9   **A.** Yes, it would.

10  **Q.** And if that turned out to be true and it was validated,

11  would that be subject to discipline?

12  **A.** It would.

13       MS. LANDRUM:  Thank you.  No further questions.

14       THE COURT:  Is there anything further for this

15  witness?

16       MR. RIACH:  Just two --

17       MS. LANDRUM:  No, Your Honor.  Sorry.

18       MR. RIACH:  I have two quick recross questions,

19  Your Honor.

20       THE COURT:  You may.

21       MR. RIACH:  Thank you.

22             RECROSS EXAMINATION

23  BY MR. RIACH:

24  **Q.** Major Dwyer, are you aware of any state trooper being

25  disciplined for any conduct involving journalists?

EXHIBIT A

Goyette, et al. vs. City of Minneapolis, et al.                                           July 28, 2021

**305**

1  A.  I am not.

2  Q.  And you just testified that when you were circulating

3  among the protesters and the mass arrests, you saw people

4  wearing press patches; is that correct?

5  A.  That is correct.

6  Q.  Did you document that anywhere?

7  A.  I don't recall.

8        MR. RIACH:  That's all I have, Your Honor.

9          E X A M I N A T I O N

10 BY THE COURT:

11 Q.  I have a question.  Was it the press patches that some

12 were wearing and the fact that individuals had cameras, or

13 was it that individuals were using their phones to videotape

14 or the camera aspect of their phone to record what was going

15 on?

16 A.  Thank you, Your Honor.  So I think that speaks to the

17 mere, like, confusing element of it.

18        There are individuals that are trying to portray

19 themselves as press, so they would indeed, you know, have

20 additions to their clothing.  I think in one of the videos

21 we saw a vest that said, "Press" on it, but there's no,

22 like, verifiable credentials.

23        There were many individuals documenting the

24 events, and then having contact with them at a later point

25 they would say that they are affiliated with a blog or an

**306**

1  independent business or what have you.  So in those

2  instances we would try to take steps to verify either

3  through their employer, but even we would implement means,

4  like, through the Secretary of State to see if they had an

5  affiliation.  And if there was anything leaning towards, we

6  would, you know, give the benefit of the doubt.  So it was

7  the actual claim that, yes, individuals were affiliated with

8  the press.

9  Q.  And that was based on their verbal representation?

10 A.  At times, yes.  We would have very -- it was very close

11 quarters and many times they were standing right in front of

12 the line and asking, you know, for compliance and it would

13 be a matter of "I'm the press," which was also compounded

14 by, like, my previous interactions with members of the

15 media, there were times where there was very unprofessional

16 dialogue being purported to myself or troopers by people

17 that were portraying them as press.  So it was engaged in

18 conversation, yes.

19 Q.  Given the prevalence of phones that record and the use

20 of phones to record activity by individuals in the community

21 and members of the press, were you discerning any means of

22 differentiation?

23 A.  So that's what lends itself to this difficult scenario

24 that we're trying to navigate through.  So there's not an

25 assignment that they're press, but they can certainly claim

**307**

1  that they're press.

2        So if there's interaction with law enforcement and

3  an individual and if they merely have a phone and they say,

4  "I'm with the press," you know, anybody at that location,

5  the entire crowd could say, "I'm a member of the press"

6  based on simply having a phone.

7        So if we are unable to identify and verify, that

8  speaks to the compounding issue or what complicates the

9  matter when we're trying to restore order in these areas.

10 It's a hurdle at the scene, and it severely complicates or

11 hinders the ability of law enforcement.

12 Q.  Well, it seems to also hinder the ability of the free

13 press to do its work with the tools that it has, if they are

14 presumed not to be members of the press because they're

15 using an iPhone to record as opposed to something else,

16 doesn't it?

17 A.  Yeah.  And it's not, like, so much the recording tool,

18 but it's the working relationship.  So to be able to have a

19 conversation with the individuals and ask them to go to a

20 safe location.  Considering the law enforcement operation

21 and that an area that is deemed unsafe not only for the

22 individuals inside, law enforcement and in this case the

23 Brooklyn Center area, the heavily residential area, we need

24 compliance.  We need to work collaboratively and

25 cooperatively.  And given the instances that we've talked

**308**

1  about in Minneapolis and Brooklyn Center, it's those

2  instances that are problematic.

