# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jared Goyette, Craig Lassig, Katie Nelson, Tannen Maury, Stephen Maturen, Edward Ou, Timothy Evans, Chris Tuite, and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals,* | Court File No. 20-cv-01302 (WMW/DTS) |
| Plaintiffs, | |
| v. | **THIRD AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; Minnesota State Patrol Major Joseph Dwyer, *in his individual capacity*; Hennepin County Sheriff David Hutchinson, *in his individual and official capacity*; John Does 1-10, *in their individual and official capacities*; | |
| Defendants. | |

## **INTRODUCTION**

During the protests arising out of George Floyd's murder, Defendants tear-gassed, pepper-sprayed, shot with "less-lethal" projectiles, arrested, threatened and assaulted journalists, all after these journalists identified themselves or otherwise clearly were engaged in their reporting duties. These were not isolated incidents. The protests were marked by an extraordinary escalation of unlawful force deliberately targeting reporters. The purpose was clear: punish the press and stop the scrutiny.

In the wake of law enforcement misconduct during the George Floyd protests, the ostensible leaders of our law enforcement agencies publicly said the right things, but these statements turned out to be nothing more than lip-service to the First Amendment. Governor Walz and others repeatedly apologized for the violence against reporters and the unlawful arrests. But the absence of any consequences or corrective action toward the officers who committed this misconduct sent a clear message to law enforcement throughout the State: it remains open season on journalists.

Not surprisingly, when protests erupted again after Daunte Wright was killed, law enforcement reverted to the same lawless behavior it displayed in 2020. Law enforcement officers targeted journalists covering the Wright protests, shot them with less-lethal weapons, pepper-sprayed them directly in the face at close range, and harassed, assaulted, and arrested them. Law enforcement also unveiled some new unconstitutional methods of intimidation: broadcasting orders for all press to disperse or face arrest, and photographing and cataloging journalists' faces, credentials, and driver's

licenses. Even Governor Walz conceded this particular Orwellian spectacle was an unconstitutional embarrassment to our State.

In the wake of international condemnation of their ongoing misconduct, some of the Defendants hired a consultant to explore new policies and procedures related to the media's First Amendment rights, with a stated commitment to develop "best practices" for future protests. But this is just a fig leaf meant to distract and deflect from the constitutional rot at the core of Defendants' misconduct. No working group need be convened. The Constitution provides the "best practices" required. Do not arrest clearly identifiable journalists. Do not pepper spray them at close range in the face. Do not threaten and harass them. Do not target them with less-lethal weapons. Do not destroy their equipment. Do not assault them.

Defendants have a long-standing pattern and practice of documented, indisputable abuse of journalists in direct contravention of the First Amendment, and a total failure of supervision to rein in this misconduct, which continues to this day. That is what this lawsuit seeks to remedy.

## **PARTIES**

1.     Plaintiff Jared Goyette is a Minnesota resident who lives in the city of Minneapolis. Goyette is a freelance journalist who works for national and international news publications.

2.     Plaintiff Craig Lassig is a Minnesota resident and freelance photographer. He has been a freelancer since 2008, and his clients include the Associated Press ("AP"),

3

Reuters, the NY Times, and the European Pressphoto Agency ("EPA"). Prior to 2008, Lassig worked as a photographer for Sun Newspapers.

3.      Plaintiff Katie Nelson is a freelance journalist, photographer and filmmaker from Nairobi, Kenya. She is currently residing in Minneapolis, Minnesota. Her work has been published by The New York Times, National Geographic, BBC, Al Jazeera, The Telegraph, Associated Press and Public Radio International, among others. She has also served as the Vice Chair of the Foreign Correspondents' Association of East Africa.

4.      Plaintiff Tannen Maury is a photographer with the European Press Agency ("EPA"). Prior to working for the EPA, Maury was a staff photographer for AP and worked as a contract photographer for Reuters and Agence France-Presse ("AFP"). He is an Illinois resident.

5.      Plaintiff Stephen Maturen is a freelance photographer based in Minneapolis. Maturen's clients include the New York Times, the Wall Street Journal, USA TODAY, and Getty Images. Maturen is a Minnesota resident.

6.      Plaintiff Edward Ou is a Canadian photojournalist. He currently resides in New York City but has spent most of his career covering events in the Middle East for AP, the New York Times, Getty Images and other news media.

7.      Plaintiff Timothy Evans is a freelance photojournalist who resides in Minnesota. Evans works with local, national, and international news publications, including EPA, NurPhoto (which distributes to AP and other news organizations), and Minnesota Public Radio.

8.      Plaintiff Chris Tuite is a freelance photojournalist whose work has appeared in AP and other news media.  Tuite resides in California.

9.      Plaintiff The Communications Workers of America ("CWA") is an international labor union representing over 700,000 workers in a broad range of industries, including print and broadcast news media, telecommunications, airline, manufacturing, education, public service, and healthcare, among others.  CWA's central purpose is protecting the rights of workers through collective bargaining and public advocacy.  CWA's headquarters is in Washington, DC; its members work and live throughout the United States, including Minnesota.  CWA is comprised of multiple sectors and districts representing members in different industries.  The News-Guild CWA ("NewsGuild") is an affiliate union of the CWA.  NewsGuild members include many on the reporting staff of the Los Angeles Times, the Chicago Tribune, the Detroit Free Press, the Denver Post, Reuters, the Associated Press, the Washington Post, the New York Times, the St. Paul Pioneer Press, and the Minneapolis Star Tribune, among others.

10.     Plaintiffs either live in or intend to return to Minnesota to cover future newsworthy events, including both small- and large-scale protests. Plaintiffs also intend to cover similar protests and gatherings throughout the United States as part of their journalistic activities. Plaintiffs fear that they will be subjected to similar unlawful actions by law enforcement, including Defendants, as they conduct their job duties in the future.

11.     Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota.

12.     Defendant Medaria Arradondo is the Minneapolis Chief of Police and a Minnesota resident.

13.     Defendant Robert Kroll is a former Lieutenant in the Minneapolis Police Department, the former president of the Police Officers Federation of Minneapolis, and a Minnesota resident.  Kroll has been a member of the Federation Board since 1996 and was Federation President from 2015-2021.

14.     Defendant John Harrington is the Minnesota Commissioner of Public Safety with supervisory responsibility over Colonel Matthew Langer and the Minnesota State Patrol.  Commissioner Harrington is a Minnesota resident.

15.     Defendant Colonel Matthew Langer commands the Minnesota State Patrol. Colonel Langer is a Minnesota resident.

16.     Defendant Major Joseph Dwyer is a senior officer at the Minnesota State Patrol who commands the State Patrol's "Special Response Team" or "SRT," which has primary responsibility at the agency for responding to protests and episodes of civil unrest.  Major Dwyer is a Minnesota resident.

17.     Defendant David Hutchinson is the Hennepin County Sheriff.   Sheriff Hutchinson is a Minnesota resident.

18.     Defendants John Does are unidentified individuals who committed the acts and omissions set forth below as agents of the City of Minneapolis, Minneapolis Police Department, Minnesota State Patrol, and Hennepin County Sheriff's Office.

## JURISDICTION

19.     Plaintiffs' claims arise under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitutions, and the First and Fourth Amendments, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

20.     Jurisdiction is proper in this Court according to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law.

## THE GEORGE FLOYD PROTESTS

**A.      GEORGE FLOYD'S MURDER AND THE ENSUING UNREST.**

21.     On Monday May 25, 2020, George Floyd, a citizen of Minneapolis, was murdered by an officer of the Minneapolis Police Department ("MPD").  The events of Floyd's arrest and murder were captured on video by multiple bystanders as well as individual officers' body cameras.  The videos depicted Mr. Floyd pinned on the street, face down and increasingly unresponsive, while MPD Officer Derek Chauvin knelt on Mr. Floyd's upper back and neck, two officers held him down, and another stood by.  All four officers were soon fired by the City.  Derek Chauvin was charged with and convicted of second- and third-degree murder and manslaughter.  The other officers have also been charged but have not yet faced trial.

22.     The videos were widely and rapidly disseminated around the world via social media and news media platforms.  Mr. Floyd's murder became international breaking news.

23.     Over the next five days and nights, thousands of people gathered across Minneapolis to protest and mourn Mr. Floyd's murder.  Some of the protests grew in intensity, and isolated bad actors used the protests to engage in the looting and burning of hundreds of buildings in Minneapolis and Saint Paul.

24.     The public unrest became international breaking news.  Numerous members of the news media arrived to cover the demonstrations and unrest and the government response.

25.     Many confrontations occurred during this period between the MPD and State Patrol, and groups of demonstrators, in which law enforcement, without any forewarning, deployed less-lethal ballistics and chemical irritants against the demonstrators.

26.     It is abnormal in situations of public unrest for law enforcement to engage in potentially injurious riot control tactics without issuing clear warnings and orders to disperse.

27.     In addition to confronting civilian demonstrators, Defendants also aggressively confronted members of the news media providing on-the-scene coverage. Numerous journalists reported injuries sustained as a result of law enforcement's use of riot control tactics against clearly identifiable members of the news media.  In one high-profile incident, CNN correspondent Omar Jimenez was arrested on national television despite asking the State Patrol to "put us back where you want us, we are getting out of

your way." [1]   Mr. Jimenez was only released after a personal phone call from CNN president Jeff Zucker to Minnesota Governor Tim Walz. [2]

28.     Governor Walz acknowledged that arresting members of the news media providing coverage of breaking news stories was improper and said that "there is absolutely no reason something like this should happen . . . . In a situation like this, even if you're clearing an area, we have got to ensure that there is a safe spot for journalism to tell this story.  The issue here is trust, the community that's down there that's terrorized by this, if they see a reporter being arrested, their assumption is something is going to happen that they don't want to be seen so that is unacceptable." [3]

29.     Despite Governor Walz's assurances that the role of the media would be fostered and respected, the MPD, State Patrol, HCSO and other law enforcement authorities continued to target and intimidate members of the news media in a concerted effort to chill protected First Amendment activity.

**B.     CURFEWS ESTABLISHED BY EXECUTIVE ORDER.**

30.     Due to widespread threats to personal safety and property, Governor Walz mobilized the Minnesota National Guard.

---

[1] https://apnews.com/eadfe65c7ce593d04c0aef7eb0276e22.
[2] https://www.startribune.com/cnn-reporter-arrested-on-live-tv-let-go-after-gov-tim-walz-intervened/570860202/
[3] https://www.cnn.com/2020/05/29/politics/tim-walz-minnesota-cnn-arrest/index.html

31.     Governor Walz also issued an executive order establishing a curfew, effective from 8:00 p.m. to 6:00 a.m. on Friday, May 29 and Saturday, May 30.[4]   The Governor re-issued the curfew order for Sunday, May 31. ("Curfew Orders").[5]  The Curfew Orders applied to "all public places within the City of Minneapolis and the City of Saint Paul[.]"  The curfews expired on Friday, June 5, 2020.

32.     The Curfew Orders mandated that "[d]uring the curfew, all persons must not travel on any public street or in any public place."

33.     The Curfew Orders contained exceptions to the travel prohibition, however: "All law enforcement, fire, medical personnel, **and members of the news media** . . . **are exempt from the curfew**.  Individuals traveling directly to and from work, seeking emergency care, fleeing dangerous circumstances, or experiencing homelessness are also exempt."

34.     The City of Minneapolis implemented a nearly identical curfew order that exempted members of the news media.

35.     Throughout the duration of the protests, both before and after the Governor's and the City of Minneapolis curfew orders, the Defendants acted in communication and concert with one another in responding to the George Floyd protests and in committing the constitutional violations described below.

---

[4] Minn. Exec. Order No. 20-65 (May 29, 2020),
https://mn.gov/governor/assets/EO%2020-65%20Final_tcm1055-434635.
[5] Minn. Exec. Order No. 20 68 (May 31, 2020),
https://mn.gov/governor/assets/EO%2020-68%20Final_tcm1055-434305.

36.     Defendants' command staffs acted in concert during the George Floyd protests, maintaining regular communication and coordinating operations regarding crowd control techniques, use of chemical agents, less-lethal ballistics and other crowd control technologies, and tactical deployment of officers and troopers, including the protest responses that resulted in the violation of constitutional rights described below.

37.     Defendants coordinated activities during the protests in part through the activities of the Multi-Agency Command Center ("MACC") set up to respond to the George Floyd Protests.  Per the Department of Public Safety:

> The MACC serves as a unified command of federal, state and local law enforcement and public safety agencies supporting the state's response to any unrest that develops following the death of George Floyd. Agencies represented in the MACC include the Minnesota Department of Public Safety (State Patrol, Bureau of Criminal Apprehension, Alcohol and Gambling Enforcement, Division of Homeland Security and Emergency Management, State Fire Marshal division, Minnesota State Patrol); National Guard; Minneapolis Police Department; Saint Paul Police Department; Metro Transit Police; Bloomington Police; University of Minnesota Police; Sheriff departments from Ramsey County, Hennepin County, Anoka County, Dakota County, Washington County; and the FBI.[6]

38.     According to July 9, 2020 legislative testimony from Commissioner Harrington, functional control of all law enforcement agencies responding to the protests devolved to the Department of Public Safety and ultimately to Commissioner Harrington,

---

[6] https://dps.mn.gov/divisions/ooc/news-releases/Pages/multi-agency-command-center-report-on-civil-unrest.aspx

with the sole exception of the Minneapolis Police.[7]  Per Commissioner Harrington, the
State Patrol and other agencies under command of the Department of Public safety acted
"in concert" with the MPD.  MPD "was not able to dictate missions to the State Patrol,"
but they were able to make requests.  Commissioner Harrington and his staff would then
vet the requests and inform the MPD if it could take on the requested mission.  Senior
officials from MPD were always present at the MACC to facilitate coordination with the
State Patrol and the other state agencies minute-by-minute as the protests unfolded.

39.     Like their command staffs, MPD officers and State Patrol troopers at the
protest scenes worked literally side-by-side and in concert in responding to the George
Floyd protests.[8]

## C.    DEFENDANTS' UNCONSTITUTIONAL ACTIONS AGAINST THE PRESS COVERING THE GEORGE FLOYD PROTESTS.

40.     Even though the Curfew Orders expressly exempted members of the news
media, Defendants ignored the exemption.  Even when members of the news media
clearly identified themselves, Defendants continued to target and intimidate the press by
threatening them, spraying them with chemical irritants, and firing less-lethal ballistics
designed for riot control directly at them.  Defendants further interfered with the news
media's right to cover public events by arresting journalists despite the lack of any
probable cause to do so, refusing access to areas where events were unfolding, and

---

[7] http://mnsenate.granicus.com/player/clip/5416?view_id=1
[8] *E.g.,* https://media.vanityfair.com/photos/5ed72084d991ee5f708bd991/master
/w_1600%2Cc_limit/george-floyd-protests-minneapolis-montgomery-18.jpg,
https://reason.com/2020/06/08/video-shows-cops-slashing-tires-across-minneapolis-
during-george-floyd-protests/

creating obstacles to reporters' movement about the city. These incidents constitute flagrant infringements on the constitutional rights of individual reporters as well as the public's interest in the dissemination of accurate information and accountability of government for its actions.

41.     The violence, intimidation, detention, and arrest of journalists, separately and collectively, had and is continuing to have a chilling effect on the First Amendment rights of the Plaintiffs and the Plaintiff Class, as well as other individuals seeking to lawfully exercise their First Amendment rights in the City of Minneapolis and elsewhere in the State of Minnesota.

42.     The unlawful actions of the Defendants include but are not limited to the following incidents.

<u>ARRESTS</u>

43.     On May 29, a Minnesota State Patrol trooper handcuffed and arrested CNN reporter Omar Jimenez and his news crew during a live broadcast. It was daytime, there were no protesters around, and Jimenez asked the State Patrol where they should position themselves prior to being arrested, stating, "Put us back where you want us, we are getting out of your way, just let us know." When Jimenez further pressed the trooper who arrested him why he was being arrested, the trooper stated, "Look, I don't know man, I'm just following orders." The crew was readily identifiable as a CNN news crew

13

and identified themselves as such repeatedly before being handcuffed and arrested.[9]   The

crew was detained for an hour.

44.     Later that day, in response to the arrest of Jimenez and his crew, Governor

Walz issued the following statement:

> So to CNN, to the CNN team, to the journalists here, this is
> about having a plan, and that's what these folks are going to
> talk about. This is about having an aggressive approach to
> understanding what the community needs, to not coming in
> heavy-handed with them but to create space where the story
> can be told. In a situation like this, even if you're clearing an
> area, we have got to ensure that there is a safe spot for
> journalism to tell the story. The issue here is trust. The
> community that's down there that's terrorized by this, if they
> see a reporter being arrested, their assumption is it's because
> something's going to happen that they don't want to be seen.
> And so that is unacceptable. We will continue to strive to
> make sure that that accessibility is maintained. Not only that,
> the protection and security and safety of the journalists
> covering this is a top priority, not because it is a nice thing to
> do, because it is a key component of how we fix this.
> Sunshine, disinfectant and seeing what's happening has to be
> done.[10]

45.     Governor Walz's apology and plea to law enforcement to treat journalists

with respect and allow them to document the protests clearly fell on deaf ears, as the

unconstitutional arrests of journalists and unlawful violence against journalists escalated

significantly over the next several days.

---

[9] https://www.nytimes.com/2020/05/29/business/media/cnn-reporter-arrested-omar-
jimenez.html

[10] https://www.washingtonpost.com/opinions/2020/05/29/minnesota-governor-issues-
spectacular-apology-arrest-cnn-crew/

46.     On May 30, Plaintiffs Tannen Maury, Stephen Maturen, and Craig Lassig were arrested and charged with curfew violations despite having identified themselves as members of the press, as detailed below.[11]

47.     On May 30, a Minnesota State Patrol trooper forced WCCO videographer Tom Aviles to the ground and arrested him even though Aviles had identified himself as a member of the press and was carrying a large video camera.[12]   Video footage shows there were no protesters within 50 yards of Aviles, and he was not obstructing law enforcement.[13]   State Patrol shouted at him to "get back."  He responded, "where do I go, I'm with WCCO."  He then tried to retreat into a parking lot, shouting for his producer, Joan Gilbertson.  The State Patrol continued to pursue him into the parking lot.  At this point, Aviles wasn't even within 50 yards of the police line moving up the street adjacent to the parking lot.  Gilbertson also identified herself as a journalist.  A State Patrol trooper told her, "You've been warned, or the same thing will happen to you.  Or you're next."  Aviles spent two hours in custody.  Earlier, police had shot Aviles with a less-lethal projectile even though he was filming them with a large video camera at the time and was clearly identifiable as a member of the press.[14]

---

[11] https://twitter.com/MJKauz/status/1267273646621499392
[12] https://www.startribune.com/wcco-cameraman-arrested-on-video-while-covering-unrest-in-minnesota/570902742/
[13] https://minnesota.cbslocal.com/2020/05/30/wcco-photojournalist-tom-aviles-arrested-in-south-minneapolis/
[14] https://minnesota.cbslocal.com/2020/05/30/wcco-photojournalist-tom-aviles-arrested-in-south-minneapolis/

48.     On May 30, Alzo Slade, a reporter for VICE Media, and three colleagues, were arrested, zip-tied, and fingerprinted by Minnesota State Patrol troopers.  Slade and colleagues were covering the protests when they encountered a long line of law enforcement officers in riot gear blocking the street.  The officers began firing tear gas and spraying pepper spray into the crowd.  Slade and his colleagues ducked into an alleyway but were followed by officers in riot gear.  Slade and the others immediately announced that they were press, but the officers told them to get on the ground. They complied.  As the State Patrol troopers approached, Slade held up his credentials and said, "I'm press, I'm press."  The troopers ignored them and zip-tied their hands behind their backs.  The troopers loaded Slade and his colleagues into a wagon in the middle of the street.  Hennepin County Sheriff's Deputies brought Slade and his colleagues to the Hennepin County Jail, fingerprinted, processed, and cited them for failure to comply with a lawful order.  The Hennepin County Sheriff's deputies consummated the arrest and booking of these journalists despite knowing that they were in fact members of the press. The State ultimately dismissed the charges against these journalists, apparently upon the request of Minnesota Commissioner of Corrections Paul Schnell, after lawyers for VICE Media filed a complaint with the State.[15]

49.     While covering the protests on May 31, Star Tribune reporter Liz Sawyer identified herself as a journalist to MPD officers.  The officers told her, "we don't care,

_____

[15] https://pressfreedomtracker.us/all-incidents/vice-media-reporter-arrested-while-covering-minneapolis-protests/

we'll arrest you."[16]  Earlier that evening, Sawyer was standing with Star Tribune reporter Chao Xiong, two Kurdish journalists, and one Japanese journalist.  MPD officers told them to go home.  When the group identified themselves as press and showed their credentials, an officer said, "Your cards are bullshit."[17]

50.    On May 31, an MPD officer arrested NBC reporter Simon Moya-Smith, despite Moya-Smith identifying himself multiple times as a reporter and displaying his press badge for the arresting officer.[18]  A police officer pepper sprayed Moya-Smith during the arrest. At approximately 2:00 a.m., he was walking with a dozen or so activists who were on their way home from the protests in honor of George Floyd.  The group was a few blocks west from the location where George Floyd was murdered when 6 to 8 police cruisers surrounded them.  The officer in the passenger side of the lead car swung the door open, shouting, "Get on the ground!  Get the fuck on the ground!"  She pepper-sprayed the entire group one-by-one while they lay on the ground, peaceably complying with the officer's order to remain still.  One of the group members, a Native American woman who is an attorney, asked, "Are you literally macing us?"  The female officer responded by pepper spraying her in the face.

51.    Another police officer approached Moya-Smith, while officers in the background laughed.  The officer asked his name.  He responded, "My name is Simon Moya-Smith.  I am a reporter with NBC News.  My press badge is on my chest."  A third

---

[16] https://twitter.com/ByLizSawyer/status/1266984068765409280
[17] https://twitter.com/ChaoStrib/status/1266959110265856000
[18] https://twitter.com/SimonMoyaSmith/status/1267054164774916096

officer approached Moya-Smith, saying, "Roll on your side, Mr. Journalist. You're going to be charged with, I don't know, breaking curfew."

52. About 10 to 15 minutes later, Moya-Smith was still lying face down on the concrete sidewalk. A fourth officer approached, pulled him up by his right bicep, and walked him to a nearby police cruiser. Moya-Smith told this officer, "I am a journalist with NBC News." This officer eyed the press badge that was suspended from Moya-Smith's neck, shrugged, and loaded Moya-Smith into the back of the police cruiser. The police took him to the Fifth Precinct, and after he identified himself as a member of the media again to the officer who was beginning to book him, he was released.

53. Early on the morning of May 31, MPD officers detained and searched an Australian television news team led by Tim Arvier after they identified themselves as members of the press. During this detention the officers handcuffed the news team's cameraman, despite the fact that he was clearly a member of the news media and no threat to anyone.[19]

54. On May 31, the State Patrol threatened a German television news crew from the Deutsche Welle network with arrest, despite them having clearly identified themselves as members of the press.[20] Earlier that evening, law enforcement officers had shot at the DW crew with less-lethal projectiles, despite (or because of) the crew being

---

[19] https://twitter.com/TimArvier9/status/1266969637817909250
[20] https://twitter.com/N_Waters89/status/1267090303867125766

obviously identifiable as a news crew doing a live report and shouting, "we're press," at the officers.[21]

55.     MPD Policy 9-200(IV)(1) prohibits the arrest and detention of individuals recording police activity except under very limited circumstances that were not present in any of the incidents described above.   Specifically, the policy authorizes detention or arrest only when a person interferes with officer activity.  Per the policy, a person is not "interfering" if he or she is "recording officers' activity from a safe distance, without any action to obstruct the activity or threaten the safety of the officer . . ."   Even when those circumstances are present (which they were not here), officers must call a supervisor to the scene before detention or arrest.

56.     MPD's actions in detaining and arresting journalists during the Floyd protests violated this policy.  The violations were repeated and widespread and involved numerous different individual officers throughout the MPD.  The number and scope of the violations reflects the MPD's ongoing failure to train and supervise its officers in accordance with its own ostensibly official policies.

57.     Similarly, the State Patrol's unconstitutional arrest and detention of journalists was widespread and involved numerous different individual troopers and commanders throughout the State Patrol.  The number and scope of the violations reflects the State Patrol's ongoing failure to train and supervise its troopers.

---

[21] https://twitter.com/rafaelshimunov/status/1267824036878278659

58.     The HCSO played a key role in effectuating the unlawful and unconstitutional arrests of journalists during the George Floyd protests.  The HCSO operates and administers the Hennepin County Jail, at which a number of unlawfully arrested journalists were processed and detained, including named-plaintiffs Maury, Maturen, and Lassig.  On information and belief, HCSO also took custody of and transported unlawfully arrested journalists – including Maury, Maturen, and Lassig – to the jail.

<u>USE OF PHYSICAL FORCE</u>

59.     On May 26, Star Tribune reporter Andy Mannix was shot in the thigh with a less-lethal projectile while documenting the protests.[22]

60.     On May 27, Minnesota Reformer reporter Max Nesterak was shot in the chest by a less-lethal projectile while documenting the protests.[23]  He was filming the protests, and there were no protesters near him when he was shot.

61.     These early law enforcement attacks on journalists were widely documented in social media and covered by the press, including Time Magazine, and Defendants were on notice that officers were targeting journalists with less-lethal projectiles and violating journalists' constitutional rights.[24]

---

[22] https://twitter.com/AndrewMannix/status/1265447846079315973
[23] https://twitter.com/maxnesterak/status/1265863514754813952
[24] *E.g.,* https://time.com/5843070/george-floyd-minneapolis-protest-police-death/ ("A Minneapolis Star Tribune reporter said he was shot in the thigh with what appeared to be a foam bullet.").

