UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jared Goyette, Craig Lassig, Katie Nelson, Tannen Maury, Stephen Maturen, Edward Ou, Timothy Evans, Chris Tuite and The Communications Workers of America, *On behalf of themselves and other similarly situated individuals,* | Court File No. 20-cv-01302 (WMW/DTS) |
| Plaintiffs, | |
| v. | **POST-HEARING REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo *in his individual and official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his individual and official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; Minnesota State Patrol Major Joseph Dwyer, *in his individual and official capacity*; Hennepin County Sheriff David Hutchinson*, in his individual and official capacity*; John Does 1-10, *in their individual and official capacities*; | |
| Defendants. | |

## **INTRODUCTION**

Declarations, documents, videos, and live testimony submitted to the Court overwhelmingly establish that State Troopers have targeted journalists with threats, profanity, intimidation, and violence in violation of their constitutional rights. State Defendants ("Defendants") do not offer any real rebuttal to this overwhelming evidence,

instead merely recycling failed arguments from past briefs. They complain that their hand-picked witness, Major Joseph Dwyer, misstated the facts when he testified under oath that he and others permanently destroyed evidence after this case was filed. But whether Defendant Dwyer[1] or others failed in their efforts to purge documents is not dispositive of this Motion, nor does recovery of some of those documents absolve the State Patrol of the spoliation attempt. Ultimately, the issue at hand is Plaintiffs' Motion for a Preliminary Injunction, which the facts and law support. Plaintiffs respectfully request that the Court enjoin Defendants from further unconstitutional conduct during the pendency of this case.

## **ARGUMENT**

**I.      THE TRO SHOULD CONTINUE AS A PRELIMINARY INJUNCTION.**

The TRO carefully balances law enforcement's need to ensure public safety and journalists' rights to document and report developing newsworthy events. It operates exactly as an injunction should: maintaining the status quo until the merits of the case are adjudicated. *See Kelley v. First Westroads Bank*, 840 F.2d 554, 558 (8th Cir. 1988); *see also Craig v. Simon*, 493 F. Supp. 3d 773, 781 (D. Minn.), *aff'd*, 980 F.3d 614 (8th Cir. 2020). The Court should continue the TRO as issued, with only minor modifications (*see* ECF No. 218 at 33–35).

### **A.      The TRO Makes Good Sense.**

For nearly six months, the TRO has worked well. Maintaining the status quo until the merits are resolved requires continuing the TRO as a preliminary injunction. ▪

---

[1] Plaintiffs recently filed their Third Amended Complaint, which among other things added Major Dwyer as a defendant.  (ECF No. 227).

███████████████████████████████████████████████

██████████[2] An ad hoc working group of the Minnesota POST Board appears to agree, having proposed a Draft Model Policy that largely tracks the TRO. (Second Riach Decl. Ex. F.)

The TRO gives Defendants flexibility to do their work. Under it, journalists remain subject to all laws other than dispersal orders. (*See* ECF 105, ¶ 2.a.) Defendants may arrest, threaten to arrest, or use physical force, against a person—even a known journalist—if there is probable cause to believe the individual has committed a crime. (*Id.*) Thus, a journalist—as defined under the TRO's objective standard—who attacks a Trooper or interferes with law enforcement activities (including a mass arrest) would be subject to arrest. But a clearly identified journalist engaged only in recording or reporting events as they transpire—like Ed Ou, Chris Tuite, Omar Jimenez, and Carolyn Sung—would not be subject to arrest or physical force.

### B.  Defendants' Suggested Modifications to the TRO Should Be Rejected.

This Court should reject the modifications to the TRO that Defendants propose. Defendants first suggest that any injunction should require journalists to disperse when ordered. (ECF 149, ¶ 2.a.) As explained below, this proposal should be rejected because it contravenes state law and the First Amendment.

---

[2] Portions of the publicly-filed version of this Memorandum have been redacted pursuant to confidentiality designations made by State Defendants under the Parties' Protective Order.  (*See* ECF No. 92.)

