UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jared Goyette, Craig Lassig, The Communications Workers of America, Tannen Maury, Katie Nelson, Stephen Maturen, Edward Ou, Timothy Evans, and Chris Tuite, | Case No. 20-cv-1302 (WMW/DTS) |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| City of Minneapolis, Medaria Arradondo, Robert Kroll, John Harrington, Matthew Langer, John Does 1–2, David Hutchinson, and Joseph Dwyer, | |
| Defendants. | |

This matter is before the Court on Plaintiffs' motion for a preliminary injunction. (Dkt. 118.) The Court previously granted Plaintiffs' motion for a temporary restraining order (TRO) on April 16, 2021. Plaintiffs now seek an order converting the TRO into a preliminary injunction. For the reasons addressed below, Plaintiffs' motion for a preliminary injunction is granted.

## BACKGROUND

The individual Plaintiffs are journalists, photographers, and other members of the press who bring this lawsuit on behalf of themselves and other similarly situated individuals. Plaintiff The Communications Workers of America is an international labor union that represents news media workers. Defendant John Harrington is the Minnesota Commissioner of Public Safety who has supervisory responsibility over the Minnesota

State Patrol and its commander, Defendant Minnesota State Patrol Colonel Matthew Langer (collectively, State Defendants).  Defendant Medaria Arradondo is the Chief of Police for Defendant City of Minneapolis (collectively, City Defendants).[1]

## I.     Factual Background

On May 25, 2020, George Floyd died as a result of an encounter with four officers of the Minneapolis Police Department (MPD).  Video of the encounter captured by bystanders shows the MPD officers placing Floyd in handcuffs and pinning him to the ground face down, while then-officer Derek Chauvin knelt on Floyd's neck.  Floyd and several bystanders pleaded with Officer Chauvin to change his position to allow Floyd to breathe.  Officer Chauvin refused and continued to kneel on Floyd's neck for several minutes after Floyd became unresponsive.  Video of the encounter circulated rapidly, and hundreds of citizens began protesting in Minneapolis and Saint Paul, as well as nationally and around the world.

Local, state, and federal law enforcement agencies created a Multi-Agency Command Center (MACC) to coordinate their "response to any unrest that develops following the death of George Floyd."  Commissioner Harrington led the state of Minnesota's law enforcement response to the protest.  The Minnesota State Patrol worked closely with the MPD in forming their plan for responding to the protests.  And, throughout the protests,

---

[1]     Defendant Robert Kroll, a former Minneapolis Police Lieutenant and President of the Police Officers Federation of Minneapolis, is not subject to the TRO or the pending motion for a preliminary injunction.  Defendants Hennepin County Sheriff David Hutchinson and Minnesota State Patrol Major Joseph Dwyer were added to this lawsuit in a third amended complaint, which was filed after the pending motion for a preliminary injunction had been heard and briefed.

the MPD and the Minnesota State Patrol worked side-by-side when deploying riot-control tactics to control the protests.

On May 26, 2020, despite mostly peaceful demonstrations, protesters at the MPD's 3rd Precinct building vandalized police vehicles with graffiti and targeted the precinct building where the officers involved in Floyd's death were assigned. Law enforcement officers used foam projectiles and tear gas to repel some of the protestors. Again, on May 27, 2020, hundreds of people protested in Minneapolis. While covering the protests at the 3rd Precinct, Plaintiff Jared Goyette witnessed a projectile fired by the MPD officers near the precinct building hit a young male protester in the head. As Goyette documented bystanders assisting the injured protester, a projectile struck Goyette in the head. A moment later, a canister of tear gas landed nearby, making it impossible for Goyette to see. Goyette maintains that he was clearly identifiable as a member of the news media as he carried a large camera, monopod, and notebook. That same evening, an auto parts store near the 3rd Precinct building was set on fire, and other nearby stores were looted and vandalized. In total, the Minneapolis Fire Department responded to approximately 30 fires related to the protests that evening, during which some fire trucks attempting to respond were hit with rocks and other projectiles.

On May 28, 2020, the MPD officers abandoned the 3rd Precinct building, which was set on fire by protesters. Because of safety concerns, the fire department was unable to respond to the 3rd Precinct building fire and other fires nearby. The Saint Paul Police Department also reported dozens of fires and more than 170 damaged or looted businesses in Saint Paul.

On May 29, 2020, Minnesota Governor Tim Walz announced that the state would restore order, calling on the resources of the Minnesota State Patrol, other state agencies, and the Minnesota National Guard.  Governor Walz implemented an emergency executive order imposing a nighttime curfew in Minneapolis and Saint Paul.  *See* Minn. Exec. Order No. 20-65 (May 29, 2020).  All "members of the news media" were exempted from the curfew.  *Id.*  The curfew was disregarded by many, and individuals hiding among otherwise peaceful protesters continued to commit acts of looting, vandalism and arson.

The largest deployment of the Minnesota National Guard in state history was mobilized the following day to restore order, along with the Minnesota State Patrol and local law enforcement officers.  They moved aggressively to disperse protesters who remained out after the curfew.  On May 31, 2020, law enforcement officers arrested approximately 150 people near downtown Minneapolis for violating the curfew.

Additional protests occurred in Minnesota in connection with the trial of Derek Chauvin in March and April 2021.  On April 11, 2021, a Brooklyn Center police officer shot and killed Daunte Wright, which led to additional protests.  Plaintiffs alleged that the State Defendants continued to violate the constitutional rights of the members of the press who were covering these protests.  Plaintiffs alleged several examples, including the police firing rubber bullets at a videographer who was a safe distance from other protestors, orders directing the press to disperse despite the curfew orders expressly exempting the press, and various other acts impeding the press's ability to observe and report about the protests and law enforcement's interactions with protestors.

