```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MINNESOTA
 3    _____
 4    Linda Tirado,              |
                                 |
 5            Plaintiff,         |
                                 |
 6    v.                         |         Case No.
                                 |0:20-cv-01338-JRT-JFD
 7    City of Minneapolis;       |
      Minneapolis Chief of Police|
 8    Medaria Arradondo, in his  |
      official capacity; Robert  |
 9    Kroll, in his individual   |
      capacity; and Minneapolis  |
10    Police Department Officers  |
      John Does 1-4, in their    |
11    official and individual    |
      capacities,                |
12                               |
              Defendants.        |
13    _____
14          REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF
15                    CITY OF MINNEAPOLIS
16       by and through their corporate representatives
17          FORMER ASSISTANT CHIEF MIKE KJOS
              LIEUTENANT THOMAS CAMPBELL
18              SERGEANT JUAN VALENCIA
              SERGEANT MATTHEW SEVERANCE
19          SERGEANT KURTIS SCHOONOVER
              LIEUTENANT MOLLY FISCHER
20          DEPUTY CHIEF TROY SCHOENBERGER
            CHIEF OF STAFF MYCHAL VLATKOVICH
21
22    DATE:       March 22, 2022
      TIME:       9:07 a.m. (Central)
23    PLACE:      Veritext Virtual Videoconference
24
      JOB NO.:    NY 5145408
25    PAGES:      1 to 338
      REPORTED BY:   Merilee Johnson, RDR, CRR, CRC, RSA
```

Ex. 24

```
 1              A P P E A R A N C E S
         (All appearing remotely via videoconference)
 2
 3    ON BEHALF OF LINDA TIRADO:
 4    SIDLEY AUSTIN LLP
      BY:   Stacy Horth-Neubert, Esq.
 5          Evan Daniel Medina, Esq.
            555 West Fifth Street
 6          Suite 4000
            Los Angeles, California 90013
 7          Phone:  (310) 729-7293
            Email:  SHorthNeubert@Sidley.com
 8          Email:  EMedina@Sidley.com
 9    -and-
10    SIDLEY AUSTIN LLP
      BY:   Gaelle E. Tribie, Esq.
11          Alyssa M. Hasbrouck, Esq.
            787 Seventh Avenue
12          New York, New York 10019
            Phone:  (212) 839-5527
13          Email:  GTribie@Sidley.com
            Email:  AHasbrouck@Sidley.com
14
      -and-
15
      SIDLEY AUSTIN LLP
16    BY:   Margaret H. Allen, Esq.
            2021 McKinney Avenue
17          Suite 2000
            Dallas, Texas 75201
18          Phone:  (214) 969-3506
            Email:  Margaret.Allen@Sidley.com
19
      -and-
20
      SIDLEY AUSTIN LLP
21    BY:   Jennifer Lim, Esq.
            Level 31 Six Battery Road
22          Singapore, 049909
            Phone:  +65 6230 3900
23          Email:  Jennifer.Lim@Sidley.com
24
25    (Appearances continued on next page)
```

Ex. 24

```
 1              A P P E A R A N C E S
                    (Continued)
 2
 3    ON BEHALF OF LINDA TIRADO (Continued):
 4    -and-
 5    GREENE ESPEL PLLP
      BY:   John M. Baker, Esq.
 6          222 South Ninth Street
            Suite 2200
 7          Minneapolis, Minnesota 55402
            Phone:  (612) 373-0830
 8          Email:  JBaker@GreeneEspel.com
 9
10    ON BEHALF OF THE CITY OF MINNEAPOLIS and
      ANDREW BRAUN:
11
      MINNEAPOLIS CITY ATTORNEY'S OFFICE
12    BY:   Kristin R. Sarff, Esq.
            Heather P. Robertson, Esq.
13          City Hall, Room 210
            350 South Fifth Street
14          Minneapolis, Minnesota 55415
            Phone:  (612) 673-2010
15          Email:  Kristin.Sarff@MinneapolisMN.gov
            Email:  Heather.Robertson@MinneapolisMN.gov
16
17    ALSO APPEARED:
18          Ben Larson, Law Clerk, Greene Espel
            Kraig Hildahl, Videographer
19
20
21
22
23
24
25
```

Ex. 24

Page 4

1                    I N D E X

2

3    WITNESSES:                                    PAGE

4    FORMER ASSISTANT CHIEF MIKE KJOS

5         Examination by Ms. Horth-Neubert.......... 13

6         Examination by Ms. Sarff.................. 63

7         Further Examination by Ms. Horth-Neubert... 66

8    LIEUTENANT THOMAS CAMPBELL

9         Examination by Ms. Allen.................. 73

10         Examination by Ms. Horth-Neubert..........131

11   SERGEANT JUAN VALENCIA

12         Examination by Ms. Allen..................176

13   SERGEANT MATTHEW SEVERANCE

14         Examination by Ms. Allen..................193

15         Examination by Ms. Tribie.................245

16         Examination by Ms. Sarff..................254

17   SERGEANT KURTIS SCHOONOVER

18         Examination by Ms. Allen..................256

19   LIEUTENANT MOLLY FISCHER

20         Examination by Ms. Allen..................264

21   DEPUTY CHIEF TROY SCHOENBERGER

22         Examination by Ms. Tribie.................276

23   MYCHAL VLATKOVICH

24         Examination by Ms. Horth-Neubert..........317

25

Ex. 24

Page 14

1     chief of police, correct?

2          A.    Yes.

3          Q.    And you became the assistant chief of

4     police in August of 2017, correct?

5          A.    Yes.

6          Q.    And you retired in January of 2021; is that

7     correct?

8          A.    Yes.

9          Q.    So you were the City's assistant chief of

10    police as of May of 2020, correct?

11         A.    Yes.

12         Q.    And do you understand that you've been

13    designated by the City of Minneapolis to speak on

14    behalf of the City today with respect to certain

15    topics as they pertain to you and to former Chief

16    of Police Medaria Arradondo?  Correct?

17         A.    Yes.

18         Q.    The topics that you'll be speaking on

19    today, as I understand it, are:  First, with

20    respect to Topics 3 and 8, you have been presented

21    to testify about meetings of senior City officials

22    during the George Floyd protests concerning the

23    use of force applied to journalists and the

24    treatment of members of the press.

25               The persons who are deemed to be the senior

Ex. 24

1     City officials for purposes of your deposition are

2     the Chief Arradondo and yourself.

3               Do you understand that?

4        A.    Yes.

5        Q.    And my understanding is you've also been

6     designated to testify regarding statements made by

7     senior City officials related to the treatment of

8     members of the press during the George Floyd

9     protests -- treatment by the MPD, the Minneapolis

10    Police Department, during the George Floyd

11    protests.

12              And the persons who are deemed senior City

13    officials for purposes of this topic are Chief

14    Arradondo and yourself?

15              Do you understand that?

16       A.    Yes.

17       Q.    And are you prepared to speak on behalf of

18    the City of Minneapolis related to those topics?

19       A.    Yes.

20       Q.    And what did you do to prepare to testify

21    on those topics here today?

22       A.    I received a phone call from City Attorney

23    Sarff last week asking me if I would be available

24    for this deposition today.  And I said yes.  And

25    she informed me of the lawsuit that we are

 1    discussing today.  And that was the first time I

 2    had been contacted regarding this situation.

 3            And she forwarded me an email with a few

 4    questions on it and a few attached documents, one

 5    being an email that I had sent --

 6            MS. SARFF:  Well, I'm going to object

 7    that this calls for privileged information.

 8    They're just asking how you prepared for the

 9    deposition.

