UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jared Goyette, Craig Lassig, Katie
Nelson, Tannen Maury, Stephen
Maturen, Edward Ou, Timothy Evans,
Chris Tuite, and The Communications
Workers of America,
*On behalf of themselves and other
similarly situated individuals,*

                    Plaintiff,

          v.

City of Minneapolis; Minneapolis
Chief of Police Medaria Arradondo *in
his individual and official capacity*;
Minneapolis Police Lieutenant Robert
Kroll, *in his individual and official
capacity*; Minnesota Department of
Public Safety Commissioner John
Harrington, *in his individual and official
capacity*, Minnesota State Patrol
Colonel Matthew Langer, *in his
individual and official capacity*;
Minnesota State Patrol Major Joseph
Dwyer, *in his individual capacity*;
Hennepin County Sheriff David
Hutchinson, *in his individual and official
capacity*; John Does 1-10, *in their
individual and official capacities*;

                    Defendants.

Ct. File No. 20-cv-01302
(WMW/DTS)

**CITY DEFENDANTS'
MEMORANDUM OF LAW IN
SUPPORT OF THEIR
MOTION FOR SUMMARY
JUDGMENT**

Plaintiffs have brought claims against the City of Minneapolis ("City") and former Minneapolis Chief of Police Medaria Arradondo in his official capacity[1] (collectively "City Defendants"), unrelated entities from the State and Hennepin County, and unknown Doe defendants. Plaintiffs have not identified or served any of the Doe defendants and those claims should be dismissed. Contrary to Plaintiffs allegations, the City Defendants have never had a policy or custom of targeting journalists.  Plaintiffs' evidence in this case falls far short of what is required to support the claims they have brought against City Defendants.

**<u>FACTS</u>**

## I.  GEORGE FLOYD PROTESTS

### A. May 26, 2020 – early morning of May 27, 2020

The video of George Floyd's murder by former MPD officer Derrick Chauvin was widely viewed worldwide by 6:00 a.m. on May 26, 2020.  (Robertson Decl.[2] Ex. 1 at 11.)  By 10:30 a.m., a crowd was gathering at the location of his murder at 38th Street and Chicago Avenue.  (*Id.*)   Around 6:00 p.m. a large group of protestors marched from there to the MPD's Third Precinct at Lake Street and Minnehaha Avenue and the crowd grew to around 8,000 people. (*Id.*)

---

[1] Plaintiffs stipulated to dismiss all individual capacity claims against Medaria Arradondo.  (ECF 393.)

[2] Unless stated otherwise, all exhibits (Ex.) are attached to the Declaration of Heather Robertson.

Around 6:45 p.m. individuals from the massive crowd broke through the front door of the Third Precinct. (*Id.* at 12.) Others broke windows out of squad cars and the Precinct building, tore down fences around the secured parking area, and vandalized the Precinct building, other property in the vicinity, and squad cars. (*Id.*) Because of the danger posed by the crowd's potential access to squad cars with weapons inside, the MPD deployed a SWAT team around 7:45 p.m. to clear the parking lot of individuals damaging the vehicles. (*Id.*; Ex. 2.)

Near 8:00 p.m., protestors in the parking lot of the Arby's, located on the west side of the Third Precinct, were throwing rocks at officers. (Ex. 3 at 3.) A reporter from the Star Tribune, Andy Mannix, was reporting at the Third Precinct. (ECF 8 at ¶8.) He posted at 7:55 p.m. that he was "just missed" by a marking round, and then at 8:00 p.m. that he was just hit with something in the thigh. (*Id.* at ¶8a-b.) Both posts include pictures. (ECF 8-3 at 10, 8-4 at 1.) One picture shows a hand holding a less-lethal foam round which is presumably what struck Mannix. (ECF 8-4 at 1.) Mannix did not report that he was carrying any equipment or credentials identifying him as a journalist, or that officers were intentionally aiming at him rather than one of the individuals nearby throwing rocks.

As the evening progressed, civil unrest around the Third Precinct increased and officers sustained injuries from items thrown by protestors. (Ex. 1 at 12.) Businesses around the precinct were broken into and looted. (*Id.*) Someone shot

a high-powered BB gun at Officers in front of the Precinct and the front door of the precinct was shot at.  (*Id.*)  Not until 5:00 a.m. did the crowd dissipate to a manageable level.  (*Id.*)

### B. Afternoon May 27, 2020 – morning May 28, 2020: Looting and fires spread out of control; City calls for the National Guard.

In the afternoon of May 27, 2020, protestors threw objects at officers, and a brick was thrown through a Third Precinct window.  (*Id.* at 12-13.) At around 5:30 p.m., the crowd used police barricades to attack the front door of the Precinct and began breaking all the windows.  (*Id.* at 13.)  In response, MPD officers used tear gas and the mounted officers to push back the crowd at approximately 6:15 p.m. (*Id.* at 13.)

### 1. Plaintiff Goyette outside the Third Precinct on May 27, 2020

Goyette stated that he was injured on May 27, 2020, near the Third Precinct, while employed as a freelance journalist.  (ECF 380-2 "Goyette Depo" at 28:18-29:6, 41:16-42:13.)  Based on the timing of his tweets, he was injured shortly after the mounted unit was deployed but before 6:27 p.m. when he posted a selfie of his injured eye.  (*Id.* at 49:14-21, 59:5-12, 73:15-18; Ex. 4 at 3.) He wore a dress shirt, slacks, a bandana, and a black face mask.  (Goyette Depo. at 73:21-25.)  He also had a bag with him to carry his equipment. (*Id.* 73:10-14; 74:1-4.)  Goyette testified that he was standing in a parking lot near the west side of the AutoZone building.  (*Id.* at 57:1-10, 58:23-25.)     In front of him were protestors facing the police.  (*Id.* at

66:12-15.)  There was a steady stream of protestors behind him heading towards the police at the intersection outside the Third Precinct.  (*Id.* at 68:1-22.)  Goyette was taking a break from reporting to collect himself and text his daughter.  (*Id.* at 60:4-8.)

As he stood near the AutoZone, he was using only his phone.  (*Id.* at 75:11-21; 76:10-13.)  He does not recall whether his notebook was in his hand with his phone, or in his pocket.  (*Id.* 78:1-7.) He is not certain whether he was wearing his journalist credentials.  (*Id.* at 74:5-13.) He does not recall whether his camera was in his bag or around his shoulder, but he was not using it.  (*Id.* at 75:22-76:6.) Goyette testified that he was looking down at his phone texting his daughter when he was struck by an object, which he believed was a projectile from law enforcement.  (*Id.* at 65:8-66:2.)  He did not see the person who fired.  (*Id.* at 66:6-23; 67:17-20.)  Notwithstanding the fact that Goyette testified that he was texting when struck, he asserted that he should have been identifiable as a journalist at that time because of "the equipment I have, the way I am dressed, and that I am not participating in the protest."  (*Id.* at 74:14-16.)

Goyette initially continued reporting and watched individuals break a window in a nearby building.  (*Id.* at 81:2-22.)  Ultimately, he decided to leave and he drove home.  (*Id.* 81:22-82:7.)

**2. Third Precinct situation worsens throughout the night.**

At approximately 6:25 p.m., members of the crowd begin looting the Target store across from the Third Precinct. (Ex. 1 at 13.) Around this time, Mayor Frey called Governor Walz to request National Guard deployment. (*Id.* at 3.) In the next two hours, multiple businesses were broken into and looted. (*Id.* at 13.) Looters took items such as golf balls, beer bottles, and fireworks, and threw them at officers. (*Id.*)

In the 9:00 hour, the Target, AutoZone, and the Aldi store were set on fire. (*Id.*) The crowd attempted to barricade the fire department in at 27th and Lake. (*Id.*) Chief Arradondo sent a written request for the assistance of the National Guard to DPS Commissioner John Harrington. (Ex. 5.) The request does not mention anything about journalists. (*Id.*)

By 11:00 p.m., looting and violence continued at the Third Precinct and had spread further down Lake Street. (Ex. 1 at 14.) The Cub Foods and Dollar Tree across the street were set on fire. (*Id.*) Around this time, Max Nesterak, a reporter for the Minnesota Reformer, tweeted that he was hit by a "rubber bullet" from police. (ECF 8 at ¶14.) Nesterak tweeted photos and videos from the evening of May 27, 2020. (*Id.*) The photos taken "right before" and then "during" getting hit shows that he was standing outside of the AutoZone store that was on fire, with police further down the block. (ECF 8-5 at 8.) Video that he posted around the

same time shows many protestors and a large fire that had been set in the street behind him.  (Ex. 6.) Nesterak took other videos while he stood next to a line of MPD officers and was not impeded in any way. (Ex. 7.)  Nesterak's tweets neither explain the circumstances when he got hit nor allege that he was targeted as a member of the press.  (ECF Doc. 8-5 at 7-8.)  Additionally, the selfie he took does not show that he was wearing anything that identified him as a member of the press.  (*Id.* at 7.)

