UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jared Goyette, *et al.*,

Plaintiffs,

v.

City of Minneapolis, *et al.*;

Defendants.

Court File No. 20-cv-01302
(WMW/DTS)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CITY OF MINNEAPOLIS' MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

*"Fuck these media . . . There's a fucking curfew here.*
*Fucking, we gave it . . . to them tonight, Mike."*

- Lieutenant Johnny Mercil to Officer Michael Osbeck, on May 30, 2020, following MPD's implementation of its ███████ strategy

This is the shocking invective spewed by one of the officers who was responsible for ████████████████████████████████████████████████ ████████████████████████████████████████████. Lieutenant Mercil's comments help explain what happened to Plaintiffs and other journalists as they tried to exercise their constitutionally-protected and difficult jobs of covering the George Floyd protests and law enforcement response.

As demonstrated below, MPD was engaged in a war in which constitutional rights meant nothing. Journalists were repeatedly and systematically ordered to leave the protests, chased, told that their rights were meaningless, shoved to the ground, gassed, and shot in

the face with less-lethal weapons. So egregious was MPD's conduct that the City's *own expert* recently told a public audience that ████████████████████████████ ███████████████████████████████████████ This after decades in which MPD Officers repeatedly violated the First Amendment rights of the press and others, and command did nothing.

These are the facts.  They constitute more than sufficient evidence upon which a reasonable juror could find that the City is liable for the constitutional violations and harm MPD inflicted on Plaintiffs. First, Plaintiffs' injuries result from a "continuing, widespread, persistent pattern of unconstitutional misconduct" to which MPD was deliberately indifferent. Second, the City failed to train and supervise MPD personnel even though it should and did have notice of the risk that, without adequate training and supervision, MPD was likely to violate Plaintiffs' rights. In addition, the City is liable for the systematic failures of MPD officers and leadership to intervene to prevent those violations. Finally, MPD conspired with other law enforcement agencies to violate Plaintiffs' rights.

Because, at minimum, genuine issues of material fact exist with respect to the City's liability, summary judgment is unwarranted and the City's Motion should be denied.

FACTS

## I. MPD HAS A LONG HISTORY OF VIOLATING THE FIRST AMENDMENT DURING MAJOR PUBLIC PROTESTS

Major protest events occur infrequently. Yet, MPD has consistently violated the press' First Amendment rights during these events and has been the subject of multiple internal and external investigations, reports, and lawsuits regarding its misconduct.

**The 2002 Dinkytown Riots.** In 2002, the Minnesota Daily newspaper filed a complaint with MPD's Internal Affairs Division regarding MPD's unconstitutional treatment of newspaper staff during a riot in Dinkytown. *See* Answer to Third Am. Compl. ("Answer") ¶ 275 (ECF 250); ("Third Amended Complaint") ¶ 275 (ECF 227). The MPD did not discipline any of the responsible officers. Answer ¶ 275.

**The 2008 Republican National Convention Protests.** In 2008, journalist Amy Goodman sued MPD and other agencies after she and her colleagues were harassed and arrested while reporting during protests at the Republican National Convention ("RNC"). Answer ¶ 276; TAC ¶ 275. *See* Declaration of Pari I. McGarraugh,[1] Ex. FFF. The lawsuit settled. Answer ¶ 276.

Journalist Tony Webster was also arrested while covering the RNC Protests. Declaration of Tony Webster ("Webster Decl."), ¶ 2. At the time, Webster was clearly identifiable as a journalist and was standing apart from protestors. *Id.* An MPD officer

---

[1] Exhibits A through FFF to the McGarraugh Declaration are referenced solely by their exhibit letter (e.g., Ex. A, Ex. B, and so on.) Please be advised that the McGarraugh Declaration is split into two documents—one carrying the publicly-filed document and one filed under seal attaching sealed documents.

forced Webster to sit on the ground with his hands on his head. *Id.* As an officer forced Webster into zip-ties, Webster's camera hit the ground, smashing the lens. *Id.* Webster identified himself as press to several officers during this process, to no avail. *Id.*

In the wake of the 2008 RNC, MPD Chief Tim Dolan worked with the Police Executive Research Forum to explore new MPD policies and practices for protest responses, including for media relations. Ex. A, 15-16. The policy recommendations included guaranteeing press access to and protection from police harm during protests. *See* Ex. B, 5. MPD never adopted these recommendations, and they were not used to train or guide officers. *Id.*

**The 2012 Occupy Minnesota Protests.** In April 2012, while filming "Occupy Minnesota" protesters, KSTP cameraman Chad Nelson was assaulted by an MPD officer who violently knocked Nelson's large, professional video camera off his shoulder. *See* Declaration of Michelle Gross ("Gross Decl."), Ex. A. MPD Internal Affairs investigated the incident, but the investigation did not include or discuss whether the officer's conduct violated Nelson's First Amendment rights; instead, it focused on whether the officer's conduct "brought discredit to the department," as the incident was "broadcast by many local media outlets." *See id.,* 1227934; 1227948-952; 1227954. The officer received a mere reprimand. *See id.*, 1227932.

**The Jamar Clark Protests**. In 2015, protests erupted in North Minneapolis after MPD officers killed Jamar Clark. Again, the media was targeted. For example, journalist Tony Webster covered the protests at the Fourth Precinct that followed Clark's killing. Webster Decl. ¶ 4. On one evening, Webster was photographing from a distance, with no

protesters around, when an MPD officer fired a chemical munitions canister directly at Webster, barely missing him. *Id.* Webster was clearly identifiable as press because he carried two professional cameras, stood away from the protesters, had visible press credentials, and was actively documenting the scene. *Id.* Another night, Webster was walking toward the protests to take photos, but was still across the street away from the protesters. *Id.* An MPD officer spotted Webster from across the street, pointed at him, and immediately marched toward him from behind a police line while pointing a rifle at Webster to intimidate him, all while Webster was easily identifiable as a journalist. *Id.* The officer did not lower the rifle until Webster backed away from the protest, ceased reporting, and left. *Id.* In yet another incident, an MPD officer shined a spotlight directly at Webster and told him he was doing so to prevent Webster from taking photographs. *Id.*, ¶ 7. This was just one of many incidents in which MPD has intentionally obstructed Webster's ability to document protests, crime scenes and other newsworthy events by shining spotlights directly at him. *Id.*

The MPD's violent response to the Jamar Clark protests was widely criticized, and MPD Chief Janee Harteau asked the Department of Justice to prepare an "after-action" report based on a comprehensive review of the protests and the police response (the "DOJ Report"). Answer ¶ 280; TAC ¶ 280. The report, released in 2017, found that MPD's First Amendment and crowd control training was inadequate; in particular the Department lacked adequate training on crowd management, and the use of less-lethal instruments; had inadequate policy, guidelines, training, and equipment for crowd management; and had no policies related to crowd-control, equipment type, use, training, or as to who receives

equipment, training on equipment, or the inspection and deployment of equipment. *See generally*, Ex. C.

In response to these deficiencies, the DOJ Report recommended that MPD implement training on "First Amendment rights and protections, legitimacy, and procedural justice," "crowd management," and "use of force and less-lethal instrument deployment." *Id.* Unfortunately, MPD "did not capitalize on its training and experience from previous large-scale events to establish a framework for crisis response and guide its actions." Ex. D ("the Heintze Report"),11.[2] Instead, MPD "missed opportunities to address the shortcomings identified in the [DOJ Report]," and "neither the City nor the MPD implemented many of the recommendations in the report[.]" *Id.*, 11, 79.

---

[2] The Heintze Report was commissioned by the Minneapolis City Council, adopted and published on the Council's website, pursuant to the audit function of the City Council. The MDHR Report, discussed and cited *infra*, was initiated by the Minnesota Department of Human Rights on June 1, 2020, in cooperation with the City and pursuant to the agency's statutory obligation to investigate discrimination. *See* Minn. Stat. § 363A.06. It is also published on the State of Minnesota website and linked to by the City's website.

These reports are admissible under FREs 201 and 803(8). *E.g., Brakebill v. Jaeger*, 905 F.3d 553, 562, n. 5 (8th Cir. 2018) (district court properly took judicial notice of state's official website); *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (same); *Boerner v. Brown & Williamson Tobacco Co.,* 394 F.3d 594 (8th Cir. 2005) (report containing factual findings made by independent scientists admissible under Rule 803(8): "the burden is on the party opposing admission to demonstrate untrustworthiness" (citation omitted)); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, (1988) ("As long as [a report's] conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report"); *Union Pac. R. Co. v. Kirby Inland Marine, Inc. of Mississippi*, 296 F.3d 671, 679 (8th Cir. 2002); *In re Levaquin Prod. Liab. Litig.*, No. 08-1943 JRT, 2010 WL 4676973, *2 (D. Minn. Nov. 9, 2010); *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300–01 (4th Cir. 1984).

In 2018, the Commission of Civil Rights issued a report discussing, *inter alia*, MPD's issues with supervision, training, and the First Amendment (the "CCR Report"). Ex. E. The CCR Report revisited and quoted verbatim from the DOJ Report, noting "[MPD], in particular, has been criticized for the management of mass protests, especially following the fatal shooting of Jamar Clark in 2015." *Id*., 33.

When the Floyd Protests erupted, MPD leadership and Minneapolis City Staff dusted off the DOJ Report and circulated it widely. *See, e.g.,* Ex. D; Ex. 43; Ex. G, Ex. H. On May 27, 2020, for example, MPD Inspector Amelia Huffman forwarded a copy of the DOJ Report to several members of MPD Command Staff. Ex. H. The officers "reviewed the [DOJ Report] to gain a better understanding of the issues identified therein and chart a better path forward" during the Floyd Protests. Ex. D, 43. But it was too late to implement the recommendations, and MPD did nothing to else to address the DOJ Report's concerns with its officers as it responded to the Floyd Protests.

## II.   MPD HAS A LONG HISTORY OF SUPERVISION FAILURES AND UNACCOUNTABILITY FOR ITS MISCONDUCT

MPD's neglect of the DOJ Report's recommendations was no isolated event. MPD has a lengthy and well-documented history of unaccountability for policy violations of all stripes. The unaddressed misconduct most notoriously relates to officers' failure to follow use-of-force policies, but has been endemic throughout the department and across the whole suite of MPD policies.

For example, the City settled at least five lawsuits alleging that MPD officer Tyrone Barze, Jr. used excessive force for a total exceeding $600,000. Answer ¶ 301; TAC ¶ 301.

Barze was the subject of 12 different complaints but had only been disciplined once. Answer ¶ 301. ████████████████████████████

████████████████████████████████████

████████████████████████████████

A similar pattern of misconduct and unaccountability involved SWAT officer Lucas Peterson. Peterson shot and killed Terrance Franklin in 2013. Answer ¶ 303; TAC ¶ 303. Franklin's family sued and the lawsuit settled, but Peterson was not disciplined. *Id.* Prior to this incident, Peterson had been sued at least 13 times for excessive force, and the City had settled the claims for more than $700,000. *Id.* ████████████████████

████████████████████████████

These are just a few examples evidencing MPD's deeply-entrenched culture of unaccountability. The 2018 CCR Report noted that while the City paid out $14 million in misconduct complaint settlements from 2006-2012, very few of those cases resulted in [3]discipline. Ex. E, 13. It concluded that "the high number of complaints sent to the Office of Police Conduct Review with little to no recourse for Minneapolis police officers suggest that more can be done to ensure officer accountability." *Id*. 35.

