UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jared Goyette, Craig Lassig, Katie
Nelson, Tannen Maury, Stephen
Maturen, Edward Ou, Timothy Evans,
Chris Tuite, and The Communications
Workers of America,
*On behalf of themselves and other*
*similarly situated individuals,*

                       Plaintiff,

      v.

City of Minneapolis; Minneapolis
Chief of Police Medaria Arradondo *in*
*his individual and official capacity*;
Minneapolis Police Lieutenant Robert
Kroll, *in his individual and official*
*capacity*; Minnesota Department of
Public Safety Commissioner John
Harrington, *in his individual and official*
*capacity*, Minnesota State Patrol
Colonel Matthew Langer, *in his*
*individual and official capacity*;
Minnesota State Patrol Major Joseph
Dwyer, *in his individual capacity*;
Hennepin County Sheriff David
Hutchinson, *in his individual and official*
*capacity*; John Does 1-10, *in their*
*individual and official capacities*;

                      Defendants.

Ct. File No. 20-cv-01302
(WMW/DTS)

**CITY DEFENDANTS' REPLY**
**MEMORANDUM OF LAW IN**
**SUPPORT OF THEIR**
**MOTION FOR SUMMARY**
**JUDGMENT**

## I.   Plaintiffs' concessions

Plaintiffs do not dispute the following:

- The John Doe defendants must be dismissed.

- Plaintiffs Evans and Tuite, who were only present in Brooklyn Center, have no claim against City Defendants.

- The claims of Plaintiffs Goyette and Ou that are based on their experiences in Brooklyn Center should be dismissed.

- Plaintiffs do not make any First Amendment claims other than a First Amendment retaliation claim (P. Mem. 51) and Count I should be dismissed.

- The MPD's official policies are not unconstitutional. (P. Mem. 11.)

## II.   Plaintiffs' *Monell* claim fails as Plaintiffs cannot establish the crucial element of "deliberate indifference".

Both theories of *Monell* liability advanced by Plaintiffs, custom and failure to train or supervise, require Plaintiffs to show that there was "deliberate indifference" to constitutional violations.  *Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir. 1998); *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th Cir. 2013).  "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability."  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013).

Without notice of either the purported violations or insufficiency of training/supervision, there can be no liability. *Id.*

### A. Plaintiffs' "evidence" of constitutional violations against the press prior to 2020 is legally insufficient to provide notice to the City.

Plaintiffs' "evidence" of the City's "long history" of violating the press' First Amendment rights is legally insufficient.

2002 Dinkytown Riots: Plaintiffs assert a complaint was made and no discipline imposed, but Plaintiffs present no evidence that discipline *should* have been imposed and cannot rely on this to support a *Monell* claim. *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 799–800 (8th Cir. 1998)(must show complaint had merit).

2008 RNC: Plaintiffs assert that a lawsuit was settled, but Plaintiffs present no evidence that the settlement involved any admission of liability by the City, and liability was expressly denied by the City. (Answer ¶276); *Williams v. City of Burlington, Iowa*, 516 F. Supp. 3d 851, 871 (S.D. Iowa 2021), *aff'd*, 27 F.4th 1346 (8th Cir. 2022)(without admission of liability, settlement not relevant in determining *Monell* liability).

Plaintiffs rely on the declaration of Tony Webster. However, Webster was never disclosed as a potential witness in this case and his entire declaration should be disregarded pursuant to Fed. R. Civ. P. 37(c)(1).  (2nd Robertson Decl. Ex 48.)

Moreover, Webster does not allege that he reported this incident to the MPD, nor that the City had notice of this alleged incident.

Plaintiffs assert that former MPD Chief Dolan worked with the Police Executive Research Forum to create new MPD policies and practices regarding media that were never instituted. There is no evidence that establishes the authenticity of the purported recommendations, and no basis to conclude that the City ever possessed such recommendations, let alone failed to act on them. (ECF 436-1, 436-2.)

2012 Occupy MN Protests: Plaintiffs rely on an incident from 2012 where an MPD officer was disciplined for knocking a reporter's camera off his shoulder. Like Webster, this reporter, Chad Nelson, was not disclosed as a witness in this case. (2nd Robertson Decl. Ex. 48.) Additionally, this allegation does not support a pattern of deliberate indifference by the City. The incident was fully investigated, and the officer received discipline. Disciplining an officer for unprofessional conduct toward a reporter does not show deliberate indifference on the part of the City. *Cf. Harris v. City of Pagedale,* 821 F.2d 499, 501–06 (8th Cir.)(municipal custom when city *failed* to investigate or punish previous misconduct, here City did both).

