UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jared Goyette, Craig Lassig, Katie
Nelson, Tannen Maury, Stephen
Maturen, Edward Ou, Timothy Evans,
Chris Tuite, and The Communications
Workers of America,
*On behalf of themselves and other*
*similarly situated individuals,*

Ct. File No. 20-cv-01302
(WMW/DTS)

Plaintiffs,

v.

**CITY DEFENDANTS'
MEMORANDUM IN
OPPOSITION TO
PLAINTIFFS' MOTION TO
SUPPLEMENT THE RECORD**

City of Minneapolis; Minneapolis
Chief of Police Medaria Arradondo *in*
*his individual and official capacity*;
Minneapolis Police Lieutenant Robert
Kroll, *in his individual and official*
*capacity*; Minnesota Department of
Public Safety Commissioner John
Harrington, *in his individual and official*
*capacity*, Minnesota State Patrol
Colonel Matthew Langer, *in his*
*individual and official capacity*;
Minnesota State Patrol Major Joseph
Dwyer, *in his individual capacity*;
Hennepin County Sheriff David
Hutchinson, *in his individual and official*
*capacity*; John Does 1-10, *in their*
*individual and official capacities*;

Defendants.

Plaintiffs seek to supplement the record with the recently-released report from the U.S. Department of Justice's ("DOJ") Pattern and Practice investigation into the Minneapolis Police Department.  However, Plaintiffs could have accessed the same information brought forth by the DOJ report during discovery when it could have been fairly challenged by both sides, and because they did not do so they cannot now supplement the record with a report that cannot be subject to cross-examination.  Additionally, for the purpose the Plaintiffs intend to use it, the report is not admissible and is not relevant. The Court should deny Plaintiffs' motion.

## FACTS

### I.    Procedural History

Plaintiffs filed the instant lawsuit on June 2, 2020. (ECF Doc. 1.)   The Department of Justice instituted an investigation into the City of Minneapolis Police Department, pursuant to 34 U.S.C. § 12601, beginning on April 21, 2021. (Robertson Decl. Ex. A at 10 & n.6.)  Plaintiffs failed to take any fact discovery in this case from the City of Minneapolis before discovery closed on December 1, 2021. (*See* ECF Doc. 358.)  Plaintiffs did not subpoena or otherwise disclose any attempt to gather information from or about the DOJ investigation before the close of fact discovery.  (Robertson Decl. ¶ 9.) The parties completed briefing on the City Defendants' Summary Judgment motion on January 18, 2023. (ECF Doc. 457.)  The

Department of Justice released the findings of the investigation in a report on June 16, 2023, in which the DOJ found it "has reasonable cause to believe that MPD and the City engage in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law."  (Ex. A at 92.)

## II.    DOJ report

The City has entered into a public "Agreement in Principle" in which the DOJ and the City "commit to negotiate in good faith to reach a comprehensive settlement in the form of a consent decree[.]"  (Ex. B at 2.) While "the City does not concede that there is a pattern or practice of unlawful behavior, the City agrees that the United States' findings raise issues of great importance to the City and the community, and the City agrees to continue to implement significant changes to address issues raised in the report."  (Ex. B at 1.)

The DOJ report has four general findings: 1) the MPD uses Excessive Force; 2) the MPD Discriminates against Black and Native American People; 3) the MPD violates people's First Amendment Rights; and 4) the City and MPD violate the Americans with Disabilities Act.  In support of all the findings, except the finding that the MPD violates First Amendment Rights, the DOJ was able to cite to statistics that it had compiled about the prevalence of constitutional violations, in addition to giving examples.  (*See* Ex. A at 10, 11, 14, 17, 18, 32-42, 61.)

In the section of the findings regarding First Amendment violation, the DOJ reports that it reviewed the following:

- Hundreds of body-worn camera videos from 22 different protest events that occurred between 2016 and the present
- MPD's protest planning materials
- MPD's internal policies and trainings related to protests and crowd-control tactics
- Evidence submitted during "relevant litigation"[1]
- Videos and "accounts" from citizens and journalists[2]

(Ex. A at 48.)

