UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Goyette, et al.,                                    Case No. 20-cv-1302 (WMW/DTS)

                        Plaintiffs,
                                                              **ORDER**
        v.

City of Minneapolis, et al.,

                        Defendants.

---

Before the Court are Defendant Hennepin County Sheriff David Hutchinson's ("Sheriff Hutchinson") motion for summary judgment, (Dkt. 395), and Defendants City of Minneapolis ("City") and former Minneapolis Chief of Police Medaria Arradondo's ("Chief Arradondo"), (collectively, "City Defendants"), motion for summary judgment, (Dkt. 403). Also, before the Court are Plaintiffs' Motion to Supplement Record, (Dkt. 523), and City Defendants' application to file conventionally, (Dkt. 526). For the reasons addressed below, the Court grants in part and denies in part Sheriff Hutchinson's motion for summary judgment, denies City Defendants' motion for summary judgment, denies Plaintiffs' Motion to Supplement Record, and grants City Defendants' application to file conventionally.

**BACKGROUND**

Plaintiffs Jared Goyette, Craig Lassig, Tannen Maury, Stephen Maturen and Katie Nelson initiated this lawsuit against Defendants, challenging the treatment by law enforcement of journalists and members of the news media reporting on the events in

Minnesota following the deaths of George Floyd and Daunte Wright.  The Hennepin County Sheriff's Office ("HCSO"), led at the time by Hennepin County Sheriff Hutchinson, played a crucial role in the law enforcement response to these tragedies.  Additionally, Defendant Medaria Arradondo, as the Minneapolis Chief of Police, held supervisory responsibility over the Minneapolis Police Department ("MPD").

HCSO along with the Minnesota State Patrol ("State Patrol") and other law enforcement agencies conducted joint operations in response to protests and civil unrest following the murder of George Floyd.  HCSO assisted in arresting, booking and detaining those who were arrested during the protests.  HCSO also tracked the complaints of law enforcement abuse of journalists during and after the Floyd Protests.

Local, state and federal law enforcement agencies created a Multi-Agency Command Center ("MACC") to coordinate their "response to any unrest that develops following the death of George Floyd."  Chief Arradondo led the MPD's response to the protest.  The State Patrol worked closely with the MPD in forming their plan for responding to the protests.  And, throughout the protests, the MPD and the State Patrol worked side-by-side when deploying riot-control tactics to control the protests.

On May 29, 2020, Minnesota Governor Tim Walz announced that the state would restore order, calling on the resources of the State Patrol, other state agencies and the Minnesota National Guard.  Governor Walz implemented an emergency executive order imposing a nighttime curfew in Minneapolis and Saint Paul.  *See* Minn. Exec. Order No. 20-65 (May 29, 2020).  All "members of the news media" were exempted from the curfew.

*Id.*   The curfew was disregarded by many, and individuals hiding among otherwise-peaceful protesters continued to commit acts of looting, vandalism, and arson.

On May 30, 2020, the largest deployment of the Minnesota National Guard in state history was mobilized, along with the State Patrol and local law enforcement officers, to restore order.  HCSO was one of the agencies among the mobilized local law enforcement agencies.  During operations, decisions were communicated between field commanders across the different law enforcement agencies through the MACC.  Among the field commanders was Sheriff Hutchinson representing HCSO.

Early in the evening of May 30, several law enforcement agencies, including HCSO, conducted an initial push to clear a large crowd that gathered in front of the Fifth Precinct.  The State Patrol used tear gas to clear the crowd, and the MPD supported the efforts by using inert blast balls and 40mm impact rounds.  Prior to engaging the large crowd, State Troopers advanced down Nicollet Avenue with flash bang grenades, projectiles, tear gas and pepper-spray.  Journalists, including Plaintiffs Edward Ou and Nelson, were attacked and ordered to disperse.  Plaintiff Goyette alleges that he was threatened and harassed by MPD later that evening as part of the same operation.

Plaintiffs Maury and Lassig were also near the Fifth Precinct covering the protests for the European Press Agency ("EPA").  When the State Patrol and the MPD began their advances, the momentum of the crowd pushed Maury and Lassig in the direction of 1st Avenue toward downtown.  Around 29th Street and Nicolle Avenue, Plaintiffs Maury and Lassig were joined by Plaintiff Maturen.  As the three plaintiffs proceeded up Nicollet, they stopped in a parking lot to regroup.  The three were the only ones in the parking lot

when the State Patrol arrived.  Plaintiffs Lassig, Maury and Maturen verbally identified themselves as media.  Their press badges and professional equipment were also visible.  Despite this, the State Patrol detained the three and handed them off to the custody of HCSO.  In HCSO's custody, Plaintiffs Lassig, Maury and Maturen were booked, fingerprinted and cited for violating the curfew.

In anticipation of the Derek Chauvin trial, multiple law enforcement agencies developed Operation Safety Net ("OSN").  OSN agencies included HCSO, the MPD and the State Patrol, among other law enforcement agencies.  OSN's leadership included Sheriff Hutchinson, Major Jeff Storms for the HCSO, MPD Commander Scott Gerlicher, Chief Medaria Arradondo, Commissioner John Harrington for the Minnesota Department of Public Safety and Colonel Matthew Langer for the State Patrol.  Before and during Derek Chauvin's trial, OSN leadership met regularly to coordinate their plans to respond to any civil unrest.  OSN discussed strategies such as "media credentialing" and "training staff about processing personnel about media interactions."