3  Q.  So if a member of the press is using an iPhone as

4  opposed to a huge, you know, camera that would look like

5  something that an ordinary tourist would not have, you would

6  not be able to discern, but you would not necessarily take

7  their word for the fact that they were a member of the press

8  when they told you they were?

9  A.  So, Your Honor, like, a piece of equipment has no

10 bearing on or, like, in my assessment of things on their

11 affiliation with the media.  It could be a flip phone.  It

12 could be an iPhone.  It could be a commercial-grade camera.

13 It's being able to work through the dialogue and the

14 parameters, a conversation that they do have a press

15 affiliation.

16        So it's this double-edged sword of members of the

17 media in the crowd and the same riotous dynamic, even though

18 they may not be engaged in it, but then on the other side

19 it's individuals that are trying to emulate or mock members

20 of the media, which is the biggest concern, who try to cause

21 harm not specifically on law enforcement, but anybody in

22 that area, which we saw in Minneapolis.  It wasn't -- nobody

23 was exempt from it.  It was the business owners.  It was

24 residences that were subject to the arson and the looting

25 and criminal activity night after night after night.

EXHIBIT A

**309**

1    So the media element isn't necessarily the largest
2  issue. It's those that are trying to portray themselves as
3  media. And given the chaotic environment and when we're
4  asked to make basically split-second decisions on how to
5  implement a plan to restore order in that environment, it's
6  very, very difficult, not to mention the environmental
7  conditions and other situational experiences that are
8  occurring.
9    THE COURT: I'm going to ask counsel in light
10  of -- I invited these -- I asked these questions, invited
11  this testimony from this witness. You have not had an
12  opportunity to question the witness about anything that the
13  witness has just said as a result of my questions. Are
14  there any additional questions that either counsel would
15  like to make or ask in light of this additional information?
16    MS. LANDRUM: No, Your Honor.
17    MR. RIACH: No, Your Honor.
18    THE COURT: Okay. Then the matter is taken under
19  advisement. Is there anything else that we need to address
20  at this time?
21    MS. LANDRUM: Your Honor, I have one minor
22  housekeeping. My co-counsel, Mr. Weiner, alerted me to the
23  fact that we laid foundation for Exhibit 10, which was the
24  use of force policy, but then I never asked Your Honor to
25  actually enter Exhibit 10, the use of force policy, into

**310**

1  evidence. May I do that now?
2    THE COURT: You may. And I thank your co-counsel
3  because I didn't realize that either.
4    MS. LANDRUM: Thank you. So the state defendants
5  move to admit Exhibit 10.
6    MR. RIACH: No objection.
7    MS. LANDRUM: Thank you, Your Honor.
8    THE COURT: Exhibit 10 is received.
9    MS. LANDRUM: Thank you so much, Your Honor, for
10  the extra time today as well.
11    MR. RIACH: Your Honor, I also received one of
12  those notes, that I forgot to offer Exhibit 27, which is the
13  e-mail thread to the DPS captains and above about the TRO.
14  We would ask to admit Exhibit 27.
15    THE COURT: Any objection?
16    MS. LANDRUM: I believe there's hearsay within
17  that exhibit, but now I don't have it pulled up and I don't
18  remember what it is. We won't object, Your Honor. You can
19  consider it.
20    THE COURT: Exhibit 27 is received.
21    I want to thank co-counsel for both parties for
22  your diligence and making sure that we have a clear and
23  accurate record and a fulsome one. So thank you.
24    I also want to thank the attorneys for your
25  presentations today and your questioning of the witnesses

**311**

1  and for handling this in such a professional and fulsome
2  manner. So thank you for the excellence in your work today.
3    And so we will conclude now. The matter is taken
4  under advisement and this will conclude our hearing.
5    MS. LANDRUM: Thank you.
6    (Court adjourned at 5:49 p.m.)
7        *   *   *
8
9
10    I, Lori A. Simpson, certify that the foregoing is a
11  correct transcript from the record of proceedings in the
12  above-entitled matter.
13
14    Certified by: s/ Lori A. Simpson
                      _____

15          Lori A. Simpson, RMR-CRR
16
17
18
19
20
21
22
23
24
25

EXHIBIT A