62.     On May 28, Michael Shum was covering the protests for the New York Times.   He was positioned outside the Third Precinct, roughly 50 feet from any protesters.   He had a large shoulder-mounted camera and was clearly identifiable as a member of the press.   MPD officers fired flash-bang grenades directly at Shum while he was filming, and those munitions exploded right in front of his camera, despite the fact that Shum was standing alone with no protesters around.   At around 9 p.m. that night, police began to disperse the protesters who had gathered in front of the precinct.   Shum was still about 50 feet away from any protesters, filming with a shoulder-mounted camera.   MPD officers nonetheless began shooting less-lethal projectiles and tear gas at Shum and a group of other journalists gathered nearby, including Star Tribune photographer Richard Song-Tatari.   Police did not give any warning or order to disperse before opening fire on Shum.   One projectile ricocheted off a wall or the ground and hit Shum in the side.   Another projectile hit Shum directly in the foot, injuring him.

63.     On May 29, freelance photographer Philip Montgomery was covering the protests at the Third Precinct.[25]   He was standing away from the protesters with a group of other news photographers, including Scott Olson from Getty Images, Victor Blue of the New York Times, John Minchillo from AP, and Lucas Jackson from Reuters.   All the photographers had their press badges out and visible, and they were documenting the protests with their professional photography gear.   Minchillo was wearing a vest with "PRESS" written on the front in large letters.   The group was clearly identifiable as

---

[25] The facts alleged in Paragraphs 54-59 are drawn in part from the Declaration of Phillip Montgomery submitted in support of this Complaint.

21

journalists and was not standing amidst or near the protestors.  They were not obstructing any crowd control activity being undertaken by law enforcement.  They were not provoking law enforcement.  They were simply standing to the side documenting what was going on.  Around midnight, law enforcement moved to clear out the protests.

64.     At that same time, without warning, a group of law enforcement officers, including MPD officers and Minnesota State Patrol troopers, moved in front of the small cluster of photographers and began to advance.  As they closed in on the photographers, they fired tear gas canisters and rubber bullets directly into the group.  One officer advanced until he was roughly 15 feet away from Montgomery.  The officer raised and pointed his riot control gun at Montgomery and fired a less-lethal projectile into Montgomery's chest.  The officer aimed directly at Montgomery even though he was clearly identified as a member of the press.

65.     The force of the blow from the projectile shocked Montgomery, and created a large, long-lasting bruise where he was hit, directly over his heart.  The injury affected his ability to continue documenting and reporting on the protests.  Other photographers in that group were also hit, including Lucas Jackson, Victor Blue, and John Minchillo.  The troopers and officers clearly targeted the group even though they were obviously journalists, not provoking or obstructing law enforcement, and were merely standing peaceably to the side exercising their First Amendment rights.  Minchillo stated in a social media post, "No distinctions were made . . . when I and my colleagues were hit by officers.  Last night was full force in a wide spread.  This is a protocol that I've not seen

elsewhere."[26]   The guns used to fire these less-lethal projectiles are equipped with sights

for precision aiming, as shown in this photograph taken by Minchillo:



66.     On May 30, Star Tribune reporters Ryan Faircloth and Chao Xiong were

trying to leave the protests in Faircloth's car.  They mistakenly turned down a street that

was blocked off at the end. Before they could turn around, the State Patrol fired less-

lethal projectiles at the car, without warning.  Later, when Faircloth was driving alone out

of the area, officers again fired less-lethal rounds at Faircloth's vehicle, injuring Faircloth

and blowing out the windows of the car.[27]

67.     On May 30, freelance journalist Linda Tirado was photographing the

protests when police or troopers shot her in the face with a less-lethal projectile.  She is

---

[26] https://twitter.com/johnminchillo/status/1267116569223725059
[27] https://twitter.com/RyanFaircloth/status/1266954131324928003

now permanently blind in her left eye.[28]  "I would say there is no way that anyone had looked at me and not known that I am a working journalist," she stated in an interview with the New York Times.  "That said, police have been pretty clear that they don't care if you are a working journalist."

68.    On May 30, MPD officers fired less-lethal projectiles at CBS reporter Michael George and his news crew, hitting sound engineer John Marschitz and severely bruising Marschitz's arm.[29]  The crew was not standing within 500 feet of any protesters at the time and had their credentials displayed and their cameras out.[30]  In a video of the incident, one of the crew members can be heard saying "they're sighting us in" as the less-lethal projectiles came closer and closer.[31]

69.    On May 30, police or troopers fired less-lethal projectiles at an MSNBC news crew, including reporter Ali Velshi, hitting Velshi in the leg.[32]  After this incident, police confronted Velshi and another TV crew in a nearly deserted parking lot.  The group informed the police that they were news media.  The officers responded, "we don't care," and began firing on the group with less-lethal projectiles.

---

[28] https://www.nytimes.com/2020/05/30/us/minneapolis-protests-press.html
[29] https://twitter.com/MikeGeorgeCBS/status/1266919447970942986
[30] https://twitter.com/MikeGeorgeCBS/status/1266916104951214080
[31] https://www.washingtonpost.com/politics/police-turn-more-aggressive-against-protesters-and-bystanders-alike-adding-to-violence-and-chaos/2020/05/31/588ad218-a32f-11ea-b619-3f9133bbb482_story.html
[32] https://www.washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482_story.html

70.     During the protests, a Fox 9 TV news crew was driving in their news van, with a placard placed on their windshield clearly indicating that the van belonged to Fox 9 News, when law enforcement fired less-lethal projectiles into the windshield, shattering it.

71.     On May 30, Reuters TV cameraman Julio-Cesar Chavez was filming police when one aimed a less-lethal projectile gun at directly at Chavez.  Later that evening, in a separate incident, police fired directly at Chavez and his crew with less-lethal projectiles.[33]  Chavez was hit in the back of his neck, under his left eye, and on his arm. A member of his crew was also hit.  They were clearly identifiable as press at the time.[34]

72.     On May 30, law enforcement pepper sprayed photojournalist Lucas Jackson in the face and also shot him in the back with a less-lethal projectile.[35]  Jackson stated in a social media post, "It's not that we were being shot because we were between cops and protesters. It's that we were shot at if we were anywhere in line of sight.  I've been hit because I was in the wrong place before.  I've never been aimed at so deliberately so many times when I was avoiding it."[36]

73.     On May 30, law enforcement hit CBC senior news correspondent Susan Ormiston in the shoulder with a less-lethal projectile and in the back with a tear gas

[33] https://www.reuters.com/article/us-minneapolis-police-protest-update/reuters-camera-crew-hit-by-rubber-bullets-as-more-journalists-attacked-at-us-protests-idUSKBN237050
[34] https://www.washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482_story.html
[35] https://twitter.com/Lucas_Jackson_/status/1266666583012892672
[36] https://twitter.com/Lucas_Jackson_/status/1267114291532046338

canister.  At the time they shot her, she was in a parking lot that had been cleared of protesters, and she and her crew were clearly identifiable as media.[37]

74.    On May 30, an MPD officer fired a flash bang grenade directly into an MSNBC news crew led by reporter Morgan Chesky, despite the fact that Chesky was live on television and he and his crew were clearly identifiable as news media.[38]

75.    On May 30, law enforcement shot a Univision cameraman who was clearly identifiable as a member of the media with a less-lethal projectile.  The projectile hit the battery used to power his large commercial video camera, and the battery exploded, burning the cameraman.

76.    On May 30, Michael Shum was again covering the protests for the New York Times.  In the early evening, around dusk, Minnesota State Patrol troopers began moving down Nicollet Avenue, near the MPD's Fifth Precinct building, where Shum and several other journalists were standing off to the side, filming the protests.  Again, Shum was filming with a large shoulder mounted camera and clearly acting as a member of the news media.  As Minnesota State Patrol pushed down the block, firing tear gas and projectiles, Shum and other journalists took shelter in a little gated area off the sidewalk.  Shum continued to film as the troopers approached, and then turned to try and escape this area when the troopers also left the sidewalk and pursued the journalists into the gated area where they were sheltering.  By this time, it was clear to Shum that law enforcement was attacking journalists with impunity, and he sought to escape the gated area.  Shum

---

[37] https://twitter.com/mcquillanator/status/1266915485741993996
[38] https://twitter.com/AndyRowell/status/1266946038373347328

climbed onto a half wall, hoping if he got to the other side he would be protected from attack by law enforcement.   As he climbed onto the wall, two State Patrol troopers approached and shoved him off the wall.   As they shoved Shum, one of the troopers said, "get the fuck off of there."   Shum fell to the ground on the opposite side of the wall and suffered several scratches, bruises, and cuts.   The troopers who pushed Shum off the wall knew he was a journalist.   He was not among any protesters, was not impeding the advance of any law enforcement personnel and was merely seeking shelter with other journalists in this little enclosed area.

77.    On May 30, Los Angeles Times reporter Molly Hennessy-Fiske and photographer Carolyn Cole were also reporting on protests at the MPD Fifth Precinct building.[39]   The two were wearing their press credentials, and Cole wore a flak jacket labeled "TV."   They were standing on the sidewalk of a street bordering the Fifth Precinct building with a group of roughly 20 other journalists.   At around 8:30 p.m., a bullhorn announced, "this is the Minnesota State Patrol" and informed protesters that they must disperse because they were violating curfew.   A line of State Patrol troopers proceeded up the street, clearing it of protesters.   Hennessy-Fiske, Cole, and the group of journalists huddled against a wall that abutted the sidewalk.   Because they were journalists, they were exempt from the curfew.   Moreover, they were clearly separate

---

[39] The facts in paragraphs 57-61 are drawn in part from the Declaration of Carolyn Cole ("Cole Dec."), attached as Exhibit 2 to the First Amended Complaint, and the Declaration of Molly Hennessy-Fiske ("Hennessy-Fiske Dec."), attached as Exhibit 3 to the First Amended Complaint.

from the protesters, who were on the opposite side of the street. There was no legitimate law enforcement reason to force the group of journalists to move, let alone assault them.

78. Hennessy-Fiske expected the troopers walking up the street to pass by the journalists. Instead, the troopers turned toward the journalists and started firing less-lethal projectiles into the group. No protesters were nearby. Hennessy-Fiske shouted, "We're reporters!" "Wait!" and "Where do we go!" at the officers, and she waved her notebook at them.[40] The troopers did not respond. The troopers were only several feet away at this point, and they fired again into the group of journalists. Hennessy-Fiske was hit at least five times in the leg with less-lethal projectiles, and her leg was bleeding. Cole was shot in the face with pepper spray. The trooper fired from so close a distance, Cole could feel the full force of the pepper spray go into her left ear and eye. Cole suffered damage to her left cornea from the pepper spray. She spent more than a month recovering from her injuries at the hands of the State Patrol.

79. The journalists piled on top of each other in an attempt to get away from the law enforcement assault. Hennessy-Fiske pleaded with the troopers to tell her where to go but received no answer. They just kept firing. When the group of journalists tried to flee, the troopers chased them and fired more less-lethal projectiles. Hennessy-Fiske saw Plaintiff Ou next to her, stunned and bleeding from the face, having been hit directly in the forehead by an exploding concussion grenade. Hennessy-Fiske continued to flee

---

[40] https://www.latimes.com/world-nation/story/2020-05-30/la-reporter-tear-gas-police

the troopers and they cornered her against another wall.  She scaled it and sought shelter in the nearest building, a senior center.

80.     The group of press that Cole was with also ran from the firing troopers. They tried to move along the precinct wall, but it was not clear where the troopers wanted the journalists to go.  The troopers were yelling "Move! Move!" and continued firing on the journalists.  Cole was unable to see, so she followed along the wall with the other journalists until they reached another wall that was about 4 feet high that she could not get over. The troopers pursued the journalists into the corner yelling "Get out! Now!" Cole responded repeatedly, "I'm trying. I'm trying. I'm trying."   A trooper told Cole that she had to get out of there, lifted Cole up onto the wall, and Cole fell over to the other side.  Cole stumbled blindly through the neighborhood until local residents helped her and gave her a bucket to wash her face.  Because Cole's face continued burning, one of the local residents drove her to the emergency room along with Hennessy-Fiske, who had reconnected with Cole by this point.  While they were driving to the hospital, police fired a paint ball gun at the car marking it with red paint.  Cole had to stop covering the protests at this point due to the injury to her eye.[41]

81.     Hennessy-Fiske has covered protests involving police in Ferguson, Baton Rouge, Dallas, and Los Angeles.  She has covered the United States military in war zones, including Iraq and Afghanistan.   But she has never been fired at by law enforcement until her reporting in Minnesota.  Cole has covered conflicts both nationally

---

[41] https://www.latimes.com/world-nation/story/2020-06-01/they-came-toward-us-firing-pepper-spray-and-rubber-bullets

and internationally for many years. She is familiar with the dangers involved in such situations, especially when reporters get between riot police and protesters. But she was shocked when the troopers directly attacked her and Hennessy-Fiske. In fact, this was the first time in Cole's 25 years of reporting for the Los Angeles Times that she has been injured covering a protest or other event.

82. Among the munitions used against journalists were the 40mm Skat Shell (which is a delivery device for chemical agents) and the Direct Impact LE 40mm Extended Range Round.

83. According to Defense Technology, Inc., the manufacturer of the 40mm Skat Shell: "The 40mm Skat Shell® is designed for outdoor use and has fire producing capability. It is not intended for barricade penetration. Do NOT fire directly at personnel, as serious injury or death may result."[42]

84. Defense Technology, Inc., also manufactures the Direct Impact 40mm Extended Range Round. It states: "The Direct Impact® Extended Range Round should only be used at ranges beyond 10 meters, targeting the subject's lower torso or extremities. Impacts closer than 10 meters or targeting the subject's head, neck, or upper torso can result in serious injury or death."[43]

---

[42] https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw66a06e0e/product-pdfs/less-lethal/40mm_Skat_Shell.pdf
[43] https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw7cc762e7/product-pdfs/40mm%20Direct%20Impact%20LE%20Extended%20Range%20Round.pdf

85.     The MPD's own use of force policy prohibits using the 40mm projectiles as they were deployed during the George Floyd protests, stating: "Officers shall not deploy 40mm launchers for crowd management purposes."  Instead, the 40mm projectiles are to be used with "combative, non-compliant, armed and/or otherwise violent subjects . . . ."[44]

86.     The MPD use of force policy further warns against firing 40mm projectiles at an individual's head or chest: "Officers shall be aware that the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to a permanent physical or mental incapacity or possible death.  Areas susceptible to death or possible severe injury are the head, neck, throat and chest (in vicinity of the heart)."  The policy indicates that firing 40mm rounds at the chest or head constitutes the use of "deadly force."[45]

87.     On information and belief, MPD and the Minnesota State Patrol fired both the Skat Shell and the Direct Impact Round at journalists in a manner contrary to the manufacturer's warnings and likely to cause injury, in contravention of their own written policies on use of force, and in fact resulting in injury in numerous instances.  For example, Plaintiff Goyette was struck in the face with a 40mm round and injured. Journalist Linda Tirado was struck in the face and blinded in one eye by a 40mm round. Photojournalist Philip Montgomery was struck directly above the heart at close range by a 40mm round.  Any one of these three individuals could have been killed by this outrageous and wholly unjustified use of deadly force.  MPD's use of precision gunsights

---

[44] http://www.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300
[45] http://www.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300

to aim directly at protesters' and journalists' heads and hearts shows that these officers acted with actual malice and with the intent to severely and potentially critically injure protesters and journalists.

88.     MPD officers repeatedly violated its policy regarding use of force during the George Floyd protests.  These violations were repeated and widespread and involved numerous different individual officers throughout the MPD.  The number and scope of the violations and their continued occurrence day after day reflects the MPD's ongoing failure to train and supervise its officers in accordance with its own ostensibly official policies.

89.     Similarly, the State Patrol's unconstitutional use of force against of journalists was widespread and involved numerous different individual troopers and commanders throughout the State Patrol.  The number and scope of the violations reflects the State Patrol's ongoing failure to train and supervise its troopers.

<u>USE OF CHEMICAL AGENTS</u>

90.     On May 28, Star Tribune columnist Jennifer Brooks was standing at a light rail station on S. 5th Street documenting the protests in a group of other media members. Several MPD squad cars drove by unimpeded.  As Squad Car 181 passed the journalists, the driver's side window rolled down and the driver indiscriminately pepper sprayed Brooks, other media members, and nearby protesters.[46]

---

[46] https://twitter.com/stribrooks/status/1266186985041022976

91.    On May 29, USA Today reporter Tyler Davis was covering the protests in downtown Minneapolis.  Several squad cars pulled up at his location.  Police got out of the squad cars and began indiscriminately spraying pepper spray in every direction and telling people to move north.  Davis was filming two young women being pepper sprayed to his left, when the officer doing the spraying turned to Davis.  Davis identified himself as a member of the media, and the officer "laid on the trigger for a few seconds" spraying Davis directly in the face.[47]

92.    On May 30, an MPD officer aimed a rifle directly at Vice magazine journalist Michael Adams while Adams was covering the protests.  At the time, Adams and other journalists clustered near him were holding up their press passes.  Shortly thereafter, an MPD officer approached Adams with a weapon pointed directly at him and threw him to the ground.  He was displaying his press pass and shouting "press."  The officer responded, "I don't care."  Adams was on his knees, alone, clearly not a threat, and was surrounded by more than a dozen officers.[48]  The officer who threw Adams down told him not to move.  Adams complied.  Another officer slowly walked by Adams.  When Adams again said, "I'm Press," and held up his credential, this officer casually pepper-sprayed Adams directly in the face from several inches away, then continued strolling while Adams writhed on the ground in agony.[49]

---

[47] https://www.usatoday.com/story/opinion/2020/05/29/george-floyd-protests-leave-usa-today-reporter-hit-chemical-spray/5282374002/
[48] https://twitter.com/MichaelAdams317/status/1267203751913422849
[49] https://twitter.com/MichaelAdams317/status/1266945268567678976?s=20

93.   KSTP investigative reporter Ryan Raiche, his photographer, and his producer, were gathered with a group of other media members during protests on the evening of May 30 outside the Fifth Precinct.  Most had large cameras, boom mikes, or visible press credentials.  The group was clearly identifiable as media and not spread out among the protesters.  They were pinned against a wall together as a line of State Troopers commanded by Defendant Dwyer advanced toward the group.  State Troopers walked up to the group and indiscriminately pepper sprayed the entire group of journalists.[50]

94.   On May 30, Star Tribune photographer Anthony Souffle was tear gassed by police or troopers.[51]

95.   The MPD use of force policy states that Chemical Agents "shall not be used against persons who are only displaying Passive Resistance as defined by policy."  It further states that officers "shall exercise due care to ensure that only intended persons are exposed to the chemical agents."[52]

96.   MPD officers wantonly violated these policies in its use of chemical agents against journalists and others during the George Floyd protests.  These violations were repeated and widespread and involved numerous different individual officers throughout the MPD.  The number and scope of the violations and their continued occurrence day

---

[50] https://twitter.com/ryanraiche/status/1267021649959845888
[51] https://twitter.com/AnthonySouffle/status/1267122936105893892
[52] http://www.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300

after day reflects the MPD's ongoing failure to train and supervise its officers in accordance with its own ostensibly official policies.

97.     Similarly, the State Patrol's unconstitutional use of chemical agents against of journalists was widespread and involved numerous different individual troopers and commanders throughout the State Patrol.  The number and scope of the violations reflects the State Patrol's ongoing failure to train and supervise its troopers.

<u>USE OF THREATENING LANGUAGE AND GESTURES</u>

98.     On May 30, Star Tribune reporter Chris Serres was twice ordered at gunpoint by MPD officers to "hit the ground," and warned that "if [he] moved an inch [he'd] be shot," despite prominently displaying his Star Tribune press badge for the police.[53]  He had already been tear gassed and shot in the groin with a less-lethal projectile earlier in the day.

99.     Maggie Koerth, a reporter for the website FiveThirtyEight was covering the protests from a sidewalk on May 30.  An MPD officer drew a weapon on Koerth and Plaintiff Jared Goyette.  Koerth and Goyette said "press, press" and held up their press badges.  The officer continued to point the gun at Koerth and told Koerth to "Shut up."[54]

100.    On May 30, MPR reporter Madeleine Baran was covering the protests with American Public Media journalist Samara Freemark.  An MPD officer pointed a weapon

---

[53] https://twitter.com/ChrisSerres/status/1267098060938776581
[54] https://www.nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html?smid=tw-share

at their heads.  When they identified themselves as press, the officer did not lower his weapon, so they ran for cover and ended their reporting for the night.[55]

101.   On May 31, MPD officers in a truck pulled up to a group of reporters, including Star Tribune reporter Andrew Mannix, pointed a "large gun" at the group and shouted, "do you know what curfew is?"   After the reporters notified the officers that they were journalists and walked to their cars, the officers ordered them to leave the area.[56]

102.   Graphic images taken during the protests show the trauma wrought by Defendants' unconstitutional actions.

---

[55] https://twitter.com/madeleinebaran/status/1266610933071138816
[56] https://twitter.com/AndrewMannix/status/1266968276481052672?s=20

103.   Below is a photograph of Plaintiff Edward Ou, who was pepper sprayed
and hit directly in the forehead with a concussion grenade:



104.   Below is a photograph of freelance journalist Linda Tirado.   The MPD permanently blinded Ms. Tirado in her left eye with a less-lethal projectile.



105.   Below is the photograph Ms. Tirado took immediately before the police took a potshot at her head and blinded her.[57]



[57] https://www.patreon.com/posts/38226327

106.    Below is a photograph of KSTP reporter Ryan Raiche after State Troopers pepper sprayed him, despite him identifying himself as a member of the press:



107.   Below is a photo that Reuters cameraman Julio-Cesar Chavez took of law enforcement taking direct aim at him, despite his being clearly identifiable as a member of the press:



108.   Below is an image of the arrest of Omar Jimenez and his news crew:



109.    Below are images published by Molly Hennessy-Fiske of the types of less-lethal projectiles law enforcement fired at journalists.





110.    Below is a photograph of Molly Hennessy-Fiske's injuries one week after the State Patrol shot her with less-lethal projectiles.[58]



---

[58] https://twitter.com/mollyhf/status/1269008792194297866

## D.   DEFENDANTS' FEEBLE RESPONSE TO LAW ENFORCEMENT MISCONDUCT AT THE GEORGE FLOYD PROTESTS.

111.   Defendants' unconstitutional conduct and abuse of journalists during the George Floyd protests was met with widespread, international condemnation.

112.   In the wake of the Omar Jimenez arrest, on May 29, 2020, Governor Walz stated: "I take full responsibility.   There is absolutely no reason something like that should happen.   Calls were made immediately.   This is a very public apology to that team. . .   The idea that a reporter would have been taken . . . was inexcusable."   Walz stressed the importance of media coverage of law enforcement crowd control actions to ensure public trust in law enforcement and government: "The issue here is trust. The community that's down there that's terrorized by this, if they see a reporter being arrested, their assumption is it's because something's going to happen that they don't want to be seen. And so that is unacceptable."   Walz even stated, "the protection, security, and safety of the journalists covering [the George Floyd protests] is a top priority."[59]

113.   After this statement, Walz gained kudos from the "PR News," for showing "strong crisis chops in [the] Jimenez arrest."[60]

114.   Despite this admirable display of "crisis chops" by Governor Walz, there has been no investigation of the arrest of Omar Jimenez or any discipline of the arresting officers or their commanders.   In fact, according to testimony from Commissioner Harrington on July 28, 2021, not a single trooper was disciplined for the misconduct that

---

[59] https://www.cnn.com/videos/us/2020/05/29/minnesota-governor-tim-walz-omar-jimenez-arrest-vpx.cnn
[60] https://prnewsonline.com/jimenez-arrest-crisis-floyd/

occurred during the George Floyd protests in the 14 months after the misconduct occurred. Not surprisingly, given this ratification of their misconduct by the State Defendants, the State Patrol engaged in the exact same (and in some instances worse) unconstitutional conduct against the press during the 2021 Daunte Wright protests.

115. On June 2, 2020, the Committee for Freedom of the Press sent a letter to Commissioner Paul Schnell and Governor Walz's General Counsel Karl Procaccini regarding the unconstitutional conduct of law enforcement.[61] The letter sets forth in detail the legal basis for journalists' ability to exercise their First Amendment rights during protests, as well as the restrictions on law enforcement's ability to interfere with journalists lawfully doing their job. The letter was copied to Defendants Langer and Harrington. It was co-signed by 155 media companies and news organizations – from Fox News and Sinclair Broadcasting to ProPublica and Mother Jones.

116. [SEALED] █████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[61] https://www.rcfp.org/wp-content/uploads/2020/06/6-2-20_Letter_to_MN_Officials.pdf

117.   [SEALED] ███████████████████████████████



118.   On September 29, 2020, Hennessy-Fiske tweeted that while she had submitted a complaint to the State Patrol, including photo and video of State Patrol's assault of her and Carolyn Cole, and her injuries, and a list of witnesses, nothing had been done.  Hennessy-Fiske stated she then filed a second complaint about the inadequate process.[62]

119.   On November 6, 2020, Hennessy-Fiske tweeted that six months had passed since her complaint, with no response from the State Patrol.[63]

120.   On November 24, 2020, Hennessy-Fiske tweeted:  "Update: @MnDPS_MSP illegally attacked me and other journalists six months ago and has yet to

---

[62] https://twitter.com/mollyhf/status/1311084827702177792
[63] https://twitter.com/mollyhf/status/1324807550123036672

apologize/take corrective action.  #Minnesota is still investigating my complaint and has refused to supply public records showing who attacked us and what they've done to investigate."[64]

121.   [SEALED]



122.   [SEALED]

[64] https://twitter.com/mollyhf/status/1331340407234588677



123.    On April 17, 2021, Hennessy-Fiske tweeted in response to footage of troopers photographing and cataloging the media at the Daunte Wright protests: "It's been nearly a year since @MnDPS-MSP assaulted us and they have yet to release records we've requested – including the names of the officers who assaulted us – so this does not surprise me at all."