Defendants next ask the Court to require journalists to display a State-issued credential. (ECF 220 at 40 (referencing ECF 146, ¶ 3).) But a State-issued credential would not have prevented the targeting of Omar Jimenez, Ed Ou, Chris Tuite, or others who were showing their press credentials when Troopers attacked or arrested them. (*See, e.g.*, Tr. 21:24-22:1, 116:2-13; Tr. Exs. 12, 68.) There is no evidence that Troopers would have behaved differently if the State had issued the credentials these journalists so prominently displayed. Further, it is premature for the Court to address any hypothetical state credentialing system.  Depending on how implemented, a state credentialing system would be of dubious constitutional validity. Requiring journalists to obtain a state credential in advance would pose insurmountable barriers for out-of-state journalists covering breaking developments like the recent protests. (*See* Tr. 14: 8-25, 96: 4-14). And a system allowing some journalists but not others to cover activity in a *quintessentially* public forum like a street or sidewalk to cover *quintessentially* public matters involving state actors would raise serious First Amendment concerns. The Court cannot fairly evaluate these practical or constitutional implications in the abstract terms presented here.

Defendants also seek the ability to establish a "safe zone" for journalists when protesters are kettled for mass arrest. (ECF 143, at 43.)  Experience teaches that this, too, is unworkable and unwise. First, these are precisely the situations most likely to be newsworthy because law enforcement and protestors are most likely to overreach during a mass arrest. Second, Defendants have demonstrably poor judgment about what areas are "safe" for journalists. As Chris Tuite testified, Troopers directed Tuite and other journalists

to a gas station blocks away, out of sight and sound of the ongoing arrests. (Tr. 119:16-25, 120:1-19). The "safe zone" Defendants seek would prevent the press from reporting.

Defendants finally ask that any injunction should find that they are not in "active concert" with other law enforcement agencies and not liable for their conduct. (ECF 220 at 32). Defendants continue to misapprehend both Rule 65 and Plaintiffs' position. Plaintiffs have never sought to hold Defendants liable for the conduct of other agencies; rather, they seek to hold other agencies to the requirements of any injunction, should the Court determine that such agencies acted "in concert with" Defendants on a particular occasion.

## II.   PLAINTIFFS' MOTION IS SUFFICIENTLY CONNECTED TO THEIR COMPLAINT.

Defendants argue the proposed injunction is insufficiently connected to the Complaint. (ECF 220, at 29–33.) Plaintiffs recently filed a Third Amended Complaint adding Ed Ou, Timothy Evans, and Chris Tuite as plaintiffs, addressing the Daunte Wright protests in detail, and challenging Defendants' inappropriate and unconstitutional use of dispersal orders, rendering this argument moot. (*See* ECF 227).

## III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

As Plaintiffs have set forth several times (*see* ECF 96 at 17–20, 120 at 28–30, 157 at 10–13, 218 at 27–30), and as the Court has already held (ECF 105 at 4–13), Plaintiffs are likely to succeed on the merits of their claims. The Court should reject Defendants' recycled arguments to the contrary.

### A.      Defendants Attempt to Artificially Narrow the Evidence.

Defendants attempt to artificially narrow the evidence of their misconduct, asserting the Court must disregard their mistreatment of journalists Carolyn Sung and Molly Hennessey-Fiske because those facts are established by "inadmissible and unreliable hearsay." (*See* ECF 220 at 23 n.11.) But Defendants' position is unsupported by applicable law. (*See* ECF 186 at 6–7, 9–11.) Multiple circuits and numerous district courts, including within the Eighth Circuit, have held that "at the preliminary injunction stage, . . . the district court may rely on otherwise inadmissible evidence, including hearsay evidence." *See e.g.*, *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993); *Walker v. Selig*, No. 2:15-cv-00166, 2015 WL 12683818, at *1 (E.D. Ark. Oct. 30, 2015). To hold otherwise would make no sense. It would require an evidentiary hearing in strict compliance with the Rules of Evidence any time a party seeks a preliminary injunction, substantially burdening courts and litigants. Defendants implicitly acknowledge that hearsay is properly considered—they submit several declarations, which are undoubtably hearsay, in opposition to this Motion. (*See* ECF 222, 223.) Nonetheless, even if this Court considered only the testimony of the live witnesses, Plaintiffs would be likely to succeed on the merits as demonstrated below.[3]

---

[3] Notably, although they presumably could disprove Plaintiffs' description of the Sung arrest if it were inaccurate, Defendants do not offer any counternarrative beyond Dwyer's May 25, 2021, declaration (ECF 147). ████████████████████████████████

6

B.    **Plaintiffs Are Likely to Prove a Retaliatory Motive.**

Defendants criticize Plaintiffs for not providing direct evidence of "the subjective intentions of troopers on the ground" (ECF 220 at 24 n.12), but direct evidence is not required and "[r]etaliatory motive . . . may be proved by circumstantial evidence giving rise to an inference of retaliatory intent." *Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008).