## II.      Procedural Background

Plaintiffs commenced this lawsuit in June 2020 alleging that the State Defendants engaged in a pattern and practice of infringing the constitutional rights of members of the press who were documenting the protests that followed George Floyd's death.  According to Plaintiffs, the State Defendants threatened, harassed, assaulted and arrested members of the press in multiple incidents over several days after the death of George Floyd.  On June 2, 2020, Goyette moved for a TRO to prevent the State Defendants from further violating the constitutional rights of the press.  The Court denied the motion without prejudice because the protests had ceased and Goyette failed to demonstrate an imminent threat of harm.

Plaintiffs filed a second motion for a TRO on April 14, 2021, when protests in Minnesota resumed in connection with the criminal prosecution of Chauvin and the death of Daunte Wright.  Plaintiffs sought an order enjoining the State Defendants from taking certain actions against "any person whom [the State Defendants] know or reasonably should know is a Journalist."  In particular, Plaintiffs sought to enjoin the State Defendants from taking the following actions against such individuals: (1) the use of any physical force, including but not limited to non-lethal projectiles; (2) the use of chemical agents, including but not limited to mace, pepper spray, and tear gas; and (3) seizing any photographic equipment, audio- or videorecording equipment, or press passes from such individuals.

The Court granted Plaintiffs' second motion for a TRO, concluding that Plaintiffs had demonstrated a likelihood of success on the merits of their claims, a threat of irreparable harm absent a TRO, and that the balance of harms and public interest weighed in favor granting a TRO.  Subsequently, the parties agreed to extend the duration of the

TRO until the date of the Court's ruling on Plaintiffs' pending motion for a preliminary injunction. The TRO, which remains in effect, does not apply to circumstances in which members of the press present an imminent threat of violence or bodily harm to persons or damage to property; unintentional violations involving an individual who does not carry or wear press credentials or distinctive clothing that identifies the individual as a member of the press; or instances when a member of the press is incidentally exposed to crowd-control devices after remaining in the area subject to an otherwise lawful dispersal order.

Plaintiffs now move to convert the TRO into a preliminary injunction. The Court held an evidentiary hearing as to Plaintiffs' motion for a preliminary injunction on July 28, 2021, and the parties filed supplemental briefing thereafter. Four witnesses testified at the evidentiary hearing: Plaintiff Edward Ou, a Canadian photojournalist who resides in New York; Plaintiff Christopher Tuite, a freelance photojournalist who resides in California; Defendant Minnesota Department of Public Safety Commissioner John Harrington; and Defendant Minnesota State Patrol Major Joseph Dwyer.

## ANALYSIS

Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of a preliminary injunction. When determining whether preliminary injunctive relief is warranted, a district court considers the four *Dataphase* factors: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between this harm and the injury that an injunction would inflict on other parties, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "A preliminary injunction is an extraordinary remedy,"

and the party seeking injunctive relief bears the burden of establishing that each factor favors granting such relief. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). The core question in this analysis "is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

## I.    Likelihood of Success on the Merits[2]

Plaintiffs contend that they are likely to succeed on the merits of their claims alleging violations of the First Amendment and Fourth Amendment to the United States Constitution. When deciding whether to grant a preliminary injunction, the "likelihood of success on the merits is most significant." *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992). The moving party need not "prove a greater than fifty per cent likelihood that [it] will prevail on the merits." *Dataphase*, 640 F.2d at 113. Rather, the moving party must demonstrate a "fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Here, Plaintiffs' likelihood of

---

[2]    As this Court previously observed when granting Plaintiffs' second motion for a TRO, the Court is mindful of certain underlying principles implicated by this case: "demonstrators have a right to protest the actions of the police and other members of the government without fear of government retaliation; police officers, especially in their duty to protect person[s] and property, have difficult and often dangerous jobs that require them to make split-second decisions; and just as not all protestors seek destruction, not all officers seek violence." *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 516 (E.D. Mich. 2020). As such, the Court must "balance the need to protect the sacred rights of speech and assembly from interference and retaliation with that of police to respond appropriately when the safety of the officers and . . . citizens [is] threatened." *Id.*

success on the merits as to their First Amendment and Fourth Amendment claims are addressed in turn.[3]

### A.   First Amendment

Plaintiffs argue that they are likely to succeed on the merits of their First Amendment retaliation claim.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  To succeed, a plaintiff alleging a First Amendment retaliation claim must prove that "(1) [the plaintiff] engaged in a protected activity, (2) the government official took adverse action against [the plaintiff] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Id.* (internal quotation marks omitted); *accord Quraishi v. St. Charles County*, 986 F.3d 831, 837 (8th Cir. 2021).  When this Court granted Plaintiffs' second motion for a TRO in April 2021, the Court concluded that Plaintiffs had demonstrated a likelihood of success on the merits as to each of these elements.  As addressed below, the record evidence that has been developed since April 2021 does not warrant a different result now.

---

[3]       The State Defendants also assert that Plaintiffs' claims fail for lack of standing.  The Court rejected these arguments when the Court ruled on the State Defendants' motion to dismiss, and the State Defendants have not presented an argument that warrants revisiting this issue now.

### 1. Protected Activity

Any law "abridging the freedom of speech, or of the press" is prohibited under the First Amendment. U.S. Const., amend. I. The Supreme Court of the United States has recognized that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Moreover, "the First Amendment goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Am. Civ. Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978)). "Reporting is a First Amendment activity." *Quraishi*, 986 F.3d at 838 (citing *Branzburg*, 408 U.S. at 681). Indeed, when reporting on government conduct, the press serves as "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).

Here, Plaintiffs' declarations and the testimony presented at the evidentiary hearing detail the treatment that members of the press have experienced while photographing, filming or otherwise documenting government activity at protest scenes. These undisputed facts demonstrate that Plaintiffs were engaged in constitutionally protected news-gathering activities. *See Alvarez*, 679 F.3d at 595, 597 ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording" because these news-gathering methods "enable speech.").