10    A.    So I've had a couple of conversations with

11    City Attorney Sarff.  And -- and then I reached out

12    to former Chief Arradondo, who is in another

13    country, doesn't have cell phone coverage, and

14    informed him that this deposition would be taking

15    place.

16    Q.    Did you review any documents in preparation

17    for your deposition here today?

18    A.    Yes.

19    Q.    What documents did you review in

20    preparation for your deposition today?

21    A.    The use of force policy that was in place

22    at the time of the George Floyd protests, a SWAT --

23    it's Addendum A.  It ties to their use of

24    40-millimeters during protest situations.  And an

25    attachment that had previous incidents listed where

Page 17

```
 1    there apparently was media interaction with

 2    officers at protests.

 3         Q.   Was it your understanding that that list of

 4    previous incidents was something that plaintiff

 5    prepared in this case?

 6         A.   Yes.

 7         Q.   Okay.  And any other documents that you

 8    reviewed in preparation for your deposition here

 9    today?

10         A.   No.

11              (B. Larson joined the proceedings.)

12         Q.   And you said you reached out to Chief

13    Arradondo.  Did you speak with Chief Arradondo?

14         A.   Through text message.  He did not have cell

15    phone service.

16              MS. HORTH-NEUBERT:  I would ask that

17    those text messages please be produced to the

18    plaintiff as soon as possible.

19              MS. SARFF:  Those text messages were

20    exchanged as a request from the City Attorney's

21    Office and therefore we consider them to be

22    attorney work product in terms of preparing for the

23    City deposition today.

24    BY MS. HORTH-NEUBERT:

25         Q.   Mr. Kjos, did you -- was Ms. Sarff or any
```

Ex. 24

Page 33

1        Q.   And under May 26, 2020, it says, in the

2    second line of the first paragraph, "As additional

3    information surfaced and MPD leadership and public

4    officials discovered the video recorded and posted

5    online by a bystander, they convened on phone calls

6    and arrived at City Hall to meet with media and

7    community leaders.

8             "The MPD opened a command post at the

9    Emergency Operations Training Facility (EOTF) in

10   the early afternoon in response to large crowds

11   gathered at 38th Street and Chicago Avenue and at

12   the 3rd Precinct, 3000 Minnehaha Avenue South."

13            Do you see that?

14       A.   Yes.

15       Q.   First, with respect to the referenced phone

16   calls, did such phone calls take place with either

17   yourself or Chief Arradondo?

18            MS. SARFF:  I'm going to object to lack

19   of foundation as to what's being referenced in this

20   report.

21   BY MS. HORTH-NEUBERT:

22       Q.   Do you understand the question, sir?

23       A.   I am trying to read that sentence on the

24   phone calls.  Just one second.  (Reviewing

25   document.)

Page 34

1           If the question is, did we make phone calls

2     on that date with regard to the group that was

3     gathering, the answer to that would be yes.

4           Q.    And was one of the topics of discussion in

5     any of those phone calls the MPD response to

6     protests with respect to use of force?

7                 MS. SARFF:   And just for the record,

8     use of force is defined as use of 40-millimeters,

9     chemical agents, or equipment used to disperse

10    crowds, subject to the court's order.

11          A.    I'm sorry.  Can you repeat the question?

12          Q.    Sure.

13                MS. HORTH-NEUBERT:   Madam Court

14    Reporter, would you mind reading back the question,

15    please.

16                (The requested portion was read back by

17                the court reporter:

18           "QUESTION:  And was one of the topics of

19           discussion in any of those phone calls the

20           MPD response to protests with respect to

21           use of force?")

22          A.    I do not recall having the topic of the

23    "use of force" as one of those topics regarding

24    conversations on that day.

25                There were discussions on how to prepare to

Ex. 24

1   have officers to respond to incidents and to set up

2   a command post.  But I do not recall any

3   conversation with regard to the use of force.

4        Q.   With respect to those phone calls that

5   you've just been describing on May 26, 2020, who

6   participated in those phone calls?

7             MS. SARFF:  I'm going to object and

8   instruct the witness not to answer.  He just said

9   that they didn't relate to use of force and,

10   therefore, the topics are outside of the -- or the

11   information is outside Topic 3, 8, and 16.

12             MS. HORTH-NEUBERT:  I'm not going to

13   object every time you -- I'll just have a standing

14   objection every time you require a witness --

15   instruct the witness not to answer.

16   BY MS. HORTH-NEUBERT:

17        Q.   Mr. Kjos, the -- during any of the phone

18   calls that you've described on May 26, 2020, was

19   the topic of the First Amendment rights of

20   journalists who attended or might attend the

21   protests discussed?

22        A.   I do not recall having any conversation on

23   this date or during this time period, actually,

24   regarding journalists and use of force.

25        Q.   And I fully recognize that you and the

Ex. 24

1    Chief were dealing with a million things during the

2    days following George Floyd's death and I have very

3    little time with you so I am trying to focus on

4    just a very small subset of those -- of those

5    conversations and issues that you were dealing

6    with.

7              Turning back to the Exhibit 1, at page 20,

8    this also mentions that the MPD leadership convenes

9    by phone and then also arrived at City Hall to meet

10   with media and community leaders.

11             Did either yourself or Chief Arradondo, in

12   fact, meet at City Hall with community leaders on

13   May 26, 2020?

14        A.   I personally did not meet with community

15   leaders on May 26th.  And I do not recall what the

16   Chief's meeting schedule was for that day, but I do

17   believe he did meet at some point with community

18   leaders.

19        Q.   Do you know if -- what the topics of

20   discussion at those meetings were with Chief

21   Arradondo?

22        A.   I do not.

23        Q.   And were you prepared for your deposition

24   today to discuss whether the topics of conversation

25   by Chief Arradondo at City Hall on May 26, 2020,

1      covered anything related to use of force against

2      members of the press at the protests?

3          A.    Yes.  And I did ask the Chief that question

4      with regard to:  Did he have any meetings or

5      discussions regarding use of force involving

6      members of the press, and he told me that he did

7      not recall having any discussions with regard to

8      media members and use of force.

9          Q.    At any time?

10         A.    At any time during the George Floyd

11     protests, period.

12         Q.    Turning back to Exhibit 1, it says that the

13     MPD convened a command post at the Emergency

14     Operations Training Facility in the early afternoon

15     of May 26, 2020.

16               Did -- was such a command post opened by

17     the MPD on May 26, 2020?

18         A.    I believe so.  Yes.

19         Q.    Did either you or Chief Arradondo attend

20     meetings, either virtually or in person, with the

21     persons who were at that command station?

22         A.    I did actually attend or go to the command

23     post.  Not sure if it was on the 26th or the 27th.

24     But I personally did go to meetings at the command

25     post several times during that time frame.  And I

1    do believe that Chief Arradondo also went to the

2    command post at various times throughout the

3    protest period after George Floyd's death.

4         Q.   And during the time that you spent or Chief

5    Arradondo spent at the command post, did the topic

6    of conversation ever turn to the use of force

7    against journalists at the protests?

8         A.   No, I do not recall any conversations that

9    I had regarding use of force against journalists.

10   And the Chief had told me, as well, that he did not

11   recall having conversations or hosting meetings

12   where a topic of discussion was force used against

13   a journalist.

14        Q.   Did you or Chief Arradondo ever have any

15   communications via text with anyone regarding the

16   use of force against journalists at the protests?

17        A.   I don't believe that I ever texted anybody

18   on that topic.  Actually, the first I heard of this

19   topic was only a week ago.  And so technically I

20   did text the Chief only last week about this topic.