As night progressed, fires and violence spread, businesses were set aflame and an apartment building under construction was fully engulfed in a terrifying inferno.  (*See id.* at 14-15; Ex. 8.) Businesses further afield from the Third Precinct were also being looted.  (*See* Ex. 1 at 14-15.)  Around 11:30 p.m., the crowd attempted to pull an officer into the crowd at the Precinct.  (*Id.* at 14.)  About 3:30 a.m., a vehicle attempted to strike officers in the Target parking lot.  (*Id.* at 15.) As late as 5:30 a.m., objects were being thrown at the front door of the Third Precinct. (*Id.*)

### C. Afternoon – Evening May 28, 2020: Third Precinct is overrun and set on fire; protests endanger officers downtown.

#### 1. Katie Nelson and other reporters are undisturbed by MPD strike team rescuing a stabbing victim in the afternoon of May 28, 2020.

Shortly after 5:00 p.m. on May 28, a stabbing was reported in the Target parking lot across from the Third Precinct.  (Ex. 1 at 15.)  News coverage shows

the MPD responding to the incident and rescuing injured victims amidst the hostile and violent protestors. (Ex. 9.) In the live, contemporaneous coverage, reporter Tim Arvier reports, that "just ten minutes ago" a man had "been stabbed in the upper chest." (*Id.* at 00:15-00:23.) ███████████████████ ███████████████████████████████████ There is no allegation any reporter was interfered with by MPD at the scene.

## 2. Large march downtown turns violent near First Precinct

At approximately 5:30 p.m. on May 28, 2020, a large protest gathered in front of the Hennepin County Government Center downtown Minneapolis. (Ex. 1 at 15.) Eventually, the group marched to the First Precinct, located at 4th St, between 1st and Hennepin.  (Ex. 11) Around 8:45 p.m., the crowd began throwing rocks and bottles at the small group of officers defending the rear parking lot of the First Precinct.  (*Id.*; Ex. 1 at 15.)

A group of MPD officers, including Samantha Belcourt, operating as Strike Team 1, was called to rescue the officers overwhelmed at the First Precinct.  (Ex. 12 at 56:4-6, 67:15-24.) ███████████████████████ ███████████████████████████████████ ███████████████████████████████████ ████████████████

In route to the scene, Officer Belcourt observed individuals throw construction cones and barrels at MPD vehicles. (Ex. 12 at 67:25-68:5.) A crowd of thousands blocked Hennepin Avenue and the Strike Team's path to the officers in need of assistance. (*Id.* at 68:6-9, 181:4-7.) Two of the police vehicles in line started down Hennepin through the crowd, which initially parted. (*Id.* at 68:10-12.) To keep the crowd from closing back towards the line of vehicles, Belcourt deployed chemical irritant out her window toward the crowd. (*Id.* at 69:3-7.)

An individual identifying herself on Twitter as a Star Tribune reporter named Jennifer Brooks, posted a video of an MPD squad car travelling through the intersection of 5th Street and Hennepin Avenue, spraying out of the window. (Ex. 14.) The posting does not specify whether Brooks was reporting at the time or identifiable as a journalist. (*Id.*)

Officer Belcourt was not aiming her spray at anyone in particular, but trying to get the crowd to move back so Strike Team 1 could rescue the officers. (Ex. 12 at 184:15-24.) The crowd "had to be pushed back and … there was no other way to do it safely." (*Id.* at 186:15-16.) Officer Belcourt was not directed by anybody to use her chemical irritant. (*Id.* at 129:9-17.)

When the Strike Team arrived to rescue the officers, objects were thrown at Officer Belcourt. (*Id.* at 85:15-86:9.) She feared for her life and the life of the other officers. (*Id.* at 181:23-182:6.)

> [T]here was a lot of very angry, violent people mixed into these crowds. And you go into a crowd of thousands of people, you don't know which person that is. [T]hat sense of insecurity, that sense of being -- feeling alone and being left out there and trapped is a very awful, awful feeling.

(*Id.* at 182:20-183:1.) It was safer for everyone to create a physical space between the crowd and officers, which maintained distance from individuals who could overpower officers and disarm them. (*Id.* at 183:12-184:14.) She used her mace to create the physical space. (*Id.* at 69:6-15.)

Plaintiffs' Complaint also cites to an article and video by a USA Today reporter, Tyler Davis, who reported he was pepper-sprayed downtown around 8:55 p.m. (Compl. ¶91 n.47.) The video shows an officer spraying a group near "the 90s" bar, the same location where Strike Team 1 arrived to rescue officers. (Ex. 15.) The officer sprays toward Davis, but stops spraying by the time Davis says he is media. There is no indication in the video or the article as to whether Davis was readily identifiable as press before he informed the officer that he was press. (*Id.*)

### 3. Third Precinct is under siege – Plaintiff Nelson alleges that she is affected by tear gas

Allegedly, Plaintiff Katie Nelson:

> was working with Mike Shum as a producer on the night of May 28, 2020, the night the Third Precinct burned down. At around 9:30 p.m., MPD officers began lobbing tear gas and flash bang grenades into the crowd Shum and Nelson were filming. The police intentionally shot directly at Shum and Nelson several times with tear gas canisters,

10

despite the fact that Shum was filming the protests with large commercial camera gear. At the time, Nelson was standing with her arms up, yelling "we're press" at law enforcement as Shum crouched in front of her while filming. Nelson was also holding a large, professional long-lens camera at the time. The MPD officers directly targeted Shum and Nelson despite the fact that they were clearly media and not protesters.

(Compl. at ¶209.) ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

Nelson's own reporting confirms that the situation at the Third Precinct turned dire in the evening of May 28, 2020.  (Ex. 19.)  About 7:45 p.m., the gate of the Third Precinct was damaged and the barricade was breached.  (Ex. 1 at 15.) About 8:50 p.m., protestors breached the front door of the Third Precinct but were temporarily driven off by officers on the roof.  (*Id.*; Ex. 20 at 2.)  There were several

thousand protestors surrounding the approximately 50 officers in the Precinct. (Ex. 20 at 5, 7, 13.)

Officers who responded to the Third Precinct to aid the trapped officers observed a chaotic situation:



At 9:55 p.m., the order was given to evacuate the Third Precinct.  (Ex. 1 at 8, 16.)

**D. Early morning of May 29, 2020 - State Troopers arrest CNN reporter**

CNN reporter Omar Jimenez was arrested by State Troopers while reporting live at approximately 5:10 a.m. on May 29, 2020, outside the Third

12

Precinct.  (Ex. 21.)  There are no MPD officers participating in the arrest or even visible in the area.  (*Id.*)

### E. May 29, 2020 – area around Fifth Precinct overrun by rioters looting, setting fires, and attacking police.

In the early-morning hours of May 29, 2020, soon after the Third Precinct was taken over, looting and fires continued in an ever-widening area of the City. (*See* Ex. 1 at 16-17.)

#### 1. Establishment of the MACC and institution of city-wide curfew.

Due to the worsening emergency, a decision was made to open a Multi-Agency Command Center (MACC) "which would become a metro-wide unified command center for all public safety resources and National Guard."  (Gerlicher Testimony at 5.)  The MACC was headed by the Minnesota Department of Public Safety (DPS) through Assistant Commissioner Booker Hodges.  (*Id.*)  However, the MPD continued to operate their own command post at MPD's emergency operations center and sent a command representative to the MACC.  (*Id.*)

Additionally, Governor Walz issued a curfew for Minneapolis and St. Paul which prohibited being in public, except for specific exceptions, between 8:00 p.m. and 6:00 a.m. on May 29 and 30. (Ex. 22.)  Mayor Frey issued a curfew with functionally identical restrictions. (Ex. 23.)  Both curfews exempted the news media.  (*See* Exs. 22, 23.)