On April 27, 2022, the Minnesota Department of Human Rights ("MDHR") released an investigative report documenting pervasive misconduct and continuing unaccountability at MPD ("MDHR Report"). Ex. M. The MDHR investigation began almost immediately after the murder of George Floyd.  It involved a comprehensive

---

[3] *See Supra,* at 6, n.2.

historical review of body warn camera ("BWC") video, case files, and interviews with MPD personnel. *Id.*, 6-7. The resulting report described the corrupt organizational culture at MPD:

> MPD maintains an organizational culture where officers are trained to be aggressive towards community members, which leads to officers escalating situations and often using inappropriate levels of force. The accountability systems in place are insufficient and ineffective at holding officers accountable. Instances of police misconduct are not properly investigated, not timely addressed, and officers are not held consistently accountable.
>
> The lack of collective and sustained action among City and MPD leaders has, in effect, allowed this organizational culture to fester within MPD and resulted in unlawful policing practices that undermine public safety.

*Id.*, 9. MDHR found that: "[m]any officers reported MPD changes its policies frequently and that violating a policy is not a significant problem because MPD does not hold officers accountable when policies are violated." *Id.*, 42.

Further, MPD's "insufficient supervisor training reinforces a culture that is averse to oversight and accountability." *Id*. The MDHR Report highlighted, for example, officers' routine use of racial slurs in violation of MPD policy. *Id.*, 38. But "MPD does not uniformly and consistently hold officers accountable for using this language." *Id*. Further, MDHR reviewed 300 MPD "Use of Force" files and concluded that MPD officers failed to intervene in 76.5% of the incidents where MPD policy required intervention. *Id.*, 46.[4]

The MDHR Report concluded: "City and MPD leaders have been aware of deep organizational culture problems within the MPD . . . . In the vacuum of collective action

---

[4] Notably, the three bystander officers involved in the Floyd murder failed to intervene and were ultimately found criminally liable for this failure. *See* Ex. N.

from key City and MPD leaders, the organizational culture at MPD has existed unchecked." *Id.*, 69. Indeed, MPD may have "many appropriate policies and plans in place, but it needs to increase oversight and accountability for adhering to orders, documents and associated training[.]" Ex. D, 81. "***Without fundamental organizational culture changes, reforming MPD's policies, procedures, and trainings will be meaningless.***" Ex. M, 8 (emphasis added).

## III.   MPD'S SUPERVISION FAILURES CONTINUED DURING THE FLOYD PROTESTS

MPD's supervision failures continued during the Floyd Protests: MPD's response was plagued by an "absence of planning efforts and non-adherence to core incident command principles." Ex. D, 10. As the protests increased in size and intensity, MPD command staff "remained disjointed, and officers and agencies on the ground clearly recognized the absence of any well-structured command and control. . . . many officers on the ground did not receive information from supervisors or an incident commander, and these officers felt that the operation lacked command and direction." *Id.*, 46. "Communication and guidance from the MPD incident command staff were limited, resulting in varied and uncoordinated responses to the protests in the field." *Id.*, 15. The absence of such guidance in a volatile situation "creates situations wherein officers act independently," and "[t]hose independent actions may not align with any department policies or desired command-level objectives communicated to the field." *Id.*, 56.

In that environment, MPD's custom of interfering with, harassing, and targeting journalists flourished.

A.      **First Amendment and the Press**

The City leans heavily on its sparse policies regarding the media, which "recognize" First Amendment rights and prohibit "interfering" with those documenting police. *See* City Mem., 31-32 (ECF 410). But, as demonstrated by the numerous constitutional violations detailed below, this policy was disregarded; it was supplanted by MPD's custom of harassing journalists.

MPD officers testified that they did not recall receiving any First Amendment training with respect to the media before or during the protests. *E.g.,* Declaration of Joshua Rissman ("Rissman Decl"), Ex. A, 50:4-11; 126:4-7; Baker Decl., Ex. B, 37:9-25. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

The Heintze Report lamented this training and supervision failure: "The MPD previously had assigned officers to the large-scale events, and as such, these officers received equipment and training in crowd-control tactics to address a large and angry crowd. However, MPD did not require or give these officers the opportunity to maintain the training." Ex. D, 50; *see also id.*, 12 ( "officers stated they had not received any formal crowd-control training since their last assignment to a large event"). ████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ Rissman

Decl., Ex. A, 52-53 ████████████████████ "The MPD's actions during the unrest

were not consistent with the recognized best practice of respecting individuals' First

Amendment rights . . . " Ex. D, 49.

### B.    Less-Lethal Weapons

At the time of the Floyd Protests, MPD Policy 5-312 provided that less lethal

weapons would not be used "[u]nless there is an immediate need to protect oneself or

another from apparent physical harm[.]" Declaration of Eric Rice ("Rice Decl."), Ex. I.

Policy 5-317(B)(2) warned that 40mm impacts to the head, neck, throat and chest "can lead

to a permanent physical or mental incapacity or possible death" and directs that "[u]nless

deadly force is justified," officers should avoid shooting individuals in these areas. *Id.* 14;

Rice Decl., Ex. A, 34:1-14. SWAT officers knew they should avoid shooting at an

individual's head for this very reason. Ex. P, 85:9-15. Yet multiple journalists and

protesters were shot in the head during the protests, including Plaintiff Goyette, and

journalists Linda Tirado and Victor Blue. *See, e.g.,* Blue Decl. ¶¶ 3; Baker Decl., Ex. A,

104:8-22.

MPD policy does not allow use of 40mm weapons solely to disperse a crowd, and

40mm rounds were not specially authorized for dispersal purposes during the Floyd

Protests. Declaration of Tim Phillips ("Philips Decl."), Ex. C, 45:15-23; Phillips Decl., Ex.

A, 38:14-16 ("I've never seen or observed anyone use the 40mm as a dispersal tool. That's

not what MPD uses that tool for.").

However, BWC footage from the Floyd Protests shows innumerable instances in which 40mm weapons were used solely for dispersal purposes—or simply because it amused the MPD officer to fire the round. *See, e.g.,* Rice Decl., Ex. L, 8:30-9:30; Rice Decl., Ex. D, 1:20-1:30. One MPD officer even testified that officers *enjoyed* shooting civilians during the protest response. Rice Decl., Ex. A, 18:8-11. This license to behave sadistically existed in part because MPD supervisors, "did not provide the officers within their area of oversight with rules of engagement [regarding 40mm weapons], nor were they aware of any provided by the command post." Ex. D, 31; *see also id*., 58 (" Although supervisors were present and seen providing some guidance to the officers, the officers in the video footage appeared to engage the crowds with the use of munitions and OC/CS foggers on their own accord."). Notably, the Heintze Report found no evidence that MPD officers issued verbal warnings before firing 40mm weapons, as MPD policy required, nor that they adhered to the policy on use-of-force reporting. *Id*., 31, 35; *see generally* Rice Decl., Exs. D, L (footage of numerous 40mm shots without warning).

In short, there was a "lack of MPD command oversight, clear objectives, coordinated crowd-control measures and accountability for the deployment of less-lethal munitions" during the Floyd Protests. Ex. D, 54.

## IV.   WITHOUT ADEQUATE SUPERVISION AND TRAINING, MPD REPEATEDLY VIOLATED JOURNALISTS' RIGHTS

### A. MPD Shoots Reporter Jared Goyette In the Face With A Less-Lethal Weapon

On May 27, 2020, Plaintiff Jared Goyette was covering the Floyd Protests for the Washington Post when an MPD officer shot him in the face. Goyette wore a press

credential on a lanyard and was carrying a monopod, a DSL camera, reporters' notebook, audio recorder; his cell phone, and a bag. Ex. Q, 31:6-8; 35:2-36:22; 74:1-4. Goyette "attempted to dress specifically in a formal way that would differentiate [himself] from protesters." *Id.*, 37:6-7. He testified: "I don't think there was any doubt to anyone who looked at me that I was a journalist." *Id.*, 74:16-18.

Moments before being shot, Goyette was attending to a young man who had just been shot in the face himself. The young man was bloody, unconscious, and convulsing. *Id.*, 49:10-50:9 & 60:1-8. Goyette was across from the Third Precinct in the Wendy's, Target, and Auto Zone parking lots, near the intersection of Lake and Minnehaha. *Id.*, 51:18-57:10. From there, he witnessed "officers on the roof who were slowly and intentionally targeting individuals with less than lethal projectiles . . . [and] those officers did not seem panicked or rushed or under threat." *Id.*, 39:20-40:1. Goyette was positioned "off to the side" and "not in the direct line between protesters and police." *Id.*, 60:16-20; 68:8-9. "I checked to make sure I wasn't around anyone and that I was off to the side, because I'm continually checking myself [to be in a relatively safe position]." *Id.*, 60:16-18. He blacked out then woke up seconds later, "screaming," with a "searing pain in my eye," and "scared because I couldn't see." *Id.*, 61:5-8. The 40mm round had hit the bridge of his nose and his eye. *Id.*, 61:3-16. Moments after Goyette regained consciousness, a tear gas canister landed "right next to the group." *Id.*, 61:22-23.

The 40mm weapons used by MPD are "very accurate." Phillips Decl., Ex. E, 26:11-12; *see also* Philips Decl., Ex. B, 13:10-15 (describing as "highly accurate"). They are equipped with a "red dot" sight for precision aiming. Phillips Decl., Ex. C, 11:24-13:23.

SWAT Officers are tested on their accuracy with the 40mm weapon at long distances. Ex. P, 84:11-21; Ex. R, 63:1-7; 98:25-99:10.

The MPD officer who shot Goyette in the face with this "very accurate" weapon clearly aimed for Goyette's head and executed a direct hit. The officer did so knowing Goyette was press, given Goyette's visible equipment and professional demeanor. Goyette Depo., 39:25-40. Goyette immediately sought medical treatment: "The doctor who examined me said I had been hit by a projectile traveling at high velocity. The doctor indicated that the pressure from swelling in my left eye was at a dangerous level, and I could have permanently lost my vision in 24-48 hours had I not sought treatment." June 2, 2020 Declaration of Jared Goyette, ¶ 7 (ECF 9).

After being shot, Goyette determined he could no longer work that day due to his injuries. Goyette Depo. 81:19-82:1. The experience traumatized him. Goyette began wearing safety equipment, including goggles, to protect himself. *See* Goyette Depo. 89:1-8. MPD's misconduct "shook" Goyette's "basic level of trust" in his safety as a journalist. *Id.*, 101:3-11. He continues to have "negative associations with" reliving his experiences. *Id.*, 101:11-14.