2015 Jamar Clark Protests: Again, Webster's improper declaration should be barred under Fed. R. Civ. P. 37, and he does not allege making any report of misconduct to the MPD. Additionally, Plaintiffs' reliance on the DOJ after-action

4

report is misplaced. That report acknowledged the MPD's "commendable restraint and resilience in these extremely difficult circumstances," and says *nothing* about the media.  (ECF 437at 6.) Accordingly, it has no bearing on the *Monell* theory advanced in this case regarding the media. *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999)(prior incidents must be factually similar).

2018 Commission of Civil Rights Report: Besides offering hearsay, the report does not identify any prior incidents involving the MPD and media. Therefore, Plaintiffs cannot rely on it to support a *Monell* claim of targeting the media.

Plaintiffs present no evidence that the City had notice of any improper incidents involving the media that went undisciplined before 2020 and the City cannot be found to be deliberately indifferent on these facts, particularly given the City's adoption of policies in 2016 forbidding interference with recording of police activities. (ECF 404-23).

**B. State Troopers' arrest of a CNN reporter cannot establish that the City had notice that MPD Officers were violating the rights of the press.**

Plaintiffs concede that the City did not have notice of any alleged violations of the constitutional rights of members of the press *by the MPD* during the protests until approximately 1:00 a.m. on May 31, 2020, when PIO Elder received an email from Reuters.  Plaintiffs argue that *the City* should have been on notice because

5

*State Troopers* arrested a CNN reporter around 5:00 a.m. on May 29, 2020.  This is nonsense.

The standard is whether there was a custom of unconstitutional conduct or a failure to train/supervise *by the City's own employees* and that the City had notice of this. *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013); *Atkinson*, 709 F.3d at 1216–17 (training/supervision claim cannot "succeed without evidence the municipality '[r]eceived notice of a pattern of unconstitutional acts committed by [its employees].'")(brackets in original).  Plaintiffs present no evidence that any failure by the State Patrol to respect the rights of the press involved the MPD.

But even if this "notice" about the *State Troopers* was somehow sufficient, it did not occur until May 29, 2020.  This timeline alone is sufficient to defeat the *Monell* claims of Goyette and Nelson which occurred on May 27 and May 28 respectively.  Without advance notice there can be no deliberate indifference and Plaintiffs' *Monell* claims fail. *Atkinson*, 709 F.3d at 1217.

### C. Even assuming notice arising during the protests, there was insufficient time to establish deliberate indifference to these incidents.

Even if the City had notice of the incidents pointed to by Plaintiffs during the Floyd protests (which it did not) and assuming each of those incidents was supported by evidence that members of the press were targeted by MPD officers (which they are not), Plaintiffs' *Monell* claim would still fail because there is no

evidence that the City was deliberately indifferent to those incidents or tacitly authorized them.

The incidents Plaintiffs rely upon as "proof" of a pattern of constitutional violations occurred during a 76-hour period from Goyette's injury around 6:20 p.m. on May 27, 2020, until the alleged threats received by Goyette around 9:30 or 10:00 p.m. on May 30, 2020.[1]   In this period, involving unprecedented and widespread unrest that threatened the lives and livelihood of people in Minneapolis, with all officers working extremely long hours under immense strain, Plaintiffs have not shown that the City was deliberately indifferent or tacitly authorized unconstitutional treatment of the press.  There simply was not time. *Burbridge v. City of St. Louis, Missouri*, 430 F. Supp. 3d 595, 620 (E.D. Mo. 2019), *aff'd*, 2 F.4th 774 (8th Cir. 2021) (citing *Johnson*, 725 F.3d at 829)("even if evidence of notice existed, the September 15-17 incidents are simply too close in time to the [plaintiffs'] arrest to show 'deliberate indifference' or 'tacit authorization.'")

---

[1]Anything alleged to have taken place *after* the Plaintiffs' incidents do not support that the City had notice and was deliberately indifferent such that City's alleged custom or failure to train/supervise could have caused *Plaintiffs'* injuries. *Mettler*, 165 F.3d at 1205.