Additionally, the DOJ report notes that the investigators spoke to "scores"[3] of unidentified individuals who had information about MPD's protest response:

- Protestors
- Journalists
- Community advocates
- **Attorneys in relevant litigation**[4]
- MPD supervisors
- Line officers

---

[1] The term "relevant litigation" is not defined nor are the cases identified.

[2] The report does not clarify whether the "accounts" from citizens and journalists are first-hand accounts.

[3] A "score" is 20. This implies that the DOJ spoke with at least 40 individuals, and likely less than 200 (as one would expect that number or greater to be described as "hundreds") but the apportionment among the categories given is not specified and it is not known whether they spoke with two officers and one hundred protestors, or the reverse, about their experience with protests.

[4] Again, "relevant litigation" is not defined. The DOJ did not attempt to speak to the attorneys for the City of Minneapolis who were representing the City or its employees in litigation relating to protests. (Robertson Decl. ¶ 10.) Therefore, presumably, the DOJ spoke only to plaintiffs' attorneys whose clients were suing the City.

(Ex. A at 48.)

From just the George Floyd protests, from May 26-May 31, 2020, there are more than 4,000 body-worn camera videos that depict policing of protests. (Robertson Decl. ¶ 11.)  The report does not clarify how the DOJ selected protest videos to review.  (*See* Ex. A at 48; *Compare* Ex. A at 10, 67, 68 where DOJ specifically selected a "random sample" of incidents from its dataset to analyze and which it used in findings unrelated to the First Amendment.)

Within the section on the First Amendment rights, the DOJ addressed dealings with protestors, journalists, members of the public who are critical of the police, and individuals who are recording MPD officers.  (Ex. A at 48-55.)  While the DOJ gives a legal definition of the rights involved in each instance and concludes the MPD "regularly" violates First Amendment rights, the DOJ report does not specify how many instances investigators found, in the hundreds of videos it reviewed, that allegedly included First Amendment violations.  The report itself identifies only a total of 18 First Amendment-related incidents between 2016 and 2022, only four of which involve journalists.  (*Id.*)

Specifically, the four incidents involving journalists are:

- May 30, 2020: MPD sergeant pepper-sprayed journalist laying on the ground
- May 2020: MPD sergeant screamed at journalists to "fucking go" and other officers pepper-sprayed
- October 2020: MPD sergeant pushed a journalist

- 2021: two officers shoved individual identifying himself as media to get him to leave

(Ex. A 51-52.)  The report leaves it entirely to speculation as to whether there are four, forty, or four hundred total interactions involving journalists over the 7-year period, and what percentage of those interactions might be interpreted as a First Amendment violation.[5]

In other parts of the report, unrelated to First Amendment violations, the DOJ indicates that the MPD and City leadership have had notice of certain issues identified in the report.  (*See* Ex. A at 42, 43 (notice regarding racial discrimination).)  However, the report does not indicate that MPD or City leadership had notice regarding the First Amendment issues identified.  (*See* Ex. A at 48-55.)  Additionally, the report notes that the MPD has disciplined officers in connection with five First Amendment incidents within the reviewed time period, but it does not identify how many incidents were presented as complaints for potential investigation or discipline nor when those incidents were made known to the MPD leadership.  (Ex. A at 54-55.)

The report does acknowledge that MPD policy is clear, and that officers are aware, that individuals are allowed to record police activity.  (Ex. A at 54.)  While

---

[5] During the week of May 26-May 31, 2020, alone, Plaintiffs represented to this Court that "hundreds of members of the news media are in the Twin Cities covering the protests that followed George Floyd's death and the aftermath." (ECF Doc. 3 at 3)(Plaintiffs arguments in favor of numerosity).

it says that police "often" use force against or arrest people who record, the report does not elaborate on what frequency is indicated by "often" nor whether MPD and City leadership were aware of these occurrences, and does not indicate whether this conduct relates specifically to journalists. (*Id.*)

Finally, while discussing alleged First Amendment violations in protest situations, the report acknowledges that "[c]rowds of peaceful protesters sometimes include people who are breaking the law." However, the report does not discuss the extremely violent nature of the protests of May 2020, which were larger, more extensive, and more violent than anything seen in the city before or since. It does not mention that the individuals within protests "breaking the law" included many launching commercial-grade fireworks at police officers, attempting to blind them with laser-pointers, throwing rocks, bricks, and human waste at the officers, breaking into and setting fire to businesses, or overrunning and setting fire to a police precinct. (*See* Ex. A at 48-55.)