On April 11, 2021, in the midst of the Derek Chauvin trial, Brooklyn Center Police Department ("BCPD") Officer Kim Potter shot and killed Daunte Wright during a traffic stop, which sparked additional protests and civil unrest.  OSN agencies, including HCSO, were deployed to Brooklyn Center to assist in the protest response.  Following the resignation of the Brooklyn Center Police Department Chief, Sheriff Hutchinson took on a lead role and assumed command in Brooklyn Center until the protests ended five days later.  The OSN agencies worked together through a unified command structure, in which senior

staffs of multiple agencies were brought together to work in concert in response to the ongoing events.

The law enforcement response to the protest following the death of Daunte Wright was similar to the response to protests following the murder of George Floyd.  Journalists were pepper-sprayed and hit with projectiles.  The response included police firing rubber bullets at a videographer who was a reasonable distance from protestors, police directing the press to disperse despite the curfew orders expressly exempting the press and various other acts that impeded the ability of the press to observe and report about the protests and law enforcement's interactions with protestors.

On April 16, 2021, this Court issued a Temporary Restraining Order ("TRO") enjoining the State Patrol and agencies working with the State Patrol from arresting, threatening, and using chemical weapons and less-lethal weapons on the press and from subjecting the press to dispersal orders requesting them to leave the protest area.  After the TRO was issued, HCSO and other agencies, including the State Patrol, conducted a mass arrest operation in front of Brooklyn Center City Hall.

While covering the Daunte Wright protests on April 16, 2021, Plaintiff Tim Evans was wearing a press credential attached to a lanyard around his neck.  Evans also had a large PRESS sticker attached to his backpack, and he carried two large cameras.  Around 9:45PM, law enforcement officers announced an unlawful assembly and began issuing dispersal orders.  Law enforcement officers then engaged the crowd.  Evans alleges that an HCSO deputy approached him and then sprayed Evans with pepper spray from about 5-7 feet away.  The HCSO deputy forced Evans to the ground, laid Evans on his stomach and

sat on Evans.  When Evans attempted to get the attention of other law enforcement officers, a second officer allegedly hit Evans on the back side of the head.  The HCSO deputy and the other officer then zip tied Evans.  Evans was eventually escorted away from the protests and directed to leave.  Plaintiff Chris Tuite was photographing Evans' incident when an HCSO deputy grabbed Tuite from behind.  A State Patrol Major intervened and directed Tuite to leave the protest area.

## ANALYSIS

## I.   DECLARATIONS OF CHANDAN KHANNA, JON STEGENGA AND MICHAEL ELLIOT

Sheriff Hutchinson argues that, because the declarations offered by Chandan Khanna, Jon Stegenga and Michael Elliot were never listed in Plaintiffs' Rule 26(a)(1) disclosures, the declarations should be excluded from the Court's consideration of this motion.  Plaintiffs contend that there were no Rule 26 violations because each of these witnesses was made known to Sheriff Hutchinson through discovery and other means before the declarations were filed.  Sheriff Hutchinson responds that Plaintiffs' argument would render Rule 26 meaningless.   Plaintiffs also argue that because Elliot is an impeachment witness, disclosure of Elliot is exempted by Rule 26.  Sheriff Hutchinson disagrees, arguing that Elliot's testimony is being offered as affirmative evidence to support Plaintiffs' claims.

Rule 26 requires parties to include in their initial disclosures potential witnesses that they may use to support their claims or defenses, unless the "use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  If a party learns of a potential witness who

has "not otherwise been made known to the other parties during the discovery process or in writing," the party must supplement its initial disclosure. Fed. R. Civ. P. 26(e)(1)(A). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). Rule 37, Fed. R. Civ. P., does not provide for mandatory sanctions, however. And the district court may find that a party's failure to include a witness in that party's initial Rule 26(a)(1) disclosures was either substantially justified or harmless. *Fair Isaac Corp. v. Fed. Ins. Co.*, 447 F. Supp. 3d 857, 883-84 (D. Minn. 2020).

Here, the Court concludes that the failure to disclose Khanna, Stegenga and Elliot in Plaintiffs' initial Rule 26(a)(1) disclosures was harmless. "There is no requirement to supplement if the information was otherwise made known to the opposing party during the discovery process." *Fair Isaac Corp.*, 447 F. Supp. 3d at 883-84. Each of these witnesses and the information they provided were at least partially disclosed during the discovery process.

As to Khanna, Sheriff Hutchinson filed the photos referenced in Khanna's declaration early in the case in an attempt to shift the blame for the assault of Evans to HCSO. The photos were watermarked with Khanna's name. Moreover, Sheriff Hutchinson was made aware of the statements in Khanna's declaration because this information was provided in a similar lawsuit brought by Khanna against Sheriff Hutchinson in December 2022. *See Sens et al. v. Hutchinson*, Case No. 22-cv-3009 (DWF/DTS) (D. Minn.). As to Stegenga, Sheriff Hutchinson was provided this

information as the arrest record appeared in Sheriff Hutchinson's response to a subpoena. As to Elliot, Sheriff Hutchinson publicly filed this correspondence between Elliot and Sheriff Hutchinson almost two years ago. Additionally, Elliot is an impeachment witness whose testimony is used solely to impeach Sheriff Hutchinson's declaration in support of his motion for summary judgment. Elliot is not subject to Rule 26(a)(1) disclosure requirements.

Sheriff Hutchinson's argument that the "belated, surprise disclosure" is not harmless is unavailing. Sheriff Hutchinson does not identify any information in the declarations that took him by surprise. *See Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 (8th Cir. 2015). And Sheriff Hutchinson had the opportunity to mitigate the alleged difficulties by moving for a continuance or attempting to depose the three witnesses, but he did not seek to do so. *See Hillesheim v. Holiday Stationstores, Inc.*, 903 F.3d 786, 790 (8th Cir. 2018).