124.    On May 26, 2021, Hennessy-Fiske and Carolyn Cole filed a separate Section 1983 lawsuit against the State Patrol, alleging among other things that the State Patrol's assault on them while they were covering the George Floyd protests, and the State Patrol's flagrant disregard for this Court's Temporary Restraining Order issued in the wake of the State Patrol's attacks on journalists at the Daunte Wright protests, "amply

demonstrates that the State Patrol does not care about the First and Fourth Amendment rights of the media and the general public."

## THE DAUNTE WRIGHT PROTESTS

A.    **DAUNTE WRIGHT'S KILLING AND THE ENSUING UNREST.**

125.    On April 11, 2021, a Brooklyn Center police officer shot and killed Daunte Wright, an unarmed Black man, during a traffic stop purportedly initiated because of Wright's expired automobile tabs.

126.    As with the killing of George Floyd, the killing of Daunte Wright generated large protests against law enforcement violence and discrimination.   These protests occurred primarily outside the Brooklyn Center City Hall where the Brooklyn Center Police Department is headquartered.

127.    And as with the George Floyd protests, local, national, and international media traveled to Brooklyn Center to cover the protests and the police response.   The situation was heightened – and the media presence increased – by the ongoing criminal trial of Derek Chauvin, the MPD officer who murdered George Floyd, taking place just a few miles away in downtown Minneapolis.

B.    **CURFEWS ESTABLISHED BY EXECUTIVE ORDER.**

128.    On April 12, 2021, Governor Walz signed Emergency Executive Order 21-17 declaring a peacetime emergency in the wake of the killing of Daunte Wright and ordering "state agencies, in cooperation with appropriate federal agencies, to assist local units of government as they respond to and recover from this emergency."

129.    Also on April 12, 2021, Governor Walz signed Emergency Executive Order 21-18.  It imposed a curfew on all public areas within Anoka, Dakota, Hennepin and Ramsey counties from 7:00 p.m. on April 12 until 6:00 a.m. on April 13.  The curfew specifically exempted members of the news media.

## C.    DEFENDANTS' UNCONSTITUTIONAL CONDUCT AGAINST THE PRESS COVERING THE DAUNTE WRIGHT PROTESTS.

### ARRESTS

130.    On April 12, a photojournalist working for the New York Times was covering the protests.  A Minnesota State Patrol Captain recognized the journalist, rushed out of a line of troopers, and grabbed him.  The trooper then pulled the journalist behind the line.  Another trooper held the journalist's hands behind his back and took his phone.  The journalist asked the trooper why he was being held and his phone seized, and the trooper responded: "Because that's our strategy now."[65]

131.    On April 13, law enforcement introduced a new First Amendment violation into its response, issuing orders to media to disperse or face arrest prior to cracking down on the protests.  Veteran CNN reporter Sara Sidner stated, "I have NEVER heard police in America actually say 'journalists will be arrested during a protest.'  But that happened in #BrooklynCenter last night."[66]

132.    On April 13, State Troopers threw CNN producer Carolyn Sung to the ground, zip-tied and arrested her while she was covering the protests, despite her showing

---

[65] https://www.rcfp.org/wp-content/uploads/2021/04/Ballard-Spahr-Minnesota-Walz-Protest-Journalist-Letter-April-17-2021.pdf
[66] https://twitter.com/sarasidnerCNN/status/1382338180993716230

her CNN credentials to the State Troopers. Sung repeatedly identified herself as a member of the press and told the troopers that the zip-ties were too tight. Sung is Asian-American. One trooper yelled at her, "Do you speak English?!" during the arrest.

133. After arresting Ms. Sung, State Troopers prepared a knowingly false "Statement of Probable Cause to Detain" to justify their arrest, detention and transport of Ms. Sung to the Hennepin County Jail for processing. This false report prepared by the State Patrol stated that Sung had "defied several dispersal orders," was "actively defiant" to State Troopers, "refused to leave the area," and "participated in vandalizing and rioting activity." State Troopers concocted these lies about Ms. Sung to justify her unlawful detention and cover up their own misconduct. Sung, through her counsel, asked the State Patrol to correct this blatantly false report and they refused to do so.

134. Sung was transported to Hennepin County Jail. HCSO deputies patted her down, fingerprinted her, and ordered her to strip and don an orange jumpsuit, despite Sung identifying herself as a member of the media. The HSCO held Sung in custody until attorneys for CNN secured her release.[67] As with named-plaintiffs Maury, Maturen, and Lassig, Sung's unlawful arrest was followed by continued unlawful and unconstitutional detention, and treatment, at the hands of the HCSO.

135. State Trooper Sgt. Andrew Derungs submitted a false sworn Statement of Probable Cause to justify the arrest and detention of Sung. The statement falsely stated Sung was defiant, had to be restrained by several officers, was part of an antagonistic

---

[67] https://www.cnn.com/2021/04/19/media/minnesota-protests-coverage-reliable-sources/index.html

crowd, and had participated in vandalism and rioting, all of which Derungs knew was untrue.

136.   The HCSO Criminal Intelligence Division added information regarding Ms. Sung to a Dossier of photographs of individuals that HCSO purports were involved in "planned events, protests, and rallies."  This Dossier was maintained by the HCSO and reviewed internally, and on information and belief contains photographs and information of other clearly identifiable journalists.  It will apparently be used to profile, monitor, and target individuals at future protests.

137.   The HCSO was well-aware of its obligation to safeguard the First Amendment rights of Ms. Sung and the other journalists, and intentionally violated their First Amendment rights despite this knowledge.

138.   On April 13, State Troopers pushed foreign reporter Adam Gray to the ground, arrested him, handcuffed him, and cited him with failure to follow a lawful order. At the time, Gray was reporting for the United Kingdom-based South West News Service.  He was clearly identifiable as a member of the press, carrying two large professional cameras in addition to press credentials issued by the New York City Police Department.  State Troopers in full riot gear charged him and shoved him into the grass despite his pleas that he was a member of the press trying to return to his car.  Troopers ziptied his hands while he was face-down in the grass before rolling him over and standing him up.  They then arrested him, took him to a patrol car and cited him for "failure to obey a lawful order."  While Gray was in custody, he heard an announcement over the patrol car radio that arrested journalists were to be charged with failure to

disperse rather than unlawful assembly. Shortly thereafter, another announcement came over the radio, instructing troopers to release members of the press.[68]

139.   On April 13, Minneapolis Star Tribune reporter Kim Hyatt was reporting on the protests when she was grabbed by a law enforcement officer and told to leave the area, despite waving a large yellow press badge at the officer.[69] Per Hyatt, law enforcement ordered press to leave the area because of the curfew, even though press remained exempt from the curfew.

140.   On April 13, journalist Naasir Akailvi was arrested and cited while reporting on the protests. Police were smashing a car's windows for some reason, and Akailvi was filming the incident. A law enforcement officer grabbed Akailvi from behind, pulled him to the ground and ziptied Akailvi's hands behind his back. Akailvi told the officer, "I'm press, I'm press." He had media credentials on his person and tried to present them to the officer. The officer took Akailvi's camera, microphone, and tripod, and told Akailvi he would be charged. Akailvi was cited for "failure to obey a lawful order" for failing to disperse when law enforcement ordered media to leave the area.[70]

---

[68] https://pressfreedomtracker.us/all-incidents/photographer-arrested-cited-while-covering-brooklyn-center-protests/
[69] https://pressfreedomtracker.us/all-incidents/minneapolis-star-tribune-reporter-grabbed-ordered-to-disperse-during-brooklyn-center-protest/
[70] https://pressfreedomtracker.us/all-incidents/journalist-cited-while-reporting-on-brooklyn-center-protest/

141.    Other journalists commented on Defendants' aggressive behavior.  CNN journalist Miguel Marquez stated, "I've only seen [behavior like that] in Afghanistan when U.S. forces were trying to control a local population."[71]

142.    On April 13, Josh McFadden, a freelance journalist on assignment with the New York Times was covering the protests at the Brooklyn Center police station.  As law enforcement became increasingly aggressive with the crowd, McFadden decided to leave for his own safety, aware that law enforcement had been targeting journalists, and because law enforcement repeatedly announced: "press go home or you will be arrested." McFadden is Black, so his fear of the potential law enforcement reaction was heightened. Moreover, McFadden had been shot with less-lethal munitions during the George Floyd protests despite being clearly identifiable as a member of the press and far away from any protesters, and he feared being shot again.

143.    McFadden was not able to walk directly to his rental car, so he walked in the opposite direction to a gas station up the street from the protests.  He hesitated to walk to his car alone, but then saw another freelance photographer he recognized – named plaintiff Chris Tuite.  The two photographers were offered a ride by another individual leaving the protests, and they gratefully accepted.  Almost immediately after they got into the car, State Troopers surrounded the car and began beating on it with their batons and

---

[71] https://www.cnn.com/2021/04/19/media/minnesota-protests-coverage-reliable-sources/index.html

the butts of their guns, shouting for the passengers to get out.[72]  Troopers were hitting the windshield and windows so hard with their batons that McFadden thought all the windows were going to shatter.  Law enforcement opened the front door of the car and pulled the driver out.  McFadden was terrified. Then officers opened the left side rear passenger door next to McFadden and began beating on his legs, as well as the camera sitting on his lap, with batons.  McFadden was shouting, "I'm Press!  I'm Press!" but the officers were not listening to him.  He stated later, "It was definitely scary – I've never been in a situation like that with so many police officers hitting me, hitting my equipment."[73]  Finally, after Tuite told the law enforcement officers McFadden was a member of the press and with the New York Times, they gave McFadden space to exit the car.[74]

144.    Tuite is white.  Though he had only an independent press credential made by a friend on him, after he informed law enforcement he was a member of the press and showed his ID, they released him to return to his car.  McFadden had a credential issued by the National Press Photographers Association, but law enforcement would not let him go.  Tuite vouched for McFadden as a member of the press, and eventually, after a standoff, the officers allowed McFadden to leave.  McFadden stated, "I do know it's

---

[72] https://pressfreedomtracker.us/all-incidents/officers-point-weapons-at-photojournalist-pull-him-out-of-car-at-brooklyn-center-protest/
[73] https://www.nytimes.com/2021/04/18/business/minnesota-journalists-assault-protests.html?smid=tw-share
[74] https://pressfreedomtracker.us/all-incidents/photojournalist-hit-by-officers-with-batons-during-brooklyn-center-protest/

because Black members of the press are treated differently.  And I have to acknowledge that."[75]

145.    On April 14, State Troopers ordered National FOX News reporter Lauren Blanchard and crew out of their vehicles, forced them to kneel, and photographed their press credentials.

146.    On April 14, State Troopers assaulted and arrested independent journalists Naasir Akailvi and Tracy Gunapalan of the online Neighborhood Reporter.  Akailvi and Gunapalan were returning to their car as the protests dwindled.  As they were departing, they stopped to film an interaction between police and protesters.  At this point, a line of State Troopers in riot gear began running up the street at Akailvi and Gunapalan.  The pair waived their camera and microphone and shouted that they were press, but the troopers yelled at them to move, so they started running.  As they were running, a trooper shoved Akailvi to the ground.  Another shoved Gunapalan to the ground.  A trooper pulled the microphone out of Akailvi's hand, and as he was falling the battery pack for his camera fell from his backpack.  The trooper sat on Akailvi's back and handcuffed him.  A different trooper handcuffed Gunapalan.[76]

147.    According to Gunapalan: "The whole time I kept yelling, 'I'm press, I'm press!' and they didn't seem to care."  Akailvi told the troopers he was press and had a press pass around his neck.  Another trooper said, "That doesn't always work, does it?"

---

[75] https://pressfreedomtracker.us/all-incidents/photojournalist-hit-by-officers-with-batons-during-brooklyn-center-protest/

[76] https://pressfreedomtracker.us/all-incidents/local-social-media-journalists-detained-while-covering-brooklyn-center-protest/

Akailvi continued to state he was press and asked to speak to a supervisor.  The trooper responded, "you can get the fuck out of here."  Troopers then brought Akailvi and Gunapalan to an area where another independent journalist was being detained.  Troopers photographed their faces, credentials, and press passes and released them.  After being processed and released, Akailvi returned to the area where he had been stopped to try to find his microphone and battery pack.  He found the microphone more than 15 feet from where he had been pulled to the ground.  It was broken into multiple pieces and destroyed.  He never located his battery pack.[77]

148.  On April 14, photojournalist Niko Georgiades of the online news organization Unicorn Riot was with a group of journalists several blocks from the Brooklyn Center police station.  The protests were winding down.  National Guard troops were loading up to leave with their vehicles, and a group of people were shouting at the Guard troops and antagonizing them.  This appeared to prompt the State Troopers and other law enforcement to arrest the protesters.  A line of troopers and other law enforcement officers started running toward Georgiades and the other journalists.  Georgiades initially ran to get away from the advancing officers, but then stopped and identified himself as a journalist.  One of the officers told Georgiades he was under arrest.  Georgiades said: "For what, I'm not doing anything!"  The officer shouted, "stop resisting," even though Georgiades was not resisting and stated, "I'm not resisting, I'm press."  The officers handcuffed Georgiades.  One officer pulled Georgiades' wireless

---

[77] https://pressfreedomtracker.us/all-incidents/social-media-journalists-detained-while-covering-brooklyn-center-protest/

microphone from his pocket, threw it on the ground, and kicked it.   The officers eventually released Georgiades after they photographed his face and press credentials.[78] Georgiades captured the events on video.   It shows Gunapalan and Akavili fleeing the charging group of law enforcement.   It also clearly shows law enforcement telling Georgiades he was under arrest.   The video confirms that there were no protesters within 100 yards of Georgiades, Gunapalan, and Akavili when law enforcement attacked them.

149.   In addition to unconstitutionally arresting or detaining journalists, Defendants repeatedly forced journalists to locations from which they could not witness, document, or report on the law enforcement response to the protesters.[79]

150.   After the Court issued the TRO in this case on April 16, State Defendants initiated a new strategy of intimidation and control in violation of the First Amendment – the detention, photographing, and cataloging of journalists – which even Governor Walz conceded "created a pretty Orwellian picture" of Minnesota law enforcement.[80]

151.   Many journalists were detained in this fashion.   Freelance journalist J.D. Duggan was with a group of journalists on April 16 whom State Troopers surrounded and forced to the ground.   When Duggan got down to his knees, an officer pushed him onto his stomach before photographing his credentials.[81]

---

[78] https://unicornriot.ninja/2021/police-break-equipment-shoot-beat-and-detain-press/
[79] https://twitter.com/JDugganMN/status/1382541484524777475
[80] https://www.startribune.com/gov-tim-walz-calls-assault-detention-of-journalists-covering-protests-unacceptable/600047293/?utm_campaign=04_25_2021&utm_medium=email&utm_source=tpfp_newsletter&utm_content=star_tribune_article
[81] https://twitter.com/JDugganMN/status/1383260154758533129

152.   Below is a photograph of State Troopers surrounding journalists whom they forced onto their stomachs prior to photographing their driver's licenses, press credentials, and faces for "easier processing":[82]



153.   Similarly, USA Today photojournalist Jasper Colt reported that troopers rounded up protesters and members of the press in one group and told everyone to lie down on their stomachs.  Officers identified people who were members of the media and brought them to another area where they photographed journalists' credentials, IDs, and their faces.  Said Colt, "They were the ones with the guns, so we were like, 'OK, well, we

---

[82] https://twitter.com/jaspercolt/status/1383285891104342023/photo/2

have to do this.'"[83]   Reuters photojournalist Leah Millis[84] and WCCO reporter Reg

Chapman (and crew) were others among the multitude of journalists detained and

photographed.  Below is an image of Millis being detained and photographed:



154.   Star Tribune journalists Liz Sawyer and Susan Du were similarly

photographed and catalogued, as video taken by Sawyer records.[85]

155.   One journalist managed to escape the photographing and cataloging

process.   State Troopers pulled independent photojournalist Jon Farina aside for

"processing."   Farina objected to being photographed, telling the trooper who had

---

[83] https://pressfreedomtracker.us/all-incidents/usa-today-photojournalist-detained-during-brooklyn-center-protest/

[84] https://pressfreedomtracker.us/all-incidents/reuters-photojournalist-detained-at-brooklyn-center-protest/

[85] https://twitter.com/MDVancleave/status/1383265657601413125

detained him that the process was unconstitutional.   The trooper called over his lieutenant, and Farina continued to explain that the so-called "processing" was unconstitutional.   After repeatedly registering Farina's objections, the lieutenant allowed Farina to proceed out of the area without being photographed.   Farina stated he believed he had been targeted for being a journalist and that law enforcement was trying to intimidate journalists: "It's very clear and obvious all journalists were targeted that day."[86]

## USE OF PHYSICAL FORCE

156.   As with the George Floyd protests, law enforcement used unreasonable and unnecessary force against journalists during the Daunte Wright protests in violation of the First Amendment.

157.   On April 12, at approximately 9:00 p.m., Star Tribune photographer Mark Vancleave was shot in the hand – the hand holding his camera – while covering the protests in Brooklyn Center.   Vancleave was easily identifiable as a member of the press by his press ID and large yellow rectangular PRESS card.   Video taken of the incident indicates that Vancleave was shot by a member of the Minnesota State Patrol.[87]   Two other journalists rushed Vancleave to North Memorial Hospital, where he spent the night. The following day, Vancleave underwent surgery on his hand.   The impact of the less-lethal munition broke Vancleave's ring finger in two places.   As a result of the injury,

---

[86] https://pressfreedomtracker.us/all-incidents/photojournalist-for-status-coup-shoved-pulled-by-law-enforcement-officers/
[87] https://twitter.com/MDVancleave/status/1383516520857276416

Vancleave could not pick up a camera for at least six weeks.[88]  Vancleave stated after his surgery: "I remain deeply concerned for my fellow journalists working to fairly and accurately report on the crisis unfolding in our communities – particularly as Minnesota law enforcement continues to target journalists with force and disregard their constitutionally protected role.  Our leaders must do better."[89]  Below is a photograph of Vancleave's injury:



158.    On April 12, freelance journalist Josh McFadden was covering the protests at the Brooklyn Center police station on assignment with the New York Times.  Around midnight, McFadden was standing with a group of other journalists near the police station

[88] https://pressfreedomtracker.us/all-incidents/photojournalist-struck-with-crowd-control-munition-during-brooklyn-center-protest/
[89] https://twitter.com/MDVancleave/status/1383520588153585675

when law enforcement shot him in the left thigh with a projectile.  The projectile burned a hole roughly four inches wide in his pants and left a powdery substance and brown singe marks on the fabric.  The projectile badly bruised his leg.  McFadden was hit with other less-lethal munitions that evening, and when he returned home and removed his helmet, he saw a mark from less-lethal munitions there.   McFadden was clearly identifiable as a member of the press when he was hit.  He was among a group of journalists, and they were all carrying large professional cameras.[90]

159.   On April 12, law enforcement struck freelance journalist Tim Speier directly in the chest with a flash-bang grenade while he was reporting on the Brooklyn Center protests.  The grenade bounced off Speier's chest and detonated at his feet.  Speier was standing among other clearly identifiable journalists, there were no protesters near him, and he was clearly identifiable as a member of the press as he was taking photographs with a large camera and had a large PRESS badge across his chest.[91]  Law enforcement fired several flash-bang grenades directly into the clutch of reporters. Another media outlet near Speier – Mercado Media – captured footage of the incident, which confirms there were no protesters anywhere near Speier when he was hit.[92] Additional video taken by the nonprofit media outlet Unicorn Riot shows that the law

---

[90] https://pressfreedomtracker.us/all-incidents/photojournalist-on-assignment-for-new-york-times-hit-with-projectiles-while-covering-brooklyn-center-protest/
[91] https://pressfreedomtracker.us/all-incidents/freelance-journalist-struck-in-chest-with-flash-bang-grenade-during-brooklyn-center-protest/
[92] https://twitter.com/timmy2thyme/status/1381675958126714886

enforcement officers who fired these grenades appeared to be Hennepin County Sheriff's deputies.[93]

160.    On April 13, journalist Niko Georgiades with the nonprofit media outlet Unicorn Riot was reporting on the protests, while standing with a group of other clearly identifiable journalists away from the protesters.   Minnesota State Patrol made the announcement that "Media, you must leave the area."   Shortly after the announcement, a law enforcement officer shot Georgiades in the right knee with a less-lethal projectile.[94] Georgiades recorded the event on video, which confirms that there was no one around Georgiades at the time he was hit, other than a few media members (as can be seen in the video from minute 32:00-35:00).[95]   Below is a photograph of the injury to Georgiades' leg:[96]



---

[93] https://twitter.com/i/broadcasts/1YqKDeQRPvwGV (at timestamp 49:25)
[94] https://pressfreedomtracker.us/all-incidents/unicorn-riot-journalist-shot-with-projectile-in-brooklyn-center/
[95] https://twitter.com/i/broadcasts/1lDGLpXXvAqGm
[96] https://twitter.com/UR_Ninja/status/1382216568332029953/photo/2

161.   Georgiades stated he believes he was targeted because he is a member of the media.  He was wearing a press pass at the time, had a camera on a shoulder rig and carried a microphone, all of which made him clearly identifiable as a member of the media.  Georgiades could not identify the agency that shot him, though there were Minnesota State Patrol, Minnesota DNR, and officers from another agency wearing dark uniforms present at the time.  The video recorded by Georgiades appears to show a Hennepin County Sheriff's deputy aiming a less-lethal weapon at Georgiades just seconds before he was shot.[97]

162.   On April 16, a photojournalist who remains anonymous online to protect himself from police retaliation, and who goes by the Twitter moniker @pjdocs (hereafter, "PJ"), was shot multiple times with less-lethal munitions despite having identified himself as a member of the press.  At around 10pm, PJ was covering the protests while standing at least 150 feet away from the main group of protesters, when law enforcement officers began shining lights on him.  PJ had a large "PRESS" marking on his chest and was taking photos of the protests.  He was clearly identifiable as a member of the press. He began photographing as a group of State Troopers rushed several other clearly marked members of the press who were also off to the side and away from the main group of protesters.  As PJ photographed this assault by the State Troopers, he began to be hit in the back of his legs by less-lethal munitions.  PJ jogged from where he had been standing when he was hit with the less-lethal rounds, shouting "PRESS! PRESS!"  At this time, he

---

[97] https://pressfreedomtracker.us/all-incidents/unicorn-riot-journalist-shot-with-projectile-in-brooklyn-center/

was shot directly in the left knee with a foam baton round.  More lights began to shine on PJ, and he feared being hit by yet more munitions.  This was a targeted attack on PJ because of his work as a journalist and his exercise of his First Amendment rights.

163.    PJ stated in a report to the Press Freedom Tracker organization: "If I was really close to the protesters and was inadvertently shot trying to capture photos, that would be different.  What really blows me away is that I was very isolated.  There was zero reason, no logical reason for this to have happened."  After the foam round hit his knee, a State Trooper or Sheriff's Deputy grabbed PJ and told him he had to leave the protests.  The officer pushed PJ in the direction of a parking lot and ordered him to leave. PJ feared being arrested based on his prior experience with Minnesota law enforcement abuse of journalists, so he left the scene.[98]  Most of the incident is captured on a video PJ posted to YouTube, which confirms his story.[99]  The video includes footage of State Troopers rushing a line of clearly identifiable photojournalists standing with their backs to a fence and no protesters in sight.

164.    Below is a photograph of PJ's knee after being hit by the foam baton:[100]

---

[98] https://pressfreedomtracker.us/all-incidents/photojournalist-hit-with-multiple-crowd-control-munitions-during-brooklyn-center-protest/
[99] https://www.youtube.com/watch?v=p5C1bVqYnHM
[100] https://twitter.com/pjdocs/status/1383786687549952003



USE OF CHEMICAL AGENTS

165.    On April 12, Star Tribune photographer Carlos Gonzalez was documenting

the protests.   He was clearly identifiable as a member of the press, was carrying his

standard press pass and a large yellow PRESS card, and was operating a professional

camera at the time.   Video footage captured by Gonzalez's GoPro camera shows a

Minnesota Trooper gratuitously directing pepper spray straight at Gonzalez's face even

though Gonzalez was clearly a member of the press, was not obstructing or impeding

anyone, and posed no threat to law enforcement.[101]   The pepper spray caused Gonzalez significant pain and he had to leave the protests. Gonzalez stated, "it was obvious that I wasn't agitating anyone, that I was documenting and not part of the protest."[102]

166.    On April 12, Aaron Nesheim, a freelance photojournalist was reporting on the protests on assignment for the New York Times.  A Minnesota State Trooper saw Nesheim photographing the protests with his professional camera, then lunged forward and pepper-sprayed Nesheim directly in the face.  Nesheim was wearing both a helmet and body armor vest labeled with "PRESS" on multiple sides, as well as press credentials issued by the New York Times and National Press Photographers Association.  Nesheim stated after the State Trooper assaulted him: "I would love to say I am surprised by this violation of my rights, but sadly I find it to be par for the course."[103]

167.    On April 16, a Hennepin County Sheriff's Deputy pepper-sprayed an AFP photojournalist named Eleonore Sens and another member of the press directly in the face at close range for no reason, and despite the fact that they were clearly identifiable as members of the press and no protesters were in sight.[104]   A photograph was taken of this incident:

---

[101] https://twitter.com/CarlosGphoto/status/1381794769182023682
[102] https://pressfreedomtracker.us/all-incidents/minneapolis-star-tribune-photojournalist-pepper-sprayed-while-documenting-protests-in-brooklyn-center/
[103103] https://pressfreedomtracker.us/all-incidents/photojournalist-for-new-york-times-targeted-with-pepper-spray-at-brooklyn-center-protest/
[104] https://twitter.com/AlexKentTN/status/1383290508181590018/photo/1



**D.    DEFENDANTS' IMPOTENT RESPONSE TO LAW ENFORCEMENT MISCONDUCT AT THE DAUNTE WRIGHT PROTESTS.**

168.    As described above, the State Defendants paid lip service to the First Amendment in the wake of the widespread First Amendment violations they committed during the Floyd Protests, but did little else, which contributed significantly to the lawless behavior of the State Troopers and other agency personnel during the Daunte Wright protests.