There is ample circumstantial evidence supporting Plaintiffs' First Amendment retaliation claim. (*See* ECF 218 at 28–30.) Defendants brush this evidence aside, arguing that they were justified in attacking journalists because, in Defendants' estimation, "no member of the media was exposed to any use of force by State Defendants except when remaining physically present in dispersal areas State Defendants were attempting to clear." (ECF 220 at 24 n.12.) The suggestion that only defiant journalists who refused to disperse were attacked is simply untrue. Both Ou and Tuite testified that they and other journalists were attacked while attempting to comply with Troopers' instructions to disperse. Ou described Troopers herding journalists into a dead end, shooting flash bangs and pepper spray at them as they retreated. (Tr. 41:15–22). Journalists had to climb a wall (or be pushed over by Troopers) to escape this unjustified aggression. (Tr. 43:13–44:22.) Ou himself was unable to do so because Troopers had already seriously injured him. (Tr. 43:23–44:5.)

Tuite testified that as he attempted to leave the protest by car with another journalist, Josh McFadden, Troopers swarmed them with weapons drawn and pulled Tuite and McFadden from the vehicle. (Tr. 104:9–15.) The Troopers "threw [McFadden] up into the car," and did not initially acknowledge McFadden was a journalist, although he had a press

credential and carried professional photography equipment. (Tr. 104:14–19) Tuite testified that even after he complied with dispersal orders and retreated several blocks so Troopers could "verify" his credentials by taking close up photographs of his face and identification, he was forbidden from documenting the events: a Trooper told him, "Get back in line. You are not allowed to document. Get back in line." (Tr. 120:4-11.) And the Court watched on video as Omar Jimenez and his crew were arrested even while stating to Troopers, live on CNN, "we can move back to where you'd like . . . just put us back where you want us." (Tr. Ex. 68)

### C.   Dispersal Orders Were Not Lawfully Directed at Plaintiffs.

Defendants continue to insist that they lawfully ordered journalists to disperse, relying on Minn. Stats. §§ 169.02, subd. 2 and 609.715. (*See* ECF 220 at 34–35.) This argument ignores that the orders were not lawful under those statutes or the First Amendment.

Defendants' reliance on Minn. Stat. § 169.02, subd. 2, which makes it a misdemeanor for any person to "willfully fail or refuse to comply with any lawful order or direction" of a peace officer with "authority to direct, control or regulate traffic," is unavailing because the Troopers' orders to disperse were not lawful as applied to journalists. The dispersal orders in May 2020 were based on the curfew order. (Tr. 224:5–7, 111:8-11; Ex. 14 at 0:06-0:16.) Because journalists were expressly exempt from these curfews, dispersal orders based solely on the curfews were not lawful orders as applied to journalists.

8

Nor does Minn. Stat. § 609.715 authorize Defendants to disperse journalists. (*See* ECF 157 at 10–13.) That statute criminalizes a person's "pres[ence] at the place of an unlawful assembly" if the person lacks a "lawful purpose." Minn. Stat. § 609.715. There is no evidence that journalists were "without lawful purpose." Indeed, Ou and Tuite each testified that he was present at the protests with the constitutionally protected purpose of documenting newsworthy events. (Tr. 20:12–18; 53:25–54:20; 97:1–12.) *See Brazenburg v. Hayes*, 408 U.S. 665, 681 (1975).

Defendants cite no law allowing them to issue blanket dispersal orders as they did. In fact, and as Plaintiffs have already asserted (*e.g.*, ECF 120, at 28–29), the First Amendment prohibits limitations on protected activity absent a significant state interest and narrow tailoring. *See Ness v. City of Bloomington*, No. 20-2571, 2021 WL 3918886, at *5 (8th Cir. Sept. 2, 2021). Similarly, Defendants may not restrict the press from places that have been historically open to it (e.g., public streets) unless they demonstrate "an overriding interest based on findings that [dispersal orders are] essential to preserve higher values and [are] narrowly tailored to serve that interest." *Index Newspapers, LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1147 (D. Or. 2020) (citing *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986)).