The State Defendants argue that First Amendment activity ceases to be *protected* activity when members of the press fail to comply with lawful dispersal orders. It is true

that First Amendment activity "loses its protection when it violates the law." *Lund v. City of Rockford*, 956 F.3d 938, 947 (7th Cir. 2020) (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)). But the State Defendants' argument does not prevail for several reasons.

First, at least some of the Plaintiffs' protected First Amendment activities occurred outside the scope of *any* dispersal-order violations. For example, Ou testified that he observed and filmed protests in Brooklyn Center in April 2021 from inside a private residence that overlooked the protest area. Even though Ou was inside a private residence, law enforcement officers pointed objects at Ou and told him to "go away" and "back off." Plaintiffs' evidence also reflects that law enforcement officers repeatedly threatened and assaulted members of the press as they attempted to comply with dispersal orders. In May 2020, for example, Minnesota State Patrol officers arrested a CNN correspondent on live television even after the correspondent told the officers "we can move back to where you'd like" and "we're getting out of your way." Similar conduct continued during the April 2021 protests, including *after* this Court issued the TRO in this case. Tuite testified that, even after he had complied with a dispersal order on April 16, 2021, state troopers detained members of the press, forced them into a line, photographed their faces and identification, and forbid them from documenting what was occurring. As such, the record reflects that on multiple occasions members of the press were engaged in protected activity that did not fall within the scope of any dispersal order.

Second, the record reflects that at least some of the dispersal orders did not lawfully apply to members of the press. For example, the sole basis for some of the dispersal orders was to enforce curfews, and it is undisputed that members of the press were expressly

exempt from those curfews.  In addition, under Minnesota law, an individual is guilty of unlawful assembly only if the individual is a "participant" in the unlawful assembly.  Minn. Stat. § 609.705.  An individual's refusal to leave an unlawful assembly when directed by law enforcement to do so is a violation of the law only if the individual remains present "without lawful purpose."  Minn. Stat. § 609.715.  Plaintiffs present evidence that members of the press clearly were engaged in news-gathering activities, such as observing and recording protests and law enforcement activities, as opposed to *participating* in an unlawful assembly.[4]  Moreover, when individual members of the press refused to disperse, they did not do so "without lawful purpose."  The record reflects that members of the press continued to lawfully engage in protected activity after the issuance of dispersal orders that did not apply to them.

Third, the government cannot restrict the press from places that have been historically open to the press and the general public without demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1147 (D. Or. 2020) (quoting *Press-Enter. Co. v. Superior Court of Cal.*, 478 U.S. 1, 9 (1986)); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 834

---

[4]     This is not an instance in which law enforcement officers had grounds to reasonably believe that "all arrested persons were part of the *unit* observed violating the law," as the State Defendants argue.  *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012) (internal quotation marks omitted).  Notably, the record includes numerous examples of law enforcement officers specifically and intentionally targeting identifiable members of the press, both verbally and physically, which belies any suggestion that members of the press were somehow indistinguishable from the crowd.

(9th Cir. 2020) (finding that the law enforcement defendants failed to establish that general dispersal orders were essential or narrowly tailored and observing that "[t]he many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others").[5]  As this Court previously observed, the recent protests in Minnesota have occurred primarily on public streets and sidewalks, giving the press a qualified right of access.  *See U.S. Marshals Serv.*, 977 F.3d at 829–30 (recognizing that streets and sidewalks historically have been open to the public).  For general dispersal orders to lawfully apply to members of the press, therefore, the State Defendants, must demonstrate that the dispersal orders are "essential to preserve higher values and [are] narrowly tailored to serve that interest."  *Id.* at 831.  The State Defendants have failed to do so.[6]  As this Court previously observed, the curfew orders exempt the press, which demonstrates that the state and local governments have concluded that press access to these events is both important and feasible.  *Cf. Index Newspapers*, 480 F. Supp. 3d at 1147–48 (rejecting federal law enforcement defendants' "blanket assertion that federal officers must

---

[5]     The State Defendants contend that *Index Newspapers* is inapplicable here because Plaintiffs have not asserted a right-of-access claim.  This argument is misplaced.  The Court's reliance on *Index Newspapers* is not intended to suggest whether Plaintiffs would have a viable right-of-access claim.  Rather, the *Index Newspapers* analysis is relevant to whether Defendants' general dispersal orders were lawful as applied to members of the press.

[6]     The State Defendants argue, in conclusory fashion, that their general dispersal orders were "essential to the preservation of public safety" and "as narrowly tailored as they could be in light of the rapidly changing circumstances."  But the State Defendants make no attempt to demonstrate why it is "essential" to public safety to repeatedly threaten, shout profanities at, assault, detain, and photograph individuals who are clearly identifiable as members of the press and are neither violating the law nor engaging in dangerous or hostile activity.

disperse everyone"). Moreover, other courts have issued preliminary injunctions in similar circumstances on terms akin to those imposed by this Court's TRO. *See, e.g.*, *id.* at 1148; *see also U.S. Marshals Serv.*, 977 F.3d at 838 (denying stay of district court's preliminary injunction pending appeal). Similar narrow tailoring is possible here, and the State Defendants offer no persuasive factual or legal argument as to why such narrow tailoring would be unfeasible.

For these reasons, Plaintiffs have demonstrated a likelihood of success on the merits as to the first element of their First Amendment retaliation claim.

### 2. Chill

Plaintiffs argue that the State Defendants' actions toward members of the press would chill a person of ordinary firmness from documenting protests and law enforcement's conduct in response. The State Defendants do not address this element of Plaintiffs' First Amendment claim.