21             But I don't recall texting anybody about

22   force used in regards to a member of the media

23   during this time frame of the George Floyd

24   protests.

25        Q.   On May 27, 2020, the -- Chief Arradondo

Ex. 24

Page 39

1    gave a directive to use gas to disperse crowds and

2    to prevent the poss- -- prevent possible violence,

3    correct?

4              MS. SARFF:  I'm going to object that

5    that is a topic designated later with a different

6    witness as to the -- as to the authorizations for

7    use of force.

8    BY MS. HORTH-NEUBERT:

9        Q.   You can answer the question, sir.

10             MS. SARFF:  And I'm instructing the

11   witness, therefore, not to answer because a

12   different witness has been designated for that

13   topic.

14   BY MS. HORTH-NEUBERT:

15       Q.   Mr. Kjos, as the -- I need to lay the

16   foundation for my question so I'm objecting to the

17   fact that this foundation hasn't been led -- has

18   been precluded from being laid.

19             I am going to represent to you that

20   documentation indicates that Chief Arradondo gave a

21   directive for the use of gas to disperse crowds on

22   May 27, 2020.

23             And my question to you, sir, is:  Did

24   either you or Chief Arradondo have any

25   conversations or meetings or make any statements

Ex. 24

1    regarding whether journalists should be exempted

2    from gassing, or that gas should or should not be

3    used if journalists were present, or near

4    journalists?

5              MS. SARFF:   I'm going to object to the

6    extent the question asks for statements, given that

7    the topics relating to statements is limited to

8    40-millimeter, less-lethal projectiles, and your

9    question is about gas.

10              And instruct the witness not answer as

11    to that portion of the question.

12              So the remaining -- the remaining

13    portion is whether or not you were engaged in -- if

14    you had any conversation with Chief Arradondo about

15    the authorization of chemical agents, if you can

16    recall.

17         A.   I do not recall conversations relative to

18    press at all at that time.   Our concerns were not

19    related to members of the media.

20         Q.   I'm going to turn your attention back to

21    Exhibit 50 [sic], at page 11, please.   Under 6 --

22    number 6 there, it says, "We learned" -- this is

23    starting in the third sentence.   "We learned that

24    when the MPD command staff convened for a meeting

25    on Wednesday, May 27th, they did not discuss or

Ex. 24

1    develop a plan."  And this is referring to a formal

2    crisis response plan, as noted in the topic.

3              "The commanders, and subsequently the

4    officers, did not receive information regarding the

5    incident command, operations plan, rules of

6    engagement, and operational objectives for the

7    first several days."

8              Do you see that?

9         A.   I do.

10        Q.   And is it fair to say that commanders and

11   officers did not receive any instruction from

12   either yourself or Chief Arradondo regarding the

13   use of force or lack thereof with respect to

14   journalists during the George Floyd protests; is

15   that correct?

16             MS. SARFF:  I'm just going to object

17   that this is a topic designated for another

18   witness.  And Assistant Chief Kjos can respond in

19   his personal capacity but not on behalf of the

20   City.

21        A.   There was no discussion with regard to

22   using force in relation to media, whatsoever, that

23   I can recall, throughout any of this period of

24   time.

25        Q.   I'm going to turn your attention to the

Page 42

1    same -- Exhibit 1 at page 43.  The very bottom of

2    the paragraph -- of the page, in the last

3    paragraph, third sentence, "The first planned

4    meeting of MPD leadership, including inspectors and

5    commanders, occurred at noon on Wednesday, May 27,

6    2020.  Much to the dismay of some with whom we

7    spoke, no plan or definitive actions were provided

8    or discussed and, most importantly, no command

9    structure was designated."

10           Do you see that?

11      A.   I do.

12      Q.   And did such a meeting of command staff

13   take place on May 27th, 2020?

14           MS. SARFF:  Again, I'm going to object

15   to the extent it doesn't relate to actually one of

16   the topics.  Are you --

17           MS. HORTH-NEUBERT:  Are you

18   instruct- -- this is foundational, but are you

19   instructing the witness not to answer or can he

20   answer the question?

21           MS. SARFF:  So to the extent there is a

22   May 27th meeting that related to use of force,

23   meaning chemical agents, 40-millimeters, or items

24   used to disperse a crowd, the Previous Press

25   Incidents, or treatment a member of the press,

Ex. 24

1    which are the topics for which you've been

2    identified, you can -- you can answer that

3    question.

4              If the May 27th meeting didn't relate

5    to one of those topics, then it's outside of the

6    designated topics identified and you don't need to

7    answer.

8              MS. HORTH-NEUBERT:  I'm going to object

9    to the -- Counsel -- both the characterization of

10   the topic and the limitation.

11   BY MS. HORTH-NEUBERT:

12   Q.   But please do answer the one question that

13   your counsel is allowing you to answer.

14             MS. SARFF:  If you disagree with the

15   characterization, perhaps we should discuss that

16   because the witness is here now.  So if you think

17   the topic is -- if you think either of the three

18   topics are broader than that, please let me know

19   because I want to make sure that the witness is

20   talking about everything for which he's been

21   designated.

22             But I believe I've fairly described the

23   limitations based upon Judge Docherty's ruling, as

24   well as the revised notice that counsel sent to me.

25             MS. HORTH-NEUBERT:  I would like to go

Ex. 24

1        off the record at this point in time to have this

2        discussion.

3                    MS. SARFF:  Okay.

4                    THE VIDEOGRAPHER:  We're going off the

5        record at 9:47 a.m.

6                    (Break:  9:47 a.m. to 9:51 a.m.)

7                    THE VIDEOGRAPHER:  We're going back on

8        the record at 9:51 a.m.

9                    MS. HORTH-NEUBERT:  We just had a, for

10       the record, colloquy off of the record between

11       counsel for the City and counsel for the Plaintiff

12       where I explained that my questioning is -- that

13       I'm currently in line of questions -- asking

14       questions relating to foundation so that I can

15       understand if the City had a meeting and -- had

16       meetings and that's what all these foundational

17       questions are about.

18                    Whether use of force was discussed and,

19       if so, whether that conversation relating to

20       use of force included the specific conversation

21       about whether or not use of force was discussed

22       with respect to use of force against journalists.

23       I believe that we have an understanding, that we

24       can go forward based on that conversation.

25                    Ms. Sarff, is there anything that you'd

Ex. 24

1    like to add?

2              MS. SARFF:   Just for the sake of the

3    witness, because he doesn't have access to

4    Judge Docherty's order, "use of force" is limited

5    to 40-millimeter and less-lethal projectiles,

6    chemical agents, and equipment used to disperse

7    crowds.

8    BY MS. HORTH-NEUBERT:

9        Q.   So before we went off the record, we had

10   looked at this Exhibit 1 in which it indicates that

11   there was a meeting of MPD leadership, including

12   inspectors and commanders, that took place at noon

13   on Wednesday, May 27th of 2020.

14             And my question to you is:  Did such a

15   meeting of command staff take place on May 27,

16   2020?

17       A.   So, to start with, my answer to this

18   question, as far as referencing that document that

19   was prepared as an after-accident report, I'm not

20   sure which meeting that document is referring to

21   that took place on May 27th.

22             I would suggest that the police

23   administration, including myself and the Chief,

24   were in continual meetings throughout the days

25   following the death of Mr. Floyd and many, many

Page 46

1    meetings each day in our front office, in our

2    police administration.

3           And I completely disagree with the

4    statement in that document that there was no

5    plans -- or no preparation until after this

6    meeting, whichever meeting they were referring to.