### 2. Protestors outside the Fifth Precinct become increasingly violent throughout the evening.

Close to 9:00 p.m., there were around 2,000 protestors outside the Fifth Precinct.  (Ex. 1 at 18.)  The crowd tried to breach the gate around the Fifth Precinct. (*Id.*)  The crowd began throwing rocks and bricks at the Precinct around 9:15 p.m. (*Id.*)  Over the next two hours, the scene grew increasingly violent: rioters began looting the Wells Fargo bank, a convenience store, a pharmacy, car wash, the Post Office, the Office Depo, and Walgreens; the Wells Fargo ATM, a gas station, a tobacco shop, and the Office Max were set on fire.  (*Id.*) Rioters tried to rip down the Fifth Precinct's fence and threw large objects and fireworks at the Fifth Precinct.  (*Id.*) At approximately 11:30 p.m., the State Patrol arrived at the Fifth Precinct to assist with dispersing the rioters.  (*Id.*)

### 3. Photographer Linda Tirado is injured amid the chaos around the Fifth Precinct.

Linda Tirado is a freelance photographer.  (ECF 8 at 4.)  Early in the morning of May 30, 2020, she tweeted a photograph of an injury to her face which she attributed to a rubber bullet.  (*Id.* at 5.) She later filed a lawsuit, and at the close of discovery alleged that either she was intentionally or unintentionally struck in the face by Office Andrew Braun or a John Doe.  (*Linda Tirado v. City of Minneapolis, et al,* 20-cv-01338 ECF 148 at ¶¶75-79.)

Despite Tirado's allegations, body-worn camera footage from Officer Braun shows that Ms. Tirado approached the officers, took photographs, and then backed away unharmed until she is no longer visible in the darkness.[3]  (Ex. 24 at 153:16-22.)  Officer Braun testified, while viewing his video, that he aimed to the right of her position, towards a person trying to blind officers with a laser, and that he fired at a car that was of concern to the officers to the left of her position. (Ex. 25 at 206:18-23 (pointing out Tirado on left hand of screen), 208:22-209:6 (Braun fires to right), 209:13-20 (firing to the right), 219:11-17 (firing to the right), 223:18-225:24 (firing at a car performing a dangerous maneuver on the street)). Officer Braun testified that he would not consider someone holding a camera taking pictures while backing away to be a threat, though he could not be sure whether such a person was a journalist or not.  (*Id.* at 129:8-130:24.)  The cause of

---

[3] During the 30(b)(6) deposition, a City designee testified that reporter Linda Tirado was not injured by a 40mm less-lethal projectile fired by an MPD officer because: (1) the officers in the vicinity of Ms. Tirado did not have green marking rounds and Ms. Tirado alleged she was struck with a green marking round, (2) there was no indication that Ms. Tirado was struck with any chemicals and the officers in the vicinity of Ms. Tirado were using less-lethal projectiles with a chemical component, (3) body worn camera footage showed Ms. Tirado walking away from officers into darkness and being uninjured, and (4) the named defendant officer denied aiming for or striking Ms. Tirado.   (Ex. 24 at 153:1-22.) Additionally, rioters in the vincity were engaging in series of actions that could have injured Ms. Tirado, including launching commercial grade fireworks, and throwing frozen water bottles and rocks.  (*Id*. at 159:4-12.)

Tirado's injury has not been determined, but the City has always denied she was struck by an MPD projectile.  (*See* Ex. 24 at 153:1-22, 159:4-12.)

### 4.  Plaintiffs allege other photographers injured around midnight on May 29, 2020.

Plaintiffs allege that on May 29 photographers Philip Montgomery, Scott Olson, Victor Blue, John Minchillo, and Lucas Jackson "had their press badges out and visible, and they were documenting the protests with their professional photography gear. Minchillo was wearing a vest with 'PRESS' written on the front in large letters." (Compl. ¶63.)  Plaintiffs allege that around midnight, "a group of law enforcement officers, including MPD officers and Minnesota State Patrol troopers, moved in front of the small cluster of photographers and began to advance. . . . [T]hey fired tear gas canisters and rubber bullets directly into the group [hitting Montgomery]."  (*Id.* at ¶¶63-64.)  They also allege that Jackson, Blue, and Minchillo were hit and that the "troopers and officers clearly targeted the group even though they were obviously journalists[.]" (*Id.* at ¶65.)  No evidence identifies what law enforcement agency fired, nor gives any idea what was occurring around the time that these journalists were allegedly struck.

The scene around the Fifth Precinct, as law enforcement tried to disperse the rioters, was described by one officer as follows:

███████████████████████████████████████████████



Officers worked until sunrise attempting to secure the area from rioters. Ex. 1 at 19.)

### F. May 30, 2020, curfew enforcement around 8:45 p.m.

By 6:45 p.m. on May 30, 2020, the crowd of protestors near the Fifth Precinct was estimated at 7,000 people.  (Ex. 1 at 19.)  During the 7:00 hour, groups threw rocks, bottles, and other objects over and at the fence around the Fifth Precinct. (*Id.*)  The curfew went into effect at 8:00 p.m. (Ex. 22.)

### 1. State Troopers injure and arrest journalists

On May 30, 2020, Governor Walz informed the public that he had fully mobilized the National Guard and other agencies in preparation for the anticipated protests.  (Ex. 27 at 4:54-5:49.)

### a. Plaintiff Ou is injured by the State Patrol

Ou arrived in Minnesota on May 30, 2020, to cover the protests and arrived at the Fifth Precinct around 7:00 p.m.  (ECF 219-1 at 20:12-23, 22:4-6.)  The mood

outside became tense when everyone received an alert on their phones that a curfew was about to go into effect.  (*Id.* at 24:20-25:1.)

Ou observed State Troopers begin to form a line around 32nd Street and Nicollet, about a block from the protestors at 31st and Nicollet.  (*Id.* at 25:3-8.)  Video taken by Ou shows the interaction.  (*Id.* at 25:12-18; Ex. 28.)   The only law enforcement present is the State Patrol. (*Id.* at 00:15-00:46.)   The State Troopers advance on the position of the journalists, and Ou backs up until there is an explosion near him.  (*Id.* at 1:18-1:32.)  As the line of Troopers draws next to Ou, the Troopers appear to be yelling for the journalists to move, and Troopers spray directly at Ou. (*Id.* at 1:40-1:46.)

Ou was corralled down Nicollet towards 31st Street.  (ECF 219-1 at 41:15-25.) The journalists ended up in a fenced-off area, some journalists climbed over the wall, and some, including Mike Shum, were shoved over the wall by the Troopers. (*Id.* at 42:1-9, 43:13-22.)  Ou was disoriented and ended up wandering back South on Nicollet Avenue after Troopers did not to arrest him.  (*Id.* at 43:23-5, 45:13-20;

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

This incident with the journalists and the State Patrol also allegedly affected Plaintiff Nelson, and journalists Mike Shum, Carolyn Cole, Molly Hennessy-Fiske, and Ryan Raiche.  Reporting by Raiche again confirms that only State Troopers were involved in this interaction.  (Ex. 29 at 1:35-5:10.)

> **b.  Plaintiffs Lassig, Maturen, and Maury are arrested by State Patrol and transported by Hennepin County Sheriff's Office.**

Plaintiffs Lassig, Maury, and Maturen were together covering the protests on May 30, 2020, near the Fifth Precinct.  (ECF 31-6 at ¶2.)  They saw law enforcement begin to disperse protestors.  (*Id.* at ¶3.) They left the scene to regroup and decide what to do next.  (*Id.* at ¶4.) Lassig states they were at 28th and Nicollet in the parking lot of a restaurant when they saw a "cruiser" stop and officers got out.  (*Id.* at ¶¶4-5.)  Lassig states that he and his companions identified themselves as media but law enforcement ordered them to the ground, handcuffed them, searched their belongings, and seized their photography gear. (*Id.* at ¶5.)  Evidence shows journalists were detained by State Troopers and handed off to Hennepin County Sheriff's deputies for booking and citation.  (ECF 380-1 at 3-4.)

c. **According to Plaintiffs, more journalists on May 30 are arrested or subjected to force by the State Patrol. There is no evidence of MPD involvement.**

Video footage provided by Plaintiffs of a WCCO newscast shows that videographer Tom Aviles was hit with a less-lethal projectile and then arrested by State Patrol while he was recording. (Ex. 30 at 0:29-1:29.) The video shows no MPD officers in the area. (*See id.* at 0:30, 0:47, 0:56.)