Perhaps unsurprisingly given the multiple head shots at the Third Precinct on May 27, the Heintze Report specifically identified "a lack of accountability and supervisory oversight for munitions and officer deployment" of 40mm weapons that day. Ex. D, 52.

**B.  MPD Fires Tear Gas Canisters And Flash Bang Grenades At Plaintiff Nelson And Her Cameraman Mike Shum**

Plaintiff Katie Nelson was working as a producer for the New York Times with videographer Mike Shum on the night of May 28, 2020. Declaration of Katie Nelson ("Nelson Decl.") ¶ 2. At around 9:30 p.m., MPD launched crowd-control weapons directly at a group of journalists that included Nelson and Shum, even though they were separated from protesters and were obviously press. *Id.*; Declaration of Mike Shum ("Shum Decl."), ¶ 2. Nelson was standing near Shum with her arms up yelling "press!" *Id.* MPD shot at the group several times with tear gas canisters and flash bangs and threw a concussion grenade that detonated directly in front of Shum's camera. Nelson Decl., ¶ 2; Shum Decl. ¶ 2. Shum was filming the protests with large, over the shoulder, commercial camera gear. Nelson Decl., ¶ 2; Shum Decl. ¶ 2. Nelson also had a large DSLR camera with commercial lenses visible at all times. Nelson Decl., ¶ 2.

**C.  The Omar Jimenez Arrest**

On the morning of May 29, 2020, the State Patrol arrested CNN reporter Omar Jimenez live on the air. Ex. S. The incident immediately became international news and received widespread condemnation. Within hours, Governor Walz was forced to hold a press conference in which he profusely apologized for the arrest. Ex. T. Walz stated passionately: "In a situation like this, even if you are clearing an area, we have got to ensure there is a safe spot for journalism to tell the story." *Id*.

MPD was well-aware of the arrest, as it was internationally notorious within hours. After it occurred, angry citizens emailed MPD leadership to complain. Ex. U; Ex. V; Ex.

W. Senior MPD Command also received notice of the arrest via their press monitoring systems. *See* Ex. X.

### D.      MPD Shoots Photojournalist Linda Tirado With a Less-Lethal Weapon, Blinding Her

On the evening of May 29, 2020, independent photojournalist Linda Tirado was taking photos on Nicollet Avenue between 31st Street and Lake Street. Baker Decl.", Ex. A, 22:22-25. Tirado was easily identifiable as a journalist, given her press badge, professional camera, and the fact that she was taking photos rather than participating in the protests. *Id*., 75:25-76:16; 80:18. As Tirado lined up a photo of the MPD deployment outside the Fifth Precinct building, an MPD officer shot her with a 40mm weapon. *Id*., 155:18-25. Tirado was struck with two rounds. One hit her backpack. *Id*., 103:1-8. The second shot hit Tirado in her left eye, blinding her. *Id*., 104:8-22. At the time, the nearest protester was roughly 100 feet away. *Id*., 131:2-5. A volunteer medic working with protesters assisted Tirado and bandaged her eye. MPD did nothing to help Tirado in her distress. *Id*., 133:2-10.

### E.      MPD Assaults Another Group of Photojournalists With 40mm Rounds

Later in the evening of May 29, 2020, Reuters photographers Victor Blue and Lucas Jackson were taking pictures of the protests across from the Wells Fargo building near the 5th Precinct. Declaration of Victor Blue ("Blue Decl.") ¶ 3; Declaration of Lucas Jackson ("Jackson Decl."), ¶¶ 2, 3. They were in a group of other photojournalists, including Philip

Montgomery and John Minchillo.[5] Blue Decl. ¶ 3; Jackson Decl. ¶ 3. They were readily identifiable as members of the press due to their large professional cameras, their press badges, and their repeated shouts of "PRESS! PRESS!" Blue Decl. ¶ 3; Jackson Decl. ¶ 7.

MPD officers targeted the group, shooting them with 40mm less-lethal weapons at close range. Blue Decl. ¶ 3; Jackson Decl. ¶¶ 4, 6. Blue was hit in the thigh with one round and, as he wheeled around, he was hit with another in the back of the head. Blue Decl. ¶ 3. Jackson was hit in the buttocks. Jackson Decl. ¶ 4. Montgomery was hit in the chest with a 40mm round – it tore his shirt and left a large bruise on his chest. Blue Decl. ¶ 3.; Jackson Decl. ¶ 5. The MPD shot these journalists "deliberately and without warning." Jackson Decl. ¶ 6.

### F.     MPD Attacks Shum Again On May 29

On May 29, Shum was again working with Nelson, documenting the protests outside MPD's Fifth Precinct building. Shum Decl., ¶ 3. As Shum filmed the protests, MPD officers fired flash bang grenades directly at him, even though he was far away from the protesters. *Id.*

A little later, MPD fired tear gas and less-lethal projectiles at the assembled protesters. *Id.* Shum was filming from a distance, close to a group of other news photographers, away from protestors, with a large shoulder-mounted camera. *Id.* MPD officers nonetheless, with no warning, began shooting less-lethal projectiles and tear gas at Shum and the journalists gathered nearby, including Star Tribune photographer Richard

---

[5] John Minchillo and Lucas Jackson were members of Plaintiff CWA on May 29, 2020. January 5, 2023 Declaration of John Schleuss ("Schleuss Dec.") ¶ 5.

Tsong-Taatarii.[6] *Id.* One projectile ricocheted off a wall or the ground and hit Shum in the side, while another projectile hit Shum in the foot. *Id.* His foot swelled up, and he had difficulty with it for a time. *Id.* Shum was shocked that the officers were clearly, intentionally firing into a group of journalists. *Id.*

**G.     On May 30, 2020, MPD Escalates The Violence Against Journalists**

**1.  MPD And Its Allied Agencies Assume A New Aggressive Posture**

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ As with prior operations, decisions about the May 30 operation were "communicated back and forth" between field commanders across agencies: "When movements were being made, conversations would be going back and

---

[6] Tsong-Taataarii is a CWA member. Schleuss Decl. ¶ 5.

forth between the command staff at the MACC that had all of the decision-makers from all of those agencies there." Phillips Decl., Ex. A, 11:7-21.

MPD Officers appreciated the new predatory posture. MPD Deputy Commander Bruce Folkens commented to another MPD officer: "tonight it was just nice to hear we're going to find some more people. Instead of chasing people around, we're gonna hunt. You guys are out hunting people now, and it's just a nice change of tempo. Fuck these people." Rice Decl., Ex. G, 1:09:14 – 1:09:33.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████ MPD and the MACC agencies, "were working all together to execute this plan." Phillips Decl., Ex. A, 13:10-17. ████████████████

███████████████████████████████████████

███████████████████████

      ██████████████████████████████████

          ███████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ The plan was

tantamount to a suspension of constitutional rights.

████████████████████████████████████████████████

████████████████████████████████ Phillips Decl., Ex. C, 19:5-7; Phillips

Decl., Ex. A, 10:7-10; ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

While deployed on the evening of May 30, MPD SWAT Officer Michael Osbeck

had this conversation with MPD Lt. Johnny Mercil and another SWAT Officer:

Lt. Mercil: Fuck these media.

Officer Michael Osbeck: Yeah. They think they can go anywhere.

Mercil: (Mockingly) Hold on a second. Let me check your credentials. Make a few phone calls just to verify who the fuck you are.

Osbeck: They think they can do whatever they want.

Mercil: There's a fucking curfew out here.

Officer: They're everywhere.

Mercil: [Inaudible].

Officer: Even over in St. Paul they were right on top of us.

Mercil: Fucking, we gave it . . . to them tonight, Mike.

Rice Decl., Ex. M, 2:10-3:20. ██████████████████████████

████████████████████████████████████████████████████

█████████████████. Mercil was in a leadership position during the protest response; he (together with other MPD commanders) planned and executed various operations, and he provided instruction, direction, and guidance to his subordinate officers. Phillips Decl., Ex. D, 10:1-13; 12:15-25.

> **3. Thus Empowered, MPD And Its Allied Agencies Attack Journalists And Peaceful Protesters**
>
> > **a. The Nicollet Avenue Assault**



During this maneuver, MPD and the State Patrol got "organized and into a *'battle rhythm'* . . . Strike teams were able to move efficiently and in closer coordination . . . . State troopers, soldiers, and police officers in the field and also in the command level at the MACC seemed to be working very well together and making an impact." Ex. TT, MPLS007179 (emphasis in original).

Before they even engaged the crowd, the State Troopers advancing down Nicollet Avenue shot journalists with flash bang grenades, projectiles, and tear gas, pepper-sprayed them in the face at close range and ordered them to cease reporting and disperse even though they had violated no lawful order. Declaration of Molly Hennessy-Fiske, ¶ 28 (ECF 31-3); Declaration of Carolyn Cole, ¶ 20 (ECF 31-2); PI Hr'g Tr. 28:7-11, 29:14–16, 117:5–10; Ex. JJ, 1:37-5:03;[7] Nelson Dec., Ex. A, 4:15-5:15.

Plaintiff Ed Ou was covering the protests for NBC News on May 30. PI Hr'g Tr., 20:12-16. Ou heard dispersal orders and understood that, as a journalist, they did not apply to him because he was exempt from the curfew. *Id*., 71:13–72:5. Troopers and officers unleashed a torrent of less-lethal munitions and chemical weapons directly at Ou and others who were clearly identified as press. *See generally*, Amended Declaration of Ed Ou ("Ou Decl."), ¶ 26. There is no evidence that journalists attacked law enforcement or interfered with their work. Nor were the protesters looting or behaving so violently so as to warrant

---

[7] ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

the attack. PI Hr'g Tr. Tr., 28:2–4. Put simply, working in coordination and conjunction with MPD, the State Patrol attacked clearly identifiable journalists without provocation.

Troopers shoved Ou, who was now bleeding, disoriented and blinded by pepper spray, corralling him and other journalists north toward 31st Street. *Id*., 41:17–25. After another concussion grenade was thrown, an MPD officer grabbed Ou. *Id*., 45:8–10. Ou heard the officer ask: "What do you want me to do with *this*?" as he clutched Ou. *Id*., 46:9–10 (emphasis added); Ou Decl., ¶ 26, 3:46 – 3:52. Ou needed help. PI Hr'g Tr., 45:15–18. Blood streamed down his face, and he was in considerable pain. Ou Decl., ¶ 26, Ed Ou Video, 3:46 – 3:51; PI Hr'g Tr., 47:6–11. Ou begged several MPD officers for help, but they ignored him. Ou Decl., ¶ 26, 3:46 – 3:51.

Los Angeles Times reporters Molly Hennessy-Fiske and Carolyn Cole[8] were also in the group of reporters outside the Fifth Precinct. At around 8 p.m., Hennessy-Fiske was observing and reporting what at that time was a peaceful protest. Hennessy-Fiske Decl., ¶ 3. Troopers and officers assaulted the group of journalists and Hennessy-Fiske was hit at least five times in the leg with less-lethal projectiles fired either by MPD or the State Patrol. *Id.*, ¶¶ 12-13, 28.