**D. Plaintiffs' alternative arguments on *Monell* liability for failure to train do not meet the high bar of the "obvious potential" for constitutional violation.**

Plaintiffs start their argument that the City has "obviously" failed to train its officers on a false premise, that "the City proffers no evidence demonstrating that MPD provided [appropriate] training…." (P. Mem. 46.)  It is not the City's burden to proffer *any* evidence in support of a summary judgment motion, it is the Plaintiffs' who have the burden of proof and must show there is a dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Plaintiffs argue that the record shows that MPD's entire training regimen was insufficient.  (P. Mem. 44-49.)  In support of this they cite to two individual depositions which do not mention the media, ████████████████████████ ███████████████████████████████████████████████████████ ██████████, and hearsay statements from an after-action report with unidentified officers allegedly stating they had not received crowd control training since the 2018 super bowl.  (*See* P. Mem. 47.)  This is not sufficient information for a jury to find that the need for further training was "so obvious" that the City was deliberately indifferent.  The question of the adequacy of training depends on the particular tasks of officers. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 & n.10 (1989).  Here, the MPD has received training on interacting with the media and the First Amendment. (ECF 404-13 at 199:11-25, 200:10-11.)   It also had in-service

training focused on mass demonstrations scheduled between January to April of 2020, though some did not take place because of the COVID-19 pandemic. (ECF 438 at 11.) The City certainly had no reason to believe that an unprecedented wave of civil unrest would overtake the City a few months after the onset of this pandemic and therefore ignored an obvious need to train. The City's training does not demonstrate deliberate indifference.

Plaintiffs mention a power point presentation of an officer training as proof that training was "insufficient" because the written slides did not include how to identify members of the media. But Plaintiffs conducted no discovery to determine the verbal, instructional content accompanying the slide, when it occurred, or whether the John Does attended. Plaintiffs have the burden to prove what was lacking from the training and did not do the work to substantiate their claim. *See Larson by Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996)(plaintiffs failed to provide evidence training was lacking). Their theory of *Monell* liability on this basis fails.

### III.    Goyette's testimony regarding being hit in the face with a projectile is insufficient to establish *Monell* liability.

Plaintiffs' memo claims Goyette was shot "in the face – just moments after officers did the same to a young man nearby". However, Goyette actually testified that, after 5-20 minutes of watching and following protestors rendering aid to someone who had been struck with a projectile, he was taking a break, looking at

his phone, and texting his daughter, when he was struck in the face with what he believes to be a law enforcement projectile. (ECF 443-1 ("GTr.") 45:12-14, 54:16-19, 57:7-58:15, 60:4-15, 65:24-66:2.) He admitted he did not see anyone aiming at him and said, "I did not see the officer who shot me, because I did look down." (GTr. at 67:1-20.)

Goyette's testimony is insufficient to establish he was identifiable as press. Goyette could not say whether any of his journalist equipment was visible:

- "I can't say for sure that I had the lanyard." (GTr. 74:12-13.)

- "[The camera] could have been in my bag[.]" (GTr. 75:22-25.)

- "I decided to focus on using my phone and my notebook to take what notes I could[.]" (GTr. 76:11-13.)

- "To answer truthfully, I'm not sure where the notebook was." (GTr. 77:17-18.)

Plaintiffs can point to no other evidence besides Goyette's testimony to show that anyone looking at Goyette would have known Goyette was a journalist. This is fatal to Goyette's claims, which are predicated on *Monell* liability of the City. Under *Monell*, a custom of unconstitutional misconduct must be the "moving force" behind the constitutional violation. *Ware*, 150 F.3d at 880. Similarly, an element of a *Monell* training/supervision claim is that the deficiency in training/supervision caused the harm. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir.

2010). Plaintiffs have not provided evidence on this element "such that a reasonable jury could return a verdict for [Plaintiffs]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Even if Plaintiffs had shown a custom of unconstitutional misconduct toward the press, all they have shown for Goyette is that a man texting on his phone was subject to an alleged constitutional violation. This insuperable disconnect between a custom related to treatment of the press and the alleged violation of rights of someone *not* identifiable as press, dooms Goyette's *Monell* claim for his facial injury.

## IV.   Neither Goyette, Ou, Nelson, Lassig, Maturen, nor Maury were seized by the MPD.

Plaintiffs make the argument that a Fourth Amendment seizure occurs "when an officer arrests a person, intentionally injures a person, or uses crowd control tactics that restrain an individual's movement." (P. Mem. 57.) In support of this they cite *Torres v. Madrid*, 141 S. Ct. 989, 994-996, 998 (2021), however *Torres'* limits its own holding. The Court in *Torres* found its holding "does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure. A seizure requires the use of force *with intent to restrain*." *Id.* at 998 (emphasis in original). The question is whether the officer applying force manifested an objective intent to restrain, that is, to continue police contact. *Id.* Here it is very clear that the officers were attempting dispersal, and not an arrest, of Goyette, Ou, Nelson, Lassig, and Maury.