### III.   Videos showing interactions with press during May 2020 Protests

In the course of litigation on other matters taking place during the protests of May 26-May 31, 2020, counsel has found videos of interactions with members of the press which show courtesy, professionalism, patience, and exempting the press from curfew violation enforcement. ██████████

- ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ████████████████████████████

▌ ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ██████████████████████

▌ ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  █████████████████████████████



These examples do not comprise the entirety of the interactions captured, most of which merely show the MPD not interfering as the press do their work.  All of these videos were produced to Plaintiffs on November 29, 2022.  (Robertson Decl. ¶¶ 4-8.)

## ARGUMENT

### I.   Plaintiff's motion is deficient under Rule 56

Plaintiffs cite to Fed. R. Civ. P. 56(d) for their proposition that this "Court has discretion to allow supplementation of the record on summary judgment after briefing concludes but before taking the matter under advisement." (P. Mot. at ¶ 12.)  This Rule actually states: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  Presumably, Plaintiffs are reading this to request that this Court issue an "appropriate order" allowing them to supplement the record with the DOJ report in support of their *Monell* claim, pursuant to Fed. R. Civ. P. 56(d)(3).  "Granting a motion to supplement the record is proper where the additional information is relevant and not previously available." *E. Coast Test Prep, LLC v. Allnurses.com, Inc.*, No. CV 15-3705 (JRT/SER), 2017 WL 2242851, at *5 (D. Minn. May 22, 2017) (citing *Ortiz-Alvarado v. Gomez,* No. 14-209, 2014 WL 3952434, at *3 (D. Minn. Aug. 13, 2014)).

Here, the motion should be denied as Plaintiffs do not include in their supporting declaration the "specified reason" that they could not have presented the information in the report in their opposition to summary judgment.  (ECF Doc.

524.)   Presumably Plaintiffs cannot supply a specified reason because the substantive information that the DOJ relied on and summarizes in the report was fully available to Plaintiffs and could have been accessed in discovery or third-party discovery, but Plaintiffs simply failed to avail themselves of the opportunity to develop their own record.  The only thing not previously available to Plaintiffs are the DOJ's legal conclusions, which should not be admissible in any event.

Even if the Court were to consider Plaintiffs' late and unsupported request, "A party may object that the material cited to support or dispute a fact [at summary judgment] cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Plaintiffs cannot rely on the report because the report would be inadmissible at trial and Plaintiffs cannot present the conclusions in the report in any other admissible way.

## I.      The DOJ report is hearsay

The DOJ report is being offered for the truth of the matter asserted — that the incidents asserted within occurred and that the MPD has a pattern and practice of violating First Amendment rights.  Plaintiffs contend that it falls within the public records exception to the hearsay rule as this is a civil case and the report is "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). City Defendants agree that the DOJ's report contains some factual findings from the DOJ's legally authorized investigation, and respect and accept the DOJ's role in

conducting pattern and practice investigations.  However, the rule provides that such a report is not admissible if "the source of information or other circumstances indicate a lack of trustworthiness" to meet the standard to be admitted as evidence in this particular case.