Therefore, the failure to name the witnesses in Plaintiffs' 26(a)(1) disclosures was harmless. Accordingly, the Court denies Sheriff Hutchinson's request to exclude the declarations of Khanna, Stegenga and Elliot.

## II.    SUMMARY JUDGMENT

Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, a district court construes the evidence in the

light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802-03 (8th Cir. 2014). When asserting that a fact is genuinely disputed, the nonmoving party must submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts in support of that assertion. *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831-32 (8th Cir. 2008); *see also* Fed. R. Civ. P. 56(c)(1)(A). A party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted).

### A. Defendant Hennepin County Sheriff David Hutchinson

#### 1. Individual Capacity Claims

##### a. Qualified Immunity

Sheriff Hutchinson argues that Plaintiffs Lassig, Maturen, Maury, Evans and Tuite's Section 1983 claims alleging violations of the First, Fourth, and Fourteenth Amendments fail because qualified immunity applies. Plaintiffs disagree.

Qualified immunity shields a government official, such as Sheriff Hutchinson, in his individual capacity if his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 835 (8th Cir. 2021). Here, to determine if qualified immunity applies, the Court considers: (1) whether the reporters have alleged facts to show a violation of a constitutional right, and (2) whether that right was clearly established at the time of

the alleged misconduct. *Id.* The right must be sufficiently defined so that a reasonable official understands that his or her conduct violates the right. *Id.*; *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The reporters must show that their right was clearly established at the time of the alleged violation. *Quraishi*, 986 F.3d at 835.

The qualified-immunity standard for supervisory liability involves the same legal standards as the merits analysis of Plaintiffs' claim for supervisory liability. *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). Qualified immunity precludes a supervisory liability claim unless a plaintiff establishes that a supervisor "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to" the plaintiffs. *Sturgeon v. Faughn*, 36 F.4th 804, 809 (8th Cir. 2022) (internal quotation marks omitted). Allegations of generalized notice are insufficient to demonstrate notice. *Livers v. Schenck*, 700 F.3d 340, 356 (8th Cir. 2012). The prior events giving notice must be "very similar to the conduct giving rise to liability." *Id*.

Any law "abridging the freedom of speech, or of the press" is prohibited under the First Amendment. U.S. Const., amend. I. The Supreme Court of the United States has acknowledged that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Moreover, "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978).

"Reporting is a First Amendment activity." *Quraishi*, 986 F.3d at 838 (citing *Branzburg*, 408 U.S. at 681).

The parties do not dispute that the constitutional rights in Plaintiffs' claims were clearly established at the time of the alleged misconduct. Sheriff Hutchinson's argument focuses on whether Plaintiffs have alleged facts to show that Sheriff Hutchinson violated their constitutional rights.

Qualified immunity applies, Sheriff Hutchinson argues, because Plaintiffs lack any evidence that Sheriff Hutchinson violated their constitutional rights. Sheriff Hutchinson contends that the evidence shows only that Sheriff Hutchinson provided leadership and high-level decision making for HCSO during the protest responses, and he did not direct others to take specific people in detention, make particular arrests, or use force. Nor did he engage in such activities. Moreover, Sheriff Hutchinson claims no evidence exists as to whether he was deliberately indifferent or tacitly authorized wrongful acts after receiving notice of a pattern of misconduct nor did he receive notice of a pattern of misconduct.

Plaintiffs contend that the evidence contradicts Sheriff Hutchinson's claims. As to Plaintiffs Lassig, Maturen and Maury, Plaintiffs allege that Sheriff Hutchinson directly participated in HCSO's violation of the rights of Plaintiffs Lassig, Maturen and Maury by creating the tactics used in response to the George Floyd protests. As to Plaintiffs Evans and Tuite, Plaintiffs contend that Sheriff Hutchinson personally commanded the response to the Daunte Wright protests. Plaintiffs also argue that Sheriff Hutchinson had notice of the constitutional violations.

As to Plaintiffs Lassig, Maturen and Maury, the record lacks any evidence that Sheriff Hutchinson was directly involved or had notice of a pattern of unconstitutional acts committed by HCSO deputies during the George Floyd protests.  The evidence that Plaintiffs offer in support of the claims brought by Plaintiffs Lassig, Maturen and Maury is unavailing.  Plaintiffs rely on a deposition from MPD Sergeant Matthew Severance, who discusses arrests made on May 30 and does not mention Sheriff Hutchinson or HCSO.  Next, Plaintiffs direct the Court to a letter that Commissioner Schnell sent to Sheriff Hutchinson that addresses discussing arrests and citations of media members a month *after* the incidents occurred.  Nothing in this letter mentions Sheriff Hutchinson's involvement in planning the response or his knowledge of the arrests of members of the media during the George Floyd protests.  Sheriff Hutchinson, therefore, is entitled to qualified immunity on these claims.

As to the claims of Plaintiffs Evans and Tuite, Sheriff Hutchinson fails to show that he entitled to summary judgment.  It is undisputed that Sheriff Hutchinson commanded the response to the Daunte Wright protests.  Sheriff Hutchinson maintains that he did not have any notice of a pattern of unconstitutional acts committed by subordinates nor did he directly engage in the constitutional violations of Plaintiffs Evans and Tuite.  However, the declaration provided by Michael Elliot contradicts this claim.  Elliot states that Sheriff Hutchinson had notice of a pattern of unconstitutional acts committed by subordinates and that Sheriff Hutchinson actively worked to change policies put in place to curtail constitutional violations.  Sheriff Hutchinson also had notice that HCSO deputies had been involved in violating the constitutional rights of journalists after receiving the letter from

Commissioner Schnell discussed above. Sheriff Hutchinson fails to show that there is "no genuine dispute as to a material fact" and is not entitled to judgment as a matter of law on these claims.