169.    On April 14, 2021, Plaintiffs filed a Motion for a Temporary Restraining Order based on State Defendants' assault on the media at the Daunte Wright protests.

170.    On April 16, 2021, the Court granted Plaintiffs' Motion for a Temporary Restraining Order.  Sadly, it had little effect on the State Defendants' conduct or the conduct of the other OSN agencies.  The State Patrol's failure to comply with the TRO is

not surprising, however, as it was not distributed to State Patrol supervisory troopers (Captains and above) until the morning of April 17, 2021.  On the evening of April 16, 2021, some of law enforcement's worst abuses of the media occurred.  These abuses were met with widespread outrage in the media and around the world.

171.   On April 17, 2021, faced with blistering criticism of the State Defendants' abuse of journalists in the face of this Court's TRO, Governor Walz stated that the incidents of journalist abuse by law enforcement are "unacceptable in every circumstance. Democracy cannot thrive without a free and fair and safe press.  These ***individual incidents*** will be looked into.  They just need to make sure they don't happen in the first place."[105]   (Emphasis added.)   Of course, by minimizing the widespread, systematic and repeated abuse of journalists as "individual incidents," Governor Walz both sidestepped the issue at the center of this case – that these are not isolated incidents but rather a pattern and practice – and compounded the problem by minimizing it.

172.   On April 17, Governor Walz also stated he was "convening a meeting today with media and law enforcement to determine a better path forward to protect the journalists covering civil unrest."[106]   Walz also conceded that "I think we all need to recognize the assault on media across the world and even in our country over the last few

---

[105] https://www.startribune.com/gov-tim-walz-calls-assault-detention-of-journalists-covering-protests-unacceptable/600047293/?utm_campaign=04_25_2021&utm_medium=email&utm_source=tpfp_newsletter&utm_content=star_tribune_article
[106] https://www.reuters.com/world/us/minnesota-police-promise-not-detain-pepper-spray-journalists-covering-protests-2021-04-18/

years is chilling."[107]  Notably, Walz's statement about "chilling" freedom of the press did not include any reference to the chilling effect of media assaults by the forces directly under his command, which reflects the State Defendants' ongoing failure to accept responsibility for the unconstitutional conduct of the Minnesota State Patrol and other agencies.

173.   On April 17, a coalition of 30 media companies and organizations sent another letter to Governor Walz, Commissioner Schnell, Commissioner Harrington, and Colonel Langer.  Like the June 2, 2020 letter, it lays out the legal protections for journalists and takes the State Defendants to task for violating the First Amendment rights of journalists.

174.   Not coincidentally, on April 17, 2021, the State Patrol also issued a "Statement from Minnesota State Patrol on Recent Temporary Restraining Order." Among other things, the statement claimed:

- "The Minnesota State Patrol (MSP) has and will continue to respect the rights of the media to cover protest activity."

- "While journalists have been detained and released during enforcement actions after providing credentials, no journalists have been arrested."

- "The MSP has not and will not target media for doing the important work of showing those who are exercising their first amendment rights to express themselves, or those who are engaged in the violent, illegal activity law enforcement is trying to prevent."

---

[107] https://www.nytimes.com/2021/04/18/business/minnesota-journalists-assault-protests.html?smid=tw-share

175. These false, disingenuous, and blatantly self-serving statements clearly show that the State Patrol does not understand its obligations under the Constitution or the command-and-control problems within its ranks, and that it viewed this lawsuit and other pushback from the media as simply a public relations problem it could cure by propagating falsehoods about its misconduct.

176. The State Patrol arrested a number of journalists, including reporter Carolyn Sung, whom the State Patrol not only arrested after she provided her credentials, but actually drove to the Hennepin County Jail and held in custody in an orange jumpsuit. The State Patrol knew it had arrested Ms. Sung, and other journalists, and its public statement to the contrary was a demonstrable lie. In fact, it was State Patrol Director of Communications Bruce Gordon who secured Ms. Sung's release from custody after CNN contacted him about her arrest.

177. The April 17 statement by the State Patrol also stated: "During recent enforcement actions in Brooklyn Center, troopers checked and photographed journalists and their credentials and driver's licenses at the scene in order to expedite the identification process. Journalists were then allowed to continue reporting. This process was implemented in response to media concerns expressed last year about the time it took to identify and release journalists." Again, this disingenuous statement masks the true purpose of the "cataloging" process that Governor Walz himself characterized as "Orwellian." Left unexplained is how this process actually "expedited" the identification process, as opposed to simply checking credentials and allowing journalists to carry on, or simply leaving alone those individuals clearly identified and identifiable as journalists.

178.   [SEALED] 

179.   As part of their public relations campaign, State Defendants have hired a consulting firm – 21st Century Policing ("21CP") – to identify and develop "best practices regarding first amendment [sic] rights during mass demonstrations, including but not limited to media relations, community relations, crowd management and policing activities."

180.   According to Commissioner Schnell, the 21CP process is meant to be "forward looking instead of focused on what happened," and involve "conversations [that] have the goal of creating clarity going forward and are not investigative in nature."

181.   [SEALED] ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

## E.   POST-DAUNTE WRIGHT MISCONDUCT.

182.   Incredibly, even after the filing of this lawsuit, and the issuance of the Court's TRO, abuse of the press has continued.

183.   On June 3, 2021, U.S. Marshals shot and killed Winston Smith, Jr., a Black man, in the Uptown neighborhood.  Again, protests erupted.

184.   Journalist Kevin Gilman was covering the protests the evening of June 3, 2021, filming police response to the protests, and clearly identifiable as a member of the press with a large "PRESS" decal across his chest as well as clearly visible press

credentials.  Police spotted Gilman reporting on the protests and attacked him.  An MPD officer ran at Gilman, who shouted, "Press!  Press!"  The officer then struck Gilman with his wooden baton, bruising Gilman's arm and knocking Gilman's phone (with which he was recording) out of his hand. [108]

185.    Similarly, Unicorn Riot reporter Niko Georgiades was assaulted multiple times by MPD officers on June 3, 2021.  One officer shoved Georgiades in the back and continued to harass him, while Georgiades, who had a press badge around his neck, a large camera with lights on it, and a handheld microphone, repeatedly said, "I'm media" to the officer. [109]

186.    When notified of these incidents by the nonprofit organization U.S. Press Freedom Tracker, the MPD stated: "If the journalist believes that he was mistreated or that officers violated policy, I would encourage him to reach out to the Internal Affairs Unit or the Office of Police Conduct Review Board and file a complaint."  This toothless response to the continued abuse of journalists by MPD officers demonstrates that the MPD's failure to train and supervise is ongoing, and its pattern and practice of targeting journalists for harassment, arrest, and assault has not abated.

---

[108] https://pressfreedomtracker.us/all-incidents/social-media-journalist-shoved-by-police-at-minneapolis-protest/

[109] https://pressfreedomtracker.us/all-incidents/unicorn-riot-journalist-pushed-by-officer-while-covering-protest/

## THE NAMED PLAINTIFFS

### A.     NAMED-PLAINTIFF JARED GOYETTE.

187.   Plaintiff Jared Goyette is a freelance journalist.  At all times relevant to this Complaint, Plaintiff was working on assignment as a contract journalist with a national publication.

188.   At around 5:00 p.m. on May 27, 2020, Goyette was observing and documenting the demonstrations near the MPD's Third Precinct, located at the intersection of Lake Street and Minnehaha Avenue.  MPD officers protecting the Third Precinct were firing ballistic rounds, marker rounds, and tear gas intermittently and without warning or orders for dispersal.

189.   Goyette was clearly a member of the news media.  He carried a camera and a monopod (a single, long leg used to stand a camera on for stability), notepad, and mobile phone.   These items would have been visible to the MPD stationed on top of and outside the Third Precinct.

190.   Goyette was standing 30 to 50 yards from the Third Precinct when he saw a young man who appeared to be severely injured.  Goyette went towards the man to document the incident.

191.    MPD officers shot Goyette in the face with less-lethal ballistic ammunition shortly after other bystanders took the injured young man from the scene.  MPD provided no warning for this use of force.  Goyette was standing alone and there was no one else within several feet of Goyette.

192.    Goyette suffered immediate physical injury to his nose and eye and, as a result, had to leave the scene and cease journalistic activities for the evening.   After receiving medical treatment, Goyette ventured back to the demonstrations to continue to provide press coverage.

193.    In the days after his injury, Goyette experienced several instances of intimidating and obstructive behavior from Defendants.   For example, an officer told him to "Shut up" after he identified himself as press.   In another instance, an officer passing by Goyette and another female reporter shouted at them, "I want to fucking peg you."

194.    On April 13, 2021, Goyette traveled to Brooklyn Center to cover the Daunte Wright protests for the Washington Post.   Goyette was wearing a bullet proof vest with a blue reflective "Press" sign on the front at chest level, and a yellow reflective jacket that had "Press" labels on the front and back.   Additionally, he was carrying a bag over his shoulder that had another reflective "Press" badge fixed to the side facing the officers.

195.    Goyette heard the State Patrol issue dispersal orders directly at the media, demanding that they leave the area of the protests or face arrest.

196.    A standoff between law enforcement and protesters developed near an apartment building that Goyette and other reporters were trying to use as cover, angling themselves so they could maintain a line of sight toward the standoff, while keeping themselves out of the area between officers and protesters.

197.   Law enforcement began firing less-lethal projectiles at the journalists, even though there were no protesters around this group of media and many, if not all, the journalists were clearly labeled as members of the press.

198.   At this time, a group of officers wielding batons came sprinting around the building toward the journalists.  The officers screamed, "get the fuck out of here!" at the clearly identifiable journalists, including Goyette.

199.   Goyette intends to continue documenting and reporting on additional protests and other First Amendment protected expression, and the police response to these protests, but he is fearful for his safety given the Defendants' misconduct at the George Floyd and Daunte Wright protests.

## B.   NAMED-PLAINTIFFS CRAIG LASSIG, TANNEN MAURY, AND STEPHEN MATUREN.[110]

200.   Plaintiff Craig Lassig is a Minnesota resident and freelance photographer. He has been a freelancer since 2008, and his clients include AP, Reuters, the NY Times, and EPA.  Prior to 2008, Lassig worked as a photographer for Sun Newspapers.

201.   Plaintiff Tannen Maury is a photographer with EPA.  Prior to working for the EPA, Maury was a staff photographer for AP and as a contract photographer for Reuters and AFP.  He is an Illinois resident but was in Minneapolis to cover the George Floyd protests from May 27-June 1.

---

[110] The allegations in this section are drawn from the Declaration of Craig Lassig ("Lassig Dec."), attached to the First Amended Complaint as Exhibit 5.)

202. Plaintiff Stephen Maturen is a freelance photographer based in Minneapolis.  Maturen's clients include the New York Times, the Wall Street Journal, USA TODAY, and Getty Images.  He covered the George Floyd protests for Getty Images.

203. On May 30, Lassig was covering the George Floyd protests for EPA, along with Maury, who had traveled to Minneapolis from Chicago to cover the protests with Lassig.

204. Lassig and Maury were documenting protests occurring near the Fifth Precinct police station in Minneapolis, at 31st and Nicollet.  Early that evening, law enforcement officers began to disburse the protesters, pushing them up 1st Avenue toward downtown.  They fired tear gas and less-lethal projectiles and shot fleeing protesters in the back.

205. Because the situation had gotten violent, Lassig and Maury left the scene and proceeded up Nicollet Avenue to regroup and decide what to do next.  At this point, Maturen, who had just arrived at the scene and was trying to link up with another photojournalist, joined with Maury and Lassig to travel together for safety.  They stopped in the parking lot of a restaurant on Nicollet Avenue to discuss where they should go next.  They were nowhere near any protesters, and they were the only three individuals standing in the parking lot. Likewise, there were no police in sight.

206. As they stood in the parking lot talking, several law enforcement vehicles drove down 28th Avenue in front of the restaurant.  One of the cruisers stopped and law

enforcement officers (MPD or State Troopers) got out.[111]  Lassig, Maury, and Maturen all had their press badges displayed at the time, and all were carrying professional camera gear.  They verbally identified themselves as news media to the officers.  One officer said, "we don't fucking care," and ordered the group onto the ground.  They complied. The officers handcuffed Lassig, Maury, and Maturen, searched all their belongings, and seized their photography gear.  Then they placed the three handcuffed journalists into a police van and drove them downtown.  The three journalists sat handcuffed in the van for about an hour.  Then they were booked, fingerprinted, and cited for violating the curfew, despite again identifying themselves as members of the press.  After roughly two hours in custody, they were released.

207.    Earlier that evening, Lassig and Maury had been with a larger group of journalists covering the protests near the Fifth Precinct, including an NBC film crew. Lassig saw MPD officers mace journalists, deliberately shoot journalists with less-lethal projectiles, and chase journalists, all of whom: were clearly identified as journalists; were standing apart from the protesters; and were not obstructing or provoking the police. Lassig was shocked at the aggressive and hostile attitude of the police toward journalists.

---

[111] Maury and Maturen remember the officers wearing brown shirts, suggesting that they were Minnesota State Patrol.  Lassig remembers the officers wearing blue shirts, suggesting that they were Minneapolis Police.

## C.   NAMED PLAINTIFF KATIE NELSON[112]

208.   Plaintiff Katie G. Nelson is a freelance journalist, photographer and filmmaker from Nairobi, Kenya.  Her work has been published by The New York Times, National Geographic, BBC, Al Jazeera, The Telegraph, AP and Public Radio International, among others. She is also the Vice Chair of the Foreign Correspondents' Association of East Africa.  During the George Floyd protests, Nelson was working on contract with the New York Times.

209.   Nelson was working with Mike Shum as a producer on the night of May 28, 2020, the night the Third Precinct burned down.  At around 9:30 p.m., MPD officers began lobbing tear gas and flash bang grenades into the crowd Shum and Nelson were filming.  The police intentionally shot directly at Shum and Nelson several times with tear gas canisters, despite the fact that Shum was filming the protests with large commercial camera gear.  At the time, Nelson was standing with her arms up, yelling "we're press" at law enforcement as Shum crouched in front of her while filming.  Nelson was also holding a large, professional long-lens camera at the time.  The MPD officers directly targeted Shum and Nelson despite the fact that they were clearly media and not protesters.

210.   On May 30, 2020, Nelson was working again with Shum.  They were filming the peaceful protests occurring on Nicollet Avenue behind the Fifth Precinct.  At 8:05 p.m., law enforcement officers announced that the crowd was in violation of the curfew and began advancing up the street in riot gear by the dozens.  Twenty seconds after

---

[112] The allegations in this section are drawn from the Declaration of Katie G. Nelson ("Nelson Dec.").)

the announcement, and before anyone who wanted to leave could vacate the area, the officers began firing tear gas, flash bang grenades, and rubber bullets into the crowd.

211.   Shum and Nelson were standing with a group of other members of the press, away from the protesters.  Law enforcement began to fire at them even though they were clearly members of the news media and exempt from the curfew.  Nelson started running when law enforcement began to fire directly at them.

212.   On left hand side of the sidewalk was a concrete alcove shaped like a triangle. A gate on one side was open.  Nelson thought that if the group of journalists could get into the alcove, they would be safe from the police, could assess the situation and get out.  Nelson quickly realized, however, that there was no exit from the alcove.  As law enforcement pushed toward the group of journalists, Nelson grabbed her assistant, Courtney, and they ran out of the alcove and into the street.  The law enforcement officers fired rubber bullets at them.   Other members of the press ran into alcove and stayed. Some were beaten there, and Shum was pushed over the wall.

213.   Shum and Nelson regrouped and continued filming.  At several points, they were boxed into sections of the street by law enforcement officers armed with tear gas and flash bangs. Whenever the officers told Shum and Nelson to leave the area, Nelson responded "We're press!" and waved her hands above her head as Shum continued to film. At one point, law enforcement officers made a line across a street blocking the ability to exit on one side of the road. Shum and Nelson continued filming this, and at one point, a male officer holding the line started yelling "I'm gonna get her," in reference to

Nelson.  He was looking at Nelson and pointing his tear gas gun at her.  At the time, Shum and Nelson were clearly identifiable as journalists.

214.    Around 12:00 a.m. that night, Nelson was driving away from the protests to try to get to the George Floyd memorial.  Nelson turned onto a street that was blocked off at one end by National Guard vehicles and law enforcement officers with riot gear.  There were cars behind her and it was almost impossible to turn around as cars lined both sides of the street. She turned on her right blinker to indicate that she would pull over and try to exit through an alleyway between the line of officers and her car.  The officers gave no direction or indication how individuals who had turned down this street were supposed to turn around given the cars behind them and the cars parked on the street.  Nelson moved very slowly forward, trying to get in position to turn around.  Her car windows were open and she shouted "we're press, we're press" at the officers at the end of the street.  They shouted back, "we don't care," and began to shoot pepper bullets or some other less-lethal projectiles at Nelson. She heard the projectiles pinging off the roof of her car.  She was terrified but somehow managed to turn around while the officers fired at her.

D.        **NAMED-PLAINTIFF EDWARD OU**

215.    In May 2020, photojournalist Edward Ou worked for NBC and was assigned to cover the protests in Minneapolis following the death of George Floyd. Ou requested the assignment because he believes in the importance of the press covering protests as a means to hold security forces accountable.  Ou saw first-hand in Egypt, while covering the Arab Spring, that the presence of cameras caused police to restrain

themselves, while in countries like Myanmar, where the international media are not allowed to operate, the violence has been far worse.

216.    Ou arrived in Minneapolis on the night of May 30, 2020 and began covering the George Floyd protests at around 6:00 p.m. in the area close to the Metro Transit Garage on Nicollet Avenue.  Ou was traveling with some colleagues from NBC, including Daniella ("Dani") Silva, a reporter, and a security guard whom NBC had assigned for protection.  The three met up with a large group of other journalists who were also covering the protests in the area.

217.    Ou knew most, if not all, of the journalists who were covering the events on the night of May 30 because he had worked alongside them covering other events in the past. At no point on the night of May 30 did Ou see any protester or other member of the public who is not a journalist wearing press insignia on their clothes, displaying press credentials, or otherwise claiming or pretending to be a journalist.

218.    When Ou arrived at the protest, it was very peaceful. It was just a gathering of people talking and a few people making speeches. Nobody was marching or shouting and there was no rioting or looting.

219.    Ou was aware that there was a curfew that night, but knew that it exempted members of the media. After he arrived, law enforcement officers began forming a line on Nicollet Avenue and marching towards the protesters from the south side of Nicollet Avenue. Some of the protesters began yelling at the law enforcement officers, but Ou did not see any protesters throwing things, using weapons or otherwise engaging in violent or aggressive conduct towards the officers or property.

220.   Ou and the other journalists in the group began moving towards the side of the street to get out of the way of the law enforcement line. Ou had learned through his years of covering protests in the Middle East to conduct a security assessment anytime he covers a protest. He is cautious about taking steps to protect himself and avoid getting hit. An important rule is never to get between protesters and the police. Ou, and the other journalists, found some alcoves on the side of the brick wall of the Metro Transit Garage and went to stand there together. The alcoves provided them with cover out of the way of the law enforcement line.

221.   It was obvious that Ou and the others in his group were journalists. Many of them had Live U backpacks and were holding tripods and camera equipment, and they were displaying press badges with logos on them. Ou was wearing a lanyard around his neck with the colorful NBC peacock logo and the words NBC NEWS emblazoned on it multiple times. In conducting his security assessment, Ou did not anticipate that any law enforcement officers would directly and purposefully target members of the press. Ou filmed the activity from where he was standing in the alcove. The closest protesters were approximately 12-15 feet away from where he was standing.

222.   The next thing Ou knew, something exploded in his face. He did not see it before it hit him, but he believes it may have been a concussion grenade. Then some State Troopers approached Ou and the other journalists who were grouped together in the alcove. Ou saw one of the State Troopers shaking a canister of pepper-spray. The trooper walked up to Ou and deliberately sprayed Ou in the face.  The trooper was close enough to clearly see Ou's lanyard and camera, so he knew that Ou was with the press. Ou is

certain this individual was with the State Troopers and not some other law enforcement agency because he was wearing a State Trooper uniform, and because he captured the trooper spraying him on video.

223.   Ou believed he had been sprayed with pepper-spray and not tear gas because he had been tear-gassed several times while covering protests, and this was much worse. Tear gas is a powder-like substance. Ou was sprayed with droplets, which not only burned his eyes, but also stuck to his skin and burned his skin as well. It would not wash off with water and remained stuck to his skin, hair and clothing for weeks.

224.   After Ou got doused with the pepper-spray, he was hit by some hard object, then hit again, and was then slammed into a wall.  Ou thought he was being hit with a State Trooper's baton but was unsure what happened because the pepper-spray temporarily blinded him, and he could not see. He did not realize at the time that he was bleeding.

225.   Ou was disoriented at that point, but he recalls that more concussion grenades went off. He also recalls being corralled with the group of journalists around a corner towards a fenced-off area where they were trapped against a wall. Several of the journalists climbed over the wall and began helping others, who were handing their cameras and tripods across the wall. Ou was covered in blood, so he stopped to rest and get his bearings.  Ou and the group of other journalists were not among any protesters and were not impeding law enforcement personnel from advancing. They were only seeking shelter.

226.   A few seconds later the State Troopers attacked the group of journalists again, throwing more concussion grenades into the group.   Another journalist, Mike Shum, was trying to climb over the wall. Ou filmed a State Trooper shoving Shum over the wall.

227.   Ou did not try to climb over the wall and escape because he was wounded and bleeding. He was also having trouble breathing because of the pepper-spray and because his N95 mask was soaked with blood. At that point, a law enforcement officer grabbed Ou. The officer was wearing a tan uniform, which was the color worn by the State Troopers at this protest.   The trooper began debating with another law enforcement officer about what to do with Ou. Ou told them he was a journalist and pleaded for help because he was having trouble seeing and breathing. They did nothing.

228.   Ou became terrified and began running. Several law enforcement officers saw him bleeding and desperately pleading for help, but walked on by and ignored his pleas.   Ou recorded all of this on his video camera, which kept running.

229.   Eventually Ou returned to the alcove near the Metro Transit Garage where he and the other journalists had first been attacked. By that time the law enforcement line had passed, and law enforcement officers were not in that area anymore. Another journalist Ou knew from the New York Times was coming from the other direction. He saw Ou and said, "I've got you." He brought Ou to a bench and sat Ou down and put gauze on his forehead. Several bystanders in a car also stopped to help, gave Ou some water and a t-shirt to wipe the pepper spray and blood off Ou's face.

230.     Then the law enforcement officers circled back to the journalists. They fired a concussion grenade at the group. It made a loud bang very close to the group. They got scared and had to run again. They ran around a corner out of the sight line of the law enforcement officers.

231.     Eventually Ou reconnected with Dani and the security guard from NBC. NBC ordered all of its journalists who were in the field covering the protests to go back to their hotel rooms immediately to avoid further assaults by law enforcement.

232.     Because the wound on Ou's forehead would not stop bleeding, he went with Dani to the Hennepin County Medical Center for treatment. The hospital conducted some tests and gave Ou a tetanus shot. They said he might have a concussion and put four stitches in his forehead. It took them a very long time to clean the pepper spray out of Ou's wound. It kept trickling down into the wound as they tried to clean it. The whole process was incredibly painful. Ou was at the hospital for several hours and did not leave until around 1:00 a.m.

233.     Ou's editor asked if he wanted to stay and cover the protest the next night. He said yes, despite his wounds and the fear he felt from the State Troopers' attack on him.  On May 31, Ou covered a group of protesters who were marching down a freeway. He stayed on a bridge over the area where the protesters were marching, where he could cover the events without coming into close proximity with law enforcement. That was when the events of the previous day really hit him. He felt incredibly scared because he no longer knew what was safe – there was nothing to stop the State Troopers from firing on him again.

234.   That fear has never gone away for Ou. Every time he covers a protest, he is afraid. His perception of what is safe and what is not safe has been turned upside down. The fear he experiences every time he covers a protest has made it very difficult for him to do his job.

235.   Ou returned to Minnesota in April 2021 to cover the protests that took place after the killing of Daunte Wright. Ou covered the story of a woman who lived in Brooklyn Center across the street from the Brooklyn Center Police Department. He felt safe covering that story because he was able to interview her in her own home and did not need to be close to the protesters or the police.

236.   Ou was present one night when law enforcement officers broadcast a message ordering everyone to disperse, including the media. Ou was surprised to hear that message because the media were exempt from the curfew in Brooklyn Center that night.  Ou did not think the dispersal order applied to him, however, because he was on private property, away from the protests, and was not interfering with the police.