Defendants' dispersal orders do not satisfy these standards. Ou testified that the crowd was calm, there was no looting or violent behavior, and he was standing apart from the crowd with a group of clearly identifiable journalists. (Tr. 24:9-14, 28:2-21.) Tuite testified that he "did not see anything . . . that warranted a mass arrest or arrest of anyone, any individual." (Tr. 111:11-13.) This Court should not credit Dwyer's self-serving

testimony that the circumstances on the ground justified dispersal and use of force against journalists given the inaccuracies in Dwyer's written reports revealed during cross-examination and the mismatch between Dwyer's testimony and the video footage examined at the hearing. (*See* ECF 218, at 9–10; Tr. Ex. 14 at 0:25–1:11.)

## IV.   PLAINTIFFS FACE IRREPARABLE HARM IF NO PRELIMINARY INJUNCTION ISSUES.

Plaintiffs face irreparable harm if the injunction is denied because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Defendants claim to have implemented changes that obviate the need for injunctive relief, but they provide no evidence that these changes have been effective. In fact, just the opposite is true. Defendants' conduct in Brooklyn Center following the April 2021 Daunte Wright protests—assaulting, threatening, and harassing clearly identifiable journalists—was a continuation of their illegal conduct during the protests in May 2020. (ECF 218 at 10–16.) Defendants had almost a year for corrective action, but their misconduct did not cease until after the TRO was issued.

Moreover, despite Defendants' lip service to the Constitution, it is undisputed that no Trooper has been disciplined. (Tr. 185:19-186:5.) Defendants argue that it is sufficient that they initiated a few internal affairs (IA) investigations. (ECF 220 at 39.) But the IA process is inadequate for at least two reasons. First, Commissioner Harrington indicated that the State will not investigate unless the journalist files a complaint. (Tr. 189:18-190:1.) The Jimenez arrest was so appalling that the Governor issued a public statement in

response, but the State did not investigate that obvious violation because Jimenez filed no

complaint. (Tr. 187:24–190:1.) 

Far from obviating the need for

judicial protection, the weaknesses of the IA process underscore the need for a preliminary

injunction while this lawsuit is pending.

## V.   DEFENDANTS ATTEMPTED TO AND DID SPOLIATE DISCOVERABLE DOCUMENTS.[5]

Defendants argue that Plaintiffs' spoliation allegations are "untrue" and based only

on Major Dwyer's "foundationless" testimony. (ECF 220 at 25–28.) Dwyer testified: "Q.

Do you know of anyone else who deleted their emails and text messages immediately after

the George Floyd protests? A. *Yes, I do*." (Tr. 262:8–11 (emphasis added).) He then

testified he believed the "vast majority of the agency" purged documents. (Tr. 262:21-23.)

Though they could have explored or clarified this testimony, Defendants did not ask Dwyer

a single question about the purge on re-direct.

---

[5] Plaintiffs acknowledge the record regarding spoliation is not yet complete and respectfully request that the Court defer ruling on that issue if it concludes sufficient prejudice caused by Defendants' actual or attempted spoliation is not yet demonstrated.

Defendants now complain Plaintiffs have made "inflammatory" allegations by relying on their lead witness's testimony. All Plaintiffs have done is reference that damning testimony, which is far from "foundationless." Defendants requested the evidentiary hearing because they "want[ed] the Court to hear directly from the [MSP/DPS] leaders who were supervising the State Patrol's participation in Operation Safety Net during the unrest in Brooklyn Center last month." (ECF 150.) They selected Dwyer, who commanded the unit primarily responsible for the Floyd and Wright protest responses, as the leader they wanted to tell their story to the Court. The Court should reject the contention that he lacks foundation to testify about the deletion of texts and emails, especially given his testimony that he did it himself and *knew* others did too.

Moreover, Defendants have access to whatever evidence might disprove Dwyer's testimony about a "vast" effort to purge. They have presented none. Rather, they represent that no purged emails were *lost*, as if this technological life raft—a "hidden folder" that spoliating employees could not see—absolves the agency of its destruction of evidence. It does not, and courts have sanctioned parties even when attempts to spoliate failed. *See, e.g.*, *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 498 (S.D.N.Y. 2016); *Roberts v. Canadian Pac. Ry. Ltd.*, No. 06-CV-1960 JMRFLN, 2007 WL 118901, at *2 (D. Minn. Jan. 11, 2007) (explaining that a party's fruitless attempt at spoliation is sanctionable because it "is an attempt to suborn the fact-finding process and an affront to the Court").