To succeed on a First Amendment retaliation claim, a plaintiff must prove that the adverse action against the plaintiff would chill a person of ordinary firmness from continuing in the protected First Amendment activity. *See Peterson*, 754 F.3d at 602. Because there is no justification for harassing people for exercising their constitutional rights, the chilling effect on speech need not be great to be actionable. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). Here, Plaintiffs' declarations and the testimony at the evidentiary hearing detail the treatment that members of the press experienced while covering protests in May 2020 and April 2021. The evidence reflects that members of the press were directed by law enforcement to vacate protest areas, verbally and physically

assaulted, struck by less-lethal projectiles and rubber bullets, pepper sprayed, and detained. In some instances, law enforcement officers confiscated or prohibited the use of cameras and other press equipment. A person of ordinary firmness would be chilled by such speech-suppressive actions. *See Peterson*, 754 F.3d at 602 (recognizing that "pepper spraying someone in the face would chill a person of ordinary firmness" (internal quotation marks omitted)); *see also Index Newspapers*, 480 F. Supp. 3d at 1142 (concluding that similar enforcement tactics to those alleged here would chill First Amendment activities). The record also reflects that several members of the press have wanted or intended to continue covering the protests but either fear for their safety or have been rendered physically unable to continue reporting because of injuries sustained as a result of law enforcement officers' tactics.

For these reasons, Plaintiffs have demonstrated a likelihood of success on the merits as to the second element of their First Amendment retaliation claim.

### 3.    Motivation

Plaintiffs argue that there is a documented pattern of hostility by the State Defendants to members of the press. According to Plaintiffs, this pattern demonstrates that the State Defendants were motivated, at least in part, by the press's First Amendment activities, which is the third element of a First Amendment retaliation claim. *See Peterson*, 754 F.3d at 602. "Retaliatory motive . . . may be proved by circumstantial evidence giving rise to an inference of retaliatory intent." *Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008). Here, although the State Defendants argue that they "do not 'target' members of the media," the record evidence suggests otherwise.

The record reflects that, although many members of the press were clearly identifiable as such, the State Defendants singled them out in a variety of ways. The State Defendants told the press specifically that they needed to vacate the protest areas, pepper sprayed them, and hit them with less-lethal projectiles. Law enforcement officers targeted the press by threatening to "arrest anyone who does not disperse in 10 minutes *including journalists*," (emphasis added), and repeatedly ordering the press to leave, shouting messages such as: "Media you need to disperse. Leave the area." One photojournalist, who had a camera and press credentials in clear view, was pepper sprayed in the eye while photographing a scene. According to another journalist, "[o]ne officer just shot our ground reporter in the leg with some kind of impact round – it appeared to be deliberate and not accidental." Plaintiff Timothy Evans, a freelance photojournalist, attests that on April 16, 2021, he identified himself as a member of the press to law enforcement officers. In response, one law enforcement officer said "I don't care," told Evans to "shut the f**k up," assaulted Evans, confiscated and discarded Evans's press credentials, and accused Evans of lying when Evans correctly asserted that the curfew did not apply to members of the press. These facts are merely a few examples of Plaintiffs' circumstantial evidence of a retaliatory motive. *See Index Newspapers*, 480 F. Supp. 3d at 1144–45 (concluding that journalists were targeted when forced to disperse based on similar allegations).

At the evidentiary hearing, Plaintiffs presented additional circumstantial evidence suggesting retaliatory motive. Ou testified that, in May 2020, state troopers "corralled" a group of people—all or mostly members of the press—into a dead end where they were "trapped" after the state troopers had peppered sprayed them. The state troopers "kept on

throwing concussion grenades at [them], telling [them] to leave, but there was nowhere for [them] to go."   Ou also testified that, during the April 2021 protests, law enforcement officers threatened him while he was observing and filming their activities from inside a private residence.   Tuite testified that on April 16, 2021—*after* this Court had issued the TRO in this case—a state trooper told him: "Media, get the f**k out of here now."   A short time later, when Tuite had left the area, "a line of state troopers . . . [was] obstructing [the press's] view completely of what was happening."   After Tuite complied with the state troopers' directions to move to a location two blocks away, the state troopers continued to obstruct members of the press from engaging in news-gathering activity.   According to Tuite:

> I was not even allowed to do my job.  They made us get into a line here and they said we need to have our faces photographed, our media credentials, as well as our IDs.  I tried to walk to the right to take a photo of someone getting arrested.  He said, "Get back in line. You are not allowed to document. Get back in line," the state trooper [said] to me.

These facts suggest that the State Defendants' actions were motivated, at least in part, by the engagement of the press in constitutionally protected activity.  *See Index Newspapers*, 480 F. Supp. 3d at 1144–45.

Plaintiffs have demonstrated a likelihood of success on the merits as to the third element of their First Amendment retaliation claim.   Accordingly, Plaintiffs have a fair chance of prevailing on the merits of their First Amendment claim and, as such, have demonstrated a likelihood of success on the merits.  *See Dataphase*, 640 F.2d at 114.

16

B.    Fourth Amendment

Plaintiffs maintain that they are likely to succeed on the merits of their Fourth Amendment claim, arguing that the State Defendants have restrained them from moving freely throughout the areas where protests are occurring.

The Fourth Amendment protects individuals from seizure through the use of excessive force by a law enforcement officer. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989). "A Fourth Amendment seizure occurs when an officer restrains the liberty of an individual through physical force or show of authority." *Quraishi*, 986 F.3d at 839 (internal quotation marks omitted). The reasonableness of law enforcement officers' actions is determined objectively based on the facts and circumstances confronting the officers, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

Plaintiffs contend, and the record reflects, that Plaintiffs were neither participating in nor suspected of participating in any crime. Nor does the record reflect that Plaintiffs presented a threat to the safety of law enforcement officers or others. Law enforcement officers nonetheless ordered members of the press to disperse, threatened them, arrested them, and subjected them to injury-inflicting force. Significantly, on April 16, 2021, *after* this Court issued the TRO in this case, these tactics continued. For example, after members of the press had moved away from the protest area as directed by state troopers, the state troopers detained those individuals; photographed their faces, press credentials, and

identification; and prohibited them from engaging in news-gathering activities. These facts demonstrate repeated unreasonable restraints on the movement of the press during the protests through intimidation tactics that included the use of projectiles, pepper spray, tear gas, batons, and verbal commands and threats. The use of these tactics persisted even after members of the press had identified themselves and complied with dispersal orders.