7           There were plenty of personnel within the

8    City of Minneapolis and the Minneapolis Police

9    Department planning to deal with crowds and

10   protests and all the needs of the city in reference

11   to response to 911 calls.

12          A host of meetings taking place both within

13   the Police Department and within other entities

14   within City government and outside agencies that

15   were preparing for potential crowd management

16   issues.

17          But I do not recall, at any time, in any of

18   the meetings that I attended during this period of

19   time, throughout the entire George Floyd protest

20   periods, where the topic of discussion surrounded

21   use of force in relation to media personnel.

22          Media personnel were not a concern of ours

23   during that time.  It was response to pressing

24   issues in the city in a timely manner and dealing

25   with buildings that were burning, looting,

Ex. 24

1    shots-fired calls, homicides.  Things of that

2    nature is what our focus was on.

3         It was not on use of force in relation to

4    media.  We did not think there would be an issue.

5    At least I -- I'm talking for myself right now.  I

6    don't recall a concern about the media.

7         Q.   During any of the calls or meetings that

8    you or Chief Arradondo participated in on May 26th

9    or May 27th of 2020, or in that general time

10   period, did anyone mention or discuss the fact that

11   a Unicorn Riot reporter named Niko had been injured

12   by an MPD projectile while covering the protests?

13        A.   I do not recall that being a topic of

14   conversation.  No.

15        Q.   During any of the calls or meetings that

16   you or Chief Arradondo participated in on May 26th,

17   May 27th, or that general time period in 2020, did

18   anyone mention or discuss the fact that the

19   Minneapolis Star reporter, Alex [sic] Mannix,

20   tweeted that he had been shot in the thigh by a

21   rubber bullet, likely by police officers?

22        A.   I do not recall that incident, but I would

23   say I have had conversations with that reporter in

24   the past.  He's actually called me, even on my

25   personal cell phone, since I've been retired.  So

Ex. 24

1     if there was an incident, I would feel that he

2     would have been willing to reach out to myself.

3          Q.    Did he?

4          A.    No.

5          Q.    Do you have any reason to believe that his

6     tweet was incorrect?

7               MS. SARFF:   Objection.   Lack of

8     foundation and it's outside of the topics.   So I'm

9     instructing you not to answer.

10    BY MS. HORTH-NEUBERT:

11         Q.    Let me rephrase.   Do you have any reason to

12    believe that a tweet by Alex -- Andy Mannix of the

13    Minneapolis Star Tribune saying that he had been,

14    quote, "shot in the thigh," close quote, by a

15    rubber bullet during the George Floyd protests is

16    incorrect?

17              MS. SARFF:   I'm going to object to lack

18    of foundation.   It calls for speculation.

19    BY MS. HORTH-NEUBERT:

20         Q.    You can answer the question.

21         A.    The answer is:   I have no knowledge of that

22    tweet, other than the fact that it was listed on

23    the document that was provided for this deposition.

24         Q.    During any of the calls or meetings that

25    you or Chief Arradondo participated in or around

1    the time period of May of 2020, following the death

2    of George Floyd, did anyone mention or discuss the

3    fact that reporter Max Nesterak of the Minneapolis

4    Reporter [sic] had alleged he was shot in the chest

5    by a less-lethal projectile while covering the

6    protests on May 27, 2020?

7        A.   I do not recall any discussions in the time

8    frame of the George Floyd protests with regard --

9    that I personally have had with regard to media

10   members being -- having force used against them.   I

11   did not participate or hear any discussions on

12   that -- that matter.

13       Q.   During the time period of May 2020 through

14   early June of 2020, after the death of

15   George Floyd, did either yourself or Mr. Arradondo

16   or anyone working on your behalf monitor press,

17   such as the Minneapolis [sic] Reformer, the

18   Minneapolis Star Tribune, regarding news related to

19   the George Floyd protests, such as the ones I've

20   just mentioned?

21       A.   I am unaware of whether or not any MPD

22   personnel were monitoring those news outlets.   I

23   have no knowledge of that occurring.

24       Q.   Were you or Chief Arradondo apprised of any

25   news stories -- during this time period of May 2020

Page 50

1    through early June of 2020, following the death of

2    George Floyd, were you or Chief Arradondo apprised

3    of any news stories related to injuries that press

4    members were alleging were being suffered during

5    the George Floyd protests due to less-lethal

6    projectiles fired by the MPD?

7        A.   I am not -- I was not made aware of any

8    story in the press regarding use of force against a

9    member of the media.

10            Chief Arradondo did tell me that during a

11   press release that he was conducting at the

12   Greek -- St. Mary's Greek Orthodox Church in

13   southwest Minneapolis, one of the journalists had

14   informed him that some media members had been

15   exposed to chemical irritants at one of the

16   protests, and that was a question posed to him

17   during this press release.

18       Q.   When was that conversation at St. Mary's

19   Greek Orthodox Church?

20       A.   It would have been during that time period

21   of the George Floyd protests when he conducted a

22   media press conference at that site.  I don't know

23   the exact date.

24       Q.   But you mentioned that the question related

25   to chemical irritants; is that correct?

Ex. 24

1    A.    That's correct.  He said that one of the

2    journalists had said that they had -- I don't know

3    if it was that journalist or some other journalist

4    had been exposed to chemical irritant when it was

5    delivered to the crowd outside of the 3rd Precinct.

6    Q.    Do you have an understanding of what kind

7    of chemical irritant was being referenced, based on

8    your conversation with Arradondo, or Chief

9    Arradondo?

10    A.    I do not.

11    Q.    During the early period of the -- the first

12    few days, May 26th, May 27th, May 28th, was the MPD

13    using chemical irritants with respect to dispersing

14    crowds?

15            MS. SARFF:  I'm going to object that

16    that's outside of this witness's topic unless it

17    relates to a meeting and note that a different

18    representative has been identified to talk about

19    the use of force during the George Floyd protests.

20            MS. HORTH-NEUBERT:  I'm following up on

21    the incident that this witness has described.

22    BY MS. HORTH-NEUBERT:

23    Q.    So you can please answer my question.

24            MS. SARFF:  I've instructed him not to

25    answer.

```
 1    BY MS. HORTH-NEUBERT:
 2        Q.   What, if anything, did you or Chief
 3    Arradondo or anyone in the MPD do in response to
 4    the question that was asked of Chief Arradondo at
 5    that meeting at St. Mary's Greek Orthodox Church
 6    regarding the use of chemical irritants?
 7        A.   Chief Arradondo told me that he apologized
 8    to the reporter for that incident having taken
 9    place.  He said that he would use the information
10    that came to him through the media to learn and to
11    attempt to mitigate in his best possible way any
12    future incidents if possible.
13        Q.   He said that at the meeting at St. Mary's?
14        A.   That is what he told me; that he said
15    something of that nature to the reporter during
16    that press conference.
17        Q.   And did Chief Arradondo or you or anyone
18    else within the MPD, in fact, use the information
19    that came to him through the media to learn and to
20    attempt to mitigate as best as possible -- in as
21    best possible way any future incidents?
22        A.   I don't know what the Chief did with that
23    information at that time.  I just learned of that
24    information this past week.  And I'm retired now.
25    I -- you know, I don't have anything I can do with
```