Plaintiffs also allege MSNBC reporter Ali Velshi, and his crew, were shot at with less-lethal projectiles by "police or troopers". (ECF 227 ¶69 & n.32.) However, footage cited in Plaintiffs' Complaint shows that this was again an encounter with only State Troopers. (Ex. 31 at 2:00-2:56.)

Plaintiffs allege that reporter Alzo Slade and his three colleagues were arrested by State Troopers. (Compl. ¶48.) An arrest report regarding Slade from the Hennepin County Sheriff's Office described the encounter as "protest curfew violation assist to State Patrol." (Ex. 32.) Again, MPD involvment is completely absent from the evidence.

2. **Cameraman Julio-Cesar Chavez takes photographs of law enforcement and was later struck by unidentified law enforcement.**

Plaintiffs allege that Reuters cameraman Julio-Cesar Chavez took a photograph of law enforcement taking direct aim at him. (Compl. at ¶107.) The photograph shows one MPD officer and one individual from another agency wearing a brown uniform. (*Id.*) Reuters contacted the MPD's Public Information

Officer ("PIO") John Elder at 12:48 a.m. on May 31, 2020, indicating that after the photograph was taken two members of the camera crew were "hit by rubber bullets and injured." (Ex. 33 at 2.) Only a few minutes after that[4], PIO Elder forwarded the links of video footage provided by Reuters to now-retired Assistant Chief of Police Michael Kjos ("AC Kjos"). (*Id.*) A Reuters article reports that while the individual in the photograph pointed a launcher at Chavez, he did not fire. (Ex. 34 at 2.)   It states that Chavez and a member of his crew were hit "minutes later" by an unidentified individual. (*Id.*) At 1:45 p.m. in the afternoon of May 31, general counsel for Reuters emailed a letter to Chief Arradondo, Mayor Frey, and AC Kjos regarding the incident. (Ex. 35.)  AC Kjos, who had been given access to the footage, informed Chief Arradondo and Mayor Frey that it was a shame the letter was directed to the MPD as it was the State Patrol who were involved. (Ex. 36.)

### G. May 30, 2020, after nightfall

---



████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████

### 2.   A line of MPD officers enforcing curfew pass by Plaintiff Goyette

Plaintiff Goyette was reporting in the Lyn-Lake, Nicollet area after the 8:00 p.m. curfew on May 30, 2020.  (Goyette Tr. 86:2-12, 87:4-6.)  Goyette was wearing a life vest to which had added a reflective press indication and protective goggles.  (*Id.* at 87:16-88:8, 89:2-23.)

Goyette and a colleague were watching a line of protestors in the street and saw a line of police form.  (*Id.* at 85:20-24.)  They were standing off the sidewalk so that the sidewalk was between them and the street.  (*Id.* at 90:4-10.)  He testified that as the police line got closer, he backed up and started to say "press, press".  (*Id.* at 90:16-23.)  He saw an officer point a projectile launcher at him.  (*Id.* at 91:22-92:10.)  When he saw this, he continued to say "press, press, press" louder to the point of shouting.  (*Id.* at 91:15-23.)  In Goyette's video  recording of this incident, the alleged act of the weapon being pointed at Goyette is not captured.  (*Id.* at 94:15-21.)  Goyette could not say which of the officers on his video was the officer who pointed a weapon at him, nor could he say for sure whether that officer was captured in the video.  (*Id.* at 98:24-99:23.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

Goyette asserts one final negative interaction with an MPD Officer during the protests. He testified that a "relatively short time after" the previous interaction, an MPD vehicle, an SUV, approached their location. (Goyette Tr. at 103:13-104:20.) Goyette was unable to give any description of the driver, the number of officers in the vehicle, or the squad number. (*Id*. at 104:22-105:2, 106:10-12.) Goyette stated the vehicle occupant rolled down the window, said, "I wish I could fucking peg you" and then drove away. (*Id*. at 104:7-10, 105:2-6-16.) After this incident, Goyette continued reporting. (*Id*. at 107:16-17.)

Goyette also testified that he had a positive experience with an MPD Officer either that same evening or the day after. (*Id*. at 110:6-19.) The officer walked up, Goyette identified himself as press, and the officer was friendly and stated he knew that journalists were just trying to do their job. (*Id*. at 110:6-15.)

Since May 30, 2020, Goyette has not been threatened with injury by any MPD Officers while working as a journalist at any of the other protests he has covered. (*Id*. at 111:21-112:2; 115:10-19.)

### 3. Deutsche Welle German television crew





### H. May 30, 2020 – Plaintiffs' allegations are unconnected to any specific law enforcement agency

Plaintiffs include references to other incidents in their Complaint, but they lack information as to what agency was involved.  For example, Plaintiffs refer to a video of Michael George from CBS who Plaintiffs allege was shot at with 40mm projectiles.  (Ex. 44.)  In the 15-second clip, one cannot tell where any "shots" came from.  (*Id.*)  Rather, there is a group of law enforcement in the distance.  (*Id.*)  Two

of the law enforcement officers are wearing the blue shirts of the MPD, but both are turned away from the group of reporters and are clearly not aiming at them. (*Id.* at 0:03.)  The rest of the law enforcement are wearing State Patrol uniforms. (*Id.*)  Some Troopers are turned toward the CBS crew, but it is not clear where the alleged shots are coming from.  (*Id.*)

Plaintiffs refer to a video of Canadian Broadcasting Company reporter Sue Ormiston who reports she had been hit with a projectile while standing with her crew in a parking lot.  (Ex. 45 at 0:26-0:38)  Ormiston does not identify the agency that hit her, though the video footage in her report shows State Troopers.  (*Id.*)

## I.  May 31, 2020, early morning – reporter Simon Moya-Smith arrested by unknown law enforcement agents.

Simon Moya-Smith declares that he was out with protestors at approximately 2:00 a.m. on May 31, 2020.  (ECF 31-1 at ¶2.)  He claims they were surrounded by 6-8 "police cruisers" and an officer got out of the lead car shouting for everyone to get on the ground and pepper sprayed everyone present.  (*Id.* at ¶¶3-4, 6.)

Another officer allegedly approached Moya-Smith and asked if he had any ID and whether he had any weapons or needles.  (*Id.* at ¶¶9-11.)  The officer then asked for Moya-Smith's name, to which he replied, "My name is Simon Moya-Smith.  I am a reporter with NBC News.  My press badge is on my chest."  (*Id.* at ¶12.)  The officer told him to stay put.  (*Id.* at ¶13.)

When Moya-Smith was escorted to a squad car, he again repeated that he was a journalist, but the officer ignored him and loaded him into the back of the police cruiser.  (*Id.* at ¶¶17-18.)  Moya-Smith says they were driven to the Fifth Precinct where an officer began to take down the names and information of the two protestors in the car with Moya-Smith.  (*Id.* at ¶¶20-21.)  The officer then came to speak to Moya-Smith, who again made referenced the press badge on his chest.  (*Id.* at ¶¶22-26.)  The officer then stopped writing and asked, "You're a journalist?"  (*Id.* at ¶27.)  When Moya-Smith affirmed this, the officer summoned over another officer.  (*Id.* at ¶¶28, 30.)  The officer that came over, stated "Nope, we aren't supposed to arrest those.  Get him out of here."  (*Id.* at ¶31.)  Moya-Smith was driven out of the Fifth Precinct and dropped off outside the perimeter.  (*Id.* at ¶33.)

While Moya-Smith says he was arrested by MPD Officers, he does not state how he came to that conclusion, nor describe the uniforms, nor the "police cruisers."  (*See id.*) When MPD officers make an arrest, the officer asks for the suspect's name early in the encounter to run the suspect's name in state and national databases, to check for any outstanding warrants.  (Garman Decl. at ¶2.) The query of a person's name and the result of the query would be recorded in the MPD's database.  (Zenzen Decl. at ¶1.)  A search of MPD databases shows that Moya-Smith's name was never run in the system.  (Zenzen Decl. at ¶2.)  Other

jurisdictions also brought arrestees to the Fifth Precinct for processing, including State Patrol and Metro Transit. (Garman Decl. at ¶7.)

## II.   MPD COMMAND STAFF ARE NOT APPRISED OF SPECIFIC INCIDENTS INVOLVING MEMBERS OF THE PRESS DURING THE PERIOD OF MAY 26-MAY 30.