Nelson was also attacked law enforcement's march down Nicollet. *See* Nelson Decl., ¶¶ 4-6. She and Shum fled the assault by State Patrol troopers and ducked into an alcove, at which point law enforcement forced them out of the alcove and over a stone wall; the fall injured Shum. *Id.,* ¶ 6; Ex. 9, Shum Decl., ¶¶ 4-5.

---

[8] Cole and Hennesy-Fiske are members of Plaintiff CWA. Schleuss Decl., ¶ 5.

On May 30, 2020, Plaintiff Tannen Maury was covering the Floyd Protests for the European Press Agency ("EPA"), along with another EPA photographer, Plaintiff Craig Lassig. Declaration of Tannen Maury ("Maury Decl."), ¶ 3; Amended Declaration of Craig Lassig ("Lassig 2nd Decl."), ¶ 3. Maury and Lassig were documenting the protests occurring near the Fifth Precinct when the State Patrol and MPD attacked, pushing protesters and journalists alike up 1st Avenue toward downtown. Maury Decl., ¶ 4; Lassig 2nd Decl., ¶ 4. The MPD fired tear gas and less-lethal projectiles at the protesters, shooting protesters in the back as they ran. Maury Decl., ¶ 4; Lassig 2nd Decl., ¶ 4. MPD officers chased Maury and Lassig away from the protest scene, despite their being easily identifiable as journalists. Maury Decl., ¶¶ 5, 7; Lassig 2nd Decl., ¶ 5. Maury and Lassig had to climb over a wall after being cornered, while an MPD officer screamed at Maury and pounded on his back with a nightstick. Maury Decl., ¶ 5; Lassig 2nd Decl., ¶ 7.

### b. MPD Harasses And Threatens Plaintiff Nelson And A Univision Crew

As State Patrol, MPD, and other allied agencies moved their officers up Nicollet, an MPD Strike Team and assigned SWAT unit rolled down the 31st Street (which crossed Nicollet) to cut off protesters and journalists. MPD continued to harass and threaten clearly identifiable journalists, including Nelson and Shum, as they fled the assault on Nicollet. MPD officers yelled at Nelson and Shum and aimed 40mm weapons at them. Nelson Decl., ¶ 7; Nelson Decl., Ex. A, 10:20-14:10. At one point, a male MPD officer started yelling "I'm gonna get her," in reference to Nelson. He was looking at Nelson and pointing his

orange less-lethal gun at her. Nelson Decl., ¶ 7. At the time, Nelson and Shum were clearly identifiable as journalists. *Id.*

The MPD officers who menaced Nelson and Shum knew exactly what they were doing. MPD officers are trained that simply aiming a 40mm weapon at an individual elicits "anxiety of having the firearm pointed at the [Subject]," and creates a "powerful mental distraction [because] the Subject must deal with the perceived danger and fears of pain." *See* Ex. Y, 98:9-22. This menacing behavior, just minutes after the assault on Nicollet, had its desired effect—it drove Nelson and other journalists away from the protests and effectively disrupted their reporting.[9] About 20 minutes later, MPD officers again harassed and threatened Nelson, as well as a Univision reporting team, pounding on the Univision reporters' van with their batons until all journalists were forced to leave the area. Nelson Decl., ¶ 8; Nelson Decl., Ex A, 41:10-45:00.

Around 11:30 p.m on May 30, Nelson and Shum were driving to the George Floyd memorial. Nelson Decl., ¶ 10. They turned onto a street that was blocked off at one end by National Guard vehicles and MPD in riot gear. *Id.* There were cars behind them blocking their egress and the officers gave no direction or indication of how Nelson could or should leave the area. *Id.* The car windows were open, and Nelson shouted "we're press, we're press" at the officers. *Id.* They shouted back, "we don't care," and fired projectiles, hitting the car. *Id.* The car windows were open and the car quickly filled with tear gas. *Id.* Nelson's eyes burned; She was coughing, and it was extremely difficult to drive. *Id.*

---

[9] The MPD also used this intimidation technique with other journalists during the protests. *See, e.g.,* Webster Decl., ¶ 6.

### c.  Multiple Journalists, Including Plaintiffs Lassig, Maturen, And Maury Were Arrested By HCSO

After fleeing the attack by MPD, Maury and Lassig ran into Plaintiff Stephen Maturen at 29th and Nicollet. The three photographers proceeded up Nicollet and stopped in the parking lot of a restaurant to regroup. They were nowhere near any protesters and were the only three individuals in the parking lot. Maury Decl., ¶ 6; Lassig 2nd Decl., ¶ 8; Amended Declaration of Stephen Maturen ("Maturen 2nd Decl.") ¶ 3. When State Patrol troopers pulled into the parking lot, all three had their press badges on and their professional camera gear was obviously visible. They verbally identified themselves as media and a trooper responded, "we don't fucking care." The troopers then forced all three onto their stomachs, handcuffed them, and handed them off to Hennepin County Sheriff's Office ("HCSO") Deputies. Maury Decl., ¶ 7; Lassig 2nd Decl., ¶ 9; Maturen 2nd Decl., ¶ 4; Ex. LL, HCSDH00000015-20.

The HCSO Deputies arrested Maury, Lassig and Maturen, loaded them into a van, confiscated their equipment, and drove them to the jail. After sitting in the van for about an hour, they were booked, fingerprinted, and cited for violating the curfew. After roughly two hours in custody, they were released. *See* Maury Decl., ¶ 8; Am. Lassig 2nd Decl., ¶ 10; Maturen 2nd Decl., ¶ 5; Ex. LL, HCSDH00000015-20.

HCSO arrested several other journalists around the same time on Nicollet. Ex. MM, HCSDH000000021, 27, 28; Ex. NN, PLAINTIFFS001500_0001-2. Like Maury, Lassig, and Maturen, these journalists were arrested and cited despite identifying themselves as media members and presenting media credentials. Ex. NN, PLAINTIFFS001500_0001-2.

### d. MPD Harasses And Threatens Goyette And Reporter Maggie Koerth

Plaintiff Goyette, was back in the field on May 30, with a bandaged eye, covering the protests with another reporter, Maggie Koerth. He tried "to have as many indications as possible that [he] was press," and was clearly marked as such. Goyette Depo. 85:20-87.25. Goyette and Koerth were standing on the sidewalk, "off to the side so that" they were not between MPD officers in the street and the protesters. As MPD officers got closer to Goyette, he said "'press, press' because [he] was nervous." Goyette Dep. 90:21-23. He started saying it louder when one of the officers walking by aimed a gun in his face. As with MPD officers who threatened Nelson and Shum, the MPD officer who threatened Goyette knew that simply aiming his weapon at Goyette would scare and intimidate him. The officer made a point of keeping the 40mm weapon fixed on Goyette even after it was clear that he was press. Goyette Depo., 40:14-41:2 & 85:22-99:6. Goyette testified: "I very clearly remember how afraid I was in that moment and I sort of feel that again now as you play [the video]." *Id.*, 101:14-16. Later that same evening, another MPD officer stopped his SUV to roll down his window and tell Goyette and Koerth "I wish I could f**king peg you." *Id.,* 104:7-105:8.

### e. MPD Attacks A Vice Media Team

At 10:38 p.m., a large group of MPD officers was gathered at Lake Street and Hiawatha Avenue. Sergeant Severance was on the phone with the MACC, informing command staff, "we just fucked them up now we're leaving. . . yup, yup, and then get out of here and hit them again." Rice Decl., Ex. B, 1:32:30-35. He directed the other officers:

"All's we're gonna do is, we're gonna take the Strike Teams and split them up . . . drive down Lake Street, you see a fucking group, call it out . . . Fuck 'em up. Gas'em, fuck 'em up." *Id.*, 1:35:00-1:35:19.

Sergeant Bittell passed along this operational plan to SWAT Unit 1281, which was under his command: "Ok, we're rolling down Lake Street, the first fuckers we see we're just hammering them with 40's." *Id.*, 1:35:12-1:35:30. The officers laughed excitedly over this plan for unrestrained violence. *Id.* No one intervened or objected when Bittell ordered his officers to fire on civilians. *See, e.g.*, *id.*, 1:35:00-1:35:19.

Five minutes later, Unit 1281 and a group of MPD officers approached a gas station where the owner and his family were sitting out front to protect it from looters. A VICE media crew was there reporting. Without making any effort to determine if the individuals were press, Sergeant Bittell urged his SWAT officers to fire the 40mm weapons: "Let'em have it boys, let'em have it! Right there! Get'em, get'em get'em!! Hit'em! Hit 'em!" *Id.*, 1:41:00-1:41:50.

When Strike Team officers rushed into the parking lot, VICE Media reporter Michael Adams got on his knees and put his hands behind his head. An MPD SWAT officer shoved Adams to the ground while Adams yelled, "I'm press, I'm press!" Rice Decl., Ex. L, 1:00-1:10. A few seconds later, a Strike Team member walked by and pepper-sprayed Adams directly in the face at close range while Adams lay on the pavement saying, "I'm press" and holding up his media credential. Ex. XX; ███████████████ █████



No supervisor or other MPD officer intervened to stop the pepper-spraying or correct the behavior. No one even commented on it. *See* Rice Decl., Ex. L, 1:00-2:00.

While Adams was being assaulted, his VICE Media camera crew stood about 10 feet away next to their van. They were easily identifiable by their press badges, professional

equipment, and conduct. SWAT Officer Ringgenberg walked toward the camera crew, aiming his 40mm directly at their faces to frighten and intimidate them. On their knees with their hands up, the camera crew nervously implored Ringgenberg "we're press!"  He responded, "I don't care." Rice Decl., Ex. L, 1:00-1:10. Ringgenberg ordered them to get in their van and "get the fuck out of here now!" The crew asked to be able to take Adams with them, but Ringgenberg just kept screaming at them to get in their van and leave. *Id.,* 1:10-1:35. The officer who had sprayed Adams then pepper-sprayed members of the camera crew as Ringgenberg walked away. *Id.*, 1:35-1:40.