**A.  Goyette's own description of MPD activities shows that there was no intent to arrest or detain him.**

Goyette testified about three interactions with MPD officers: 1) when he was allegedly struck with a projectile; 2) when he alleges an officer pointed a 40mm launcher at him and then passed him; and 3) when an officer allegedly threatened him.

Nothing in the record shows that officers were arresting *anyone* near Goyette on May 27.  Goyette was given no commands by any officer before he was allegedly hit with a projectile, nor did any officers attempt to apprehend him after he fell.  Goyette stayed in the area reporting, and then left, completely unimpeded by the MPD.  Just as the protestors in *Dundon v. Kirchmeier*, Goyette was legally not seized.

When an officer allegedly aimed a 40mm launcher at Goyette while walking down a street to clear protestors, the officer gave no commands to Goyette at all. (GTr. 89:1-99:23.)   A few seconds later, the officer and his line had passed completely.  (ECF 405:17 at 0:17.)   Goyette continued his reporting activities unimpeded.

When an officer allegedly threatened Goyette, there were no commands involved.  (GTr. 105:4-16.)  An officer that stops to speak to someone on the street does not seize that person absent some show of authority.  *U.S. v. Mendenhall*, 446 U.S. 544, 555 (1980).  Goyette did not testify that the officer illuminated the lights

on his squad, blocked Goyette's path, or in any other way objectively indicated that engaging with the officer was compelled. In short, "nothing in the record suggests that [Goyette] had any objective reason to believe that [he was not free to] proceed on [his] way." *Id.* He, in fact, did proceed on his way.

### B. Plaintiffs' exaggeration of Ou's interactions with the MPD still does not show a seizure.

Plaintiffs' memo erroneously states that "MPD officers grabbed [Ou], ridiculed him, and then ignored him, leaving him to face the continued barrage of munitions unaided, bleeding and injured." (P. Mem at 61.) This account is refuted by Ou's sworn declaration, his sworn testimony, and his own video footage, which show these actions taken by the *State Patrol*. (ECF 219-1 45:8–10, 15-18; Tr. 46:9–10; ECF 429 ¶17.) Ou has suddenly recollected, two and a half years later, that after the video ends, "MPD and State Patrol officers circled back. They fired something in our direction even while I was getting help with my injuries. It made a loud bang very close to us. We got scared and had to run again. We ran around a corner out of the sight line of the law enforcement officers." (ECF 429 ¶20.) Assuming without evidence that MPD deployed the munition making a "loud bang", there is no indication there was a command to stop, that this munition resulted in any actual physical contact with anyone, or that Ou was pursued by law enforcement. The objective intent was to disperse.

**C.     Nelson's evidence shows the MPD engaged in dispersing a crowd.**

Nelson asserts that she and her colleague Mike Shum were "shot at" on May 28 several times with tear gas cannisters and flash bangs while Shum was filming and that she was standing near him and yelling press while they were apart from protestors.  (ECF 425 ¶2.)  However, the video she has provided of May 28 does not capture anyone yelling "press" and does not show any appreciable distance between reporters and protestors.  (ECF 405-7.)  But even if everything Nelson represented were true, she does not allege that she was physically touched by anything.  Nor does she assert that officers indicated that she was seized or under arrest.  This is practically identical to the situation in *Quraishi* (except that Nelson was in an active and violent riot).  There, the Eighth Circuit explicitly found that reporters who could not report in the place of their choosing due to the use of tear gas did *not* have their freedom to move "terminated or restricted."  *Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 839–40 (8th Cir. 2021)(citing *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019) (en banc)).  The same analysis holds here, Nelson was not seized.

Nelson now, years later, states that on May 30, when her group of reporters were the subject of force by State Troopers, that MPD officers also fired at them.  This flies in the face of the videos from Ou, Raiche, and Nelson herself, which does not show the MPD appearing until after the reporters had climbed or been pushed

14

over the wall. (*See* ECF 405 Ex. A 4:10-10:27 (showing only State Patrol.)) Regardless, everything Nelson describes points to a dispersal rather than a seizure. She stated that MPD officers "armed with tear gas and flash bangs … told us to leave." (ECF 425 at ¶7.)  Nowhere does Nelson assert that she was physically touched by any MPD officers or their munitions.  (*Id.*) The intention manifested by any MPD officers was to disperse the crowd in front of them, including Nelson. Objectively and as a matter of law, Nelson was not seized.