The evidentiary "trustworthiness inquiry" into a report offered under Fed. R. Evid. 803(8) was expounded upon by the U.S. Supreme Court as the "primary safeguard against the admission of unreliable evidence, and it is important to note that it applies to all elements of the report. Thus, a trial judge has the discretion, and indeed the obligation, to exclude an entire report or portions thereof . . . that she determines to be untrustworthy." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988).  In *Beech Aircraft Corp.* the Court noted that the Advisory Committee proposed a non-exclusive list of helpful factors in passing on evidentiary trustworthiness including, "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Id.* at 168 n.11 (citing Advisory Committee's Notes on Fed. Rule Evid. 803(8)).  Additionally, the Court noted that "the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them." *Id.* at 168.  Other courts have added that "This list of factors is not exclusive; any circumstance

which may affect the trustworthiness of the underlying information, and thus, the trustworthiness of the findings, must be considered when ruling upon the admissibility of factual findings under [Rule 803(8)]." *Alexander v. CareSource*, 576 F.3d 551, 563 (6th Cir. 2009) (citing *In re Complaint of Paducah Towing Co., Inc.*, 692 F.2d 412, 420 (6th Cir.1982))

The DOJ report findings regarding the First Amendment, particularly the treatment of journalists, do not have sufficient guarantees of evidentiary trustworthiness to be admissible under the hearsay exception with respect to the allegations in this particular case. Plaintiffs cite a number of cases where DOJ reports on pattern and practice investigations have been admitted in Section 1983 lawsuits. (*See* P. Mot. At 2 n.1.) However, individual courts can differ about the admissibility of the same report, depending on the particular allegations at issue. *Compare Moore v. City of Ferguson, Missouri,* 213 F. Supp. 3d 1138, 1146 (E.D. Mo. 2016) (admitting DOJ report on Ferguson PD in allegations involving use of taser on individual with mental health condition) *with Watson v. Boyd,* 447 F. Supp. 3d 924, 935–36 (E.D. Mo. 2020), *vacated in part, appeal dismissed in part on other grounds*, 2 F.4th 1106 (8th Cir. 2021) (refusing to admit DOJ report on Ferguson PD regarding allegation of unlawful traffic stop). Additionally, courts have refused to wholesale admit any particular category of report. *Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d 1304, 1309 (8th Cir. 1984) (refusing to find that EEOC reports are *per se* admissible

13

under Fed. R. Evid. 803(8) as "they vary greatly in . . . factual detail.")  As this report has just been released there are no judicial opinions regarding the admissibility of *this* report.

As to the evidentiary trustworthiness of this report, the main issue is that the DOJ leaves out information that would allow City Defendants, or anyone else, to test and judge the evidentiary trustworthiness of the findings.  For example, City Defendants have no basis to impugn the skill and experience of the investigators from the DOJ, because the report does not identify them.  It merely states that the investigative team "consists of career civil staff from the Civil Rights Division of the Department of Justice and the U.S. Attorney's Office for the District of Minnesota. More than a dozen experts assisted us, including law enforcement experts, mental health clinicians, and statisticians."  (Ex. A at 7-8.)  The credentials of the individuals chosen as experts are not presented.  (*Id.*)

The crux of the objection to the evidentiary trustworthiness of the report is that no hearing or anything like it has been held regarding the findings in the DOJ report.  The Rule's Advisory Committee notes, cited with approval by the U.S. Supreme Court, cite to a 10th Circuit case that discusses the basis for the exception for public reports. Advisory Committee's Notes on Fed. Rule Evid. 803(8) (citing *Franklin v. Skelly Oil Co.*, 141 F.2d 568 (10th Cir. 1944)).  *Franklin* states that the admissibility of such reports is "considered a justifiable abridgement of the

privilege of cross-examination on the grounds that the inquisition or inquiry [of the public official] was in the nature of a judicial proceeding wherein the right of cross-examination was amply safeguarded and protected. *Id.* At 572. The investigation into First Amendment violations described by the DOJ in its report was clearly not in the nature of a judicial proceeding and no rights of cross-examination have been safeguarded in any way

Here, in its investigation into First Amendment violations, the DOJ stated that, among the scores of individuals they spoke to, they spoke with "attorneys in relevant litigation." However, no attorneys representing the City of Minneapolis or its employees, in the litigation regarding First Amendment activities, were interviewed by the DOJ as part of its investigation. This detracts from the report's trustworthiness as evidence in this case as it suggests that the DOJ has listened to the advocates of various plaintiffs, who each have had a vested financial interest in establishing a pattern and practice of First Amendment violations, while the DOJ has not given an opportunity for attorneys representing the City in those particular cases to present a countervailing viewpoint on the incidents. Notably, other DOJ reports on police departments in other jurisdictions do not rely on interviews with attorneys in litigation.[6] This irregular practice of relying on input

---

[6] *See* Investigation of the Ferguson Police Department, United States Department of Justice Civil Rights Division (March 4, 2015), *available at*

from plaintiffs' attorneys calls the evidentiary trustworthiness of the report into question as there was no hearing or adversarial process to test the one-sided assertions by plaintiffs' counsel.