In summary, Sheriff Hutchinson is entitled to qualified immunity from the claims brought by Plaintiffs Lassig, Maturen and Maury because Plaintiffs fail to show Sheriff Hutchinson's direct involvement in or notice of a pattern of unconstitutional acts committed by his subordinates. Sheriff Hutchinson, however, is not entitled to qualified immunity as to the claims brought by Plaintiffs Evans and Tuite because there is a genuine dispute of material fact as to Sheriff Hutchinson's direct involvement in and the existence of a pattern of unconstitutional acts committed by his subordinates. Accordingly, the Court grants Sheriff Hutchinson's qualified immunity defense as it pertains to the Section 1983 claims alleging violations of the First, Fourth, and Fourteenth Amendments of Plaintiffs Lassig, Maturen and Maury and denies the defense in all other respects.

### b.    Conspiracy Claims

Sheriff Hutchinson next argues that summary judgment should be granted as to Plaintiffs' civil conspiracy claims because Plaintiffs' fail to provide any evidence that he conspired with other defendants. Plaintiffs dispute the contention.

To establish a civil conspiracy claim under 42 U.S.C. § 1983, the plaintiff must demonstrate that (1) the defendant conspired with others to deprive the plaintiff of constitutional rights, (2) at least one alleged co-conspirator engaged in an overt act to further the conspiracy, and (3) the overt act resulted in injury to the plaintiff. *White v.*

*McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).  A plaintiff must show a deprivation of a constitutional right or privilege to prevail on a Section 1983 civil conspiracy claim.  *Id*.

It is undisputed that Sheriff Hutchinson and HCSO were involved with the MACC during the George Floyd protests.  Following the protests, law enforcement agencies established OSN in preparation of possible civil unrest during the Derek Chauvin trial.  The OSN framework also was used in response to the killing of Daunte Wright.  Sheriff Hutchinson commanded the response to the Daunte Wright protests with support from OSN.  Under both the MACC and OSN, law enforcement agencies worked together under a unified command structure.  The constitutional violations Plaintiffs allege arise from the actions of law enforcement under this structure.  While the evidence is circumstantial, direct evidence of conspiracy is not required, as circumstantial evidence alone may raise a factual issue to defeat a motion for summary judgment.  *White*, 519 F.3d at 816.  There is a genuine dispute as to a material fact, namely whether a conspiracy existed.  Accordingly, Sheriff Hutchinson's Motion for Summary Judgment against Plaintiffs' conspiracy claims is denied.

### c.  Failure to Intervene

Sheriff Hutchinson argues that the failure-to-intervene claims made by Plaintiffs Lassig, Maturen and Maury fall short because Plaintiffs do not allege that excessive force was used against them.  Sheriff Hutchinson contends that, because he did not employ force against any Plaintiffs, did not direct the use of force against any Plaintiffs and did not witness any force being applied to any Plaintiffs, the failure-to-intervene claims are deficient.  Plaintiffs respond that the evidence shows that Sheriff Hutchinson was on notice

of the attacks against journalists at the protests.  Plaintiffs contend that there is a genuine dispute about whether Sheriff Hutchinson knew that HCSO deputies and other law enforcement personnel were violating journalists' rights and whether Sheriff Hutchinson had a duty to intervene.

Law enforcement officers have a duty to intervene to prevent the use of excessive force.  *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981); *Livers*, 700 F.3d at 360.  A failure-to-intervene claim in the Eighth Circuit pertains to an individual officer who fails to intervene when there is an opportunity to prevent the unconstitutional use of force by another officer.  *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009).

The United States Court of Appeals for the Eighth Circuit has not recognized a duty to intervene to prevent constitutional violations other than in excessive-force cases. *Livers*, 700 F.3d at 360.  Other circuits, however, have concluded that an officer may be liable under Section 1983 under a theory of bystander liability when the officer knows that another officer is violating an individual's constitutional rights.  *See, e.g.*, *Yang v. Hardin*, 37 F.3d 282, 284-86 (7th Cir. 1994); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002); *Bunkley v. City of Detroit*, 902 F.3d 552, 566 (6th Cir. 2018); *Bledsoe v. Carreno*, 53 F.4th 589, 616–17 (10th Cir. 2022); *Buress v. City of Miami*, No. 21-12131, 2022 WL 2161438, at *3 (11th Cir. 2022); *see also Whitley v. Hanna*, 726 F.3d 631, 647 n.11 (5th Cir. 2013).

The failure-to-intervene claim, Count VI of the Third Amended Complaint, alleges that Sheriff Hutchinson and other Defendants failed to intervene to prevent the constitutional harms and personal injuries of Plaintiffs.  There is no evidence in the record

that Sheriff Hutchinson knew that the constitutional rights of Plaintiffs Lassig, Maturen and Maury were violated at the time of their arrest.  Without such knowledge, Sheriff Hutchinson did not have a reasonable opportunity to prevent the harm.  Sheriff Hutchinson is entitled to summary judgment on these claims.

As to Plaintiffs Evans and Tuite, there is a genuine dispute as to whether Sheriff Hutchinson knew that the constitutional rights of journalists were being violated during the Daunte Wright protests.[1]  If Sheriff Hutchinson was aware of the ongoing constitutional violations, he failed to intervene when he had the opportunity to do so.  Accordingly, the Court concludes that Sheriff Hutchinson's motion for summary judgment as to Plaintiffs' failure-to-intervene claim is granted in part and denied in part.