237.   Incredibly, a law enforcement officer saw Ou filming the woman and her children through an open window in her home. He approached the window and pointed something at Ou.  Ou could not precisely identify the object but believes it  might have been a stick or some kind or a launcher. The law enforcement officer threatened Ou and ordered him to back off, even though he was on private property, <u>inside a private residence</u>. The only purpose of this thuggish behavior by the law enforcement officer was to intimidate Ou into ceasing his protected First Amendment conduct.  The officer's conduct demonstrated a total ignorance of the First Amendment rights of the woman

being interviewed, as well as Ou's First Amendment rights, and is indicative of Defendants' complete failure to correct the misbehavior that led to the countless First Amendment violations that occurred during the Floyd protests.

238.    Ou did not want to do anything that would cause the woman he was interviewing or her home to be attacked. He put his camera down and stayed out of sight. Ou was scared that law enforcement would attack him, his interviewee, and her children like they did in May and June 2020, even though the group was inside a private residence.

E.    **NAMED-PLAINTIFF TIMOTHY EVANS**

239.    On April 16, 2021, Evans was covering the Daunte Wright protests in Brooklyn Center.  He began taking photographs around 7:00 p.m. outside the police precinct building.  He was wearing a press credential attached to a lanyard around his neck, and he had a large PRESS sticker attached to his backpack.  He was carrying two cameras – one slung on his arm while he used the other to take photos.

240.    Around 9:45 p.m., law enforcement announced an unlawful assembly and ordered protesters to disband.  Shortly thereafter, law enforcement officers rushed the crowd.  Evans moved backward to try and get away from the scrum while still taking pictures.  Law enforcement officers were indiscriminately tackling people and pepper spraying everyone.

241.    As Evans moved back, he looked over to his left and saw an officer approaching rapidly.  His cameras were visible and he was clearly taking photos.  He was yelling "PRESS, PRESS!" this whole time.  The officer bear sprayed Evans from several

feet away and Evans went to his knees.  Evans was able to take a couple more photos, then another officer ordered him to the ground and tackled him.

242.    Initially, Evans believed that it was a State Patrol trooper who originally assaulted him.  Later, Evans received a photograph (taken by Chris Tuite) from another journalist, suggesting it was in fact a Hennepin County Sheriff's Deputy who initially assaulted him:



243.    The deputy sat on Evans' stomach and pinned him to the ground. Evans told the deputy, "I'm press!  I'm press!"  The deputy responded, "I don't care."  Then the deputy told Evans to "shut the fuck up," and punched Evans in the face, directly in his goggles, and forced Evans onto his stomach, as can be seen in the above-photograph. Evans showed the deputy the credential he had attached to a lanyard and said, "I'm press." The deputy told Evans to shut up, ripped the lanyard off his neck, and threw it in the dirt. The deputy then said, "too bad, you should have gone when you had the chance, shut the

fuck up." Evans told the deputy press were exempt from the curfew, and the deputy responded, "you're a liar. Shut the fuck up."

244.   Evans started looking around trying to make eye contact and get the attention of other law enforcement officers who might be able to come help him. Eventually another officer saw Evans – it is unclear whether this was another Sheriff's Deputy or a State Trooper. The officer came over and Evans said, "I'm press!" The officer responded, "shut up," then hit Evans in the back of his head and smashed the left side of his face into the ground. Then the officers zip tied Evans.

245.   One of the deputies picked up Evans' credential and began to walk away with it. Evans begged for the deputy to give it back, which he finally did. Then he and the other officer sat Evans on the curb, zip-tied and bruised.

246.   Eventually a female officer came up to do well-checks on those who had been detained. It is unclear whether she was a Sheriff's Deputy or from some other agency. She asked if Evans was ok and he told her he was with the press. She walked off to talk with her lieutenant, who must have told her Evans could be released because she came back and removed the zip ties. She then said, "I can escort you out but you have to leave," and walked Evans outside the law enforcement perimeter that had been established. It was clear that Evans would be released only if he ceased reporting on the protests. As the officer escorted Evans out of the area, he explained to her how he had been assaulted. The officer commiserated with Evans but did not offer to file a complaint or put Evans in touch with a superior officer to report the abuses.

247.    Evans left the protests and went home.  He would have stayed and continued covering the protests had he not been assaulted, arrested, and forced to leave the area.

248.    During the protests, Evans witnessed other journalists he knows being pepper sprayed and detained while state troopers photographed their personal id's and press credentials before letting them go.

F.    NAMED-PLAINTIFF CHRIS TUITE

249.    Tuite was present in Minnesota documenting the protests surrounding the Derek Chauvin trial during March and April 2021. In his capacity as a journalist, Tuite attended the protests related to the killing of Daunte Wright for several hours on the evenings of April 11, 12, 13, 14, 15 and 16, 2021 in Brooklyn Center.

250.    On each night of April 11 through April 16, 2021, Tuite remained there doing his job until the crowd was dispersed or even after. He did not see or hear a single person claiming to be a member of the media who was not a legitimate journalist.

251.    During Tuite's time covering the Brooklyn Center protests, he was aware that officers from multiple law enforcement agencies were present. He observed that many of the officers clearing the crowds, enforcing the dispersal orders, and interacting directly with protestors and members of the media were State Troopers. Tuite knew this because he recognized the uniform—a yellow reflective shirt covered by a black vest with the State of Minnesota printed or stitched in white on the chest. There were also many Hennepin County Sheriff's Deputies performing these tasks.

252. As compared with officers of other agencies on the scene in Brooklyn Center, the State Troopers were, by far, the most aggressive towards Tuite. In fact, the State Troopers' aggression toward Tuite stands out among his experiences documenting protests across the country. Tuite has photographed protests in numerous cities including New York City, Louisville, Washington, D.C., and Minneapolis. He also covered the George Floyd protests at the federal courthouse in Portland, Oregon between July 23, 2020 and July 26, 2020.

253. On the evening of April 13, 2021, Tuite was with Joshua McFadden, an independent journalist then on assignment for the New York Times, at the Brooklyn Center police department covering the protest. Around 10:30, someone started a campfire in the middle of the street on the pavement. Law enforcement officers, primarily State Troopers, immediately closed in and pushed everyone – protestor and media alike – to a gas station a few blocks away. As described above, McFadden and Tuite were attempting to leave the protest, but were unable to reach McFadden's car. Another individual offered them a ride out of the area and back to the car. The car they were in was swarmed by State Troopers who charged at the vehicle, pointing what looked like long guns at the vehicle and banging against the windows.

254. Tuite pressed a card identifying himself as a member of the independent media up against the window and screamed, "Media!" multiple times. The State Troopers pulled Tuite from the vehicle, but quickly released him. The troopers also pulled McFadden out of the vehicle, slammed into the side of the vehicle, and struck him several times, damaging his camera. McFadden was wearing a press pass around his neck and was

carrying a professional grade camera.   McFadden was attempting to present his press pass to the troopers, but they wouldn't listen to him. Tuite yelled numerous times that McFadden was with the press. It was Tuite's impression that the State Troopers did not believe McFadden was a real journalist until Tuite vouched for him.

255.    On April 16, 2021 Tuite was working at the Brooklyn Center police department protest beginning at approximately 7:00 p.m. Based on his personal observation, the crowd gathered there was not riotous or violent that evening. Tuite was aware that fireworks were being shot off into the air, but he personally did not see any fireworks fired at law enforcement. Tuite did see a few water bottles and a single open soda can tossed over the fence around the police department; he did not personally witness any other objects being thrown. These objects were not a physical threat to the officers inside the fences who were protected by riot gear, many of them holding shields. The mood and activities of the protestors on the evening of April 16 were very similar to the mood and activities the prior evening, April 15, 2021. On April 15, the protestors dispersed without incident around curfew time.

256.    On April 16, at approximately 10 p.m., when the curfew went into effect, a line of State Troopers marched in from the south and from the east. HCSO personnel also appeared on the scene. The law enforcement officers formed a kettle to conduct a mass arrest.

257.    Tuite attempted to document the mass arrest, but State Troopers swore at Tuite and ordered him to disperse outside of the kettle.  The Troopers clearly recognized Tuite as press because one shined a light directly in his face as he was taking a photograph

and screamed, "Press, immediately leave the area." Tuite moved outside the kettle as directed, but the place that Tuite was initially directed to go after the State Troopers moved in had an obstructed view of the ongoing arrests because the State Troopers created a wall with their bodies.

258.    As Tuite was moving outside the kettle as he had been directed, he stopped briefly to document a Hennepin County Sheriff's Deputy kneeling on the back of another photojournalist, Tim Evans, whose experience is described above.  Metadata on Tuite's photographs confirm that he paused for only four seconds, but in that time, a State Trooper grabbed Tuite by the hood of his jacket and yanked, as if to pull Tuite down to the ground.  The trooper handled Tuite so roughly that it ripped the neck of Tuite's shirt. The trooper screamed profanities and that Tuite was under arrest.  Another trooper grabbed Tuite, pulling him away from the first trooper.  He told Tuite to "walk north." Tuite tried to comply, when at least five more troopers threatened him with arrest, and one trooper raised a can of pepper spray to Tuite's face, though he did not fire.  The trooper screamed, "What the fuck do you not understand?  Go fucking north.  You had your one free pass.  Are you fucking stupid?  Go now or I'll arrest you."

259.    State Troopers ordered Tuite and other journalists to leave the area and walk further to the north. Once Tuite arrived at a gas station approximately two blocks north, his face, driver's license and press card were photographed by State Troopers. Tuite was not able to observe or document the ongoing mass arrest from this location or while he was being photographed.

260.    Tuite has a press pass made by an acquaintance clearly identifying him as a member of the independent media, displaying a photograph of his face and a QR code link to his Instagram page which publishes his professional work. Because Tuite is an independent photographer, his press pass was not issued by a media outlet or other authority. This is common in the industry for multiple reasons, including that traditional media outlets are increasingly using freelancers rather than their own employees to cover major events, and that some small, independent and/or informal media outlets don't issue media credentials at all.

## G.    NAMED-PLAINTIFF CWA

261.    Plaintiff The Communications Workers of America ("CWA") is an international labor union representing over 700,000 workers in a broad range of industries, including print and broadcast news media, telecommunications, airline, manufacturing, education, public service, and healthcare, among others.   CWA's central purpose is protecting the rights of workers through collective bargaining and public advocacy. CWA's headquarters is in Washington, DC; its members work and live throughout the United States, including Minnesota.   CWA is comprised of multiple sectors and districts representing members in different industries.   The News-Guild CWA ("NewsGuild") is an affiliate union of the CWA.   NewsGuild represents journalists and media members across America.   The guild has roughly 14,000 dues paying members.   NewsGuild members include many on the reporting staff of the Los Angeles Times, the Chicago Tribune, the Detroit Free Press, the Denver Post, Reuters, the Associated Press, the Washington Post, the New York Times, the St. Paul Pioneer Press, and the Minneapolis Star Tribune, among

others.  (Declaration of Jon Schluess ("Schluess Dec.") ¶ 1-2 (attached as Exhibit 4 to the First Amended Complaint).)

262.   Many of the individual reporters and photojournalists affected by police violence and intimidation against the news media at the George Floyd protests are represented by the NewsGuild (and by extension the CWA), including all of the Star Tribune journalists mentioned by name in this Complaint.  Los Angeles Times journalists Molly Hennessy-Fiske and Carolyn Cole, who were shot with pepper spray and less-lethal projectiles as described in paragraphs 54-58 above, are also NewsGuild members.  (Cole Dec. ¶ 1; Hennessy-Fiske Dec. ¶ 1.)

263.   Because some of the NewsGuild's affected members, and their news organizations, report on the MPD and Minnesota State Patrol as part of their journalism, ethical considerations that guide reporting make directly suing those organizations as individual plaintiffs complicated, if not impossible.  (Schluess Dec. ¶ 4.)

264.   Article I, Section 2 of the NewsGuild Constitution provides:

> SECTION 2. The purpose of the Guild shall be to advance the economic interests and to improve the working conditions of its members; to guarantee, as far as it is able, equal employment and advancement opportunity in the industry and constant honesty in news, editorials, advertising, and business practices; to raise the standards of journalism and ethics of the industry; to foster friendly cooperation with all other workers; and to promote industrial unionism in the jurisdiction of the Guild.

265.   And Article III of the CWA Constitution likewise provides:

> The objects of the Union shall be: (a) To unite the workers within its jurisdiction in a single cohesive labor union for the purpose of collective effort; (b) To improve the conditions of

the workers with respect to wages, hours, working conditions and other conditions of employment; (c) To disseminate information among the workers respecting economic, social, political and other matters affecting their lives and welfare; (d) To advance the interests of the workers by advocating the enactment of laws beneficial to them and the defeat or repeal of laws detrimental to them; (e) To do all things which may be necessary or proper to secure for the workers the enjoyment of their natural rights.

266.    These foundational provisions of the international labor union and its sector Constitutions undergird CWA's participation in this lawsuit.  Essentially, they provide that all CWA members, including NewsGuild-CWA members, agree to work together, through the auspices of their union, to ensure that members work under safe and lawful conditions.  (Schluess Dec. ¶ 7.)

267.    NewsGuild members have been targeted by the recent police violence in Minneapolis.  Members have had their speech chilled.  And Members have been assaulted and injured by both the MPD and the Minnesota State Patrol, and have been subjected to other unconstitutional conduct by those agencies and their officers, agents, and employees.

## MUNICIPAL ALLEGATIONS

## I.    THE STATE, COUNTY AND MUNICIPAL DEFENDANTS

268.    The City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo, Minneapolis Police Lieutenant Robert Kroll, Minnesota Department of Public Safety Commissioner John Harrington, Minnesota State Patrol Colonel Matthew Langer, and Hennepin County Sheriff David Hutchinson, in their official capacities (the "State, County and Municipal Defendants") each have established policies, practices, and/or

customs of violating the constitutional rights of members of the press and others, and of unlawful use of excessive force, or have been deliberately indifferent to such constitutional violations by their officers, agents, and employees, as discussed herein.

### a. Unconstitutional Treatment of Journalists

269.   The State, County and Municipal Defendants each have a policy, practice, or custom of deploying chemical agents and injurious, less-lethal ballistics against members of the news media.  In addition, the State, County and Municipal Defendants each have been deliberately indifferent to unconstitutional uses of chemical agents and less-lethal ballistics by their officers against members of the news media.

270.   The State, County and Municipal Defendants each have a policy, practice, or custom of failing to provide warnings and/or dispersal orders before using chemical agents and injurious, less-lethal ballistics against protesters and members of the news media.   In addition, the State, County and Municipal Defendants each have been deliberately indifferent to risks that their officers, agents, or employees would fail to provide warning or dispersal orders before using chemical agents and injurious, less lethal ballistics.

271.   The State, County and Municipal Defendants each have a policy, practice, or custom of intimidating, threatening, arresting, and detaining news media who are lawfully reporting on protests and other First Amendment expressive activity, or have been deliberately indifferent to the risks that their officers, agents, or employees would behave in such a manner.

272.   The State, County and Municipal Defendants' failure to supervise and train their employees and agents with respect to First Amendment protected activity amounts to a reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class Members.

273.   In a June 10, 2020 news conference, Chief Arradondo stated: "Our media must be protected," stated that he will be looking at "why journalists were fired upon," and apologized for the police abuses of journalists that occurred during the George Floyd protests.[113]  In a June 5, 2020 statement, the State Patrol stated: "When conducting law enforcement operations to restore order and keep people safe, it can be difficult for officers to distinguish journalists from those who are violating a curfew order or not complying with commands to leave an area. . . . we are reviewing the incidents involving our troopers in an effort to prevent similar incidents in the future."[114]  On information and belief, however, neither the State Patrol nor the MPD have reprimanded, disciplined or suspended any officer involved in any of the unlawful conduct described in this Complaint, nor has any additional training been implemented to "prevent similar incidents in the future."

274.   The State, County and Municipal Defendants were on notice of their policies, practices, and/or customs of unconstitutional conduct against journalists

---

[113] https://kstp.com/news/-minneapolis-police-department-spokesman-john-elder-and-police-chief-medaria-arradondo-address-the-media/5755828/
[114] https://www.startribune.com/minnesota-aclu-sues-to-halt-alleged-misconduct-by-enforcement-agencies-against-media/570991902/

covering protests, and they had ample reason to believe that their training and supervision regarding these issues was inadequate.

275.   For example, in 2002, the Minnesota Daily (the University of Minnesota student newspaper) filed a complaint with the MPD's Internal Affairs Division related to officer actions against student journalists during a riot following a University of Minnesota Hockey championship victory.   According to written statements in the complaint, a photographer was pushed to the ground from behind and kicked in the back. When a reporter went to help the photographer, she was sprayed directly in the face with a chemical irritant.   Two other photographers were sprayed in the face with a chemical irritant and hit repeatedly with riot sticks. Two photographers had press passes displayed in the middle of their chests, and the others told police officers they were members of the press, according to the complaint.[115]   On information and belief, none of the officers involved in this misconduct were disciplined pursuant to this investigation, and no new or additional training regarding journalists' First Amendment rights or the use of force was provided in the wake of this incident.[116]   Defendant Kroll was in command during this riot.[117]

276.   In 2008, Amy Goodman, host of "Democracy Now!", and her crew were arrested during the Republican National Convention in St. Paul, despite posing no threat

---

[115]https://archive.nytimes.com/www.nytimes.com/uwire/uwire_JOIN042420022302015.html
[116] https://splc.org/2002/08/students-await-word-on-probe-into-police/
[117] https://www.youtube.com/watch?v=fLbePial8xI

and complying with police orders.[118]  Defendant John Harrington, then Saint Paul Police Chief, brushed off the First Amendment concerns.  Dozens of other journalists were arrested and/or assaulted by police during these protests, including an AP photographer and a journalist from the New York Post, in incidents strikingly similar to those that occurred during the George Floyd protests.  Goodman and her crew filed a federal civil rights lawsuit against various law enforcement agencies, including the Saint Paul Police Department and the MPD based on these unconstitutional actions.  The lawsuit settled in 2011, with the payment of $100,000 in compensation to the affected journalists, as well as an agreement by the Saint Paul Police Department to implement new training aimed at educating officers regarding the First Amendment and the rights of the press covering demonstrations.[119]  The Saint Paul Police Department also agreed to work to get the MPD to implement similar training and to make its own training available to law enforcement state-wide.  On information and belief, the MPD never implemented such training, however, nor did the Minnesota State Patrol avail itself of the training offered by the Saint Paul Police Department pursuant to this settlement.

277.  MPD officers also assaulted and unlawfully arrested another journalist, Kelly Benjamin, during the RNC protests after he identified himself as a member of the media and displayed his credentials.  Benjamin was injured and his video camera destroyed as a result of this assault by the MPD.   In 2012, Benjamin filed a federal civil

---

[118]https://www.minnpost.com/politics-policy/2008/09/amy-goodmans-arrest-when-journalists-are-story/
[119] https://www.youtube.com/watch?v=1VtmmFFhTxk

rights lawsuit against the City of Minneapolis and the officers who injured him. The case settled in October 2013 for an unknown amount. On information and belief, the MPD officers involved in this unlawful arrest and assault were not disciplined, and the MPD did not implement any additional training as a result of this incident or the lawsuit.

278.   In 2012, the MPD's Internal Affairs Unit initiated an investigation after Officer Blayne Lehner shoved KSTP photographer Chad Nelson to the ground, damaging Nelson's news camera and injuring Nelson's neck and shoulder.[120]   Nelson filed a criminal complaint against Lehner based on this assault. Earlier that same year, Lehner had been videotaped choking a peaceful female protester, pepper-spraying other peaceful protesters, and arresting a journalist for no reason with the help of other officers.[121] Chief Tim Dolan apologized to Nelson for Lehner's assault, but Lehner received no disciplinary consequences for these constitutional violations, and the MPD did not implement any additional training in the wake of these incidents.

279.   In 2015, the Minnesota State Patrol arrested KMSP-TV reporter Jack Highberger while he reported on protests regarding the MPD's killing of Jamar Clark.[122] Video shows Highberger in the middle of a live shot, speaking into his microphone,

---

[120] https://kstp.com/news/mpd-officer-who-has-been-fired-twice-for-excessive-force-will-remain-fired-following-arbitration-ruling/5772259/
[121] http://www.citypages.com/news/mpd-officer-blayne-lehner-shown-choking-and-pepper-spraying-protesters-in-new-footage-video-6549465
[122] https://www.usnews.com/news/articles/2015/11/17/reporter-arrested-covering-minnesota-highway-protest-over-jamar-clark-shooting

reporting on the State Patrol beginning to arrest protesters.[123]   A State Patrol trooper walked up to Highberger, said, "You wanna be next?" and cuffed him seconds later.  The State Patrol incident report from Highberger's arrest states that State Patrol Lt. Stricker instructed the arresting trooper, Bowman, to "first arrest [the] male with a video camera" – Highberger – before arresting anyone else.[124]   Hundreds of protesters and other media were peacefully milling about when Highberger was arrested.  Highberger was clearly targeted for arrest *because* he was in the act of reporting.  Highberger was booked, charged, and jailed, despite his obvious status as a journalist.[125]   Highberger's arrest received national media attention and was widely reported locally.[126]   On information and belief, the State Patrol did not discipline any troopers as a result of Highberger's arrest, nor was any additional training implemented.

280.   Other credentialed journalists covering the Jamar Clark protests were arrested, and MPD officers pepper sprayed WCCO-TV reporter Reg Chapman during the protests.  The MPD's response to the Jamar Clark protests was widely criticized, and the City asked the Department of Justice to prepare an "after-action" report based on a comprehensive review of the protests and the police response.  The report, released in

---

[123] https://www.facebook.com/JackHighbergerJournalist/videos/as-some-of-you-may-know-i-was-arrested-this-evening-while-covering-a-protest-for/981050458623682/
[124] https://www.unicornriot.ninja/wp-content/uploads/2016/05/pdf20160111_11310735-final.pdf
[125] https://twitter.com/JackHighberger/status/666643697581166593
[126] https://money.cnn.com/2015/11/17/media/tv-reporter-arrested-black-lives-matter-minneapolis/index.html

2017, was entitled "Maintaining First Amendment Rights and Public Safety in North Minneapolis."[127]

281.   The DOJ Report made many recommendations, including some regarding crowd control and use-of-force that are discussed below.  One of the recommendations was that the MPD implement training on "First Amendment rights and protections, legitimacy, and procedural justice" to avoid future unconstitutional actions by the MPD. On information and belief, the MPD ignored this recommendation from the Department of Justice, despite being put on notice by the DOJ Report that its training was deficient with respect to the First Amendment.

282.   In 2017, the Minnesota State Patrol arrested City Pages journalist Susan Du and Minneapolis Daily City Editor David Clarey during the protests following the Philando Castile killing.  Troopers seized Du's phone, camera, keys, notes, and laptop. The State Patrol detained Du and Clarey for nine hours, even though they had attempted to comply with troopers' directions to disperse.  Du and Clarey had identified themselves as members of the press but were detained nonetheless.  On information and belief, no troopers were investigated or disciplined for these unlawful arrests, nor did the Minnesota State Patrol implement any new training in the wake of these arrests.

283.   The State, County and Municipal Defendants are fully cognizant of the constitutional rights they are failing to protect, and they had ample notice that officers and troopers were violating journalists' constitutional rights during the George Floyd and

---

[127] https://www.policefoundation.org/wp-content/uploads/2017/03/Maintaining-First-Amendment-Rights-and-Public-Safety-in-North-Minneapolis.pdf

Daunte Wright protests, yet they utterly failed to exercise any supervision or discipline to curb the lawless and unconstitutional acts of their officers and troopers.

284.   Either the officers and troopers were told explicitly to disregard journalists' rights, or there has been a failure of command to supervise and discipline officers and troopers regarding violations of those rights.

285.   There is a culture of hostility to the media among officers and troopers that the State, County and Municipal Defendants have taken no steps to curb, and in some instances have encouraged.  For example, MPD officers routinely parrot former President Trump's demonization of journalists as the enemy of the people, railing about the "lamestream media" and "fake news"--comments that echo the disparaging remarks about the media made in Defendant Kroll's statement to Federation Members in the wake of the protests.[128]

286.   MPD officer David Pena displayed the rank-and-file's attitude towards the media in Facebook posts[129] commenting on the First Amendment violations that occurred during the protests:[130]

---

[128] https://www.gq.com/story/minneapolis-police-officer-interview
[129] Pena posts under the pseudonym Dave Rock.
[130] http://citypages.com/news/minneapolis-police-officer-urges-looting-of-cedar-riverside-arresting-press/571046391



**Dave Rock**
Friday at 5:16 AM · 👥                    •••

CNN 2nd guy arrested live just now lolololol



👍😆 Dave Rock and 5 others          3 Comments   281 Views

👍 Like                    💬 Comment



**Dave Rock**
Friday at 5:15 AM · 👥                    •••

This just happened live and cnn reporter arrested by state patrol!!!! Lolol



👍😆 Dave Rock and 7 others          7 Comments   373 Views

287.   Consistent with Officer Pena's flippant attitude toward the unlawful arrest of Omar Jimenez and his crew, and Defendant Kroll's disparaging statements about the news media, MPD officers and State Troopers responded with profanity and verbal abuse when members of the press identified themselves in the midst of the unconstitutional acts described above, stating, among other things:  "I don't care;" "we don't fucking care;" "shut up;" "if you move an inch you'll be shot;" "Roll on your side, Mr. Journalist. You're going to be charged;" "we don't care, we'll arrest you;" "Your [press badges] are bullshit;" "I'm going to get her;" "Do you know what curfew is?" and "I want to fucking peg you."