Finally, Defendants' claim that there "is no spoliation" is untrue. Defendants concede Dwyer's purged texts cannot be recovered. (ECF 220 at 27.) The loss of text messages is sanctionable spoliation even if the messages' content may never be

ascertained. *See, e.g.*, *Paisley Park Enterprises*, *Inc. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019) ("Defendants' claim that no prejudice has occurred is wholly unconvincing, given that it is impossible to determine precisely what the destroyed documents contained or how severely the unavailability of these documents might have prejudiced [Plaintiffs'] ability to prove [their] claims . . ..") (internal quotation omitted). Defendants represent that "various text messages" have been preserved (ECF 220 at 28), an ambiguous and feeble statement contrasting with Defendants' vehement argument that *all* discoverable emails have been preserved, and one which provides cold comfort given Dwyer's testimony about an agency-wide purge of texts.



██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

## VI.   DEFENDANTS' CLAIM THAT PLAINTIFFS DID "NO DUE DILIGENCE" IS FALSE AND IRRELEVANT.

Defendants claim that Plaintiffs did "practically no due diligence" and did not "inquir[e]" into the spoliation. (ECF 220 at 3, 9.) This is untrue. Just days after the hearing, Plaintiffs served extensive discovery regarding the spoliation. (Second Riach Decl., Ex. J, ¶7.) Defendants' responses did not detail the retention practices described in the Langer and MacDonald declarations, did not explain that deleted materials had been recovered, and provided no detail about the litigation hold letter.[7] (*Compare* Langer Decl. ¶¶ 4–15, *and* MacDonald Decl. ¶¶ 2–9, *with* Riach Decl. Ex. D.)

Defendants' gripe that Plaintiffs relied on Defendants' own witness's testimony is just another red herring to distract from the uncontroverted evidence that they purged discoverable material and deflect attention from their unavailing arguments on the merits of Plaintiffs' Motion.

---

[7] Plaintiffs also served a Rule 34 request for forensic examination of Dwyer's phone and computer. (Second Riach Decl., Ex. K.) The parties have engaged in a lengthy (and ongoing) meet-and-confer process regarding this request, but at no point did Defendants indicate they had preserved Dwyer's purged emails. (*See* Riach Dec. ¶ 9.)

14

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Court convert its TRO into a Preliminary Injunction with only the modifications described in their opening brief.

Dated: September 29, 2021          */s/* Kevin C. Riach
                                    Dulce J. Foster (#0285419)
                                    Karen G. Schanfield (#0096350)
                                    Pari I. McGarraugh (#0395524)
                                    Emily McAdam (#0400898)
                                    **FREDRIKSON & BYRON, P.A.**
                                    200 South Sixth Street, Suite 4000
                                    Minneapolis, MN 55402-1425
                                    (612) 492-7000
                                    dfoster@fredlaw.com
                                    kschanfield@fredlaw.com
                                    pmcgarraugh@fredlaw.com
                                    emcadam@fredlaw.com
                                    ***Attorneys for Plaintiffs Goyette, Lassig, Maury, Maturen and Nelson***

                                    Kevin C. Riach (#0389277)
                                    **THE LAW OFFICE OF KEVIN C. RIACH, PLLC**
                                    P.O. Box 270815
                                    Vadnais Heights, MN 55127
                                    Telephone: (612) 203-8555
                                    kevin@riachdefense.com

                                    Adam W. Hansen (#0391704)
                                    Colin Reeves (*pro hac vice*)
                                    **APOLLO LAW LLC**
                                    333 Washington Avenue North, Suite 300
                                    Minneapolis, MN 55401
                                    Telephone: 612.927.2969
                                    adam@apollo-law.com

                                    Teresa Nelson (#0269736)
                                    Isabella S. Nascimento (#0401408)
                                    **AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
                                    P.O. Box 14720
                                    Minneapolis, MN 55414
                                    Telephone: 651.529.1692
                                    tnelson@aclu-mn.org
                                    inascimento@aclu-mn.org

                                    ***Attorneys for All Plaintiffs***

16