The State Defendants reiterate their argument that members of the press are not exempt from generally applicable dispersal orders. But, as addressed by the Court, the record reflects that law enforcement officers repeatedly used intimidation and restraint tactics against individuals who either were not subject to a lawful dispersal order or had not violated a lawful dispersal order. And law enforcement officers, in some instances, did so even *after* members of the press had complied or attempted to comply with law enforcement officers' orders. The State Defendants also argue that the Fourth Amendment is not violated when law enforcement officers have grounds to reasonably believe that "all arrested persons were part of the *unit* observed violating the law." *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012) (internal quotation marks omitted). But the record in this case includes numerous examples of law enforcement officers specifically and intentionally targeting identifiable members of the press, both verbally and physically. As such, the record belies any suggestion that members of the press were somehow indistinguishable from others.

For these reasons, Plaintiffs have demonstrated a likelihood of success on the merits as to their Fourth Amendment claim.

18

## II.     Threat of Irreparable Harm

Plaintiffs contend that the State Defendants' violation of Plaintiffs' constitutional rights are immediate and ongoing.  The State Defendants counter that they present no threat of future harm.

Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  But to establish the need for injunctive relief to avoid irreparable harm, the movant "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (internal quotation marks omitted).  A mere "possibility of harm" is insufficient.  *Roudachevski*, 648 F.3d at 706.  In cases alleging constitutional harm, demonstrating a likelihood of success "ordinarily warrants a finding of irreparable harm."  *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

As this Court observed when granting Plaintiffs' second motion for a TRO, several factors demonstrate the clear and present need for injunctive relief in this case: (1) the State Defendants' repeated conduct in contravention of Plaintiffs' constitutional rights; (2) the ongoing, albeit intermittent, protests in Minnesota pertaining to law enforcement officers' use of force; and (3) Plaintiffs' intention to continue their press coverage of the protests.  The harm to Plaintiffs is no longer speculative or a mere possibility.  Rather, the protests

continued, and the harm inflicted by the State Defendants did not abate until the Court issued the TRO in this case. Moreover, the record reflects that little if any investigation or discipline has been carried out by the State Defendants in response to the alleged misconduct in this case, which suggests that similar misconduct could recur if the TRO is not converted into a preliminary injunction.

Although the State Defendants argue that no large-scale unrest situations are imminent, the threat of imminent future interactions between the State Defendants and members of the press persists.[7]  In light of the events that have occurred over the last year and a half, the likelihood of demonstrations and protests persists. The criminal trial of the law enforcement officer who killed Daunte Wright is scheduled to begin in November 2021. The criminal trial of Chauvin's co-defendants is scheduled to begin in March 2022. And federal criminal charges against Chauvin and his co-defendants are pending in this District. If the press cannot document these events of public importance, Plaintiffs' First Amendment rights will be irreparably harmed. *See Elrod*, 427 U.S. at 373. Because of the likelihood that this harm could recur before a decision on the merits of this case can occur, the threat of irreparable harm to Plaintiffs is sufficiently immediate to warrant injunctive relief. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016).

Accordingly, the threat of irreparable harm to Plaintiffs continues to exist.

---

[7]     The State Defendants suggest that a preliminary injunction is unwarranted because the alleged harm has abated. But this argument fails to account for the fact that the harm abated only *after* the Court issued a TRO. And this fact suggests that injunctive relief is necessary to prevent ongoing harm.

### III.     Balance of Harms

The parties dispute whether the balance of harms weighs in favor of granting a preliminary injunction.

When, as here, a plaintiff raises a legitimate constitutional question, the balance of hardships tips sharply in the plaintiff's favor. *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007).  As this Court has observed, a well-tailored injunction that balances the freedom of the press with the government's ability to exercise its police power does not irreparably harm the government.  *See, e.g.*, *Index Newspapers*, 977 F.3d at 835.  Here, the record contains specific allegations and evidence particularized to the State Defendants.  And, as addressed above, Plaintiffs have demonstrated both irreparable harm and a likelihood of success on the merits of their First Amendment and Fourth Amendment claims.  For these reasons, the balance of harms weighs heavily in Plaintiffs' favor.  *See, e.g.*, *Cmty. House*, 490 F.3d at 1059; *see also Kersten v. City of Mandan*, 389 F. Supp. 3d 640, 647 (D.N.D. 2019) (finding that the balance of harms "generally favors the constitutionally-protected freedom of expression" (internal quotation marks omitted)).

The State Defendants correctly counter that they have a substantial interest in maintaining order and ensuring public safety.  But the State Defendants do not present any evidence or persuasive argument that these important interests have been materially impeded by the TRO.  The State Defendants argue that it is difficult to distinguish members of the press from other individuals during situations of chaotic unrest, and the State Defendants presented testimony to this effect from Commissioner Harrington and Major Dwyer.  But as detailed throughout this Order, many of the alleged instances of misconduct

involved law enforcement officers willfully disregarding indicia that a person was a member of the press and targeting individuals who were clearly identifiable as members of the press or who were attempting to display their press credentials. The tactics used against these individuals included harassing, threatening, intimidating, assaulting, or detaining individuals who were complying with or attempting to comply with dispersal orders or who were merely observing protests from private property. The State Defendants' suggestion that these tactics are somehow necessary to maintaining order and ensuring public safety is unpersuasive.