Page 53

```
1    that.  But, again, I am unaware of what, if
2    anything, the Chief did with that information.
3        Q.   On behalf of the City, were you prepared to
4    provide testimony regarding what, if anything, the
5    Minneapolis Police Department did in response to
6    learning at the meeting at St. Mary's Greek
7    Orthodox that journalists had been exposed to
8    chemical irritants during the George Floyd
9    protests?
10            MS. SARFF:  I'm going to object to the
11   extent that that calls for attorney-client
12   communications, attorney work product, and is, in
13   and of itself, outside of the topics designated for
14   this witness.  And therefore instruct him not to
15   answer.
16   BY MS. HORTH-NEUBERT:
17       Q.   During any of the calls or meetings that
18   you or Chief Arradondo participated in, in the time
19   period of May 26 through June -- early June of
20   2020, did anyone mention or discuss the fact that
21   freelance journalist Jared Goyette had alleged he
22   was struck in the eye and gassed by the MPD while
23   covering protests on May 27, 2020?
24       A.   I do not recall any conversations with
25   regard to that individual.  No.
```

Ex. 24

Page 54

1     Q.   During the -- on May 29, 2020, there was a
2     very well-publicized incident in which a CNN
3     reporter, Omar Jimenez, and his team were arrested
4     in Minneapolis by the Minneapolis State Patrol on
5     live television while covering the protests.
6          Do you recall that?
7               MS. SARFF:  I'm just going to correct.
8     It was the Minnesota State Patrol, not Minneapolis
9     State Patrol.
10              MS. HORTH-NEUBERT:  Oh, sorry.  My
11    abbreviation was incorrect.  Thank you.
12     A.   I'm sorry.  I don't -- what is the
13    question?
14     Q.   The question is whether you recall the
15    incident in which CNN Reporter Omar Jimenez and his
16    team were arrested on live television while
17    covering the protests?
18     A.   And these are the individuals that had an
19    interaction with the State Patrol?
20     Q.   Correct.
21     A.   I don't recall the names of the individuals
22    involved, but I did recall news coverage of an
23    incident that took place between the Minnesota
24    State Patrol and potentially a member of the media.
25              And, in fact, when I was contacted with

Ex. 24

1    regard to this deposition, I made the statement

2    immediately that you must be referencing the

3    State Patrol's incident.  And then I was told that

4    is not -- that was a separate incident.

5            So that was the only -- the only incident

6    that I was aware of was because of news coverage of

7    some interaction between the State Patrol, I

8    believe, at the 5th Precinct during one of the

9    protests.

10       Q.   And as a -- and you learned about the

11   incident with the CNN regarding the Minnesota State

12   Patrol at or around the time it occurred; is that

13   correct?

14       A.   I don't recall if it was CNN.  I guess if

15   you're saying it was, I'll take your word at it --

16   for that.  But it was covered in the news, I

17   believe, and State Patrol did some sort of a press

18   release, I believe, at the time.  But I don't

19   recall the actual incident itself or what the

20   State Patrol's response was.

21       Q.   As a result of -- sorry.  Strike that.

22            You don't recall if it was CNN, but you do

23   recall the incident involving the State Patrol.

24   And did that -- did you learn of that incident

25   involving the State Patrol in the time frame of

Page 56

1       May 26, 2020, through early June of 2020?

2            A.   Yes, I believe so.

3            Q.   And as a result of learning about that

4       incident involving the State Patrol and the arrest

5       of a journalist, did you or Chief Arradondo have

6       any meetings or make any statements related to the

7       use of force against the press during the

8       George Floyd protests?

9                 MS. SARFF:   I'm just going to object to

10      the extent that that question relates to statements

11      and statements is limited to the previous press

12      incidences and that this incident is not listed on

13      that Exhibit B.

14      BY MS. HORTH-NEUBERT:

15           Q.   You can answer the question.

16           A.   I do not recall making any statements

17      regarding the State Patrol's use of force in that

18      incident.

19           Q.   To be clear, my question was not whether

20      you made any statement regarding that incident.  My

21      question was whether, after learning of that

22      incident, you or Chief Arradondo had any meetings

23      or made any statements related to the use of force

24      against the press during the George Floyd protests?

25           A.   No.  We did not have discussion with regard

Ex. 24

Page 57

1    to that incident or any discussion about

2    use of force against media.  I want to reiterate:

3    Media was not our concern during these protests.

4                MS. HORTH-NEUBERT:  I'd like to go off

5    the record and put another exhibit on the

6    Exhibit Share.  This is tab 97J, please, Alyssa.

7                THE VIDEOGRAPHER:  Did you want to go

8    off the record?

9                MS. HORTH-NEUBERT:  Yes, please.

10                MS. SARFF:  Again, just -- Kraig, I

11    want to be clear that we're not agreeing to go off

12    the record.

13                MS. HORTH-NEUBERT:  For your purposes,

14    Kraig, that means that you have to stay on the

15    record, but we are requesting that this time not be

16    taken -- used -- counted against our time on the

17    record with the witness.

18                (Exhibit 2 was marked for

19                identification.)

20                MS. HORTH-NEUBERT:  And also, K,

21    please.  Oh, sorry.  No, just J.  Just J.  Just J.

22    BY MS. HORTH-NEUBERT:

23        Q.   It should be there now, I believe, on your

24    Exhibit Share and also it is on the screen.

25                For the record, we've marked as Exhibit 2

Ex. 24

Page 58

```
 1      an email dated May 31, 2020, from Kurtis Schoonover
 2      to Police - 40-millimeter Operator Contact List,
 3      Bates stamp MPLS_Tirado006647, is the first Bates
 4      stamp.
 5              Mr. Kjos, have you seen this document
 6      before?
 7          A.   I don't recall seeing this document, no.
 8          Q.   Do you know who Kurtis Schoonover is?
 9          A.   Yes.  His -- we refer to him as Sergeant
10      "Scoon-over."
11          Q.   Oh, did I mispronounce the name?  I'm
12      sorry.  "Scoon-over."
13              And do you know who is on this LISTSERV
14      police 40-millimeter operator contact list?
15          A.   I do not.
16          Q.   Were you on that contact list?
17          A.   I do not believe so.
18          Q.   Were you aware that Kurtis Schoonover sent
19      this email on or around May 31, 2020?
20          A.   I was not.
21          Q.   I'd like to direct your attention to the
22      next page, which is Bates marked 6648.  In the
23      second bullet -- sorry.  Let me go back to the
24      first page first.  I apologize.
25              On the first page, it says, "I just wanted
```

Ex. 24

1     to reach out to all of the 40-millimeter operators

2     for a quick reminder on the protocol of use."

3               Do you see that?

4        A.    Yes.

5        Q.    And the next page, second bullet says,

6     "40-millimeter less-lethal Direct Impact

7     green marking rounds, blue Direct Impact rounds, or

8     BIP impact rounds may be used to protect officers

9     from assault and to protect officers in immediate

10    danger."

11              Do you see that?

12                MS. SARFF:  Just for the record --

13       A.    Is that -- is that on the second page?  I'm

14    only --

15       Q.    Correct.

16       A.    -- seeing the first page.

17                MS. HORTH-NEUBERT:  Alyssa, can you go

18    to the second page, please?  Sorry.

19    BY MS. HORTH-NEUBERT:

20       Q.    Do you see that there, where my cursor is?

21    I don't know if you can see my cursor actually.  It

22    says, "40-millimeter" -- second bullet --

23    "less-lethal Direct Impact green marking rounds..."

24              Do you see that?

25       A.    Yes, I see that.

1      Q.   And is it fair to say that neither you nor

2   Chief Arradondo instructed anyone to send this

3   reminder email?

4      A.   Yes, I did not instruct anyone to send this

5   and I don't believe the Chief instructed anyone to

6   send this directive.

7      Q.   And did -- and neither you or Chief

8   Arradondo reviewed this direct -- this email before

9   it was sent, correct?

10      A.   I definitely did not.  I do not know -- I

11   believe the Chief did not, but he would need to

12   answer that.