During a 30(b)(6) Deposition in the *Tirado* case, AC Kjos was designated to answer questions on behalf of the City regarding: (1) meetings of senior City officials, specifically Chief of Police Medaria Arradondo and AC Kjos, during the George Floyd protests concerning the use of force applied to journalists and the treatment of members of the press, and (2) statements by Chief Arradondo and AC Kjos related to the MPD treatment of members of the press during the George Floyd protests.  (Ex. 24 at 14:9-15:16.)

On behalf of the City, AC Kjos testified that neither he nor Chief Arradondo recalled having any discussions during the George Floyd protests regarding journalists and use of force. (*Id*. at 35:17-24, 36:23-37:11.)  "I do not recall any conversations that I had regarding use of force against journalists.  And the Chief had told me, as well, that he did not recall having conversations or hosting meetings where a topic of discussion was force used against a journalist." (*Id*. 38:8-13, 61:2-22 (confirming that neither had discussions with the Mayor or City Councilmembers regarding allegations of use of force against the press).)

While there were a multitude of issues requiring an emergency response, the topic of members of the press and use of force was never raised in internal or external law enforcement meetings:

> There were plenty of personnel within the City of Minneapolis and the Minneapolis Police Department planning to deal with crowds and protests and all the needs of the city in reference to response to 911 calls.
>
> A host of meetings taking place both within the Police Department and within other entities within City government and outside agencies that were preparing for potential crowd management issues.
>
> But I do not recall, at any time, in any of the meetings that I attended during this period of time, throughout the entire George Floyd protest period, where the topic of discussion surrounded use of force in relation to media personnel.

(*Id*. at 46:7-47:6; s*ee also id*. at 40:17-19 ("I do not recall conversations relative to press at all at that time.")) AC Kjos further explained, "we didn't believe that the media would be of concern to us . . . because we had not had prior experience with media where there was a concern regarding force against the media." (*Id*. at 65:20-66:1.)

Specifically, with respect to the  protests, neither Chief Arradondo nor AC Kjos recall ever discussing or having anyone mention claims of injuries alleged by reporters Andy Mannix, Max Nesterak, or Jared Goyette. (*Id*. at 47:7-48:22, 48:24-49:12; 53:17-25.)  AC Kjos noted that Andy Mannix had his personal cell phone number and could have reported any alleged incident to him but did not.  (*Id*. at

47:15-48:4; 48:21-23.)   AC Kjos has no knowledge of any MPD personnel monitoring the press during the protests. (*Id*. at 49:13-23.)

During one press conference attended by Chief Arradondo, someone asked a question about a single instance in which a journalist was inadvertently exposed to chemical irritant.  (*Id*. at 64:12-18.)  Someone commented that a "journalist had been exposed to chemical irritant when it was delivered to the crowd outside of the 3rd Precinct." (*Id*. at 51:2-5.)  The comment was not posed as a complaint.  (*Id*. at 64:12-18.)  Had complaints been made, the Chiefs would have assigned them to Internal Affairs for investigation.  (*Id*. at 64:19-21.)  AC Kjos noted that the Chief has "been very clear that he supports First Amendment rights and the freedom of the press." (*Id*. at 65:16-18.)

Following May 30, the record shows that three complaints came in via email to PIO Elder about treatment of the press, which he forwarded to some command staff. First was about the Reuters reporter which came in May 31, just before 1:00 a.m., ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████. (Exs. 33, 39, 42 at 1.)

## III.   MPD TRAINING AND POLICIES ON DEALING WITH MEMBERS OF THE PRESS

The MPD Policy and Procedure Manual that was effective during May 26-May 31, 2020, contains Policy 9-202, Public Recording of Police Activities which

protects "the constitutional and legal rights of citizens to photograph and make audio and video recordings of Minneapolis Police Department personnel." (Ex. 46 at 1-2.) It provides further: "The Minneapolis Police Department recognizes that members of the general public have an unambiguous First Amendment right to record police officers while they are conducting official business or while acting in an official capacity in any public space, unless such recordings interfere with police activity." (*Id.* at 2.)

MPD policy 6-201 also states, "The policy of the MPD is to establish a cooperative relationship with the news media in supplying information on matters of public interest." (Ex. 47 at 1.) Additionally, "MPD employees shall not unnecessarily obstruct news media personnel from performing their duties at emergency scenes." (*Id.* at 2.)

In 2018 or 2019, the MPD conducted some in-service training for all officers in the department to assist them in recognizing members of the press during civil disturbances. (Ex. 24 at 199:11-25, 200:10-11.) Additionally, MPD officers in the Civil Disturbance Unit that served at the Superbowl and NCAA tournament received training from FEMA on recognizing members of the press. (*Id.* at 200:25-201:10.) Following the George Floyd protests, the MPD training unit reached out to the City Attorney's Office and other agencies for the purpose of learning which law enforcement responses worked and which did not in terms of media, and

made sure in "every brief [relating to Operation Safety Net preparing for Derek Chauvin's trial] that every officer saw was a discussion of how to deal with and identify press."  (*Id*. at 206:25-208:7, 209:20-210:3.)

## IV.   DAUNTE WRIGHT PROTESTS

Daunte Wright was shot and killed by a Brooklyn Center Police Officer on April 11, 2021.  (Compl. at ¶125.)  Protests began on April 12, 2021, in front of the Brooklyn Center Police Department.  (*Id*. at ¶126.)  This occurred during the trial of Derek Chauvin.  (*Id*. at ¶127.)

Plaintiffs make numerous allegations regarding the mistreatment of the press during these protests, but they do not allege or provide any evidence that any MPD officer was involved in any of these incidents or policing those protests. (I*d*. at ¶¶130-181.)

## **ARGUMENT**

Plaintiffs have brought six causes of action in their Complaint.  Plaintiffs, however, have failed to support their claims against City Defendants with more than the allegations in their complaint and therefore all their claims must be dismissed.

## I.   PLAINTIFFS CANNOT WITHSTAND SUMMARY JUDGMENT BY CONTINUING TO RELY ON THE ALLEGATIONS IN THEIR COMPLAINT.

Summary judgment is proper if "there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  While a party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion", [the moving party] does not have any requirement to provide materials negating the opponent's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Rather, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322-23. The forms of evidence that must be produced to defeat summary judgment include "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" but *not* just the pleadings.  Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 324.  Plaintiffs' claims can no longer survive by Plaintiffs pointing to their "unsupported and self-serving allegations" and they must now point to "probative evidence that would permit a finding in [their] favor."  *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009).

## II.   THE CLAIMS AGAINST THE DOE DEFENDANTS MUST BE DISMISSED.

Plaintiffs have not identified any of the Doe defendants.  If "a defendant is not served within 90 days after the complaint is filed, the court … must dismiss the action without prejudice against that defendant[.]" Fed. R. Civ. P. 4(m); *see also Thornton v. U.S. Dep't of Just.*, 93 F. Supp. 2d 1057, 1063–64 (D. Minn. 2000)(citing *Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985)(dismissing Doe deputies still unidentified after close of discovery).) Plaintiffs' Third Amended Complaint was filed on September 28, 2021, more than a year ago.  (Compl.)  Ultimately "the Court cannot exercise jurisdiction over a defendant that the plaintiff has failed to serve." *Jacox v. City of Bloomington*, No. CV 16-492 (RHK/DTS), 2017 WL 1411486, *2 (D. Minn. Apr. 20, 2017)(citing *Dodco, Inc. v. Am. Bonding Co.*, 7 F.3d 1387, 1388 (8th Cir. 1993)).  The Doe defendants must be dismissed because Plaintiffs have not identified them, have not served them, discovery has closed, and Plaintiffs cannot amend their Complaint further.

## III.   THE ONLY MEANS FOR PLAINTIFFS TO PROVE ANY CLAIMS AGAINST CITY DEFENDANTS IS ON A THEORY OF *MONELL* LIABILITY.

There is no automatic liability for a municipality if one of its employees commits a constitutional tort.  *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 985 (8th Cir. 2016).  Rather, to have a claim against the municipality for the unconstitutional conduct of an employee, the violation of a plaintiff's

constitutional rights must have "resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citations omitted). Therefore, the question is whether Plaintiffs' *Monell* theory of liability against the City[5] can withstand the summary judgment standard.