### f. MPD Harasses And Threatens A Deutsche Welle Camera Crew

Around the same time the Vice Media crew was being attacked, MPD officers confronted a crew from the German television station Deutsche Welle in their vehicle, ordering them to leave the protest site, and threatening to pepper-spray and arrest them. *See* Ex. WW. The Deutsche Welle crew were obviously journalists, based on their equipment, demeanor, and repeated cries that they were press. *See id.* ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ *see*

Ex. WW.[10]

---

[10] An hour earlier, the Deutsche Welle crew had been shot at with less-lethal weapons by either MPD officers or State Troopers while filming a live shot. *See* Ex. WW. ████████

███████████████████████████████████████████████

### g.  MPD Shoves And Threatens Another Camera Crew

In yet another incident on May 30, MPD SWAT officers aimed their 40mm weapons and "red-dotted" the heads of several journalists who were easily identifiable as press. Officers shoved these journalists and harassed them to interfere with their reporting. Rice Decl., Ex D, 3:00-3:40. During this incident, MPD SWAT Officer Dauble fired his 40mm weapon at a camera crew from just a few feet away, launching a round into their backs as they fled his assault. *Id.*, 3:30-3:40. Immediately before being attacked, the crew was trying to film MPD officers arresting a protester who was yelling, "I can't breathe" as he was pinned to the ground. *Id.*, 3:30-3:40. The journalists had to stop reporting this incident and run from Dauble and the other officers. *Id.*

### 3.    MPD Attacks Reuters Journalist Julio-Cesar Chavez.[11]

At 8 p.m. on May 31, Reuters journalist Julio-Cesar Chavez was reporting on the Floyd Protests along with his security advisor Rod Seward. Ex.OO, 1475334-5. Chavez was holding a video camera and wearing a press pass around his neck and a large flack jacket emblazoned with "PRESS" on the chest and back. *Id.* They were standing at the edge of the protest, adjusting their camera gear, when MPD shot at them with 40mm weapons. *Id.* One round hit Seward in the face. *Id.*; *see* Declaration of Nick Cohen, ¶ 2. They immediately turned and began running. MPD continued to fire less-lethal rounds at the pair

---

[11] Julio Cesar-Chavez was a member of Plaintiff CWA at the time he was attacked by MPD. Schleuss Decl. ¶ 5.

as they fled, hitting Chavez in the arm and the back of the helmet. *Id.* Both men sustained injuries, and Seward required medical attention. *Id.* In the wake of this incident, Reuters General Counsel Gail C. Cove wrote Chief Arradondo and Mayor Frey, demanding that MPD cease attacking journalists. *Id.*

### H.     MPD Misconduct Continues Into May 31, 2020.

#### 1.     MPD Harasses And Arrests NBC Journalist Simon Moya-Smith

NBC journalist Simon Moya-Smith left the protests around 2:00 a.m. May 31, 2020, and was walking with a group of protesters when several squad cars pulled up alongside the group and pepper-sprayed it. Second Declaration of Simon Moya-Smith ("2nd Moya-Smith Decl.") ¶¶ 1-4. One of the MPD officers ordered the group to "get on the fucking ground," which they promptly did. *Id.* ¶ 4. The MPD officer continued to pepper-spray the group as they lay on the ground:

> Myself and the other individuals lying on the ground were not resisting the police; rather, we were complying with every order. No one was moving. Yet this particular officer pepper-sprayed me and the other protesters like she was crop-dusting us and wanted to empty her pepper-spray can just for the sake of it. It was gratuitous abuse and one of the most egregious experiences I have had as a journalist.

*Id.* ¶ 5. The other MPD officers laughed at this abuse. *Id.* ¶ 6-7.

Moya-Smith told the officers he was a journalist and showed the NBC press credentials hanging on a lanyard from his neck. One of the officers responded: "Roll on your side Mr. Journalist. You're going to be charged with, I don't know, breaking curfew." *Id.*, ¶ 8. After about 15 minutes of laying on the ground, another officer grabbed Moya-Smith and walked him to a police cruiser. Moya-Smith told the officer, "I am a journalist

with NBC News." *Id*., ¶ 9-10. The officer shrugged and loaded Moya-Smith into the cruiser. *Id*., ¶ 10. Not until Moya-Smith was being booked at the Fifth Precinct was he finally released without citation. *Id*., ¶ 13. According to Moya-Smith, MPD was "indiscriminately assaulting everyone present, including journalists," but were "especially targeting journalists and those documenting the protests for abuse. The officers' reason for this targeted abuse was obvious: prevent the visual documentation of their misconduct." Id., ¶ 15.

### 2. MPD Assaults Reporters During A Mass Arrest

On the afternoon of May 31, the State Patrol, DNR, and MPD conducted a mass arrest of a group of protesters outside the Bobby & Steve's gas station. MPD executed a kettling action, surrounding a vehicle that appeared to contain only innocent bystanders trying to leave the area before being kettled. Blue Decl., ¶¶ 4, 5. MPD officers dragged several black women out of the car at gunpoint, forcing them to the ground. *Id*. This action drew the attention of nearby photojournalists, and they began to document what was happening. *Id*. The journalists were readily identifiable as such, due to their professional camera equipment, press badges, behavior, and that they were outside the kettle. Among the crowd of journalists was Victor Blue and Richard Tsong-Taatarii of the Star Tribune. *Id*. ¶ 6.

The MPD officers who had dragged the women out of the car noticed the journalists were photographing them. *Id.*, ¶ 7. Some of the officers detaining the women turned and walked toward the line of journalists. Id. When the officers were less than 15 feet away from the journalists, they doused the journalists with pepper spray. *Id*. Victor Blue was one

of those hit by the spray. It covered his hands and face and immediately incapacitated him. *Id*. It was obviously a retaliatory action meant to punish Blue and the other reporters for documenting MPD's misconduct and to discourage further documentation. *Id*.

**V.** ███████████████████████████████████
███████

███████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████

████████████████████████████████

██████████████████████████████████

█████████████

████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████

████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



## VI.    MPD WORKED CLOSELY WITH OTHER ALLIED AGENCIES THROUGHOUT THE FLOYD PROTESTS

Throughout the Floyd Protests, MPD worked hand-in-glove with the State Patrol and other allied agencies. SWAT Team commanders and State Patrol command personnel were in constant communication and worked together in the field to plan and execute combined maneuvers. *See, e.g.,* Phillips Decl., Ex. B, 17:2-17 (describing field conversations between SWAT commanders and State Patrol).



Commander Gerlicher was MPD's "Incident Commander" for the Floyd Protests, and MPD's SWAT teams reported directly to him, which made him an ideal choice for MPD's MACC liaison. Ex. Y, 76:25-78:12; Ex. TT, MPLS007193. His "role in addition to making command level decisions was to formulate response plans for the MPD to respond to the civil unrest facing [Minneapolis] and to coordinate with [MPD's] public safety partners at the local, state, and federal level on this response . . ." *Id.* MPD Assistant

Chief Kjos was also present at the MACC during the protests, seated next to State Patrol Colonel Matthew Langer. Baker Decl., Ex. B, 113:3-22.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

Commissioner Harrington was present at the MACC into the early-morning hours of May 30, 2020, the evening that was marked by the most egregious and pervasive First Amendment violations against journalists. The next day, he sent an email to various law enforcement partners thanking them for "working together in partnership with proper execution of a truly masterful plan of operations. . . ." Ex. CCC, DC000188-189.

In short, MPD and State Patrol (and other agencies) worked together, in close coordination, throughout the duration of the protests. This encompassed coordination between command staff at the highest levels all the way down to troopers and MPD officers standing side-by-side in the "battle" field conducting mass arrests and firing less-lethal and chemical weapons.

## ARGUMENT

## I.   LEGAL STANDARD

To defeat a motion for summary judgment, Plaintiffs need not prove anything. Rather, the movant must show there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine dispute arises when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party." *Brennan v. Qwest Communs. Int'l, Inc*., 727 F. Supp. 2d 751 (D. Minn. 2010). The evidence offered by the non-moving party is to be believed and all justifiable inferences therefrom are to be drawn in the light most favorable to that party. *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

The standard for considering evidence at summary judgment is whether it can be presented in a form that could be admissible at trial, not whether the evidence as-filed is admissible. *See* Fed. R. Civ. P. 56(c)(2); *Gannon Int'l., Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012).

## II. SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE, AT MINIMUM, GENUINE ISSUES OF MATERIAL FACT EXIST WITH RESPECT TO *MONELL* LIABILITY.

### A. The *Monell* Standard

Municipalities are liable under § 1983 when the violation of constitutional rights was "visited pursuant to governmental custom" even though [the] custom [was] not . . . formal[ly] approv[ed]." *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690-91 (1978). A "custom" requires (1) "[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the [municipality's] employees"; (2) "[d]eliberate indifference to or tacit authorization of such conduct by the [municipality's] policymaking

officials after notice to the officials of that misconduct"; and (3) an "injury by acts pursuant

to the [municipality's] custom." *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1990)

(brackets omitted). These elements may be proven by circumstantial evidence. *Simmons v.

Bradshaw*, 879 F.3d 1157, 1173 (11th Cir. 2018) (internal citations omitted); *see also

Harris v. Pagedale*, 821 F.2d 499, 505 (8th Cir. 1987).

**B.      MPD Engaged In A Continuing, Widespread, Persistent Pattern Of
        Unconstitutional Misconduct**

The evidence demonstrates that MPD deliberately violated the constitutional rights

of no fewer than a dozen journalists covering the George Floyd protests between May 27,

2020 and May 31, 2020 involving numerous incidents. Prior to and during the Floyd

Protests, MPD had a custom and practice of targeting journalists to interfere with their

lawful newsgathering activities and to subject them to excessive force in violation of their

constitutional rights.

**C.      The City Was On Notice Of A Pattern And Practice of Constitutional
        Violations**

The City has been on notice of MPD's unconstitutional tactics for more than a

decade, and their actions manifest a deliberate indifference – indeed, an overt hostility – to

the First Amendment and Plaintiffs' rights. Yet, the City failed to take corrective actions

through appropriate training and supervision. Thus, "notice may be implied" because the

failure to train or supervise was "so likely to result in a violation of constitutional rights

that the need for training [and supervision] is patently obvious." *Thelma D. v. Board of

Education of the City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991).

- 41 -

Implied notice is not the only basis for imposing liability here, because the City was on *actual* notice of the high risk of systematic constitutional violations. In fact, MPD has been on notice of incidents of mistreatment of the press during protests and civil unrest going back to at least 2002, and in 2008, 2012, and 2015. *See, e.g.,* Answer ¶ 275 (complaints stemming from hockey riots); TAC ¶ 275 (same); Answer ¶ 276 (arrest of Goodman); TAC ¶ 275 (same); Webster Decl. ¶¶ 2, 4, 6; Gross Decl., Ex. A. The DOJ Report in 2017 and then the Commission of Civil Rights in 2018 picked up on this theme, identifying concerns about MPD's training, supervision and handling of First Amendment issues. Ex. E, 33.

MPD ignored the DOJ Report – and its own knowledge of past misconduct – and by the time it belatedly dusted it off and circulated it within the Department, MPD's response to the Floyd Protests had already spiraled out of control, and it was too late to implement meaningful changes. Ex. F, 1206682-1206690; Ex. H, 1206689-1206797; Ex. D, 43; *see also* Ex. G, 178416-1178423. MPD "missed opportunities to address the shortcomings identified" in the DOJ Report and "did not capitalize on its training and experience from previous large-scale events to establish a framework for crisis response and guide its actions." Ex. D, 11. Instead, "neither the City nor the MPD implemented many of the recommendations in the report . . . ." *Id.*, 11, 79.

Not only was MPD aware of the risks of press abuse, the entire world was aware by mid-day on May 29, 2020, when State Patrol arrested CNN reporter Omar Jimenez and his crew live on the air. *See* Ex. T. This event was so shocking that Governor Walz profusely apologized for the arrest in a televised press conference, emphasizing to the law

- 42 -

enforcement community: "[E]ven if you are clearing an area, *we have got to ensure there is a safe spot for journalism to tell the story*." *Id.* (emphasis added). It defies logic to believe MPD was unaware of this incident or the international outcry, especially given the numerous emails it received on this issue in the hours after Jimenez's arrest. Yet MPD did *nothing* to heed the Governor's plea. In fact, on the day after this press conference, MPD implemented a "battle" plan resulting in the mass assault on the press, and Lieutenant Mercil crowed that MPD "got" the press that night.