### D.  Lassig and Maury allege that they were told to scale a fence to leave the area and were not arrested by the MPD.

The accounts of Plaintiffs Lassig and Maury are based on video taken by an MSNBC journalist.  (ECF 431 Ex. A.)  They back up through a parking lot as the MPD advanced dispersing protestors.  (ECF 430 ¶4; ECF 431 ¶4.)  They state that they had to climb over a fence "while an MPD officer was pounding on [Maury's] back with his nightstick and screaming for him to hurry up and leave the area." (ECF 431 ¶7.)  However, the photos provided by Lassig do not show MPD officers within arm's reach of Maury while he climbs the fence.  (ECF 431 Ex. D.)  Nor does the video show officers laying hands on Maury, nor attempting to stop any of the journalists from leaving the scene.  (ECF 431 Ex. A.)  Quite the contrary, officers clearly wanted them to leave.  Again, these officers manifested an objective intention to disperse all individuals from the immediate area and no seizure occurred. *See Dundon v. Kirchmeier*, 2017 WL 5894552, *3, *18 (D.N.D. Feb. 7, 2017),

*aff'd mem.* 701 F. App'x 538 (8th Cir. 2017) (per curiam).  Both Lassig and Maury

state that they and Maturen were later arrested by State Patrol and HCSO without

any involvement of the MPD.  (ECF 430 ¶¶7-8; ECF 431 ¶¶8-10.)

**V.    Plaintiffs erroneously argue that they have proven that "the MPD" had a retaliatory motive when violating the rights of the press, when in fact Plaintiffs must prove that individual MPD officers acted on retaliatory motives.**

Even if Plaintiffs had shown that there was a custom of First Amendment

retaliation against members of the press, that would be insufficient to support the

Plaintiffs' First Amendment Retaliation claims.  Each Plaintiffs' First Amendment

Retaliation claim stands or falls on the specific facts of each Plaintiff's own incident

because there can be no *Monell* violation without an underlying constitutional

violation of a plaintiff's rights.  *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th

Cir. 2007).  To prove their claims, each Plaintiff must show that the retaliatory

motive of the officer who took adverse action against them was a "but-for cause"

of the adverse action.  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir.

2010).  "If the response was driven not by 'animus' but by the defendant's

understanding—however mistaken—of his official duties, then it was not

'retaliatory.'" *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022).  Plaintiffs have

no evidence that the individual officers that they dealt with were motivated by

animus towards journalists.  The question is, have the Plaintiffs shown that the

officers would have treated them better if they were not journalists?  *Nieves v.*

*Bartlett*, 139 S. Ct. 1715, 1722 (2019)(citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).

Here, the evidence Plaintiffs present is that had they not appeared to be journalists they would have received the same treatment as the surrounding protestors and rioters.  Goyette was not identifiable as press and was allegedly struck in the face.  On both May 28 and May 30, Nelson was close to protestors or rioters as MPD were attempting dispersals with tear gas or flash bangs. On May 30, Nelson as a journalist was allowed to be far closer to MPD officers than protestors.  (ECF 425 Ex. A 40:25-44:40.)  Lassig and Maury allege that on May 30, MPD were shooting fleeing protestors in the back with 40mm projectiles, but they do not allege that they saw any members of the press hit with projectiles by the MPD.  (ECF 430 ¶4, ECF 431 ¶4.) Plaintiffs were not subject to any worse treatment from the MPD than other individuals who the MPD was attempting to move from the area.

Additionally, the "obvious retaliatory motive" of the MPD proposed by Plaintiffs, that the MPD did not want their conduct to be recorded (P. Mem. 54), has no evidentiary support.  Unlike the State Patrol, MPD officers were equipped with body-worn cameras ("BWC") and were recording as much of their activity as possible.  (*See* ECF 447-2 at 10-82 (reports referring to BWC activation).)  Altogether there were **17,159 BWC videos** recorded by MPD officers between May 26 and

CASE 0:20-cv-01302-WMW-DTS   Doc. 457   Filed 01/18/23   Page 18 of 21

May 31, 2020. (2ⁿᵈ Robertson Decl. ¶3.) The idea that MPD officers were hoping to conceal anything by stopping journalists from recording is not only "mere speculation, conjecture, or fantasy" unsupported by evidence, it is nonsensical. *Laney v. City of St. Louis, Missouri*, No. 21-3530, 2023 WL 116837, at *4 (8th Cir. Jan. 6, 2023) (quotation omitted).