The fact that the DOJ spoke generally to "line officers" does not remedy the situation as first, the line officers are not professional advocates and second, there is no indication that the line officers the DOJ spoke to were the same officers who were accused of retaliatory conduct and therefore whose perspective and state of mind would have been particularly relevant as to whether they were, in fact, retaliating against the protestors for their protected conduct.

Further, the DOJ report does not identify how evidence was selected for review in the First Amendment section.  In other sections the DOJ specifically noted that a random statistical sample of data was reviewed.  For its review of First Amendment incidents, DOJ does not state that the review was done in that

---

https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf; Investigation of the Chicago Police Department, United States Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Illinois (January 13, 2017), *available at* https://www.justice.gov/opa/file/925846/download; Investigation of the Cleveland Division of Police, United States Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Ohio (December 4, 2014), *available at* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/04/cleveland_division_of_police_findings_letter.pdf.

fashion.  There are not just hundreds of videos depicting protest activity, there are thousands.  Therefore, how the videos were selected for review is important.  If the DOJ, in its First Amendment investigation, selected videos that were at issue in "relevant litigation" that would skew the sample of videos and would not be reliably representative of the usual practice of MPD officers.

Additionally, the report does not specify the total number of allegedly problematic incidents identified by the DOJ in its review of "hundreds of videos."  The report also does not break down the numbers or percentages for individual types of incidents between protestors, journalists, criticisms, and filming.  The DOJ merely concludes that the MPD "regularly" violates First Amendment rights without defining what "regularly" means nor quantifying how many of each type of violation was observed.

The report similarly fails to give context to its finding that the MPD failed to discipline officers for First Amendment violations.  It stated that discipline only resulted from five First Amendment incidents, but it failed to note what percentage of total incidents that it thinks should have been disciplined or what percentage of complaints presented to the MPD for potential discipline resulted in actual discipline, nor how many officers were disciplined from those incidents.  If the MPD only received ten complaints and disciplined in the five cases where discipline was called for, then the facts would not support the conclusion of the

report that the MPD has failed to discipline appropriately.  Because the DOJ does not identify the data backing its conclusion in the First Amendment context, the report lacks evidentiary trustworthiness in this case.

It is not even known whether the sources relied on by the DOJ are first-hand sources or if individuals are providing the DOJ with hearsay information.  The plaintiff attorneys DOJ spoke with are clearly providing hearsay information.  The journalists and community advocates would also be potential sources of hearsay information.   Even if the hearsay exception for the report itself applies, it would not encompass the hearsay-within-hearsay that the report contains.  As the report does not specify how its First Amendment conclusions rely on hearsay statements versus first-hand accounts, these conclusions are not trustworthy enough to be admitted as evidence in this case.

The fact that the DOJ's methodology and sources are not identified in the report makes it difficult to have a meaningful opportunity to rebut the report in this case at summary judgment or trial.  There is no individual to cross-examine, there is no underlying methodology to scrutinize, there is not a list of videos watched, or specific individuals from whom information was gathered.  *Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d at 1309 ("Moreover, the trial judge properly may give weight to the hearsay nature of the [report presented for admission under Fed. R. Evid. 803(8)] and to the inability of the defendant to cross-examine the

report in the same way that a party can cross-examine an adverse witness.")  How, then, in either the motion for summary judgment or in a trial in this case, can the City rebut the pronouncements of the DOJ that the MPD "regularly" violates the First Amendment rights of protestors, journalists, critics, or observers?

Discovery in this case is closed and the City cannot compel the DOJ to provide this information.  There was no opportunity for a hearing before the report was issued.  The lack of an opportunity for a hearing on the report's findings in this case deeply undercuts the evidentiary trustworthiness of the report's findings on the First Amendment and the report is inadmissible.