## 2.   Official Capacity

Sheriff Hutchinson argues that he is entitled to summary judgment on Plaintiffs' official capacity claims because Plaintiffs cannot establish an official policy, unofficial custom, or a deliberate failure to train or supervise.  Plaintiffs argue otherwise.

When a plaintiff sues a government actor in his official capacity, it is generally "an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  A county may be held liable for a constitutional violation under Section 1983 if the violation resulted from "(1) an 'official [county] policy,' (2) an unofficial

---

[1] This Court issued a TRO enjoining the State Patrol and agencies working with the State Patrol from arresting, threatening, and using chemical and less-lethal weapons on the press and from subjecting the press to dispersal orders requesting them to leave the protest area. It is likely that Sheriff Hutchinson had knowledge of the TRO because it pertained to the conduct of the State Patrol and agencies working with the State Patrol, including HCSO, during the Daunte Wright protests.

'custom,' or (3) a deliberately indifferent failure to train or supervise." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019); *see also Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

Sheriff Hutchinson argues that Plaintiffs fail to provide any evidence that Hennepin County, along with the City of Minneapolis and State of Minnesota, had "a policy, practice or custom" of using unlawful force, failing to provide warnings prior to using force, and unlawfully arresting and detaining members of the news media. As to custom, Sheriff Hutchinson contends that Plaintiffs failed to provide any evidence of a "continuing, widespread, persistent pattern" of violations by HCSO employees and that Plaintiffs lack any evidence that HCSO employees failed to act after they had notice of such misconduct. As to failure-to-train, Sheriff Hutchinson maintains that HCSO officers are well-trained and that no evidence exists to show that there was a pattern of similar constitutional violations.

"A 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the [county] official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Plaintiffs point to Sheriff Hutchinson's dispersal orders that expressly ordered members of the press to leave the area as the policy that led to Plaintiffs' injuries. Plaintiffs argue that but for this decision, HCSO would not have violated the constitutional rights of Plaintiffs Evans and Tuite.

To establish a claim for an unofficial custom, a plaintiff must show: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of

such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom. *Mettler*, 165 F.3d at 1204. The plaintiff must allege that the custom was the moving force behind the constitutional violation. *Id*.

Plaintiffs contend that during the protests HCSO participated in a pattern of unconstitutional arrests, including those of Plaintiffs Lassig, Maturen and Maury. Sheriff Hutchinson had notice of these issues when Commissioner Schnell sent him a letter regarding the arrest of Plaintiffs Lassig, Maturen and Maury and other journalists. Viewing the facts in the light most favorable to the non-moving party, Plaintiffs argue, there is a genuine dispute as to whether Sheriff Hutchinson failed to act or was deliberately indifferent to doing so, which resulted in the violation of Evans' and Tuite's constitutional rights.

To prevail on a failure-to-train claim, a plaintiff must show: (1) the county's training practices were inadequate; (2) the county was deliberately indifferent to the rights of others in adopting those training practices such that the failure to train reflects a deliberate or conscious choice by the county; and (3) the inadequate training caused a constitutional deprivation. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010). A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Connick v. Thompson*, 563 U.S. 51, 64 (2011) (quoting *Bd. of Cnty. Com'rs v. Brown*, 520 U.S. 397, 409 (1997)).

Plaintiffs contend that Sheriff Hutchinson acted indifferently and failed to train and supervise HCSO deputies when Sheriff Hutchinson knew about the arrests of journalists,

when concerns about protecting the members of the press were raised to Sheriff Hutchinson by Commissioner Schnell and other constituents and through knowledge of this Court's TRO protecting the members of the press. All of this information, Plaintiffs argue, was known before the rights of Plaintiffs Evans and Tuite were violated.

A genuine dispute of material facts exists as Plaintiffs have provided evidence that, when viewed in the light most favorable to Plaintiffs, establishes an official policy, an unofficial custom, or a deliberate failure to train or supervise that resulted in the alleged violation of Plaintiffs' constitutional rights. Accordingly, the Court denies Sheriff Hutchinson's motion for summary judgment as to Plaintiffs' official capacity claims.

### 3.      Injunctive and Declaratory Relief

Sheriff Hutchinson argues that Plaintiffs' request for injunctive relief and declaratory relief fails because Plaintiffs lack standing or, alternatively, because the claims are moot.[2]

A plaintiff must demonstrate that an injury is likely to be redressed by a favorable ruling. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). Surviving a motion for summary judgment based on lack of standing demands more than the mere plausibility of the allegations in the complaint. *See Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645

---

[2] Sheriff Hutchinson also raises standing challenges as to the conspiracy claims and the individual Section 1983 claims brought by Plaintiffs Lassig, Maturen, Maury, Evans and Tuite. Many of Sheriff Hutchinson's arguments in support of the lack of standing are similar to those raised in his Individual Capacity arguments. These arguments fail for those same reasons. This Court has also denied similar standing arguments related to the conspiracy claims in the response to Defendants' motion to dismiss. *See Goyette v. City of Minneapolis*, No. 20-cv-1302 (WMW/DTS), 2021 WL 3222495, at *5 (D. Minn. July 29, 2021.)

F. Supp 2d 734, 748-49 (D. Minn. 2009).   At the summary judgment stage, the party invoking federal jurisdiction must allege facts to establish the elements of standing.  *Lujan*, 504 U.S. at 561.  A plaintiff must establish standing for each claim the plaintiff seeks to pursue and for each form of relief the plaintiff seeks.  *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).  A plaintiff seeking injunctive relief satisfies the injury-in-fact element by showing that the plaintiff faces a threat of ongoing or future harm.  *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000).  Similarly, declaratory relief without a showing of concrete, imminent injury would result in "a quintessential advisory opinion."  *Missouri v. Yellen*, 39 F.4th 1063, 1070 (8th Cir. 2022).