288.   The Minneapolis Police Policy and Procedure Manual Section 6-200 provides:

> MPD employees shall not unnecessarily obstruct news media personnel from performing their duties at emergency scenes. However, news media will not be allowed to cross police lines, which are set up to protect a crime scene. Members of the media must follow all municipal, state, and federal statutes. Media can be restricted from an area where their presence can jeopardize police operations. Only the ranking on-scene officer may grant news media representatives access to any area closed because of investigation or health and safety hazards.

The manual provides no other instruction or guidance on how to identify the media or ensure their First Amendment rights are respected.  It does not discuss how to safeguard press freedoms at protests, Section 6-200 does not appear to have been updated since 2008, and the MPD's conduct throughout the Floyd protests showed a widespread

disregard and contempt for this policy.  Notably, the words "First Amendment" appear nowhere in the entire MPD Policy and Procedure Manual.

289.  MPD officers either do not know, or do not care, about the press's First Amendment rights.  Or, as is apparently the case with Officer Pena and Defendant Kroll, they are actively hostile toward those rights.  Regardless, this state of affairs reflects an unconstitutional MPD policy, practice or custom regarding the rights of the press, and a failure by Chief Arradondo and his command structure to train and supervise regarding the rights of the press and the First Amendment generally.

290.  The Minnesota State Patrol is similarly dismissive of the rights of journalists.  After the barrage of international criticism arising out of its illegal detention of Jimenez and his crew, the State Patrol issued the following statement: "In the course of clearing the streets and restoring order at Lake Street and Snelling Avenue, four people were arrested by State Patrol troopers, including three members of a CNN crew. The three were released once they were confirmed to be members of the media."  Of course, it was obvious from the outset that these individuals were members of the media, posed no threat, and sought to accommodate the State Patrol in its mission, because at the time they were broadcasting on live TV and repeatedly sought guidance on where to go. Arresting them had nothing to do with "restoring order" and everything to do with retaliating against and intimidating the press.  The State Patrol's clearly false statement demonstrates the State Patrol's and Defendant Langer's reckless and deliberate indifference to the constitutional rights of the press and the violation of those rights by the State Patrol.

112

291.    HCSO provided law enforcement assistance during the 2016 Standing Rock protests against construction of the Dakota Access Pipeline.   During those protests, HCSO deputies arrested, assaulted,[131] and pepper-sprayed journalists, including journalists from the nonprofit independent media organization Unicorn Riot.[132]

292.    During the Floyd and Wright protests, dozens if not hundreds of news articles in the local, national, and international press ran every day regarding abuse and arrest of journalists by the State, County and Municipal Defendants, yet nothing has been done to curb the rampant unconstitutional conduct or discipline those involved.

293.    The State, County and Municipal Defendants' failure to properly supervise and train their officers, agents, and employees in the wake of past incidents of unconstitutional conduct and hostility to the press, their unlawful use of force against the press and others, and their inaction despite ample notice during the Floyd and Wright protests that journalists' constitutional rights were being violated, demonstrates a reckless and deliberate indifference to and/or a tacit authorization of violations of the constitutional rights of Plaintiffs and the Plaintiff Class.

---

[131] https://twitter.com/UR_Ninja/status/791742742531563520
[132] https://twitter.com/UR_Ninja/status/791771220513591296?ref_src=twsrc%5Etfw%7C twcamp%5Etweetembed%7Ctwterm%5E791771220513591296%7Ctwgr%5E%7Ctwcon %5Es1_&ref_url=https%3A%2F%2Fkitoconnell.com%2F2016%2F10%2F28%2F100- arrested-brutal-police-crackdown-standing-rock-water-protectors%2F

### b.    Unconstitutional Use of Force.

294.    The State, County and Municipal Defendants each have a policy, practice, or custom of unconstitutional use of excessive force in violation of their own written policies.

295.    The MPD has a custom or practice of ignoring its own written use of force policies, and has failed to adequately train on those policies, failed to supervise its officers with respect to those policies, and failed to discipline officers who violated those policies in the past, all of which contributed to the unlawful acts of violence against journalists described above.

296.    A study in 2013 determined that the Office of Police Conduct Review, created in 2012 to replace the Civilian Review Authority as an oversight body for the internal MPD disciplinary process, had received 439 complaints about officer misconduct.  Not a single complaint resulted in discipline for an accused officer. [133]

297.    In 2015, local nonprofit Communities United Against Police Brutality filed a Data Practices Act request with the MPD.  They learned that only two cases had been closed with discipline between October 2012 and March 2015. [134]

298.    A Reuters investigation determined that between 2012 and 2020, the MPD received roughly 3,000 complaints about officer misconduct, including unlawful use of

---

[133] https://www.usccr.gov/pubs/2018/03-22-MN-Civil-Rights.pdf
[134] https://www.southwestjournal.com/news/2015/12/a-look-inside-the-office-of-police-conduct-review/

force.   Ninety-percent of those complaints were resolved without discipline or other intervention.[135]

299.   Ultimately, only 1.5% of complaints filed against MPD officers between 2013-2019 resulted in suspensions, terminations, or demotions.[136]  Letters of Reprimand were issued in just 1.1% of cases.  In other words, 97.4% of the complaints filed during that seven-year period resulted in no discipline.

300.   These statistics are consistent with MPD's message to officers that they need not fear discipline for violating the MPD's use-of-force policies or individuals' constitutional rights, as MPD's policy, practice and custom has been to excuse and ignore patterns of unconstitutional excessive force by its officers.

301.   For example, in 2015, the City settled a federal lawsuit filed after Officer Tyrone Barze, Jr., confiscated the cellphone of a woman who was filming him and punched her in the face.  The suit settled for $82,000.  The City had previously settled a lawsuit filed after Barze put a high school student in a chokehold.  That suit settled for $140,000.  The City had also settled a lawsuit for $34,000 that was filed after Barze "unreasonably" pepper sprayed the manager of an Uptown bar.[137]  Barze was sued again for unnecessary force later that year.[138]  The lawsuit noted that Barze had been the

---

[135] https://www.reuters.com/article/us-minneapolis-police-culture-specialrep/special-report-how-union-supreme-court-shield-minneapolis-cops-idUSKBN23B2LL
[136] https://www.cnn.com/2020/06/11/us/minneapolis-police-discipline-invs/index.html
[137] http://www.citypages.com/news/minneapolis-officer-tyrone-barze-investigated-again-for-police-brutality-6544768
[138] https://www.startribune.com/man-sues-city-cop-for-excessive-force-during-2014-arrest/361637401/

subject of five previous unnecessary force lawsuits.  The suit settled for $62,500.  As of April 2016, the City had paid $318,000 to settle excessive force lawsuits against Barze.[139] A number of these lawsuits involved Barze's unlawful seizure and destruction of the victims' cellphones or deletion of footage of Barze's misconduct.[140]  Nonetheless, Kroll lauded Barze as "excellent" and a "hardworking cop" and complained that the City Attorney's office was "too quick to settle" excessive force cases.[141]  Kroll had trained and supervised Barze when he first joined the MPD.  On information and belief, Barze had been the subject of 12 different complaints at MPD but had only been disciplined once despite the multiple excessive force settlements.  Instead of disciplining Barze, the MPD chose him to train officers on appropriate use-of-force.[142]

302.   As another example, despite multiple excessive force complaints, Officer Ty Jindra was not disciplined or removed from patrol duty with the MPD until he came under federal investigation for criminal allegations involving his excessive use of force.[143]   On information and belief, at least 12 separate complaints have been filed against Jindra in his 5 years at the MPD.  Among the incidents involving Jindra was one in which he pointed his service weapon at two handcuffed individuals and asked them if

---

[139] https://www.startribune.com/settlement-in-suit-against-mpd-cop-who-s-cost-the-city-320-000/377502941/

[140] https://m.facebook.com/cuapb.org/posts/10156444445252221

[141] https://www.startribune.com/minneapolis-pays-82-000-in-case-of-maple-grove-woman-allegedly-punched-by-officer/328687241/

[142] https://www.startribune.com/settlement-in-suit-against-mpd-cop-who-s-cost-the-city-320-000/377502941/

[143] https://www.startribune.com/sources-minneapolis-cop-under-federal-investigation-for-alleged-excessive-force-theft/568245842/

they wanted "to get fucking shot."[144]   Jindra was not disciplined for this incident.

Jindra's father, Jeff Jindra, was also an MPD officer with a history of uses of excessive

force, including one incident in which he kicked a handcuffed suspect so hard in the face

that he broke the individual's jaw.   The City settled this lawsuit for $110,000.[145]   The

elder Jindra was not disciplined for this unlawful use of force.

303.    In 2013, Officer Lucas Peterson shot and killed Terrence Franklin during a

confrontation in Uptown.  At the time, Peterson had been sued at least 13 times for use of

excessive force, claims which settled for more than $700,000 total.[146]   Notably, one of

these settled claims involved Peterson firing a 40mm "marking round" at close range at

an RNC protester in 2008.[147]   Peterson was not disciplined for this incident.  In fact,

despite Peterson's lengthy excessive force complaints, his only discipline has been a

letter of reprimand.   Franklin's estate sued Peterson for wrongful death, and the City

settled that case for $800,000 in February 2020.[148]  Peterson was never disciplined for the

killing of Franklin, and he remains the training coordinator for the MPD Swat Team.[149]

---

[144] http://www.citypages.com/news/charges-dropped-after-scene-of-chaotic-minneapolis-arrest-released-video/566842611

[145] https://www.minnpost.com/politics-policy/2015/10/disorderly-conduct-its-zeal-bust-drug-dealers-and-prostitutes-minneapolis-po/

[146] https://www.startribune.com/13-excessive-force-complaints-against-minneapolis-cop-involved-in-shooting/213718651/

[147] https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/1509687595/Lucas_Peterson_13_excessive_force_lawsuits.pdf?1509687595

[148] https://www.startribune.com/council-approves-795-000-payment-to-family-of-terrance-franklin-in-2013-police-shooting/567878132/

[149] https://www.linkedin.com/in/lucas-peterson-56237b80

304.    In 2013, MPD officer Blayne Lehner (whose assault of protesters and unlawful arrest of a journalist are described above) kicked an 18-year-old handcuffed in the back of his squad car so hard that the man's teeth were knocked out and his jawbone exposed (Lehner's assault and unlawful arrest of journalists in 2012 is described above).[150]   Lehner was sued in 2015 for this misconduct.   The City paid $360,000 to settle the lawsuit.   Lehner had been the subject of at least 30 internal affairs investigations, received two letters of reprimand, and been suspended twice for misconduct.   He had been previously disciplined five times for excessive force.   Yet on information and belief, he was not disciplined for this incident.   It was not his first federal lawsuit for kicking an individual in the face.   In 2012, Lehner was sued for a 2011 incident in which he kicked a prone, non-resisting individual in the face during an unlawful warrantless search of a duplex apartment.[151]   That lawsuit settled for $85,000.   On information and belief, Lehner was not disciplined for either the 2011 or 2012 incident.

305.    A 2015 Department of Justice analysis of the MPD disciplinary system found that "serious disciplinary actions against officers occur infrequently."   The review recommended that the disciplinary system be re-vamped to better ensure compliance with

---

[150] https://minnesota.cbslocal.com/2016/01/28/mpls-police-union-files-grievances-over-2-officer-firings/

[151] http://www.citypages.com/news/mpd-officer-blayne-lehner-named-in-misconduct-lawsuit-mpls-settles-for-85k-6547490

MPD's use of force and other policies.[152]  On information and belief, the MPD has not

implemented the DOJ's recommendations on how to improve its systems for preventing,

investigating, and sanctioning police misconduct.[153]

306.   In 2015, protests erupted in North Minneapolis after the MPD killing of

Jamar Clark.  The MPD's violent response to the protests was widely criticized.  As

noted above, in 2017 the Department of Justice released an after-action report regarding

the MPD's response to the Jamar Clark protests.  It found that the MPD "did not have

adequate department-wide training on crowd management, negotiated resolution, de-

escalation, the use of personal protective equipment or the use of less-lethal instruments .

. ."[154]  On information and belief, few if any of these DOJ recommendations were

adopted by the MPD.

307.   Among other things, the DOJ Report found:

> "The Minneapolis Police Department did not have adequate
> department-wide training on crowd management, negotiated
> resolution, de-escalation, the use of personal protective
> equipment, or the use of less-lethal instruments prior to the
> [Jamar Clark protests];"

> "The Minneapolis Police Department had inadequate policy,
> guidelines, training, and equipment for crowd management;"

> "No departmental policy currently exists on [crowd-control]
> equipment type, use, or training.  Also, no policy exists to

---

[152] https://docplayer.net/2826886-Diagnostic-analysis-of-minneapolis-police-department-mn.html
[153] https://www.startribune.com/minneapolis-police-behind-the-ball-on-years-old-department-of-justice-report/510595072/
[154] https://www.policefoundation.org/wp-content/uploads/2017/03/Maintaining-First-Amendment-Rights-and-Public-Safety-in-North-Minneapolis.pdf

define who receives equipment, training on equipment, or the inspection and deployment of equipment;"

"Marking rounds were deployed without plans for the subsequent extraction and arrest of the individuals who were marked . . . [and] The MPD does not have policy, procedures, or training regarding the deployment of marking rounds."

308.   In response to these deficiencies, the DOJ Report recommended that:

At a minimum, future department-wide training should include the following:

■ First Amendment rights and protections, legitimacy, and procedural justice;

■  Crowd management, MFF operations, de-escalation, negotiated management, and problem solving;

■ ICS training that builds on the FEMA curricula as a foundation for the MPD, its regional public safety partners, and elected officials;

■ Use of force and less-lethal instrument deployment in accordance with MPD's recently released use of force policy and best practices;

■ Hands-on personal protective equipment training.

309.   The DOJ Report also found that "During the occupation at the Fourth Precinct, MPD employees deployed less-lethal and non-lethal weapons without clear authorization from the incident commander, in violation of policy 5-312."   On information and belief, no officers were disciplined for these violations and no additional training was implemented to prevent similar violations in the future.

310.   The DOJ Report also found that: "MPD deployed chemical agents without prior authorization, in violation of policy 5-313."   On information and belief, no officers

were disciplined for these violations, and no additional training was implemented to prevent similar violations in the future.

311.  The MPD did not implement additional policies, controls, or training after the issuance of the DOJ Report to address the negative findings in the report or the recommendations it made.

312.  In 2016, the Minneapolis Police Conduct Oversight Commission issued a report regarding the MPD citizen complaint filing procedure.[155]  It concluded that some civilian complaints were not even reaching the OPCR.  The report flagged the following issues, among others:

- Top search results for the five most commonly used search engines (i.e. "File complaint against Minneapolis police officer") leads to a police department page on the city website that has no mention of OPCR and instructs complainants who want to file in person to go to a precinct;

- MPD website directs complainants to file complaints at any of the five precincts. Testers were sent to each precinct and asked to file complaints. In 13 of the 15 attempts, complainants were not offered the opportunity to file a complaint at the precinct;

- Testers were often told that no paper forms were available. Forms were provided to precincts and can be printed from the MPD website;

- Testers were told they had to go to another precinct to file a complaint. Complaints should be accepted at any precinct regardless of where the incident occurred.

---

[155] https://www.aclu-mn.org/sites/default/files/field_documents/wcmsp-184609.pdf

The report made 11 recommendations regarding how to handle the complaint intake process to ensure all complaints were heard.  On information and belief, none of these recommendations have been implemented.

313.   A current MPD officer told one reporter recently: "We've had a number of cases that led to internal investigations, and the worst punishment any officer has received was a 48-hour suspension. In a department with the track record of Minneapolis, that shows everything."[156]  The MPD called this reporter and pushed her to disclose the identity of this anonymous MPD officer, claiming it had launched an "internal investigation" into the "leak."[157]

314.   Former Chief Harteau has called MPD's disciplinary system "ineffective." Chief Arradondo has complained that the system is "debilitating" because it prevents him from terminating officers whose misconduct warrants termination.  Former Mayor R.T. Rybak has complained about "wanting to take harder discipline and running into all sorts of contract issues."[158]

315.   A culture of impunity, tolerance for constitutional violations, and open hostility to the press, all of which constitute the custom, practice, and policy of the MPD, culminated in the police abuses of the press described above.  The constitutional violations alleged above were a direct result of MPD policy, practice, and custom, as well as the failure of the MPD to supervise and discipline officers to ensure they adhered to

---

[156] https://www.gq.com/story/minneapolis-police-officer-interview
[157] https://twitter.com/LEBassett/status/1280966908527984645
[158] https://www.cnn.com/2020/06/11/us/minneapolis-police-discipline-invs/index.html

MPD's written policies on use of force and the media and demonstrated respect for the Constitution and the law.

316.   Like the MPD, the Minnesota State Patrol has written policies regarding use of force, First Amendment assemblies (General Order 21-10-013), and the media (General Order 10-10-53), that have been blatantly and repeatedly violated by State Troopers with no discipline or consequence to the troopers, which confirms that the true First Amendment policy, custom, and practice at the Minnesota State Patrol is the unwritten policy of impunity for the arrest and abuse of clearly identifiable journalists.

317.   For example, during the George Floyd protests, a roving band of SWAT team members rolled through the streets of Minneapolis in an unmarked van, periodically opening fire with less-lethal weapons on peaceful protesters in a manner completely at odds with MPD's official policy and for no reason other than gratification of their own sadistic impulses.[159]   One leader of this unit, Sgt. Andrew Bittell, told his officers as the unmarked van drove down Lake Street, "The first fuckers we see, we're just hammering them with 40s."   Bittell was referring of course to the 40mm "less-lethal" weapons used to attack and blind journalists during the protests.

318.   At one point, Bittell's unit saw a group of people peacefully standing outside a gas station.   "Right there, get'em, get'em, get'em, hit'em, hit'em!"   Bittell yelled as the van door slid open and the officers opened fire without warning.   The individuals shot turned out to be the gas station owner, neighbors, and relatives keeping

---

[159] https://minnesotareformer.com/2021/09/01/jaleel-stallings-shot-at-the-mpd-a-jury-acquitted-him-of-wrongdoing/

watch over the gas station during the unrest.  This was the same incident in which the Vice News reporter was pepper-sprayed in the face by a member of Bittell's unit, as described in Paragraph 92 of this Complaint.[160]

319.   When MPD commander Bruce Folkens was told of the thuggish behavior of Bittell and his unit, Folkens stated it was "nice to hear" officers were "hunting people" instead of "chasing people around."  Bittell stated he and his officers "enjoyed" shooting at the peaceful protesters with 40mm rounds, explaining that the "enjoyment and laughter" at hitting civilians with 40mm rounds was a "coping mechanism" for the stress he and his unit felt during the protests.[161]

320.   On information and belief, neither Bittell nor his unit were disciplined for their misconduct or violations of MPD's written policies.

## II.   THE POLICYMAKING ROLE OF DEFENDANT KROLL.

321.   Defendant Kroll was both a Lieutenant in the MPD and the president of the Federation of Minneapolis Police ("the Federation"), the union that represents Minneapolis police officers.  Kroll's supervisory role was significantly amplified by his position as Federation President.  Kroll occupies a unique position among the State, County and Municipal Defendants, as he acted under color of state law with respect to both his supervisory duties as a lieutenant but also in his role as Federation President.

---

[160] https://minnesotareformer.com/2021/09/01/jaleel-stallings-shot-at-the-mpd-a-jury-acquitted-him-of-wrongdoing/
[161] https://minnesotareformer.com/2021/09/01/jaleel-stallings-shot-at-the-mpd-a-jury-acquitted-him-of-wrongdoing/

322.   Under the contract between the City and the Federation, Kroll had full time release from his policing duties while being paid by the city and had an office in the MPD's Human Resources Unit which gave him access to more personnel data and on a quicker basis than he would otherwise have in his role as union president.

323.   Kroll acted as an unofficial policymaker and state actor within the MPD far beyond his command and supervisory duties as a lieutenant.  The Federation's contract with the City of Minneapolis establishes that while certain inherent managerial policy matters fall within the authority of the City (and the MPD command structure), the Federation has a role in setting those policies, a provision under which Kroll operated in his capacity as Federation President.[162]  Kroll also influenced MPD custom and practice through his public and private statements and instructions to officers.

324.   Thus, the MPD's policies, customs and practices derive not just from the command structure within the department, but also from Kroll in his role as Federation President.  Kroll actively sowed discord between rank-and-file officers and the command structure as a means of further amplifying his policy role and outsize influence over police culture.  What Kroll casts as his "opinions" as Federation President have the practical effect of serving as policy guidance for officers, which aggravates the State and Municipal Defendant's training and supervision failures described above.

325.   For example, during the George Floyd protests, even after some of the egregious abuses of journalists described above, Kroll implored MPD commanders to

---

[162]http://www2.minneapolismn.gov/www/groups/public/@hr/documents/webcontent/wcmsp-200131.pdf

further loosen the existing, ineffective restrictions on use of less-lethal projectiles and chemical agents.  In so doing, Kroll inserted himself into the command structure in a policymaking and advisory role inconsistent with his rank.

326.    Kroll wrote in an email to command staff on May 29, 2020: "The officers have lost faith in leadership that appears handcuffed by political power that despises us. That was very evident with numerous examples by several at today's press conference. Examples include no arrests, no mobile booking stations, restrictions on use of gas and less lethal.  At some point community engagement needs to end and law enforcement needs to take place."[163]  Unsurprisingly, given Kroll's insistence on "unhandcuffing" the MPD's protest response, many of the most egregious attacks on journalists occurred on May 30 and 31.

327.    On June 2, 2020, Kroll released a statement to Federation members that underscores his role as *de facto* policymaker and Kroll's failure to supervise with respect to the particular First and Fourth Amendment issues described in this Complaint. [164]

328.    Kroll's June 2 statement sought to drive a wedge between rank-and-file officers and MPD leadership:

> "No one with the exception of [Kroll and the Federation board] is willing to recognize and acknowledge the extreme bravery you have displayed throughout this riot."

> "What has been very evident throughout this process is you have lacked support from the top."

---

[163] https://kstp.com/news/minneapolis-police-union-blames-failed-leadership-for-riots-violence-june-23-2020/5769384/
[164] https://twitter.com/ChiefHarteau/status/1267460683408564225/photo/1

"I've noted in press conferences from our mayor, our governor, and beyond, how they refuse to acknowledge the work of MPD and continually shift blame to it. It is despicable behavior. How our command staff can tolerate it and live with themselves I do not know."

"Your federation board will not remain silent. It's important for us to get order restored and safety resumed. We do have a lot to say about failed leadership when the time is right. We've been formulating plans for that."

329. Kroll's statement flags both his outsized supervisory role and his failure to supervise. In it, he speaks of himself as though he, and not Chief Arradondo, leads the department, and he ratifies the rampant unconstitutional conduct detailed below:

"Although I have not been visibly present, I am closely monitoring what is occurring. I commend you for the excellent police work you are doing . . ."

"I've had numerous conversations with politicians at the state level. I gave a detailed plan of action including a range of 2000 to 3000 National Guard, their deployment allocations throughout our city and St. Paul, in a phone meeting with Senate majority leader Paul Gazelka."

"I've worked with other police leaders from New York to Las Vegas to push our messaging on a national level."

330. Kroll's statement scapegoats the "liberal media," accusing the press of somehow preventing him from being more vocal, and explicitly ties media coverage to danger to the rank-and-file police officers and to Kroll himself, statements which constitute incitement against the press given the current climate of unrest:

"I've been a visible target from the groups conducting this riot, politicians on the left allowing it and encouraging it, and liberal media. My visibility during this time would only

increase your danger.  I've received countless death threats throughout this."

331.    Former Minneapolis Police Chief Janee Harteau responded to the Kroll statement by stating: "A disgrace to the badge!  This is the battle that myself and others have been fighting against.  Bob Kroll turn in your badge!"[165]

332.    Kroll had engaged in public criticism of the department during prior protest situations.  During the protests that erupted in the wake of the Jamar Clark killing, Kroll routinely gave radio interviews in which he criticized the Mayor and the Chief, and lambasted the MPD command structure for what he viewed as a weak response to the protests, undercutting the Mayor's order that the MPD act with restraint in response to the protests, and the public statements from Chief Harteau that protesters First Amendment rights would be respected.[166]

333.    Kroll's outsize influence in setting police policy, custom, and practice, is widely known.  During her tenure, Chief Harteau sought to reform policy and practice within the MPD but was consistently resisted and subverted by Kroll.  She explained recently: "The police federation has historically had more influence over police culture than any police chief ever could.  I was fought at every turn from bringing body cameras to the police department to having implicit bias training to professional development

---

[165] https://twitter.com/ChiefHarteau/status/1267460683408564225
[166] https://www.policefoundation.org/wp-content/uploads/2017/03/Maintaining-First-Amendment-Rights-and-Public-Safety-in-North-Minneapolis.pdf

processes and having some more consistency in promotions."[167]  She stated that when she sought to implement a body camera program for the department, the Federation opposed the policy change and resisted it "at every turn."[168]

334.   Former Assistant Minneapolis Police Chief Kris Arneson, who served during Chief Harteau's tenure, has stated: "Kroll instigates behind the scenes all the time, and if anybody thinks he doesn't, they don't know what they're talking about.  I've seen him agree to reform efforts and then hack away at them behind the scenes."[169]

335.   In 2017, the MPD rolled out changes to its "deadly force" policy that the Federation opposed.  Kroll attacked the policy in private conversations with officers and in public appearances, complaining it was too vague, hamstrung officers, and visited unfair penalties on those who violated the policy.[170]  Kroll's opposition to the policy change ultimately killed the policy, and the Federation's preferred "deadly force" policy remained in place.