The terms of the TRO are carefully tailored to preserve law enforcement officers' ability to maintain order and ensure public safety. For example, members of the press must obey the law, and the TRO permits law enforcement officers to arrest a member of the press or seize his or her property if there is probable cause to believe that the individual committed a crime. Members of the press do not have a "free pass" to obstruct justice by actively impeding law enforcement. Law enforcement officers also remain authorized to use crowd-control tools and tactics, including against members of the press who present an imminent threat of violence or bodily harm to persons or damage to property. The State Defendants are not precluded from issuing otherwise lawful crowd-dispersal orders, and the State Defendants are not liable for violating the TRO if a member of the press is incidentally exposed to crowd-control tactics. The State Defendants have not identified any specific evidence that the carefully tailored terms of the injunction are unworkable or have impeded the State Defendants' ability to maintain order and ensure public safety. Indeed, although the TRO has been in place for more than six months, the State Defendants

have not identified any specific instance in which the injunction has materially obstructed their legitimate law-enforcement functions.

The State Defendants correctly observe that it can be inefficient and difficult to differentiate members of the press during situations involving chaotic unrest. For example, Colonel Langer attests that, "since the TRO issued, the State Patrol has encountered significant difficulty in implementing the TRO as it pertains to dispersal." Colonel Langer describes examples of these difficulties, but has not identified a single incident that involved any demonstrable threat or harm to public safety:

> For example, during recent protests at both the Governor's residence and the Capitol complex, several troopers encountered difficulty with several individuals locating themselves to record events in areas which caused a safety concern at worst, and a distraction at best. Given the TRO's limitations on dispersal, many troopers have not asked these individuals to relocate, even when their position is exceedingly close to law enforcement activity, directly at the back of troopers or in-between their legs, or even directly within the sphere of law enforcement activity.

> Further, during the recent protests at the Governor's residence and the Capitol complex, troopers observed individuals who were recording events working directly with the protesters. This made it difficult to ascertain whether these individuals were protesters or members of the media or both.

Colonel Langer concedes that "no critical incidents have yet occurred as a result" of the TRO, which has been in effect for more than six months. The Court is mindful that the TRO may cause some inefficiencies, inconveniences, and other challenges for the State Defendants. But the United States Constitution requires inefficiency, sometimes by design, to limit abuses of power. *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 601 (2014) (Scalia, J.,

concurring) (observing that the "Constitution is not a road map for maximally efficient government, but a system of carefully crafted restraints designed to protect the people from the improvident exercise of power" (internal quotation marks omitted)).  The fact that the State Defendants' compliance with the injunction may be inefficient or difficult does not, without more, establish that the balance of harms weighs in their favor.

Accordingly, the balance of harms weighs in favor of granting Plaintiffs a preliminary injunction.

## IV.  Public Interest

The parties dispute whether the public interest weighs in favor of granting a preliminary injunction.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (internal quotation marks omitted).  "Abridgment of freedom of speech and of the press . . . impairs those opportunities for public education that are essential to effective exercise of the power of correcting error through the processes of popular government." *Thornhill v. State of Alabama*, 310 U.S. 88, 95 (1940).  "By reporting about the government, the media are 'surrogates for the public.' " *Index Newspapers*, 480 F. Supp. 3d at 1146 (quoting *Richmond Newspapers*, 448 U.S. at 573).  Because the American public has limited time and resources to devote to first-hand observation of government operations, the press is an indispensable resource in our constitutional democracy.  *See id.* (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975)).

At stake here are Plaintiffs' First Amendment and Fourth Amendment rights, as well as the public's ability to learn about ongoing events of public importance. The potential harm arising from suppressing press coverage of the protests is great and the public interest favors protecting these First Amendment principles. *See Reno*, 154 F.3d at 288. The State Defendants correctly observe that it also is in the public's interest to control unrest, violence, and other chaotic situations. But constitutional rights are not diminished during a period of "chaotic unrest." *See Ex parte Milligan*, 71 U.S. 2, 120–21 (1866) ("The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes . . . ., at all times, and under all circumstances."). "Democracies die behind closed doors." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002).

For these reasons, the public interest supports granting Plaintiffs a preliminary injunction. Because all four *Dataphase* factors weigh in favor of converting the TRO into a preliminary injunction, Plaintiffs' motion for a preliminary injunction is granted.[8]

## V.    Scope of the Preliminary Injunction

Plaintiffs contend that the TRO should be converted into a preliminary injunction with two modifications: (1) broadening the injunction's geographic scope beyond Brooklyn Center, and (2) broadening the injunction's applicability to include those who are "in active concert" with the State Defendants. The State Defendants contend that, if

---

[8]    Plaintiffs also seek an adverse-inference sanction against the State Defendants for the alleged spoliation of evidence. Because the Court has not relied on any adverse inferences in granting Plaintiffs' motion for a preliminary injunction, the Court declines to address the spoliation issue at this time.

the Court grants Plaintiffs' motion for a preliminary injunction, the injunction should be modified to provide that members of the press are *not* fully exempt from general dispersal orders and to require members of the press to identify themselves clearly, visibly, and consistently.

### A.    Geographic Scope

Plaintiffs first argue that the injunction should be broadened to apply outside Brooklyn Center.  The State Defendants do not object to this modification.

An injunction binds only those "who receive actual notice of it by personal service or otherwise."  Fed. R. Civ. P. 65(d)(2).  Although the TRO did not contain an express geographic limitation, the TRO required the State Defendants to provide copies of the TRO only to "employees, officers, and agents of the State Defendants currently deployed in Brooklyn Center, Minnesota."  Because it is undisputed that the State Defendants' personnel can be deployed anywhere in the state, this requested modification is granted.

The preliminary injunction is modified to require the State Defendants to provide copies of this Order to *all* of the State Defendants' employees, officers, and agents.

### B.    Active Concert

Plaintiffs next argue that the injunction should be broadened to bind those who are "in active concert" with the State Defendants.  The State Defendants oppose this modification.