13           MS. HORTH-NEUBERT:   Okay.  You can take

14   that down, Alyssa.  Thank you.

15   BY MS. HORTH-NEUBERT:

16      Q.   Are you familiar with the organization

17   Silha Center, S-i-l-h -- sorry, S-i-l-h-a, Silha

18   Center?

19      A.   No.

20      Q.   So is it fair to say that you were not

21   reading any of the reports issued by the Silha

22   Center during this time period; in particular, the

23   report titled, "List of incidents involving police

24   and journalists during civil unrest in Minnesota"?

25      A.   I don't know that organization so it is

1    likely I have not read any documents they provided.

2        Q.   Closing the loop here, the -- did you or

3    Chief Arradondo attend any meetings with City

4    councilmembers relating to the use of force against

5    journalists during the George Floyd protests in

6    May of 2020 through early June of 2020?

7        A.   I do not recall attending any meetings with

8    councilmembers with regard to force used against

9    media at any time.

10           And the Chief told me that during that

11   period, he did not recall meetings that he hosted

12   or the Mayor hosted with regard to any force used

13   in regard to media.

14       Q.   And is it fairer to say that you -- neither

15   you nor Chief Arradondo had any meetings, virtual

16   or in person, with any City councilmembers at which

17   the City councilmember informed you that they were

18   being told by constituents about mistreatment of

19   the media during the George Floyd protests?

20       A.   Again, I do not recall any communication

21   between myself or the Chief with councilmembers

22   specific to force used regarding media members.

23       Q.   And to be clear, your testimony here today

24   is that despite numerous press reports and reports

25   to City councilmembers and the question to Chief

Ex. 24

1      Arradondo at a meeting at St. Mary's Church,

2      neither you nor Chief Arradondo had any meetings or

3      made any statements regarding the use of force

4      against members of the press covering the

5      George Floyd protests; is that correct?

6                  MS. SARFF:  I'm going to object to the

7      extent it misstates facts, particularly multiple

8      reports to City councilmembers, and that it

9      misstates the witness's previous testimony

10     regarding public statements involving members of

11     the press.

12     BY MS. HORTH-NEUBERT:

13        Q.    You can answer the question, sir.

14                  MS. SARFF:  You can answer subject to

15     those objections.

16        A.    There was a lot going on during that period

17     of time and we were extremely busy dealing with,

18     not just crowd control issues, but also crime

19     throughout the city.  And our focus was on

20     preservation of life and protection of property and

21     response to 911 calls, all in addition to dealing

22     with the largest protests this city has ever seen.

23                  And our focus as police administrators was

24     not to be concerned about the media.  And we did

25     not have meetings where we discussed use of force

Page 63

1    against media because that was not the focus that

2    we were concerned with at that time.

3         Q.   Thank you.  I have no further questions.  I

4    would like to make a statement unless you have

5    something you need to say?

6              MS. SARFF:  I have some follow-up

7    questions.

8                        EXAMINATION

9    BY MS. SARFF:

10        Q.   Assistant Chief Kjos, during your

11   deposition, you mentioned a couple times that

12   members of the media were not the concern of you or

13   Chief Arradondo.

14             Is that because both you and Chief

15   Arradondo had not been informed of any complaints

16   that members of the press were being targeted or

17   unusually subjected to use of force during the

18   George Floyd protests?

19             MS. HORTH-NEUBERT:  I'm going to object

20   because I asked this exact question, whether the

21   City was obtaining any complaints about

22   use of force related to journalists, and you

23   instructed the witness not to answer that question.

24   BY MS. SARFF:

25        Q.   Please go ahead, Assistant Chief Kjos.

Ex. 24

1      A.    I'm sorry.

2      Q.    When you said that you were -- that the

3  City -- that you and Chief Arradondo were not

4  concerned about the media, is that because you were

5  unaware of allegations of use of force against

6  members of the press?

7      A.    That's correct.  That we had not received

8  complaints -- at least I'm unaware of any

9  complaints -- that came in during that period of

10  time, at least presented to myself or the Chief, of

11  a complaint of force being used in regard to media.

12        The one statement that the Chief did make

13  is that -- at that press conference, it was

14  presented that chemical irritant had -- that some

15  media members had come into contact with that.  But

16  it wasn't -- he didn't mention that it was in a

17  complaint format.  It was a question at a press

18  release.

19        And had complaints come in, we would have

20  dealt with them in accordance and assigned them to

21  the Internal Affairs Unit for investigation.

22      Q.    And when you say that you and Chief

23  Arradondo were not concerned about the media during

24  the George Floyd protests, is part of that because

25  you did not expect that media -- members of the

Page 65

1      media would impede the MPD's attempt to respond to

2      the protests and the riot?

3                  MS. HORTH-NEUBERT:  Objection.

4      Leading.

5      BY MS. SARFF:

6          Q.   You can answer.  Was that --

7                  MS. HORTH-NEUBERT:  Assumes facts not

8      in evidence.

9          A.   Can I speak?

10         Q.   Yes.

11         A.   While we were aware that there was going to

12     be a huge amount of press and media in the city of

13     Minneapolis during these protests, we had no

14     indication or feeling that the press was going to

15     be part of our problem in dealing with crowds.

16              And the Chief has been very clear that he

17     supports First Amendment rights and the freedom of

18     the press.  And both of us have been very open to

19     speaking with media when there have been requests.

20              And so the reason we didn't believe that

21     the media would be of concern to us in dealing with

22     our situations we had to take care of during these

23     protests and the calls for service and that type

24     of -- is because we had not had prior experience

25     with media where there was a concern regarding

Ex. 24

Page 66

1    force used against media.  So it never came up as a

2    topic between him and I.

3            MS. SARFF:  Ms. Horth-Neubert, do you

4    have any additional questions for Assistant Chief

5    Kjos?

6            MS. HORTH-NEUBERT:  Yes, I do.

7                FURTHER EXAMINATION

8    BY MS. HORTH-NEUBERT:

9       Q.   Mr. Kjos, you testified regarding not

10   receiving complaints that journalists were injured

11   or the use of force was applied to journalists

12   during the George Floyd protests; is that correct?

13      A.   Yeah, I testified that I did not -- I was

14   not aware of the complaints.  If, in fact, there

15   were complaints made, they were not presented to

16   me.

17      Q.   █████████████████████████████████████

     ██████████████████████████████████████

     █████████████████████████████████████

     ██████████████████████████████

     ████████

     ██    ████████████████████████████████

     ██████████████████████████████████

     ████████████████████████████████  █

     ███████████████████████████████

Ex. 24

1    request?

2        A.   No, ma'am.

3        Q.   I'm going to turn to some other topics now.

4    Do you understand that you have been designated to

5    testify --

6            MS. HORTH-NEUBERT:  You can take that

7    document down, Alyssa.

8    BY MS. HORTH-NEUBERT:

9        Q.   You've been testified -- designated to

10   testify on behalf of the City with respect to all

11   facts supporting the City's contention that, quote,

12   "the City denies that an MPD officer struck

13   plaintiff with a projectile," close quote.

14           Do you understand you've been designated by

15   the City to answer questions responsive to that

16   request -- that interrog- -- that topic?  Excuse

17   me.

18       A.   Yes.

19       Q.   Okay.  And does the City dispute that

20   Ms. Tirado was injured in her left eye on the night

21   of May 29, 2020, while covering the Floyd protests

22   as a journalist?

23       A.   Yes.

24       Q.   What facts does the City rely upon in

25   taking that position?