The first task in applying *Monell* is to identify the municipal policy or custom at issue. *Mahaffy v. Kroll*, 2010 WL 3385222, *12–13 (D. Minn. Aug. 24, 2010)(citing *Dick v. Watonwan County,* 738 F.2d 939, 943 (8th Cir. 1984)). Plaintiffs allege in their Complaint that the City had a custom, a policy, and a failure to train and supervise that: 1) caused First Amendment rights violations; 2) caused First Amendment retaliation; 3) caused unlawful seizures and excessive use of force; and 4) that caused the due process violations. (Compl. ¶¶401, 423, 459, 468.) Each alleged constitutional violation is premised on the targeting of Plaintiffs and purported class members because they are journalists. (Compl. ¶¶397, 400, 407-15, 419, 422, 429-437, 446-455, 474-481.)

_____

[5] Plaintiffs also maintain claims against former Chief Medaria Arradondo in his official capacity. Suits against individuals in their official capacity are treated as a suit against the government entity and so the analysis applies equally to both the City and the Chief. *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

A.   **Plaintiffs Cannot Sustain a *Monell* Claim Against the City Unless Individual Plaintiffs Can Show a Violation of Their Individual Constitutional Rights by a City Employee**

For a viable *Monell* claim, plaintiff's harm must have been caused by: 1) a constitutional violation; 2) committed by the municipality's employee. *Golberg v. Hennepin Cnty.*, 417 F.3d 808, 813 (8th Cir. 2005); *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).

1.   **Plaintiffs Lassig, Maury, Maturen, Ou, Evans, and Tuite were not injured by a City employee.**

Plaintiffs Lassig, Maury, and Maturen were arrested by the State Patrol and then immediately transferred to Hennepin County Sheriff Deputies who transported them to jail.  Plaintiff Ou was injured by the State Patrol on May 30, 2020, and allegedly threatened in Brooklyn Center in April 2021.  Plaintiff Evans alleges he was injured by Hennepin County Sheriff's Deputies.  Plaintiff Tuite alleges he was threatened and had force used on him by State Patrol.  Because they have presented no evidence that City employees were involved in their alleged injuries their *Monell* claims against the City must be dismissed.

2.   **Plaintiffs Goyette and Nelson claims of constitutional violations by the MPD fail as a matter of law.**

Goyette and Nelson allege the MPD violated their First, Fourth and Fourteenth Amendment rights. (Compl. ¶¶407, 411, 429,433, 336, 450, 474478.)

### a. Goyette and Nelson were not seized, precluding their Fourth Amendment claims.

Goyette and Nelson cannot sustain a Fourth Amendment claim based on unreasonable force because they have not established that they were seized. "To state an excessive force claim 'under the Fourth Amendment, plaintiffs must show *both* that a seizure occurred and that the seizure was unreasonable.'" *Clark v. Bowcutt*, 675 Fed.Appx. 799, 805 (10th Cir. 2017)(citing to *Brower v. Cty of Inyo*, 489 U.S. 593, 598-99 (1989)("Seizure alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'"))

A seizure occurs when the government terminates a person's freedom of movement through means intentionally applied. *Brower*, 489 U.S. at 597. However, "force intentionally applied for some other purpose" than restraint is not a seizure. *Torres v. Madrid*, 141 S. Ct. 989, 998 (2021). Force used to "repel" someone does not constitute a seizure. *See Martinez v. Sasse*, 37 F.4th 506, 509 (8th Cir. 2022)(immigration officer's push to keep lawyer from entering immigration facility, was not a seizure because it was meant to repel the lawyer).

In *Dundon v. Kirchmeier*, 2017 WL 5894552, *3, *18 (D.N.D. Feb. 7, 2017), *aff'd mem.* 701 F. App'x 538 (8th Cir. 2017) (per curiam), the Court held that protestors kept back from a police line by projectiles, or exposed to tear gas or flash bang devices, were not seized because they were never arrested, never told they could not leave, and they could have removed themselves by voluntarily leaving

through areas not secured by law enforcement. Similarly, in *Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 834, 840 (8th Cir. 2021), the Eighth Circuit held that reporters, who were subjected to tear gas while covering protests were not seized even though they "could not stay in their chosen location" because the "reporters' freedom to move was not terminated or restricted … [t]hey were dispersed." *Id.* at 840. *See also Brown v. City of St. Louis, Missouri*, 2012 WL 1501368, *5 (May 12, 2022)(pepper sprayed protester was not seized under the Fourth Amendment).

Neither Goyette nor Nelson provide evidence sufficient to establish a seizure. The uncontroverted evidence shows they were not surrounded by MPD officers, commanded to stay, nor were otherwise detained, and they had a means of egress. In short, their freedom of movement was not inhibited. To the contrary, on May 27, Goyette alleges he was struck but nonetheless resumed reporting and later drove himself home. On May 30, Goyette claims an officer pointed a launcher at him, but he was able to continue reporting in that location and leave the area when he chose.

On the evening of May 28, the night the Third Precinct was breached and set on fire, video shows that officers lobbed a munition into the crowd. But Nelson's reporting proves that those dispersal tools only had the law enforcement function of attempting to "repel" the crowd from the barricaded Third Precinct. Nelson was not confined or restricted from leaving as a result of the tear gas or

flash bangs.  Having failed to establish a threshold seizure, the Fourth Amendment claims pursued by Goyette and Nelson fail as a matter of law.

**b.   Plaintiffs' First Amendment claim fails as a matter of law because the City did not enact any prior restraint of the press**

Non-retaliation First Amendment claims are directed at government laws, regulations, rules, or policies which, when enforced, would have the effect of curtailing the freedom of speech or the press.  *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571–72 (1942).  However, Plaintiffs do not identify any City law, regulation or policy that is directed at limiting the First Amendment rights of the press, let alone any that had the effect of preventing or restricting the First Amendment rights of the press.  Instead, MPD Policy 9-202 explicitly protected the ability of people, including press, to record and observe officers, MPD Policy 6-201 forbids unnecessarily obstructing news media at emergency scenes, and the City's curfew during the civil unrest explicitly exempted members of the press. There is no cognizable prior restraint set forth by Plaintiffs.

**c.   Goyette and Nelson's First Amendment retaliation claim fails as there is no evidence of a retaliatory motive.**

To establish a First Amendment Retaliation claim, Plaintiffs "must show (1) [they] engaged in a protected activity, (2) the government official took adverse action against [them] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part

by the exercise of the protected activity." *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004).   As an initial matter, Goyette has not shown that at the time he was struck that he was engaging in a protected activity.   Goyette testified that he was texting his daughter.   He was not actively reporting, nor was he engaging in any expressive conduct.   Goyette did not see an officer aim at him and cannot present any evidence that this officer knew that Goyette was a reporter.   This also defeats the third element, causation.

Under the causation prong, Plaintiffs must show that the retaliatory motive was a "but-for cause" of the adverse action, meaning the plaintiff must have been singled out because of the exercise of constitutional rights. *Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir. 2010).   Neither Goyette nor Nelson have produced evidence of the motive of the unidentified officers that they encountered, much less that they received different treatment than non-reporters in their immediate area.   In *Quraishi,* the Eighth Circuit found that a retaliatory motive could be inferred from the fact that reporters' video showed a peaceful scene interrupted by the officer firing tear gas at reporters, but not at others in the area.   986 F.3d at 834, 838.   Here there is no evidence that Nelson or Goyette were singled out as reporters, as there was widespread use of crowd-control munitions and 40mm projectiles by officers attempting to quell riotous crowds in front of the Third Precinct.   Similarly, when Goyette claims that an officer pointed a 40mm

launcher at him on May 30, 2020, there is no evidence about what that officer was perceiving, what caused him to raise the launcher, nor any evidence that the officer treated Goyette differently from the protestors the officers were approaching. Without evidence establishing there was a retaliatory motive, the First Amendment Retaliation claims fail.

### d. Any procedural due process claim by Goyette or Nelson are barred by the *Paratt-Hudson* doctrine.

Goyette and Nelson generally allege encounters with MPD violated their right to Due Process under the Fourteenth Amendment.  To the extent Plaintiffs are invoking a procedural due process claim, their claims are barred by the *Paratt-Hudson* doctrine.  The *Paratt-Hudson* doctrine provides that where there are adequate state law remedies for random and unauthorized deprivations of property or liberty interests then there is no basis for a procedural due process claim. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990); *Hanson v. Larkin*, 605 F. Supp. 1020, 1025–26 (D. Minn. 1985). "To the extent a procedural due process claim is asserted, the claim fails because [Plaintiffs Goyette and Nelson] have made no attempt to establish that state law would not have afforded them an adequate post-deprivation tort remedy."  *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003).