### D. MPD's Custom Of Violating Citizens Constitutional Rights Caused Plaintiffs' Injuries

Whether the City's custom and practice was the moving force behind Plaintiffs' injuries is reserved for the jury unless there is only one possible conclusion. *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 739 (8th Cir. 2001); *see S.M. v. Lincoln Cty.,* 874 F.3d 581, 585, 589 (8th Cir. 2017); *Richardson v. Berti*, No. 4:12-cv-543-CDP, 2014 U.S. Dist. LEXIS 72218, *16 (E.D. Mo. May 28, 2014). Here, there is substantial evidence that the City's custom and practice of violating constitutional rights proximately caused Plaintiffs' injuries. At minimum, causation must be left to the jury.

MPD knew there was a substantial risk that the Floyd Protests would result in an eruption of constitutional violations by its officers. For example, MPD's belated circulation of the DOJ Report is powerful evidence that *it knew of the dangers.* Further, it is "patently obvious" that the City's failure to adequately train MPD officers to handle the challenges and volatility of a mass protest was "likely to result in a violation of constitutional rights" of Plaintiffs. *See Thelma D.*, 934 F.2d at 934. The obvious "pattern of constitutional

violations" incontrovertibly placed the City on notice that its responses to recurring situations were insufficient to protect Plaintiffs' constitutional rights. *Id.* at 935.

### E.  The City's Arguments Do Not Disprove *Monell* Liability

The City argues its "policy explicitly protecting the rights of the public to record police activities," and a single "training on civil disturbances including dealing with the media" conducted in 2018 or 2019 excuse its conduct. City Mem., 46. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

The evidence above also contradicts the City's contention that "[t]here is absolutely no evidence that City policy makers were on notice of the custom of unconstitutional conduct," or of the City's "deliberate indifference to or tacit authorization of such conduct." City Mem., 51. Finally, the City's claim that it did not receive notice of any unconstitutional conduct toward Plaintiffs "until the early morning hours of May 31, 2020, which was too late to evidence deliberate indifferent" is simply not true as demonstrated above. *Id.*, 54.

### F.  The City's Failure To Train Established A Custom That Gives Rise To Municipal Liability

#### 1.  Legal Standard

Failure to train or supervise may "become[] [a] policy or custom" that is the basis for § 1983 liability. *Richardson,* 2014 U.S. Dist. LEXIS 72218, *11 (E.D. Miss. May 28, 2014). Unlike other *Monell* claims, failure to train or supervise claims do not require plaintiffs to prove a continuing, widespread, and persistent pattern of unconstitutional

misconduct: a single event causing harm can suffice because the failure(s) to train or supervise establishes the "custom" for purposes of *Monell*. *Larson by Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996); *Erickson v. Pope Cnty.,* No. 19-cv-3061-SRN/LIB, 2022 U.S. Dist. LEXIS 219935, *123 (D. Minn. May 6, 2022) (a single violation suffices where "accompanied by a showing that the municipality had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." (citation omitted)).

To prevail, Plaintiffs must show that: (1) the City's training or supervision practices were deficient; (2) the City was deliberately indifferent to individuals' rights in adopting its training or supervision practices; and (3) the alleged deficiency caused the harm. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010); *Richardson*, 2014 U.S. Dist. LEXIS 72218, *12-13; *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Deliberate indifference after notice may be demonstrated in two ways. First, "notice may be implied where failure to train [or supervise] officers or employees is *so likely to result in a violation of constitutional rights* that the need for training is patently obvious." *Thelma D. v. Board of Education of the City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991) (citing *Canton*, 489 U.S. at 390 & n.10) (emphasis added). The municipality need not have actual knowledge of constitutional violations—it must only know that there is a "substantial risk" of violations arising from the failure to train or supervise. *Kahle v. Leonard*, 477 F.3d 544, 551 (8th Cir. 2007); *Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002).

Second, a failure to train or supervise claim arises where "a pattern of constitutional violations [places] the municipality on notice that its employees' responses to a regularly recurring situation are insufficient to protect" constitutional rights. *Thelma D.*, 934 F.2d at 935 ; *see Brandy v. City of St. Louis* (E.D.Mo. May 20, 2022, No. 4:18CV1674 JCH) 2022 U.S. Dist. LEXIS 91101, *24-29 (in pepper-spray case, notice of prior incidents involving excessive force and adoption of deficient supervision and training sufficient to defeat summary judgment); *see also Harris*, 821 F.2d at 506 (municipality was deliberately indifferent when it was notified "on repeated occasions" and "repeatedly failed to take any remedial action").

### 2.      The City Failed To Train Officers To Respect The Constitution

The adequacy of training or supervision practices is a question of fact. *See, e.g.*, *Erickson*, 2022 U.S. Dist. LEXIS 219935, *122-23 (conflicting testimony regarding training practices); *Bechtold v. Stearns County*, No. 05-2701 (JRT/RLE), 2007 U.S. Dist. LEXIS 75507, *21 (D. Minn. Sept. 28, 2007) (disputed facts regarding failure to ensure annual training).

The City is simply wrong that there can be no dispute of fact on the adequacy of MPD's training. *See* City Mem., 54. Notably, the City proffers no evidence demonstrating that MPD provided training reasonably designed to prevent the widespread constitutional violations that occurred. The City argues only that MPD has a policy to "establish a cooperative relationship with the news media," and to ensure that MPD does not "obstruct news media personnel from performing their duties at emergency scenes." *Id.*, 32. This "policy" is meaningless because MPD failed to train on it, which is unsurprising given that

Lieutenant Mercil – whos boasted about how well MPD "gave it to" the media on May 30

– ███████████████ Multiple officers testified that they did not recall receiving *any*

training on First Amendment media issues or were unaware of any policies specific to

media relations. *See* Rissman Decl., Ex. A, 50:4-11; 126:4-7; Baker Decl., Ex. B, 37:9-25,

44:10-16; 59:10-60:6, 214:20-215:7; ██████████████; Ex. D, 12. █████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

        ███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████

Thus, the record establishes a genuine issue as to whether the City provided adequate training to its officers regarding interactions with members of the press

### 3. The City's Failure To Train Despite Notice Of Violations Demonstrates Its Deliberate Indifference

"[A] single violation . . . can lead to municipal liability where . . . accompanied by a showing that the municipality had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Erickson*, 2022 U.S. Dist. LEXIS 219935, *123 (citation omitted). To determine whether a recurring situation "presented an obvious potential for a constitutional violation . . . courts consider whether the employee violated a clear constitutional duty and whether there were clear constitutional guideposts." *Id.* *125; *Richardson*, 2014 U.S. Dist. LEXIS 72218, *17 (finding deliberate indifference where need for training was "so patently obvious that it need no further discussion").

The City was on notice of complaints about media relations since at least 2002 and failed to implement then-Chief Dolan's training recommendations made after the 2008 RNC protests. Answer ¶ 275; Ex. B, 1510561-68. The need for training of law enforcement personnel regarding proper interaction with members of the media is apparent, such that the failure to provide it constitutes deliberate indifference█████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ The City's failure to train their officers or provide safeguards to avoid constitutional violations demonstrates deliberate indifference to Plaintiffs' rights.

### 4. The City's Failure To Train Its Officers Caused Plaintiffs' Injuries

The causation element is satisfied "if the negligent conduct was a substantial factor in bringing about the injury." *Grant v. Duluth*, 672 F.2d 677, 682 (8th Cir. 1982). There is considerable evidence demonstrating the City's failure to adequately train its officers on how they should interact with the media during an incident of civil unrest caused Plaintiffs' injuries. Had MPD appropriately trained on how to recognize the media, or that media were exempt from the curfew, officers would not have engaged widespread violations of Plaintiffs' rights.

The record reveals numerous genuine disputes of material fact relevant to Plaintiffs' *Monell* failure to train claim. The Court should deny summary judgment on this claim.

### G. Disputed Facts Prevent Dismissal Of Plaintiffs' Failure to Supervise Claim

The City argues that Plaintiff cannot proffer evidence sufficient to succeed on their failure to supervise claim. City Mem., 54. This argument too should be rejected. Plaintiffs have amassed voluminous evidence that: (1) MPD had sufficient notice of constitutional violations being committed by their officers against Plaintiffs and was deliberately indifferent to those violations, (2) MPD failed to take sufficient actions to supervise their officers, and (3) this failure to supervise caused injury to the Plaintiffs.

### 1.     The City Was Deliberately Indifferent

Plaintiffs easily satisfy this element as demonstrated in Facts, Sections I-IV, *supra*.

### 2.     The City Failed To Adequately Supervise MPD

The City proffers no evidence that MPD appropriately supervised the officers on the ground. In contrast, with its years-long history of ignored warnings, admonitions and red flags behind the City, its officers' widespread, systematic violations of department policy regarding the media, the use of force including less-lethal weapons and chemical irritants, the City's curfew, and constitutional rights, night after night as the protests dragged on, is powerful evidence of the inadequate supervision provided by MPD leadership. *Harris v. Luckie*, 821 F.2d 499, 506-508 (8th Cir. 1987) ("Where it becomes clear that a police force needs close and continuing supervision because of a known pattern of misconduct, and the municipality fails to provide such supervision, 'the inevitable result' is a continuation of the misconduct. . . .We conclude this amounts to deliberate indifference to police abuses.") ███████████████████████

████████████████████████████████████████████

█████████████████████████

In light of this evidence, the City fails in its efforts to demonstrate that there is no genuine issue of fact relating to the inadequacy of the supervision received by MPD officers, and to the harm resulting therefrom.

### III.    THE RECORD REFLECTS GENUINE DISPUTES OF MATERIAL FACTS RELATING TO PLAINTFFS' FIRST AMENDMENT CLAIMS

The evidence demonstrates that MPD officers systematically and deliberately targeted and even hunted journalists in a successful effort to impede or stop them from exercising their constitutionally-protected rights to report on the George Floyd protests.

### A.    Legal Standard

A First Amendment "retaliation" claim requires plaintiff show (1) defendant engaged in a protected activity; (2) defendant took adverse action against them that would chill a person of ordinary firmness from continuing in the activity; and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Peterson v. Kopp*, 754 F.3d 594, 603, (8th Cir. 2014). Importantly, the Eight Circuit holds that "[t]he causal connection is generally a jury question . . . [unless] the question is so free from doubt as to justify taking it from the jury." *Id.*

### B.    Plaintiffs' Reporting Activities Are Protected By The First Amendment.

Reporting falls squarely within the scope of First Amendment protected activity. *See Quraishi v. St. Charles Cty.*, 986 F.3d 831, 838, (8th Cir 2021). "Indeed, when reporting on government conduct, the press serves as 'surrogates for the public.'" Preliminary Injunction Order, Dkt. No. 243, 9 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)). Each Plaintiff was present at the protests in their capacity as a journalist and was therefore engaged in First Amended protected activity. *See* Goyette Decl. ¶¶ 2, 9 (ECF 9); Goyette Depo. 28:15-25; Am. Lassig Dec, ¶¶ 3-4; Maury ¶¶ 2-4; Maturen Decl. ¶2; Nelson Decl. ¶¶ 2-4; PI Hr'g Tr. 20:12-16.