## VI.   Plaintiffs ignore the legal meaning of "shocks the conscience".

In fast-moving situations where officials are required to make split-second decisions there is a high bar for Plaintiffs to prove that official conduct was "conscience shocking". The City does not argue that officers were "merely reckless". (P. Mem. 63.) Rather, the City points out that even "precipitate recklessness" would be insufficient under the law to shock the conscience, and that Plaintiffs have the burden to show that individual officers who allegedly violated the rights of Plaintiffs behaved "maliciously and sadistically for the very purpose of causing harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).

Plaintiffs frequently quote Lt. Mercil expressing frustration with the media, however Lt. Mercil did not commit any constitutional violations against Plaintiffs. Plaintiffs' evidence fails to show that individual officers allegedly violating individual Plaintiff's due process rights were acting maliciously rather than attempting to balance the needs of law enforcement in a difficult situation with the

18

need for restraint. *See id.* Plaintiffs' underlying due process claims must therefore fail.

### VII.   Plaintiffs' Failure to Intervene Claim Fails

Failure to intervene claims are only available for claims of excessive force. *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009). As the individual Plaintiffs' excessive force claims fail, the failure to intervene claims must also fail. Additionally, Plaintiffs cannot point to any individual from the MPD who had the opportunity to intervene to *prevent* the uses of force against the named Plaintiffs. *Id.*

### VIII.   Plaintiffs' conspiracy claim is missing any evidence of a meeting of the minds about the press.

"To advance past the summary judgment stage, [Plaintiffs] must 'allege with particularity and specifically demonstrate material facts that the defendants reached an agreement' to violate the Plaintiffs' constitutional rights. *Reasonover v. St. Louis Cnty., Mo.*, 447 F.3d 569, 582 (8th Cir. 2006)(citing *Marti v. City of Maplewood,* 57 F.3d 680, 685 (8th Cir.1995)).  Plaintiffs' specious line of reasoning is that Defendants' agreement to use unlawful force upon, and retaliate against the press, is circumstantially demonstrated by: 1) agencies worked together to respond to the protests; and 2) agencies did not put in a written document nor explicitly tell all officers that press were exempt from the curfew.  (P. Mem. 66.)

While Plaintiffs may rely on circumstantial evidence of a conspiracy, such evidence must support a plausible inference of a meeting of the minds. *Mershon v. Beasley*, 994 F.2d 449, 452 (8th Cir. 1993). It is implausible to conclude that if commanders did not give explicit instructions that press were exempt from the curfew that officers would consider themselves commanded to violate the constitutional rights of the press. The fact is, if there was no communication from the City to individual officers about the press, there could not be a meeting of the minds between individual officers and the City to violate the rights of the press. *See Burbridge v. City of St. Louis, Missouri*, 430 F. Supp. 3d 595, 619–23 (E.D. Mo. 2019), aff'd, 2 F.4th 774 (8th Cir. 2021) ("evidence that the officers conspired with one another does not prove that the City conspired with the officers.")

### IX.    Plaintiff Maturen has no claim against the City of Minneapolis.

Maturen's declaration makes clear that he had no interaction with the MPD, stating that on May 30, 2020, "I saw the Minneapolis Police Department ("MPD") pushing people north. I headed north[.]" (ECF 432 ¶3.) His other interaction with law enforcement was exclusively with State Patrol and the HCSO. As such, *any* claims by Maturen against the City should be dismissed.

## <u>CONCLUSION</u>

City Defendants respectfully request that the Court dismiss all Plaintiffs' claims against them.

20

Dated: January 18, 2023

KRISTYN M. ANDERSON
Minneapolis City Attorney
By
*/s/ Heather P. Robertson*
Heather P. Robertson (#0390470)
Kristin R. Sarff (#388003)
Sharda Enslin (#0389370)
Assistant City Attorneys
Office of the Minneapolis City Attorney
City Hall, Room 210
350 S. Fifth Street
Minneapolis, MN 55415
Telephone: 612-673-3949
heather.robertson@minneapolismn.gov
kristin.sarff@minneapolismn.gov
sharda.enslin@minneapolismn.gov

*Attorneys for Defendants City of
Minneapolis and Chief of Minneapolis
Police Medaria Arradondo*