## II.   Even if not hearsay, the DOJ report does not change the analysis of Plaintiff's *Monell* claim

Even if this Court were to find that the report was admissible, the report does not change the analysis of the *Monell* claim for which Plaintiffs offer it and therefore is not relevant.   Fed. R. Evid. 401 (fact must be "of consequence in determining the action.")  Here, the DOJ report does not give any indication that the City policymakers had notice of any of the incidents mentioned in the report. In order for either a custom claim or a failure to train/supervise claim to survive there must be a showing of deliberate indifference to a known issue.  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013)   For incidents with journalists, the report does not cite any instances earlier than May 30, 2020, which would be later than or contemporaneous with any alleged injuries to Plaintiffs.

(*See* ECF Doc. 226.)  The report does not move the needle on the *Monell* issue as it fails to show there was notice to and deliberate indifference on the part of the City's policymakers.  Therefore, it is not of consequence in determining a fact at issue in this case and should be excluded as irrelevant.

Plaintiffs also argue that the report's conclusions on training show that the training was "so deficient" that no prior notice would be necessary.  However, the report does not support that argument.  The report notes that most officers knew that they were not to interfere with individuals who were recording them, which would, of course, include the press.

That officers knew that media were to be allowed to continue reporting is supported by the videos that the City has viewed showing officers accommodating the media and exempting them from arrest for curfew violations.  Nothing in the report would allow the Court to conclude that a violation of the First Amendment was the obvious consequence of the training provided by the MPD.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) (obvious failure of a training program would be sending armed officers without any training on when officers are allowed to use lethal force).  The report is not relevant and should be excluded.

### III.    The DOJ report's First Amendment findings are substantially more prejudicial than probative and present an undue risk of confusing the issues in this case

Evidence may be excluded if the probative value is substantially outweighed by a danger of unfair prejudice or confusing the issues.  Fed. R. Evid. 403.  This report should be excluded under Rule 403 because the findings in the report are legal conclusions and because the legal standard for a "pattern and practice" determination is more lenient than the "custom" standard under *Monell*.

In *United States v. Town of Colorado City*, the Ninth Circuit dealt with an issue, not previously addressed in any other court, as to whether under 34 U.S.C. § 12601 a "pattern or practice" had the same meaning as a "custom" under *Monell*.  935 F.3d 804, 808 (9th Cir. 2019).  There the court found that § 12601 imposed *respondeat superior* liability upon the municipality for a pattern of unconstitutional conduct and there was not a requirement to show that there was either a policy or custom of the municipality that caused the violation.  *Id.* at 808-09.  In preparing the report, the DOJ was working under a materially different legal standard than Plaintiffs must prove under *Monell*.

Under *Monell*, there is no custom unless the practice is "so widespread, persistent, and continuing that it has 'the effect and force of law'." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990).  The DOJ report does not define "pattern or practice."  However, in the DOJ report on the

Chicago Police Department the DOJ adopted the definition of "pattern or practice" that is used for Title VII employment discrimination or under the Fair Housing Act. *See* Investigation of the Chicago Police Department, United States Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Illinois (January 13, 2017) at 22-23 *available at* https://www.justice.gov/opa/file/925846/download. The definition used was much broader than the *Monell* standard. *Id.* (citing *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 336 n.l6 (1977); *Coates v. Johnson & Johnson*, 756 F.2d 524, 533 (7th Cir. 1985); *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971)). In these cases, "[t]he words 'pattern or practice' . . . were intended to encompass more than an 'isolated or accidental or peculiar event.' " *United States v. W. Peachtree Tenth Corp.*, 437 F.2d at 227. That is a much lower threshold than a custom so pervasive that it has the effect and force of law, as is required to show *Monell* liability.