Sheriff Hutchinson argues that Plaintiffs fail to provide any evidence that injunctive or declaratory relief would redress the injuries alleged by Plaintiffs.  Plaintiffs respond that injunctive or declaratory relief would prevent Sheriff Hutchinson and HCSO from causing any future harm given the past pattern of misconduct.

Here, Plaintiffs, in their individual capacity, seek injunctive or declaratory relief against Sheriff Hutchinson.  They do not seek this relief as a class.  Any relief granted would bind only the named parties.  But Plaintiffs have presented no evidence related to the conduct of Sheriff Hutchinson or HCSO that poses a "real and immediate threat" to Plaintiffs' constitutional rights that injunctive or declaratory relief would be able to redress. Plaintiffs argue that injunctive or declaratory relief is proper because HCSO has repeatedly violated journalists' constitutional rights.  But the imminent harm that Plaintiffs allege would arise from a protest that is declared unlawful and results in the improper dispersing of, or use of excessive force on, journalists or legal observers.  *See Index Newspapers LLC*

*v. City of Portland*, 3:20-cv-1035 SI, 2022 WL 4466881, at *5 (D. Or. Sept. 26, 2022). Without more, a history of protest does not demonstrate that the harm is "sufficiently likely to occur." *Id.*

Because Plaintiffs have not shown that injunctive or declaratory relief would address any real and immediate threat, Sheriff Hutchinson's Motion for Summary Judgment on these claims is granted.[3]

### B.      Defendants City of Minneapolis and former Minneapolis Chief of Police Medaria Arradondo

#### 1.      *Monell*[4] liability

To establish a *Monell* claim, the plaintiff's harm must result from a constitutional violation committed by a municipality's employee. *Golberg v. Hennepin Cnty.*, 417 F.3d 808, 813 (8th Cir. 2005); *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). The constitutional violation must be caused by an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise. *Mettler*, 165 F.3d at 1204. Municipalities can be held liable under Section 1983 for the violation of constitutional rights if the violation results from a governmental custom, even if the custom was not formally approved. *Monell*, 436 U.S. at 690-91. *Monell* liability requires (1) a continuing, widespread, persistent pattern of unconstitutional misconduct by municipal employees, (2)

---

[3]Additionally, Plaintiffs also lack any evidence tending to show that Hutchinson, in his individual capacity, will cause any future harm now that he is no longer Hennepin County Sheriff or part of HCSO. *See* Bill Strande*, Dawanna Witt makes history as new Hennepin Co. sheriff,* KARE11, (Jan. 3, 2023), https://www.kare11.com/article/news/local/historic-swearing-in-of-hennepin-county-sheriff-dawanna-witt-minnesota/89-a21d120a-1456-4943-a7f7-f97b4d4fb84c.

[4] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658.

deliberate indifference or tacit authorization of such conduct by the municipality's policymakers after notice of the misconduct, and (3) an injury caused by acts pursuant to the municipality's custom. *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1990).

Here, Plaintiffs allege that City Defendants had a custom and policy of failing to train and supervise their employees. The alleged practice of failure to train employees has purportedly led to multiple constitutional violations, encompassing infringements upon First Amendment rights, instances of First Amendment retaliation, unlawful seizures, the use of excessive force, and violations of due process. Each alleged constitutional violation, Plaintiffs argue, is based on the targeting of Plaintiffs and purported class members because they are journalists. City Defendants dispute Plaintiffs' claims, contending that their *Monell* claims against City Defendants must be dismissed because some of the Plaintiffs were not injured by City Defendants.

City Defendants contend that Goyette and Nelson's Fourth Amendment claims of constitutional violations by the MPD fail because Goyette and Nelson were not seized and the use of force by law enforcement officers to repel individuals or disperse crowds does not constitute a seizure under the Fourth Amendment. City Defendants also argue that Plaintiffs' First Amendment claim fails because there is no evidence of a prior restraint of the press by City Defendants. And Plaintiffs' First Amendment retaliation claim fails, City Defendants argue, because there is no evidence of a retaliatory motive.

Regarding *Monell* liability, Plaintiffs present evidence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the MPD in deliberately violating the constitutional rights of journalists covering the George Floyd protests. Plaintiffs argue that

City Defendants had notice of this pattern and practice of constitutional violations but failed to take appropriate corrective actions, thus exhibiting deliberate indifference.  The United States Department of Justice ("DOJ") Report in 2017 and the Commission of Civil Rights report in 2018 support Plaintiffs' argument as both reports raised concerns about the MPD's training, supervision, and handling of First Amendment issues.

Plaintiffs contend that City Defendants, despite having knowledge of the DOJ Report and past misconduct, appear to have ignored the DOJ Report's recommendations. Plaintiffs further contend that, when the report was finally circulated within the department, the MPD's response to the Floyd Protests had already spiraled out of control and that the MPD "missed opportunities to address the shortcomings identified" in the DOJ Report and failed to leverage its training and experience from previous large-scale events to establish a crisis response framework.

Plaintiffs rebut City Defendants' arguments that their policies and training on civil disturbances and media relations excuse City Defendants' conduct.  Plaintiffs refer to evidence suggesting that City Defendants' training was deficient and that City Defendants were aware of the custom of unconstitutional conduct and acted with deliberate indifference.

When viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that there are genuine issues of material fact with respect to *Monell* liability and summary judgment, therefore, is unwarranted.  Plaintiffs have provided evidence of a continuing, widespread, persistent pattern of unconstitutional misconduct by MPD, deliberate indifference by City Defendants, and evidence of a causal link between MPD's

custom and Plaintiffs' injuries.  Moreover, the evidence presents genuine issues of material fact as to whether other constitutional rights were violated.  Therefore, City Defendants are not entitled to summary judgment as to the issue of *Monell* liability.