336.   Also, in 2017, in the wake of the Justine Damond shooting, the MPD instituted a new policy requiring police body cameras be activated when officers were dispatched.  Kroll attacked the new policy in public, calling it "a knee-jerk reaction and

---

[167] https://www.theguardian.com/us-news/2020/jun/05/minneapolis-police-union-bob-kroll-us
[168] https://www.reuters.com/article/us-minneapolis-police-culture-specialrep/special-report-how-union-supreme-court-shield-minneapolis-cops-idUSKBN23B2LL
[169] https://www.startribune.com/after-decades-of-union-clout-entire-police-dept-now-at-risk/571242042/
[170] https://m.startribune.com/minneapolis-cops-retreat-from-stricter-deadly-force-policy/429986473/

politically motivated," and stating that any such policy change should be "carefully examined" before going into effect.

337.   Former Mayor R.T. Rybak has stated Kroll has an outsize (and highly negative) influence on MPD custom and practice.[171]   Rybak recently stated: "We've never had a person leading the Federation who is as bombastic, who is as overtly racist, who is as likely to provide comfort to someone when they do something wrong, who is as central to that toxic culture as Bob Kroll.   And it is time to name names. Bob Kroll is a cancer on this police department; on this city."[172]

338.   Current Mayor Jacob Frey has also struggled to combat Kroll's influence on MPD policy, practice, and custom, stating that the Federation has resisted all the reforms he has worked to institute, and that he is "hamstrung by the architecture of the system" of the Federation's contract with the City of Minneapolis.

339.   Frey has stated that the main obstacle to changing MPD policy and practice is the Federation, explaining: "what I'm talking about is pushing back hard on the union contract, it's about going after the police union," and suggesting in order to implement the command structure's stated policy, practice and custom at the MPD, it may be necessary to abolish the Federation.[173]

---

[171] https://www.theguardian.com/us-news/2020/jun/05/minneapolis-police-union-bob-kroll-us
[172] https://deadspin.com/all-the-reasons-bob-kroll-can-go-to-hell-including-his-1843905449
[173] https://minnesota.cbslocal.com/2020/06/08/mayor-frey-supports-massive-structural-transformational-reform-of-police-department-not-abolishing-it/

340.   For example, in 2019, Frey banned MPD's use of so-called "warrior-style training" for its officers.  Frey explained: "We have adopted this new policy because proper training on use of force and de-escalation is of paramount importance," cautioning that "[o]fficers found to pursue any training that conflicts with MPD's training and has not been preapproved will be subject to discipline."  MPD spokesman John Elder clarified the importance of officers being trained only through processes sanctioned by the MPD command staff:  "The policy just requires preapproval for external trainings on these topics to make sure there is not a conflict. The MPD encourages and supports training for its staff that encompasses officer and community safety based on procedurally just methodology."  Undaunted, Kroll announced that the Federation would pay for and offer the warrior-style training to MPD officers, essentially usurping the official training function of the MPD and the training determinations of its command structure.[174]  While it is not clear whether any officers took the Kroll up on the offer, warrior-style training videos were ultimately circulated among the MPD rank-and-file to blunt the command structure's attempts at reform.[175]

341.   Frey recently stated: "For years in Minneapolis, police chiefs and elected officials committed to change have been thwarted by police union protections and laws that severely limit accountability among police departments," and Frey identified the

---

[174] https://www.startribune.com/minneapolis-police-union-offers-free-warrior-training-in-defiance-of-mayor-s-ban/509025622/?refresh=true

[175] https://www.washingtonpost.com/national/police-chiefs-and-mayors-push-for-reform-then-they-run-into-veteran-officers-unions-and-how-culture-is-created/2020/06/28/7d2ff812-b2ef-11ea-8f56-63f38c990077_story.html

Federation as a "persistent barrier" to reforms of the MPD's policies, practices, and customs.[176]

342.    Similarly, Defendant Arradondo has complained that he is stymied in carrying out his duties of supervision and discipline because the Federation's contract "diminishes [his] authority as chief . . ."[177]  Per Arradondo, Kroll's attitudes and outlook "absolutely" has an influence on the police force.[178]

343.    Indeed, Arradondo recently announced publicly that the MPD was withdrawing from its contract negotiations with the Federation in an attempt to curb the Federation's influence over MPD policy, practice, and custom.  Arradondo's stated rationale for this move confirms that the Federation's role has devolved from negotiating for its members to influencing and developing MPD policy:  "This is not about officers' wages, bonuses or salaries . . . [t]his is about examining those significant matters that touch on things such as critical incident protocol, use of force . . . and also the discipline process to include both grievances and arbitration."[179]  Frey supported withdrawal from the negotiations, explaining that changing the MPD's relationship to the Federation was not just about a new contract but about a "new compact between the people of Minneapolis" and the MPD.

[176] https://www.startribune.com/minn-officials-push-for-systems-change-at-minneapolis-police-dept/570958652/

[177] https://www.cbsnews.com/news/minneapolis-police-chief-medaria-arradondo-geroge-floyd-killing-60-minutes-2020-06-21/

[178] https://www.cbsnews.com/news/minneapolis-police-chief-medaria-arradondo-geroge-floyd-killing-60-minutes-2020-06-21/

[179] https://minnesota.cbslocal.com/2020/06/10/chief-arradondo-announces-immediate-withdrawal-from-contract-with-police-union/

344.   As discussed above, in response to a request from Minnesota Senate Majority Leader Paul Gazelka, Kroll developed a "detailed plan" for deployment of National Guard troops to be effectuated in coordination with the MPD's response to the George Floyd protests.  That Gazelka thought it appropriate to reach out to Kroll to solicit policy suggestions related to the protests, that Kroll thought it appropriate to respond and develop a "detailed plan of action," and that Gazelka then passed that information on to the Governor's office and discussed it at his own press conference demonstrates that legislative leaders outside the City of Minneapolis view Kroll as an official policy maker separate and distinct from the MPD command structure.[180]

345.   Consistent with this perception, the Minnesota Senate's Judiciary and Public Safety, and Transportation, Finance, and Policy Committees held a joint July 15, 2020 hearing on "Local Law Enforcement Response to Riots and Lawlessness."  It invited three representatives from the Federation board to testify and answer questions, to explain the official actions of the MPD during the George Floyd protests, and to make legislative and policy recommendations.  Neither Chief Arrandondo, Mayor Frey, nor anyone from the Mayor's staff or the MPD command structure were called to testify.  In contrast, Commissioner Harrington and Colonel Langer – those with actual command

---

[180] *See* https://twitter.com/paulgazelka/status/1267939016940359687

responsibility for the State response to the protests – were called to testify and answer questions about the State's response.[181]

346.   Kroll's policymaking role was front-and-center at the Mohammad Noor trial, during which both the victim's family and the Hennepin County Attorneys' Office accused the Federation of instructing officers how and when to respond to official inquiries about the killing.  When the Hennepin County Attorney's Office threatened to hold officers in contempt for refusing to testify before Noor's grand jury, Kroll threatened that the move could affect officers' relationships with the county attorney, stating: "They need to figure out whose side they're on — law enforcement should work collectively with city and county attorneys to prosecute criminals."[182] After Noor's conviction, Justine Damond's father stated: "We believe that this conviction was reached despite the active resistance of a number of Minneapolis officers, including the head of the union."[183]

347.   In 2019, Minneapolis Councilmember Steven Fletcher advanced an initiative to divert money from hiring additional MPD officers and toward a newly created office of violence prevention.  Fletcher has stated that in response to this policy initiative, the police stopped responding as quickly to 911 calls placed by his constituents: "Politicians who cross the MPD find slowdowns in their wards. After the

---

[181] https://www.senate.mn/committees/2019-2020/3102_Committee_on_Transportation_Finance_and_Policy/Agenda%20-%20Joint%20Hearing%204.pdf

[182] https://www.startribune.com/tension-rises-between-county-attorney-police-union-in-noor-grand-jury-investigation/475458363/

[183] https://kstp.com/news/mohamed-noor-trial-differences-police-prosecutors/5337364/

first time I cut money from the proposed police budget, I had an uptick in calls taking forever to get a response, and MPD officers telling business owners to call their councilman about why it took so long."[184]  Fletcher further stated, "It makes it very hard to implement reforms if … the federation is in the background saying, 'Don't worry about this, we'll file a grievance.  That sends a strong signal that you can just ignore leadership. That has, over time, created a culture that is very resistant to change."[185] Councilmember Phillipe Cunningham echoed Fletcher's statement, indicating he too had suffered artificially slow MPD response times after proposing to cut the MPD budget.[186] Councilmember Jeremiah Ellison has stated, "Kroll is now the leader of one of the most hostile PDs in the country.  Officers treat their job less like a job and more like an ideology because of Bob's guidance."[187]

348.   Federation board members also refer to Kroll as a "leader" of the MPD rank-and-file, conflating his role as Federation President into a policymaking role at the MPD far exceeding his rank of Lieutenant.  In a June 24, 2020 interview with KARE 11 news, Federation Vice President Sgt. Sherral Schmidt stated: "Right now our members

---

[184] https://twitter.com/MplsWard3/status/1267891878801915904
[185] https://minnesota.cbslocal.com/2020/06/22/in-minneapolis-talk-of-changing-police-department-means-taking-on-police-union/
[186] https://twitter.com/CunninghamMPLS/status/1267920374207037448
[187] https://spokesman-recorder.com/2020/06/05/bob-kroll-reaffirms-suspicions-the-mpd-is-beyond-reform/

want . . . they want leadership from someone.  And the Federation and Bob are the only ones that are providing that right now."[188]

349.   In the wake of the George Floyd killing, other Minnesota labor unions called for Kroll's resignation and flagged the Federation's outsize role in establishing MPD's policy, practice, and custom and thwarting the implementation of official policy. The AFL-CIO castigated Kroll and the Federation for "enabl[ing] violence and brutality to grow within police ranks . . ."[189]   The American Federation of Government Employees, which represents federal law enforcement officers, stated: "as a union that represents law enforcement officers, we also have a special responsibility to ensure that the labor movement doesn't serve as a shield for bad actors or a barrier to needed structural change . . ."[190]  AFSCME wrote: "Unions exist to protect the rights of working people, not to prevent the justice system from doing what is right."[191]   Education Minnesota President Denise Specht stated: "We know the dangerous culture of the Minneapolis Police Department will not be changed overnight by [Kroll's removal], but it's a start."[192]

---

[188] https://www.kare11.com/article/news/local/george-floyd/police-union-president-bob-kroll-will-not-resign/89-2090d428-d5ab-423f-ac73-626ec6b0c969

[189] https://www.mnaflcio.org/updates/minnesota-afl-cio-calls-minneapolis-police-union-president-bob-kroll%E2%80%99s-immediate-resignation

[190] https://www.afge.org/publication/largest-union-representing-federal-employees-in-minn.-calls-for-immediate-resignation-of-minneapolis-police-union-president-bob-kroll/

[191] https://www.afscmemn.org/council-5/news/afscme-council-5-executive-director-julie-bleyhl-calls-bob-kroll-s-immediate

[192] https://educationminnesota.org/news/media-resources/news-releases/Education-Minnesota-calls-for-resignation-of-Minne

350.   Community leaders likewise perceive the outsize influence Kroll and the Federation exercise over MPD policy, practice, and custom.   For example, Jaylani Hussein, head of the Minnesota chapter of the Council on American Islamic Relations recently stated that while Arradondo is "the best person to oppose Kroll's influence," he is "fighting an uphill battle."[193]   Former labor leader and local activist Javier Morillo has stated that the Federation today is unlike any union in Minnesota and is far removed from the workers' rights movements central to organized labor, resembling instead something more akin to a union within the U.S. Army, which inevitably confuses the command structure.   Morillo stated: "So long as police departments operate in that same kind of structure, to me it begs the question: Is this really a labor-management situation?"[194]

351.   Kroll himself has trumpeted his and the Federation's influence.   In a 2015 interview with the City Pages, Kroll stated: "I think [protesters] see the police federation as a power and they want to take me out of that equation to eliminate part of that power."[195]

352.   In a 2015 interview with WCCO Radio, Kroll was attacking Mayor Hodges when Harteau called into the radio show.   Harteau and Kroll debated MPD policy and practice with respect to protests outside the MPD's Fourth Precinct building, with Kroll pushing for MPD to adopt a more aggressive response to the protests.   This policy debate

---

[193] https://www.mprnews.org/story/2020/06/12/calls-for-mpd-union-leaders-resignation-grow-louder
[194] https://www.startribune.com/after-decades-of-union-clout-entire-police-dept-now-at-risk/571242042/
[195] http://www.citypages.com/news/activists-claim-police-union-chief-bob-kroll-is-racist-7877832

and Kroll's insubordination occurred despite his ostensibly limited role as a mere lieutenant.[196]

353.   Kroll's public statements to the news media and at political rallies underscore the shadow command structure that has emerged under his leadership at the Federation.  Kroll has appeared many times on local and national television and on radio, disparaging official police policy and undermining the authority of the MPD command structure.  Kroll has used these public appearances to render his own and the Federation's positions on MPD policy, practice, and custom.  For example, onstage at a rally for President Trump viewed by millions on national television, Kroll complained generally that police reforms advanced by President Obama and the Department of Justice were "despicable," and accused the Department of Justice of "putting handcuffs on the police," that were "taken off" by the Trump Administration.[197]  Kroll stated in a 2019 radio interview that officers had the right to attend the prohibited "warrior-style" training and that "this isn't the Soviet Republic of Minneapolis, although a lot of the progressive politicians would like it to become that."[198]

354.   Kroll has also publicly downplayed issues with officer misconduct, stating, "You show me an officer who's never had a [misconduct] complaint in 30 years and I'll

---

[196] https://www.youtube.com/watch?v=fLbePial8xI
[197] https://www.cnn.com/videos/politics/2020/06/01/minneapolis-police-union-president-praise-trump-campaign-rally.cnn
[198] https://wccoradio.radio.com/media/audio-channel/bob-kroll-chad-hartman-4-19mp3

show you an officer that's what we call on the job, a load or a slug — that doesn't do anything."[199]

355.    In March 2020, Kroll bragged about his impunity on law enforcement podcast "The Skirmish Line": "I've had 54 complaints filed against me over my 31 years, and I'm still here.  I'm still Lieutenant.  I've been disciplined, but none of it has ever been upheld.  I've been sued 11 times."[200]  In explaining how the Federation "lessen[s] the impact" of civilian oversight of the police, Kroll stated that the Federation "coach[es]" officers facing discipline on how to give a statement during the investigation, specifically, "how to verbalize the justification for their actions," because some officers need "assistance" to explain their conduct.

356.    In 2016, the MPD terminated officer Rod Webber after he pulled over a car containing four Somali teens, held them without arrest for 45 minutes, and threatened to break the legs of one of the teens.  This incident was captured on cell phone video.  Kroll commended Webber in an interview, stating Webber was a "highly decorated 25-year veteran officer" and that the termination was "unwarranted."[201]  The Federation filed a grievance contesting his termination.[202]

---

[199] https://www.mprnews.org/story/2020/06/12/calls-for-mpd-union-leaders-resignation-grow-louder
[200] https://theskirmishline.podbean.com/e/s01e04-a-discussion-about-civilian-oversight-of-the-police
[201] https://minnesota.cbslocal.com/2016/01/25/minneapolis-officer-who-allegedly-threatened-to-break-teens-leg-fired/
[202] https://minnesota.cbslocal.com/2016/01/28/mpls-police-union-files-grievances-over-2-officer-firings/

357.    In 2016, Chief Harteau attempted to fire Officer Blayne Lehner, whose lengthy record of misconduct is described above, after a 2014 incident of excessive force by Lehner.  The Federation filed a grievance, arguing that the termination constituted disparate treatment of Lehner "by punishing him more severely than other officers who have engaged in more serious misconduct."[203]   The arbitrator agreed, overturning the termination and explaining "the comparator evidence submitted by the Union shows that other officers who have engaged in other policy violations have received discipline short of discharge."[204]

358.    Incredibly, at the time of his 2016 attempted termination, Lehner was a member of the Federation board.  Kroll stated in response to Lehner's termination that "Blayne Lehner is an exceptional officer and federation board member," that Lehner was an "excellent cop" who had "served the city well," and called him a "great cop." [205] Lehner was ultimately terminated in 2019 for unspecified misconduct.

359.    The Lehner saga demonstrates how the MPD's policy, practice, and custom of lax discipline, driven by Kroll's negative influence, created a culture of impunity at the MPD that was on display during the MPD's response to the George Floyd protests.

360.    At a 2018 U.S. Civil Rights Commission hearing, Kroll testified, among other things, about the death of Eric Garner, who was suffocated by New York police officers while complaining he couldn't breathe, in a horrific precursor to the murder of

---

[203] https://mn.gov/bms/documents/BMS/127868-20161006-Mpls.pdf
[204] https://mn.gov/bms/documents/BMS/127868-20161006-Mpls.pdf
[205] https://www.mprnews.org/story/2016/10/18/minneapolis-police-officer-reinstated-after-firing; https://minnesota.cbslocal.com/2016/10/18/mpls-cop-fired-blayne-lehner/

George Floyd. With respect to Garner's death, Kroll testified, "of course we had the Eric Garner situation, he said he couldn't breathe 11 times. Now you can't breathe, you can't say you can't breathe, particularly 11 times. It was a false narrative."[206] In an example of Kroll's malign influence on MPD customs and culture, Officer Chauvin parroted Kroll as he kneeled on George Floyd's neck, dismissing Floyd's pleas that he couldn't breathe and stating, "it takes a heck of a lot of oxygen to talk."

361. At that same hearing before the Civil Rights Commission, Kroll attacked the news media, accusing it of perpetuating "false narratives" about the MPD that "ha[ve] set us back greatly," and that because of "adverse effect in the media," MPD officers were "thinking twice before getting out and investigating suspicious circumstances."[207]

362. Kroll's dismissive attitude toward use of force complaints and hostility toward the news media have infected the MPD. His decades of service in Federation leadership, and his strong public and private statements on those issues, have shaped MPD custom and practice, and MPD leadership and the City are well aware of Kroll's influence on MPD policy, practice, and custom.

363. Notably, Kroll has a long history of racist and inflammatory statements and conduct, from calling Attorney General (then Congressman) Keith Ellison a "terrorist," to his membership in the City Heat off-duty law enforcement motorcycle club, an organization called out by the Anti-Defamation League for displaying white supremacist

---

[206] https://www.usccr.gov/pubs/2018/03-22-MN-Civil-Rights.pdf
[207] https://www.usccr.gov/pubs/2018/03-22-MN-Civil-Rights.pdf

symbols, including Ku Klux Klan symbols and "proud to be white" patches.[208]  Kroll was

asked in a 2009 interview about the motorcycle club, and specifically a picture in which

one member's motorcycle jacket included a KKK cross emblem with an "I'm Here For

The Hanging" patch right below it.    Kroll said the patch, worn by someone Kroll

believed was a Chicago-area member of the club, was being misinterpreted as racist,

stating it was "some type of inside joke with Chicago."  He elaborated for the reporter:

> "Aren't you aware of hangings in old Western shows?" Kroll
> asked. He believes the patch stems from "Beer for My
> Horses," a country-western song Kroll says is popular among
> cops because of its strong law-and-order lyrics.  The song
> "has reference to taking all the rope in Texas, find a tall oak
> tree, round up all of them bad boys, hang 'em high in the
> street," Kroll said. "Great song — I have the CD."[209]

Kroll's misconduct, including his membership in City Heat and his contribution to the

MPD's racist culture, was called out in a 2009 Section 1983 action filed by current Chief

Arradondo and several other plaintiffs.

364.    Kroll has a reputation for violent threats and conduct both on and off-duty,

including against journalists.  In October 2018, the Southside Pride newspaper wrote an

article about Kroll that discussed, among other things, Arradondo's 2009 racial

discrimination lawsuit that included allegations about Kroll.  Kroll called the reporter and

left him an angry voicemail, stating, "You want to talk about facts?  Or you just wanna

keep on reporting the same garbage you've been reporting your whole life?  I'd love to

---

[208] https://www.adl.org/sites/default/files/documents/assets/pdf/combating-
hate/ADL_CR_Bigots_on_Bikes_online.pdf
[209] https://www.twincities.com/2009/01/10/ruben-rosario-cops-off-duty-club-questioned-
in-lawsuit/

meet with you and discuss our differences anytime, anywhere.  I don't know you, but you seem to know a lot about me.  I've about had it with your garbage bullshit reporting.  I'm available, [phone number], if you've got the guts, but I doubt it."[210]

365.    In October 2019, a local Jewish activist visited Kroll at Federation headquarters to complain about Kroll's participation in the Trump rally.    The conversation devolved, and the activist called Kroll an asshole, at which point Kroll walked up to the activist and threatened, "Say that again.  I dare you.  I'm not wearing a body camera."[211]

366.    In November 2019, Kroll responded angrily to a Minneapolis resident who had left a comment on the Federation's Facebook page calling Kroll a "Nazi" after Kroll appeared on stage at a Donald Trump rally.  Kroll wrote back, publicly: "If you hate me so much, why don't you stop by and beat the shit out of me? 1811 University Ave. NE. Mid day Mon-Fri. My bet is it won't happen, because you are a cowardly cunt."[212]

367.    In 2008, Kroll was sued after assaulting several individuals while off-duty.  During this proceeding, three separate witnesses testified they saw Kroll repeatedly kick the plaintiff in the head while the plaintiff lay handcuffed on the sidewalk.  The case settled for an undisclosed amount after Kroll's motion for summary judgment was denied.  Kroll was suspended for 160 hours as a result of this incident, though this

---

[210] https://southsidepride.com/2018/10/16/still-out-of-control-part-two/
[211] http://www.citypages.com/news/bob-kroll-sat-down-with-a-local-jewish-activist-it-didnt-go-well/563847601
[212] http://www.citypages.com/news/bob-kroll-calls-random-minneapolis-man-cowardly-cunt/566024921

discipline was apparently overturned.[213]  This 2008 suit was just one of 11 times Kroll has been sued.  As he has bragged publicly, there have been 54 complaints filed against him, but he has never been disciplined.

368.   Kroll and the Federation have continued to lay blame for the MPD's deteriorating reputation on the news media, in an unsubtle message to the rank-and-file that the media is their enemy.  For example, Federation Vice President Sherral Schmidt stated recently: "we've watched an ongoing barrage of media stories that continue to unfairly demonize an entire profession over the actions of a very few."[214]

369.   When a Washington Post reporter knocked on Kroll's door seeking comment on the George Floyd killing, he was soon pulled over by a police officer who said that Kroll had reported suspicious activity on his front porch and that "he doesn't want any press."[215]  This traffic stop apparently at Kroll's request was made with no probable cause and was clearly an attempt to intimidate the reporter at Kroll's direction.[216]

370.   Thus, past and present Minneapolis mayors, Minneapolis City Council members, past and present MPD commanders, the Hennepin County Attorney's Office, community leaders, Federation leaders, other unions, and Kroll himself, understand and

---

[213] http://www.citypages.com/news/activists-claim-police-union-chief-bob-kroll-is-racist-7877832

[214] https://kstp.com/news/minneapolis-police-union-blames-failed-leadership-for-riots-violence-june-23-2020/5769384/

[215] https://www.washingtonpost.com/nation/2020/06/03/george-floyd-police-officers-charges/

[216] https://www.washingtonpost.com/nation/2020/06/03/george-floyd-police-officers-charges/

articulate that Kroll plays what amounts to an official role in the establishment of MPD policy, practice, and custom. The MPD's failures of training and supervision have in some instances been caused, and in some instances been exacerbated, by Kroll's actions. Kroll in his capacity as Federation President has historically displayed a reckless and deliberate indifference to the constitutional rights of Minnesotans as a whole, but also specifically to the constitutional rights of the Plaintiffs in this case.

371. The comments of Mayor Rybak, Mayor Frey, Chief Harteau, Chief Arradondo, and others quoted above demonstrate that the MPD command structure does not have complete command of the department. Kroll exercises control as well, acting essentially as official source of policy, practice, and custom at the MPD, sometimes in concert with and sometimes in contravention of City policy. The widespread lawlessness and disregard for the Constitution displayed by MPD officers during the George Floyd protests derives not just from the unconstitutional actions of the State, County and Municipal Defendants, but also from Kroll's reckless and deliberate indifference to Plaintiffs' constitutional rights.

372. Defendants City of Minneapolis and Arradondo enabled Kroll's usurpation of authority by failing to negotiate with the Federation for adequate controls that would prevent the MPD and its officers from violating individuals, including Plaintiffs', constitutional rights.

373. Kroll acted under color of state law in advancing his own preferred policies, practices, and customs at MPD. Kroll implicitly and explicitly directed officers to operate in a manner abhorrent to the Constitution by encouraging officers to use

unnecessary force on the citizens of Minneapolis, by thwarting discipline and enabling a culture and practice of immunity from sanction for constitutional violations, and by creating a climate of hostility to media and the press that resulted in the abuses of Plaintiffs described above.  Kroll cloaked these policy goals in state power by using his status as a law enforcement status to advance those goals, and he used the Federation's financial and political power to breathe life into his particular ideology.  The MPD's unconstitutional policies, practices, and customs, and the injuries to Plaintiffs and the Plaintiff Class, derive at least in part from Kroll's acts done under color of state law.

## III.   NAMED-DEFENDANT MAJOR JOSEPH DWYER

374.   Defendant Dwyer commands the Minnesota State Patrol's Mobile Response Team ("MRT").  The MRT has primary responsibility at the State Patrol for providing crowd control and responding to protests or incidents of civil unrest.  The MRT provided crowd control at both the George Floyd and Daunte Wright protests.  The MRT contains a separate unit of troopers trained in and tasked with the use of chemical weapons for crowd control purposes, and which did use such weapons under Dwyer's supervision at both the Floyd and Wright protests.