A preliminary injunction can bind "other persons who are in active concert or participation with" the parties or their employees, officers, or agents.  Fed. R. Civ. P. 65(d)(2)(C).  "Under Rule 65(d), a nonparty with actual notice may be held in contempt

[when] the nonparty aids or abets a named party in a concerted violation of a court order."
*Indep. Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 920 (8th Cir. 1998).  "The 'essence' of this rule 'is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.' " *Id.* (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).

The State Defendants do not dispute that Rule 65(d) authorizes the Court to enjoin those who are "in active concert or participation with" the State Defendants.  But the State Defendants maintain that they are not in "active concert" with other law enforcement agencies or liable for the conduct of other law enforcement agencies.  The City Defendants, against whom Plaintiffs have *not* sought a preliminary injunction, also argue that they are not in "active concert" with the State Defendants and should not be bound by the injunction.

The Court need not attempt to predict, however, whether any particular law enforcement agency might violate this injunction in the future while "in active concert or participation with" the State Defendants.  Whether a person or entity is in active concert or participation with an enjoined party "ordinarily presents a question of fact requiring examination of the circumstances of each case as it arises."  *Crane Boom Life Guard Co. v. Saf-T-Boom Corp.*, 362 F.2d 317, 322 (8th Cir. 1966).  As such, the Court will include in the preliminary injunction the language authorized by Rule 65(d)(2)(C), but in doing so the Court expresses no opinion as to whether any particular entity or individual other than the State Defendants is bound by the injunction pursuant to Rule 65(d)(2)(C).  If Plaintiffs later move for a contempt order based on an alleged violation of the injunction, the Court will evaluate the relevant facts and circumstances to determine whether the alleged

contemnor was bound by the injunction.  Attempting to make such a determination now would be advisory, speculative and, therefore, premature.[9]

Accordingly, the preliminary injunction is modified to include "other persons who are in active concert or participation with" the State Defendants or their employees, officers, or agents, and who have received actual notice of this Order.  Fed. R. Civ. P. 65(d)(2)(C).

### C.    The State Defendants' Proposed Modifications

The State Defendants also propose modifications to the injunction.  The State Defendants first argue that the injunction should be modified to provide that members of the press are *not* fully exempt from general dispersal orders.  But as addressed above, the State Defendants' dispersal orders are inapplicable to members of the press for several reasons.  First, dispersal orders based solely on curfews from which members of the press are exempt cannot apply to members of the press.

Second, under Minnesota law, an individual is guilty of unlawful assembly only if the individual is a "participant" in the unlawful assembly.  Minn. Stat. § 609.705.  And an individual's refusal to leave an unlawful assembly when directed to do so by law enforcement is a violation of the law only if the individual remains present "without lawful purpose."  Minn. Stat. § 609.715.  Generally, members of the press are in proximity to a protest to observe, record, and report about the protest, not to *participate* in the assembly. In addition, when a member of the press refuses to leave an unlawful assembly for

---

[9]    For this reason, the Court will not require the State Defendants to provide copies of this Order to a nonparty unless the State Defendants have reason to believe that the nonparty is in active concert or participation with the State Defendants.

newsgathering purposes, he or she is not acting "without lawful purpose."[10]  As such, when a member of the press is engaged in newsgathering in a location subject to a general dispersal order and is not otherwise violating the law, that individual's mere presence— without more—is not criminal conduct under Minnesota law.

Third, the government cannot lawfully restrict members of the press from places that have been historically open to the press and the public without demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Index Newspapers*, 480 F. Supp. 3d at 1147 (quoting *Press-Enter. Co.*, 478 U.S. at 9).  The State Defendants undoubtedly have an interest in maintaining order and ensuring public safety.  But they have not demonstrated that their methods of issuing and enforcing general dispersal orders against members of the press, as described throughout this Order, are narrowly tailored to serve that interest.

The scope of this Court's injunction is consistent with these relevant legal principles. And the injunction preserves law enforcement officers' ability to arrest members of the press who violate the law; use crowd-control tactics against members of the press who present an imminent threat of violence, bodily harm, or property damage; and use crowd-

---

[10]    The distinction between being present for a lawful purpose versus an unlawful purpose is significant for at least two reasons.  First, under Minnesota law, it is presumed that "the legislature intends the entire statute to be effective and certain" and that "the legislature does not intend to violate the Constitution of the United States."  Minn. Stat. § 645.17(2), (3).  The phrase "without lawful purpose" in Section 609.715 would be meaningless if refusing to leave an unlawful assembly was *always* a criminal act regardless of purpose.  Second, criminal laws may raise due-process concerns if they draw "no distinction between innocent conduct and conduct calculated to cause harm."  *City of Chicago v. Morales*, 527 U.S. 41, 50–51 (1999).  Here, the record does not reflect that Plaintiffs' refusal to disperse was "without lawful purpose."

control tactics that unintentionally or incidentally impact members of the press. Narrowing the injunction in the manner suggested by the State Defendants would not address the irreparable harms identified throughout this Order.

The State Defendants also argue that the injunction should be modified to require members of the press to identify themselves more clearly, visibly, and consistently than currently required by the TRO. The Court's TRO includes a non-exclusive list of relevant indicia that an individual is a member of the press, such as displaying press credentials or wearing distinctive clothing. The TRO also provides that the State Defendants will not be liable for unintentional violations of the injunction involving individuals who do *not* carry or wear press credentials or distinctive clothing. Notably, many of the alleged incidents of misconduct in this case involved law enforcement officers actively disregarding clearly displayed press credentials, distinctive clothing, and other indicia that individuals were members of the press. Rather than an inability to identify members of the press, the record reflects many instances of law enforcement officers willfully disregarding the relevant identifiers. This demonstrates a problem of compliance, not a problem of clarity. As such, the State Defendants have not demonstrated why any modification or clarification of these aspects of the injunction is necessary.