Ex. 24

Page 153

1          A.    The facts of the -- obviously the BWC

2     footage of Officer Braun and the -- I would say the

3     additional footage of teammates that were around

4     Officer Braun and, based on his deposition, stating

5     that he did not strike her with a 40-millimeter.

6               I believe Officer Braun ████████████████

7     ████████████████████████████████ also stated that he

8     didn't strike her with a 40-millimeter less-lethal

9     round.  Officers in that area didn't have

10    green marking rounds at the time in their

11    possession.

12              In respects to training, we don't target

13    people's faces.  It's always as zone 1 or 2, which

14    is legs, below the waist, or -- or like a torso,

15    like stomach area.

16              You know, and it appeared in BWC footage,

17    also, that the complainant walked away on her own,

18    didn't show any signs of injury or distress and

19    went off into her own into the darkness.  And then,

20    lastly, with regards to rounds, there was no sign

21    that she was also hit with any type of chemical, as

22    that would have been apparent if she had.

23         Q.   Any other facts that the City relies on in

24    disputing that Ms. Tirado was injured in her left

25    eye on the night of May 29th while covering the

Ex. 24

Page 154

1      Floyd protests as a journalist?

2              MS. SARFF:  And I'll just put on the

3      record that these answers are subject to the City's

4      objections to the extent it calls for attorney work

5      product or expertise.

6              You can answer if you're ready.

7      A.    I have no further knowledge or information.

8      Q.    And I want to be really clear that my

9      question specifically was whether the City disputed

10     that Ms. Tirado was, in fact, injured in her left

11     eye on the night of May 29th, not who caused it.

12     So I just want to ask that question again and make

13     sure it was really clear.

14             Does the City dispute that Ms. Tirado was

15     injured in her left eye on the night of May 29,

16     2020, while covering the Floyd protests as a

17     journalist?

18             MS. SARFF:  I'm going to object that

19     that's outside of the topics, which was "identify

20     all facts where the City denies that she was struck

21     by a 40-millimeter."  And therefore --

22             MS. HORTH-NEUBERT:  If the City -- if

23     the City denies that she was actually struck, that

24     would be a fact that would support the City's

25     position.  So I need to know the answer to that

Ex. 24

1           MS. SARFF:  Other than the -- other

2      than the testimony he's already provided.

3      BY MS. HORTH-NEUBERT:

4           Q.   So the question was:  Does the City have

5      any evidence that Ms. Tirado's injury was caused by

6      something other than a less-lethal projectile fired

7      by an MPD officer?

8           A.   Sure.  I -- just by viewing and being out

9      there and reviewing the body-worn camera footage of

10     all the items being thrown, commercial fireworks

11     going off, reports of frozen bottles, rocks, any of

12     those items could have caused those injuries.

13          Q.   Does the City have any evidence that any of

14     those items caused her injury?

15          MS. SARFF:  Same objections.  Expertise

16     and work product.

17          A.   No.

18          Q.   Does the City deny that Ms. Tirado's

19     backpack was struck by a green marking round on the

20     night of May 29, 2020?

21          A.   I'm sorry.  You broke up just for a moment.

22     I'm sorry.

23          Q.   Sure.  Does the City deny that Ms. Tirado's

24     backpack was struck with a green marking round on

25     the night of May 29, 2020?

Ex. 24

Page 199

1    use of force, and policies under which use of force

2    was authorized.

3              Also, number 13, for policies and

4    procedures, training programs, courses, education,

5    regarding identification of members of the press.

6              And number 17 regarding certain discovery

7    responses by the City.

8              Are you prepared to talk about those topics

9    tonight -- or today?

10        A.   Yes, ma'am.

11        Q.   Okay.  So let's just jump in with the

12   members of the press.  Before May 29, 2020, what

13   training did MPD provide to its officers about how

14   to recognize members of the press?

15        A.   I believe in 2019, during an in-service,

16   Lieutenant Nelson did put on, as part of in-service

17   for the City, a civil disturbance piece that

18   touched on that.

19        Q.   Okay.  Did all officers go to that

20   training?

21        A.   It is our in-service, so, yes -- to the

22   best of my knowledge, officers are all required to

23   attend annual in-service in the City.

24        Q.   Including SWAT?

25        A.   Yes, ma'am.

Ex. 24

1        Q.    Do you remember if there was a PowerPoint

2   or other materials used at that in-service

3   training?

4        A.    I don't -- I don't recall if there was a

5   PowerPoint, ma'am.  I apologize.

6        Q.    And what was the name of the officer who

7   conducted the training?

8        A.    Gary -- Lieutenant Gary Nelson.

9        Q.    Okay.

10       A.    And I might be off on the time.  Might have

11   been the summer of 2018.

12       Q.    Okay.

13       A.    But I do remember that -- a lieutenant

14   putting on a civil disturbance presentation.

15       Q.    And what did that training contain

16   regarding identification of members of the press?

17       A.    I don't -- I don't recall that being the --

18   it wasn't the purpose of the -- of the training.

19       Q.    Okay.  It was an ancillary issue?

20       A.    Ma'am, I'm just a simple man.  You're going

21   to have to --

22       Q.    A side issue; it was a side deal?

23       A.    Yes, ma'am.

24       Q.    Okay.  Other than that one training that

25   either happened in 2018 or 2019, do you remember

1    any other -- or do you know of any other instances

2    where the MPD has provided training to its officers

3    about how to identify members of the press?

4         A.    In 2018, there was, I believe, probably 50

5    members of MPD that was -- were assigned to the

6    Civil Disturbance Unit for the Superbowl; and then

7    again in 2019, a similar group was put together

8    again for the NCAA.  During that time, they

9    attended FEMA training or entry-level Mobile Field

10   Force courses in which they touched on that topic.

11        Q.    And is this from your personal knowledge or

12   is this from understanding, you know, what you've

13   been educated on and prepared for for this topic?

14        A.    On both.  I was a part of both of those.

15        Q.    Okay.  Were there any materials that went

16   along with those trainings that you just mentioned?

17        A.    Uh...

18             MS. SARFF:  I'm going to object.  Vague

19   as to who's the provider.

20   BY MS. ALLEN:

21        Q.    I mean, the MPD.  Whoever put on the

22   training, were there any materials provided to the

23   officers who attended the training --

24        A.    So we --

25        Q.    -- about identifying members of the press?

Page 202

1        A.   I'm sorry.  We weren't -- we sent our

2    officers to be trained by an outside source, so it

3    wasn't our training.

4        Q.   Got it.  Okay.

5        A.   Sorry about --

6        Q.   Let me be clear then.  That's fine.  I want

7    information on that too.  Thank you.

8             So were -- in connection with those

9    trainings that were provided by a third-party

10   provider, did that third-party provider give you

11   any training materials about how to identify

12   members of the press?

13       A.   What was that word you used before?

14       Q.   "Ancillary"?

15       A.   Yeah, that word.

16       Q.   Okay.  Side issue.

17       A.   Yes, ma'am.

18       Q.   Okay.

19       A.   So during entry-level Mobile Field Force

20   training, that was a topic of discussion.  However,

21   that is not the course that they attended.  Right?

22   So it wasn't -- police officers weren't sent just

23   to understand this one topic.

24       Q.   And how many officers attended those

25   trainings that were provided by the third-party

Ex. 24

1    provider?

2        A.    It was called the Civil Disturbance Unit.

3    Those assignments -- it was Super Bowl.  Probably

4    approximately 50 officers.  Yeah.  So I would say

5    about 50, ma'am.

6        Q.    Okay.  Do you feel like MPD officers are

7    adequately trained on ways to identify members of

8    the press or do you feel like MPD is not provided

9    enough training in that regard?