42

### e. Goyette and Nelson cannot support a substantive due process claim.

As discussed *supra*, Goyette and Nelson were never seized by the MPD nor have they supported a First Amendment retaliation claim.   Where a plaintiffs' claim is not "covered" by any specific constitutional provision, the plaintiff's claim may be analyzed as a substantive due process claim.   *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).   "To establish a violation of substantive due process rights by an executive official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the 'contemporary conscience.'"  *Flowers v. City of Minneapolis, Minn.*, 478 F.3d 869, 872–73 (8th Cir. 2007).

██████████████████████████████████████████████████████

███████ is insufficient to show a violation of a fundamental right.  "[F]undamental rights are those 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'"  *Flowers*, 478 F.3d at 873.   Nelson was amid a riot that was minutes  from overrunning and setting fire to a police precinct.   To say she has a liberty interest in not being exposed to crowd-control measures in such a situation does not recognize the limited scope of the fundamental rights that have been recognized by the Supreme Court.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

Additionally, neither Nelson nor Goyette have produced evidence sufficient to demonstrate any MPD conduct here "shocks the conscience." In situations such as a riot -- where it is an officer's duty to "restore and maintain lawful order" an officer is "supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance'" -- the standard for what constitutes "conscience shocking" behavior is very high. *Lewis*, 523 U.S. at 853 (quoting *Whitley v. Albers,* 475 U.S. 312, 327 (1986)). In the unprecedented civil unrest that overtook the City starting on May 26, MPD officers had to make decisions in haste, under pressure, and without the luxury of a second chance. Nelson and Goyette's alleged violations occurred in this context.

In such a situation, even "precipitate recklessness" is insufficient to shock the conscience, only malicious intent to harm will suffice. *Id.* Plaintiffs have no evidence that officers maliciously intended to harm them. Goyette testified he did not see an officer aim at him and could not see the protestors around him because he was looking down at his phone when he was struck. There is nothing to substantiate that an officer was intending to hit Goyette with a projectile rather than someone else. Nelson has ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████   There is no evidence that this officer

was acting maliciously versus attempting to disperse a riotous crowd.  Goyette

and Nelson cannot substantiate a substantive due process claim.

> **B.      Plaintiffs Cannot Point to an "Official Municipal Policy" That Caused Any Violation of Plaintiffs' Rights.**

For the purposes of *Monell* analysis, a "policy" is an official policy, a

deliberate choice of a guiding principle, or procedure made by the municipal

official who has final authority regarding such matters.  *Mettler v. Whitledge*, 165

F.3d 1197, 1204 (8th Cir. 1999).  A policy that does not affirmatively sanction

unconstitutional conduct cannot be the moving force behind a constitutional

violation, and therefore it cannot establish *Monell* liability.  *Dick v. Watonwan Cty.*,

738 F.2d at 942.  Plaintiffs have only alleged that the City's policy on media

relations does not provide sufficient "instruction or guidance on how to identify

the media or ensure their First Amendment rights are respected." (Compl. at

¶288.)

Even if it were true that there was no guidance on dealing with the media

in the MPD Policy & Procedure Manual, giving insufficient guidance to employees

cannot establish *Monell* liability.  *See Szabla v. City of Brooklyn Park, Minnesota*, 486

F.3d 385, 392 (8th Cir. 2007) (facially constitutional policy that fails to give detailed

guidance does not give rise to municipal liability); *Atkinson*, 709 F.3d at 1216

(absence of a policy that "would have prevented an unconstitutional act by an employee otherwise left to his own discretion" is insufficient to impose municipal liability).

There is nothing in MPD Policies that sanctions violating the First Amendment rights of reporters, using excessive force against or arresting reporters, or that requires the deprivation of any reporter's due process rights. Rather, reading policies 9-202 and 6-201 together show that the MPD's policy is not to interfere with either media or recording by the public generally. The MPD policies are constitutional.

### C. Plaintiffs Have Not Established That There Was a "Custom" Of Unconstitutional Behavior Towards Journalists by the MPD

To establish the existence of a municipal "custom," for the purposes of *Monell,* a plaintiff must show:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir. 1998).

**1. Plaintiffs have not shown the existence of a widespread, persistent, and continuing custom of unconstitutional conduct.**

In order to prove the City has *Monell* liability based on an unconstitutional custom, the unconstitutional misconduct must be so widespread, persistent, and continuing that it has "the effect and force of law". *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990). Plaintiffs appear to rely on three categories of evidence of a pattern: 1) general instances of past excessive force allegedly committed by MPD officers; 2) six instances involving the MPD and members of the press prior to 2020, occurring in 2002, 2008, 2012, and 2015. (Compl. at ¶¶275-78, 280); and 3) instances of alleged use of force targeting journalists during the George Floyd protests from May 26, 2020, to May 31, 2020.

As to the first category of general excessive force unrelated to press, this is insufficient as a matter of law to substantiate Plaintiffs' *Monell* claim. The incidents constituting the pattern must be factually similar to the custom alleged. *See Mettler*, 165 F.3d at 1204; *Ball-Bey v. Chandler*, 415 F. Supp. 3d 884, 895 (E.D. Mo. 2019) (quoting *Peterson v. Fort Worth* 588 F.3d 838, 851 (5th Cir. 2009)) ("[a] pattern requires similarity and specificity"). Complaints that the MPD used excessive force unrelated to press, 40mm projectiles, or chemical irritants, do not establish a pattern.

Regarding the pre-2020 incidents that allegedly involved the press, Plaintiffs have no evidence about these incidents beyond the allegations in the Complaint.

47

Such inadequately supported incidents cannot support a *Monell* claim.  *See, e.g.* *Mettler*, 165 F.3d at 1204 (*Monell* claim properly dismissed where plaintiff failed to provide factual backgrounds of previous complaints or evidence the investigations into any complaints were inadequate); *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 799 (8th Cir. 1998) ("There must also be some showing that the complaints had merit[.]")  Additionally, the most recent pre-2020 allegation was five years before the events at-issue in this case. In the interim, in 2016, the MPD adopted a policy explicitly protecting the rights of the public to record police activities, and in 2018 or 2019 conducted training on civil disturbances including dealing with the media.

Plaintiffs also assert that the conduct of the MPD during the George Floyd protests supports that there was a custom of targeting journalists; this is similarly unsupported by evidence.  Just as with prior complaints, these substantially contemporaneous actions must be supported by evidence that they have merit. *Rogers*, 152 F.3d at 799; *accord Holmes v. Slay*, 99 F. Supp. 3d 978, 988–89 (E.D. Mo. 2015) (no *Monell* claim where plaintiff did not show prior complaints had merit).

Plaintiffs have offered no evidence that journalists during the first three days of protests, May 26, 27, or 28, were identifiable as journalists at the time they were allegedly injured by MPD.  There is no evidence that reporters Mannix,

Nesterak, Goyette, Brooks, Davis, Nelson[6] or Shum, were identifiable as members of the press when they allegedly encountered the MPD.  Nor is there evidence that Nelson and Shum, whose footage shows them filming next to protestors attempting to breach the Third Precinct, were specifically targeted with munitions which are used to disperse a crowd.

As for the situation on May 29 and the early morning of May 30 by the Fifth Precinct where Plaintiffs allege that reporters Tirado, Minchillo, Montgomery, Olson, and Blue were injured, there was a large contingent of State Patrol present and they cannot definitively identify what agency fired at them.  While Tirado alleged Officer Braun or a Doe officer fired at her, this is contradicted by video that shows her taking photographs and moving away unharmed, and she maintains the incident could have been a negligent act, which does not give rise to *Monell* liability.

On May 30, the evidence shows that the majority of journalists incidents involved injury or arrest by the State Patrol, and only the State Patrol.  (Plaintiffs Ou, Nelson, Lassig, Maturen, Maury, and journalists Cole, Hennessy-Fiske, Shum,

---

[6] Nelson's allegations in the Complaint that she was identifiable as press are unsupported by evidence, either declaration or otherwise, her video footage does not show her or Shum's appearance nor does it capture any verbal assertions that they are press.

Raiche, Aviles, Slade, Velshi.)   For others, Plaintiffs present no evidence to establish which agency the journalists encountered.  (Chavez, Ormiston, George.)