**C.      The City's Actions Would Chill A Person Of Ordinary Firmness.**

The Eighth Circuit has recognized that repeated actions by law enforcement are sufficient to chill a person of ordinary firmness from engaging in First Amendment activity. *Hoyland v. McMenomy*, 869 F.3d 644, 656-57 (8th Cir. 2017) (broadly construing the chilling effect and affirming denial of summary judgment). Importantly, the Eighth Circuit has held that evidence showing § 1983 defendants "engaged the punitive machinery of government in order to punish [plaintiffs'] for [their] speaking out," creates a triable issue as to the ordinary firmness prong. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (reinstating jury verdict that retaliatory issuance of parking tickets would chill speech).

MPD's conduct toward Plaintiffs and other journalists would chill a journalist of ordinary firmness from continuing to cover the protests and the police without diminished vigor. *See* Goyette Depo. 60:1-61:23 (Goyette shot with less-lethal round while reposerting), 40:14-14:2 (officer threatens Goyette with a gun), 104:1-105:8 (officer tells Goyette, "I wish I could fu**king peg [shoot] you"); Blue Decl. ¶ 3 (photojournalists including CWA member Minchillo shot with less-lethal rounds at close range), ¶ 7 (photojournalists including CWA member Tsong-Taatarii pepper-sprayed while filming MPD violently arresting protestors); Maury Decl. ¶ 4-5 (Maury chased, threatened and struck with a nightstick by MPD); Am. Lassig Decl. ¶ 4-5 (Lassig chased by MPD); Nelson Decl. ¶¶ 2-9 (Nelson harassed and threatened by MPD), 41:10-45:00 (MPD attacked the van carrying Nelson and Univision crew).

In fact, the City's conduct forced Plaintiffs to flee areas where they were reporting, and otherwise *actually* impeded the freedom of the press. *See* Goyette Depo. 81:19-82:1 (Goyette unable to continue reporting after being shot), 101:3-16 (MPD's conduct "shook" Goyette's "basic level of trust" and he continues to have "a lot of negative associations" reliving what happened to him); Maury Decl. ¶ 5 (Maury forced to run away from MPD); Am. Lassig Decl. ¶ 2 (same); Nelson Decl. ¶ 5 (Nelson forced to run because she had "no other option if we were to stay safe").

### D.   The City's Retaliatory Actions Were Motivated By Plaintiffs' Constitutionally Protected Reporting Activities

"Retaliatory motive . . . may be proved by circumstantial evidence[.]." *Goyette*, 2021 U.S. Dist. LEXIS 208359, *18 (D. Minn. Oct. 28, 2021) (quoting *Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008)). "'The causal connection [between police conduct and the exercise of a constitutional right] is generally a jury question . . . [unless] the question is so free from doubt as to justify taking it from the jury.'" *Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014) (citation omitted). *See, e.g., Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1144 (D. Or. 2020) (placement of journalists between police and protestors insufficient to hold that, as a matter of law, they were not targeted by the police).

The record is replete with evidence that MPD officers, fueled by animosity towards the press, deliberately and systematically targeted journalists – including Goyette, Koerth, Lassig, Nelson, Maury, Tirado, Blue, Montgomery, Jackson, and CWA members Minchillo, Jackson and Tsong-Taatarii. As outlined above, each of these individuals was

clearly identifiable as press, was not committing any crime, and was nevertheless targeted. In the absence of any legitimate reason to use force against, detain or harass Plaintiffs, the reasonable inference is that MPD was motivated by Plaintiffs' status as reporters.

MPD's retaliatory motive is also revealed by the fact that multiple journalists—Goyette, Blue, and Linda Tirado—were shot in the head. Goyette Depo. 65:24-66:25; Baker Ex. A, 104:8-22; Blue Dec. ¶ 4. According to officers, 40mm launchers are "very accurate." Phillips Decl., Ex. E, 26:11-12, Phillips Decl., Ex. B, 13:10-15. ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ The obvious inference is that the officers that shot Goyette, Tirado, and Blue on purpose. BWC video also shows SWAT Officer Dauble shooting a camera crew in the back as they flee him. Rice Decl., Ex D, 3:30-3:40. Multiple reporters – non-parties in this case – also described the obvious retaliatory motive of MPD. Blue Dec. ¶ 7; Moya-Smith 2nd Dec. ¶ 15.

MPD's retaliatory motives are also demonstrated by officers' numerous hostile comments and actions toward members of the press. Rice Decl. Ex. M, 2:10-3:20 (Mercil statements); Ex. WW; ████████████████████████████ ████████ ; 2d Moya-Smith Decl. ¶ 8 (Moya-Smith met with hostile comments and threat of arrest after identified himself as press); Ex. Q, 104:7-105:8 (Goyette and Koerth threatened).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████

### E.    The City's Arguments Fail.

This Court should reject the City's arguments on Plaintiffs' First Amendment claim.

First, the City's assertion that Plaintiffs cannot proffer the evidence of a retaliatory motive, City Mem., 40-42, is belied by the evidence cited above. This issue is not, remotely, "so free from doubt as to justify taking it from the jury." *Peterson*, 754 F.3d, at 603. At the very least, Plaintiffs have presented sufficient evidence to create a genuine dispute of material fact that they were deliberately targeted by MPD. Johnny Mercil's comments *alone* are sufficient, but Plaintiffs rely on far more evidence than that.

Second, the City's efforts to excuse this and other malicious and retaliatory conduct by pleading the need for MPD "to quell riotous crowds in front of the Third Precinct" fails to blunt the force of the evidence against it or excuse the City's conduct, as this Court has already held. *See* Dkt. No. 105. At a minimum, the City's argument that its conduct was reasonable under the circumstances creates an issue of fact for trial.

### F.    Disputes Of Fact Remain Regarding Municipal Liability

As demonstrated above, the City was well-aware of its history of failing to protect the rights of the press. But the City failed to act. Ex. D, 11. Without adequate training or supervision, MPD personnel widely and openly disregarded MPD's sparse policies during the protests. *See id.*, 81. As Plaintiffs' expert explains, ██████████████████████



## IV.   PLAINTIFFS' FOURTH AMENDMENT CLAIMS SURVIVE SUMMARY JUDGMENT

The City argues that the Fourth Amendment claims fail because no Plaintiff was seized. *See* City Mem., 38-39. Yet, the evidence shows that Plaintiffs Goyette and Nelson were both "seized" for purposes of the Fourth Amendment. The evidence also shows that the *Monell* standard is met such that the City must be liable for these constitutional violations.

### A.   The Legal Standard

An unreasonable seizure violates the Fourth Amendment. *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003). "A person is seized . . . when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement. . . 'through means intentionally applied'. . . ." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (cleaned up). Circumstances which suggest a seizure occurred include "the threatening presence of several officers, the display of a weapon by an officer, some

physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Campbell-Martin*, 17 F.4th 807, 813 (8th Cir. 2021).

A Fourth Amendment seizure also occurs when an officer arrests a person, intentionally injures a person, or uses crowd control tactics that restrain an individual's movement. *See Torres v. Madrid*, 141 S. Ct. 989, 994-996, 998 (2021) (The "application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person. . . While a mere touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain"); *see also Atkinson v. City of Mt. View*, 709 F.3d 1201, 1207-1208 (8th Cir. 2013) (the "restraint need not actually succeed in stopping or holding the person even for an instant").

Whether a seizure was "unreasonable" depends on the totality of the circumstances—which is an issue for the jury. *See Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999)

### B.  Multiple Plaintiffs Were Seized by MPD

There can be no question that intentionally shooting Goyette in the face – just moments after officers did the same to a young man nearby – was sufficient to "*objectively* manifest[] an intent to restrain." *Torres,* 141 S. Ct. at 998; *Nelson*, 685 F.3d at 875-876; *Atkinson*, 709 F.3d at 1209. Goyette's freedom of movement was actually restrained when he lost consciousness as a result of the blow to his head. *See* Goyette Depo. 61:1-2. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████

Similarly, Nelson was the victim of the coordinated efforts of the State Patrol and MPD, including an MPD Strike Team and assigned SWAT unit, to trap protesters and journalists near the Fifth Precinct, while MPD continued to harass and threaten Plaintiff Nelson and other journalists by shooting rubber bullets, tear gas and flash bangs at them. Ex. 8, Nelson Decl. ¶¶ 4-7. The intended and actual effect was to force them away from the protests and end their reporting. *Id.* These actions constituted a seizure. *See Nelson v. City of Davis*, 685 F.3d 867, 875-876 (9th Cir. 2012) (intentional shooting of crowd with pepper balls constituted seizure); *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 U.S. Dist. LEXIS 25685, *10 (D. Ore. Sept. 8, 2003); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 264-265 (S.D. Ohio 2021).

The City relies on three cases to argue that Goyette and Nelson were not seized at all. None carry the day. First, in *Quraishi v. St. Charles Cnty., Missouri*, the Eighth Circuit examined whether an officer was entitled to qualified immunity and, in that context, held that the use of tear gas to disperse a crowd is not a seizure. 986 F.3d at 840. However, this case involves far more force than the simple use of tear gas with the intent to disperse a crowd, and *Quraishi* did not involve an injury to the plaintiffs which the case law recognizes can be a seizure. The evidence here also includes the use of less-lethal projectiles in addition to chemical irritants and physically trapping Plaintiffs, which was not the case in *Quraishi.*

- 58 -

The City also cites *Dundon v. Kirchmeier*, 2017 WL 5894552, *3, *18 (D.N.D. Feb. 7, 2017) and *Brown v. City of St. Louis, Missouri*, 2012 WL 1501368, *5 (May 12, 2022), and argues that the use of non-lethal force to disperse a crowd can never be a seizure. In each of those cases, protestors were in a fixed location and police used non-lethal means to attempt to disperse the crowd. Here, however, Plaintiffs and other reporters were targeted by MPD when they were lawfully engaged in protected conduct of reporting and either identified themselves or were clearly identifiable as members of the press. Plaintiffs were not part of the protests, but rather engaging in constitutionally-protected conduct that MPD – in violation of MPD policy and the curfew – attempted to stamp out through unreasonable force.