To admit a report that, under a different legal standard, finds there was a "pattern or practice" naturally confuses the issue of whether there was a "custom" for the purposes of a *Monell* claim. The report, in its First Amendment findings, gives a handful of examples, and then concludes that based on those examples and perhaps other instances which are not addressed, there was enough to convince the DOJ that these were more than isolated incidences. However, that does not

get to a finding on whether there was a "custom" for *Monell* purposes.  In fact, courts have routinely held that a custom was not presented under *Monell* based on instances more numerous than identified in the DOJ report.  *See Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir. 1999) (noting that fifteen citizen complaints against deputies failed to establish an unofficial custom).  The fact that a finding of a pattern or practice by the DOJ does not automatically establish a custom for *Monell* purposes, risks that the report, if considered in this case, would be given undue weight and that a jury would not appreciate the distinctions in the legal standards.  In addition, as discovery has concluded in this case, Plaintiffs cannot compel the DOJ to produce the information its findings are based on any more than the City can.  The only thing Plaintiffs have to offer into evidence to establish the custom is the report itself.  The report itself, by only including four journalist incidents, one of which Plaintiffs already rely on (spraying the reporter in the gas station parking lot), and two of which occurred long after the incidents alleged by Plaintiffs, does not establish a custom under *Monell* as a matter of law as to pervasiveness or notice. Allowing the report's conclusions that there is a pattern or practice under that different legal standard into evidence to support the *Monell* standard confuses the issue and is substantially more prejudicial than probative.

Additionally, the DOJ's conclusions that certain conduct violated the First Amendment are legal conclusions.  The DOJ report explicitly sets out the legal

standard and determines whether the facts meet the standard.  (*See, e.g.*, Ex. A at 49 & n.60.)  The Supreme Court has specifically left open the question of whether legal conclusions are admissible in an otherwise admissible report.  *Beech Aircraft*, 488 U.S. at 170, n. 13.  If the DOJ's conclusions had been offered by Plaintiffs through a proposed expert witness, they would be inadmissible.  In *Schmidt v. City of Bella Villa*, the Eighth Circuit upheld the district court's decision to exclude an expert report where the expert rendered his opinion on the reasonableness of officer conduct in light of Fourth Amendment standards, and which was "devoid of any standards and explanations that would assist the trier of fact in contextualizing his opinions."  557 F.3d 564, 570 (8th Cir. 2009). The DOJ report suffers from both evidentiary problems.  The report makes legal conclusions regarding whether officers' conduct violated the First Amendment.  It also does not explain what data supports these legal conclusions.  Therefore, the report would be substantially more prejudicial than probative and should be excluded. *See Marten v. Montana*, No. CV 17-31-H-CCL, 2019 WL 4753249, at *3 (D. Mont. Sept. 30, 2019) ("The introduction of the 'Analysis and Finding' section of the DOJ Report would be unduly prejudicial to Defendant and would be excluded on that basis[.]")

## CONCLUSION

Plaintiffs' attempt to prop up their *Monell* claim with the DOJ report's First Amendment conclusions is improper. Plaintiffs could have accessed the information underlying the DOJ's findings during the course of discovery but did not, and they cannot now attempt to supplement the record under Fed. R. Civ. P. 56(d)(3). Additionally, the report's First Amendment conclusions are hearsay as they do not satisfy the evidentiary trustworthiness standard applicable to its use in this case because there was not and has not been a hearing to test the methodology or conclusions in the report. The report is also not relevant as it does not change or contribute to the analysis of the *Monell* issue in this case. Finally, the report is inadmissible under Rule 403 as it is unduly prejudicial and confuses the legal issues in the case. The Plaintiffs' motion should be denied.

Dated: June 30, 2023

KRISTYN M. ANDERSON
Minneapolis City Attorney
By
*/s/ Heather P. Robertson*
Heather P. Robertson (#0390470)
Kristin R. Sarff (#388003)
Sharda Enslin (#0389370)
Assistant City Attorneys
Office of the Minneapolis City Attorney
City Hall, Room 210
350 S. Fifth Street
Minneapolis, MN 55415
Telephone: 612-673-3949
heather.robertson@minneapolismn.gov
kristin.sarff@minneapolismn.gov

sharda.enslin@minneapolismn.gov

*Attorneys for Defendants City of*
*Minneapolis and Chief of Minneapolis*
*Police Medaria Arradondo*