### 2.    First Amendment

To establish a First Amendment retaliation claim, a plaintiff must demonstrate three elements: (1) engagement in a protected activity, (2) adverse action taken against the plaintiff that would deter a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014).  The causal connection between police conduct and the exercise of constitutional rights is generally a question for the jury, except in cases where the evidence is so clear that it justifies removing the question from the jury. *Id*.

Here, the act of reporting falls within the scope of First Amendment protected activity, and members of the press serve as surrogates for the public when reporting on government conduct.  *Quraishi*, 986 F.3d at 838; *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).  Each Plaintiff was present at the protests in his or her capacity as a journalist, engaging in protected activity.

Repeated actions by law enforcement can be sufficient to chill a person of ordinary firmness from engaging in First Amendment activity.  *Hoyland v. McMenomy*, 869 F.3d 644, 656-57 (8th Cir. 2017).  In this case, MPD's conduct towards Plaintiffs and other journalists, including physical attacks, threats, and obstruction, would deter a journalist of

ordinary firmness from continuing to cover the protests and the police without diminished vigor.

City Defendants' conduct forced Plaintiffs to flee areas where they were reporting and impeded the freedom of the press. City Defendants contend that Plaintiffs' First Amendment claim fails as a matter of law because City Defendants did not enact any prior restraint of the press. Non-retaliation First Amendment claims focus on government laws, regulations, rules or policies that curtail the freedom of speech or the press. *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571-72 (1942). Retaliatory motive can be proven through circumstantial evidence. *Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008). The record in this case provides substantial evidence that MPD officers deliberately and systematically targeted journalists, including Plaintiffs, who were identifiable as members of the press and not committing any crimes.

Multiple journalists received projectile shots to the head, and evidence suggests that the shots were intentional. City Defendants' expert testified that the use of force against Goyette was unwarranted, and any trained officer should have been able to avoid hitting a target in the head. MPD officers made hostile comments and took hostile actions toward members of the press, further indicating retaliatory motives. Moreover, despite curfews exempting the press, MPD's failure to communicate this exemption to the officers created conditions that allowed mistreatment of the press.

City Defendants' assertion that Plaintiffs cannot provide evidence of a retaliatory motive is contradicted by the evidence presented. This disputed fact, therefore, warrants a

jury's determination.  *Peterson*, 754 F.3d, at 603.  City Defendants' argument that their conduct was reasonable under the circumstances creates a genuine issue of fact for trial.

### 3.     Fourth Amendment

To establish an excessive force claim under the Fourth Amendment, Plaintiffs must demonstrate that a seizure occurred, and that the seizure was unreasonable.  *Brower v. Cty of Inyo*, 489 U.S. 593, 598-99 (1989).  Here, Plaintiffs Goyette and Nelson have provided evidence to establish a seizure under the Fourth Amendment.  Plaintiff Goyette was intentionally shot in the face, which objectively manifests an intent to restrain.  He lost consciousness as a result of a blow to his head, and the shooting violated law enforcement best practices.  Similarly, Plaintiff Nelson was subjected to coordinated efforts by law enforcement to trap protesters and journalists, including the use of rubber bullets, tear gas, and flash bangs.

The issue of *Monell* liability is also relevant in this analysis.  Numerous journalists were kettled, arrested, shot with less`-lethal projectiles and exposed to chemical irritants during the protests, and City Defendants failed to prevent these constitutional harms.  This creates a disputed fact issue as to whether MPD engaged in a custom of seizing journalists, and whether this custom was the motivating force behind the Fourth Amendment violations. Additionally, the presence of a broader custom within MPD suggesting a tolerance for excessive force and Fourth Amendment violations supports the existence of *Monell* liability.

In conclusion, Plaintiffs Goyette and Nelson have stated claims of Fourth Amendment violations by City Defendants.  When the evidence is viewed in the light most

favorable to Goyette and Nelson, the evidence establishes that they were seized, and the reasonableness of these seizures and the issue of *Monell* liability are disputed matters to be resolved by a jury.  Therefore, the Court denies summary judgment as to this claim.

### 4.    Failure to Intervene

Law enforcement officers have a duty to intervene to prevent the use of excessive force.  *Putman*, 639 F.2d at 423; *Livers*, 700 F.3d at 360.  A failure-to-intervene claim pertains to an individual officer who fails to intervene in preventing the unconstitutional use of force by another officer when there was an opportunity to do so.  *Krout*, 583 F.3d at 566.

City Defendants contend that Plaintiffs have not alleged a failure to intervene claim against City Defendants, as such a claim pertains to individual officers.  Additionally, City Defendants argue, Plaintiffs have not made any allegations or offered any evidence that City Defendants had knowledge or notice of a policy, custom, or supervisory failure related to failing to intervene in constitutional violations against members of the press.

When viewed in the light most favorable to Plaintiffs, however, the evidence presented demonstrates a recurring pattern of MPD officers and MPD leadership failing to intervene in instances of excessive force against Plaintiffs and other journalists.  Multiple incidents, such as Plaintiff Ou being shot with a concussion grenade and chemical irritants, Sgt. Bittell ordering officers to open fire on civilians, and officers intentionally targeting peaceful protestors, indicate a failure to intervene.  These incidents, along with data showing a high percentage of violations of the duty to intervene by MPD officers, support Plaintiffs' claim of failure to intervene by City Defendants.

The evidence presented establishes a genuine issue of material fact as to City Defendants' liability for failure to intervene. Summary judgment, therefore, is unwarranted as to Plaintiffs' failure to intervene claim.