375.   Defendant Dwyer was in command of the State Troopers who attacked Hennessy-Fiske, Cole, Ou, and the other journalists on May 30.  Dwyer formulated and delivered to his troopers the operational plan to be implemented on May 30.  Defendant Dwyer was present at the scene of the May 30 attack and had actual knowledge that the troopers under his command were attacking journalists in violation of the Constitution.  Defendant Dwyer knew of the other unconstitutional conduct against journalists by

146

troopers that occurred before the May 30 attack, including the unlawful arrest of Omar Jimenez, but did not intervene to stop that unconstitutional conduct, or take any steps to prevent it from continuing.

376.    Contrary to Dwyer's fraudulent incident report regarding the events of May 30, 2020, written as an after-the-fact justification for his and his troopers' intentional violation of journalists' and protesters' constitutional rights, the protesters at the scene on May 30, 2020 did not throw debris or other projectiles at the State Troopers before the State Troopers began firing less-lethal weapons.  Rather, pursuant to a premeditated plan, the State Troopers fired less-lethal weapons and chemical weapons on an otherwise peaceful crowd and then commenced their attack on the journalists covering this conduct. Dwyer knew his conduct and that of his troopers violated the Constitution, and that the group of journalists attacked were lawfully exercising their First Amendment rights, but he did nothing to stop the attack on the journalists.  Instead, he lied in his report of this incident to obscure his and his troopers' misconduct.

377.    Dwyer was also responsible for the training and supervision of the MRT. The rampant unconstitutional conduct by those troopers at the George Floyd and Daunte Wright protests (as detailed above) demonstrates his complete failure of supervision and training with respect to the First Amendment rights of the media.

378.    Shortly after the George Floyd protests ended, Dwyer intentionally destroyed his email and text message communications to avoid their disclosure.  Dwyer's destruction of electronic records violated Department of Public Safety policy and constituted intentional spoliation of evidence, given his knowledge at the time of

destruction that litigation had commenced regarding the State Patrol's misconduct during the George Floyd protests.  Dwyer's intentional destruction of these records reflects his knowledge of wrongdoing and his malice toward Plaintiffs and the Plaintiff Class.

379.   According to Dwyer's testimony at the preliminary injunction hearing in this matter, not only did he delete his own email and text message correspondence immediately after the George Floyd protests, so did the vast majority of State Troopers, reflecting a coordinated, agency-wide attempt to destroy evidence and engage in a cover-up of the State Defendants'[217] widespread misconduct, which confirms State Defendants' malice toward the First Amendment rights of Plaintiffs and the Plaintiff Class.

## IV.     OPERATION SAFETY NET AND THE HCSO UNIFIED COMMAND

380.   Operation Safety Net ("OSN") is an unincorporated association of law enforcement agencies that assembled to plan for and conduct crowd control operations during the protests expected to occur during the murder trial of Derek Chauvin and the trials of the other MSP officers who participated in the murder of George Floyd.

381.   OSN is comprised of the Hennepin County Sheriff's Office, the Minneapolis Police Department, the St. Paul Police Department, the Ramsey County Sheriff's Department, Metro Transit Police, the Minnesota State Patrol, the Minnesota Department of Public Safety, the Minnesota Department of Natural Resources, the

---

[217] "State Defendants" include, collectively, Defendant Commissioner Harrington, Defendant Colonel Langer, Defendant Major Dwyer and unidentified John Does who violated Plaintiffs' constitutional rights during the protests as agents or employees of the State of Minnesota.

Minnesota Department of Homeland Security and Emergency Management and the Minnesota National Guard.

382.   OSN and its constituent agencies referred to OSN as a "joint working group" and a "unified command" among other things.

383.   The OSN member agencies "acted in concert" with one another during the Daunte Wright protests, according to hearing testimony from Commissioner Harrington. The agencies communicated and coordinated both tactics and operations on the ground during the protests in Brooklyn Center.

384.   OSN operated as a vehicle by which the Defendants conspired to and did violate Plaintiffs' constitutional rights.

385.   During the Daunte Wright protests, Defendant Hutchinson had operational command of the law enforcement officers at the scene as part of the OSN function.  The Brooklyn Center Police Department and Hennepin County Sheriff's Office shared primary jurisdiction over the protest area, but because the Brooklyn Center Police Chief resigned after Wright's killing, Sheriff Hutchinson effectively had command over law enforcement at the scene.  Specifically, on April 13, Brooklyn Center made a request through the Hennepin County Chiefs of Police Association for the Hennepin County Sheriff's Office to take the lead role in incident command at the protests, and that night the HCSO and Hutchinson assumed command of the law enforcement response to the protests under a unified command structure.

386.   As the on-site commander directing the response to the protesters, Hutchinson was aware of the arrests, assaults, and mistreatment of journalists, and

directly participated in the constitutional violations.  Moreover, he did nothing to quell the law enforcement misconduct and instead ratified it in an ongoing failure of supervision that resulted in the copious constitutional violations identified above. Further, the unchecked unconstitutional conduct of the HCSO deputies at the Daunte Wright protests reflects the HCSO's failure to train and supervise its deputies with respect to the First Amendment rights of journalists, and a pattern and practice of targeting journalists in retaliation for the journalists' exercise of their First Amendment rights.

## **CLASS ALLEGATIONS**

387.    Under Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for prospective relief on behalf of themselves and other similarly situated people who, as members of the news media[218], will in the future observe and record protest activity and the conduct of law enforcement officers on duty in public places within the cities of Minneapolis and Saint Paul and elsewhere in Minnesota in traditional or designated public fora (the "Plaintiff Class"). The Plaintiff Class is defined as:

> All members of the news media, as the term is used in Emergency Executive Order 20-69, who are engaged in news gathering or reporting activities in Minnesota.

388.    The Plaintiff Class is so numerous that joinder of all the members would be impracticable.  Hundreds of members of the news media operate in Minnesota.

---

[218] The term "members of the news media" is used in the Curfew Orders as well as the May 29, 2020 City of Minneapolis Emergency Regulation No. 2020-2-1.

389.   As a result of the State, County and Municipal Defendants' customs and policies of arresting members of the news media, targeting them with less-lethal projectiles and chemical irritants without constitutionally adequate justification or warning, denying them freedom of movement to observe and record public demonstrations and law enforcement officers on duty, and intimidation by threats of violence, the Plaintiff Class have been and will continue to be deprived of their constitutional rights under the First, Fourth, and Fourteenth Amendments.

390.   Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class because protests are ongoing and Plaintiffs and the Plaintiff Class members have a reasonable fear that Defendants will continue to carry out their unconstitutional customs or policies of deploying less-lethal projectiles and chemical irritants without constitutionally adequate warning, denying them freedom of movement to observe and record public demonstrations and law enforcement officers on duty, and intimidation by threats of violence.

391.   Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class.   Plaintiffs have no conflicts involving other class members or Defendants. Plaintiffs understand their role as class representatives and their duties to the class in this litigation.   Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

392.   Questions of law or fact are common to the class.   These legal and factual questions include but are not limited to:

    **a.**     Do arrests and targeting of journalists through a series of common methods violate the First, Fourth, and Fourteenth Amendments?

    **b.**     Are the State, County and Municipal Defendants liable for implementing an unlawful policy or custom as set forth under principles of municipal liability?

    **c.**     Have the State, County and Municipal Defendants manifested a failure to properly train and supervise their agents and officers?

    **d.**     Have the State, County and Municipal Defendants exhibited a reckless and deliberate indifference to the unconstitutional conduct alleged herein?

393.   Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards for law enforcement would be entirely untenable. Doing so would only contribute to a state of uncertainty and confusion that allows the constitutional violations described in this Complaint to continue.

394.   This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(A). A ruling with respect to a single Plaintiff in this case would arguably be strong stare decisis—if not necessarily res judicata—with respect to other putative class members and members of the law enforcement community. There is no benefit to allowing the overwhelmingly common

issues in this case to be litigated individually. The interests of both class members and defendants requires class-wide treatment.

395.   Finally, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b). There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals. Rather, they have been repeatedly targeted because of their membership in a class of journalists. Plaintiffs' targeting exists only by virtue of a broader pattern and practice of unconstitutional conduct directed at journalists as a class. Logically, injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the class.

## CAUSES OF ACTION

### COUNT I:
### First Amendment—Free Speech, Free Press, Free Assembly, 42 U.S.C. § 1983

396.   Plaintiffs[219] and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

397.   Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of observing and recording events of public interest, including public demonstrations and the conduct of law enforcement officers on duty in a public place.  Plaintiffs and the

---

[219] For purposes of Paragraphs 232-308 and the Prayer for Relief, "Plaintiffs" includes members of CWA represented in this litigation by Plaintiff CWA.  Plaintiff CWA seeks only declaratory and injunctive relief on behalf of its members.

Plaintiff Class will continue to do so in the future to cover the events related to the protests and law enforcement's response.

398.   Defendants, acting under color of law, used excessive force to curb Plaintiffs' and the Plaintiff Class's exercise of their First Amendment rights.

399.   Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

400.   These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to observe and record some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place.

401.   It was the State, County and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused Defendants to violate the First Amendment rights of Plaintiffs and the Plaintiff Class.

402.   The State, County and Municipal Defendants' failure to supervise and train their employees and agents with respect to the First Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for First Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

403.   The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the Floyd and Wright protests demonstrates the reckless and deliberate indifference of the State, County and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

404.   Given the multiple constitutional violations documented above, the State, County and Municipal Defendants' lengthy past pattern and practice of such violations, the multiple past federal lawsuits arising out of such violations, and the multiple Department of Justice reports recommending changes in supervision and training protocols regarding individuals' constitutional rights, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State, County and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

405.   Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of constitutional rights, was willful and recklessly indifferent to the rights of Plaintiffs and the Plaintiff Class.

406.   Defendants violated the First Amendment rights of Plaintiffs and the Plaintiff Class by issuing dispersal orders at the Daunte Wright protests ordering that media must leave the area or face arrest.

407.    Plaintiff Goyette's First Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

408.    Plaintiff Lassig's First Amendment rights were violated when police arrested him without probable cause and despite Lassig identifying himself as a member of the press.

409.    Plaintiff Maturen's First Amendment rights were violated when police arrested him without probable cause and despite Lassig identifying himself as a member of the press.

410.    Plaintiff Maury's First Amendment rights were violated when police arrested him without probable cause and despite Lassig identifying himself as a member of the press.

411.    Plaintiff Nelson's First Amendment rights were violated when MPD officers and State Troopers threatened and assaulted her, despite her identifying herself as member of the press.

412.    Plaintiff Ou's First Amendment rights were violated when State Troopers targeted him with chemical irritants and threatened him with arrest while he was covering a protest.

413.    Plaintiff Ou's First Amendment rights were further violated when he was deliberately targeted and shot with a less-lethal munition during the course of his reporting activities.   His First Amendment rights were again violated when an OSN participant threatened him for engaging in reporting activities while he was on private property.

414.    Plaintiff Evans' First Amendment rights were violated when he was targeted, assaulted and arrested by Hennepin County Sheriff's Deputies and State Troopers.

415.    Plaintiff Tuite's First Amendment rights were violated when he was threatened, detained, and assaulted by State Troopers, and when State Troopers photographed and catalogued Tuite, his credentials, and his drivers' license, despite Tuite identifying himself as a member of the press.

416.    Plaintiffs suffered physical injury as a direct and proximate result of Defendants' violations of their constitutional rights.

417.    Defendants are jointly and severally liable to Plaintiffs and the Plaintiff Class.

**COUNT II:**
**First Amendment—Retaliation, 42 U.S.C. § 1983**

418.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

419.    Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of observing and recording events of public interest, including public demonstrations and the conduct of law enforcement officers on duty in a public place.  Plaintiffs and the Plaintiff Class will continue to do so in the future to cover the events related to the protests and law enforcement's response.

420.    Defendants retaliated against Plaintiffs and the Plaintiff Class for engaging in constitutionally protected activity. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

421.    Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

422.    These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to observe and record some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place.

423.    It was the State, County and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

424.    The State, County and Municipal Defendants' failure to supervise and train their employees and agents with respect to the First Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for First Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

425.    The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the Floyd and Wright protests demonstrates the

reckless and deliberate indifference of the State, County and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

426.   Given the multiple constitutional violations documented above, the State, County and Municipal Defendants' lengthy past pattern and practice of such violations, the multiple past federal lawsuits arising out of such violations, and the multiple Department of Justice reports recommending changes in supervision and training protocol regarding individuals' constitutional rights, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State, County and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

427.   Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force to retaliate against Plaintiffs and the Plaintiff Class, and continued retaliatory violation of constitutional rights, was willful and recklessly indifferent to the rights of Plaintiff and the Plaintiff Class.

428.   Defendants retaliated against the exercise of First Amendment rights by Plaintiffs and the Plaintiff Class by issuing dispersal orders at the Daunte Wright protests ordering that media must leave the area or face arrest.

429.   Plaintiff Goyette's First Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

430.   Plaintiff Lassig's First Amendment rights were violated when police arrested him without probable cause and despite Lassig identifying himself as a member of the press.

431.   Plaintiff Maury's First Amendment rights were violated when police arrested him without probable cause and despite Maury identifying himself as a member of the press.

432.   Plaintiff Maturen's First Amendment rights were violated when police arrested him without probable cause and despite Maturen identifying himself as a member of the press.

433.   Plaintiff Nelson's First Amendment rights were violated when Minneapolis Police and State Troopers threatened and assaulted her, despite her identifying herself as member of the press.

434.   Plaintiff Ou's First Amendment rights were violated when State Troopers threatened and assaulted him with chemical irritants, despite Ou identifying himself as a member of the press.

435.   Plaintiff Ou's First Amendment rights were further violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities. His First Amendment rights were again violated when an OSN participant threatened him for engaging in reporting activities while he was on private property.

436.   Plaintiff Evans' First Amendment rights were violated when he was targeted, assaulted and arrested by Hennepin County Sheriff's Deputies and Minnesota State Patrol Troopers.

437.   Plaintiff Tuite's First Amendment rights were violated when he was insulted, threatened, detained, and assaulted by Minnesota State Troopers, despite his identifying himself as a member of the press.

438.   Plaintiffs suffered physical injury as a direct and proximate result of Defendants' violations of their constitutional rights.

439.   Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future if they continue to observe, record, or participate in constitutionally protected activity.

440.   The fear of future retaliation establishes an ongoing and continuous injury by chilling their exercise of their First Amendment rights, which will not be remedied by any alleged policy changes voluntarily undertaken by the State, County and Municipal Defendants.

### COUNT III:
### Fourth Amendment—Unlawful Seizure and Excessive Force, 42 U.S.C. § 1983

441.   Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

442.   Plaintiffs and the Plaintiff Class were seized by Defendants when their officers intentionally, through the use of force and threat of arrest, chemical agents, and nonlethal projectiles, terminated their freedom of movement.   Defendants were acting

under color of law when they violated the Fourth Amendment rights of Plaintiff and the Plaintiff Class.

443.  Members of the Plaintiff Class were also seized by Defendants when they were arrested and detained.

444.  The photographing and cataloging of Plaintiff Class members and their credentials and government issued identification, by State Defendants, also constituted an unlawful seizure under the Fourth Amendment.

445.  Defendants' dispersal orders at the Daunte Wright protests ordering that media must leave the area or face arrest violated the Fourth Amendment rights of Plaintiffs and the Plaintiff Class.

446.  Plaintiff Goyette's Fourth Amendment rights were violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

447.  Plaintiff Lassig's Fourth Amendment rights were violated when he was detained, booked, and cited for curfew violation without probable cause and after identifying himself as a member of the news media.

448.  Plaintiff Maturen's Fourth Amendment rights were violated when he was detained, booked, and cited for curfew violation without probable cause and after identifying himself as a member of the news media.

449.  Plaintiff Maury's Fourth Amendment rights were violated when he was detained, booked, and cited for curfew violation without probable cause and after identifying himself as a member of the news media.

450.    Plaintiff Nelson's Fourth Amendment rights were violated when police and State Troopers used force to terminate her freedom of movement, despite Nelson identifying herself as member of the press.

451.    Plaintiff Ou's Fourth Amendment rights were violated when State Troopers used force to terminate his freedom of movement, despite Ou identifying himself as a member of the press.

452.    Plaintiff Ou's Fourth Amendment rights were further violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

453.    Plaintiff Evans' Fourth Amendment rights were violated when he was targeted, assaulted and arrested by Hennepin County Sheriff's Deputies and Minnesota State Patrol Troopers.

454.    Plaintiff Tuite's Fourth Amendment rights were violated when State Troopers used force to terminate his freedom of movement, despite Tuite identifying himself as a member of the pres.

455.    Plaintiff Tuite's Fourth Amendment rights were violated when State Troopers detained and photographed Tuite, his press credentials, and his driver's license.

456.    Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

457.    Plaintiffs and the Plaintiff Class did not commit a crime, because as members of the news media, they were specifically exempted from the Curfew Orders and permitted to cover the protests outside the restricted times.

458.    Plaintiffs and the Plaintiff class did not pose a threat to any of Defendants' officers or agents or any other person.

459.    It was the State, County and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

460.    The State, County and Municipal Defendants' failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

461.    The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the Floyd and Wright protests demonstrates the reckless and deliberate indifference of the State, County and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

462.    Given the multiple constitutional violations documented above, the State, County and Municipal Defendants' lengthy past pattern and practice of such violations, the multiple past federal lawsuits arising out of such violations, and the multiple Department of Justice reports recommending changes in supervision and training

protocols regarding individuals' constitutional rights, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State, County and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

463. Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of constitutional rights, and failure to supervise, discipline, or correct these violations was willful and recklessly indifferent to the rights of Plaintiffs and the Plaintiff class.

464. As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered physical injury.

465. Plaintiffs and the Plaintiff Class reasonably fear further violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

### COUNT IV:
### Fourteenth Amendment—Due Process, 42 U.S.C. § 1983

466. Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

467. The Due Process rights of Plaintiffs and the Plaintiff Class were violated when the State, County and Municipal Defendants, through their officers and agents,

arrested members of the Plaintiff Class without probable cause, and deployed chemical agents and nonlethal projectiles without providing a warning and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

468.   It was the State, County and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the due process violations.

469.   The State, County and Municipal Defendants' failure to supervise and train their employees and agents with respect to the Due Process rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Due Process violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

470.   The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred in prior protests and during the Floyd and Wright protests demonstrates the reckless and deliberate indifference of the State, County and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

471.   Given the multiple constitutional violations documented above, the State, County and Municipal Defendants' lengthy past pattern and practice of such violations, the multiple past federal lawsuits arising out of such violations, and the multiple Department of Justice reports recommending changes in supervision and training protocols regarding individuals' constitutional rights, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State, County and Municipal

Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

472. Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of constitutional rights, and failure to supervise, discipline, or correct these violations was willful and recklessly indifferent to the rights of Plaintiff and the Plaintiff class.

473. Defendants violated the Fourteenth Amendment rights of Plaintiffs and the Plaintiff Class by issuing dispersal orders at the Daunte Wright protests ordering that media must leave the area or face arrest.

474. Plaintiff Goyette's Fourteenth Amendment rights were violated when he was deliberately targeted and shot with a rubber bullet during the course of his reporting activities.

475. Plaintiff Lassig's Fourteenth Amendment rights were violated when he was detained, arrested, and cited for a curfew violation despite a lack of probable cause for the arrest and after he had identified himself as a member of the news media.

476. Plaintiff Maturen's Fourteenth Amendment rights were violated when he was detained, arrested, and cited for a curfew violation despite a lack of probable cause for the arrest and after he had identified himself as a member of the news media.

477.   Plaintiff Maury's Fourteenth Amendment rights were violated when he was detained, arrested, and cited for a curfew violation despite a lack of probable cause for the arrest and after he had identified himself as a member of the news media.

478.   Plaintiff Nelson's Fourteenth Amendment rights were violated when police and State Troopers threatened and assaulted her, despite her identifying herself as member of the press.

479.   Plaintiff Ou's Fourteenth Amendment rights were violated when State Troopers threatened and assaulted him with chemical irritants, despite Ou identifying himself as a member of the press.  Plaintiff Ou's Fourteenth Amendment rights were also violated when he was deliberately targeted and shot with a less-lethal projectile during the course of his reporting activities.

480.   Plaintiff Evans' Fourteenth Amendment rights were violated when he was targeted, assaulted and arrested by Hennepin County Sheriff's Deputies and Minnesota State Patrol Troopers.

481.   Plaintiff Tuite's Fourteenth Amendment rights were violated when police and State Troopers threatened and assaulted him, detained him, and photographed him, his credentials, and drivers' license, despite Tuite identifying himself as a member of the press.

482.   Plaintiffs and the Plaintiff Class reasonably fear further violation of the right to due process in the future if they observe, record, or participate in constitutionally protected activity.

## COUNT V:
## CIVIL CONSPIRACY, 42 U.S.C. § 1983

483.   Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

484.   Defendants conspired, under color of law, to deprive Plaintiffs and the Plaintiff Class of their constitutional rights.

485.   Defendants acted in concert and committed overt acts in furtherance of the conspiracy.  Defendants targeted members of the press and used unlawful, excessive force to interfere with and retaliate against the Plaintiffs' and the Plaintiff Class's exercise of their constitutional rights.

486.   Defendants coordinated with one another prior to and during the Floyd and Wright protests regarding their response to the protests and to the journalists covering the protests.

487.   Defendants acted in concert with one another in violating the constitutional rights of Plaintiffs and the Plaintiff Class.

488.   As described above, Defendants engaged in overt acts in furtherance of their conspiracy to violate the constitutional rights of Plaintiffs and the Plaintiff Class, and these overt acts injured Plaintiffs and the Plaintiff Class.

489.   Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class.

490.   Plaintiffs and the Plaintiff Class reasonably fear Defendants will continue to conspire to violate the constitutional rights of Plaintiff and the Plaintiff Class.

## COUNT VI:
## FAILURE TO INTERVENE, 42 U.S.C. § 1983

491.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

492.    During the constitutional violations described in this Complaint, Defendants, including but not limited to John Doe supervisors and commanders in the MPD, Hennepin County Sheriff's Department, and Minnesota State Patrol, Colonel Langer, Sheriff Hutchinson, Major Dwyer, Chief Arradondo, and Commissioner Harrington, stood by without intervening to prevent the misconduct.

493.    Defendants had a duty to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

494.    Defendants had the authority to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

495.    Defendants had a reasonable opportunity to prevent the constitutional harms and personal injuries described in this Complaint but failed to do so.

496.    Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

497.    The misconduct described in this Count was undertaken under color of state law, and Defendants acted at all times under the color of state law when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and as representatives of the class defined

herein, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1) or 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as class counsel;

C.    A declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments of the U.S. Constitution;

D.    A permanent injunction barring:

    1.    Use of chemical agents on Plaintiffs or a Plaintiff Class Member, including but not limited to mace/oleoresin capsicum spray or mist/pepper spray/pepper gas, tear gas, skunk, inert smoke, pepper pellets, xylyl bromide, and similar substances, where the Plaintiff or Plaintiff Class Member has identified themselves as a member of the news media or it is reasonably clear that the individual is engaged in news gathering activities, except where Plaintiffs or Plaintiff Class Members present an imminent threat of violence or bodily harm to persons or damage to property;

    2.    Use of physical force against Plaintiffs or a Plaintiff Class Member, including through the use of flash bang grenades, non-lethal projectiles, riot batons, or any other means, where the Plaintiff or Plaintiff Class Member has identified themselves as a member of the news media or it is reasonably clear that the individual is engaged in news gathering activities, except where Plaintiffs or Plaintiff Class Members present an imminent threat of violence or bodily harm to persons or damage to property;

    3.    The arrest, detention, or taking into custody of Plaintiffs or a Plaintiff Class Member, where the Plaintiff or Plaintiff Class Member has identified themselves as a member of the news media or it is reasonably clear that the individual is engaged in news gathering activities, except where Plaintiffs or Plaintiff Class Members present an imminent threat of violence or bodily harm to persons or damage

to property, or as otherwise justified by the presence of probable cause for arrest;

4.     The use of threatening language or gestures to harass or intimidate Plaintiffs or a Plaintiff Class Member, where the Plaintiff or Plaintiff Class Member has identified themselves as a member of the news media or it is reasonably clear that the individual is engaged in news gathering activities, except where Plaintiffs or Plaintiff Class Members present an imminent threat of violence or bodily harm to persons or damage to property.

E.     Damages compensating Plaintiffs for their injuries, including but not limited to compensatory, pecuniary, and medical expense damages;

F.     Punitive damages;

G.     An award of pre-judgment interest;

H.     An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

I.     An award of such other and further relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: September 28, 2021       /s/ Kevin C. Riach
_____

Dulce J. Foster (#0285419)
Karen G. Schanfield (#0096350)
Pari I. McGarraugh (#0395524)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000
dfoster@fredlaw.com
kschanfield@fredlaw.com
pmcgarraugh@fredlaw.com
***Attorneys for Plaintiffs Goyette, Lassig, Maury,
Maturen, Nelson, Ou, Tuite, and Evans***

Kevin C. Riach (#0389277)
**THE LAW OFFICE OF KEVIN C. RIACH, PLLC**
P.O. Box 270815
Vadnais Heights, MN 55127
Telephone: (612) 203-8555
kevin@riachdefense.com

Adam W. Hansen (#0391704)
Colin Reeves (*pro hac vice*)
**APOLLO LAW LLC**
333 Washington Avenue North, Suite 300
Minneapolis, MN 55401
Telephone: 612.927.2969
adam@apollo-law.com

Teresa Nelson (#0269736)
Isabella S. Nascimento (#0401408)
**AMERICAN CIVIL LIBERTIES UNION
OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Telephone: 651.529.1692
tnelson@aclu-mn.org
inascimento@aclu-mn.org

***Attorneys for All Plaintiffs***