For these reasons, the State Defendants' proposed modifications to the injunction are denied.

## VI.   Rule 65 Bond Requirement

Having concluded that a preliminary injunction is warranted, the Court next considers whether to require Plaintiffs to post a bond as security for the effects of the preliminary injunction on the State Defendants.

A district court must expressly consider whether to require a bond, but a district court is not required to impose one.  *See Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989).  The bond requirement to secure injunctive relief "is a security device, not a limit on the damages the . . . defendants may obtain against [the plaintiff] if the facts warrant such an award."  *Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997).  Rule 65(c) of the Federal Rules of Civil Procedure provides, in pertinent part:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c).  While a district court has broad discretion in setting a bond, that discretion is abused if the district court acts with an improper purpose, fails to require an adequate bond, or fails to make the necessary findings in support of its decision.  *See Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991).  Courts have concluded that a bond is not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment.  *See, e.g.*, *Bukaka, Inc. v. County of Benton*, 852 F. Supp. 807, 813 (D. Minn. 1993).

The Court waived the bond requirement when it issued the TRO as requested by Plaintiffs, and the parties have not addressed this issue in connection with Plaintiffs' motion for a preliminary injunction.   In these circumstances, a waiver of the bond requirement is appropriate. *See, e.g.*, *Fantasysrus 2, L.L.C. v. City of E. Grand Forks*, 881 F. Supp. 2d 1024, 1033 (D. Minn. 2012) (waiving the security requirement when the government did not object to the movant's request for waiver); *Northshor Experience, Inc. v. Duluth,* 442 F. Supp. 2d 713, 723 (D. Minn. 2006) (granting a waiver when the defendant had not objected or otherwise "addressed this issue or attempted to quantify any dollar amount of harm that it may face from a wrongly issued injunction").

Accordingly, the Court waives the bond requirement in this case.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.     Plaintiffs' motion for a preliminary injunction, (Dkt. 118), is **GRANTED**.

2.     Defendants Minnesota Department of Public Safety Commissioner John Harrington, in his individual and official capacity; Minnesota State Patrol Colonel Matthew Langer, in his individual and official capacity; their agents, servants, employees and representatives (collectively, the State Defendants); and all other persons who are in active concert or participation with the State Defendants, are hereby enjoined from:

> a.     arresting, threatening to arrest, or using physical force—including through use of flash bang grenades, non-lethal projectiles, riot batons, or any other means—directed against any person whom they know or reasonably

should know is a Journalist (as defined in Paragraph 4 below), *unless* the State Defendants have probable cause to believe that such individual has committed a crime. For purposes of this Order, such persons shall not be required to disperse following the issuance of an order to disperse, and such persons shall not be subject to arrest for not dispersing following the issuance of an order to disperse. Such persons shall, however, remain bound by all other laws;

b.      using chemical agents directed against any person whom they know or reasonably should know is a Journalist, including but not limited to mace/oleoresin capsicum spray or mist/pepper spray/pepper gas, tear gas, skunk, inert smoke, pepper pellets, xylyl bromide, and similar substances, unless such Journalist presents an imminent threat of violence or bodily harm to persons or damage to property; and

c.      seizing or intentionally damaging any photographic equipment, audio-recording or video-recording equipment, or press passes in the possession of any person whom the State Defendants know or reasonably should know is a Journalist, or ordering such person to stop photographing, recording, or observing a protest, unless the State Defendants are lawfully seizing that person consistent with this Order. Except as expressly provided in Paragraph 3 below, the State Defendants must return any seized equipment or press passes immediately upon release of a person from custody.

3.      If any State Defendant, agent or employee of the State Defendants, or any person acting under the State Defendants' direction seizes property from a Journalist who is lawfully arrested consistent with this Order, such State Defendant shall, as soon thereafter as is reasonably possible, make a written list of seized property and shall provide a copy of that list to the Journalist.  If property seized in connection with the lawful arrest of a Journalist is needed for evidentiary purposes, the State Defendants shall promptly seek a search warrant, subpoena, or other court order to authorize the continued seizure of such property.  If such a search warrant, subpoena, or other court order is denied, or if property seized in connection with an arrest is not needed for evidentiary purposes, the State Defendants shall immediately return the seized property to its rightful possessor.

4.      To facilitate the State Defendants' identification of Journalists protected under this Order, the following shall be considered indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional or authorized press pass or wearing a professional or authorized press badge or other official press credentials or distinctive clothing that identifies the wearer as a member of the press.  These indicia are not exclusive, and a person need not exhibit every indicium to be considered a Journalist under this Order.  The State Defendants shall not be liable for unintentional violations of this Order in the case of an individual who does not carry or wear a press pass, badge, or other official press credential or distinctive clothing that identifies the wearer as a member of the press.

5.      The State Defendants are not precluded by this Order from issuing otherwise lawful crowd-dispersal orders.  The State Defendants shall not be liable for violating this

injunction if a Journalist is incidentally exposed to crowd-control devices after remaining in the area where such devices were deployed in conjunction with the enforcement of an otherwise lawful dispersal order.

6.      To promote compliance with this Order, the State Defendants shall provide copies of this Order, in either electronic or paper form, within 48 hours, to: (a) all employees, officers, and agents of the State Defendants with any supervisory or command authority over any person who is engaged in the law enforcement response to civil unrest or protests covered by Journalists; and (b) all other persons who the State Defendants have reason to believe are in active concert or participation with the State Defendants in the law enforcement response to civil unrest or protests covered by Journalists.

7.      Plaintiffs need not provide any security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

8.      This Order shall expire upon the entry of final judgment resolving all of Plaintiffs' claims on the merits, unless otherwise provided by further order of the Court.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  October 28, 2021                    s/Wilhelmina M. Wright
                                            Wilhelmina M. Wright
                                            United States District Judge