10       A.    So you're asking me as a person?

11       Q.    I'm asking you as your role in the City --

12   so one of the things that my client would like to

13   see is more training.  You know, she believes that

14   maybe she wouldn't have been hurt in the protests

15   if people had had more training.

16             And she -- I will tell you:  She has

17   nothing against police officers.  She really

18   doesn't.  She just thinks that things could have

19   been -- things that went bad that night could have

20   been prevented.  And that's how she's seeing this

21   case.

22             And so I'm asking you -- and then she feels

23   like she should have been able to be identified as

24   press.  And I understand that there is a disconnect

25   there and that the City doesn't necessarily have

1    that same point of view.

2              And so my question to you, sir, as an MPD

3    officer and as in your role as a representative for

4    the City, is:  Do you think the police officers are

5    getting adequate training on how to identify

6    members of the press in these civil disturbance

7    situations?  Or could the City be doing a better

8    job?

9              MS. SARFF:  I'm going to object to the

10   extent it misstates facts, argumentative, and

11   compound.

12       A.   Ma'am, do you want to speak -- do you want

13   me to answer the --

14       Q.   Yeah, you can go ahead and answer.  You can

15   go ahead and answer.

16       A.   At that exact time or are you talking about

17   up until today's date?

18       Q.   Both.

19              MS. SARFF:  Objection.  Compound.

20       A.   Do you want me to -- so do --

21       Q.   You can answer.  You can answer.  I mean,

22   if you want to start with how -- whether you felt

23   it was adequate back in, you know, May 29, 2020,

24   that might give us a place to start.

25       A.    Okay.  So the City did take some steps and

1      other steps were kind of the in-service touching

2      points that wasn't the focus of any major training.

3      Obviously there's always things that we can do

4      better as an agency, as any department can.

5             And how we handle those situations, being

6      so complex, and not just the violence or the

7      numbers, but also in what was worn.  This was the

8      first time that I think -- covering faces at that

9      exact time in our lives, I think it was still very

10     odd for people to be wearing -- to cover your face.

11            And I think, historically, when you do

12     that, you know, it kind of makes a little bit of

13     uneasiness.  Not saying that covering your face or

14     wearing a face mask is bad or anything; it was just

15     one of those things.  I think the complex issues of

16     how just the dynamics kind of worked out, we had

17     never seen anything like that before.

18            I've been the supervisor of protests

19     leading up to this event and it was a lot easier to

20     identify people, the press, so I, who had training,

21     because of these new complex issues, struggled as

22     well.

23        Q.   Okay.  So it sounds like, at least in some

24     places, you think the City could have done a better

25     job with its trainings; is that fair?

1              MS. SARFF:  Objection.  Vague.  And

2      objection to the extent it calls for a legal

3      conclusion.

4          A.   I mean, I guess, like I said, I think

5      any -- you can always be a better driver, you can

6      always be a better golfer.  If we had the ability

7      to, you know, spend hundreds of hours on any one

8      thing, we could always do better.  They did have --

9      we did have some things to try to mitigate some of

10     these issues, but it was -- it was very complex,

11     ma'am.

12         Q.   So you just said "to mitigate these

13     issues."  What has the City done to help officers

14     since the -- since the May 29, 2020, protests to

15     identify members of the press?

16              MS. SARFF:  I'm just going to object to

17     the extent it calls for attorney-client

18     communications or attorney work product.

19              Otherwise, you can answer.

20         A.   So since this event --

21              THE WITNESS:  So I can talk about

22     after, not just in the May into June, all the way

23     leading up?  Is that okay?

24              MS. SARFF:  For this topic.

25         A.   Training was reached out -- we reached out

1    to the City Attorney's Office and other agencies.

2    When lessons were learned from all of the other

3    things that have happened, whether it was later on

4    that year in August or in Brooklyn Center, agencies

5    that were involved but then learned responses that

6    worked and that didn't, training was put on during

7    those times to prepare the Minneapolis Police

8    Department's officers and their supervisors on how

9    to deal with that.

10           The media was one of those talking points.

11   So during the trial for Operation Safety Net, in

12   every brief that every officer saw was a discussion

13   on how to deal with and identify press.

14       Q.   I'm sorry.  What were those documents you

15   just mentioned?

16       A.   So in every -- every one of the briefs that

17   was held at the Convention Center.

18       Q.   And when was that?

19       A.   When was the --

20       Q.   I mean, when were the briefs held -- when

21   were the briefs held at the Convention Center?

22       A.   For Operation Safety Net?

23       Q.   Mm-hmm.  When?

24       A.   There was -- are you asking me the dates of

25   the trial?

Ex. 24

1      Q.   Yeah.  Around -- if you know.  Or just

2   rough time period.

3      A.   I have -- ma'am, I apologize.  I don't know

4   the date of the criminal trial for Derek Chauvin,

5   so -- but during this trial --

6      Q.   Is it 2020?  2021?

7      A.   It was 2021, ma'am.

8      Q.   Okay.

9      A.   I believe it was in March of -- maybe?

10     Q.   Okay.

11     A.   Springtime of 2021 was Operation Safety

12  Net.  And leading up into Operation Safety Net was

13  a critical incident in Brooklyn Center.  And we

14  took away some of the learning points from that

15  incident.  And one of the things that was learned

16  from that was the identification of the press and

17  how to try to mitigate some of those issues.

18     Q.   And what was that incident?

19     A.   What -- what incident, ma'am?

20     Q.   The one you were just talking about.  The

21  one where you took away lessons about how to

22  identify press.

23     A.   You want to know the officer's name or --

24     Q.   I just don't know what the issue was.  What

25  was the issue that caused apparently someone from

Ex. 24

1    the press to be hurt?

2         A.   I don't know if it was an injury or if it

3    was just a complaint of -- allegations of being

4    targeted.  But we -- I wanted to try to mitigate,

5    moving forward, any of this kind of stuff as best

6    we could.  So it became one of our topics for

7    training.

8         Q.   Are there any written materials that

9    reflect the City's training to police officers or

10   third parties' trainings to police officers on

11   identification of the use -- of identification of

12   members of the press?

13              MS. SARFF:  I'm going to object to the

14   extent it calls for attorney work product or

15   attorney-client communications.

16              You can answer, otherwise.

17              THE WITNESS:  I can answer to what?

18              MS. SARFF:  You can answer outside of

19   work product or attorney-client communications.

20        A.   So we had training on this and the

21   documents that went along with the training was

22   during November 2nd of 2021, put on by a City

23   attorney.  And during his presentation, it was how

24   to deal with the press.

25              It was not like the entire -- he had other

1    things, First Amendment, but most of his focal

2    points were legal issues regarding First Amendments

3    and dealing with civil disturbances.

4                MS. ALLEN:  Okay.  Let's pull up,

5    Alyssa, the SWAT policy, Appendix A, the

6    MPLS_Tirado006189.

7    BY MS. ALLEN:

8        Q.   In the meantime, Mr. Severance -- or

9    Officer Severance --

10               MS. SARFF:  Sergeant.

11   BY MS. ALLEN:

12       Q.   -- do you agree that the City should

13   develop guidance or reviewing applications or

14   exemptions for curfew requirements, such as for the

15   press, and require appropriate notice to the MPD of

16   that exemption to curfew?

17               MS. SARFF:  I'm going to object that

18   that's outside of topic and instruct the witness

19   not to answer.

20   BY MS. ALLEN:

21       Q.   Officer Severance, are you familiar with

22   the Hillard Heintze report?

23               MS. SARFF:  Ms. Allen, I know it's just

24   inadvertent, but it's Sergeant Severance.

25               ///