The only MPD encounters on May 30 with any evidentiary support are Goyette's being passed by a group of MPD officers, who did not injure him, and VICE reporter Adams being pepper-sprayed.  As for Goyette, his video shows that MPD officers passed by him and did not fire on him or use any force whatsoever. He says he was wearing a life jacket with a reflective press marking stuck on it.  It was dark, the video does not show light shining onto Goyette.  Goyette did not identify the officer he says aimed a launcher at him and the perceptions of that officer are not known.  Therefore, Goyette has not presented evidence that a jury could rely on to find that he was targeted because of his status as a journalist.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████        *See Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985) (plurality opinion).

Finally, the last incident involving the MPD, the detention of Moya-Smith in the early-morning hours of May 31, 2020, also fails to support a pattern.  Moya-Smith alleges he, and all the non-journalists with him, were pepper-sprayed immediately upon detention, but he does not allege any pepper-spraying after he

identified himself as a journalist, that he should have been immediately identifiable as a journalist, or that he was treated worse than the other arrestees due to his status as a journalist.  It is, in fact, unclear whether Moya-Smith was arrested by the MPD at all as other jurisdictions were also bringing arrestees to the Fifth Precinct.  The fact is, Moya-Smith was released quickly, without being deprived of any equipment or credentials, without being booked, and in plenty of time for him to widely document and publicize his experience.  This also does not support a pattern of targeting members of the press.  Without evidence of a custom that had "the force and effect of law" Plaintiffs cannot maintain a *Monell* claim.

### 2. Plaintiffs have not shown that there was notice of or deliberate indifference to unconstitutional conduct by the City.

Plaintiffs must show that policymakers were deliberately indifferent to or tacitly authorized the misconduct they complain of – here targeting the press – *after* policymakers had notice of the misconduct. *Ware,* 150 F.3d at 880; *Parrish v. Luckie*, 963 F.2d 201, 204 (8th Cir. 1992)(must have had notice and *deliberately* failed to take action). There is absolutely no evidence that City policy makers were on notice of the custom of unconstitutional conduct that Plaintiffs have alleged, much less that they showed deliberate indifference to or tacit authorization of such conduct.

Plaintiffs alleged that MPD were aware of attacks on the press because it was reported on by the press, but they have made no showing that the MPD was

monitoring these news reports or was aware of them at all.  The only evidence of notice to the MPD are the complaints submitted to MPD regarding Reuters reporters, ██████████████████████████████████.  The first of these complaints was not received until 1:00 a.m. on May 31.  The only press incident, during the George Floyd protests, allegedly involving the MPD, that took place after 1:00 a.m. on May 31, is the arrest of Moya-Smith around 2:00 a.m., about an hour later.  Even assuming there was sufficient evidence that this was MPD action directed against the press, an hour of notice is hardly sufficient time for policymakers, who were addressing unprecedented civil unrest in the City, to address the allegation.  *Burbridge v. City of St. Louis, Missouri*, 430 F. Supp. 3d 595, 619–23 (E.D. Mo. 2019), *aff'd,* 2 F.4th 774 (8th Cir. 2021).  "And even if evidence of notice existed, the [contemporaneous] incidents are simply too close in time to the [plaintiffs' incident] to show 'deliberate indifference' or 'tacit authorization.'" *Id.* (citing *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013)).  What the evidence does show is that the complaints received were ████████████ ████████████████████████  This does not support Plaintiffs' theory of deliberate indifference.

### 3. Plaintiffs have not shown that their alleged injuries are attributable to the custom they have alleged.

"To establish municipal liability, a plaintiff must prove that a municipal policy or custom was the moving force behind the constitutional violation; only

deliberate action by a municipality can meet the 'moving force' requirement."
*Ward v. City of Des Moines*, 184 F. Supp. 2d 892, 896 (S.D. Iowa 2002)(citing *Mettler,*
165 F.3d at 1204).  Plaintiffs have alleged generally that the City had a custom of
targeting members of the press as they reported on protests.  However, Plaintiffs
have not provided evidence that this custom was the moving force behind the
violations alleged by the individual Plaintiffs.

In *Brewington v. Keener,* the *Monell* claim could not be sustained because the
plaintiffs presented no evidence that the alleged custom, of using excessive force
against detainees, motivated the use of force in the particular case.  902 F.3d 796,
801–02 (8th Cir. 2018).  Rather the only evidence was that the individual deputy's
anger was the moving force behind the violation.  *Id.* at 802.  Here, Plaintiffs have
presented no evidence whatsoever on what may have motivated any individual
officers.  Goyette was not identifiable as a member of the press when he was
allegedly struck by a projectile. Nor is there any information as to what an officer
who pointed a launcher at Goyette was able to perceive. Nelson was in the middle
of a riot outside the besieged Third Precinct and was close to protestors.  The other
Plaintiffs present no evidence that the MPD was involved in their alleged injuries.
There is no causal connection between the alleged policy of targeting members of
the press by the MPD and the injuries alleged by Plaintiffs.  Therefore, this element
of *Monell* also fails.

### D.   Plaintiffs Failed to Provide Evidence of a Failure to Train or Supervise.

Plaintiffs have alleged municipal liability via a failure to train or supervise. Both training and supervisory *Monell* allegations require the same analysis, and neither can succeed "without evidence the municipality "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." *Atkinson*, 709 F.3d at 1216-17 (quotation omitted).   As discussed *supra*, Plaintiffs provided no evidence that the City's MPD policymakers received notice of any allegedly constitutional acts against the press until the early morning hours of May 31, 2020, which was too late to evidence deliberate indifferent to those acts.  *Id.* at 1217.

## IV.   PLAINTIFFS HAVE FAILED TO PRESENT EVIDENCE OF A CIVIL CONSPIRACY BETWEEN THE CITY AND ANY OTHER ENTITY.

"To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).  Inherent in these requirements is that Plaintiffs must show a "deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim."  *Id.*

As discussed *supra,* Goyette and Nelson have failed to demonstrate any constitutional violation committed against them by officers of the MPD.

Assuming, without agreeing, that the other Plaintiffs, Ou, Lassig, Maturen, Maury, Tuite, and Evans suffered a deprivation of constitutional rights, they have failed to show that the City conspired with anyone to commit these acts.

Plaintiffs have not supplied any evidence of a link between the City working with other agencies on responding to the civil unrest generally, and any specific plans regarding how to deal with members of the press.  AC Kjos testified that there were no meetings with external partners discussing the press or how to deal with the press.  Plaintiffs can point to no evidence that there were any discussions whatsoever between any of the alleged co-conspirators and City officials about the press or how to deal with press during the George Floyd or Daunte Wright protests.  Undermining any idea that these parties had reached a meeting of the minds to attack the press, ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████.  This is not indicative of a conspiracy to target the press.  Plaintiffs' evidence that the parties had the opportunity to communicate about responses to the *protests* is not enough to support a conclusion that the parties were communicating about the *press* or how to deal with the press, let alone communicating about targeting press, it is

pure speculation.  "Speculation and conjecture are not enough to prove a conspiracy exists."  *Mettler*, 165 F.3d at 1206.

## V.   PLAINTIFFS HAVE NOT ALLEGED A FAILURE TO INTERVENE CLAIM AGAINST THE CITY.

Failure to intervene claims in the Eighth Circuit have been recognized as claims against individual officers who fail to intervene in preventing the unconstitutional use of force by another officer when they had the opportunity to do so.  *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009).  Given that the City is not an individual officer, the claim fails.  Even assuming a failure to intervene claim could be made against the City itself, such a claim fails as Plaintiffs have neither made allegations nor produced evidence the City had or had notice of a policy, custom, or supervisory failure of failing to intervene in constitutional violations against members of the press.  (*See* Compl. at ¶¶491-97.)

## <u>CONCLUSION</u>

Plaintiffs have failed to provide evidence on every count they have raised against City Defendants.  Based upon the foregoing, City Defendants, respectfully request that the Court dismiss all Plaintiffs' claims against them.

Dated: December 5, 2022

KRISTYN M. ANDERSON
Minneapolis City Attorney
By
*/s/ Heather P. Robertson*
Heather P. Robertson (#0390470)
Kristin R. Sarff (#388003)
Sharda Enslin (#0389370)
Assistant City Attorneys
Office of the Minneapolis City Attorney
City Hall, Room 210
350 S. Fifth Street
Minneapolis, MN 55415
Telephone: 612-673-3949
heather.robertson@minneapolismn.gov
kristin.sarff@minneapolismn.gov
sharda.enslin@minneapolismn.gov

*Attorneys for Defendants City of
Minneapolis and Chief of Minneapolis
Police Medaria Arradondo*