Moreover, Plaintiffs have presented unrebutted expert testimony that ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ This alone raises a fact issue with respect to Goyette's Fourth Amendment claim, as "an objectively unreasonable use of force is excessive, violating the Fourth Amendment's prohibition against unreasonable seizures." *Williams v. City of Burlington, Iowa,* 27 F.4th 1346, 1350–51 (8th Cir. 2022)

### C.    The Facts Regarding *Monell* Liability Are Disputed

During the protests, MPD kettled, arrested, shot with less-lethal projectiles, immobilized with chemical irritants or otherwise seized numerous journalists. *See, e.g.,* Ex. 11, Blue Decl. ¶¶ 3, 6-7 (less-lethal projectiles and pepper spray which was

"immediately incapacit[ating]"); Ex. 18, Moya-Smith Decl. ¶ 4-11 (pepper-sprayed, arrested and transported); Rice Decl., Ex. L, Ringgenberg BWC 5/30/30 1:00-1:10 (pepper sprayed); Baker Decl., Ex. A, 104:8-22 (Tirado blinded by a less-lethal projectile). The City did nothing to prevent these constitutional harms.

The number of these incidents over the multiple nights of the protest is more than sufficient to create a trial issue of fact regarding whether MPD engaged in custom of seizing journalists, and that this custom was the motivating force behind those violations. *Cf. Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392 1408 (S.D. Fla. Aug. 19, 2014) (multiple incidents lead to the "logical inference" that "the municipality encouraged or at least condoned" the conduct). Moreover, they are part of a larger custom within MPD of condoning uses of excessive force and violations of the Fourth Amendment. During the protests, multiple SWAT officers equipped with less-lethal launchers had long and checkered histories of excessive force. *See* Answer ¶¶ 301 (Barze), 303 (Peterson); TAC ¶¶ 301, 303.

## V.   SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFFS' FAILURE TO INTERVENE CLAIM

It is well established in the Eighth Circuit that law enforcement officers have a constitutional duty to intervene to prevent or stop the use of excessive force. *See Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981); *see also Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012).

The City argues that Plaintiffs cannot proffer the evidence required to warrant a trial on their failure to intervene claim.[12] *See* City Mem., 56. The City is wrong. The evidence shows that while MPD officers routinely engaged in the use of excessive force against Plaintiffs and other journalists, MPD officers and leadership repeatedly and systematically failed to stop these constitutional violations. No one intervened to help Ed Ou as after he was shot at close range with a concussion grenade and chemical irritants. Instead, in response to his pleas, MPD officers grabbed him, ridiculed him, and then ignored him, leaving him to face the continued barrage of munitions unaided, bleeding and injured. PI Hr'g Tr. 45:8–10, 15-18; Tr. 46:9–10; Ou Decl., ¶ 26, 3:46 – 3:52. No one intervened when Sgt. Bittell ordered his officers to open fire on civilians, or when the same officers ordered Vice Media reporter Michael Adams to the ground and then pepper sprayed him in the face. *See* Rice Decl., Ex. L, 1:00-1:10; Ex. XX. No one intervened in to stop the officers on the roof of the Third Precinct from "slowly and intentionally" targeting peaceful protestors, including the young man who had been shot in the head, moments before Goyette himself was shot in the face. *See* Goyette Depo., 39:16-40:1. No one intervened while MPD officers *hunted* journalists in the streets and from rooftops.

---

[12] The City also wrongly asserts that a failure to intervene must be brought against individual officers. *See* City Mem., 56. The case cited by the City did not so hold. *See generally Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009). Indeed, *Krout* did not even involve a municipal claim. *See id*. Notably, several cases have involved failure to intervene claims brought solely against municipalities; there is no Eighth Circuit case law supporting the City's position. *See, e.g.*, *M.W. v. Shikellamy Sch. Dist.*, No. 4:20-cv-00018, 2020 U.S. Dist. LEXIS 104768 (M.D. Pa. June 16, 2020); *Kavanaugh v. Vill. Of Green Island*, No. 8:14-cv-01244 (BKS/DJS), 2016 U.S. Dist. LEXIS 180210 (N.D.N.Y. Dec. 30, 2016).

██████████████████████████████████████

████████████ This pattern matched MPD's marked history of failing to intervene. *See* Ex. M, 46 (MPD officers violated their duty to intervene in 76.5% of incidents where policy required intervention). Indeed, the very incident that sparked the protests—George Floyd's murder—involved the *criminal* failure of three officers to intervene to prevent the killing. Ex. N. This evidence amply demonstrates the City's liability for failure to intervene under *Monell*.

## VI.     PLAINTIFFS' FOURTEENTH AMENDMENT CLAIMS SHOULD NOT BE DISMISSED

The City argues that Goyette and Nelson's Fourteenth Amendment claims must fail because: (1) MDP's conduct did not shock the conscience; and (2) any procedural due process claim is barred by the *Paratt-Hudson* Doctrine. *See* City Mem., 42-45. The City's arguments are wrong.

### A.     The City's Actions Shocked the Conscience and Deprived Plaintiffs' Of Their Fourteenth Amendment Substantive Due Process Rights

To establish a Fourteenth Amendment violation, the "plaintiff must demonstrate both that the official's conduct was conscience-shocking, and that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Hall v. Ramsey Cnty.*, 801 F.3d 912, 919 (8th Cir. 2015) (quoting *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (citations omitted). Substantive due process is concerned with violations that "amount[] to a brutal and inhumane abuse of

official power literally shocking to the conscience." *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (quotation omitted).

The City argues MPD did not intend to injure Goyette and Nelson—essentially asserting that officers were merely reckless. However, the record is replete with example after example of actions that were egregious, outrageous, and deliberately intended to injure Plaintiffs and other reporters. *See* Rice Dec., Ex. M, 2:10-3:20 ("Fuck these media"); Ex. XX; Baker Decl., Ex. A, 74:13-18 (Tirado blinded); Rice Decl. Ex. A, 18:8-11 (testimony that officers "enjoyed" shooting civilians); Rice Decl., Ex. B, 1:35:00-1:35:19 (Fuck 'em up. Gas 'em, fuck 'em up."); Rice Decl., Ex. G, 1:09:14 – 1:09:33 ("You guys are out hunting people now, and it's just a nice change of tempo. Fuck these people."); Blue Dec. ¶ 7 (blatantly pepper-spraying journalists in direct retaliation for reporting). The evidence also points strongly toward the conclusion that MPD officers took deliberate aim at Goyette, who was identifiable as a journalist, and "slowly and intentionally" shot him in the head (just moments after shooting a nearby peaceful protestor in the head). Goyette Depo., 39:20-40:1; 74:13-18. If this conduct does not shock the conscience, what would?

## B.  Plaintiffs' Procedural Due Process Claims Are Not Barred by the *Parratt-Hudson* Doctrine

The *Parratt-Hudson* doctrine holds that "random and unauthorized deprivations of property or liberty interests by a state employee do not violate the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *ERA Venture Capital, Inc. v. Lokke*, 2019 U.S. Dist. LEXIS 37314, *8 (D. Minn. Mar. 8, 2019). However, the Supreme Court has held that post-deprivation remedies do not satisfy due process where

deprivation is caused by established state procedures. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982). There was nothing "random" about the repeated, widespread and persistent violence against journalists.

## VII.   AT MINIMUM, A FACT ISSUE EXISTS WITH RESPECT TO PLAINTIFFS' CONSPIRACY CLAIMS

A Section 1983 civil conspiracy requires: (1) the defendant(s) conspired with others to deprive the plaintiff of his or her constitutional rights, (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy, and (3) the overt act injured the plaintiff. *Goyette v. City of Minneapolis*, No. 20-CV-1302 (WMW/DTS), 2021 WL 3222495, *9 (D. Minn. July 29, 2021) (citing *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008)). A plaintiff need not prove that each participant knew "the exact limits of the illegal plan," but must provide evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights. *Larson by Larson v. Miller,* 76 F.3d 1446, 1458 (8th Cir. 1996).

"The elements of a conspiracy are rarely established through means other than circumstantial evidence . . . and summary judgment is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided. The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy." *Westborough Mall, Inc. v. City of Cape Girardeau,* 693 F.2d 733, 743 (8th Cir.1982). Put differently, "the question of the existence of a conspiracy" is a jury question unless there is no "possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the

conspirators to achieve the conspiracy's aims." *Id.*

In *White v. McKinley*, for example, the Eighth Circuit affirmed a summary judgment denial where Plaintiff alleged his ex-wife and a police officer who investigated a molestation case against him conspired to prevent disclosure of an exculpatory diary in violation of *Brady v. Maryland*. *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008).

The only conspiracy evidence proffered in *White* was that the ex-wife and police officer were romantically involved, knew each other before the abuse allegations surfaced, and the officer may have reviewed and returned the diary to the ex-wife before it "disappeared." *Id.* The court affirmed denial because the jury could infer the parties reached an agreement based solely on that circumstantial evidence. *See also Burbridge v. City of St. Louis, Missouri,* 430 F. Supp. 3d 595, 615 (E.D. Mo. 2019), aff'd, 2 F.4th 774 (8th Cir. 2021) (denying summary judgment where jury could infer a meeting of the minds among several officers because none filed a use of force report related to their beating of a journalist).

Here, far more conspiracy evidence exists than the tenuous connections that sufficed in *White*. First, as detailed above, Plaintiffs Goyette, Nelson, Ou, Maury, Lassig, Maturen, and CWA (via its journalist members) were injured by violations of their First Amendment rights on May 30, 2020, by MPD and/or one or more of its co-conspirators. Second, ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

As the Eighth Circuit made clear in *White* and *Burbridge*, direct evidence of conspiracy is not required – circumstantial evidence alone may raise a sufficient fact issue to defeat summary judgment. All that is required is that the evidence show a conspiracy could be inferred. Here, ample circumstantial evidence supports the inference that MPD, State Patrol and the other agencies agreed to disregard the curfew exemption and the First Amendment rights of journalists and interfere with their reporting, leading to the injuries detailed above.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this court deny the City's motion in its entirety.

Dated: January 5, 2023

/s/ Pari I. McGarraugh
Pari I. McGarraugh (#0395524)
Karen G. Schanfield (#0096350)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
Tel: (612) 492-7000
kschanfield@fredlaw.com
pmcgarraugh@fredlaw.com
*Attorneys for Plaintiffs Goyette, Lassig,*
*Maury, Maturen, Nelson, Ou, Tuite, and*
*Evans*

Steven D. Hamilton (pro hac vice)
**REED SMITH LLP**
10 S. Wacker Dr., 40th Floor
Chicago, IL 60606
Tel: (312) 207-1000
shamilton@reedsmith.com

Edward B. Schwartz (pro hac vice)
Frederick Robinson (pro hac vice)
Jamie L. Lanphear (pro hac vice)
**REED SMITH LLP**
1301 K St. NW #1100E
Washington, DC 20005
Tel: (202) 414-9200
eschwartz@reedsmith.com
frobinson@reedsmith.com
jlanphear@reedsmith.com

Kevin C. Riach (#0389277)
**THE LAW OFFICE OF KEVIN C.
RIACH, PLLC**
P.O. Box 270815
Vadnais Heights, MN 55127
Tel: (612) 203-8555
kevin@riachdefense.com

Teresa Nelson (#0269736)
**AMERICAN CIVIL LIBERTIES UNION
OF MINNESOTA**
P.O. Box 14720 Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
***Attorneys for All Plaintiffs***