### 5.   Fourteenth Amendment

City Defendants argue that summary judgment is warranted as to Plaintiff Goyette's and Plaintiff Nelson's Fourteenth Amendment claims because MPD's conduct did not shock the conscience, and any procedural due process claim is barred by the Parratt-Hudson Doctrine.

### a.   Substantive Due Process

To establish a Fourteenth Amendment violation, the plaintiff must demonstrate that the official's conduct was conscience-shocking and violated fundamental rights deeply rooted in the nation's history and tradition. *Hall v. Ramsey Cnty.*, 801 F.3d 912, 919 (8th Cir. 2015). Substantive due process addresses violations that amount to a brutal and inhumane abuse of official power that is shocking to the conscience. *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002).

City Defendants contend that MPD did not intend to injure Plaintiffs Goyette and Nelson, claiming that the officers were merely reckless. However, the record contains numerous examples of actions that were deliberately intended to injure Plaintiffs and other reporters. The evidence includes statements such as "F[***] these media," statements of officers that they "enjoyed" shooting civilians, and directives to harm individuals. There is an abundance of evidence suggesting that MPD officers deliberately targeted Plaintiff Goyette as a journalist and intentionally shot him in the head. The severity and deliberate

nature of these actions, when viewed in the light most favorable to Plaintiffs, is sufficient to support a substantive due process claim.

### b.      Procedural Due Process

The Parratt-Hudson doctrine states that random and unauthorized deprivations of property or liberty interests by a state employee do not violate the Fourteenth Amendment if a meaningful post-deprivation remedy is available. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). But post-deprivation remedies do not satisfy due process when the deprivation is caused by established state procedures. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982). To prevail on a procedural due process claim, a plaintiff must establish that state law would not have provided an adequate post-deprivation tort remedy. *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003). When viewed in the light most favorable to the plaintiffs in this case, the repeated, widespread, and persistent violence against journalists does not appear to be "random." When viewed in this light, the evidence demonstrates a pattern of abuse and targeted actions against the press, such that the deprivations were not arbitrary, but rather caused by established state procedures.

Based on the alleged deliberate nature of City Defendants' actions, which shock the conscience, and the absence of randomness in the deprivation of rights, Plaintiffs have stated valid Fourteenth Amendment claims. City Defendants' arguments regarding the lack of intent to injure and the applicability of the Parratt-Hudson Doctrine present disputes for a jury to resolve. Therefore, City Defendants' motion for summary judgment as to the Fourteenth Amendment claims is denied.

### 6.      Conspiracy

City Defendants seek summary judgment on Plaintiffs' civil conspiracy claim, asserting that Plaintiffs have failed to provide any evidence of a conspiracy with other defendants.  Plaintiffs dispute the contention.

To state a civil conspiracy claim under 42 U.S.C. § 1983, the plaintiff must allege: (1) the defendant conspired with others to deprive the plaintiff of a constitutional right or privilege, (2) at least one alleged co-conspirator engaged in an overt act to further the conspiracy, and (3) the overt act resulted in injury to the plaintiff.  *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).

Upon examining the evidence presented in this case in the light most favorable to Plaintiffs, there are genuine issues of fact that preclude granting summary judgment as to the conspiracy claim.  First, Plaintiffs have alleged violations of their constitutional rights, specifically their First Amendment rights, caused by the MPD or its co-conspirators.

Second, the evidence presented includes circumstantial evidence that supports the inference of a conspiracy between the MPD, State Patrol and other agencies to disregard curfew exemptions and interfere with the First Amendment rights of journalists.  The agencies operated under a unified command center, the MACC, making decisions by consensus and coordinating their actions during the protests.  This coordination and collective decision-making present questions of fact as to whether there was an agreement among City Defendants and other agencies to deprive Plaintiffs of their constitutional rights.  The agencies' disregard of the Governor's curfew exemption for journalists

demonstrated by allowing officers to interfere with their reporting further supports the inference of a conspiracy.

Circumstantial evidence alone may raise a factual issue to defeat summary judgment. *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008).  Here, Plaintiffs have alleged and supported more conspiracy evidence than was deemed sufficient in *White*.  The evidence here, including the unified command structure, decision-making processes, and disregard of curfew exemptions, provides a sound basis to infer a conspiracy among City Defendants and other agencies to interfere with Plaintiffs' constitutional rights.  The existence of genuine issues of fact precludes granting summary judgment.  City Defendants' motion for summary judgment on this ground, therefore, is denied.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1. Defendant Sheriff David Hutchinson's motion for summary judgment, (Dkt. 395), is **GRANTED IN PART AND DENIED IN PART**, as follows:

   a. Defendant Sheriff David Hutchinson's motion is **GRANTED** as to Plaintiffs Lassig, Maturen and Maury's Section 1983 claims alleging violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution and failure-to-intervene;

   b. Defendant Sheriff David Hutchinson's motion is **GRANTED** as it pertains to each named Plaintiff's injunctive and declaratory relief claims against Sheriff David Hutchinson; and

   c. Defendant Sheriff David Hutchinson's motion is **DENIED** as to the remaining claims.

2. City Defendants' motion for summary judgment, (Dkt. 403), is **DENIED**.

3. Plaintiffs' Motion to Supplement Record, (Dkt. 523), is **DENIED as moot**.

4. City Defendants' application to file conventionally, (Dkt. 526), is **GRANTED**.[5]

Dated:  September 26, 2023

s/ Wilhelmina M. Wright
_____
Wilhelmina M. Wright
United States District Judge

---

[5] The Order is amended solely because the Court should not have entered judgment, with no other part of the Order being altered.